**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **TALEN ENERGY SUPPLY, LLC,** *et al.,* | § | **Case No. 22-90054 (MI)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**DECLARATION OF RYAN LELAND OMOHUNDRO IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Ryan Leland Omohundro, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Alvarez & Marsal ("**A&M**") and have been retained to advise Talen Energy Supply, LLC ("**TES**"), a wholly-owned direct subsidiary of Talen Energy Corporation ("**TEC**" and, together with its direct and indirect subsidiaries, the "**Company**" or "**Talen**"). I have been advising the Company in that capacity since April 2021. My engagement with the Company includes: both personally and through working with employees of the Company and my oversight of representatives of A&M, assisting with the design, negotiation and implementation of a restructuring strategy designed to maximize the Debtors' enterprise value; evaluating the Debtors' cash-flow projections and identifying and implementing liquidity-enhancing opportunities; assessing the Debtors' liquidity and cash flow models; working with the Debtors and their advisors in evaluating and negotiating financings; contingency planning;

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/talenenergy.  The Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

assisting with electronic data collection; and assisting the Debtors in their communications strategy with outside parties.

2.     I am a Managing Director in the North American Commercial Restructuring group at A&M and I am based in A&M's office at 700 Louisiana Street, Suite 3300, Houston, Texas 77002.  I received a master's degree in professional accounting and a bachelor's degree in business administration from the University of Texas at Austin, graduating with Highest Honors. I am a Certified Public Accountant (CPA), a Chartered Financial Analyst (CFA), a Certified Insolvency & Restructuring Advisor (CIRA), and a Certified Fraud Examiner (CFE).  I have been employed at A&M since June 2006.

3.     A&M has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these chapter 11 cases.  In addition to the Debtors, I have advised several distressed energy companies in recent comparable chapter 11 reorganizations such as Weatherford International, Superior Energy Services, FTS International, NorthEast Gas Generation, Arena Energy, Hi-Crush Inc., Castex, Parker Drilling Company, and New MACH Gen, among others.

4.     As a result of my role advising the Company, I am generally knowledgeable and familiar with the Company's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases.  I have overseen (and continue to oversee) the services provided by A&M, as described above.

5.     Commencing on May 9, 2022 (the "**Petition Date**"), TES and certain of its direct and indirect subsidiaries (collectively, the "**Debtors**") filed in this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable about and familiar with the Company's business and financial affairs.  I submit

2

this declaration (this "**Declaration**") in support of the Debtors' voluntary petitions for relief and motions filed concurrently herewith (the "**First Day Motions**").  I am authorized to submit this Declaration on behalf of the Debtors.

6.     Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees, my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition, or my discussions with the Debtors' officers and advisors, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), Evercore Group L.L.C. ("**Evercore**"), and A&M (together with Weil and Evercore, the "**Advisors**").  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

7.     This Declaration has been organized into four (4) sections.  The **first** provides an overview of the Debtors and their chapter 11 cases, including the general framework for the Debtors' restructuring.  The **second** describes the Company's business, its organizational and capital structure, its history and its current operations.  The **third** describes the events leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts.  The **fourth** section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

## I.     Overview

8.     The Debtors form one of the largest competitive power generation companies in North America.  Their generation portfolio consists of 18 facilities that are collectively capable of producing approximately 13,000 megawatts (MW) of power.  The Debtors' fleet is diverse in both its fuel sources and technology—facilities are fueled by nuclear power, natural gas, oil, or coal, and certain facilities are capable of using multiple fuel sources.

WEIL:\98218907\32\76974.0003

**Figure 1: Susquehanna Nuclear Plant**



9.      As explained in more detail below, the Debtors have commenced these chapter 11 cases in large part due to immediate and significant liquidity concerns that can be traced back to the sudden and sustained rise of natural gas prices in late 2021, which sharply increased the collateral requirements for the Debtors' hedging activities, resulting in an unexpected squeeze on available cash.

## A.      Natural Gas and Power Prices

10.      Existing technology does not allow electricity to be stored in very large quantities.  Accordingly, electricity must be produced as needed, in real time, and electricity prices are primarily a function of relatively near-term supply and demand.  Although near-term demand is unpredictable and may suddenly spike or drop due to weather events or seasonality, over the last decade, demand for power in the United States has stayed relatively flat—and even decreased in some regions.[2]  At the same time, supply has increased due to, among other things, (i) new gas-fired generation facilities built in the last five years, spurred by the availability of cheap natural

---

[2] In the Debtors' primary market, PJM Interconnection, L.L.C. ("**PJM**"), the Debtors estimate that average demand has declined 3% and peak demand has declined 6% over the last decade.  The Debtors estimate that demand in the PJM region is expected grow less than 1% annually for the next five years.

WEIL:\98218907\32\76974.0003

gas and (ii) the addition of renewable energy facilities, driven by regulatory policy and declining equipment costs.[3]

11.     The markets in which the Debtors operate rely heavily on gas-fired generation and, because natural gas prices were historically low prior to 2021, electricity prices in the Debtors' markets were correspondingly low.  Moreover, the low price of natural gas and the addition of new renewable energy capacity has meant that, in most scenarios, the Debtors' coal-fueled assets were no longer economical to run.

12.     In July 2021, however, natural gas prices began to rise.  From June through November 2021, winter Henry Hub natural gas prices increased by approximately 45% and regional natural gas prices had increased by approximately 51%.  By late November 2021, natural gas prices were $5.45/MMBtu—$1.53 higher than July 30, 2021 and $2.86 higher than a year earlier in November 2020.[4]

**Figure 2: Natural Gas Prices from January 2019 to April 2022**



Henry Hub pricing.  Price per million British thermal unit (MMBtu).

13.     By late November 2021, the increased strength of the natural gas market had resulted in stronger power forwards as well: the winter PJM West Hub forward power prices had

---

[3] In the PJM market, the Debtors estimate that generation supply exceeds peak demand by approximately 25%.

[4] In the PJM market, natural gas prices averaged approximately $3/MMBtu over the last decade.  Prices from late 2021 through April 2022 have exceed $6/MMBtu and are projected to remain above $6MMBtu through 2023.

WEIL:\98218907\32\76974.0003

increased by approximately 66% from June 2021 to $95/MWh, reaching a high of approximately

$109/MWh, the highest levels experienced since 2014.  The increase in the market price for power

uplifted forward energy margin and strengthened the Debtors' forecasted 2022 Adjusted EBITDA.

**Figure 3: 2021 PJM Western Hub Forward Curves**



### B.    Hedging Activities and Liquidity

14.    As described further in the *Emergency Motion of Debtors for Order
(I) Authorizing Debtors to (A) Continue Performing Under Prepetition Hedging Agreements,
(B) Enter Into and Perform Under New Postpetition Hedging Agreements, and (C) Grant Related
Liens and Superpriority Claims and Authorize Posting of Postpetition Margin Collateral and
Exchange Collateral, (II) Modifying Automatic Stay, and (III) Granting Related Relief* filed
contemporaneously herewith (the "**Hedging Motion**")[5], derivative contracts (collectively,
the "**Hedging Agreements**" and the activities related thereto, the "**Hedging Activities**") are a
critical component of the Debtors' business because they allow the Debtors to manage their

---

[5] In support of the Hedging Motion, the Debtors filed the *Declaration of Ryan Leland Omohundro in Support of
Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) Continue Performing Under Prepetition
Hedging Agreements, (B) Enter Into and Perform Under New Postpetition Hedging Agreements, and (C) Grant
Related Liens and Superpriority Claims and Authorize Posting of Postpetition Exchange Collateral, (II) Modifying
Automatic Stay, and (III) Granting Related Relief* filed as Exhibit A to the Hedging Motion (the "**Hedging
Declaration**").

exposure to risks related to commodity prices, power prices and volumes, and interest rates.   In the ordinary course of their business, the Debtors have had an extensive book of Hedging Agreements, consisting primarily of fixed-price swaps, physical swaps, swaptions, basis swaps, call options, put options, and emission allowances.   With respect to power generation prices and volume, the Debtors sell forward a portion of the Debtors' forecasted power generation.   The Debtors' Hedging Activities operate to reduce their exposure to fluctuations in commodity prices, power prices and volumes, and interest rates and provide the Debtors with long-term cash flow predictability to manage their business.   Consistent with their past practices, the Debtors target hedging up to 75% of their expected overall power generation, weighted towards the upcoming twelve month period.   The Hedging Activities consist of Exchange Traded Hedges and Bilateral Hedges (each as defined in the Hedging Motion).

15.    The significant increase in natural gas prices in 2021 and concurrent increase in power prices, resulted in the Debtors being required to provide cash collateral in large amounts as the Exchange Traded Hedges moved further out of the money—reaching as high as $451 million in October.   In turn, this caused a significant liquidity squeeze for the Debtors, particularly in light of certain then near-term cash requirements, including the maturity of $114 million in unsecured notes due in December 2021 (the "**2021 Notes**").   To manage liquidity, the Debtors exited collateral-intensive Exchange Traded Hedges while prioritizing trades under the Bilateral Hedges, which would align timing for posting discretionary letters of credit.

16.    The effectiveness of the Debtors' Exchange Traded Hedging Agreements is dependent on having ample cash collateral available to enter into or maintain these contracts, and, given the sustained increase in the price of natural gas in the second half of 2021 and the first

quarter of 2022, these liquidity requirements were much greater than the Debtors could have anticipated or were capable of financing.

17.     However, based on the then-projected forward power prices in late 2021, the Debtors anticipated that this liquidity squeeze would be reversed in early 2022—when the majority of the posted collateral would be released as the Debtors captured the favorable high prices with their actual sales of wholesale energy[6] in 2022 onwards:

**Figure 4: Quarterly Collateral Summary as of November 2021**



18.     Thus, as a means to bridge the near-term collateral posting and liquidity requirements with the expected, renewed liquidity, the Debtors commenced a competitive process to procure additional financing in October 2021.   In December 2021, the Debtors ultimately entered into an $848 million first lien revolving Accordion Facility (as defined below).   Among other purposes, the proceeds of the Accordion Facility were used to (i) repay all outstanding interest and principal under the Talen RCF (other than, for the avoidance of doubt, letter of credit obligations), (ii) post cash collateral for hedge positions, and (iii) provide up to $50 million to cash collateralize the Debtors' issued and undrawn letters of credit.

---

[6] Retail sales historically account for a very small percentage of the Company's total EBITDA.

WEIL:\98218907\32\76974.0003

19.     With the Accordion Facility in place, the Debtors paid the 2021 Notes at maturity and expected to have adequate liquidity for at least enough time for the Debtors to allow the important winter 2021-22 season to play out and also preserve the opportunity to negotiate a consensual recapitalization transaction with their creditors.  However, real-time and forward prices fell through the mild winter in December 2021 and the first quarter of 2022.  In particular, the decline of day-ahead and real time PJM and ERCOT pricing exerted further downward pressure on the Debtors' liquidity.

**Figure 5: PJM Western Hub – November 2021 Forecast vs. Actual**



20.     Collateral postings under the Exchange Traded Hedges remained high through the winter, due in part to higher margin rates.  Additionally, because the Debtors exited many of their Exchange Traded Hedges in late 2021 and have since had insufficient cash to enter into new Hedging Agreements, the Debtors are currently under-hedged and exposed to market price volatility (i.e. the Debtors' future margins are "open" to market volatility).

21.     Given the recent uptick in future power prices (principally through the balance of 2022 and the winter of 2023) and the Debtors' open position, the Debtors' have the ability to lock in higher than normal future cash flows.  However, because of the Debtors' lack of

WEIL:\98218907\32\76974.0003

liquidity and balance sheet constraints, they are unable to hedge and lock in these higher than normal cash flows.

**C.     Restructuring Support Agreement and Restructuring Term Sheet**

22.     With their runway unexpectedly shortened, the Debtors worked diligently to complete their business plan and begin engagement with organized groups of their creditors.  In March 2022, the Debtors were able to negotiate an extension until May 31, 2022 of a final repurchase under the Inventory Facility (as defined below), which allowed the Debtors to complete the annual, planned outage and refueling at the Nuclear Plant without the risk of costly and dangerous disruptions due to a chapter 11 filing.

23.     Over the past several months, certain of the Debtors' creditors have organized, including: (i) an ad hoc group of CAF Lenders represented by Akin Gump Strauss Hauer & Feld LLP and Houlihan Lokey Capital, Inc. (the "**CAF Lender Group**"), (ii) an ad hoc group of 2026 TLB Lenders and holders of Senior Secured Notes represented by King & Spalding LLP and Houlihan Lokey Capital, Inc. (the "**2026 TLB Lender Group**" and, together with the CAF Lender Group, the "**Secured Creditor Group**"), (iii) an ad hoc group of "crossholder" creditors consisting of 2026 TLB Lenders and holders of Senior Secured Notes and Senior Unsecured Notes represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Perella Weinberg Partners LP (the "**Crossholder Group**"), and (iv) an ad hoc group of holders of the Senior Unsecured Notes represented by Kirkland & Ellis LLP and Rothschild & Co US Inc. (the "**Unsecured Notes Group**" and, collectively with the Secured Creditor Group and the Crossholder Group, the "**Ad Hoc Groups**").

WEIL:\98218907\32\76974.0003

24. The Debtors and their Advisors have been working with the Ad Hoc Groups' advisors to respond to diligence requests and educate them on the Debtors, their business plan, and ultimately a potential restructuring framework.

25. In April 2022, certain members of the Ad Hoc Groups executed non-disclosure agreements (the "**Creditor NDAs**") with the Debtors. Pursuant to the Creditor NDAs, the Debtors provided holders in each group with certain material non-public information ("**MNPI**") to assist them in evaluating and negotiating the terms of a potential restructuring transaction with the Debtors. The Creditor NDAs provide that the Debtors will make such MNPI public by the earlier of May 31, 2022 and certain other trigger events, including the commencement of these chapter 11 cases by the Debtors. During the month of April and the first week of May, the Debtors held multiple separate in-person meetings in New York attended by creditors and advisors representing the Secured Creditor Group, the Crossholder Group, and the Unsecured Notes Group to discuss, among other things, the Debtors' recent and project financial performance, a restructuring proposal, and proposed DIP Financing.

26. <u>Restructuring Support Agreement and Restructuring Term Sheet</u>. The Debtors are pleased to announce that, after extensive negotiations, they have reached an agreement with the Unsecured Notes Group on a restructuring term sheet (the "**Restructuring Term Sheet**") and a restructuring support agreement (the "**Restructuring Support Agreement**").[7] Pursuant to the Restructuring Support Agreement, the Debtors and the Unsecured Notes Group have agreed to support the transactions set forth in the Restructuring Term Sheet. The Restructuring Term Sheet provides for an up to $1.65 billion rights offering (the "**Rights Offering**") that would provide for the payment of secured claims in full, backstopped by certain members of the Unsecured Notes

---

[7] The Restructuring Support Agreement is attached hereto as **<u>Exhibit A</u>**. The Restructuring Term Sheet is <u>Exhibit B</u> of the Restructuring Support Agreement.

WEIL:\98218907\32\76974.0003

Group (the "**Backstop Parties**") pursuant to a form of backstop commitment letter (the "**Backstop Commitment Letter**") appended to the Restructuring Support Agreement as Exhibit C. Additionally pursuant to the Restructuring Support Agreement, the Unsecured Notes Group has agreed to equitize the $1.4 billion of Senior Unsecured Notes held by their group.

27.     DIP Financing.  Beginning in March 2022, and as further detailed in the *Emergency Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* filed contemporaneously herewith (the "**DIP Motion**"), the Debtors launched a solicitation process to obtain debtor in possession financing and the consensual use of cash collateral to fund these chapter 11 cases.  The Debtors were able to secure postpetition financing (the "**DIP Financing**") in the form of a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of $1.758 billion (the "**DIP Facility**"), to be led by (i) Citibank, N.A. ("**Citi**"), (ii) Goldman Sachs & Co. LLC ("**Goldman**"), and (iii) RBC Capital Markets, LLC ("**RBC**" and together with Citi and Goldman, and solely in such capacity, the "**DIP Lenders**").

28.     Thus, with the outage and refueling at the Nuclear Plant completed, the Restructuring Support Agreement having been executed with the Unsecured Notes Group, and DIP Financing secured, the Company filed these chapter 11 cases.

## II.     Background

29.     The Debtors produce electricity primarily from conventional fuels (i.e., nuclear fuels, natural gas, and coal) at their energy generation assets (the "**Energy Plants**").  The

WEIL:\98218907\32\76974.0003

Debtors' primary sources of revenue are (i) energy revenue (revenue from the wholesale sales of energy produced from the Energy Plants, as well as the sale of electricity to commercial and industrial retail customers, and related services) and (ii) capacity revenue (revenue from the Debtors' contracts to provide energy generation capacity for energy in the future). Additionally, the Debtors also recognize revenues from unrealized gains or losses resulting from the changes in fair value on commodity derivative instruments.

        30.     As described further below, in the various regions or states where it engages in electricity generation, electricity marketing, and commodity risk and fuel management activities, the Debtors are subject to regulation set forth in tariffs of regional transmission organizations ("**RTOs**") and independent system operators ("**ISOs**"). RTOs and ISOs coordinate, control, and monitor the electric transmission systems owned by electric utilities and administer organized, bid-based markets for buying and selling electric energy, capacity, and ancillary services. The Debtors conduct most of their business operations in the RTOs/ISOs overseen by PJM, ISO New England Inc. ("**ISO-NE**"), and the Electric Reliability Council of Texas ("**ERCOT**"), and also engage in bilateral transactions within the Western Electricity Coordinating Council ("**WECC**") region.

WEIL:\98218907\32\76974.0003

Figure 6: Geographic locations and Markets of the Energy Plants.



31.    The following table describes certain Debtors' current portfolio of Energy

Plants.

| Asset | Location | Fuel Type | Ownership | Owned Capacity (1) | Region |
|---|---|---|---|---|---|
| **Susquehanna Nuclear, LLC** | | | | | |
| Susquehanna | PA | Nuclear | 90% | 2,254 MW | PJM |
| **Talen Generation, LLC** | | | | | |
| Martins Creek (2) | PA | Natural Gas | 100% | 1,711 MW | PJM |
| Montour | PA | Coal (Convert to Nat. Gas) | 100% | 1,518 MW | PJM |
| Brunner Island | PA | Coal (Dual Fuel) | 100% | 1,422 MW | PJM |
| Brandon Shores | MD | Coal (Convert to Oil) | 100% | 1,308 MW | PJM |
| H.A. Wagner | MD | Coal (Convert to Oil) | 100% | 834 MW | PJM |
| Lower Mt. Bethel (2) | PA | Natural Gas | 100% | 607 MW | PJM |
| Conemaugh | PA | Coal | 22% | 383 MW | PJM |
| Peaking units (2) | PA | Oil | 100% | 330 MW | PJM |
| Keystone | PA | Coal | 12% | 214 MW | PJM |
| Camden | NJ | Natural Gas | 100% | 147 MW | PJM |
| Newark Bay | NJ | Natural Gas | 100% | 122 MW | PJM |
| Pedricktown | NJ | Natural Gas | 100% | 113 MW | PJM |
| **Talen Texas, LLC** | | | | | |
| Barney Davis | TX | Natural Gas | 100% | 925 MW | ERCOT |
| Nueces Bay | TX | Natural Gas | 100% | 633 MW | ERCOT |
| Laredo | TX | Natural Gas | 100% | 177 MW | ERCOT |
| **Talen Montana Holdings, LLC** | | | | | |

WEIL:\98218907\32\76974.0003

| Asset | Location | Fuel Type | Ownership | Owned Capacity (1) | Region |
|---|---|---|---|---|---|
| Colstrip Unit 3 | MT | Coal | 30% | 222 MW | WECC |
| **Talen NE LLC** | | | | | |
| Dartmouth | MA | Natural Gas | 100% | 80 MW | ISO-NE |

(1) Electric generation capacity (summer rating) is based on factors, among others, such as operating experience and physical conditions which may be subject to revision.

(2) Non-debtor affiliates LMBE-MC own the Lower Mount Bethel and Martins Creek plants, as well as 71 MW of the peaking units.

32.     Over the last five years, Talen has worked to make its existing business more efficient—particularly, since 2016 Talen reduced (i) its general and administrative expenses by 50%, (ii) its operating and maintenance expenses by 25%, and (iii) its capital expenditures by 60%. Additionally, from 2015 to 2021, Talen significantly improved its safety performance. For example, it reduced its OSHA Incident Rate (the number of work-related injuries per 100 full-time workers during a period) from 1.4 to 0.4.

**Figure 7: OSHA Incident Rates**



(1) Includes Energy Plants operated by third parties

(2) OSHA Incident Rate represents the number of work-related injuries per 100 full-time workers during a one-year period and is calculated by multiplying the number of OSHA reportable injuries and illnesses by 200,000, divided by the total number of employee hours worked. When calculating, 200,000 represents 100 employees working 40 hours a week for 50 weeks during a calendar year

## D.     Corporate Structure

33.     TEC was formed on June 6, 2014 in connection with the spinoff of TES, then known as PPL Energy Supply, LLC, a competitive power generation business owned by PPL Corporation ("**PPL**"), and the subsequent combination of that business with RJS Generation

WEIL:\98218907\32\76974.0003

Holdings LLC, a competitive power generation business controlled by Riverstone Holdings LLC ("**Riverstone**"), which closed on June 1, 2015.  Following the spinoff and business combination, TEC became a public reporting company under the U.S. Securities Exchange Act of 1934.  Then, in a subsequently negotiated go-private transaction that closed on December 6, 2016, certain entities controlled by Riverstone (the "**Sponsor Entities**") acquired all of TEC's outstanding shares of common stock that they did not already own.  As a result of the go-private transaction, TEC terminated the registration of its common stock and suspended its public reporting obligations.  Since then, TEC has existed as a private company (with publicly traded debt), and the Sponsor Entities have effectively controlled 100% of the TEC common stock.  All of the Debtors are wholly-owned direct or indirect subsidiaries of TEC.  Neither TEC nor any of its non-TES subsidiaries are debtors in these chapter 11 cases.

34.     Collectively, the Debtors consist of TES and all of its wholly-owned subsidiaries—except for LMBE-MC HoldCo I LLC and its three subsidiaries ("**LMBE-MC**") and Talen Receivables Funding LLC ("**TRF**")—totaling 72 entities formed under the laws of Delaware, Massachusetts, New Jersey, and Pennsylvania.  The Company's headquarters are located in The Woodlands, Texas.  A chart illustrating the Debtors' complete organizational structure as of the Petition Date is attached as **Exhibit B** to this Declaration.  The following chart depicts the Company's simplified corporate structure:

WEIL:\98218907\32\76974.0003



(a)    **Talen Energy Supply, LLC**

35.    All of Talen's currently producing Energy Plants are held by certain subsidiaries of TES (each, a "**TES Generating Subsidiary**").  As further detailed in the Wages Motion (as defined below), as of the Petition Date, the Debtors have approximately 2,097 full-time employees, 866 of which are represented by a union and covered by a collective bargaining agreement with the International Brotherhood of Electrical Workers ("**IBEW**") Local 1600, IBEW Local 1638, and International Brotherhood of Teamsters Local 190.  TES itself employs a staff of approximately 217 full-time employees, all of which are non-union employees and which includes the Company's management team.

36.    Additionally and as described further below, TES is the primary obligor on most of the Company's funded debt: TES is the sole borrower under the Talen RCF and 2026 TLB, and TES is the issuer of both the Senior Secured Notes and the Senior Unsecured Notes.[8]  TES is also the borrower under certain unsecured letter of credit facilities collectively providing the

_____

[8] TES is not a borrower under the Accordion Facility; TEM and Susquehanna Nuclear (both subsidiaries of TES) are the borrowers thereunder.  However, because TES is party to the agreement as parent and guarantor, the Accordion Facility is considered a "TES Debt" for purposes of this Declaration.

Company access to letters of credit in an amount not to exceed $200 million.  The credit facilities (including the Accordion Facility), Senior Secured Notes, Inventory Facility, and letter of credit facilities are guaranteed by sixty-nine of TES's wholly-owned subsidiaries (the "**TES Subsidiary Guarantors**").[9]  TES's debt obligations are described in Section II.I below.

37.    TEM.  Talen Energy Marketing, LLC ("**TEM**") is a wholly-owned TES subsidiary that does not own or operate Energy Plants.  TEM employs a staff of approximately 30 full-time employees, all of which are non-union employees.  TEM is the Talen entity party to most of the Hedging Agreements, and it provides energy management services to, and purchases wholesale power from, each TES Generating Subsidiary to engage in subsequent wholesale power sales, pursuant to certain agreements.  Additionally, TEM is a borrower under the Accordion Facility.

38.    TEM enters into certain power sales arrangements (the "**Power Sales Arrangements**") with each TES Generating Subsidiary.  Pursuant to the Power Sales Arrangements, TEM purchases the power generated by the Energy Plants, and then sells such power into the wholesale electricity markets, pursuant to certain Market Participant Agreements (as defined below) that TEM or the TES Generating Subsidiary enters into with each respective RTO or ISO.

39.    TEM, on behalf of certain of the TES Generating Subsidiaries, also enters into certain energy management agreements (the "**Energy Management Agreements**") with third-party service providers ("**Energy Managers**").  Generally, the Energy Management Agreements provide that the Energy Manager will, among other things, (i) maintain a trading desk

---

[9] The TES Subsidiary Guarantors include all subsidiaries of TES in which TES has a majority common equity ownership *except* Talen II Growth Holdings LLC, Talen Technology Ventures LLC, LMBE-MC Holdco I LLC, LMBE-MC Holdco II LLC, MC Project Company LLC, LMBE Project Company LLC, Talen Receivables Funding LLC.

available to serve as the TES Generating Subsidiary's point of contact for power markets and power scheduling; (ii) schedule, bid, and dispatch all electric energy generated by the Energy Plants, and coordinate daily operations and scheduling; (iii) minimize and mitigate any electric transmission imbalances and resupply charges; and (iv) communicate with transmission providers, balancing authorities, and market participants as necessary.

40.     Susquehanna Nuclear, LLC.   Susquehanna Nuclear, LLC ("**Susquehanna Nuclear**") is a subsidiary of TES.   Its primary asset is a nuclear power generation facility in Berwick, Pennsylvania, (the "**Nuclear Plant**"), which occupies approximately 1,075 acres.   As part of the Talen Transition Strategy, land adjacent to the Nuclear Plant will be the site of the Data Campus (as defined below).   Susquehanna Nuclear's interest in the Nuclear Plant consists of a 90% undivided interest in the plant.   A non-profit electric cooperative owns the remaining 10% undivided interest in the plant (the "**Nuclear Co-Owner**"), with a contractual arrangement to share all costs of operating the Nuclear Plant with Susquehanna Nuclear.[10]   Pursuant to certain agreements with the Nuclear Co-Owner, Susquehanna Nuclear operates the Nuclear Plant and employs a staff of approximately 915 full-time employees, consisting of approximately 414 union and approximately 501 non-union employees.   Sales of power and energy-related products from the Nuclear Plant are conducted in the PJM market.   Additionally, Susquehanna Nuclear is a borrower under the Accordion Facility.

41.     As a nuclear power generating facility, Susquehanna Nuclear is regulated by the U.S. Nuclear Regulatory Commission ("**NRC**") with respect to licensing requirements, including security, safety, and employee-related requirements, and the Federal Emergency Management Agency with respect to its comprehensive emergency response plans.   Additionally,

---

[10] If Susquehanna Nuclear defaults under the arrangements with the Nuclear Co-Owner, the Nuclear Co-Owner may be entitled to all of the energy and capacity generated by the Nuclear Plant that would have been allocated to Susquehanna Nuclear.

Susquehanna Nuclear is regulated by the U.S. Federal Energy Regulatory Commission ("**FERC**") with respect to the transmission and wholesale sales of power.  Susquehanna Nuclear is required to adhere to strict safety and security protocols and maintains an employee and vendor base with sufficient and necessary security clearance and safety protocol experience to meet these requirements.

42.   Talen Generation.   Talen Generation, LLC (collectively with its subsidiaries, "**Talen Generation**") is a subsidiary of TES.  Talen Generation's primary assets are eleven coal, oil, and natural gas fired power generating plants and peaking units located in Pennsylvania, New Jersey, and Maryland (the "**Talen Generation Plants**").  Talen Generation owns (i) a 100% interest in nine of the Talen Generation Plants, (ii) a 22% co-interest (with several power generation companies owning the balance) in a coal-fired plant outside of Indiana, PA, (the "**Conemaugh Plant**") and (iii) a 12% co-interest (with several power generation companies owning the balance) in another coal-fired plant outside of Johnstown, PA (the "**Keystone Plant**").[11]  Talen Generation operates all but four of the Talen Generation Plants and employs a staff of approximately 609 full-time employees, consisting of approximately 258 union and approximately 351 non-union employees.[12]   The remaining four Talen Generation Plants, including the Conemaugh Plant and the Keystone Plant, are operated by third-party operators who provide administrative, operating, and maintenance services for each of the plants pursuant to certain operation and maintenance agreements.[13]   Sales of electricity products from the Talen Generation Plants are regulated by FERC and conducted in the PJM markets.

---

[11] Two of the Talen Generation Plants and 71 MW of the peaking units are owned by non-debtor affiliates, the LMBE-MC entities.

[12] Ten of these employees are staffed at the Dartmouth Plant.

[13] The Debtors have contractual arrangements to share all costs of operating the Conemaugh Plant and the Keystone Plant with the respective co-owners of each.  Defaults under these arrangements may only be remedied with specific performance.

WEIL:\98218907\32\76974.0003

43.     The Talen Generation Plants include three coal-fired generation facilities (the Montour plant in Washingtonville, Pennsylvania (the "**Montour Plant**") and the Brandon Shores and H.A. Wagner plants in Maryland), which will cease coal-fired operations by the end of 2025 as part of the Talen Transition Strategy.  Additionally, the Brunner Island dual-fueled plant in Pennsylvania will cease coal-fired operations by the end of 2028.

44.     The Debtors are currently in the process of implementing a plan to convert the Montour Plant from coal to natural gas-fueled, which will ensure that the Montour Plant can continue operation after it stops burning coal at the end of 2025 (the "**Montour Decarbonization Project**").  Under the terms of the conversion permit, the Debtors have spent $19.6 million in capital expenditures towards this conversion as of March 31, 2022.  The Debtors estimate that the capital expenditure requirement for conversion is approximately $154 million.  On November 4, 2021, the Debtors received a six month permit extension, extending the time in which the capital expenditures for the conversion process must be made.  Additionally, as part of the Talen Transition Strategy, land adjacent to the Montour Plant is expected to be used for a solar generation facility.

45.     Talen Texas.  Talen Texas, LLC (collectively with its subsidiaries, "**Talen Texas**") is a subsidiary of TES.  Talen Texas's primary assets are three natural-gas fired power production plants located in Texas (the "**Texas Plants**").  Talen Texas owns a 100% interest in each of the Texas Plants.  Talen Texas operates the plants and employs a staff of approximately 62 full-time employees, all of which are non-union employees.  Sales of electricity products from the Texas Plants are regulated by the Texas PUC (as defined below) and conducted in the ERCOT market.

WEIL:\98218907\32\76974.0003

46.      <u>Talen Montana</u>.    Talen Montana Holdings, LLC (collectively with its subsidiaries, "**Talen Montana**") is a subsidiary of TES.  Its primary asset (other than its claim against PPL, described below) is a coal-fired power production plant located east of Billings, Montana (the "**Colstrip Plant**"), which occupies approximately 20 square miles.[14]   Talen Montana's interest in the Colstrip Plant consists of co-ownership of an undivided interest in the plant with several public utility companies as co-owners (collectively, the "**Colstrip Co-Owners**").  As described further in the Vendor Motion, Talen Montana is party to a contractual arrangement to share all costs of operating the Colstrip Plant with the Colstrip Co-Owners.  The below charts show the percent ownership interests in the Colstrip Units:

**Figure 8: Colstrip Unit Ownership**



**Interests are subject to the reciprocal sharing arrangement described in Footnote 14 hereto.**

47.      Pursuant to certain operating agreements with the Colstrip Co-Owners, Talen Montana operates the Colstrip Plant and employs a staff of approximately 264 employees, consisting of approximately 194 union and approximately 70 non-union employees.  Sales of

---

[14] The Colstrip Plant originally consisted of four generating units (each, a "**Colstrip Unit**").  In January 2020, Talen Montana and the other co-owner of Colstrip Units 1 and 2 permanently retired the units.  Talen Montana is responsible for 50% of the decommissioning and other related costs of Colstrip Units 1 and 2.  Talen Montana owns 30% of Colstrip Unit 3, and does not own any portion of Colstrip Unit 4.  However, it is a participant in a joint-owner sharing agreement which governs each party's responsibilities and rights whereby Talen Montana is responsible for 15% of the total operating costs and expenditures of Colstrip Unit 3 and 15% of Colstrip Unit 4. Accordingly, it is entitled to 15% of the available generation from each of these units.

power and energy-related products from the Colstrip Plant are conducted on a bilateral basis within the WECC region.

**Figure 9: Aerial View of Colstrip Plant**



48.     Talen Montana, as operator of the Colstrip Plant, employs the staff and develops budgets for the facility.  Additionally, unlike the other TES Generating Subsidiaries and as described more fully in the Vendor Motion, Talen Montana pays the majority of its operating expenses directly and then bills back a proportion of those expenses to the Colstrip Co-Owners for reimbursement.

49.     As described in more detail below, in 2012, on behalf of the Colstrip Co-Owners, Talen Montana entered into that certain *Administrative Order on Consent Regarding Impacts Related to Wastewater Facilities Comprising the Close-Loop System at Colstrip Steam Electric Statement, Colstrip Montana*, dated August 3, 2012 (the **"Colstrip AOC"**) by and between PPL Montana, LLC, as Operator of the Colstrip Steam Electric Station, and Montana Department of Environmental Quality (the "**MDEQ**"), which required Talen Montana to develop a "Facility Closure Plan" for the Colstrip Units.  The total remaining cost of closure and

WEIL:\98218907\32\76974.0003

remediation is estimated to be approximately $388 million.  Additionally, the Colstrip AOC requires, among other things, the posting of financial assurance for coal ash and wastewater pond remediation and closure at the Colstrip Plant ("**Financial Assurance**").  Since 2012, the Debtors have reached additional agreements with the MDEQ and the Colstrip Co-Owners, pursuant to which the Colstrip Co-Owners provided Financial Assurance commensurate with their respective ownership share in the Colstrip Plant.  The Financial Assurance has been fully provided in line with the estimated and agreed upon closure plans.

50.     Talen NE.  Talen NE LLC (collectively with its subsidiaries, "**Talen NE**") is a subsidiary of TES.  Talen NE's primary asset is a natural-gas fired power production plant located in Massachusetts (the "**Dartmouth Plant**").  Talen NE owns a 100% interest in the Dartmouth Plant.  Talen NE operates the plant with a staff of ten full-time employees, all of which are non-union employees.[15]  Sales of power and energy-related products from the Dartmouth Plant are regulated by FERC and conducted in the ISO-NE market.

**(b)     Talen Transition Strategy**

51.     Many political and regulatory authorities, along with certain of the Debtors' financing sources and well-funded activist groups, are making substantial efforts to minimize fossil fuel use.  Concerns about the environmental impacts of fossil fuel combustion, including impacts on global climate issues, are resulting in increased regulation of coal combustion and other sustainability mandates, which in turn result in unfavorable lending policies and difficulty raising capital toward financing for traditional fossil fuel-powered generation facilities.  In addition, the previously low price of natural gas has meant that coal-fueled assets are no longer economical to run or keep updated.  Thus, in many markets in the United States, generating capacity is

---

[15] These full-time employees of the Dartmouth Plant are employed by a Talen Generation subsidiary.

WEIL:\98218907\32\76974.0003

transitioning from a coal-dominated generation base to a mix that incorporates larger amounts of natural gas and renewable units.

52.     Today's electricity consumers, businesses, and technologies demand electricity that is not only low-cost, but also reliable and zero-carbon.  In response and recognizing this dilemma, the Debtors began investing in additional carbon-free power projects and complementary battery storage.  In addition, the Debtors have begun investing in certain opportunities created by the convergence of power generation and digital infrastructure, including the construction of hyperscale data centers and cryptocurrency mining infrastructure directly connected to the Debtors' generation facilities.  And further, the Debtors committed to, and began the process of, eliminating coal use at all of their wholly-owned facilities.  Each of these projects are part of the transformation of the Company's assets and business model toward a decarbonized future (collectively, the "**Talen Transition Strategy**").

53.     In May 2021, the Company held an equity investor event to highlight Talen's initiatives for positioning itself toward a sustainable future to investors (the "**2021 Investor Event**").  At the event, Talen set forth the Talen Transition Strategy—the Company's infrastructure investments and energy transition strategy, including its plans to develop a large-scale portfolio of renewable energy, battery storage, digital currency mining, and digital infrastructure assets through then-TES subsidiaries.  The Talen Transition Strategy is summarized in the table below.

| Decarbonization | Data Centers | Coin Mining | Renewables & Batteries |
|---|---|---|---|
| Conversion of the Debtors' wholly-owned coal-fueled generating facilities to lower carbon fuels, underpinned by strong economics, resulting in grid stability while continuing to support the communities | Development of a 475 MW cloud data center campus (the "**Data Campus**") to deliver leasable hyperscale data center capability, directly fueled by the zero-carbon Nuclear Plant and with lowest known all-in cost | Development of 200 MW zero-carbon digital currency mining facility at the Data Campus and other sites, including land adjacent to certain Talen Texas and Talen Generation Plants, with the ability to expand the | Development of 2.7 GW pipeline of renewable energy and battery storage being developed largely utilizing existing owned land and interconnections, primarily in close proximity to the Debtors' fossil generation plants, |

WEIL:\98218907\32\76974.0003

| Decarbonization | Data Centers | Coin Mining | Renewables & Batteries |
|---|---|---|---|
| in which Talen operates | in the U.S. | operation up to 300 MW. Talen's vision is to create verifiable low or zero-carbon coins, with the appropriate regulatory overlay, mined in the United States in a secure, compliant location | with a focus on communities; partnering with reputable, experienced developers on selective projects to leverage their experience |

54.     The development of (i) the Data Campus (the "**Cumulus Data Project**") through non-Debtor subsidiary Cumulus Data LLC ("**Cumulus Data**") and (ii) the digital currency mining facility at the Data Campus (the "**Cumulus Coin Project**" and, together with the Cumulus Data Project, the "**Cumulus Digital Project**") through non-Debtor subsidiary Cumulus Coin LLC ("**Cumulus Coin**") creates a competitive advantage by solving the reliability, costs, and zero-carbon "energy trilemma" by providing an integrated power and digital infrastructure solution.  As described above, flat power demand and an increased power supply have decreased the Debtors' profits, particularly in the PJM region where the Nuclear Plant is located.  The Cumulus Digital Project capitalizes on a clear synergy by bringing a growing electricity demand (i.e., data storage and digital currency mining) directly to the Nuclear Plant's low-cost, reliable, and carbon-free power supply.

55.     Pursuant to certain power purchase agreements, Susquehanna Nuclear will sell power generated by the Nuclear Plant to Talen Generation, as a wholesale customer, and Talen Generation will then sell the power to Cumulus Data, as a retail customer.  Cumulus Data is expected to sub-meter this power to customers of its Data Campus.  Because Cumulus Data will own the transmission line that interconnects the Cumulus Digital Project to the Nuclear Plant, the cost of power to be sub-metered will be reduced by eliminating the need to transport the power on the grid and incur the associated costs with such transportation.  This arrangement will positively impact supply and demand dynamics for the Debtors by providing a stable, long-term source of

revenue for the Nuclear Plant, enabling its longevity.  This model can also be replicated at other Talen Generation facilities, with similar potential benefits.

56.     Moreover, each of these Talen Transition Strategy initiatives brings value to the communities in which Talen operates by providing stable employment, safe operations, and engagement with local organizations.  In particular, through the Montour Decarbonization Project, the Debtors preserve 80 full-time, permanent jobs at the Montour Plant and add between 200-300 temporary jobs to execute the project over a one-year period.  Additionally, in connection with the development Cumulus Data Project, the Company expects to create up to 1,000 temporary jobs for the construction of the Data Campus and approximately 50 full-time, permanent jobs.  And, in connection with the development of Cumulus Coin Project, the Company expects to create 300 temporary jobs to execute the project over a nine-month period and 50 full-time, permanent jobs. The average salary is approximately $125,000 for full-time jobs created under these projects.

**(c)     TES' Investment in Cumulus Growth Holdings LLC**

57.     Following the 2021 Investor Event, the Company sought investment for the Talen Transition Strategy from many parties, both inside and outside of its existing capital structure.  However, only one unaffiliated party has come forward, Orion Energy Partners ("**Orion**"), to fund the initial common infrastructure for the Cumulus Digital Project.

58.     To implement the financing with Orion, the Company formed Cumulus Growth Holdings LLC ("**Cumulus Growth**" and, collectively with its direct and indirect subsidiaries, "**Cumulus**")[16] as a direct subsidiary to TEC and began a process to sell equity interests in certain clean energy project development entities, as well as certain undeveloped land, from the Debtors to the newly-formed Cumulus entities in exchange for the Cumulus Preferred Shares.  This sale was largely completed in September 2021, with certain land being transferred in

---

[16] None of the Cumulus entities are debtors in these chapter 11 cases.

exchange for additional preferred shares upon completion of required subdivision processes.[17] Following the organizational transition, Orion consummated an up to $175 million financing (the "**Orion Financing**") with Cumulus Digital LLC (a wholly-owned subsidiary of Cumulus Growth, "**Cumulus Digital**").[18]

59.    TES currently owns, directly and through its subsidiaries, voting convertible preferred equity in certain subsidiaries of Cumulus Growth, which provide the Debtors with an equity participation in the Cumulus Digital's digital infrastructure, including data center and bitcoin mining operations (the "**Cumulus Preferred Shares**").  The Cumulus Preferred Shares provide certain of the Debtors with an economic interest, the right to quarterly distributions from certain Cumulus entities, and, with respect to certain Cumulus entities, governance control.  As of the Petition Date, the Debtors have invested approximately $54 million in the Cumulus Coin Project and $67 million in the Cumulus Data Project.  The Company anticipates that the first phase of the Cumulus Coin Project will require a total investment of $350 million and the first phase of the Cumulus Data Project will require a total investment of $525 million.  Accordingly, TES' investment through the Cumulus Preferred Shares provides the estate with growth opportunities and the potential for increase in enterprise value.

60.    As further detailed in the Cash Management Motion (as defined below), funds from the Orion Investment are currently distributed to and held in accounts at certain Cumulus entities and are used to pay Orion-Cumulus Project related vendors.  Other accounts held by the Debtors are used to fund accounts held by Non-Debtor Cumulus entities (in exchange for preferred units in the respective Cumulus entity), which then pay non-Orion-Cumulus Project related Cumulus vendors.  As further described in the DIP Motion, the Debtors intend to use

---

[17] Certain parcels of land are in process of being subdivided and will be transferred from TES subsidiaries to Cumulus Real Estate Holdings LLC upon completion of the subdivision.

[18] Cumulus Data and Cumulus Coin are each wholly-owned subsidiaries of Cumulus Digital.

funding from the DIP Facility to continue their investment in Cumulus Growth by funding near-term costs of ongoing construction of building and electrical infrastructure for the Data Campus.

61.     Pursuant to corporate and operational services agreements, TES and certain of its subsidiaries provide corporate and administrative services to (i) Cumulus Digital and (ii) the bitcoin mining joint venture on behalf of Cumulus Digital, each in exchange for an annual management fee and monthly fee for all indirect overhead charges and expenses that to date has been paid with additional Cumulus Preferred Shares.  Cumulus currently has no employees and no operations aside from the development of these projects.  100% of Cumulus' common equity interests are directly or indirectly owned by non-Debtor TEC.

## E.     Decommissioning Efforts

62.     Like most power generation companies, the Debtors, in the ordinary course of business, close and decommission older Energy Plants and/or their related non-core generation assets (e.g., coal piles, water basins, and ash basins) and dispose of or sell parts, machinery, equipment, or scrap.  For example, and as noted throughout this Declaration, the Debtors are working to decommission certain coal-fueled Energy Plants.  As part of the decommissioning process, equipment and materials may be cleaned, disposed of, and/or sold in the ordinary course of the Debtors' business.  In certain cases, the Company may later convert these decommissioned plants, or the land they are on, into lower-carbon generation assets or renewable energy projects. For example, certain solar projects under Cumulus are being constructed on closed ash basins adjacent to decommissioned Energy Plants.

## F.     Regulation of Debtors' Business

63.     The Debtors are subject to extensive federal, state, and local laws and regulations as a result of the Debtors' core business of generating and selling power.  Such laws

and regulations include the regulation of rates, terms, and conditions of electricity sales, construction and operation of electric generation and generator interconnection facilities, air emissions, water discharges, and the management of radioactive, hazardous, and solid waste, among other oversight.  The ability to assure ongoing compliance with applicable regulations, permits, and licensing is integral to the preservation of the Debtors' business and value.

        64.    <u>Federal Regulation</u>.  At the federal level, the Debtors are subject to regulation by various federal entities, including, without limitation, the FERC, the North American Electric Reliability Corporation, the NRC, and the EPA.

        65.    FERC regulates the Debtors' transmission and wholesale sales of electricity, as well as the ownership and operation of associated facilities.  FERC finds its authority under various laws, including, without limitation, the Federal Power Act, pursuant to which FERC regulates the rates, terms, and conditions of transmission and wholesale sales of electricity by energy generating entities that fall under FERC's jurisdiction, certain transactions involving or affecting control over such entities, and the issuance of securities by such entities, among other things.  FERC's authority extends to all of the Debtors' plants as well as TEM, and pursuant to such authority, FERC may impose civil penalties of up to approximately $1.3 million per violation per day or, in certain circumstances, criminal penalties.  FERC also governs the majority of the ISOs and RTOs within which the Debtors operate.

        66.    The regulations governing the markets administered by the RTOs and ISOs are highly complex, constantly evolving, and give rise to assessments associated with membership and participation within the applicable RTO's or ISO's market.  For example, the Debtors are party to certain agreements relating to the use of the RTO's or ISO's electric transmission systems and participation in the markets and that, in turn, require the Debtors to comply with certain tariffs or

WEIL:\98218907\32\76974.0003

protocols (such agreements, the "**Market Participant Agreements**").  As wholesale providers, the Debtors receive revenue from the RTO and ISO markets for energy and capacity generated by the Debtors' Energy Plants and sold by TEM into the respective RTO or ISO markets, and as retail providers, the Debtors purchase power from an RTO's or ISO's grid to service the Debtors' retail customers.[19]

67.    As noted above, in connection with the operation of the Nuclear Plant, the Debtors are also subject to oversight by the NRC, which regulates commercial nuclear power plants and other uses of nuclear materials through licensing, inspection, and enforcement of its requirements.  The Debtors' hold reactor licenses under NRC jurisdiction relating to the generation of nuclear power and storage and handling of spent nuclear fuel.

68.    Finally, in connection with ongoing oversight of the Debtors' operations, the EPA and various other federal agencies issue environmental permits, charge regulatory fees, and conduct regulatory inspections, investigations, and enforcement actions.  The Debtors may face monetary penalties for failing to comply with EPA regulations at both the federal and state level.[20]  Additionally, environmental permits are verified by individuals on behalf of the Debtors, and such individuals may face liability for the Debtors' noncompliance.

69.    <u>State Regulation</u>.  At the state level, the Debtors must abide by limits and requirements set by state environmental regulatory agencies that govern air emissions, water discharges, dam safety, and hazardous and solid waste discharge, among other things, and require the Debtors to obtain permits and pay various fees relating to waste, water, and emissions. Additionally, in certain jurisdictions in which the Debtors operate, the Debtors are required to hold

---

[19] Although the Debtors intend to wind down substantially all of their retail business, the Debtors will continue to purchase power from the RTOs' and ISOs' grids to service their few remaining retail customers.

[20] Although the Debtors incur assessments in connection with EPA oversight, the majority of such assessments are remitted directly to state agencies to which the EPA has delegated authority.

WEIL:\98218907\32\76974.0003

licenses to conduct retail energy sales, and such licenses are subject to regulation by state public utility commissions (each, a "**PUC**" and, collectively, the "**PUCs**").

70.     The state regulations include requirements designed to promote the use of renewable energy sources or otherwise reduce greenhouse gas emissions by imposing various cap-and-trade obligations on emissions generated by the Debtors' non-renewable operations.  For example, the Debtors' New Jersey, Maryland, and Massachusetts operations are subject to caps on greenhouse gas emissions under the Regional Greenhouse Gas Initiative ("**RGGI**").  In addition to those states, as of April 23, 2022 Pennsylvania has joined RGGI and will begin to enforce starting on July 1, 2022.  Under RGGI, power plants located in participating jurisdictions must obtain allowances equal to the respective plant's $CO_2$ emissions, measured over a three-year compliance period.  At the end of the three-year compliance period, each power plant in a RGGI-participating state must demonstrate that it holds RGGI allowances equal to or greater than the number of tons of $CO_2$ that such plant emitted during the applicable compliance period.  Failure to comply with such obligations may lead the applicable state environmental regulator to impose certain monetary fines and penalties or altogether revoke the Debtors' operating licenses, such that the Debtors would be unable to run their facilities.  In connection with the Debtors' retail operations, the Debtors are also obligated to purchase renewable energy credits ("**RECs**"), which are designed to offset indirect greenhouse gas emissions associated with purchased electricity and without which the Debtors would be unable to fulfill their retail generation obligations.[21]  The Debtors are obligated to purchase a certain percentage of RECs relative to the amount of power they sell to retail counterparties and must file reports with the PUCs demonstrating compliance.

---

[21] Although the Debtors' have moved to reject substantially all unaffiliated commercial, industrial, and institutional customer counterparties, effective as of the date hereof, there may still be RECs associated with retail power contracts not rejected pursuant to that motion, and the Debtors intend to keep their retail licenses for certain limited retail power sales necessary for operation of the power plants.

Failure to comply with such obligations may lead a PUC to cancel the Debtors' retail licenses, such that the Debtors would be unable to sell power to retail counterparties.

71.     Local Regulation.  Finally, at the local level, the Debtors are regulated by various environmental agencies and local municipalities that charge fees associated with land permits, waste-water discharge, fire code inspections, and storm water discharge.  The Debtors may incur project-level monetary penalties for failure to comply with such obligations, as well as the suspension or revocation of general operating or project-based permits that allow the Debtors to operate such projects in the ordinary course of business.  For example, the failure to pay waste water discharge fees may result in the Debtors' inability to discharge waste-water to municipal treatment plants.

72.     Environmental Regulation.     Extensive   federal,   state   and   local environmental laws and regulations are applicable to the Debtors' power generation operations, including the regulation of air emissions, water discharges and the management of hazardous and solid waste, including radioactive waste, and other aspects of the business.  Separately, the Debtors are also subject to numerous environmental laws in the development, construction, ownership and operation of their generating projects.  These laws generally require that governmental permits and approvals be obtained before construction and during operation of power generation facilities.  In addition, many of these environmental considerations are also applicable to the operations of key suppliers, or customers, such as coal producers and industrial power users, and may impact the cost for their products or their demand for the Company's services.  For example:

- Under the Pennsylvania Clean Streams Law, a subsidiary of Talen Generation is obligated to remediate acid mine drainage at a former mine site and may be required to take additional steps to prevent acid mine drainage at this site.  As of December 31, 2021, liabilities of $21 million were accrued to cover the costs of groundwater pumping and treating groundwater at the site for approximately 50 years.

33

- On behalf of the Colstrip Co-Owners, in 2012 Talen Montana entered into the Colstrip AOC that requires the posting of financial assurance for coal ash and wastewater pond remediation and closure at the Colstrip Plant. Pursuant to the Colstrip AOC, Talen Montana, in its capacity as the operator of the Colstrip Plant, is obligated to close and remediate coal ash disposal ponds at Colstrip. The Colstrip AOC specifies an evaluation process between Talen Montana and the MDEQ on the scope of remediation and closure activities, requires the MDEQ to approve such scope, and requires financial assurance to be provided to the MDEQ on approved plans. Each of the Colstrip Co-Owners have provided their proportional share of financial assurance to the MDEQ on approved plans. On behalf of Talen Montana, as of the Petition Date, the Company has provided $113 million in financial assurance to the MDEQ for Talen Montana's proportional share of its remediation and closure activities. In connection with the Colstrip AOC, on or about October 18, 2021, Talen Montana entered into a settlement agreement with MDEQ, pursuant to the terms of which, Talen Montana posted a surety bond in its proportional share of $120.1 million, equaling $60.1, in December 2021.

**G.    Litigation**

73.    The Debtors are subject to a number of prepetition lawsuits, including among others:

74.    <u>Winter Storm Uri Litigation</u>.   In March 2021, Talen Texas was sued in multiple Texas state courts.  In these suits, the plaintiffs allege, among other things, that they suffered loss due to the defendants' failure to prepare their facilities to withstand extreme winter weather and due to defendants' other operational failure during Winter Storm Uri.

75.    <u>Kinder Morgan Litigation</u>.  In June 2021, an affiliate of Kinder Morgan filed a suit in the State of Texas District Court in Harris County against TEM and certain other TES affiliates.  In the suit, the Kinder Morgan affiliate alleges, among other things, that affiliates of TES agreed to purchase natural gas from it during Winter Storm Uri at the then prevailing market rate.  TES disputes that it purchased gas from the Kinder Morgan affiliate.

76.    <u>Montana Hydroelectric Litigation</u>.   Talen Montana is a defendant in litigation currently pending in the U.S. District Court for the District of Montana relating to Talen Montana's past ownership and operation of hydroelectric generation facilities in Montana, which were sold to NorthWestern Corporation in November 2014.

WEIL:\98218907\32\76974.0003

77.    <u>PPL/Talen Montana Litigation</u>.    In October 2018, the Talen Montana Retirement Plan ("**TMT Retirement Plan**") filed a class action suit in Montana state court against PPL, its affiliates, and certain officers and directors relating to a distribution by Talen Montana to PPL of $733 million of net proceeds from the sale of Talen Montana's hydroelectric facilities in November 2014 (the "**Distribution**"), which was during PPL's tenure as owner of Talen Montana. The action generally alleges that the Distribution was improper under applicable law and claims that PPL and its directors improperly made the Distribution, leaving Talen Montana without adequate funds to pay its obligations.    TMT Retirement Plan seeks compensatory and punitive damages.

78.    In November 2018, PPL filed a lawsuit in Delaware Court of Chancery seeking, among other things, a declaratory judgment that the claims asserted in the Montana state lawsuits are without merit and raising contractual and statutory defenses to the those claims.  Talen Montana and its affiliates believe that PPL's claims are without merit.

79.    <u>Pension Litigation</u>.  In November 2020, four former Talen employees filed a lawsuit in the United States District Court for the Eastern District of Pennsylvania against TES, TEC, the Talen Energy Retirement Plan (the "**TERP**"), and the TERP plan administrator, alleging that they are owed enhanced benefits under the TERP because of certain of the Company's transactions.  The lawsuit seeks class action status on behalf of certain Talen non-union employees.

## H.    Corporate Governance and Management

80.    In November 2021, the organizational documents of TES were amended, changing it from a member managed entity to a board managed entity, including a requirement for an independent manager.  Pursuant to the amendment, an independent manager and four of the

WEIL:\98218907\32\76974.0003

existing TEC board members were appointed to the new board of managers of TES (the "**TES Board**").   Additionally, in March 2022, the organizational documents of TES were further amended to require two independent managers as well as an additional Riverstone designee.   In April 2022, the TES Board formed a restructuring committee that includes both of its independent managers.

81.   The Debtors' senior leadership team consists of the following individuals:

| Name | Position |
|------|----------|
| Alex Hernandez | President and Chief Executive Officer |
| John Chesser | Chief Financial Officer and Treasurer |
| Andrew Wright | General Counsel and Corporate Secretary |

## I.   Capital Structure

82.   The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.   The following table provides a summary of the Debtors' funded debt, as described in more detail below.[22]

| Facility | Maturity | Principal |
|----------|----------|-----------|
| **TES Secured Debt** | | |
| Talen RCF | March 2024 | — |
| Accordion Facility | Sept. 2024 | $848 million |
| 2026 TLB | July 2026 | $428 million |
| Senior Secured Notes | 2027 – 2028 | $1,620 million |
| **Total Secured Debt:** | | $2,896 million |
| **TES Unsecured Debt** | | |
| Senior Unsecured Notes | 2022 – 2036 | $1,329 million |
| PEDFA Bonds | 2037 – 2038 | $231 million |
| **Total Unsecured Debt:** | | $1,561 million |
| **Total Funded Debt:** | | **$4,455 million** |

### (a)   TES Debt

83.   TES is the borrower or issuer on most the Company's debt, including the Talen RCF, 2026 TLB, Senior Secured Notes, Senior Unsecured Notes, the PEDFA Loan

---

[22] This table does not include certain obligations under letters of credit or the Debtors' hedge exposure.

WEIL:\98218907\32\76974.0003

Agreements and Reimbursement Agreements supporting the PEDFA Bonds, and the ALOC Facilities (each as defined below).  TEM and Susquehanna Nuclear are the borrowers under the Accordion Facility (as defined below, and collectively with the Talen RCF, the 2026 TLB, the Senior Secured Notes, the Senior Unsecured Notes, the PEDFA Bonds, and the ALOC Facilities, the "**TES Debt**").

84.     _Talen RCF_.   Certain of the Debtors are parties to that certain _Credit Agreement_, dated as of June 1, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Talen RCF**"), by and among TES, as borrower, the lenders from time to time party thereto (the "**RCF Lenders**"), and Citi, as administrative agent (in such capacity, the "**RCF Agent**") and collateral trustee (the "**Collateral Trustee**").  The Talen RCF provides for a senior secured revolving loan facility in the aggregate maximum committed principal amount of approximately $459 million (including any letters-of-credit issued thereunder).[23]  The Talen RCF matures in 2024 and bears interest at a rate equal to the Base Rate plus 8.00%.  Amounts available under the Talen RCF are currently only able to be used for the issuance of letters of credit.

85.     Pursuant to the Guarantee and Collateral Agreement and the Mortgages (each as defined below), the obligations under the Talen RCF are guaranteed by TES and the TES Subsidiary Guarantors and are secured by first priority liens and security interests in substantially all the assets of TES and the TES Subsidiary Guarantors, subject to customary exceptions.  Subject to the terms of the Intercreditor Agreement (as defined below), these security interests are equal and ratable with the security interests securing the other First Lien Obligations (as defined below).

---

[23] Pursuant to the Waivers, Amendment No. 7 (each as defined below), and previous waivers and/or amendments, this amount was reduced from $1.85 billion to the current amount.

WEIL:\98218907\32\76974.0003

86.     As of the Petition Date, there are no revolving loans outstanding under the Talen RCF; however, there is $458 million in issued and outstanding undrawn letters of credit thereunder and $89 million of cash collateral supporting letters of credit, plus any unpaid interest, fees, premiums, or other amounts due thereunder, and no further loans are permitted to be drawn (collectively, the "**RCF Claims**").   Subject to the terms of the Intercreditor Agreement, the obligations under the Talen RCF rank *pari passu* in right of payment with the obligations under the other First Lien Obligations.

87.     <u>Accordion Facility</u>.  Certain of the Debtors are parties to that certain *Credit Agreement*, dated as of December 14, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Accordion Facilit**y"), by and among TES, as parent, TEM and Susquehanna Nuclear, as borrowers, the lenders from time to time party thereto (the "**CAF Lenders**"), and Alter Domus (US) LLC, as administrative agent (the "**CAF Agent**").  The Accordion Facility provides for a senior secured revolving loan facility in the aggregate maximum principal amount of up to $848 million.  The Accordion Facility matures in 2024 and bears interest at a per annum rate equal to (i) in the case of Base Rate loans, 7.00% and (ii) in the case of LIBO rate loans, 8.00%.  In addition, the borrowers are required to pay a quarterly fee of 4.50% per annum on unused revolving loan commitments.

88.     Pursuant to the Guarantee and Collateral Agreement and the Mortgages, the obligations under the Accordion Facility are guaranteed by TES and the TES Subsidiary Guarantors and are secured by first priority liens and security interests in substantially all the assets of TES and the TES Subsidiary Guarantors, subject to customary exceptions.  Subject to the terms of the Intercreditor Agreement, these security interests are equal and ratable with the security interests securing the other First Lien Obligations.

WEIL:\98218907\32\76974.0003

89.     As of the Petition Date, the aggregate amount of loans outstanding under the Accordion Facility is $848 million, plus any unpaid interest, fees, premiums, or other amounts due thereunder (collectively, the "**CAF Claims**").   Subject to the terms of the Intercreditor Agreement, the obligations under the Accordion Facility rank *pari passu* in right of payment with the obligations under the other First Lien Obligations.

90.     <u>2026 TLB</u>.  Certain of the Debtors are parties to that certain *Term Loan Credit Agreement*, dated as of July 8, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**2026 TLB**"), by and among TES, as borrower, the lenders from time to time party thereto (the "**2026 TLB Lenders**"), and Wilmington Trust, National Association, as administrative agent (the "**2026 TLB Agent**").

91.     The 2026 TLB provides for a senior secured term loan facility in the aggregate maximum principal amount of $500 million.  The 2026 TLB matures in 2026 and bears interest at a variable rate of LIBOR plus 3.75%.

92.     Pursuant to the Guarantee and Collateral Agreement and the Mortgages, the obligations under the 2026 TLB are guaranteed by TES and the TES Subsidiary Guarantors and are secured by first priority liens and security interests in substantially all the assets of TES and the TES Subsidiary Guarantors, subject to customary exceptions.  Subject to the Intercreditor Agreement, these security interests are equal and ratable with the security interests securing the other First Lien Obligations.  As of the Petition Date, the aggregate amount outstanding under the 2026 TLB is approximately $428 million, plus any unpaid interest, fees, premiums, or other amounts due thereunder (collectively, the "**TLB Claims**").   Subject to the terms of the Intercreditor Agreement, the obligations under the 2026 TLB rank *pari passu* in right of payment with the obligations under the other First Lien Obligations.

93.     <u>Senior Secured Notes</u>.  TES, as issuer, and the TES Subsidiary Guarantors, as guarantors, are parties to the following indentures (collectively, as amended, restated, or supplemented from time to time, the "**Secured Notes Indentures**"):

      (i)       that certain indenture dated May 21, 2019, with the Bank of New York Mellon, as trustee;

      (ii)      that certain indenture dated July 8, 2019, with the Bank of New York Mellon, as trustee; and

      (iii)     that certain indenture dated May 22, 2020, with the Bank of New York Mellon, as trustee.

94.     The Secured Notes Indentures govern the following three tranches of senior secured notes (collectively, the "**Senior Secured Notes**"):

| Notes | Principal Amount Outstanding | Rate | Maturity |
|---|---|---|---|
| 2027 Secured Notes | $750 million | 7.25% | May 2027 |
| 2028 Secured Notes | $470 million | 6.625% | January 2028 |
| 2028 Secured Notes | $400 million | 7.625% | June 2028 |
| **Total:** | **$1,620 million** | | |

95.     The Senior Secured Notes are secured by liens to the same extent as the other First Lien Obligations and are subject to the Intercreditor Agreement.

96.     <u>Senior Unsecured Notes</u>.  TES, as issuer, and certain TES subsidiaries, as guarantors,[24] are parties to the following indentures (collectively, as amended, restated, or supplemented from time to time, the "**Unsecured Notes Indentures**"):

      (i)       that certain indenture dated October 1, 2001, the Bank of New York Mellon, as trustee;

      (ii)      that certain indenture dated April 13, 2017, with the Bank of New York Mellon, as trustee;

      (iii)     that certain indenture dated August 4, 2017, with the Bank of New York Mellon, as trustee; and

      (iv)     that certain indenture dated November 29, 2017, with the Bank of New York Mellon, as trustee.

---

[24] The guarantors of the Senior Unsecured Notes do not include all of the guarantors under the Secured Debt Documents (the TES Subsidiary Guarantors, which are uniform across the First Lien Obligations).

WEIL:\98218907\32\76974.0003

97. The Unsecured Notes Indentures govern the following seven tranches of senior unsecured notes (collectively, the "**Senior Unsecured Notes**"):

| Notes | Principal Amount Outstanding | Rate | Maturity |
|---|---|---|---|
| 2022 Senior Notes | $17 million | 9.500% | July 2022 |
| 2024 Senior Notes | $24 million | 6.500% | September 2024 |
| 2025 Senior Notes | $543 million | 6.500% | June 2025 |
| 2026 Senior Notes | $607 million | 10.500% | January 2026 |
| 2027 Senior Notes | $20 million | 7.000% | October 2027 |
| 2036 Senior Notes | $119 million | 6.000% | December 2036 |
| **Total:** | **$1,330 million** | | |

98. <u>PEDFA Bonds</u>. Three series of unsecured Exempt Facilities Revenue Refunding Bonds, each of which was issued by the Pennsylvania Economic Development Financing Authority ("**PEDFA**") on behalf of TES, are currently outstanding (collectively, the "**PEDFA Bonds**"):

| Municipal Bonds | Principal Amount Outstanding | Rate | Maturity |
|---|---|---|---|
| Series A Bonds | $100 million | 6.400% | December 2038 |
| Series B Bonds | $50 million | 0.900% | December 2038 |
| Series C Bonds | $81 million | 0.900% | December 2037 |
| **Total:** | **$231 million** | | |

99. TES and PEDFA are parties to (i) that certain *Series 2009A Exempt Facilities Loan Agreement*, dated April 1, 2009, (ii) that certain *Series 2009B Exempt Facilities Loan Agreement*, dated April 1, 2009, and (iii) that certain *Series 2009C Exempt Facilities Loan Agreement*, dated April 1, 2009 (collectively, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**PEDFA Loan Agreements**"), pursuant to which PEDFA loaned the proceeds of the PEDFA Bonds to TES.[25]

100. All premium and interest obligations on the Series B Bonds and Series C Bonds are paid by MUFG Bank, Ltd. ("**MUFG**") on behalf of TES, pursuant to that certain *Letter*

---

[25] Certain TES subsidiaries are guarantors under the PEDFA Loan Agreements.

WEIL:\98218907\32\76974.0003

*of Credit Reimbursement Agreement (Series 2009B)*, dated February 3, 2021 and that certain *Letter of Credit Reimbursement Agreement (Series 2009C)*, dated February 3, 2021 (together, the "**Reimbursement Agreements**").  TES' reimbursement obligations to MUFG on account of such premium and interest obligations are backstopped by letters of credit issued under the Talen RCF.

101.    <u>ALOC Facilities</u>.  Certain of the Debtors are parties to (i) that certain *Credit Agreement*, dated as of May 4, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**CS ALOC**"), by and among TES, as borrower, the TES Subsidiary Guarantors, as guarantors, and Credit Suisse International, as lender and issuing bank and (ii) (x) that certain *Amended and Restated Credit Agreement (2019-1)*, dated as of June 21, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**GS ALOC-1**"), (y) that certain *Amended and Restated Credit Agreement (2019-2)*, dated as of June 21, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**GS ALOC-2**"), and (z) that certain *Amended and Restated Credit Agreement (2019-3)*, dated as of June 21, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**GS ALOC-3**" and together with GS ALOC-1 and GS ALOC-2, the "**GS ALOCs**," and the GS ALOCs, together with the CS ALOC, the "**ALOC Facilities**"), in each case, by and among TES, as borrower, the TES Subsidiary Guarantors, as guarantors, Goldman Sachs Mortgage Company, as issuing bank, the lenders from time to time party thereto and Goldman Sachs Mortgage Company, as administrative agent.

102.    The CS ALOC provides for an unsecured letter of credit facility in the aggregate maximum principal amount of $100 million and matures in 2023.  As of the Petition

Date, the aggregate amount of letters of credit issued under the CS ALOC is approximately $10 million, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

103.    The GS ALOCs provide collectively for unsecured letter of credit facilities in the aggregate (for all GS ALOCs) maximum principal amount up to $100 million and mature in 2022.  As of the Petition Date, there are no letters of credit issued under the GS ALOCs.

### (b)    Other Debtor Obligations

104.    <u>1L Hedging Agreements</u>.  As described in the Hedging Motion and the Hedging Declaration, Debtors TES and TEM are party to the 1L Hedging Agreements, under which TES and the TES Subsidiary Guarantors provide the counterparties with a first priority security interest in certain assets instead of posting liquid collateral.  The obligations under the 1L Hedging Agreements are secured by liens to the same extent as the other First Lien Obligations and, subject to the Intercreditor Agreement, rank *pari passu* in right of payment with the obligations under the other First Lien Obligations.  As of the Petition Date, there were $722 million of secured obligations outstanding under the 1L Hedging Agreements.

105.    <u>Inventory Facility</u>.  Certain of the Debtors are party to that certain *Product Purchase and Sale Agreement*, dated as of December 19, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Inventory Purchase Agreement**"), by and among J. Aron & Company LLC ("**J. Aron**"), TEM, and Talen Generation. Pursuant to the Inventory Purchase Agreement, TEM and Talen Generation sells and transfers title of certain coal and fuel oil inventory quantities (the "**Inventory**") to J. Aron in exchange for advanced cash consideration.  TEM and Talen Generation are subsequently required to repurchase the Inventory as needed for electric generation or at expiry of the arrangement (the "**Inventory Facility**" and the obligations thereunder the "**Inventory Facility Obligations**").  The Inventory

WEIL:\98218907\32\76974.0003

Facility Obligations are secured by back-up liens on the purchased fuel inventory as well as the collateral securing as the First Lien Obligations and are subject to the Intercreditor Agreement.  As amended by the Inventory Facility Extension (as defined below), the final repurchase obligation under the Inventory Purchase Agreement is due on May 31 2022.  As of the Petition Date, the gross collateral value as defined by the Inventory Facility Extension is $260 million, the principal outstanding on the facility is $165 million, and the remaining first lien ISDA exposure for J. Aron is $203 million, resulting in a net exposure against the collateral of -$109 million.

106.    <u>TRF Accounts Receivable Facility</u>.  One of the Debtors is party to that certain *Receivables Sale and Contribution Agreement*, dated as of December 16, 2019 (the "**RSCA**"), by and between Debtor TEM and non-Debtor TRF and that certain *Receivables Purchase Agreement*, dated as of December 16, 2019 (the "**RPA**"), by and among TRF, TEM, the purchasers party thereto, and Regions Bank ("**Regions**"), as administrative agent.  Pursuant to the RSCA and the RPA, TRF purchases retail receivables from TEM and sells such receivables to Regions, who then sells them to third-party purchasers.  In exchange, the purchasers, through Regions, paid an advance amount for the receivables to TRF (the "**TRF Accounts Receivable Facility**").  Under the RSCA and RPA, TRF collects certain retail receipts, which it then disburses to TEM or Regions for service fees, interest or principal payments on the TRF Accounts Receivable Facility, and to buy additional retail receivables.  In the event that the sale of these receivables under the RSCA and RPA is not viewed as a true sale, TRF has granted Regions a security interest in the transferred receivables, the collections, collections accounts, related security and all other rights and payments relating to the receivables and proceeds thereof.

107.    As of the Petition Date, the amount outstanding under the RPA and RSCA is $41 million.

108.     _Intercreditor Agreement_.  On June 1, 2015, TES entered into that certain _Collateral Trust and Intercreditor Agreement_ (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**")[26] with the TES Subsidiary Guarantors, the RCF Agent, the Collateral Trustee, each other first lien secured party thereto from time to time (collectively, with the RCF Agent, the Collateral Trustee, the "**First Lien Secured Parties**"), and each other person party thereto from time to time providing, among other things, for the establishment of a collateral trust to secure certain obligations under the Talen RCF, the Accordion Facility, the 2026 TLB, the Senior Secured Notes, the 1L Master Agreements, the Inventory Facility, certain cash management obligations and other hedging arrangements and first lien indebtedness from time to time (collectively, the "**Secured Debt Documents**" and the obligations thereunder, the "**First Lien Obligations**") and the relative priorities and rights in the collateral of the lenders under the Secured Debt Documents and holders of other priority lien debt (if any).

109.     Under the terms of the Intercreditor Agreement, if the Collateral Trustee (acting at the direction of certain of the RCF Lenders) desires to permit TES or the TES Subsidiary Guarantors to use cash collateral or obtain DIP Financing during a bankruptcy, then the Collateral Trustee and each of the First Lien Secured Parties agree to (a) not object to the use of cash collateral or to such DIP Financing and (b) not request or accept adequate protection or any other relief in connection with the use of such cash collateral or DIP Financing; provided that each First Lien Secured Party retains the right to object to any ancillary agreements or ancillary arrangements regarding the cash collateral or DIP Financing that are materially prejudicial to their interests (unless they are equally materially prejudicial to all First Lien Secured Parties).  _See_ Intercreditor Agreement § 6.1.  Additionally, the RCF Agent, the CAF Agent, and CAF Lenders have separately

---

[26] The Intercreditor Agreement is attached hereto as Exhibit C.

agreed, pursuant to a side letter agreement dated December 14, 2021, to not object or support any objection to any "roll-up", refinancing or further cash collateralization of letters of credit in connection with any DIP Financing.

110.   Guarantee and Collateral Agreement.  Certain of the Debtors are party to that certain *Guarantee and Collateral Agreement*, dated as of June 1, 2015 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Guarantee and Collateral Agreement**"), by and among TES, the TES Subsidiary Guarantors, and the Collateral Trustee.  Pursuant to the Guarantee and Collateral Agreement, TES and the TES Subsidiary Guarantors (other than TES with respect to its own obligations) agreed to guarantee the First Lien Obligations, and TES and the TES Subsidiary Guarantors secured the First Lien Obligations, including any guarantee thereof, by granting a first priority security interest in, and lien upon, substantially all of their assets of TES and the TES Subsidiary Guarantors, subject to customary exceptions (the "**First Lien Collateral**").  In addition to the liens and security interests granted pursuant to the Guarantee and Collateral Agreement, certain of the TES Subsidiary Guarantors granted first priority security interests to the Collateral Trustee in certain material fee owned real property located in Pennsylvania, Texas and Maryland pursuant to appropriate mortgages or similar documentation as required by the local laws of the relevant jurisdiction (such documents, the "**Mortgages**").

111.   Surety Bonds.  Surety bonds provide financial performance assurance to third parties on behalf of certain subsidiaries for obligations including, but not limited to, environmental obligations and asset retirement obligations.  In the event of nonperformance by the applicable subsidiary, the beneficiary would make a claim to the surety, and the Company would be required to reimburse any payment by the surety.  The Company's liability with respect to any

WEIL:\98218907\32\76974.0003

surety bond is released once the obligations secured by the surety bond are performed.  Surety bond providers generally have the right to request additional collateral or request that such bonds be replaced by alternate surety providers, in each case upon the occurrence of certain events.  As of the Petition Date, the aggregate amount of surety bonds outstanding was approximately $247 million, which obligations are partially collateralized by letters of credit in the approximate amount of $111.2 million and cash in the approximate amount of $104.1 million.

<p style="text-align:center">(c)      <strong>Non-Debtor Affiliate Obligations</strong></p>

112.    <u>Orion Facility</u>.   Certain non-Debtor affiliates are parties to that certain *Credit Agreement*, dated as of September 20, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Orion Facility**"), by and among Cumulus Digital, as borrower, Cumulus Digital Holdings LLC, as Holdings, the subsidiaries of Cumulus Digital party thereto, as guarantors, the lenders from time to time party thereto, and Orion Energy Partners Investment Agent, LLC, as administrative agent and collateral agent.  The Orion Facility provides for a senior secured term loan facility in the aggregate maximum committed principal amount of $125 million, together an up to $50 million incremental credit facility, which may be accessed subject to satisfaction of certain terms and conditions.  The Orion Facility matures in 2027 and bears interest at a rate of 12.50%.  Up to 2.50% per annum of any interest payments required at the end of each of the first four fiscal quarters after the closing date of the Orion Facility may be paid in kind.

113.    A bankruptcy filing of certain Debtors who are parties to certain agreements material to the Orion-Cumulus Project (each a "**Project Counterparty**"), may trigger an event of default under the Orion Facility, but only in the event that the Project Counterparty has also stopped performing its material obligations under such agreement.  Under the Orion Facility, TES

is obligated to procure letters of credit to backstop Cumulus Digital's obligations under the Orion Facility, and has procured two such letters of credit totaling $50 million in the aggregate. Additionally, TEC has signed a limited guaranty to cover certain shortfalls in interest payments and principal payments.

114.    The obligations under the Orion Facility are secured by first priority liens and security interests in substantially all the assets of non-debtors Cumulus Digital LLC, Cumulus Digital Holdings LLC, Cumulus Data Holdings LLC, Cumulus Data LLC, Cumulus Coin Holdings LLC, and Cumulus Coin LLC.  As of the Petition Date, the aggregate amount outstanding under the Orion Facility is approximately $86 million, plus any unpaid interest, fees, premiums, or other amounts due thereunder, and additional draws are available if certain conditions are satisfied.

115.    LMBE-MC Credit and Guaranty Agreement.  Certain non-Debtor affiliates are parties to that certain *Credit and Guaranty Agreement*, dated as of December 3, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**LMBE-MC Credit and Guaranty Agreement**"), by and among LMBE-MC HoldCo II LLC, as borrower, LMBE-MC HoldCo I LLC, as Holdings, MC Project Company, LLC and LMBE Project Company LLC, as subsidiary guarantors, the lenders from time to time party thereto, MUFG Bank, Ltd., as administrative agent, and MUFG Union Bank, N.A., as initial issuing bank.  The LMBE-MC Credit and Guaranty Agreement provides for a term loan facility in the aggregate principal amount of $450 million (the "**LMBE-MC 2025 TLB**") and a revolving loan facility in the aggregate maximum committed principal amount of $25 million (including any letters-of-credit issued thereunder) (the "**LMBE-MC RCF**").

116.    The LMBE-MC 2025 TLB matures in 2025 and the LMBE-MC RCF matures in 2023; each bears interest at a variable rate of the LIBO rate plus 4.00%.  Obligations

WEIL:\98218907\32\76974.0003

under the LMBE-MC Credit and Guaranty Agreement are secured by first-priority liens and security interests in substantially all the assets of non-debtors LMBE-MC HC and each of its subsidiaries.

117.    As of the Petition Date, there are no amounts outstanding under the LMBE-MC RCF and the aggregate amount outstanding under the LMBE-MC 2025 TLB is approximately $332 million, plus any unpaid interest, fees, premiums, or other amounts due thereunder.  The LMBE-MC Credit and Guaranty Agreement is nonrecourse to TES or any other TES or Cumulus subsidiaries.

118.    Pursuant to the LMBE-MC Credit and Guaranty Agreement, when LMBE-MC's principal debt under the agreement is less than or equal to a certain target balance, 50% of the LMBE-MC excess cash flow is eligible to be distributed to Main Operating Account as a dividend to TES and the other 50% must be used to pay down principal.  Over the past two years, LMBE-MC has made quarterly dividends to TES in amounts ranging between $1.45 million and $13.6 million.

119.    TEM and LMBE-MC HoldCo II LLC are parties to that certain International Swap and Derivatives Association, Inc. Master Agreement dated December 3, 2018 (the "**LMBE-MC ISDA**"), which is secured by first priority liens under the LMBE-MC Credit and Guaranty Agreement.  TEM and LMBE-MC periodically settle any hedge receipts or disbursements.  As of the Petition Date, LMBE-MC HoldCo II LLC owes TEM approximately $9.2 million under the LMBE-MC ISDA.

### III.    Key Events Leading to Chapter 11

120.    The Debtors proactively took a number of steps prior to filing these chapter 11 cases in an effort to bolster and preserve liquidity, address near-term debt payments, and maximize value for stakeholders.  Ultimately, however, the Debtors' hedge book remained

49

relatively open after the fourth quarter of 2021, leaving it exposed to volatility in power prices, and lower realized prices from December 2021 to March 2022 have resulted in the Debtors' inability to meet certain near-term debt maturities and service payments, forcing the Debtors to commence these chapter 11 cases.

## A.    Challenges Facing Debtors' Business

121.    Many of the Debtors' financial challenges mirror those in the downturn of power sector generally.  As described in Section I above, prior to 2021, market energy prices (and thus profitability) were declining due to (i) flat demand, (ii) new supply, and (iii) falling natural gas prices.  In response to these market challenges, over the last five years, the Debtors have worked to make their existing business more efficient.  In particular, since 2016, the management team has delivered $500 million of annual cost reductions: Talen reduced (i) its general and administrative expenses by 50%, (ii) its operating and maintenance expenses by 25%, and (iii) its capital expenditures by 60%.  Additionally, as described above, through the Debtors' investment in Cumulus and the Talen Transition Strategy, Talen is developing a renewable power generation and sustainable coin mining platform to complement their existing conventional power generation facilities.

122.    However, unpredictable and unlikely weather patterns and commodity/fuel pricing have proved to be a strong headwind for the Debtors: for example, in February 2021, winter storm Uri caused a $78 million loss from ERCOT commercial activities, and, as illustrated in Figure 2 above, in July 2021, natural gas prices began an unprecedented rise.  The price rebound in the market uplifted forward energy margin and strengthened the Debtors' forecasted 2022 Adjusted EBITDA, but also drove elevated levels of collateral and working capital requirements from commodity exchanges.

WEIL:\98218907\32\76974.0003

123.    The Exchange Traded Hedges for 2022 on a mark-to-market basis—which were primarily entered into during lower pricing environments—had declined in value.  Given the elevated contract value, the Debtors' existing hedge positions, and market volatility, cash collateral postings under the Exchange Traded Hedges reached as much $451 million in October 2021.

124.    In November, based on the then-projected forward power prices, the Debtors anticipated that the liquidity squeeze would be reversed in early 2022—the majority of the posted collateral would be released as the Debtors captured the projected favorable high prices with their actual sales of energy in 2022 onwards.  However, before the Debtors could access such renewed liquidity, they had a number of near-term cash requirements, including the maturity of $114 million of the 2021 Notes in December.

125.    Thus, with these liquidity constraints rendering them likely unable to redeem the 2021 Notes or post additional collateral under the Exchange Traded Hedges, the Debtors refocused their financing efforts.

**B.      Prepetition Strategic Efforts**

126.    Prior to filing these chapter 11 cases, the Debtors attempted to address their capital structure and liquidity needs without a comprehensive in-court restructuring.  In 2021, the Debtors retained Weil, as counsel, Evercore, as investment banker, and A&M, as financial advisor, to explore strategic alternatives and assist them in developing and implementing a comprehensive plan to access additional financing.

127.    In the period leading to the Petition Date, the Debtors took numerous steps to rationalize their business, reduce discretionary capital expenditure, and employ other strategies to preserve liquidity.  Specifically, in November 2021, the Debtors exited collateral intensive Exchange Traded Hedges while prioritizing trades under the Bilateral Hedges, in addition to

WEIL:\98218907\32\76974.0003

aligning timing of discretionary letters of credit postings.  As a result, the Debtors' commercial position provided ability to participate in anticipated market upside with lessened risk of material collateral calls.  These actions improved near term liquidity in excess of $100 million and sustained liquidity up to the December 15th payment on the 2021 Notes.

128.    On October 20, 2021, the Debtors, through their investment banker, Evercore, began soliciting offers for a first-lien commodity accordion facility and/or a second lien loan or note.  To ensure the widest net was cast in terms of potential available financings, the Debtors did not restrict the form of financing they were willing to explore with bona fide parties participating in the process, provided that their proposal was feasible under the Debtors' existing credit agreements and provided sufficient incremental liquidity to allow the 2021-22 winter prices to pay out.  These actions and steps included:

- Soliciting proposals for financing alternatives from approximately 32 potential financing parties both inside and outside of the Debtors' existing capital structure;

- Executing non-disclosure agreements with 25 parties;

- Receiving term sheets from 10 parties; and

- Negotiating three commodity accordion proposals involving six parties.

129.    Certain of the financings pursued by the Debtors did not by their terms require the consent of the RCF Lenders—for example, certain first lien and second lien financings—however, due to a potential senior-secured leverage ratio ("**SSLR**") covenant default, the RCF Lenders had an effective veto over the Debtors' financing process.  Accordingly, throughout the process, the Debtors provided frequent status updates to certain of the RCF Lenders, the RCF Agent, and their advisors, providing detail and reports on the status of the financing and summaries of the proposals received.

WEIL:\98218907\32\76974.0003

130.     As the due date for the Debtors' third quarter financial reporting and earnings call approached, in early November 2021, the Debtors approached the RCF Lenders seeking a waiver of, among other things, a SSLR covenant default.  The purpose of the waiver was to provide additional time for negotiations on potential financing transactions to develop.  In November 2021, the Company entered into two waivers[27] with consenting lenders under the Talen RCF (collectively, the "**Waiving Lenders**").  As part of the Waiving Lenders' agreement to waive exercising their contractual rights with respect to these defaults under the Talen RCF, the Waiving Lenders and the Company agreed to certain milestones, including with respect to contingency planning and debtor in possession financing.

131.     As a result of the competitive financing process, the Debtors received four proposals from seven entities or syndicates, including proposals for a super senior secured loan, first lien commodity accordion facility and/or a second lien loan or note.  Of those, the Debtors determined that the only actionable offer was the one proposing first lien financing, and the Debtors then pivoted to negotiate in earnest to negotiate the terms of the commitment letter for the proposal.

132.     In December 2021, the Debtors ultimately entered into the Accordion Facility, the proceeds of which were used as cash collateral for hedge positions and repayment of the Talen RCF funded amount.  With the Accordion Facility in place, the Debtors made the 2021 Notes payment and, based on the then-projected forward prices, the Debtors expected to have adequate liquidity until at least mid-2022.  During that time, the Debtors planned to advance ongoing efforts to raise third party capital to fund Cumulus (thereby enhancing the value of TES'

---

[27] The Company entered into that certain *Limited Waiver and Amendment No. 5 to Credit Agreement* on November 19, 2021 and that certain *Limited Waiver and Amendment No. 6 to Credit Agreement* on November 30, 2021 (together, the "**Waivers**").

economic stakes in Cumulus) and negotiate a consensual recapitalization transaction with creditors at TES.

133. Unfortunately, as described in <u>Section I</u> above, temperatures in the markets in which the Debtors operate remained mild through the winter months, real-time and future power prices were generally lower than expected, and the Company was unable to realize the previously forecasted revenue.  With its runway shortened, the Company worked diligently to complete its business plan and begin engagement with organized groups of its creditors.

134. Thus, due to its deteriorating liquidity position and certain upcoming cash requirements, including the maturity of the Inventory Facility on March 31, 2022, the Debtors determined that a chapter 11 filing was necessary.  However, the Debtors concluded that it was also necessary to postpone a filing until early May, so that they could continue engaging with their creditors on a potential restructuring and so that they could complete the annual, planned refueling outage of the Nuclear Plant.  Thus, it became necessary for the Debtors to seek an extension of the maturity date under the Inventory Facility.  On March 31, 2022, the Debtors entered into the *Omnibus Amendment Agreement to Product Purchase and Sale Agreement, ISDA Master Agreement and Fee Letter* (the "**Inventory Facility Extension**") with J. Aron, pursuant to which the maturity date of the Inventory Facility was extended to May 15, 2022 with a further extension to May 31, 2022 if certain bankruptcy related milestones were met.

(a)    **Restructuring Support Agreement and Restructuring Term Sheet**

135. Over the past several months, certain of the Company's creditors have organized, including: (i) the Secured Lender Group, (ii) the Crossholder Group, and (iii) the Unsecured Notes Group.  The Company and its Advisors have been working with the Ad Hoc Groups' advisors to respond to diligence requests and educate them on the Company, its business

plan, and on ultimately a potential restructuring framework.  To date, the Company has provided over 1,800 documents in a virtual data room and provided access to ten advisor groups representing the creditors.

136.     In April 2022, certain members of the Ad Hoc Groups executed the Creditor NDAs with the Company.  Pursuant to the Creditor NDAs, the Company provided holders in each group with certain MNPI to assist them in evaluating and negotiating the terms of a potential restructuring transaction with the Company.  The Creditor NDAs provide that the Company will make such MNPI public by the earlier of May 31, 2022 and certain other trigger events, including the commencement of chapter 11 cases by the Company.  During the month of April and the first week of May, the Company held numerous separate in-person meetings in New York attended by creditors and advisors representing the Secured Creditor Group, the Crossholder Group, and the Unsecured Notes Group to discuss, among other things, the Company's recent and project financial performance, a restructuring proposal, and proposed DIP Financing.

137.     Restructuring Support Agreement and Restructuring Term Sheet.  On eve of filing these chapter 11 cases and after extensive negotiations, the Debtors reached an agreement with the Unsecured Notes Group on the Restructuring Term Sheet and the Restructuring Support Agreement.  Pursuant to the Restructuring Support Agreement, the Debtors and the Unsecured Notes Group have agreed to support the transactions set forth in the Restructuring Term Sheet.  The Restructuring Term Sheet provides for an up to $1.65 billion rights offering, the Rights Offering, that would provide for the payment of secured claims in full, backstopped by certain members of the Unsecured Notes Group pursuant to the Backstop Commitment Letter.

WEIL:\98218907\32\76974.0003

(b)     **Postpetition Hedging Agreements**

138.     As previously described, the Debtors are currently under-hedged, in part because the Debtors exited many of their Exchange Traded Hedges due to the liquidity constraints described herein.  In preparation for a potential chapter 11 filing, the Company has also entered into certain amended ISDA agreements and new ISDA agreements with certain existing hedge counterparties and third-parties (collectively, the "**Postpetition Hedging Agreements**").  The Postpetition Hedging Agreements will allow the Company to continue entering hedge trades throughout the chapter 11 cases, and are structured to incentivize existing hedge counterparties to enter trades with the Company postpetition.  Specifically, the Postpetition Hedging Agreements will allow the Debtors to enter into hedge trades immediately as of the Petition Date and throughout these chapter 11 cases in order to lock in the high forward power prices for the balance of 2022 and the winter of 2023 (i.e. a critical activity to maximize the value of the Debtors).

(c)     **DIP Financing**

139.     The Debtors, through Evercore, solicited offers for debtor-in-possession financing from 33 parties, including: (i) a steerco group of the Debtors' existing RCF Lenders led by the Citi (the "**Steerco Group**"), four of the other existing RCF Lenders outside of the Steerco Group, other lenders within the Debtors' existing capital structure, and alternative lenders outside of the capital structure.  The Debtors signed non-disclosure agreements with 23 parties and received seven initial proposals.  The Debtors, through Evercore, then engaged in good-faith negotiations with each of the potential counterparties, providing feedback through multiple rounds of negotiation and drafts of term sheets.

140.     The Debtors were able to use elements from the various proposals to foster competitive tension and drive the negotiations to an outcome that provided the Debtors with an

optimal structure and facility that met their primary objectives. The Debtors ultimately determined that the best path forward would be a financing structure that combined the most favorable features from several of the proposals, led by members of the Steerco Group and other existing RCF Lenders. The process was rigorous, marked by hard bargaining, and resulted in significant lender concessions and additional benefits to the Debtors. The Debtors were able to secure DIP Financing in the form of a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of $1.758 billion, the DIP Facility, to be provided by the DIP Lenders. The Debtors and the DIP Lenders have negotiated final form credit agreements with respect to the DIP Facility which are attached to the DIP Motion as Exhibit 1 and Exhibit 2. Thus, with the Outage completed, the Debtors having exhausted all possible out-of-court alternatives, and DIP Financing secured, the Debtors filed these chapter 11 cases.

## IV.     The First Day Motions

141.     The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession. I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in the success of these chapter 11 cases, and best serves the Debtors' estates and creditors' interests. The facts set forth in each First Day Motion are incorporated herein by reference. Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions. Below is an overview of each of the First Day Motions.

**A.     Joint Administration Motion**

142.     Pursuant to the *Emergency Motion of Debtors Pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1 for Order Directing Joint Administration of Chapter*

*11 Cases* filed concurrently herewith, the Debtors request entry of an order directing consolidation of these chapter 11 cases for procedural purposes only.  The Debtors are all under common ownership under Talen Energy Supply, LLC.  I believe joint administration of the Debtors' chapter 11 cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.  Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") and other parties in interest would similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

143.    I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes.  It does not seek substantive consolidation of the Debtors' estates.  Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**B.      Cash Management Motion**

144.    Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue their Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, (C) Continue Intercompany Transactions, and (D) Continue Utilizing Employee Credit Cards and BIP/SIP Programs; and (II) Granting Related Relief* filed contemporaneously herewith (the "**Cash Management Motion**"), the Debtors request authority to: (i) continue participating in the Debtors' existing cash management system (the "**Cash Management System**"), including, without limitation, to continue to maintain the Debtors' existing bank accounts and business forms; (ii) implement

changes to the Cash Management System in the ordinary course of business insofar as such changes relate to the Debtors' participation in or control of the Cash Management System, including, without limitation, opening new or closing existing bank accounts owned by the Debtors; (iii) continue utilizing Corporate Credit Cards and the BIP/SIP Programs (as defined below) and pay all obligations related thereto; (iv) continue to perform under and honor intercompany transactions in the ordinary course of business, and make certain payments on behalf of certain non-debtor affiliates; (v) provide administrative expense priority for postpetition intercompany claims against the Debtors; and (vi) honor and pay all prepetition and postpetition Bank Fees (as defined below) payable by the Debtors.  The Debtors are also requesting that the Court authorize the Banks to continue to charge bank fees, if any, and to charge back returned items to the bank accounts, whether such items are dated before, on, or after the commencement of these chapter 11 cases.

145.    As described more fully in the Cash Management Motion, in the ordinary course of their business, the Debtors have historically used the Cash Management System to collect receipts and to fund their operations, as well as the operations of certain non-debtor affiliates.  It is my understanding that the Cash Management System is tailored to meet the Debtors' needs as a competitive power generation company.  The Cash Management System allows the Debtors to efficiently collect and transfer the cash generated by their business and pay their financial and other obligations.  It also enables the Debtors to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the Debtors' approximately 30 bank accounts (together with any other bank accounts the Debtors may open in the ordinary course of their business, the "**Bank Accounts**") owned by the Debtors and maintained with multiple banks (each a "**Bank**" and collectively, the "**Banks**").

WEIL:\98218907\32\76974.0003

146.     It is my understanding that the Debtors' primary Cash Management Bank is MUFG Union Bank, N.A. ("**Union Bank**"), where the Debtors maintains 15 of the 30 Bank Accounts.  The Debtors also maintain Bank Accounts with 12 Cash Management Banks other than Union Bank, as listed on Schedule 1 annexed to the Cash Management Motion.

147.     As described more fully in the Cash Management Motion, the Debtors engage in intercompany transactions with each other and with certain of their Non-Debtor Affiliates in the ordinary course of their business (collectively, the "**Intercompany Transactions**" and each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "**Intercompany Claim**").  The Intercompany Transactions include power sale and energy management arrangements, financial derivative contracts, intercompany loans, payroll processing, vendor payments, and various other intercompany transfers.  For example, TES receives receipts through the Main Operating Account for the wholesale sale of electricity on behalf of TES subsidiaries and then makes payments to third-parties on behalf of those subsidiaries, creating intercompany balances among the Debtors (or Non-Debtor Affiliates). Certain of these Intercompany Transactions are described below.

148.     TEM.  As discussed in more detail above, TEM is party to most of the Company's contracts, including its energy sale, fuel purchase, and hedging contracts.  Electricity is produced by the generation facilities held by TES subsidiaries (*e.g.*, Talen Montana, Susquehanna Nuclear, Talen Texas, and Non-Debtor Affiliate LMBE-MC), and TEM enters into contracts on behalf of those affiliate entities for, among other things, the sale of electricity or the purchase of fuel for their generation operations in the ordinary course of business.  These transactions are recorded as intercompany transfers on those entities' books and records.

149.    Pursuant to the RSCA and RPA, TRF purchases retail receivables from TEM and sells such receivables to Regions, who then sells them to third-party purchasers.  In exchange, the purchasers, through Regions, paid an advance amount for the receivables to TRF.  Under the RSCA and RPA, TRF collects certain retail receipts in an account held by it (the "**TRF Retail Account**"), which it then disburses to TEM or Regions for service fees, interest or principal payments on the TRF Accounts Receivable Facility, and to buy additional retail receivables.  TRF has granted Regions a security interest in the TRF Retail Account.

150.    <u>Talen Montana</u>.  Talen Montana and Colstrip are funded from cash received from the wholesale sale of electricity, loans from the TEM/Montana Revolver, and reimbursements from the co-owners of Talen Montana.  As described above, the Main Operating Account collects receipts on behalf of Talen Montana, which are then transferred to the Talen Montana Operating Account once a month.  These receipts are then primarily used to (i) directly pay Talen Montana's vendors and (ii) distribute funds to the Payroll Account and T&G Account.  In 2018, TEM and Talen Montana entered into the TEM/Montana Revolver, pursuant to which TEM provides revolving loans to Talen Montana to pay the expenses of Talen Montana's power generation operations.  The Main Operating Account funds the TEM Revolver Account, which then distributes loan funds to the Talen Montana Operating Account.  The Talen Montana Operating Account makes repayments of the loans to the TEM Revolver Account, which are then disbursed to the Main Operating Account.  Additionally, as described in more detail in the Omohundro Declaration and the Vendor Motion, the co-owners of Talen Montana reimburse or prepay their proportional share of obligations incurred in connection with the operation of the Colstrip Plant to Talen Montana.

WEIL:\98218907\32\76974.0003

151.   <u>LMBE-MC</u>.   As described above, receipts for sales of electricity produced by the generation facilities of LMBE-MC are received by the Main Operating Account.  LMBE-MC's share of the receipts net of operating expenses paid by the Main Operating Account on behalf of LMBE-MC are then transferred to an operating account held by LMBE-MC on or around the 15th and 30th of each month and used to fund its operations and make payments on its secured-debt obligations, specifically the LMBE-MC Credit and Guaranty Agreement (as defined in the Omohundro Declaration), by and among LMBE-MC HoldCo II LLC, as borrower, LMBE-MC HoldCo I LLC, as Holdings, MC Project Company, LLC and LMBE Project Company LLC, as subsidiary guarantors, the lenders from time to time party thereto, MUFG Bank, Ltd., as administrative agent, and Union Bank, as initial issuing bank.  The LMBE-MC Credit and Guaranty Agreement provides for a term loan facility in the aggregate principal amount of $450 million and a revolving loan facility in the aggregate maximum committed principal amount of $25 million.  As of the Petition Date, the aggregate amount outstanding under the LMBE-MC Credit and Guaranty Agreement is approximately $332 million, plus any unpaid interest, fees, premiums, or other amounts due thereunder.  Pursuant to the LMBE-MC Credit and Guaranty Agreement, when LMBE-MC's principal debt under the agreement is less than or equal to a certain target balance, 50% of the LMBE-MC excess cash flow is eligible to be distributed to Main Operating Account as a dividend to TES and the other 50% must be used to pay down principal. Over the past two years, LMBE-MC has made quarterly dividends to TES in amounts ranging between $1.45 million and $13.6 million.

152.   As further described in the Hedging Motion, the Debtors have historically entered into derivative contracts to hedge the Debtors' exposure to risks, including intercompany derivative contracts.  For example, TEM and LMBE-MC HoldCo II LLC are parties to that certain

International Swap and Derivatives Association, Inc. Master Agreement dated December 3, 2018 (the "**LMBE-MC ISDA**"), which is secured by first priority liens under the LMBE-MC Credit and Guaranty Agreement (as defined in the Omohundro Declaration).  TEM and LMBE-MC settle any hedge receipts or disbursements on the 30th of each month.  As of the Petition Date, LMBE-MC HoldCo II LLC owes TEM approximately $9.2 million under the LMBE-MC ISDA.

153.    _Cumulus Project_.  As described further above, the Debtors own voting convertible preferred equity interests in certain subsidiaries of Cumulus Growth, which provide the Debtors with an equity participation in the ongoing development of the Company's new digital infrastructure and renewables platform (the "**Cumulus Project**").  Certain aspects of the Cumulus Project, including payments related to the development of a renewable energy and battery storage pipeline and certain bitcoin mining projects, are paid by Non-Debtor Affiliate Bank Accounts, which are funded by Debtor Bank Accounts (e.g., the Main Operating Account and the Talen Growth Account).  On a periodic basis, the independent directors of the TES Board authorize fund transfers by the Debtor Bank Accounts to Non-Debtor Affiliate Cumulus entities.  In exchange for these funds, the Debtors receive additional preferred equity in the Cumulus entities.  These transfers are reflected as investments in the Books and Records of the Debtors and do not create claims between the Debtors and the Non-Debtor Affiliate Cumulus entities.

154.    At any given time, as a result of the Intercompany Transactions (except for the Intercompany Transactions related to the Cumulus Project), there may be claims owing by one Debtor to another Debtor or Non-Debtor Affiliate, and vice versa.  The Debtors intend to continue undertaking such transactions on account of obligations arising on a postpetition basis as between Debtors and both other Debtors and their Non-Debtor Affiliates in the ordinary course.  The Debtors maintain, and will continue to maintain, records of these transfers of cash and

WEIL:\98218907\32\76974.0003

bookkeeping entries on a postpetition basis, and can ascertain, trace, and account for the Intercompany Transactions on demand.  In certain instances, Intercompany Transactions between the Debtors and between Debtors and Non-Debtor Affiliates are "netted" to allocate outstanding amounts due and owing at the Debtors' discretion.

155.    In the ordinary course business, the Debtors maintain employee issued company-paid credit cards (the "**Employee Credit Cards**").  The Employee Credit Cards are issued by Union Bank and American Express (the "**Credit Card Providers**").  In general, the Employee Credit Cards are used by certain of the Debtors' executives and employees for various travel expenses and other incidentals including, but not limited to, airfare, hotel, business meals, vehicle maintenance, and other required business expenses.  As of the Petition Date, there were approximately 700 issued and active Employee Credit Cards.

156.    The Debtors estimate that they incur total liabilities of approximately $540,000 per month on account of the Employee Credit Cards.  The Debtors seek authority to pay any prepetition amounts due and owing under the Employee Credit Cards and to continue to make payments on a postpetition basis in the ordinary course of business.  As of the Petition Date, the Debtors estimate that they owe approximately $600,000 on account of the Employee Credit Cards.

157.    In the ordinary course of business, the Debtors maintain e-payor programs through Union Bank whereby certain of the Company's vendors opt-in to receive payments when amounts due reach a certain balance (a supplier-initiated payment) or beyond the Company's normal billing cycle (a buyer-initiated payment) (the "**BIP/SIP Programs**").  The Debtors estimate that they incur total liabilities of approximately $1.5 million per month on account of the BIP/SIP Programs.  The Debtors seek authority to pay prepetition amounts due and owing under the BIP/SIP Programs, subject to entry of an order by the Court's approval of the payment of

prepetition vendor claims pursuant to the Vendor Motion, and to continue to make payments on a postpetition basis in the ordinary course of business.

158.     In the ordinary course of business, the Debtors maintain e-payable programs through Union Bank whereby certain of the Company's vendors opt-in to receive payments when amounts due reach a certain balance (a supplier-initiated payment) or beyond the Company's normal billing cycle (a buyer-initiated payment) (the "**BIP/SIP Programs**").  This program handles a large universe of vendors with relatively de minimis average spend, thus allowing the Debtors to efficiently process payments to these vendors through this program.  The Debtors estimate that they incur total liabilities of approximately $1.5 million per month on account of the BIP/SIP Programs.

159.     The arrangements under Employee Credit Cards issued by Union Bank and the BIP/SIP Programs are set forth in that certain *Commercial Card Agreement*, dated February 3, 2016, between TES and Union Bank (as amended, modified, supplemented or restated from time to time, the "**Commercial Card Agreement**").  Pursuant to that certain *Cash Collateral Agreement*, dated as of December 14, 2021, between TES and Union Bank (the "**Cash Collateral Agreement**"), the obligations of the Debtors under the Commercial Card Agreement are secured by, among other things, a pledge of cash collateral by TES to Union Bank in the amount of $3 million (the "**Cash Collateral**").

160.     I am advised by the Debtors' attorneys that the Bank Accounts are required to comply with section 345(b) of the Bankruptcy Code unless the Court orders otherwise for "cause."  Seventeen of the Debtors' 30 Bank Accounts are maintained with authorized depositories under the Operating Guidelines and Reporting Requirements for Debtors in Possession and

Trustees (the "**UST Operating Guidelines**") published by the Office of the United States Trustee for Region 7.

161.    The Debtors are further requesting that the Court authorize the Banks to receive, process, honor, and pay, at the Debtors' direction and to the extent of funds on deposit, any and all checks drawn or electronic funds transfers requested or to be requested by the Debtors relating to the relief sought in the First Day Motions. Without the ability to transfer funds through banks and financial institutions, the Debtors will not be able to operate or reorganize.

162.    I believe that any disruption to the Debtors' Cash Management System would have a severe and adverse impact upon the Debtors' reorganization efforts. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and all parties in interest and should be granted.

## C.    Vendor Motion

163.    Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Lien Claims, (C) 503(B)(9) Claims, and (D) Co-Ownership Obligations; and (II) Granting Related Relief* filed contemporaneously herewith (the "**Vendor Motion**"), the Debtors are requesting (i) authority, but not direction, to pay in the ordinary course of business, in their sole discretion and based on their sound business judgment, prepetition amounts owed to (a) Critical Vendors (as defined below), (b) Lien Claimants (as defined below), (c) certain vendors that have delivered goods to the Debtors in the ordinary course of business within twenty (20) days before the Petition Date and whose prepetition claims are thus entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claimants**"), and (d) vendors to whom

the Debtors have incurred Co-Ownership Obligations (as defined below) (each such vendor, together with the Critical Vendors, the Lien Claimants, and the 503(b)(9) Claimants, the "**Vendors**" and, the Vendors' prepetition claims, the "**Vendor Claims**") and (ii) related relief.

164.     As described in this Declaration, the Taxes & Regulatory Motion, and the Vendor Motion, the Debtors' Energy Plants operate within a highly regulated environments.

165.     I understand that, the Debtors' wide-ranging business enterprise incorporates significant technological and operational diversity through their nuclear, natural gas, fuel, and coal power-generation facilities.  Many of these facilities operate independently and rely on certain highly specialized vendors with an in-depth understanding of those aspects of the particular site that they service or vendors that are sole-source providers of goods and services critical to the Debtors' operations.  Given the diversity of the Debtors' power generation sources, I understand that they often rely on vendors with various areas of expertise for necessary goods and services as between the various plants and production facilities that they operate.  In addition, I understand that many of these vendors possess intrinsic knowledge of the Debtors' production facilities given longstanding histories of their collaborative involvement with the plants they supply or service.

166.     Given the highly regulated nature of the Debtors' business, many of these specialized vendors require unique authorizations, permits, training, and skills sets that enable them to provide the Debtors with the specialized goods or services they require in compliance with applicable standards and regulations.  I understand that, in many instances, replacement of vendors in possession of the requisite regulatory approvals necessary to maintain the Debtors' compliance with such laws and regulations is not feasible, or may be impractical in a shortened period of time.  For example, only vendors that are authorized for on-site nuclear access and possess the pre-

requisites to handle potentially hazardous and radioactive materials may be sourced for the Susquehanna Nuclear Plant. In addition, operation of nuclear power plants in the United States (like the Debtors') relies on single-source fabricators for nuclear fuel rods given the extraordinary setup cost and lengthy design process required to ensure the nuclear fuel rods are fabricated to meet the specific requirements of a particular nuclear reactor. This costly and time-consuming approval process and the extraordinary setup costs and lengthy design process for nuclear fuel constricts the Debtors' ability to source secondary suppliers.

167.    Moreover, and as further described herein and in the Vendor Motion, the Debtors' already significant reliance on vendors increases materially during planned outages at their generation facilities. The Debtors completed one such annual outage at the Nuclear Plant just prior to the Petition Date (the "**Outage**"). During the Outage, Susquehanna Nuclear's full-time workforce of approximately 900 employees was supplemented by an additional 1,200-1,500 independent contractors, temporary employees, and vendors, all of whom were on site during the month-long Outage, working around the clock, in a coordinated and time-sensitive fashion, to shut down and restore one of the plant's two reactors. The vendors, many of whom have undergone extensive training and have developed a comprehensive understanding of the Debtors' nuclear reactors, played vital roles in opening the reactor for refueling, relocating the fuel rods from the reactor to the on-site spent nuclear fuel pool, installing new fuel rods, inspecting each and every step of the process, and performing a number of related ancillary tasks necessary to support the safe and successful completion of the Outage.

168.    Further, while the Outage at Susquehanna is the most significant of the Debtors' planned outages, the Debtors also have seven additional planned outages ongoing as of the Petition Date across coal and natural gas plants. Like the Outage at Susquehanna, these outages

require coordinated efforts among the Debtors' employees and vendors to perform vital maintenance at these plants as the Debtors' prepare to enter the summer generation season.

169.    Accordingly, I believe that any disruption in the supply of these Critical Vendors' goods or services would jeopardize the Debtors' ability to generate power or maintain compliance with their regulatory requirements, as I believe that many of these Critical Vendors cannot be replaced and without them the Debtors would suffer insurmountable operational, regulatory, and financial challenges.

170.    As further described in the Vendor Motion, to continue meeting their power generation commitments in the ordinary course, I understand the Debtors, with the assistance of their Advisors, have identified the universe and type of vendors they deem to be critical to their ongoing operations.  I understand the Debtors have spent considerable time and effort leading up to the Petition Date analyzing and reviewing, among other things, the Debtors' operational requirements, accounts payable systems, historical vendor usage, and vendor and service provider lists to identify those parties that are critical to the Debtors' operations.  As further described in the Vendor Motion, the general types of Vendor that the Debtors request authority to pay are (i) Fuel and Fuel Support Vendors, (ii) Specialized Services Providers, and (iii) Environmental & Regulatory Vendors (each as defined below and further described in the Vendor Motion).

171.    As further described in the Vendor Motion, the Debtors rely on various fuel sources critical to their ability to generate power at each of their power generation facilities, including nuclear, coal, natural gas, and oil inputs.  Accordingly, each of the Debtors' power plants maintains a complex fuel procurement and related services network that is vital to such plant's ability to successfully meet power output demand along with its consumer and regulatory requirements (all such Critical Vendors, the "**Fuel and Fuel Support Vendors**").  As described

WEIL:\98218907\32\76974.0003

below, certain of the Fuel and Fuel Support Vendors are sole-source providers for the fuel and related services the Debtors rely on, either due to specific regulatory authorizations, patented technology, product specifications unique to the Debtors' operations, limited supplies in light of current global supply chain issues, or otherwise.  In other cases, alternative vendors simply cannot supply or transport the required fuel in sufficient quantity, quality, or reliability, or they are unable to supply the required fuel on a cost-efficient and timely basis in the appropriate geographic areas. If one or more of the Debtors were unable to obtain the required fuel, or access the required fuel support services, certain of the Debtors and the plants that such Debtors operate would suffer severe disruption, jeopardizing their ability to safely provide power and energy without interruption.

172.    As further described in the Vendor Motion, power generation at each of the Debtors' power plants involves highly complex and technical operations that require a variety of specialized vendors to provide a wide range of critical services, ranging from maintaining electrical and technological infrastructure to highly specialized repair and maintenance, as well as engineering and security services vital to the oversight and operation of the Debtors' facilities (the "**Specialized Service Providers**").  Due to the specialized and often hazardous nature of the highly regulated businesses in which the Debtors operate, most of these essential services can only be obtained from Specialized Service Providers with unique safety training or governmental and regulatory permits or approvals given that many such vendors are operating on site at the Debtors facilities, working with high-voltage electricity, high-pressure gas, high-speed rotation motors, and potentially hazardous and dangerous substances which are commonplace at the Debtors' power plants.  Further, many of these Specialized Service Providers need to possess the requisite safety and training authorizations or regulatory approvals required simply to enter certain of the Debtors'

WEIL:\98218907\32\76974.0003

facilities or to begin working on an applicable project for the Debtors.  These approval processes can take considerable amounts of time and decisions relating thereto are often outside of the Debtors' control.  For example, it can take a potential vendor several weeks to complete the requisite background checks required for acquisition of necessary security clearances, whereas replacement of certain approved vendors to the Susquehanna Nuclear Plant (such as the vendor procured for the maintenance of the reactor floor during the Outage) can potentially take several months and may require the approval of a number of federal regulatory agencies.  In other cases, the Specialized Service Providers have experiential knowledge about the Debtors' business operations and the specific power plants that they service, which, in many cases, has been developed over the course of the Specialized Service Provider's longstanding relationship with the Debtors such that these vendors cannot be readily replaced (if at all).

173.    Given the nature of the Debtors' businesses and the applicable public interest therein, the Debtors are subject to a high degree of governmental and regulatory oversight from a variety of regulatory bodies, including, without limitation, the NRC, FERC, ERCOT, the Pennsylvania Public Utility Commission, the Public Utility Commission of Texas, the United States Environmental Protection Agency, and numerous other state agencies.  Accordingly, the Debtors rely on a number of Critical Vendors to assist them in ensuring compliance with applicable governmental laws and regulations as well as their obligations as a holder of certain fuel and material licenses, export licenses, and certificates of compliance (the "**Regulatory Compliance Vendors**").  The Debtors also rely on certain Critical Vendors to remove regulated waste and chemicals from the Debtors' facilities for proper disposal in accordance with their licensing requirements.  For example, Regulatory Compliance Vendors were of particular importance during the Outage, as they are essential for the safe and compliant handling of the nuclear fuel rods at the

WEIL:\98218907\32\76974.0003

reactor.    Additionally, the Debtors procure specific goods and services from Regulatory Compliance Vendors to ensure their production of power complies with all the requirements of their applicable regulators.  For example, the Debtors procure limestone for the Coal Plants to use in a flue-gas desulfurization, commonly referred to as a "scrubber," that removes sulfur dioxide from the exhaust gases of fossil-fuel plants to ensure emissions from such plants satisfy all federal, state, and local regulatory requirements.  In addition, the Debtors rely on access to specialty chemical, water treatment, airflow, and related service providers to assist in the safe removal and disposal of their Coal Plant byproducts such as coal ash and wastewater in accordance with applicable environmental and regulatory standards.  Certain other vendors ensure the Debtors' compliance with environmental remediation standards and other requirements under applicable permits related to the Debtors' power generation activities, testing, and related services.  These Regulatory Compliance Vendors are vital to the continued operation of the Debtors' businesses and to ensuring the Debtors are able to transition into chapter 11 smoothly and without unnecessary disruptions or delays, which could result in significant harm to the Debtors' estates and those that rely on the Debtors for their power supply.

174.    Without these Critical Vendors, I believe the Debtors may not be able to meet their obligations in a highly regulated environment, which could materially harm the Debtors' business and/or the public, to the detriment of all stakeholders in these chapter 11 cases.

175.    Further, the Debtors are requesting authority to pay (i) certain outstanding prepetition claims of (a) third party service providers, that may be able to assert and perfect liens against the property of the Debtors and (b) certain vendors whose prepetition claims are entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code, and (ii) Co-Ownership Obligations (as defined in the Vendor Motion) which are incurred in connection

with the Debtors' operation of the Colstrip Plant or related remediation and environmental obligations.  In connection with the payment of such Co-Ownership Obligations, I understand the Debtors either receive prepayment from or are subsequently reimbursed by the applicable co-owners for their agreed-upon share of amounts paid by the Debtors.  I believe a failure by the Debtors to pay prepetition Co-Ownership Obligations could result in a breach of the Colstrip Plant co-ownership agreement, which would disrupt and potentially restrict the Debtors' ability to operate Colstrip Units 3 and 4.

176.    I believe the Debtors are making every effort to maintain operational compliance with their regulators and to avoid interruptions in their supply chain to avoid the disruptive effects that even a temporary restriction on their ability to acquire fuel inputs and other goods and services could have on the Debtors' business and the public.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Vendor Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and should be granted.

**D.      Insurance and Surety Bond Motion**

177.    Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond Program, and (B) Pay Certain Obligations with Respect Thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief* filed contemporaneously herewith (the "**Insurance and Surety Bond Motion**") the Debtors request entry of interim and final orders (i) authorizing, but not directing them to (a) continue to maintain and renew, amend, supplement, place, or extend (if necessary) their Insurance Programs and Surety Bond Program (each as defined below) in accordance with their applicable insurance policies and indemnity and reimbursement agreements and to continue to perform their obligations with respect

thereto during these chapter 11 cases, and (b) pay certain prepetition obligations arising under the Insurance Programs or Surety Bond Program; (ii) modifying the automatic stay to the limited extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined below); and (iii) granting related relief.

178.    In the ordinary course of their energy and power generation operations, I understand that the Debtors maintain workers' compensation, third-party liability, property, and other insurance programs (the "**Insurance Programs**") and incur obligations to pay premiums and other obligations related thereto, including, but not limited to, any broker, advisor or third-party administrator fees, taxes, other fees, collateral, and deductibles, in accordance with, or relating to, their respective insurance policies (each, an "**Insurance Policy**") through several insurance carriers (each, an "**Insurance Carrier**"), including those listed on Exhibit C annexed to the Insurance and Surety Bond Motion.

179.    The Debtors are obligated to make premium payments related to the Insurance Policies based upon a fixed rate established and billed by each Insurance Carrier (collectively, the "**Insurance Premiums**").   The Debtors pay approximately $35 million in Insurance Premiums each year, not including applicable taxes and surcharges, deductibles, broker and consulting fees, and commissions.

180.    The Debtors' Insurance Programs include: (i) coverage of workers' compensation and employer's liability (the "**Workers' Compensation Program**"); (ii) coverage of potential third-party liability in connection with the Debtors' business; (iii) coverage of the Debtors' vehicles and related third-party liability; (iv) coverage for property losses; (v) coverage for risks and damages arising from data breaches and other data losses; (vi) coverage for losses arising from acts of terrorism; (vii) coverage of management and directors' and officers' liability;

WEIL:\98218907\32\76974.0003

(viii) excess coverage for various Insurance Policies, as described below; (ix) coverage for legal liability incurred related to pollution; and (x) coverage for potential property damage and loss of life arising from the Debtors' nuclear facilities.  The Debtors also retain the services of various insurance service providers in connection with maintaining the Debtors' Insurance Programs. Each of these is described more fully in the Insurance and Surety Bond Motion.

181.    I understand that, in the ordinary course of business, the Debtors maintain the Workers' Compensation Program for claims arising from, or related to, employment by the Debtors (the "**Workers' Compensation Claims**").  The Debtors contract with certain third-party administrators (the "**Third-Party Administrators**") to investigate, administer and pay claims arising under the Workers' Compensation Program.  It is my understanding that, in many instances, applicable law in the jurisdictions in which the Debtors operate—including Texas, Maryland, Massachusetts, Montana, New Jersey, and Pennsylvania—requires that the Debtors maintain the Workers' Compensation Program.  The Workers' Compensation Program covers, among other things, statutory workers' compensation and employer liability claims generally arising from accidents, death, or disease sustained by employees in the course of their employment with the Debtors.   Obligations under the Workers' Compensation Program are collateralized by a commercial letter of credit in the amount of approximately $14.3 million.

182.    It is my understanding that, under applicable workers' compensation laws, the Third-Party Administrators may be obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives.  Although unlikely, it is possible that an event giving rise to an obligation of the Third-Party Administrators to make such a payment on behalf of the Debtors or the Insurance Carrier—for example, for injury or disease of an employee—could have occurred prepetition

without the Debtors' knowledge.  To that end, out of an abundance of caution, the Debtors seek relief from the automatic stay for authorization to pay such Workers' Compensation Claims and related costs, and for the Third-Party Administrators to have authorization to do the same.

183.   As noted above, the Debtors employ the Third-Party Administrators to investigate, administer, and pay claims arising under their Workers' Compensation Program.  The Debtors reimburse the Third-Party Administrators each month for payments the Third-Party Administrators make with respect to the Workers' Compensation Claims (the "**Claim Reimbursements**").  The Debtors estimate that, on average, they pay approximately $600,000 annually to the Third-Party Administrators on account of the Claim Reimbursements, and they currently owe approximately $200,000 in Claim Reimbursements to the Third-Party Administrators for Workers' Compensation Claims accrued prior to the Petition Date.

184.   In addition to the Claim Reimbursements, one of the Third-Party Administrators charges the Debtors monthly fees on a per claim basis (collectively, the "**Service Fees**").  The Service Fees are variable and Debtors estimate that, on average, they pay approximately $200,000 annually on account of the Service Fees, and they will owe approximately $75,000 in prepetition Service Fees to the Third-Party Administrator within the first twenty-one (21) days of the Petition Date.[28]

185.   The Debtors also contract with Lockton Companies, LLC and Aon Risk Services Inc., to serve as their insurance brokers and consultants for certain of the Insurance Programs (each in such capacity, an "**Insurance Broker**" and, together with the Third-Party Administrators, the "**Insurance Service Providers**").  The Insurance Brokers provide access to specific insurance markets and expertise in certain lines and types of coverage.  In addition, the

---

[28] The Debtors are currently negotiating a formal contract with the Third-Party Administrator for the current year, but anticipate that the fee structure will remain the same.

Insurance Brokers often act as the intermediary between the Debtors and the Insurance Carriers, as the Insurance Brokers will often transfer insurance premiums and claims asserted for various Insurance Programs to the various Insurance Carriers.  The Debtors pay the Insurance Brokers' commissions up-front as policies are renewed each year, based on the aggregate amount of the Debtors' insurance premiums.  As of the Petition Date, the Debtors owe approximately $125,000 in fees to the Insurance Brokers in connection with policies renewed effective April 1, 2022 and May 1, 2022.

186.     In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties, including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with its power generation operations (the "**Surety Bond Program**").  These obligations arise from, among other things: (i) the operation of disposal and treatment facilities; (ii) coal mining operations; (iii) utility expenses; and (iv) supplying electric generation services to the public.  A list of the surety bonds in the Surety Bond Program is attached as <u>Exhibit D</u> to the Insurance and Surety Bond Motion.

187.     For each surety bond, the Debtors have either (i) entered into an indemnity agreement that sets forth the surety's rights to recover from the Debtors (collectively, the "**Surety Indemnity Agreements**") or (ii) fully collateralized the surety bonds by cash or letters of credit.  Under each Surety Indemnity Agreement, the Debtors agree to indemnify the surety from any loss, cost, or expense that the surety may incur on account of the issuance of any surety bonds on behalf of the Debtors.

188.     The premiums for the surety bonds (the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis.  Payment is remitted by the Debtors when the bonds are issued and annually upon

each renewal, typically 30 days prior to such renewal.  In the twelve months preceding the Petition Date, the Surety Premiums totaled approximately $2.2 million.  As of the Petition Date, the Debtors have approximately $247 million in outstanding surety bonds, which obligations are partially collateralized by (i) letters of credit in the approximate amount of $73.1 million issued for the benefit of Arch Insurance Company; (ii) a letter of credit in the approximate amount of $32 million issued for the benefit of Argonaut Insurance Company; (iii) a letter of credit in the approximate amount of $6.4 million issued for the benefit of Travelers Casualty and Surety Company of America; and (iv) cash held in escrow in the approximate amount of $104.1 million for the benefit of Arch Insurance Company and Intact Insurance.

189.    I understand that the Debtors maintain the Insurance Programs to help manage and limit the various risks associated with operating their business, which is essential to the preservation of the value of the Debtors' business and properties.  I believe it essential that the Debtors maintain the Insurance Programs and the Surety Bond Program, and that they obtain authority to pay certain obligations related thereto, including payments to the Insurance Service Providers.  Furthermore, I understand that the Debtors must maintain most or all of the Insurance Programs and the Surety Bond Program to comply with the UST Operating Guidelines, applicable state and federal laws, and other prepetition contracts.  Based on the foregoing, I believe that the relief requested in the Insurance and Surety Bond Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

E.    **Wages Motion**

190.    Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefits Programs and Pay Related Obligations, and (C) Pay Prepetition*

WEIL:\98218907\32\76974.0003

*Employment Expenses, and (II) Granting Related Relief* filed concurrently herewith (the "**Wages Motion**"), the Debtors request entry of an order (i) authorizing but not directing them to (a) pay all Employee Obligations, Other Compensation Obligations, and related fees, costs, and expenses incident to the foregoing, including amounts owed to third-party service providers and administrators and taxing authorities, and (b) maintain, and continue to honor and pay amounts with respect to, the Debtors' business practices, programs, and policies for their employees as such were in effect prior to the Petition Date and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (ii) granting related relief.

191.    As described more fully in the Wages Motion, the Debtors' employ approximately 2,097 employees (each, an "**Employee**").  The Employees perform a number of critical functions, including sales, customer service, plant operations, legal, financial, human resources, and other services necessary to operate the enterprise effectively.  Certain of the Debtors' Employees are represented by unions and covered by collective bargaining agreements. Without the Employees' continued, uninterrupted services, an effective reorganization of the Debtors will not be possible.  In the ordinary course of their operations, the Debtors incur a number of obligations to, or on account of, their Employees, including those related to compensation ("**Employee Compensation Obligations**"), benefits ("**Employee Benefits Obligations**"), and onboarding of new employees ("**Employee Onboarding Obligations,**" collectively, the "**Employee Obligations**").

192.    The Debtors' Employees are the most important part of their business.  I believe that any delay in paying or failure to pay prepetition Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial.  Failure to pay the Employee Obligations

WEIL:\98218907\32\76974.0003

could also inflict a significant financial hardship on the families of the Employees.  The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees at risk of such hardship.  Without the relief requested in the Wages Motion, otherwise-loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise.  Payment of these obligations in the ordinary course of business would enable the Debtors to focus on completing a successful reorganization, which would benefit all parties in interest.

193.    In the ordinary course of business, the Debtors incur and pay obligations relating to salaries, wages and other compensation owed to Employees, independent contractors, and staffing firms that provide the Debtors with contingent workers.  Additionally, Employees are entitled to reimbursement of certain reasonable and necessary expenses incurred while performing their employment duties, including job-related travel and meal expenses (the "**Expenses**").  I believe that payment of prepetition Expenses is necessary because any other treatment of Employees would be highly inequitable and risk alienation of the Debtors' workforce.  Employees who have incurred reimbursable Expenses should not be forced personally to bear the cost of the Expenses, especially because those Employees incurred such Expenses for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

194.    In the ordinary course of business, the Debtors are required by law to deduct from Employees' gross pay including, without limitation, garnishments, child support, spousal support, service charges and similar deductions, and other pre- and after-tax deductions payable pursuant to certain employee benefit plans discussed in the Wages Motion (collectively, the "**Deductions**").  In addition to the Deductions, certain laws require the Debtors to withhold

WEIL:\98218907\32\76974.0003

amounts from the Employees' gross pay related to federal, state, and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withholdings**"), which the Debtors must match, from their own funds, amounts for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively with the Withholdings, the "**Payroll Taxes**").  I believe that disbursement of the Deductions and payment of the Payroll Taxes would not prejudice other creditors because I have been informed by counsel that such obligations generally give rise to priority claims under section 507(a) of the Bankruptcy Code.

195.    As a part of their Employee Compensation Obligations, the Debtors also maintain, in the ordinary course, a variety of employee bonus programs (the "**Employee Bonus Programs**") and have a general practice of paying severance to certain non-insider Employees (the "**Employee Severance Obligations**").  The Employee Bonus Programs and the Employee Severance Obligations are necessary for maintaining positive Employee morale and loyalty, and failure to honor obligations under these programs could cause severe hardship to the Debtors' workforce in a critical time; the programs are integral and necessary for maintaining a stable workforce and the ultimate successful operation of the Debtors' business.

196.    The Debtors also make employee benefits available to eligible Employees. The benefits fall within the following categories:  (i) employee leave benefits, including personal time off and holidays; (ii) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment insurance, disability insurance, and health savings accounts; (iii) retirement savings plans including three 401(k) plans, and (iv) certain other benefits (collectively, the "**Employee Benefits**").  I believe that maintaining the Employee Benefits are

critical for maintaining Employee morale during these chapter 11 cases, and to prevent Employees from seeking employment from other companies that offer similar benefits.

197.    As described in the Wages Motion, the Debtors pay fees to third-party administrators and servicers of Employee Compensations Obligations, Employee Benefits, and Employee Onboarding Obligations.  Third-party administrators assist the Debtors with, among other things, servicing the Health Benefits Claims (as defined in the Wages Motion) and administering of the Employee Benefits, and also assist with payroll servicing and payroll transfer administration in connection with Employee Obligations.  I believe that continued payment to third-party administrators is necessary, and without the continued service of these administrators, the Debtors will be unable to continue honoring their obligations to Employees in an efficient and cost-effective manner.

198.    The Debtors are not seeking relief to pay prepetition Employee Obligations to any individual Employee or Contractor in excess of the $13,650 cap imposed by section 507(a)(4) of the Bankruptcy Code.  I also believe that the total amount sought to be paid by the Wages Motion is modest compared to the magnitude of the Debtors' overall business. Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations.  Accordingly, I believe the relief requested in the Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

**F.     Taxes & Regulatory Motion**

199.    Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments Owed to Taxing Authorities or Regulatory Authorities and (II) Granting Related Relief* (the "**Taxes & Regulatory Motion**") filed

concurrently herewith, the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to satisfy, or use tax credits to offset, all Taxes (as defined below) due and owing to various federal, state, and local taxing authorities (collectively, the "**Taxing Authorities**") that arose prior to the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date, (ii) authorizing, but not directing, the Debtors to satisfy all Regulatory Assessments (as defined below) due and owing to various federal, state, and local regulatory authorities (collectively, the "**Regulatory Authorities**")[29] that arose prior to the Petition Date, and (iii) granting related relief.

200.    I understand that the taxes the Debtors typically incur generally fall into the following categories: Franchise Taxes, Property Taxes, Sales and Use Taxes, Gross Receipts Taxes, and Income Taxes (each as defined in the Taxes & Regulatory Motion and, collectively, the "**Taxes**").  I understand that approximately $10.4 million in Taxes relating to periods prior to the Petition Date will come due and owing to the Taxing Authorities after the Petition Date.

201.    Further, I understand that the regulatory assessments the Debtors typically incur generally fall into the following categories: Federal Regulatory Obligations, State Regulatory Obligations, and Local Regulatory Obligations (each as defined in the Taxes & Regulatory Motion and, collectively, the "**Regulatory Assessments**").  I understand that approximately $11.4 million in Regulatory Assessments relating to periods prior to the Petition Date will come due and owing to the Regulatory Authorities after the Petition Date.

202.    As more fully described in the Taxes & Regulatory Motion, I understand that failure to pay the Taxes and the Regulatory Assessments, as applicable, may cause the Taxing

---

[29] The definitions of "Taxing Authorities" and "Regulatory Authorities" include, but are not limited to, those parties set forth in Exhibit 1 to the Taxes & Regulatory Motion.  The inclusion of any entity on, or the omission of entity from, such list is not an admission by the Debtors that such entity is, or is not, a Taxing Authority or Regulatory Authority to which the Debtors owe any amount, and the Debtors reserve all rights with respect to any such determination.

WEIL:\98218907\32\76974.0003

Authorities and Regulatory Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the ordinary course in the applicable jurisdictions in which they operate, and potentially holding directors and officers personally liable, all of which would disrupt the Debtors' day-to-day business operations, potentially impose significant costs of the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully reorganize.  Based on the foregoing, I believe that the relief requested in the Taxes & Regulatory Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

**G.     Utilities Motion**

203.    Pursuant to the *Emergency Motion of Debtors for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service; (IV) Authorizing Debtors to Honor Obligations to Third Party Servicer in Ordinary Course of Business; (V) Authorizing Debtors to Continue Remitting Transmission and Distribution Costs in Ordinary Course of Business; and (VI) Granting Related Relief* filed concurrently herewith (the "**Utilities Motion**"), the Debtors request entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies, (ii) establishing procedures for resolving objections by the Utility Companies relating to the adequacy of the Debtors' proposed adequate assurance, (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices, (iv) authorizing the Debtors to pay outstanding fees and honor obligations to the Servicer in the ordinary course of business, (v) authorizing the Debtors to

continue remitting transmission and distribution costs in the ordinary course of business, and (vi) granting related relief.

204.    As more fully described in the Utilities Motion, in the ordinary course of business, the Debtors incur expenses for, among other things, electricity, natural gas, water, sewage, telecommunications, waste disposal, and other utilities.  I believe that preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations.  As previously mentioned, the Debtors own and/or control approximately 13,000 megawatts of generating capacity in wholesale U.S. power markets, and any interruption in utility services—even for a brief period of time—would seriously disrupt the Debtors' ability to continue operations and jeopardize the Debtors' restructuring efforts and, ultimately, creditor recoveries.

205.    Based on a monthly average for the twelve months prior to the Petition Date, the Debtors estimate that their aggregate cost of Utility Services for the next thirty (30) days will be approximately $1.1 million.  To provide additional assurance of payment, the Debtors propose to deposit into a segregated bank account a sum equal to the cost of two weeks' worth of the average utility cost for each Utility Company (less any amounts guaranteed pursuant to a letter of credit issued in favor of any such Utility Company that have not been applied to outstanding prepetition amounts), based on the Debtors' average usage of such Utility Company (collectively, the "**Adequate Assurance Deposit**").  The Debtors estimate that the Adequate Assurance Deposit would total approximately $535,000.  Such Adequate Assurance Deposit will further assure the Utility Companies of payment for postpetition services.

206.    Furthermore, I believe the Adequate Assurance Procedures are necessary for the Debtors to effectuate their chapter 11 strategy without unnecessary and costly disruptions on account of discontinued utility services.  If the Adequate Assurance Procedures are not

approved, the Debtors likely will be confronted with and forced to address numerous requests by their utility providers at a critical time for their business.  I understand that the Debtors' utility providers could unilaterally decide that they are not adequately protected and, therefore, may make exorbitant demands for payment to continue providing service or discontinue providing service to the Debtors altogether.  Such an outcome could seriously jeopardize the Debtors' operations and their ability to maximize the value of their estates.

207.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, and should be granted.

**H.      Schedules and Statements Motion**

208.    Pursuant to *the Emergency Motion of Debtors for an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Current Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Reports* filed contemporaneously herewith (the "**Schedules and Statements Motion**") the Debtors seek entry of an order extending the deadline by which the Debtors must file their (a) schedules of assets and liabilities, (b) schedules of current income and current expenditures, (c) schedules of executory contracts and unexpired leases, and (d) statements of financial affairs (collectively, the "**Schedules and Statements**") by 45 days, for a total of 59 days from the Petition Date, through and including July 7, 2022, without prejudice to the Debtors' ability to request additional extensions for cause shown.

209.    I am advised that section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c) generally requires debtors to file Schedules and Statements within 14 days after their petition date.  I am also advised that under Bankruptcy Rule 1007(c), the Court has the authority

WEIL:\98218907\32\76974.0003

to extend the time required for filing the Schedules and Statements "for cause." I believe cause exists for granting the extensions requested in the Schedules and Statements Motion because of the voluminous information the Debtors must compile to complete the Schedules and Statements. Collecting the necessary information requires a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to address the immediate needs of the Debtors' business operations.

210.    Additionally, pursuant to the Schedules and Statements Motion, the Debtors request the Court grant them an extension of the time until the later of (i) 15 days after the initial meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "**341 Meeting**") and (ii) 45 days from the Petition Date, for the Debtors to either file their initial reports of financial information with respect to entities in which their chapter 11 estates hold a controlling or substantial interest, as set forth in Bankruptcy Rule 2015.3 (the "**2015.3 Reports**"), or file a motion with the Court seeking a modification of such reporting requirements for cause.

211.    I have been advised that Bankruptcy Rule 2015.3 requires a debtor, by no later than seven days prior before the date set for the 341 Meeting and no less than every six months thereafter, to file periodic financial reports of the value, operations and profitability of each entity that is not a publicly traded corporation or a debtor in the chapter 11 cases, and in which the estate holds a substantial or controlling interest. I am also advised that pursuant to Bankruptcy Rule 9006(b)(1), the Court has the authority to enlarge the period of time to file the 2015.3 Reports "for cause" and that under Bankruptcy Rule 2015.3(d), the Court can modify the reporting requirements for cause, including that the debtor is "not able, after a good faith effort, to comply with those reporting requirements, or that the information . . . is publicly available."

WEIL:\98218907\32\76974.0003

212.     The Debtors consist of 72 separate entities, many of which have non-debtor affiliates that are not publicly traded corporations and in which there is a presumption that the Debtors hold a "substantial or controlling" equity interest.  Thus, I believe cause exists to extend the deadline for filing the Rule 2015.3 Reports based on (a) the size and complexity of the Debtors' business and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases.  Extending the deadline for the initial 2015.3 Reports also will enable the Debtors to work with their financial advisors and the U.S. Trustee to determine the appropriate nature and scope of the 2015.3 Reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

## I.        Creditor List Motion

213.     Pursuant to the *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors and (B) Redact Certain Personal Identification Information and (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information* filed contemporaneously herewith (the "**Creditor List Motion**"), the Debtors are seeking entry of an order (i) authorizing the Debtors to (a) file a consolidated creditor matrix (the "**Consolidated Creditor Matrix**") and a consolidated list of the Debtors' thirty (30) largest unsecured creditors (the "**Consolidated Top 30 Creditors List**") and (b) redact certain personal identification information of the Debtors' employees and independent contractors and (ii) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases and other information.

214.     I am advised that Bankruptcy Rule 1007(a) requires each debtor to file a separate mailing matrix, each containing names and addresses of all creditors, including

WEIL:\98218907\32\76974.0003

individuals, as well as a separate list of top unsecured creditors for each debtor.  Because the

preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and

administratively burdensome, the Debtors request authority to file one Consolidated Creditor

Matrix for all Debtors.  Further, because a significant number of creditors may be shared among

the Debtors, the Debtors request authority to file the Consolidated Top 30 Creditors List for all

Debtors, rather than file separate top 20 creditor lists for each Debtor.  I understand that the

Consolidated Top 30 Creditors List will help alleviate administrative burden, costs, and the

possibility of duplicative service.

215.    I also believe that cause exists to authorize the Debtors to redact address

information of the Debtors' current and former employees and independent contractors from the

Consolidated Creditor Matrix because such information could be used to perpetrate identity theft.

Further, the Debtors propose to provide, upon request, an unredacted version of the Consolidated

Creditor Matrix to the Court, the U.S. Trustee, and counsel to any official committees appointed

in these chapter 11 cases.

216.    Finally, I am advised that, in compliance with the requirements of

Bankruptcy Rule 2002(a), of which I have been advised, the Debtors, through Kroll Restructuring

Administration LLC ("**Kroll**"),[30] their proposed claims and noticing agent, propose to serve the

Notice of Commencement (as defined in the Creditor List Motion) on all parties entitled to notice

of commencement of these chapter 11 cases, to advise them of commencement of these chapter 11

cases and the section 341 meeting of creditors.  I believe service of the Notice of Commencement

on the Consolidated Creditor Matrix will not only prevent the Debtors' estates from incurring

unnecessary costs associated with serving multiple notices to the parties listed on the Debtors'

---

[30] On March 29, 2022, Prime Clerk LLC changed its name to Kroll Restructuring Administration LLC.  There has not been any change in the company's ownership structure.

WEIL:\98218907\32\76974.0003

voluminous Consolidated Creditor Matrix, but will also preserve judicial resources and prevent creditor confusion through the efficient service of critical information.

217.     Based on the foregoing, I believe that the relief requested in the Creditor List Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**J.     NOL Motion**

218.     Pursuant to the *Emergency Motion of Debtors Pursuant to Sections 362 And 105(A) of the Bankruptcy Code for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in, and Claims Against, Debtors, and (B) Claiming of Certain Worthless Stock Deductions* filed contemporaneously herewith (the "**NOL Motion**"), the Debtors are seeking to establish procedures to protect (i) the potential value of the Debtors' carryforwards of net operating losses ("**NOLs**"), disallowed business interest expense, and certain other tax benefits (including certain state tax attributes) (collectively, the "**Tax Attributes**") for use during the chapter 11 cases and in connection with the reorganization of the Debtors and (ii) the Debtors' estate against potential current tax liabilities that could arise if Talen (which is treated as a corporation for U.S. federal income tax purposes) were deconsolidated from TEC for U.S. federal income tax purposes.  The Procedures (as defined in the NOL Motion) include separate procedures applicable to (i) the beneficial ownership (including direct and indirect ownership) of membership interests in TES, which is taxable as a corporation for U.S. federal income tax purposes ("**Talen Stock**"), and any options or similar rights (within the meaning of applicable U.S. Treasury regulations) to acquire such interests, as well as to any claim (for U.S. federal income tax reporting purposes) of a worthlessness deduction under section 165 of title 26 of the United States Code (the "**Tax Code**") by a Majority Holder (as

WEIL:\98218907\32\76974.0003

defined in the NOL Motion) with respect to the beneficial ownership of Talen Stock (a "**Worthless Stock Deduction**"), and (ii) the beneficial ownership (including direct and indirect ownership) of prepetition claims (each, as defined in section 101(5) of the Bankruptcy Code, a "**Claim**") against one or more of the Debtors.

219.   The Debtors have certain Tax Attributes, which I understand include, as of the Petition Date, estimated available NOL carryforwards of at least $1.5 billion, estimated interest expense carryforwards of at least $720 million and certain other favorable Tax Attributes (including certain state tax attributes).  Additionally, unnecessary tax liabilities would result if TES were deconsolidated from TEC for U.S. federal income tax purposes, which could have a material adverse effect on the Debtors' estates.  I believe the Procedures with respect to Talen Stock will allow the Debtors to monitor the transfer of, and the claiming of a Worthless Stock Deduction by any Majority Stockholder with respect to, beneficial ownership of Talen Stock and thereby preserve their ability to seek the necessary relief if it appears that any such transfer(s) or claim(s) may jeopardize the Debtors' ability to utilize their Tax Attributes or may result in the deconsolidation of TES from the TEC consolidated group for U.S. federal income tax purposes.

220.   I understand the principal parties affected by the Talen Stock related procedures are persons controlled by or otherwise affiliated with Riverstone Holdings LLC, including TEC (collectively, the "**Riverstone Parties**").  The Riverstone Parties have consented to the Stock Procedures (as defined in the NOL Motion) set forth in the proposed interim order contemplated by the NOL Motion, and reserve all rights with respect to such procedures on a final basis.

221.   I believe that the Procedures with respect to Claims (the "**Claims Procedures**") will preserve the Debtors' ability under appropriate circumstances to determine and,

WEIL:\98218907\32\76974.0003

if applicable, preserve the availability of the special relief afforded by section 382(l)(5) of the Tax Code (as such provision is further described in the NOL Motion). The Claims Procedures would allow for full trading of Claims until if and when the Debtors, or another plan proponent, files a chapter 11 plan contemplating the potential utilization of section 382(l)(5) of the Tax Code.

222.    Accordingly, I believe that the relief requested in the NOL Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**K.     Claims Agent Retention Application**

223.    Pursuant to the *Emergency Ex Parte Application for Entry of an Order Authorizing Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* filed concurrently herewith (the "**Claims Agent Retention Application**"), the Debtors request entry of an order appointing Kroll as the claims, noticing, and solicitation agent (the  "**Claims and Noticing Agent**") for the Debtors in their chapter 11 cases, effective as of the Petition Date.

224.    As more fully described in the Claims Agent Retention Application, the Claims and Noticing Agent will, among other tasks, (i) serve as the noticing agent to mail notices to creditors, equity security holders, and other parties in interest, (ii) provide computerized claims, objection, solicitation, and balloting database services, and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these chapter 11 cases, pursuant to the provisions of the Engagement Agreement (as defined in the Claims Agent Retention Application).

225.    The Debtors' counsel has informed me that, pursuant to noticing requirements, the Debtors will be required to provide notice to thousands of persons and entities

during the pendency of these chapter 11 cases.  The appointment of Kroll as the Claims and Noticing Agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the proposed plan of reorganization, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks.  In addition, by appointing Kroll as the Claims and Noticing Agent in these chapter 11 cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing.  Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

## L.      Request for Emergency Consideration

226.    Pursuant to the *Request for Emergency Consideration of Certain "First Day" Matters* filed concurrently herewith, the Debtors request emergency consideration of the Joint Administration Motion; the DIP Motion; the Motion to Seal DIP Fee Letters; the Cash Management Motion; the Vendor Motion; the Insurance and Surety Bond Motion; the Wages Motion; the Taxes & Regulatory Motion; the Utilities Motion; the Schedules and Statements Motion; the Creditor List Motion; the NOL Motion; the Claims Agent Retention Application; and the Hedging Motion.  I believe that, based on the complexity of these chapter 11 cases (as explained to me by the Debtors' counsel) and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

## Conclusion

227.    The above describes the Debtors' business and capital structure, the factors that precipitated the commencement of these chapter 11 cases, and the critical need for the Debtors to restructure their financial affairs and operations.  The provisions of the Bankruptcy Code will assist the Debtors in achieving their financial reorganization and reestablishing themselves as a

healthy economic enterprise able to effectively compete in their industry for the benefit of their economic stakeholders and employees.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WEIL:\98218907\32\76974.0003

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 9, 2022
       Houston, Texas

                                     */s/ Ryan Leland Omohundro*
                                     Ryan Leland Omohundro
                                     Managing Director
                                     Alvarez & Marsal

**<u>Certificate of Service</u>**

I hereby certify that on May 9, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


   */s/ Gabriel A. Morgan*
Gabriel A. Morgan

## **Exhibit A**

Restructuring Support Agreement

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**") dated May 9, 2022 is entered into by and among:

(a) Talen Energy Supply, LLC ("**TES**") and the direct and indirect wholly owned subsidiaries listed on **Exhibit A** to this Agreement (collectively, the "**Company**"); and

(b) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders as of the date hereof (such undersigned parties, collectively, the "**Initial Consenting Parties**"), of unsecured notes issued under (i) that certain *Indenture* dated as of October 1, 2001, (ii) that certain *Indenture* dated as of April 13, 2017, (iii) that certain *Indenture* dated as of August 4, 2017, (iv) that certain *Indenture* dated as of November 29, 2017, or (v) that certain *Series 2009A Indenture* dated as of April 1, 2009 (each as amended, restated, amended and restated, supplemented or otherwise modified from time to time, collectively, the "**Unsecured Notes Indentures**" and, such unsecured notes, the "**Unsecured Notes**").

The Company and each Consenting Party (as defined below), and any subsequent Person that becomes a party hereto in accordance with the terms hereof are collectively referred to herein as the "**Parties**" and each, individually, as a "**Party**." Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below) or if not defined their plain meaning given the context of their use. The terms of the Restructuring Term Sheet are hereby incorporated and included in the terms of this Agreement as if fully set forth herein.

## RECITALS

WHEREAS, the Parties consent to (as applicable) and have agreed to consummate and support a restructuring of the Company's capital structure (the "**Restructuring**") on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (as may be amended, supplemented, or otherwise modified from time to time pursuant to this Agreement, the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, collectively, the "**Restructuring Transactions**");

WHEREAS, the Company will implement the Restructuring Transactions through the commencement by the Company of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases so commenced, the "**Chapter 11 Cases**"); and

WHEREAS, as of the date hereof, the Initial Consenting Parties, in the aggregate, hold, own, or control approximately 62.32% of the aggregate outstanding principal amount of Unsecured Notes;

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, on a several but not joint basis, agree as follows:

1.    **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)    "**Agreement Effective Period**" means, with respect to a Party, the period from the Support Effective Date to the Termination Date applicable to that Party.

(b)    "**Alternative Restructuring**" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of a material portion of assets, financing (debt or equity), plan proposal, recapitalization, restructuring of the Company, or other transaction of similar effect (in each case, outside of the ordinary course of business), other than in accordance with or in furtherance of the Restructuring.

(c)    "**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to any Alternative Restructuring.

(d)    "**Backstop Approval Order**" means the order of the Bankruptcy Court approving the Debtors' assumption of the Backstop Commitment Letters.

(e)    "**Backstop Commitment Letter**" means that certain backstop commitment letter to be entered into in accordance with the Milestones, in the form attached hereto as **Exhibit C** (except for any changes mutually agreed on between the Company and the Required Backstop Parties).

(f)    "**Backstop Commitment Parties**" means at any time and from time to time, the parties that have committed to backstop the Rights Offering; *provided* that each Backstop Commitment Party shall be either (a) an Initial Backstop Party, or (b) consented to by the Requisite Initial Backstop Parties.

(g)    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

(h)    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

(i)    "**Business Day**" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

(j)    "**Chapter 11 Cases**" has the meaning set forth in the recitals.

(k)     "**Claim**" with respect to the Company, has the meaning set forth in section 101(5) of the Bankruptcy Code.

(l)     "**Company**" has the meaning set forth in the recitals.

(m)     "**Company Termination Event**" has the meaning set forth in <u>Section 5.03</u>.

(n)     "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order.

(o)     "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases.

(p)     "**Consenting Claims**" means all Claims against the Company held by Consenting Parties from time to time.

(q)     "**Consenting Parties**" means, collectively, the Initial Consenting Parties and any Subsequent Consenting Parties.

(r)     "**Consenting Party Termination Event**" has the meaning set forth in <u>Section 5.02</u>.

(s)     "**Definitive Documents**" means, collectively:   (i) the Plan, the Plan Supplement, and all material documents, annexes, schedules, exhibits, amendments, modifications, or supplements thereto, or other documents contained therein, including, without limitation, any schedules of assumed or rejected contracts; (ii) the Disclosure Statement and its exhibits; (iii) the Solicitation Materials; (iv) the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials; (v) the Rights Offering Documents; (vi) the Backstop Commitment Letters, any related pleadings, and the Backstop Approval Order; (vii) the Confirmation Order; (viii) the First Day Orders (other than the DIP Order) and the DIP Order, solely to the extent that the DIP Order has a material effect on the Rights Offering, the Backstop Commitment Letters, this Agreement, or the transactions contemplated thereby; (ix) any Employee Equity Incentive Plan or senior executive employment agreement entered into after the Support Effective Date; (x) the New Corporate Governance Documents; (xi) the Exit Facility Documents; and (xii) any other agreements and documentation reasonably desired or necessary to consummate and document or achieve the Restructuring Transactions; *provided*, *however*, that the following are not Definitive Documents:  ministerial notices and similar ministerial documents; retention applications; fee applications; fee statements; any similar pleadings or motions relating to the retention or fees of any professional; statements of financial affairs and schedules of assets and liabilities; or statements pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "**Non-Substantive Documents**").

(t)     "**DIP Financing**" means the financing by the use of cash collateral and a postpetition senior secured superpriority debtor-in-possession credit facility to the Company on the terms and conditions consistent with the DIP Order**.**

(u)      "**DIP Order**" means the interim or final, as applicable, order of the Bankruptcy Court setting forth the terms of debtor-in-possession financing and use of cash collateral.

(v)      "**Disclosure Statement**" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

(w)      "**Employee Equity Incentive Plan**" means any long-term equity incentive program of the Reorganized Company to be established as contemplated in the Plan, and in accordance with this Agreement and the Definitive Documents.

(x)      "**Environmental Law**" means any applicable federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment or human health or safety (as such relates to exposure to Hazardous Substances) or Hazardous Substances.

(y)      "**Environmental Regulator**" means any federal, state, municipal, local, or governmental agency or regulatory body responsible for regulating (i) pollution, the protection of the environment or the protection of human health and safety as it relates to exposure to Hazardous Substances or (ii) the use, treatment, storage, transport, handling, release or disposal of any Hazardous Substances.

(z)      "**ERCOT**" means the Electric Reliability Council of Texas.

(aa)     "**Exit Facility**" means the financing facility, including a revolving credit facility and letter of credit facility, to be entered into on the Plan Effective Date.

(bb)     "**Exit Facility Documents**" means the agreements and related documents governing the Exit Facility.

(cc)     "**FCC**" means the Federal Communications Commission.

(dd)     "**FERC**" means the Federal Energy Regulatory Commission.

(ee)     "**First Day Orders**" means the orders of the Bankruptcy Court granting the First Day Pleadings.

(ff)     "**First Day Pleadings**" means the first-day pleadings that the Company files with the Bankruptcy Court upon the commencement of the Chapter 11 Cases.

(gg)     "**Hazardous Substances**" means:  (i) any petroleum or petroleum products, radioactive materials, or asbestos containing materials; (ii) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants" or words of similar import, under any Environmental

Law; and (iii) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

(hh) "**Initial Backstop Commitment Parties**" means those Backstop Commitment Parties to the Backstop Commitment Letters as of the first date they are executed by the Company and the Backstop Commitment Parties; *provided* that each Initial Backstop Commitment Party shall be designated by the Requisite Consenting Parties.

(ii) "**Initial Consenting Parties**" has the meaning set forth in the recitals.

(jj) "**Interest**" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in any Company entity, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, profits interest or other instrument, evidencing any fixed or contingent ownership interest, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest.

(kk) "**Joinder Agreement**" means a joinder agreement in the form attached hereto as **Exhibit D**.

(ll) "**Milestones**" means the milestones set forth in the Restructuring Term Sheet.

(mm) "**New Corporate Governance Documents**" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, shareholders' agreement, and such other applicable formation, organizational and governance documents (if any) of the Reorganized Company, the material terms of each of which shall be included in the Plan Supplement.

(nn) "**NRC**" means the Nuclear Regulatory Commission.

(oo) "**Outside Petition Date**" has the meaning set forth in Section 2.02.

(pp) "**Permitted Transferee**" has the meaning set forth in Section 3.02.

(qq) "**Person**" means any "person" as defined in section 101(41) of the Bankruptcy Code, including any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

(rr) "**Petition Date**" has the meaning set forth in Section 2.02.

(ss) "**Plan**" means the joint chapter 11 plan of reorganization filed by the Company in the Chapter 11 Cases to implement the Restructuring Transactions in accordance with this Agreement and the Definitive Documents.

(tt) "**Plan Effective Date**" means the date on which the conditions to effectiveness of the Plan have been satisfied or waived in accordance with its terms.

WEIL:\98588686\18\76974.0003

(uu)    "**Plan Supplement**" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan filed by the Company with the Bankruptcy Court.

(vv)    "**Qualified Marketmaker**" has the meaning set forth in <u>Section 3.02</u>.

(ww)    "**Qualified Marketmaker Joinder Date**" has the meaning set forth in <u>Section 3.02</u>.

(xx)    "**Reorganized Company**" means TES as reorganized on the Plan Effective Date in accordance with the Plan and the Restructuring Term Sheet.

(yy)    "**Requisite Backstop Commitment Parties**" means, as of the date of determination, Backstop Commitment Parties that have committed to provide at least 50.1% in aggregate principal amount of commitments under the Backstop Commitment Letters.

(zz)    "**Requisite Consenting Parties**" means, as of the date of determination, Consenting Parties holding at least 50.1% in aggregate principal amount of Unsecured Notes held by the Consenting Parties as of such date.

(aaa)    "**Requisite Initial Backstop Commitment Parties**" means, as of the date of determination, Initial Backstop Commitment Parties holding at least 50.1% in aggregate principal amount of commitments under the Backstop Commitment Letters held by the Initial Backstop Commitment Parties as of such date.

(bbb)    "**Restructuring**" has the meaning set forth in the recitals.

(ccc)    "**Restructuring Term Sheet**" has the meaning set forth in the recitals.

(ddd)    "**Restructuring Transactions**" has the meaning set forth in the recitals.

(eee)    "**Rights Offering**" has the meaning set forth in the Restructuring Term Sheet.

(fff)    "**Rights Offering Documents**" means, collectively, any and all agreements, documents, and instruments delivered or entered into in connection with the Rights Offering, including, without limitation, the Rights Offering Procedures.

(ggg)    "**Rights Offering Procedures**" means those certain procedures for the Rights Offering.

(hhh)    "**Securities Act**" means the U.S. Securities Act of 1933, as amended, and any rules and regulations promulgated thereby.

(iii)    "**Solicitation Materials**" means any materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

(jjj)    "**Subsequent Consenting Party**" means any Person that becomes a party to this Agreement by executing a Joinder Agreement in accordance with the terms of this Agreement.  For the avoidance of doubt, the Subsequent Consenting Parties will not include the Initial Consenting Parties.

(kkk)    "**Support Effective Date**" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company and (ii) Consenting Parties holding at least 50.1% of the aggregate outstanding principal of Unsecured Notes.

(lll)    "**Support Period**" means the period commencing on the Support Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 5 hereof.

(mmm)"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 5.01, Section 5.02, Section 5.03, or Section 5.04, as applicable.

(nnn)    "**TES**" has the meaning set forth in the recitals.

(ooo)    "**Transfer**" has the meaning set forth in section 101(54) of the Bankruptcy Code.

(ppp)    "**Unsecured Creditor Group**" means that certain ad hoc group of holders of Unsecured Notes.

(qqq)    "**Unsecured Creditor Group Advisors**" means, collectively, (i) the Unsecured Creditor Group Counsel, (ii) Rothschild & Co US Inc., and (iii) other local or regulatory counsel or other advisors retained by the Unsecured Creditor Group.

(rrr)    "**Unsecured Creditor Group Counsel**" means Kirkland & Ellis LLP, as legal advisors to the Unsecured Creditor Group.

(sss)    "**Weil**" means Weil, Gotshal & Manges LLP, as legal advisors to the Company.

2.    **Commencement**

Section 2.01   Restructuring Term Sheet.    The Restructuring Term Sheet is expressly incorporated herein and made a part of this Agreement as if fully set forth herein.  The terms and conditions of the Restructuring are set forth in the Restructuring Term Sheet; *provided*, *however*, that the Restructuring Term Sheet is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Restructuring Term Sheet, the terms of the Restructuring Term Sheet shall govern.

Section 2.02   Commencement.    Provided that the Support Effective Date has occurred,   no   later   than   11:59 p.m.   (prevailing   Central   time)   on   May  9,  2022

(the "**Outside Petition Date**"), the Company shall file the Chapter 11 Cases in the Bankruptcy Court (the date on which such filing occurs, the "**Petition Date**").

        Section 2.03   <u>Milestones</u>.  During the Agreement Effective Period, the Company shall implement the Restructuring Transactions in accordance with the Milestones, as applicable, unless extended or waived in writing (which may be by electronic mail between applicable counsel) by the Company and the Requisite Consenting Parties.  For the avoidance of doubt, nothing in the Milestones shall prevent the Company from exercising their respective fiduciary duties under applicable law; *provided* that the exercise by the Company of a Fiduciary Out (as defined below) shall not impede the Consenting Parties' rights to terminate this Agreement pursuant to <u>Section 5.</u>

        Section 2.04   <u>Definitive Documents</u>.

        (a)     Each of the Definitive Documents and related motions and orders remain subject to negotiation and completion and shall contain terms and conditions consistent in all material respects with this Agreement and the Restructuring Term Sheet, and the following Definitive Documents shall otherwise be in form and substance acceptable to the Requisite Consenting Parties and the Company: (a) the Plan; (b) the Plan Supplement, including any Employee Equity Incentive Plan and any schedules of assumed or rejected contracts and leases; (c) the Confirmation Order; (d) the Backstop Approval Order; (e) the Exit Facility Documents; and (f) the New Corporate Governance Documents.  The Definitive Documents other than those referenced in the preceding sentence shall contain terms and conditions consistent in all material respects with this Agreement and the Restructuring Term Sheet and shall otherwise be in form and substance reasonably acceptable to the Requisite Consenting Parties and the Company.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the exhibits and annexes hereto), as they may be modified, amended, or supplemented in accordance with <u>Section 9</u>.

        Section 2.05   <u>Solicitation</u>.  The Company will launch the solicitation of votes on the Plan in accordance with the Milestones.

        Section 2.06   <u>Confirmation of the Plan</u>.  Subject to the terms of this Agreement and the Milestones, the Company will use commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable after the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement.  Each Consenting Party shall use commercially reasonable efforts to cooperate fully and coordinate amongst each other and with the Company in connection therewith, as contemplated by this Agreement.  Each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary or as may be required by order of the Bankruptcy Court, to carry out the purpose and intent of this Agreement (including, without limitation, to provide any information reasonably necessary, or information requested from federal, state, or local regulators, to obtain required regulatory approvals necessary for confirmation of the Plan or consummation of the Restructuring, including, but not limited to, approvals from the NRC, FERC, FCC, any Environmental Regulator, or any other regulatory body

or authority whose approval or consent is determined by the Company to be necessary to consummate the Restructuring Transactions).

3. **Agreements of the Consenting Parties.**

Section 3.01   <u>Support.</u>   Each Consenting Party, with respect to each of its respective Consenting Claims, hereby covenants and agrees, severally and not jointly, during the Support Period, that it shall:

(a)   timely vote within five (5) Business Days following receipt of the solicitation of the Plan all of its Claims and Interests (or Claims and Interests under its control), including all Claims that are impaired under the Plan, to accept the Plan and not change or withdraw (or cause to be changed or withdrawn) any such vote; *provided* that each Consenting Party may change or withdraw its vote if (i) the Company withdraws the Plan or modifies the Plan in a manner that materially and adversely affects the treatment of such Consenting Party as compared to the treatment set forth in the Restructuring Term Sheet, or (ii) the Termination Date occurs as to all Parties;

(b)   grant and, if applicable, not opt-out of the release of third-party claims pursuant to the Plan and Confirmation Order;

(c)   not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, DIP Financing, or acceptance, confirmation, or implementation of the Plan, (ii) propose, support, vote for, encourage, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any entity regarding, any Alternative Restructuring (other than in accordance with this Agreement), including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including without limitation, the NRC, FERC, ERCOT, any Environmental Regulator, or any other regulatory body or authority or making or supporting any press release, press report or comparable public statement, or filing with respect to any Alternative Restructuring, or (iii) to otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring;

(d)   not direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Consenting Party's obligations under this Agreement or the Restructuring Term Sheet and, if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with such Consenting Party's obligations under this Agreement or the Restructuring Term Sheet, such Consenting Party will use its reasonable best efforts to direct such administrative agent, collateral agent, or indenture trustee to cease, desist, and refrain from taking any such action;

(e)   negotiate in good faith and, upon agreement to the terms of the Definitive Documents, complete, enter into, and effectuate the Definitive Documents (as applicable) within the timeframes contemplated herein;

(f)   timely vote (or cause to be voted) its Claims or Interests against any Alternative Restructuring;

(g)      cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the Company and to use reasonable best efforts to support and consummate the Restructuring, including, for the avoidance of doubt, using reasonable best efforts to obtain any necessary federal, state, and local regulatory approvals, including, without limitation, approvals from the NRC, FERC, ERCOT, any Environmental Regulator, or any other regulatory body or authority required to obtain confirmation of the Plan or consummate the Plan and the Restructuring contemplated thereby and herein by the Plan Effective Date;

(h)      timely oppose, including by way of joinder, any objections filed with respect to the Bankruptcy Court approval of any of the Definitive Documents;

(i)      act in good faith consistent with this Agreement;

(j)      to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address and resolve any such impediment;

(k)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from other material stakeholders to the extent reasonably prudent; and

(l)      refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement or interfere with the Restructuring Transactions (including encouraging another person to undertake any action prohibited by this Agreement).

Section 3.02    Transfers.  Each Consenting Party agrees that during the Support Period, it shall not Transfer, directly or indirectly, any Claims against or Interests in the Company, option thereon, or right or interest therein or any other Claims against or Interests in the Company (including by granting any proxies, depositing any such Claims or Interests into a voting trust or entering into a voting agreement with respect to such Claims or Interests), and any purported such Transfer shall be void and without effect unless the transferee thereof:

(a)      is an Initial Consenting Party or a Subsequent Consenting Party;

(b)      before such Transfer, agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Subsequent Consenting Party and to be bound by all of the terms of this Agreement applicable to a Subsequent Consenting Party (including with respect to any and all Claims and Interests it already may hold before such Transfer) by executing a Joinder Agreement and delivering an executed copy of such Joinder Agreement to Weil and the Unsecured Creditor Group Counsel promptly after the consummation of such Transfer.

Each Consenting Party agrees that any Transfer of any Claim or Interest that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

(c)      Notwithstanding anything to the contrary in this Agreement, a Consenting Party may Transfer Claims and Interests to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or

become (i) an entity identified in Section 3.02(a) or (b) hereof (a "**Permitted Transferee**") or (ii) a Subsequent Consenting Party; *provided* that (a) any such Qualified Marketmaker may only subsequently Transfer the right, title or interest to such Claims and Interests to a transferee that is a Permitted Transferee and (b) the Transfer documentation between such Consenting Party and such Qualified Marketmaker shall contain a covenant that providing for the requirement in the preceding clause (a); *provided*, *further*, that if a Consenting Party is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims and Interests that it acquires that are not Consenting Claims (i.e., received by such Qualified Marketmaker from a holder that is not a Consenting Party) without such Transfer being subject to this Section 3.02.

(d)     If at the time of a proposed Transfer of any Claims and Interests to a Qualified Marketmaker, such Claims and Interests: (i) may be voted or consent solicited with respect to the Restructuring, then the proposed transferor must first vote or consent such Claims or Interests in accordance with Section 3.01, or (ii) have not yet been and may yet be voted or consent solicited with respect to the Restructuring and such Qualified Marketmaker does not Transfer such Claims to a Permitted Transferee before the third Business Day before the expiration of an applicable voting or consent deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first Business Day immediately after the Qualified Marketmaker Joinder Date, become a Subsequent Consenting Party with respect to such Claims or Interests in accordance with the terms hereof; *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Subsequent Consenting Party with respect to such Claim or Interest at such time as such Claim or Interest has been Transferred by such Qualified Marketmaker to a transferee that is a Permitted Transferee in accordance with this Agreement.

For these purposes, "**Qualified Marketmaker**" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Claims against the Company, or enter with customers into long and/or short positions in Claims against the Company, in its capacity as a dealer or market maker in such Claims and (ii) is in fact regularly in the business of making a market in claims, interests, or securities of issuers or borrowers.

Section 3.03     Additional Claims or Interests.  To the extent any Consenting Party (i) acquires additional Claims or Interests entitled to vote on the Plan or (ii) Transfers any Claims or Interests, then, in each case, each such Consenting Party shall promptly notify Weil and the Unsecured Creditor Group Counsel and each such Consenting Party hereby agrees that such additional Claims and/or Interests shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims and Interests entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 3.01(a) hereof.

Section 3.04     Forbearance.  The Consenting Parties agree to forbear during the Support Period from the exercise of (and to direct an agent or trustee to forebear from the exercise of) any and all rights and remedies in contravention of this Agreement, whether at law, in equity, by agreement or otherwise, which are or become available to them in respect of the Unsecured Notes, or any other Claims and Interests.  Additionally, during the Support Period, the Consenting

Parties agree not to support, join, or otherwise assist any person in litigation against the Company in connection with the Chapter 11 Cases, Restructuring, the Unsecured Notes, or any other Claims and Interests; *provided* that the foregoing will not limit any of the Consenting Parties' rights to enforce any rights under this Agreement or right to appear as a party in interest and filing papers in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not litigation against the Company and not inconsistent with the Restructuring.

Section 3.05   <u>Additional Disclosures</u>.   Upon written request (including by electronic mail) by the Company or Weil, each Party shall promptly (and, in any event, not later than two (2) Business Days thereafter) identify, in writing, to the Company and Weil the nature and amount of the "disclosable economic interest" (as that term is defined by Rule 2019 of the Federal Rules of Bankruptcy Procedure) held in relation to the Company by all entities represented by the Consenting Party in connection with the Company as of the date of such request.

Section 3.06   <u>Investment Management Exclusions</u>.  Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge that all representations, warranties, covenants, and other agreements made by the Consenting Parties that is a separately managed account or sub-desk of an investment manager are being made only with respect to the Claims managed by such investment manager for the purpose of such account or sub-desk's direction, and shall not apply to (or be deemed to be made in relation to) any Claims or Interests that may be beneficially owned by such Consenting Parties that are not held through accounts managed by such investment manager.

4.      **Additional Agreements of the Company.**

Section 4.01   <u>Affirmative Commitments</u>.   In addition to the obligations of the Company set forth in <u>Section 2</u> of this Agreement, the Company also agrees during the Support Period to use commercially reasonable efforts to do all things in furtherance of the Restructuring, including:

(a)      to (i) act in good faith and use commercially reasonable efforts to support and successfully complete solicitation of the Plan, (ii) pursue any necessary federal, state, and local regulatory approvals to enable confirmation of the Plan, including, without limitation, approvals from the NRC, FERC, FCC, any Environmental Regulator, or any other regulatory body or authority whose approval or consent is determined by the Company to be necessary to consummate the Restructuring Transactions, and (iii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring in accordance with and within the time frames contemplated by this Agreement and the Restructuring Term Sheet; *provided* that, notwithstanding the forgoing, no actions, approvals, consents or waivers of any Environmental Regulator or any other governmental or regulatory body or authority required to consummate the transactions contemplated by this Agreement shall contain any condition or requirement that would so materially and adversely impact the economics or business of the Company that, had such condition or requirement been known prior to signing this Agreement, the Company would not, in its reasonable judgment, have entered into this Agreement; *provided further* that, notwithstanding the forgoing, the Company shall not be required to appeal any

determination regarding such action, approval, consents, or waivers of any such regulatory body or authority.

(b)      to provide advance initial draft copies of the Definitive Documents referenced in <u>Section 1(s)(i)-(ii), (iv)-(vii), (ix)-(xi)</u> to the Unsecured Creditor Group Counsel as soon as reasonably practicable, and will provide such documents no later than five (5) calendar days prior to the date when any Company Parties intend to file the applicable Definitive Documents with the Bankruptcy Court; *provided*, *however*, that for other Definitive Documents, if five (5) calendar days in advance is not reasonably practicable, in no event shall such document be provided later than seventy-two (72) hours in advance of any filing thereof.  The Company Parties acknowledge and agree that they will provide advance initial draft copies of any substantive pleadings (which do not include the Non-Substantive Documents) other than the Definitive Documents to the Unsecured Creditor Group Counsel no later than forty-eight (48) hours prior to the date when any Company Parties intend to file the applicable substantive pleadings with the Bankruptcy Court;

(c)      not to directly or indirectly take any action that would be inconsistent with this Agreement or interfere with the Restructuring (including encouraging another person to undertake any action prohibited by this Agreement);

(d)      to consult with the Consenting Parties and their advisors as to:

(i)      the status and progress of the contract rejection process, the negotiations of the Definitive Documents, and discussions with the Company's shareholders;

(ii)      the status of the Company's business plan and any discussions with third parties in connection therewith;

(iii)      any potential rejection, assumption, or other modification with respect to any of the Company Parties' material contracts or entry into any new material contracts by the Company Parties;

(iv)      the business and financial (including liquidity and budget) performance of the Company;

(v)      hedging strategies;

(vi)      strategy concerning the maximization of tax efficiencies;

(vii)      the allowance of any claims pursuant to the Plan, a motion filed by the Company, or a Bankruptcy Court order against the Company in an amount greater than $500,000; it being understood that this provision does not prohibit the Company from making payments to unaffiliated third parties that are authorized pursuant to any First Day Order (including the DIP Order) or otherwise in the ordinary course of business:

(viii)      the Claims reconciliation process; and

WEIL:\98588686\18\76974.0003

(ix)    affairs concerning any necessary or desirable authorizations (including consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, regulatory body, or any stock exchange (including, but not limited to, approvals from the NRC, FERC, FCC, any Environmental Regulator, or any other federal, state, or local regulatory body or authority whose approval or consent is determined by the Company to be necessary to consummate the Restructuring Transactions);

(e)    without limiting any consent rights otherwise provided in this Agreement, obtain the consent (not to be unreasonably withheld) of the Requisite Consenting Parties prior to effecting any filing or payment, as applicable, contemplated by Section 4.01(d)(vii) above if the amount at issue is at least $5 million;

(f)    provide the Consenting Parties reasonable access to the books and records of the Company upon reasonable advance notice to the Company and without disruption to the operation of the Company's business; notwithstanding the foregoing, in no event shall the Company be required (x) to permit any inspection, or to disclose any information that, in the reasonable judgement of the Company, would cause the Company to violate its respective obligations with respect to confidentiality to a third party if the Company used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (y) to disclose any legally privileged information of the Company, or (z) to violate applicable law.

(g)    provide the Consenting Parties reasonable access to the management of the Company upon reasonable advance notice to the Company and without disruption to the operation of the Company's business;

(h)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent; and

(i)    operate their businesses in the ordinary course, taking into account the Restructuring Transactions and the Chapter 11 Cases.

Section 4.02   Negative Commitments.  During the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)    incur any liens or security interest, other than:   (i) those existing immediately prior to the date hereof, (ii) those permitted pursuant to the DIP Financing, or (iii) those granted under or permitted by the DIP Order;

(b)    commence, support, or join any litigation or adversary proceedings against the Consenting Parties, *provided*, *however*, that the Company can enforce this Agreement notwithstanding the foregoing;

(c)    propose, solicit, file, support, or vote for any Alternative Restructuring Proposal; *provided* that the foregoing does not affect the Company's right to exercise its Fiduciary Out (as defined below); and

(d)      except as contemplated by this Agreement, the Plan, or pursuant to the Restructuring Transactions, issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its Interests, including capital stock or limited liability company interests.

5.      **Termination of Agreement.**

Section 5.01   Generally.   This Agreement will automatically terminate upon (i) the Plan Effective Date (as to all Parties) or (ii) three (3) Business Days following the receipt of written notice, delivered in accordance with Section 20 hereof, from (a) the Requisite Consenting Parties to the other Parties at any time after the occurrence of any Consenting Party Termination Event (as defined below) or (b) the Company (which for the avoidance of doubt, may be delivered by Weil on behalf of any or all entities constituting the Company) to the other Parties at any time after the occurrence of any Company Termination Event (as defined below).  No Party may terminate this Agreement based on a Consenting Party Termination Event or Company Termination Event, as applicable, caused by such Party's failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's prior failure to perform or comply in all material respects with the terms and conditions of this Agreement).

Each of the dates and time periods in this Section 5 may be extended by mutual agreement (which may be evidenced by e-mail confirmation between applicable counsel) among the Company and the Requisite Consenting Parties.

Section 5.02   A "**Consenting Party Termination Event**" will mean any of the following:

(a)      failure to meet any of the Milestones;

(b)      termination of the DIP Financing;

(c)      the Company withdraws or modifies the Plan or Disclosure Statement or files any motion or pleading with the Bankruptcy Court that is in any material respect inconsistent with this Agreement or the Plan and such withdrawal, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the Company receives written notice from the Requisite Consenting Parties that such withdrawal, modification, motion, or pleading is materially inconsistent with this Agreement or the Plan and (ii) entry of an order of the Bankruptcy Court approving such withdrawal, modification, motion, or pleading;

(d)      the material breach by the Company of any of the representations, warranties, covenants, or other obligations of the Company set forth in this Agreement, which breach has not been cured (if curable) within ten (10) Business Days of written notice from the Requisite Consenting Parties;

(e)      the Company exercises a Fiduciary Out (as defined below);

(f)      the Company (i) withdraws the Plan, (ii) publicly announces its intention not to support the Restructuring Transactions, or (iii) determines not to grant releases to any Consenting Party;

(g)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) fifteen (15) Business Days after such issuance the Company provides written notice to the other Parties that such final ruling, judgment, or non-appealable order is materially inconsistent with this Agreement;

(h)      the Bankruptcy Court enters an order denying confirmation of the Plan or any material provision thereof, including any provisions in the Plan relating to releases by the Company Parties of the Consenting Parties, or any material provisions relating to third party releases of the Consenting Parties and such order remains in effect for five (5) Business Days following the entry thereof;

(i)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the Confirmation Date and (b) three (3) Business Days after the Requisite Consenting Parties provide written notice to the other Parties that such order is materially inconsistent with this Agreement;

(j)      any order approving the Plan or the Disclosure Statement is reversed, stayed, dismissed, vacated, or reconsidered without the prior written consent of the Requisite Consenting Parties or is modified or amended (i) in a manner that is inconsistent in any material respect with this Agreement and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Party transmits a written notice describing any such breach;

(k)      the Company fails to timely file a formal objection, after consultation in good faith with the Consenting Parties, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(l)      the Company fails to timely file a formal objection, after consultation in good faith with the Consenting Parties, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases;

(m)      the Company fails to pay the Transaction Expenses of the Unsecured Creditor Group Advisors in accordance with <u>Section 10</u> hereof; or

(n)      the occurrence of the DIP Financing maturity date or the termination of the DIP Order.

WEIL:\98588686\18\76974.0003

Section 5.03    A "**Company Termination Event**" will mean any of the following:

(a)    the Consenting Parties entitled to vote on the Plan will have failed to timely vote their Claims and Interests in favor of the Plan or at any time change their votes to constitute rejections to the Plan, in either case in a manner inconsistent with this Agreement; *provided* that this termination event will not apply if sufficient Consenting Parties have timely voted (and not withdrawn) their Claims and Interests to accept the Plan in amounts necessary for each applicable impaired class under the Plan to "accept" the Plan consistent with section 1126 of the Bankruptcy Code;

(b)    if, as of 11:59 p.m. prevailing Eastern Time on May 30, 2022, the Support Effective Date has not occurred;

(c)    if the requisite Backstop Commitment Letters are not executed within 21 days of the Petition Date;

(d)    termination of the Backstop Commitment Letter;

(e)    failure to meet a Milestone;

(f)    if the Requisite Consenting Parties give notice of termination of this Agreement pursuant to this Section 5;

(g)    the occurrence of the DIP Financing maturity date or the termination of the DIP Order;

(h)    the Consenting Parties file or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement or the Plan and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the filing or supporting party receives written notice from the Company or Weil that such Alternative Restructuring, modification, motion, or pleading is inconsistent with this Agreement or the Plan and (ii) entry of an order of the Bankruptcy Court approving such Alternative Restructuring, modification, motion, or pleading;

(i)    the material breach by one or more of the Consenting Parties of any of the representations, warranties, covenants, or other obligations of the Company set forth in this Agreement, which breach has not been cured (if curable) within ten (10) Business Days of written notice from the Company;

(j)    the board of directors, board of managers, or such similar governing body of any entity constituting the Company reasonably determines in good faith after consultation with outside counsel that continued performance under this Agreement or failure to pursue an Alternative Restructuring would be inconsistent with the exercise of its fiduciary duties under any applicable law (such determination, a "**Fiduciary Out**");

(k)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the

consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) ten (10) Business Days after the Company provides written notice to the other Parties that such ruling, judgment, or order is materially inconsistent with this Agreement; or

(l)    the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the Confirmation Date and (b) three (3) Business Days after the Company provides written notice to the other Parties that such order is materially inconsistent with this Agreement.

Section 5.04   <u>Mutual Termination</u>.  This Agreement may be terminated by mutual written agreement of the Company and the Requisite Consenting Parties.  The Company will deliver written notice of any such termination to all Parties in accordance with <u>Section 20</u> hereof.

Section 5.05   <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with this <u>Section 5</u>, this Agreement will forthwith become void and of no further force or effect and each Party will, except as provided in this <u>Section 5.05</u> and in <u>Section 14</u>, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and will have all the rights and remedies that it would have had and will be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Unsecured Notes, and any ancillary documents or agreements thereto; *provided* that in no event will any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder before the date of such termination.

Upon any termination of this Agreement, each Consenting Party will be deemed to have automatically revoked and withdrawn its participation in the Restructuring, without any further action and irrespective of the expiration or availability of any "withdrawal period" or similar restriction, whereupon any such consents will be deemed, for all purposes, to be null and void *ab initio* and will not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, and the Company agrees not to accept any such consents and to take all action necessary or reasonably required to allow the Consenting Parties to arrange with their custodian and brokers to effectuate the withdrawal of such consents, including the reopening or extension of any withdrawal or similar periods; *provided* that the revocation and withdrawal herein will not apply (i) if this Agreement is terminated upon the Plan Effective Date or (ii) to the Consenting Parties if this Agreement is terminated as a result of their breach of this Agreement.

Section 5.06   <u>Settlement</u>.  This Agreement and the Definitive Documents are part of a proposed settlement of a dispute among certain of the Parties.  If the Restructuring is not consummated, nothing herein will be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all

negotiations relating hereto will not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

6.      **Additional Documents.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise commercially reasonable efforts with respect to, the negotiation, drafting and execution and delivery of the Definitive Documents.

7.      **Representations and Warranties.**

        Section 7.01   Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or such later date that such Party first becomes bound by this Agreement) and solely with respect to the Company, subject to any limitations or approvals arising from or required by the commencement of the Chapter 11 Cases:

        (a)      such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

        (b)      the execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) in the case of the Consenting Parties, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

        (c)      the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings that may be necessary in connection with the Chapter 11 Cases and such filings as may be necessary or required for disclosure by (i) the U.S. Securities and Exchange Commission or other securities regulatory authorities under applicable securities laws and (ii) the NRC, FERC, FCC, any Environmental Regulator, or any other regulatory body or authority whose approval or consent is determined by the Company to be necessary to consummate the Restructuring Transactions; and

        (d)      this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

Section 7.02   Each Consenting Party severally (and not jointly), represents and warrants to the other Parties that as of the date hereof (or such later date that such Party first becomes bound by this Agreement), such Consenting Party:

(a)      is not a Qualified Marketmaker with respect to the Unsecured Notes set forth below its name on the signature page; *provided* that the requirement to satisfy this representation and warranty can be waived by the Company in its sole discretion in consultation with the Unsecured Creditor Group Advisors;

(b)      does not own or control any other "claims", "equity security" or "security" in respect of the Company (including as such terms are defined in section 101 of the Bankruptcy Code) other than as set forth below its name on the signature page; *provided* that with respect to a Qualified Marketmaker, the requirement to satisfy this representation and warranty can be waived by the Company in its sole discretion in consultation with Unsecured Creditor Group Advisors;

(c)      is not a party to any other agreement, arrangement, or understanding with respect to the subject matter hereof with another Consenting Party;

(d)      (i) is the beneficial owner of the Unsecured Notes set forth below its name on the applicable signature page of this Agreement or (ii) has, with respect to the beneficial owners of such Unsecured Notes, (a) sole investment or voting discretion with respect to such Unsecured Notes, (b) full power and authority to vote on and consent to matters concerning such Unsecured Notes, and (c) full power and authority to bind or act on the behalf of, such beneficial owners.

8.      **Disclosure; Publicity.**

Section 8.01   Within two (2) Business Days of the Support Effective Date, the Company will publicly disseminate a press release disclosing the existence of this Agreement and the terms hereof.  If the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any Initial Consenting Party may publicly disclose the foregoing, including this Agreement, and all of its exhibits and schedules (subject to the redactions called for by this <u>Section 8</u> hereof), and the Company hereby waives any claims against the Initial Consenting Parties arising as a result of such disclosure by an Initial Consenting Party in compliance with this Agreement.

Section 8.02   The Company will submit drafts to the Unsecured Creditor Group Counsel of any press releases, public documents, and any and all filings that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days before making any such disclosure (if reasonably practicable, and, if two (2) Business Days is not reasonably practicable, in no event shall such document be provided later than twelve (12) hours in advance of any such disclosure), and will afford them a reasonable opportunity to comment on such documents and disclosures and will consider any such reasonable comments in good faith.  Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Party, no Party or its advisors will disclose to any person (including, for the avoidance of doubt, any other Consenting Party), other than to Weil, the principal amount or percentage of any Unsecured Notes, or any other securities of the Company held by any Consenting Party without such Consenting Party's prior written

consent; *provided* that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party will afford the relevant Consenting Party a reasonable opportunity to review and comment in advance of such disclosure and will take all reasonable measures to limit such disclosure and (ii) the foregoing will not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Unsecured Notes held by all the Consenting Parties collectively.  Notwithstanding the provisions in this Section 8, if consented to in writing by a Consenting Party, any Party hereto may disclose such Consenting Party's individual holdings.

9.      **Amendments and Waivers.**

(a)      This Agreement (or any exhibit, annex, or schedule hereto) may be modified, amended, or supplemented, or a condition or requirement of this Agreement (or any exhibit, annex, or schedule hereto) may be waived, in a writing signed by:  (a) each Company Party, and (b) the Requisite Consenting Parties.  Notwithstanding the foregoing, the consent of each such affected Consenting Party shall also be required to effectuate any modification, amendment, waiver, or supplement if the proposed modification, amendment, waiver, or supplement has a disproportionate (as compared to other Consenting Parties holding Claims within the same class as provided for in the Plan) adverse effect on any of the Company Claims held by a Consenting Party.  Notwithstanding anything herein to the contrary, for the avoidance of doubt, no amendment, modification, waiver, or supplement of (i) this Section 9 or (ii) the definition of "Requisite Consenting Parties" shall be effective without the consent of each Party hereto.

(b)      Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 9 shall be ineffective and void *ab initio* as to any non-consenting Party affected thereby.

(c)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by a Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy by such Party.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by law.

10.     **Transaction Expenses.**

The Company Parties shall pay and reimburse all reasonable and documented prepetition and postpetition fees and expenses (including indemnification expenses, as applicable) of the Unsecured Creditor Group Advisors (the "**Transaction Expenses**") and, unless otherwise agreed to by the Company and the applicable firm, the Company shall:  (i) pay, as a precondition to effectiveness of this Agreement, the Transaction Expenses accrued by the Unsecured Creditor Group Advisors as of such date; (ii) fund or replenish, as the case may be, any retainers requested by any of the Unsecured Creditor Group Advisors; (iii) after the Support Effective Date has occurred, pay all accrued and unpaid Transaction Expenses on a monthly basis and within seven (7) Business Days of receipt of invoices in respect thereof; and (iv) on the Plan Effective Date, pay all accrued and unpaid Transaction Expenses incurred up to (and including) the Plan

Effective Date by the Unsecured Creditor Group Advisors without any requirement for Bankruptcy Court review or further Bankruptcy Court order; *provided, however*, that the DIP Order shall provide for the payment of all Transaction Expenses pursuant to this <u>Section 10</u>.

11. **Effectiveness.**

This Agreement will become effective and binding on (i) the Company, the Initial Consenting Parties, and any Subsequent Consenting Party that has entered into a Joinder Agreement prior to the Support Effective Date on the date of the Support Effective Date and (ii) any Subsequent Consenting Party that enters into a Joinder Agreement on or following the Support Effective Date, upon delivery of such validly completed Joinder Agreement and of a signed acknowledgement from the Company to the other Parties; *provided* that:

(a)    signature pages executed by Consenting Parties will be delivered to (a) the Company, other Consenting Parties, and the Unsecured Creditor Group Counsel in a redacted form that removes such Consenting Party's holdings of the Unsecured Notes and (b) Weil in an unredacted form (to be held by Weil on a professionals' eyes only basis); and

(b)    the Company Parties shall have paid in full the Transaction Expenses of the Unsecured Creditor Group Advisors that are accrued but unpaid as of the Support Effective Date, whether or not such Transaction Expenses are then due, outstanding, or otherwise payable.

12. **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RESTRUCTURING CONTEMPLATED HEREBY.   NOTWITHSTANDING THE FOREGOING, DURING THE PENDENCY OF THE CHAPTER 11 CASES, ALL PROCEEDINGS CONTEMPLATED BY THIS <u>SECTION 12</u> SHALL BE BROUGHT IN THE BANKRUPTCY COURT.

WEIL:\98588686\18\76974.0003

13.     **Remedies/Specific Performance.**

All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party (and for the avoidance of doubt, it is agreed by the other Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party will be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach); *provided* that in connection with any remedy for specific performance, injunctive or other equitable relief asserted in connection with this Agreement, each Party agrees to waive the requirement for the securing or posting of a bond in connection with any remedy and to waive the necessity of proving the inadequacy of money damages.  All rights, powers, and remedies provided under this Agreement or otherwise available at law or in equity will be cumulative and not alternative, and the exercise of any remedy, power, or remedy by any Party will not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Person.

14.     **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, Section 5.06, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 and 24 (and, to the extent applicable to the interpretation of such surviving sections, Section 1) will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

15.     **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and will not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16.     **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns.  The rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person except as expressly permitted herein.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, will be held invalid or unenforceable in whole or in part, such invalidity or unenforceability will attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

17.     **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement will be solely for the benefit of the Parties and no other person or entity will be a third-party beneficiary hereof.

18.     **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements heretofore executed between the Company and any Consenting Party (or the Unsecured Creditor Group Advisors) will continue in full force and effect in accordance with the terms thereof.

19.     **Counterparts.**

This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail, which will be deemed to be an original for the purposes of this <u>Section 19</u>.

20.     **Notices.**

All notices hereunder will be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and electronic mail addresses:

(1)     If to the Company, to:

Talen Energy Supply, LLC
1780 Hughes Landing Boulevard, Suite 800
The Woodlands, Texas 77380
Attention:   Alex Hernandez, CEO (alex.hernandez@talenenergy.com)
             John Chesser, CFO (john.chesser@talenenergy.com)
             Andrew Wright, General Counsel (andrew.wright@talenenergy.com)

with a copy (which will not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:   Matt Barr, Esq. (Matt.Barr@weil.com)
             Alexander Welch, Esq. (Alexander.Welch@weil.com)
             Katherine Lewis, Esq. (Katherine.Lewis@weil.com)

             and

700 Louisiana Street, Suite 1700
Houston, Texas 77002

Attention:   Gabriel Morgan, Esq. (Gabriel.Morgan@weil.com)
               Clifford Carlson, Esq. (Clifford.Carlson@weil.com)

(2)     If to the Consenting Parties, to the addresses or electronic mail addresses set forth below the Consenting Party's signature, with copies to (which will not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile: (212) 446-4900
Attention:  Steven N. Serajeddini, P.C. (steven.serajeddini@kirkland.com)

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Facsimile: (312) 862-2200
Attention:  Patrick J. Nash, Jr., P.C. (patrick.nash@kirkland.com)
             Christopher S. Koenig (chris.koenig@kirkland.com)

Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by electronic mail will be effective upon confirmation of transmission.

21.    **Reservation of Rights; No Admission.**

Nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties (i) to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries), (ii) purchase, sell, or enter into any transactions in connection with the Unsecured Notes or any other Claim against the Company; provided that any such transaction must comply with the requirements of this Agreement, including Sections 3.02-3.03, (iii) enforce any right under the Unsecured Notes, subject to the terms hereof, (iv) consult with other Consenting Parties, other holders of Unsecured Notes, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) regarding the Restructuring (and not any other Alternative Restructuring) in furtherance of the Restructuring, or (v) enforce any right, remedy, condition, consent or approval requirement under this Agreement or in any of the Definitive Documents. Without limiting the foregoing, if this Agreement is terminated in accordance with its terms for any reason (other than consummation of the Restructuring), the Parties each fully and expressly reserve any and all of their respective rights, remedies, claims, defenses and interests, subject to Sections 5, 12, and 13 in the case of any claim for breach of this Agreement arising before termination.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

22.     **Relationship Among Parties.**

It is understood and agreed that no Consenting Party has any duty of trust or confidence in any kind or form with any other Consenting Party, and, except as expressly provided in this Agreement, there are no commitments between them as a result of this Agreement.  In this regard, it is understood and agreed that any Consenting Party may acquire Unsecured Notes, or other debt or equity securities of the Company without the consent of the Company or any other Consenting Party, subject to applicable securities laws and the terms of this Agreement; *provided* that no Consenting Party will have any responsibility for any such acquisition to any other entity by virtue of this Agreement.

23.     **No Solicitation; Representation by Counsel; Adequate Information.**

Section 23.01  This Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

Section 23.02  Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel will have no application and is expressly waived.

Section 23.03  Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, an offering of securities, each Consenting Party acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act, (ii) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (iii) understands that (a) any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and (b) that such securities are being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Party's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iv) has such knowledge and experience in financial and business matters that such Consenting Party is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

24.     **Fiduciary Duties.**

Nothing in this Agreement will require the Company or any directors, officers, managers, or members of the Company, each in its capacity as a director, officer, manager, or member of the Company, to take any action or to refrain from taking any action, to the extent inconsistent with its or their fiduciary duties under applicable law (as determined by them after consultation with legal counsel); *provided, however*, that this <u>Section 24</u> shall not impede any Party's right to terminate this Agreement pursuant to <u>Section 5</u>; provided, further, that the applicable Company Party shall inform the Unsecured Creditor Group Counsel of any decision to exercise a Fiduciary

Out within two (2) Business Days of such decision being made and provide (subject to any confidentiality restrictions) a copy of any Alternative Restructuring Proposal to the Unsecured Creditor Group Counsel.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**Company Signature Page to
the Restructuring Support Agreement**

**AUTHORIZED SIGNATORY OF
TALEN ENERGY SUPPLY, LLC
and each of its direct and indirect wholly owned subsidiaries
listed on <u>Exhibit A</u> hereto**

By: _____

Name:  Andrew M. Wright
Title:   Authorized Signatory

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**APPALOOSA LP, ON BEHALF OF CERTAIN FUNDS FOR WHICH IT ACTS AS MANAGING MEMBER OR INVESTMENT ADVISOR**

By: _____

Name: David Bersh

Title: General Counsel


Address: 51 JFK Parkway, Short Hills, NJ 07078


E-mail address(es): d.bersh@amlp.com


| Claims (principal amount) | | | |
|---|---|---|---|
| - RCF LCs | | | |
| - CAF Loans | | | |
| - Term Loans | | | |
| - 2027 Secured Notes | | | |
| - 6.625% 2028 Secured Notes | | | |
| - 7.625% 2028 Secured Notes | | | |
| - 9.500% Senior Notes due 2022 | | | |
| - 6.500% Senior Notes due 2024 | | | |
| - 6.500% Senior Notes due 2025 | | | |
| - 10.500% Senior Notes due 2026 | | | |
| - 7.000% Senior Notes due 2027 | | | |
| - 6.000% Senior Notes due 2036 | | | |
| - Existing Equity Interests | | | |
| - Other (please describe) | | | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**CARRONADE CAPITAL MASTER, LP**
By Carronade Capital Management, LP, its investment manager

By: _____
Name: Dan Gropper
Title: Managing Partner

Address:
c/o Carronade Capital Management, LP
17 Old Kings Highway South – Suite 140
Darien, CT 06820
Attention: Operations

E-mail address(es):
dgropper@carronade.com
operations@carronade.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**CastleKnight Management LP**

By: _(signature)_

Name:  Aaron Weitman
Title:   Managing Partner

Address:  810 Seventh Avenue, Suite 803
New York, NY 10019

E-mail address(es):  dshapir@castleknight.com
csullivan@castleknight.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**CITADEL EQUITY FUND LTD.**
By its Portfolio Manager, Citadel Advisors LLC

By: _____
Name:          Shellane Mulcahy
Title:          Authorized Signatory

Address: c/o Citadel Enterprise Americas LLC, 131 S Dearborn St, Chicago, IL 60603
E-mail address(es): CitadelAgreementNotice@citadel.com

| Claims (principal amount) | |
|---|---|
| -   RCF LCs | |
| -   CAF Loans | |
| -   Term Loans | |
| -   2027 Secured Notes | |
| -   6.625% 2028 Secured Notes | |
| -   7.625% 2028 Secured Notes | |
| -   9.500% Senior Notes due 2022 | |
| -   6.500% Senior Notes due 2024 | |
| -   6.500% Senior Notes due 2025 | |
| -   10.500% Senior Notes due 2026 | |
| -   7.000% Senior Notes due 2027 | |
| -   6.000% Senior Notes due 2036 | |
| -   Existing Equity Interests | |
| -   Other (please describe): Short CDS | |

JC

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**CONTRARIAN CAPITAL MANAGEMENT, L.L.C.**

By: _____
Name:
Title:       Jon Bauer

              Chief Investment Officer

Address:
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

E-mail address(es):
pzuckerman@contrariancapital.com

| Claims (principal amount) | |
|---|---|
| -    RCF LCs | |
| -    CAF Loans | |
| -    Term Loans | |
| -    2027 Secured Notes | |
| -    6.625% 2028 Secured Notes | |
| -    7.625% 2028 Secured Notes | |
| -    9.500% Senior Notes due 2022 | |
| -    6.500% Senior Notes due 2024 | |
| -    6.500% Senior Notes due 2025 | |
| -    10.500% Senior Notes due 2026 | |
| -    7.000% Senior Notes due 2027 | |
| -    6.000% Senior Notes due 2036 | |
| -    Existing Equity Interests | |
| -    Other (please describe) | |

**Consenting Party Signature Page to
Restructuring Support Agreement**

**FOURSIXTHREE CAPITAL LP**

By: _____
Name: William Kelly
Title: Chief Operating Officer


Address:

FourSixThree Capital LP
520 Madison Avenue 19th floor
New York, NY 10022


E-mail address(es):

scott@463cap.com
rayan@463cap.com
drew@463cap.com
bill@463cap.com
nitin@463cap.com

| Claims (principal amount) | |
|---|---|
| -   RCF LCs | |
| -   CAF Loans | |
| -   Term Loans | |
| -   2027 Secured Notes | |
| -   6.625% 2028 Secured Notes | |
| -   7.625% 2028 Secured Notes | |
| -   9.500% Senior Notes due 2022 | |
| -   6.500% Senior Notes due 2024 | |
| -   6.500% Senior Notes due 2025 | |
| -   10.500% Senior Notes due 2026 | |
| -   7.000% Senior Notes due 2027 | |
| -   6.000% Senior Notes due 2036 | |
| -   Existing Equity Interests | |
| -   Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**FRANKLIN ADVISERS, INC., AS INVESTMENT MANAGE ON BEHALF OF CERTAIN
FUNDS AND ACCOUNTS**

By: _Glenn Voyles_
Name: Glenn Voyles
Title:  SVP


Address:  One Franklin Parkway, San Mateo, CA 94403


E-mail address(es):  gary.kiang@franklintempleton.com; chris.chen@franklintempleton.com


| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**KING STREET GLOBAL DRAWDOWN FUND, L.P.**
By: King Street Capital Management, L.P.
     Its Investment Manager


By:  _____
Name: Howard Baum
Title: Director of Operations


Address: 299 Park Avenue, 40th Floor
         New York, NY 10171


E-mail address(es): pboperations@kingstreet.com


| Claims (principal amount) | |
|---|---|
| -   RCF LCs | |
| -   CAF Loans | |
| -   Term Loans | |
| -   2027 Secured Notes | |
| -   6.625% 2028 Secured Notes | |
| -   7.625% 2028 Secured Notes | |
| -   9.500% Senior Notes due 2022 | |
| -   6.500% Senior Notes due 2024 | |
| -   6.500% Senior Notes due 2025 | |
| -   10.500% Senior Notes due 2026 | |
| -   7.000% Senior Notes due 2027 | |
| -   6.000% Senior Notes due 2036 | |
| -   Existing Equity Interests | |
| -   Other (please describe) | |

**Consenting Party Signature Page to
Restructuring Support Agreement**

**KING STREET CAPITAL, L.P.**
By: King Street Capital Management, L.P.
    Its Investment Manager

By: _____
Name: Howard Baum
Title: Director of Operations


Address: 299 Park Avenue, 40th Floor
         New York, NY 10171


E-mail address(es): pboperations@kingstreet.com


| Claims (principal amount) | |
|---|---|
| -    RCF LCs | |
| -    CAF Loans | |
| -    Term Loans | |
| -    2027 Secured Notes | |
| -    6.625% 2028 Secured Notes | |
| -    7.625% 2028 Secured Notes | |
| -    9.500% Senior Notes due 2022 | |
| -    6.500% Senior Notes due 2024 | |
| -    6.500% Senior Notes due 2025 | |
| -    10.500% Senior Notes due 2026 | |
| -    7.000% Senior Notes due 2027 | |
| -    6.000% Senior Notes due 2036 | |
| -    Existing Equity Interests | |
| -    Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**KING STREET CAPITAL MASTER FUND, LTD.**
By: King Street Capital Management, L.P.
    Its Investment Manager

By: _____
Name: Howard Baum
Title: Director of Operations

Address: 299 Park Avenue, 40th Floor
       New York, NY 10171

E-mail address(es): pboperations@kingstreet.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**LIVELLO CAPITAL MANAGEMNT LP**

By: _Joseph Salegna_

Name: Joseph Salegna

Title: Chief Financial Officer

Address: 1 World Trade Center, 85th Floor, New York, NY 10007

E-mail        address(es):        jsalegna@livellocap.com,        adefelice@livellocap.com,
pgiordano@livellocap.com, operations@livellocap.com

| Claims (principal amount) | |
|---|---|
| -    RCF LCs | |
| -    CAF Loans | |
| -    Term Loans | |
| -    2027 Secured Notes | |
| -    6.625% 2028 Secured Notes | |
| -    7.625% 2028 Secured Notes | |
| -    9.500% Senior Notes due 2022 | |
| -    6.500% Senior Notes due 2024 | |
| -    6.500% Senior Notes due 2025 | |
| -    10.500% Senior Notes due 2026 | |
| -    7.000% Senior Notes due 2027 | |
| -    6.000% Senior Notes due 2036 | |
| -    Existing Equity Interests | |
| -    Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**LORD, ABBETT & CO. LLC, AS INVESTMENT ADVISER ON BEHALF OF CERTAIN ACCOUNTS IT MANAGES**

By: _____

Name: Lawrence B. Stoller

Title: Member & General Counsel

Address: Lord, Abbett & Co. LLC
         90 Hudson Street
         Jersey City, NJ 07302

E-mail address(es): LegalNotices@lordabbett.com

| Claims (principal amount) | |
|---|---|
| -    RCF LCs | |
| -    CAF Loans | |
| -    Term Loans | |
| -    2027 Secured Notes | |
| -    6.625% 2028 Secured Notes | |
| -    7.625% 2028 Secured Notes | |
| -    9.500% Senior Notes due 2022 | |
| -    6.500% Senior Notes due 2024 | |
| -    6.500% Senior Notes due 2025 | |
| -    10.500% Senior Notes due 2026 | |
| -    7.000% Senior Notes due 2027 | |
| -    6.000% Senior Notes due 2036 | |
| -    Existing Equity Interests | |
| -    Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**NUVEEN ASSET MANAGEMENT, LLC,**
**as investment adviser on behalf of certain fund/accounts**


By: _____

Name:  Stuart J. Cohen
Title:   MD & Head of Legal


Address:  Nuveen
             333 West Wacker Drive
             Chicago, Illinois 60606
             Attn: Douglas Johnston, MD & Senior Research Analyst


E-mail address(es):  douglas.johnston@nuveen.com, stuart.cohen@nuveen.com;


| Claims (principal amount) | |
|---|---|
| -    RCF LCs | |
| -    CAF Loans | |
| -    Term Loans | |
| -    2027 Secured Notes | |
| -    6.625% 2028 Secured Notes | |
| -    7.625% 2028 Secured Notes | |
| -    9.500% Senior Notes due 2022 | |
| -    6.500% Senior Notes due 2024 | |
| -    6.500% Senior Notes due 2025 | |
| -    10.500% Senior Notes due 2026 | |
| -    7.000% Senior Notes due 2027 | |
| -    6.000% Senior Notes due 2036 | |
| -    Existing Equity Interests | |
| -    Other (please describe)<br><br>Unsecured Municipal Bonds due 2038 | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**BLACKWELL PARTNERS LLC - SERIES A**
**BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By: _____

Name:  Jacob Rubin
Title:  Managing Member


Address:  3000 Sand Hill Road, Building 4, Suite 110, Menlo Park, CA 94025


E-mail address(es):  jacob@philosophycap.com; operations@philosophycap.com

| Claims (principal amount) | |
|---|---|
| -     RCF LCs | |
| -     CAF Loans | |
| -     Term Loans | |
| -     2027 Secured Notes | |
| -     6.625% 2028 Secured Notes | |
| -     7.625% 2028 Secured Notes | |
| -     9.500% Senior Notes due 2022 | |
| -     6.500% Senior Notes due 2024 | |
| -     6.500% Senior Notes due 2025 | |
| -     10.500% Senior Notes due 2026 | |
| -     7.000% Senior Notes due 2027 | |
| -     6.000% Senior Notes due 2036 | |
| -     Existing Equity Interests | |
| -     Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**CASSINI PARTNERS, LP**
**BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By: _____

Name:  Jacob Rubin
Title:  Managing Member


Address:  3000 Sand Hill Road, Building 4, Suite 110, Menlo Park, CA 94025


E-mail address(es):  jacob@philosophycap.com; operations@philosophycap.com


| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**STAR V PARTNERS LLC**
**BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By: _____

Name:  Jacob Rubin
Title:  Managing Member


Address:  3000 Sand Hill Road, Building 4, Suite 110, Menlo Park, CA 94025


E-mail address(es):  jacob@philosophycap.com; operations@philosophycap.com


| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**PHILOSOPHY CAPITAL PARTNERS, LP**
**BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By: _____

Name:  Jacob Rubin
Title:  Managing Member

Address:  3000 Sand Hill Road, Building 4, Suite 110, Menlo Park, CA 94025

E-mail address(es):  jacob@philosophycap.com; operations@philosophycap.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**RUBRIC CAPITAL MANAGEMENT LP**
As Manager or Sub-Manager on behalf of its funds and accounts

By: _____
Name: Michael Nachmani
Title: Authorized Signatory


Address:
155 East 44th St, Suite 1630
New York, NY 10017

E-mail        address(es):        michael@rubriccapital.com;        brian@rubriccapital.com;
jonathan@rubriccapital.com

| Claims (principal amount) | |
|---|---|
| -     RCF LCs | |
| -     CAF Loans | |
| -     Term Loans | |
| -     2027 Secured Notes | |
| -     6.625% 2028 Secured Notes | |
| -     7.625% 2028 Secured Notes | |
| -     9.500% Senior Notes due 2022 | |
| -     6.500% Senior Notes due 2024 | |
| -     6.500% Senior Notes due 2025 | |
| -     10.500% Senior Notes due 2026 | |
| -     7.000% Senior Notes due 2027 | |
| -     6.000% Senior Notes due 2036 | |
| -     Existing Equity Interests | |
| -     Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

CAPTIAL VENTURES INTERNATIONAL

BY: SUSQUEHANNA ADVISORS GROUP, INC., ITS AUTHORIZED AGENT

By:

Name: Kathy Harley
Title: Assistant Vice President

Address: Capital Ventures International c/o Susquehanna Advisors Group, Inc. – 401 City Avenue – Suite 220, Bala Cynwyd, PA 19004

E-mail address(es): convertsops@sig.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**SYSTEM 2 MASTER FUND LIMITED**

By: _____

Name:   Glenn Kennedy

Title:    Director

Address:  9 Forum Lane, Suite 3119, Camana Bay, Grand Cayman, Cayman Islands

E-mail address(es): oliver.chadwick@system2capital.com

| Claims (principal amount) | |
|---|---|
| -    RCF LCs | |
| -    CAF Loans | |
| -    Term Loans | |
| -    2027 Secured Notes | |
| -    6.625% 2028 Secured Notes | |
| -    7.625% 2028 Secured Notes | |
| -    9.500% Senior Notes due 2022 | |
| -    6.500% Senior Notes due 2024 | |
| -    6.500% Senior Notes due 2025 | |
| -    10.500% Senior Notes due 2026 | |
| -    7.000% Senior Notes due 2027 | |
| -    6.000% Senior Notes due 2036 | |
| -    Existing Equity Interests | |
| -    Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**TWO SEAS GLOBAL (MASTER) FUND LP**

By: _____

Name:      Sina Toussi
Title:      Managing member of Two Seas Global
           Fund GP LLC, its general partner
Address:   32 Elm Place – 3rd Floor
           Rye, NY 10580

E-mail address(es): stoussi@twoseascap.com, finops@twoseascap.com

| Claims (principal amount) | |
|---|---|
| -      RCF LCs | |
| -      CAF Loans | |
| -      Term Loans | |
| -      2027 Secured Notes | |
| -      6.625% 2028 Secured Notes | |
| -      7.625% 2028 Secured Notes | |
| -      9.500% Senior Notes due 2022 | |
| -      6.500% Senior Notes due 2024 | |
| -      6.500% Senior Notes due 2025 | |
| -      10.500% Senior Notes due 2026 | |
| -      7.000% Senior Notes due 2027 | |
| -      6.000% Senior Notes due 2036 | |
| -      Existing Equity Interests | |
| -      Other (please describe) | |

**Exhibit A**

**Company Parties**

1.      Talen Energy Supply, LLC
2.      Talen Montana Holdings, LLC
3.      Talen Montana, LLC
4.      Montana Growth Holdings LLC
5.      Colstrip Comm Serv, LLC
6.      Talen Generation, LLC
7.      Montour, LLC
8.      Brunner Island, LLC
9.      Raven Power Generation Holdings LLC
10.     Raven Power Group LLC
11.     Raven Power Finance LLC
12.     Raven Power Fort Smallwood LLC
13.     Raven FS Property Holdings LLC
14.     H.A. Wagner LLC
15.     Brandon Shores LLC
16.     Raven Lot 15 LLC
17.     Fort Armistead Road – Lot 15 Landfill, LLC
18.     Raven Power Property LLC
19.     RMGL Holdings LLC
20.     Brunner Island Services, LLC
21.     Realty Company of Pennsylvania
22.     BDW Corp.
23.     Lady Jane Collieries, Inc.
24.     Montour Services, LLC
25.     Holtwood, LLC
26.     Martins Creek, LLC
27.     Sapphire Power Generation Holdings LLC
28.     Sapphire Power LLC
29.     Sapphire Power Finance LLC
30.     MEG Generating Company, LLC
31.     Sapphire Power Marketing LLC
32.     Pedricktown Management Company LLC
33.     Pedricktown Investment Company LLC
34.     Pedricktown Cogeneration Company LP
35.     York Plant Holding, LLC
36.     York Generation Company LLC
37.     Elmwood Energy Holdings, LLC
38.     Elmwood Park Power, LLC
39.     Camden Plant Holding, L.L.C.
40.     Newark Bay Holding Company, L.L.C.
41.     Liberty View Power, L.L.C.

42. Newark Bay Cogeneration Partnership, L.P.
43. Morris Energy Management Company, LLC
44. Morris Energy Operations Company, LLC
45. Lower Mount Bethel Energy, LLC
46. Pennsylvania Mines, LLC
47. MC OpCo LLC
48. Talen Nuclear Development, LLC
49. Bell Bend, LLC
50. Susquehanna Nuclear, LLC
51. Talen Texas, LLC
52. Barney Davis, LLC
53. Nueces Bay, LLC
54. Laredo, LLC
55. Talen Texas Property, LLC
56. Talen Texas Group, LLC
57. Talen Energy Marketing, LLC
58. Talen Energy Retail LLC
59. Talen Treasure State, LLC
60. Talen Energy Services Group, LLC
61. Talen Energy Services Holdings, LLC
62. Talen Energy Services Northeast, Inc.
63. Talen Land Holdings, LLC
64. Talen NE LLC
65. NorthEast Gas Generation Holdings, LLC
66. Dartmouth Plant Holding, LLC
67. Dartmouth Power Holding Company, L.L.C.
68. Dartmouth Power Generation, L.L.C.
69. Dartmouth Power Associates Limited Partnership
70. Talen II Growth Parent LLC
71. Talen II Growth Holdings LLC
72. Talen Technology Ventures LLC

**<u>Exhibit B</u>**

**Restructuring Term Sheet**

# Restructuring Term Sheet

| Transaction Structure[1] |
|---|

| | |
|---|---|
| **Transaction** | <ul><li>**Up to $1.65bn equity rights offering**: $1.3bn equity rights offering (the "**Rights Offering**") backstopped by certain members of the Ad Hoc Group of Unsecured Noteholders (the "**Ad Hoc Group**").  On the Adjustment Determination Date (as defined and described below), the Rights Offering amount (the "**Initial Backstop Amount**") may be decreased to a minimum of $600 million or increased up to $1.65bn</li><li>"**Adjustment Determination Date**" shall be a date following entry of the Confirmation Order[2] and prior to the Plan Effective Date, selected by the Debtors in consultation with the Required Backstop Parties; provided that the Parties shall work in good faith to select, if practicable and subject to the requirements or limitations of the NRC, a date that is approximately 90 days prior to the projected Plan Effective Date.</li><li>On the Adjustment Determination Date, there will be a test of projected Net Debt and Minimum Liquidity (each as defined below) as of the projected Plan Effective Date (the "**RO Adjustment Determination**").  Based on the RO Adjustment Determination, the Rights Offering amount will be automatically increased (up to a maximum of $1.65 billion) or automatically decreased (down to a minimum of $600 million).  The Backstop Parties may (but are not required to) agree at any time to backstop any upsized Rights Offering amount on the same terms as the initial $1.3 billion backstop commitment.<ul><li>By no earlier than 120 days in advance of the projected Plan Effective Date, the Debtors shall seek prospective ratings from the Ratings Agencies (as defined below), based on the updated business plan to be incorporated into the Disclosure Statement.   If the Ratings Agencies (as defined below) determine that the projected corporate rating of the Reorganized Debtors is no less than BB (or equivalent rating), then there shall be no upsize of the Rights Offering above $1.3 billion on the Adjustment Determination Date.  The "**Ratings Agencies**" shall be two out of the following three nationally recognized ratings agencies as agreed upon by the Debtors and the Requisite Initial Backstop Parties: S&P, Moody's and Fitch</li></ul></li><li>Net Debt (as defined below) at emergence shall be consistent with a schedule (the "**Net Debt Schedule**"), with Net Debt being $1.5 billion assuming a Plan Effective Date in June 2023; at least a $1.0bn Priority Exit RCF for additional liquidity / LC capacity</li><li>Allowed secured claims paid in full in cash with proceeds from Exit Debt / Rights Offering, given option to roll into new exit debt, or otherwise unimpaired</li><li>Unsecured Notes to receive (a) 100% of new common equity, less equity distributed on account of the unsecured claims equity recovery pool, and subject to dilution from the Rights Offering (including the Backstop Commitment Agreement) and Employee Incentive Program; and (b) participation in the Rights Offering</li></ul> |
| **Implementation** | <ul><li>Predicated on chapter 11 filing no later than May 9, 2022</li><li>Transaction implemented through a chapter 11 bankruptcy process pursuant to RSA between Company and the Ad Hoc Group</li><li>Transaction to be structured (including issuer of new stock) to minimize potential tax liability and maximize tax attributes of the Reorganized Debtors</li></ul> |
| **Exit Debt Capital Structure** | <ul><li>$1.0bn or more Priority Exit Revolving Credit Facility, including $500m LC sublimit (if LC sublimit not available under Exit RCF, to enter into standalone facility)</li><li>Net Debt at emergence (including PEDFA reinstatement) to comply with the Net Debt Schedule, with Net Debt being $1.5 billion assuming a Plan Effective Date in June 2023.  The Net Debt Schedule shall reflect the Net Debt target on the Plan Effective Date, which shall fluctuate over time based on the projections in the Company's DIP budget (as adjusted for exit costs and capital structure), and the Net Debt Schedule shall be agreed between the Backstop Parties and the Company and attached to the Backstop Commitment Letters</li><li>"**Net Debt**" defined as Gross Funded Debt (as defined below) net of any unrestricted cash</li><li>"**Gross Funded Debt**" to include all funded indebtedness including up to $131 million of reinstated PEDFA bonds and any net LMBE-MC indebtedness (if not refinanced / repaid), and shall be $1.631 billion (based on $155 million of unrestricted cash) assuming a Plan Effective Date of June 30, 2023, which shall be adjusted pursuant to the Net Debt Schedule</li><li>"**Minimum Liquidity**" shall be $650 million, consisting of unrestricted cash and revolver availability</li><li>"**Minimum LC Capacity**": $500 million of LC capacity, which can also be satisfied with revolver availability and/or unrestricted cash incremental to the Minimum Liquidity requirement</li></ul> |

**Notes**
1.   Terms used herein but otherwise not defined shall have the meanings provided in the Restructuring Support Agreement or Backstop Commitment Letter.
2.   Current Company estimate is 120-150 days following entry of the Confirmation Order.

# Restructuring Term Sheet

| Transaction Structure | |
|---|---|
| **Rights Offering** | • Rights Offering to be available to all unsecured noteholders (subject to eligibility under applicable securities laws) backstopped by the Initial Backstop Parties and any other Backstop Parties.  On the Adjustment Determination Date, the RO Adjustment Determination shall occur. If the Ratings Agencies determine that the projected corporate rating of the Reorganized Debtors is no less than BB (or equivalent rating), then there shall be no upsize of the Rights Offering above $1.3 billion on the Adjustment Determination Date.<br>• Premium equal to 20% of each Backstop Party's portion of the backstop commitment (the "**Backstop Premium**"), to be paid in equity if the chapter 11 plan is consummated, and a periodic premium paid monthly equal to 10% per annum of each Backstop Party's portion of the backstop commitment (the "**Periodic Premium**", together with the Backstop Premium, the "**Put Premium**").  The Periodic Premium shall be credited against the Backstop Premium, and shall be payable in cash or new equity (in each Backstop Party's discretion)<br>    • No greater than 1/3 of the aggregate Periodic Premium can be paid in cash on a monthly basis. The Periodic Premium shall accrue from signing but in no event will any cash payment be made prior to court approval of the Backstop Agreement<br>• **Alternative Transaction Premium**: to be earned upon a customary termination event and paid following the Plan Effective Date, equal to 50% of the Backstop Premium payable in cash, after crediting for any Periodic Premium that has been paid in cash, subject to the exclusions in the Backstop Commitment Letter<br>• Market terms for backstop commitment to include, but not be limited to, a 25% discount to plan equity value assuming a $4.5 billion total enterprise value and a 30% direct investment for Backstop Parties on account of the backstop commitment<br>• Rights Offering to be conducted in accordance with applicable securities laws; expectation is that (a) Rights Offering stock will be exempted pursuant to section 1145 or, if section 1145 is not available, 4(a)(2) and/or Reg D and (b) Backstop Parties are eligible to stock issued on account of backstop under 4(a)(2) and/or Reg D |
| **Employee Incentive Program ("EIP")** | • Employees of the Reorganized Debtors to have reserved for them 12% of the new common equity as follows:<br>    • 8.0% reserved for the Chief Executive Officer (the "**CEO**") of Reorganized TES, the CEO's direct reports, and certain other employees of Reorganized TES<br>    • 2.0% reserved for plant level employees of Reorganized TES, including plant union employees<br>    • 2.0% reserved for employees who join Reorganized TES after the Plan Effective Date, recruiting of key talent-to-value roles and succession planning |
| **Corporate Governance** | • To be determined by the Requisite Initial Backstop Parties; new Board members to be selected by the Requisite Initial Backstop Parties; Initial Backstop Parties to consult with the Company regarding number of board seats; CEO to be a board member |
| **Releases and Exculpations** | • Customary debtor and third party releases for directors, officers and holders of Interests and affiliates, including Riverstone ("**Equity Affiliates**"); provided, however, that the Consenting Parties' consent to debtor and third party releases for holders of Interests and Equity Affiliates shall be only upon and subject to the terms of any Talen Global Settlement (as defined below), and the Consenting Parties retain the right to object to the Debtors' release of holders of Interests and Equity Affiliates if not resolved under the Talen Global Settlement |

# Restructuring Term Sheet

| Treatment of Claims | |
|---|---|
| **DIP Facility / Super Priority Claims** | • Repaid in full in cash at emergence |
| **RCF / CAF / 1L TL / 1L Notes / Other 1L Obligations[1]** | • Allowed secured claims to be paid in full in cash or otherwise unimpaired, claims subject to diligence and negotiation.  Allowed secured claims to be subject to the consent of the Requisite Consenting Creditors |
| **LMBE-MC Credit Facilities** | • LMBE-MC is a non-debtor during chapter 11 process, with existing credit facilities either (1) remaining in place or (2) refinanced at emergence at the option of the Requisite Consenting Creditors |
| **Unsecured Notes** | • Pro rata share of 100% of new common equity, less new common equity in unsecured claims equity recovery pool, subject to dilution from the Rights Offering (including the Backstop Commitment Agreement) and Employee Incentive Program<br>• Pro rata share of the Rights Offering |
| **Existing Equity** | • Canceled (subject to tax structuring considerations) |
| **GUC / Trade** | • To receive pro rata share of either (x) unsecured claims cash recovery pool or (y) unsecured claims equity recovery pool on a claim by debtor basis subject to dilution from the Rights Offering (including the Backstop Commitment Agreement) and Employee Incentive Program |
| **Employee Obligations** | • Assumption of collective bargaining agreements, subject to the consent of the Requisite Consenting Creditors<br>• Assumption of management employment agreements, subject to the consent of the Requisite Consenting Creditors<br>• Pension obligations unimpaired subject to the consent of the Requisite Consenting Creditors |
| **Cumulus Considerations** | • All Cumulus considerations reserved subject to diligence and negotiations; including potential direct investment in Cumulus, offered to unsecured holders in a TBD allocation with structure and form TBD and with terms acceptable to the Company and the Requisite Consenting Creditors<br>• Continued funding of investments during the case consistent with the latest DIP Budget<br>• Ad Hoc Group to negotiate in good faith regarding a resolution, to the satisfaction of the Company and Requisite Consenting Creditors, of all matters, disputes, arrangements regarding intercompany and antecedent transactions between the Company, Cumulus, TEC, and Riverstone (any such resolution, a "**Talen Global Settlement**") |
| **Other Claims** | • Rejection of retail contracts at commencement of case<br>• Asset retirement obligations unimpaired, subject to the consent of the Requisite Consenting Creditors<br>• PEDFA B & C Bonds unimpaired at emergence with the consent of the Requisite Consenting Creditors, but during the pendency of the chapter 11 cases subject to the DIP Order and in the discretion of the Company<br>• Treatment of environmental liabilities subject to the consent of the Requisite Consenting Creditors |

**Notes**
1.   Fuel Financing to be repaid upon entry of the Interim DIP Order.

3

# Restructuring Term Sheet

| Milestones |
|---|
| **Milestones**<br><br>**(Subject to Court's Availability)** | No later than 11:59 p.m. CT on May 9, 2022 (the "**Outside Petition Date**"), the Company shall commence filing of the chapter 11 cases in the Bankruptcy Court (the date on which such filing occurs, the "**Petition Date**")<br><br>1. The Bankruptcy Court shall have entered the DIP Order on an interim basis: no later than 3 Business Days after the Petition Date<br><br>2. The Company and the Backstop Parties shall have entered into the Backstop Commitment Letters and have agreed upon an amended fee letter for the Ad Hoc Group's financial advisor: no later than 21 days after the Petition Date<br><br>3. The Consenting Creditors shall hold 66.66% in principal amount of total unsecured notes: no later than 21 days after the Petition Date<br><br>4. The Bankruptcy Court shall have entered the DIP Order on a final basis: no later than 45 days after the Petition Date or such later date as agreed to by the requisite consenting lenders under the DIP Order<br><br>5. The Company shall have filed the (i) Plan, (ii) Motion to Approve the Disclosure Statement, and (iii) Motion to Assume the Backstop Commitment Letters: no later than 90 days after the Petition Date<br><br>6. The Talen Global Settlement shall be agreed to the satisfaction of the Company and the Requisite Consenting Creditors: no later than 90 days after the Petition Date<br><br>7. The Bankruptcy Court shall have entered (i) the order approving the Disclosure Statement, and (ii) the Backstop Approval Order: no later than 130 days after the Petition Date<br><br>8. The hearing to approve the Confirmation Order shall have commenced: no later than 170 days after the Petition Date<br><br>9. The Confirmation Order shall have been entered: no later than 184 days after the Petition Date<br><br>10. The Rights Offering shall have been launched: no later than 15 days after the Adjustment Determination Date<br><br>11. Rights Offering Funding Date: no later than 7 days before the projected Plan Effective Date<br><br>12. The Plan Effective Date shall have occurred: no later than 12 months after the Petition Date; *provided* that this milestone may be extended by up to 6 months solely to obtain regulatory approvals |

<u>**Exhibit C**</u>

**Backstop Commitment Letter**

May [●], 2022

<u>CONFIDENTIAL</u>

Talen Energy Supply, LLC
1780 Hughes Landing Boulevard, Suite 800
The Woodlands, Texas 77380
Attention:    Alex Hernandez, CEO
           John Chesser, CFO
           Andrew Wright, General Counsel

**Commitment Letter**

Gentlemen:

Reference is made to that certain Restructuring Support Agreement, dated as of May [●], 2022 (including any exhibits and schedules thereto, the "<u>Restructuring Support Agreement</u>"), by and among Talen Energy Supply, LLC (now and as it may be reorganized under a joint chapter 11 plan of reorganization (the "<u>Plan</u>"), "<u>TES</u>" and collectively with certain direct and indirect subsidiaries of TES set forth on <u>Exhibit A</u> to the Restructuring Support Agreement, the "<u>Debtors</u>") and certain holders of notes issued pursuant to the Unsecured Notes Indentures (as defined in the Restructuring Support Agreement). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement.

The Debtors expect to implement the Restructuring Transactions through the commencement of voluntary cases (the "<u>Chapter 11 Cases</u>") under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder, the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of Texas (together with any court with jurisdiction over such cases, the "<u>Bankruptcy Court</u>"). The Debtors have requested that certain holders of Unsecured Notes that are Consenting Parties and signatories hereto (individually, a "<u>Backstop Party</u>" and, collectively, the "<u>Backstop Parties</u>") "backstop" the Rights Offering contemplated by the Restructuring Support Agreement. The Restructuring Support Agreement, including the term sheet attached thereto as <u>Exhibit B</u> (the "<u>Term Sheet</u>") and incorporated as if fully set forth therein, sets forth the terms and conditions upon which the Backstop Parties are willing to "backstop" the Rights Offering.

This Commitment Letter (this "<u>Commitment Letter</u>") shall be effective upon (a) the execution and delivery by TES and each Backstop Party of the signature pages attached hereto and (b) the occurrence of the Support Effective Date.

1.    <u>Commitments</u>.

(a)    In connection with the Restructuring Transactions and pursuant to the Plan, among other things, the Company will conduct a rights offering (the "<u>Rights Offering</u>"), by distributing to each holder of Unsecured Notes (subject to eligibility requirements under applicable securities laws) rights to purchase ("<u>Subscription Rights</u>") new equity to be

issued pursuant to the Plan (the "New Equity") and available to be purchased in connection with the Rights Offering, and in an amount consistent with the Term Sheet.

(b)     Subject to the terms and conditions set forth herein and in the Term Sheet, each Backstop Party set forth in **Schedule I** hereto hereby severally, and not jointly, commits to purchase, on the Plan Effective Date, the aggregate amount of New Equity that has not been subscribed for and purchased (if any) in the Rights Offering on the terms set forth in the Term Sheet equal to the percentage set forth opposite the name of such Backstop Party on **Schedule I** (as to each Backstop Party at the applicable date of determination, its "Backstop Commitment Percentage") (each such commitment, a "Commitment" and collectively, the "Commitments").

(c)     The Rights Offering will be made, and the New Equity issued thereunder will be issued and sold in reliance upon, the exemption from registration under the Securities Act of 1933 (the "Securities Act") provided in section 1145 of the Bankruptcy Code or, if not available, an exemption from registration provided by section 4(a)(2) and Regulation D of the Securities Act or another available exemption from registration under the Securities Act; *provided*, that, all New Equity issued to the Backstop Parties on account of the Backstop Commitments will be made in reliance on the exemption from registration provided by section 4(a)(2) and Regulation D of the Securities Act or another available exemption from registration under the Securities Act, and, in each case, the Disclosure Statement, Confirmation Order and Plan shall include a statement to such effect; *provided, further*, that any New Equity issued pursuant to the Put Premium shall be issued and sold in reliance upon, the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code or, if not available, an exemption from registration provided by section 4(a)(2) and Regulation D of the Securities Act or another available exemption from registration under the Securities Act.  For the avoidance of doubt, in no event shall any Backstop Party be required to purchase New Equity in excess of the amount equal to its Backstop Commitment Percentage (subject to the satisfaction of its obligations under Section 1(d) hereof).  The Backstop Parties, and by countersigning this Commitment Letter, the Debtors, hereby, severally and not jointly, agree to cooperate and negotiate in good faith the terms and conditions of the New Equity issued to the Backstop Parties and the documents and agreements governing the procedures and arrangements for the Rights Offering, including, without limitation, the Rights Offering Procedures, which shall be in form and substance reasonably acceptable to the Requisite Backstop Commitment Parties.

(d)     Subject to the terms and conditions set forth herein and the Rights Offering Procedures, each Backstop Party agrees, severally and not jointly, to (i) fully exercise all rights issued to it and its Affiliates to purchase New Equity pursuant to the Rights Offering at the applicable per share price, (ii) duly purchase all New Equity issuable to it and its Affiliates pursuant to such exercise (the "Subscription Amount") at the applicable per share price, and (iii) complete, duly execute and submit a subscription exercise form and any other documentation required pursuant to the Rights Offering Procedures and the Plan.

2

2.  <u>Termination</u>.

This Commitment Letter shall terminate (A) automatically, without further action or notice by any person or entity, if the Restructuring Support Agreement is terminated pursuant to the terms thereof or (B) upon written notice from (x) the Requisite Backstop Parties to TES or (y) TES to the Backstop Parties, (i) if the Bankruptcy Court fails to enter the Backstop Approval Order, which order shall be in form and substance acceptable to Requisite Backstop Parties, by 130 days following the Petition Date, (ii) if the Plan Effective Date does not occur by the date that is twelve months after the Petition Date (the "<u>Termination Date</u>"); provided that the Debtors may extend the Termination Date by six (6) months to the extent that the only unsatisfied condition precedent to the occurrence of the Plan Effective Date is obtaining required regulatory approval, or (iii) (a) if any of the Backstop Approval Order, the order approving the Disclosure Statement, or the Confirmation Order is terminated, reversed, stayed, dismissed, vacated or reconsidered, or any such order is modified or amended after entry without the prior written consent of the Requisite Backstop Commitment Parties, (b) (x) by the Requisite Commitment Parties, if any Debtor has committed a material breach of this Commitment Letter affecting the Commitments, which breach remains uncured and outstanding for a period of ten (10) business days after notice by the Requisite Backstop Commitment Parties or (y) by TES, if any Backstop Commitment Party has committed a material breach of this Commitment Letter, which breach remains uncured and outstanding for a period of ten (10) business days after notice by the Debtors, or (c) if any law or order shall have become effective or been enacted, adopted or issued by any governmental authority that prohibits the implementation of the Plan or the transactions contemplated by this Commitment Letter or the Restructuring Support Agreement.   Additionally, this Commitment Letter may be terminated and the transactions contemplated hereby may be abandoned at any time by mutual written consent of the Debtors and the Requisite Backstop Parties or by the Debtors at their election.   Upon any termination pursuant to the terms herein, this Commitment Letter shall forthwith become void and there shall be no further obligations or liabilities on the part of the Debtors or the Backstop Parties; *provided* that the Debtors' obligations to pay the Put Premium (as defined below) and their reimbursement obligations pursuant to the Restructuring Support Agreement and Section 3 hereof and the indemnification obligations pursuant to Section 4 hereof shall survive the termination of this Commitment Letter indefinitely and shall remain in full force and effect.

3.  <u>Put Premium</u>.

Whether or not the transactions contemplated hereunder are consummated or this Commitment Letter is terminated, the Debtors shall (a) pay to each Backstop Party the premium in the amount set forth in, and calculated in accordance with, the Term Sheet (under the heading "Rights Offering") (the "<u>Put Premium</u>") (which shall be paid in accordance with the Term Sheet), and (b) shall reimburse certain reasonable and documented fees and expenses of the Backstop Parties and Consenting Parties set forth under "Transaction Expenses" in the Restructuring Support Agreement.   If the Put Premium becomes payable as a result of the termination of this Commitment Letter due to certain termination events that customarily trigger the Alternative Transaction Premium (as described in the Term Sheet), the Debtors shall pay the Alternative Transaction

3

Premium as described in the Term Sheet. If the Alternative Transaction Premium becomes payable due to the Debtors exercising a Fiduciary Out or pursuing an Alternative Transaction, the Put Premium shall be paid upon the earlier of (a) promptly following such termination, [to the extent that there is availability under the DIP budget given minimum liquidity constraints, or (b) at such later time as is permitted under the DIP budget][1]; provided that the Put Premium shall be paid upon consummation of an Alternative Restructuring if it has not previously been paid.  Upon entry of the Backstop Approval Order, such premiums and reimbursements will be fully earned and, once paid, to the extent permitted by applicable law, shall not be refundable under any circumstances; *provided* that nothing herein limits the Debtors' rights with respect to the Put Premium paid to any Backstop Party in the event of a breach by such Backstop Party of its obligations under this Commitment Letter and the Restructuring Support Agreement.  The provision for the payment of such premiums and reimbursements is an integral part of the transactions contemplated by this Commitment Letter and, without this provision, the Backstop Parties would not have entered into this Commitment Letter, and any unpaid premiums or reimbursements are intended to constitute an allowed administrative expense of the Debtors under sections 503(b) and 507 of the Bankruptcy Code.  If this Commitment Letter is terminated, nothing contained herein shall limit or restrict the Backstop Parties from seeking allowance and payment of any such unpaid premiums or reimbursements as administrative expenses of the Debtors' estates under the Bankruptcy Code, including under sections 503(b) and 507 thereof.  The terms set forth in this Section 3 shall survive termination of this Commitment Letter and shall remain in full force and effect regardless of whether the transactions contemplated hereby are consummated.

4.  <u>Indemnification</u>.

(a)  If following the date of this Commitment Letter any action, suit or proceeding (related to or arising from this Commitment Letter, the Restructuring Support Agreement or the transactions contemplated hereby or thereby), claim, challenge, litigation or investigation relating to any of the foregoing shall be commenced against, or any claim or demand (related to or arising from this Commitment Letter, the Restructuring Support Agreement or the transactions contemplated hereby or thereby) shall be asserted against any of the Backstop Parties, then the Debtors, together with their respective successors and assigns (each, an "<u>Indemnifying Party</u>"), on a joint and several basis, shall indemnify, defend and hold harmless each Backstop Party and each of such Backstop Party's affiliates and each of their respective officers, directors, managers, partners, stockholders, members, employees, advisors, agents and other representatives and any affiliate of the foregoing, and each of their respective successors and assigns (each, an "<u>Indemnified Party</u>") from and against, and shall promptly reimburse each Indemnified Party for, all losses, damages, liabilities and reasonable and documented costs and expenses, including, without limitation, reasonable and documented out-of-pocket attorneys' fees and expenses and, solely in the case of a conflict of interest, one additional counsel in each applicable jurisdiction to each group of affected Indemnified Parties similarly situated, taken as a whole; arising or resulting from or in connection with any such action, suit or proceeding by a third-party (collectively, "<u>Indemnified Liabilities</u>"); *provided* that Indemnified

---

[1]    NTD: Details of DIP compliance to be finalized prior to execution of this Commitment Letter.

Liabilities shall exclude any losses, damages, liabilities, costs or expenses found by a final, non-appealable judgment of a court of competent jurisdiction to arise from an Indemnified Party's gross negligence, bad faith, fraud or a material breach of the obligations of such Indemnified Party under this Commitment Letter or the Restructuring Support Agreement. In addition, the Indemnified Liabilities shall exclude any claim by one Backstop Party against another Backstop Party.

(b)     Each Indemnified Party entitled to indemnification hereunder shall (i) give prompt written notice to the Indemnifying Party of any claim with respect to which it intends to seek indemnification or contribution pursuant to this Commitment Letter and (ii) permit such Indemnifying Party to assume the defense of such claim with counsel selected by the Indemnified Party and reasonably satisfactory to the Indemnifying Party, *provided* that the failure to so notify any Indemnifying Party will not relieve any Indemnifying Party from any liability that any Indemnifying Party may have hereunder except to the extent such Indemnifying Party has been materially prejudiced by such failure; *provided, further*, that any Indemnified Party entitled to indemnification hereunder shall have the right to employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Indemnifying Party has agreed in writing to pay such fees and expenses, (y) the Indemnifying Party shall have failed to assume the defense of such claim within a reasonable time following delivery of the written notice of the Indemnified Party with respect to such claim or failed to employ counsel reasonably satisfactory to such Indemnified Party or (z) in the reasonable judgment of such Indemnified Party, based upon advice of its counsel, a conflict of interest may exist between such Indemnified Party and the Indemnifying Party with respect to such claim (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such claim on behalf of such Indemnified Party). In connection with any settlement negotiated by an Indemnifying Party, no Indemnifying Party shall, and no Indemnified Party shall be required by an Indemnifying Party to, (i) enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Party of a full and unconditional release from all liability in respect to such claim or litigation, (ii) enter into any settlement that attributes or admits liability or fault to the Indemnified Party, or (iii) consent to the entry of any judgment that does not include as a term thereof a full dismissal of the litigation or proceeding with prejudice. In addition, without the consent of the Indemnified Party, no Indemnifying Party shall be permitted to consent to entry of any judgment or enter into any settlement which provides for any action or restriction on the part of the Indemnified Party other than the payment of money damages which are to be paid in full by the Indemnifying Party. If an Indemnifying Party fails or elects not to assume the defense of a claim or is not entitled to assume or continue the defense of such claim pursuant to the foregoing, the Indemnified Party shall have the right (without prejudice to its right of indemnification hereunder), in its discretion, to contest, defend and litigate such claim and may settle such claim, either before or after the initiation of litigation, at such time and upon such terms as the Indemnified Party deems fair and reasonable; *provided, however*, that at least ten days prior to any settlement, written notice of its intention to settle is given to the Indemnifying Party. If requested by the Indemnifying Party, the Indemnified Party agrees (at the expense

5

of the Indemnifying Party) to reasonably cooperate with the Indemnifying Party and its counsel in contesting any claim that the Indemnifying Party elects to contest; *provided* that such cooperation shall not include the provision of any information to the extent that the provision thereof would violate any attorney-client privilege, law, rule or regulation, or any obligation of confidentiality binding on such Indemnified Party.  If such indemnification is for any reason not available or is insufficient to hold an Indemnified Party harmless, each Indemnifying Party agrees to contribute to the Indemnified Liabilities to which the Indemnified Party may be subject in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by each Indemnifying Party and each Indemnified Party with respect to the Commitments or, if such allocation is judicially determined to be unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of each Indemnifying Party on the one hand and of each Indemnified Party on the other hand; *provided*, *however*, that, to the extent permitted by applicable law, an Indemnified Party shall not be responsible for amounts which in the aggregate are in excess of the amount of all premiums and reimbursements actually received by the Indemnified Party from the Indemnifying Party in connection with the Commitments.  Relative benefits to an Indemnifying Party, on the one hand, and an Indemnified Party, on the other hand, with respect to the Commitments shall be deemed to be in the same proportion as (i) the total value paid or received or proposed to be paid or received by the Indemnifying Party pursuant to the issuance and sale of the New Equity contemplated by this Commitment Letter bears to (ii) all premiums and reimbursements actually received by the Indemnified Parties in connection with the Commitments.  The terms set forth in this Section 4 shall survive termination of this Commitment Letter and shall remain in full force and effect regardless of whether the transactions contemplated hereby are consummated.

5.  <u>Information</u>.

The Debtors hereby represent and warrant that any forecasts or projections that have been or will be made available to the Backstop Parties by or on behalf of the Debtors or any of their respective  representatives have been or will be prepared in good faith based upon assumptions that are believed by the Debtors to be reasonable at the time any such forecasts or projections are delivered to the Backstop Parties; it being understood that any such forecasts and projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the Debtors' control, that no assurance can be given that any particular forecasts or projections will be realized, that actual results may differ significantly from the projected results and that such differences may be material.

6.    <u>Conditions to the Obligations of the Backstop Parties</u>.

The obligation of the Backstop Parties to consummate the funding obligations under this Commitment Letter shall be subject to the satisfaction of each of the following conditions precedent:

a.    <u>Exit Liquidity</u>.  The liquidity of the Reorganized Company as of the Plan Effective Date shall be no less than Minimum Liquidity and satisfy Minimum LC Capacity as set forth in the Term Sheet.

b.    <u>Net Debt</u>. The net debt of the Reorganized Company as of the Plan Effective Date shall be as set forth in the Term Sheet.

c.    <u>Exit Financing</u>.  The Exit Facility Documents, including a revolving credit facility and letter of credit facility (if not incorporated within the revolving credit facility), shall be acceptable to the Requisite Backstop Parties.

d.    <u>Agreements</u>.  Each of the Restructuring Support Agreement and this Commitment Letter shall remain in full force and effect and shall not have been terminated prior to the Plan Effective Date and the Debtors shall not have committed a material breach of their obligations thereunder, which material breach remains uncured and outstanding.

e.    <u>Backstop Approval Order</u>.  The Bankruptcy Court shall have entered the Backstop Approval Order in form and substance satisfactory to the Requisite Backstop Commitment Parties.

f.    <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Requisite Backstop Commitment Parties.

g.    <u>No Termination</u>.  The Backstop Approval Order, or the  Confirmation Order shall not have been terminated, reversed, stayed, dismissed,  vacated or reconsidered, and no such order shall have been modified or amended in a manner adverse to the Backstop Parties after entry without the prior written consent of the Requisite Backstop Commitment Parties.

h.    <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with the Rights Offering Documents, and the Rights Offering shall have expired in accordance with the terms of the Rights Offering Procedures.

i.    <u>Covenants</u>.  Each of the Debtors shall have performed and complied, in all material respects, with all of its respective covenants and agreements contained in this Commitment Letter that contemplate, by their terms, performance or compliance prior to the Plan Effective Date.

WEIL:\98611384\23\76974.0003

j.  <u>No Material Adverse Effect</u>.  Since the date of this Commitment Letter, there shall not have been a Material Adverse Effect.  "<u>Material Adverse Effect</u>" shall mean any event, change, effect, circumstance, occurrence, development, condition, result, state of facts or change of facts ("<u>Event</u>") occurring after the date hereof that, individually or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (i) the Company's ability to implement the Restructuring Transactions or (ii) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of the Debtors, taken as a whole; except, for purposes of clause (ii), to the extent that such Event results from, arises out of, or is attributable to, the following (either alone or in combination): (a) any change in global, national, or regional political conditions (including, without limitation, civil unrest, riots, hostilities, acts of war, sabotage, terrorism (including, without limitation, any cyberattack) or military actions or any escalation or material worsening of any such actions), (b) any change in global, national or regional financial or economic conditions affecting the industries, regions or markets in which the Debtors operate, including, without limitation, any change in the United States or applicable foreign economies or securities, commodities or financial markets (including, without limitation, any changes or developments in prices for oil, natural gas, or other commodities or power prices), (c) any changes in the market price or trading volume of the claims or debt or equity securities of the Company or any other Debtor, (d) any act of God or other calamity or force majeure event (whether or not declared as such), including, without limitation, any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado or other weather event, epidemic, pandemic, disease outbreak (including, without limitation, COVID-19, SARS-CoV-2 virus or any mutation or variation thereof), (e) any changes after the date hereof in applicable law or GAAP or the interpretation or enforcement thereof, (f) the filing or pendency of the Chapter 11 Cases, or (g) any matters disclosed in any first day pleadings or declarations to the extent made available to the Backstop Parties prior to the date hereof; provided, that exceptions set forth in clauses (a), (b), (c), (d), and (e) of this definition shall not apply to the extent that such Event is disproportionately adverse to the Debtors, taken as a whole, as compared to other companies operating in the industries or participating in the markets in which the Debtors operate or participate, as applicable.

k.  <u>Put Premium</u>.  The Debtors shall have paid the applicable Put Premium and shall have paid, or substantially concurrently with the occurrence of the Plan Effective Date will pay, all fees and expenses of the Backstop Parties required to be paid pursuant to Section 3 of this Commitment Letter and the Restructuring Support Agreement.

l.  <u>Antitrust Approvals</u>.  All waiting periods imposed by any antitrust authority in connection with the transactions contemplated by this Commitment Letter shall have terminated or expired and all authorizations, approvals, consents or clearances under the applicable antitrust laws in connection with the transactions contemplated by this Commitment Letter shall have been obtained.

8

m.  <u>Other Governmental Approvals</u>.  All other governmental and regulatory approvals or authorizations necessary for the occurrence of the Plan Effective Date shall have been obtained and any required governmental and regulatory filings shall have been made, to the extent the failure to obtain such approvals or authorizations or to make such governmental and regulatory filings would reasonably be expected to result in a Material Adverse Effect on the Debtors (taken as a whole), and no law or order shall have become effective or been enacted, adopted or issued by any governmental authority that prohibits the implementation of the Plan or the transactions contemplated by this Commitment Letter or the Restructuring Support Agreement.

7.  <u>Transfer and Assignment; Third Party Beneficiaries</u>.

No Debtor may assign its rights, interests or obligations hereunder without the prior written consent of the Requisite Backstop Commitment Parties and any purported assignment by the Debtors in violation of this Section 7 shall be void *ab initio*. The Backstop Parties may assign their respective Commitments hereunder to (a) any of their respective affiliates so long as (i) such affiliate is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act and (ii) such affiliate shall have delivered a duly executed joinder to the Restructuring Support Agreement, (b) any other Backstop Party, or (c) to any other party with the prior written consent of the Debtors and the Requisite Backstop Commitment Parties so long as (i) such party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act and (ii) such party shall have delivered a duly executed joinder to the Restructuring Support Agreement.

Except as provided in Section 4 hereof with respect to the Indemnified Parties, this Commitment Letter is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Commitment Letter.

8.  <u>Governing Law; Jurisdiction</u>.

This Commitment Letter shall be governed and construed in accordance with the laws of the State of New York. The parties hereto consent and agree that any action to enforce this Commitment Letter or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Commitment Letter and the agreements, instruments and documents contemplated hereby and thereby shall be brought exclusively in the Bankruptcy Court, or if the Chapter 11 Cases have not yet commenced, in either the United States District Court for the Southern District of New York or any New York state court in the Borough of Manhattan (the "<u>Chosen Courts</u>"). Each of the parties hereto (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto or constitutional authority to finally adjudicate the matter.

9

Without limiting the rights of any party hereto, each party acknowledges and agrees that the Debtors are entitled to seek damages from any Backstop Party that breaches its obligations under this Commitment Letter; *provided* that each party hereto hereby waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding any special, exemplary, punitive or consequential damages. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS COMMITMENT LETTER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

9. <u>Amendments</u>.

This Commitment Letter and the Restructuring Support Agreement represent the final agreement and the entire understanding among the parties hereto with respect to the subject matter hereof and may not be contradicted by evidence of prior or contemporaneous agreements and understandings of the parties hereto. There are no unwritten oral agreements or understandings between the parties hereto relating to the subject matter hereof. This Commitment Letter may only be modified, amended, or supplemented by an agreement signed by the Debtors and the Requisite Backstop Commitment Parties; *provided*, that (a) the prior written consent of each Backstop Party adversely affected thereby shall be required for any amendment that would (i) modify such Backstop Party's Backstop Commitment Percentage, (ii) have an adverse and disproportionate effect on such Backstop Party, (iii) alter the pricing or duration terms set forth in the Term Sheet and/or this Commitment Letter, or (iv) modify such Backstop Party's Backstop Commitment Percentage; (b) each Backstop Party's prior written consent shall be required for any amendment that would increase its or the aggregate Commitment amount; and (c) each Backstop Party's prior written consent shall be required to amend the definition of "Requisite Backstop Commitment Parties" or to amend this Section 9. Notwithstanding the foregoing, **<u>Schedule I</u>** shall be revised as necessary without requiring a written instrument signed by the Debtors and the Requisite Backstop Commitment Parties to reflect changes in the composition of the Backstop Parties and Backstop Commitment Percentages as a result of transfers permitted hereby.

10. <u>Counterparts</u>.

This Commitment Letter may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to each other party (including via facsimile, portable document format (.pdf) or other electronic transmission), it being understood that each party need not sign the same counterpart.

11. <u>No Fiduciary Duties</u>.

Notwithstanding anything to the contrary herein, the entry into this Commitment Letter and the transactions contemplated hereby shall not create any fiduciary duties between and among the Backstop Parties or other duties or responsibilities to each other, the Debtors or any Debtor's creditors or other stakeholders.

10

12. <u>Antitrust Approval</u>.

(a)    Each of the Debtors and the Backstop Parties agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Commitment Letter, the Plan and the other Definitive Documents, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "<u>HSR Act</u>") with respect to the transactions contemplated by this Commitment Letter with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any other Antitrust Authority, any drafts thereof) under any other antitrust laws that are necessary to consummate and make effective the transactions contemplated by this Commitment Letter as soon as reasonably practicable and no later than fifteen (15) business days following the date of entry of the Backstop Approval Order and (ii) promptly furnishing documents or information reasonably requested by any Antitrust Authority and supplying to any governmental entity as promptly as practicable any additional information or documents that may be requested by such governmental entity or pursuant to any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any governmental entity and taking, or cause to be taken, all other actions and doing, or causing to be done, all other things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Commitment Letter. "<u>Antitrust Authorities</u>" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other governmental entity having jurisdiction pursuant to the antitrust laws, and "<u>Antitrust Authority</u>" means any one of them.

(b)    The Company and each Backstop Party subject to an obligation pursuant to applicable antitrust laws to notify any transaction contemplated by this Commitment Letter, the Plan or the other Definitive Documents that has notified the Company in writing of such obligation (each such Backstop Party, a "<u>Filing Party</u>") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content.  The Company and each Filing Party shall, to the extent permitted by applicable Law:  (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally of) any communications from or with an Antitrust Authority; (ii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all correspondence and communications between such Filing Party or the Company and the Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary or desirable in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (v) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Requisite Backstop Parties and the Company.

11

(c)     Should a Filing Party be subject to an obligation under antitrust laws to jointly notify with one or more other Filing Parties (each, a "Joint Filing Party") any transaction contemplated by this Commitment Letter, the Plan or the other Definitive Documents, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

(d)     The Company and each Filing Party shall use their commercially reasonable efforts to obtain all authorizations, approvals, consents, or clearances under any applicable antitrust laws or to cause the termination or expiration of all applicable waiting periods under any antitrust laws in connection with the transactions contemplated by this Commitment Letter at the earliest possible date after the date of filing.   The communications contemplated by this Section 12 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.   The obligations in this Section 12 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Commitment Letter, the Plan or the other Definitive Documents.

13.     <u>Funding Default.</u>

(a)     Upon the occurrence of the failure by any Backstop Party to pay the applicable purchase price in respect of its Commitment (the "Funding Amount" and such failure, a "Funding Default"), the Backstop Parties (other than any Backstop Party that causes a Funding Default ("a Defaulting Backstop Party")) shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all Backstop Parties of such Funding Default, which notice shall be given promptly following the occurrence of such Funding Default (such five (5) Business Day period, the "Replacement Period"), to elect, by written notice to the Company, to purchase all or any portion of the New Equity attributable to such Defaulting Backstop Party's Commitment (such purchase, a "Replacement Purchase") on the terms and subject to the conditions set forth in this Commitment Letter and in such amounts as may be agreed upon by all of the non-defaulting Backstop Parties that elect to purchase all or any portion of the New Equity attributable to such Defaulting Backstop Party, or, if no such agreement is reached by the date upon which the Replacement Period expires, based upon each such electing Backstop Party's Backstop Commitment Percentage of the aggregate amount of New Equity that has not been purchased as a result of such Funding Default (such Backstop Parties, the "Replacing Backstop Parties").   The purchase price paid by any Replacing Backstop Party in connection with a Replacement Purchase shall be equal to the applicable purchase price in respect of such Defaulting Backstop Party's Commitment.

(b)     If a Backstop Party is a Defaulting Backstop Party, or is otherwise in breach of its obligations hereunder, it shall not be entitled to any of the Put Premium hereunder.

(c)     Nothing in this Commitment Letter shall require any Backstop Party to fund more than its Backstop Commitment; *provided* that if a Backstop Party makes an election to cover a Defaulting Backstop Party, such election shall be binding, and failure to fund

<div align="center">12</div>

any such cover amount in accordance with this Section 13 shall constitute a Funding Default; *provided* that, for the avoidance of doubt, this Section 13(c) shall not be deemed to limit any Backstop Party's obligations under Section 1(d).

(d)     Notwithstanding anything to the contrary set forth in Section 2 but subject to Section 8, no provision of this Agreement shall relieve any Defaulting Backstop Party from liability hereunder, or limit the availability of the remedies available to the non-defaulting parties hereto, in connection with any such Backstop Party's Funding Default.

(e)     Promptly, and in any case no later than two (2) business days following a Funding Default, each Defaulting Backstop Party shall return to TES (a) any portion of the Put Premium previously paid to it and (b) any fees and expenses for which it has received reimbursement pursuant to the Restructuring Support Agreement.

[*Signature Pages Follow*]

13

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**TALEN ENERGY SUPPLY, LLC**

By: _____
     Name:
     Title:

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

[Debtors to provide appropriate signature block(s)]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

[Backstop Party signature pages to be updated]

*[Signature pages to Commitment Letter]*

## <u>SCHEDULE I</u>

Backstop Percentages

| Backstop Party | Backstop Commitment Percentage |
|---|---|
| [TO COME] | [TO COME] |
|  |  |
|  |  |
|  |  |
|  |  |

**<u>Exhibit D</u>**

**Joinder**

  
**FORM OF JOINDER AGREEMENT FOR CONSENTING PARTIES**

This joinder agreement to the *Restructuring Support Agreement*, dated as of [_____], 2022 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**"), between the Company and the Consenting Parties, each as defined in the Agreement, is executed and delivered by _____ (the "**Joining Party**") as of _____, 2022.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

2.  <u>Effectiveness</u>.  Upon (i) delivery of a signature page for this joinder and (ii) written acknowledgement by the Company, the Joining Party shall hereafter be deemed to be a "Subsequent Consenting Party" and a "Party" for all purposes under the Agreement and with respect to any and all Claims and Interests held by such Joining Party.

3.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Claims and Interests set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Parties, as set forth in <u>Section 7</u> of the Agreement to each other Party to the Agreement.

4.  <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Joining Party has caused this joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By:_____
Name:
Title:


Principal Amount of the RCF LCs: $_____
Principal Amount of the CAF Loans: $_____
Principal Amount of the Term Loans: $_____
Principal Amount of 2027 Secured Notes due 2027: $_____
Principal Amount of 6.625% 2028 Secured Notes: $_____
Principal Amount of 7.625% 2028 Secured Notes: $_____
Principal Amount of 9.500% Senior Notes due 2022: $_____
Principal Amount of 6.500% Senior Notes due 2024: $_____
Principal Amount of 6.500% Senior Notes due 2025: $_____
Principal Amount of 10.500% Senior Notes due 2026: $_____
Principal Amount of 7.000% Senior Notes due 2027: $_____
Principal Amount of 6.000% Senior Notes due 2036: $_____
Existing Equity Interests: _____
Other (please describe): _____

Notice Address:

_____
_____
_____
Fax: _____
Attention: _____
Email: _____

Acknowledged:

**TALEN ENERGY SUPPLY, LLC**
**(on behalf of the Company)**

By:_____
Name:
Title:

*[Signature Page to Joinder to Restructuring Support Agreement]*

**<u>Exhibit B</u>**

Organizational Chart



TALEN ENERGY

# Corporate Structure

1. Non-debtor subsidiaries of Talen Energy Supply, LLC are excluded from this Organizational Chart.
2. Direct and indirect subsidiaries of Talen Generation, LLC provided on page 2 hereof.

**Ownership interests are 100%, unless otherwise noted.**
**Entities are organized in Delaware, unless otherwise noted.**



TALEN ENERGY

**Ownership interests are 100%, unless otherwise noted.**
**Entities are organized in Delaware, unless otherwise noted.**

# **Exhibit C**

Intercreditor Agreement

**EXECUTION VERSION**

COLLATERAL TRUST AND INTERCREDITOR AGREEMENT

Dated as of June 1, 2015

Among

PPL ENERGY SUPPLY, LLC,

THE SUBSIDIARY GUARANTORS PARTY HERETO FROM TIME TO TIME,

CITIBANK, N.A.,
as Administrative Agent,

CITIBANK, N.A.,
as Collateral Trustee,

and

EACH OTHER PERSON PARTY HERETO FROM TIME TO TIME

# TABLE OF CONTENTS

**Page**

SECTION 1.      Definitions.................................................................................................... 2

    1.1      Defined Terms ................................................................................................ 2
    1.2      Computation of Time Periods; Other Definitional Provisions....................... 18
    1.3      Certifications, Etc ......................................................................................... 18
    1.4      Construction ................................................................................................. 19

SECTION 2.      Declaration of Trust; Acknowledgement of Security Interests.................... 19

    2.1      Trust Estate .................................................................................................. 19
    2.2      Collateral Trustee ........................................................................................ 19
    2.3      Pari Passu .................................................................................................... 19
    2.4      Prohibition on Contesting Liens .................................................................. 20
    2.5      No New First-Priority Liens ......................................................................... 20

SECTION 3.      Enforcement ............................................................................................... 20

    3.1      Exercise of Remedies.................................................................................... 20
    3.2      Enforcement of Liens.................................................................................... 20

SECTION 4.      Payments .................................................................................................... 23

    4.1      Application of Proceeds................................................................................ 23
    4.2      Limitations on Payment Post Default ........................................................... 24
    4.3      Turnover........................................................................................................ 24
    4.4      Debt Balances ............................................................................................... 24
    4.5      Other Credit Support .................................................................................... 25

SECTION 5.      Other Agreements ...................................................................................... 25

    5.1      Releases ........................................................................................................ 25
    5.2      Amendments to Financing Documents; Class Voting .................................. 26
    5.3      Certain Actions ............................................................................................. 27
    5.4      Cash Collateral Accounts; Amounts Not Subject to Sharing....................... 28
    5.5      Additional First-Lien Indebtedness Agreement............................................ 29
    5.6      Secured Hedge Agreements and Secured Treasury Services Agreements ................. 30
    5.7      Representative; Relationship ........................................................................ 31

SECTION 6.      Insolvency or Liquidation Proceedings....................................................... 31

    6.1      Finance and Sale Issues ............................................................................... 31
    6.2      Avoidance Issues ........................................................................................... 32
    6.3      Reorganization Securities ............................................................................. 32
    6.4      Relief from the Automatic Stay .................................................................... 32
    6.5      Asset Dispositions in an Insolvency Proceeding .......................................... 32
    6.6      Other Credit Support.................................................................................... 32

SECTION 7.       Collateral Trustee .................................................................................. 33

    7.1   Appointment ................................................................................... 33
    7.2   Delegation of Duties ...................................................................... 33
    7.3   Exculpatory Provisions .................................................................. 34
    7.4   Non-Reliance on Collateral Trustee and Other First-Lien Secured Parties ................. 35
    7.5   Collateral Trustee in Individual Capacity ..................................... 36
    7.6   Successor Collateral Trustee .......................................................... 36
    7.7   Security Documents ........................................................................ 37
    7.8   Indemnification .............................................................................. 37
    7.9   No Risk of Funds ........................................................................... 38

SECTION 8.       Reliance; Waivers; Etc ........................................................................... 38

    8.1   Reliance .......................................................................................... 38
    8.2   No Warranties or Liability ............................................................. 38
    8.3   No Waiver ....................................................................................... 38
    8.4   Obligations Unconditional ............................................................. 39

SECTION 9.       Miscellaneous ......................................................................................... 39

    9.1    Conflicts ......................................................................................... 39
    9.2    Effectiveness; Continuing Nature of this Agreement; Severability ............................. 39
    9.3    Amendments; Waivers ................................................................... 40
    9.4    Voting ............................................................................................. 40
    9.5    Information Concerning Financial Condition of the Credit Parties ........................... 41
    9.6    GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVERS ................. 41
    9.7    Notices ........................................................................................... 42
    9.8    Further Assurances; Insurance ....................................................... 43
    9.9    Binding on Successors and Assigns ............................................... 43
    9.10   Specific Performance ..................................................................... 43
    9.11   Headings ........................................................................................ 43
    9.12   Counterparts ................................................................................... 43
    9.13   Authorization ................................................................................. 43
    9.14   No Third Party Beneficiaries ......................................................... 43
    9.15   Provisions Solely to Define Relative Rights ................................. 43
    9.16   Additional Guarantors .................................................................... 44
    9.17   Rights under Hedges ...................................................................... 44
    9.18   Insolvency ...................................................................................... 44
    9.19   Rights and Immunities of Secured Debt Representatives ............................................. 44

ANNEXES

Annex I          –        Notices
Annex II         –        Existing Commodity Hedging Agreements

EXHIBITS

Exhibit A        –        Form of Accession Agreement
Exhibit B        –        Form of Additional Guarantor Accession Agreement

# COLLATERAL TRUST AND INTERCREDITOR AGREEMENT

This COLLATERAL TRUST AND INTERCREDITOR AGREEMENT (this "*Agreement*") is dated as of June 1, 2015, and entered into by and among PPL ENERGY SUPPLY, LLC, a Delaware limited liability company (the "*Borrower*"), the Subsidiary Guarantors (as defined below), CITIBANK, N.A., in its capacity as collateral trustee for the First-Lien Secured Parties (as defined below), CITIBANK, N.A., as Administrative Agent (as defined below) and each of the other Persons (as defined below) party hereto from time to time in accordance with the terms hereof.  Capitalized terms used in this Agreement have the meanings assigned to them in Section 1 below.

PRELIMINARY STATEMENT

(1)     The Borrower, the lenders party thereto from time to time (the "*Lenders*"), Citibank N.A., as administrative agent (in such capacity, and including any successor administrative agent thereto, the "*Administrative Agent*"), Citibank N.A., as collateral trustee (in such capacity, and including any successor Collateral Trustee thereto, the "*Collateral Trustee*"), and each other Person from time to time party thereto, are entering into a Credit Agreement, dated as of the date hereof (as amended, modified, restated or supplemented from time to time, the "*Credit Agreement*"), which provides, among other things, for the provision of the borrowing of up to $1,850 million pursuant to a revolving credit facility.

(2)     the Borrower, Citicorp USA, Inc., as issuing bank (the "*Issuing Bank*"), the lenders from time party thereto (together with the Issuing Bank, the "*Other Lenders*") and Citicorp USA, Inc., as administrative agent (in such capacity, and including any successor administrative agent thereto, the "*Other Administrative Agent*"), and the Collateral Trustee may enter into a credit agreement (as amended, restated, amended and restated, replaced or otherwise modified and/or supplemented from time to time, the "*Other Credit Agreement*") on a future date on which the Other Administrative Agent, the Borrower and the other parties thereto comply with Section 9.2(d) hereof (the "*Other Credit Agreement Effective Date*").

(3)     the Borrower and Citibank, N.A., as letter of credit issuer under the Reimbursement Agreement referred to below (the "*L/C Issuer*") may enter into a reimbursement agreement on the Other Credit Agreement Effective Date (as amended, restated, amended and restated, replaced or otherwise modified and/or supplemented from time to time, the "*Reimbursement Agreement*").

(4)     Pursuant to the Guarantee and Collateral Agreement, the Subsidiary Guarantors have guaranteed the Borrower's obligations under the Financing Documents.

(5)     The Credit Parties may from time to time enter into Secured Commodity Hedges, Secured Interest Rate Hedges, Secured Treasury Services Agreements, Secured Trading Facilities (as defined in the Credit Agreement), Permitted First Priority Refinancing Debt (as defined in the Credit Agreement), Permitted Second Priority Refinancing Debt (as defined in the Credit Agreement) or other Additional First-Lien Indebtedness Agreements which may be secured by Liens on the Collateral to the extent permitted under the Financing Documents as then in effect and the relevant counterparties have executed and delivered an Accession Agreement to be joined as a party to this Agreement.

(6)     (a) The obligations of the Borrower under the Credit Agreement, any Other Credit Agreement, any Reimbursement Agreement, the Guarantee and Collateral Agreement and under each Secured Commodity Hedge, each Secured Interest Rate Hedge, each Secured Treasury Services Agreement, Permitted First Priority Refinancing Debt or Permitted Second Priority Refinancing Debt to which it is a party and (b) the obligations of each Subsidiary Guarantor under the Guarantee and Collateral Agreement and under each Secured Commodity Hedge, each Secured Interest Rate Hedge, each Secured Treasury

Services Agreement and any Permitted First Priority Refinancing Debt to which it is a party, in each case will be secured on a first-priority basis by Liens on the Collateral pursuant to the terms of the Security Documents.

(7)     The Financing Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral and certain other matters.

(8)     In order to induce the First-Lien Secured Parties to enter into the transactions contemplated by the Financing Documents, each of the parties hereto has agreed to the agency, intercreditor and other provisions set forth in this Agreement.

## **AGREEMENT**

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

SECTION 1.     Definitions.

1.1     Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"*Acceptable Commodity Counterparty*" shall mean any Person who, at the time the applicable Eligible Commodity Hedging Agreement is entered into, (i) in the ordinary course purchases or sells power or enters into commodity transactions and (ii)(A) has a corporate rating of BBB- or higher by S&P or a corporate family rating of Baa3 or higher by Moody's (or an equivalent rating by another nationally recognized statistical rating organization of similar standing if either of such ratings agencies is not then in the business of providing such ratings), or (B) whose obligations are supported by collateral, guarantees or letters of credit in a manner consistent with the then prevailing industry practice from Persons that have the ratings described in clause (A) above.

"*Acceptable Financial Counterparty*" shall mean any Person who, at the time the applicable Eligible Commodity Hedging Agreement is entered into, (a) in the ordinary course enters into financial derivative transactions (including rate swaps, commodity hedges, swaps, futures or options) or commodity transactions (including power purchase or sale or gas purchase or sale and tolling agreements) or provides treasury services or cash management services and (b)(i) has a corporate rating of A- or higher by S&P or a corporate family rating of A3 or higher by Moody's (or an equivalent rating by another nationally recognized statistical rating organization of similar standing if either of such rating agencies is not then in the business of providing such ratings), or (ii) whose obligations are supported by collateral, guarantees or letters of credit in a manner consistent with the then prevailing industry practice from Persons that have the ratings described in clause (i) above.

"*Accession Agreement*" shall mean an Accession Agreement substantially in the form attached hereto as Exhibit A, or such other form reasonably approved by the Collateral Trustee and the Borrower.

"*Additional First-Lien Indebtedness Agreement*" shall mean any pari passu secured first-lien credit agreement, credit facility agreement, letter of credit facility agreement, indenture, note purchase agreement, secured trading facility (including, to the extent applicable, the Secured Trading Facility) or other similar agreement entered into by a Credit Party to the extent permitted by Section 10.01 and Section 10.04 of the Credit Agreement.

"**_Additional First-Lien Indebtedness_**" shall mean indebtedness incurred pursuant to each Additional First-Lien Indebtedness Agreement (including any guarantees thereof by the Credit Parties) entered into by one or more Credit Parties after the date hereof which (i) requires that the obligations of the Credit Parties thereunder be secured on a pari passu basis by first-priority Lien on the Collateral and (ii) is permitted (if addressed therein, or, otherwise not prohibited) by the Financing Documents at the time such Additional First-Lien Indebtedness Agreement is entered into, to be secured by a first-priority Lien on the Collateral; provided that, with respect to each Additional First-Lien Indebtedness, the applicable Secured Debt Representative on behalf of the creditors thereto shall have executed and delivered to the Collateral Trustee an Accession Agreement in accordance with the provisions of this Agreement pursuant to which such applicable Secured Debt Representative has become a party to this Agreement and agreed (on its behalf and on behalf of the applicable secured creditors) to be bound by the obligations of a First-Lien Secured Party under the terms hereof.

"**_Additional First-Lien Obligations_**" shall mean all Obligations under, or with respect to, any Additional First-Lien Indebtedness Agreement.

"**_Additional Guarantor Accession Agreement_**" shall mean an accession agreement substantially in the form of Exhibit B.

"**_Administrative Agent_**" shall have the meaning specified in the preliminary statement to this Agreement.

"**_Affiliate_**" shall mean, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"**_Agent_**" shall mean the Collateral Trustee, the Administrative Agent, any Other Administrative Agent and any other Secured Debt Representative that is an administrative agent or collateral trustee under an Additional First-Lien Indebtedness Agreement, as the context may require.

"**_Agreement_**" shall mean this Collateral Trust and Intercreditor Agreement.

"**_Asset Sale_**" shall mean a sale, lease (as lessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor), transfer or other disposition to, or any exchange of Property with, any Person, in one transaction or a series of transactions, of all or part of the Credit Parties' Properties, whether now owned or hereafter acquired, leased or licensed, to the extent such sale, lease, sale and leaseback, assignment, conveyance, license, transfer or other disposition not prohibited (if addressed therein, or, otherwise not prohibited) under the terms of the Financing Documents then in effect.

"**_Attributable Debt_**" shall mean, in respect of a sale and leaseback transaction, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction including any period for which such lease has been extended or may, at the option of the lessor, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP; _provided_, _however_, that if such sale and leaseback transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

"*Authorized Officer*" shall mean, with respect to delivering financial information (including, without limitation, calculations of "Fair Market Value") and Officer's Certificates and any other matters in connection with this Agreement or any applicable Financing Documents, the chief executive officer, the president, the chief financial officer, the treasurer, the assistant treasurer, the principal accounting officer, the general counsel, assistant general counsel, any senior vice-president or any vice-president or any other responsible financial officer or accounting officer of the Borrower or any other person of the Borrower having substantially the same responsibilities as the aforementioned officers.

"*Bankruptcy Code*" shall mean Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect or any successor statute.

"*Board of Directors*" shall mean:

      (a)      with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

      (b)      with respect to a partnership, the Board of Directors of the general partner of the partnership;

      (c)      with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

      (d)      with respect to any other Person, the board or committee of such Person serving a similar function.

"*Borrower*" shall have the meaning specified in the introductory statement to this Agreement.

"*Breakage Costs*" shall mean, with respect to any borrowing of a loan under the Credit Agreement, any Other Credit Agreement or any Additional First-Lien Indebtedness Agreement, the loss, cost and expense attributable to (a) the prepayment of the principal amount of such loan on any date other than on the last day of the applicable interest period for such loan or (b) the revocation by the applicable Credit Party of any notice of borrowing or notice of issuance submitted pursuant to the Credit Agreement, any Other Credit Agreement or any Additional First-Lien Indebtedness Agreement, after the applicable minimum period for the submission of such notice of borrowing or notice of issuance, as applicable, specified therein, any default in the making of any prepayment required to be made thereunder after notice of such prepayment has been delivered by the applicable Credit Party or the failure of the conditions precedent to be met after delivery of any such notice of borrowing or notice of issuance.

"*Business Day*" shall mean any day except Saturday, Sunday and any day which shall be in New York, New York, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close.

"*Capital Lease Obligations*" shall mean, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"*Capital Stock*" shall mean:

      (a)      in the case of a corporation, corporate stock;

(b)        in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(c)        in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(d)        any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act.

"**Closing Date**" shall mean June 1, 2015.

"**Collateral**" shall mean all property with respect to which any security interest has been granted (or purported to be granted) in favor of the Collateral Trustee, for the benefit of the First-Lien Secured Parties, pursuant to any Security Document.  For the avoidance of doubt, Collateral shall not include any Excluded Assets.

"**Collateral Trustee**" shall have the meaning specified in the preliminary statement to this Agreement.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Commodity Hedging Agreement**" shall mean any agreement (including each confirmation entered into pursuant to any master agreement) providing for swaps, caps, collars, puts, calls, floors, futures, options, spots, forwards, power purchase or sale agreements, fuel purchase or sale agreements, tolling agreements, emissions credit purchase or sales agreements, power transmission agreements, fuel transportation agreements, fuel storage agreements, netting agreements, commercial or trading agreements, weather derivatives agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy or weather related commodity, service or risk, price or price indices for any such commodities, services or risks or any other similar derivative agreements, any renewable energy credits, carbon emission credits and any other "cap and trade" related credits, assets or attributes with an economic value and any other similar agreements, entered into by the Borrower or any Restricted Subsidiary.

"**Credit Agreement**" shall have the meaning specified in the preliminary statement to this Agreement.

"**Credit Agreement Obligations**" shall mean the "Obligations", as defined in the Credit Agreement.

"**Credit Parties**" shall mean the Borrower and each Subsidiary Guarantor.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"***DIP Financing***" shall have the meaning specified in Section 6.1.

"***Discharge of Obligations***" shall mean, except to the extent otherwise expressly provided in Section 6.2:

(a) that a Discharge of Specific Debt has occurred with respect to each Series of Secured Debt;

(b) that a Discharge of Specific Secured Hedge Agreement has occurred with respect to each Secured Hedge Agreement; and

(c) payment in full in cash of all other Obligations (including Obligations under Secured Treasury Services Agreements) that are outstanding and unpaid at the time clauses (a), (b) and (c) are satisfied (other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time).

"***Discharge of Specific Debt***" shall mean, with respect to any Series of Secured Debt, the occurrence of each of the following with respect to such Series of Secured Debt:

(a) termination or expiration of all commitments to extend credit that would constitute such Series of Secured Debt;

(b) payment in full in cash of the principal of (other than with respect to undrawn letters of credit, but including unreimbursed amounts under any drawn letters of credit) and interest, fees and premium (if any) on such Series of Secured Debt;

(c) with respect to any undrawn letters of credit either (x) discharge or cash collateralization or back-stopping (at the lower of (A) 103% of the aggregate undrawn amount (or such lower amount agreed to by the issuer of such outstanding letter of credit) and (B) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the applicable Financing Document) of all outstanding letters of credit issued pursuant to such Series of Secured Debt; (y) the deemed reissuance with the consent of the issuer of such outstanding letters of credit and any holder of the related Series of Secured Debt that has reimbursement obligations with respect to such outstanding letters of credit under another credit facility (whether or not such credit facility constitutes a Series of Secured Debt hereunder), *provided* that if such letters of credit are deemed reissued under another Series of Secured Debt hereunder then they will be outstanding under such other Series of Secured Debt hereunder); or (z) the issuer of each such letter of credit has notified the Collateral Trustee in writing that alternative arrangements satisfactory to such issuer and holders of the related Series of Secured Debt that has reimbursement obligations with respect thereto have been made; and

(d) payment in full in cash of all other Obligations owing under the Financing Documents for such Series of Secured Debt that are outstanding and unpaid at the time that the requirements of clauses (a) through (c) above are satisfied (other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time).

"***Discharge of Specific Secured Hedge Agreement***" shall mean with respect to any given Secured Hedge Agreement:  (a) all Obligations in respect of such Secured Hedge Agreement have been paid in full in accordance with the terms thereof and all transactions entered into under such Secured Hedge

Agreement have expired or have been terminated or (b) alternative collateral arrangements or other arrangements satisfactory to the Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank, as applicable, have been made and the Collateral Trustee has been notified in writing of such event by such Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank (other than, in the case of clause (a) or (b), any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time).

"***Early Termination Event***" shall mean, with respect to any Secured Hedge Agreement, the occurrence of an Early Termination Date or the date of any applicable termination pursuant to a termination event under such Secured Hedge Agreement (as defined in such Secured Hedge Agreement) under any such Secured Hedge Agreement which has resulted in the termination of all transactions or all affected transactions under such Secured Hedge Agreement.

"***Eligible Commodity Hedging Agreement***" shall mean any Commodity Hedging Agreement entered into by the Borrower or any Restricted Subsidiary with an Eligible Commodity Hedging Counterparty, which, individually or together with other Commodity Hedging Agreements (other than Commodity Hedging Agreements that are either unsecured, are supported by letters of credit or Guarantees from Persons that are not Credit Parties (but, in each case, not secured by all or substantially all of the assets of any Credit Party)) entered into or being entered into with such counterparty or its affiliates, is at the time entered into reasonably expected to hedge the anticipated exposure of the Borrower or the relevant Subsidiary Guarantor(s) to one or more commodity price risks relating to the business and operations of the Borrower or the relevant Restricted Subsidiary; *provided* that any Commodity Hedging Agreement that is entered into to offset all or any portion of an outstanding Eligible Commodity Hedging Agreement shall constitute an Eligible Commodity Hedging Agreement so long as, at the time entered into, such offsetting Commodity Hedging Agreement, together with all other outstanding Eligible Commodity Hedging Agreements, in the aggregate, are reasonably expected to hedge the anticipated exposure of the Borrower or the relevant Restricted Subsidiary to one or more commodity price risks relating to the business and operations of the Borrower or the relevant Restricted Subsidiary.

"***Eligible Commodity Hedging Counterparty***" shall mean (i) a counterparty to an Eligible Commodity Hedging Agreement that, at the time the relevant Eligible Commodity Hedging Agreement is entered into, is either an Acceptable Commodity Counterparty or an Acceptable Financial Counterparty and (ii) each Existing Commodity Hedging Agreement Counterparty.

"***Eligible Hedge Amount***" shall mean, as of any date of determination with respect to any Secured Hedge Agreement, (a) if such date is prior to the occurrence of an Early Termination Event in respect of such Secured Hedge Agreement, the greater of (i) the Floor Amount (if any) applicable to such Secured Commodity Hedge and (ii) an amount equal to (A) the Outstanding Amount (if any, calculated in accordance with subclause (b)(i) of that definition) applicable to such Secured Hedge Agreement at such time *less* (B) (so long as no Other Credit Support Exception has occurred) the aggregate amount of Other Credit Support Amounts under any Other Credit Support issued or pledged in favor of the applicable Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank to support the Obligations of the applicable Credit Party under such Secured Hedge Agreement and (b) if such date is on or after the occurrence of an Early Termination Event in respect of such Secured Hedge Agreement, an amount equal to (i) the Outstanding Amount (if any, calculated in accordance with subclause (b)(ii) of that definition) applicable to such Secured Hedge Agreement *less* (ii) (so long as no Other Credit Support Exception has occurred) the aggregate amount of Other Credit Support Amounts under any Other Credit Support issued or pledged in favor of the applicable Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank to support the Obligations of the applicable Credit Party under such Secured Hedge Agreement.

"**Environmental Action**" shall mean any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Law**" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment or human health or safety (as such relates to exposure to Hazardous Materials) or Hazardous Materials.

"**Equity Interests**" shall mean Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"**Event of Default**" shall mean (i) any event or condition which, under the terms of any Series of Secured Debt causes, or permits holders of Obligations outstanding thereunder (with or without the giving of notice or lapse of time, or both, and whether or not notice has been given or time has lapsed) to cause, the Obligations outstanding thereunder to become immediately due and payable or (ii) any ISDA Event of Default with respect to a Credit Party under any Secured Commodity Hedge, in each case unless the respective Obligations have been repaid or discharged in accordance with the terms of the respective Financing Documents.

"**Excluded Assets**" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"**Excluded Hedging Obligation**" shall mean with respect to any Subsidiary Guarantor, any Hedging Obligation if, and to the extent that, all or a portion of the guarantee of such Subsidiary Guarantor of, or the grant by such Subsidiary Guarantor of a security interest to secure, such Hedging Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Subsidiary Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the security interest of such Subsidiary Guarantor becomes effective with respect to such Hedging Obligation. If a Hedging Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedging Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"**Existing Commodity Hedging Agreements**" shall mean the master agreements listed on Annex II hereto and shall include each confirmation entered into pursuant to such master agreement.

"**Existing Commodity Hedging Agreement Counterparties**" shall mean each counterparty to the Existing Commodity Hedging Agreements.

"**Fair Market Value**" shall mean the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by an Authorized Officer of the Borrower.

"*Financing Documents*" shall mean, collectively (without duplication), (a) this Agreement, the Credit Agreement, any Other Credit Agreement, any Reimbursement Agreement, each Secured Interest Rate Hedge, each Secured Treasury Services Agreement, each Secured Commodity Hedge and each Additional First Lien Indebtedness Agreement, in each case secured by a first-priority Lien on the Collateral, (b) the Security Documents and (c) all other agreements, promissory notes, instruments, documents and certificates executed by or on behalf of any Credit Party in connection with any of the foregoing, in each case as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"*First-Lien Secured Parties*" shall mean, at any time, the holders of Obligations at such time, including the Administrative Agent, any Other Administrative Agent, the Collateral Trustee, the Lenders, any Other Lenders (including any Issuing Bank), any L/C Issuer, the Secured Debt Representatives, the Interest Rate Hedge Banks, the Treasury Services Providers and the Eligible Commodity Hedging Counterparties and the lenders, noteholders, investors and other finance parties (and agents) party to any Additional First Lien Indebtedness.

"*Floor Amount*" shall mean as of any date of calculation, with respect to any Secured Hedge Agreement, the sum of the aggregate amount identified (if any) as the "floor amount" (which shall be calculated based on the expected exposure of the applicable Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank to the Borrower or the applicable Subsidiary Guarantor under such Secured Hedge Agreement, as determined by the Borrower or the applicable Subsidiary Guarantor and such Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank in good faith on an arm's length basis consistent with market practice in the independent power generating industry) for such Secured Hedge Agreement and set forth in one or more contracts, confirmations, schedules or other writings issued and agreed by the applicable Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank and the Borrower or the applicable Subsidiary Guarantor party to such Secured Hedge Agreement; *provided* that (a) no such "floor amount" shall be effective for any purpose hereunder unless, promptly following each such determination, the Borrower shall have notified the Collateral Trustee in writing of the relevant "floor amount" and the Secured Hedge Agreement to which such "floor amount" applies, (b) the "*Floor Amount*" for all Secured Hedge Agreements shall not exceed $400,000,000 in the aggregate at any time and (c) to the extent that there are no transactions outstanding under a Secured Hedge Agreement, the "*Floor Amount*" for such Secured Hedge Agreement shall be zero.

"*GAAP*" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time; *provided*, *however*, that if any operating lease would be recharacterized as a capital lease due to changes in the accounting treatment of such operating leases under GAAP since June 1, 2015, then solely with respect to the accounting treatment of any such lease, GAAP shall be interpreted as it was in effect on June 1, 2015.

"*Governmental Authority*" shall mean any nation or government, or any state, province, territory or other political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, or any governmental or non-governmental authority regulating the generation and/or transmission of energy.

"*Guarantee*" of or by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any

obligation of such Person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided*, *however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"*Guarantee and Collateral Agreement*" shall mean that certain Guarantee and Collateral Agreement dated as of the date hereof by and among the Borrower, the Subsidiary Guarantors and the Collateral Trustee, on behalf of and for the benefit of the First-Lien Secured Parties.

"*Guaranty*" shall mean a guaranty given by a Credit Party in favor of the Collateral Trustee (for and on behalf of the First-Lien Secured Parties) under the Guarantee and Collateral Agreement.

"*Hazardous Materials*" shall mean (a) any petroleum or petroleum products, radioactive materials, or asbestos containing materials; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants" or words of similar import, under any Environmental Law; and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"*Hedging Obligations*" shall mean, with respect to any specified Person, the obligations of such Person under:  (i) agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates, commodity prices or commodity transportation or transmission pricing or availability, including, for the avoidance of doubt, currency exchange, interest rate or commodity swap, cap or collar agreements; (ii) any netting arrangements, power purchase and sale agreements, fuel purchase and sale agreements, swaps, options and other agreements, in each case, that fluctuate in value with fluctuations in energy, power or gas prices; and (iii) agreements or arrangements for commercial or trading activities with respect to the purchase, transmission, distribution, sale, lease or hedge of any energy related commodity or service.

"*Indebtedness*" shall mean, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables, except as provided in clause (e) below), whether or not contingent:

        (a)      in respect of borrowed money;

        (b)      evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

        (c)      in respect of banker's acceptances;

        (d)      representing Capital Lease Obligations or Attributable Debt in respect of sale and leaseback transactions;

        (e)      representing the balance deferred and unpaid of the purchase price of any property (including trade payables) or services due more than six months after such property is acquired or such services are completed; or

(f)       representing the net amount owing under any Hedging Obligations;

if and to the extent any of the preceding items (other than letters of credit, Attributable Debt and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP.  In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the guarantee by the specified Person of any Indebtedness of any other Person; *provided*, that the amount of such Indebtedness shall be deemed not to exceed the lesser of the amount secured by such Lien and the value of the Person's property securing such Lien.

"***Indemnified Costs***" shall have the meaning set forth in Section 7.8(a).

"***Insolvency or Liquidation Proceeding***" shall mean:

(a)       any voluntary or involuntary case or proceeding under any Debtor Relief Laws with respect to any Credit Party:

(b)       any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Credit Party or with respect to a material portion of its respective assets;

(c)       any liquidation, dissolution, reorganization or winding up of any Credit Party whether voluntary or involuntary and whether or not involving insolvency or bankruptcy;

(d)       any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Credit Party; or

(e)       any other proceeding of any type or nature in which substantially all claims of creditors of any Credit Party are determined and any payment or distribution is or may be made on account of such claims.

"***Interest Expense***" shall mean, for any period, all interest, commitment fees, letter of credit fees, participation fees and Breakage Costs in respect of outstanding Obligations accrued, capitalized or payable during such period (whether or not actually paid during such period) pursuant to the terms of the respective Financing Documents.

"***Interest Rate/Currency Hedging Agreement***" shall mean any agreement of the type described in clauses (a), (b) or (c) of the definition of "Interest Rate/Currency Hedging Obligations."

"***Interest Rate/Currency Hedging Obligations***" shall mean, with respect to any specified Person, the obligations of such Person under (a) interest rate swap agreements (including fixed-to-floating or floating-to-fixed swaps), interest rate cap agreements and interest rate collar agreements, (b) other agreements or arrangements designed to manage interest rates or interest rate risk and (c) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates.

"***Interest Rate Hedge Bank***" shall mean  a party to any Secured Interest Rate Hedge that is an Acceptable Financial Counterparty, Lender, Administrative Agent or an Affiliate thereof, or any Person that was a Lender, Administrative Agent or an Affiliate thereof at the time it entered into such Secured Interest Rate Hedge; *provided* that, in the case of any Interest Rate Hedge Bank (other than a Lender or an Administrative Agent) that is not a party to this Agreement as of the date hereof, such Interest Rate Hedge

Bank shall have executed and delivered to the Collateral Trustee an Accession Agreement pursuant to which such Interest Rate Hedge Bank has become a party to this Agreement and has agreed to be bound by the obligations of a First-Lien Secured Party under the terms hereof.

"***ISDA Event of Default***" shall mean any Event of Default as defined in the relevant Secured Hedge Agreement.

"***Issuing Bank***" shall have the meaning specified in the preliminary statements to this Agreement.

"***L/C Issuer***" shall have the meaning specified in the introductory statement to this Agreement.

"***Lenders***" shall have the meaning specified in the preliminary statements to this Agreement.

"***Lien***" shall mean any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other) or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement) and any preference or priority having the effect of security, and any lease having substantially the same effect as any of the foregoing.

"***Moody's***" shall mean Moody's Investors Service, Inc., or any successor thereto.

"***Mortgaged Property***" shall mean each real property that is subject to a Mortgage.

"***Mortgages***" shall mean a collective reference to each mortgage, deed of trust, deed to secure debt, debenture or similar security instrument entered into by any Credit Party to secure any Obligations.

"***Obligations***" shall mean all amounts owing by the Borrower or any Subsidiary Guarantor to any Agent or any First-Lien Secured Party pursuant to the terms of this Agreement or any other Financing Document (including all interest, fees and other amounts which accrue after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of the Borrower or any of its Subsidiary Guarantors, whether or not allowed in such case or proceeding but excluding, with respect to any Guarantor, all Excluded Hedging Obligations of such Guarantor, and shall include all Credit Agreement Obligations, any Other Credit Agreement Obligations and any Reimbursement Agreement Obligations.

"***Officer's Certificate***" shall mean a certificate signed on behalf of the Borrower by an Authorized Officer of the Borrower, which certificate shall include: (a) a statement that such Authorized Officer making such certificate has read the applicable covenant or condition, (b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate are based, (c) a statement that, in the opinion of such Authorized Officer, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not the applicable covenant or condition has been complied with and (d) a statement as to whether or not, in the opinion of such Authorized Officer, the applicable condition or covenant has been complied with.

"***Ordinary Course Settlement Payments***" shall mean all regularly scheduled payments due under any Secured Hedge Agreement from time to time, calculated in accordance with the terms of such Secured Hedge Agreement, but excluding, for the avoidance of doubt any Termination Payments due and payable under such Secured Hedge Agreement in connection with an Early Termination Event.

"***Other Administrative Agent***" shall have the meaning specified in the preliminary statement to this Agreement.

"***Other Credit Agreement***" shall have the meaning specified in the preliminary statement to this Agreement.

"***Other Credit Agreement Effective Date***" shall have the meaning specified in the preliminary statement to this Agreement.

"***Other Credit Agreement Obligations***" means the "Obligations", as defined in any Other Credit Agreement.

"***Other Credit Support***" shall mean any letter of credit, guaranty of the relevant Secured Hedge Agreement or Additional First-Lien Indebtedness that is in the form of a secured trading facility, including the Secured Trading Facility, or cash collateral issued or pledged, as applicable, as contemplated or required by the relevant Secured Hedge Agreement or Additional First-Lien Indebtedness that is in the form of a secured trading facility, including the Secured Trading Facility, in favor of the applicable Eligible Commodity Hedging Counterparty, Interest Rate Hedge Bank or First-Lien Secured Party, as applicable, (other than pursuant to the Security Documents) to support the Obligations of the Borrower or any Subsidiary Guarantor under such Secured Hedge Agreement or Additional First-Lien Indebtedness that is in the form of a secured trading facility, including the Secured Trading Facility, which letter of credit, guaranty or cash collateral, as applicable, satisfies the requirements of such Secured Hedge Agreement or Additional First-Lien Indebtedness Agreement that is in the form of a secured trading facility, including the Secured Trading Facility, with respect to letters of credit, guaranties or cash, as applicable.  For avoidance of doubt, Other Credit Support shall not include separate insurance, credit default swap protection or other protection against loss arranged by the Eligible Commodity Hedging Counterparty, Interest Rate Hedge Bank or First-Lien Secured Party, as applicable, for its own account or (y) any guarantees provided by one or more Credit Parties or Collateral provided pursuant to the Security Documents.

"***Other Credit Support Amount***" shall mean the sum of (a) the amount of cash constituting Other Credit Support, (b) the amount payable under any guaranty constituting Other Credit Support and (c) the amount available to be drawn under any letter of credit constituting Other Credit Support.

"***Other Credit Support Exception***" shall mean (a) with respect to any Other Credit Support constituting a guaranty, the guarantor thereunder fails to make payment after receipt of a demand for payment thereunder made in accordance with the terms of such guaranty, within three Business Days of its receipt of such demand or (b) with respect to any Other Credit Support constituting a letter of credit, the occurrence and continuance of any of the following:  (i) a restraint or injunction shall be threatened against the issuer of such letter of credit or the applicable Eligible Commodity Hedging Counterparty, Interest Rate Hedge Bank or First-Lien Secured Party, as applicable, that is the beneficiary thereof that restrains or limits or seeks to restrain or limit a draw upon, or the application of proceeds from, such letter of credit prior to, concurrently with, or following such draw or application, (ii) the issuing bank of such letter of credit shall be subject to a bankruptcy proceeding or (iii) the issuing bank of such letter of credit shall have disavowed, repudiated or dishonored its obligations under such letter of credit after, if applicable, delivery to such issuing bank of a conforming draw request thereunder.

"***Other Lenders***" shall have the meaning specified in the preliminary statements to this Agreement.

"***Other Required Lenders***" has the meaning given to the term Required Lenders in any Other Credit Agreement.

"**_Outstanding Amount_**" shall mean:

(a)      with respect to any Series of Secured Debt (except to the extent provided in clause (d) below with respect to any secured trading facility), at any time, an amount equal to the sum of (i) the aggregate outstanding principal amount of the Obligations of such Series of Secured Debt (including the face amount of outstanding letters of credit whether or not then available or drawn) and (ii) except during any period in which the Collateral Trustee has exercised remedies or the protections of Liens on Collateral, the aggregate unfunded commitments to extend credit which, when funded, would constitute Obligations under such Series of Secured Debt;

(b)      with respect to any Secured Hedge Agreement (with respect to any Secured Interest Rate Hedge, for the purposes of Sections 4.4(a) and 7.8 only), (i) at any time prior to the occurrence of an Early Termination Event under such Secured Hedge Agreement, the amount of all Obligations (including Ordinary Course Settlement Payments, Termination Payments and related Interest Expense) that would be owed to the applicable Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank under such Secured Hedge Agreement if there occurred at such time an Early Termination Event under such Secured Hedge Agreement where the Borrower or any Subsidiary Guarantor party thereto is the sole "Affected Party" or the "Defaulting Party" (or equivalent term), or (ii) at any time from and after the occurrence of an Early Termination Event under such Secured Hedge Agreement, the amount of all Obligations (including Ordinary Course Settlement Payments, Termination Payments and related Interest Expense) then due and owing to the applicable Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank under such Secured Hedge Agreement;

(c)      with respect to any Secured Treasury Services Agreement for the purposes of Sections 4.4(a) and 7.8 only, an amount equal to the aggregate outstanding amount of the Obligations in respect of such Secured Treasury Services Agreement; and

(d)      with respect to any secured trading facility (including, if applicable, the Secured Trading Facility), at any time, the amount equal to the aggregate facility utilization (or similar amount, however named) thereunder, together (without duplication) with any Termination Payments (whether as a result of the occurrence of an event of default or other termination event), including any "Settlement Amount" or "Early Termination Amount" as defined in the related secured party ISDA Agreement payable to any secured counterparty thereunder.

"**_Person_**" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"**_Pledged Collateral_**" shall mean, as the context may require, (a) any Collateral, to the extent that possession or control thereof is necessary to perfect a Lien thereon under the UCC, (b) any rights to receive payments under any insurance policy that constitute Collateral and with respect to which a secured party is required to be named as an additional insured or a loss payee in order to perfect a Lien thereon and/or (c) any other Collateral with respect to which a secured party must be listed on a certificate of title in order to perfect a Lien thereon.

"**_Property_**" shall mean any right or interest in or to any asset or property of any kind whatsoever (including Equity Interests), whether real, personal or mixed and whether tangible or intangible.

"**_Reimbursement Agreement_**" shall have the meaning specified in the preliminary statement to this Agreement.

-14-

"***Reimbursement Agreement Obligations***" means the "Obligations", as defined in any Reimbursement Agreement.

"***Release***" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"***Remedy Event***" shall have the meaning set forth in Section 4.2.

"***Required First-Lien Secured Parties***" shall mean, at any time with respect to any matter, First-Lien Secured Parties owed or holding more than 50% of the sum of (without duplication) (a) subject to any voting restrictions set forth in the applicable Financing Document for a Series of Secured Debt, the Outstanding Amount under the Credit Agreement, any Other Credit Agreement, any Reimbursement Agreement and/or any Additional First-Lien Indebtedness Agreement at such time and (b) the Eligible Hedge Amount under each Secured Commodity Hedge and each Secured Interest Rate Hedge at such time.

"***Required Lender Parties***" shall mean (i) at any time prior to the Other Credit Agreement Effective Date with respect to any matter, the Required Lenders and (ii) at any time on or after the Other Credit Agreement Effective Date with respect to any matter, the Lenders, the Other Lenders and the L/C Issuer owed or holding more than 50% of, subject to any voting restrictions set forth in the Credit Agreement (including in the definition of Required Lender therein), the Other Credit Agreement and the Reimbursement Agreement, the sum of (without duplication) the Outstanding Amount under the Credit Agreement, the Other Credit Agreement and the Reimbursement Agreement at such time.

"***Required Lenders***" has the meaning given to such term in the Credit Agreement.

"***Restricted Subsidiary***" shall mean the "Restricted Subsidiaries", as defined in the Credit Agreement.

"***S&P***" shall mean Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business and its successors and assigns.

"***Secured Commodity Hedge***" shall mean (i) each Existing Commodity Hedging Agreement and (ii) each Eligible Commodity Hedging Agreement entered into by the Borrower or a Subsidiary Guarantor which requires that the obligations of such Borrower or a Restricted Subsidiary be secured by a Lien on the Collateral; *provided* that, with respect to each Secured Commodity Hedge, the Eligible Commodity Hedging Counterparty party thereto shall have executed and delivered to the Collateral Trustee an Accession Agreement pursuant to which such Eligible Commodity Hedging Counterparty has become a party to this Agreement and has agreed to be bound by the obligations of a First-Lien Secured Party under the terms hereof

"***Secured Debt Representative***" shall mean (a) with respect to the Lenders under the Credit Agreement, the Administrative Agent, (b) with respect to any Other Lenders under any Other Credit Agreement, any Other Administrative Agent, (c) any L/C Issuer with respect to any Reimbursement Agreement, (d) with respect to the lenders, noteholders, investors and other finance parties under any Additional First-Lien Indebtedness, the administrative agent, trustee or similar representative who maintains the applicable transfer register, (e) with respect to any Secured Interest Rate Hedge, the Interest Rate Hedge Bank party thereto, (f) with respect to any Secured Commodity Hedge, the Eligible Commodity Hedging Counterparty party thereto and (g) with respect to any Secured Treasury Services Agreement for the purposes of Section 4.4(a) only, the Treasury Services Provider party thereto.

"**Secured Hedge Agreement**" shall mean each Secured Commodity Hedge and each Secured Interest Rate Hedge.

"**Secured Hedging Obligations**" shall mean with respect to any specified Person, the obligations of such Person under any Secured Hedge Agreement.

"**Secured Interest Rate Hedge**" shall mean each Interest Rate/Currency Hedging Agreement entered into by the Borrower or any Restricted Subsidiary with an Interest Rate Hedge Bank; *provided* that, with respect to each Secured Interest Rate Hedge, the Interest Rate Hedge Bank party thereto that is not a Lender or Administrative Agent shall have executed and delivered to the Collateral Trustee an Accession Agreement pursuant to which such Interest Rate Hedge Bank has become a party to this Agreement and has agreed to be bound by the obligations of a First-Lien Secured Party under the terms hereof.

"**Secured Trading Facility**" shall mean the "Secured Trading Facility", as defined in the Credit Agreement.

"**Secured Treasury Services Agreement**" shall mean each Treasury Services Agreement entered into by the Borrower or any Restricted Subsidiary with a  Treasury Services Provider; *provided* that, with respect to each Secured Treasury Services Agreement, the Treasury Services Provider party thereto that is not a Lender or the Administrative Agent shall have executed and delivered to the Collateral Trustee an Accession Agreement pursuant to which such Treasury Services Provider has become a party to this Agreement and has agreed to be bound by the obligations of a First-Lien Secured Party under the terms hereof.

"**Securities**" shall mean any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "*securities*" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Security Documents**" shall mean the Guarantee and Collateral Agreement, the Mortgages, this Agreement and each other agreement, document or instrument executed and delivered pursuant to any of the foregoing (including pursuant to Section 9.10 of the Credit Agreement or any similar provision of any other Financing Document) that creates or purports to create a first-priority Lien in favor of the Collateral Trustee for the benefit of the First-Lien Secured Parties.

"**Series of Secured Debt**" shall mean, severally, the Credit Agreement, any Other Credit Agreement, any Reimbursement Agreement and any Additional First-Lien Indebtedness Agreement.

"**Stated Maturity**" shall mean, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the Closing Date, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"**Subsidiary**" shall mean any subsidiary of the Borrower; "*subsidiary*" shall mean, with respect to any specified Person:  (i) any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or

other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and (ii) any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).

"*Subsidiary Guarantor*" shall mean each of the Persons identified on the signature pages hereto as a "*Subsidiary Guarantor*" and each other Subsidiary of the Borrower which is required to guarantee the Obligations from time to time pursuant to the terms of the Financing Documents and which shall have executed and delivered to the Collateral Trustee an Additional Guarantor Accession Agreement pursuant to which such Subsidiary Guarantor has become a party to this Agreement and has agreed to be bound by the obligations of a Credit Party and Credit Party under the terms hereof.

"*Supplemental Collateral Trustee*" shall have the meaning set forth in Section 7.2(b).

"*Swap Transactions*" shall mean any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any Secured Hedge Agreement.

"*Termination Payment*" shall mean the amount, if any, payable by the Credit Parties in connection with an Early Termination Event of any Secured Hedge Agreement, including any "*Settlement Amount*", "*Early Termination Amount*" or "*Close-out Amount*" or substantially similar term as defined in the relevant Secured Hedge Agreement; *provided* that, for the avoidance of doubt, "*Termination Payments*" shall not include any Ordinary Course Settlement Payments due under any such Secured Hedge Agreement.

"*Treasury Services Agreement*" shall mean any agreement between the Borrower or any Subsidiary and any Treasury Services Provider relating to treasury, depository, credit card, debit card, stored value cards, purchasing or procurement cards and cash management services or automated clearinghouse transfer of funds or any similar services.

"*Treasury Services Obligations*" shall have the meaning specified in Section 5.6(b).

"*Treasury Services Provider*" shall mean any Acceptable Financial Counterparty (other than a Credit Party) that is a party to any Secured Treasury Services Agreement; *provided* that, in the case of any Treasury Services Provider that is not a party to this Agreement as of the date hereof, such Treasury Services Provider shall have executed and delivered to the Collateral Trustee an Accession Agreement pursuant to which such Treasury Services Provider has become a party to this Agreement and has agreed to be bound by the obligations of a First-Lien Secured Party under the terms hereof.

"*Trust Estate*" shall have the meaning set forth in Section 2.1.

"*UCC*" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; *provided* that if, with respect to any filing statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Collateral Trustee pursuant to the applicable Security Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Financing Document and any filing statement relating to such perfection or effect of perfection or non-perfection.

"**_Voting Stock_**" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

1.2     Computation of Time Periods; Other Definitional Provisions.

(a)     As used herein and in the other Financing Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) unless the context otherwise requires, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Equity Interests, securities, revenues, accounts, leasehold interests and contract rights, (iv) the word "will" shall be construed to have the same meaning and effect as the word "shall," (v) unless the context otherwise requires, any reference herein (A) to any Person shall be construed to include such Person's permitted successors and assigns and (B) to the Borrower or any other Credit Party shall be construed to include the Borrower or such Credit Party as debtor and debtor-in-possession and any receiver or trustee for the Borrower or any other Credit Party, as the case may be, in any insolvency or liquidation proceeding, (vi) all references to "knowledge" of any Credit Party or a Subsidiary of the Borrower means the actual knowledge of an Authorized Officer responsible for monitoring compliance with the Financing Documents, (vii) references to "the best of an officer's knowledge" or similar phrases referring to "best knowledge" of an officer shall be interpreted to mean that such officer has made such diligent investigation or inquiry as would be customary and prudent for such officer to make in the reasonable judgment of such officer in the context of the applicable circumstances and (viii) all references to any Governmental Authority, shall include any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(b)     The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(c)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)     Unless otherwise expressly provided herein, (i) all references to documents, instruments and other agreements (including the Financing Documents) and all other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements, modifications, refinancings, renewals, replacements and restructurings thereto, but only to the extent that such amendments, restatements, amendments and restatements, extensions, supplements, modifications, refinancings, renewals, replacements and restructurings are permitted by the Financing Documents; and (ii) references to any law (including by succession of comparable successor laws) shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

(e)     Unless otherwise set forth herein, references to principal amount shall include, without duplication, any reimbursement obligations with respect to a letter of credit and the face amount thereof (whether or not such amount is, at the time of determination, drawn or available to be drawn).

1.3     Certifications, Etc.  All certifications to be made hereunder by an officer or representative of a Credit Party shall be made by such Person in his or her capacity solely as an officer or a representative of such Credit Party, on such Credit Party's behalf and not in such Person's individual capacity.

1.4    Construction.  This Agreement and the other Security Documents will be construed without regard to the identity of the party who drafted it and as though the parties participated equally in drafting it.  Consequently, each of the parties hereto acknowledges and agrees that any rule of construction that a document is to be construed against the drafting party will not be applicable either to this Agreement or the other Security Documents.

SECTION 2.    Declaration of Trust; Acknowledgement of Security Interests.

2.1    Trust Estate.  To secure the payment of the Obligations and in consideration of the premises and mutual agreements set forth in this Agreement, each Credit Party hereby confirms the grant to the Collateral Trustee, and the Collateral Trustee hereby accepts and agrees to hold, in trust under this Agreement for the benefit of all current and future First-Lien Secured Parties, a security interest in and Lien on all of such Credit Party's right, title and interest in, to and under all Collateral now or hereafter granted to the Collateral Trustee under any Security Document for the benefit of the First-Lien Secured Parties, together with all of the Collateral Trustee's right, title and interest in, to and under the Security Documents, and all interests, rights, powers and remedies of the Collateral Trustee thereunder or in respect thereof and all cash and non-cash proceeds thereof (collectively, the "***Trust Estate***").

The Collateral Trustee and its successors and assigns under this Agreement will hold the Trust Estate in trust for the benefit solely and exclusively of all current and future First-Lien Secured Parties as security for the payment of all present and future Obligations.

Notwithstanding the foregoing, if at any time:

(1)    all Liens securing the Obligations have been released as provided in Section 5.1;

(2)    no monetary obligation is outstanding and payable under this Agreement to the Collateral Trustee or any of its co-trustees or agents (whether in an individual or representative capacity); and

(3)    the Borrower delivers to the Collateral Trustee an Officer's Certificate stating that all Obligations have been terminated, released or otherwise satisfied or collateralized in a manner satisfactory to the counterparty of such Obligation and the Liens of the Collateral Trustee are permitted to be released, or have been released, in compliance with all applicable provisions of the Financing Documents;

then the first-priority lien trust arising hereunder will terminate (subject to any reinstatement pursuant to Section 6.2), except that all provisions set forth in Section 7.8 that are enforceable by the Collateral Trustee or any of its co-trustees or agents (whether in an individual or representative capacity) will remain enforceable in accordance with their terms.

The parties further declare and covenant that the Trust Estate will be held and distributed by the Collateral Trustee subject to the further agreements herein.

2.2    Collateral Trustee.  The Collateral Trustee and its successors and assigns under this Agreement will act for the benefit solely and exclusively of all present and future holders of Obligations as security for the payment and performance of all present and future Obligations.

2.3    *Pari Passu*.  As among the First-Lien Secured Parties, the Obligations shall rank *pari passu*, no First-Lien Secured Party shall be entitled to any preferences or priority over any other First-Lien Secured Party with respect to the Collateral and the First-Lien Secured Parties shall share in the Col-

lateral and all proceeds thereof equally and ratably in accordance with the terms of this Agreement notwithstanding the time of incurrence of any Obligation or the time or method of creation or perfection of any of the Liens securing the Obligations.

2.4     Prohibition on Contesting Liens.  Each of the Collateral Trustee (on behalf of itself and each First-Lien Secured Party), the Administrative Agent (on behalf of itself and each Lender), any Other Administrative Agent (on behalf of itself and any Other Lender), the L/C Issuer  and each other First-Lien Secured Party, agrees that it will not (and hereby waives any right to) object to, question or contest, or support any other Person in objecting to, questioning or contesting, in any proceeding (including any Insolvency or Liquidation Proceeding) (a) the priority, validity, extent, perfection, attachment or enforceability of a Lien held by or on behalf of any of the First-Lien Secured Parties in all or any part of the Collateral in accordance with the terms of this Agreement or (b) any or all of the provisions of this Agreement; *provided* that nothing in this Agreement shall be construed to prevent or impair the rights of the Collateral Trustee, the Administrative Agent, any Other Administrative Agent, any L/C Issuer or any other First-Lien Secured Party to enforce this Agreement in accordance with the terms hereof.

2.5     No New First-Priority Liens.  So long as the Discharge of Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Credit Party, the parties hereto agree that no Credit Party shall grant or permit any additional first-priority Liens on any assets or property that constitute Collateral to secure any Obligations other than in respect of any Other Credit Support or otherwise permitted under each of the Financing Documents, unless it has granted or concurrently grants a first-priority Lien on such Collateral to secure all Obligations on a *pari passu* basis.

SECTION 3.     Enforcement.

3.1     Exercise of Remedies.  The Collateral Trustee, at the direction of the Required First-Lien Secured Parties, shall have the exclusive right to enforce rights, exercise remedies (including setoff (but subject to Section 5.4(a)) and the right to credit bid any or all of the Obligations) and make determinations regarding the release, sale, disposition or restrictions (including bidding or auction procedures) with respect to the Collateral in accordance with the provisions of this Agreement and the relevant Security Documents.  In exercising rights and remedies with respect to the Collateral, the Collateral Trustee, at the direction of the Required First-Lien Secured Parties, may enforce the provisions of the Security Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion.  Such exercise and enforcement shall include the rights of the Collateral Trustee (or any other agent appointed by the Required First-Lien Secured Parties) to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and the Security Documents and of a secured creditor under the Debtor Relief Laws.

3.2     Enforcement of Liens.

(a)     The Required First-Lien Secured Parties will have, subject to the terms of this Agreement, the right to authorize and direct the Collateral Trustee with respect to the Security Documents and the Collateral, including the exclusive right to authorize or direct the Collateral Trustee to enforce, collect or realize on any Collateral or exercise any other right or remedy with respect to the Collateral.

(b)     Except to the extent directed or consented to by the Required First-Lien Secured Parties, none of the Collateral Trustee, any Secured Debt Representative or any other First-Lien Secured Party will:

(A)     request judicial relief, in any Insolvency or Liquidation Proceeding or in any other court, that would hinder, delay, limit or prohibit the lawful exercise or enforcement of any right or remedy otherwise available to the First-Lien Secured Parties in respect of the Liens granted to the Collateral Trustee, for the benefit of the First-Lien Secured Parties;

(B)     oppose or otherwise contest any motion for relief from the automatic stay or for any injunction against foreclosure or enforcement of Liens granted to the Collateral Trustee, for the benefit of the First-Lien Secured Parties, made by the Collateral Trustee, acting at the direction of, or as consented to by, the Required First-Lien Secured Parties, in any Insolvency or Liquidation Proceeding;

(C)     oppose or otherwise contest any lawful exercise by the Collateral Trustee, acting at the direction of, or as consented to by, the Required First-Lien Secured Parties, of the right to credit bid any or all of the Obligations at any sale in foreclosure of the Liens granted to the Collateral Trustee, for the benefit of the First-Lien Secured Parties; or

(D)     oppose or otherwise contest any other request for judicial relief made in any court by the Collateral Trustee, acting at the direction of, or as consented to by, the Required First-Lien Secured Parties relating to the lawful enforcement of any Lien;

*provided*, *however*, that the Collateral Trustee may (but will not be obliged to) take such actions as it deems desirable in its sole discretion to create, prove, preserve or protect the Liens upon any Collateral in the manner contemplated by the Security Documents.  Notwithstanding the foregoing, both before and during an Insolvency and Liquidation Proceeding, any First-Lien Secured Party and any Secured Debt Representative may take any actions and exercise any and all rights in each case, that are consistent with this Agreement, that they would have as an unsecured creditor, including the commencement of an Insolvency or Liquidation Proceeding against any Credit Party in accordance with applicable law and the termination of any Financing Document in accordance with the terms thereof; *provided* that the First-Lien Secured Parties and the Secured Debt Representatives may not take any of the actions prohibited by clauses (A) through (D) above or oppose or contest any other claim that it has agreed not to oppose or contest under Section 6; and *provided*, *further*, that, in the event that any First-Lien Secured Party becomes a judgment lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes as the other Liens securing the Obligations are subject to this Agreement.

(c)     Notwithstanding anything to the contrary set forth herein or in any other Financing Document, in no event shall the Collateral Trustee (or any other Person on its behalf) exercise any rights or remedies with respect to the Collateral unless (i) such exercise occurs after the occurrence of an Event of Default following notice to the Collateral Trustee in accordance with Section 5.3 and (ii) the Collateral Trustee has been instructed to so exercise such rights or remedies by the Required First-Lien Secured Parties (or to the extent expressly provided herein, the Required Lender Parties) in accordance with the terms set forth herein.  In exercising rights and remedies with respect to the Collateral after the occurrence of any Event of Default, the Secured Debt Representatives may, at the direction of the Required First-Lien Secured Parties, instruct the Collateral Trustee to enforce (or to refrain from enforcing) the provisions of the Security Documents in respect of the Obligations and exercise (or refrain from exercising) remedies thereunder or any such rights and remedies, all in such order and in such manner as the Collateral Trustee may determine, unless otherwise directed by the Required First-Lien Secured Parties, including:

(A)     the exercise or forbearance from exercise of all rights and remedies in respect of the Collateral and/or the Obligations:

(B)      the enforcement or forbearance from enforcement of any Lien in respect of the Collateral;

(C)      the exercise or forbearance from exercise of rights and powers of a holder of Equity Interests or any other form of Securities in the Collateral to the extent provided in the Security Documents;

(D)      the acceptance of the Collateral in full or partial satisfaction of the Obligations; and

(E)      the exercise or forbearance from exercise of all rights and remedies of a secured lender under the UCC or any similar law of any applicable jurisdiction or in equity.

(d)      Without in any way limiting the generality of clause (c) above, the Collateral Trustee, the Administrative Agent, any Other Administrative Agent, any L/C Issuer, each Interest Rate Hedge Bank, each Eligible Commodity Hedging Counterparty and each other First-Lien Secured Party and any of them may, at any time and from time to time in accordance with, and to the extent not prohibited by, this Agreement and/or applicable law, without the consent of or notice to any other First-Lien Secured Party, without incurring responsibility to any other First-Lien Secured Party and without impairing or releasing the Lien priorities and other benefits provided in this Agreement, do one or more of the following:

(i)      change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the Obligations and related Financing Documents; *provided* that if any Secured Commodity Hedges contain restrictions on increases of principal under the Financing Documents, each Eligible Commodity Hedging Counterparty party thereto agrees to promptly inform each other Secured Debt Representative of any such restriction;

(ii)      release the Lien on the Collateral securing such First-Lien Secured Party's Obligations;

(iii)      settle or compromise any Obligation or any other liability of any Credit Party; and

(iv)      exercise or delay in or refrain from exercising any right or remedy against any Credit Party or any other Person, elect any remedy and otherwise deal freely with any Credit Party.

(e)      Following notice of any Event of Default received pursuant to Section 5.3, any Secured Debt Representative of the type set forth in clauses (a), (b) or (d) of the definition thereof may request in writing that the Collateral Trustee pursue any lawful action in respect of the Collateral in accordance with the terms of the Security Documents.  Upon any such written request, the Collateral Trustee shall seek the consent of the Required First-Lien Secured Parties to pursue such action (it being understood that the Collateral Trustee shall not be required to advise the Required First-Lien Secured Parties to pursue any such action).  Following receipt of any notice that an Event of Default has occurred, the Collateral Trustee may await direction from the Required First-Lien Secured Parties and will act, or decline to act, as directed by the Required First-Lien Secured Parties, in the exercise and enforcement of the Collateral Trustee's interests, rights, powers and remedies in respect of the Collateral or under the Security Documents or applicable law and, following the initiation of such exercise of remedies, the Collateral Trustee will act, or decline to act, with respect to the manner of such exercise of remedies as directed by the Required First-Lien Secured Parties.  Subsequent to the Collateral Trustee receiving written notice that any Event of De-

fault has occurred entitling the Collateral Trustee to foreclose upon, collect or otherwise enforce the Liens then, unless it has been directed to the contrary by the Required First-Lien Secured Parties, the Collateral Trustee in any event may (but will not be obligated to) take all lawful and commercially reasonable actions permitted under the Security Documents that it may deem necessary or advisable in its reasonable judgment to protect or preserve its interest in the Collateral and the interests, rights, powers and remedies granted or available to the Collateral Trustee under, pursuant to or in connection with the Security Documents.

SECTION 4.    Payments.

4.1    Application of Proceeds.  Notwithstanding any ongoing Insolvency or Liquidation Proceeding which has been commenced by or against any Credit Party, any Collateral or any proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral and proceeds thereof shall be applied in the following order upon the occurrence and during the continuation of a Remedy Event (it being agreed that the Collateral Trustee shall apply such amounts in the following order as promptly as is reasonably practicable after the receipt thereof; *provided* that such amounts shall not be so applied until such time as the amount of the Obligations has been determined in accordance with the terms hereof and under the terms of the relevant Financing Document, including and subject to Sections 4.4 and 4.5 below):

*first*, on a *pro rata* basis, to the payment of all amounts owing to the Agents (in their respective capacities as agents) and any fees owing to letter of credit issuing banks under the Credit Agreement, any Other Credit Agreement, any Reimbursement Agreement or any Additional First-Lien Indebtedness Agreement under any of the Financing Documents (including indemnification obligations thereunder);

*second*, on a *pro rata* basis to any First-Lien Secured Party which has theretofore advanced or paid any fees to any Agent, other than any amounts covered by priority *first*, an amount equal to the amount thereof so advanced or paid by such First-Lien Secured Party and for which such First-Lien Secured Party has not been previously reimbursed;

*third*, on a *pro rata* basis, to the payment of, without duplication, (a) any Interest Expense and all principal and other amounts then due and payable in respect of the Obligations under the Credit Agreement, any Other Credit Agreement and any Reimbursement Agreement, (b) the payment of all Termination Payments then due and payable to any Interest Rate Hedge Bank under any Secured Interest Rate Hedge (including any Interest Expense due and payable in respect thereof), (c) the payment of all Termination Payments then due and payable to any Eligible Commodity Hedging Counterparty under any Secured Commodity Hedge (including any Interest Expense due and payable in respect thereof), (d) any Interest Expense and all principal and other amounts then due and payable in respect of the Obligations under any Secured Treasury Services Agreement and any Additional First-Lien Indebtedness (including cash collateralization or backstopping (at the lower of (1) 103% of the aggregate undrawn amount of such letters of credit (or such lower amount as agreed to by the issuer of the application outstanding letter of credit) and (2) the percentage of the aggregate undrawn amount required for release of Liens under the terms of the Credit Agreement, any Other Credit Agreement, any Reimbursement Agreement or the applicable Additional First-Lien Indebtedness) of all outstanding letters of credit constituting Obligations) and (e) all other Obligations due to any First-Lien Secured Party;

*fourth*, on a *pro rata* basis, to the payment of, without duplication, all other Obligations owing to any First-Lien Secured Party, but not yet due and payable; and

*last*, the balance, if any, after all of the Obligations have been paid in full in cash, to the Credit Parties or as otherwise required by a court of competent jurisdiction.

In connection with the application of proceeds pursuant to this Section 4.1, except as otherwise directed by the Required First-Lien Secured Parties, the Collateral Trustee may sell any non-cash proceeds for cash prior to the application of the proceeds thereof.

4.2    <u>Limitations on Payment Post Default</u>.  After (i) the Obligations outstanding under any of the Financing Documents have become due and payable in full (whether at maturity, upon acceleration or otherwise) and have not been repaid in full, or any Obligations outstanding under any of the Financing Documents has not been paid when due and remains unpaid (after any applicable grace period) and (ii) the Required First-Lien Secured Parties have instructed the Collateral Trustee (unless they are stayed by the applicable Insolvency or Liquidation Proceeding from giving such instructions) to enforce, collect or realize on any Collateral or exercise any other right or remedy with respect to the Collateral and to cause all proceeds to be applied in accordance with Section 4.1 (a "***Remedy Event***"), no payment of cash (or the equivalent of cash) shall be made from the proceeds of Collateral by any Credit Party to the Collateral Trustee for the benefit of any First-Lien Secured Party, except as provided for in Section 4.1.

4.3    <u>Turnover</u>.  If any First-Lien Secured Party shall obtain any amount in respect of any Obligations owed to such First-Lien Secured Party other than in accordance with the express terms of this Agreement, such First-Lien Secured Party shall forthwith notify each other Secured Debt Representative thereof and shall promptly, and in any event within 10 Business Days of its so obtaining the same, pay such amount (less any reasonable costs and expenses incurred by such First-Lien Secured Party in obtaining such amount) to the Collateral Trustee for the account of the First-Lien Secured Parties, to be shared in accordance with Section 4.1.

4.4    <u>Debt Balances</u>.

(a)    Upon the written request of the Collateral Trustee, each Secured Debt Representative shall promptly (and, in any event, within five Business Days) give the Collateral Trustee written notice of the aggregate amount of the Obligations then outstanding and owed by any Credit Party to the First-Lien Secured Parties represented by such Secured Debt Representative under the applicable Financing Documents and any other information that the Collateral Trustee may reasonably request.  Each Secured Debt Representative agrees that it will share such information with any other Secured Debt Representative, upon request by a Secured Debt Representative.  In addition to the foregoing, the Collateral Trustee may request from a Secured Debt Representative specified amounts of Obligations in connection with the application of amounts in accordance with Section 4.4(b), the determination of "Required First-Lien Secured Parties" and any other applicable provisions of this Agreement, including (i) in the case of the Administrative Agent, Secured Debt Representative under an Additional First-Lien Indebtedness Agreement, any Other Administrative Agent, any L/C Issuer or Treasury Services Provider, the Outstanding Amount under the Credit Agreement, any Other Credit Agreement, any Reimbursement Agreement, an Additional First-Lien Indebtedness Agreement or Secured Treasury Services Agreement (as applicable) at such time, (ii) in the case of each Interest Rate Hedge Bank, the Eligible Hedge Amount under the applicable Secured Interest Rate Hedge at such time, and (iii) in the case of each Eligible Commodity Hedging Counterparty, the Eligible Hedge Amount under the applicable Secured Commodity Hedge at such time, and each such Secured Debt Representative shall promptly provide such amounts in writing (and, in any event, within five Business Days).  Upon receipt of each such notice from a Secured Debt Representative, the Collateral Trustee shall provide such notice to each other Secured Debt Representative.

(b)    Without limiting the foregoing, upon receipt of any of the monies referred to in Section 4.1, the Collateral Trustee shall promptly provide notice to each Secured Debt Representative of the re-

ceipt of such monies.  Within 10 Business Days of the receipt of such notice, each Secured Debt Representative shall give the Collateral Trustee written certification by an authorized officer or representative thereof of the aggregate amount of the Obligations then outstanding owed by any Credit Party to the First-Lien Secured Parties represented by such Secured Debt Representative under the applicable Financing Documents to be certified to as presently due and owing after giving effect to the application of any Other Credit Support in respect of such Obligations as contemplated by Section 4.5 (and, promptly upon receipt thereof, the Collateral Trustee shall provide a copy of each such certification to each other Secured Debt Representative).  Unless otherwise directed by a court of competent jurisdiction or each Secured Debt Representative, the Collateral Trustee shall use the information provided for in such notices as the basis for applying such monies in accordance with Section 4.1.  Notwithstanding anything herein to the contrary, the proceeds of any Collateral shall not be applied to the Obligations owed to such Eligible Commodity Hedging Counterparty and each Interest Rate Hedge Bank, as applicable, until each Eligible Commodity Hedging Counterparty and each Interest Rate Hedge Bank shall have applied any Other Credit Support to the Obligations owing to such Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank (as applicable) as contemplated by Section 4.5.

(c)     In calculating the amount of Obligations owed to any Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank, the applicable Obligations owed under any Secured Hedge Agreement shall be determined by the party specified in such Secured Hedge Agreement in accordance with the terms of the relevant Secured Hedge Agreement, as applicable.

4.5     Other Credit Support.  If, following the occurrence of an Early Termination Event under any Secured Hedge Agreement, any Credit Party shall fail to pay any of the Obligations owing under such Secured Hedge Agreement as and when required thereunder, then each applicable Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank agrees that, subject to the occurrence of any Other Credit Support Exception, it shall if a Remedy Event then exists, to the extent permitted under such Secured Hedge Agreement, the terms of any relevant Other Credit Support and applicable law, promptly (i) make a demand for payment under any Other Credit Support consisting of letters of credit, cash collateral or a guarantee issued in favor of such Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank to support the Obligations of the Credit Parties under such Secured Hedge Agreement and (ii) promptly apply the proceeds received under any Other Credit Support consisting of letters of credit, cash collateral or guarantee and any cash consisting of Other Credit Support pledged in favor of such Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank to reduce the outstanding amount of such Obligations.

SECTION 5.     Other Agreements.

5.1     Releases.

(a)     (i) Upon the request of any Credit Party in connection with any Asset Sale (other than in connection with the exercise of the Collateral Trustee's rights and remedies in respect of the Collateral provided for in Sections 3.1 and 3.2) by any Credit Party or the release of Liens on Collateral that has become an Excluded Asset or other assets of the Credit Parties as Collateral, to the extent permitted (if addressed therein, or, otherwise, not prohibited) by the terms of the Financing Documents as then in effect, the Collateral Trustee will, at the Borrower's sole cost and expense, execute and deliver to the applicable Credit Party such documents (including UCC termination statements, reconveyances, customary pay-off letters, and return of Collateral) as such Credit Party may reasonably request to evidence and effectuate the irrevocable and concurrent release of (A) with respect to any Asset Sale to a Person that is not a Credit Party, Excluded Assets or other applicable assets, any Lien granted thereon under any of the Security Documents in any Collateral being disposed of in connection with such Asset Sale, Excluded Assets or other applicable assets whose release is permitted (if addressed in the applicable Financing Docu-

ment, or, otherwise, not prohibited) and (B) with respect to any Asset Sale to a Person that is not a Credit Party in respect of all of the Equity Interests in, or assets of, such Credit Party, such Credit Party from its Obligations and guarantees, if any, under the Financing Documents; *provided* that, in each case, such Credit Party shall have delivered to the Collateral Trustee and each Secured Debt Representative, at least five Business Days or such lesser period of time as the Collateral Trustee or Secured Debt Representative may agree prior to the date of the proposed release (such date of the proposed release, the "***Release Date***") (a) a written request for release specifying the Release Date and identifying (generally) the relevant Collateral to which the requested release relates and, to the extent applicable, the Credit Party to be released from the Liens under the Security Documents and its Obligations under the Financing Documents, and (b) an Officer's Certificate of an Authorized Officer of the Borrower stating that such Asset Sale, release of Excluded Assets or release of other applicable assets is in compliance with the terms of all of the Financing Documents.  On the Release Date, the Collateral disposed of pursuant to an Asset Sale, that has become Excluded Assets or other applicable assets, as the case may be, identified in the written request and Officer's Certificate referred to above shall be automatically released from all Liens under the Security Documents, in each case subject to any actions required to be taken by the Collateral Trustee to effectuate any such release.

(ii)      Upon the Discharge of Obligations, all rights in and to the Collateral shall revert to the applicable Credit Party, and, upon the written request of the Borrower, the Collateral Trustee will, at the Borrower's sole cost and expense, (x) promptly cause to be transferred and delivered as the Borrower may direct, without any recourse, warranty or representation whatsoever, any Collateral and any proceeds received in respect thereof and (y) execute and deliver to the Credit Parties customary payoff letters, re-conveyances, UCC termination statements and other documentation as the Credit Parties may reasonably request to effect the termination and release of the Liens on the Collateral.

(iii)     Upon request of the Borrower, the Collateral Trustee will take any action set forth in Section 5.1(a)(i) prior to releasing any Lien under the Security Documents on Excluded Assets as reasonably requested by the Borrower; *provided* that the Collateral Trustee may, in its reasonable discretion, request an Officer's Certificate of the Borrower with respect to the release of the Liens on Excluded Assets.

(b)      Subject to any requirements of the Financing Documents, without further written consent, notice to or authorization from any First-Lien Secured Party, the Collateral Trustee shall execute any documents or instruments necessary to release any Collateral to the extent such release is permitted (if addressed therein, or, otherwise, not prohibited) by the terms of the Financing Documents or if such release is not permitted by the terms of any of the Financing Documents, the relevant First-Lien Secured Parties have consented to such release in accordance with the terms of such Financing Documents.

5.2      <u>Amendments to Financing Documents; Class Voting</u>.

(a)      The Financing Documents may be amended, supplemented or otherwise modified in accordance with their terms, in each case, without notice to, or the consent of any First-Lien Secured Party except to the extent required by any such Financing Document without affecting the provisions of this Agreement.

(b)      (i) Notwithstanding anything to the contrary in this Agreement or in any of the Security Documents, without the written consent of the Required Lenders, any Other Required Lenders, the L/C Issuer and each First-Lien Secured Party under a Secured Commodity Hedge set forth below, no amendment, modification, termination, waiver or consent in respect of this Agreement or the Security Documents shall be effective if the effect thereof would:  (A) without the written consent of each such Required Lender, any Other Required Lender, any L/C Issuer and First-Lien Secured Party (or in the case of any Series of Secured Debt, the consent of the holders of such Indebtedness that is required in accordance

with the Financing Documents for such Series of Secured Debt) that would be adversely affected thereby, (1) amend the definition of "*Acceptable Commodity Counterparty*," "*Acceptable Financial Counterparty*," "*Commodity Hedging Agreements*," "*Eligible Commodity Hedge Agreement*," "*Eligible Commodity Hedging Counterparty*," "*Existing Commodity Hedging Agreement*," "*Existing Commodity Hedging Agreement Counterparty*," "*Discharge of Obligations*," "*Early Termination Event*," "*Eligible Hedge Amount*," "*Event of Default*," "*Financing Documents*," "*Floor Amount*," "*Hedging Obligations*," "*Secured Hedging Obligations*," "*Secured Hedge Agreement*," "*Interest Rate/Currency Hedging Agreement*," "*Interest Rate/Currency Hedging Obligations*," "*Interest Rate Hedge Bank*," "*Obligation*," "*Ordinary Course Settlement Payments*," "*Other Credit Support*," "*Other Credit Support Amount*," "*Other Credit Support Exception*," "*Outstanding Amount*," "*Secured Commodity Hedge*," "*Required First-Lien Secured Parties*," "*Additional First Lien Indebtedness*," "*Secured Debt Representative*," "*Secured Hedge Agreement*," "*Secured Interest Rate Hedge*," " *First-Lien Secured Parties*," "*Additional First-Lien Indebtedness Agreement*," "*Secured Treasury Services Agreement*" or "*Termination Payment*," in each case as such term applies to the then outstanding Obligations and/or Financing Documents or (2) cause any netting or setoff rights of an Eligible Commodity Hedging Counterparty under its Secured Commodity Hedge, an Interest Rate Hedge Bank under its Secured Interest Rate Hedge or a Treasury Services Provider under its Secured Treasury Services Agreement, in either case, to be prohibited hereunder, or (B) without the written consent of each Required First-Lien Secured Party (or Secured Debt Representative on its behalf) whose then outstanding Financing Documents (or related outstanding Obligations) would be adversely affected thereby, (1) change the order of application of proceeds of Collateral and other payments set forth in Section 4.1 or any other provision setting forth a priority of payment in respect of the Obligations; (2) cause the Obligations owed under the Credit Agreement, any Other Credit Agreement, any Reimbursement Agreement, any Additional First-Lien Indebtedness Agreement, any Secured Treasury Services Agreement, any Secured Hedge Agreement to cease to be secured by Liens on the Collateral on a *pari passu* basis with all other Obligations; (3) release all or substantially all of the Collateral or all or substantially all of the Subsidiary Guarantors from their respective Guaranties, except as expressly provided in (or permitted by) all of the Financing Documents then in effect (including Section 5.1); or (4) amend or otherwise modify this Section 5.2 in a manner that would materially and adversely affect such First-Lien Secured Party.

(ii)      Without limiting the generality of the other provisions of this Section 5.2, no consent shall be required of any First-Lien Secured Party to execute any amendment, modification, waiver, termination or consent in respect of this Agreement or the Security Documents if after giving effect thereto, this Agreement or the Security Documents are (x) more favorable to such First-Lien Secured Party and (y) not materially less favorable to such First-Lien Secured Party than to any other First-Lien Secured Party.

5.3      <u>Certain Actions</u>.  So long as any Obligations remain outstanding in respect of more than one class of First-Lien Secured Parties, the following provisions shall apply:

(a)      Each Secured Debt Representative hereby agrees to give, pursuant to the terms set forth in the Financing Documents, the Collateral Trustee prompt written notice of the occurrence of (i) any Event of Default under such Person's Financing Documents, as applicable, of which such Person has written notice, (ii) any amendment or waiver under such Person's Financing Documents and (iii) acceleration of the maturity of any Obligations under any of the Financing Documents for which it acts as a Secured Debt Representative wherein such Obligations have been declared to be or have automatically become due and payable earlier than the scheduled maturity thereof or termination date thereunder (or similar remedial actions including demands for cash collateral (except in accordance with ordinary course margining under Secured Hedge Agreements) have been taken) and setting forth the aggregate amount of Obligations that have been so accelerated under such Financing Documents, in each case, as soon as practicable after

the occurrence thereof (and, in any event, within ten Business Days after the occurrence thereof); *provided*, *however*, that the failure to provide such notice shall not limit or impair the rights of the First-Lien Secured Parties, or the obligations of the Credit Parties, hereunder or under the other Financing Documents.  Upon receipt of any of the notices described in clause (i), (ii) or (iii) above from any Secured Debt Representative, the Collateral Trustee shall promptly notify each other Secured Debt Representative.  The Collateral Trustee shall not be deemed to have knowledge or notice of the occurrence of an Event of Default under any Financing Document until it has received a written notice of such Event of Default in accordance with the preceding sentences of this Section 5.3.

(b)  The Collateral Trustee hereby agrees to give each Secured Debt Representative prompt written notice of the occurrence of an Event of Default following receipt thereof of written notice to it and provide a copy of all other related information provided to it by any Credit Party under the Security Documents upon request.

(c)  Each Credit Party hereby agrees that, at any time and from time to time, at its sole cost and expense and following the reasonable request of the Collateral Trustee, it shall promptly execute and deliver all further agreements, instruments, documents and certificates and take all further action that may be necessary in order to fully effect the purposes of this Agreement and the Security Documents (including, to the extent required by any Security Document, the delivery of any Collateral represented by certificated securities that hereafter comes into existence or is acquired in the future by the Collateral Trustee as pledgee for the benefit of the First-Lien Secured Parties) and to enable the Collateral Trustee to exercise and enforce its rights and remedies under the Security Documents with respect to the Collateral or any part thereof.

5.4    Cash Collateral Accounts; Amounts Not Subject to Sharing.

(a)  Subject to the terms of this Section 5.4(a), nothing contained in this Agreement shall be construed (i) to impair the rights of any First-Lien Secured Party to exercise its rights and remedies with respect to any cash collateral pledged for its sole benefit or as a beneficiary under and pursuant to any Other Credit Support issued or pledged in its favor, (ii) to impair the rights of any First-Lien Secured Party to exercise any of its rights and remedies as an unsecured creditor under any or all Financing Documents to which it is a party that are consistent with the terms of this Agreement, (iii) to impair the rights of any Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank to exercise its rights to setoff and net amounts across Swap Transactions under any Secured Hedge Agreement to which it is a party, (iv) impair the rights of the Lenders under Section 13.02 of the Credit Agreement, (v) impair the rights of any Other Lenders under any analogous section regarding rights of set-off of any Other Credit Agreement, or (vi) impair the rights of the L/C Issuer under any analogous section regarding rights of set-off of each Reimbursement Agreement; *provided* that each Eligible Commodity Hedging Counterparty and Interest Rate Hedge Bank agrees that it shall only exercise such rights of setoff and netting, among amounts owing by or to such Interest Rate Hedge Bank or Eligible Commodity Hedging Counterparty under the Secured Hedge Agreements to which it is a party; *provided* that, except with respect to cash collateral described in clause (i), any amounts received as a result of such setoff described in clauses (iii), (iv), (v) and (vi) shall be applied pursuant to Section 4.1.

(b)  Notwithstanding anything to the contrary, no First-Lien Secured Party shall have any obligation to share any amounts received or deemed received by it in respect of any Obligation owed to it from separate insurance, credit default swap protection, Other Credit Support or other similar protection against loss arranged by such First-Lien Secured Party for its own account in respect of any such Obligation (which amounts shall be for the sole benefit of such First-Lien Secured Party).

5.5     Additional First-Lien Indebtedness Agreement.

(a)     The Collateral Trustee will perform its duties as Collateral Trustee hereunder with respect to any Obligations under any Additional First-Lien Indebtedness if each of the designated Secured Debt Representative for such Obligations, the Borrower and the other applicable Credit Party (if any) signs an Accession Agreement and delivers the same to the Collateral Trustee.  Such Accession Agreement must be appropriately completed as contemplated by Exhibit A and delivered to the Collateral Trustee, which shall, in turn, promptly deliver a copy of such Accession Agreement to each other Secured Debt Representative.

(b)     Although the Collateral Trustee shall be required to deliver a copy of such Accession Agreement to each then existing Secured Debt Representative, the failure to so deliver a copy of the Accession Agreement to any then existing Secured Debt Representative shall not affect the status of such debt as Additional First-Lien Indebtedness if the other requirements of this Section 5.5 are complied with. Each of the Collateral Trustee and any then-existing Secured Debt Representative shall have the right to request that the Borrower provide a legal opinion of counsel as to the Additional First-Lien Indebtedness being secured by a valid and perfected security interest in the Collateral.  Notwithstanding the foregoing, nothing in this Agreement will be construed to allow the Borrower or any other Credit Party to incur Additional First-Lien Indebtedness if prohibited by the terms of any Financing Documents as then in effect.

(c)     With respect to any Additional First-Lien Indebtedness incurred after the date hereof, Borrower and each of the other Credit Parties agrees to take such actions (if any) as may from time to time reasonably be requested by the Collateral Trustee or the Required First-Lien Secured Parties, and enter into such technical amendments, modifications and/or supplements to the then existing Guaranties and/or Security Documents (or execute and deliver such additional Security Documents) as may from time to time be reasonably requested by such Persons (including as contemplated by clause (d) below), to ensure that such Additional First-Lien Indebtedness and the Additional First-Lien Obligations are secured by, and entitled to the benefits of, the relevant Security Documents, and each First-Lien Secured Party (by its acceptance of the benefits hereof) hereby agrees to, and authorizes the Collateral Trustee to enter into, any such technical amendments, modifications and/or supplements (and additional Security Documents). Borrower and each other Credit Party hereby further agree that, if there are any recording, filing or other similar fees payable in connection with any of the actions to be taken pursuant to this Section, all such amounts shall be paid by, and shall be for the account of, Borrower and the other respective Credit Parties, on a joint and several basis.

(d)     Without limitation of the foregoing, Borrower and each other Credit Party agrees to take the following actions with respect to any real property Collateral with respect to any and all Additional First-Lien Indebtedness within 60 days after the delivery of the respective Accession Agreement (or such later date as the Collateral Trustee agrees to in its sole discretion):

(1)     Borrower and the other applicable Credit Parties shall enter into, and deliver to the Collateral Trustee a mortgage modification (each such modification, a "Modification") or new mortgage or deed of trust with regard to each real property subject to a Mortgage (and each such property subject to a Mortgage, a "Mortgaged Property"), in proper form for recording in all applicable jurisdictions, in form and substance reasonably satisfactory to the Collateral Trustee, and the Borrower and the other Credit Parties are jointly and severally liable to pay all filing and recording fees and taxes, documentary stamp taxes and other taxes, charges and fees, if any, necessary for filing or recording in the recording office of each jurisdiction where such real property to be encumbered thereby is situated;

(2)      Borrower or the applicable Credit Party will cause to be delivered a local counsel opinion with respect to each such Mortgaged Property in form and substance reasonably satisfactory to the Collateral Trustee; and

(3)      Borrower or the applicable Credit Party will cause a title company reasonably acceptable to the Collateral Trustee to have delivered to the Collateral Trustee a title insurance policy (or, as applicable, a date down or modification endorsement to each title insurance policy previously delivered to the Collateral Trustee with respect to the Mortgage or Mortgages), or other evidence reasonably satisfactory to the Collateral Trustee, including, without limitation, a title search, in each case ensuring that each mortgage, as modified by a Modification or each new mortgage, as applicable, is a first-priority lien on the applicable Mortgaged Property, subject to Liens permitted by each Financing Document.

5.6      <u>Secured Hedge Agreements and Secured Treasury Services Agreements</u>.

(a)      The Collateral Trustee will perform its duties as Collateral Trustee hereunder with respect to any Obligations under a Secured Hedge Agreement or Secured Treasury Services Agreement incurred after the date hereof if the Eligible Commodity Hedge Counterparty or Interest Rate Hedge Bank or Treasury Services Provider and the Borrower and the other applicable Credit Party (if any) signs an Accession Agreement and delivers the same to the Collateral Trustee (it being understood and agreed that only one Accession Agreement per Eligible Commodity Hedge Counterparty, Interest Rate Hedge Bank or Treasury Services Provider (as the case may be) will be required for each Secured Hedge Agreement). Such Accession Agreement must be appropriately completed as contemplated by Exhibit A and delivered by the Borrower to the Collateral Trustee, which shall, in turn, promptly deliver a copy of such Accession Agreement to each other Secured Debt Representative.

(b)      Although the Collateral Trustee shall be required to deliver a copy of such Accession Agreement to each then existing Secured Debt Representative, the failure to so deliver a copy of the Accession Agreement to any then existing Secured Debt Representative shall not affect the status of such debt as Obligations under a Secured Hedge Agreement or Secured Treasury Services Agreement (as applicable) if the other requirements of this Section 5.6 are complied with.  Nothing in this Agreement will be construed to allow the Borrower or any other Credit Party to incur additional Indebtedness or Liens or enter into any Swap Transactions if prohibited by the terms of any Financing Document as in effect at the time of such incurrence.

(c)      With respect to any Secured Hedging Obligations and Treasury Service Obligations, the Borrower and each other Credit Party agrees to take such actions (if any) as may from time to time reasonably be requested by the Collateral Trustee or the Required First-Lien Secured Parties, and enter into such amendments, modifications and/or supplements to the then existing Guaranties and Security Documents (or execute and deliver such additional Security Documents) as may from time to time be reasonably requested by such Persons, to ensure that the Secured Hedging Obligations and Treasury Service Obligations incurred after the date hereof are secured by, and entitled to the benefits of, the relevant Security Documents, and each First-Lien Secured Party (by its acceptance of the benefits hereof) hereby agrees to, and authorizes the Collateral Trustee to enter into, any such amendments, modifications and/or supplements (and additional Security Documents).  The Borrower and each other Credit Party hereby further agree that if there are any recording, filing or other similar fees or taxes payable in connection with any of the actions to be taken pursuant to this Section 5.6 all such amounts shall be paid by, and shall be for the account of, the Borrower and the respective Credit Parties, on a joint and several basis.

5.7     Representative; Relationship.

(a)     The Collateral Trustee agrees to hold the Pledged Collateral that is in its possession or control (or in the possession or control of its agents or bailees) as Collateral Trustee for the First-Lien Secured Parties and any assignee solely for the purpose of perfecting the security interest granted under the Security Documents, subject to the terms and conditions of this Section 5.7.

(b)     The Collateral Trustee shall have no obligations whatsoever to the First-Lien Secured Parties to ensure that the Pledged Collateral is genuine or owned by any Credit Party or to preserve the rights or benefits of any Person except as expressly set forth in this Section 5.7.  The duties or responsibilities of the Collateral Trustee under this Section 5.7 shall be limited solely to holding the Pledged Collateral in accordance with this Section 5.7 and delivering the Pledged Collateral upon a Discharge of Obligations as provided in clause (d) below.

(c)     The Collateral Trustee acting pursuant to this Section 5.7 shall not have by reason of the Security Documents, this Agreement or any other document a fiduciary relationship in respect of the any Secured Debt Representative or any other First-Lien Secured Party.

(d)     Upon the Discharge of Obligations, the Collateral Trustee shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements, to the applicable Credit Parties at the sole cost and expense of the Credit Parties.

SECTION 6.     Insolvency or Liquidation Proceedings.

6.1     Finance and Sale Issues.  If the Borrower or any other Credit Party shall be subject to any Insolvency or Liquidation Proceeding and the Collateral Trustee (acting at the direction of the Required Lender Parties) shall desire to permit the use of "*Cash Collateral*" (as such term is defined in Section 363(a) of the Bankruptcy Code), on which the Collateral Trustee or any other First-Lien Secured Party has a Lien or to permit the Borrower or any other Credit Party to obtain financing, whether from any of the First-Lien Secured Parties or any other Person under Section 364 of the Bankruptcy Code or any similar Debtor Relief Laws ("*DIP Financing*"), then the Collateral Trustee, each Eligible Commodity Hedging Counterparty, each Interest Rate Hedge Bank, and each other First-Lien Secured Party agrees that it (a) will raise no objection to, nor support any other Person objecting to, the use of such Cash Collateral or to such DIP Financing, (b) will not request or accept adequate protection or any other relief in connection with the use of such Cash Collateral or such DIP Financing, (c) to the extent the DIP Financing requires that the Liens securing the Obligations be subordinated to or *pari passu* with the Liens securing such DIP Financing, and/or any carve-out (to which the Collateral Trustee consents (acting at the direction of the Required Lender Parties)) for the professional fees and expenses of the Credit Parties and any official committee of unsecured creditors appointed in any such Insolvency or Liquidation Proceeding will consent to such subordination or *pari passu* treatment and (d) agrees that notice received two calendar days prior to the entry of an interim order approving such usage of Cash Collateral or approving such DIP Financing shall be adequate notice and that notice received 15 calendar days prior to a hearing to approve such DIP Financing or use of Cash Collateral on a final basis shall be adequate; *provided* that (i) each First-Lien Secured Party retains the right to object to any ancillary agreements or ancillary arrangements regarding the Cash Collateral use or the DIP Financing that are materially prejudicial to their interests (unless such ancillary agreements or arrangements, including any adequate protection orders, are equally materially prejudicial to all First-Lien Secured Parties, in which case there shall be no independent right of a First-Lien Secured Party to object), (ii) the DIP Financing (x) does not compel any Credit Party to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing documentation or a related document, and (y) the DIP Financing document or Cash Collateral order does not expressly require the liquidation of the Collateral prior to a

default under the DIP Financing documentation or Cash Collateral order and (iii) if any cash collateral order contemplates the liquidation of the Collateral, such order provides that the Liens of the Collateral Trustee (for the benefit of the First-Lien Secured Parties) will attach to the proceeds of such liquidation equally and ratably.

6.2     Avoidance Issues.  If any First-Lien Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Borrower or any other Credit Party any amount paid in respect of the Obligations (a "*Recovery*"), then such First-Lien Secured Party shall be entitled to a reinstatement of Obligations with respect to all such recovered amounts.  In such event, (a) the Discharge of Obligations shall be deemed not to have occurred and (b) if this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

6.3     Reorganization Securities.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any Property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, on account of the Obligations, then, to the extent the debt obligations distributed on account of the Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

6.4     Relief from the Automatic Stay.  Each First-Lien Secured Party agrees that it has no independent right to seek adequate protection or relief from the automatic stay or from any other stay in any Insolvency or Liquidation Proceeding, and that the Collateral Trustee, acting at the direction of the Required First-Lien Secured Parties, has the exclusive authority to seek adequate protection or relief from the automatic stay or from any other stay in any Insolvency or Liquidation Proceeding on behalf of the First-Lien Secured Parties; *provided*, *however*, that any adequate protection or stay relief sought or obtained by the Collateral Trustee shall not be materially more favorable to any First-Lien Secured Party than to any other First-Lien Secured Party.  Each First-Lien Secured Party further agrees that it shall not object to any motion, action or proceeding by the Collateral Trustee (acting at the direction of the Required First-Lien Secured Parties) for adequate protection or for relief from the automatic stay or from any other stay in any Insolvency or Liquidation Proceeding or any adequate protection or stay relief granted unless such motion, action, proceeding or relief is in violation of the provisions of this Agreement.

6.5     Asset Dispositions in an Insolvency Proceeding.  Each First-Lien Secured Party agrees that it will consent to, and raise no objection or oppose a motion, whether under Section 363 or 364, or otherwise, under the Bankruptcy Code to sell or otherwise dispose of any Collateral pursuant to Section 363 of the Bankruptcy Code free and clear of all Liens securing the Obligations so long as the Collateral Trustee acting at the direction of the Required First-Lien Secured Parties have consented to such sale or disposition of such assets.

6.6     Other Credit Support.  Notwithstanding anything to the contrary contained herein, the provisions of this Section 6 shall not (i) limit the rights of any First-Lien Secured Party in respect of its Other Credit Support and shall not prevent any First-Lien Secured Party from taking any actions to enforce such rights to the extent permitted under applicable law, including by (x) objecting to any use of Cash Collateral to the extent constituting Other Credit Support for such First-Lien Secured Party or (y) objecting to any priming or *pari passu* Lien on Other Credit Support for such First-Lien Secured Party, or (ii) limit the right of any First-Lien Secured Party that is an Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank under a Secured Hedge Agreement or a First-Lien Secured Party under an Ad-

ditional First-Lien Indebtedness Agreement that is in the form of a secured trading facility, including the Secured Trading Facility, to, among other things, terminate, close out, set off or apply Other Credit Support with respect to any such Secured Hedge Agreement or Additional First-Lien Indebtedness Agreement that is in the form of a secured trading facility, including the Secured Trading Facility, or take any actions to enforce its rights under such agreement, to the extent permitted under applicable law.

SECTION 7.    Collateral Trustee.

7.1    Appointment.

(a)    Each of the Administrative Agent (for itself and on behalf of each Lender), any Other Administrative Agent (for itself and on behalf of any Other Lender), the L/C Issuer, each Secured Debt Representative under any Additional First-Lien Indebtedness Agreement, each Interest Rate Hedge Bank, each Eligible Commodity Hedging Counterparty and each Treasury Services Provider hereby appoints and authorizes the Collateral Trustee to act as its Collateral Trustee in accordance with the terms hereof and the other Financing Documents.  The Collateral Trustee hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Financing Documents, as applicable.  In performing its functions and duties hereunder, the Collateral Trustee shall act solely as an agent of the First-Lien Secured Parties and does not assume and shall not be deemed to have assumed any obligation towards, or relationship of agency or trust with or for, any Credit Party.  Each of the Administrative Agent (for itself and on behalf of each Lender), any Other Administrative Agent (for itself and on behalf of any Other Lender), the L/C Issuer, each Secured Debt Representative under any Additional First-Lien Indebtedness Agreement, each Interest Rate Hedge Bank, each Eligible Commodity Hedging Counterparty and each Treasury Services Provider hereby irrevocably authorizes the Collateral Trustee to take such action on their behalf and to exercise such powers, rights and remedies hereunder and under the other Financing Documents as are specifically delegated or granted to the Collateral Trustee by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.  The Collateral Trustee shall have only those duties and responsibilities that are expressly specified herein and the other Financing Documents.  The Collateral Trustee may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  The Collateral Trustee shall not have, by reason hereof or any of the other Financing Documents, a fiduciary relationship in respect of any First-Lien Secured Party, and nothing herein or any of the other Financing Documents, expressed or implied, is intended to or shall be so construed as to impose upon the Collateral Trustee any obligations in respect hereof or any of the other Financing Documents except as expressly set forth herein or therein.

(b)    The provisions of this Section 7 (other than Section 7.6) are solely for the benefit of the Collateral Trustee, and neither the First-Lien Secured Parties and nor any Credit Party shall have any rights as a third party beneficiary of any of the provisions hereof.

(c)    Each First-Lien Secured Party hereby authorizes the Collateral Trustee to enter into each intercreditor agreement expressly contemplated by the Credit Agreement, any Other Credit Agreement and any Reimbursement Agreement on the date hereof and the provisions of such intercreditor agreements shall be binding on all First-Lien Secured Parties.

7.2    Delegation of Duties.

(a)    The Collateral Trustee may execute any of its duties under this Agreement and the Financing Documents, (including for purposes of holding or enforcing any Lien on the Collateral or any portion thereof granted under the Security Documents or of exercising any rights or remedies thereunder) by or through agents or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts of its choice concerning all matters pertaining to such duties.  No Collateral Trustee shall be

responsible for the negligence or misconduct of any agent or attorney-in-fact selected by it with reasonable care.

(b)     The Collateral Trustee may also from time to time, when the Collateral Trustee deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral sub-agents or attorneys-in-fact (each, a "***Supplemental Collateral Trustee***") with respect to all or any part of the Collateral; *provided*, *however*, that no such Supplemental Collateral Trustee shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Collateral Trustee.  Should any instrument in writing from any Credit Party be required by any Supplemental Collateral Trustee so appointed by the Collateral Trustee to more fully or certainly vest in and confirm to such Supplemental Collateral Trustee such rights, powers, privileges and duties, such Credit Party shall execute, acknowledge and deliver any and all such instruments promptly upon request by the Collateral Trustee.  If any Supplemental Collateral Trustee, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Supplemental Collateral Trustee, to the extent permitted by law, shall automatically vest in and be exercised by the Collateral Trustee until the appointment of a new Supplemental Collateral Trustee.  The Collateral Trustee shall not be responsible for the negligence or misconduct of any agent, attorney-in-fact or Supplemental Collateral Trustee that it selects in accordance with the foregoing provisions of this Section 7.2(b) in the absence of the Collateral Trustee's gross negligence, bad faith or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.

(c)     Any notice, request or other writing given to the Collateral Trustee shall be deemed to have been given to each Supplemental Collateral Trustee.  Every instrument appointing any Supplemental Collateral Trustee shall refer to this Agreement and the conditions of this Section 7.2.

(d)     Any Supplemental Collateral Trustee may at any time appoint the Collateral Trustee as its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf or in its name.

7.3     Exculpatory Provisions.

(a)     Neither the Collateral Trustee nor any of its officers, partners, directors, employees or agents shall be liable to the First-Lien Secured Parties for any action taken or omitted by the Collateral Trustee under or in connection with any of the Financing Documents except to the extent caused by the Collateral Trustee's gross negligence, bad faith or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  The Collateral Trustee shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Financing Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the Collateral Trustee shall have received instructions in respect thereof from the Required First-Lien Secured Parties, Required Lender Parties or Required Lenders and/or any Other Required Lenders and/or any L/C Issuer (as applicable) and, upon receipt of such instructions from the Required First-Lien Secured Parties, Required Lender Parties, Required Lenders and/or any Other Required Lenders and/or any L/C Issuer (as applicable), the Collateral Trustee shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions.  Without prejudice to the generality of the foregoing, (i) the Collateral Trustee shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for any Credit Party), accountants, experts and other professional advisors selected by it (and shall have no duty whatsoever to investigate or verify whether any such signature is genuine or authorized or whether the information in any such communication, instru-

ment or other document is genuine or accurate); and (ii) no First-Lien Secured Party shall have any right of action whatsoever against the Collateral Trustee as a result of the Collateral Trustee acting or (where so instructed) refraining from acting hereunder or any of the other Financing Documents in accordance with the instructions of the Required First-Lien Secured Parties or, to the extent expressly provided herein, the Required Lender Parties.

(b)     Notwithstanding anything to the contrary in Section 5.7, beyond the exercise of reasonable care in the custody thereof and as otherwise specifically set forth herein, the Collateral Trustee shall not have any duty as to any of the Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Collateral Trustee shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral.  The Collateral Trustee shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Trustee in good faith.

(c)     The Collateral Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Trustee as determined by a court of competent jurisdiction in a final and non-appealable judgment, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any Credit Party to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.

(d)     In the event that the Collateral Trustee is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Collateral Trustee's reasonable discretion may cause the Collateral Trustee to be considered an "owner or operator" under the provisions of the CERCLA or otherwise cause the Collateral Trustee to incur, or be exposed to, any Environmental Liability or any liability under CERCLA or any other federal, state or local law, the Collateral Trustee reserves the right, instead of taking such action, either to resign as Collateral Trustee or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Collateral Trustee shall not be liable to any Person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Collateral Trustee's actions and conduct as authorized, empowered and directed hereunder or relating to the discharge, Release or threatened Release of Hazardous Materials into the environment, except to the extent such environmental liability, environmental claims or contribution actions resulted directly from the gross negligence or willful misconduct on the part of the Collateral Trustee as determined by a final non-appealable judgment of a court of competent jurisdiction.

7.4     <u>Non-Reliance on Collateral Trustee and Other First-Lien Secured Parties.</u>

(a)     Each of the Administrative Agent (for itself and on behalf of each Lender), any Other Administrative Agent (for itself and on behalf of any Other Lender), the L/C Issuer, the Secured Debt Representative under any Additional First-Lien Indebtedness Agreement, each Interest Rate Hedge Bank, each Eligible Commodity Hedging Counterparty and each Treasury Services Provider:  (i) expressly acknowledges that neither the Collateral Trustee nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Collateral Trustee hereinafter taken, including any review of the affairs of the Borrower or any of its Affili-

ates, shall be deemed to constitute any representation or warranty by the Collateral Trustee to any such Person; and (ii) represents and warrants to the Collateral Trustee that it has made its own independent investigation of the financial condition and affairs of each Credit Party and its subsidiaries in connection with its decision to extend credit to the Borrower and that it has made and shall continue to make its own appraisal of the creditworthiness of each Credit Party and its subsidiaries.

(b)     The Collateral Trustee shall not be responsible to any First-Lien Secured Party for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Financing Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by the Collateral Trustee to First-Lien Secured Parties or by or on behalf of any Credit Party, to any First-Lien Secured Party or the Collateral Trustee in connection with the Financing Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall the Collateral Trustee be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Financing Documents or as to the use of the proceeds of loans borrowed pursuant to the Credit Agreement, any Other Credit Agreement, any Reimbursement Agreement or any other Financing Document or as to the existence or possible existence, or absence of, of any Event of Default or to make any disclosures with respect to the foregoing.

7.5     Collateral Trustee in Individual Capacity.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, the Collateral Trustee in its individual capacity as a First-Lien Secured Party hereunder.  With respect to Obligations made or renewed by it or any of its Affiliates, the Collateral Trustee and its Affiliates shall have the same rights and powers under this Agreement and the other Financing Documents as any First-Lien Secured Party and may exercise the same as though the Collateral Trustee were not the Collateral Trustee, and the terms " *First-Lien Secured Party*" and " *First-Lien Secured Parties*" shall (to the extent applicable), unless the context clearly otherwise indicates, include the Collateral Trustee in its individual capacity.

7.6     Successor Collateral Trustee.  Subject to the appointment and acceptance of a successor Collateral Trustee as provided below, the Collateral Trustee may resign at any time by notifying each Secured Debt Representative.  Upon any such resignation, the Required First-Lien Secured Parties shall have the right to appoint a successor with, so long as no Event of Default arising from a non-payment by the Borrower or Insolvency or Liquidation Proceeding has occurred and is continuing, the consent of the Borrower (not to be unreasonably withheld or delayed).  If no successor shall have been so appointed by the Required First-Lien Secured Parties and approved by the Borrower (if applicable) and shall have accepted such appointment within 30 days after the retiring Collateral Trustee gives notice of its resignation, then the retiring Collateral Trustee may, on behalf of the First-Lien Secured Parties with, so long as no Event of Default arising from a non-payment by the Borrower or Insolvency or Liquidation Proceeding has occurred and is continuing, the consent of the Borrower (not to be unreasonably withheld or delayed), appoint a successor Collateral Trustee which shall be a bank with an office in New York, New York (or a bank having an Affiliate with such an office) having a combined capital and surplus that is not less than $1,000,000,000 or an Affiliate of any such bank.  Upon the acceptance of any appointment as Collateral Trustee hereunder by a successor bank, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Trustee and the retiring Collateral Trustee shall be discharged from its duties and obligations hereunder.  After the Collateral Trustee's resignation hereunder, the provisions of this Section 7 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Collateral Trustee.

7.7    <u>Security Documents</u>.  Subject to Section 5 and the other terms of this Agreement, prior to the Discharge of Obligations, without further written consent or authorization from the First-Lien Secured Parties, the Collateral Trustee shall execute any documents or instruments reasonably requested by the Borrower or the respective Credit Parties to (i) in connection with any Asset Sale, release any Lien encumbering any item of Collateral that is the subject of such Asset Sale or other disposition of assets or to which the Required First-Lien Secured Parties have otherwise consented, (ii) release any Person from a Guaranty in accordance with the terms of the Guarantee and Collateral Agreement or with respect to which Required First-Lien Secured Parties have otherwise consented, (iii) cause obligations of the Credit Parties to become "Obligations" and the holders of such obligations to become " First-Lien Secured Parties" as contemplated by Section 5.6 (including by countersigning Accession Agreements in accordance therewith) or (iv) facilitate the nondisturbance of an easement, right-of-way or other similar Lien on a Mortgaged Property that is permitted under the terms of the Financing Documents.

(a)    Anything contained in any of the Financing Documents to the contrary notwithstanding, the Borrower, the Collateral Trustee and each First-Lien Secured Party hereby agree that (i) no First-Lien Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Trustee and (ii) in the event of a foreclosure by the Collateral Trustee on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Trustee or any First-Lien Secured Party may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Trustee, as agent for and representative of the First-Lien Secured Parties (but not any First-Lien Secured Party or First-Lien Secured Parties in its or their respective individual capacities unless the Required First-Lien Secured Parties shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Trustee at such sale or other disposition.

7.8    <u>Indemnification</u>.

(a)    Each Lender (through the Administrative Agent), any Other Lender (through any Other Administrative Agent), the L/C Issuer, the First-Lien Secured Parties in respect of any Additional First-Lien Indebtedness (through the Secured Debt Representative in respect of such Additional First-Lien Indebtedness), each Interest Rate Hedge Bank, each Eligible Commodity Hedging Counterparty and each Treasury Services Provider severally agrees to indemnify the Collateral Trustee (to the extent Collateral Trustee is not promptly reimbursed by any Credit Party) for and against such First-Lien Secured Party's ratable share of the Obligations (calculated on the basis of such First-Lien Secured Party's then-current Outstanding Amount) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Collateral Trustee in exercising its powers, rights or remedies or performing its duties hereunder or under any of the Financing Documents or otherwise in its capacity as Collateral Trustee in any way relating to or arising out of the Financing Documents (collectively, the "***Indemnified Costs***"); *provided*, *however*, that no First-Lien Secured Party shall be liable to the Collateral Trustee for any portion of any such Indemnified Costs resulting from the Collateral Trustee's gross negligence, bad faith or willful misconduct, as determined by a final and nonappealable decision of a court of competent jurisdiction.  If any indemnity furnished to the Collateral Trustee for any purpose shall, in the opinion of the Collateral Trustee, be insufficient or become impaired, the Collateral Trustee may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; *provided*, in no event shall this sentence require any First-Lien Secured Party to indemnify the Collateral Trustee against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of

such First-Lien Secured Party's ratable share thereof; and *provided further*, this sentence shall not be deemed to require any First-Lien Secured Party to indemnify the Collateral Trustee against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

(b)      The agreements in this Section 7.8 shall survive termination of this Agreement.

7.9      No Risk of Funds.  None of the provisions of this Agreement or the other Financing Documents shall be construed to require the Collateral Trustee in its individual capacity to expend or risk its own funds or otherwise to incur any personal financial liability in the performance of any of its duties hereunder or thereunder.

SECTION 8.    Reliance; Waivers; Etc.

8.1      Reliance.  Other than any reliance on the terms of this Agreement, the Collateral Trustee, the Administrative Agent (on behalf of itself and each Lender), any Other Administrative Agent (on behalf of itself and any Other Lender), the L/C Issuer and each other First-Lien Secured Party acknowledges that it and each other First-Lien Secured Party has, independently and without reliance on any First-Lien Secured Party and based on documents and information deemed by it appropriate, made its own credit analysis and decision to enter into such Financing Documents and be bound by the terms of this Agreement and it will continue to make its own credit decision in taking or not taking any action under the Financing Document or this Agreement.

8.2      No Warranties or Liability.  The Collateral Trustee (on behalf of the First-Lien Secured Parties), the Administrative Agent (on behalf of itself and each Lender), any Other Administrative Agent (on behalf of itself and any Other Lender), the L/C Issuer and each other First-Lien Secured Party acknowledges and agrees that no First-Lien Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Financing Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  Except as otherwise expressly provided herein, the First-Lien Secured Parties will be entitled to manage and supervise their respective loans and extensions of credit under the Financing Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

8.3      No Waiver.

(a)      No right of the First-Lien Secured Parties, the Collateral Trustee or any of them to enforce any provision of this Agreement or any other Financing Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Credit Party or by any act or failure to act by any First-Lien Secured Party or the Collateral Trustee, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement or any other Financing Document, regardless of any knowledge thereof which the Collateral Trustee or any First-Lien Secured Party, or any of them, may have or be otherwise charged with.

(b)      Notwithstanding anything to the contrary in any of the Security Documents, none of the Security Documents shall be amended, modified or supplemented in any manner materially adverse to any of the First-Lien Secured Parties (except as expressly contemplated hereby) or in any manner inconsistent with any of the provisions of this Agreement without the prior written consent of each Secured Debt Representative.

8.4     Obligations Unconditional.  All rights, interests, agreements and obligations of each of the Collateral Trustee, the Administrative Agent, any Other Administrative Agent, any L/C Issuer and the First-Lien Secured Parties, respectively, hereunder shall remain in full force and effect regardless of:

(a)     any lack of validity or enforceability of any Financing Documents;

(b)     except as otherwise expressly set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the Obligations or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any Financing Document;

(c)     except as otherwise expressly set forth in this Agreement, any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Obligations;

(d)     the commencement of any Insolvency or Liquidation Proceeding in respect of any Credit Party; or

(e)     any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Credit Party in respect of the Collateral Trustee, the Obligations or any First-Lien Secured Party.

SECTION 9.     Miscellaneous.

9.1     Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of any other Financing Document, the provisions of this Agreement shall govern and control.

9.2     Effectiveness; Continuing Nature of this Agreement; Severability.

(a)     This Agreement shall become effective when executed and delivered by each of the parties hereto.

(b)     Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to any Credit Party shall include such Credit Party as debtor and debtor-in-possession and any receiver or trustee for such Credit Party (as the case may be) in any Insolvency or Liquidation Proceeding.

(c)     This Agreement shall terminate and be of no further force and effect with respect to the Collateral Trustee, the Administrative Agent, any Other Administrative Agent, any L/C Issuer, the other First-Lien Secured Parties and the Obligations, on the date of Discharge of Obligations, subject to the rights of the Collateral Trustee, the Administrative Agent, any Other Administrative Agent, any L/C Issuer and the other First-Lien Secured Parties under Section 6.3.

(d)     References in this Agreement to the "Other Credit Agreement," "Other Administrative Agent," "Issuing Bank," "L/C Issuer," "Other Lenders," "Other Required Lenders" and "Reimbursement Agreement" shall be effective on and after the Other Credit Agreement Effective Date upon compliance with the following:

(i)     each Secured Debt Representative, the Other Administrative Agent and the L/C Issuer shall have received an Officer's Certificate stating that indebtedness incurred pursuant to

the Other Credit Agreement and the Reimbursement Agreement (including any guarantees there-of by the Credit Parties) entered into by one or more Credit Parties is permitted (if addressed therein, or, otherwise not prohibited) by the Financing Documents at the time the Other Credit Agreement and the Reimbursement Agreement are entered into, to be secured by a first-priority Lien on the Collateral; and

(ii)     the Other Administrative Agent and the L/C Issuer shall have executed and de-livered to the Collateral Trustee an Accession Agreement in accordance with the provisions of this Agreement.

9.3     <u>Amendments; Waivers</u>.

(a)     Subject to Sections 5.2(b), 5.5, 5.6, 9.3(b) and 9.3(c), no amendment, modification or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Credit Party and the Collateral Trustee (with the consent of the Required First-Lien Secured Parties) or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.

(b)     So long as any Event of Default shall have occurred and is continuing and notwithstand-ing Section 9.3(a), no Credit Party shall have any right to consent to or approve any amendment, modifi-cation or waiver of any provision of this Agreement except to the extent its rights are directly affected (and the Credit Parties' rights or obligations shall be deemed to be directly affected, including, without limitation, by (A) any modification to the provisions relating to the designation of additional Obligations to be secured by the Collateral in accordance with Section 5.5 or 5.6, (B) any release of Collateral or a Guaranty and (C) any other modification that is inconsistent with the terms of any Financing Document and is directly adverse to the rights of any Credit Party).

(c)     Notwithstanding the other provisions of this Section 9.3, the Credit Parties and the Col-lateral Trustee may (but shall have no obligation to) amend or supplement this Agreement or the Security Documents without the consent of any First-Lien Secured Party:  (i) to cure any ambiguity, defect or in-consistency; (ii) to make any change that would provide any additional rights or benefits to the First-Lien Secured Parties; or (iii) to make, complete or confirm any grant of Collateral permitted or required by this Agreement or any of the Security Documents or any release of any Collateral that is otherwise permitted under the terms of this Agreement and the Financing Documents.

(d)     Each of the First-Lien Secured Parties waives any claim it may now or hereafter have against the Collateral Trustee arising out of (i) any election by the Collateral Trustee (acting at the direc-tion of the Required Lender Parties) in any Insolvency or Liquidation Proceeding of the application of Section 1111(b) of the Bankruptcy Code or any similar Debtor Relief Law or (ii) subject to Section 6.1, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any similar Debtor Relief Law, by, the Borrower or any other Credit Parties, as debtor-in-possession.  Each of the First-Lien Secured Parties further agrees that it will not assert or en-force any claim under Section 506(c) of the Bankruptcy Code senior to or on parity with the Liens secur-ing any of the Obligations for costs or expenses of preserving or disposing of any Collateral.

9.4     <u>Voting</u>.

(a)     Without limiting anything contained herein (including Sections 5.1, 5.5, 5.6, and 9.3) and other than ministerial and administrative acts contemplated by the Security Documents to which it is a party, the Collateral Trustee shall not take any other action (including the exercise of remedies, the

amendment of Security Documents, the granting of waivers under such Security Documents), or grant its consent under any Security Documents, unless and to the extent directed to do so by the Required First-Lien Secured Parties or, to the extent expressly provided herein, the Required Lender Parties.  If the Collateral Trustee determines that discretion is needed in the taking of any action, it may refrain from taking such action until such directions or instructions are received and shall have no liability to the First-Lien Secured Parties for so refraining.  Notwithstanding anything to the contrary set forth herein but subject to the terms hereof, the Collateral Trustee hereby agrees that it will enter into (i) documents necessary in order to effect releases of Collateral in accordance with Section 5.1 and (ii) Accession Agreements as contemplated by Sections 5.5, 5.6 and 9.16.

(b)     In connection with any matter under this Agreement requiring a vote of holders of Indebtedness with respect to a Series of Secured Debt, each Series of Secured Debt will cast its votes in accordance with the Financing Documents.  In connection with any act or decision by the Required First-Lien Secured Parties or Required Lenders under this Agreement or any of the Security Documents, (i) the vote of each Series of Secured Debt shall be calculated based on the Outstanding Amount owed to such Series of Secured Debt at the time the applicable matter is presented for a vote and (ii) the vote of each Interest Rate Hedge Bank and Eligible Commodity Hedging Counterparty shall be calculated based on the Eligible Hedge Amount under the relevant Secured Hedge Agreement at the time the applicable matter is presented for a vote.

9.5     <u>Information Concerning Financial Condition of the Credit Parties</u>.  The Agents and the First-Lien Secured Parties shall be responsible for keeping themselves informed of the financial condition of the Credit Parties and all endorsers and/or guarantors of the Obligations and all other circumstances bearing upon the risk of nonpayment of the Obligations.  No Secured Debt Representative or any other First-Lien Secured Party shall have any duty to advise any other Secured Debt Representative or other First-Lien Secured Party of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event that any Secured Debt Representative or other First-Lien Secured Party, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any other Secured Debt Representative or other First-Lien Secured Party, it or they shall be under no obligation:

(a)     to make, and the Secured Debt Representative and the other First-Lien Secured Parties shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(b)     to provide any additional information or to provide any such information on any subsequent occasion;

(c)     to undertake any investigation; or

(d)     to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

**9.6     GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVERS**.

**(a)     THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS TO THE EXTENT THAT THE SAME ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD REQUIRE OR PERMIT THE APPLICATION OF**

THE LAW OF ANOTHER JURISDICTION.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS.  EACH PARTY HERETO HEREBY FURTHER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY.  EACH PARTY HERETO FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS SET FORTH IN ANNEX I HERETO, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(b)      EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)      EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.7    Notices.  Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including .pdf, telegraphic, telecopier or cable communication) and mailed, telegraphed, telecopied, cabled or delivered:  (i) if to any Credit Party, at the address specified on Annex I attached hereto and (ii) if to the Collateral Trustee, at the address specified on Annex I attached hereto or, as to any Credit Party or the Collateral Trustee, at such other address as shall be designated by such party in a written notice to the other parties hereto.  All such notices and communications shall, when mailed, telegraphed, telecopied, or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telecopier, except that notices and communications to the Collateral Trustee and the Borrower shall not be effective until received by the Collateral Trustee or the Borrower, as the case may be.

9.8     Further Assurances; Insurance.

(a)     The Borrower and the other Credit Parties will do or cause to be done all acts and things that may be required, or that the Collateral Trustee from time to time may reasonably request, to assure and confirm that the Collateral Trustee holds, for the benefit of the holders of Obligations, duly created and enforceable and perfected Liens upon the Collateral (including any property or assets that are acquired or otherwise become, or are required by any Financing Document to become, Collateral after the date hereof).

(b)     Upon the reasonable request of the Collateral Trustee at any time, the Borrower and the other Credit Parties will promptly execute, acknowledge and deliver such security documents, instruments, certificates, notices and other documents, and take such other actions as may be reasonably required, or that the Collateral Trustee may reasonably request, to create, perfect, protect, assure or enforce the Liens and benefits intended to be conferred, in each case as contemplated by the Financing Documents for the benefit of holders of Obligations.

(c)     All insurance policies required to be in force and effect pursuant to the terms of any Financing Document will name the Collateral Trustee as a loss payee and additional insured.

9.9     Binding on Successors and Assigns.  This Agreement shall be binding upon the Credit Parties, Collateral Trustee and the First-Lien Secured Parties, and their respective successors and assigns.

9.10    Specific Performance.  The Collateral Trustee may demand specific performance of this Agreement.  The Collateral Trustee, on behalf of the First-Lien Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the Collateral Trustee or the First-Lien Secured Parties.

9.11    Headings.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

9.12    Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy, facsimile or non-editable pdf file shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

9.13    Authorization.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

9.14    No Third Party Beneficiaries.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First-Lien Secured Parties.  Nothing in this Agreement shall impair, as between the Credit Parties and the Collateral Trustee and the First-Lien Secured Parties, or as among the Credit Parties, the obligations of the Credit Parties set forth in the Financing Documents.

9.15    Provisions Solely to Define Relative Rights.  The provisions of this Agreement are and are intended for the purpose of defining the relative rights of the Collateral Trustee and the First-Lien Se-

cured Parties and for the other express purposes provided herein. Nothing in this Agreement is intended to or shall impair the obligations of any Credit Party, which are absolute and unconditional, to pay the Obligations as and when the same shall become due and payable in accordance with their terms.

9.16    <u>Additional Guarantors</u>. The Borrower represents and warrants that each Person who is a Credit Party on the date hereof has duly executed this Agreement. The Borrower shall cause each of its direct or indirect Subsidiaries that becomes a Subsidiary Guarantor, or is required by the terms of any Financing Document to become a Subsidiary Guarantor, to become a party to this Agreement by causing such Subsidiary to execute and deliver to the parties hereto an Additional Guarantor Accession Agreement, whereupon such Subsidiary shall be bound by the terms hereof to the same extent as if it had executed and delivered this Agreement as of the date hereof. The Borrower shall promptly provide, or cause to be provided, the Collateral Trustee and each Secured Debt Representative with a copy of each Additional Guarantor Accession Agreement executed and delivered pursuant to this Section.

9.17    <u>Rights under Hedges</u>. Each of the parties to this Agreement hereby acknowledges that nothing in this Agreement shall limit any Credit Party's rights under any Secured Hedge Agreement.

9.18    <u>Insolvency</u>. This Agreement shall be applicable both before and after the commencement of any Insolvency or Liquidation Proceeding by or against any Credit Party. The relative rights, as provided for in this Agreement, shall continue after the commencement of any such Insolvency or Liquidation Proceeding on the same basis as prior to the date of the commencement of any such case, as provided in this Agreement.

9.19    <u>Rights and Immunities of Secured Debt Representatives</u>. The Administrative Agent will be entitled to all of the rights, protections, immunities and indemnities set forth in the Credit Agreement, any Other Administrative Agent will be entitled to all of the rights, protections, immunities and indemnities set forth in any Other Credit Agreement, any L/C Issuer will be entitled to all of the rights, protections, immunities and indemnities set forth in any Reimbursement Agreement and any future Secured Debt Representative will be entitled to all of the rights, protections, immunities and indemnities set forth in the applicable Financing Document with respect to which such Person will act as an agent or similar representative, in each case as if specifically set forth herein. In no event will any Secured Debt Representative be liable for any act or omission on the part of the Credit Parties or the Collateral Trustee hereunder.

9.20    <u>Effectiveness of Obligations of RJS Credit Parties</u>. Notwithstanding anything to the contrary in this Agreement, the obligations of each RJS Credit Party (as defined in Schedule 13.16 to the Credit Agreement) pursuant to this Agreement shall be deemed to be of no force or effect until the RJS Release Date (as defined in Schedule 13.16 to the Credit Agreement) shall have occurred. The provisions of this Section 9.20 shall immediately terminate and be of no further force and effect as of the RJS Release Date and from and after such date the obligations of each RJS Credit Party shall be effective to the extent provided herein.

*(signature pages follow)*

IN WITNESS WHEREOF, the parties hereto have executed this Collateral Trust and Intercreditor Agreement as of the date first written above.

PPL ENERGY SUPPLY, LLC
as Borrower

By: _____

    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer

SUBSIDIARY GUARANTORS:

BARNEY M. DAVIS, LP

By: TOPAZ POWER GROUP GP II, LLC
      its sole General Partner

By: TOPAZ POWER HOLDINGS, LLC
      its Managing Member

By: _____
      Name:  Russell R. Clelland
      Title: Vice President and Treasurer

BRANDON SHORES LLC

By: _____
      Name:  Russell R. Clelland
      Title:  Vice President and Treasurer

C/R TOPAZ HOLDINGS, LLC

By: _____
      Name:  Russell R. Clelland
      Title:  Vice President and Treasurer

FORT ARMISTEAD ROAD - LOT 15 LANDFILL, LLC

By: _____
      Name:  Russell R. Clelland
      Title:  Vice President and Treasurer

H.A. WAGNER LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer


JADE POWER GENERATION HOLDINGS LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer


LAREDO WLE, LP

By: TOPAZ POWER GROUP GP II, LLC
    its sole General Partner

By: TOPAZ POWER HOLDINGS, LLC
    its Managing Member

By: _____
    Name:  Russell R. Clelland
    Title: Vice President and Treasurer


LOWER MOUNT BETHEL ENERGY, LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer

NUECES BAY WLE, LP

By: TOPAZ POWER GROUP GP II, LLC
    its sole General Partner

By: TOPAZ POWER HOLDINGS, LLC
    its Managing Member

By: _____
    Name:  Russell R. Clelland
    Title: Vice President and Treasurer


PENNSYLVANIA MINES, LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer


PPL BRUNNER ISLAND, LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer


PPL ENERGYPLUS, LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer

PPL GENERATION, LLC

By: _____
      Name:  Russell R. Clelland
      Title:  Vice President and Treasurer


PPL INVESTMENT CORPORATION

By: _____
      Name:  Russell R. Clelland
      Title:  President


PPL MARTINS CREEK, LLC

By: _____
      Name:  Russell R. Clelland
      Title:  Vice President and Treasurer


PPL MONTOUR, LLC

By: _____
      Name:  Russell R. Clelland
      Title:  Vice President and Treasurer


PPL SUSQUEHANNA, LLC

By: _____
      Name:  Russell R. Clelland
      Title:  Vice President and Treasurer

[Signature Page to Collateral Trust and Intercreditor Agreement]

PPL GENERATION, LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer


PPL INVESTMENT CORPORATION

By: _____
    Name:  Russell R. Clelland
    Title:  President


PPL MARTINS CREEK, LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer


PPL MONTOUR, LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer


PPL SUSQUEHANNA, LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer

RAVEN FS PROPERTY HOLDINGS LLC

By: _____
Name:  Russell R. Clelland
Title:  Vice President and Treasurer


RAVEN LOT 15 LLC

By: _____
Name:  Russell R. Clelland
Title:  Vice President and Treasurer


RAVEN POWER FINANCE LLC

By: _____
Name:  Russell R. Clelland
Title:  Vice President and Treasurer


RAVEN POWER FORT SMALLWOOD LLC

By: _____
Name:  Russell R. Clelland
Title:  Vice President and Treasurer


RAVEN POWER GENERATION HOLDINGS LLC

By: _____
Name:  Russell R. Clelland
Title:  Vice President and Treasurer

RAVEN POWER MARKETING LLC

By: _____
Name:  Russell R. Clelland
Title:  Vice President and Treasurer


RAVEN POWER OPERATING LLC

By: _____
Name:  Russell R. Clelland
Title:  Vice President and Treasurer


RJS POWER HOLDINGS LLC

By: _____
Name:  Russell R. Clelland
Title:  Vice President and Treasurer


RJS POWER LLC

By: _____
Name:  Russell R. Clelland
Title:  Vice President and Treasurer


TOPAZ POWER GROUP GP II, LLC

By: _____
Name:  Russell R. Clelland
Title:  Vice President and Treasurer


[Signature Page to Collateral Trust and Intercreditor Agreement]

TOPAZ POWER GROUP LP II, LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer


TOPAZ POWER HOLDINGS, LLC

By: _____
    Name:  Russell R. Clelland
    Title:  Vice President and Treasurer

**CITIBANK, N.A.,**
individually as Administrative Agent and Collateral
Trustee

By: _____

        Name:  Kirkwood Roland
        Title:   Managing Director & Vice President

ANNEX I

## NOTICES

**Borrower or any Subsidiary Guarantor:**

**PPL Energy Supply, LLC**

835 W. Hamilton Ave.
Allentown, PA 18101
Attention: General Counsel
Telephone:  610-774-4918
Telecopy:  610-774-2755
with a copy to:

PPL Energy Supply, LLC
835 W. Hamilton Ave.
Allentown, PA  18101
Attention:  Treasurer
Telephone No.:  610-774-4480
Telecopier No.:  610-774-4511

**Administrative Agent or the Collateral Trustee:**

Citibank, N.A.,
Citigroup Global Markets Inc.
580 Crosspoint Pkwy
Getzville, NY 14068
E-Mail:  CRMS.NA.Documentation@citi.com

with a copy to:

Citibank, N.A.
Citigroup Global Markets Inc.
1615 Brett Road, Ops III
New Castle, DE  19720
Attention:  Global Loans Support
Telephone No.:  302-894-6010
Telecopier No.: 646-274-5080
E-Mail:  Global.Loans.Support@citi.com

ANNEX II

**EXISTING COMMODITY HEDGING AGREEMENTS**

EXHIBIT A

FORM OF
ACCESSION AGREEMENT — *First-Lien Secured Parties*

THIS ACCESSION AGREEMENT (this "***Agreement***"), dated as of [      ], 20[      ], is entered into by [      ], a [      ] (the "***Joining Party***"), and acknowledged by PPL ENERGY SUPPLY, LLC, a Delaware limited liability company (the "***Borrower***") and each Credit Party, and CITIBANK, N.A., in its capacity as Collateral Trustee under the Intercreditor Agreement (as defined below).

Reference is made to that certain Collateral Trust and Intercreditor Agreement (as amended, modified, restated or supplemented from time to time, the "***Intercreditor Agreement***"), dated as of [            ] by and among the Borrower, the Subsidiary Guarantors, the Collateral Trustee, the Administrative Agent and each of the other Persons party thereto from time to time in accordance with the terms thereof. Capitalized terms used herein without definition shall have the meaning assigned thereto in the Intercreditor Agreement. This Accession Agreement is being executed and delivered pursuant to Section 5.6(a) of the Collateral Trust Agreement.

[***Option A — where Joining Party is an agent under an Additional First-Lien Indebtedness Agreement, the Other Credit Agreement or the Reimbursement Agreement or the refinanced Credit Agreement***] The Joining Party, as agent under [describe applicable Additional First-Lien Indebtedness Agreement, the Other Credit Agreement or the Reimbursement Agreement or the refinanced Credit Agreement], hereby becomes a SECURED DEBT REPRESENTATIVE under the Intercreditor Agreement.

[***Option B — where Joining Party is an*** [ELIGIBLE COMMODITY HEDGING COUNTERPARTY]/ [INTEREST RATE HEDGE BANK]/[TREASURY SERVICES PROVIDER]] under [***describe applicable Secured Commodity Hedge, Secured Interest Rate Hedge or Secured Treasury Services Agreement***] hereby becomes a FIRST-LIEN SECURED PARTY under the Intercreditor Agreement.

Each of the Borrower and the Joining Party hereby agree for the benefit of the First-Lien Secured Parties as follows:

(1)     The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the Joining Party will be deemed to be a party to the Intercreditor Agreement, and, from and after the date hereof, shall have all of the obligations of a [SECURED DEBT REPRESENTATIVE]/[FIRST-LIEN SECURED PARTY]/[ELIGIBLE COMMODITY HEDGING COUNTERPARTY]/[INTEREST RATE HEDGE BANK]/[TREASURY SERVICES PROVIDER] thereunder as if it had executed the Intercreditor Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions applicable to the [SECURED DEBT REPRESENTATIVE]/[FIRST-LIEN SECURED PARTY]/[ELIGIBLE COMMODITY HEDGING COUNTERPARTY]/[INTEREST RATE HEDGE BANK]/ ]/[FIRST-LIEN SECURED PARTY IN ITS CAPACITY AS A LENDER OR ISSUING BANK UNDER AN ADDITIONAL FIRST-LIEN INDEBTEDNESS AGREEMENT]/[TREASURY SERVICES PROVIDER] contained in the Intercreditor Agreement. The first-lien obligations to be secured under [***describe applicable Financing Document***] are hereby designated "***Obligations***" and will be secured equally and ratably with all existing and future Obligations permitted by the Financing Documents.

A-1

[(2)      To the extent the Joining Party is joining as a Secured Debt Representative as agent or trustee for one or more First-Lien Secured Parties, the Joining Party acknowledges that it has the authority to bind such First-Lien Secured Parties to the Intercreditor Agreement and such First-Lien Secured Parties are hereby bound by the terms and conditions of the Intercreditor Agreement.]

[(2)][(3)]      The Joining Party hereby agrees [(on behalf of itself and any First-Lien Secured Party claiming through it)] to comply with the terms of the Intercreditor Agreement.

[(3)][(4)]      Each of the undersigned Credit Parties hereby consents to the designation of [*describe applicable Financing Document*] as Obligations as set forth herein and hereby confirms its respective guarantees, pledges, grants of security interests and other obligations, as applicable, under and subject to the terms of each of the Financing Documents to which it is party, and agrees that, notwithstanding the designation of such additional indebtedness or any of the transactions contemplated thereby, such guarantees, pledges, grants of security interests and other obligations, and the terms of each Financing Document to which it is a party, are not impaired or adversely affected in any manner whatsoever and shall continue to be in full force and effect and such additional secured debt shall be entitled to all of the benefits of such Financing Documents.

[(4)][(5)]      The address of the Joining Party for purposes of all notices and other communications under the Intercreditor Agreement is [          ,          ], Attention of [          ] (Facsimile No. [          ], electronic mail address: [          ]).

[(5)][(6)]      This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute one contract.

[(6)][(7)]      The provisions of Section 9.6 of the Intercreditor Agreement will apply with like effect to this Accession Agreement.

A-2

     IN WITNESS WHEREOF, each of the Joining Party, each Credit Party and the Collateral Trustee has caused this Accession Agreement to be duly executed by its respective authorized representative, as of the day and year first above written.

[JOINING PARTY]

By: _____
     Name:
     Title:

Acknowledged:

PPL ENERGY SUPPLY, LLC

By: _____
     Name:
     Title:

**[INSERT DETAILS OF ALL CREDIT PARTIES UNDER SECURITY DOCUMENTS AS AT DATE OF THIS ACCESSION AGREEMENT]**

By: _____
     Name:
     Title:

Acknowledged:

CITIBANK, N.A., as Collateral Trustee

By: _____
     Name:
     Title:

EXHIBIT B

**FORM OF**
**ADDITIONAL GUARANTOR ACCESSION AGREEMENT**

Reference is made to that certain Collateral Trust and Intercreditor Agreement (as amended, modified, restated or supplemented from time to time, the "***Intercreditor Agreement***"), dated as of [          ] by and among the Borrower, the Subsidiary Guarantors, the Collateral Trustee, the Administrative Agent and each of the other Persons party thereto from time to time in accordance with the terms thereof.  Capitalized terms used herein without definition shall have the meaning assigned thereto in the Intercreditor Agreement.  This Additional Guarantor Accession Agreement is being executed and delivered pursuant to Section 9.16 of the Intercreditor Agreement.

1.      ***Joinder***.  The undersigned,     , a     , hereby agrees to become party as a Credit Party under the Intercreditor Agreement for all purposes thereof on the terms set forth therein, and to be bound by the terms of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement as of the date thereof.

2.      ***Governing Law and Miscellaneous Provisions***.  The provisions of Section 9.6 of the Intercreditor Agreement will apply with like effect to this Additional Guarantor Accession Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Additional Guarantor Accession Agreement to be executed by their respective officers or representatives as of     , 20  .

[                ]

By: _____
      Name:
      Title:

The Collateral Trustee hereby acknowledges receipt of this Additional Guarantor Accession Agreement and agrees to act as Collateral Trustee with respect to the Collateral pledged by the new Credit Party:

, as Collateral Trustee

B-1