**<u>Exhibit B</u>**

**Redline**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| | § | |
| **TALEN ENERGY SUPPLY, LLC,** *et al.,* | § | **Case No. 22-90054 (MI)** |
| | § | |
| | § | **(Joint~~ly~~ Administ~~ration~~ered ~~Requested~~)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS
TO OBTAIN POST-PETITION FINANCING, (B) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND
PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
FIRST LIEN SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,
(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**")[2] of Talen Energy Supply, LLC ("**TES**") and each

of its affiliates that are debtors and debtors-in-possession (each, a "**Debtor**" and collectively,

the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**") and pursuant to sections

105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503,

506(c), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

(the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 4001-1(b), 4002-1(i), and

9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern

District of Texas (collectively, the "**Local Rules**"), and the Procedures for Complex Chapter 11

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/talenenergy.  The Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

[2] Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the DIP Motion.

Bankruptcy Cases (together with the Local Rules, the "**Bankruptcy Local Rules**"), seeking entry of this interim order (the "**Interim Order**") providing, among other things:

(i)  authorizing TES (the "**Borrower**") to obtain post-petition financing ("**DIP Financing**") pursuant to senior secured superpriority debtor-in-possession credit facilities subject to the terms and conditions set forth in that certain Superpriority Secured New Money Debtor-in-Possession Credit Agreement attached hereto as **Exhibit C** (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**DIP New Money Credit Agreement**") and that certain Superpriority Senior Secured Continuing Letter of Credit Debtor-in-Possession Credit Agreement attached hereto as **Exhibit D** (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**DIP Continuing LC Credit Agreement**" and, together with the DIP New Money Credit Agreement, the "**DIP Credit Agreement**"), consisting of:

(a)  a new money term loan facility in the aggregate principal amount of $1 billion (the "**Term Facility**" and the loans issued thereunder, the "**Term Loans**"), of which $800 million will be available immediately upon entry of this Interim Order (the "**Initial Funding**");

(b)  a revolving credit facility (the "**Revolving Facility**" and, together with the Term Facility, the "**New Money DIP Facilities**"; the loans incurred under Revolving Facility, the "**Revolving Loans**" and, together with the Term Loans, the "**New Money Loans**") with aggregate commitments of $300 million (together with the commitments under the Term Facility, the "**New Money Commitments**"), including a letter of credit sub-facility in an aggregate amount of up to $75 million to issue new letters of credit (the "**New Money DIP Letters of Credit**"), of which $75 million will be available immediately upon entry of this Interim Order (and, together with the $800 million of immediately available Term Loans, the "**Initial Funding**"); and

(c)  a letter of credit facility (the "**Continuing L/C Facility**" and, together with the New Money DIP Facilities, the "**DIP Facilities**"; the commitments under the Continuing L/C Facility, the "**Continuing L/C Commitments**" and, together with the New Money Commitments, the "**Commitments**"), which shall be available immediately upon entry of this Interim Order, in the aggregate amount of $[457,905,219] consisting of all letters of credit outstanding under the Prepetition Revolving Credit Facility as of the Petition Date (the "**Existing Letters of Credit**") which shall be deemed issued under the DIP Continuing LC Credit Agreement (as extended, renewed, and/or replaced under the Continuing L/C Facility, the "**Continuing Letters of Credit**" and, together with the New Money DIP Letters of Credit, the "**DIP Letters of Credit**"; any Loans resulting from an unreimbursed draw on any Continuing Letters of Credit shall be

referred to herein as the "**Continuing LC Loans**" and, together with the New Money Loans, the "**Loans**");

by and among, in each case, the Borrower, the Guarantors, Citibank, N.A. as administrative agent and collateral trustee for each of the DIP Facilities (in such capacities, and in its capacity as collateral trustee for the DIP Intercreditor Agreement, together with its successors and permitted assigns in each such capacity, the "**DIP Agent**") and, with respect to the DIP New Money Credit Agreement, the Term Lenders, Revolving Lenders, and Issuing Lenders (as defined in the DIP New Money Credit Agreement (the "**New Money L/C Issuers**")) and, with respect to the DIP Continuing LC Credit Agreement, the Issuing Lenders (as defined in the DIP Continuing LC Credit Agreement (the "**Continuing L/C Issuers**") and, together with the New Money L/C Issuers, the "**DIP L/C Issuers**" and, collectively with the Term Lenders, Revolving Lenders, the "**Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**");

(ii)    authorizing all Debtors other than the Borrower (the "**Guarantors**") to jointly and severally guarantee the DIP Facilities and DIP Obligations as set forth herein and therein;

(iii)    authorizing the Debtors to deem the Existing Letters of Credit to have been issued under the Continuing L/C Facility as Continuing Letters of Credit immediately upon entry of this Interim Order;

(iv)    authorizing the Debtors to execute, deliver, and perform under the DIP Credit Agreement and other documentation, including, without limitation, credit agreements, security agreements, pledge agreements, control agreements, mortgages, guarantees, promissory notes, certificates, instruments, intellectual property security agreements, notes, an intercreditor agreement and/or a collateral trust and intercreditor agreement (the "**DIP Intercreditor Agreement**"), and each other fee letter entered into by any Credit Party in connection with the DIP Credit Agreement (the "**Fee Letters**"), that certain Commitment Letter, dated as of May 9, 2022, by and among Citigroup Global Markets Inc., as an arranger, and each other arranger and financial institution party thereto (the "**Commitment Letter**", and such other documentation which may be necessary or reasonably required to implement the DIP Facilities and perform thereunder and/or that may be reasonably requested by the Administrative Agent, in each case, as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement, all Credit Documents (as defined in the DIP Credit Agreement) and this Interim Order, the "**DIP Documents**");

(v)    authorizing the Debtors to incur and guarantee loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, letter of credit fees, letter of credit issuing fees, commitment fees, administrative agency fees, and other fees payable pursuant to the Fee

3

Letters and the Commitment Letter), costs, expenses, and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other Obligations (as defined in the DIP Credit Agreement) due or payable under the DIP Facilities, including with respect to the DIP Letters of Credit (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable, or appropriate in connection therewith; *provided* that the DIP Obligations in respect of the Continuing L/C Facility shall be referred to herein as the "**Continuing L/C Obligations**" and all other DIP Obligations shall be referred to herein as the "**New Money DIP Obligations**";

(vi)  authorizing the Borrower to solicit the Lenders or other prospective lenders determined by the Borrower to provide one or more incremental term loan facilities to the Term Facility (each, an "**Incremental Term Loan Facility**") and/or one or more increases to the Revolving Facility commitments (each, an "**Incremental Revolving Facility**" and, together with the Incremental Term Loan Facilities, the "**Incremental DIP Facilities**") in an aggregate amount not to exceed $250 million, all in accordance with the DIP Credit Agreement;

(vii)  subject and subordinate to the Carve Out (as defined herein), granting to the DIP Agent—for the benefit of the DIP Secured Parties—allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

(viii)  subject and subordinate to the Carve Out, granting to the DIP Agent—for the benefit of the DIP Secured Parties and the Permitted Secured Hedge Providers—valid, enforceable, non-avoidable and automatically perfected security interests and liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code upon all DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" and all proceeds thereof, including, subject to the entry of the Final Order (as defined herein), any Avoidance Proceeds (as defined herein), which security interests and liens shall be subject to the priorities set forth herein, but subject to certain excluded assets as described below;

(ix)  authorizing the Debtors to incur DIP Superpriority Claims and grant DIP Liens on account of applicable Permitted Hedge Obligations (each as defined herein) in accordance with the terms of the Hedging Order (entered by the Court concurrently herewithas defined herein), this Interim Order, and the DIP Documents;

(x)  subject to the provisions set forth below, authorizing the Debtors to waive (a) their right to surcharge the Prepetition First Lien Collateral (including the Cash Collateral) and the DIP Collateral  (each as defined herein) pursuant to

4

section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xi)     authorizing the Debtors to waive the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and Permitted Secured Hedge Providers (as defined ~~in the Hedging Order (as defined~~ herein)) and (b) with respect to any of the Prepetition First Lien Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition First Lien Secured Parties (as defined herein), subject to the provisions set forth below;

(xii)    authorizing the Debtors to use proceeds of the DIP Facilities solely in accordance with this Interim Order and the DIP Documents;

(xiii)   authorizing the Prepetition PPSA Sellers (as defined herein) to purchase certain products subject to the Prepetition PPSA (as defined herein);

(xiv)    authorizing the Debtors to pay the principal, interest, fees, expenses, reimbursements, and other amounts payable under the DIP Documents as such become earned, due, and payable to the extent provided in, and in accordance with, the DIP Documents;

(xv)     subject to the restrictions set forth in the DIP Documents and this Interim Order, authorizing the Debtors to use the Prepetition First Lien Collateral (including Cash Collateral) and provide Adequate Protection (as defined herein) to the Prepetition First Lien Secured Parties, the Eligible Commodity Hedging Counterparty (as defined in the Prepetition Intercreditor Agreement), the Interest Rate Hedge Bank (as defined in the Prepetition Intercreditor Agreement), solely to the extent of any diminution in value of their respective interests in the Prepetition First Lien Collateral (including Cash Collateral), resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**"), the Debtors' use, sale, or lease of the Prepetition First Lien Collateral (including Cash Collateral), and the priming of their respective interests in the Prepetition First Lien Collateral (including Cash Collateral);

(xvi)    vacating and modifying the Automatic Stay to the extent set forth herein and necessary to permit the Debtors and their affiliates and the Prepetition First Lien Secured Parties to implement and effectuate the terms and provisions of this Interim Order, the DIP Documents, and, upon entry, the Final Order (as defined herein), and to deliver any notices of termination described below and as further set forth herein;

(xvii)   authorizing TES to continue to honor its obligations under the Reimbursement Agreements (as defined below), and authorizing TES to incur post-petition credit under the Letter of Credit Agreements (as defined below) and providing related relief as set forth herein;

5

(xviii)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

(xix)    scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facilities and use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"), as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Roopesh Shah in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition First Secured Lien Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "**Shah Declaration**"), the *Declaration of Ryan Leland Omohundro in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "**Omohundro Declaration**"), and the *Declaration of Ryan Leland Omohundro in Support of Emergency Motion of Debtors For Order (I) Authorizing Debtors to (A) Continue Performing Under Prepetition Hedging Agreements, (B) Enter Into and Perform Under New Postpetition Hedging Agreement, and (C) Grant Related Liens and Superpriority Claims and Authorize Posting of Margin Collateral and Postpetition Exchange Collateral, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* (the "**Hedging Declaration**", together with the Shah Declaration and the Omohundro Declaration, the "**First Day Declarations**"), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on [•]May 10, 2022 (the "**Interim Hearing**"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearing having

6

been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.     *Petition Date*.  On May 9, 2022 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**").   On [•]May 10, this Court entered an order approving the joint administration of the Chapter 11 Cases.

B.     *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     *Jurisdiction and Venue*.  This Court has jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.

---

[3]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court may enter a final order consistent with Article III of the United States Constitution. Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 363(m), 364(c), 364(d)(1), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1.

D.    *Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

E.    *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Proper, timely, adequate, and sufficient notice of the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and no other or further notice of the DIP Motion or the entry of this Interim Order shall be required.

F.    *Debtors' Stipulations*.  Without prejudice to the rights of the Debtors' estates or any other party in interest (but subject to the limitations thereon contained in paragraph 25 below), and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate, and agree that:

(i)    Certain of the Debtors are parties to (a) that certain Guarantee and Collateral Agreement, dated as of June 1, 2015 (as amended, restated, amended and restated, supplemented and/or otherwise modified prior to the date hereof, the "**Prepetition Guarantee and Collateral Agreement**"), by and among TES, the Subsidiaries (as defined in the Prepetition

8

Guarantee and Collateral Agreement) party thereto (the "**Prepetition Guarantors**" and, collectively, with TES, the "**Prepetition Credit Parties**"), and Citibank, N.A. as collateral trustee (together with any successor in such capacity, the "**Prepetition Collateral Trustee**"), (b) that certain Collateral Trust and Intercreditor Agreement, dated as of June 1, 2015 (as amended by that certain First Amendment to Collateral Trust and Intercreditor Agreement, dated as of November 13, 2015, that certain Second Amendment to Collateral Trust and Intercreditor Agreement, dated as of August 2, 2019, and as otherwise amended, restated, amended and restated, supplemented and/or modified prior to the date hereof, the "**Prepetition Intercreditor Agreement**"), by and among TES, the Subsidiary Guarantors (as defined in the Prepetition Intercreditor Agreement), the Prepetition Collateral Trustee, the Prepetition Revolving Credit Facility Agent (as defined herein), and each of the other Persons (as defined in the Prepetition Intercreditor Agreement) party thereto, and (c) certain other security documents, mortgages, and, ancillary agreements, all pursuant to which the Prepetition Collateral Trustee has been granted a first lien security interest in and continuing liens on (collectively, the "**Prepetition Collateral Trust Liens**") all right, title and interest in substantially all assets and property of the Prepetition Credit Parties, excluding the Prepetition RCF Cash Collateral (as defined herein) and the other Excluded Assets (as defined in the Prepetition Guarantee and Collateral Agreement) (such collateral, the "**Prepetition First Lien Collateral**"), to secure the Prepetition First Lien Debt (as defined herein).  Pursuant to the Prepetition Guarantee and Collateral Agreement, TES and each of the Prepetition Guarantors unconditionally and irrevocably guaranteed, jointly and severally, each as a primary obligor and not merely as a surety, the Prepetition First Lien Debt to the Prepetition Collateral Trustee for the benefit of the Prepetition First Lien Secured Parties (as defined herein) (the "**Prepetition Guarantees**").

(ii)     *Prepetition Revolving Credit Facility*.  Pursuant to (a) that certain Credit Agreement dated as of June 1, 2015 (as amended by that certain First Amendment to Credit Agreement, dated as of January 19, 2016, that certain Amendment No. 2, dated as of March 21, 2017, that certain Supplement to Amendment No. 2, dated March 29, 2017, that certain Amendment No. 3, dated as of December 12, 2018, that certain Amendment No. 4, dated as of May 21, 2019, that certain Limited Waiver and Amendment No. 5, dated as of November 19, 2021, that certain Limited Waiver and Amendment No. 6, dated as of November 30, 2021, that certain Amendment No. 7, dated as of December 14, 2021, and that certain Amendment No. 8, dated as of February 28, 2022, and as otherwise amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof, the "**Prepetition Revolving Credit Agreement**"), by and among (1) TES, as borrower (in such capacity, the "**Prepetition Revolving Credit Facility Borrower**"), (2)  Citibank, N.A., as administrative agent (together with any successor in such capacity, the "**Prepetition Revolving Credit Facility Agent**") and as Prepetition Collateral Trustee, (3) the Lenders (as defined in the Prepetition Revolving Credit Agreement) party thereto (collectively, the "**Prepetition Revolving Lenders**") and (4) the Issuing Lenders (as defined in the Prepetition Revolving Credit Agreement) (the "**Prepetition Issuing Lenders**" and, collectively, with the Prepetition Revolving Lenders, the Prepetition Revolving Credit Facility Agent, and the Prepetition Collateral Trustee, the "**Prepetition Revolving Credit Facility Secured Parties**") and (b) the other Credit Documents (as defined in Prepetition Revolving Credit Agreement and as amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof) (collectively, the "**Prepetition Revolving Credit Facility Documents**" and the facility governed thereby, the "**Prepetition Revolving Credit Facility**"), the Prepetition Revolving Credit Facility Secured Parties have

extended credit, including in the form of the Existing Letters of Credit, and provided other financial accommodations to, and for the benefit of the Prepetition Credit Parties.

(iii)    *Prepetition Revolving Credit Facility Debt*.  As of the Petition Date, TES and the other Prepetition Credit Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Prepetition Revolving Credit Facility Secured Parties, without defense, counterclaim, or offset of any kind, with respect to all obligations on account of amounts available for drawing under the Existing Letters of Credit in an aggregate amount of $[457,905,219] including, without limitation, all accrued and unpaid interest, any fees, premiums, expenses and disbursements (collectively, including letter of credit fees, letter of credit issuing fees, breakage fees, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, reimbursement obligations and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Credit Parties pursuant to, or secured by, the Prepetition Revolving Credit Facility Documents, including all accrued but unpaid Obligations (as defined in the Prepetition Revolving Credit Agreement), in each case, solely to the extent they are chargeable or reimbursable by the Prepetition Credit Parties under the Prepetition Revolving Credit Facility Documents (the "**Prepetition Revolving Credit Facility Debt**").

(iv)    *Prepetition Term Loan Facility*.  Pursuant to (a) that certain Term Loan Credit Agreement, dated as of July 8, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "**Prepetition Term Loan Credit Agreement**"), by and among (1) TES, (2) Wilmington Trust Company, as term loan

11

administrative agent (together with any successor in such capacity, the "**Prepetition Term Loan Administrative Agent**"), (3) the Lenders (as defined in the Prepetition Term Loan Credit Agreement) party thereto (collectively, the "**Prepetition Term Loan Lenders**" and, together with the prepetition Term Loan Administrative Agent, the "**Prepetition Term Loan Secured Parties**") and (b) any other agreements and documents executed or delivered in connection therewith (as amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof, together with the Prepetition Term Loan Facility Credit Agreement, the "**Prepetition Term Loan Facility Documents**" and the facility governed thereby, the "**Prepetition Term Loan Facility**"), the Prepetition Term Loan Lenders provided term loans and other financial accommodations to and for the benefit of the Prepetition Credit Parties.

(v)     *Prepetition Term Loan Debt*. As of the Petition Date, TES and the other Prepetition Credit Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the Prepetition Term Loan Facility Secured Parties, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $428 million (together with any accrued and unpaid interest, any fees, premiums, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, reimbursement obligations and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Credit Parties' obligations pursuant to, or secured by, the Prepetition Term Loan Credit Agreement, including all accrued but unpaid Obligations (as defined in the Prepetition Term Loan Credit Agreement), in each case, solely to

the extent they are chargeable or reimbursable by the Prepetition Credit Parties under the Prepetition Term Loan Credit Agreement, the "**Prepetition Term Loan Debt**").

(vi) *Prepetition Commodity Accordion Facility*. Pursuant to (a) that certain Credit Agreement, dated as of December 14, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "**Prepetition Commodity Accordion Credit Agreement**") by and among (1) Talen Energy Marketing, LLC ("**TEM**"), and Susquehanna Nuclear, LLC, as borrowers (in such capacity, the "**Prepetition Commodity Accordion Facility Borrowers**"), (2) TES, as parent, (3) Alter Domus (US) LLC, as administrative agent (together with any successor in such capacity, the "**Prepetition Commodity Accordion Agent**"), and (4) the Lenders (as defined in the Prepetition Commodity Accordion Credit Agreement) party thereto (the "**Prepetition Commodity Accordion Facility Lenders**" and, together with the Prepetition Commodity Accordion Agent, the "**Prepetition Commodity Accordion Secured Parties**") and (b) any other agreements and documents executed or delivered in connection therewith (as amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof, collectively with the Prepetition Commodity Accordion Credit Agreement, the "**Prepetition Commodity Accordion Facility Documents**", and the facility governed thereby, the "**Prepetition Commodity Accordion Facility**"), the Prepetition Commodity Accordion Facility Lenders extended credit in the form of loans and provided other financial accommodations to the Prepetition Commodity Accordion Facility Borrowers.

(vii) *Prepetition Commodity Accordion Facility Debt*. As of the Petition Date, the Prepetition Commodity Accordion Facility Borrowers and the other Prepetition Credit Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations)

13

to the Prepetition Commodity Accordion Facility Secured Parties, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $848 million (together with any accrued and unpaid interest, fees, premiums, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, reimbursement obligations and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Commodity Accordion Facility Borrowers' or the obligations of the guarantors thereunder pursuant to, or secured by, the Prepetition Commodity Accordion Facility Documents, including all accrued but unpaid Obligations (as defined in the Prepetition Commodity Accordion Facility Credit Agreement), in each case, solely to the extent they are chargeable or reimbursable by the Prepetition Credit Parties under the Prepetition Commodity Accordion Credit Agreement, the "**Prepetition Commodity Accordion Facility Debt**"), *provided*, for the avoidance of doubt, that the Debtors are not stipulating as to the validity, priority, or enforceability of any "Applicable Premium," MOIC Amount, or other premium under the Prepetition Commodity Accordion Facility Documents and reserve all rights with respect thereto;

(viii)   *Prepetition 7.25% Senior Secured Notes.*   Pursuant to (a) that certain Indenture for certain 7.25% notes due 2027 (the "**Prepetition 7.25% Senior Secured Notes**"), dated as of May 1, 2019 (as supplemented by that certain Supplemental Indenture No. 1, dated as of September 11, 2021, and as otherwise amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof, the "**Prepetition 7.25% Senior Secured Notes Indenture**") by and among (1) TES, as issuer (together with any successor in such

14

capacity, the "**Prepetition 7.25% Senior Secured Notes Issuer**"), (2) the Guarantors (as defined in the Prepetition 7.25% Senior Secured Notes Indenture), party thereto, as guarantors and (3) The Bank of New York Mellon, as trustee (together with any successor in such capacity, the "**7.25% Notes Trustee**") and (b) and any other agreements and documents executed or delivered in connection therewith (as amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof, collectively with the Prepetition 7.25% Senior Secured Notes Indenture, the "**Prepetition 7.25% Senior Notes Documents**"), TES issued the Prepetition 7.25% Senior Secured Notes to the Holders (as defined in the Prepetition 7.25% Senior Secured Notes Indenture and, together with the 7.25% Notes Trustee, the "**7.25% Notes Secured Parties**"), and the Prepetition Credit Parties have incurred indebtedness to the Prepetition 7.25% Notes Secured Parties.

(ix) *Prepetition 7.25% Senior Secured Notes Debt*. Pursuant to the Prepetition 7.25% Senior Secured Notes Indenture, the Prepetition 7.25% Senior Secured Notes were originally issued in the principal amount of $750 million.  As of the Petition Date, the Prepetition Credit Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the 7.25% Notes Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of $750 million (collectively, with any accrued and unpaid interest, fees, premiums, expenses, disbursements, indemnification obligations, guarantee obligations, reimbursement obligations and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of the Prepetition Credit Parties' obligations pursuant to the Prepetition 7.25% Senior Secured Notes and the Prepetition 7.25% Senior Secured Notes Documents, in each case, solely to the extent they are chargeable or reimbursable by the

15

Prepetition Credit Parties under the Prepetition 7.25% Senior Secured Notes Indenture, the "**Prepetition 7.25% Senior Secured Notes Debt**"; *provided*, that the Debtors are not stipulating as to the validity, priority, or enforceability of any "Applicable Premium" or other premium under the Prepetition 7.25% Senior Notes Documents and reserve all rights with respect thereto;

(x)     *Prepetition 6.625% Senior Secured Notes.*  Pursuant to (a) that certain Indenture for certain 6.625% notes due 2028 (the "**Prepetition 6.625% Senior Secured Notes**"), dated as of July 8, 2019 (as supplemented by that certain Supplemental Indenture No. 1, dated as of September 11, 2021, and as otherwise amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof, the "**Prepetition 6.625% Senior Secured Notes Indenture**") by and among (1) TES, as issuer (together with any successor in such capacity, the "**Prepetition 6.625% Senior Secured Notes Issuer**"), (2) the Guarantors (as defined in the Prepetition 6.625% Senior Secured Notes Indenture), party thereto, as guarantors and (3) The Bank of New York Mellon, as trustee (together with any successor in such capacity, the "**6.625% Notes Trustee**") and (b) and any other agreements and documents executed or delivered in connection therewith (as amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof, collectively with the Prepetition 6.625% Senior Secured Notes Indenture, the "**Prepetition 6.625% Senior Notes Documents**"), TES issued the Prepetition 6.625% Senior Secured Notes to the Holders (as defined in the Prepetition 6.625% Senior Secured Notes Indenture and, together with the 6.625% Notes Trustee, the "**6.625% Notes Secured Parties**"), and the Prepetition Credit Parties have incurred indebtedness to the Prepetition 6.625% Notes Secured Parties.

WEIL:\98616197\1\76974.0003

(xi)     *Prepetition 6.625% Senior Secured Notes Debt*.  Pursuant to the Prepetition 6.625% Senior Secured Notes Indenture, the Prepetition 6.625% Senior Secured Notes were originally issued in the principal amount of $470 million.  As of the Petition Date, the Prepetition Credit Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the 6.625% Notes Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of $470 million (collectively, with any accrued and unpaid interest, fees, premiums, expenses, disbursements, indemnification obligations, guarantee obligations, reimbursement obligations and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of the Prepetition Credit Parties' obligations pursuant to the Prepetition 6.625% Senior Secured Notes and the Prepetition 6.625% Senior Secured Notes Documents, in each case, solely to the extent they are chargeable or reimbursable by the Prepetition Credit Parties under the Prepetition 6.625% Senior Secured Notes Indenture, the "**Prepetition 6.625% Senior Secured Notes Debt**"), *provided*, that the Debtors are not stipulating as to the validity, priority, or enforceability of any "Applicable Premium" or other premium under the Prepetition 6.625% Senior Notes Documents and reserve all rights with respect thereto.

(xii)     *Prepetition 7.625% Senior Secured Notes.*  Pursuant to (a) that certain Indenture for certain 7.625 notes due 2028 (the "**Prepetition 7.625% Senior Secured Notes**"), dated as of May 22, 2020 (as supplemented by that certain Supplemental Indenture No. 1, dated as of September 11, 2021, and as otherwise amended, restated, amended and restated, supplemented, waived and/or modified prior to the date hereof, the "**Prepetition 7.625% Senior Secured Notes Indenture**") by and among (1) TES, as issuer (~~together with any successor in~~

~~such capacity,~~ the "**Prepetition 7.625% Senior Secured Notes Issuer**"), (2) the Guarantors (as defined in the Prepetition 7.625% Senior Secured Notes Indenture), party thereto, as guarantors and (3) The Bank of New York Mellon, as trustee (together with any successor in such capacity, the "**7.625% Notes Trustee**")[4] and (b) and any other agreements and documents executed or delivered in connection therewith (as amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof, collectively with the Prepetition 7.625% Senior Secured Notes Indenture, the "**Prepetition 7.625% Senior Notes Documents**"), TES issued the Prepetition 7.625% Senior Secured Notes to the Holders (as defined in the Prepetition 7.625% Senior Secured Notes Indenture and, together with the 7.625% Notes Trustee, the "**7.625% Notes Secured Parties**"), and the Prepetition Credit Parties have incurred indebtedness to the Prepetition 7.625% Notes Secured Parties.

(xiii)   *Prepetition 7.625% Senior Secured Notes Debt*.   Pursuant to the Prepetition 7.625% Senior Secured Notes Indenture, the Prepetition 7.625% Senior Secured Notes were originally issued in the principal amount of $400 million.  As of the Petition Date, the Prepetition Credit Parties were justly and lawfully indebted and liable (including pursuant to guarantee obligations) to the 7.625% Notes Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of $400 million (collectively, with any accrued and unpaid interest, fees, premiums, expenses, disbursements, indemnification obligations, guarantee obligations, reimbursement obligations and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of the Prepetition Credit Parties' obligations pursuant to the

---

[4] "**Prepetition Agents**" means, collectively, the Prepetition Collateral Trustee, Prepetition Revolving Credit Facility Agent, Prepetition Commodity Accordion Agent, 7.25% Notes Trustee, 6.625% Notes Trustee, 7.625% Notes Trustee, and Prepetition Term Loan Administrative Agent.

Prepetition 7.625% Senior Secured Notes and the Prepetition 7.625% Senior Secured Notes Documents, in each case, solely to the extent they are chargeable or reimbursable by the Prepetition Credit Parties under the Prepetition 7.625% Senior Secured Notes Indenture, the "**Prepetition 7.625% Senior Secured Notes Debt**"), *provided*, that the Debtors are not stipulating as to the validity, priority, or enforceability of any "Applicable Premium" or other premium under the Prepetition 7.625% Senior Notes Documents and reserve all rights with respect thereto.

(xiv)    *Prepetition PPSA and Prepetition PPSA Obligations.*  Pursuant to (a) that certain Product Purchase and Sale Agreement, dated as of December 19, 2020 (as amended, restated, amended and restated and/or otherwise modified prior to the date hereof, the "**Prepetition PPSA**"), between (1) Talen Energy Marketing, LLC and Talen Generation, LLC (the "**Prepetition PPSA Sellers**") and (2) J. Aron & Company, LLC (the "**Prepetition PPSA Buyer**") and (b) any other agreements and documents executed or delivered in connection therewith (as amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof, together with the Prepetition PPSA, the "**Prepetition PPSA Documents**", and the facility governed thereby, the "**Prepetition PPSA Facility**"), (x) the Prepetition PPSA Buyer purchased products from the Prepetition PPSA Sellers, whereupon the Prepetition PPSA Buyer owned and held exclusive titles to such products, (y) the Prepetition PPSA Sellers incurred certain obligations, including obligations with respect to the repurchase of such products from the Prepetition PPSA Buyer (the "**PPSA Obligations**") and (z) the Prepetition Credit Parties granted Prepetition Guarantees and Prepetition Collateral Trust Liens in respect of the PPSA obligations.  As of the Petition Date, the PPSA Obligations totaled ~~a principal of~~ not less than $165 million.  Pursuant to Section 3.2 of the Prepetition PPSA, the Prepetition PPSA Sellers

have a contractual right to repurchase the Final Volume (as defined in the Prepetition PPSA) within five business days after a bankruptcy filing (the "**PPSA Inventory Purchase**").

(xv)     *Other Prepetition First Lien Instruments*.  In addition to the foregoing, certain other instruments and exposures, including, without limitation, Secured Commodity Hedges, Secured Interest Rate Hedges, and Secured Treasury Services Agreements (each as defined in the Prepetition Intercreditor Agreement) benefit from the Prepetition Guarantees and the Prepetition Collateral Trust Liens (the "**Other Prepetition First Lien Instruments**" and, collectively with the Prepetition Revolving Credit Facility, the Prepetition Term Loan Facility, the Prepetition Commodity Accordion Facility, the Prepetition 7.25% Notes, the Prepetition 6.625% Notes, the Prepetition 7.625% Notes, and the Prepetition PPSA Facility, the "**Prepetition First Lien Facilities**"), pursuant to certain other the agreements, indentures, or other documents, including Accession Agreements (as defined in the Prepetition Intercreditor Agreement) to the Prepetition Intercreditor Agreement in accordance with the terms thereof (such documents, collectively with the Prepetition Revolving Credit Facility Documents, the Prepetition Term Loan Facility Documents, the Prepetition Commodity Accordion Facility Documents, the Prepetition 7.25% Senior Secured Notes Documents, the Prepetition 6.625% Senior Secured Notes Documents, the Prepetition 7.625% Senior Secured Notes Documents, and the Prepetition PPSA Documents, the "**Prepetition First Lien Debt Documents**"; the secured parties under the Other Prepetition First Lien Instruments, collectively, with the Prepetition Revolving Credit Facility Secured Parties, the Prepetition Term Loan Secured Parties, the Prepetition Commodity Accordion Secured Parties, the 7.25% Notes Secured Parties, the 6.625% Notes Secured Parties, the 7.625% Notes Secured Parties, and the Prepetition PPSA Buyer, the "**Prepetition First Lien Secured Parties**") and the obligations of the Debtors to the

20

Prepetition First Lien Secured Parties under the Prepetition First Lien Debt Documents, the "**Prepetition First Lien Debt**").

(xvi)   *Prepetition RCF Cash Collateral*.   Pursuant to (a) the Prepetition Revolving Credit Agreement and the other Credit Documents (as defined in the Prepetition Revolving Credit Agreement, and including that certain Cash Collateral Agreement (Account No. 1), dated as of December 14, 2021, by and between TES and the Prepetition Revolving Credit Facility Agent (the "**First RCF Cash Collateral Agreement**") and that certain Cash Collateral Agreement (Account No. 2), dated as of December 14, 2021, by and between TES and the Prepetition Revolving Credit Facility Agent (the "**Second RCF Cash Collateral Agreement**")), and any deposit control agreements, other agreements, and documents executed or delivered in connection therewith (all as amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof), the Prepetition Credit Parties pledged cash collateral to the Prepetition Revolving Credit Facility Agent for the benefit of the Prepetition Revolving Credit Facility Secured Parties (the "**Prepetition RCF Cash Collateral**"), which Prepetition Cash Collateral consisted, as of the Petition Date, of $60,000,000.00 held in Account No. 1 (as defined in the Prepetition Revolving Credit Agreement and established pursuant to the terms thereof) and $~~21,400,000~~29,424,823 held in Account No. 2 (as defined in the Prepetition Revolving Credit Agreement and established pursuant to the terms thereof) and (b) that certain Cash Collateral Agreement, dated as of December 14, 2021, by and among TEM, TES and the Prepetition Commodity Accordion Agent (the "**CAF Cash Collateral Agreement**"), and any deposit control agreements, other agreements, and documents executed or delivered in connection therewith (all as amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof), the Prepetition Credit Parties granted

(1) a junior lien on the Prepetition RCF Cash Collateral and (2) a lien on any cash collateral held in the TEM Account (as defined in the CAF Cash Collateral Agreement) (the "**TEM Cash Collateral**"), which Prepetition Cash Collateral consisted, as of the Petition Date, of approximately $0.00 in each case, to the Prepetition Commodity Accordion Agent for the benefit of the Prepetition Commodity Accordion Secured Parties.  The Prepetition Revolving Credit Facility Agent has senior ranking security interests in, and continuing liens on, the Prepetition RCF Cash Collateral (the "**Prepetition RCF Cash Liens**"), and, for the avoidance of doubt, (a) neither the Prepetition RCF Cash Collateral nor the TEM Cash Collateral is subject to the Prepetition Collateral Trust Liens or the DIP Liens; *provided* that the DIP Liens shall attach with first priority to any reversionary rights of the Debtors in the Prepetition RCF Cash Collateral and TEM Cash Collateral, (b) this Interim Order shall not grant any authority to the Debtors to use the Prepetition RCF Cash Collateral or the TEM Cash Collateral, and (c) prior to the Continuing L/C Facility becoming effective with respect to all Prepetition Revolving Credit Facility Obligations, the Prepetition RCF Cash Collateral shall only be used in accordance with paragraph 12 hereof.  Pursuant to that certain Cash Collateral Intercreditor Agreement, dated as of December 14, 2021 (as amended, restated, amended and restated, and/or otherwise modified prior to the date hereof, the "**Cash Collateral Intercreditor Agreement**"), by and among the Prepetition Revolving Credit Facility Agent and the Prepetition Commodity Accordion Facility Agent, the Prepetition Commodity Accordion Facility Agent, for the benefit of the Prepetition Commodity Accordion Facility Secured Parties, has junior liens (the "**Prepetition Junior CAF Liens**", and the senior ranking security interests in, and continuing liens on, the TEM Account granted to the Prepetition Commodity Accordion Facility Agent, the "**Prepetition TEM CAF Liens**", collectively, the "**Prepetition CAF Cash Collateral Liens**") on the Prepetition RCF

WEIL:\98616197\1\76974.0003

Cash Collateral, which junior lien is subject and subordinate in all respects to the Prepetition RCF

Cash Liens unless and until the Continuing L/C Facility is fully effective and the Final Order has

been entered.  For the avoidance of doubt, the Prepetition RCF Cash Liens and Prepetition CAF

Cash Collateral Liens constitute Permitted Prior Liens, subject to paragraph 25 hereof.

(xvii)  *Prepetition Credit Card Cash Collateral*.  Pursuant to that certain Cash

Collateral Agreement, dated as of December 14, 2021 (the "**Credit Card Cash Collateral**

**Agreement**") by and between TES and MUFG Union Bank, N.A. ("**MUFG**"), and any deposit

control agreements, other agreements, and documents executed or delivered in connection

therewith (all as amended, restated, amended and restated, supplemented, and/or modified prior

to the date hereof), the Prepetition Credit Parties pledged cash collateral to MUFG (the "**MUFG**

**Cash Collateral**") to secure obligations of TES in favor of MUFG under the Card Program (as

defined in the Credit Card Cash Collateral Agreement) (the "**MUFG Obligations**"), which

MUFG Cash Collateral consisted, as of the Petition Date, of $3,000,000 held in a designated

bank account of TES for the benefit of MUFG.  MUFG has senior ranking security interests in,

and continuing liens on, the MUFG Cash Collateral (the "**MUFG Cash Liens**").  The account

holding the MUFG Cash Collateral is subject to a deposit account control agreement in favor of

the Prepetition Collateral Trustee that provides that any amounts in such account in excess of the

MUFG Cash Collateral are subject to Prepetition Collateral Trust Liens; *provided* the DIP Liens

shall attach with first priority to any reversionary rights of the Debtors in the MUFG Cash

Collateral.  For the avoidance of doubt, the MUFG Cash Liens constitute Permitted Prior Liens.

(xviii) *Prepetition Guarantee and Collateral Agreement*.  The Prepetition

Guarantee and Collateral Agreement is binding and enforceable in accordance with its terms and

unless otherwise subsequently modified or amended, the Borrower and Subsidiary Guarantors

(each as defined therein) are not entitled to take any actions that would be contrary to the provisions thereof.

(xix)   *Prepetition Intercreditor Agreement.*   The Prepetition Intercreditor Agreement is binding and enforceable in accordance with its terms and unless otherwise subsequently modified or amended, the Credit Parties (as defined therein) are not entitled to take action that would be contrary to the provisions thereof that are binding or otherwise restrict the Credit Parties.   For the avoidance of doubt, nothing in this paragraph (xix) modifies any of the terms of the Prepetition Intercreditor Agreement.

(xx)   *The Prepetition Documents are Safe Harbored Agreements.*, (a) the Prepetition PPSA Buyer is a "forward contract merchant" (as such term is defined in the Bankruptcy Code and used in section 556 of the Bankruptcy Code) and each purchase and sale agreed to under the Prepetition PPSA Documents and the Prepetition PPSA Documents themselves constitute "forward contracts" (as such term is defined in the Bankruptcy Code and as used in section 556 of the Bankruptcy Code); (b) the Prepetition PPSA Buyer is a "master netting agreement participant" and the Prepetition Documents are "master netting agreements" for all purposes as each such term is defined in sections 101(38A) and 101(38B) of the Bankruptcy Code and as used in section 561 of the Bankruptcy Code; (c) subject to the express terms of the Prepetition PPSA Documents, the Prepetition PPSA Buyer's right to liquidate, terminate, accelerate, net and set off rights and obligations under the Prepetition PPSA Documents is not stayed, avoided, or otherwise limited by the Bankruptcy Code, including sections 362(a), 547, 548 or 553 thereof, and the Prepetition PPSA Buyer is entitled to the rights, remedies and protections afforded by and under, among other sections, sections 362(b)(6),

WEIL:\98616197\1\76974.0003

362(b)(17), 362(b)(27), 546(e), 546(g), 546(j), 548(d), 553, 556, 560, 561 and 562 of the Bankruptcy Code.

(xxi) ~~(xx)~~ *Validity, Perfection and Priority of Prepetition Collateral Trust Liens, Prepetition First Lien Debt.* The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Collateral Trust Liens on the Prepetition First Lien Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Collateral Trust Liens were senior in priority over any and all other liens on the Prepetition First Lien Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition First Lien Debt Documents, solely to the extent any such permitted liens were, as of the Petition Date, valid, properly perfected (or are perfected subsequent to the Petition Date as permitted by section 546(b)), non-avoidable, and senior in priority to the Prepetition Collateral Trust Liens (such liens, the "**Permitted Prior Liens**"); (c) the Prepetition First Lien Debt constitutes legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition First Lien Debt Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Collateral Trust Liens or Prepetition First Lien Debt exist, and no portion of the Prepetition Collateral Trust Liens or Prepetition First Lien Debt is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law

25

equivalents, or actions for recovery or disgorgement, against any of the Prepetition First Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition First Lien Facilities; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition First Lien Debt, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Collateral Trust Liens securing the Prepetition First Lien Debt.

(xxii) ~~(xxi)~~ The Prepetition PPSA Buyer Property.  The Prepetition PPSA Buyer owns all right, title, and interest in the Coal and Fuel held at Included Locations (as such terms are defined in the Prepetition PPSA) (the "**PPSA Inventory**").  No Debtor has any right, title, or interest in the PPSA Inventory and, accordingly, the PPSA Inventory is not property of the Debtors' estate under section 541 of the Bankruptcy Code.

(xxiii) ~~(xxii)~~ [Reserved.]

(xxiv) ~~(xxiii)~~ *Validity, Perfection and Priority of Prepetition RCF Cash Liens*. The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition RCF Cash Liens on the Prepetition RCF Cash Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Revolving Credit Facility Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition RCF Cash Liens were senior in priority over any and all other liens on the Prepetition RCF Cash Collateral; (c) the Prepetition Revolving Credit Facility Debt constitutes legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Revolving Credit Facility Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the

Prepetition RCF Cash Liens and no portion of the Prepetition RCF Cash Liens is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Revolving Credit Facility Debt, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition RCF Cash Liens securing the Prepetition Revolving Credit Facility Debt.

(xxv) ~~(xxiv)~~ *Validity, Perfection and Priority of Prepetition CAF Cash Liens.* The Debtors acknowledge and agree that, as of the Petition Date, (a) the Prepetition CAF Cash Collateral Liens on the Prepetition RCF Cash Collateral and TEM Cash Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Commodity Accordion Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition CAF Cash Collateral Liens were senior in priority over any and all other liens on the Prepetition RCF Cash Collateral (but subject and subordinate to the Prepetition RCF Cash Liens pursuant to the Cash Collateral Intercreditor Agreement) and the TEM Cash Collateral; (c) the Prepetition Commodity Accordion Debt constitutes legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Commodity Accordion Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition CAF Cash Collateral Liens and no portion of the Prepetition CAF Cash Collateral Liens is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) the

Debtors waive, discharge, and release any right to challenge any of the Prepetition Commodity Accordion Debt, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition CAF Cash Collateral Liens securing the Prepetition Commodity Accordion Debt.

(xxvi) (xxv) *Validity, Perfection and Priority of MUFG Cash Liens*.   The Debtors acknowledge and agree that as of the Petition Date (a) the MUFG Cash Liens on the MUFG Cash Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the MUFG for fair consideration and reasonably equivalent value; (b) the MUFG Cash Liens were senior in priority over any and all other liens on the MUFG Cash Collateral; and (c) the Debtors waive, discharge, and release any right to challenge the validity, extent, and priority of the MUFG Cash Liens on the MUFG Cash Collateral.

(xxvii) (xxvi) *MUFG Bank Letter of Credit Facility*.

(a)      To provide credit support for those certain 2009B Bonds, MUFG Bank, LTD. ("**MUFG Bank**") issued Irrevocable Transferable Direct Pay Letter of Credit No. S528838N for the benefit of The Bank of New York Mellon Trust Company, N.A., as Trustee under the Series 2009B Trust Indenture (the "**2009B Direct Pay LC**"), which 2009B Direct Pay LC is required to be and is fully backstopped by that certain Irrevocable Standby Letter of Credit No. SB-52358 issued by Natixis (the "**2009B Backstop LC**"), which is an Existing Letter of Credit.  TES and MUFG Bank are party to that certain Letter of Credit Reimbursement Agreement (Series 2009B), dated as of February 3, 2021 (the "**2009B Reimbursement Agreement**"), pursuant to which TES is obligated to, inter alia, reimburse MUFG Bank for any drawings honored by MUFG Bank under the 2009B Direct Pay LC, either via a direct payment by TES or via a

WEIL:\98616197\1\76974.0003

drawing under the 2009B Backstop LC.  In addition, pursuant to the 2009B Reimbursement Agreement and the 2009B Backstop LC, in the event that TES commences a voluntary bankruptcy case, MUFG Bank is permitted to draw under the 2009B Backstop LC in the amount of all draws under the 2009B Direct Pay LC during the ninety days immediately preceding the commencement of such case and for which MUFG Bank was reimbursed from or on behalf of TES (other than from under the 2009B Backstop LC).

(b)      To provide credit support for those certain 2009C, MUFG Bank issued Irrevocable Transferable Direct Pay Letter of Credit No. S528839N for the benefit of The Bank of New York Mellon Trust Company, N.A., as Trustee under the Series 2009C Trust Indenture (the "**2009C Direct Pay LC**," and, together with the 2009B Direct Pay LC, the "**Direct Pay LCs**"), which 2009B Direct Pay LC is required to be and is fully backstopped by that certain Irrevocable Standby Letter of Credit No. SB-52359 issued by Natixis (the "**2009C Backstop LC**," and, together with the 2009B Backstop LC, the "**Backstop LCs**").  TES and MUFG Bank are party to that certain Letter of Credit Reimbursement Agreement (Series 2009C), dated as of February 3, 2021 (the "**2009C Reimbursement Agreement**," and, together with the 2009B Reimbursement Agreement, the "**Reimbursement Agreements**," and the Reimbursement Agreements together with the Direct Pay LCs and the Backstop LCs, the "**Letter of Credit Agreements**," and the credit support provided by MUFG Bank thereunder, the "**MUFG Bank Letter of Credit Facilities**"), pursuant to which TES is obligated to, inter alia, reimburse MUFG Bank for any drawings honored by MUFG Bank under the 2009C Direct Pay LC, either via a direct payment by TES or via a drawing under the 2009C Backstop LC.  In addition, pursuant to the 2009C Reimbursement Agreement and the 2009C Backstop LC, in the event that TES commences a voluntary bankruptcy case, MUFG Bank is permitted to draw under the 2009C

WEIL:\98616197\1\76974.0003

Backstop LC in the amount of all draws under the 2009C Direct Pay LC during the ninety days immediately preceding the commencement of such case and for which MUFG Bank was reimbursed from or on behalf of TES (other than from under the 2009C Backstop LC).

(c)     MUFG Bank does not control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Letter of Credit Agreements.  No claims or causes of action are held by the Debtors or their estates exist against, or with respect to, MUFG Bank under the Letter of Credit Agreements.

(d)     Good and sufficient cause has been shown for authorization of TES to continue, in its discretion, to honor its obligations under the Reimbursement Agreements, and authorizing TES, to incur post-petition credit under the Letter of Credit Agreements (as defined below) on a post-petition basis and providing related relief as set forth herein.  Maintaining the regular operation of the Letter of Credit Agreements and the MUFG Bank Letter of Credit Facilities on a post-petition basis is in the best interests of the Debtors and their estates.  The post-petition financing provided under the Letter of Credit Agreements and the related relief set forth herein have been negotiated in good faith and at arm's length among the Debtors and MUFG Bank, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the MUFG Bank Letter of Credit Facilities, and the Letter of Credit Agreements shall be deemed to have been extended by MUFG Bank in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and MUFG Bank (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this

WEIL:\98616197\1\76974.0003

Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise. Upon entry of this Interim Order, TES' continued performance under the Letter of Credit Agreements and the MUFG Bank Letter of Credit Facilities reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(xxviii)   (xxvii) *No Control.*  None of the Prepetition First Lien Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition First Lien Debt Documents.

(xxix)   (xxviii) *No Claims or Causes of Action.*  No claims or causes of action exist that are held by the Debtors or their estates against, or with respect to, any Prepetition Revolving Credit Facility Secured Party, Prepetition Term Loan Secured Party, Prepetition Commodity Accordion Secured Party, 7.25% Notes Secured Party, and 6.625% Notes Secured Party, the Prepetition PPSA Buyer, and any 7.625% Notes Secured Party, any Eligible Commodity Hedging Counterparty or Interest Rate Hedge Bank (as defined in the Prepetition Intercreditor) that is a Prepetition First Lien Secured Party, (collectively, the "**Prepetition Credit and Notes Secured Parties**") under the Prepetition Revolving Credit Facility Documents, Prepetition Term Loan Facility Documents, Prepetition Commodity Accordion Facility Documents, Prepetition 7.25% Senior Notes Documents, Prepetition 6.625% Senior Notes Documents, Prepetition 7.625% Senior Notes Documents, Secured Hedge Agreements (as defined in the Prepetition Intercreditor Agreement), the Prepetition PPSA Documents, (collectively, the "**Prepetition Credit and Notes Documents**"), the Prepetition Guarantee and Collateral Agreement, or the Prepetition Intercreditor Agreement; *provided*, for the avoidance of

31

doubt, that the releases set forth in this section shall not (i) apply to any executory obligations arising in the ordinary course on account of any ongoing transactions, including any hedging transactions, between any of the Debtors and any of the Prepetition Credit and Notes Secured Parties set forth in separate documents other than the Prepetition Credit and Notes Documents (such separate documents, the "**Other Documents**"), pursuant to the terms thereof or (ii) impair any of the Debtors' or any of the Prepetition First Lien Secured Parties' claims, rights and defenses under the Prepetition Intercreditor Agreement.

(xxx) ~~(xxix)~~ *Release*.  Effective as of the date of entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Credit and Notes Secured Parties, the DIP Secured Parties, MUFG Bank, and each of their respective Representatives (as defined herein) (collectively, the "**Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition Credit and Notes Documents, the MUFG Bank Letter of Credit Facilities, the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder, in each case

that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order; *provided*, for the avoidance of doubt, that the releases set forth in this section shall not apply to any claims, defenses, or rights arising in the ordinary course on account of any ongoing transactions, including any hedging transactions, between any of the Debtors and any of the Released Parties under any Other Documents, pursuant to the terms thereof, or any rights of the Debtors to enforce performance of continuing obligations of any Released Parties under such Other Documents (subject to the terms of all first-day orders entered by the Court, including the Cash Management Order).

G.     *Cash Collateral.*  All of the Debtors' cash, wherever located and held, including any cash in deposit accounts (whether subject to control agreements or otherwise), other than the Prepetition RCF Cash Collateral, the CAF Cash Collateral, cash collateral posted to secure hedging prepetition hedging obligations of the Debtors ("**Prepetition Hedge Cash Collateral**") and/or the MUFG Cash Collateral, constitutes or will constitute "cash collateral" of the Prepetition First Lien Secured Parties and DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"); *provided* that, for the avoidance of doubt, any reversionary rights of the Debtors in the Prepetition RCF Cash Collateral, the CAF Cash Collateral, Prepetition Hedge Cash Collateral and/or the MUFG Cash Collateral shall constitute (i) DIP Collateral and (ii) Cash Collateral, in each case, upon reversion to any the Debtors.

33

H.      *Findings Regarding the DIP Financing and Use of Cash Collateral.*

(i)      Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Credit Agreement.

(ii)      The Debtors have an immediate and critical need to obtain the DIP Financing and to use Prepetition First Lien Collateral (including Cash Collateral) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to enter into, and continue to perform under hedging transactions and the PPSA Inventory Purchase,, to satisfy other working capital and operational needs and to fund expenses of these Chapter 11 Cases.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition First Lien Collateral, the incurrence of new indebtedness and the other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(iii)      The Debtors are unable to obtain financing on more favorable terms from sources other than the Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.    The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting the DIP Liens and the DIP Superpriority Claims (each as defined herein) to the DIP Secured Parties and Permitted Secured Hedge Providers and incurring Adequate Protection Obligations (as defined herein), in each case subject and subordinate to the Carve Out (as defined herein), under the

34

terms and conditions set forth in this Interim Order, the Hedging Order, and in the DIP Documents.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition First Lien Collateral and acquire equipment, inventory, and other personal property, all of which constitute Prepetition First Lien Collateral under the Prepetition First Lien Debt Documents that are subject to the Prepetition First Lien Secured Parties' security interests as set forth in the Prepetition First Lien Debt Documents, as applicable.

(v)    The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds, and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition First Lien Secured Parties under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring, products, proceeds, and profits, in existence as of the Petition Date, including balances of funds in the Debtors' prepetition and post-petition operating bank accounts, also constitute Cash Collateral.

(vi)    Based on the DIP Motion, the First Day Declarations, and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of Adequate Protection granted to the Prepetition First Lien Secured Parties as provided in paragraph 19 of this Interim Order, and the terms on which the Debtors may continue to use the Prepetition First Lien Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

(vii)    To the extent consent is required, the Prepetition First Lien Secured Parties have consented or are deemed to have consented under the Prepetition Intercreditor Agreement, the Prepetition Guarantee and Collateral Agreement, or any other applicable Prepetition Debt Document to the Debtors' use of Cash Collateral and the other Prepetition First Lien Collateral, and the Debtors' entry into the DIP Documents and the Permitted Hedges (as defined herein) in accordance with and subject to the terms and conditions in this Interim Order, the Hedging Order, and the DIP Documents.

(viii)    The DIP Financing (including, for the avoidance of doubt, both New Money DIP Facilities and Continuing L/C Facility), the Adequate Protection, and the use of the Prepetition First Lien Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition First Lien Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing, and the DIP Documents, including, without limitation: all loans made to, letters of credit issued at the request of, and guarantees issued by the Debtors pursuant to the DIP Documents, and any DIP Obligations shall be deemed to have been extended by the DIP Agent and the Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.  To the fullest extent permitted by applicable law, the Debtors and their counsel shall be exculpated from any claim or cause of action in connection with any opinions provided in connection with the Dip Documents.

(ix)     The Prepetition First Lien Secured Parties have acted in good faith regarding the DIP Financing (including, for the avoidance of doubt, both New Money DIP Facilities and Continuing L/C Facility) and the Debtors' continued use of the Prepetition First Lien Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence of and performance under the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Prepetition First Lien Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(x)     The Prepetition First Lien Secured Parties are entitled to Adequate Protection (as defined herein) pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code as and to the extent provided for in this Interim Order.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed Adequate Protection (as defined herein) and of the use of the Prepetition First Lien Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition First Lien Collateral, including the Cash Collateral; *provided* that nothing in this Interim Order, the Hedging Order, or the DIP Documents shall (a) be construed as the affirmative consent by any of the Prepetition First Lien Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order to the extent such consent has been or will be given, or (b) be construed as a consent by any party to the terms of any financing or any lien encumbering the Prepetition First Lien

Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by this Interim Order.

(xi) ~~The incurrence of DIP Superpriority Claims and granting of DIP Liens pursuant to certain hedging obligations (the "~~**Permitted Hedges**~~") in accordance with the terms of this Interim Order or the Final Order, as applicable, the DIP Documents, and~~ Pursuant to an order entered by the Court concurrently herewith, in form and substance reasonably satisfactory to the DIP Agent (the "**Hedging Order**"), ~~authorizing the Debtors to continue, enter into, or deem incurred on a post-petition basis, such Permitted Hedges reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties~~ the DIP Documents, and this Interim Order, the Debtors are authorized to enter into and continue certain Hedging Agreements (as defined in the Hedging Order, the "**Permitted Hedges**") with Consenting 1L Hedge Counterparties (as defined in the Hedging Order, and such Consenting 1L Hedge Counterparties with whom the Debtors enter into Permitted Hedges, the "**Permitted Secured Hedge Providers**") and Consenting FCMs (as defined in the Hedging Order).  The Debtors are hereby authorized to incur DIP Superpriority Claims and grant DIP Liens on account of obligations arising out of such Hedging Agreements "**Permitted Hedge Obligations**") in accordance with the terms of this Interim Order or the Final Order, as applicable, the DIP Documents, and the Hedging Order; _provided_, such obligations shall be Permitted Hedge Obligations notwithstanding the failure of the Debtors to comply with the covenants or other terms of the DIP Documentations with respect to their incurrence.  If the Debtors did not have access to reliable post-petition hedge counterparties, the DIP Agent and the DIP Lenders would not otherwise be willing to provide the DIP Facilities or extend credit to the Debtors thereunder. The Permitted Hedges will (a) create greater availability under the DIP Facilities, (b) benefit the

Debtors and their estates because they will avoid the termination of such hedging arrangements and it will enable the Debtors to obtain urgently needed financing critical to administering these Chapter 11 Cases and funding their operations and (c) enable the Debtors to maintain hedging obligations to mitigate energy, commodity, and interest rate risk inherent in the Debtors' operations.

(xii)     Upon entry of this Interim Order, the deemed issuance of letters of credit under the Continuing L/C Facility reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The Prepetition Revolving Credit Facility Lenders and Prepetition Collateral Trustee would not otherwise consent to the use of their Cash Collateral or the subordination of their the Prepetition Collateral Trust Liens to the DIP Liens the Continuing L/C Issuers would not agree to renew, extend, and modify the Existing Letters of Credit, in accordance with the DIP Documents and this Interim Order and to provide such additional commitments with respect to the Revolving Facility as set forth in the DIP Documents, and the DIP Agent and the Prepetition Revolving Credit Facility Lenders that are Revolving Lenders would not be willing to provide the DIP Facilities or extend credit to the Debtors thereunder. The Continuing L/C Facility will (a) create greater availability under the DIP Facilities, (b) benefit the Debtors and their estates because it will enable the Debtors to obtain urgently needed financing critical to administering these Chapter 11 Cases and funding their operations, and (c) enable the Debtors to maintain outstanding prepetition letters of credit without interruption, which will provide critical reassurance to the Debtors' commercial counterparties and to the regulatory agencies overseeing the Debtors' operations, thereby protecting the value of the Debtors' estates.

(xiii)   The Debtors have prepared and delivered to the DIP Agent and the advisors to the Lenders an initial budget, attached hereto as **Exhibit A** (the "**Cash Flow Forecast**").  The Cash Flow Forecast reflects the Debtors' anticipated cash receipts, operating disbursements, and net cash flow for each calendar week during the period from the Petition Date through and including the thirteenth week following the Petition Date.  The Cash Flow Forecast has been approved by the Administrative Agent.  The Debtors believe that the Cash Flow Forecast is reasonable under the facts and circumstances.  The Administrative Agent and the Lenders are relying, in part, upon the Debtors' agreement to comply with the DIP Documents, this Interim Order, and the Hedging Order in determining to enter into the post-petition financing arrangements provided for in this Interim Order.

(xiv)   Each of the Prepetition First Lien Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition First Lien Collateral; provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order.

I.   *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) and Bankruptcy Local Rule 4001-1(b).  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing and the use of Prepetition First Lien Collateral (including Cash Collateral), in accordance with this Interim Order, the Hedging Order, and the DIP Documents are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  The DIP

Motion and this Interim Order comply with the requirements of Bankruptcy Local Rule 4001-1(b).

J.      *Permitted Prior Liens; Continuation of Prepetition Collateral Trust Liens.* Except to the extent explicitly set forth in any finding or stipulation in this Interim Order (subject, as applicable, to paragraph 25 hereof) with respect to the Prepetition RCF Cash Liens or any other Permitted Prior Lien, (i) nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable; and (ii) nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Agent, the Lenders or the Prepetition First Lien Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien and/or security interests.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject and subordinate to the DIP Liens (as defined herein).  The Prepetition Collateral Trust Liens and the DIP Liens that prime the Prepetition Collateral Trust Liens are continuing liens and the Prepetition First Lien Collateral is and will continue to be encumbered by such liens in light of the integrated nature of the DIP Facilities, the DIP Documents, and the Prepetition First Lien Debt Documents.  For the avoidance of doubt, the DIP Liens shall not prime the Prepetition RCF Cash Liens with respect to the Prepetition RCF Cash Collateral.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

WEIL:\98616197\1\76974.0003

1.      [Reserved.]

2.      *Objections Overruled*.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

3.      *Authorization of the DIP Financing and the DIP Document*.

(a)      The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Documents, and such other and further acts as may be necessary, appropriate, or desirable in connection therewith.  The Borrower is hereby authorized to borrow money, and obtain letters of credit (on behalf of itself or on behalf of other Debtors and/or Affiliates), pursuant to the DIP Credit Agreement, and each Guarantor is hereby authorized to provide a guaranty of payment in respect of the Borrower's obligations with respect to such borrowings, subject to any limitations under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtors, to perform under the PPSA Inventory Purchase and to pay interest, fees, and expenses and fund Adequate Protection Obligations and other payments in accordance with this Interim Order and the DIP Documents, as set forth in the DIP Documents.

(b)      In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements, and other similar documents), and to pay all fees and expenses in connection with or that may be reasonably required, necessary, or desirable for the Debtors' performance of their obligations under or related to the DIP Financing, including, without limitation:

WEIL:\98616197\1\76974.0003

(i)        the execution and delivery of, and performance under, each of the DIP Documents;

(ii)        the execution and delivery of, and performance under, one or more amendments, waivers, consents, or other modifications to and under the DIP Documents, in each case, in such form as the Debtors and the DIP Agent (acting in accordance with the terms of the DIP Credit Agreement), may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents, or other modifications to and under the DIP Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities, and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder, increase the aggregate commitments, or increase the rate of interest or fees calculated on commitments that are payable thereunder; provided, the Debtors shall not make any amendments or modifications to the DIP Documents that would increase, or have the effect of increasing, (x)  any related basket with respect to investments in the Talen Non-Debtors (as defined below) or (y) ~~S~~sections 10.01(b), ~~Section~~ 10.01(c), ~~Section~~ 10.04(b)(viii), and ~~Section~~ 10.07(b) of the DIP Credit Agreement without, in either instance, first providing five days' notice on the Court's docket;

(iii)        the non-refundable payment to the DIP Agent, the Lenders, in their respective capacities as such or as arrangers or underwriters, as the case may be, of all fees including, without limitation, letter of credit fees, letter of credit issuing fees, unused facility fees, amendment fees, prepayment premiums, early termination fees, servicing fees, audit fees, liquidator fees, structuring fees, underwriting fees, arranger fees, administrative agent's fees, collateral agent's fees, upfront fees, closing fees, commitment fees, backstop fees, exit fees,

43

prepayment fees, agency fees, and professional fees (which fees shall be irrevocable and shall be, and shall be deemed to have been, approved upon entry of this Interim Order, whether or not the fees arose before or after the Petition Date and whether or not the transactions contemplated hereby are consummated and, upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action, or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise by any person or entity) and any amounts due (or that may become due) in respect of any indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or the DIP Documents (or in any separate letter agreements, including, without limitation, between any or all Debtors, on the one hand, and any of the DIP Agent and/or Lenders, in such capacities or as arrangers or underwriters, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, reasonable and documented fees and expenses of the professionals retained by, or on behalf of, the DIP Agent (including, prior to the effectiveness of the Continuing L/C Facility with respect to all Prepetition Revolving Credit Facility Obligations (and at any time thereafter should the Continuing L/C Facility no longer be in effect with respect to all Prepetition Revolving Credit Facility Obligations), in the DIP Agent's capacity as Prepetition Revolving Credit Facility Agent) or any of the Lenders (including Davis Polk & Wardwell LLP, RPA Advisors, LLC, Haynes and Boone, LLP, any other local counsel engaged by the DIP Agent, and any other advisors as are permitted under the DIP Documents), in each case, as provided for in the DIP Documents (with respect to such professionals, the "**DIP Professional Fees and Expenses**"), without the need to file retention motions or fee applications; and

(iv)       the performance of all other acts required under or in connection with the DIP Documents, including the granting and perfection, as applicable, of the DIP Liens and DIP Superpriority Claims as permitted herein and therein.

4.     *DIP Obligations*.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable against each Credit Party and their estates in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").  Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the Administrative Agent, any of Lenders or DIP L/C Issuers, in each case, under, or secured by, the DIP Documents (including this Interim Order), including all principal, interest, costs, fees, premiums, expenses, and other amounts under the DIP Documents (including this Interim Order).  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall be due and payable, without notice or demand, except as otherwise required hereunder and under the DIP Documents, and the use of Cash Collateral shall automatically cease, in accordance with paragraph 13(d) of this Interim Order, on the Carve Out Trigger Date (as defined herein) or the occurrence of any event or condition set forth in paragraph 23(b) of this Interim Order.  Except as permitted hereby or in the Hedging Orders, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the Lenders (including

45

their Representatives (as defined herein)) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.      *Continuing L/C Facility*.  Effective immediately upon entry of this Interim Order, the Existing Letters of Credit, with an aggregate undrawn face amount of $[457,905,219] outstanding, are deemed to have been issued under the DIP Facilities and shall constitute DIP Obligations.  The deemed issuance of letters of credit under the Continuing L/C Facility into DIP Obligations as described in this paragraph 5 shall be deemed indefeasible and shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the Continuing L/C Issuers to renew, extend, and modify the Existing Letters of Credit, in accordance with the DIP Documents (including this Interim Order) and to provide such additional commitments with respect to the DIP Facilities as set forth in the DIP Documents, and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Revolving Credit Facility Debt.

6.      *Carve Out*.

WEIL:\98616197\1\76974.0003

(a) *Carve Out*. As used in this Interim Order, the "**Carve Out**" means the sum of: (i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iv) below); (ii) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $100,000, incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (d) below); (iii) to the extent allowed at any time, whether by interim or final compensation or other order, all accrued and unpaid claims for fees, costs and expenses (including any transaction fees or success fees then earned and payable as of the Carve Out Trigger Date) incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or retained by any official committee (the "**Committee**") appointed in the Cases pursuant to sections 328 or 1103 of the Bankruptcy Code (such professionals, collectively, the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**," and such fees, costs, and expenses of Professional Persons other than any such financing transaction fees with respect to the DIP Facility, the "**Professional Fees**"), at any time on or prior to the first business day after delivery of a Carve Out Notice (as defined herein), whether allowed before or after delivery of a Carve Out Notice and without regard to whether such fees, costs, and expenses are provided for in the Cash Flow Forecast or were invoiced after the Carve Out Trigger Date (as defined herein); (iv) any Professional Fees of the Debtors incurred after the first business day following delivery by of the Carve Out Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, in an aggregate amount not to exceed $20,000,000 (the amount set forth in this clause (iv) being the "**Debtor Post-Carve Out Cap**"); any Professional Fees of the Committee

WEIL:\98616197\1\76974.0003

incurred after the first business day following delivery by of the Carve Out Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, in an aggregate amount not to exceed $1,000,000 (the amount set forth in this clause (v) being the "**Committee Post-Carve Out Cap**" and, together with the Debtor Post-Carve Out Cap, the **"Post-Carve Out Caps**"), *provided*, that nothing herein shall be construed to, impair the ability of any party to object to the allowance of the fees, expenses, reimbursement or compensation described herein on any grounds.  For purposes of the foregoing, "**Carve Out Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Prepetition Collateral Trustee after (i) the DIP Obligations have been indefeasibly paid in full, in cash and (ii) any unused Commitments under the DIP Facilities terminated) to the Debtors, their lead restructuring counsel (Weil, Gotshal & Manges LLP), the U.S. Trustee, and lead counsel to the Committee (if any), with a copy to Kirkland & Ellis LLP, as lead counsel to that certain ad hoc group of holders of unsecured notes (the "**Unsecured Creditor Group**"), and each other Prepetition Agent, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein) and/or acceleration of the DIP Obligations (or, after (x) the DIP Obligations have been indefeasibly paid in full, in cash and (y) any unused Commitments under the DIP Facilities terminated, following the occurrence and during the continuation of an Event of Default that would provide a basis for termination of the Debtors' use of Cash Collateral) or the occurrence of the DIP Facilities Termination Date, stating that the Post-Carve Out Caps have been invoked.

(b)     *Professional Fees Account*.  On the day on which a Carve Out Notice is received by the Debtors (such date, the "**Carve Out Trigger Date**"), the Carve Out Notice shall constitute a demand to the Debtors to utilize all cash on hand to transfer to the Professional Fees

Account (as defined herein) cash in an amount equal to all obligations benefiting from the Carve Out.  On and after the Carve Out Trigger Date, the DIP Agent shall deposit into a segregated account of the Debtors not subject to the control of the DIP Agent, any DIP Lender or any Prepetition First Lien Secured Party (the "**Professional Fees Account**") any cash swept or foreclosed after delivery of the Carve Out Notice (including cash received as a result of the sale or other disposition of any assets) until the Professional Fees Account has been fully funded in an amount equal to all obligations benefiting from the Carve Out; provided that the DIP Secured Parties shall retain a residual security interest on any excess amount held in the Professional Fees Account following the payment in full of all Professional Fees and, following such payment in full, any such excess funds remaining in the Professional Fees Account shall be paid directly to the DIP Agent for the benefit of the Lenders, unless (i) the DIP Obligations have been indefeasibly paid in full, in cash and (ii) any unused Commitments under the DIP Facilities terminated, in which case any such excess shall be paid in accordance with the Relative Priorities (as defined herein) and otherwise in accordance with the terms of the Prepetition First Lien Debt Documents (including the Prepetition Intercreditor Agreement).  Notwithstanding anything to the contrary herein or in the DIP Documents, following delivery of a Carve Out Notice, the DIP Agent, the Lenders and the Prepetition First Lien Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Professional Fees Account has been fully funded in an amount equal to all obligations benefiting from the Carve Out.  For the avoidance of doubt, to the extent that Professional Fees of Professional Persons have been incurred by the Debtors at any time before or on the first business day after delivery by the DIP Agent or the Prepetition Revolving Credit Facility Agent, as applicable, of a Carve Out Notice but have not yet been

allowed, such Professional Fees of the Professional Persons shall constitute Professional Fees benefiting from the Carve Out upon their allowance, whether by interim or final compensation order and whether before or after delivery of the Carve Out Notice, and the Debtors shall fund the Professional Fees Account inclusive of the amount of such professional fees and expenses.

(c)     Notwithstanding anything to the contrary herein, (i) the failure of the Professional Fees Account to be funded in an amount equal to the full amount of the Professional Fees benefiting from the Carve Out shall not affect the priority of the Carve Out and (ii) in no way shall the Carve Out, Professional Fees Account, or the Cash Flow Forecast or any reporting relating thereto (or any good faith estimate of Professional Fees) be construed as a cap or limitation on the amount of the Professional Fees or the Statutory Fees due and payable by the Debtors or that may be allowed at any time (whether by interim order, final order, or otherwise).

(d)     *Payment of Professional Fees Prior to the Carve Out Trigger Date*.  Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Date in respect of any Professional Fees shall not reduce the Carve Out.

(e)     *Payment of Carve Out on or After the Carve Out Trigger Date*.  Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Date in respect of any Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(f)     *No Obligation to Pay Professional Fees*.  None of the DIP Agent, the Lenders, or the Prepetition First Lien Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code, regardless of whether payment of such fees or disbursement has been allowed by the Court.

Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the Lenders, or the Prepetition First Lien Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Persons or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

7.      *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations and Permitted Hedge Obligations (to the extent provided by, and in accordance with, the Hedging Order and the DIP Documents) shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall, in accordance with the DIP Documents (including this Interim Order and paragraph 25 hereof), subject and subordinate only to the Carve Out, be payable from and have recourse to all prepetition and post-petition pProperty of the Debtors and all proceeds thereof, excluding (a) the Prepetition RCF Cash Collateral, TEM Cash Collateral, the MUFG Cash Collateral, Prepetition Hedge Cash Collateral, but including the reversionary rights of the Debtors on each of the foregoing, and (b) any  claims

52

and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, and any other avoidance actions under the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law (collectively, "**Avoidance Actions**") but, subject to the entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise ("**Avoidance Proceeds**")) in accordance with the DIP Documents and this Interim Order, including paragraph 25 hereof, subject and subordinate only to the Carve Out.   The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.   The DIP Superpriority Claims shall all be senior to the 507(b) Claims (as defined herein), and the DIP Superpriority Claims granted to the Lenders on account of the New Money DIP Obligations, the Continuing L/C Obligations and to the Permitted Hedge Providers on account of the Permitted Hedge Obligations shall be *pari passu* in right of payment with one another.

WEIL:\98616197\1\76974.0003

8.      *DIP Liens*.  As security for the DIP Obligations, effective and automatically, properly, and validly perfected upon the date of this Interim Order and without the necessity of the execution, recordation, or filing by the Debtors or any of the DIP Secured Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, notation of certificates of title for titled goods or other similar documents, or the possession or control by the DIP Agent of, or over, any Property, and without any further action by the DIP Agent or the Lenders, the valid, binding, continuing, enforceable, and non-avoidable security interests and liens set forth in the following subparagraphs (all property identified in clauses (a) through (c) below shall herein be collectively referred to as the "**DIP Collateral**") are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Secured Parties (all such liens and security interests, the "**DIP Liens**").

(a)      *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully perfected, first priority security interest in and lien upon all prepetition and post-petition Property of the Debtors, whether existing on the Petition Date or thereafter acquired, that is not subject to a either a valid, perfected and non-avoidable lien on or as of the Petition Date or a valid and non-avoidable lien in favor of a third party and in existence immediately prior to the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.  "**Property**" means, all owned or hereafter acquired assets and property of a person or entity (including, without limitation, cash, general intangibles, inventory, accounts receivable, property, plant, equipment, owned and leased real property, fixtures, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property, claims and causes of action and capital stock of

54

subsidiaries), and the rents, issues, products, offspring, proceeds, and profits thereof; *provided* that, with respect to the Property of any Debtor, Property shall, in all circumstances, (i) exclude the Excluded Assets (as defined in the DIP Credit Agreement), (ii) exclude the PPSA Inventory, (iii) exclude any Avoidance Actions (but, subject to the entry of the Final Order, shall include any Avoidance Proceeds), and (iv) include, to the extent owned by any of the Debtors, any common or preferred equity, or other interest or claim, in or against any non-debtor entity or joint-venture or similar entity in which Talen Energy Corporation holds an interest, directly, or indirectly, including, without limitation, Cumulus Growth Holdings LLC or any of its subsidiaries (collectively, the "**Talen Non-Debtors**").

(b)     *Liens Priming Certain Prepetition Collateral Trust Liens*.   Pursuant to section 364(d)(1) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully perfected, first priority priming security interest in and lien upon (the "**Priming Liens**") all prepetition and post-petition Property of the Debtors that is currently purported to be subject to Prepetition Collateral Trust Liens, regardless of where locations, regardless of whether or not any Prepetition Collateral Trust Liens on the assets are voided, avoided, invalidated, lapsed, or unperfected, and such Priming Liens shall prime in all respects the interests of the Prepetition First Lien Secured Parties arising from current and future liens of the Prepetition First Lien Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition First Lien Secured Parties); *provided*, however, that, for the avoidance of doubt, nothing herein provides that the DIP Liens are deemed to prime any valid, non-avoidable statutory liens that (A) were perfected as of the Petition Date or (B) were in existence immediately prior to the Petition Date and are perfected subsequent to the Petition Date as permitted by section 546(b) of the

Bankruptcy Code and the rights of any party asserting such statutory lien (if any) are not amended or modified under this Interim Order with respect to such statutory lien. Notwithstanding anything herein to the contrary, the Priming Liens shall be (i) subject and subordinate to only the Carve Out and (ii) senior in all respects to the Prepetition Collateral Trust Liens and any Adequate Protection Liens granted hereby (collectively, the "**Primed Liens**").

(c)     *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and post-petition Property of each Credit Party that is subject to either (i) valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the Petition Date (other than the Primed Liens), (ii) the Prepetition RCF Cash Liens and any Permitted Prior Liens or (iii) any other valid and non-avoidable liens in favor of third parties (other than the Primed Liens) in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (such liens described in the foregoing clauses (i)-(iii), "**Existing Senior Liens**"), which shall be immediately junior and subordinate to such Existing Senior Liens; *provided* that nothing in the foregoing sentence shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such Existing Senior Liens are not permitted thereunder.

(d)     *DIP Liens Securing Certain Hedging Obligations*.  The hedging agreements with the Consenting 1L Hedge Counterparties the "**Permitted First-Lien Secured Hedges**") shall be secured by the DIP Liens up to the full extent of the Permitted Hedge Obligations thereunder and shall recover from the DIP Collateral and any proceeds thereof on a *pari passu* basis with the DIP Secured Parties in respect of the New Money DIP Obligations;

56

*provided* that the Consenting 1L Hedge Counterparties that are counterparties under such Permitted First-Lien Secured Hedges shall not have any independent right to exercise remedies or enforce against DIP Collateral and shall have no rights to direct or instruct the DIP Agent with respect to the foregoing; provided further that the DIP Agent shall not have any liability whatsoever in connection with the foregoing.

9.     *Relative Priority of Liens and Claims*.  Notwithstanding anything to the contrary in this Interim Order, the Hedging Order, the DIP Documents or any documentation relating to the Permitted Hedges, the relative priority (the "**Relative Priorities**") of each DIP Lien granted in the foregoing paragraph 8, the Primed Liens, the Existing Senior Liens, the Adequate Protection Liens, the DIP Superpriority Claims, the Superpriority Hedge Claims, and the Adequate Protection Claims (all subject to paragraph 25 hereof) shall be as set forth in **Exhibit B** attached hereto; *provided* that, the Prepetition Collateral Trust Liens and any Adequate Protection Liens granted to the holders thereof ~~on account of such~~shall remain subject to the Prepetition Intercreditor Agreement (after giving effect to the resolution of any Intercreditor Dispute and any successful Challenge (each as defined herein)); *provided*, *further*, that for the avoidance of doubt, each such lien and claim shall be subject and subordinate to (~~a~~i) the Carve-Out, (~~b~~ii) with respect to the Prepetition RCF Cash Collateral, TEM Cash Collateral, the MUFG Cash Collateral and any cash collateral pledged by the Debtors pursuant to or in compliance with the DIP Documents, the security interest of the beneficiary of such cash collateral, and (~~e~~iii) the rights of the Prepetition PPSA Buyer with respect to the PPSA Inventory, and (~~d~~iv) with respect to any Post-petition Exchange ~~Collateral and Postpetition Margin~~ Collateral posted to Consenting FCMs and Margin Collateral posted to Consenting 1L Hedge Counterparties (each as defined in the Hedging Motion) in accordance with the Hedging Orders and DIP Documents,

the security interest of the beneficiary of such Post-petition Exchange Collateral _or Margin Collateral, as applicable_; *provided*, *further*, that the DIP Liens shall attach on a first priority basis to any proceeds of and reversionary rights of the Debtors on certain Excluded Assets (as defined in the DIP Credit Agreement).

10. *Certain Hedging Matters.*

(a)     10. *FCM Hedges.* Notwithstanding anything to the contrary in this Interim Order~~.~~: (a) cash posted as Postpetition Exchange Collateral ~~(as defined in the Hedging Order)~~ to any Consenting FCM ~~(as defined in the Hedging Order)~~ shall not constitute ~~Excluded Assets, to the extent~~DIP Collateral; *provided* ~~for in the DIP Credit Agreement (with~~, that the Debtors' reversionary rights therein shall constitut~~ing~~e DIP Collateral~~) and (b) to the extent any~~; *provided*, *further*, that all rights of the DIP Secured Parties and the Prepetition Collateral Trustee are reserved to demand and pursue the prompt return of any cash posted as Postpetition Exchange Collateral ~~constitutes DIP Collateral, then the liens and security interests~~in contravention of the DIP Documents or any order of the Court, and all rights and defenses of the applicable Consenting FCM ~~in such Postpetition Exchange Collateral shall be senior in all respects to the DIP Liens and any Adequate Protection Liens thereon.~~are reserved with respect to any such demand or pursuit; (b) for the avoidance of doubt, any knowing violation by the Debtors of the limitations on hedging transactions and cash posting to support hedging transactions set forth in sections 10.01(b), 10.01(c), 10.04(b)(viii), and 10.07(b) of the DIP Credit Agreement shall be deemed to be a willful violation of this Interim Order; (c) promptly following the close of business on each business day, the Debtors shall provide to the DIP Agent and its advisors a copy of the settlement report for all hedging transactions (including both FCM and bilateral hedges) for such business day (it being understood that the inadvertent failure to deliver such

58

report, cured or waived by the DIP Agent within 3 business day thereafter or 1 business day upon delivery of notice of failure to provide, shall not be an Event of Default hereunder or under the DIP Documents; and (d) with respect to the Final Order, the rights of all parties are reserved with respect to the matters set forth in this paragraph 10(a).

(b)    All rights of the DIP Secured Parties and the Prepetition Collateral Trustee are reserved to demand and pursue the prompt return of any cash posted as Postpetition Exchange Collateral in contravention of the DIP Documents or any order of the Court.  Nothing in this Interim Order limits any safe harbor or automatic stay exemption applicable to any Consenting FCM or Consenting 1L Hedge Counterpartyies (as defined in the Hedging Motion) or any automatic stay relief granted thereto under the Hedging Order, unlessexcept as otherwise agreed to by the parties.

11.    *Maintenance of Letters of Credit*.  To the extent permitted by the DIP Documents, the Debtors are authorized to maintain and renew letters of credit issued or deemed issued under the DIP Documents and to take all actions reasonably appropriate with respect thereto on an uninterrupted basis, all in accordance with the same practices and procedures and subject to the same documents under which they were issued as were in effect prior to the Petition Date; *provided* that, with respect to any extended, renewed, or replacement Continuing Letter of Credit, the face amount shall not be increased and the purpose, primary terms, and respective beneficiary shall not be altered (other than with respect to a name change or a successor legal entity resulting from an acquisition or merger), and no new letters of credit shall be issued under the Continuing L/C Facility except as may be necessary to facilitate any such extension, renewal, or replacement pursuant to the terms thereof and the terms of the Prepetition Revolving Credit Facility.  For the avoidance of doubt, the Borrower shall not be permitted nor required to

59

reimburse any DIP L/C Issuer for the principal amount of any Loan resulting from a drawing under any Continuing Letter of Credit prior to the satisfaction in full of the New Money DIP Obligations.

12.     *Prepetition RCF Cash Collateral.*  Notwithstanding anything to the contrary herein, unless and until the Continuing L/C Facility has become effective with respect to all Prepetition Revolving Credit Facility Obligations, or no longer remains effective with respect to all Prepetition Revolving Credit Facility Obligations:  (a) the Prepetition RCF Cash Liens shall remain and be in full force and effect for the benefit of the Prepetition Revolving Credit Facility Secured Parties and shall not be in any way primed or impaired by the DIP Liens or any other term or provision of this Interim Order; (b) the Debtors shall not be permitted to use, remove or otherwise disturb the Prepetition RCF Cash Collateral; (c) the Prepetition Revolving Credit Facility Agent and the Depository Bank (as defined in each of the First RCF Cash Collateral Agreement and the Second RCF Cash Collateral Agreement, respectively), shall be permitted to take, withdraw, transfer, and/or apply all amounts thereunder in accordance with the Prepetition Revolving Credit Facility Documents (including following the occurrence of a draw on any Existing Letter of Credit), without notice or demand to any party or any further relief from this Court; *provided* that the Prepetition Revolving Credit Facility Secured Parties shall be permitted to issue any such notice or demand in their sole discretion; (d) the Prepetition Revolving Credit Facility Secured Parties shall have no obligation to the Debtors hereunder to renew, extend, or replace any Existing Letter of Credit (and shall be permitted to send non-extension notices with respect thereto) (it being understood that any such obligation will be replaced and shall exist only to the extent provided for in the Continuing L/C Facility); (e) the Debtors shall be authorized to pay fees and reimburse expenses to the Prepetition Revolving Credit Facility

Secured Parties and/or to provide cash collateral thereto in connection with any agreed extension, renewal, or replacement of an Existing Letter of Credit; and (e) no action of the Prepetition Revolving Credit Facility Secured Parties shall be deemed to constitute a violation of the Automatic Stay.

13.     *Protection of Lenders' Rights*.

(a)     So long as there are any DIP Obligations or DIP Letters of Credit not fully cash collateralized or the Lenders have any outstanding Commitments under the DIP Documents, the Prepetition First Lien Secured Parties shall, subject, and without prejudice, to their rights under the Prepetition Intercreditor Agreement: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition First Lien Debt Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens (as defined herein); (ii) be deemed to have consented under any applicable Prepetition First Lien Debt Documents to any transfer, disposition or sale of, or release of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition, or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the Commitments), to the extent the transfer, disposition, sale, or release is authorized by the applicable DIP Secured Parties in accordance with the DIP Documents; provided that, notwithstanding the foregoing, nothing herein shall constitute, or be deemed to constitute, the Prepetition First Lien Secured Parties' acknowledgement or agreement that any transfer, disposition, sale, or release is a prudent exercise of the Debtors' reasonable business judgment, in the best interest of the Debtors' estates, or otherwise authorized under any applicable law, including the Bankruptcy Code, and nothing in this paragraph 13(a) shall limit the rights of any

Prepetition First Lien Secured Party to raise objections or otherwise make arguments in respect of the foregoing; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than as necessary to give effect to this Interim Order other than, (x) solely as to this clause (iii), the Collateral Agent filing financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or (y) as may be required by applicable state law to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the Lenders or other documents necessary to effectuate and/or evidence the release, termination, and/or assignment of liens on any portion of the DIP Collateral subject to any court-approved disposition.

(b)     To the extent any Prepetition First Lien Secured Party has possession of any Prepetition First Lien Collateral or DIP Collateral or has control with respect to any Prepetition First Lien Collateral or DIP Collateral, or has been noted as a secured party on any certificate of title for a titled good constituting Prepetition First Lien Collateral or DIP Collateral, then such Prepetition First Lien Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the Lenders, and such Prepetition First Lien Secured Party and the Prepetition Agents shall comply with the instructions of the Collateral Agent with respect to the exercise of such control.

(c)     So long as there are any DIP Obligations or DIP Letters of Credit not fully cash collateralized or the Lenders have any outstanding Commitments under the DIP

Documents, any proceeds of Prepetition First Lien Collateral subject to the Primed Liens received by any Prepetition First Lien Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition First Lien Collateral or otherwise received by any of the Prepetition Agents (but excluding any fees or expenses paid for the benefit of professionals thereof in accordance with this Interim Order), shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements.  The DIP Agent is hereby authorized to make any such endorsements as agent for each of the Prepetition Agents or any such Prepetition First Lien Secured Party.  This authorization is coupled with an interest and is irrevocable.

(d)     The Automatic Stay is hereby modified to the extent necessary to permit the DIP Agent, acting with the requisite authority under the DIP Documents, to take any or all of the following actions, at the same or different time, immediately upon the occurrence of an Event of Default (subject to the terms of this Interim Order), and, in the case of the actions set forth in the following provisions (i) and (ii), without further order or application of the Court: (i) deliver a notice of an Event of Default and/or Carve Out Notice; (ii) declare (1) the termination, reduction, or restriction of any further Commitments (including, without limitation, any commitment to issue, renew, or extend any letters of credit under the DIP Documents, and to send notices of non-extension with respect to letters of credit) to the extent any such Commitment remains outstanding, (2) all DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors, and/or (3) the termination of the DIP Facilities with respect to any future liability or obligation of the DIP Agent and the Lenders, but, for the avoidance of doubt, without

affecting any of the DIP Liens, DIP Superpriority Claims, or the DIP Obligations, and (iii) upon the giving of 5 business days' notice to the Debtors (extended to the next business day if such five calendar day period shall expire on a day that is not a business day), which shall run concurrently with any notice required to be provided under the DIP Documents and, subject to entry of further order of the Court, which may fashion an appropriate remedy at the hearing pursuant to a Stay Relief Motion (as defined below), including (1) terminate the consensual use of Cash Collateral and (2) exercise all other rights and remedies provided for in the DIP Documents and under applicable law (subject to the terms of this Interim Order).  Following the delivery of such notice, the DIP Agent may file a motion (the "**Stay Relief Motion**") seeking emergency relief from the automatic stay.  In any hearing regarding any exercise of rights or remedies under the DIP Documents, the Debtors may seek relief from the Court seeking to stay the DIP Agent's exercise of any rights and remedies (including seeking to use cash collateral on a non-consensual basis).  The Debtors shall not object to any motion for such a hearing to be heard on shortened notice.  Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facilities (to the extent drawn prior to the occurrence of the Event of Default) or Cash Collateral to fund operations in accordance with the DIP Credit Agreement.

(e)      No rights, protections, or remedies of the DIP Agent or the Lenders granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified, or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order

WEIL:\98616197\1\76974.0003

or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

14.     *Limitation on Charging Expenses Against Collateral.*  Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition First Lien Collateral or Prepetition RCF Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, acting with the requisite authority under the DIP Documents, or the Prepetition Agents, acting with the requisite authority under the applicable series of Prepetition First Lien Debt, as applicable, and no consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the Lenders, the DIP Secured Parties, the Prepetition Agents, or the Prepetition First Lien Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the Lenders, the DIP Secured Parties, the Prepetition Agents, or the Prepetition First Lien Secured Parties to any charge, lien, assessment, or claim against the DIP Collateral or Prepetition First Lien Collateral under section 506(c) of the Bankruptcy Code or otherwise; provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order.

15.     *No Marshaling.*  In no event shall the DIP Agent, the Lenders, the Prepetition Agents or the Prepetition First Lien Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition First Lien Debt, or the Prepetition First Lien Collateral (including Cash Collateral),

provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Agents or the Prepetition First Lien Secured Parties with respect to proceeds, products, offspring, or profits of any Prepetition First Lien Collateral, provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order.

16.     *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agent by, through, or on behalf of the DIP Secured Parties pursuant to the provisions of this Interim Order, the Hedging Order, the DIP Documents, or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment, or other liability, including without limitation, any claim or charge arising out of or based on, directly or indirectly, section 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors, and solely in the case of payments made or proceeds remitted after the Carve Out Trigger Date, subject to the Carve-Out in all respects.

17.     *Use of Cash Collateral.*  The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, to use all Cash Collateral; *provided* that (a) the Prepetition First Lien Secured Parties are granted Adequate Protection as hereinafter set forth and (b) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

18.     *Disposition of DIP Collateral*.   The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, except as otherwise provided for in the DIP Documents, or otherwise permitted by an order of the Court.

19.     *Adequate Protection of Prepetition First Lien Secured Parties*.   The Prepetition First Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, to adequate protection (as set forth herein, the "**Adequate Protection**") of their interests in all Prepetition First Lien Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition First Lien Secured Parties' interests in the Prepetition First Lien Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution in value resulting from the sale, lease, or use by the Debtors of the Prepetition First Lien Collateral, the priming of the Prepetition Collateral Trust Liens by the Priming Liens pursuant to the DIP Documents and this Interim Order, the payment of any amounts under the Carve Out, and the imposition of the Automatic Stay (each such amount, an "**Adequate Protection Claim**").   In consideration of the foregoing, the Prepetition Agents for the benefit of the Prepetition First Lien Secured Parties, are hereby granted the following as Adequate Protection for, and to secure repayment of an amount equal to any such Adequate Protection Claim, and as an inducement to the Prepetition First Lien Secured Parties to consent to the priming of the Prepetition Collateral Trust Liens and use of the Prepetition First Lien Collateral (including Cash Collateral) (collectively, the "**Adequate Protection Obligations**"):

(a)     *Adequate Protection Liens*.   The Prepetition Agents, for their own benefit and for the benefit of the other Prepetition First Lien Secured Parties, are hereby granted (effective and perfected upon the date of this Interim Order, and without the necessity of the

WEIL:\98616197\1\76974.0003

execution of any mortgages, security agreements, pledge agreements, financing statements, or other agreements) to secure the Prepetition First Lien Secured Parties' Adequate Protection Claims, valid, perfected security interests in and liens upon (collectively, the "**Adequate Protection Liens**") all of the DIP Collateral that is owned by the Prepetition Credit Parties, in each case which shall be subject and subordinate to the Carve Out, the DIP Liens, and liens to which the DIP Liens are junior, all in accordance with the Relative Priorities, subject in all cases to any Intercreditor Dispute, the Prepetition Intercreditor Agreement and paragraph 25 hereof.

(b)      *Section 507(b) Claims*.  Each of the Prepetition Agents, for their own benefit and for the benefit of the other Prepetition First Lien Secured Parties, is hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (such claims, the "**507(b) Claims**") in the amount of the Prepetition First Lien Secured Parties' Adequate Protection Claims, with, except as set forth in the Relative Priorities, priority in payment over any and all administrative expenses of any kind specified or ordered pursuant to any provision of the Bankruptcy Code other than the DIP Superpriority Claims, which 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral that is owned by the Prepetition Credit Parties; *provided* that, notwithstanding anything to the contrary herein, the Prepetition First Lien Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the 507(b) Claims or in respect of any Prepetition First Lien Debt unless and until all DIP Obligations have been indefeasibly paid in full in cash.  For the avoidance of doubt and in accordance with the DIP Intercreditor Agreement, none of the Prepetition Agents (for their own benefit and for the benefit of the respective Prepetition First Lien Secured Parties they represent) shall assert their 507(b) Claims

unless and until the Continuing L/C Facility has become effective with respect to all Prepetition Revolving Credit Facility Obligations.

(c)     *Fees and Expenses*.   The Prepetition Collateral Trustee shall receive payment of reasonable and documented professional fees and expenses payable thereto in accordance with the Prepetition First Lien Secured Documents (collectively the "**Adequate Protection Fees and Expenses**"), including, but not limited to, the reasonable and documented fees and disbursements of counsel, financial advisors, and other consultants retained thereby. Reimbursement of the Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in paragraph 24 of this Interim Order.

(d)     *Prepetition First Lien Secured Parties' Information Rights*.   The Debtors shall continue to provide the Prepetition Agents with (i) financial and other reporting substantially in compliance with the documentation governing their respective series of Prepetition First Lien Debt; provided that, to the extent such financial and other reporting is not required by the terms of the DIP Documents, such reporting shall not be required by this clause (i) and (ii) ~~and~~ any reporting described in this Interim Order or provided for in the other DIP Documents; *provided* that each Prepetition Agent shall be entitled to receive any reporting provided to any other Prepetition Agent or the DIP Agent pursuant to ~~this~~Interim Order; *provided, further*, that, notwithstanding anything else herein, the foregoing shall not apply to any reporting required or made deliverable pursuant to paragraph 10(a) hereof.  To the extent the Debtors share business plan materials with any party in interest in the Cases, the Debtors shall also promptly (and in no event more than 3 business days thereafter) deliver copies of such materials to the DIP Agent and each Prepetition Agent for distribution to their constituent

WEIL:\98616197\1\76974.0003

Prepetition First Lien Secured Parties; *provided* that such distribution may be limited to parties that elect to receive information through a "private side" date-site or the equivalent.

20.     *Prepetition Intercreditor Agreement.*  Nothing in this Interim Order shall amend or otherwise modify the terms or enforceability of the Prepetition Intercreditor Agreement, including without limitation, the turnover and bankruptcy-related provisions contained therein, and the Prepetition Intercreditor Agreement shall ~~each~~ remain in full force and effect.  The rights of the Prepetition First Lien Secured Parties shall at all times remain subject to the Prepetition Intercreditor Agreement  For the avoidance of doubt, nothing in this paragraph 20 modifies any of the terms of the Prepetition Intercreditor Agreement.

21.     *Reservation of Rights of Prepetition First Lien Secured Parties.*   Under the circumstances and given that the above-described Adequate Protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds, solely for purposes of this Interim Order, that the Adequate Protection provided herein is reasonable and appropriate to protect the interests of the Prepetition First Lien Secured Parties and any other parties' holding interests that are secured by Primed Liens.

22.     *Perfection of DIP Liens and Adequate Protection Liens*.

WEIL:\98616197\1\76974.0003

(a)      Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 8 hereof and the Adequate Protection Liens granted pursuant to paragraph 19 hereof, the DIP Agent, the Lenders, the Permitted Secured Hedge Providers, and the Prepetition First Lien Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments in any jurisdiction, or take possession of or control over cash or securities (subject to paragraph 12 hereof), or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate and perfect the liens and security interests granted to them hereunder ("**Perfection Actions**"). Whether or not the DIP Agent, on behalf of the Lenders or the Prepetition First Lien Secured Parties shall, in their sole discretion, choose to take such Perfection Actions, the liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination (but subject to paragraph 25 hereof as to the Prepetition First Lien Secured Parties), at the time and on the date of entry of this Interim Order. Upon the request of the DIP Agent or the Prepetition Agents, each of the Prepetition First Lien Secured Parties and the Debtors, without any further consent of any party, is authorized (in the case of the Debtors) and directed (in the case of the Prepetition First Lien Secured Parties) to take, execute, deliver, and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve, and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized and directed to accept a certified copy of this Interim Order for filing and/or recording, as applicable.  The Automatic Stay shall be modified to the extent necessary to permit the applicable DIP Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

23.    *Preservation of Rights Granted Under this Interim Order.*

(a)    Other than the Carve Out and other claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent and the Lenders or the Prepetition Agents and the Prepetition First Lien Secured Parties shall be permitted while any of the DIP Obligations or Adequate Protection remain outstanding, and, except as otherwise expressly provided in this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board, or court for any liability of the Debtors; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.

(b)    The occurrence of any Event of Default (as defined in the DIP Credit Agreement) shall, after notice by the DIP Agent (acting in accordance with the terms of this Interim Order and the DIP Credit Agreement) in writing to the Borrower, constitute an event of default under this Interim Order (each an "**Event of Default**") and, upon any such Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in, and to the extent required by, the DIP Credit Agreement.  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code:  (A) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the

74

Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations, and Adequate Protection Obligations shall have been paid in full (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by this Interim Order shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests, referred to in this paragraph and otherwise in this Interim Order.

(c)     Notwithstanding anything else to the contrary in the DIP Documents or herein, it shall be an Event of Default for the Bankruptcy Court to enter an order in any of the Chapter 11 Cases confirming a chapter 11 plan that does not, upon to the consummation thereof provide for the termination of the aggregate Commitments and indefeasible payment in full in cash of the DIP Obligations (unless each holder thereof agrees to different treatment) and is otherwise acceptable to the DIP Agent.

(d)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect: (i) the validity, priority, or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur, or stay; or (ii) the validity, priority, or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any reversal, modification, vacatur, or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations, or Adequate Protection Liens incurred by the Debtors to the DIP Agent, the Lenders, the Prepetition Agents, or the Prepetition

75

First Lien Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the Lenders, the Prepetition Agents, and the Prepetition First Lien Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted in sections 364(e) and 363(m) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations, and Adequate Protection Obligations.

(e)      Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Agent, the Lenders, the Prepetition Agents, and the Prepetition First Lien Secured Parties granted by the provisions of this Interim Order, and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); and (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors having waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly

administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the Lenders, the Prepetition Agents, and the Prepetition First Lien Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents and the Commitments have been terminated.

24.     *Payment of Fees and Expenses*.  The Fee Letters and the Commitment Letter are hereby approved, and the Debtors are authorized to and shall pay the DIP Professional Fees, and Expenses as provided in the DIP Documents.  Subject to the review procedures set forth in this paragraph 24, payment of all DIP Professional Fees and Expenses and Adequate Protection Fees and Expenses shall not be subject to allowance or review by the Court or subject to the U.S. Trustee fee guidelines; *provided* that any time that such professionals seek payment of fees and expenses from the Debtors after the Initial Funding and prior to confirmation of a chapter 11 plan, each professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the Debtors, the U.S. Trustee, and counsel to the Committee, if any (collectively, the "**Review Parties**"); *provided, however*, that the U.S. Trustee and the Committee, if any, reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals.  Any objections raised by any Review

Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within 10 business days after the receipt by the Review Parties (the "**Review Period**").  If no written objection is received by 12:00 p.m., prevailing Central Time, at the end date of the Review Period, the Debtors shall pay such invoices within 5 business days.  If an objection to a professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  The Debtors are authorized and directed to pay on the Effective Date (as defined in the DIP Credit Agreement) the DIP Professional Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date without the need for any professional engaged by, or on behalf of, the DIP Secured Parties or the Prepetition First Lien Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Review Parties (other than the Debtors).  No attorney or advisor to the DIP Secured Parties or any applicable Prepetition First Lien Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the (i) DIP Secured Parties in connection with or with respect to the DIP Facilities; and (ii) Prepetition Revolving Credit Facility Agent (for the benefit of the Prepetition Revolving Lenders) in connection or with respect to these matters, are hereby approved in full and shall not be subject to any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

78

25.     *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes. The Debtors' stipulations, admissions, agreements, and releases contained paragraph F of this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) such committee or other party in interest that has or has been granted requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) and has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, without limitation, in this paragraph) by (i) 60 calendar days after entry of this Interim Order or (ii) any later date as has been agreed to, in writing, by the applicable Prepetition Agent (with respect to its respective series or tranche of Prepetition First Lien Debt) and the DIP Agent, and (iii) any later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph (the time period established by the foregoing clauses (i), (ii), and (iii), the "**Challenge Period**"), *provided* that if the Chapter 11 Cases are converted to chapter 7, or a chapter 7 or chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Period, any such estate representative or trustee shall receive the full benefit of any remaining time before expiration of the Challenge Period, which shall be extended for a period of sixty (60) calendar days, (A) objecting to or challenging the amount, validity,

perfection, enforceability, priority or extent of the Prepetition First Lien Debt or the Prepetition Collateral Trust Liens, or (B) otherwise asserting or prosecuting any action on behalf of the Debtors' estates for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims, or causes of action, objections, contests, or defenses of the Debtors (collectively, the "**Challenges**") against the Prepetition First Lien Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition First Lien Debt Documents, the Prepetition First Lien Debt, the Prepetition Collateral Trust Liens, and the Prepetition First Lien Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released, and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (i) the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order shall be binding on all parties in interest; (j) subject to the reservations of rights set forth in section F of this Interim Order, the obligations of the Debtors under the Prepetition First Lien Debt Documents, including the Prepetition First Lien Debt, shall constitute allowed claims not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether

80

equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (k) the Prepetition Collateral Trust Liens on the Prepetition First Lien Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors); and (l) any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) against any of the Prepetition First Lien Secured Parties and their Representatives arising out of or relating to any of the Prepetition First Lien Debt Documents, the Prepetition First Lien Debt, the Prepetition Collateral Trust Liens, and the Prepetition First Lien Collateral shall be deemed forever waived, released, and barred.  If any such Challenge is timely filed

WEIL:\98616197\1\76974.0003

during the Challenge Period, the stipulations, admissions, agreements, and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition First Lien Debt Documents, the Prepetition First Lien Debt or the Prepetition Collateral Trust Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any plan of reorganization.

26. *Investigations.* For the avoidance of doubt and notwithstanding any other provision of the Interim Order or any other order entered by the Court to the contrary, no portion of the Carve Out, DIP Loans, DIP Letters of Credit, Collateral, or Prepetition First Lien Collateral (including Cash Collateral) may be used directly or indirectly in connection with (a) the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation, (i) against any of the Lenders, the DIP Agent, or the Prepetition First Lien Secured Parties (whether in such capacity or otherwise), or any of each of their respective Representatives, or (ii) challenging the amount, validity, perfection, priority, or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Documents or in connection with the Prepetition

First Lien Debt, including, in each case without limitation, for lender liability or pursuant to Sections 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights and remedies granted to the Prepetition First Lien Secured Parties, the DIP Agent, or the Lenders under this Interim Order, the Prepetition First Lien Debt Documents, the DIP Documents, as applicable; (c) attempts to prevent, hinder, or otherwise delay any of the Lenders', DIP Agent's, or Prepetition First Lien Secured Parties' assertion, enforcement, or realization upon any Collateral in accordance with the DIP Documents and the Interim Order once an Event of Default has occurred and any applicable remedy notice period expired; *provided*, however, that the Debtors shall not be precluded from using Cash Collateral and/or proceeds from DIP Loans to contest whether an Event of Default has occurred and is continuing and/or prepare for and participate at any hearing held by the Bankruptcy Court regarding any exercise of rights or remedies under the DIP Documents; (d) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the obligations under or in respect of (i) the DIP Facilities, (ii) DIP Liens or the Prepetition Collateral Trust Liens, or (iii) any other rights or interest of any of the DIP Agent, the Lenders, or the Prepetition First Lien Secured Parties following the occurrence of an Event of Default; (e) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to or *pari passu* with the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, and 507(b) Claims granted to the Prepetition First Lien Secured Parties; or (f) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing

WEIL:\98616197\1\76974.0003

by the Lenders, expressly permitted under this Interim Order, or otherwise do not violate any terms of the DIP Documents, in each case unless all DIP Obligations, Prepetition First Lien Debt, Adequate Protection Obligations, and claims granted to the DIP Agent, the Lenders, or the Prepetition First Lien Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit), or otherwise agreed to in writing by the DIP Secured Parties; *provided* that, notwithstanding the foregoing sentence, up to, but no more than, $50,000 in the aggregate of the proceeds of the DIP Facility, the DIP Collateral, Prepetition First Lien Collateral, the Cash Collateral, and the Carve-Out may be used by any Committee to investigate (but not prosecute or Challenge, or initiate the prosecution of, including the preparation of any complaint or motion on account of) the Stipulations. Notwithstanding anything to the contrary set forth herein, to the extent any dispute arises between any of the Prepetition First Lien Secured Parties (an "**Intercreditor Dispute**"), the Debtors (but, for the avoidance of doubt, not any other party exercising derivative standing on behalf of the Debtors' estates) shall not be precluded from supporting or opposing any relief sought by any Prepetition First Lien Secured Party related to such Intercreditor Dispute and nothing herein shall abrogate or waive any rights of the Debtors to enforce the Prepetition Intercreditor Agreement or obligations owed to the Debtors by any of the Prepetition First Lien Secured Parties (without prejudice to limitations or waivers agreed to by the Debtors in other DIP Documents).

27.     *Limits to Lender Liability.*

(a)     Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition First Lien Secured Parties

(in each case, in their capacities as such) of any liability for any claims arising from the prepetition or post-petition activities of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their business, or in connection with their restructuring efforts.   Other than as a result of a willful violation of applicable law (including the Bankruptcy Code) or the DIP Documents by the DIP Secured Parties and the First Lien Secured Parties, as applicable, (a) the DIP Secured Parties and Prepetition First Lien Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition First Lien Collateral, including Cash Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and (b) all risk of loss, damage, or destruction of the DIP Collateral or Prepetition First Lien Collateral, including Cash Collateral, shall be borne by the Debtors.

(b)      In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the Prepetition First Lien Collateral (including the Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents, or the Prepetition First Lien Debt Documents, none of the DIP Secured Parties or Prepetition First Lien Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States

Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code).

28.     *Indemnification.*  The Prepetition First Lien Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facilities or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing,  Accordingly, without limitation to any other right to indemnification, the Prepetition First Lien Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition First Lien Documents and the DIP Documents, as applicable, including, without limitation, Section 13.01 of the DIP Credit Agreement.  The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in this paragraph 28 or in the DIP Documents, or in the Prepetition First Lien Debt Documents to indemnify and/or hold harmless the DIP Agent,  any other DIP Secured Party, or any Prepetition First Lien Secured Party, as the case may be, and any such defenses are hereby waived.

29.     *Letter of Credit Agreements.*  Each of the Debtors and MUFG Bank are authorized to perform, on a post-petition basis, all obligations under the Letter of Credit Agreements, including with respect to the reinstatement of the Direct Pay LCs and the Backstop LCs on a post-petition basis as contemplated therein and in accordance with the terms thereof and including with respect to all payments that TES is obligated to make to MUFG Bank under

the Reimbursement Agreements, and to pay MUFG Bank's attorneys' fees and costs incurred in connection with the Letter of Credit Agreements or these Cases, whether incurred prepetition or post-petition.   To the extent not paid by the Debtors, MUFG Bank shall have an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "**MUFG Bank Superpriority Claim**"), *pari passu* with all other superpriority administrative expense claims granted under this Order against the Debtors (but subject to and subordinate to the Carve Out and DIP Liens), for and in the amount of all amounts owed by the Debtors to MUFG Bank under the Letter of Credit Agreements and all of MUFG Bank's attorneys' fees and costs incurred in relation thereto or these Cases, whether incurred prepetition or post-petition.  MUFG Bank is hereby granted relief from the automatic stay to the full extent necessary to permit them to perform all obligations and to exercise all rights and remedies under the Letter of Credit Agreements in accordance with the terms thereof.  Any and all payments remitted to MUFG Bank (or their counsel, with respect to attorneys' fees and costs) by, through, or on behalf of TES pursuant to the provisions of this Interim Order, the Letter of Credit Agreements, or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment, or other liability.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect the validity, priority, or enforceability of any obligations of the Debtors under the Letter of Credit Agreements or hereunder incurred prior to the actual receipt of written notice by MUFG Bank of the effective date of such reversal, modification, vacatur, or stay. Notwithstanding any such reversal, modification, vacatur, or stay, any MUFG Bank Superpriority Claim incurred by the Debtors to MUFG Bank prior to the actual receipt of written notice by MUFG Bank of the effective date of such reversal, modification, vacatur, or stay shall

be governed in all respects by the original provisions of this Interim Order, and MUFG Bank shall be entitled to all the rights, remedies, privileges, and benefits granted in sections 364(e) of the Bankruptcy Code, this Interim Order and the Letter of Credit Agreements with respect to all any obligations of the Debtors under the Letter of Credit Agreements.  Except as expressly provided in this Interim Order or in the Letter of Credit Agreements, the MUFG Superpriority Claim and all other rights and remedies of MUFG Bank granted by the provisions of this Interim Order and the Letter of Credit Agreements shall survive, and shall not be modified, impaired, or discharged by: (a) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; or (b) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors having waived any discharge as to any remaining obligations to MUFG Bank under the Letter of Credit Agreements or hereunder.  The terms and provisions of this Interim Order and the Letter of Credit Agreements shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the MUFG Bank Superpriority Claim and all other rights and remedies of MUFG Bank granted by the provisions of this Interim Order and the Letter of Credit Agreements shall continue in full force and effect until the Direct Pay LCs have been terminated (and the originals thereof having been returned to MUFG Bank) and all obligations of TES to MUFG Bank under the Letter of Credit Agreements and hereunder have been indefeasibly paid in full in cash.

30.   *PPSA Inventory Purchase.*  The Debtors are authorized, but not directed, to perform the PPSA Inventory Purchase in accordance with the terms of the Prepetition PPSA.

31.    30. *Interim Order Governs*.   In the event of any inconsistency between the provisions of this Interim Order, the Hedging Order, the DIP Documents (including, but not limited to, with respect to Adequate Protection), or any other order entered by this Court (other than the Final Order), the provisions of this Interim Order shall govern.   Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents.

32.    31. *Binding Effect; Successors and Assigns*.   The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the Lenders, the Permitted Secured Hedge Providers, the Prepetition First Lien Secured Parties, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the Lenders, the Prepetition First Lien Secured Parties, MUFG Bank, and the Debtors and their respective successors and assigns; *provided* that the DIP Agent, the Lenders, the Permitted Secured Hedge Providers, the Prepetition First Lien Secured Parties, and MUFG Bank shall have no obligation to permit the use of DIP Collateral or the Prepetition First Lien Collateral, including Cash Collateral, by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

33.   ~~32.~~ *Master Proof of Claim*.  The Prepetition Agents and/or any other Prepetition First Lien Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to assert claims on behalf of themselves or the Prepetition First Lien Secured Parties for payment of the Prepetition First Lien Debt arising under the Prepetition First Lien Debt Documents, including, without limitation, any principal, unpaid interest, fees, expenses, and other amounts under the Prepetition First Lien Debt Documents.  The statements of claim in respect of such indebtedness set forth in this Interim Order, together with any evidence accompanying the DIP Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Agents is authorized to file in the Debtors' lead chapter 11 case *In re Talen Energy Supply, LLC.*, Case No. 22-90054 (MI), a master proof of claim on behalf of its respective Prepetition First Lien Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition First Lien Debt Documents and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors.  Upon the filing of a Master Proof of Claim by any of the Prepetition Agents, it shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition First Lien Debt Documents, and the claim of each applicable Prepetition First Lien Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition First Lien Secured Party acquired its claim from another party

90

and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 32 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition First Lien Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition First Lien Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Agent.  The DIP Agent and the Lenders shall similarly not be required to file proofs of claim with respect to their DIP Obligations under the DIP Documents, and the evidence presented with the DIP Motion and the record established at the Interim Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, secured status, and priority.

34.    33. *Insurance*.  To the extent that any of the Prepetition Agents is listed as loss payee under the Borrowers' or Guarantors' insurance policies, the DIP Agent shall also deemed to be the loss payee under the insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and thereafter to the payment of the applicable Prepetition First Lien Debt (consistent with the Prepetition Intercreditor Agreement), including, without limitation, title insurance on any Real Property (as defined in the DIP Credit Agreement) of the Debtors.

WEIL:\98616197\1\76974.0003

35.   34.  *Effectiveness*.   This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

36.   35.  *Modification of DIP Documents*.   The Debtors are hereby authorized, without further order of this Court, to enter into agreements with the DIP Secured Parties providing for any consensual modifications to the DIP Documents or of any other modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim Order, in each case consistent with the amendment provisions of the DIP Documents; *provided*, *however*, that notice of any material modification or amendment to the DIP Documents shall be provided to the U.S. Trustee which shall have 5 days from the date of such notice within which to object, in writing, to the modification or amendment, *provided, further,* that in connection with any material modification or amendment to the DIP Documents, the Debtors shall provide 5 days' prior written notice to the advisors to the Unsecured Creditor Group, the Ad Hoc Group of First Lien Creditors, the Ad Hoc Term Loan and Secured Notes Group, and the Ad Hoc Group of Crossholders.  If the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, the modification or amendment shall only be permitted pursuant to an order of the Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material modification on an expedited basis.

WEIL:\98616197\1\76974.0003

37. 36. *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

38. 37. *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral, or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the applicable DIP Agent and the Lenders and shall immediately turn over the proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

39. 38. *Miscellaneous*.  Upon request of the DIP Agent, the Debtors' advisors shall make themselves reasonably available (including for reasonable weekly telephone conferences) to discuss significant items and developments in the Chapter 11 Cases, including with respect to any material contracts, any material litigation, and any material operational or regulatory items. Upon request of the DIP Agent, the Debtors and Debtors' advisors shall also make themselves available for one update call per month at a reasonable time and upon reasonable advance notice with the DIP Agent, the Lenders, the Prepetition First Lien Secured Parties, and their respective advisors, covering the 13-week cash flow forecasts, the DIP variance reports, the Debtors' financial condition, business operations, liquidity and business plan, hedging and commodities exposure, and supply and the status of the Chapter 11 Cases generally.

40.  39. *Credit Bidding*.  (a) The DIP Secured Parties shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral and (b) subject to the Prepetition Intercreditor Agreement, the Prepetition First Lien Secured Parties shall have the right to credit bid up to the full amount of the Prepetition First Lien Debt (excluding any Prepetition First Lien Debt deemed outstanding as DIP Obligations) in any sale of the Prepetition First Lien Collateral, in each case, as provided for in section 363(k) of the Bankruptcy Code and subject to any successful Challenge, without the need for further order of the Court authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, but subject in all respects to the DIP Intercreditor Agreement and Relative Priorities.

41.  40. *Payment of Prepetition First Lien Secured Parties' Fees and Expenses*. Subject to the notice requirements set forth in paragraph 24 of this Interim Order, the Debtors shall be authorized, but not directed, to pay the reasonable and documented professional fees and expenses (collectively the "Secured Creditor Professional Fees and Expenses") for one primary counsel, one local counsel, and one financial advisor for each of the following: (a) an ad hoc group of Prepetition First Lien Secured Parties represented by Akin Gump Strauss Hauer & Feld LLP and Houlihan Lokey Capital, Inc. (the "**Ad Hoc Group of First Lien Creditors**"), (b) an ad hoc group of Prepetition First Lien Secured Parties represented by King & Spalding LLP and Houlihan Lokey Capital, Inc. (the "**Ad Hoc Term Loan and Secured Notes Group**"), and (c) an ad hoc group of "crossholder" creditors consisting of 2026 TLB Lenders and holders of Senior Secured Notes and Senior Unsecured Notes represented by (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as lead counsel, (ii) Porter Hedges LLP, (iii) Perella Weinberg

94

Partners LP, and (iv) Winston & Strawn LLP (the "**Ad Hoc Group of Crossholders**"), subject to recharacterization of such payments as principal payments under the applicable Prepetition First Lien Debt Documents in the event of a final determination by order of the Court that the Prepetition First Lien Secured Parties are undersecured (solely upon a motion filed by the Debtors, the Creditors' Committee or any other party in interest), in each case, so long as such creditor group independently holds not less than 2520% of the aggregate principal amount of all Obligations (as defined in the Prepetition Intercreditor Agreement) (excluding any indebtedness under Other First Lien Instruments) as evidenced by a disclosure filed with the Court pursuant to Bankruptcy Rule 2019 or such lower amount as agreed to by the Debtors in their sole discretion but in consultation with the DIP Agent.  In connection with any amount paid pursuant to this paragraph, the Debtors and the DIP Secured Parties shall be exculpated and held harmless from any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements incurred by, imposed on or assessed against any of the Debtors or the DIP Secured Parties, as applicable, as a result of, or arising out of, or in any way related to the payment of Secured Creditor Professional Fees and Expenses, including (but not limited to) any claims asserted or any other party's rights, protections, indemnifications, privileges, and defenses under the Prepetition Intercreditor Agreement and the other Prepetition First Lien Facilities with respect to any claims, causes of action, or otherwise arising from any such payments under this paragraph 40.  For the avoidance of doubt, the payment of any Secured Creditor Professional Fees and Expenses shall be within the Debtors' sole discretion, in consultation with the DIP Agent.  Notwithstanding anything to the contrary herein or in the DIP Documents, neither the payment of, nor failure to pay, any Secured Creditor Professional Fees and Expenses shall constitute an Event of Default or

terminate the Debtors' right to use cash collateral.  For the avoidance of doubt, neither the foregoing nor any payment made pursuant to this paragraph 40 is intended to be or shall be deemed to be an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.

42.  41. *Unsecured Creditor Group Matters*.  So long as that certain Restructuring Support Agreement, dated May 9, 2022, by and among the Debtors and the Consenting Parties (as defined therein), (the "**Restructuring Support Agreement**") has not been terminated:

(a)     subject to paragraph 24, the Debtors are authorized to pay in cash the accrued and unpaid reasonable and documented fees and out-of-pocket expenses incurred by the Unsecured Creditor Group Advisors, including Kirkland & Ellis LLP, as counsel, Rothschild & Co US Inc., as financial advisor, and other local or regulatory counsel or other advisors retained by the Unsecured Creditor Group; and

(b)     the Debtors shall substantially contemporaneously provide the Unsecured Creditor Group Advisors all required written information, financial reporting, and other periodic reporting that is required to be provided to the DIP Agent or the DIP Lenders under the DIP Loan Documents and the DIP Orders or to any of the Prepetition Agents in their capacities as such (including, without limitation, such information as is provided to the Prepetition Agents in accordance with paragraph 19(d)).  The Unsecured Creditor Group Advisors may share such information with any member of the Unsecured Creditor Group subject to applicable duties of confidentiality.  For the avoidance of doubt, the members of the Unsecured Creditor Group shall not be entitled to any consent right granted to the DIP Agent or any of the DIP Lenders with respect to such written financial reporting and other periodic reporting.

WEIL:\98616197\1\76974.0003

43.     *Permitted Secured Hedge Providers*.  Notwithstanding anything to the contrary herein, the Permitted Secured Hedge Providers are, with respect to Permitted Hedge Obligations owing thereto, granted the same rights, benefits, protections, and other relief as the DIP Secured Parties are granted with respect to DIP Obligations owing thereto pursuant to the following paragraphs hereunder: J, 6, 8, 13(a), 13(b), 13(c), 14, 15, 23(a), 23(d), 23(e), 32, and 38 and hereof.

44.     ~~42.~~ *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

45.     ~~43.~~ *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

46.     ~~44.~~ *Necessary Action*.  The Debtors, the DIP Secured Parties, and the Prepetition First Lien Secured Parties are authorized to take all actions as are necessary or appropriate to implement the terms of this Interim Order.  In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in these Chapter 11 cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

47.     ~~45.~~ *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

48.     ~~46.~~ *Final Hearing*.  The Final Hearing is scheduled for [•], 2022 at [•] [a/p].m. before this Court.

49.     47.  *Objections*.  Any party in interest objecting to the relief sought at the Final Hearing shall file a written objection no later than [●], 2022 at [●]:00 [a/p].m., prevailing Central Time.

50.     48.  The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing and to any party that has filed a request for notices with this Court.

Dated:    [●], Texas2022
          [●]Houston, 2022Texas

[●]MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

98



SUBJECT TO FEDERAL RULE OF EVIDENCE 408
STRICTLY CONFIDENTIAL

## Exhibit A

### ~~Budget~~Cash Flow Forecast

($ in millions)

| # | Week Number | 1 Forecast May-22 5/13/2022 | 2 Forecast May-22 5/20/2022 | 3 Forecast May-22 5/27/2022 | 4 Forecast Jun-22 6/3/2022 | 5 Forecast Jun-22 6/10/2022 | 6 Forecast Jun-22 6/17/2022 | 7 Forecast Jun-22 6/24/2022 | 8 Forecast Jul-22 7/1/2022 | 9 Forecast Jul-22 7/8/2022 | 10 Forecast Jul-22 7/15/2022 | 11 Forecast Jul-22 7/22/2022 | 12 Forecast Jul-22 7/29/2022 | 13 Forecast Aug-22 8/5/2022 | Weeks 1-13 Forecast 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Beginning Total Cash Balance(1)** | **$357.8** | **$608.3** | **$605.4** | **$637.7** | **$613.5** | **$608.5** | **$573.4** | **$840.2** | **$832.7** | **$889.9** | **$871.9** | **$1,000.9** | **$989.3** | **$357.8** |
| | **Receipts** | | | | | | | | | | | | | | |
| 1 | ISO Receipts | $2.9 | $26.1 | $39.0 | $40.3 | $48.9 | $55.4 | $91.4 | $97.5 | $92.3 | $96.8 | $150.5 | $168.2 | $165.3 | $1,074.5 |
| 2 | Other Margin | (0.3) | (0.3) | (0.1) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (1.3) | (0.3) | (0.9) | (1.1) | (10.5) |
| 3 | **Total Receipts** | **$2.6** | **$25.7** | **$38.9** | **$40.0** | **$48.5** | **$55.0** | **$91.0** | **$97.2** | **$91.4** | **$95.5** | **$147.2** | **$167.3** | **$164.2** | **$1,064.0** |
| 4 | Fuel & Other VOM | ($45.6) | ($7.9) | ($9.5) | ($6.8) | ($12.8) | ($21.6) | ($17.9) | ($43.0) | ($14.4) | ($22.3) | ($17.2) | ($105.3) | ($14.2) | ($338.5) |
| 5 | Bilateral Hedges | (10.1) | 13.5 | 12.6 | 9.8 | 0.0 | (29.5) | 9.6 | (8.9) | 18.1 | (29.8) | 11.7 | (25.2) | 22.4 | (5.7) |
| 6 | FCM Hedges | 1.1 | 0.0 | 8.9 | (0.0) | (22.2) | 0.0 | 0.0 | 0.0 | 10.7 | (28.6) | 0.0 | 7.8 | (47.9) | (70.3) |
| 7 | **Realized Cash Margin(2)** | **($52.0)** | **$31.3** | **$50.8** | **$43.0** | **$13.6** | **$3.9** | **$82.8** | **$55.5** | **$66.5** | **$43.4** | **$141.8** | **$44.5** | **$124.4** | **$649.5** |
| 8 | Owner Reimbursement | 5.1 | 10.7 | (0.4) | (0.4) | 2.4 | 8.7 | (0.5) | (0.5) | (0.5) | 10.9 | (0.5) | (0.5) | (0.4) | 34.2 |
| | **Operating Disbursements** | | | | | | | | | | | | | | |
| 9 | Trade | ($11.3) | ($11.0) | ($10.8) | ($8.1) | ($7.8) | ($7.1) | ($7.3) | ($8.1) | ($7.9) | ($7.2) | ($7.1) | ($6.5) | ($6.3) | ($106.4) |
| 10 | Payroll & Benefits | – | (12.0) | – | (12.0) | – | (13.2) | – | (13.0) | – | (15.0) | – | (11.7) | – | (76.9) |
| 11 | Other Operating Disbursements | (0.4) | (0.7) | (1.1) | (2.4) | (0.3) | (1.3) | (0.3) | (2.8) | (0.4) | (1.1) | (0.4) | (4.6) | (0.4) | (16.3) |
| 12 | **Total Operating Disbursements** | **($11.7)** | **($23.7)** | **($11.9)** | **($22.5)** | **($8.1)** | **($21.5)** | **($7.6)** | **($23.8)** | **($8.3)** | **($23.4)** | **($7.5)** | **($22.8)** | **($6.7)** | **($199.6)** |
| 13 | **Operating Cash Flow** | **($58.6)** | **$18.2** | **$38.5** | **$20.1** | **$7.9** | **($8.9)** | **$74.7** | **$31.2** | **$57.7** | **$31.0** | **$133.8** | **$21.2** | **$117.3** | **$484.1** |
| 14 | **Operating Cash Flow (excluding Hedges)** | **($49.5)** | **$4.7** | **$17.0** | **$10.3** | **$30.1** | **$20.6** | **$65.1** | **$29.3** | **$68.3** | **$60.7** | **$122.0** | **$38.6** | **$142.8** | **$560.1** |
| 15 | CapEx | (6.2) | (6.2) | (6.2) | (6.2) | (5.3) | (9.0) | (5.3) | (5.5) | (4.8) | (6.6) | (4.8) | (10.9) | (4.0) | (80.9) |
| 16 | **Operating Cash Flow less CapEx** | **($64.8)** | **$12.0** | **$32.3** | **$13.9** | **$2.5** | **($17.8)** | **$69.4** | **$25.8** | **$52.9** | **$24.4** | **$129.0** | **$10.3** | **$113.3** | **$403.2** |
| | **Financing Activity** | | | | | | | | | | | | | | |
| 17 | DIP Facility(3) | $790.0 | – | – | – | – | – | $197.5 | – | – | – | – | – | – | $987.5 |
| 18 | Interest & Fees(4) | (16.5) | – | – | – | – | – | – | (3.2) | – | – | – | – | – | (19.7) |
| 19 | Other Debt Draw/(Paydown) | (165.0) | – | – | – | – | – | – | – | – | – | – | – | – | (165.0) |
| 20 | **Total Financing Activity** | **$608.5** | **–** | **–** | **–** | **–** | **–** | **$197.5** | **($3.2)** | **–** | **–** | **–** | **–** | **–** | **$802.8** |
| | **Intercompany Activity** | | | | | | | | | | | | | | |
| 21 | LMBE-MC Intercompany | – | (14.9) | – | (1.3) | – | (17.3) | – | ($17.4) | $4.2 | (35.2) | – | – | (19.7) | ($101.5) |
| 22 | Cumulus Intercompany | (6.4) | – | – | (36.8) | – | – | – | (12.7) | – | – | (15.0) | – | – | (70.9) |
| 23 | **Total Intercompany Activity** | **($6.4)** | **($14.9)** | **–** | **($38.1)** | **–** | **($17.3)** | **–** | **($30.1)** | **$4.2** | **($35.2)** | **–** | **($15.0)** | **($19.7)** | **($172.4)** |
| | **Restructuring Disbursements** | | | | | | | | | | | | | | |
| 24 | Debtor Professional Fees | – | – | – | – | – | – | – | ($0.1) | – | – | – | ($7.0) | – | ($7.0) |
| 25 | Lender & Other Professional Fees | – | – | – | – | – | (7.5) | – | – | – | (7.2) | – | – | – | (14.7) |
| 26 | UST Fees | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 27 | Utilities Adequate Assurance | (1.0) | – | – | – | – | – | – | – | – | – | – | – | – | (1.0) |
| 28 | Cash Collateral | (285.7) | – | – | – | – | – | – | – | – | – | – | – | – | (285.7) |
| 29 | Adequate Protection | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 30 | **Total Restructuring Disbursements** | **($286.7)** | **–** | **–** | **–** | **–** | **($7.5)** | **–** | **–** | **($0.1)** | **–** | **($7.2)** | **–** | **($7.0)** | **($308.4)** |
| 31 | **Total Cash Flow** | **$250.6** | **($2.9)** | **$32.3** | **($24.2)** | **($4.9)** | **($35.1)** | **$266.9** | **($7.5)** | **$57.2** | **($18.0)** | **$129.0** | **($11.6)** | **$93.6** | **$725.2** |
| 32 | **Ending Total Cash Balance** | **$608.3** | **$605.4** | **$637.7** | **$613.5** | **$608.5** | **$573.4** | **$840.2** | **$832.7** | **$889.9** | **$871.9** | **$1,000.9** | **$989.3** | **$1,082.9** | **$1,082.9** |
| 33 | Less: Restricted Cash | (376.3) | (376.3) | (385.1) | (385.1) | (362.9) | (362.9) | (362.9) | (373.6) | (345.0) | (345.0) | (345.0) | (352.8) | (304.8) | (304.8) |
| 34 | Unrestricted Cash | $232.1 | $229.2 | $252.6 | $228.3 | $245.6 | $210.5 | $477.3 | $459.1 | $544.9 | $526.9 | $655.9 | $636.6 | $778.1 | $778.1 |
| 35 | Plus: DIP Revolver Availability | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 300.0 | 300.0 | 300.0 | 300.0 | 300.0 | 300.0 | 300.0 | 300.0 |
| 36 | **Total Liquidity** | ~~$232.1~~ **$307.1** | ~~$229.2~~ **$304.2** | ~~$252.6~~ **$327.6** | ~~$228.3~~ **$303.3** | ~~$245.6~~ **$320.6** | ~~$210.5~~ **$285.5** | **$777.3** | **$759.1** | **$844.9** | **$826.9** | **$955.9** | **$936.6** | **$1,078.1** | **$1,078.1** |
| | **Memo:** | | | | | | | | | | | | | | |
| | **FCM Restricted Cash Rollforward** | | | | | | | | | | | | | | |
| 37 | Beginning Restricted Cash | $256.7 | $286.8 | $286.8 | $295.7 | $295.7 | $273.5 | $273.5 | $273.5 | $284.2 | $255.6 | $255.6 | $255.6 | $263.3 | $256.7 |
| 38 | Collateral Posting / (Release) | 30.1 | – | 8.9 | (0.0) | (22.2) | – | – | 10.7 | (28.6) | – | – | 7.8 | (47.9) | (41.3) |
| 39 | FCM Ending Restricted Cash | $286.8 | $286.8 | $295.7 | $295.7 | $273.5 | $273.5 | $273.5 | $284.2 | $255.6 | $255.6 | $255.6 | $263.3 | $215.4 | $215.4 |
| 40 | Non-FCM Restricted Cash | 89.4 | 89.4 | 89.4 | 89.4 | 89.4 | 89.4 | 89.4 | 89.4 | 89.4 | 89.4 | 89.4 | 89.4 | 89.4 | 89.4 |
| 41 | Total Restricted Cash | $376.3 | $376.3 | $385.1 | $385.1 | $362.9 | $362.9 | $362.9 | $373.6 | $345.0 | $345.0 | $345.0 | $352.8 | $304.8 | $304.8 |
| | **DIP Facility** | | | | | | | | | | | | | | |
| 42 | Beginning Balance | – | $790.0 | $790.0 | $790.0 | $790.0 | $790.0 | $790.0 | $790.0 | $987.5 | $987.5 | $987.5 | $987.5 | $987.5 | – |
| 43 | DIP TL Draws / (Repayments)(3) | 790.0 | – | – | – | – | – | – | 197.5 | – | – | – | – | – | 987.5 |
| 44 | DIP Revolver Draws / (Repayments) | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 45 | **Ending Balance** | **$790.0** | **$790.0** | **$790.0** | **$790.0** | **$790.0** | **$790.0** | **$987.5** | **$987.5** | **$987.5** | **$987.5** | **$987.5** | **$987.5** | **$987.5** | **$987.5** |

(1) Projected beginning cash balance as of 5/10/22; profile reflects post-petition activity only
(2) Energy margin based on forward commodity pricing as of 4/29/2022
(3) Proceeds shown net OID
(4) Reflects 3-month Interest Period shown; no DIP Term Facility Interest is paid during the period shown



SUBJECT TO FEDERAL RULE OF EVIDENCE 408
STRICTLY CONFIDENTIAL

## Exhibit B

**Relative Priorities Grid**

| Priority[1] | Prepetition First Lien Collateral Owned by Prepetition Credit Parties | Prepetition First Lien Collateral Owned by Debtors that are not Prepetition Credit Parties | DIP Collateral that was Unencumbered As of the Petition Date | Prepetition RCF Cash Collateral | MUFG Cash Collateral | TEM Cash Collateral | Solely to the Extent Constituting Excluded Assets: Margin Collateral Posted to Consenting 1L Hedge Counterparties, Prepetition Hedge Cash Collateral | ~~Prepetition Hedge Cash Collateral /~~ [~~Post-petition~~ Postpetition Exchange Collateral~~]~~ |
|---|---|---|---|---|---|---|---|---|
| First | DIP Liens | DIP Liens | DIP Liens | Prepetition RCF Cash Liens | MUFG Cash Liens | Prepetition Junior CAF Liens | Liens of applicable hedge provider | Liens of applicable hedge provider |
| Second | Adequate Protection Liens | | Adequate Protection Liens (to the extent owned by Prepetition Credit Parties) | CAF Cash Collateral Liens | DIP Liens | DIP Liens | | ~~DIP Liens~~ |
| Third | Prepetition Collateral Trust Liens | | | DIP Liens | Adequate Protection Liens | Adequate Protection Liens | | ~~Adequate Protection Liens~~ |
| Fourth | | | | | Prepetition Collateral Trust Liens* | Prepetition Collateral Trust Liens | | ~~Prepetition Collateral Trust Liens~~ |

[1] For the avoidance of doubt, the DIP Secured Parties, the Permitted Secured Hedge Parties, and the Prepetition First Lien Secured Parties, as applicable, shall retain reversionary rights in the Debtors' interests in all posted collateral, even if such parties do not have direct liens on such collateral while posted.

#95747905v4