IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE:                           § CASE NO. 22-90054-11
                                 § HOUSTON, TEXAS
TALEN ENERGY SUPPLY, LLC,        § TUESDAY,
ET AL,                           § MAY 10, 2022
            DEBTORS.             § 4:00 P.M. TO 7:13 P.M.


<u>FIRST DAY HEARING</u>


BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE




APPEARANCES:                          SEE NEXT PAGE

        (RECORDED VIA COURTSPEAK; AUDIO ISSUES NOTED)






TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:


FOR THE DEBTOR:                   WEIL, GOTSHAL & MANGES
                                  Matt Barr, Esq.
                                  Paul Genender, Esq.
                                  767 Fifth Avenue
                                  New York, NY  10153
                                  212-310-8000

FOR AD HOC GROUP OF
UNSECURED NOTE HOLDERS:           KIRKLAND AND ELLIS, LLP
                                  Steven N. Serajeddini, Esq.
                                  Patrick Nash, Esq.
                                  Christopher Koenig, Esq.
                                  601 Lexington Avenue
                                  New York, NY  10022
                                  212-446-4800

FOR AD HOC TERM LOAN AND
SECURED NOTES GROUP:              KING & SPALDING, LLP
                                  Matthew L. Warren, Esq.
                                  Lindsey Henrikson, Esq.
                                  353 N. Clark Street
                                  12th Floor
                                  Chicago, IL  60654
                                  312-764-6921

FOR AD HOC GROUP OF
CROSSHOLDERS                      PAUL WEISS RIFKIND
                                  WHARTON & GARRISON LLP
                                  Alice B. Eaton, Esq.
                                  1285 Avenue of the Americas
                                  New York, NY 10019
                                  212-373-3000

FOR AD HOC GROUP OF
FIRST LIEN HOLDERS:               AKIN GUMP STRAUSS
                                  HAUER & FELD LLP
                                  Scott Alberino, Esq.
                                  Marty L. Brimmage, Esq.
                                  2300 N. Field Street
                                  Suite 1800
                                  Dallas, TX  75201
                                  214-969-2885

| | |
|---|---|
| 1 | **HOUSTON, TEXAS; TUESDAY, MAY 10, 2022; 4:00 P.M.** |
| 2 | THE COURT:  All right, good afternoon.  We're here |
| 3 | on first day hearings on the Talen Energy case.  It's |
| 4 | 22-90054.  Appearances have been made electronically. |
| 5 | So let me get the Debtor to start by telling me |
| 6 | where they think we should be going today.  You can make your |
| 7 | opening statement and then we'll hear from anyone else.  So |
| 8 | I'm going to ask the Debtor to please press -- whoever is |
| 9 | taking lead for the Debtor to please press the five star. |
| 10 | Somebody's already there that may be the Debtor. |
| 11 | (Pause in the proceeding.) |
| 12 | THE COURT:  From 312-862-9131. |
| 13 | (Pause in the proceeding.) |
| 14 | THE COURT:  Whoever is speaking may have their own |
| 15 | line muted.  312-862-9131. |
| 16 | (No audible response.) |
| 17 | THE COURT:  All right, let's try a different number. |
| 18 | 212-310-8000, who do we have. |
| 19 | MR. BARR:  Your Honor, this is Matt Barr from Weil |
| 20 | Gotshal, can you hear me? |
| 21 | THE COURT:  Yes. |
| 22 | MR. BARR:  Thank you. |
| 23 | THE COURT:  Mr. Barr, what number are you dialing in |
| 24 | from Mr. Barr?  That 212 number? |
| 25 | MR. BARR:  Yes.  Yes, Judge. |

1          THE COURT:  Okay, I'm going to go ahead and let you

2     start.  I'm going to mute the other line that I activated.

3          Go ahead, Mr. Barr.  Good afternoon.

4          MR. BARR:  Good afternoon, Your Honor.  Thank you

5     very much.  And Matt Barr of Weil Gotshal, & Manges proposed

6     counsel for the Debtor, on behalf of Talen Energy Supply and

7     the 71 affiliated Debtors that filed overnight.

8          First, Your Honor, on behalf Talen, it's management

9     team, it's employees we thank you very much for taking the

10    time today to hear us on such short notice with respect to our

11    first day.

12         As we will discuss in a few minutes in more detail,

13    Your Honor, I'm happy to stand here today to report that last

14    night after significant time and negotiations and discussions

15    with our various creditor groups, which you'll hear about in a

16    little while, we were able to execute a Restructuring Support

17    Agreement with certain of our unsecured bonds, roughly 62

18    percent now and we expect many more in the days to come.

19         That provides for the satisfaction of our secured

20    debt.  And we'll talk about that in a few moments as well

21    because that's billions of dollars of secured debt.

22         The equitization of our unsecured claims, a backstop

23    of a rights offering from our unsecured ad hoc group of

24    somewhere between 1.3 and 1.65 that there's a rachet which

25    we'll talk about also down in a little bit for Your Honor's

1      context.

2                      A significant DIP financing and hedging program that

3      will help the company lock in operating cash flow funding not

4      only the operations of the business, but also a number of

5      growth initiatives under the DIP financing which you'll hear

6      about as well.

7                      Your Honor, we want to thank the US Trustee and

8      various creditors that have reached out to us prior to the

9      hearing.  I believe that my colleagues through each of the

10     pleadings with Your Honor, under the agenda will go through.

11     I believe we have resolved all informal objections.

12                     And we checked the docket right before we started

13     and I do not believe there are any formal objections that have

14     been filed, Your Honor.

15                     So with that note, I'd like to make a few

16     introductions and then talk about, if amendable to you, our

17     game plan for the next hour or two however long it takes.  And

18     then, if Your Honor is amendable, we'll go through our

19     presentation.

20                     THE COURT:  That's fine.  I've had somebody that's

21     pressed five star.  Let me see if that's because they have an

22     objection to what you're doing.

23                     It's from 281-203-5302.  Let me see who that is.

24     Who do we have?

25                     MR. HERNANDEZ:  Your Honor, this Alex Hernandez of

1      Talen.  I was just in the cue to speak next.

2              THE COURT:  Mr. Hernandez, welcome to you.

3              MR. BARR:  Your Honor, the first introduction was

4      Mr. Alex Hernandez, the CEO of Talen and it's subsidiaries.  I

5      will get back to Mr. Hernandez in a few moments.

6              We also have in the room with us, Mr. Andrew Wright.

7      Mr. Wright is the general counsel of Talen and the Debtors.

8              We also have Leonard Lobeyondo (phonetic) who's the

9      executive vice president of restructuring.  I apologize,

10     they're all in the room with me.  I can tell you that -- the

11     camera is not moving.

12             We also have with us Ryan Omohundro, Managing

13     Director of Alvarez & Marsal, the Debtor's proposed financial

14     advisor.  And he is a first day declarant and is available

15     here to testify and take the stand if necessary.

16             We also have Mr. Roopesh Shah, Evecore.  And Evecore

17     the Debtor's proposed investment banker and declarant in

18     connection with our DIP financing.

19             We also have on the phone with us Mr. Benjamin

20     Steele.  He's from Kroll, Prime Clerk.  Your Honor, may

21     remember the name.  The Debtor's proposed claims and noticing

22     agent and a declarant in connection with today's hearing.

23             And Your Honor will see numerous Weil Gotchel

24     attorneys that are entering various pleadings.  We also have

25     Mr. Genender with us who will be handling the evidentiary

1   portion of the case.

2         Your Honor, our proposal if agreeable to you is as

3   follows.  We have a slide deck that we would like to go through

4   that tells you who we are, why we're here and where we're

5   going.

6         Mr. Hernandez will take the first part of the

7   demonstrative and have the CEO's perspective of who we are for

8   Your Honor and the rest of the parties.

9         And then I will handle why we're here and where we

10  would like to go.

11        After that, our -- I will had it over to Mr. Genender

12  who will talk about the evidence, the declarations and the

13  exhibits.  And then over to Mr. Morgan who will lead the charge

14  doing the agenda.

15        THE COURT:  All right.  When we -- before we start

16  the evidentiary portion, I want to be sure that anyone else has

17  an opportunity to make an opening statement.

18        But you certainly can go through your slide deck and

19  things of that nature.  As far as I'm concerned, if somebody

20  does object to what you're doing, they'll need to press five

21  star one time on their phone.

22        MR. BARR:  Thank you, Your Honor.

23        THE COURT:  So, the floor is you're Mr. Barr.

24        MR. BARR:  Thank you, Your Honor.  At this time, we

25  have somebody other than Mr. Carlson helping us with our

1    computer.

2              Is it possible to get Weil screen share to post

3    something so everybody can see it on their screen?

4              THE COURT:  Yeah, hold on a minute.  Let me find it.

5              MR. BARR:  Thank you.

6              THE COURT:  There are like more than 100 people

7    there.  I'm going to go ahead and turn on this camera if you

8    would and then we'll I'll find him and I can -- it's very hard

9    to find him.

10         (Pause in the proceeding.)

11             THE COURT:  Got it.  Hold on one second.  Okay,

12   you're now the presenter.  And you can go ahead and turn your

13   camera off now that we're able to find you there.  Thank you.

14             MR. BARR:  Excellent.  So, with this, Your Honor, I'm

15   going to turn it over again for demonstrative purposes to go

16   through this to Mr. Hernandez to talk about the company and who

17   we are.

18             THE COURT:  Thank you.

19             MR. HERNANDEZ:  Thank you, Matt.  Your Honor, my name

20   is Alex Hernandez.  I very much appreciate the opportunity to

21   speak on behalf of the company.

22             If it would please the Court, I would be glad to give

23   you a summary of Talen, our business and our people over the

24   next few minutes.

25             So who is Talen?  Talen is a business -- if we can go

1    to the prior slide, please -- headquartered in The Woodlands,

2    Texas with approximately 2,000 employees nationally.

3              We're a privately held independent power producer and

4    we own, we acquire and we optimize high quality power

5    generation infrastructure across North America.

6              Our generation portfolio today consists of

7    approximately 19 generation facilities that can produce

8    approximately 13 gigawatts of power generation capacity across

9    the country.

10             Our fleet is comprised of a variety of fuel sources

11   including nuclear power, natural gas, coal and fuel oil, and a

12   growing renewables and battery portfolio.

13             As I'll discuss in a moment, Your Honor, our strategy

14   is to transform the current asset base as well as the company

15   in the aggregate to a clean power and digital infrastructure

16   platform to continue growing the value of the enterprise and

17   provide a future for our people.

18             One of the things that you'll get to know about

19   Talen, Your Honor, is that we have a code of operating

20   excellence; we have a keen (indiscernible); we have a strong

21   waiver relationship with all of our team.

22             And we are driven by the concept of a one Talen mind

23   set to ensure the success of every employee and every

24   individual at Talen.

25             Other distinguishing characteristics that you'll get

1    to know about our company, Your Honor, is we pride ourselves on

2    nuclear excellence.  We'll talk about Susquehanna nuclear, one

3    of the largest defense operative power plants in the United

4    States.

5             We are focused on reducing the company's carbon

6    footprints, to modernize the firm as we look ahead to our next

7    chapter.  And this culture, Your Honor, has resulted --

8    notwithstanding the difficult circumstances that we find

9    ourselves in today -- Talen being among the best decisive

10   employers in North America for two consecutive years.

11            Next slide please.  Let me spend a moment, Your

12   Honor, giving you an overview of our asset base.  We operate in

13   approximately six states.  The preponderance of our people and

14   our assets are located in Texas, Pennsylvania, Montana and

15   Maryland.  Although we have a smaller set of assets in other

16   jurisdictions.

17            And as you can see here, our assets provide critical

18   resiliency to key metropolitan areas across the United States

19   including South Texas, Baltimore, Philadelphia, New York,

20   Boston, and the Western United States power grid.  Next slide,

21   please.

22            More important than the assets, are the people that

23   operate them every day.  And let me tell you, Your Honor, about

24   our people.  Talen is 2,000 individual strong.

25            As you can see in the exhibits, approximately a third

1    of our demographics is above the age of 55.  In view of the

2    demographic challenges faced by our sector, approximately half

3    of that population, Your Honor, is a beneficiary pension plan

4    that we'll talk about during the hearing today.

5            And importantly, approximately one quarter of our

6    population has the ability to retire with a pension today.

7    That'll be an important fact as we discuss the operating

8    parameters of our assets.

9            Given the dynamic, Your Honor, -- I apologize we have

10   spent -- I apologize there was an echo -- a very considerable

11   amount.

12           THE COURT:  I think you're breaking up just a little

13   bit Mr. Hernandez.  Not sure what happened there.  I heard

14   you -- you said "given that you're spending a considerable

15   amount" and then I lost the next words.

16           MR. HERNANDEZ:  (Indiscernible).

17           THE COURT:  Nope.

18       (Pause in the proceeding.)

19           MR. HERNANDEZ:  (Indiscernible).

20       (Pause in the proceeding.)

21           MR. HERNANDEZ:  Okay, Your Honor, can you hear me

22   okay?

23           THE COURT:  It seems better now, Mr. Hernandez.

24   Thank you.

25           MR. HERNANDEZ:  Okay, thank you, sir.  And so given

1     this demographic, Your Honor, we have spent considerable amount
2     of time recruiting the next generation of employees coming into
3     the company.
4              This is a demographic change that we ask that --
5              THE COURT:  I've lost you again.  Hold on.
6          (Pause in the proceeding.)
7              THE COURT:  Mr. Barr, I'm going to disable your line
8     for now.  Mr. Hernandez, let's see if that helps eliminate the
9     interference.  If it doesn't, we'll figure out another way to
10    go.
11             Can you hear me alright Mr. Hernandez?
12         (No audible response.)
13             THE COURT:  Mr. Barr -- somehow I'm getting feedback.
14    I've never seen that before.  Let me turn off your line for a
15    few minutes.
16         (Pause in the proceeding.)
17             THE COURT:  Testing one, two, three.  No, I'm still
18    getting feedback.
19         (Pause in the proceeding.)
20             THE COURT:  Testing.
21         (Pause in the proceeding.)
22             THE COURT:  For those of you that can hear me.  I'm
23    step down.  I don't want to disconnect my line because it's
24    going to disconnect your lines.  So just hold on.
25         (Pause in the proceeding.)

1           THE COURT:  Testing.

2       (Pause in the proceeding.)

3           THE COURT:  Mr. Hernandez, this is a problem, I

4   believe, on my end not on your end.  So let me see if I've got

5   that worked out.  No, I don't.

6       (Pause in the proceeding.)

7           THE COURT:  Could you say something, please,

8   Mr. Hernandez?

9       (No audible response.)

10      (Pause in the proceeding.)

11          THE COURT:  Mr. Hernandez, welcome back.

12          MR. HERNANDEZ:  Thank you, sir.  Can you hear me,

13   Your Honor?

14          THE COURT:  I can hear you fine.  Let's wait a few

15   minutes for everybody else.  I'm pretty sure it was my

16   technical problem here.  I don't know what -- don't know enough

17   to know what happened.  I just know that it messed up.

18          MR. HERNANDEZ:  Yes, sir.  Thank you.  Thank you,

19   very much.

20          THE COURT:  You probably thought it was your problem,

21   but I don't think it was, so.

22          MR. HERNANDEZ:  Yes, sir.  I tried three phones with

23   the same outcome.  So your technical skills are better than

24   mine.

25      (Pause in the proceeding.)

1          THE COURT:  I'm just watching the dialing and know

2     when they've pretty well stopped connecting and then we'll move

3     ahead.

4          MR. HERNANDEZ:  Okay.  Yes, Your Honor.

5        (Pause in the proceeding.)

6          THE COURT:  So while we're waiting.  I've probably

7     used this bridge now 3,000 times and it's broken about three

8     times.  So, you're unlucky on that.  But I feel like I've been

9     pretty lucky so far because I've encourage lawyers to let their

10    CEO's speak more, but I've never seen one where they let you do

11    the PowerPoint.  And I'm very much enjoying this.  So, thank

12    you for taking the trouble to do that.

13         It helps me learn about the company and, you know,

14    it's different than reading the cold words on the paper when I

15    read somebody's declaration.  So I do want to thank you for

16    taking the trouble to do this.  And apologize to you that I

17    interrupted you, but not much choice.

18         MR. HERNANDEZ:  No apology need.  And it's our

19    pleasure.  And there's not important than to be here.  So,

20    thank you for your comments.

21       (Pause in the proceeding.)

22         THE COURT:  We're still getting a quite a few more

23    dial-I'm not sure. .  We're up to 191 -- 194 people have now

24    dialed back in.  So, just another minute or two,  It's slowing

25    down a little bit.

1          (Pause in the proceeding.)

2              THE COURT:  And you're coming in crystal clear.  I

3      hope that you can hear me well at this point as well.

4              MR. HERNANDEZ:  Yes, sir.  I can hear you perfectly,

5      not an echo.  All seems well.

6          (Pause in the proceeding.)

7              THE COURT:  Mr. Barr, I've got your line reconnected

8      as well.

9              MR. BARR:  Thank you, Your Honor.  And thank you for

10     the comments.  We appreciate that.

11             THE COURT:  We're up to 225 people have now

12     reconnected.  And so with my apologies to all of you, we're

13     going to let Mr. Hernandez continue.  Thank you.

14             MR. HERNANDEZ:  Thank you, Your Honor.  For those

15     following on the phone, I'm going to recap page 5 where we were

16     commenting giving the Court some specific of employee

17     population.

18             As I was saying, the team talent is comprised, Your

19     Honor, of approximately 2,000 employees across the country.

20     Roughly one third of those employees are currently above age

21     55.  Which presents a demographic challenge as we think about

22     transitioning the company for the future.

23             Roughly half of our employee population, Your Honor,

24     has the benefit of a pension plan that will be part of the case

25     during these proceedings.

1           And given this demographic change and the investments
2    that we're making into the future of the company, we continue
3    to spend an incredible amount of time on bringing in new talent
4    into our company that will continue to execute the business
5    plan, world value and define our future, Your Honor.
6           And you can see that here on slide five in the bottom
7    left as the younger part of our population is growing,
8    notwithstanding the circumstances that we're going through
9    largely because they continue to believe on the opportunities
10   and the future of the company.
11          Let me now turn to some brief business highlights,
12   Your Honor that encapsulates a couple of the key things that
13   you're learn about our company.  If I could ask the presenter
14   to move to the next slide, please, slide six.
15          As I mentioned, we had 13 gigawatts of generating
16   capacity today.  The majority of that generating capacity are
17   in well developed markets like PJM with capacity sales.  The
18   rest of our capacity is in ERCOT, Your Honor, which I know you
19   now well and the western U.S.
20          I'll give you a sense briefly of the company's
21   history over the last five years, which is relevant to where we
22   are today.  We have effectuated a operating turn around of
23   Talen over the last six years, meaningfully reducing the cost
24   position and increasing the competitiveness of the business in
25   view of the weak power market that we've seen over the last

1    five years, which now are turning around quite quickly.

2          On the people side, we have also worked very closely

3    with our labor unions to renegotiate what is a successful labor

4    contract in 2018 that is good for the employees, it is good for

5    the company and you'll hear about that contract from some of

6    our Declarants today.  The next contract is up for negotiations

7    in 2023, so possibly during the timing of this case.

8          In addition to the acid base we have, I'll give you

9    some sense of the acid base we are developing.  That acid base

10   will include the decarbonation of approximately five and half

11   gigawatts of coal generation, converting those coal assets to

12   cleaner sources of generation while providing opportunity for

13   the people that operate them in this energy transition.

14         You'll hear about our 27 gigawatt pipeline of

15   renewable work project and about the data centers that we are

16   building adjacent to our power plants.  These characteristics

17   will define the future of the company.

18         Next slide.  Let me just spend 30 seconds to let you

19   know how we got here.  We're very proud, Your Honor, of what's

20   been accomplished by our team over the last five years.  Talen

21   was a business in 2016 that was taken private.  It was a

22   business that was operationally broken that has no distinct

23   culture, that had a high cost base and was ill-suited to

24   compete in what are very competitive power markets particularly

25   during a weak power environment.

1          And so what you see here is a product of work of

2     2,000 people over five years which seems unfair to summarize it

3     with just one slide.  But what you'll see, Your Honor, is that

4     we've reduced the company's SGNA cost structure by 50 percent

5     from nearly 180 million to $80 million today.

6          We have significantly improved the company's

7     operating O and N profile and we significantly improved the

8     company's capital budget investing every dollar as if it were

9     our own.

10          The sum total of that is a $500 million annual

11     improvement.  That's important.  Annual improvement in the

12     company's cash flow and cost structure as a result of this

13     performance.  Which is not only driven by cost reduction, but

14     is really driven by operating our assets in a much better way.

15          And this, Your Honor, is what provides significant

16     cash flow during weak markets, but will also provide

17     significant cash flow in the strong markets that we're

18     beginning to see.

19          Next slide please.  Let me give you an example, Your

20     Honor, of perhaps the marquee asset for the Debtor across our

21     fleet.  This is the picture of the Susquehanna Nuclear, one of

22     the largest super power plants in the United States.

23          This power plant is 2.3 gigawatts of aggregate

24     generating capacity.  It has the power to power over two

25     million homes.  It has the long useful life of 2062.  We are

19

1      proud, Your Honor, that with benefit of our team, Susquehanna

2      over a five year period has become one of the best operated,

3      safest and lowest cost power plant in the United States.

4              That took not just cost reduction, but it took a

5      transformation of the culture of every employee at this plant

6      lead by our chief nuclear officer.

7              We have 1,000 people that work at this sight.

8      Roughly half of our employee population.  And this asset

9      provides a very significant percentage of the company's cash

10     flow in the current environment.

11             You'll see that this power plant is also very much

12     linked to our future which we'll talk about in a moment.  And

13     of course, given the importance and the sensitivity of the

14     nuclear business, we are in close contact and regulated by our

15     regulators at the NRC, info the self regulatory body, FERK and

16     other national state jurisdictions.

17             Next slide, please.  So let me now talk, Your Honor,

18     not just about the assets we have, but the businesses that we

19     are building to grow value of the Debtor in a PDS.

20             You'll hear now the names Cumulus which is the name

21     of an affiliate business, a non-Debtor business, of which TES

22     is a shareholder.  This business is developing clean power

23     plants across our assets and it is also developing data centers

24     across our assets.

25             And this, Your Honor, is insertive of growing Talen

1    over the years and not just being subject to the whims of

2    commodity markets as commodity prices shift up and down in the

3    world.

4           Next slide please.  Why are we embarking on this

5    journey, Your Honor?  We're embarking on this journey, because

6    we see a convergence between the world of power that we live,

7    the world's infrastructure of our power assets, and the growth

8    of technology across the world.

9           Technology requires electricity for everything that

10   we do.  And everything that we do can ultimately be converted

11   from data to infrastructure to power.  And as such, we are

12   connecting Talen to two of the greatest forces that are driving

13   the world today which are the growth of technology, the growth

14   of infrastructure and growth of carbon free power.

15          And this is the purpose and the business plan of the

16   Cumulus business that you'll hear about as we go through case.

17   Next slide, please.

18          To provide you some detail, I won't go through all of

19   this.  The date and building these data centers adjacent to our

20   plants, we have invested approximately $117 million of TES's

21   financial capital into constructing this business.

22          In exchange for this investment, TES has become an

23   equity owner int his business.  But we do need incremental

24   capital to successfully execute this business plan, both of

25   which is being provided by the DIP that you'll hear about, as

1    well as other sources of capital that we ultimately need to
2    raise.
3          Next slide please.  You can see here is a picture,
4    Your Honor, of the data center that is being constructed
5    adjacent to Susquehanna.  You saw a picture of Susquehanna,
6    this is immediately adjacent to the nuclear power plant.  This
7    data center, which is a large class A office building if you
8    will.
9          It's difficult to tell the scale here, but this is a
10   300,000 square foot building.  It is approximately four
11   football fields long and wide under roof.  And it will store
12   approximately 50 megawatts of computers that will run cloud
13   applications for companies like Microsoft, companies like
14   Facebook and other potential clients.
15         This data center powered shell is scheduled to be
16   completed this summer and over next number of months and
17   quarters, the building will be outfitted with data halls in its
18   interior as customer releasing activity accelerates.
19         This is one of the largest projects that we have
20   ongoing across the company and TES, the Debtor, is a very
21   significant shareholder both in this project and in the
22   business overall.
23         Next page, please.  As we're building demand across
24   our fleet, we're also making our fleet cleaner, Your Honor, to
25   make sure that Talen is positioned for the future.  The useful

1    life of our coal assets we know will not be unlimited.  Those

2    coal assets and nuclear assets are extremely valuable in the

3    current elevated commodity environment.  They provide a greater

4    resiliency, they provide fuel storage in what is a very

5    volatile world.

6              However, the future will not just be about fossil.

7    The future will be about carbon free and renewables.  And so

8    over the last two or three years, the same time as our team is

9    working on the operating turn around, we have quietly developed

10   a large scale pipeline of renewable and battery projects.

11             This light summarizes projects that are in flight.

12   And as you can see, there's a very significant volume of wind,

13   solar and battery projects across Texas, Montana and our

14   mid-Atlantic fleet.

15             I anticipate these projects will be operational over

16   the next several years.  And the first to break ground is a

17   project called Montors Solar One, which is a legacy coal plant

18   that we're converting to natural gas.  And at the same time as

19   that gas conversions occurs, adding a solar field connected to

20   the new natural gas facility that was previously a coal

21   facility.

22             This is an example of how we will transform the fleet

23   and in doing so provide good jobs for our employees and our

24   communities.

25             Next slide, please.  Your Honor, this is a summary of

1    the other coal to natural gas and decarbonization projects.  I

2    won't go through them in detail.  But you can see that there is

3    approximately four and half gigawatts of coal that we are

4    investing in, in order to increase the useful life and value of

5    these assets.

6          This is roughly -- it's approximately a third of our

7    aggregate fleet.  And making these investments, which the DIP

8    financing order would allow us to do, is an important element

9    of continuing to drive the business operations and to

10   ultimately increase the value of TES.

11         Next slide, please.  This is a picture of the Montor

12   gas plant, Your Honor.  You can see that in the distance, we

13   are connecting Montor to the lighting hub via a 17 mile

14   pipeline.  This project breaks ground now and will be completed

15   next year.

16         It will increase the useful life of this asset from a

17   plant that would have otherwise closed in two or three years to

18   one that we hope has second life and will remain competitive in

19   the current environment.

20         Next slide and then we'll move to just a couple

21   closing remarks.  And lastly, Your Honor, as you can see here,

22   these are the first set of solar projects that are being funded

23   by TES in part with proceeds from the DIP and the company's

24   cash flow from operations.  And we are ultimately also

25   beginning our first battery project at the H.A. Wagner station

1    in Baltimore, Maryland.  Which is a 1960's oil plant that has

2    had 60 years of service and now is being converted to a battery

3    site, which will ensure a long useful life.

4              And ultimately, we would envision that every plant

5    across Talen is transformed in some fashion to another fuel

6    source through renewables, to batteries and would be co-located

7    with data centers overtime to connect the business not just to

8    the current commodity trend but really to a long term secular

9    trend that would grown the value of TES during this process and

10   well beyond.

11             Next page.  And lastly, Your Honor, you know this

12   well given your experience in energy and in power cases, but I

13   wanted to provide you a list of our other stakeholders.  We

14   talked about our employees, our customers, our unions and our

15   other important stakeholders.

16             This, of course, is another list of important

17   stakeholders.  We're regulated and have frequent interaction by

18   all these entities.  I'm pleased to report for the Court that

19   Talen has a cultural of compliance.  We are in active dialogue

20   with all of these entities and strive not just to drive value,

21   but also to do so in a responsible way, across every

22   jurisdiction that we operate in.

23             And with that, Your Honor, on behalf of Talen, my

24   2,000 colleagues and employees, I'm grateful for your time and

25   the time of the Court in learning about our company.

1          THE COURT:  Mr. Hernandez, I want to disagree with

2     one thing that you said.  You said that 2023 might be within

3     the life of the bankruptcy case.  That means we all failed.

4     This is not where --

5          MR. HERNANDEZ:  Yes, sir.

6          THE COURT:  This isn't where you want to be.

7     Mr. Barr knows that.  He isn't going to make you wait that

8     long.  Force him to go faster.

9          MR. HERNANDEZ:  Yes, sir.  It pleases me very much to

10    hear that.  I -- it's my job to show the future of the people

11    and I'm doing all that we can to make this an expeditious

12    process.

13         I'm also grateful for our stakeholders on the line

14    that put the company in a stronger position by signing its RSA

15    prior to the final.  But thank you, Your Honor for the Court's

16    comments.

17         THE COURT:  Thank you.  Mr. Barr, do you want to do

18    any other part of opening?  Otherwise, I'm going to let someone

19    else make any statements they want to make.  And then we'll go

20    into your evidentiary record.

21         MR. BARR:  Sure.  The only thing I want to say Judge,

22    and we'll save the story for another day, is the RSA does

23    provide a timeline.  I just want to answer your question.

24         We agree with you 100 percent.  We worked really hard

25    to make sure this would be as efficient a case as possible.  So

1    you will hear as time goes on, our restructuring support

2    agreement actually provides, subject to your calendar, that

3    hopefully we confirm the case within 184 days.

4         The issue with 2023, unfortunately, is the regulatory

5    approvals with NRC, in particular, given the nuclear asset that

6    we may need to sit in bankruptcy completely confirmed and just

7    going through that process.

8         But just so it's said, we hear you.  You heard from

9    our CEO.  He's a strong CEO.  He drilled that into us.  We

10   worked really hard and we're very happy that we have the

11   support of our unsecured, our secured and our other

12   stakeholders.

13        But I will skip my presentation, Judge, so we can get

14   right on to the evidence when you're ready.

15        THE COURT:  So I want to make a couple of overview

16   comments about some of the things in today's orders.  And maybe

17   I should just start with one.  And you were talking about your

18   RSA.

19        Today's not the day where I want to do anything to

20   approve the RSA, to ratify the RSA, to disrupt the RSA.  And

21   I'm concerned that in a lot of the orders it says nothing in

22   here conflicts with the RSA or something like that.

23        I'm going to find a way to make you-all comfortable

24   that the RSA parties can decide whether they want to object to

25   these orders.  But I can't have the orders be subject to the

1  RSA.  That's the same as ratifying it.

2          And so we either need to change that language or take

3  it out, probably.  I will tell all the RSA parties that if what

4  we approve today violates the RSA, then it violates the RSA.

5  I'm not finding it doesn't.

6          And so if the Debtors are foolish enough to go

7  violate their RSA by getting an order, then you know, so be it.

8  But I'm not going to come back later and say well what I did

9  overrides the RSA.  It doesn't.  I'm not doing an RSA on day

10  one.

11          So that's going to be a repeat theme.  I've got other

12  detailed comments as, you know, I always do over the specifics.

13  But as we get to each order, you-all need to find a way to make

14  that clear.

15          And frankly I know no one was trying to do that.  But

16  it makes me nervous to see that.  And so, just -- I made my

17  point.

18          Let me see who else wants to make a comment.  I've

19  got somebody that's raised their hand and we'll go there.

20      (Pause in the proceeding.)

21          THE COURT:  Mr. Serajeddini.

22          MR. SERAJEDDINI:  Good afternoon, Your Honor.  On

23  behalf of the RSA parties, I can say we are very comfortable

24  with what Your Honor proposes.

25          For the record, Steven Serajeddini of Kirkland and

1    Ellis, on behalf of the Ad Hoc Group of unsecured note holders
2    and plan sponsors in these cases.

3              I'm here today with my partners Mr Nash and
4    Mr. Koenig.  You'll be seeing a lot of each of us over the
5    course of the cases.

6              But it's great to be before Your Honor and I want to
7    thank the Court for hearing us today on an expedited basis.

8              I'd also like to give Your Honor, with your
9    indulgence, a brief, just update on who we are and a little bit
10   on this remarkable result from our advantage point.

11             Your Honor, we formed this Ad Hoc Group of unsecured
12   creditors a little over a month ago.  And we found ourselves
13   having to make some room for ourselves at a crowded table.

14             Part of the reason for that crowding as we observed
15   early on is that there was a large discrepancy in these cases
16   between the value of the enterprise where pretty much every
17   party agreed as a functional matter that we were the fulcrum,
18   in the amount of de-leveraging the Debtor's receiving and
19   that's not usually good news for unsecured creditors.

20             It means you've got to write up a check and check
21   that's going to capitalize the business going forward, but also
22   pay down secured debt.  Otherwise, you risk being subject to an
23   RSA where you have very unfavorable terms.

24             And we learned that the company was engaged in
25   discussions with the secured lenders along those lines.  And

1    the Debtor's definitely maximized their leverage.  I give a lot

2    of kudos to Mr. Hernandez, Mr. Barr and the full team.

3            You know, we don't fault them for that.  If anyone

4    can appreciate it, it's us.  But they told us and our clients

5    after our group formed, that we faced the risk if we weren't

6    able to mobilize quickly.

7            Now our natural response to that as unsecured

8    creditors, Your Honor, was we wanted to understand the

9    situation.  We need to evaluate all the aspects of the

10   business, get more certainty around future cash flows, resolve

11   unresolved issues -- a few of which I'll flag for Your Honor.

12           But we didn't want to commit in a vacuum, but at the

13   same time, and to their credit, our clients took that feedback

14   and worked really, really hard here.

15           We raced to negotiate terms, circle capital and build

16   support among bond holders and that process continues to this

17   date as you heard.

18           In the meantime, we were able to get to a deal.  And

19   that's the deal that's before the Court.  It's an astronomical

20   level of de-leveraging.  You heard about the check size.  We're

21   giving the management team their preferred capital structure so

22   they can go out and create value.

23           We're coming as the fulcrum constituency with support

24   for the case.  And we're leaving senior creditors unimpaired

25   and giving them the comfort that we're going be behind them

1      with a meaningful check over the next year and half.  Hoping,
2      as Your Honor does it, it takes much, much less time than that.
3
4            But obviously subject to the regulatory process that
5      Mr. Hernandez flagged.
6            So, Your Honor, I want to say that's no small feet.
7      We're talking about a check that's bigger than the bond tranche
8      itself.  And that check is going to be locked in for a year and
9      half in a very volatile geo-political and commodity
10     environment, you know, perhaps more volatile than we've seen in
11     a long time.  Something Your Honor knows better than anybody
12     else, having lived in this Court the past decade plus.
13           And we're doing this all, Your Honor, in very short
14     underwriting timeline.  So, you know, my colleague Mr. Nash,
15     compared it to Rich Strike's performance at the Kentucky Derby.
16     The fact that we were able to come to the table so quickly in
17     the last furlong and we're thrilled about that.
18           But I do want to point out that nobody is popping the
19     champagne quite yet or perhaps box wine when that check is
20     funded.  But knowing that we have to meet our burdens here.
21     And we intend to do that.
22           And in addition, though Your Honor, there are certain
23     issues that need to be resolved pursuant to our RSA and we look
24     forward to stakeholders to try to resolve those issues.  Those
25     issues relate to a comprehensive global settlement sponsor in

1    these cases.

2         Given the timing here, we haven't had a chance to

3    engage the party.  The company has a very long and complicated

4    corporate history that we're going to have to sort through.  As

5    well as tax and structuring issues.  So it's complicated.

6         But we know their advisors as well and we're

7    confident they will work reasonable here as well to get us all

8    in alignment.

9         In addition, we're also focused on working with the

10   secured creditors just to finalize claim amounts.  There could

11   be debates to be had here down the road regarding make wholes

12   and again regarding potential claims and what is a claim and

13   what isn't a claim.

14        But again we know that the stakeholders and the

15   advisors here will work well with us in trying to finalize

16   those issues.  Those issues aren't, in our mind, preconditions

17   to what we're going here -- with the exception of the 90 day

18   milestone.

19        But in any event, we think that those issues can

20   either be resolved consentually or non-consentually.  But we're

21   very hopeful that it'll be done consentually.

22        So with that, Your Honor, I want to thank the Court,

23   thank the Debtors, thank the parties.  It's an extraordinary

24   results for us to be here today with the deal that we have.

25   There's a lot more work to do and we look forward with the

1    parties to doing that work.

2            And if I can answer any questions Your Honor may

3    have.

4            THE COURT:  Thank you.  No, look you're going to hear

5    some things that I'm not willing to do today.  And I mean that

6    literally today.

7            I have been reading your materials for what, you

8    know, six hours.  So not long enough really to understand

9    everything.

10           There's nothing there that offends me.  But there's

11   some timing issues that I can't do.  And you'll hear about

12   those.  I don't want people misreading some things I won't do

13   as saying I won't do them in a final order or anything like

14   that.

15           But today there are some things you're asking me to

16   do that you probably knew I wouldn't do.  Just didn't know

17   whether I'd find them today.  But there are something there

18   that are going to cause some heartburn.  But I don't want you

19   misreading the heartburn.

20           So we'll move ahead.

21           MR. SERAJEDDINI:  Yes, I understand.  Thank you.

22           THE COURT:  Glad to have you back, Mr. Serjeddini.

23   Mr. Warren, let me get your line active.

24           Mr. Warren, welcome.

25           MR. WARREN:  Thank you, Your Honor.  Matt Warren of

1    King and Spalding on behalf of the Ad Hoc Term Loan and secured

2    notes group.  I'm joined here today with my colleague Mr. Dywer

3    and Ms. Hendrikson.

4           Your Honor, everything Mr. Serajeddini said and

5    Mr. Barr said sounds great to our group of secured lenders.  We

6    would welcome being cashed out in full with a cash check.

7           I think I want to put a little bit of a downer on the

8    optimism though.  The Debtor's don't come into the case with a

9    backstop commitment letter for $3 billion, which is how much

10   secured debt they have.

11          What they come in with is a hope that sometime in the

12   next three weeks maybe they'll get a backstop commitment for

13   $1.3 billion.  Then they'll make up the other 1.7 on the come,

14   which I do think they need to go into -- in the mid-2023 on.

15   Not just nuclear -- they're effectively just hoping that

16   they'll generate enough revenue during the next 12 months of

17   running bankruptcy case to take it together with the 1.3 that

18   they hope that they can get from the unsecured creditors to pay

19   the secureds in full.

20          And that would be great, Your Honor, but I do think

21   it colors our view on some of the relief and we're not going

22   to -- we don't have a lot of issues with the others, we got

23   them also roughly at 4:00 in the morning when they started to

24   be filed.

25          We've been through them as much as we can.  Our plan

1    going forward, Your Honor, is to work cooperative with Debtors
2    like we have frankly since August when we started working
3    together.
4         But there's aggressive hedging plan here.  There's
5    aggressive investments in entities that are owned 100 percent
6    by Riverstone, at this point.  We're still evaluating a lot of
7    the elements of the business plan and where our collateral is
8    going.
9         And again, I don't want to sit here and say that
10   we're a secured lender that doesn't want to be paid on the
11   dollar.  We're happy to but frankly, Your Honor, a little bit
12   of our concern is that we don't want to be just a put option
13   that's being used while our collateral is sort of gambled where
14   the upside to sponsor where the downside is born by us.  Then
15   we'll wait here until June of 2023 and we'll find out.
16        Because as I read it, if they're short on the cash
17   generation, between the 1.3 and our $3 billion of debt there is
18   no plan B in the RSA.  It's just going to terminate and then
19   we'll be figuring this out a year from now on how we pick up
20   the pieces.
21        And I don't know that, that's a completely fair
22   approach to th case either.  So I just wanted to let Your Honor
23   we might have some comments on the inter-motors as we go
24   through.  But that's where our position is as a group and I
25   wanted to give that color at the outset to make clear that we

1    do plan to work with the Debtors.  We would love to be cashed

2    out.

3          We're a little bit skeptical of the Plan that you can

4    borrow half the money on the come and make the rest on the --

5    as the case goes and pay us off in 12 months.  Then we should

6    just sit on the sidelines and see how that plays out.

7          Thank you, Your Honor.

8          THE COURT:  Mr. Warren, that's fair enough and I hear

9    you wishing them well, but being skeptical as to whether they

10   can make it.  And nothing wrong with that.

11         I'm going to leave your line open all day and if you

12   have problems with the orders, speak up and let me know, okay?

13         MR. WARREN:  Thank you, Your Honor.

14         THE COURT:  Ms. Eaton, let me get your line active.

15   And good afternoon to you.

16         MS. EATON:  Good afternoon, Your Honor.  Alice Eaton

17   with Paul Weiss on behalf of the Ad Hoc Group of Crossholders.

18         It's good to see you.

19         THE COURT:  Good to see you.

20         MS. EATON:  And hopefully soon we'll actually be in

21   Houston for an in-person hearing.

22         I raised my hand to speak up because on behalf of the

23   Ad Hoc Group of Crossholders, we just wanted to introduce

24   ourselves.  We have -- we hold approximately $952 million of

25   pre-petition debt.  Around 770 million of which is the first

1    lien debt and 132 million of unsecured notes.  So we've
2    straddled the capital structure.
3              And today, we're not objecting to any of the interim
4    relief being sought by the Debtors.  Like everybody else, we
5    didn't get advance notice of the Debtor's RSA before it was
6    filed with the Court.  And we're going to review the proposed
7    transaction.
8              You know, in the coming days we might have more to
9    say about it, but we'll review, we'll consider it.  But for
10   today's purposes, we're going to focus on a few issues that we
11   have clearly previewing for you the matters that we hope to get
12   resolved in connection with entry of final orders, in
13   particular the DIP.
14             And, you know, we recognize the next 21 days for the
15   Debtors are going to be very critical.  In particular we're
16   focused on the hedging that need to be put in place as they
17   serve as the backbone of the company's business plan.
18             And we wish the Debtor's well in their negotiations
19   with the RSA parties.  And their ability to sign up the
20   backstop commitment letter.
21             And during this time, we do hope that the Debtor's
22   are going to -- we actually expect that they will, work with us
23   and others to resolve our various issues.  And, you know, we're
24   not at the DIP order yet, but just to be crystal clear, our
25   issues are limited voters on this matter.  Our issues fall into

1      categories relating to adequate protection and preserving
2      various contractual intercreditor (indiscernible).
3             We don't think that interim order really quite does
4      it.  But this is an interim relief and we'll leave it at that.
5      And when we get to the DIP order I can give you more context
6      and color about our views.
7             But there's no need to get into that detail now.  We
8      can wait until the motion is heard.
9             THE COURT:  Ms. Eaton, thank you.  And just to
10     clarify.  I know it's a minor issue that you raised, but so
11     that everybody knows.
12            We made a decision as a Court that first day hearings
13     should all be remote so that, in fact, people can all prepare
14     instead of be on airplanes.
15            But after today, I hope to see you in person when
16     it's appropriate to see you in person or a video.  And so it
17     will be totally your option after today.
18            But we did limit first days and so far it's working,
19     but.  By the way if people think it doesn't work, you need to
20     complain to Chief Judge Jones and you're free to do that.
21            Next case --
22            MS. EATON:  As a member of your (indiscernible), Your
23     Honor, I was a big advocate of the first day hearings being
24     remote.  And as somebody who was up at 4:00 a.m. reading the
25     DIP order that I had just received, I am quite happy to have

1    not been on a plane this morning.

2         So in any --

3         THE COURT:  Good I appreciate that.  Mr. Alberino,

4    let me get your line active.  Go ahead, please.

5         MR. ALBERINO:  Good afternoon, Your Honor.  Scott

6    Alberino from Akin Gump on behalf of the Ad Hoc First Lien

7    group.

8         Your Honor, good to see you again.  I'll be brief,

9    but I figure everyone is making a few opening statements and

10   giving you some thoughts on the case.  I thought I would take

11   two minutes to just kind of walk you through, introduce our

12   group and talk to you about some of the issues that we're going

13   to be concerned about in the case.  None of which will surprise

14   you.

15        First of all, Your Honor, our group holds

16   approximately 1.2 billion of secured claims.  We've been

17   working several months now with my good friend, Mr. Warren from

18   King & Spalding and his Ad Hoc group, and working with the

19   company on developing a pathway and a course of action here to

20   deleverage the business.

21        We've been very much (indiscernible) with the company

22   and other stakeholder groups for quite some time here trying to

23   figure out how to solve the problem of the Talen balance sheet.

24        Mr. Serajeddini and our good friends at Kirkland, I

25   like the Kentucky Derby reference.  I mean, that's pretty much

1    what happened here.

2         We watched this case progress the last month with an

3    eye on forward curves in the power markets.  And as gas prices

4    rose and power prices rose in the whole sale markets, we

5    clearly kind of saw the shift and how de-leveraging may happen

6    here.

7         And we applaud Mr. Serajeddini and his group for

8    showing up and offering to write a significant check here.  And

9    ultimately, if we're going to be paid off in full, you know, we

10   applaud them, wish them well and hope they actually can get to

11   the finish line here.

12        But as Mr. Warren pointed out, we are kind of at the

13   early days here in the RSA.  This group who signed on to the

14   RSA they've been underwriting this for about a month now.  As,

15   Your Honor may or may not be aware.  The company did not come

16   into the case with signed equity commitment letters, but with a

17   promise to hopefully get those commitment letters signed up

18   over the next three weeks -- in which we hope they do.

19        And, Your Honor, there also are significant

20   conditions that need to be solved for or waived by that group.

21   Now we're cautious.  We understand what the market looks like.

22   We've been involved in these situations before and, you know,

23   we're hoping and you know, encouraging that group to show up

24   with firm, but solid commitments and to work with the timeline

25   that they've promised the Debtors and the other stakeholders in

1    this case.

2            We've also been around the block.  We've seen this

3    story play out in other cases.  And we hope we are not finding

4    ourselves in the position a month from now, three months from

5    now, 12 months from now where the secured creditors are left

6    picking up the pieces because an unsecured sponsored deal could

7    not get across the finish line.

8            I think given who the professionals are and given the

9    firms who are involved, we have every reason to believe we're

10   going to get there.  And Mr. Serajeddini and his clients will

11   get there on firm commitments here and hopefully we're

12   confirmed in six months and off to the races with the NRC.

13           But we will be watching this case, you know,

14   cautiously.  We are going to choose where we wish to speak up

15   and where we wish to resolve ourselves in the case.  We're

16   going to be very focused, Your Honor, on leakage; money going

17   out the door.

18           We're going to be very focused on the company taking

19   permanent steps here with respect to owners who may not turn

20   out to be owners.  So from our perspective, you know, we

21   certainly don't want to get in the way of a deal getting done.

22   But at the same time, we want to make sure that, you know, we

23   are not watching value walk out the door.

24           We want to make sure the company is not taking

25   unnecessary risks from our perspective, you know, in the even,

1      you know, we turn out not to be owners of this business down

2      the road.

3              So we wish everyone well.  We think it's an

4      encouraging start.  We'll be cautiously optimistic.  I think

5      you know, Your Honor, we'll be back in front of you with

6      concerns about how the case is proceeding and whether people

7      are not living up to the bargains that they made with the

8      Debtors and that they're representing to the Court today.

9              Your Honor, we have a couple of issues on the DIP.

10     We have been working with Mr. Barr and Mr. Welch and the team

11     at Weill to resolve them.  I think we're done.  I'm hoping

12     we're going to make a few statements and the company will make

13     a few statements on the record to deal with issues that are

14     near and dear to our clients on the adequate protection front.

15             Just a preview, a post-petition interest issue, Your

16     Honor.  You may notice it's not being paid on a current basis

17     for creditors under this interim order.  I think Weil will have

18     something to say about that when we get to the financing part

19     of the hearing today.

20             And we also will probably have something to say about

21     the scope of the replacement lease, but again, you know, we've

22     been in a dialogue with Weil and I think we'll kind of see what

23     the company has to say when we reach that portion of the

24     hearing.

25             But other than that I will be quite.  Happy to answer

1   any questions, but you know, we wish the company good luck.

2            THE COURT:  Mr. Alberino, thank you.  I know that

3   Mr. Brimmage wanted to contradict something you said so.

4            Go ahead Mr. Brimmage.

5            MR. BRIMMAGE:  Your Honor, I was just going to weigh

6   in a little bit but Mr. Alberino covered it all very, very

7   well.  So there's no need.  Everyone likes it when I don't

8   speak very much.  That's probably a good thing.

9            THE COURT:  All right, thank you.  Mr. Barr?

10            MR. BRIMMAGE:  Thank you, Your Honor.

11            MR. BARR:  I'm sorry you were muted.  Did you say

12   Mr. Barr?

13            THE COURT:  Yeah, you're --

14            MR. BARR:  Your Honor, I'm going to do what we do

15   which is not respond to some of the rhetoric we think we heard.

16   We'll obviously just move straight to our presentation,

17   and we'll deal with these issues if they ever become issues in

18   front of you, Judge.  So thank you very much and thank you all

19   of the advisors for all of their efforts to get to this state.

20   If it's okay with you, I'm going to yield the podium now to

21   Mr. Genender.

22            Judge, we'll take down the screen share if you want

23   to take -- yes.

24            MR. GENENDER:  Good afternoon, Your Honor.  How are

25   you?

1          THE COURT:  I'm good, Mr. Genender.  Good to see you.

2          MR. GENENDER:  Good to see you as well.  Your Honor,

3     we filed at document 96, a witness and exhibit list for today's

4     hearing.  And associated with that are documents at ECF 96-1,

5     through 96-27.

6          For reference 96-24, and 25, were filed redacted.

7     96-27 -- I'm sorry, 96-26 and 96-27, were filed under seal.

8     The unredacted and unsealed documents are on file at ECF 58.

9          There is a sealing motion on file at ECF 55.  Sorry

10    for working backwards.  I just wanted to put that in

11    perspective for the Court.

12         I would offer into evidence ECF 96-1 through 96-27

13    which includes, Your Honor, the declarations of Mr. Omohundro

14    at 97-1, and 97-3.  And Mr. Shaw, at 97-2, and Mr. Seale, of

15    Kroll, at 97-4.  And then each of those witnesses, Your Honor,

16    are here for examination.

17         THE COURT:  Let's start with the offer of the written

18    documents.  Does anyone object to the admission of 96-1 through

19    96-27?  If you're already spoken today, and left your line

20    open, and you can just speak up with an objection?

21         If you haven't spoken previously, you'll need to

22    press five-star to speak.  We have over 300 people on the

23    phone, so there's no way that we show up on all the lines.  I

24    do have somebody that wants to make an objection.  Let me get

25    to that line.  From area code 214-763-3440.

1          MR. ACOSTA:  Yes, good afternoon, Your Honor.  This

2     is Joseph Acosta, of Dorsey & Whitney.  We represent

3     Northwestern Corporation.  Regretfully, I did not have a chance

4     to reach out to the Debtors counsel before the hearing.  So I

5     have to make a formal appearance.

6          I think this is really a non-issue but since the note

7     holders are about to shell out $800 million, and get a first

8     lien, I just thought I would raise it.  But we are co-tenants

9     with coal strips out in Montana with the Debtor.

10         And I don't think there's any theory of law where the

11    Debtors can grant a security interest on the interest of co-

12    tenants.  But I'd love that clarification from the Debtors if

13    possible, and they're going to the -- papers.

14         THE COURT:  Let me start with the question whether

15    you object to the admission of the exhibits, Mr. A?

16         MR. ACOSTA:  I do not, Your Honor, no.

17         THE COURT:  All right.  I'm admitting 96-1 through

18    96-27.  And Mr. Genender, when we get to the DIP motion, I'll

19    need you to address Mr. Acosta's question, unless you just want

20    to do it really quickly now, but --

21         MR. GENENDER:  I think the answer is we're not doing

22    what he's concerned about we're doing, and we can address it

23    when the DIP motion is formally presented, if that's okay?

24         THE COURT:  Works for me.  Thank you.  Mr. Acosta,

25    I'll leave your line open and if something comes up you need to

1    speak on, you'll be able to speak up.  If you would, just your

2    own line like everyone else needs to do.  All right.  Thank

3    you.

4        So does anyone have any cross-examination of any of the

5    declarants today?  All right.  No one is seeking an cross-

6    examination.

7            MR. SCHNEIDER:  Your Honor, I trust this will be the

8    last -- make it so easy for me.  Thank you very much.

9            THE COURT:  Thank you, Mr. Schneider.

10           MR. SCHNEIDER:  I will pass the podium to Mr. Morgan,

11   to proceed with the agenda.  Thank you, Judge.

12           THE COURT:  Thank you.  Mr. Morgan, good afternoon.

13           MR. MORGAN:  Good afternoon, Your Honor, Gabe Morgan,

14   Weil, Gotshal, here on behalf of the -- and Debtors.  Your

15   Honor, I'll be the one to start us off on today's formal

16   agenda.

17           And I'll skip over the first three items, although

18   before I do that, and realizing the -- administration is

19   typically entered in our jurisdiction before the case begins.

20   There was a discussion that I was having with Mr. Duran of the

21   U.S. Trustees Office, relating to our formal joint admin order.

22           And so I would like to give him an opportunity to

23   speak if he wishes.  I don't want to rush past it.

24           THE COURT:  I'm sorry.  What's the first motion

25   you're going to take up?

1          MR. MORGAN:  The motion, the joint administration

2     motion of docket number 19, and orders entered as docket

3     number 30.

4          THE COURT:  So I've already -- that's something I've

5     already done.  I'm not -- tell me again, why we're going there?

6          MR. MORGAN:  Your Honor, prior to filing -- maybe

7     this is where I should start.  Prior to filing all of our

8     papers, we have shared them with the United States Trustees

9     office, starting in the middle of last week.

10         We've been working with them collaboratively over the

11    course of the time between then and now.  They've been

12    particularly helpful in giving us feedback and guidance on the

13    form of our papers.

14         We have one open point relating to the form of joint

15    administration order, and I don't know.  I, unfortunately,

16    wasn't able to connect with Mr. Duran before the hearing

17    started, and so I don't know if he has an issue with what was

18    entered by Your Honor.  I just don't want to rush past it in

19    the agenda, and not give him --

20         THE COURT:  Got it.

21         MR. MORGAN:  -- an opportunity to speak.

22         THE COURT:  Mr. Duran, good afternoon.

23         MR. DURAN:  Good afternoon, Your Honor.  Hector Duran

24    with the Department of Justice, on behalf of the U.S. Trustee.

25    I thank Mr. Morgan for bringing this issue up.  The joint

1       administration order has, as it presently looks, requires the
2       Debtors to file consolidated operating reports.
3               I just wanted to report that we will probably seek an
4       amendment to the joint administration order to permit the
5       Debtors to file consolidated operating reports for the 25
6       Debtors who are -- whole -- companies or dormant companies.
7               And that the remaining Debtors would file separate
8       operating reports.  And if that's agreeable with the Debtors,
9       we would seek an amendment to the joint administration order to
10      accomplish that.
11              THE COURT:  All right.  Mr. Duran, if you and
12      Mr. Morgan reach an agreement on the language that works,
13      please don't bother to file a motion.  I'm authorizing y'all to
14      just upload an amended order that does it.
15              I basically need to sign the joint administration
16      order in order to get all the cases moved over to me.  I try to
17      do that very early.  I don't have any problem one way or the
18      other on this issue.
19              If y'all have a disagreement about what to do, about
20      paragraph 11 of the order, then I will reconsider it at any
21      time.  So just file a quick motion for reconsideration.  But
22      you don't need to do that if y'all can just agree on it.
23              No one else is going to care on this question to the
24      point of objecting to it.  Does that work for you and
25      Mr. Morgan?

1          MR. DURAN:  It does for us, Your Honor.

2          THE COURT:  All right. Thank you.  All right.  Where

3      do you want to go next, Mr. M?

4          MR. MORGAN:  Okay.  So now we'll take it as to the

5      meat.  I want to go next to item number four, on the agenda,

6      which is the Debtors motion for approval of Ingram's approval

7      of Debtor possession financing.

8          And Your Honor, before we totally clear of

9      housekeeping, we did file a amended form of order after the

10     hearing had started.  It's now on the docket as docket number

11     110.  I think where we want to go eventually is to put through

12     those changes to show Your Honor the relatively light markup.

13         But I do want to make sure that we all are looking at

14     the same form of order -- so I don't want to discredit it, or

15     dismiss it.

16         THE COURT:  All right.  So tell me what you'd like me

17     to look at this point?

18         MR. MORGAN:  It'd be docket number 110.

19         THE COURT:  All right.

20         MR. MORGAN:  And I apologize for the delay in getting

21     that uploaded and to Your Honor.  We've been working with

22     parties pretty much since we gave them a draft of the order on

23     Friday, nonstop.  And --

24         THE COURT:  Okay.  Well --

25         MR. MORGAN:  -- it was a little late.

1          THE COURT:  -- I'm on the redlined version.  So tell

2    me what you need to tell me?

3          MR. MORGAN:  All right.  So before we jump into the

4    weeds, Your Honor, I think it'd help to sort of take a step

5    back and let me offer you some context and an overview of

6    the -- thing.

7          You know, we filed a good motion in the early hours

8    of today, but for many of the Debtors and secured parties, that

9    was not the first time they saw it.  We -- in the later part of

10   last week had shared a pretty well advanced form of the order

11   and solicited feedback from all the stakeholders that we knew

12   were going to be affected, and that we knew were represented.

13         So we also shared it with the USSB.  Everyone had

14   comments.  We've been trying to incorporate and resolve issues

15   at least through the interim.  To -- comments, there are some

16   issues that are going to continue to waiver.

17         We're aware of that, and we want to work with

18   everyone to try and resolve those before the final.  But that's

19   not what we're here for today.  With that said, Your Honor --

20   in terms of great effort over the past several weeks and

21   months, even -- that have proposed investment banker who's been

22   conducting an extensive marketing process in conjunction with

23   the -- clients management.

24         We contacted over 30 parties, advance documents and

25   negotiations in parallel with several competitive groups.  And

1    that resulted in a -- process that produced a favorable debt

2    for the Debtors, and were syndicated and over-subscribed prior

3    to file.

4         Each of the facilities, and there's three facilities

5    under this debt, Turnwell and a revolver and a continued letter

6    of credit facility.  Arrives value in its own way.  Turnwell is

7    $1 billion, and provides funded debt that the Debtors can use

8    as collateral to support expansion bilateral hedges, to ensure

9    the company can capitalize in current market conditions without

10   the risk of uncertain collateral calls.

11        It provides capital for capital expenditures related

12   to growth and gives the -- strategy.  But it also is going to

13   provide us with the cash, we hope to realize on a pretty good

14   opportunity to repurchase some coal and fuel oil under group

15   efficiency DSA with -- the revolver -- is 300 million, with a

16   75 million letter of credit -- and provides liquidity for

17   working capital and help the company ensure a smooth, ongoing

18   operation and payment of -- expenses given the cash on hand at

19   the moment.

20        As Your Honor may have seen in our paper, it'd be

21   better filed with $11 million cash on hand.  And finally, Your

22   Honor, the letter of credit facility, it's a 468 million

23   post -- continuation of the existing LC facility.

24        And that's a -- there's access to letter of credit

25   financing, including on a renewed and extended basis throughout

1          the Chapter 11 cases, which is going to help the Debtors

2          support critical operational, financial and regulatory needs as

3          they continue to operate and do well during the course of the

4          Chapter 11 -- the note, Your Honor.

5                    We had an 18 month term, with a free six month

6          extension which is for regulatory approval, and that gives the

7          company stability, gives us run way to pursue a plan and to

8          work through any issues we may have.

9                    As we've said and others have said, we're not looking

10         to take all that time.  We certainly hope we don't have to use

11         the full runway, but we have it.  And not having the pressure

12         of milestones and not having the pressure of, you know, running

13         short on liquidity is going to give us the best position for

14         proceeding forward towards -- we hope.  We shall see.

15                   And then the -- profile -- so the company -- it

16         permits the Debtors to engage fully in hedging activity and

17         value of -- projects.  The -- and reporting obligations allow

18         the company to offer it relatively freely in the ordinary

19         course without -- while executing on stated strategies and

20         maximize its value for creditors in this case.

21                   Competitive process resulted in competitive rates,

22         pricing and -- particularly for facilities that have three

23         stand-alone facility characteristics and that's favorable --

24         and covenants.

25                   And then, Your Honor, it has a security package

1    including -- range, that our position is are consensual.  You

2    will undoubtedly hear reservations, rights from other parties

3    who are taking a different view on their rights and what they

4    can and cannot do under a -- creditor.

5            We reserve all rights on that issue.  My

6    understanding, based on the discussions that we've been

7    having with folks over the past 36, 72 hours, is that we have

8    resolved those issues for the interim, and so we're not going

9    to have that fight before Your Honor today.  But I'll let other

10   parties speak for themselves.

11           And then, Your Honor, just a note on the interim --

12   and what are we doing with our cash now.  And from there, I'd

13   also like to talk briefly about adequate protections which was

14   an issue that the parties raised -- get into more of the

15   reasons.

16           So perhaps what's important for today, Your Honor,

17   interim financing under the proposed facility -- allows the

18   Debtors to fund hedges and cash collaterals to the tune of 289

19   million, invest in -- for nuclear fuel, maintenance and

20   decarbonization efforts, 25 million.

21           Make certain permitted investments, primarily in --

22   data.  The permitted investments in non-Debtors.  And that's to

23   the tune of 43 million.  And then it also covers certain --

24   expenses and fees.  That's 27 million.  And one of the largest

25   items here is an inventories ability payoff, and I want to take

1    a moment just to talk about that, Your Honor.

2            The pre-petition PSSA that the Debtors have with --

3    has a term in it that allows Debtors to purchase the final

4    insolvent of the coal and fuel oil which currently has a market

5    value far in excess of the purchase price that the --

6    contractual purchase price.

7            So what it contemplates is we'll be able to get the

8    cash, $157 million, which will allow us to purchase that coal.

9    We need the coal to burn so we'll get coal for 165.  It has a

10   market value -- in excess of its contract value, and the

11   contract value is 250, as of the -- date.

12           So we're able to at least realize $85 million within

13   five business days of entry of this order.  And that, in and of

14   itself seems like extra protection to me because both that cash

15   and that coal become property, become collateral.  So Your

16   Honor, before moving onto the order --

17           THE COURT:  Show me on the budget where the 85

18   million comes in, and explain to me what's the negative 285.7

19   in the budget in week one under cash collateral?  I just don't

20   know what that last -- is at all?  So let's start with showing

21   me the inflow of the 85 million?

22           MR. MORGAN:  So the 85 million doesn't show up here.

23   Where you see it is you see on line 19, other debt draw paid on

24   that, the 165.  And then what happens is we're spending $155

25   million to purchase coal in a volume that is worth -- under the

1      terms of our contract, 250 million.  But it's not that we're

2      actually bringing 85 million of cash immediately.

3              THE COURT:  So you're not going to resell that coal?

4      You're going to use it in operations?

5              MR. MORGAN:  We are, Your Honor, and part of that has

6      to do with the current market --

7              THE COURT:  Well, no, that I understand why I'm not

8      seeing it.  I'd misunderstood what you'd said.  That's fine.

9      What is the negative 285.7 mean?  I'm on line 28.

10             MR. MORGAN:  That, Your Honor, is cash collateral.

11     That's the cash that we're proposing to use for hedging, among

12     some other minor expenses.  The vast majority of that is

13     initial margins to equate with heavy -- that it would be

14     entered into -- primarily composed of -- two pieces, or two

15     counter-parties, like that's what that is.

16             THE COURT:  So that's a use of cash collateral to

17     enter into hedge agreements?

18             MR. MORGAN:  I'm sorry.  Yeah, let me dissect this a

19     little bit.  That's -- that'll be a use of this loan -- to

20     serve as collateral, the initial margin of the collateral

21     that's posted to the hedge -- maybe -- collateral.

22             It's all collateral -- so but that's effectively a

23     deposit, an initial deposit that you pay to a hedge counter-

24     party that then is what serves as the collateral for -- their

25     collateral.

1           And some of the changes -- the order that came

2     through actually are addressing some of the inter-creditor

3     issues that that raises.  So we'll certainly talk about that a

4     little more.

5           THE COURT:  So before we go any further, what is your

6     response to Mr. Acosta's question as to whether any of the

7     collateral that you are providing includes the interests of any

8     co-owner?

9           MR. MORGAN:  So Your Honor, the Debtors don't own the

10    co-owners interest.  We can't pledge something we don't own and

11    we don't purport to pledge something we don't own.

12          THE COURT:  Mr. Acosta, do you need more than that,

13    or is that what you wanted to hear?

14          MR. ACOSTA:  I think that's what I needed to hear

15    from the parties, Your Honor.  Thank you very much.

16          THE COURT:  Thank you.  So Mr. Morgan, I've got a few

17    problems with what's being proposed, and I'll just run through

18    the biggest one first.  There's, in effect, a roll up of $457

19    million worth of letter of credit obligations.

20          And the only purpose I'm really seeing of that roll

21    up, because I thought most of the letter of credit obligations

22    were cash security, or otherwise secured.  It's to make it so

23    that at confirmation, if someone other than the MRSA parties

24    are the purchasers of the assets, they can't deal with that

25    debt.  They have to pay it in cash.

1          And why am I doing this day one?  I understand that

2     may be in a final order, but tying my hands on day one for 457

3     million of effective roll up money is bothersome to me in a

4     fairly major way.  Maybe I misunderstand what you're doing, but

5     tell me if I do?

6          MR. MORGAN:  Your Honor, so a couple -- there's a lot

7     to unpack there.  I think the first point I would say is --

8     just sort of being sure we all understand what uniforms

9     everyone's wearing.

10          The MRSA is with the unsecured note holders.  The LC

11     facility, the existing LC facility is with the pre-petition

12     revolving credit lenders.  So they're not the same party.

13     There's no roll up of an MRSA party's debt to try and give them

14     a blocking position over the disposition of a case.

15          THE COURT:  Well, maybe I'm --

16          MR. MORGAN:  There is --

17          THE COURT:  It says the 457 million will all be

18     treated as post-petition debt, not pre-petition?

19          MR. MORGAN:  Correct, Your Honor.

20          THE COURT:  How can we treat a pre-petition debt as

21     post-petition debt, and why would we do that?

22          MR. MORGAN:  So a couple of reasons.  First, I would

23     actually reject the characterization of it as a roll up.  This

24     isn't funded --

25          THE COURT:  Fine.  Why are we treating 457 million of

1    a pre-petition obligation on day one, and making it into a

2    post-petition obligation so that if somebody that doesn't want

3    to pay off that secured debt at confirmation would have to?

4    We're tying the hands of the estate for reasons that I don't

5    understand.

6              MR. MORGAN:  Because, Your Honor, we -- two reasons.

7    One, we need those LC's operationally.  So we need to --

8              THE COURT:  They're there.  I'm not talking about new

9    LC's.  You have an existing LC out there.  As I understand what

10   you're doing, you're taking an existing letter of credit, where

11   somebody's taken that risk pre-petition, and you're saying,

12   okay, but from now on, we'll treat that as a post-petition risk

13   you took.  It's not.  It's a pre-petition risk they took.

14             I have no problem if want you to say is if a new LC

15   is issued, that's administrative.  I think it already is.

16   You're taking the old ones and making them administrative, and

17   I'm not close to understanding why, on day one.  I may

18   understand that's just a deal point at a final, but on day one,

19   I don't understand it.

20             MR. MORGAN:  So Your Honor, you actually -- you stole

21   the thunder of my number two.  And my number two is that it's

22   continuation.  And one of the points that we fought and

23   negotiated for was that -- would not be static LC's.

24             As they expire, the LC providers would have to issue

25   new LC's.  And so there will be during the interim period,

1    granted, not 457 million worth, totally up front.  But there

2    will be new LC's that are renewed.  And so there is a extension

3    of credit component to it.

4              THE COURT:  Are they secured already, the LC's?

5              MR. MORGAN:  They are, Your Honor.

6              THE COURT:  Well, if an LC creditor has -- and I'm

7    just going to assume for a minute because a lot of these from

8    the description I've read are cash collateralized.  So if an LC

9    creditor has $10 million of cash, and issues a $9.75 million

10   letter of credit, and we're going to make it so that if they

11   renew that, where they get to keep their cash collateral, they

12   now not only get to keep their cash collateral when they renew

13   it, they get to demand at confirmation that they be taken out

14   of the facility.

15             We are tying hands here, and I'm not prepared to do

16   that without a justification other than that's just the deal.

17   If new credit is extended, I'm perfectly all right with it.  If

18   it is a renewal of old credit, maybe on a case-by-case basis.

19   But that's not even what's being proposed.

20             What's being proposed is the entire portfolio, as I

21   understood it, 457 million suddenly takes on administrative

22   characteristics on day one.

23             MR. MORGAN:  You understand correctly, Your Honor,

24   that my claim was that some portion of that portfolio is

25   attributable to new credit, and you understood it correctly

1    that the entire portfolio, not all of it's new credit, would be

2    rolled up from a secured position to a -- position on day one.

3    And to some extent, you are correct, it is a deal point.   It

4    was something that we did negotiate over quite hard.  But it

5    also was a consistent point of the parties that ultimately were

6    the ones to guide and drive that this facility of a -- tenor

7    and flexibility that is ultimately advantageous to the

8    Debtors -- and so we looked -- on balance, we looked at what we

9    were getting, we looked at what we had to give and we agreed to

10   it, Your Honor.

11             THE COURT:  Mr. Schnabel, good afternoon.  Good to

12   see you.

13             MR. SCHNABEL:  Good afternoon, Your Honor.  Thanks

14   for unmuting me.  This is David Schnabel, from Davis Polk.  I'm

15   here appearing on behalf of City Bank, which is the -- and debt

16   agent.  And if I could give you a little bit of color into the

17   LC system continuation.

18             The reason we think it's appropriate here, Your

19   Honor, is that this is a -- these are $458 million of existing

20   LC's -- during the course of the case, we will roll off over

21   time -- something like $50 million of them will -- are expected

22   to come into that status during the first 45 days.

23             What -- the deal that was cut, and Your Honor has to

24   understand that the extension, LC portfolios, the Debtors need

25   to continue to operate.  This is regulatory LC, surety LC,

1    hedge exposure LC's, that the company needs in order to get --
2    decision.
3           So for the company to be able to say to the world, we
4    have our LC programs that exist, and it's going to continue to
5    exist and it's going to continue to be renewed over time, what
6    we needed to do with the 10 different banks that make up that
7    LC -- to make it -- is be able to say, okay, we need you to
8    agree now, today, to agree to continue all of those LC's as
9    they roll off, and we'll additionally provide you with $300
10   million of additional revolving credit, and underwriting,
11   stepping up for the billion dollars in term loan.
12          We need you to agree that the company is going to
13   maintain its hedge portfolio, its LC portfolio, through the
14   entirety of the case including pass the current -- what would
15   be the termination of the LC facility, and the actual credit
16   immunity itself past maturity.
17          We need you to agree today to provide that to the
18   Debtors for the entirety of the case including past, what would
19   have been the majority of facility.  And when you are working
20   with 10 different banks that need to all be able to say to the
21   Debtors because they wanted us to, today, you will have that
22   entire LC portfolio for the entirety of the case.
23          These are unfunded, obviously, LC's.  These are LC's
24   that are never expected to be funded.  And Your Honor mentioned
25   they're cash collateralized.  They're partly cash

1    collateralized.  As part of the roll up, the cash collateral

2    will be released.

3          So there wouldn't be cash collateral for them

4    anymore, so it's freeing up cash collateral for the Debtors as

5    well.  That was the deal.  The deal was we would provide the

6    billion dollars of term loan.

7          We will arrange, underwrite the billion dollars of

8    term loan.  We will provide the $300 million of ongoing

9    revolver, and we will provide this $458 million facility and we

10   will commit that as LC's come up, they will be renewed in the

11   ordinary course.  And the Debtors can tell their counter-

12   parties all's right with the world.  We have this.

13         There's no worries that you're going to get a

14   termination -- there's no worries that we're not going to be

15   able to renew them.  And unlike -- Your Honor, I'm usually

16   often appearing before Your Honor, and there's like three

17   parties that I have to go.

18         We can all make a decision.  These are multinational

19   banks from around the world.  And in order to be able to get

20   that signed up today, we had to say, if unfunded exposure is

21   taken off the table today, and you're going to have to continue

22   to provide this program going forward.

23         So there's nothing for anyone to pay off at the end

24   of the case.  These are going to remain unfunded.  They're

25   going to continue to roll along -- continues to operate, and

1      then at the end of the case, they'll hopefully be rolled again,

2      so that the company can continue to operate.

3              It's more of an operational feature than a funded

4      debt -- issue, but even if you were looking at funded debt --

5      issue, you've got the billion dollars that's being provided.

6      You've got that $300 million that's being provided, and you've

7      got the ongoing structure that's being provided.

8              THE COURT:  Look, I'm not going to have a problem on

9      new fundings, but how much are we talking about in terms of

10     rolling these in the next, let's say, 25 days or so, till we

11     can get to a final hearing?  Do we have a --

12             MR. SCHNABEL:  Approximately, Your Honor, it's

13     approximately -- I believe it's approximately -- you know, Your

14     Honor, I never tell you anything I don't know for sure.  I am

15     told approximately $44 million in the next 45 days of the LC's

16     that came up.

17             But the problem is you can't really look at it in a

18     vacuum because unfortunately, Your Honor, I just -- I don't

19     have the 10 banks who all needed -- to support -- with the

20     entire facility to say that they will provide the entire

21     facility without getting this integral part of the facility

22     which, Your Honor, the U.S. Trustee, I believe was -- we spoke

23     to Mr. Duran about this, and we made sure that he understood

24     it.

25             We've made sure that all the parties understood it.

1    We have not gotten objections from the parties on it.  And by

2    the way, Your Honor, obviously, the roll up -- I don't know if

3    you call the roll up.  If you'll call it the roll up, the

4    continuation, is subject to the challenge period, right.  So

5    it's not undoable.

6            It's subject to the challenge period like every other

7    aspect of this is.  But if I don't have that aspect of the

8    system approved today, then I don't have any aspect of the

9    system that I can send up to the Debtors.  And otherwise, we

10   have -- standing by to fund this entire facility tomorrow.  And

11   that's the issue here.

12           THE COURT:  So am I correct that the way that this is

13   structured though, and maybe this is where the tweak can be, is

14   that unless your clients consent, they are entitled to a full

15   payoff on the effective date of the plan?

16           MR. SCHNABEL:  Well, Your Honor, again you say full

17   payoff, but again these are unfunded LC's, so at the -- they'd

18   have to be cash collateralized or replaced at emergent but

19   remember, Your Honor, part of this -- facility provides the

20   company not just a 12 month structure, but provides the company

21   with up to an 18 month structure.

22           So the company has a tremendous amount of time that

23   they're getting, you know, effectively for free, renewals that

24   they wouldn't be entitled to otherwise during the course of the

25   case.

1           But yeah, at the end of the case, if there weren't a

2   further continuation facility to -- into an emergent which Your

3   Honor and I have been doing enough cases together over the

4   years, as you know, is always the case, that the LC facility

5   just continues to roll through.  But it's not committed to roll

6   through now, 18 months from now --

7           THE COURT:  All right.  I want to hear from the

8   parties about this because I am very uncomfortable tying the

9   hands of those folks who aren't here.  How much money is the

10  Debtor going to draw from your clients between -- actually draw

11  between now and --

12          MR. SCHNABEL:  Right.

13          THE COURT:  -- let's say, 30 or 45 days from now?

14          MR. SCHNABEL:  Your Honor, the initial draw of the

15  term loan is $800 million.  The initial draw and the revolver

16  is projected to be $75 million.  And again, Your Honor, I said

17  this already but just to restate it.  You know, it is subject

18  to the challenge period --

19          THE COURT:  The challenge period isn't -- if it turns

20  out that you have legitimate loans right now which I'm not --

21  I'm assuming that you do, the challenge period can't undo this.

22  I'm thinking of maybe adding into the challenge period, because

23  I'm trying to think of a solution that preserves people's

24  rights and works is that within, you know, 45 days of today,

25  that they can repay your advances in cash, and repay any new

1    letters of creditor, or cash collateralizing the letters of

2    credit at which point the deal would be unwrapped for lack of a

3    better description.

4         And then your clients are no worse off having agreed

5    to it, and it gives the time for a committee to determine, you

6    know, can we go out and raise that kind of money.  I don't know

7    what the Debtor thinks of that, but I need to do something to

8    preserve people's rights today, at first day hearings.  Do you

9    all want to take a few minutes and think about this?  I will

10   tell you that I'll run through, by the way, the other three

11   problems I have.  This is by far the biggest problem I got.  I

12   don't want to dribble them out at you.

13        So I don't think the others may even affect you, but

14   let me run through them.  And then maybe we'll take a break,

15   and we'll see if y'all can think about an unraveling mechanism

16   so that your clients are not disadvantaged if they agree to do

17   this today in some reasonable period of time.

18        The second problem is, page 58, and I think this may

19   have been unintended.  And I'm talking about -- not the new

20   order, because I haven't seen the new order.  The one that was

21   filed with it allows --

22        MR. MORGAN:  Your Honor, paragraph number?

23        (Crosstalk.)

24        THE COURT:  Sure.  Yeah, hold on, I can.  Page --

25   subparagraph D, of paragraph 13.  And it's about in the middle

1    of the paragraph.  And what is says is that if there is an

2    event of default, that the lender can terminate the consensual

3    use of cash collateral, no problem.

4              But also could exercise all other rights and remedies

5    provided for in the DIP documents and under applicable law,

6    effectively saying, I think, that the DIP lender can seize

7    assets without coming back to court first.  I don't think --

8              MR. DURAN:  Your Honor --

9              THE COURT:  -- that's what's intended when we get on

10   through the paragraph, but I think that's what it says.  And I

11   want some clean up on that.  So I don't -- yes?

12             MR. DURAN:  Hector Duran.

13             THE COURT:  Yes, sir.

14             MR. DURAN:  We insisted on some language in that

15   paragraph which would indicate that subject to entry of a

16   further order of the Court, which may fashion any appropriate

17   remedy at the hearing pursuant to a stay -- motion.  That

18   language was added --

19             THE COURT:  Is that in the new order?  Is that in the

20   new one that I haven't seen yet?

21             MR. SCHNABEL:  Yes, Your Honor.  So --

22             MR. DURAN:  Yes, Your Honor.

23             THE COURT:  Okay.  Well, good.

24             MR. SCHNABEL:  I think that should be in the order

25   that you have.  Mr. Duran's language does appear, and this is

1  also -- so I believe it says upon giving five business days

2  notice to the Debtors, and then subject to further entry of the

3  Court, and adding Mr. Duran's language.  Then --

4  THE COURT:  Yeah, I'm looking at ECF 17, because

5  that's the only one I could read before I got on here.

6  MR. SCHNABEL:  Okay.  Yes, so, Your Honor, the

7  version now says, and this is -- F, three, it says upon the

8  giving of five business days notice to the Debtors, right, so

9  we have to give notice when the Debtors can run into court, and

10  then subject to entry of further order of the court, which

11  may -- and then Mr. Druan added, which may fashion an

12  appropriate remedy at the hearing pursuant to a stay -- motion,

13  then basing -- so in other words, only after providing the

14  notice and getting the further order of the court effectively

15  can either of those things happen.

16  This is what I call the judge -- language.  I've been

17  beaten up by both of you enough over this paragraph.  I know

18  what I'm allowed to do and what I'm not allowed to do.

19  THE COURT:  I taught him well, that's what that

20  means.  Thank you.  On page --

21  MR. SCHNABEL:  Thank you, Your Honor.

22  THE COURT:  -- 78, paragraph 29, I guess it really is

23  language that's on 79, but essentially this says that MUFG can

24  exercise all of its rights against collateral too.  So if we

25  have similar language that Mr. S just described to cover

1    paragraph 29, I think that would solve that problem.

2         MR. SCHNABEL:  Your Honor, we will take that up with

3    MUFG's counsel.  That was language added by one of the banks

4    for a specific bilateral which we don't have anything to do

5    with but we'll fix it.

6         THE COURT:  Thank you.  The next comment.  This has

7    to do with Mr. Serraginni, where for an under-secured secured

8    creditor, if fees and expenses are paid, and it turns  they are

9    an under-secured, secured creditor, it applies to principal.

10   You guys are wholly unsecured.  I don't have a problem if we

11   get to confirmation and you keep the fees because the whole

12   deal changes.

13        But if for some reason the plan that you're

14   advocating doesn't get confirmed, I need those fees you got

15   paid also to be applied to principal to be consistent with

16   that.  I doubt that causes you a problem but it is a problem

17   for me, or am I correct, Mr. Serraginni?

18        MR. SERRAGINNI:  Yes, Your Honor.  If we're having to

19   take it subject to recharacterization.

20        THE COURT:  Thank you.

21        MR. SCHNABEL:  Your Honor --

22        THE COURT:  Yes.

23        MR. SCHNABEL:  -- you have a long hearing, and

24   there's a bunch of issues that people are going to want to talk

25   about.  I'd love to save Your Honor some time if you don't

1     mind.

2             We can take a break but I feel comfortable that I can

3     agree that if this facility is repaid in full in accordance

4     with the credit agreement during the interim period, then the

5     pre-petition LC's roll down.  That's something I --

6             THE COURT:  I'd like to hear somebody talk to me

7     about that and see, because I mean it's obviously an idea I'm

8     coming up with on the fly.  And we will take a break but we'll

9     see what others think of that.  The final comment I have has

10    already been resolved by other issues.

11            So that's it in terms of what I'm going to raise on

12    the DIP.  I do have somebody that has a comment.  Let me get

13    them active.  Go ahead.  I think that's Mr. Teetra?

14            MR. TEETRA:  Yes, Your Honor.  Good afternoon, Your

15    Honor, Steven Teetra, on behalf of MUFG.  I just raised my hand

16    to address the point with respect to the MUFG paragraph that

17    you identified, if I could?

18            THE COURT:  Thank you, Mr. Teetra.

19            MR. TEETRA:  Great.  Thank you, Your Honor.  We're a

20    little bit differently situated.  I represent MUFG as the

21    issuer of a direct pay of fee to the -- that were issued at

22    credit support, for the respective series of bonds that were

23    issued for the benefit of DES.

24            Our direct pay LC's are then in turn backstopped by

25    LC's issued by -- and I believe what the Debtor, and the Debtor

1    can add their own color to this, but what the Debtor would like

2    to do during the case, and under this DIP order with respect to

3    our facility is to have the authority to continue to honor its

4    reimbursement obligations with respect to our direct pay LC's.

5         There is a component of an post-petition extension of

6    credit under our direct pay LC's because our direct pay LC's

7    get drawn on a monthly basis to pay interest under those bonds.

8    And then our purpose, as long as -- LC, or -- paid through

9    obligations for around -- on behalf of -- then our LC

10   reinstates to the full amount on a monthly basis.

11        Our recourse is to resort to the -- LC's.  We do not

12   have collateral pledged in the form of assets of the Debtors.

13   And so when we say in that paragraph that we want the ability

14   to exercise our rights and remedies under our agreements, the

15   LC agreements, the reimbursement agreement, we're not talking

16   about taking any action against the Debtor's assets or its

17   collateral to -- benefit.

18        THE COURT:  This is -- then just clarify, that you

19   can exercise your rights against the -- LC's?  Just say that?

20        MR. SERRAGINNI:  Okay.  Thank you, Your Honor.  I'll

21   check that with my client.

22        THE COURT:  Because I mean otherwise, I mean this

23   language is so broad, it would give you the right to go sue the

24   Debtor in a foreign country, and it would be just fine with

25   this language.  But if what you want to do is to draw on a

1    third party LC, just say that, and I'm fine with that.

2         MR. SERRAGINNI:  Okay.  Thank you, Your Honor.  Let

3    me discuss it with my client.

4         THE COURT:  Thank you.  Mr. Warren?

5         MR. WARREN:  Thank you, Your Honor.  Matt Warren,

6    King & Spaulding on behalf of the Ad Hoc Term Lender and

7    Secured Notes Group.  Your Honor, I want to comment on one

8    concern we still do have as we work through the DIP during the

9    day today.

10        Look, Your Honor, the Debtors have been quite clear

11   with us, and they're very clear in the DIP motion, that they

12   believe the roll up of the LC's, and the roll up of the hedges

13   and the other first lien parties is not an ancillary agreement

14   that our clients are permitted to object to.

15        But at a minimum, Your Honor, we're trying to

16   preserve rights here for a final hearing, rather than deal with

17   it on the first day.  And there is a finding in clause 87, of

18   the DIP order which has, Your Honor, a finding that we're

19   deemed to have consented to all of the relief requests in the

20   DIP motion which we, as we noted in our statement, really goes

21   to beyond the pre-petition -- creditor, and could bind our

22   hands in a final hearing, including on whether we take issue

23   with whether or not this is an ancillary agreement around the

24   roll up.

25        And that is really -- should read that -- proposed --

1    creditor, we proposed some language -- Debtors to -- that the

2    pre-petition first lien secured parties are just --

3    subordination of their -- and I don't think the pre-petition --

4    creditor goes beyond that.

5         And so we would request that finding be modified, or

6    at least have a statement on the record that we're not being

7    deemed to have consented to all of the relief in the DIP motion

8    that's being sought, Your Honor.

9         THE COURT:  What language, what should the language

10   say that allows the order to be --

11        MR. WARREN:  I believe --

12        THE COURT:  -- that preserves your rights?

13        MR. WARREN:  Our proposal, Your Honor, would be the

14   pre-petition first lien secured parties are deemed to have

15   consented to the subordination of their lien at the time the

16   pre-petition -- agreement, the DIP liens for the avoidance

17   without.  Nothing in this paragraph modifies any of the terms

18   of the pre-petition inter-creditor agreement.

19        MR. MORGAN:  That's fine, Your Honor.  That works for

20   the Debtors, Your Honor.

21        THE COURT:  All right.  We'll save that language.

22   Can I hear others comment about the roll down that

23   Mr. Serraginni is prepared to live with in order to keep me a

24   happy person?  Does that cause heartburn to other parties to

25   the deal?

1          MR. SERRAGINNI:  No, Your Honor, on behalf of the Ad
2   Hoc Unsecured Group.  We appreciate the LC facility staying in
3   place, and Mr. S's the person to do that.  We just want to see
4   what's best for the business.  This is all senior -- from our
5   perspective, so no issue.
6          THE COURT:  Mr. Morgan?
7          MR. MORGAN:  It's okay with us, Your Honor, if
8   they're willing to live by it.
9          THE COURT:  All right.  And Mr. Albarino, go ahead.
10         MR. ALBARINO:  No objection, Your Honor.
11         THE COURT:  Thank you.  Anyone else have any issue
12  with the roll down feature?  Does anyone have any other
13  objections to the DIP order.  All right.  This is a matter I
14  have jurisdiction of.  I'm sorry, go ahead.
15         MR. SCHNABEL:  So sorry, Your Honor, you know I can't
16  help myself.  One clarification to my generous offer.  We --
17  obviously as Your Honor said, to the extent of LC's that are
18  newly issued during the interim period, those obviously could
19  not be subject to a roll down.  I think that's obvious from
20  what Your Honor said, but I wanted to clarify that.
21         THE COURT:  Sorry.  If -- look, if -- no, what
22  they --
23         MR. SCHNABEL:  In other words --
24         THE COURT:  -- have to do is they have to pay you
25  back any cash in advance, and they have to put up enough cash

1    for the LC's you've issued during the interim period.

2              MR. SCHNABEL:  Correct.

3              THE COURT:  Yeah.  So I'll let you all craft that

4    language to be sure you're protected and you get the benefit of

5    the bargain that we've talked about.  I don't think that'll be

6    that -- once y'all get to crafting it.  I've got one more

7    person that had a comment.

8              Let me see.  Ms. Eaton, go ahead.

9              MS. EATON:  Thank you, Your Honor -- and I understood

10   that there were going to be some clarifications on adequate

11   protection made by Weil Gotshal.  I have the preview of what's

12   to come in between the periods between now and the final order.

13   Is that going to be addressed now, or is that going to be

14   addressed after you approve the order?

15             THE COURT:  I don't know it's coming, so I'll let

16   Mr. Morgan tell us.

17             MR. MORGAN:  I would -- that was -- I was going to

18   try and interject, Your Honor, before you moved too quickly

19   past me.  Where I sort of was intending to take my calls way at

20   the beginning, we have in this order and very deliberately put

21   the payment of professional fees separate and apart from

22   adequate protection as others have flagged to you, Your Honor.

23   That's deliberate, and that's because we don't believe is

24   adequate protection in case -- for other reasons.

25             Similarly we are looking at and willing to entertain

1        the concept of paying post-petition interest in cash

2        periodically under a final order.  It wasn't something that we

3        could quite work out.  There are liquidity concerns and we need

4        to make sure that we come up with the mechanics that works for

5        the company that also works for the secured creditors.

6                And we're willing to entertain that.  We've been

7        talking to them about that, and we'd like to continue talking

8        to them about that, and hopefully propose something in a final

9        order that -- and Your Honor, as well.

10               THE COURT:  As Mr. Schnabel, knows, I'm much easier

11       to get along with at a final hearing, so that's fine with me.

12       Mr. Albarino, did you have a similar comment?  I think you

13       raised your hand again?

14               MR. ALBARINO:  Yeah, I was waiting desperately, Your

15       Honor, to get your attention.  Ms. Eaton beat me to the punch

16       though, and Mr. Morgan began to address the issue.  It's just

17       interesting in this case that, you know, we are, you know --

18       that we're at the cusp of approving a very material -- where

19       the company is handing -- the unsecured creditors yet.

20               The secured creditors are not receiving current

21       interest during the course of the bankruptcy case.  I know

22       you've looked at the budget, Your Honor, because I know you

23       spend a lot of time scrutinizing it.

24               And you know, I was just calling your attention to

25       the line 34, for the company's unrestricted cash balance.  You

1     can see, towards the end of period 13, which is in August, the

2     company has an unrestricted cash balance of close to $780

3     million, Your Honor.

4            This company will be building cash throughout the

5     bankruptcy case.  Now I think the company and their advisors,

6     to their credit, they have -- at this point, and while we

7     recognize that there are liquidity issues perhaps at the front

8     end of the case, that's not the case as the case progresses.

9            And you know, given the facts and circumstances here,

10    including the amount of priming that is occurring, not

11    addressing other obligations that being elevated here, you

12    know, we think it makes perfect sense, and we think the company

13    can afford it.

14           We've been dealing with inter-creditor issues for

15    many months now, with the company telling us, you know, what

16    they don't have to do.  And I think there's a big difference

17    between the company, you know, can do and what the company

18    should be doing here.

19           So we look forward to working with the company

20    between now and the final hearing.  We have to work on language

21    to address their liquidity concerns.  But you know, if we're

22    not there on language, you know, you should expect to hear from

23    us at the final hearing on whether the company should be

24    keeping their secured capital -- current during the course of

25    this bankruptcy case.

1          THE COURT:  So I hope you all can reach an agreement,

2    but I'll tell both you and the Debtor, and this is a case where

3    I don't know how it'll come out, so I hope you read this the

4    right way.  I follow Timbers of Linwood Forest like the Supreme

5    Court makes me do.

6          So you know, if you don't reach an agreement, we'll

7    have an evidentiary hearing as to whether you're entitled to

8    it, and I'll follow Timbers.  And I don't know how the evidence

9    is going to turn out on that.

10         So I'm telling that to both sides is as you're doing

11   your negotiations, I'm not going to do what I think is right.

12   I'm going to do what I think Timbers tells me to do.  So --

13         MR. ALBARINO:  Understood, Your Honor.

14         THE COURT:  -- that may help you a lot, it may hurt

15   you a lot.  And I don't know the facts.  But just so everybody

16   knows what I'll do.

17         MR. MORGAN:  Yes, Your Honor.  Since we're all

18   previewing, there is an inter-creditor in place.  The ability

19   of the secured parties that have been speaking pretty freely at

20   this hearing to object to adequate protection is constrained.

21   And so if we're going to have evidentiary hearings, we're also

22   probably going to have motion in limine.  So hopefully we can

23   all work this out and come to you with a consensual mechanic.

24         THE COURT:  I hope, but if not, I don't mind calling

25   shots.

1          MR. MORGAN:   (Indiscernible).

2          THE COURT:  That's what we'll do.  I'm just trying to

3    preview with everybody.  You know, you might as well put your

4    thoughts into what the evidentiary record will look like.  And

5    I'm not ruling on whether in fact they can present evidence.

6    If they can't, it's going to be a hard objection.

7          But I haven't ever looked at the inter-creditor

8    agreement.  I think it's before me, but I haven't read it.  And

9    so I'm not ruling one way or the other whether they have the

10   right to do that.  All right, Mr. Ashmead, let me get your line

11   active.  Hold on.  Mr. Ashmead, good afternoon.

12         MR. ASHMEAD:  Good afternoon, Your Honor.  John

13   Ashmead, of Seward & Kissel, on behalf of Wilmington Trust,

14   N.A.  It's an administrative agent on the 2019 term loan --

15   Your Honor has heard from representatives of a number of our

16   holders through King Spaulding and Paul White's group.

17         So you know, I'd just like to say given that there's

18   all the discussion about the debt that we're still getting our

19   sea legs under us, and the agent's silence here is certainly

20   not a consent to anything, you know, what rights are, what they

21   are.  We reserve them, and as appropriate, we'll raise issues

22   in the future.

23         And you know, we're not looking to go beyond anything

24   that constraints.  It's a creditor agreement but that's yet to

25   be seen.  With that, Your Honor, I have nothing else.

1          THE COURT:  Thank you, Mr. Ashmead.  All right.  I

2     have jurisdiction over this under 20 USC, Section 1334.  This

3     is a core matter under 20 USC, Section 157.  There are actually

4     no objections that have been lodged today, nor has there been

5     any evidence that contradicts the Debtor's first day evidence.

6          I'm ruling on a first day basis only.  I'm not ruling

7     at all what a final order should look like.  But the Debtors

8     have demonstrated through the evidence that is in the record

9     their need for this cash, and their need for the loan, and a

10    reasonable prospect of where they are heading in the case that

11    demands that they be able to use the funds that are provided.

12         The protections which we have now amended in some

13    ways by agreement on the record of the parties are appropriate,

14    and the parties have now all agreed to those additional

15    protections ordered by the Court.

16         I find based on the evidentiary record before me,

17    that the proposed interim DIP loan, or interim order is

18    appropriate.  I will ask the Debtor to upload a revised form of

19    order that includes the changes that were discussed on the

20    record today, and I will get that signed, I suspect around the

21    time you wake up in the morning, if you get it done before you

22    go to sleep tonight.

23         It'll be the first thing I do when I wake up.  So

24    you'll have your order done in the morning.  Let me see.

25    Someone had a question.  Mr. Teetra, go ahead.

1          MR. TEETRA:  Yes, Your Honor.  Thank you.  I just

2     wanted to circle back on the MUFG LC point.  And we'll work

3     with the Debtors on some language to limit that, all rights

4     with respect to the relief from today.  I just wanted to raise

5     my hand to clarify.

6          Really we just want to make that we have the ability,

7     not only to draw on the -- LC, but to issue whatever notices

8     are contemplated under the reimbursement agreement in the event

9     of a default by Talen to not reinstate our LC, effectively

10    terminate.  You know, those sorts of rights.

11         We're not trying to take any action against any

12    collateral.  Like I said, we don't have any, or file any

13    lawsuits.  But we're happy to work with the Debtor on some

14    clarifying language, if that satisfies Your Honor.

15         THE COURT:  It does.  And I appreciate your

16    clarification.  Of course, that's fine with me.  Thank you.

17    All right.  I am authorizing the Debtor -- I'm sorry,

18    Ms. Eaton, did you have something else?

19         MS. EATON:  Yes, Your Honor.  There is -- there's an

20    issue, and I'm only raising this now because it's something I

21    hope we get resolved.  But really out of respect for you

22    because it's potentially material, just want to put it on your

23    radar screen.

24         You know, this has nothing to do with adequate

25    protection but really out of respect for the inter-creditor

1    itself since there's been a lot of discussion about it.

2    There's a potential, hopefully not, but a potential -- about

3    whether the commodity -- is eligible to be treated as a first

4    lien secured facility, and whether that'll be subject to

5    challenge -- how the facility was -- potentially a violation of

6    pre-petition credit agreements.  So the way to address this is

7    to bring it under as set forth as drafted to a party in

8    interest under the intercreditor would bring it under the

9    challenge period.

10           My clients are advocating to not do that and to

11   resolve this consensually.  That is going to be a matter for

12   discussion between now and the final hearing.  It's a material

13   issue because the commodity facility is a material part of the

14   capital structure.  And that's something that if we can't get

15   the consensual resolution or if the case falls apart and the

16   (indiscernible) are not successful, there could be a big issue

17   in your case.

18           And we're hopeful that that doesn't happen, and we

19   are all singing Kumbaya and, you know, this is going to go

20   forward without any disputes.

21           But I just wanted to alert you that over the next

22   several weeks, Your Honor, the parties are going to be working

23   together to make sure that that isn't an issue.  And I didn't

24   want you to plan up on the second day not ever having heard

25   about this at all.

1          THE COURT:  No, no, I'm glad you gave me the heads

2     up.  I just want to repeat back to you at least though part of

3     what I'm hearing, which is that's an objection that you may

4     raise at final but you're not raising it at interim; is that

5     correct?

6          MS. EATON:  Correct.  I heard you entered -- approved

7     the order so, no.  But just to alert you that that is a

8     negotiation to come.

9          THE COURT:  Appreciate the heads up.  I don't think

10    it alters the ruling that I made.  And I'm -- but I'm glad to

11    know that that might happen.  Thank you.

12         All right.  The Debtors are authorized orally to

13    borrow under the facility, under the interim order on the terms

14    that I have now orally approved.  Again, I'll get this done

15    first thing in the morning.  But you all can go ahead and start

16    doing overnight draws and things like that with my authority so

17    that no one's violating it.

18         I got it that the lenders may not fund it until I

19    sign an order.  They may be willing to.  But in any event the

20    Debtors are authorized to act, as are the lenders, under the

21    oral ruling.

22         Where do you want to go next, Mr. Morgan?

23         MR. MORGAN:  (Indiscernible) Mr. Barr.

24         MR. BARR:  Your Honor, sorry to interrupt but

25    Mr. Hernandez actually has plans to fly to certain of the

1     plants to speak with the employees in the morning, and is doing

2     a couple of circuits.  If it's okay with you I would ask that

3     he be allowed to be excused.

4               THE COURT:  Mr. Hernandez, thank you for coming

5     today.  Go take care of your people.

6               MR. HERNANDEZ:  Thank you, sir.  Appreciate the

7     Court's time, Your Honor.

8               THE COURT:  Thank you.  Mr. Hernandez, you're free

9     when you're in your car to just dial in and listen if you want

10    to hear what's going on.

11              MR. HERNANDEZ:  Yes, sir, I will do that.  I very

12    much appreciate the offer.

13              THE COURT:  Thank you.  All right.  Mr. Morgan.

14              MR. DURAN:  Your Honor.

15              THE COURT:  Yes.

16              MR. DURAN:  Hector Duran for the U.S. Trustee.  I

17    didn't know if I heard the date for a final hearing and an

18    objection deadline.

19              THE COURT:  Yeah, when do you want that?

20              MR. SPEAKER:  As soon as we can before 35 days.

21              THE COURT:  Mr. Morgan, what's the ideal date for the

22    Debtor for that final hearing?

23              MR. MORGAN:  Okay.  Hold on, Your Honor, if I could

24    grab a calendar.

25              THE COURT:  I think the thirty-fifth day is I believe

1    June 14th, if I've counted it right.

2         MR. MORGAN:  That's right, Your Honor.  Yeah, I'm

3    just looking at calendar now.  I would say the week before.

4    Unless anyone else in the room is telling me that that doesn't

5    work for them or is problematic, I would say some time in the

6    week of the 6th or maybe the 7th, 8th, 9th, if that works, Your

7    Honor.

8         THE COURT:  Okay.  You don't want to see -- I promise

9    you're not going to want to see me on the 6th.  How about the

10   7th at 1:30?

11        MR. MORGAN:  Good with the Debtors, Your Honor.

12        THE COURT:  Okay.  Final on the cash collateral will

13   be June 7th, 1:30.  The objection deadline is June 2nd at

14   5:00 o'clock p.m.  If you'll just put that in the final that

15   you submit, Mr. Morgan.

16        MR. MORGAN:  Your Honor, I just -- is there any

17   chance we could actually push it to the 8th?  Would that be

18   possible?  I apologize for the back and forth.

19        (Pause)

20        THE COURT:  I can do it on the 8th but I can't start

21   until about 3:30, if that works for you.

22        MR. MORGAN:  That'll work for us, Your Honor.

23        THE COURT:  Does anyone object to the 8th of June at

24   3:30?

25        (No audible response)

1           THE COURT:  All right.  The deadline for objecting

2    will be the 3rd at 5:00 o'clock.

3           MR. MORGAN:  Perfect.  Thank you.

4           THE COURT:  Thank you.

5           MR. MORGAN:  Thank you, Mr. Duran, and thank you,

6    Your Honor, for entry of the DIP order.  It really is a

7    milestone for the Debtors, and we appreciate it.

8           I'm actually going to turn the podium over to my

9    colleague Mr. Carlson --

10          THE COURT:  All right.

11          MR. MORGAN:  -- to take our next item on the agenda.

12          THE COURT:  Thank you.

13          MR. CARLSON:  Good evening, Your Honor.  Cliff

14   Carlson of Weil Gotshal for the Talen Debtors.

15          THE COURT:  Afternoon.

16          MR. CARLSON:  Your Honor, I think from here I would

17   like to go to the hedging motion at ECF Number 29.

18          THE COURT:  All right.

19          MR. CARLSON:  And also shortly into the hearing we

20   filed a -- we uploaded an updated form of order there based on

21   discussion with counterparties leading right up to the hearing

22   today.  That's at ECF Number 109.

23          THE COURT:  Okay.  Let me bring that over.  Hold on.

24          MR. CARLSON:  Sure.

25          (Pause)

1          THE COURT:  I have the new hedging order open.

2          MR. CARLSON:  So just some preliminary remarks before

3     maybe we go to the relief requested.  As you probably surmised

4     from seeing the papers, the Debtors' hedging program is

5     extremely important to them and a big part of sort of their

6     plan going -- the plan going forward.

7          Historically they've sought to have about 70 to 75

8     percent of their projected generation hedged.  It's

9     significantly below that amount to date for a couple of

10    reasons, but primarily because hedge counterparties have been

11    unwilling to trade with the Debtors outside of bankruptcy.

12         And so that's -- so, Your Honor, the -- in the weeks

13    leading up to and months leading up to the filing, we've been

14    actively engaged with the counterparties.

15         And a little bit of background.  There's generally

16    two types of trading, hedges that are put on by the company.

17    There are the exchange-based trade through (indiscernible) and

18    that goes through a futures contract merchant that's -- and

19    then that is typically requires the company to post cash

20    collateral to trade.

21         And then there's their lien-based trading with their

22    bilateral trade with the counterparties, which they have about

23    around 20 of those.  Those claims, those counterparties, are

24    secured by the company's collateral, first lien collateral,

25    parried with the other one (indiscernible) creditors in the

1    case.

2             And so those also primarily secured by that

3    collateral's (indiscernible) margin.

4             And so the focus has been on reaching arrangements

5    with these counterparties leading up to the filing to be able

6    to implement the Debtors' hedging program and have the capacity

7    to hit its targets and also avoid a scenario where there's

8    going to be counterparties terminating on day one and

9    crystalizing first lien claims against the estate at a very,

10   very, very high amount.

11            I think as noted in Mr. Alejandro's declaration

12   couple days -- as of a day or two ago, it would have been to

13   the tune of about $600 million.

14            And so moving into the relief requested here, the

15   first part of it is sort of the ordinary relief you'd see in a

16   hedging motion to allow the Debtors to continue performing

17   under their hedge agreements, including pre- and post- as they

18   come due, and under both Debtor exchange-based trades through

19   the one existing exchange of FCM (phonetic).  And also with all

20   the counterparties to allow them to continue performing and

21   posting collateral as required.

22            The second part of the relief is authorizing the

23   Debtors to grant what I'll call like the DIP protections to

24   these counterparties.  We've reached an agreement with five of

25   the counterparties.  And then I think we're on the cusp of

1    maybe a sixth here.

2           And the structure of those agreements has been

3    essentially, number one, the counterparty agrees to waive or

4    forebear from exercising their termination rights and their

5    safe harbor Debtor under the Bankruptcy Code and have the right

6    to do so, and they get sort of a new set of termination rights

7    while in bankruptcy while trading with the Debtors.

8           And then, number two, the other benefit here is we

9    are getting some level of commitment from the counterparty to

10   trade.  And then there's sort of varying degrees of commitment

11   and what the agreements provide for.

12          And so then we've -- in addition to that, we've sort

13   of -- the way we've structured this is we've worked in kind of

14   a mechanism in the proposed order that essentially says that to

15   the extent a counterparty just fails to live up to their

16   commitment under the agreement, the Court can essentially

17   unwind those DIP protections.

18          And I'll talk to you -- I can tell you about what

19   those -- exactly what those DIP protections are that we're

20   telling -- we're requesting the Court to authorize.

21          As I said, so it's sort of bifurcated between pre-

22   and post-petition.  All of the post-petition allegations that

23   the counterparties -- that the Debtors would incur to the

24   counterparties would be, number one -- and right now I'm

25   talking about the counterparties -- would be secured by super

1    priority liens that are parried with the DIP.

2          And, number two, they would also have super priority

3    administrative expense claims against the estate for those

4    post-petition.  And that is effective upon an entry of this

5    interim order today.

6          And then the second piece of that is prepetition

7    claims will also be -- will have those same two protections

8    effective upon a final order, with the exception of two parties

9    who the arrangements that are reached is then that their

10   prepetition claims would be rolled into the DIP on day one.

11         And for sure the unique circumstances and value that

12   they're providing to the Debtors' estate that I'll walk the

13   Court through and that Mr. Omohundro will walk through in his

14   declaration that we filed at Docket Number 44.

15         And then with respect to the FCM, the future contract

16   merchants, as of today we just have one of those.  And we've

17   reached an agreement or on the cusp of reaching agreement for

18   what that FCM will provide for post-petition with the Debtors.

19   We would be granting the FCM a super priority admin. expense

20   claim securing the Debtors' obligations, pre- and post-petition

21   obligations effective upon entry of the interim order.  And

22   they're essentially a broker, right, processing exchange trades

23   from the Debtors.

24         And so then, Your Honor, I'll just go straight to

25   sort of the two counterparties that are being treated a little

1    bit differently here.

2         J. Aron is the first.  And the value that they're

3    providing here is, number one, historically they've been at the

4    top of the list for the level of volume of trading with the

5    company.

6         And based on the commercial discussions, the hope and

7    expectation is that they'll be close to that level or at least

8    some level that's been really -- helped the company reach its

9    targeting hedging levels.

10        But, number two, there's also a -- there also is the

11   repurchase agreement of coal that Mr. Morgan was -- briefly

12   touched upon in walking through the budget with you.  And

13   basically what that -- the way that agreement works is the

14   Debtors have a five-business day option to purchase --

15   repurchase the coal that's worth approximately $230 million

16   today for 165 million.

17        That option also, however, requires payment of the

18   prepetition (indiscernible) claims to J. Aron, and so

19   effectively would result in dollar-for-dollar payment, which is

20   -- the Debtors intends to execute that option.  So those are --

21   so that's the J. Aron sort of unique relationship there.

22        With respect to the Morgan Stanley, the other

23   counterparty that's being treated differently, the arrangement

24   that has been reached with them is that their rollup will be

25   effective upon execution of trades that have already been

1    contemplated and discussed between the commercial teams at
2    Talen and Morgan Stanley.
3           And so the deal is basically they don't get the
4    protections until the trade is executed and which is expected
5    to occur shortly after hopefully orders are entered.
6    So I'll pause there for a second in case you have questions.
7           THE COURT:  No.  I mean, I actually thought that the
8    motion made a lot of sense.  And I understand why hedging is
9    treated differently than other things.  And I want to hear
10   whether any parties have any issues where maybe I'm not looking
11   at this right.
12          I'll tell you when I started reading it, I thought I
13   was going to have a lot of problems.  And when I finished
14   reading it, I really didn't.
15          So the only real thing I was going to talk to you
16   about was deleting, you know, paragraph 16, which we talked
17   about at the beginning of the hearing.
18   But does any party think that this hedging motion should not be
19   approved as set forth in the proposed order?
20       (No audible response)
21          THE COURT:  All right.  Well, based on the
22   declarations -- let me clarify with Mr. Serraginni, given what
23   I stated at the beginning of the hearing, do you have any
24   objection to me taking out the language in paragraph 16 of the
25   proposed order?

1        MR. SERRANGINNI:  I do not, Your Honor.  And I can

2   reaffirm that for any future orders as well.

3        THE COURT:  Thank you.  I'm just going to take out

4   16.  And if no one has any objection, then based on the

5   uncontested evidence and argument of counsel, I'm going to

6   approve this.

7        Tell me again when the final hearing is set.  I'll

8   put the right time in.  I think it was June 8th at 3:30, right?

9        MR. CARLSON:  That's correct, Your Honor.

10       THE COURT:  We had objections due on June 3rd at

11   5:00 o'clock; is that what we said?

12       MR. CARLSON:  Yes, Your Honor.

13    (Pause)

14       THE COURT:  I sent it to docketing.  All right.  What

15   do you have next, Mr. Carlson?

16       MR. CARLSON:  So next, Your Honor, is just our motion

17   to file under seal we filed at ECF Number 55.

18       THE COURT:  Yeah, I'm not going to take that up

19   today.  I'll just let that run its course.  They stay under

20   seal until I rule on it.  It's just not an emergency.

21       MR. CARLSON:  Okay.  Great.  Then I'll pass the

22   podium over to my colleague Katherine Lewis.

23       THE COURT:  Thank you.

24       MR. CARLSON:  Thank you, Your Honor.

25       MS. LEWIS:  Good afternoon, Your Honor, Katherine

1    Lewis of Weil, Gotshal, and Manges on behalf of the Debtors.  I
2    will be on -- well, I guess one -- the next item on the agenda
3    is actually the NOL motion at agenda item number seven.
4             If you don't mind, we moved things around a little
5    bit this morning and so my colleague Daphne Papadatos will be
6    handling that motion after I handle docket items or agenda
7    items eight, nine, and ten, if that's okay with you.  Is that
8    all right to proceed in that order?
9             THE COURT:  Sure.  Tell me which one you want to go
10   to.
11            MS. LEWIS:  So I would first like to go if it's all
12   right with you to agenda item number eight on the Debtors'
13   vendor motion.
14            THE COURT:  Sorry, the Debtors' which motion?
15            MS. LEWIS:  The vendor motion.
16            THE COURT:  Vendor motion.
17            MS. LEWIS:  Yes.  So item number eight which ties to
18   Docket Number 13.  By this motion the Debtors receive the
19   authority to pay prepetition claims of certain vendors.
20            These claims include critical vendor claims, lien
21   claims, 503(b)(9) claims, and co-ownership obligations, which
22   those obligations are obligations of the Debtors as co-owner
23   and operator of its coal plant in Montana in which a
24   significant portion of such amounts owed are actually prepaid
25   or reimbursed by those co-owners.

1          So pursuant to the motion, the Debtors seek authority

2     and discretion to pay up to the following amounts on an interim

3     basis:  40.2 million with respect to critical vendor claims;

4     23.3 million with respect to lien claims; 30.1 million with

5     respect to 503(b)(9) claims; and 14.7 million with respect to

6     those co-ownership obligations.  Again, all on an interim

7     basis.

8          Your Honor, we've broken the vendors out into those

9     four categories.  But really, regardless of the specific legal

10    basis of relief we're relying on, the truth of the matter is

11    that any of -- any disruption receiving the goods or services

12    provided by any of those vendors would -- could severely impact

13    the Debtors' power generation operations, create public safety

14    or regulatory issues, and ultimately impact the Debtors'

15    ability to generate revenue.

16         Taking the different categories of relief in turn --

17    and I promise I'll be quick.  I am mindful of the time.  The

18    critical vendors fall into three subcategories or buckets:  the

19    fuel and fuel support vendors, the specialized services and

20    support vendors; and then the regulatory and compliance

21    vendors.

22         I'm happy to talk about each of those subgroups of

23    critical vendors, about how they are critical pieces of the

24    puzzle, that is the Debtors' operations and the importance of

25    their continued relationships with the Debtors.  But it is

1       clearly laid out in the motion that we filed today so it's up
2       to you.
3               And we tried very, very hard, if you couldn't tell,
4       and hopefully you could, to set all of this out in great detail
5       in the motion to provide Your Honor and other third parties in
6       interest with the fullest picture of why this relief -- and I
7       won't pretend that it is an insignificant number, so why the
8       relief is truly critical to the preservation of value and that
9       the relief needs to be granted today.
10              THE COURT:  So, Ms. Lewis, let's go to --
11              MS. LEWIS:  I --
12              THE COURT:  -- your form of order then because I do
13      think you laid everything out.  First of all, I think in
14      paragraph one, the fourth line, I think there's just some words
15      missing where it says, described in the motion 40.2 million.
16      Should that say not to exceed 40.2 million?
17              MS. LEWIS:  Yes.
18              THE COURT:  Okay.  Why is it that I should approve
19      your client using reasonable efforts and failing, and you're
20      going to pay somebody anyway that won't agree to trade vendor
21      terms?  Why would we pay somebody a prepetition debt if they
22      won't agree to continue to provide you post-petition goods and
23      services?  You use reasonable --
24              MS. LEWIS:  Good question, Your Honor, --
25              THE COURT:  -- efforts and fail, you still want to be

1    able to pay them.  And I don't understand that at all.

2         MS. LEWIS:  I apologize for interrupting.  It's a

3    good question, Your Honor.  The answer is really, and the

4    reason why we're filing the motion itself, these vendors truly

5    are critical.  And if you look at the motion and the reasons we

6    have laid out therein, you -- for many of these vendors there

7    is no alternative.  So we --

8         THE COURT:  I understand there's --

9         MS. LEWIS:  -- may unfortunately --

10        THE COURT:  No, I understand there's no alternative.

11   But they won't agree to continue to provide you services so why

12   are you going to pay them?  Which is what this says.

13        MS. LEWIS:  Well, I believe the language is that they

14   would perhaps not continue to provide services on the same or

15   equal terms.  I'm not sure I -- it obviously would not be in

16   the Debtors' interest to agree to pay a vendor if they were

17   refusing to, you know, ongoing relationship with the company.

18   So I agree with you on that front and certainly --

19        THE COURT:  And what if they come back to you and

20   say, we're so critical, we're doubling our rates?  And you want

21   me to authorize that today.  I want you --

22        MS. LEWIS:  Your Honor, the Debtors --

23        THE COURT:  If your client can't get somebody to

24   agree, they don't get paid.

25        MS. LEWIS:  Understood.  The Debtors will endeavor

1       to, you know, negotiate and ensure that the vendors continue to
2       provide goods and services on the terms that they were
3       providing them prepetition.
4               I think that is certainly the goal.  We -- just
5       because of how critical and the single source of some of these
6       vendors, we would want a little bit of flexibility with the
7       language.  But I agree with you.  It is the Debtor's intent to
8       ensure that all these vendors are agreeing to continue to
9       provide goods and services on the same terms that they did
10      prepetition.  I think --
11              THE COURT:  If --
12              MS. LEWIS:  -- our hope would be that it would --
13              THE COURT:  If I give you discretion, I take away
14      your leverage.  People either are going to provide the trade
15      terms or they're not going to get paid.  That's paragraph one.
16      Paragraph two I'm okay with.
17              Paragraph three, this is again reasonable efforts.
18      No.  If they want to get paid, they're going to agree to it.
19              MS. LEWIS:  Understood, Your Honor.
20              THE COURT:  I didn't understand in paragraph four,
21      however, the reasoning behind paragraph four was that you had
22      to pay co-ownership obligations absolutely.  But you've used
23      critical vendor reasoning in it.
24              I don't understand the language in paragraph four.
25      Maybe I misunderstood the motion.  But I thought these were

1      co-ownership obligations and it didn't really matter if they

2      were critical vendors or not.

3              MS. LEWIS:  They are -- well, they are co-ownership

4      obligations.  Certain of the vendors I think -- certain of the

5      vendors in that bucket could fall into -- even if we decide the

6      co-ownership obligations could fall into the critical vendor

7      bucket, we kind of grouped these with these just because of the

8      niche -- the concept.

9              THE COURT:  No.  But this --

10             MS. LEWIS:  But --

11             THE COURT:  -- paragraph says co-ownership

12     obligations, you still have to use reasonable efforts to get a

13     trade agreement.  And I thought it was just a different

14     rationale for co-ownership obligations.  Am I missing --

15             MS. LEWIS:  Your -- no, I think you actually may be

16     right.

17             So we did provide these motions to the U.S. Trustee.

18     And I'm not suggesting that this -- in discussions with the

19     U.S. Trustee we were talking about adding this language to each

20     of these, you know, these buckets for relief and the standard

21     that they would like us to apply in negotiating these

22     agreements.  I think it may have just been a carryover.

23             So we can tweak this and make sure it, you know,

24     makes more sense.  And we apologize for the oversight in

25     incorporating those comments.

1        THE COURT:  Okay.  I'm just going to take all that
2   critical vendor stuff out of this paragraph and authorize -- I
3   think you justified doing that but I don't think that it    I
4   just think the language is wrong.
5        MS. LEWIS:  Your Honor, and I was actually also just
6   reminded, we are the operator of the plant -- or of the coal
7   plants.  So, you know, that's also a consideration and perhaps
8   makes -- and we pay the vendors on behalf of the co-owners, who
9   then reimburse us.  The reimbursement is up to 85 percent, so a
10  significant portion of those claims are prepaid by the
11  co-owners.
12       THE COURT:  I'm giving you more than what you're
13  asking me for.
14       MS. LEWIS:  Okay.  We understand.  And thank you.
15       THE COURT:  Paragraph six, I'm not going to authorize
16  you to negotiate, modify, or amend the form of vendor agreement
17  if that eliminates their obligation to pay trade terms.  So
18  I'll add that language.
19       MS. LEWIS:  All right.
20      (Pause)
21       THE COURT:  Okay.  Does anyone have any objection to
22  the critical vendor motion?
23      (No audible response)
24       Take out paragraph 11.  With no objections, I find
25  that the declarations and the motion justify the relief.  We'll

1    give you the same final hearing.  Let me fill that in.  I

2    signed your order and we will send it to docketing with those

3    changes.

4                    MS. LEWIS:  Very grateful, Your Honor.  Thank you.

5                    THE COURT:  Where do you want to go next?

6                    MS. LEWIS:  So next I am looking at agenda item

7    number nine, a very important motion, the Debtors' wages motion

8    which is tied to docket number five.

9                    As I'm sure you've read in the motion, and as

10   Mr. Hernandez said earlier this evening, the Debtors very

11   proudly employ over 2,100 employees, as well as certain

12   supplemental workers.  These individuals are the people

13   responsible for, among other things, keeping the Debtors'

14   plants running safely and efficiently.  And the emphasis really

15   should be on safely, Your Honor.  I know the Debtors are --

16   they take great pride in their safety record.

17                   Your Honor, in addition to wages and compensation

18   obligations, in the ordinary course of business the Debtors

19   maintain customary employee programs, including health and

20   welfare benefits, retiree benefits, expense reimbursement, paid

21   time off, very typical stuff.  Hopefully nothing in here

22   surprises you too much.

23                   There are a few things I would like to go ahead and

24   highlight for you.  First, the Debtors maintain a number of

25   employee bonus programs across the corporate structure.  Many

1    of them are tied to specific plants or geared towards certain

2    objectives.  For example, safety as I said is very important to

3    the company.

4            The Debtors also maintain severance policies or have

5    entered into severance agreements with respect to certain

6    employees, including certain insiders.

7            Pursuant to the motion, the Debtors are seeking

8    authority to continue these bonus programs with respect to

9    non-insiders only.  We are not seeking any insider relief with

10   respect to bonus programs at this time.

11           The Debtors are also seeking to continue its

12   severance programs for both insiders and non-insiders and any

13   payments to insiders not to exceed those amounts set by Section

14   503(c)(9) of the Code.

15           Related to each of those topics -- and like I said,

16   we did share the motions with the U.S. Trustee before filing,

17   and we received some comments.

18           Among other very helpful cleanup changes, which we

19   appreciate, their office has requested the Debtors provide ten

20   days' notice, along with certain detail regarding the recipient

21   to the U.S. Trustee and any statutory committee appointed in

22   the cases regarding any bonus-related amounts or severance

23   amounts to be paid to non-insiders.  We're happy to accept this

24   comment.  We've incorporated it into the proposed order.

25           And we feel we have proposed a reasonable threshold

1    -- this wasn't discussed with the U.S. Trustee when we parted

2    ways after our call to discuss the motions.  So we spoke with

3    the company and feel that a $60,000 threshold for that notice

4    requirement is reasonable in light of the circumstances.  And

5    so we hope that this works for the U.S. Trustee.

6          Your Honor, the U.S. Trustee did have a few other

7    questions and comments for us, some information requests that

8    we are endeavoring to be as responsive as possible to make sure

9    they get all the information their office needs.  Many of those

10   have already gone out the door with their comments incorporated

11   into the proposed order.

12         Unless you have any questions for me on the motion,

13   we would ask the Court help us keep the lights on for the folks

14   at home that are helping many other people keep the lights on

15   by approving the order and the employee-related relief we

16   requested today.

17         THE COURT:  Thank you.  Does any party have any

18   objection to the employee motion?

19      (No audible response)

20         THE COURT:  All right.

21         MR. DURAN:  Your Honor, Hector Duran.

22         THE COURT:  Mr. Duran.

23         MR. DURAN:  Just wanted to make sure that the U.S.

24   Trustee is okay with that proposed cap of 60,000.  We're

25   providing information in connection with employee bonus

1   obligations and employee severance obligations.

2           I also wanted to alert the Court that we had raised

3   the issue of a PTO cash-out.  Debtors have provided this

4   information indicating that in 2022, PTO cash-out was pretty

5   low.  And in applicable state law -- applicable state law would

6   provide for cash-out of PTO in certain states.

7           And so I just alerted that we may request information

8   in the future to see if it's still a very low amount that's

9   being requested in the form of PTO cash-out.

10          THE COURT:  I appreciate the heads up and hope that

11  you don't need to do it.  But if you do, come on back and we'll

12  deal with it.

13          MR. DURAN:  Appreciate it, Your Honor.

14          MS. LEWIS:  And we're happy to provide --

15          THE COURT:  Thank you.  I'll go ahead and sign the

16  order and send it to docketing.  Thank you.

17          MS. LEWIS:  Thank you very much, Your Honor.  We

18  appreciate it.

19          THE COURT:  What do we have next?

20          MS. LEWIS:  Last for me is item -- agenda item

21  number 10, Docket number 11, the Debtors' utilities motion.

22  Pursuant to this motion, the Debtors seek entry of an order

23  approving the proposed form of adequate assurance of payment to

24  utility companies, establishing procedures for resolving

25  objections by utility companies, prohibiting utility companies

1    from altering, refusing, or discontinuing service, authorizing

2    the Debtors' to honor obligations to third party servicers in

3    the ordinary course of business, and otherwise authorizing the

4    Debtors to continue remitting transmission and distribution

5    costs in the ordinary course of business.

6              Your Honor, this is fairly standard relief.  We

7    haven't strayed far from the generally accepted norm in terms

8    of proposed formula for calculating adequate assurance and

9    objection procedures related thereto.

10             I would note that the U.S. Trustee did review this

11   draft again before filing, and we discussed their comments with

12   them.  And we believe and hope that the proposed order

13   accurately reflects comments that they are satisfied with.  But

14   of course we defer to the U.S. Trustee.

15             THE COURT:  So let me ask you this.  I'm a utility

16   company and I have a three-week deposit from the Debtors.

17   Hypothetical utility company.  And I think I need a six-week

18   deposit.  Doesn't this order bar me from complaining?

19             MS. LEWIS:  (No audible response)

20             THE COURT:  And how can I do that?

21             MS. LEWIS:  (No audible response)

22             THE COURT:  It says I've got a certify that I don't

23   have more than a two-week deposit or I can't complain.  Why

24   would we do that?

25             MS. LEWIS:  That's a fair comment, Your Honor, and

we're happy to tweak that to allow anyone to, you know, express

concern with the adequate assurance that any deposit they may

have (indiscernible) and we can resolve it pursuant to, you

know, procedures that you're comfortable with.

THE COURT:  How is it that you can add a utility

outside of the 30-day period without the utility's consent and

still comply with 366?

MS. LEWIS:  Sorry, just give me a moment, Your Honor.

THE COURT:  Three sixty-six says you have to give the

adequate protection within 30 days of the petition date.  So if

you add them on the fortieth day, how have you given them

adequate protection in the first 30?

MS. LEWIS:  I suppose we haven't and we are just

being kind.  But we --

THE COURT:  No, no, no, no, you're not being kind.

They get to cut off your utilities.  You're exercising a right

that the Code doesn't give you.

MS. LEWIS:  Understood.  We can -- we will fix that.

THE COURT:  And then you also have it takes you 30

days to resolve an objection, then you request a hearing.  No.

You have to give them the adequate protection within 30 days or

they can cut off your utilities.  I -- let's get these

consistent with the Code.

I don't have any problem granting the utility motion

of course.  But think through how you're going to meet that 30

1    days, give people notice.  And don't restrict them from being

2    able to come in and complain.

3            I really found that two-week certification by them

4    pretty offensive.

5            MS. LEWIS:  We apologize that -- for that, Your

6    Honor.  We'll --

7            THE COURT:  All right.

8            MS. LEWIS:  -- keep that in mind in the future.

9            THE COURT:  I'll get you an uploaded order that does

10   it.  Thank you.  What do you have next?

11           MS. LEWIS:  Thank you very much.  I am conceding the

12   podium to my colleague Daphne Papadatos.

13           THE COURT:  All right.  Thank you.

14           MS. LEWIS:  Thank you, Your Honor.  I appreciate it.

15           MS. PAPADATOS:  Good afternoon, Your Honor, or good

16   evening.  Daphne Papadatos, Weil, Gotshal, and Manges on behalf

17   of the Debtor.

18           THE COURT:  Good afternoon.

19           MS. PAPADATOS:  Today, Your Honor, I'm going to

20   bounce back a bit of Katherine previewed back to agenda item

21   number seven.  That's the Debtors' NOL motion, and that was

22   filed as Docket Number 8, following which I'll move to agenda

23   items 11 and 12, those being the Debtors' insurance and taxes

24   motion.

25           So, Your Honor, with apologies, very shortly before

1    the hearing we did file an amended form of proposed order.

2    That was filed at Docket Number 112.

3         And obviously I apologize, you won't have had a

4    chance to review those changes, and it's a more than a hundred

5    page document to begin with.  But happy to speak through those

6    changes at a high level or be available for any questions as

7    you review.

8         THE COURT:  So it's my understanding from the motion

9    that the only party that's affected, Blackstone, has agreed to

10   these restrictions; is that right?

11        MS. PAPADATOS:  Riverstone.  That's right, we did

12   provide them with advance notice of the motion and the order.

13   We consulted with them.  And they have consented on an interim

14   basis and they've reserved rights with respect to final relief.

15   And that's set out in the motion.

16        THE COURT:  So I just want to be sure I'm getting my

17   facts right.  You're asking me to enter an order that only

18   affects one party adversely, and they've agreed to it.  Seems

19   to me I should just sign it.

20        MS. PAPADATOS:  We agree.  That sounds like a

21   fantastic idea, your --

22        THE COURT:  Okay.  I just want to -- I want to make

23   sure I'm not being asked to affect some other party; because if

24   all I'm being asked to affect is Blackstone, and they're

25   willing to live with the restrictions, I actually don't know

1    that I care how severe the restrictions are or how liberal they

2    are.  You're happy, they're happy, it's a bilateral problem.

3    And I'm trying to figure out if I'm missing something in the

4    mix.  But if that's it then I think I'm just okay with it.  I

5    want to look at the red-letter changes.  But until you're --

6    unless you're going to try and affect some party other than

7    Blackstone, and Blackstone's agreed, then I think we're okay.

8         MS. PAPADATOS:  I mean, Your Honor, just to correct

9    the record, Blackstone will go unaffected.  Riverstone

10   (indiscernible) any --

11        THE COURT:  I meant Riverstone, yeah.  Sorry.  I'm

12   just looking at your redlines.

13        MS. PAPADATOS:  Yes, absolutely.

14      (Pause from 6:40 p.m. to 6:41 p.m.)

15        THE COURT:  Does any party object to entering the

16   order that was uploaded at 112?

17      (No audible response)

18        THE COURT:  All right.  Based on the evidence before

19   me I am going to sign that order.  And I'll go ahead and fill

20   in the same final dates.  Will that work for you?

21        MS. PAPADATOS:  Yes.  That's great, Your Honor.

22        THE COURT:  Thank you.

23        MS. PAPADATOS:  Thank you.  Next, Your Honor, as I

24   said, item --

25        THE COURT:  Hold on, let me finish typing this in.

1          MS. PAPADATOS:  Sorry.  When you're done.

2          (Pause from 6:42 p.m. to 6:44 p.m.)

3          THE COURT:  I signed the order.  What you have next?

4          MS. PAPADATOS:  Thank you very much, Your Honor.

5     Next on the agenda is item number 11.  That's the Debtor's

6     insurance motion I filed at Docket Number 10, requesting

7     authority to continue all of the Debtors' insurance programs in

8     the ordinary course, and certain other limited related relief.

9     The motion also refers to workers' compensation claims and the

10    Debtors' surety bond obligations and obligations related

11    thereto.

12         Your Honor, with apologies again, we did file a

13    proposed amended order on the docket just before the hearing.

14    It was not for lack of trying.  But that is at Docket 111.  And

15    the order was amended just to include certain minor comments

16    received in advance of the hearing.  And I'm happy to discuss

17    those.

18         THE COURT:  So I'll open that in a minute.  Let me

19    ask whether you've addressed a problem that I had with the

20    original motion.

21         If the Debtor has a self-insured retention and that

22    self-insured retention let's say attaches to a liability

23    policy, somebody sues the Debtor for a personal injury.

24         The way that I read the form of order, that

25    self-insured retention might become an administrative

1     obligation of the Debtor rather than a prepetition obligation

2     of the Debtor.  Same would be true for an insurance deductible.

3     Is that what you're intending or am I maybe reading it wrong or

4     maybe we just need to fix it?

5         MS. PAPADATOS:  Sure, Your Honor.  If you would you

6     point me to the language that you're referring to, I'm happy to

7     take a look and discuss the interpretation.

8         THE COURT:  Well, it says that you're going to be

9     authorized to honor all your insurance obligations, and one of

10    those is to provide an SIR, self-insured retention.

11        So that -- let's say you have a million dollar

12    self-insured retention, somebody sues you for personal injury.

13    Doesn't that mean that you might have to pay it?

14        MS. PAPADATOS:  Your Honor, apologies for any

15    ambiguity there.  We can certainly correct the order to make

16    that clarification.  I can ensure that that's correct in the

17    subsequent order we submit to the Court following the hearing.

18        THE COURT:  Okay.  Why don't I get you to do that and

19    just upload one overnight and we'll get it signed tomorrow.  I

20    don't see any reason why this needs to be done tonight.  Does

21    any party have any objection to the insurance motion?

22        (No audible response)

23        THE COURT:  All right.  I'm going to grant the

24    insurance motion.  I want a clarification that this does not

25    authorize the Debtor to pay any deductibles or self-insured

1      retention, and you'll need to return to Court if that's

2      appropriate, if that works for you.

3               MS. PAPADATOS:  That works for us, Your Honor.  We'll

4      make that change.

5               THE COURT:  Okay.  Thank you.  What do we have next?

6               MS. PAPADATOS:  Your Honor, finally -- well, not

7      finally for the agenda but finally for me, item number 12 on

8      the agenda.  That's the Debtors' taxes and regulatory motion

9      that was filed at Docket Number 7, I believe.  And I'm happy to

10     report that there is no amended order that we'll need you to

11     look at.  It's the order that was filed on the docket at number

12     seven at sometime, well, yesterday evening.

13               By the motion, the Debtors are seeking authority to

14     pay certain prepetition taxes and regulatory assessments and

15     continue making payments on account of those obligations as

16     they come due and owing in the ordinary course.

17               Your Honor, these obligations include the standard

18     suite of tax obligations applicable to a company of this

19     nature, as well as obligations related to regulation to which

20     the Debtors are subject at the Federal, State, and local

21     levels.

22               As set out in the motion, Your Honor, in the

23     aggregate the Debtors estimate that approximately $10.4 million

24     in taxes are due and owing as of the -- or have accrued as of

25     the petition date, and approximately 1.5 million of which we

1    expect to become due and payable within the first 30 days of

2    the cases.

3            And approximately $11.4 million in regulatory

4    assessments, approximately 4.5 million of which will become due

5    and payable within the first 30 days of the cases.

6            We did preview the motion with the U.S. Trustee, Your

7    Honor, and we did receive a few comments.  Those have all been

8    incorporated prior to filing the motion yesterday.

9            THE COURT:  All right.

10           MS. PAPADATOS:  I'm happy to -- sorry, go ahead, Your

11   Honor.

12           THE COURT:  No.  I was -- I thought you were done.  I

13   wasn't trying to interrupt you.

14           MS. PAPADATOS:  I'm happy to (indiscernible) I was

15   going to say, you know, happy to head straight to the order or

16   answer any questions you may have.

17           THE COURT:  I think I'm good.  Does any party have

18   any objection to the taxes and regulatory motion?

19       (No audible response)

20           THE COURT:  All right.  You want the same final as

21   the other hearings?

22           MS. PAPADATOS:  Yes, please, Your Honor.

23           THE COURT:  I signed the order and I've -- well, wait

24   a minute.

25           Mr. Laws, it's not letting me send it the normal way.

1      I am reassigning this to the workgroup and you'll need to go

2      and find the order in the workgroup.

3              All right.  What do you have next?

4              MS. PAPADATOS:  Nothing more from me, Your Honor.

5      With that I will cede the podium to my colleague Hillarie James

6      who will be taking you through the cash management motion.

7              THE COURT:  Thank you.

8              MS. PAPADATOS:  Thank you.

9              MS. JAMES:  Good afternoon, Your Honor, Hillarie

10     James with Weil Gotshal on behalf of the Debtors.

11             THE COURT:  Good afternoon, Ms. James.

12             MS. JAMES:  Good afternoon or evening I suppose now.

13     I'm covering agenda items 13, 14, and 15, which are the motions

14     for cash management, the schedules and statements extension,

15     and the consolidated creditors and redaction motion.

16     The first for me is item number 13 on the agenda, the Debtors'

17     cash management motion filed at Docket Number 14.  In this

18     motion we're seeking authority to continue operating the

19     company's cash management system in the ordinary course, to

20     maintain their bank accounts, continue using their existing

21     business forms and records, ePayer programs, and employee

22     credit cards.

23             We're seeking to pay prepetition amounts related to

24     those credit cards and ePayer program and to pay prepetition

25     bank fees and to continue paying those in the ordinary course

1    post-petition.

2         We're also seeking an extension of time to comply

3    with Section 345 requirements.

4    And additionally we're seeking to continue intercompany

5    transactions in the ordinary course, and to provide

6    administrative expense priority for any post-petition

7    intercompany claims.

8         As set out in the motion, the 72 Debtors operate a

9    complex centralized cash management system which consists of 30

10   bank accounts held by nine of the Debtors.

11        The Debtors' treasury team maintains daily oversight

12   of the system and they maintain the Debtors' books and records,

13   documenting a wide array of operating information.

14   As with any other large company, the system helps control

15   funds, ensures that cash is available for both Debtor and

16   non-Debtor affiliates, and reduces administrative expenses by

17   facilitating the movement of these funds.

18        Any destruction of this system would be detrimental

19   and disruptive to the Debtor's operation.

20        So, Judge, unless you have any questions, the

21   Debtors' respectfully request that you enter the proposed

22   interim order.

23        THE COURT:  Under the motion, are there going to be

24   any funds that are not at either approved banks or fully

25   insured?

1          MS. JAMES:  Yes, that's correct.  I think we only

2     have 17 banks that are currently at UST-authorized depositories

3     of the 30.

4          THE COURT:  I didn't quite follow because I think

5     there was just some noise in the background.  So will there be

6     funds that the estate has that are either not in an approved

7     depository or not insured?

8          MS. JAMES:  I believe so, yes, in a number of the

9     bank accounts.  I don't believe that they're insured.

10          THE COURT:  And they're not at depository banks.

11          MS. JAMES:  Sorry, they're not UST-authorized

12     depository banks.

13          THE COURT:  Are the amounts, though, less than the

14     insured amounts under FDIC insurance or are they greater than

15     that?

16          MS. JAMES:  I don't have that information off the top

17     of my head.  I'm sorry, Your Honor.

18          THE COURT:  Mr. Duran, can you help me out here?  I

19     thought that they either needed to be in one or the other.  Am

20     I missing something?

21          MR. DURAN:  That's right, Your Honor.  We intend to

22     meet with representatives of the Debtors to try to get to the

23     bottom of what is in the unauthorized depositories.

24          I know one of them is the RBC accounts which has

25     millions of dollars, and I think it's collateral for the

1    hedging transactions.

2            I don't know what we can do on those but we're going

3    to try to reach agreement, try to put the Debtor on some kind

4    of a program to comply with Section 345(b).

5            This proposed order provides the time in order to

6    accomplish that.

7            THE COURT:  So what I'm going to do is I'm going to

8    -- tell me if this works for you, counsel -- allow you in a

9    further order to just leave things the way they are.

10           But I want you to file a supplemental declaration

11   that identifies for the Court expected cash amounts that will

12   be neither in a depository account nor under the insured

13   limits.  And I want that declaration to explain why we should

14   approve that.

15           Because normally I'm dealing with -- sometimes I'll

16   have, you know, accounts not a depository institution, but

17   they're fairly small numbers.

18           But if I've got millions of dollars there, I need a

19   better understanding of why I'm waiving that.  And so can I get

20   a supplemental declaration to do that?

21           MS. JAMES:  Yes, Your Honor.

22           THE COURT:  And can you live with an oral

23   authorization to keep the accounts where they are until we

24   issue an order?  And once you get that supplemental

25   declaration, file a revised proposed form of order that

1    addresses it the way that you think is appropriate, all right?

2              MS. JAMES:  Yes, Your Honor.

3              THE COURT:  Okay.  Thank you.  What do we have next?

4              MS. JAMES:  Next we move to item number 14 on the

5    agenda, which is the consolidated creditor and redaction motion

6    filed at Docket Number 9.  In this motion we're requesting

7    authority to file a consolidated creditor matrix, a

8    consolidated top 30 list of creditors, and to redact certain

9    personal information of employees and independent contractors.

10   We're also requesting approval of the notice of commencement

11   which is attached as Exhibit 1 to the motion.

12             With respect to the redaction, and as you'll note in

13   this approved order, Judge, to preserve the privacy of the

14   individuals while also addressing any due process or noticing

15   concerns, upon a request to the Debtors or the Court, a party

16   in interest can be provided with the unredacted document on the

17   condition that it's not to be shared.

18             So, Judge, unless you have any questions, the Debtors

19   respectfully request the entry of the proposed order.

20             THE COURT:  So the proposed order has a notice

21   attached to it, and the notice leaves open the 341 meeting and

22   leaves open the bar date.  Can we close those loops so that

23   you're only sending one out?  Can I set a bar date now?  Can

24   Mr. Duran in the next day or two set a 341 date?  And that way

25   people will get one piece of paper that tells them what they

1    need to know.

2            MS. JAMES:  Yes, absolutely.

3            THE COURT:  What kind of bar date do you want to try

4    and have?

5            MS. JAMES:  Sixty days from the petition date, does

6    that work?

7            MR. JAMES:  Works for me.  Does that work for your

8    client?

9            MS. JAMES:  Does that work for our client?

10           MR. SPEAKER:  We'll confirm.

11           MS. JAMES:  We'll confirm.

12           THE COURT:  All right.  I want it to be something

13   that works in terms of your whole plan process, somewhere

14   between 60 and 90 days after the 341 meeting of creditors,

15   since it sounds like you're not that concerned about it.  So go

16   ahead and get from Mr. Duran a 341 meeting date, calculate a

17   date that you and Mr. Duran can agree on.

18           And I'm making now my own motion to set a bar date

19   and I'm ordering it will be set between 60 and 90 days after

20   the 341 meeting of creditors at a date to be selected by the

21   Debtors and Mr. Duran jointly and included in a proposed order.

22   That way we'll just do this one time and people will get the

23   one piece of paper.

24           I appreciate you're willing to live with that

25   efficiency.  What do you have next?

1           MS. JAMES:  Next and finally we have number 15 on the

2     agenda, the motion to extend time to file schedule, statements,

3     and Rule 2015.3 reports filed at Docket Number 6.

4           And in this motion we're requesting a 45-day

5     extension of the period to file the Debtors' schedules and

6     statements of financial affairs, for a total of 59 days from

7     the petition date, without prejudice for ability to request

8     additional extension.

9           And, second, an extension for the Debtors to file

10    their initial 2015.3 reports until the later of either 15 days

11    after the 341 meeting or 45 days from the petition date.

12          THE COURT:  All right.  Does anyone have any

13    objection to that, the schedules and statements motion?

14          MR. DURAN:  Your Honor, Hector Duran for the U.S.

15    Trustee.  We had requested 30-day extension.  Debtors want 45.

16    I don't know where we left off on that issue.

17          THE COURT:  They've got in their proposal that it's

18    15 days after the initial 341 meeting or 45 days from the

19    petition date to file their 2015.3 reports.  And their

20    schedules and statements go to June 7th.  Do either of those

21    dates bother you?

22          MR. DURAN:  June 7th.

23          THE COURT:  I'm sorry, July 7th.  I told you wrong.

24          MR. DURAN:  July 7th, that's what I thought.  Okay.

25    So that would be like the 45-day plus the 14.

1           THE COURT:  Yeah.  Mr. Duran, this is like the most
2    complicated case I've seen in years.  You're --
3           MR. DURAN:  It is.
4           THE COURT:  I'd rather get them right the first time.
5    Unless you feel pretty --
6           MR. DURAN:  I understand.
7           THE COURT:  -- strongly about this, I think it's a
8    reasonable request, I'll just tell you.
9           MR. DURAN:  Okay, Your Honor, we'll go with the 45.
10   And then we'll work out a 341 meeting date based on the
11   schedules being filed.
12          THE COURT:  I appreciate your flexibility on that.  I
13   have signed the order and I will send that to docketing.  I
14   assume no one else has any issue with the schedules motion.  If
15   you do, please let me know.
16       (No audible response)
17          THE COURT:  All right.  It's gone.
18          MS. JAMES:  All right.  Thank you, Your Honor.
19   That's it for me.  I will hand the podium over to Matt Barr.
20          THE COURT:  Mr. Barr, before you --
21          MR. BARR:  Your Honor, just --
22          THE COURT:  Mr. Barr, I made a comment earlier about
23   I wasn't very happy about the utilities two-week motion.  My
24   comment was out of line.  I wish I weren't there but my comment
25   was out of line.  I apologize to you all for the comment.

1          MR. BARR:  No problem, Your Honor, we appreciate

2    that.  But we're big boys and big girls, we could take a

3    criticism.  So we'll fix it.

4          I have two clarifications --

5          THE COURT:  All right.

6          MR. BARR:  -- that I want to go through.  And then of

7    course thank you.

8          With respect to the bar date, I didn't get to go

9    through my presentation so you don't truly understand at least

10   the milestones.  And I know your view on restructuring support

11   agreements, but we do have milestones in the restructuring

12   support agreement.

13         THE COURT:  Right.

14         MR. BARR:  One of the milestones in the restructuring

15   support agreement is entry of the disclosure statement order,

16   of course, and then commencement of confirmation.  And in order

17   for us to commence a confirmation, we have a deadline of no

18   later than 170 days from the petition date.

19         If I now step back and you had questions with respect

20   to bar dates and you said something 60 to 90 days after the

21   341, and then I just heard Mr. Duran say after the schedules

22   are filed, they'll have the 341.

23         I think we all need to take a step back and figure

24   out the timing so that we can fit in.  Obviously we need a bar

25   date prior to the voting on our plan so we can fit all those

1    in.

2              So what I would suggest is that we have a

3    conversation with Mr. Duran and we come back to Your Honor with

4    some scheduling order or otherwise, whatever is best for you,

5    with respect to the right time for a bar date so we don't blow

6    our milestones out of the gate.

7              THE COURT:  Why don't you all just file an agreement

8    on that motion?  I will withdraw the comment that it has to be

9    within the range I said.  I'm not going to be that sensitive to

10   that.  I would rather get something that works with your

11   confirmation requirements.

12             If you and Mr. Duran aren't able to agree, then file

13   a request for hearing.

14             I would like to do it all on the one piece of paper

15   if that's possible.

16             MR. BARR:  Sure.  We will do that as long as

17   Mr. Duran is okay with that.

18             MR. DURAN:  And we are, Your Honor.

19             THE COURT:  Thank you.

20             MR. BARR:  Great.  And then, Your Honor, lastly

21   before I thank you again, with respect to the continuation of

22   existing cash management system, retaining of existing business

23   forms, intercompany transactions, utilizing credit cards,

24   et cetera, where you orally approved the motion subject to the

25   declarations that were filed with respect to the 345(b)

1      waivers.

2              My concern about that, Judge, is as you may remember

3      when you were practicing, we have to go to our banks tomorrow

4      morning and show an order that says our existing bank accounts

5      can remain with the DIP, etcetera, and unfreeze our bank

6      accounts.

7              Without an order, we're going to have to convince

8      them of your oral ruling.

9              If it's possible, could we somehow bifurcate the

10     order where we have your either something we add to it that

11     says the 345 waiver is not approved until we do "X" and "Y,"

12     but the rest of the order is?  So we could physically show our

13     banks so they open up the bank accounts.

14             THE COURT:  Yes, sir.  Let's --

15             MR. BARR:  Thank you.  Would you like us to do that

16     or --

17             THE COURT:  Well, I'm thinking maybe the easiest

18     thing to do is to simply leave the whole order alone and then

19     go to paragraph 22.

20             MR. BARR:  Okay.  Paragraph?

21             THE COURT:  I'm going to take out the existing

22     paragraph 22 on down, and I'm just going to insert a whole

23     thing that says -- and I'll put it up on the screen so you can

24     see it.  Hold on.

25             (Pause from 7:03 p.m. to 7:06 p.m.)

1      THE COURT:  Does that solve the problem?

2      MR. BARR:  It does very much.  Thank you, Your Honor.

3      THE COURT:  I hadn't thought through it.  And you're

4  correct, so I need to just take this out.

5      What else have I messed up for you today, Mr. Barr,

6  anything?

7      MR. BARR:  I need some sleep.  I'll figure it -- I'm

8  joking, Your Honor.  Nothing.  We thank you very much for

9  fixing that.  We appreciate it.  And thank you very much for

10  your time, and as always understanding what's necessary in

11  order to safely land into Chapter 11.

12      And we look forward to laying everything out for you

13  and getting this on a very quick we hope path.

14      As you said, it's a big, complex company.  We were

15  very fortunate to have you heard a lot of conversations,

16  negotiations, some use leverage, some used the markets changed,

17  and our fulcrum securityholder changed, and we'll ultimately

18  see how this plays out.

19      But very cooperative, very helpful, very constructive

20  -- not to say who did this, but we talked about term sheets

21  that were clever and thoughtful and driving.

22      And it meant a lot to the management team, it meant a

23  lot to the company, and obviously it means a lot to the

24  employees who now have clarity, because there was a lot of

25  uncertainty.

1          So thank you for your time today.  Thank you very

2     much for entering the orders.  And we look forward to working

3     with all the parties.

4          THE COURT:  Mr. Barr, before we leave, are there any

5     dates it would be helpful to set now?  Do you want a

6     confirmation hearing date, for example?

7          MR. BARR:  Sure.  That'd be fantastic.  So our

8     milestone, Judge, is no later than 170 days from last night to

9     commence a confirmation hearing.  If I can just walk over and

10    grab my calendar?

11         THE COURT:  That has to be around --

12         MR. BARR:  Mr. Nash --

13         THE COURT:  -- November 18th-ish, something like

14    that.

15         MR. BARR:  I think our client would like it sooner

16    than that.  So maybe I was just looking at -- one of our

17    clients jokingly put a closing dinner on our calendars which is

18    earlier than that.  But that's not going to happen.

19         Why don't we do this if it's okay with you -- and I

20    very much appreciate the sentiment.  Can we set the

21    confirmation hearing at the second day so we can have an

22    opportunity to talk to Mr. Nash and his clients and line it up?

23         But I appreciated what you were just offering us.

24         THE COURT:  Sure.  I'm happy to delay it and set it

25    then.  Are there any dates that you know that you need, though,

1    now?  Because I'd rather set them aside on my calendar and not

2    have you have to fight for a date if things get busy.

3    But if you're okay with just coming back for second days,

4    Mr. Nash, I mean, if there's a date you want but --

5              MR. BARR:  We can't hear you, Pat.

6              THE COURT:  Mr. Nash, you've got to press five-star

7    one time on your line.

8              MR. NASH:  (No audible response).

9              THE COURT:  Don't know what that is.  Hold on.

10         (Pause)

11             MR. BARR:  Your Honor, as you're opening up

12   Mr. Nash's line, we'll try to come up with a calendar which

13   we'll propose to you.  We can try to file it before the second

14   day but if not, at the second day hearing.  Obviously if

15   Mr. Nash has a different view, he could express it.

16             He's shaking his head "no."  I think he agrees.

17   Thumbs-up.  Record reflect he gave a thumbs-up, Your Honor.

18   But we'll come back to you at the second day hearing with a

19   case calendar for your consideration.

20             THE COURT:  All right.  One second.  Mr. Nash, thank

21   you.

22             MR. NASH:  Your Honor, Pat Nash from Kirkland and

23   Ellis.  It's great to be back in front of you.  And thank you

24   very much for all your hard work today, Judge.  We appreciate

25   it.

1          THE COURT:  All right.  Is there anything else that

2     we need to do for your client today?

3          MR. NASH:  No, sir, no, sir, thank you.

4          THE COURT:  All right.  And I think I have one more

5     person, though, that does want to speak.  And, anyone else,

6     please press five-star one time on your line.  Yes.  From

7     Chicago, who do we have, 312-862-9131?

8          MR. NASH:  That's Kirkland and Ellis, Your Honor.

9     That would be our line, I guess.  Nothing further from us,

10    Judge.

11         THE COURT:  All right.  Thank you.  Let me just

12    confirm that's everything.  Mr. Barr, I appreciate your

13    comments.  I would like to make one in return, which is your

14    firm has gone out of the way in a very positive way to be sure

15    that your younger lawyers have an opportunity to present

16    matters at hearing like this today.

17         They all did a great job.  I gave some of them a

18    harder time than others just because that's was notes where I

19    didn't know who was going to be there for what.  They did a

20    good job.  They stood their ground.  They told me when they

21    could give some ground.

22         And it's good to see that we're going to have young

23    lawyers that are well-trained and are getting experience

24    appearing in hearing.

25         So I want to express my appreciation to you as to

1    many of the firms that come here have decided that that's the

2    right thing to do.  And it is, and it's very appreciated on my

3    part.

4            So please bring those same people back again soon.  I

5    want to hear from them.

6            MR. BARR:  Great.  Thank you, Your Honor.  We

7    appreciate that, and we agree with you.

8            THE COURT:  Thank you.

9            MR. BARR:  Again, thank you.  Have a good night, Your

10   Honor.  Thank you.

11           THE COURT:  Good night, everybody.  We're in recess.

12       (Proceeding adjourned at 7:13 p.m.)

13                          * * * * *

14           *I certify that the foregoing is a correct transcript*

15   *to the best of my ability due to the condition of the*

16   *electronic sound recording of the ZOOM/video/telephonic*

17   *proceedings in the above-entitled matter.*

18     */S./   MARY D. HENRY*

19   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

20   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

21   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

22   *JTT TRANSCRIPT #65719*

23   *DATE FILED:  MAY 13, 2022*

24

25