**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **TALEN ENERGY** | § | **Case No. 22-90054 (MI)** |
| **SUPPLY, LLC,** *et al.,* | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |

**MOTION OF DEBTORS FOR**
**APPROVAL OF KEY EMPLOYEE INCENTIVE PROGRAM**

> IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.
>
> A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 28, 2022 AT 2:00 P.M. (CENTRAL PREVAILING TIME) IN COURTROOM 404, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.
>
> YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.
>
> AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE. THE MEETING CODE IS "JUDGEISGUR". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.
>
> HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE ISGUR'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/talenenergy. The Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

Talen Energy Supply, LLC ("**TES**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**" and, together with their non-Debtor affiliates, "**Talen**" or the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement

1.      The Debtors' senior management, together with certain key employees, have continued to drive the successful operation of the Debtors' business, while also dedicating significant time and effort to obtaining critical first-day relief, securing postpetition debtor-in-possession financing, and negotiating competing plan proposals with their largest creditors and key constituents.  Those negotiations resulted in the Debtors initiating these chapter 11 cases with an executed restructuring support agreement ("**RSA**") with an ad hoc group of holders of the Senior Unsecured Notes (the "**Unsecured Notes Group**") that provides a framework for the Debtors to pursue and effectuate a value-maximizing restructuring, and contemplates, among other things: (i) an equity rights offering up to $1.65 billion that would provide for the payment of secured claims in full, backstopped by certain members of the Unsecured Notes Group and (ii) equitization of $1.4 billion of Senior Unsecured Notes.  While tangible progress has been made, much work remains.

2.      Prosecuting these chapter 11 cases and achieving the key business objectives underlying the proposed reorganization will require significant effort on the part of the Debtors' senior management and key employees beyond their normal responsibilities.  Now, more than ever, significant time, dedication, and focus will be demanded of the Company's employees, in particular senior-level employees who must both run the business and navigate the rigors of chapter 11.  Although the Debtors have a path forward, the success of these chapter 11 cases and the recoveries to creditors is not guaranteed and will ultimately depend in large

part on the performance and productivity of the Debtors' senior management and key employees, including, without limitation, seven individuals that fall within the definition of "insider" as defined section 101(31) of the Bankruptcy Code (such individuals, the "**KEIP Participants**").

3.       The KEIP Participants are responsible for the overall management, strategy, and direction of the Debtors' business and will drive the Debtors' ability to meet and exceed the operational and financial assumptions underpinning the Company's business plan and the objectives critical to the success of these cases, including the Debtors' postpetition hedging strategy, which presents unique challenges given the volatile power market conditions, coal shortages, rail interruptions, and supply chain challenges.   Properly motivating and rewarding performance by the Debtors' talented and experienced senior leadership team has a clear link to value maximization for the benefit of all of the Debtors' estates.

4.       Willis Towers Watson U.S. L.L.C. ("**Willis Towers Watson**"), the Debtors' independent compensation consultant, concluded that the annualized target total direct compensation of the KEIP Participants is, in the aggregate, below the 50th percentile of the market.   To address the KEIP Participants' below-market pay opportunities and ensure their extraordinary efforts continue, the Debtors, in consultation with Willis Towers Watson and the Debtors' other professional advisors and after discussions with the Unsecured Notes Group and its advisors, designed the key employee incentive plan described herein (the "**KEIP**").   The KEIP incentivizes the KEIP Participants to meet and exceed challenging performance targets during these chapter 11 cases, and does not provide a payout unless the Company achieves performance at or above the threshold level on a Performance Metric (as defined below).   Upon the achievement of such Performance Metrics, the KEIP Participants become eligible

(collectively) to receive between approximately $1.4 million (at threshold performance), $6.9 million (at target performance), and $13.8 million (at maximum performance) (the "**KEIP Award**") in the aggregate over six fiscal quarters beginning with the second quarter of 2022 and ending at the third quarter of 2023, depending on how significantly they exceed certain operational and financial performance targets.  The KEIP Participants' quarterly threshold, target, and maximum award opportunities change over the course of the program due to the varied measurement of each Performance Metric.  A summary of the KEIP Participants' threshold, target, and maximum quarterly award opportunities is attached hereto as **Exhibit A**. Should the KEIP Participants not meet the threshold performance level for any given metric, no KEIP award would be paid on account of such metric.

5.     The KEIP complies with the requirements of the Bankruptcy Code and is reasonable under the circumstances.  Importantly, the KEIP is incentive-based as all awards under the KEIP are conditioned on meeting and surpassing targets of challenging financial and operational metrics, which in turn, will result in value creation for the Debtors and its stakeholders as well as increased recoveries for the Debtors' creditors.  The Debtors designed the KEIP using analyses from Willis Towers Watson, in consultation with the Debtors' other professional advisors, to ensure that the KEIP meets its goal of incentivizing key employees, while being consistent with competitive practices.  The Debtors established the metrics for the KEIP by considering, among other things, certain metrics under their existing short-term incentive program (the "**STIP**"), business needs, existing forecasts, and discussions with the Restructuring Committee (as defined below) and certain creditors (including the Unsecured Notes Group and its advisors).  The metrics are challenging, focus on the core drivers of the Debtors' success, and drive enhanced performance by the Debtors and the KEIP Participants.

After carefully evaluating the need for an incentive plan and ensuring that the KEIP would include only the "insider" employees that are essential to the Debtors' overall management and operations, the Debtors calculated the proposed amounts to be paid and the criteria and metrics for payment based upon market precedent.  Specifically, Willis Towers Watson evaluated the reasonableness of the KEIP, including its scope and cost, by comparing it to incentive plans implemented (i) at companies generally similar to the Company in size and type of industry and (ii) in comparable chapter 11 cases to ensure that the KEIP is consistent with market practices.

6.    As noted above, the Debtors designed the KEIP in consultation with Willis Towers Watson and the Debtors' other advisors.  In addition, and in accordance with the RSA, the Debtors shared the KEIP proposal with the Unsecured Notes Group.  The design of the KEIP went through multiple iterations as a result of discussions with and feedback from the independent managers of the restructuring committee (the "**Restructuring Committee**") of the Board of Managers of TES (the "**Board**") as well as the Unsecured Notes Group.  Following such discussions, the Debtors finalized the structure and terms of the KEIP (as presented in this Motion), and the Restructuring Committee reviewed and approved the KEIP and recommended it to the Board, which in turn approved the program.  The Debtors also intend to engage with the official committee of unsecured creditors (the "**Creditors' Committee**") and hope to obtain its support for the KEIP.

7.    The implementation of the KEIP is reasonable, within the Debtors' sound business judgment, and satisfies the requirements for approval under the Bankruptcy Code.  The KEIP Participants have extensive industry expertise and knowledge of the Debtors' businesses, assets, liabilities, counterparties, and operations, and they are vital to maximization of value

consistent with the intent and purposes of chapter 11.  Accordingly, the Debtors respectfully request that the Court (as defined below) approve the KEIP.

## Relief Requested

8.     By this Motion, pursuant to sections 363(b) and 503(c)(3) of the Bankruptcy Code, the Debtors request entry of an order approving and authorizing the KEIP.

9.     In support of this Motion, the Debtors submit the declaration of Zachary P. Georgeson, senior director at Willis Towers Watson, annexed hereto as **Exhibit B** (the "**Georgeson Declaration**").

10.     A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit C** (the "**Proposed Order**").

## Jurisdiction

11.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

12.     Commencing on May 9, 2022 (the "**Petition Date**"), each of the Debtors filed with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.     Also on May 9, 2022, the Debtors executed the RSA with the Unsecured Notes Group.  The Debtors have also secured debtor in possession financing in the amount of

approximately $1.8 billion to operate the Debtors' business in the ordinary course and cover the costs of implementing the restructuring.

14.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

15.     On May 23, 2022, the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**") in these chapter 11 cases.  No trustee or examiner has been appointed in these chapter 11 cases.

16.     Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Ryan Leland Omohundro in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 16] (the "**First Day Declaration**").[2]

### **KEIP Overview**

## I.     **KEIP Participants**

17.     The Debtors, with input from their advisors, identified seven members of the senior management team—each of whom is an "insider" as defined by section 101(31) of the Bankruptcy Code—that will compose the group of KEIP Participants:

(i)     Alejandro Hernandez, President and Chief Executive Officer,

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the First Day Declaration.

(ii)     John Chesser, Chief Financial Officer,

(iii)    Andrew Wright, General Counsel and Secretary,

(iv)    Brad Berryman, Chief Nuclear Officer,

(v)     Dale Lebsack, Senior Vice President of Fossil Operations,

(vi)    Timothy Woodland, Senior Vice President of Commercial, and

(vii)   Dustin Wertheimer, Senior Vice President and Chief Financial Officer of Cumulus Data.

18.     The KEIP Participants have played and will continue to play a central role in the Debtors' business and are critical to the Debtors' business performance and overall success.  Specifically, the KEIP Participants are expected to contribute meaningfully to the Debtors' restructuring and creditor recoveries by taking the following actions, among others:

     i.   operate the Debtors' power generation facilities, including the Debtors' Susquehanna nuclear power stations (Unit 1 and Unit 2), which generate material operating cash flow and are subject to significant regulation;

    ii.   reduce operating and capital expenses while maintaining and improving operating excellence;

   iii.   execute the Debtors' postpetition hedging strategy, including coal and rail procurement, to capture significant future cash flows for the Debtors;

   iv.   lead and support negotiations with vendors (including highly regulated nuclear fuel fabrication), customers, and other key constituents;

    v.   negotiate, in 2022, the Company's collective bargaining agreement ("**CBA**"), which expires in 2023, to maintain strong labor relations and operating excellence at the Susquehanna nuclear plant and other key power generation assets during the case;

   vi.   recruit a significant number of critical operating roles ("talent-to-value"), including offsetting a demographic wave of retirements driven by the Debtors' demographic population (more than 50% of the Debtors' fossil employees are currently eligible for retirement);

  vii.   implement "first day" and other relief to stabilize the Debtors' business and operations;

    viii.   comply with certain postpetition financing and hedging covenants that impose significant limitations on the Debtors' hedging activities;

    ix.   continue to implement the Debtors' previously announced decarbonization strategy, including the near-term execution of the Montour coal-to-gas conversion project;

    x.   protect the Debtors' equity investment in its non-debtor affiliate's (Cumulus) digital infrastructure business;

    xi.   execute environmental remediation projects across the Debtor's asset base, including the successful construction and closure of ash basins to minimize potential future liabilities and maximize creditor recoveries; and

    xii.   successfully and efficiently manage the Debtors' restructuring process, including by minimizing restructuring-related expenses and optimizing the time spent in Chapter 11.

These actions will preserve and maximize value for the Debtors, their estates, and their stakeholders.

## II.     KEIP Terms

19.     As set forth above, the KEIP is designed to incentivize the KEIP Participants during the chapter 11 cases to exceed financial and operational targets, facilitate/administer the chapter 11 cases, execute any necessary restructuring transaction, and align the interests of these KEIP Participants to maximize estate value and creditor recoveries. The Debtors established the metrics for the KEIP Award by considering, among other things, certain metrics under the previously Board-approved STIP, their ongoing business needs, existing forecasts, and discussions with the Restructuring Committee and certain creditors to ensure that the metrics are challenging and drive enhanced performance by the KEIP Participants.   The independent managers of the Restructuring Committee and the Board determined that the KEIP was in the best interests of the Debtors and their stakeholders and that it appropriately addresses the Debtors' objectives.

20.     The KEIP contemplates cash payments to be made to the KEIP Participants based upon five performance metrics: (i) the extent to which the Company's cash balance as of March 31, 2023 exceeds the Company's current forecast, weighted at 60% (the "**Cash Balance Metric**"); (ii) safety, weighted at 10% (the "**Safety Metric**"); (iii) equivalent forced outage factor ("**EFOF**"), weighted at 15% (the "**EFOF Metric**"); (iv) the timing of confirmation of the Debtors' plan of reorganization, weighted at 15% (the "**Confirmation Metric**"); and (v) a portion of any asset-sale proceeds (the "**Asset Sale Metric**" and, collectively, the "**Performance Metrics**").  A summary of the key terms of the KEIP is as follows:

i.   <u>Performance Period</u>.  The Performance Metrics will be measured over distinct performance periods for each metric (collectively, the "**Performance Periods**").  The EFOF Metric and Safety Metric will be measured first over the March 31, 2022 through September 30, 2022 period on a cumulative basis and thereafter on a quarterly basis through fiscal quarter ending September 30, 2023.  The Cash Balance Metric will be measured as of March 31, 2023 and paid as soon as practicable thereafter (except as provided in section (v) of this paragraph).  The Confirmation Metric will be measured through December 31, 2022.  The Asset Sale Metric will be measured periodically as the Debtors execute sale agreements (if any) through the fiscal quarter ending September 30, 2023.

ii.  <u>Performance Targets</u>.  The KEIP Participants may earn incentive payments at the end of each Performance Period if the Debtors achieve specified targets (the "**Performance Targets**") for each of the five Performance Metrics.  For certain of the Performance Metrics, the Debtors established three levels of Performance Targets: (i) a threshold performance level; (ii) a target performance level; and (iii) a maximum performance level.  For the Asset Sale Metric, however, which is designed to only reward out-performance, no incentive payment will be earned unless the target performance level is exceeded.  The Performance Targets for each of the Performance Periods are summarized below:

| Metric | Performance Period | Performance Goals | | | Regular Payment Timing |
|---|---|---|---|---|---|
| | | Threshold | Target | Maximum | |
| Cash Balance March 31, 2023 in excess of forecast | Q2 2022 – Q1 2023 (4 quarters) | $102 million | $482 million | $751 million[3] | As soon as practicable after March 31, 2023 |
| Safety – Lost Time Incident Rate ("**LTIR**") | Quarterly through 9/30/2023 | 0.75 | 0.30 | 0.20 | Quarterly |
| Equivalent Forced Outage Factor ("**EFOF**") | Quarterly through 9/30/2023 | 6.6% | 3.3% | 2.3% | Quarterly |
| Confirmation | Q2 2022 – Q4 2022 (3 quarters) | December 15, 2022 | November 15, 2022 | On or prior to October 15, 2022 | Cash payment as soon as practicable after confirmation |
| Asset Sale | Q2 2022 – Q3 2023 (6 quarters) | N/A | $0 | Greater than $70 million[4] | Payment on signing binding agreements (if any) |

iii. <u>KEIP Payout Ranges</u>.  The KEIP will provide for potential payments representing a range from 20% of target payment for threshold performance and up to (i) 180% of target payment for performance at or above maximum for the Cash Balance and Confirmation Metrics, (ii) 112.5% of target payment for performance at or above maximum for the Safety Metric, and (iii) 225% of target payment for performance at or above maximum for the EFOF Metric.  With respect to the Asset Sale Metric, the KEIP will provide a payment for above target-level performance up to 20% of each KEIP Participant's overall target KEIP opportunity.   Straight-line linear interpolation will be applied to determine the earned KEIP payment for achievement of any Performance Metric between the threshold and target, or target and maximum performance goals, as applicable.

iv. <u>KEIP Cost</u>.  The KEIP does not provide a payout unless the Company achieves performance at or above the threshold level on the Cash Balance, Safety, EFOF and Confirmation Metrics.  The KEIP does not provide a payout on the Asset Sale Metric unless the Company achieves performance above the target level.  Assuming the Debtors' chapter 11 cases continue through September 30, 2023, the forecasted aggregate cost of the KEIP would be approximately (i) $1.4 million at threshold performance, (ii) $6.9 million at target performance, and (iii) $13.8 million at maximum performance.  The individual total aggregate award

---

[3]  To the extent the Company's cash balance on March 31, 2023 exceeds forecast by more than $751 million, the KEIP Participants will be eligible to receive a cash bonus from the reorganized debtors pursuant to a post-emergence incentive program, which will be approved as part of the plan of reorganization.

[4]  To the extent the Company's total sale proceeds exceed $70 million, the KEIP Participants will be eligible to receive a cash bonus equal to any amount in excess of $70 million from the reorganized debtors pursuant to a post-emergence incentive program, which will be approved as part of the plan of reorganization.

opportunities available to each KEIP Participant for the six-quarter period under the KEIP can be summarized as follows:

| Title | Threshold KEIP Opportunity | | | | | |
|---|---|---|---|---|---|---|
| | Cash Balance | Safety | EFOF | Confirmation Timing | Asset Sale Proceeds | Total KEIP Opportunity |
| Chief Executive Officer | $400,000 | $100,000 | $150,000 | $75,000 | $0 | $725,000 |
| Chief Financial Officer | $120,000 | $30,000 | $45,000 | $22,500 | $0 | $217,500 |
| GC & Corporate Secretary | $80,000 | $20,000 | $30,000 | $15,000 | $0 | $145,000 |
| SVP - Chief Nuclear Off. | $100,000 | $25,000 | $37,500 | $18,750 | $0 | $181,250 |
| SVP - Fossil Operations | $32,000 | $8,000 | $12,000 | $6,000 | $0 | $58,000 |
| SVP - Commercial | $16,000 | $4,000 | $6,000 | $3,000 | $0 | $29,000 |
| SVP & CFO, Cumulus Data | $16,000 | $4,000 | $6,000 | $3,000 | $0 | $29,000 |
| Aggregate Award Opportunity | $764,000 | $191,000 | $286,500 | $143,250 | $0 | $1,384,749 |

| Title | Target KEIP Opportunity | | | | | |
|---|---|---|---|---|---|---|
| | Cash Balance | Safety | EFOF | Confirmation Timing | Asset Sale Proceeds | Total KEIP Opportunity |
| Chief Executive Officer | $1,999,999 | $500,000 | $750,000 | $375,000 | $0 | $3,624,999 |
| Chief Financial Officer | $600,000 | $150,000 | $225,000 | $112,500 | $0 | $1,087,500 |
| GC & Corporate Secretary | $400,000 | $100,000 | $150,000 | $75,000 | $0 | $725,000 |
| SVP - Chief Nuclear Off. | $499,999 | $125,000 | $187,500 | $93,750 | $0 | $906,249 |
| SVP - Fossil Operations | $160,001 | $40,000 | $60,000 | $30,000 | $0 | $290,001 |
| SVP - Commercial | $79,999 | $20,000 | $30,000 | $15,000 | $0 | $144,999 |
| SVP & CFO, Cumulus Data | $79,999 | $20,000 | $30,000 | $15,000 | $0 | $144,999 |
| Aggregate Award Opportunity | $3,819,998 | $955,000 | $1,432,499 | $716,250 | $0 | $6,923,747 |

| Title | Maximum KEIP Opportunity | | | | | |
|---|---|---|---|---|---|---|
| | Cash Balance | Safety | EFOF | Confirmation Timing | Asset Sale Proceeds | Total KEIP Opportunity |
| Chief Executive Officer | $3,599,999 | $562,500 | $1,687,499 | $675,000 | $725,000 | $7,249,997 |
| Chief Financial Officer | $1,080,000 | $168,750 | $506,250 | $202,500 | $217,500 | $2,175,000 |
| GC & Corporate Secretary | $720,001 | $112,500 | $337,501 | $135,000 | $145,000 | $1,450,003 |
| SVP - Chief Nuclear Off. | $899,999 | $140,625 | $421,874 | $168,750 | $181,250 | $1,812,497 |
| SVP - Fossil Operations | $288,001 | $45,000 | $135,001 | $54,000 | $58,000 | $580,003 |
| SVP - Commercial | $143,999 | $22,500 | $67,499 | $27,000 | $29,000 | $289,997 |
| SVP & CFO, Cumulus Data | $143,999 | $22,500 | $67,499 | $27,000 | $29,000 | $289,997 |
| Aggregate Award Opportunity | $6,875,997 | $1,074,375 | $3,223,124 | $1,289,249 | $1,384,749 | $13,847,494 |

v. <u>Payment</u>. Each KEIP Award (other than on account of the Asset Sale Metric), if any, will be paid to the applicable KEIP Participant in cash at the end of each Performance Period. To the extent that the Debtors emerge from chapter 11 as reorganized debtors prior to March 31, 2023, the KEIP Participants will receive a cash payment at the maximum level upon emergence on account of the Cash Balance Metric, subject to clawback (on an after-tax basis) for actual performance as measured on March 31, 2023. With respect to the Asset Sale Metric, any KEIP Award will be determined and paid as soon as practicable after the execution of the applicable purchase and sale or other similar agreement.

vi. <u>Termination of Employment</u>.  If a KEIP Participant's employment is terminated by the Debtors without "cause," by such participant for "good reason," or upon death or disability during a Performance Period, the KEIP Participant will be entitled to: (i) a pro-rata portion of the KEIP Award that is earned for such Performance Period based on (a) actual performance during the Performance Period and (b) the percentage of the Performance Period that the KEIP Participant was employed by the Debtors; or (ii) with respect to the Cash Balance Metric, a pro-rata portion of the maximum KEIP payment on account of such metric based on the percentage of the Performance Period that the KEIP Participant was employed by the Debtors and subject to clawback (on an after-tax basis) for actual performance as of March 31, 2023.  If a KEIP Participant's employment is terminated for any other reason (including voluntary termination and termination by the Debtors for "cause"), any remaining unpaid portion of the KEIP Award will be forfeited by the KEIP Participant.

vii. <u>KEIP Wind-Up</u>:  If the Debtors emerge from these chapter 11 cases prior to September 30, 2023, performance on account of the Safety and EFOF Metrics will be measured at the end of the Performance Period during which the Debtors emerge from these chapter 11 cases.  KEIP Awards will be determined for such Performance Period based on actual performance, and the KEIP will be terminated at the end of such Performance Period.  With respect to the Cash Balance Metric, if the Debtors emerge from these chapter 11 cases prior to March 31, 2023, the KEIP Participants will receive a cash payment at the maximum level upon emergence, subject to clawback (on an after-tax basis) for actual performance as of March 31, 2023.

21.     The Performance Metrics focus on the business objectives that are critical to the success of these chapter 11 cases and create and maximize value for the Debtors and their stakeholders.  The Cash Balance Metric measures the extent to which the Debtors' actual adjusted target cash ("**ATC**") exceeds the forecasted ATC in order to incentivize the KEIP Participants to maximize the value of continuing operations, which will benefit all parties in interest.  The Safety Metric holds the KEIP Participants accountable for safe operations and the well-being of employees, ensuring a focus on responsible operations during these chapter 11 cases.  The EFOF Metric holds management accountable for the reliable operation of, and maintaining the quality of, power generating assets.  The Confirmation Metric measures the

timing of confirmation of the Debtors' plan of reorganization, which incentivizes administrative efficiency and a prompt exit from chapter 11.  The Asset Sale Metric rewards the KEIP Participants for creating and maximizing value for the Debtors, their estates, and all parties in interest through the sale of non-core assets.  The inclusion of the Asset Sale Metric was a specific request by the Unsecured Notes Group, who have asked that management, in addition to their previously contemplated activities, explore potential non-core asset dispositions.

**Market Analysis**

22.     The Debtors retained Willis Towers Watson in March 2022 to, among other things, provide the Company, its Board, and its other professionals with independent compensation consulting services.   Georgeson Decl. ¶ 2.   Willis Towers Watson is an international professional service firm that offers a wide variety of services to its clients, including expert analysis of executive and management compensation issues.  *Id.* ¶ 5.  Willis Towers Watson has access to a broad range of market compensation data, including data related to companies in chapter 11 cases.  *Id.* ¶ 6.  Willis Towers Watson also has substantial expertise in designing such programs for companies undergoing restructuring or bankruptcy.  *Id.* ¶ 6–7.

23.     To ensure that the KEIP is market-based and reasonable, Willis Towers Watson reviewed the KEIP Award in comparison with the structure and costs of KEIPs approved in comparable chapter 11 cases that are generally similar in size to the Company (i.e., companies with prepetition revenues ranging from $500 million to $4 billion or prepetition assets ranging from $5 billion and $25 billion).  *Id.* ¶ 18.  Willis Towers Watson also evaluated the annualized target total direct compensation of the KEIP participants relative to market using a peer group of 22 comparably sized companies, including power generating, data center and crypto-currency companies, and published compensation survey data representing the power generation industry.  Willis Towers Watson determined, based on its review and depth of

industry experience, that even if the KEIP Participants receive the maximum aggregate KEIP Award, such annualized KEIP Award would still be within the range of annualized KEIP costs in comparable chapter 11 cases as well as annualized total direct compensation in relation to market.[5]  *Id.* ¶ 19.

24.     As set forth in <u>Table I(A)</u> below, the number of participants in the KEIP is below the 50th percentile of its comparable peers, and the total annualized KEIP costs are below the 50th percentile of the market.  Georgeson Decl. ¶ 19.  Willis Towers Watson also compared the KEIP Participants' total direct compensation opportunities against market data. More specifically, Willis Towers Watson considered the following elements of compensation: (a) base salary; (b) target annual incentive opportunity; (c) target total cash compensation (i.e., base salary plus target bonus); (d) annualized expected grant value of long-term incentives; and (e) target total direct compensation (i.e., target total cash compensation plus long-term incentive compensation) and found, as set forth in <u>Table I(B)</u> below, that the KEIP Participants'

---

[5]     As disclosed in the Debtors' *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefits Programs and Pay Related Obligations, and (C) Pay Prepetition Employment Expenses; and (II) Granting Related Relief* [Docket No. 5], in April 2022, the Board approved the payment of STIP awards to certain members of the Debtors' senior management on account of the Company's anticipated target performance for the second quarter of 2022 through the first quarter of 2023 (the "**Accelerated STIP Awards**"). Each eligible employee's Accelerated STIP Award is subject to clawback if such employee is terminated for cause or resigns without good reason before March 31, 2023 and the Company's actual satisfaction of the financial and operational performance targets between the second quarter of 2022 through the first quarter of 2023. The KEIP Participants were paid approximately $5,323,000 in the aggregate on account of Accelerated STIP Awards.

The Board also approved certain amendments to the Talen Retention Awards (the "**TRA Amendment**"), which included: (i) accelerating the second cash lump sum payment for all participating employees; (ii) offering an additional cash award to certain existing participants identified as "key specialized employees"; and (iii) offering a cash award to one new participant.  Any award granted to an eligible employee pursuant to the TRA Amendment is subject to clawback if such employee is terminated for cause or resigns without good reason before the earlier of (x) December 31, 2023, (y) 30 days after change of control event, and (z) 60 days following the effective date of the Debtors' chapter 11 plan of reorganization.  The KEIP Participants were paid approximately $4,241,000 in the aggregate on account of awards granted pursuant to the TRA Amendment.

annualized target total direct compensation, in aggregate including target KEIP Awards, is in line with the market, falling between 50th and 75th percentile of the market. *Id.* ¶ 17.

25.     Further, as set forth in <u>Table I(C)</u> below, Willis Towers Watson concluded that, without the compensation opportunity from the proposed KEIP, the annualized target total direct compensation of the KEIP Participants is, in aggregate, below the market 50th percentile. *Id.* ¶ 16.  Accordingly, Willis Towers Watson concluded that the cost and size of the KEIP are reasonable in comparison to market practices.

**Table I(A): Peer Comparison of the Annualized KEIP Cost**

| Summary Statistics | Number of Participants | Threshold Total Cost ($M) | Target Total Cost ($M) | Maximum Total Cost ($M) |
|---|---|---|---|---|
| 25th Percentile | 7 | $2.4 | $5.4 | $7.6 |
| 50th Percentile | 9 | $4.9 | $9.9 | $16.1 |
| 75th Percentile | 11 | $7.1 | $14.2 | $27.7 |
| **Talen** | **7** | **$0.9** | **$4.6** | **$9.2** |
| | *Percentile Rank* | 3rd | 14th | 29th |

**Table I(B): KEIP Participant Annualized Target Total Direct Compensation vs. Market**

| | | Market Target TDC Data | | Talen vs. 50th Percentile | Talen vs. 75th Percentile |
|---|---|---|---|---|---|
| Title | Target TDC ($K) | 50th Percentile | 75th Percentile | | |
| Chief Executive Officer | $6,356 | $5,888 | $10,071 | 8% | -37% |
| Chief Financial Officer | $1,744 | $1,598 | $2,524 | 9% | -31% |
| General Counsel | $1,516 | $1,462 | $1,830 | 4% | -17% |
| SVP - Chief Nuclear Off. | $1,631 | $1,714 | $2,358 | -5% | -31% |
| SVP - Fossil Operations | $1,098 | $1,131 | $1,527 | -3% | -28% |
| SVP - Commercial | $897 | $778 | $1,089 | 15% | -18% |
| SVP & CFO, Cumulus Data | $899 | $525 | $1,005 | 71% | -11% |
| Total | $14,142 | $13,096 | $20,404 | 8% | -31% |

**Table I(C): KEIP Participant Annualized Target Total Direct Compensation (excluding KEIP) vs. Market**

| Title | TDC (excl. KEIP) ($K) | Market Target TDC Data | | Talen vs. 50th Percentile | Talen vs. 75th Percentile |
|---|---|---|---|---|---|
| | | 50th Percentile | 75th Percentile | | |
| Chief Executive Officer | $3,939 | $5,888 | $10,071 | -33% | -61% |
| Chief Financial Officer | $1,019 | $1,598 | $2,524 | -36% | -60% |
| General Counsel | $1,033 | $1,462 | $1,830 | -29% | -44% |
| SVP - Chief Nuclear Off. | $1,027 | $1,714 | $2,358 | -40% | -56% |
| SVP - Fossil Operations | $905 | $1,131 | $1,527 | -20% | -41% |
| SVP - Commercial | $801 | $778 | $1,089 | 3% | -26% |
| SVP & CFO, Cumulus Data | $802 | $525 | $1,005 | 53% | -20% |
| Total | $9,526 | $13,096 | $20,404 | -27% | -53% |

26.     According to Willis Towers Watson, the absence of any meaningful incentive opportunity for the KEIP Participants would further erode the current competitiveness of the Debtors' compensation programs, which could impact the Debtors' ability to motivate the KEIP Participants to achieve and exceed business performance goals and create value during these chapter 11 cases for the Debtors and their constituents.  Georgeson Decl. ¶ 20.  Without the availability to provide incentive grants consistent with typical market practice for these KEIP Participants, the Debtors' ongoing compensation structure would be below market and could result in the loss of the focus and devotion necessary from these critical employees to operate the Debtors' business through emergence from chapter 11.

### Relief Requested Should Be Granted

27.     The Court should grant the relief requested because (i) the implementation of the proposed KEIP reflects a reasonable exercise of the Debtors' business judgment and, therefore, is appropriate under section 363(b) of the Bankruptcy Code; and (ii) the KEIP satisfies section 503(c) of the Bankruptcy Code because (a) the KEIP is not a retention bonus due to its incentive-based structure, and (b) the KEIP is justified by the facts and circumstances of these chapter 11 cases.

I.      **Implementation of KEIP Is a Reasonable Exercise of Sound Business Judgment and Authorized Under Bankruptcy Code Section 363(b)(1)**

28.     The KEIP constitutes a sound exercise of the Debtors' business judgment and should be approved under section 363(b)(1) of the Bankruptcy Code.  Section 363(b)(1) provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  *In re Viking Offshore (USA), Inc.*, No. 08-31219-H3-11, 2008 WL 1930056, at *2 (Bankr. S.D. Tex. Apr. 30, 2008) (applying the business judgment rule to determine whether the debtors' proposed bonuses were justified outside the ordinary course of business); *In re Mesa Air Grp., Inc.*, No. 10-10018 (MG), 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept. 24, 2010) (approving employee bonus programs as "valid exercise of their business judgment" under section 363(b)).

29.     The implementation of the KEIP is a sound exercise of the Debtors' business judgment as it incentivizes the KEIP Participants to achieve and exceed financial and operational metrics that will create value and maximize such value for the Debtors' estates to the benefit of all parties in interest.  The KEIP addresses the Debtors' need to properly incentivize the KEIP Participants to achieve optimal business performance goals.  The Debtors' business performance is a critically important factor in maximizing estate value, and the Debtors believe that creating proper incentives to achieve this goal is a necessary means to this end.  The KEIP Participants are the Debtors' key business leaders; they possess skills, knowledge, and experience that are critical to the Debtors' ability to drive performance.  The KEIP, therefore, is structured to drive outperformance from these individuals, providing incentives to surpass targeted performance at levels that will benefit the Debtors' estates and all parties in interest if such goals are achieved.  As discussed in the Georgeson Declaration, the KEIP resulted from an independent analysis undertaken by the Debtors, with the assistance of Willis Towers

Watson and the Debtors' restructuring advisors, and an arm's-length negotiation with the Unsecured Notes Group.  The KEIP sets appropriate and reasonable compensation award opportunities.  The Debtors submit that the performance targets are suitably set to drive performance at levels at which all of the Debtors' stakeholders will benefit if those metrics are achieved.

30.     Accordingly, the KEIP is authorized by section 363(b)(1) of the Bankruptcy Code and should be approved.

## II.     KEIP Satisfies Section 503(c) of the Bankruptcy Code

31.     The KEIP satisfies section 503(c) of the Bankruptcy Code because the KEIP is not a retention bonus due to its incentive-based structure.  Moreover, the KEIP is justified by the facts and circumstances of these chapter 11 cases.

### A.     KEIP Is an Incentive-Based Program

32.     Section 503(c)(1) of the Bankruptcy Code imposes substantial limitations on retention-based insider compensation programs, but section 503(c)(1) does not apply to performance-based incentive plans. *See, e.g.*, *In re Velo Holdings, Inc.*, 472 B.R. 201, 209–10 (Bankr. S.D.N.Y. 2012) (finding that an incentive-based plan alleviated the need for a section 503(c)(1) analysis); *In re Borders Grp. Inc.*, 453 B.R 459, 471 (Bankr. S.D.N.Y. 2011) (finding that the debtors met the burden to establish that the incentive plan was incentivizing, "thereby alleviating the need for a section 503(c)(1) analysis").  In determining whether an employee bonus plan is incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).  This analysis further recognizes that all compensation, to some degree, has a retentive element. *See In re Glob. Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The fact . . . that all compensation has a retention element does not

reduce the Court's conviction that [the] Debtors' primary goal [is] to create value by motivating performance."). Rather, the focus is on whether the plan is, on the whole, truly incentivizing in nature by demanding a "stretch" before an award opportunity is achieved. *In re Dana Corp.*, 358 B.R. 567, 581 (Bankr. S.D.N.Y. 2006); *accord Glob. Home Prods.*, 369 B.R. at 785 ("The entire analysis changes if a bonus plan is not primarily motivated to retain personnel or is not in the nature of severance.").

33.    The KEIP does not provide bonuses for retention, but rather, allocates payments to key employees who are the most critical to maximizing the value of the Debtors' estates. The KEIP has been crafted with great care to ensure it directly incentivizes participants to exceed the Debtors' business objectives and further maximize the value of each Debtor's estate.

34.    To the extent the KEIP may also encourage KEIP Participants to remain employed with the Debtors throughout the chapter 11 cases, that should not bar implementation of the KEIP. Indeed, all successful incentive plans have the indirect benefit of incentivizing an employee to remain with the company. *See In re Alpha Natural Resources, Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("[A] KEIP that merely has some retentive effect should not be analyzed under § 503(c)(1)."). As discussed herein, payouts under the KEIP require more than merely remaining employed; they require completion of certain operational and financial performance targets that are challenging. Accordingly, there is no guarantee that the KEIP Participants will receive any payouts.

35.    In view of the foregoing, the Debtors submit that section 503(c)(1) of the Bankruptcy Code does not bar approval of the KEIP.

**B.** **KEIP is Justified by Facts and Circumstances**

36.     Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case."   11 U.S.C. § 503(c)(3).   In determining whether a particular program is justified under the facts and circumstances of a particular case, courts consider whether "the KEIP's implementation will serve the interests of creditors and the debtor's estate."   *In re Country Fresh Holding Co.*, No. 21-30574, 2021 Bankr. LEXIS 1839, at *35 (Bankr. S.D. Tex. July 12, 2021).   Courts also consider several other factors, including: (i) whether the plan is calculated to achieve the desired performance; (ii) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (iii) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (iv) whether the plan is consistent with industry standards; (v) whether the debtor performed due diligence in investigating the need for the plan; and (vi) whether the debtor received independent advice in performing due diligence with respect to creating and authorizing the plan.   *See Glob. Home Prods.*, 369 B.R. at 786; *Dana Corp.*, 358 B.R. at 576–77.   No single factor is dispositive, and the Court has discretion to weigh each of these factors based on the specific facts and circumstances before it.   *See Dana Corp.*, 358 B.R. at 576 ("[S]ection 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention or in the nature of severance.").   As set forth below, the KEIP satisfies all of these factors:

- ***KEIP Is Structured to Achieve the Desired Performance***.
  The KEIP incentivizes the Debtors' key employees to achieve optimal business performance goals that will drive a successful restructuring. Achievement of the Performance Metrics will require substantial efforts from the KEIP Participants in the midst of a challenging financial situation and operating environment.   The KEIP Participants "simply

21

showing up" will not result in achievement of the Performance Metrics and, therefore, no award will be earned without substantial outperformance by the KEIP Participants.

- ***Scope of the KEIP Is Fair and Reasonable***.

  The KEIP Participants are limited to a set of seven members of senior management at the Company who drive performance and are critical to ensuring the success of the Debtors' business generally. The KEIP is reasonably limited to the KEIP Participants and its cost is reasonable when compared to KEIPs in comparable chapter 11 cases.

- ***Debtors Developed the KEIP with Independent Advice and Oversight***.

  The Debtors actively sought input from their legal, financial, and compensation advisors during the development process. This process included Willis Tower Watson's specific compensation-related expertise and analysis and oversight and approval of the independent managers on the Restructuring Committee.

- ***Debtors Were Duly Diligent***.

  The Debtors, with the assistance of Willis Towers Watson and their other restructuring advisors, performed considerable diligence on their employees' existing compensation levels (both with and without some form of incentive-based compensation) and market comparables.[6] As a result of such diligence, and as discussed below, the Debtors determined that the KEIP Participants were being compensated below market for their positions.

- ***The KEIP Is Consistent with Industry Practices***.

  To evaluate an appropriate compensation structure for the KEIP Participants, Willis Towers Watson gathered external market compensation data from several data sources, encompassing a representative database of compensation information for comparable industries and the labor market for executives. Absent the KEIP, Willis Towers Watson determined that KEIP Participants would be compensated below industry standards for their positions. With the potential KEIP payouts, the KEIP Participants' total compensation will be within an appropriate range of total compensation for the Debtors' industry, particularly considering the additional duties and challenges faced by the KEIP Participants and the difficult goals that must be achieved in order to receive a KEIP Award.

- ***Cost of the KEIP Is Reasonable***.

  The cost of the KEIP falls within the range of costs of programs implemented in comparable chapter 11 cases. As stated above, the

---

[6] This benchmarking also accounted for the Debtors' payments to the KEIP Participants on account of the Accelerated STIP Awards and TRA Amendment.

annualized cost of the KEIP would be approximately (i) $900,000 at threshold performance, (ii) $4.6 million at target performance, and (iii) $9.2 million at maximum performance.  Assuming the Debtors' chapter 11 cases continue through September 30, 2023, the total forecasted aggregate cost of the KEIP would be approximately (i) $1.4 million at threshold performance, (ii) $6.9 million at target performance, and (iii) $13.8 million at maximum performance.  The annualized cost of the KEIP at threshold, target, and maximum are at the 3rd, 14th, and 29th percentile, respectively, of annualized KEIP costs among a group of 20 comparable restructuring companies.  Furthermore, the total compensation opportunities for the KEIP Participants are reasonable compared to relevant benchmarks in the power generation and digital industries.  The KEIP Participants' annualized target total direct compensation in the aggregate would be between the 50th and 75th percentiles of market practices.

37.     Accordingly, the KEIP satisfies the standard applicable under section 503(c)(3) of the Bankruptcy Code and is justified under the facts and circumstances of these chapter 11 cases.

## DIP Order[7] Controls

38.     The DIP Order and the DIP Documents (as defined therein) contain terms that limit and otherwise apply to the Debtors' ability to utilize the relief requested herein. Nothing herein is intended to modify, alter, or waive, in any way, any terms, provisions, requirements, or restrictions of the DIP Order or the DIP Documents.  For the avoidance of doubt, the relief described and requested herein and/or granted by any order issued pursuant hereto is subject in all respects to, and superseded by, the terms of the DIP Order and the DIP Documents, and in the event of any conflict between the terms of the DIP Order, the DIP

---

[7]     "**DIP Order**" means the *Interim Order (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 127] or, from and after its entry, any final order associated therewith and entered by the Court in accordance to the terms thereof.

Documents, and the terms of the Proposed Order, the DIP Order and the DIP Documents are intended to govern.

### Notice

39.     Notice of this Motion will be served upon any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 3, 2022
      Houston, Texas

/s/ Gabriel A. Morgan
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email: Gabriel.Morgan@weil.com
      Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Alexander Welch (admitted *pro hac vice*)
Katherine Lewis (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007
Email: Matt.Barr@weil.com
      Alexander.Welch@weil.com
      Katherine.Lewis@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that, on June 3, 2022, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>*/s/ Gabriel A. Morgan*</u>
Gabriel Morgan