**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 22-90054 (MI) |
| TALEN ENERGY SUPPLY, LLC, *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors.[1] | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**OMNIBUS RESPONSE AND OBJECTION OF OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS TO FINAL APPROVAL OF DEBTORS' DIP**
**FINANCING, CASH MANAGEMENT, AND HEDGING MOTIONS**
**[Related ECF Nos. 14, 17, 18, 29, 44, 122, 127, 144]**

The Official Committee of Unsecured Creditors (the "Committee") of Talen Energy

Supply, LLC and the other above-captioned debtors in possession (collectively, the "Debtors")

hereby submits this response and objection (the "Objection") to the final approval of:

1. *Emergency Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [ECF No. 17] ("DIP Motion"),

2. *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, (C) Continue Intercompany Transactions, and (D) Continue Utilizing Employee Credit Cards and BIP/SIP Programs; and (II) Granting Related Relief* [ECF No. 14] ("Cash Management Motion"), and

3. *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) Continue Performing Under Prepetition Hedging Agreements, (B) Enter Into and Perform Under New Postpetition Hedging Agreements,*

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/talenenergy. The Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

*and (C) Grant Related Liens and Superpriority Claims and Authorize Posting of Margin Collateral and Postpetition Exchange Collateral, (II) Modifying Automatic Stay, and (III) Granting Related Relief* [ECF No. 29] ("Hedging Motion" and, together with the DIP Motion and the Cash Management Motion, the "Motions").[2]

In support thereof, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.    In the short time since the Committee was formed and retained professional advisors, it has been working nearly around the clock to bring itself up to speed on the complex issues arising in these cases.  These efforts have led to a constructive dialogue with the Debtors and their advisors, allowing the Committee to reach consensual resolutions of many of the concerns raised by the broad first day relief the Debtors seek.  But the large number of highly complex issues the Motions implicate and the sheer volume of diligence materials that the Committee needs to assess in order to evaluate the proposed relief, coupled with the Debtors' apparent desire to outperform relative to already-aggressive case milestones, has artificially hamstrung the Committee's ability to form an educated view on, among many other things, the Debtors' intended use of more than $1.3 billion of DIP proceeds, which the Debtors characterize as "ordinary course."  There is nothing "ordinary course" about what the Debtors are proposing.  Of the $1.3 billion of new money the Debtors intend to borrow, they are seeking unfettered authority to utilize approximately 40% of those proceeds to support their hedging program (the apparent cause of their bankruptcy filing) and to continue their large investments in a highly speculative, as-yet-unbuilt, data center and digital coin mining joint venture called

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the relevant Motion or the Court's order approving the DIP Financing on an interim basis [ECF No. 17] (the "Interim DIP Order"), as applicable.

Cumulus, a Non-Debtor Affiliate.  But neither of these activities is at the core of the Debtors' actual business as a power and energy generator.

2.     To be clear, the Committee has no objection to the size of the DIP, the associated fees or economic terms, or the marketing process related thereto.  In fact, the Committee agrees that many aspects of the DIP are quite favorable for the Debtors' estates and are consistent with market terms.  It is for this reason that the Committee was frustrated that it was unable to reach a global resolution of its issues to avoid the need for the filing of this Objection.

3.     While the Committee does not wish to prevent the Debtors from obtaining postpetition financing, operating their business, or consummating an efficient restructuring process, the Committee has serious concerns about the unchecked authority the Debtors seek through the Motions.  This is not a case where unsecured creditors are unimpaired.  The Committee must be able to perform its statutory duties to protect the interests of all unsecured creditors.  So far, the Debtors have been unwilling either to rein in the scope of the relief they seek or to provide the Committee the time and information necessary for it to form a definitive view on these issues. Accordingly, the Committee asks this Court to decline entering final orders on the Motions unless they are modified to (i) afford appropriate notice and consent rights to the Committee, (ii) permit the Committee to effectively conduct its investigation in an effort to unlock additional value for the estates, and (iii) preserve the opportunity for the Committee to seek relief from the Court on an emergency basis if it believes the Debtors are exercising the wide discretion they seek here in a manner that is unnecessarily harmful to the Committee's constituency.

4.     None of the objections detailed herein should be surprising to the Debtors, as each has been raised in discussions with their advisors.  But the Debtors have consistently responded to the Committee's concerns by suggesting that the Committee should have only a perfunctory role

in these cases and simply go along with the requested relief because the senior creditors and the *ad hoc* group of noteholders that signed the restructuring support agreement ("RSA") do not oppose it. This flawed logic must be put to rest now. Of course there is no reason for the DIP Lenders or the prepetition secured creditors—who, based on the RSA, are presumed to be oversecured—to object to the Debtors' proposed use of funds: if the DIP Motion is approved on a final basis, the DIP Lenders and the prepetition secured creditors (through adequate protection) will have liens on ***all assets*** of the estates, including previously unencumbered assets and the proceeds of avoidance actions. And the noteholders that are party to the RSA stand to receive additional significant pecuniary benefit if these cases are resolved in accordance with the RSA.

5.       But the secured creditors and the *ad hoc* noteholder group are not the only stakeholders in these cases. The Committee is charged with protecting the interests of ***all*** unsecured creditors, including those that are not party to any of the negotiated agreements with the Debtors. The Committee is the sole party in interest with the duty to investigate the Debtors' business and conduct and, if appropriate, seek to recover, additional value for the benefit of ***all*** unsecured creditors of these estates. So too is the Committee the only party capable of evaluating the Debtors' prepetition and postpetition activity as an independent fiduciary. It should be permitted to do so effectively.

6.       The Committee therefore objects to final approval of the Motions on the following grounds, among others detailed herein.

7.       ***DIP Motion***. The Committee's most significant concerns with respect to the DIP Motion are the request to grant liens on and superpriority claims with recourse to proceeds of

avoidance actions[3] in favor of the DIP Lenders and the prepetition secured creditors,[4] and the imposition of an overly-restrictive timeline and budget for the Committee's investigation.  This is not a case where the Committee's investigation into potential sources of additional value is a check-the-box exercise: even at this early stage in these cases, it is apparent that many prepetition activities will require the Committee's close attention—including, at a minimum, the following issues related to the prepetition Commodity Accordion Facility (the "CAF"):

- whether security interests perfected within the preference period and outside the safe harbor of 11 U.S.C. § 547 are avoidable;

- whether the indebtedness under the CAF was permitted under preexisting debt documents; and

- whether obligations incurred by Susquehanna Nuclear, LLC under the CAF constituted fraudulent transfers or are otherwise voidable.

Preserving the Committee's ability to investigate matters relating to the Debtors' prepetition secured creditors is particularly necessary as the Debtors' desired restructuring path is not guaranteed.  In the event it does falter, the Committee's role in identifying and preserving value will be indispensable.  Thus, the Committee believes that an investigation period of 90 days from entry of the Final DIP Order—which is nearly two months before the outside date for the Debtors to confirm their chapter 11 plan under the RSA—and a budget of $600,000 is needed to allow it to discharge its fiduciary duties.

8.     The Committee has been working constructively with the DIP Lenders to reach a consensual resolution with respect to the Final DIP Order and believes that significant progress

---

[3]    While the Committee's investigation into potential avoidance actions is ongoing, it is already apparent that areas for investigation will include (i) the activities of Riverstone in its management of Talen Montana, including a $500 million dividend paid to Riverstone in 2017 and a $900 million dividend distributed by Talen Montana in 2014 (the latter of which is already the subject of a pending adversary proceeding), and (ii) intercompany transfers, including transfers to Non-Debtor Affiliates.

[4]    For the avoidance of doubt, the Committee does not object to the grant of Superpriority Hedge Claims and Postpetition Hedging Liens to secure the Debtors' Hedging Obligations.

has been made to date, including an agreement to increase the investigation budget to $600,000. But the Committee, the DIP Lenders, and the Debtors have not yet reached an agreement on all issues, including the investigation period.  The Committee is hopeful that resolutions can be reached before the hearing on the DIP Motion, but nevertheless is compelled to file this Objection to preserve its rights.

9.     ***Cash Management Motion***.  At this early stage, before the Committee has had a sufficient opportunity to conduct the necessary diligence into the Cumulus project (though the Committee has made extensive inquiries), the Debtors should not be granted unchecked discretion to fund hundreds of millions of dollars into a speculative, yet-to-be-built venture in exchange only for preferred equity (the common equity being retained by the Debtors' sponsor).  Cumulus is a highly unique project; no one contends otherwise.  The Debtors argue that this one-of-a-kind nature is precisely why their investments are so valuable and necessary.  They might be right.  But the Committee is not yet in the position to know one way or the other.  The Committee cannot form a view without taking the time required to reach an educated opinion on the advisability of continued equity investments in this admittedly novel, early-stage, and untested project—particularly given the Debtors' status as debtors in possession.  And the fact that the Debtors' independent directors oversee these investments does little to assuage the Committee's concerns; those directors have different duties than the Committee, and their duties do not trump or displace the Committee's. The Committee needs additional time to evaluate the diligence materials regarding the Cumulus project before the Debtors are given sweeping authority to transfer cash to this Non-Debtor Affiliate—several weeks before even the Debtors acknowledge these transfers need to be made. The Debtors have only engaged with the Committee to say that investments in Cumulus are ordinary course transactions—an untenable position for companies engaged in the power-

generation business and that have never before operated data centers or engaged in cryptocurrency mining.  On that unsupportable basis, the Debtors have rebuffed the Committee's efforts to reach a compromise.

10.     ***Hedging Motion***.  Finally, the Committee seeks additional notice and oversight protections with respect to the Debtors' hedging operations.  The Debtors have been candid with the Court and other parties in interest regarding the role their prepetition hedge positions played in their liquidity crisis and the need to seek chapter 11 protection.  It should not be surprising that the Committee, in fulfilling its statutory duties, is evaluating the hedging strategy that precipitated this bankruptcy and the way the Debtors have since modified that strategy.  It should be equally unsurprising that the Committee seeks the ability to ensure the Debtors remain within the bounds of their revised hedging strategy.  The changes to the final hedging order the Committee requests (as communicated to the Debtors) would preserve the Committee's ability to do both.  To date, the Debtors have been unwilling to agree to ***any*** procedures that would provide the Committee sufficient oversight over the Debtors' entry into material hedging arrangements or the ability to seek relief from this Court should the need arise.  Discussions between the Committee and Debtors with respect to the Debtors' reporting obligations to the Committee remain ongoing but have yet to yield a compromise.

*          *          *

11.     Accordingly, the Committee requests that the final orders approving the Motions be modified to remedy the problems identified herein and reserves its rights to supplement this Objection, including based on new information that may be received between now and the final hearing on the Motions.

## OBJECTION

## I.  CREDITORS' COMMITTEES ARE CHARGED WITH STATUTORY AND FIDUCIARY OBLIGATIONS

12.     The Committee is a fiduciary for the Debtors' unsecured creditors.  *See, e.g.*, *In re Venturelink Holdings, Inc.*, 299 B.R. 420, 423 (Bankr. N.D. Tex. 2003); *In re First RepublicBank Corp.*, 95 B.R. 58, 61 (Bankr. N.D. Tex. 1988); *see also Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 256 (3d Cir. 2001).  As such, it has statutory duties that it must discharge in pursuing its express purpose of protecting the rights of its constituency.  *See* H.R. REP. NO. 95-595, at 104 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6053 (creditors' committees are "primarily negotiating bodies for the classes of the creditors that they represent"); *see also Advisory Comm. of Major Funding Corp. v. Sommers (In re Advisory Comm. of Major Funding Corp.*), 109 F.3d 219, 224 (5th Cir. 1997) (creditors' committees "have the responsibility to protect the interest of the creditors; in essence, 'the function of a creditors' committee is to act as a watchdog on behalf of the larger body of creditors which it represents'"); *In re Refco, Inc.*, 336 B.R. 187, 195 (Bankr. S.D.N.Y. 2006) ("An official committee of creditors plays a pivotal role in the bankruptcy process.  The function of an official creditors committee is to aid, assist and monitor the debtor to ensure that the unsecured creditors' views are heard and their interests promoted and protected") (internal citation omitted).

13.     In furtherance of this purpose, Congress authorized official committees to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or the formulation of a plan."  11 U.S.C. § 1103(c)(2).  Section 1109(b) of the Bankruptcy Code also provides that a creditors' committee may raise, appear, and be heard on any issue in a chapter 11 case.  *Id.* § 1109(b).  These powers were granted to official creditors'

committees so that they may perform their chartered tasks effectively, consistent with the Bankruptcy Code's overarching objective of protecting and advancing the interests of unsecured creditors. *See, e.g.*, *In re Duratech Indus., Inc.*, 241 B.R. 291, 296 (Bankr. E.D.N.Y. 1999) ("[T]he central purpose of a bankruptcy case [is] to maximize the distribution of assets or plan payments to unsecured creditors."). The active participation of official creditors' committees is vital to the effective administration of chapter 11 cases. *See CHS, Inc. v. Plaquemines Holdings, L.L.C.*, 735 F.3d 231, 238 (5th Cir. 2013) (a debtor in possession cannot operate its business as it did prepetition, "unfettered and without restraint") (citation omitted).

14.     The Committee's objections to the Motions all seek to protect the Committee's ability to discharge its duties, enhance the value of these estates, and maximize recoveries for general unsecured creditors.

## II.     THE FINAL DIP ORDER SHOULD BE MODIFIED AS PROVIDED HEREIN[5]

### A.     Avoidance Action Proceeds Should Remain Unencumbered and Their Value Should Be Reserved for Unsecured Creditors

15.     The DIP Motion contemplates that avoidance action proceeds will be part of both the DIP Collateral and collateral securing Adequate Protection Liens. *See* Interim DIP Order ¶¶ 8, 19(a). It also contemplates that both the DIP Secured Parties and Prepetition First Lien Secured Parties will be given superpriority administrative expense claims with recourse to the avoidance action proceeds. *See* Interim DIP Order ¶¶ 7, 19(b). That is not appropriate.

16.     Where, as here, the secured creditors are presumptively oversecured by other assets, it is not appropriate to give them liens on and superpriority claims to avoidance action proceeds.

---

[5]     The Committee has raised numerous issues with the Debtors with respect to the Final DIP Order that are not discussed herein as the Committee believes that the DIP Lenders have agreed to make appropriate modifications to the Final DIP Order. In the event the DIP Lenders do not make those modifications, the Committee reserves the right to submit a supplemental objection or raise those issues at the hearing on the Final DIP Order.

As the Fifth Circuit has explained, the proceeds recovered in an avoidance action should benefit "the debtor's estate and particularly, the debtor's unsecured creditors." *McFarland v. Leyh* (*In re Tex. Gen. Petroleum Corp.*), 52 F.3d 1330, 1335 (5th Cir. 1995) (citing *Citicorp Acceptance Corp. v. Robison (In re Sweetwater)*, 884 F.2d 1323, 1327 (10th Cir. 1989). That is why the Procedures for Complex Cases in the Southern District of Texas (the "Procedures") require that any DIP motion seeking authority to grant liens on avoidance actions or their proceeds must emphasize this request to the court and "provide specific reasons" why such grant may be appropriate. *See* Procedures ¶ 8.d. The Debtors have failed to provide any such "specific reasons." The Debtors' conclusory and self-serving statement that "the liens were required by the DIP Secured Parties as a condition to extending credit" (*see* DIP Motion, p. 22) does not qualify.

17. The Debtors have the burden of proving that the proposed DIP Financing is in the best interest of their estates and creditors. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003); *In re Phase-I Molecular Toxicology, Inc.*, 285 B.R. 494, 495 (Bankr. D.N.M. 2002). And courts will not approve a DIP financing where it is not in the best interests of the estate and instead is designed to favor the lender at the expense of other creditors. *See In re Laffite's Harbor Dev. I, L.P.*, No. 17-36191-H5-11, 2018 WL 272781 at *3 (Bankr. S.D. Tex. Jan. 2, 2018) (rejecting approval of DIP financing, noting that bankruptcy courts "do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender"). The Debtors have failed to carry their burden.

18. The Committee believes that the proceeds of avoidance actions have the potential to yield significant value in these cases. It would be inequitable to shift this value away from the Debtors' unsecured creditors to the DIP Secured Parties and Prepetition First Lien Secured Parties

where the Debtors have not produced any evidence that this feature of the DIP Financing was necessary.  They have not produced any evidence to demonstrate that their negotiations with the DIP Secured Parties and the Prepetition First Lien Secured Parties regarding the avoidance action proceeds were hard-fought.  The DIP Motion and its supporting declarations contain no discussion of any give-and-take in the parties' negotiations pertaining to the avoidance action proceeds.  Nor do the Debtors' papers mention any board deliberations on this issue.[6]

19.     Thus, the Debtors have not shown why the Court should allow them to encumber avoidance action proceeds.  *See In re Laffite's Harbor*, 2018 WL 272781 at *3.  If it were sufficient for a prospective DIP lender to simply ask for a lien on avoidance action proceeds, regardless of the level of security it is already enjoying, avoidance action proceeds would become encumbered in every chapter 11 case.  But that is not the case.  The Procedures and the caselaw in this Circuit and elsewhere requires more.

20.     Accordingly, the Court should deny granting any liens or superpriority claims with recourse to the avoidance action proceeds.

**B.     The Final DIP Order Improperly Restricts the Committee's Ability to Conduct an Investigation and Fulfill Its Statutory Duties**

21.     The Committee understands that the Debtors seek to impose an unrealistic 52-day time frame from entry of the Final DIP Order (even more restrictive than what is contemplated in the DIP Motion),[7] to coincide with their proposed (and overly aggressive) objection deadline for a

---

[6]     The Prepetition Intercreditor Agreement permits only the Prepetition Revolving Lenders to request adequate protection in the Debtors' bankruptcy cases, while prohibiting all other Prepetition First Lien Secured Parties from requesting adequate protection.  Issuers of letters of credit under the Prepetition Revolving Credit Facility are having their prepetition claims elevated to DIP Obligations.  *See* Interim DIP Order ¶ 5.  Accordingly, there is no justification for granting Adequate Protection Liens or superpriority administrative expense claims with respect to avoidance actions proceeds in favor of any Prepetition First Lien Secured Parties.

[7]     The DIP Motion indicates that a 60-day window would begin on the date of the Court's entry of the Final DIP Order if an official creditors' committee is appointed.  *See* DIP Motion ¶ 8.  In either case, the proposed investigation period is unrealistic under the facts and circumstances of these cases.

to-be-scheduled Disclosure Statement hearing, in which the Committee must (i) investigate potential claims against, among others, the Prepetition First Lien Secured Parties, (ii) obtain standing, if necessary, and (iii) initiate an adversary proceeding or contested matter. *See* Interim DIP Order ¶ 26.

22.     As explained above, the Committee, as a fiduciary for the Debtors' unsecured creditors, has statutory duties that it must discharge. The Committee's actions should be governed by these statutory mandates, not dictated by the Debtors and their secured creditors. Any attempt to limit the Committee's ability to discharge its obligation to represent the interests of unsecured creditors diligently, while improperly shielding the purportedly secured creditors from potential claims, is inappropriate and unacceptable. *See*, *e.g.*, *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("failure to provide a reasonable sum for professionals [may leave] estates, creditors' committees and trustees without the assistance of counsel and the Court without the adversary system contemplated by Congress").

23.     The restrictions that the Debtors attempt to impose on the Committee are inappropriate as they would unduly constrain the Committee in discharging its duties. The Court should not countenance such a result. Instead, a budget of $600,000 and a 90-day challenge period (tolled upon the Committee's filing a standing motion) is warranted here.

       1.     <u>More Time Is Needed for the Committee to Conduct Its Investigation</u>

24.     Challenging claims and liens of prepetition secured creditors is often a source of additional recovery for unsecured creditors in chapter 11 cases. *See generally In re Sanchez Energy Corp.*, No. 19-34508, 2021 WL 923182 at *2 (Bankr. S.D. Tex. Mar. 9, 2021); *see also Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 573 (3d Cir. 2003) ("avoidance actions are designed to protect" the interests of "unsecured creditors");

*Official Comm. of Unsecured Creditors v. Goold Elecs. Corp. (In re Goold Elecs. Corp.)*, 1993 WL 408366 at *3-4 (N.D. Ill. Sept. 22, 1993) (vacating DIP financing order granting security interests in preference actions so as not to "frustrate the policy of equal treatment of creditors under the Code"). Under the DIP Financing, the period in which the Committee is supposed to investigate the claims and liens of the Prepetition First Lien Secured Parties (among others), and any potential claims against them, to determine whether any additional recovery for unsecured creditors may be available in these cases, is unreasonably short.

25.     This is not the typical case in which an official committee need only conduct a limited, routine perfection review with respect to one or two prepetition facilities. Instead, the Debtors' proposed stipulations, admissions, and releases are extensive and involve complex factual and legal issues. They span roughly 25 pages, covering (i) three loan facilities, (ii) three issuances of notes, (iii) a prepetition product and purchase sale agreement, (iv) commodity hedges, interest rate hedges, and treasury services agreements, (v) a credit card program, and (vi) letter of credit facilities. *See* Interim DIP Order ¶ F. The Debtors propose to release claims and causes of action against numerous parties—the DIP Secured Parties, the Prepetition Credit and Notes Secured Parties, and their respective Representatives. *See* Interim DIP Order ¶ F. These admissions and releases implicate such issues as the validity, perfection, and priority of prepetition liens, the applicability of bankruptcy safe harbors, and the extent of estate property. Moreover, here, unlike in many other cases, accusations have already been made regarding failed perfection and potential preferences, which mandate an even more thorough investigation by the Committee than usual. Accordingly, the 52-day limitation would unduly and unjustifiably restrict the Committee from conducting a proper investigation.

26.     Several courts, in this Circuit and elsewhere, have approved challenge periods significantly longer than that proposed here.  *See, e.g.*, *In re Fieldwood Energy LLC*, No. 20-33948 (Bankr. S.D. Tex. Sept. 15, 2020) [ECF No. 346] ¶ 23 (establishing challenge period of 75 days after entry of final DIP order); *In re EP Energy Corp.*, No. 19-35654 (Bankr. S.D. Tex. Nov. 25, 2019) [ECF No. 482] ¶ 21 (establishing challenge period of 120 days after the petition date); *In re Chesapeake Energy Corp.*, No. 20-33233 (Bankr. S.D. Tex. July 31, 2020) [ECF No. 597] ¶ 19 (establishing challenge period of 85 days after committee selected counsel).  Furthermore, courts frequently order that an official committee's filing of a standing motion satisfies the requirement of commencing a challenge within the challenge period.  *In re Sanchez Energy Corp.*, No. 19-34508 (Bankr. S.D. Tex. Jan. 22, 2020) [ECF No. 865] ¶ 23; *In re EP Energy Corp.*, No. 19-35654 (Bankr. S.D. Tex. Nov. 25, 2019) [ECF No. 482] ¶ 21.

27.     The Committee is prepared to move quickly and work within tight deadlines.  But it is unable to do the necessary work without the relevant information, which only the Debtors can provide; this process is only in the early stages.  Accordingly, the Committee requests that its challenge period be extended to 90 days from the entry of the Final DIP Order, subject to tolling upon it filing a standing motion.

       2.     <u>Adequate Funding Is Needed for the Committee to Conduct Its Investigation</u>

28.     Considering the complexity of the Debtors' capital and corporate structures, and in particular the perfection issues associated with the CAF, a $50,000 investigation budget is woefully inadequate for the Committee to fulfill its duties.  As explained above, the Debtors' proposed stipulations, admissions, and releases are extensive and involve complex factual and legal issues.

29.     To preserve the integrity of the bankruptcy process, the Committee's professionals must be in the position to advocate on behalf of the Debtors' unsecured creditors.  Effectively subjecting them to the control of third parties whose interests are not aligned with those of the Committee's constituency is inappropriate and inconsistent with the Bankruptcy Code.  Thus, in large, complex chapter 11 cases, courts have sometimes imposed no budget at all on a committee's investigation.  *See, e.g.*, *In re TOUSA, Inc.*, No. 08-10928 (Bankr. S.D. Fla. Jan. 9, 2009) [ECF No. 2355] (no budget for use of cash collateral to investigate claims); *In re Tropicana Ent., LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008) [ECF No. 219] (same); *In re Delta Air Lines, Inc.*, No. 05-17923 (Bankr. S.D.N.Y. Oct. 6, 2005) [ECF No. 652] (no investigation budget).  Even where courts have imposed caps, such caps significantly exceed the $50,000 cap proposed here. *See, e.g.*, *In re Chesapeake Energy Corp.*, No. 20-33233 (Bankr. S.D. Tex. July 31, 2020) [ECF No. 597] ¶ 20 ($400,000 budget); *In re EP Energy Corp.*, No. 19-35654 (Bankr. S.D. Tex. Nov. 25, 2019) [ECF No. 482] ($450,000 budget).

30.     In light of these concerns, the Committee understands that the DIP Lenders have agreed to increase the budget to $600,000 to ensure that the Committee can properly discharge its statutory duties.

### C.     The Proposed Section 506(c) and 552(b) Waivers Should Not Be Approved

31.     The DIP Financing contemplates a waiver of the estates' rights to surcharge the DIP Collateral and certain Prepetition Collateral under section 506(c) of the Bankruptcy Code. *See* Interim DIP Order ¶ 14.  It also contemplates a waiver of this Court's statutory right to apply the "equities of the case" exception under section 552(b)(2) of the Bankruptcy Code.  *See* Interim

DIP Order ¶ 15.  The Court should not approve either of these waivers of fundamental bankruptcy rights.[8]

1.      The Debtors' Section 506(c) Surcharge Rights Must Be Preserved

32.      Section 506(c) of the Bankruptcy Code permits a debtor to recover, for the benefit of its estate (and thus its unsecured creditors), the "reasonable, necessary costs and expenses of preserving, or disposing of, [a secured creditor's collateral] to the extent of any benefit" to such creditor.  11 U.S.C. § 506(c); s*ee also Borrego Springs Bank, N.A. v. Skuna River Lumber, L.L.C.* (*In re Skuna River Lumber, LLC*), 564 F.3d 353, 355 (5th Cir. 2009) ("[S]ection 506(c) of the Bankruptcy Code . . . allows administrative expenses to be surcharged against a creditor's collateral[.]").

33.      "[T]he underlying purpose of 11 U.S.C. § 506(c) is that the secured creditor should pay for the benefit it received."  *First Servs. Grp., Inc. v. O'Connell* (*In re Ceron*), 412 B.R. 41, 48 (Bankr. E.D.N.Y. 2009) (citation omitted); *see also Southwest Sec., FSB v. Segner* (*In re Domistyle, Inc.*), 811 F.3d 691, 696 (5th Cir. 2015) ("a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost") (citation omitted); *Precision Steel Shearing, Inc. v. Fremont Fin. Corp.* (*In re Visual Indus., Inc.*), 57 F.3d 321, 325 (3d Cir. 1995) (section "506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant" who has expended money to preserve or dispose of the secured creditor's collateral by enabling a debtor to recover such costs from the secured creditor or its collateral).

---

[8]      The Committee has informed the DIP Lenders that a resolution of the Committee's objections to the waiver of sections 506(c) and 552 of the Bankruptcy Code depends on a resolution of the treatment of avoidance action proceeds.

34.     The Committee has not yet completed its investigation and therefore cannot know at this time whether there are any unencumbered assets in the Debtors' estates (apart from avoidance actions and their proceeds) and whether such unencumbered assets may be used to maintain or increase the value of any secured creditor's collateral.  Accordingly, the Court should reject any prospective waiver of this important statutory right at the outset of these cases, thereby preventing the Debtors' secured creditors from receiving a windfall at the unsecured creditors' expense.

2.     The Section 552(b) Equities of the Case Exception Must Be Preserved

35.     Section 552(b) of the Bankruptcy Code permits a court to refuse, based on the "equities of the case," to extend a prepetition lien to postpetition "proceeds, products, offspring, or profits" of prepetition collateral.  11 U.S.C. § 552(b).  This statutory provision "is intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing the interests of secured creditors against the general policy of the Bankruptcy Code, which favors giving debtors a 'fresh start.'"  *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 409– 10 (Bankr. N.D. Tex. 2003) (finding that, based on the equities of the case, secured creditor's lien did not extend to all cash generated postpetition because a portion of such cash constituted proceeds of unencumbered assets); *see also Wolters Village, Ltd. v. Village Props., Ltd. (In re Village Props., Ltd.)*, 723 F.2d 441, 444 (5th Cir. 1984) (legislative history regarding the "equities of the case" exception "indicates its purpose was to cover cases where an expenditure of the estate's funds increases the value of [a secured creditor's] collateral") (citation omitted); *Nanuet Nat'l Bank v. Photo Promotion Assocs., Inc.* (*In re Photo Promotion Assocs., Inc.*), 61 B.R. 936, 939 (Bankr. S.D.N.Y. 1986) ("The equity exception is meant for the case where the trustee or

debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral.") (internal citation omitted).

36.     The section 552(b) "equities of the case" exception is a statutory right that the Bankruptcy Code has conferred on this Court and, by extension, on all parties in interest. Permitting the Debtors to waive that right unilaterally is not appropriate.  Accordingly, if it turns out that the Debtors are using unencumbered assets postpetition to enhance the value of the Prepetition First Lien Collateral, the Committee should retain the right to argue that any such increased value inures to the benefit of unsecured creditors, rather than to the benefit of the Prepetition First Lien Secured Parties.

### D.     The Court Should Not Approve Certain Other Aspects of the DIP Financing

37.     In addition, the DIP Financing contains several other features that are inappropriate and should be remedied in the Final DIP Order.  Although the Committee is hopeful that resolution will be reached in advance of the hearing, the remaining issues are described below.

- Carve-Out: Carve-outs are intended to assure that there will be sufficient assets in the estate to compensate *estate professionals* and pay statutory fees after the debtors otherwise lose access to financing.  It is vital that *all* estate professionals continue to function for as long as necessary.  *See In re Evanston Beauty Supply, Inc.*, 136 B.R. 171, 177 (Bankr. N.D. Ill. 1992) (carveouts are necessary "to preserve the balance of the adversary system in reorganization" and are "used in order to avoid skewing the necessary balance of debtor and creditor protection needed to foster the reorganization process"); *see also In re Rite Indus.*, Nos. B-99-12653C-11G, B-99-12654C-11G, 2000 WL 33673764 (Bankr. M.D.N.C. Aug. 16, 2000).  Yet, the proposed Carve-Out for estate professionals following an Event of Default is disproportionately skewed in favor of the Debtors' professionals: they will have access to $20 million, while the Committee's professionals will be limited to $1 million.  *See* Interim DIP Order ¶ 6(a).

- Events of Default: Several Events of Default are improper, namely:

  - filing a plan of reorganization that is not acceptable to the DIP Agent (*see* Interim DIP Order ¶ 23(c); DIP Credit Agreement § 11.11(xix));

      o  the Debtors pursuing or supporting any pleading seeking to impair any claims of the Prepetition Revolving Credit Facility Secured Parties (*see* DIP Credit Agreement § 11.11(vii)); and

      o  failing to obtain a confirmation order by May 4, 2023, that is acceptable to the DIP Agent (*see* DIP Credit Agreement § 9.16(b)).

The Committee submits that (i) if a chapter 11 plan filed by the Debtors or the order confirming such plan provide for the repayment of all DIP Obligations in full, in cash, on the plan effective date, they should be deemed to be acceptable to the DIP Agent without more, and (ii) the Debtors' rights to seek to impair the claims of the Prepetition Revolving Credit Facility Secured Parties must be preserved to avoid converting the DIP Financing into an impermissible *sub rosa* plan.  *See Clyde Bergemann, Inc. v. Babcock & Wilcox Co. (In re Babcock and Wilcox Co.)*, 250 F.3d 955, 960 (5th Cir. 2001) (indicating DIP financing agreements that "limit[] future reorganization options" may be inappropriate); *In re Laffite's Harbor*, 2018 WL 272781 at *3 ("The bankruptcy court cannot, under the guise of Section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.").

- <u>Payment of Fees and Expenses of Prepetition Creditors</u>: In several instances, the Interim DIP Order requires or authorizes the Debtors to pay fees and expenses of some of their prepetition creditors—without either subjecting those fees and expenses to appropriate review or the ability to, if appropriate, have these payments recharacterized as payments of principal.  *See* Interim DIP Order ¶¶ 2(b)(iii), 19(c), 29, 41-42.

- <u>Scope of Challenge</u>: The definition of a "Challenge" is too narrow.  The Committee should be able to Challenge any of the Debtors' stipulations, admissions, agreements, or releases relating to any prepetition claims, liens, rights, or obligations, holders thereof, or other counterparties to prepetition documents.  Accordingly, the definition of "Challenge" should be broadened in the Final DIP Order to assure there is no stipulation, admission, agreement, or release that arguably is not challengeable.

- <u>Debtor Releases</u>: The Interim DIP Order provides, subject to the challenge provisions, for releases of the Prepetition Credit and Notes Secured Parties, the DIP Secured Parties, and each of their respective Representatives.  *See* Interim DIP Order ¶ F(xxvi).

- <u>Effect of Stipulations</u>: The Interim DIP Order provides that, absent a successful challenge, the Debtors' obligations under the Prepetition First Lien Debt Documents and the Prepetition Collateral Trust Liens on the Prepetition First Lien Collateral shall not be subject to, among other things, impairment or recharacterization.  *See* Interim DIP Order ¶ 25.

- <u>Reporting</u>:  The Final DIP Order should require the Debtors to provide reporting to the Committee, consistent with the reporting other parties are to receive.  *See*, *e.g.*, Interim DIP Order ¶¶ 10(a) (DIP Agent to receive hedging settlement reports), 19(d) (Prepetition Agents to receive reporting contemplated by the DIP Documents or

otherwise provided to the DIP Agent, and business plan materials shared with any party, but excluding the hedging settlement reports), 42(b) (Unsecured Creditor Group Advisors to receive reporting).

- <u>Amendments</u>: The Interim DIP Order permits the Debtors to amend the DIP Documents in certain instances without notice to the Committee or Court approval. *See* Interim DIP Order ¶ 2(b)(ii), 36.

- <u>Preservation of Avoided Liens for the Estate</u>: The Interim DIP Order provides that the DIP Liens and Adequate Protection Liens shall not be subject or junior to any lien that is avoided. *See* Interim DIP Order ¶ 23(a). This provision directly conflicts with section 551 of the Bankruptcy Code, which provides that any lien avoided pursuant to a debtor's avoiding powers "is preserved for the benefit of the estate." 11 U.S.C. § 551.

- <u>Diminution in Value</u>: The Final DIP Order should clarify that, for purposes of measuring the Prepetition First Lien Secured Parties' right, if any, to Adequate Protection, any payments of interest to the Prepetition First Lien Secured Parties and fees and expenses of various prepetition creditors are expressly excluded from the "diminution in value" of their interests in the Prepetition First Lien Collateral.

## III. THE FINAL CASH MANAGEMENT ORDER SHOULD BE MODIFIED AS PROVIDED HEREIN

### A. The Court Should Impose Guardrails on the Debtors' Ability to Engage in Intercompany Transactions

38.     The proposed Final Cash Management Order authorizes the Debtors to, among other things, "perform and honor Intercompany Transactions in the ordinary course of business and make certain payments on behalf of certain Non-Debtor Affiliates." Final Cash Management Order ¶ 10. The Committee's recently-selected advisors require time to fully review the nature, scope, substance, and necessity of the Intercompany Transactions. Accordingly, the Committee asks the Court to implement procedures (described below) to allow it to conduct such a review and evaluate the Intercompany Transactions going forward.

39.     While all Intercompany Transactions with Non-Debtor Affiliates require scrutiny, the Committee is particularly concerned about the Debtors' plans to make additional investments into the preferred equity of Cumulus, a speculative project which involves a data center and "the

development of a renewable energy and battery storage pipeline and bitcoin mining projects."
Cash Management Motion ¶ 24. This is not an ordinary course investment under any standard.[9]
Yet the DIP Financing permits the Debtors to invest up to $275 million in Non-Debtor Affiliates,
including Cumulus, without requiring the DIP Lenders', or anyone else's, consent. *See* DIP
Motion ¶ 39; DIP Credit Agreement § 10.03(a)(iii).[10]

40. As the Debtors have disclosed, "Cumulus currently has no employees and no
operations aside from the development of the [described] projects." *Declaration of Ryan Leland
Omohundro in Support of Debtors' Chapter 11 Petitions and First Day Relief* [ECF No. 16] ("First
Day Decl.") ¶ 61. The Debtors sought investment in Cumulus from many parties, both inside and
outside of their capital structure, but only one unaffiliated party, Orion Energy Partners ("Orion"),
came forward. First Day Decl. ¶ 57. Cumulus is a purported "growth" investment, with one of its
major focuses being a bitcoin mining operation—the viability of which depends on notoriously
volatile bitcoin prices. According to the Debtors, Cumulus's outstanding debt under its credit
facility was at least $86 million as of the Petition Date, with further draws available—up to $175
million. *Id.* ¶ 114. This debt bears interest at the rate of 12.5% *per annum*. *Id.* ¶ 112.

41. The Debtors have failed to meet their burden of showing that the proposed transfers
to Cumulus are justified. The Debtors' proposal to use estate resources to fund Cumulus through

---

[9]   To determine whether a transaction is inside or outside a debtor's ordinary course of business, courts in the Fifth
      Circuit, and elsewhere, have utilized both "vertical" and "horizontal" tests. *See, e.g., In re Patriot Place, Ltd.*,
      486 B.R. 773, 793 (Bankr. W.D. Tex. 2013). Under the vertical test, courts look at "whether the transaction
      subjects a hypothetical creditor to a different economic risk than existed when the creditor originally extended
      credit." *Id.* Under the horizontal test, courts look at "whether the transaction was of the sort commonly
      undertaken by companies in the industry. The primary focus is on the debtor's pre-petition business practices
      and conduct." *Id.* A transaction by a chapter 11 debtor that is outside the ordinary course of its business and
      lacks court approval is "unenforceable, ineffective, and void." *Id.* In *Patriot Place*, the court found that, even
      though the debtor in that case, an operator of a shopping plaza, regularly entered into and terminated leases with
      the plaza's tenants, the proposed unilateral termination of the lease of the plaza's major tenant who was paying
      rent was not consistent with the debtor's pre-bankruptcy business practices and conduct, was not common in the
      industry, and subjected its creditors to higher economic risk than they had bargained for.

[10]  This $275 million basket is limited to $115 million for the first 120 days of these cases. *Id.*

investments into its preferred equity is highly unusual—if not unprecedented—for a chapter 11 debtor:  not only is a Debtor funding a non-Debtor, but the investment is in exchange only for preferred equity, and the project is early-stage and highly speculative.  The Committee understands that the Cumulus data center requires significant additional funding to become operational and has a long and uncertain path to traverse before producing any returns for its investors, including the Debtors.  Cumulus also is partly owned by Riverstone—a potential target of avoidance actions and other claims in these cases.

42.     The sum that the DIP Financing gives the Debtors unlimited authority to transfer to their Non-Debtor Affiliates, including Cumulus, is $275 million—a substantial amount from the perspective of the Debtors' unsecured creditors.  But it may only be a drop in the bucket of the total funding Cumulus requires.  The Committee and its advisors have yet to understand the Debtors' position for why Cumulus' funding must come from their estates and in the form of riskier preferred equity investments rather than loans.

43.     The Committee and its advisors also need to understand numerous key aspects of Cumulus' business to determine its value, if any, for unsecured creditors.  For example, the Committee understands that the Debtors have identified specific uses—all of which relate to Cumulus—for a portion of the $275 million investment basket.  The Committee has not received sufficient detail on these proposed specific uses and has no visibility whatsoever into how the Debtors plan to use the remaining amount of the investment basket capacity.

44.     Additional diligence items that the Committee is still waiting to receive from the Debtors to evaluate the proposed Cumulus investment are substantial and include:

- Cumulus' anticipated short-term and long-term financing needs;

- alternatives structures for future financing, if any, provided by the Debtors;

- Cumulus' target customers and expected pricing and other key commercial terms;

- Cumulus' operating budget, capital budget, and actual capex spend by facility;

- Cumulus' arrangements with its joint venture partners; and

- management's view of bitcoin price volatility and its expected impact on financial performance.

45.     The Committee is concerned (pending further diligence) that allowing the Debtors to move forward with the proposed Cumulus investments will create substantial risks of non-payment.  In light of the highly speculative and unprecedented nature of their proposed investment in Cumulus, the Debtors need to demonstrate an exigent need for using estate resources to make this extraordinary investment and a reasonable prospect of return that appropriately compensates the Debtors and their estates for the risks the Debtors are taking.  The Debtors have yet to do that.

46.     The good news, however, is that more time is available for the Committee to conduct its diligence.  The Debtors' 13-week cash flow forecast attached to the DIP Motion shows that the Debtors do not expect to transfer additional funds to Cumulus until the week ending July 1, 2022 ($12.7 million), and then do not expect to transfer any additional funds to Cumulus until the week ending July 29, 2022 ($15.0 million).  It is therefore premature to authorize the Debtors now to transfer more funds to Cumulus.  At a minimum, the Court should prohibit the Debtors from engaging in more transfers to Cumulus without the Committee's consent or further order of the Court.  Hitting the "pause" button on these transfers will provide the Committee—the other estate fiduciary in these cases—an opportunity to work with the Debtors to evaluate their Cumulus investment.

47.     Aside from the Cumulus investments, the Debtors seek authority to engage in numerous other Intercompany Transactions among the Debtors, as well as to Non-Debtor Affiliates.  The Committee would support Intercompany Transactions that benefit the Debtors'

estates but requires an opportunity to review the proposed Intercompany Transactions in advance to ensure that they are, in fact, beneficial from the estates' perspective.

48.     The fact that other case constituencies are willing to give the Debtors almost *carte blanche* authority to continue engaging in risky Intercompany Transactions is of no moment, either.  The DIP Secured Parties appear to be massively oversecured; the Prepetition First Lien Secured Parties are expected to be unimpaired under the plan of reorganization contemplated by the RSA; and the members of the *ad hoc* noteholder group have cut a favorable deal for themselves under the RSA by extracting very favorable economics in connection with backstopping a rights offering.  Those parties' interests and the interests of general unsecured creditors are not necessarily aligned.  And it is the unsecured creditors who have the most to lose if any Intercompany Transactions go awry.

49.     Accordingly, the Committee submits that the Final Cash Management Order should be modified to implement the following guardrails:

- the Debtors may only engage in Intercompany Transactions that are materially consistent with their prepetition ordinary course practices;

- if a proposed Intercompany Transaction is materially inconsistent with the prepetition ordinary course practices, the Debtors must consult with the Committee and the Committee shall have a reasonable opportunity to object before the Debtors may enter into such transaction;

- the Debtors shall not be permitted to effectuate transfers to Non-Debtor Affiliates without the Committee's consent or further order of the Court;

- the Debtors shall not be permitted to pay or settle prepetition Intercompany Claims without the consent of the Committee or further order of the Court;

- the Debtors must document all Intercompany Transactions and provide appropriate reporting to the Committee; and

- the Committee's rights are fully preserved with respect to the validity, amount, or priority of any prepetition or postpetition Intercompany Claims.

**B.** **Certain Aspects of the Final Cash Management Order Should Not Be Approved**

50.     The Committee also submits that the Final Cash Management Order should be modified in the following important respects to ensure that the *status quo* is maintained:

- Information: It should include provisions assuring transparency and notice to the Committee, obligating the Debtors to:

  o provide the Committee with a monthly matrix of payments, postpetition intercompany balances among Debtors, as well as among Debtors and Non-Debtor Affiliates, with explanations of material activity, cash transfers from Debtors to Non-Debtor Affiliates, and cash balances for each Bank Account;

  o inform the Committee promptly if they make credit card payments that materially exceed historic practices in amount or frequency;

  o provide the Committee as soon as possible a detailed summary of (a) all outstanding amounts due, as a result of Intercompany Transactions, to and from each Debtor and Non-Debtor Affiliate as of the Petition Date; and (b) current balance sheets, income statements, and cash flow statements for all Debtors and Non-Debtor Affiliates; and

  o keep records of all Intercompany Transactions, so that they may be readily ascertained, traced, and recorded properly on applicable intercompany accounts.

  The Final Cash Management Order also should make clear that the Committee reserves the right to seek additional disclosures, including the terms of specific Intercompany Transactions, and to object to specific proposed Intercompany Transactions.

- Changes to Cash Management System:  The Debtors should be required to provide seven days' advance notice to the Committee of any material changes to the Cash Management System.

- Priority of Claims:  The Cash Management Motion requests that the Intercompany Claims be afforded simple administrative expense status.  The Committee, however, believes that, to maintain the *status quo* while the Committee completes its review of the Cash Management System, any postpetition Intercompany Claims among Debtors should be afforded ***superpriority*** administrative expense status.

As the Debtors' estates have not been substantively consolidated, this modification is necessary to ensure that, if a Debtor makes a postpetition transfer to another Debtor, the transferor (and its creditors) will not be funding the operations of the recipient (and its creditors) without a reasonable

assurance of repayment.  In making this request, the Committee does not seek to impair the Debtors' ability to make appropriate transfers amongst themselves.  The grant of only an ordinary administrative expense status, however, may impair a Debtor's ability to recover on a postpetition Intercompany Claim if the recipient's estate becomes administratively insolvent.

51.     Courts in this and other Districts have granted similar relief in other cases.  *See, e.g.*, *In re Ultra Petroleum Corp.*, No. 16-32202 (Bankr. S.D. Tex. June 28, 2016) [ECF No. 382] ¶ 13 ("[a]ll postpetition transfers from a Debtor to or on behalf of another Debtor . . . are hereby accorded, in accordance with section 364(c)(1) of the Bankruptcy Code, superpriority administrative expense status and shall have priority over any administrative claims that arise under sections 503(b) or 507(b) of the Bankruptcy Code"); *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. Feb. 25, 2001) [ECF No. 1666] ¶ 5 (providing that, to the extent any debtor transfers property (including cash) postpetition to or for benefit of any other debtor, transferring debtor shall receive, among other things, allowed superpriority administrative expense against beneficiary debtor having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b)); *In re MF Global Holdings, Inc.*, No. 11-15059 (Bankr. S.D.N.Y. Jan. 19, 2012) [ECF No. 373] ¶ 5 ("[P]ursuant to Bankruptcy Code sections 364(c)(1) and 507(b), the intercompany transfer shall constitute an allowed superpriority claim of the applicable affiliate against the applicable Beneficiary Debtor . . . ."); *In re Delphi Corp.*, No. 05-44481 (Bankr. S.D.N.Y. Nov. 4, 2005) [ECF No. 882] ¶ 12 ("To the extent a Debtor receives a postpetition intercompany loan or transfer . . .  [such entity] shall have . . . an allowed claim under sections 364(c)(1) and 507(b) of the Bankruptcy Code against the Beneficiary Debtor for the amount of such Advance, having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.").

IV.     **THE FINAL HEDGING ORDER SHOULD BE MODIFIED AS PROVIDED HEREIN**

52.     The proposed final order approving the Hedging Motion (the "Final Hedging Order") unduly restricts the Committee's ability to fulfill its statutory duty to protect the rights of unsecured creditors.  It authorizes the Debtors, in the ordinary course of business, to continue to perform under their prepetition Hedging Agreements, enter into, and perform under, postpetition Hedging Agreements, satisfy any and all Hedging Obligations (whether arising pre- or postpetition), and post collateral and grant liens to secure such obligations.  Moreover, the Final Hedging Order provides certain Hedge Counterparties with postpetition liens on all DIP Collateral to secure both pre- and postpetition Hedging Obligations and superpriority claims to the extent such collateral proves to be insufficient to pay these obligations in full.

53.     At the same time, the Final Hedging Order provides no notice, consent, or consultation rights to the Committee with respect to new Hedging Agreements or modifications to the existing Hedging Agreements.  The Debtors are under no obligation to provide either the Court or the Committee with any reporting on their Hedging Activities.  Nor is any Hedge Counterparty obligated to provide notice before exercising setoff or other enforcement actions.

54.     All of this is particularly concerning given the role the Debtors' Hedging Activities played in their need to file for bankruptcy protection:  the Debtors admit they were forced to file "in large part due to immediate and significant liquidity concerns that can be traced back to the sudden and sustained rise of natural gas prices in late 2021, which sharply increased the collateral requirements for the Debtors' hedging activities, resulting in an unexpected squeeze on available cash."  First Day Decl. ¶ 9.  As the Committee understands presently, the Debtors' prepetition FCM Agreements required the Debtors to "post collateral in the form of cash and/or letters of credit" daily in respect of both the initial margin and the variation margin.  Hedging Motion ¶ 12.

As gas prices rose in 2021 and certain hedges moved further out of the money, the Debtors had to provide large amounts of collateral under these agreements—as much as $451 million in October 2021.  *See* First Day Decl. ¶ 15.  The Debtors did not have sufficient cash to comply with these collateral requirements, nor were they able to finance them.  This significant liquidity squeeze necessitated a bankruptcy filing.[11]

55.    The Committee is still in the process of conducting diligence with respect to the causes of the Debtors' prepetition liquidity problems, the outcome of which will inform the degree of scrutiny and monitoring of the Debtors' postpetition hedging program that may be warranted to minimize the risk of an unfavorable scenario repeating itself.  The Committee's preliminary understanding is that, while market movements may have resulted in greater margin requirements under the FCM Agreements, it is ultimately the Debtors' management of their hedging program that has caused the severe liquidity crunch.  A hedging portfolio, when appropriately structured, managed, and stress-tested, can—and should—withstand market movements that increase collateral posting requirements.  There are several mitigants available to manage market volatility, including the use of bilateral or over-the-counter (OTC) derivative trades that, unlike exchange traded hedges, can be supported by liens and do not require cash collateral.  There are other strategies that would have been available to the Debtors and helped to avoid the liquidity crisis resulting from the spike in gas prices in 2021.  But the Debtors have not yet provided information to the Committee sufficient to determine what, if any, mitigating actions had been taken in response to market movements in 2021, whether such mitigating actions were contemplated, and, if they were contemplated but rejected, why.

---

[11]   Indeed, liquidity is a particular concern in energy markets with heightened volatility, including those in which the Debtors operate.  In light of the Debtors' acknowledged difficulties in managing collateral, monitoring these activities is of obvious importance.  Without oversight, the Debtors may undertake Hedging Activities that are not appropriate or that expose unsecured creditors to excessive and unnecessary risks.

56.     With its diligence incomplete, the Committee cannot be certain that the Debtors, if given unfettered discretion regarding Hedging Activities, will refrain from pursuing strategies that expose them to insufficiently mitigated market risk.  Moreover, given the complexity and the magnitude of the Debtors' hedging program,[12] the Hedge Counterparties' liens on substantially all of the Debtors' unencumbered assets (granted under the Final DIP Order), and the Debtors' ability to continue posting margin as collateral to secure other pre- and postpetition Hedging Obligations in the ordinary course of business (granted under the Final Hedging Order), the relief the Debtors seek may have a profound adverse effect on their unsecured creditors' recoveries in these cases.

57.     The Debtors expect hedging to be a critical component of their go-forward business (*see* First Day Decl. ¶ 14)—yet another reason to have maximum transparency with respect to their Hedging Activities.  But the Final Hedging Order gives the Debtors *carte blanche* authority to amend the existing Hedging Agreements and enter into new ones without any oversight by either the Court or the Committee.  It is important that the Committee receive (i) advance notice of any such actions and an opportunity to object (if, for example, the Debtors' proposed entry into a new, or modification of an existing, Hedging Agreement is unnecessary or violates any of the existing restrictions on the Hedging Activities), and (ii) consent rights with respect to any actions that are not within the authority of the Head of Commercial under, and as defined in, the Risk Management Policy.  In addition, the Committee should be provided (iii) forecasts of all activities that will (or may) be hedged, such that it may analyze the expected effectiveness and shortcomings of the proposed transactions, as well as their compliance with the targets and limits of the Debtors' Risk Management Policy and other existing limitations, and (iv) sufficient reporting detailed below,

---

[12]    As set forth in the Hedging Motion, as of the Petition Date, the Debtors have over $300 million of posted cash and other credit support for their Exchange Traded Hedges, and their aggregate exposure of all derivative assets and liabilities related to the 1L Hedging Agreements is a net liability of approximately $675 million (subject to daily fluctuations).  *See* Hedging Motion ¶¶ 12, 16.

including copies of all reporting provided to the DIP Lenders or Hedge Counterparties, to enable the Committee (a) to assess independently the risk metrics of the hedging portfolio, liquidity stresses, and likelihood of the necessity to close any particular hedge position due to cash margin caps and (b) to avoid unnecessary or redundant analysis and monitoring.

58.     The reporting provided to the DIP Lenders and other parties fails to provide sufficient information to allow the Committee to evaluate the effectiveness of the hedges or confirm compliance with the existing restrictions.  The proposed reporting does not provide enough detail to enable the Committee to independently confirm the accuracy of the reported figures.  Furthermore, the reports provide aggregated values that do not correspond to the constraints contained in the DIP Financing (*e.g.*, a covenant in the DIP Credit Agreement prohibits exchange trading of options, but there is no breakdown of the exposures by exchange or OTC in the reports that would confirm compliance with this covenant), do not provide details at the time of the trade, and do not permit a review of certain important details of the trades (such as trade liquidity).  The DIP reporting requirements are also set forth at a high level, and the Debtors can unilaterally change the report or methodology to calculate the exposures and values.

59.     To address the foregoing concerns, the Committee has requested that certain provisions be included in the Final Hedging Order (and any necessary conforming changes be made):

- Notwithstanding the definition of the term "Hedging Agreements" in the Motion, as used in this Final Order, it shall have the meaning ascribed thereto in the DIP Credit Agreement, and shall include, for the avoidance of doubt, Prepetition Hedging Agreements, Postpetition 1L Hedging Agreements, Postpetition FCM Agreements, Other Hedging Agreements, and related guarantees (and the counterparties to such Hedging Agreements, the "Hedging Counterparties").[13]

---

[13]   This change will make the definition of "Hedging Agreements" in the DIP Credit Agreement and the Final Hedging Order coextensive and ensure that the definition of "Hedging Counterparties" is in sync with the modified definition of Hedging Agreements.

- All Postpetition Hedging Agreements shall be consistent with the Debtors' existing hedging policy and practices (such policies and practices, including the Risk Management Policy, the Risk Management Policies (as defined in the DIP Credit Agreement), and the Hedge Practices, the "Hedging Policies" and each a "Hedging Policy"),[14] and the Debtors shall not materially amend any Hedging Policy without further order of the Court and upon at least five (5) business days' advance notice (with supporting documentation) to the Committee.  For the avoidance of doubt, the Debtors shall not engage in any Hedging and Trading Activities (as defined below) that are speculative in nature.

- Within twenty (20) calendar days following the entry of this Final Order, the Debtors shall provide to the Committee the Debtors' forecasts for the next twenty-four (24) months (accompanied by an analysis thereof and supporting documentation with respect thereto) of production and generation, natural gas, coal, and uranium use, emissions, expectations for pricing in respect of power, fuel, emissions allowances, expectations in respect of interest rates and expected Hedging Activities and other trading activities, including, without limitation, any bilateral or exchange-traded or cleared trades for the procurement of fuel, power, and other physical commodities or spot transactions of commodities or other instruments, and any purchase or sale of power on all day-ahead and real-time clearing markets and similar exchanges and spot transactions (collectively, "Hedging and Trading Activities")[15] in respect thereof (such forecasts and analysis and supporting documentation, collectively the "Hedge Forecast").  The Debtors shall thereafter update the Hedge Forecast within ten (10) calendar days of the end of each calendar month and deliver the same to the Committee; *provided* that if the Debtors update the Hedge Forecast or any elements thereof at any other time, the Debtors shall promptly deliver the same to the Committee.

- The Debtors shall provide the Committee with monthly reports, to be delivered no later than the 10th calendar day of each month, which shall include, without limitation, the preceding month's outstanding hedges and other trading positions and Hedging and Trading Activities undertaken by or on behalf of the Debtors during the preceding month, including (a) a summary of total volume hedged or traded, (b) realized power demand and generation on an hourly basis, (c) fuel usage indicated by type and by quantity reported on a daily basis (or, if the Debtors do not keep daily records, the shortest time interval for which the Debtors prepare reports), (d) daily emissions (or, if the Debtors do not keep daily records, the shortest time interval for which the Debtors prepare reports), (e) any other realized activity (including in respect of FTRs and CRRs) that was connected to or associated with Hedging and Trading Activities, and (f) a comparison to the most recent Hedge Forecast covering such period.

---

[14]   This definition will ensure that all hedging policies are included in the definition, rather than only the Risk Management Policy of May 2022.

[15]   This definition will ensure that, in addition to "derivative and commodity transactions" included in the definition of "Hedging Activities" in the Hedging Motion, "Hedging and Trading Activities" will also pick up the purchase or sale of power on clearing markets, similar exchanges, and spot transactions.

- The Debtors shall provide the Committee with copies of (a) all reports as and when produced pursuant to the Hedging Policies (including, without limitation, those specified in Section 4 of the Risk Management Policy), (b) each FCM mark-to-market and complete margin statements produced by FCM counterparties on a bi-weekly basis, (c) trade confirmations of each new OTC trade within three (3) business days, and (d) all reports regarding Hedging Agreements and Hedging Activities as and when required to be delivered under the DIP Documents, including, but not limited to, reports required to be delivered under Section 9.01(k) of the DIP Credit Agreement.

- The Debtors shall provide the Committee with (a) any reports or memoranda submitted to any level above the Head of Commercial (as defined in the Risk Management Policy) including, without limitation, the Risk Management Committee, the Board, or any other person or committee to whom decisions related to Hedging and Trading Activities may be delegated related to a Hedging Agreement or Hedging and Trading Activities (any such level, an "Enhanced Approval Level"), (b) notices describing in reasonable detail the outcome of any vote or decision related to the Hedging Agreements or Hedging and Trading Activities at any Enhanced Approval Level, and (c) to the extent a Debtor is not in compliance with any Hedging Policy, notice of such non-compliance and copies of all reports delivered to the Risk Management Committee or any other committee or person of equivalent or higher seniority (including each Debtor's respective board of directors) with authority on Hedging and Trading Activities or involved in the review and evaluation of Hedging and Trading Activities or performance of the Debtors in respect of such non-compliance.

- The Debtors shall promptly provide the Committee with copies of all Hedging Agreements and documentation related to Hedging and Trading Activities (including all FCM Agreements, Bilateral Hedges, schedules and confirmations entered into pursuant to ISDAs, 1L Hedging Agreements, and Other Hedging Agreements) to the extent not previously provided to the Committee.

- The Debtors shall provide at least ten (10) calendar days' notice to the Committee of their intention to enter into any new Hedging Agreements other than new transactions under existing ISDAs, EEIs, NAESBs, or similar enabling agreements (such new Hedging Agreements, the "New Hedging Transaction Agreements") or any modifications to any then-existing Hedging Agreements or ancillary agreements/arrangements and provide the Committee with all relevant documentation and summaries of the indicative terms thereof, and the Committee shall have the opportunity to review and comment on such proposed New Hedging Transaction Agreements or modifications of existing Hedging Agreements or ancillary agreements/arrangements prior to execution thereof. The Committee shall have the right to request additional information regarding any New Hedging Transaction Agreements or modification of existing Hedging Agreements or ancillary agreements/arrangements. In the event of any objection by the Committee, the Debtors and the Committee will meet and confer in good faith to resolve the objection, and to the extent the matter cannot be resolved, either party shall have the right to request a hearing with the Court. To the extent the Debtors or the Committee requests a hearing

before the expiration of the ten (10) calendar days' notice period, the Debtors shall not be permitted to enter into the proposed documentation without further Court approval. For the avoidance of doubt, the Debtors shall bear the burden of proof that entering into the proposed documentation is permitted under the Bankruptcy Code.

- The Debtors shall not enter into any Hedging Agreements or undertake any Hedging and Trading Activities that are not within the authority of the Head of Commercial under, and as defined in, the Risk Management Policy without the prior consent of the Committee, to be requested by the Debtors no later than five (5) business days prior to the proposed date of entry into such Hedging Agreements or Hedging and Trading Activities.

- In the event the Committee has concerns that any particular Hedging Agreements or Hedging and Trading Activities are having a negative effect on the Debtors' estates, the Committee shall have the right to seek relief from the Court on an emergency basis to determine the extent to which the Debtors may perform under such Hedging Agreements and engage in such Hedging and Trading Activities.

- Notwithstanding paragraphs 2 and 3 or any other provisions in this Final Hedging Order, all Hedging Counterparties shall provide ten (10) days' notice to the Debtors, the U.S. Trustee, and the Committee prior to exercising any setoff, enforcement actions, or other rights and remedies with respect to pre- and postpetition collateral, or applying any payments (including any settlement payments, termination payments, and any other amounts that such counterparty would be entitled to receive under any Hedging Agreement or related document) under the pre- and postpetition Hedging Agreements or related documents, and the Debtors, the U.S. Trustee, and the Committee shall be permitted to seek expedited relief in connection therewith.

- Nothing in this Final Hedging Order shall in any way impair, limit, or preclude any investigation, litigation, or pursuit of causes of action, on behalf of any Debtor's estate or otherwise, by the Debtors, the Committee, or any other party in interest, related to pre- or postpetition Hedging Agreements, Hedging and Trading Activities, Hedging Obligations, or the termination or wind down of any prepetition Hedging Agreements. For the avoidance of doubt, the rights of the Committee and any other parties in interest with respect to any such investigations, litigations, or actions are expressly preserved.

- If there exists an outstanding balance due from the Debtors to a Hedging Counterparty that does not perform under the Hedging Agreements on a postpetition basis or otherwise exercises valid and enforceable termination rights under sections 555, 556, 559, 560, and 561 of the Bankruptcy Code with respect to any prepetition Hedging Agreement, the Debtors will seek authorization from the Court to recharacterize and apply any payments made pursuant to this Final Hedging Order, and, as applicable, any collateral posted pursuant to this Final Hedging Order to such postpetition balance, and the Hedging Counterparty shall repay immediately in cash to the applicable Debtor (and, as applicable, return collateral posted by the applicable Debtor) any amounts that

exceed the postpetition Hedging Obligations then outstanding, and without any claim, right of setoff, or recoupment against the Debtors resulting thereby.

These proposed provisions will enable the Committee to fulfill its statutory duties by enabling it to monitor the Debtors' Hedging and Trading Activities closely and to seek prompt relief from the Court if necessary.

60. The Committee submits that these additions to the Final Hedging Order are reasonable and appropriate under the facts and circumstances of these cases. Hedging orders entered by courts in this and other Districts have provided official creditors' committees with similar protections. *See, e.g.*, *In re Chesapeake Energy Corp.*, No. 20-33233 (DRJ) (Bankr. S.D. Tex. June 29, 2020) [Dkt No. 129] (providing creditors' committee with monthly reporting of hedging activities); *In re Ultra Petroleum Corp.*, No. 20-32631 (MI) (Bankr. S.D. Tex. June 8, 2020) [Dkt No. 228] (providing creditors' committee with monthly reporting on hedging activities and all reporting provided to DIP lenders); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. Aug. 16, 2016) [Dkt No. 820] (providing creditors' committee with notice and consultation rights prior to entering into new hedging agreements, analysis and information rights, and advance notice from hedging counterparties prior to exercising setoff, netting, or other rights and remedies); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) [Dkt No. 1069] (providing creditors' committee with notice and consultation rights prior to entering into new, or modifying existing, hedging agreements, as well as information rights); *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. June 9, 2020) [Dkt No. 246] (providing creditors' committee with advance notice prior to entering into new, or materially modifying existing, hedging agreements); *In re Grupo Aeromexico S.A.B. de C.V.*, No. 20-11563 (SCC) (Bankr. S.D.N.Y. July 29, 2020) [Dkt No. 207] (providing creditors' committee with advance notice before entering new, or modifying existing, hedging agreements or making one or

more related payments in excess of a certain dollar amount on account of prepetition amounts, and providing creditors' committee with robust reporting).

## RESERVATION OF RIGHTS

61.     The Committee reserves its right to raise additional arguments in respect of the DIP Motion, Cash Management Motion, Hedging Motion, or any final order approving these Motions. This Objection is without prejudice to the Committee's right to seek other appropriate relief, including reconsideration of any relief granted in any interim order.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (i) sustain the Objection, (ii) deny final approval of the Motions unless the terms of the final orders approving them are modified in a manner consistent with the relief requested herein, and (iii) grant such other and further relief to the Committee as the Court deems just and proper.

Dated: June 13, 2022
       Houston, Texas

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

By:  */s/ Michael D. Warner*_____
Michael D. Warner (TX Bar No. 00792304)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: 713-691-9385
Facsimile: 713-691-9407
Email:    mwarner@pszjlaw.com

- and -

**MILBANK LLP**

Dennis F. Dunne (*admitted pro hac vice*)
Evan R. Fleck (*admitted pro hac vice*)
Matthew L. Brod (*admitted pro hac vice*)
Atara Miller (*admitted pro hac vice*)
Alexander B. Lees (*pro hac vice application forthcoming*)
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
Email:  ddunne@milbank.com
        efleck@milbank.com
        mbrod@milbank.com
        amiller@milbank.com
        alees@milbank.com

Alex G. Romain (*admitted pro hac vice*)
2029 Century Park East
Los Angeles, CA 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063
Email:  aromain@milbank.com

*Proposed Counsel to the Official*
*Committee of Unsecured Creditors*

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served electronically through the Court's CM/ECF system on June 13, 2022, on all parties that are registered to receive electronic service in the above cases.

By: _/s/ Michael D. Warner_____
Michael D. Warner