**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **TALEN ENERGY SUPPLY, LLC**, *et al.*, | § | **Case No. 22-90054 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**MOTION OF DEBTORS FOR ORDER (I) AUTHORIZING
ENTRY INTO BACKSTOP COMMITMENT LETTER, (II) APPROVING
OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://DOCKET.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Talen Energy Supply, LLC ("**Talen**" or "**TES**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

**Preliminary Statement**

1.  <u>Restructuring Support Agreement.</u>  As set out in the First Day Declaration (as defined below), prepetition on May 9, 2022, the Debtors entered into a Restructuring Support Agreement (the "**RSA**") with an ad hoc group of holders of Unsecured Notes (the "**Unsecured**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/talenenergy.  The Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

**Notes Group**"), a copy of which is attached hereto as **Exhibit A**.[2]  Pursuant to the RSA, the Debtors and the Unsecured Notes Group have agreed to support the transactions set forth in the Restructuring Term Sheet (the "**Term Sheet**"), which is attached to the RSA as Exhibit B.  The RSA and the Term Sheet are the product of an extensive prepetition process amongst the Debtors, the Restructuring Committee (as defined below), and various creditor constituencies (including the Unsecured Notes Group, groups of prepetition secured lenders, and a cross-holder group of lenders).

2.    As noted at the first day hearing, the Debtors were able to negotiate a proposed restructuring that maximizes the value of the Debtors' estates and establishes a high level of consensus and support from unsecured debtholders.  Prepetition, the Debtors and their advisors spent countless hours discussing, negotiating and soliciting restructuring proposals from various constituencies and potential other parties.  These discussions included various potential structures at differing implied valuations that would have produced disparate outcomes for constituents.  The Debtors' proposed restructuring set forth in the Term Sheet: (i) provides for unimpaired treatment of allowed secured claims; (ii) will significantly deleverage the Debtors' balance sheet—including the equitization of $1.4 billion of Unsecured Notes; (iii) substantially increase the Debtors' cash flow on a go-forward basis by reducing the Debtors' annual debt service obligations; and (iv) through the infusion of up to $1.65 billion of new equity capital via the Rights Offering (as defined below), assures adequate working capital post emergence, for a stronger, healthier balance sheet, providing stability and growth opportunities for the Debtors and their employees.

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the First Day Declaration, the RSA, or the Backstop Commitment Letter (each as defined herein), as applicable.

WEIL:\98655598\30\76974.0003

3.     In accordance with the RSA, the Debtors intend to file a plan of reorganization (the "**Plan**") with the Court by no later than August 7, 2022 that will provide for, among other things:[3]

    i.     an up to $1.65 billion common equity rights offering (the "**Rights Offering**"), $1.3 billion of which will be backstopped by certain members of the Unsecured Notes Group on the terms and conditions set forth in the backstop commitment letter attached hereto as **<u>Exhibit B</u>** (the "**Backstop Commitment Letter**");

    ii.     repayment of the DIP Facility;

    iii.     payment in full of allowed secured claims;

    iv.     holders of allowed Unsecured Notes to receive their pro rata share of (a) 100% of the new common equity in the reorganized Company (the "**New Equity**"), less any New Equity distributed to general unsecured creditors pursuant to the Plan (the "**GUC Equity Pool**"), and subject to dilution from the Rights Offering and Employee Incentive Program (as defined below) and (b) subject to meeting eligibility requirements under applicable securities laws, the option to participate in the Rights Offering;

    v.     holders of allowed general unsecured claims to receive their pro rata share of either (i) the GUC Equity Pool (subject to dilution by the Rights Offering and the Employee Incentive Program) or (ii) a cash recovery pool, in either scenario in amount consistent with the value that such holders are entitled to receive under the Bankruptcy Code;

    vi.     the Debtors' collective bargaining agreements, pension obligations, and asset retirement obligations to be assumed and/or otherwise unimpaired (subject to diligence by and the consent of the Requisite Consenting Parties (as defined in the RSA)); and

    vii.     overall, a significant deleveraging of the Debtors' balance sheet.

4.     As the evidence presented at the hearing on the Motion will demonstrate, in the weeks leading up to the Petition Date and since commencement of these chapter 11 cases, the Debtors, the Unsecured Notes Group, and their respective advisors worked tirelessly to finalize

---

[3] The summary is intended as a reference only and is qualified in its entirety by reference to the RSA.  In the event of any inconsistency between this summary and the RSA, the RSA controls.

definitive documentation to memorialize the agreement set forth in the RSA and secure the commitments necessary to effectuate the Debtors' restructuring.  In particular, prior to the Petition Date, the Debtors and the Unsecured Notes Group negotiated a form of backstop commitment letter that served as the framework for the Backstop Commitment Letter.  Pursuant to the RSA, the Unsecured Notes Group had 21 days from the Petition Date to secure and allocate commitments under and finalize and execute the Backstop Commitment Letter.  During those three weeks, the Debtors and the Unsecured Notes Group negotiated, among other things, the final open points in the Backstop Commitment Letter, including the provisions pertaining to the payment of the termination fee, as detailed below.  On May 31, 2022, in accordance with the applicable RSA milestone, the Debtors entered into the Backstop Commitment Letter with those certain members of the Unsecured Notes Group listed on Schedule I thereto (the "**Backstop Parties**").[4]  At the time the Backstop Commitment Letter was executed, the Backstop Parties owned approximately 71.8% (i.e., $1.027 billion principal amount) of the Unsecured Notes.

5.      Backstop Commitment.  Pursuant to the Backstop Commitment Letter, the Backstop Parties have committed, for as long as 18 months, to backstop $1.3 billion (the "**Backstop Commitment**") of the Rights Offering (provided that the commitment of each Backstop Party, individually, is limited to the percentage set forth opposite such Backstop Party's name on Schedule I to the Backstop Commitment Letter).  The Backstop Commitment Letter provides the Backstop Parties with the rights to purchase the New Equity at a 25% discount to Plan equity value (assuming a $4.5 billion total enterprise value) and subscription rights to purchase 30% of the New Equity issued on account of the Backstop Commitment.  Based on the RO

---

[4] The May 30, 2022 milestone in the RSA to execute the Backstop Commitment Letter was extended by agreement of the parties to May 31, 2022 due to the milestone falling on Memorial Day.

WEIL:\98655598\30\76974.0003

Adjustment Determination (as defined below), the Rights Offering amount may ultimately be increased, up to a maximum of $1.65 billion, or decreased down to a minimum of $600 million. By no earlier than 120 days in advance of the projected Plan Effective Date, the Debtors will seek prospective ratings from the Ratings Agencies (as defined in the Restructuring Term Sheet) based on the Debtors' business plan.  If the Ratings Agencies determine that the projected corporate rating of the Reorganized Company is no less than BB (or equivalent rating), then there will be no automatic upsize of the Rights Offering on the Adjustment Determination Date.

6.      The new-money investment generated and, in turn, the debt reduction realized from the Rights Offering are essential to the implementation of the Restructuring provided for by the RSA, and the commitments made by the Backstop Parties under the Backstop Commitment Letter provide the appropriate assurances that the equity infusion needed to consummate the Restructuring will be funded at emergence.

7.      In consideration of the Backstop Parties' substantial and lengthy commitments under the Backstop Commitment Letter, the Backstop Commitment Letter provides that the Debtors shall provide to the Commitment Parties:

i.      a premium equal to 20% of each Backstop Party's portion of the backstop commitment upon the consummation of the chapter 11 plan (the "**Backstop Premium**");

ii.      a periodic premium, paid monthly, equal to 10% per annum of each Backstop Party's portion of the backstop commitment and fully credited against the Backstop Premium (the "**Periodic Premium**" and, together with the Backstop Premium, the "**Put Premium**");

iii.      in the event that the Backstop Commitment Letter is terminated and a Specified Event (as defined below) has not occurred, the Backstop Parties will be entitled to a fee equal of up to 50% of the Backstop Premium (the "**Alternative Transaction Premium**");[5]

---

[5] As detailed on **Exhibit D** hereto, in certain circumstances, the Alternative Transaction Premium may not be triggered and in others, only 50% of the Alternative Transaction Premium may be due.

WEIL:\98655598\30\76974.0003

iv.      payment and reimbursement of all "Transaction Expenses" described in the RSA (the "**Expense Reimbursement Obligations**");[6] and

v.      subject to certain exceptions, indemnification against all losses, damages, liabilities, and reasonable and documented costs and expenses, arising or resulting from any action, suit, proceeding, claim, challenge, litigation, investigation, claim, or demand related to or arising from the Backstop Commitment Letter, the RSA, or the transactions contemplated thereby (the "**Indemnification Obligations**", and collectively with the Alternative Transaction Premium and Expense Reimbursement Obligations, the "**Commitment Protections**").

8.      As described above, pursuant to the Backstop Commitment Letter, the Backstop Parties have committed a significant amount of equity capital to ensure the successful implementation of the Restructuring.[7]   Moreover, due to the various regulatory approvals (e.g., Nuclear Regulatory Commission approval) that will need to be obtained before consummating the Restructuring, the Backstop Parties are committing their capital for an extended period of time—up to 18 months.  As the evidence presented at the hearing on this Motion will demonstrate, in light of the significant amount and length of commitment of the Backstop Parties and the circumstances of these chapter 11 cases, including the volatility of the global power markets, the volatility and uncertainty within broader financial markets, and the competitive prepetition negotiation process undertaken, the Debtors believe that the Put Premium and Commitment Protections are reasonable and appropriately compensate the Backstop Parties for their cost of capital and the substantial assurances they are providing to the Debtors' Restructuring process.

---

[6] Pursuant to the terms of the RSA, the Debtors negotiated and agreed on the terms of the financial advisor to the Backstop Parties, Rothschild & Co US Inc., and together with the reasonably incurred fees of their counsel, such fees are included in the Expense Reimbursement Obligations included in this Motion.

[7] If called to testify, a representative of Evercore Group L.L.C. would testify to the facts and conclusions set forth herein, to the extent such facts and conclusions relate to the reasonableness of the Put Premium, Commitment Protections, and other obligations under the Backstop Commitment Letter.  The Debtors reserve all rights to designate additional witnesses and otherwise put forth additional evidence in support of the relief requested in this Motion.

9.      The Debtors' decision to enter into the Backstop Commitment Letter represents a sound exercise of the Debtors' business judgment.  As evidenced by the significant amount of time expended negotiating with their key economic stakeholders prior to the Petition Date, the Debtors thoroughly explored a number of alternative restructuring proposals.  Although the Debtors exchanged multiple proposals with the Unsecured Notes Group, Secured Creditor Group, and Crossholder Group, the Debtors, overseen by the Restructuring Committee, determined that the transactions contemplated by the RSA, including the Backstop Commitment Letter, represented the best available alternative and maximized value for the benefit of all of the Debtors' stakeholders.  The Debtors thoroughly negotiated both the terms of the RSA and the Backstop Commitment Letter with the Unsecured Notes Group.

10.      Importantly, the Backstop Commitment Letter assures the Debtors and their stakeholders that the Debtors have a committed source of necessary new capital committed to fund the Plan, effectuate the transactions contemplated thereby, and emerge from these chapter 11 cases as expeditiously as possible, while accommodating the potential for a lengthy regulatory approval process.  The benefits provided by the Debtors' entry into the Backstop Commitment Letter are commensurate with the Put Premium and Commitment Protections provided to the Commitment Parties in exchange for their substantial commitments under the Backstop Commitment Letter and the benefits being received by the Debtors and their estates.

11.      An efficient resolution to these chapter 11 cases is key to the preservation of the value of the Company's assets and the Debtors' estates.  The terms of the RSA and Backstop Commitment Letter reflect that goal and contain certain milestones that must be satisfied to obtain the benefit of the Unsecured Notes Group's support of the Restructuring (including the backstopping of the Rights Offering).  The certainty of the substantial funding commitment by the

Backstop Parties pursuant to the Backstop Commitment Letter also supports the Debtors' ongoing operational efforts regarding, among other things, hedging and preserving relationships with key suppliers. The Debtors are confident that entry into and performance under the Backstop Commitment Letter will maximize the value of their estates. Accordingly, entry into the Backstop Commitment Letter is in the best interests of all creditors, and the Debtors submit that the determination to enter into and perform under the Backstop Commitment Letter is a sound exercise of the Debtors' business judgment and should be approved.

### Relief Requested

12.     Pursuant to section(s) 363(b), 503(b), 507, and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors request entry of an order authorizing them to enter into the Backstop Commitment Letter and approving all obligations thereunder, including the Put Premium, Alternative Transaction Premium, Expense Reimbursement Obligations, and Indemnification Obligations in accordance with the terms of the Backstop Commitment Letter.

13.     A proposed form of order granting the relief requested herein is attached hereto as **Exhibit C** (the "**Proposed Order**").

### Jurisdiction

14.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

15.     On May 9, 2022 (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue

WEIL:\98655598\30\76974.0003

to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

16.     Also on May 9, 2022, the Debtors executed the RSA with the Unsecured Notes Group.  The Debtors have also secured debtor in possession financing in the amount of approximately $1.8 billion to operate the Debtors' business in the ordinary course and cover the costs of implementing the restructuring.

17.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

18.     On May 23, 2022, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**"). No trustee or examiner has been appointed in these chapter 11 cases.

19.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Ryan Leland Omohundro in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 16] (the "**First Day Declaration**").

<u>Backstop Commitment Letter</u>

**A.     Oversight by the Restructuring Committee**

20.     As described in the First Day Declaration, in November 2021, an independent manager was appointed to the board of managers of TES.  In March 2022, an additional independent manager was appointed and a three (3) member restructuring committee was formed, with the final member being the CEO, Alex Hernandez (the "**Restructuring Committee**").  The Restructuring Committee was tasked with, among other things, overseeing the

Debtors' restructuring process and negotiations with its various constituents.  More specifically, the Restructuring Committee was delegated with transaction approval authority with respect to any "Potential Related Party Transaction."[8]  Approval of any Potential Related Party Transaction requires the affirmative vote of each independent manager.  The negotiations regarding the RSA and Backstop Commitment Letter were overseen by the Restructuring Committee, with management and the Company's advisors meeting and conferring with the Restructuring Committee on the progress of the negotiations and to discuss key negotiated terms, including the terms of the Backstop Commitment Letter and the associated fees.

**B.      Negotiations Leading to Entry into RSA and Backstop Commitment Letter**

21.      As the evidence will show, in the months leading up to the Petition Date, the Debtors and their advisors—overseen by the Restructuring Committee—engaged in continuous and rigorous discussions with the Debtors' existing stakeholders with respect to a range of restructuring solutions.  Such stakeholders included: (i) an ad hoc group of CAF Lenders (the "**CAF Lender Group**"); (ii)  an ad hoc group of TLB Lenders and holders of Senior Secured Notes (the "**2026 TLB Lender Group**" and, together with the CAF Lender Group, the "**Secured Creditor Group**"); (iii) an ad hoc group of "crossholder" creditors consisting of 2026 TLB Lenders, holders of Senior Secured Notes, and holders of Senior Unsecured Notes (the "**Crossholder Group**"); and (iv) the Unsecured Notes Group (collectively with the Secured Creditor Group and the Crossholder Group, the "**Ad Hoc Groups**"), as well as the Debtors' equity sponsor (the "**Sponsor**").

---

[8] "Potential Related Party Transaction" refers to any "transaction or arrangement (or any series of similar transactions or arrangements) with respect to or in which one or more affiliates of Talen or any of such affiliates' direct or indirect subsidiaries (other than, in each case, Talen or any of its direct or indirect subsidiaries) (x) is or will be a party or (y) has, or will have a material interest, whether direct or indirect."

WEIL:\98655598\30\76974.0003

22.     In the weeks leading up to the Petition Date, the Debtors and their advisors had numerous telephone and videoconference calls and in-person meetings in New York with principals of and/or advisors to the Ad Hoc Groups and the Sponsor, and the Restructuring Committee convened multiple times per week to analyze and consider the Debtors' strategic options, including proposals made by each of the Ad Hoc Groups and the Sponsor, and formulate thoughtful and value-maximizing counterproposals.  The Debtors exchanged multiple competing proposals with each of the Ad Hoc Groups, certain of which proposals provided for a potential restructuring backstopped by a new-money investment in the Company.

23.     Throughout the process, the Restructuring Committee directed Talen and its advisors to progress proposals and negotiations with the Ad Hoc Groups simultaneously to maximize competitive tension between the groups and, in turn, obtain the best and most competitive terms as possible.  The Debtors were intentionally transparent with each of the Ad Hoc Groups regarding the fact that the Debtors were meeting with and actively developing proposals with each of the other Ad Hoc Groups.  Frequently, meetings with the Ad Hoc Groups were staggered on the same day, such that the Ad Hoc Groups and their respective advisors would pass as a meeting with one group was ending and the meeting with the next was set to begin.  Accordingly, the Debtors believe the process was run as competitively as possible.

24.     After extensive, hard-fought negotiations and fully exploring their alternatives, the Restructuring Committee determined that it would be in the best interests of the Debtors and their stakeholders to agree to a transaction with the Unsecured Notes Group. Accordingly, on the Petition Date, the Debtors executed the RSA with the Unsecured Notes Group, which included the form of Backstop Commitment Letter.  Following the Debtors' "first-day" hearing, the Debtors and their advisors engaged in good-faith, arms'-length negotiations with the

11

Unsecured Notes Group to finalize the Backstop Commitment Letter contemplated by the RSA, which ultimately resulted in entry into the Backstop Commitment Letter on May 31, 2022.[9]  The Debtors and the Unsecured Notes Group are continuing to negotiate definitive documentation, such as the Plan, and are endeavoring to file such documents with the Court ahead of the timeline contemplated by the RSA.

**C.      Summary of Principal Terms**

25.      The up to $1.65 billion of new money proceeds generated from the Rights Offering are essential to the successful implementation of the Plan and the recapitalization of the Debtors' business.  As discussed in Section A above, the principal terms of the RSA and the Backstop Commitment Letter were extensively negotiated in the months leading up to the Petition Date.  The commitments made by the Backstop Parties under the Backstop Commitment Letter ensure that the Reorganized Company will be adequately capitalized on the Plan Effective Date.

26.      The following chart summarizes the principal terms of the Backstop Commitment Letter, which provides for an efficient path towards the successful de-leveraging of the Debtors' balance sheets and emergence from these chapter 11 cases:[10]

| Summary of Material Terms of Backstop Commitment Letter | |
| --- | --- |
| **Backstop Commitment**<br><br>*See* Backstop Commitment Letter § 1(b); Term Sheet pp. 1–2 | The Backstop Parties will backstop $1.3 billion of the Rights Offering.  The backstop will include a 25% discount to plan equity value, assuming a $4.5 billion total enterprise value, and subscriptions rights to purchase 30% of the New Equity on account of the backstop commitment.<br><br>On a date following the entry of the Confirmation Order and prior to the Plan Effective Date, selected by the Debtors in consultation with the Required Backstop Parties (such date, the "**Adjustment Determination Date**"), there will be a test of projected Net Debt and Minimum Liquidity as of the |

---

[9] As noted above, the May 30, 2022 milestone in the RSA to execute the Backstop Commitment Letter was extended by agreement of the parties to May 31, 2022 due to the milestone falling on Memorial Day.

[10] This summary of the Backstop Commitment Letter is qualified in its entirety by the actual terms and provisions of the Backstop Commitment Letter.  To the extent that the summary conflicts with the Backstop Commitment Letter, the Backstop Commitment Letter shall govern.

<table>
<tr>
<td></td>
<td>projected Plan Effective Date (the "<strong>RO Adjustment Determination</strong>"). Based on the RO Adjustment Determination, the Rights Offering amount will be automatically increased, up to a maximum of $1.65 billion, or automatically decreased, down to a minimum of $600 million. Additionally, the Backstop Parties may agree at any time to backstop an upsized Rights Offering amount on the same terms as the initial $1.3 billion backstop commitment.<br><br>By no earlier than 120 days in advance of the projected Plan Effective Date, the Debtors shall seek prospective ratings from the Ratings Agencies, based on the updated business plan to be incorporated into the Disclosure Statement. If the Ratings Agencies determine that the projected corporate rating of the Reorganized Company is no less than BB (or equivalent rating), then there will be no automatic upsize of the Rights Offering above $1.3 billion on the Adjustment Determination Date.</td>
</tr>
</table>

| **Put Premium**<br><br>*See* Backstop Commitment Letter § 3; Term Sheet p. 2 | Unless and until the Backstop Commitment Letter is terminated, the Backstop Parties will receive a periodic premium, paid monthly, equal to 10% per annum of each Backstop Party's portion of the backstop commitment (the "**Periodic Premium**"), and a premium equal to 20% of each Backstop Party's portion of the backstop commitment upon the consummation of the chapter 11 plan (the "**Backstop Premium**" and, together with the Periodic Premium, the "**Put Premium**"). The Periodic Premium will be payable in cash or new equity, in each Backstop Party's discretion (although no greater than 1/3 of the aggregate Periodic Premium can be paid in cash on a monthly basis), and the Backstop Premium will be payable in new equity. The Periodic Premium will be credited against the Backstop Premium. |
|---|---|
| **Alternative Transaction Premium**<br><br>*See* Backstop Commitment Letter § 3; Term Sheet p. 2 | If the Backstop Commitment Letter is terminated and a Specified Event (as defined below) has not occurred, the Backstop Parties will be entitled, to a fee equal to 50% of the Backstop Premium (the "**Alternative Transaction Premium**"). The Alternative Transaction Premium will be payable in cash, after crediting for any Periodic Premium that has been paid in cash.<br><br>"Specified Events" include:<br><br>(i)    a Backstop Party committing a material breach of the Commitment Letter (such party, the "**Breaching Party**"), which breach (the "**Individual Breach**") remains uncured and outstanding for a period of ten (10) business days after notice by the Debtors, solely as to such breaching Backstop Party; *provided* that the Alternative Transaction Premium will not be due or payable to any Backstop Party, including the Breaching Party, where such Individual Breach results, following an opportunity for the other Backstop Parties to cure such Individual Breach, in an inability to consummate the Rights Offering;<br><br>(ii)    the Backstop Parties holding at least 50.1% in aggregate principal amount of Senior Unsecured Notes (the "**Requisite Backstop Commitment Parties**") collectively committing a material breach of the Commitment Letter, which breach remains uncured and |

WEIL:\98655598\30\76974.0003

outstanding for a period of ten (10) business days after notice by the Debtors;

(iii)    the termination of the RSA by (a) the Requisite Consenting Parties due to a failure to meet any of the Milestones, (b) by the Debtors as a result of (1) the Consenting Parties entitled to vote on the Plan fail to timely do so, (2) termination of the Backstop Commitment Letter due to a Specified Event, (3) the Consenting Parties file or support any Alternative Restructuring that is materially inconsistent with the RSA or the Plan, and the Court approves such Alternative Restructuring, (4) the failure to meet any of the Milestones that was the result of a material breach of the Backstop Commitment Letter or the RSA by any Backstop Party, (5) the failure to meet any of the Milestones, to the extent such failure to meet a Milestone occurs as a result of a governmental authority, including any regulatory authority or court of competent jurisdiction, issuing a ruling, judgment, or order enjoining the consummation or rendering illegal the Restructuring, or otherwise indicating that the consummation of the Restructuring shall not be approved, in each case as a result of the identity, business, ownership, or conduct or any other fact or circumstance relating to any Consenting Party, and such ruling, judgment, or order has not been reversed or vacated by the later of (x) the date on which the hearing to approve the Confirmation Order is scheduled to commence in the order approving the Disclosure Statement and (y) ten (10) Business Days after the Debtors provide written notice to the Backstop Parties (the foregoing (x) and (y), as applicable, the "**Governmental Authority Cure Deadline**"), it being understood that nothing in this Commitment Letter shall require the Debtors to appeal any decision made by any governmental authority, or (6) the failure to meet any of the Milestones as the result of a material breach by any Backstop Party of the Backstop Commitment Letter or RSA or (c) mutual written agreement of the Company and the Requisite Consenting Parties; *provided*, *however*, that half of the Alternative Transaction Premium will be due and payable if the RSA is terminated by the Debtors due to a failure to meet Milestone 6 (agreement between the Debtors and the Requisite Backstop Commitment Parties on the terms of the Talen Global Settlement), Milestone 7 (entry of the order approving the Disclosure Statement and the Backstop Approval Order), or if the RSA is terminated by the Requisite Consenting Parties due to a failure to meet Milestone 9 (entry of the Confirmation Order) and, in each case, and such termination is not due to a material breach of the Backstop Commitment Letter or the RSA by any Backstop Party;

(iv)    the Backstop Commitment Letter is terminated (a) upon written notice from the Company to the Backstop Parties if the Plan Effective Date does not occur by the date that is twelve months after the Petition Date, if such termination occurs as a result of (1) the identity, business, ownership, or conduct or any other fact or circumstance relating to any Backstop Party or (2) a material breach of this Commitment Letter or the Restructuring Support Agreement by any Backstop Party, or (b) if any law or order shall have become

<table>
<tr><td></td><td colspan="2">effective or been enacted, adopted or issued by any governmental authority that prohibits the implementation of the Plan or the transactions contemplated by the Backstop Commitment Letter or the RSA, if such termination occurs as a result of a governmental authority, including any regulatory authority or court of competent jurisdiction, issuing a ruling, judgment, or order enjoining the consummation or rendering illegal the Restructuring, or otherwise indicating that the consummation of the Restructuring shall not be approved, in each case as a result of the identity, business, ownership, or conduct or any other fact or circumstance relating to any Consenting Party, and such ruling, judgment, or order has not been reversed or vacated by the Governmental Authority Cure Deadline; and</td></tr>
</table>

|   | (v) | the Backstop Commitment Letter is terminated by (a) the mutual written consent of the Debtors and the Requisite Backstop Commitment Parties or (b) the Requisite Backstop Commitment Parties if the Bankruptcy Court fails to enter the Backstop Approval Order within sixty (60) days of the execution of the Backstop Commitment Letter. |
|---|---|---|

A chart outlining when an Alternative Transaction Premium is due is included as **Exhibit D** hereto.

A chart demonstrating the potential termination fee payable based on hypothetical termination dates is included as **Exhibit E** hereto.

| **Termination Events**<br><br>*See* Backstop Commitment Letter § 2 | | The Backstop Commitment Letter: |
|---|---|---|
|  | (i) | shall be terminated automatically if the RSA is terminated pursuant to the terms thereof; |
|  | (ii) | may be terminated, upon written notice, by the Debtors or the Backstop Parties, (a) if the Court fails to enter the Backstop Approval Order by 130 days following the Petition Date, (b) if any of the Backstop Approval Order, the order approving the Disclosure Statement, or the Confirmation Order is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such order is modified or amended after entry without the prior written consent of the Requisite Backstop Commitment Parties, (c) by the non-breaching party if either the Debtors or any Backstop Party has committed a material breach of the Backstop Commitment Letter, which breach remains uncured and outstanding for a period of ten (10) business days after notice by the non-breaching party, or (d) if any law or order shall have become effective or been enacted, adopted, or issued by any governmental authority that prohibits the implementation of the Plan or the transactions contemplated by the Backstop Commitment Letter or the RSA; |
|  | (iii) | may be terminated, upon written notice, by the Debtors if the Plan Effective Date does not occur by the date that is twelve months after the Petition Date (the "**Termination Date**"); |
|  | (iv) | may be terminated, solely as to a Backstop Party, by such Backstop Party if the Plan Effective Date does not occur by the Termination |

WEIL:\98655598\30\76974.0003

<table>
<tr>
<td></td>
<td>Date; <em>provided</em> that the Debtors or the Requisite Backstop Commitment Party may extend the Termination Date by six (6) months to the extent that the only unsatisfied condition precedent to the occurrence of the Plan Effective Date is obtaining required regulatory approvals;</td>
</tr>
<tr>
<td></td>
<td>(v)   may be terminated, upon written notice, by the Requisite Backstop Commitment Parties if the Court fails to enter the Backstop Approval Order within sixty (60) days of the execution of the Backstop Commitment Letter; and</td>
</tr>
<tr>
<td></td>
<td>(vi)   may be terminated and the transactions contemplated thereby may be abandoned at any time by mutual written consent of the Debtors and the Requisite Backstop Commitment Parties or by the Debtors at their election.</td>
</tr>
<tr>
<td><strong>Expense Reimbursement</strong><br><br><em>See</em> Backstop Commitment Letter § 3</td>
<td>The Debtors will reimburse the Backstop Parties and Consenting Parties for certain reasonable and documented fees and expenses set forth under "Transaction Expenses" in the RSA, including all reasonable and documented prepetition and postpetition fees and expenses (including indemnification expenses, as applicable) of the Unsecured Creditor Group Advisors (as defined in the RSA).</td>
</tr>
<tr>
<td><strong>Indemnification Obligations</strong><br><br><em>See</em> Backstop Commitment Letter § 4</td>
<td>The Debtors will indemnify and hold harmless each Backstop Party and its affiliates, and each of their respective officers, directors, managers, partners, stockholders, members, employees, advisors, agents and other representatives and any affiliate of the foregoing, and each of their respective successors and assigns (each, an "<strong>Indemnified Party</strong>") from and against all losses, damages, liabilities, and reasonable and documented costs and expenses arising or resulting from or in connection with any action, suit, proceeding, claim, challenge, litigation, investigation, claim, or demand related to or arising from the Backstop Commitment Letter, the RSA, or the transactions contemplated thereby; <em>provided</em>, that the foregoing indemnity will not, apply to (i) any losses, damages, liabilities, costs, or expenses found by a final, non-appealable judgment of a court of competent jurisdiction to arise from an Indemnified Party's gross negligence, bad faith, fraud, or a material breach of the obligations of such Indemnified Party under the Backstop Commitment Letter or the RSA or (ii) any claim by one Backstop Party against another Backstop Party.</td>
</tr>
<tr>
<td><strong>Conditions Precedent</strong><br><br><em>See</em> Backstop Commitment Letter § 6</td>
<td>The closing of the Backstop Commitment Letter is subject to the satisfaction of certain closing conditions, including, but not limited to:<br><br>(i)   the (a) liquidity of the Reorganized Company as of the Plan Effective Date shall be no less than Minimum Liquidity and satisfy Minimum LC Capacity (as set forth in the Term Sheet), (b) net debt of the Reorganized Company as of the Plan Effective Date shall be as set forth on Schedule II of the Backstop Commitment Letter, and (c) Exit Facility Documents shall be acceptable to the Requisite Backstop Commitment Parties;<br><br>(ii)   The Court shall have entered (a) the Backstop Approval Order in form and substance satisfactory to the Requirement Backstop Commitment Parties and (b) the Court shall have entered the</td>
</tr>
</table>

16

| | | |
|---|---|---|
| | | Confirmation Order in form and substance satisfactory to the Requisite Backstop Commitment Parties; |
| | (iii) | Each of the RSA, Backstop Commitment Letter, Backstop Approval Order, and Confirmation Order shall remain in full force and effect; |
| | (iv) | The Rights Offering shall have been conducted in all material respects in accordance with the Rights Offering Documents, and the Rights Offering shall have expired in accordance with the terms of the Rights Offering Procedures; |
| | (v) | Each of the Debtors shall have performed and complied, in all material respects, with all of its respective covenants and agreements contained in the Backstop Commitment Letter that contemplate, by their terms, performance, or compliance prior to the Plan Effective Date; |
| | (vi) | Since the date of the Backstop Commitment Letter, there shall not have been a Material Adverse Effect; |
| | (vii) | The Debtors shall have paid the applicable Put Premium and shall have paid, or substantially concurrently with the occurrence of the Plan Effective Date will pay, all fees and expenses of the Backstop Parties required to be paid pursuant to Section 3 of the Backstop Commitment Letter and the RSA; and |
| | (viii) | All governmental and regulatory approvals or authorizations necessary for the occurrence of the Plan Effective Date, including antitrust approval, shall have been obtained and any required governmental and regulatory filings shall have been made, to the extent the failure to obtain such approvals or authorizations or to make such governmental and regulatory filings would reasonably be expected to result in a Material Adverse Effect on the Debtors (taken as a whole), and no law or order shall have become effective or been enacted, adopted, or issued by any governmental authority that prohibits the implementation of the Plan or the transactions contemplated by the Backstop Commitment Letter or the RSA. |
| **Transfer and Assignment**<br><br>*See* Backstop Commitment Letter § 7 | | The Backstop Parties may assign their respective Commitments under the Backstop Commitment Letter to: |
| | (i) | any of their respective affiliates (a) with the prior written consent of the Debtors, so long as such affiliate (1) is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act and (2) shall have delivered a duly executed joinder to (x) the RSA and (y) the Backstop Commitment Letter, or (b) without the prior written consent of the Debtors (*provided* that the transferor continues to have the financial wherewithal sufficient to satisfy the applicable obligations under the Backstop Commitment Letter and continues to be liable for all of the obligations of it, so long as such affiliate (1) is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the |

WEIL:\98655598\30\76974.0003

|  | | Securities Act and (2) shall have delivered a duly executed joinder to (x) the RSA and (y) the Backstop Commitment Letter; |
|  | (ii) | any other Backstop Party; or |
|  | (iii) | any other party with the prior written consent of the Debtors and the Requisite Backstop Commitment Parties, so long as (a) such party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act and (b) such party shall have delivered a duly executed joinder to (1) the RSA and (2) the Backstop Commitment Letter. |

## **Relief Requested Should Be Granted**

27.     Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re BNP Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016) (granting debtor's request to enter settlement agreement because the agreement "provided the estate with immediate cash and also eliminated the underlying controversy"); *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.").

28.     The business judgment standard under section 363(b) is "flexible and encourages discretion." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has

WEIL:\98655598\30\76974.0003

considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale (other than the appeasement of major creditors) . . . .").  Generally, courts "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose."  *In re Glob. Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003).

A.     **Sound Business Reasons Support Entry into Backstop Commitment Letter**

29.     The Debtors submit that sound business reasons exist to grant the relief requested herein.  The Backstop Commitment Letter represents the product of extensive good faith, arm's-length negotiations among the Debtors and the Unsecured Notes Group that built upon extensive prepetition negotiations among the Debtors and all of their key economic stakeholders. As stated above, and as the evidence presented at the hearing on the Motion will demonstrate, the Debtors and their advisors, overseen by the Restructuring Committee, spent months leading up to the Petition Date exploring the terms of a restructuring with numerous parties in the Debtors' capital structure, driving competition between the Ad Hoc Groups, and developing the framework for a restructuring that maximizes value for all of the Debtors' creditors.   Ultimately, the Restructuring Committee determined it was in the best interests of the Debtors to enter into definitive agreements that provide for the significant equity infusion and deleveraging embodied by the RSA.  After months of canvassing the universe of potential strategic options, the Debtors submit they have secured the restructuring transaction that, in the exercise of their business judgment, is most likely to maximize the value of the Debtors' estates—i.e., the Restructuring contemplated by the RSA with the Unsecured Notes Group.

WEIL:\98655598\30\76974.0003

30.     The Backstop Commitment Letter is a critical element of the RSA, as well as key to the Debtors' ability to emerge from chapter 11 successfully.  Together with the RSA, it ensures creditor support for a Plan that will reduce the Debtors' debt obligations by billions of dollars.  It provides for payment in full of the Debtors' allowed First Lien Obligations and also ensures that necessary funds will be available and that the Debtors will achieve the necessary debt reduction to consummate the Plan and operate their businesses post reorganization.

**B.      Put Premium, Commitment Protections, and Other Obligations Under Backstop Commitment Letter Should Be Approved**

31.     In consideration of the Commitment Parties' substantial and lengthy commitments under the Backstop Commitment Letter and to compensate the Unsecured Notes Group for the considerable time and expense they have incurred during the negotiation process, and will continue to incur as the parties proceed to plan confirmation and consummation of the Restructuring, the Backstop Commitment Letter provides for the Put Premium, Alternative Transaction Premium, Expense Reimbursement Obligations, and Indemnification Obligations. For the reasons set out below, and as the evidence will demonstrate, these fees and related obligations are appropriate and reasonable in the circumstances.

**1.      Put Premium and Commitment Protections Are Reasonable and Appropriate and Represent a Sound Exercise of Debtors' Business Judgment**

32.     Agreeing to the Put Premium and Commitment Protections is a reasonable exercise of the Debtors' business judgment given (i) the significant benefit to the estates of having a definitive agreement for a value maximizing transaction that will facilitate a substantial deleveraging of the Debtors' balance sheet and emergence from these chapter 11 cases, (ii) the costs incurred by the Unsecured Notes Group engaging with the Debtors and negotiating the terms of the Backstop Commitment Letter and other transaction documents, (iii) the costs, in terms of both capital and opportunity, of the Backstop Parties' reserving $1.3 billion of capital

commitments for up to 18 months, and (iv) the substantial amount of time that likely lies ahead before the Plan Effective Date due to the extensive regulatory approvals that will be necessary to consummate the Restructuring.  Under these circumstances, the Put Premium and Commitment Protections are reasonable in amount and necessary to maximize the value of the Debtors' estates.

33.     The Backstop Parties have provided the means of implementing a chapter 11 plan through the infusion of up to $1.65 billion of cash and the equitization of at least $1.4 billion of debt.  It is clear that the Backstop Parties are conferring a material benefit to the Debtors' estates as they help lead the Debtors successfully out of bankruptcy to continue to operate as a healthy and profitable going concern enterprise and with the balance sheet needed to withstand volatile market dynamics, saving hundreds of jobs and allowing the Debtors to continue their operations in the ordinary course.

34.     Over the past several months, the Backstop Parties have spent substantial time and expense conducting diligence and submitting proposals regarding potential restructuring transactions with the Debtors.  The Backstop Parties have also incurred significant expense negotiating and drafting the Backstop Commitment Letter and RSA, and they will continue to incur significant costs until confirmation and consummation of the Plan (which, as previously disclosed to the Court and discussed herein, may be subject to an extended regulatory approval period).  As the Backstop Parties await the Debtors' prosecution of the Plan, they are exposed to the risk that their efforts could result in tremendous opportunity cost if the Plan is not approved by the Court or, even if approved, is ultimately not consummated due to factors outside of the parties' control.

35.     As an inducement to the Backstop Parties to provide commitments under the Backstop Commitment Letter, the Debtors agreed to the Put Premium of 20% of each Backstop

Party's portion of the Backstop Commitment, to be paid upon the consummation of the chapter 11 plan contemplated by the RSA. In addition, to compensate the Backstop Parties for their significant efforts in negotiating, documenting, and committing to provide the Backstop Commitment, the Backstop Parties negotiated for certain additional transaction protections:

  i.  If the Backstop Commitment Letter is terminated (subject to certain specified exceptions), an Alternative Transaction Premium of up to 10% of each Backstop Party's portion of the Backstop Commitment as and when the Debtors have available liquidity or otherwise upon the consummation of an alternative transaction;

  ii.  Expense Reimbursement Obligations; and

  iii.  Indemnification Obligations.

  36.  The Backstop Parties negotiated for the Put Premium, the Alternative Transaction Premium, the Expense Reimbursement Obligations, and the Indemnification Obligations to be treated as administrative expenses of the Debtors' estates. The foregoing premiums and expense and indemnification obligations are intended to compensate and otherwise protect the Backstop Parties with respect to the substantial financial, economic, market, commercial, and execution risks that they are undertaking in committing significant amounts of capital for up to 18 months, which commitments are critical to the Debtors' restructuring efforts and to the maximization of distributable value for all stakeholders in these chapter 11 cases.

  37.  When negotiating and considering the reasonableness of the Put Premium and other Commitment Protections, the Debtors and their advisors considered many factors, the driving considerations being (i) the tenor of the Backstop Commitment, (ii) the size of the Backstop Commitment, and (iii) the volatility of the global power markets, including the regional markets in which the Debtors operate, as well as the volatility and uncertainty within broader financial markets. As previously stated, the Backstop Parties have agreed to reserve $1.3 billion of capital to fund the Rights Offering for up to 18 months, a significantly longer period than is

WEIL:\98655598\30\76974.0003

typical in a chapter 11 scenario and longer than the backstop period contemplated by all other proposals that were received.  Indeed, the Debtors and their advisors, as well as the Backstop Parties and their advisors, are collectively unaware of a chapter 11 case with a comparable backstop commitment period.

38.     Not only must the Backstop Parties maintain the capacity to fully fund the $1.3 billion issuance associated with the Rights Offering for the entire 18 month commitment period, they are also forgoing the opportunity to deploy that capital elsewhere during that extended timeframe.  It is reasonable for the Backstop Parties to be compensated commensurately for the magnitude and tenor—potentially unprecedented—of their $1.3 billion commitment in light of the potential opportunity costs associated with making such commitment.

39.     In addition to the size and length of the Backstop Parties' commitments, the Debtors and their advisors also considered the volatility of the global power markets, which is currently being driven, in part, by the ongoing political conflict between Russia and Ukraine and certain other macroeconomic factors beyond the Debtors' or the Backstop Parties' control.  The volatility of the power markets is exacerbated by the Debtors' limited ability to hedge.  As described in the First Day Declaration, prior to commencing these chapter 11 cases the Debtors did not have sufficient liquidity to enter into exchange-based hedges, and certain other critical hedging counterparties were unable or unwilling to enter into hedging arrangements with the Debtors due to the Debtors' precarious financial position and rumors of an imminent chapter 11 filing.  Since the Petition Date, the Debtors have entered into, and continue to enter into, postpetition hedging arrangements thanks to the liquidity afforded to them by the DIP Facility. Notwithstanding their postpetition hedging efforts, however, the Debtors remain underhedged with respect to their targets for winter of 2022–2023.  Notwithstanding the unequivocal importance of

WEIL:\98655598\30\76974.0003

hedging to the Debtors' business and the financial uncertainty driven by hedging constraints, as a result of negotiations by the Debtors, ultimately the Unsecured Notes Group did not require that the RSA or Backstop Commitment Letter include milestones or targets related to hedging—a feature which set the Unsecured Notes Group's proposal apart from other transaction proposals received by the Debtors where counterparties would have had potential termination rights if such milestones or targets were not achieved due to factors that are, in some cases, simply beyond the Debtors' control.  Moreover, the RSA and Backstop Commitment Letter do not contain overly restrictive covenants and permit the Debtors to, among other things, continue making investments in Cumulus through the Cumulus Preferred Shares, which, as described in the First Day Declaration, provides the estates with immense growth opportunities and the potential for increase in enterprise value for the benefit of all of the Debtors' stakeholders.  Undoubtedly, the flexibility afforded to the Debtors by the RSA and Backstop Commitment Letter provides greater certainty to the Debtors while conversely increasing the risks borne by the Backstop Parties.  In light of the foregoing, the Debtors determined and continue to believe, in their business judgment and in consultation with their advisors, that the Put Premium and other Commitment Protections are reasonable and justly compensate the Backstop Parties with respect to these market-based and other risks.

40.     The Put Premium and Commitment Protections are integral parts of the Backstop Commitment Letter, and without these protections, the Debtors have been advised that the Backstop Parties would not have agreed to the binding commitments to backstop the Rights Offering.  The provisions were heavily and extensively negotiated, and if the Put Premium and Commitment Protections are not approved, the Backstop Parties' commitment to the backstop the Rights Offering will be jeopardized, as the Backstop Parties' would have the right to terminate the

WEIL:\98655598\30\76974.0003

Backstop Commitment Letter and RSA. The Put Premium and Commitment Protections are reasonable in light of the magnitude of the Debtors' chapter 11 cases and the tangible benefit to the estates of having a substantial committed plan investment.

41.     Similarly, payment of the Expense Reimbursement Obligations to the Backstop Parties is warranted. The Backstop Parties have already expended significant time and effort in pursuing the transactions contemplated by the RSA and the Backstop Commitment Letter, including substantial due diligence, protracted negotiations, and the preparation and negotiation of the documents necessary in connection therewith. Reimbursing such fees and expenses is customary in other similar transactions to address the substantial efforts expended by backstopping parties.

42.     The Restructuring contemplated by the RSA, and supported by the Backstop Parties' commitments, maximizes value for all of the Debtors' stakeholders. The Backstop Parties, which are also Consenting Parties under the RSA, negotiated the RSA in conjunction with, and in contemplation of, the Backstop Commitment. Accordingly, the RSA and Backstop Commitment are intertwined, and without the Backstop Commitment, there is no assurance the Restructuring provided for by the RSA can be consummated. In light of the benefits that will inure to the Debtors and their estates as a result of the commitment of capital and equitization of debt necessary to backstop the Rights Offering and implement the Restructuring provided for in the RSA, the Debtors submit that entry into the Backstop Commitment Letter and effectuating the transactions contemplated thereby, including payment of the Put Premium upon the Plan Effective Date, the Alternative Transaction Premium, Expense Reimbursement Obligations, and Indemnification Obligations are justified, in the best interest of the Debtors' estates, and should be approved by this Court.

25

43. Further, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Approval of the Backstop Commitment Letter is necessary for an expeditious path towards confirmation of the Plan, which after months of hard-fought negotiations, has the support of several of the Debtors' major creditor constituencies and will promote the Debtors' successful emergence from chapter 11. Accordingly, the Debtors believe that application of section 105(a) of the Bankruptcy Code forms a basis to grant the relief requested.

**2.    Put Premium and Commitment Protections Should Be Allowed as Administrative Expenses Pursuant to Sections 503(b) and 507(a)(2) of Bankruptcy Code**

44. Section 503(b)(1)(A) of the Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including— (1)(A) the actual, necessary costs and expenses of preserving the estate." 11 U.S.C § 503(b)(1)(A). Further, section 507(a)(2) of the Bankruptcy Code provides that "administrative expenses allowed under section 503(b)" are entitled to priority. 11 U.S.C § 507(a)(2).

45. As detailed above, and as the evidence will demonstrate, the Put Premium and Commitment Protections represent material inducements for the Backstop Parties to enter into the Backstop Commitment Letter and consummate the transaction contemplated thereby, which will provide a material benefit to the Debtors' estates. Compared to the substantial value provided by the Backstop Parties, the Put Premium, Alternative Transaction Premium, Expense Reimbursement Obligations, and Indemnification Obligations are a reasonable use of estate resources and should be accorded administrative expense priority. These payments constitute "actual, necessary costs and expenses of preserving the estate." *See* 11 U.S.C § 503(b)(1)(A).

WEIL:\98655598\30\76974.0003

Further, agreeing to the Alternative Transaction Premium was necessary to obtain the benefits of the Backstop Commitment Letter.  Accordingly, in the event that the Alternative Transaction Premium becomes payable under the terms of the Backstop Commitment Letter, such expenses should be an allowed administrative expense of the Debtors' estates entitled to priority.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

46.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

### Reservation of Rights

47.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code, or (v) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.  The Debtors expressly reserve all of their rights with respect to the foregoing matters.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute and/or contest such claim.

### Notice

48.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Rule 9013-1(d).

WEIL:\98655598\30\76974.0003

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated: June 13, 2022
      Houston, Texas

Respectfully submitted,

  /s/  Gabriel A. Morgan
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
        Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Alexander Welch (admitted *pro hac vice*)
Katherine Lewis (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Matt.Barr@weil.com
        Alexander.Welch@weil.com
        Katherine.Lewis@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\98655598\30\76974.0003

### Certificate of Service

I hereby certify that, on June 13, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' claims, noticing, and solicitation agent.

_/s/ Gabriel A. Morgan_____
Gabriel A. Morgan