**<u>Exhibit A</u>**

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**") dated May 9, 2022 is entered into by and among:

       (a)     Talen Energy Supply, LLC ("**TES**") and the direct and indirect wholly owned subsidiaries listed on **Exhibit A** to this Agreement (collectively, the "**Company**"); and

       (b)     the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders as of the date hereof (such undersigned parties, collectively, the "**Initial Consenting Parties**"), of unsecured notes issued under (i) that certain *Indenture* dated as of October 1, 2001, (ii) that certain *Indenture* dated as of April 13, 2017, (iii) that certain *Indenture* dated as of August 4, 2017, (iv) that certain *Indenture* dated as of November 29, 2017, or (v) that certain *Series 2009A Indenture* dated as of April 1, 2009 (each as amended, restated, amended and restated, supplemented or otherwise modified from time to time, collectively, the "**Unsecured Notes Indentures**" and, such unsecured notes, the "**Unsecured Notes**").

The Company and each Consenting Party (as defined below), and any subsequent Person that becomes a party hereto in accordance with the terms hereof are collectively referred to herein as the "**Parties**" and each, individually, as a "**Party**." Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below) or if not defined their plain meaning given the context of their use. The terms of the Restructuring Term Sheet are hereby incorporated and included in the terms of this Agreement as if fully set forth herein.

## RECITALS

WHEREAS, the Parties consent to (as applicable) and have agreed to consummate and support a restructuring of the Company's capital structure (the "**Restructuring**") on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (as may be amended, supplemented, or otherwise modified from time to time pursuant to this Agreement, the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, collectively, the "**Restructuring Transactions**");

WHEREAS, the Company will implement the Restructuring Transactions through the commencement by the Company of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases so commenced, the "**Chapter 11 Cases**"); and

WHEREAS, as of the date hereof, the Initial Consenting Parties, in the aggregate, hold, own, or control approximately 62% of the aggregate outstanding principal amount of Unsecured Notes;

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, on a several but not joint basis, agree as follows:

1. **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)     "**Agreement Effective Period**" means, with respect to a Party, the period from the Support Effective Date to the Termination Date applicable to that Party.

(b)     "**Alternative Restructuring**" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of a material portion of assets, financing (debt or equity), plan proposal, recapitalization, restructuring of the Company, or other transaction of similar effect (in each case, outside of the ordinary course of business), other than in accordance with or in furtherance of the Restructuring.

(c)     "**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to any Alternative Restructuring.

(d)     "**Backstop Approval Order**" means the order of the Bankruptcy Court approving the Debtors' assumption of the Backstop Commitment Letters.

(e)     "**Backstop Commitment Letter**" means that certain backstop commitment letter to be entered into in accordance with the Milestones, in the form attached hereto as **Exhibit C** (except for any changes mutually agreed on between the Company and the Required Backstop Parties).

(f)     "**Backstop Commitment Parties**" means at any time and from time to time, the parties that have committed to backstop the Rights Offering; *provided* that each Backstop Commitment Party shall be either (a) an Initial Backstop Party, or (b) consented to by the Requisite Initial Backstop Parties.

(g)     "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

(h)     "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

(i)     "**Business Day**" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

(j)     "**Chapter 11 Cases**" has the meaning set forth in the recitals.

WEIL:\98588686\18\76974.0003

(k) "**Claim**" with respect to the Company, has the meaning set forth in section 101(5) of the Bankruptcy Code.

(l) "**Company**" has the meaning set forth in the recitals.

(m) "**Company Termination Event**" has the meaning set forth in Section 5.03.

(n) "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order.

(o) "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases.

(p) "**Consenting Claims**" means all Claims against the Company held by Consenting Parties from time to time.

(q) "**Consenting Parties**" means, collectively, the Initial Consenting Parties and any Subsequent Consenting Parties.

(r) "**Consenting Party Termination Event**" has the meaning set forth in Section 5.02.

(s) "**Definitive Documents**" means, collectively:  (i) the Plan, the Plan Supplement, and all material documents, annexes, schedules, exhibits, amendments, modifications, or supplements thereto, or other documents contained therein, including, without limitation, any schedules of assumed or rejected contracts; (ii) the Disclosure Statement and its exhibits; (iii) the Solicitation Materials; (iv) the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials; (v) the Rights Offering Documents; (vi) the Backstop Commitment Letters, any related pleadings, and the Backstop Approval Order; (vii) the Confirmation Order; (viii) the First Day Orders (other than the DIP Order) and the DIP Order, solely to the extent that the DIP Order has a material effect on the Rights Offering, the Backstop Commitment Letters, this Agreement, or the transactions contemplated thereby; (ix) any Employee Equity Incentive Plan or senior executive employment agreement entered into after the Support Effective Date; (x) the New Corporate Governance Documents; (xi) the Exit Facility Documents; and (xii) any other agreements and documentation reasonably desired or necessary to consummate and document or achieve the Restructuring Transactions; *provided*, *however*, that the following are not Definitive Documents:  ministerial notices and similar ministerial documents; retention applications; fee applications; fee statements; any similar pleadings or motions relating to the retention or fees of any professional; statements of financial affairs and schedules of assets and liabilities; or statements pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "**Non-Substantive Documents**").

(t) "**DIP Financing**" means the financing by the use of cash collateral and a postpetition senior secured superpriority debtor-in-possession credit facility to the Company on the terms and conditions consistent with the DIP Order**.**

(u)     "**DIP Order**" means the interim or final, as applicable, order of the Bankruptcy Court setting forth the terms of debtor-in-possession financing and use of cash collateral.

(v)     "**Disclosure Statement**" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

(w)     "**Employee Equity Incentive Plan**" means any long-term equity incentive program of the Reorganized Company to be established as contemplated in the Plan, and in accordance with this Agreement and the Definitive Documents.

(x)     "**Environmental Law**" means any applicable federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment or human health or safety (as such relates to exposure to Hazardous Substances) or Hazardous Substances.

(y)     "**Environmental Regulator**" means any federal, state, municipal, local, or governmental agency or regulatory body responsible for regulating (i) pollution, the protection of the environment or the protection of human health and safety as it relates to exposure to Hazardous Substances or (ii) the use, treatment, storage, transport, handling, release or disposal of any Hazardous Substances.

(z)     "**ERCOT**" means the Electric Reliability Council of Texas.

(aa)    "**Exit Facility**" means the financing facility, including a revolving credit facility and letter of credit facility, to be entered into on the Plan Effective Date.

(bb)    "**Exit Facility Documents**" means the agreements and related documents governing the Exit Facility.

(cc)    "**FCC**" means the Federal Communications Commission.

(dd)    "**FERC**" means the Federal Energy Regulatory Commission.

(ee)    "**First Day Orders**" means the orders of the Bankruptcy Court granting the First Day Pleadings.

(ff)    "**First Day Pleadings**" means the first-day pleadings that the Company files with the Bankruptcy Court upon the commencement of the Chapter 11 Cases.

(gg)    "**Hazardous Substances**" means: (i) any petroleum or petroleum products, radioactive materials, or asbestos containing materials; (ii) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants" or words of similar import, under any Environmental

Law; and (iii) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

(hh) "**Initial Backstop Commitment Parties**" means those Backstop Commitment Parties to the Backstop Commitment Letters as of the first date they are executed by the Company and the Backstop Commitment Parties; *provided* that each Initial Backstop Commitment Party shall be designated by the Requisite Consenting Parties.

(ii) "**Initial Consenting Parties**" has the meaning set forth in the recitals.

(jj) "**Interest**" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in any Company entity, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, profits interest or other instrument, evidencing any fixed or contingent ownership interest, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest.

(kk) "**Joinder Agreement**" means a joinder agreement in the form attached hereto as **Exhibit D**.

(ll) "**Milestones**" means the milestones set forth in the Restructuring Term Sheet.

(mm) "**New Corporate Governance Documents**" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, shareholders' agreement, and such other applicable formation, organizational and governance documents (if any) of the Reorganized Company, the material terms of each of which shall be included in the Plan Supplement.

(nn) "**NRC**" means the Nuclear Regulatory Commission.

(oo) "**Outside Petition Date**" has the meaning set forth in Section 2.02.

(pp) "**Permitted Transferee**" has the meaning set forth in Section 3.02.

(qq) "**Person**" means any "person" as defined in section 101(41) of the Bankruptcy Code, including any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

(rr) "**Petition Date**" has the meaning set forth in Section 2.02.

(ss) "**Plan**" means the joint chapter 11 plan of reorganization filed by the Company in the Chapter 11 Cases to implement the Restructuring Transactions in accordance with this Agreement and the Definitive Documents.

(tt) "**Plan Effective Date**" means the date on which the conditions to effectiveness of the Plan have been satisfied or waived in accordance with its terms.

(uu)   "**Plan Supplement**" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan filed by the Company with the Bankruptcy Court.

(vv)   "**Qualified Marketmaker**" has the meaning set forth in Section 3.02.

(ww)   "**Qualified Marketmaker Joinder Date**" has the meaning set forth in Section 3.02.

(xx)   "**Reorganized Company**" means TES as reorganized on the Plan Effective Date in accordance with the Plan and the Restructuring Term Sheet.

(yy)   "**Requisite Backstop Commitment Parties**" means, as of the date of determination, Backstop Commitment Parties that have committed to provide at least 50.1% in aggregate principal amount of commitments under the Backstop Commitment Letters.

(zz)   "**Requisite Consenting Parties**" means, as of the date of determination, Consenting Parties holding at least 50.1% in aggregate principal amount of Unsecured Notes held by the Consenting Parties as of such date.

(aaa)   "**Requisite Initial Backstop Commitment Parties**" means, as of the date of determination, Initial Backstop Commitment Parties holding at least 50.1% in aggregate principal amount of commitments under the Backstop Commitment Letters held by the Initial Backstop Commitment Parties as of such date.

(bbb)   "**Restructuring**" has the meaning set forth in the recitals.

(ccc)   "**Restructuring Term Sheet**" has the meaning set forth in the recitals.

(ddd)   "**Restructuring Transactions**" has the meaning set forth in the recitals.

(eee)   "**Rights Offering**" has the meaning set forth in the Restructuring Term Sheet.

(fff)   "**Rights Offering Documents**" means, collectively, any and all agreements, documents, and instruments delivered or entered into in connection with the Rights Offering, including, without limitation, the Rights Offering Procedures.

(ggg)   "**Rights Offering Procedures**" means those certain procedures for the Rights Offering.

(hhh)   "**Securities Act**" means the U.S. Securities Act of 1933, as amended, and any rules and regulations promulgated thereby.

(iii)   "**Solicitation Materials**" means any materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

(jjj)   "**Subsequent Consenting Party**" means any Person that becomes a party to this Agreement by executing a Joinder Agreement in accordance with the terms of this Agreement.  For the avoidance of doubt, the Subsequent Consenting Parties will not include the Initial Consenting Parties.

(kkk)   "**Support Effective Date**" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company and (ii) Consenting Parties holding at least 50.1% of the aggregate outstanding principal of Unsecured Notes.

(lll)   "**Support Period**" means the period commencing on the Support Effective Date and ending on the date on which this Agreement is terminated in accordance with Section 5 hereof.

(mmm)"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 5.01, Section 5.02, Section 5.03, or Section 5.04, as applicable.

(nnn)   "**TES**" has the meaning set forth in the recitals.

(ooo)   "**Transfer**" has the meaning set forth in section 101(54) of the Bankruptcy Code.

(ppp)   "**Unsecured Creditor Group**" means that certain ad hoc group of holders of Unsecured Notes.

(qqq)   "**Unsecured Creditor Group Advisors**" means, collectively, (i) the Unsecured Creditor Group Counsel, (ii) Rothschild & Co US Inc., and (iii) other local or regulatory counsel or other advisors retained by the Unsecured Creditor Group.

(rrr)   "**Unsecured Creditor Group Counsel**" means Kirkland & Ellis LLP, as legal advisors to the Unsecured Creditor Group.

(sss)   "**Weil**" means Weil, Gotshal & Manges LLP, as legal advisors to the Company.

2.   **Commencement**

Section 2.01   Restructuring Term Sheet.   The Restructuring Term Sheet is expressly incorporated herein and made a part of this Agreement as if fully set forth herein.  The terms and conditions of the Restructuring are set forth in the Restructuring Term Sheet; *provided*, *however*, that the Restructuring Term Sheet is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Restructuring Term Sheet, the terms of the Restructuring Term Sheet shall govern.

Section 2.02   Commencement.   Provided that the Support Effective Date has occurred,   no   later   than   11:59 p.m.   (prevailing   Central   time)   on   May   9,   2022

(the "**Outside Petition Date**"), the Company shall file the Chapter 11 Cases in the Bankruptcy Court (the date on which such filing occurs, the "**Petition Date**").

Section 2.03   Milestones.  During the Agreement Effective Period, the Company shall implement the Restructuring Transactions in accordance with the Milestones, as applicable, unless extended or waived in writing (which may be by electronic mail between applicable counsel) by the Company and the Requisite Consenting Parties.  For the avoidance of doubt, nothing in the Milestones shall prevent the Company from exercising their respective fiduciary duties under applicable law; *provided* that the exercise by the Company of a Fiduciary Out (as defined below) shall not impede the Consenting Parties' rights to terminate this Agreement pursuant to Section 5.

Section 2.04   Definitive Documents.

(a)   Each of the Definitive Documents and related motions and orders remain subject to negotiation and completion and shall contain terms and conditions consistent in all material respects with this Agreement and the Restructuring Term Sheet, and the following Definitive Documents shall otherwise be in form and substance acceptable to the Requisite Consenting Parties and the Company: (a) the Plan; (b) the Plan Supplement, including any Employee Equity Incentive Plan and any schedules of assumed or rejected contracts and leases; (c) the Confirmation Order; (d) the Backstop Approval Order; (e) the Exit Facility Documents; and (f) the New Corporate Governance Documents.  The Definitive Documents other than those referenced in the preceding sentence shall contain terms and conditions consistent in all material respects with this Agreement and the Restructuring Term Sheet and shall otherwise be in form and substance reasonably acceptable to the Requisite Consenting Parties and the Company.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the exhibits and annexes hereto), as they may be modified, amended, or supplemented in accordance with Section 9.

Section 2.05   Solicitation.  The Company will launch the solicitation of votes on the Plan in accordance with the Milestones.

Section 2.06   Confirmation of the Plan.  Subject to the terms of this Agreement and the Milestones, the Company will use commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable after the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement.  Each Consenting Party shall use commercially reasonable efforts to cooperate fully and coordinate amongst each other and with the Company in connection therewith, as contemplated by this Agreement.  Each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary or as may be required by order of the Bankruptcy Court, to carry out the purpose and intent of this Agreement (including, without limitation, to provide any information reasonably necessary, or information requested from federal, state, or local regulators, to obtain required regulatory approvals necessary for confirmation of the Plan or consummation of the Restructuring, including, but not limited to, approvals from the NRC, FERC, FCC, any Environmental Regulator, or any other regulatory body

or authority whose approval or consent is determined by the Company to be necessary to consummate the Restructuring Transactions).

3.      **Agreements of the Consenting Parties.**

Section 3.01   Support.   Each Consenting Party, with respect to each of its respective Consenting Claims, hereby covenants and agrees, severally and not jointly, during the Support Period, that it shall:

(a)      timely vote within five (5) Business Days following receipt of the solicitation of the Plan all of its Claims and Interests (or Claims and Interests under its control), including all Claims that are impaired under the Plan, to accept the Plan and not change or withdraw (or cause to be changed or withdrawn) any such vote; *provided* that each Consenting Party may change or withdraw its vote if (i) the Company withdraws the Plan or modifies the Plan in a manner that materially and adversely affects the treatment of such Consenting Party as compared to the treatment set forth in the Restructuring Term Sheet, or (ii) the Termination Date occurs as to all Parties;

(b)      grant and, if applicable, not opt-out of the release of third-party claims pursuant to the Plan and Confirmation Order;

(c)      not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, DIP Financing, or acceptance, confirmation, or implementation of the Plan, (ii) propose, support, vote for, encourage, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any entity regarding, any Alternative Restructuring (other than in accordance with this Agreement), including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, including without limitation, the NRC, FERC, ERCOT, any Environmental Regulator, or any other regulatory body or authority or making or supporting any press release, press report or comparable public statement, or filing with respect to any Alternative Restructuring, or (iii) to otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring;

(d)      not direct any administrative agent, collateral agent, or indenture trustee (as applicable) to take any action inconsistent with such Consenting Party's obligations under this Agreement or the Restructuring Term Sheet and, if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with such Consenting Party's obligations under this Agreement or the Restructuring Term Sheet, such Consenting Party will use its reasonable best efforts to direct such administrative agent, collateral agent, or indenture trustee to cease, desist, and refrain from taking any such action;

(e)      negotiate in good faith and, upon agreement to the terms of the Definitive Documents, complete, enter into, and effectuate the Definitive Documents (as applicable) within the timeframes contemplated herein;

(f)      timely vote (or cause to be voted) its Claims or Interests against any Alternative Restructuring;

(g)    cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the Company and to use reasonable best efforts to support and consummate the Restructuring, including, for the avoidance of doubt, using reasonable best efforts to obtain any necessary federal, state, and local regulatory approvals, including, without limitation, approvals from the NRC, FERC, ERCOT, any Environmental Regulator, or any other regulatory body or authority required to obtain confirmation of the Plan or consummate the Plan and the Restructuring contemplated thereby and herein by the Plan Effective Date;

(h)    timely oppose, including by way of joinder, any objections filed with respect to the Bankruptcy Court approval of any of the Definitive Documents;

(i)    act in good faith consistent with this Agreement;

(j)    to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address and resolve any such impediment;

(k)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from other material stakeholders to the extent reasonably prudent; and

(l)    refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement or interfere with the Restructuring Transactions (including encouraging another person to undertake any action prohibited by this Agreement).

Section 3.02    Transfers.  Each Consenting Party agrees that during the Support Period, it shall not Transfer, directly or indirectly, any Claims against or Interests in the Company, option thereon, or right or interest therein or any other Claims against or Interests in the Company (including by granting any proxies, depositing any such Claims or Interests into a voting trust or entering into a voting agreement with respect to such Claims or Interests), and any purported such Transfer shall be void and without effect unless the transferee thereof:

(a)    is an Initial Consenting Party or a Subsequent Consenting Party;

(b)    before such Transfer, agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Subsequent Consenting Party and to be bound by all of the terms of this Agreement applicable to a Subsequent Consenting Party (including with respect to any and all Claims and Interests it already may hold before such Transfer) by executing a Joinder Agreement and delivering an executed copy of such Joinder Agreement to Weil and the Unsecured Creditor Group Counsel promptly after the consummation of such Transfer.

Each Consenting Party agrees that any Transfer of any Claim or Interest that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

(c)    Notwithstanding anything to the contrary in this Agreement, a Consenting Party may Transfer Claims and Interests to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or

WEIL:\98588686\18\76974.0003

become (i) an entity identified in Section 3.02(a) or (b) hereof (a "**Permitted Transferee**") or (ii) a Subsequent Consenting Party; *provided* that (a) any such Qualified Marketmaker may only subsequently Transfer the right, title or interest to such Claims and Interests to a transferee that is a Permitted Transferee and (b) the Transfer documentation between such Consenting Party and such Qualified Marketmaker shall contain a covenant that providing for the requirement in the preceding clause (a); *provided*, *further*, that if a Consenting Party is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims and Interests that it acquires that are not Consenting Claims (i.e., received by such Qualified Marketmaker from a holder that is not a Consenting Party) without such Transfer being subject to this Section 3.02.

(d)     If at the time of a proposed Transfer of any Claims and Interests to a Qualified Marketmaker, such Claims and Interests: (i) may be voted or consent solicited with respect to the Restructuring, then the proposed transferor must first vote or consent such Claims or Interests in accordance with Section 3.01, or (ii) have not yet been and may yet be voted or consent solicited with respect to the Restructuring and such Qualified Marketmaker does not Transfer such Claims to a Permitted Transferee before the third Business Day before the expiration of an applicable voting or consent deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first Business Day immediately after the Qualified Marketmaker Joinder Date, become a Subsequent Consenting Party with respect to such Claims or Interests in accordance with the terms hereof; *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Subsequent Consenting Party with respect to such Claim or Interest at such time as such Claim or Interest has been Transferred by such Qualified Marketmaker to a transferee that is a Permitted Transferee in accordance with this Agreement.

For these purposes, "**Qualified Marketmaker**" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Claims against the Company, or enter with customers into long and/or short positions in Claims against the Company, in its capacity as a dealer or market maker in such Claims and (ii) is in fact regularly in the business of making a market in claims, interests, or securities of issuers or borrowers.

Section 3.03   Additional Claims or Interests.  To the extent any Consenting Party (i) acquires additional Claims or Interests entitled to vote on the Plan or (ii) Transfers any Claims or Interests, then, in each case, each such Consenting Party shall promptly notify Weil and the Unsecured Creditor Group Counsel and each such Consenting Party hereby agrees that such additional Claims and/or Interests shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims and Interests entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 3.01(a) hereof.

Section 3.04   Forbearance.  The Consenting Parties agree to forbear during the Support Period from the exercise of (and to direct an agent or trustee to forebear from the exercise of) any and all rights and remedies in contravention of this Agreement, whether at law, in equity, by agreement or otherwise, which are or become available to them in respect of the Unsecured Notes, or any other Claims and Interests.  Additionally, during the Support Period, the Consenting

WEIL:\98588686\18\76974.0003

Parties agree not to support, join, or otherwise assist any person in litigation against the Company in connection with the Chapter 11 Cases, Restructuring, the Unsecured Notes, or any other Claims and Interests; *provided* that the foregoing will not limit any of the Consenting Parties' rights to enforce any rights under this Agreement or right to appear as a party in interest and filing papers in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not litigation against the Company and not inconsistent with the Restructuring.

Section 3.05   <u>Additional Disclosures</u>.   Upon written request (including by electronic mail) by the Company or Weil, each Party shall promptly (and, in any event, not later than two (2) Business Days thereafter) identify, in writing, to the Company and Weil the nature and amount of the "disclosable economic interest" (as that term is defined by Rule 2019 of the Federal Rules of Bankruptcy Procedure) held in relation to the Company by all entities represented by the Consenting Party in connection with the Company as of the date of such request.

Section 3.06   <u>Investment Management Exclusions</u>.   Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge that all representations, warranties, covenants, and other agreements made by the Consenting Parties that is a separately managed account or sub-desk of an investment manager are being made only with respect to the Claims managed by such investment manager for the purpose of such account or sub-desk's direction, and shall not apply to (or be deemed to be made in relation to) any Claims or Interests that may be beneficially owned by such Consenting Parties that are not held through accounts managed by such investment manager.

4.   **Additional Agreements of the Company.**

Section 4.01   <u>Affirmative Commitments</u>.   In addition to the obligations of the Company set forth in <u>Section 2</u> of this Agreement, the Company also agrees during the Support Period to use commercially reasonable efforts to do all things in furtherance of the Restructuring, including:

(a)   to (i) act in good faith and use commercially reasonable efforts to support and successfully complete solicitation of the Plan, (ii) pursue any necessary federal, state, and local regulatory approvals to enable confirmation of the Plan, including, without limitation, approvals from the NRC, FERC, FCC, any Environmental Regulator, or any other regulatory body or authority whose approval or consent is determined by the Company to be necessary to consummate the Restructuring Transactions, and (iii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring in accordance with and within the time frames contemplated by this Agreement and the Restructuring Term Sheet; *provided* that, notwithstanding the forgoing, no actions, approvals, consents or waivers of any Environmental Regulator or any other governmental or regulatory body or authority required to consummate the transactions contemplated by this Agreement shall contain any condition or requirement that would so materially and adversely impact the economics or business of the Company that, had such condition or requirement been known prior to signing this Agreement, the Company would not, in its reasonable judgment, have entered into this Agreement; *provided further* that, notwithstanding the forgoing, the Company shall not be required to appeal any

WEIL:\98588686\18\76974.0003

determination regarding such action, approval, consents, or waivers of any such regulatory body or authority.

(b)     to provide advance initial draft copies of the Definitive Documents referenced in <u>Section 1(s)(i)-(ii), (iv)-(vii), (ix)-(xi)</u> to the Unsecured Creditor Group Counsel as soon as reasonably practicable, and will provide such documents no later than five (5) calendar days prior to the date when any Company Parties intend to file the applicable Definitive Documents with the Bankruptcy Court; *provided, however*, that for other Definitive Documents, if five (5) calendar days in advance is not reasonably practicable, in no event shall such document be provided later than seventy-two (72) hours in advance of any filing thereof.  The Company Parties acknowledge and agree that they will provide advance initial draft copies of any substantive pleadings (which do not include the Non-Substantive Documents) other than the Definitive Documents to the Unsecured Creditor Group Counsel no later than forty-eight (48) hours prior to the date when any Company Parties intend to file the applicable substantive pleadings with the Bankruptcy Court;

(c)     not to directly or indirectly take any action that would be inconsistent with this Agreement or interfere with the Restructuring (including encouraging another person to undertake any action prohibited by this Agreement);

(d)     to consult with the Consenting Parties and their advisors as to:

(i)     the status and progress of the contract rejection process, the negotiations of the Definitive Documents, and discussions with the Company's shareholders;

(ii)     the status of the Company's business plan and any discussions with third parties in connection therewith;

(iii)     any potential rejection, assumption, or other modification with respect to any of the Company Parties' material contracts or entry into any new material contracts by the Company Parties;

(iv)     the business and financial (including liquidity and budget) performance of the Company;

(v)     hedging strategies;

(vi)     strategy concerning the maximization of tax efficiencies;

(vii)     the allowance of any claims pursuant to the Plan, a motion filed by the Company, or a Bankruptcy Court order against the Company in an amount greater than $500,000; it being understood that this provision does not prohibit the Company from making payments to unaffiliated third parties that are authorized pursuant to any First Day Order (including the DIP Order) or otherwise in the ordinary course of business:

(viii)     the Claims reconciliation process; and

(ix) affairs concerning any necessary or desirable authorizations (including consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, regulatory body, or any stock exchange (including, but not limited to, approvals from the NRC, FERC, FCC, any Environmental Regulator, or any other federal, state, or local regulatory body or authority whose approval or consent is determined by the Company to be necessary to consummate the Restructuring Transactions);

(e) without limiting any consent rights otherwise provided in this Agreement, obtain the consent (not to be unreasonably withheld) of the Requisite Consenting Parties prior to effecting any filing or payment, as applicable, contemplated by Section 4.01(d)(vii) above if the amount at issue is at least $5 million;

(f) provide the Consenting Parties reasonable access to the books and records of the Company upon reasonable advance notice to the Company and without disruption to the operation of the Company's business; notwithstanding the foregoing, in no event shall the Company be required (x) to permit any inspection, or to disclose any information that, in the reasonable judgement of the Company, would cause the Company to violate its respective obligations with respect to confidentiality to a third party if the Company used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (y) to disclose any legally privileged information of the Company, or (z) to violate applicable law.

(g) provide the Consenting Parties reasonable access to the management of the Company upon reasonable advance notice to the Company and without disruption to the operation of the Company's business;

(h) use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent; and

(i) operate their businesses in the ordinary course, taking into account the Restructuring Transactions and the Chapter 11 Cases.

Section 4.02   Negative Commitments.  During the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a) incur any liens or security interest, other than:  (i) those existing immediately prior to the date hereof, (ii) those permitted pursuant to the DIP Financing, or (iii) those granted under or permitted by the DIP Order;

(b) commence, support, or join any litigation or adversary proceedings against the Consenting Parties, *provided*, *however*, that the Company can enforce this Agreement notwithstanding the foregoing;

(c) propose, solicit, file, support, or vote for any Alternative Restructuring Proposal; *provided* that the foregoing does not affect the Company's right to exercise its Fiduciary Out (as defined below); and

(d)    except as contemplated by this Agreement, the Plan, or pursuant to the Restructuring Transactions, issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its Interests, including capital stock or limited liability company interests.

5.    **Termination of Agreement.**

Section 5.01    Generally.    This Agreement will automatically terminate upon (i) the Plan Effective Date (as to all Parties) or (ii) three (3) Business Days following the receipt of written notice, delivered in accordance with Section 20 hereof, from (a) the Requisite Consenting Parties to the other Parties at any time after the occurrence of any Consenting Party Termination Event (as defined below) or (b) the Company (which for the avoidance of doubt, may be delivered by Weil on behalf of any or all entities constituting the Company) to the other Parties at any time after the occurrence of any Company Termination Event (as defined below).  No Party may terminate this Agreement based on a Consenting Party Termination Event or Company Termination Event, as applicable, caused by such Party's failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's prior failure to perform or comply in all material respects with the terms and conditions of this Agreement).

Each of the dates and time periods in this Section 5 may be extended by mutual agreement (which may be evidenced by e-mail confirmation between applicable counsel) among the Company and the Requisite Consenting Parties.

Section 5.02    A "**Consenting Party Termination Event**" will mean any of the following:

(a)    failure to meet any of the Milestones;

(b)    termination of the DIP Financing;

(c)    the Company withdraws or modifies the Plan or Disclosure Statement or files any motion or pleading with the Bankruptcy Court that is in any material respect inconsistent with this Agreement or the Plan and such withdrawal, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the Company receives written notice from the Requisite Consenting Parties that such withdrawal, modification, motion, or pleading is materially inconsistent with this Agreement or the Plan and (ii) entry of an order of the Bankruptcy Court approving such withdrawal, modification, motion, or pleading;

(d)    the material breach by the Company of any of the representations, warranties, covenants, or other obligations of the Company set forth in this Agreement, which breach has not been cured (if curable) within ten (10) Business Days of written notice from the Requisite Consenting Parties;

(e)    the Company exercises a Fiduciary Out (as defined below);

WEIL:\98588686\18\76974.0003

(f)      the Company (i) withdraws the Plan, (ii) publicly announces its intention not to support the Restructuring Transactions, or (iii) determines not to grant releases to any Consenting Party;

(g)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) fifteen (15) Business Days after such issuance the Company provides written notice to the other Parties that such final ruling, judgment, or non-appealable order is materially inconsistent with this Agreement;

(h)      the Bankruptcy Court enters an order denying confirmation of the Plan or any material provision thereof, including any provisions in the Plan relating to releases by the Company Parties of the Consenting Parties, or any material provisions relating to third party releases of the Consenting Parties and such order remains in effect for five (5) Business Days following the entry thereof;

(i)      the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the Confirmation Date and (b) three (3) Business Days after the Requisite Consenting Parties provide written notice to the other Parties that such order is materially inconsistent with this Agreement;

(j)      any order approving the Plan or the Disclosure Statement is reversed, stayed, dismissed, vacated, or reconsidered without the prior written consent of the Requisite Consenting Parties or is modified or amended (i) in a manner that is inconsistent in any material respect with this Agreement and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Party transmits a written notice describing any such breach;

(k)      the Company fails to timely file a formal objection, after consultation in good faith with the Consenting Parties, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(l)      the Company fails to timely file a formal objection, after consultation in good faith with the Consenting Parties, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases;

(m)      the Company fails to pay the Transaction Expenses of the Unsecured Creditor Group Advisors in accordance with <u>Section 10</u> hereof; or

(n)      the occurrence of the DIP Financing maturity date or the termination of the DIP Order.

Section 5.03    A "**Company Termination Event**" will mean any of the following:

(a)    the Consenting Parties entitled to vote on the Plan will have failed to timely vote their Claims and Interests in favor of the Plan or at any time change their votes to constitute rejections to the Plan, in either case in a manner inconsistent with this Agreement; *provided* that this termination event will not apply if sufficient Consenting Parties have timely voted (and not withdrawn) their Claims and Interests to accept the Plan in amounts necessary for each applicable impaired class under the Plan to "accept" the Plan consistent with section 1126 of the Bankruptcy Code;

(b)    if, as of 11:59 p.m. prevailing Eastern Time on May 30, 2022, the Support Effective Date has not occurred;

(c)    if the requisite Backstop Commitment Letters are not executed within 21 days of the Petition Date;

(d)    termination of the Backstop Commitment Letter;

(e)    failure to meet a Milestone;

(f)    if the Requisite Consenting Parties give notice of termination of this Agreement pursuant to this Section 5;

(g)    the occurrence of the DIP Financing maturity date or the termination of the DIP Order;

(h)    the Consenting Parties file or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement or the Plan and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the filing or supporting party receives written notice from the Company or Weil that such Alternative Restructuring, modification, motion, or pleading is inconsistent with this Agreement or the Plan and (ii) entry of an order of the Bankruptcy Court approving such Alternative Restructuring, modification, motion, or pleading;

(i)    the material breach by one or more of the Consenting Parties of any of the representations, warranties, covenants, or other obligations of the Company set forth in this Agreement, which breach has not been cured (if curable) within ten (10) Business Days of written notice from the Company;

(j)    the board of directors, board of managers, or such similar governing body of any entity constituting the Company reasonably determines in good faith after consultation with outside counsel that continued performance under this Agreement or failure to pursue an Alternative Restructuring would be inconsistent with the exercise of its fiduciary duties under any applicable law (such determination, a "**Fiduciary Out**");

(k)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the

consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) ten (10) Business Days after the Company provides written notice to the other Parties that such ruling, judgment, or order is materially inconsistent with this Agreement; or

        (l)     the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing the Chapter 11 Cases, or (iii) appointing a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the Confirmation Date and (b) three (3) Business Days after the Company provides written notice to the other Parties that such order is materially inconsistent with this Agreement.

        Section 5.04   <u>Mutual Termination</u>.  This Agreement may be terminated by mutual written agreement of the Company and the Requisite Consenting Parties.  The Company will deliver written notice of any such termination to all Parties in accordance with <u>Section 20</u> hereof.

        Section 5.05   <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with this <u>Section 5</u>, this Agreement will forthwith become void and of no further force or effect and each Party will, except as provided in this <u>Section 5.05</u> and in <u>Section 14</u>, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and will have all the rights and remedies that it would have had and will be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Unsecured Notes, and any ancillary documents or agreements thereto; *provided* that in no event will any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder before the date of such termination.

Upon any termination of this Agreement, each Consenting Party will be deemed to have automatically revoked and withdrawn its participation in the Restructuring, without any further action and irrespective of the expiration or availability of any "withdrawal period" or similar restriction, whereupon any such consents will be deemed, for all purposes, to be null and void *ab initio* and will not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, and the Company agrees not to accept any such consents and to take all action necessary or reasonably required to allow the Consenting Parties to arrange with their custodian and brokers to effectuate the withdrawal of such consents, including the reopening or extension of any withdrawal or similar periods; *provided* that the revocation and withdrawal herein will not apply (i) if this Agreement is terminated upon the Plan Effective Date or (ii) to the Consenting Parties if this Agreement is terminated as a result of their breach of this Agreement.

        Section 5.06   <u>Settlement</u>.  This Agreement and the Definitive Documents are part of a proposed settlement of a dispute among certain of the Parties.  If the Restructuring is not consummated, nothing herein will be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all

negotiations relating hereto will not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

6.      **Additional Documents.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise commercially reasonable efforts with respect to, the negotiation, drafting and execution and delivery of the Definitive Documents.

7.      **Representations and Warranties.**

        Section 7.01    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or such later date that such Party first becomes bound by this Agreement) and solely with respect to the Company, subject to any limitations or approvals arising from or required by the commencement of the Chapter 11 Cases:

        (a)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

        (b)     the execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) in the case of the Consenting Parties, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

        (c)     the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings that may be necessary in connection with the Chapter 11 Cases and such filings as may be necessary or required for disclosure by (i) the U.S. Securities and Exchange Commission or other securities regulatory authorities under applicable securities laws and (ii) the NRC, FERC, FCC, any Environmental Regulator, or any other regulatory body or authority whose approval or consent is determined by the Company to be necessary to consummate the Restructuring Transactions; and

        (d)     this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

Section 7.02   Each Consenting Party severally (and not jointly), represents and warrants to the other Parties that as of the date hereof (or such later date that such Party first becomes bound by this Agreement), such Consenting Party:

(a)   is not a Qualified Marketmaker with respect to the Unsecured Notes set forth below its name on the signature page; *provided* that the requirement to satisfy this representation and warranty can be waived by the Company in its sole discretion in consultation with the Unsecured Creditor Group Advisors;

(b)   does not own or control any other "claims", "equity security" or "security" in respect of the Company (including as such terms are defined in section 101 of the Bankruptcy Code) other than as set forth below its name on the signature page; *provided* that with respect to a Qualified Marketmaker, the requirement to satisfy this representation and warranty can be waived by the Company in its sole discretion in consultation with Unsecured Creditor Group Advisors;

(c)   is not a party to any other agreement, arrangement, or understanding with respect to the subject matter hereof with another Consenting Party;

(d)   (i) is the beneficial owner of the Unsecured Notes set forth below its name on the applicable signature page of this Agreement or (ii) has, with respect to the beneficial owners of such Unsecured Notes, (a) sole investment or voting discretion with respect to such Unsecured Notes, (b) full power and authority to vote on and consent to matters concerning such Unsecured Notes, and (c) full power and authority to bind or act on the behalf of, such beneficial owners.

8.   **Disclosure; Publicity.**

Section 8.01   Within two (2) Business Days of the Support Effective Date, the Company will publicly disseminate a press release disclosing the existence of this Agreement and the terms hereof.  If the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any Initial Consenting Party may publicly disclose the foregoing, including this Agreement, and all of its exhibits and schedules (subject to the redactions called for by this <u>Section 8</u> hereof), and the Company hereby waives any claims against the Initial Consenting Parties arising as a result of such disclosure by an Initial Consenting Party in compliance with this Agreement.

Section 8.02   The Company will submit drafts to the Unsecured Creditor Group Counsel of any press releases, public documents, and any and all filings that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) Business Days before making any such disclosure (if reasonably practicable, and, if two (2) Business Days is not reasonably practicable, in no event shall such document be provided later than twelve (12) hours in advance of any such disclosure), and will afford them a reasonable opportunity to comment on such documents and disclosures and will consider any such reasonable comments in good faith.  Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Party, no Party or its advisors will disclose to any person (including, for the avoidance of doubt, any other Consenting Party), other than to Weil, the principal amount or percentage of any Unsecured Notes, or any other securities of the Company held by any Consenting Party without such Consenting Party's prior written

consent; *provided* that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party will afford the relevant Consenting Party a reasonable opportunity to review and comment in advance of such disclosure and will take all reasonable measures to limit such disclosure and (ii) the foregoing will not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Unsecured Notes held by all the Consenting Parties collectively.  Notwithstanding the provisions in this <u>Section 8</u>, if consented to in writing by a Consenting Party, any Party hereto may disclose such Consenting Party's individual holdings.

9.      **Amendments and Waivers.**

(a)      This Agreement (or any exhibit, annex, or schedule hereto) may be modified, amended, or supplemented, or a condition or requirement of this Agreement (or any exhibit, annex, or schedule hereto) may be waived, in a writing signed by:  (a) each Company Party, and (b) the Requisite Consenting Parties.  Notwithstanding the foregoing, the consent of each such affected Consenting Party shall also be required to effectuate any modification, amendment, waiver, or supplement if the proposed modification, amendment, waiver, or supplement has a disproportionate (as compared to other Consenting Parties holding Claims within the same class as provided for in the Plan) adverse effect on any of the Company Claims held by a Consenting Party.  Notwithstanding anything herein to the contrary, for the avoidance of doubt, no amendment, modification, waiver, or supplement of (i) this <u>Section 9</u> or (ii) the definition of "Requisite Consenting Parties" shall be effective without the consent of each Party hereto.

(b)      Any proposed modification, amendment, waiver, or supplement that does not comply with this <u>Section 9</u> shall be ineffective and void *ab initio* as to any non-consenting Party affected thereby.

(c)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by a Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy by such Party.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by law.

10.     **Transaction Expenses.**

The Company Parties shall pay and reimburse all reasonable and documented prepetition and postpetition fees and expenses (including indemnification expenses, as applicable) of the Unsecured Creditor Group Advisors (the "**Transaction Expenses**") and, unless otherwise agreed to by the Company and the applicable firm, the Company shall:  (i) pay, as a precondition to effectiveness of this Agreement, the Transaction Expenses accrued by the Unsecured Creditor Group Advisors as of such date; (ii) fund or replenish, as the case may be, any retainers requested by any of the Unsecured Creditor Group Advisors; (iii) after the Support Effective Date has occurred, pay all accrued and unpaid Transaction Expenses on a monthly basis and within seven (7) Business Days of receipt of invoices in respect thereof; and (iv) on the Plan Effective Date, pay all accrued and unpaid Transaction Expenses incurred up to (and including) the Plan

Effective Date by the Unsecured Creditor Group Advisors without any requirement for Bankruptcy Court review or further Bankruptcy Court order; *provided, however*, that the DIP Order shall provide for the payment of all Transaction Expenses pursuant to this Section 10.

11.    **Effectiveness.**

This Agreement will become effective and binding on (i) the Company, the Initial Consenting Parties, and any Subsequent Consenting Party that has entered into a Joinder Agreement prior to the Support Effective Date on the date of the Support Effective Date and (ii) any Subsequent Consenting Party that enters into a Joinder Agreement on or following the Support Effective Date, upon delivery of such validly completed Joinder Agreement and of a signed acknowledgement from the Company to the other Parties; *provided* that:

(a)    signature pages executed by Consenting Parties will be delivered to (a) the Company, other Consenting Parties, and the Unsecured Creditor Group Counsel in a redacted form that removes such Consenting Party's holdings of the Unsecured Notes and (b) Weil in an unredacted form (to be held by Weil on a professionals' eyes only basis); and

(b)    the Company Parties shall have paid in full the Transaction Expenses of the Unsecured Creditor Group Advisors that are accrued but unpaid as of the Support Effective Date, whether or not such Transaction Expenses are then due, outstanding, or otherwise payable.

12.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RESTRUCTURING CONTEMPLATED HEREBY.  NOTWITHSTANDING THE FOREGOING, DURING THE PENDENCY OF THE CHAPTER 11 CASES, ALL PROCEEDINGS CONTEMPLATED BY THIS SECTION 12 SHALL BE BROUGHT IN THE BANKRUPTCY COURT.

13.     **Remedies/Specific Performance.**

All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party (and for the avoidance of doubt, it is agreed by the other Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party will be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach); *provided* that in connection with any remedy for specific performance, injunctive or other equitable relief asserted in connection with this Agreement, each Party agrees to waive the requirement for the securing or posting of a bond in connection with any remedy and to waive the necessity of proving the inadequacy of money damages.  All rights, powers, and remedies provided under this Agreement or otherwise available at law or in equity will be cumulative and not alternative, and the exercise of any remedy, power, or remedy by any Party will not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Person.

14.     **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, Section 5.06, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 and 24 (and, to the extent applicable to the interpretation of such surviving sections, Section 1) will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

15.     **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and will not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16.     **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns.  The rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person except as expressly permitted herein.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, will be held invalid or unenforceable in whole or in part, such invalidity or unenforceability will attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

17.    **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement will be solely for the benefit of the Parties and no other person or entity will be a third-party beneficiary hereof.

18.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements heretofore executed between the Company and any Consenting Party (or the Unsecured Creditor Group Advisors) will continue in full force and effect in accordance with the terms thereof.

19.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail, which will be deemed to be an original for the purposes of this Section 19.

20.    **Notices.**

All notices hereunder will be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and electronic mail addresses:

      (1)    If to the Company, to:

Talen Energy Supply, LLC
1780 Hughes Landing Boulevard, Suite 800
The Woodlands, Texas 77380
Attention:   Alex Hernandez, CEO (alex.hernandez@talenenergy.com)
             John Chesser, CFO (john.chesser@talenenergy.com)
             Andrew Wright, General Counsel (andrew.wright@talenenergy.com)

with a copy (which will not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:   Matt Barr, Esq. (Matt.Barr@weil.com)
             Alexander Welch, Esq. (Alexander.Welch@weil.com)
             Katherine Lewis, Esq. (Katherine.Lewis@weil.com)

             and

700 Louisiana Street, Suite 1700
Houston, Texas 77002

Attention:   Gabriel Morgan, Esq. (Gabriel.Morgan@weil.com)
Clifford Carlson, Esq. (Clifford.Carlson@weil.com)

(2)      If to the Consenting Parties, to the addresses or electronic mail addresses set forth below the Consenting Party's signature, with copies to (which will not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile: (212) 446-4900
Attention:   Steven N. Serajeddini, P.C. (steven.serajeddini@kirkland.com)

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Facsimile: (312) 862-2200
Attention:   Patrick J. Nash, Jr., P.C. (patrick.nash@kirkland.com)
Christopher S. Koenig (chris.koenig@kirkland.com)

Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by electronic mail will be effective upon confirmation of transmission.

21.     **Reservation of Rights; No Admission.**

Nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties (i) to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries), (ii) purchase, sell, or enter into any transactions in connection with the Unsecured Notes or any other Claim against the Company;  provided that any such transaction must comply with the requirements of this Agreement, including Sections 3.02-3.03, (iii) enforce any right under the Unsecured Notes, subject to the terms hereof, (iv) consult with other Consenting Parties, other holders of Unsecured Notes, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) regarding the Restructuring (and not any other Alternative Restructuring) in furtherance of the Restructuring, or (v) enforce any right, remedy, condition, consent or approval requirement under this Agreement or in any of the Definitive Documents. Without limiting the foregoing, if this Agreement is terminated in accordance with its terms for any reason (other than consummation of the Restructuring), the Parties each fully and expressly reserve any and all of their respective rights, remedies, claims, defenses and interests, subject to Sections 5, 12, and 13 in the case of any claim for breach of this Agreement arising before termination.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

22.     **Relationship Among Parties.**

It is understood and agreed that no Consenting Party has any duty of trust or confidence in any kind or form with any other Consenting Party, and, except as expressly provided in this Agreement, there are no commitments between them as a result of this Agreement.  In this regard, it is understood and agreed that any Consenting Party may acquire Unsecured Notes, or other debt or equity securities of the Company without the consent of the Company or any other Consenting Party, subject to applicable securities laws and the terms of this Agreement; *provided* that no Consenting Party will have any responsibility for any such acquisition to any other entity by virtue of this Agreement.

23.     **No Solicitation; Representation by Counsel; Adequate Information.**

Section 23.01  This Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

Section 23.02  Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel will have no application and is expressly waived.

Section 23.03  Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, an offering of securities, each Consenting Party acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act, (ii) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (iii) understands that (a) any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and (b) that such securities are being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Party's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iv) has such knowledge and experience in financial and business matters that such Consenting Party is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

24.     **Fiduciary Duties.**

Nothing in this Agreement will require the Company or any directors, officers, managers, or members of the Company, each in its capacity as a director, officer, manager, or member of the Company, to take any action or to refrain from taking any action, to the extent inconsistent with its or their fiduciary duties under applicable law (as determined by them after consultation with legal counsel); *provided, however*, that this <u>Section 24</u> shall not impede any Party's right to terminate this Agreement pursuant to <u>Section 5</u>; provided, further, that the applicable Company Party shall inform the Unsecured Creditor Group Counsel of any decision to exercise a Fiduciary

Out within two (2) Business Days of such decision being made and provide (subject to any confidentiality restrictions) a copy of any Alternative Restructuring Proposal to the Unsecured Creditor Group Counsel.

[*Remainder of Page Intentionally Left Blank*]

WEIL:\98588686\18\76974.0003

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**Company Signature Page to
the Restructuring Support Agreement**

**AUTHORIZED SIGNATORY OF
TALEN ENERGY SUPPLY, LLC
and each of its direct and indirect wholly owned subsidiaries
listed on <u>Exhibit A</u> hereto**

By: _____

Name:  Andrew M. Wright

Title:   Authorized Signatory

**Consenting Party Signature Page to
Restructuring Support Agreement**

**APPALOOSA LP, ON BEHALF OF CERTAIN FUNDS FOR WHICH IT ACTS AS MANAGING MEMBER OR INVESTMENT ADVISOR**

By: _____

Name: David Bersh

Title: General Counsel

Address: 51 JFK Parkway, Short Hills, NJ 07078

E-mail address(es): d.bersh@amlp.com

| Claims (principal amount) | |
|---|---|
| - | RCF LCs |
| - | CAF Loans |
| - | Term Loans |
| - | 2027 Secured Notes |
| - | 6.625% 2028 Secured Notes |
| - | 7.625% 2028 Secured Notes |
| - | 9.500% Senior Notes due 2022 |
| - | 6.500% Senior Notes due 2024 |
| - | 6.500% Senior Notes due 2025 |
| - | 10.500% Senior Notes due 2026 |
| - | 7.000% Senior Notes due 2027 |
| - | 6.000% Senior Notes due 2036 |
| - | Existing Equity Interests |
| - | Other (please describe) |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**CARRONADE CAPITAL MASTER, LP**
By Carronade Capital Management, LP, its investment manager

By: _____
Name: Dan Gropper
Title: Managing Partner

Address:
c/o Carronade Capital Management, LP
17 Old Kings Highway South – Suite 140
Darien, CT 06820
Attention: Operations

E-mail address(es):
dgropper@carronade.com
operations@carronade.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to
Restructuring Support Agreement**

**CastleKnight Management LP**

By: _[signature]_

Name:  Aaron Weitman
Title:   Managing Partner

Address:  810 Seventh Avenue, Suite 803
New York, NY 10019

E-mail address(es):  dshapir@castleknight.com
csullivan@castleknight.com

| Claims (principal amount) | |
|---|---|
| -    RCF LCs | |
| -    CAF Loans | |
| -    Term Loans | |
| -    2027 Secured Notes | |
| -    6.625% 2028 Secured Notes | |
| -    7.625% 2028 Secured Notes | |
| -    9.500% Senior Notes due 2022 | |
| -    6.500% Senior Notes due 2024 | |
| -    6.500% Senior Notes due 2025 | |
| -    10.500% Senior Notes due 2026 | |
| -    7.000% Senior Notes due 2027 | |
| -    6.000% Senior Notes due 2036 | |
| -    Existing Equity Interests | |
| -    Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

## CITADEL EQUITY FUND LTD.
By its Portfolio Manager, Citadel Advisors LLC

By:

Name:    Shellane Mulcahy

Title:    Authorized Signatory

Address: c/o Citadel Enterprise Americas LLC, 131 S Dearborn St, Chicago, IL 60603
E-mail address(es): CitadelAgreementNotice@citadel.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe): Short CDS | |

JC

**Consenting Party Signature Page to
Restructuring Support Agreement**

## CONTRARIAN CAPITAL MANAGEMENT, L.L.C.

By: _____

Name:
Title:
       Jon Bauer

       Chief Investment Officer

Address:
411 West Putnam Avenue, Suite 425
Greenwich, CT 06830

E-mail address(es):
pzuckerman@contrariancapital.com

| Claims (principal amount) | |
|---|---|
| -    RCF LCs | ███████ |
| -    CAF Loans | ███████ |
| -    Term Loans | ███████ |
| -    2027 Secured Notes | ███████ |
| -    6.625% 2028 Secured Notes | ███████ |
| -    7.625% 2028 Secured Notes | ███████ |
| -    9.500% Senior Notes due 2022 | ███████ |
| -    6.500% Senior Notes due 2024 | ███████ |
| -    6.500% Senior Notes due 2025 | ███████ |
| -    10.500% Senior Notes due 2026 | ███████ |
| -    7.000% Senior Notes due 2027 | ███████ |
| -    6.000% Senior Notes due 2036 | ███████ |
| -    Existing Equity Interests | ███████ |
| -    Other (please describe) | ███████ |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**FOURSIXTHREE CAPITAL LP**

By: _____
Name: William Kelly
Title: Chief Operating Officer

Address:

FourSixThree Capital LP
520 Madison Avenue 19th floor
New York, NY 10022

E-mail address(es):

scott@463cap.com
rayan@463cap.com
drew@463cap.com
bill@463cap.com
nitin@463cap.com

| Claims (principal amount) | |
|---|---|
| -     RCF LCs | |
| -     CAF Loans | |
| -     Term Loans | |
| -     2027 Secured Notes | |
| -     6.625% 2028 Secured Notes | |
| -     7.625% 2028 Secured Notes | |
| -     9.500% Senior Notes due 2022 | |
| -     6.500% Senior Notes due 2024 | |
| -     6.500% Senior Notes due 2025 | |
| -     10.500% Senior Notes due 2026 | |
| -     7.000% Senior Notes due 2027 | |
| -     6.000% Senior Notes due 2036 | |
| -     Existing Equity Interests | |
| -     Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**FRANKLIN ADVISERS, INC., AS INVESTMENT MANAGE ON BEHALF OF CERTAIN**
**FUNDS AND ACCOUNTS**

By: _Glenn Voyles_

Name: Glenn Voyles

Title:   SVP


Address:  One Franklin Parkway, San Mateo, CA 94403


E-mail address(es):  gary.kiang@franklintempleton.com; chris.chen@franklintempleton.com

| Claims (principal amount) | |
|---|---|
| -    RCF LCs | |
| -    CAF Loans | |
| -    Term Loans | |
| -    2027 Secured Notes | |
| -    6.625% 2028 Secured Notes | |
| -    7.625% 2028 Secured Notes | |
| -    9.500% Senior Notes due 2022 | |
| -    6.500% Senior Notes due 2024 | |
| -    6.500% Senior Notes due 2025 | |
| -    10.500% Senior Notes due 2026 | |
| -    7.000% Senior Notes due 2027 | |
| -    6.000% Senior Notes due 2036 | |
| -    Existing Equity Interests | |
| -    Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**KING STREET GLOBAL DRAWDOWN FUND, L.P.**
By: King Street Capital Management, L.P.
      Its Investment Manager

By: _____
Name: Howard Baum
Title: Director of Operations

Address: 299 Park Avenue, 40th Floor
             New York, NY 10171

E-mail address(es): pboperations@kingstreet.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to
Restructuring Support Agreement**

**KING STREET CAPITAL, L.P.**
By: King Street Capital Management, L.P.
    Its Investment Manager

By: _____
Name: Howard Baum
Title: Director of Operations


Address: 299 Park Avenue, 40th Floor
       New York, NY 10171


E-mail address(es): pboperations@kingstreet.com


| Claims (principal amount) | |
| --- | --- |
| -    RCF LCs | |
| -    CAF Loans | |
| -    Term Loans | |
| -    2027 Secured Notes | |
| -    6.625% 2028 Secured Notes | |
| -    7.625% 2028 Secured Notes | |
| -    9.500% Senior Notes due 2022 | |
| -    6.500% Senior Notes due 2024 | |
| -    6.500% Senior Notes due 2025 | |
| -    10.500% Senior Notes due 2026 | |
| -    7.000% Senior Notes due 2027 | |
| -    6.000% Senior Notes due 2036 | |
| -    Existing Equity Interests | |
| -    Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**KING STREET CAPITAL MASTER FUND, LTD.**
By: King Street Capital Management, L.P.
    Its Investment Manager


By: _____
Name: Howard Baum
Title: Director of Operations


Address: 299 Park Avenue, 40th Floor
         New York, NY 10171


E-mail address(es): pboperations@kingstreet.com


| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**LIVELLO CAPITAL MANAGEMNT LP**

By: _Joseph Salegna_

Name: Joseph Salegna

Title: Chief Financial Officer

Address: 1 World Trade Center, 85th Floor, New York, NY 10007

E-mail        address(es):        jsalegna@livellocap.com,        adefelice@livellocap.com,
pgiordano@livellocap.com, operations@livellocap.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**LORD, ABBETT & CO. LLC, AS INVESTMENT ADVISER ON BEHALF OF CERTAIN ACCOUNTS IT MANAGES**

By: _____

Name: Lawrence B. Stoller

Title: Member & General Counsel

Address: Lord, Abbett & Co. LLC
          90 Hudson Street
          Jersey City, NJ 07302

E-mail address(es): LegalNotices@lordabbett.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**NUVEEN ASSET MANAGEMENT, LLC,**
**as investment adviser on behalf of certain fund/accounts**


By: _____

Name:  Stuart J. Cohen
Title:    MD & Head of Legal


Address:  Nuveen
                333 West Wacker Drive
                Chicago, Illinois 60606
                Attn: Douglas Johnston, MD & Senior Research Analyst


E-mail address(es):  douglas.johnston@nuveen.com, stuart.cohen@nuveen.com;


| Claims (principal amount) | |
|---|---|
| -      RCF LCs | |
| -      CAF Loans | |
| -      Term Loans | |
| -      2027 Secured Notes | |
| -      6.625% 2028 Secured Notes | |
| -      7.625% 2028 Secured Notes | |
| -      9.500% Senior Notes due 2022 | |
| -      6.500% Senior Notes due 2024 | |
| -      6.500% Senior Notes due 2025 | |
| -      10.500% Senior Notes due 2026 | |
| -      7.000% Senior Notes due 2027 | |
| -      6.000% Senior Notes due 2036 | |
| -      Existing Equity Interests | |
| -      Other (please describe)<br><br>Unsecured Municipal Bonds due 2038 | |

**Consenting Party Signature Page to
Restructuring Support Agreement**

**BLACKWELL PARTNERS LLC - SERIES A
BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By: _____

Name:  Jacob Rubin
Title:  Managing Member


Address:  3000 Sand Hill Road, Building 4, Suite 110, Menlo Park, CA 94025


E-mail address(es):  jacob@philosophycap.com; operations@philosophycap.com


| Claims (principal amount) | |
|---|---|
| -      RCF LCs | |
| -      CAF Loans | |
| -      Term Loans | |
| -      2027 Secured Notes | |
| -      6.625% 2028 Secured Notes | |
| -      7.625% 2028 Secured Notes | |
| -      9.500% Senior Notes due 2022 | |
| -      6.500% Senior Notes due 2024 | |
| -      6.500% Senior Notes due 2025 | |
| -      10.500% Senior Notes due 2026 | |
| -      7.000% Senior Notes due 2027 | |
| -      6.000% Senior Notes due 2036 | |
| -      Existing Equity Interests | |
| -      Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**CASSINI PARTNERS, LP**
**BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By: _____

Name:  Jacob Rubin
Title:  Managing Member


Address:  3000 Sand Hill Road, Building 4, Suite 110, Menlo Park, CA 94025


E-mail address(es):  jacob@philosophycap.com; operations@philosophycap.com


| Claims (principal amount) | |
|---|---|
| -      RCF LCs | |
| -      CAF Loans | |
| -      Term Loans | |
| -      2027 Secured Notes | |
| -      6.625% 2028 Secured Notes | |
| -      7.625% 2028 Secured Notes | |
| -      9.500% Senior Notes due 2022 | |
| -      6.500% Senior Notes due 2024 | |
| -      6.500% Senior Notes due 2025 | |
| -      10.500% Senior Notes due 2026 | |
| -      7.000% Senior Notes due 2027 | |
| -      6.000% Senior Notes due 2036 | |
| -      Existing Equity Interests | |
| -      Other (please describe) | |

**Consenting Party Signature Page to
Restructuring Support Agreement**

**STAR V PARTNERS LLC
BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By: _____

Name:  Jacob Rubin
Title:  Managing Member

Address:  3000 Sand Hill Road, Building 4, Suite 110, Menlo Park, CA 94025

E-mail address(es):  jacob@philosophycap.com; operations@philosophycap.com

| Claims (principal amount) | |
|---|---|
| -    RCF LCs | |
| -    CAF Loans | |
| -    Term Loans | |
| -    2027 Secured Notes | |
| -    6.625% 2028 Secured Notes | |
| -    7.625% 2028 Secured Notes | |
| -    9.500% Senior Notes due 2022 | |
| -    6.500% Senior Notes due 2024 | |
| -    6.500% Senior Notes due 2025 | |
| -    10.500% Senior Notes due 2026 | |
| -    7.000% Senior Notes due 2027 | |
| -    6.000% Senior Notes due 2036 | |
| -    Existing Equity Interests | |
| -    Other (please describe) | |

**Consenting Party Signature Page to
Restructuring Support Agreement**

**PHILOSOPHY CAPITAL PARTNERS, LP
BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By: _____

Name:  Jacob Rubin
Title:  Managing Member

Address:  3000 Sand Hill Road, Building 4, Suite 110, Menlo Park, CA 94025

E-mail address(es):  jacob@philosophycap.com; operations@philosophycap.com

| Claims (principal amount) | |
| --- | --- |
| -      RCF LCs | |
| -      CAF Loans | |
| -      Term Loans | |
| -      2027 Secured Notes | |
| -      6.625% 2028 Secured Notes | |
| -      7.625% 2028 Secured Notes | |
| -      9.500% Senior Notes due 2022 | |
| -      6.500% Senior Notes due 2024 | |
| -      6.500% Senior Notes due 2025 | |
| -      10.500% Senior Notes due 2026 | |
| -      7.000% Senior Notes due 2027 | |
| -      6.000% Senior Notes due 2036 | |
| -      Existing Equity Interests | |
| -      Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**RUBRIC CAPITAL MANAGEMENT LP**
As Manager or Sub-Manager on behalf of its funds and accounts

By: _____

Name: Michael Nachmani
Title: Authorized Signatory


Address:
155 East 44th St, Suite 1630
New York, NY 10017

E-mail         address(es):         michael@rubriccapital.com;         brian@rubriccapital.com;
jonathan@rubriccapital.com

| Claims (principal amount) | |
|---|---|
| -   RCF LCs | |
| -   CAF Loans | |
| -   Term Loans | |
| -   2027 Secured Notes | |
| -   6.625% 2028 Secured Notes | |
| -   7.625% 2028 Secured Notes | |
| -   9.500% Senior Notes due 2022 | |
| -   6.500% Senior Notes due 2024 | |
| -   6.500% Senior Notes due 2025 | |
| -   10.500% Senior Notes due 2026 | |
| -   7.000% Senior Notes due 2027 | |
| -   6.000% Senior Notes due 2036 | |
| -   Existing Equity Interests | |
| -   Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

CAPTIAL VENTURES INTERNATIONAL

BY: SUSQUEHANNA ADVISORS GROUP, INC., ITS AUTHORIZED AGENT

By: _____

Name: Kathy Harley
Title: Assistant Vice President

Address: Capital Ventures International c/o Susquehanna Advisors Group, Inc. – 401 City Avenue – Suite 220, Bala Cynwyd, PA 19004

E-mail address(es): convertsops@sig.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to
Restructuring Support Agreement**

**SYSTEM 2 MASTER FUND LIMITED**

By: _____

Name:  Glenn Kennedy

Title:   Director

Address:  9 Forum Lane, Suite 3119, Camana Bay, Grand Cayman, Cayman Islands

E-mail address(es): oliver.chadwick@system2capital.com

| Claims (principal amount) | |
|---|---|
| - RCF LCs | |
| - CAF Loans | |
| - Term Loans | |
| - 2027 Secured Notes | |
| - 6.625% 2028 Secured Notes | |
| - 7.625% 2028 Secured Notes | |
| - 9.500% Senior Notes due 2022 | |
| - 6.500% Senior Notes due 2024 | |
| - 6.500% Senior Notes due 2025 | |
| - 10.500% Senior Notes due 2026 | |
| - 7.000% Senior Notes due 2027 | |
| - 6.000% Senior Notes due 2036 | |
| - Existing Equity Interests | |
| - Other (please describe) | |

**Consenting Party Signature Page to**
**Restructuring Support Agreement**

**TWO SEAS GLOBAL (MASTER) FUND LP**

By: _____

Name:    Sina Toussi
Title:     Managing member of Two Seas Global
           Fund GP LLC, its general partner
Address:  32 Elm Place – 3rd Floor
           Rye, NY 10580

E-mail address(es): stoussi@twoseascap.com, finops@twoseascap.com

| Claims (principal amount) | |
|---|---|
| -   RCF LCs | |
| -   CAF Loans | |
| -   Term Loans | |
| -   2027 Secured Notes | |
| -   6.625% 2028 Secured Notes | |
| -   7.625% 2028 Secured Notes | |
| -   9.500% Senior Notes due 2022 | |
| -   6.500% Senior Notes due 2024 | |
| -   6.500% Senior Notes due 2025 | |
| -   10.500% Senior Notes due 2026 | |
| -   7.000% Senior Notes due 2027 | |
| -   6.000% Senior Notes due 2036 | |
| -   Existing Equity Interests | |
| -   Other (please describe) | |

**Exhibit A**

**Company Parties**

1.     Talen Energy Supply, LLC
2.     Talen Montana Holdings, LLC
3.     Talen Montana, LLC
4.     Montana Growth Holdings LLC
5.     Colstrip Comm Serv, LLC
6.     Talen Generation, LLC
7.     Montour, LLC
8.     Brunner Island, LLC
9.     Raven Power Generation Holdings LLC
10.    Raven Power Group LLC
11.    Raven Power Finance LLC
12.    Raven Power Fort Smallwood LLC
13.    Raven FS Property Holdings LLC
14.    H.A. Wagner LLC
15.    Brandon Shores LLC
16.    Raven Lot 15 LLC
17.    Fort Armistead Road – Lot 15 Landfill, LLC
18.    Raven Power Property LLC
19.    RMGL Holdings LLC
20.    Brunner Island Services, LLC
21.    Realty Company of Pennsylvania
22.    BDW Corp.
23.    Lady Jane Collieries, Inc.
24.    Montour Services, LLC
25.    Holtwood, LLC
26.    Martins Creek, LLC
27.    Sapphire Power Generation Holdings LLC
28.    Sapphire Power LLC
29.    Sapphire Power Finance LLC
30.    MEG Generating Company, LLC
31.    Sapphire Power Marketing LLC
32.    Pedricktown Management Company LLC
33.    Pedricktown Investment Company LLC
34.    Pedricktown Cogeneration Company LP
35.    York Plant Holding, LLC
36.    York Generation Company LLC
37.    Elmwood Energy Holdings, LLC
38.    Elmwood Park Power, LLC
39.    Camden Plant Holding, L.L.C.
40.    Newark Bay Holding Company, L.L.C.
41.    Liberty View Power, L.L.C.

42.     Newark Bay Cogeneration Partnership, L.P.
43.     Morris Energy Management Company, LLC
44.     Morris Energy Operations Company, LLC
45.     Lower Mount Bethel Energy, LLC
46.     Pennsylvania Mines, LLC
47.     MC OpCo LLC
48.     Talen Nuclear Development, LLC
49.     Bell Bend, LLC
50.     Susquehanna Nuclear, LLC
51.     Talen Texas, LLC
52.     Barney Davis, LLC
53.     Nueces Bay, LLC
54.     Laredo, LLC
55.     Talen Texas Property, LLC
56.     Talen Texas Group, LLC
57.     Talen Energy Marketing, LLC
58.     Talen Energy Retail LLC
59.     Talen Treasure State, LLC
60.     Talen Energy Services Group, LLC
61.     Talen Energy Services Holdings, LLC
62.     Talen Energy Services Northeast, Inc.
63.     Talen Land Holdings, LLC
64.     Talen NE LLC
65.     NorthEast Gas Generation Holdings, LLC
66.     Dartmouth Plant Holding, LLC
67.     Dartmouth Power Holding Company, L.L.C.
68.     Dartmouth Power Generation, L.L.C.
69.     Dartmouth Power Associates Limited Partnership
70.     Talen II Growth Parent LLC
71.     Talen II Growth Holdings LLC
72.     Talen Technology Ventures LLC

## Exhibit B

## Restructuring Term Sheet

# Restructuring Term Sheet

| | **Transaction Structure[1]** |
|---|---|
| **Transaction** | • **Up to $1.65bn equity rights offering**: $1.3bn equity rights offering (the "**Rights Offering**") backstopped by certain members of the Ad Hoc Group of Unsecured Noteholders (the "**Ad Hoc Group**").  On the Adjustment Determination Date (as defined and described below), the Rights Offering amount (the "**Initial Backstop Amount**") may be decreased to a minimum of $600 million or increased up to $1.65bn <br> • "**Adjustment Determination Date**" shall be a date following entry of the Confirmation Order[2] and prior to the Plan Effective Date, selected by the Debtors in consultation with the Required Backstop Parties; provided that the Parties shall work in good faith to select, if practicable and subject to the requirements or limitations of the NRC, a date that is approximately 90 days prior to the projected Plan Effective Date. <br> • On the Adjustment Determination Date, there will be a test of projected Net Debt and Minimum Liquidity (each as defined below) as of the projected Plan Effective Date (the "**RO Adjustment Determination**").  Based on the RO Adjustment Determination, the Rights Offering amount will be automatically increased (up to a maximum of $1.65 billion) or automatically decreased (down to a minimum of $600 million).  The Backstop Parties may (but are not required to) agree at any time to backstop any upsized Rights Offering amount on the same terms as the initial $1.3 billion backstop commitment. <br>   ○ By no earlier than 120 days in advance of the projected Plan Effective Date, the Debtors shall seek prospective ratings from the Ratings Agencies (as defined below), based on the updated business plan to be incorporated into the Disclosure Statement.   If the Ratings Agencies (as defined below) determine that the projected corporate rating of the Reorganized Debtors is no less than BB (or equivalent rating), then there shall be no upsize of the Rights Offering above $1.3 billion on the Adjustment Determination Date.  The "**Ratings Agencies**" shall be two out of the following three nationally recognized ratings agencies as agreed upon by the Debtors and the Requisite Initial Backstop Parties: S&P, Moody's and Fitch <br> • Net Debt (as defined below) at emergence shall be consistent with a schedule (the "**Net Debt Schedule**"), with Net Debt being $1.5 billion assuming a Plan Effective Date in June 2023; at least a $1.0bn Priority Exit RCF for additional liquidity / LC capacity <br> • Allowed secured claims paid in full in cash with proceeds from Exit Debt / Rights Offering, given option to roll into new exit debt, or otherwise unimpaired <br> • Unsecured Notes to receive (a) 100% of new common equity, less equity distributed on account of the unsecured claims equity recovery pool, and subject to dilution from the Rights Offering (including the Backstop Commitment Agreement) and Employee Incentive Program; and (b) participation in the Rights Offering |
| **Implementation** | • Predicated on chapter 11 filing no later than May 9, 2022 <br> • Transaction implemented through a chapter 11 bankruptcy process pursuant to RSA between Company and the Ad Hoc Group <br> • Transaction to be structured (including issuer of new stock) to minimize potential tax liability and maximize tax attributes of the Reorganized Debtors |
| **Exit Debt Capital Structure** | • $1.0bn or more Priority Exit Revolving Credit Facility, including $500m LC sublimit (if LC sublimit not available under Exit RCF, to enter into standalone facility) <br> • Net Debt at emergence (including PEDFA reinstatement) to comply with the Net Debt Schedule, with Net Debt being $1.5 billion assuming a Plan Effective Date in June 2023.  The Net Debt Schedule shall reflect the Net Debt target on the Plan Effective Date, which shall fluctuate over time based on the projections in the Company's DIP budget (as adjusted for exit costs and capital structure), and the Net Debt Schedule shall be agreed between the Backstop Parties and the Company and attached to the Backstop Commitment Letters <br> • "**Net Debt**" defined as Gross Funded Debt (as defined below) net of any unrestricted cash <br> • "**Gross Funded Debt**" to include all funded indebtedness including up to $131 million of reinstated PEDFA bonds and any net LMBE-MC indebtedness (if not refinanced / repaid), and shall be $1.631 billion (based on $155 million of unrestricted cash) assuming a Plan Effective Date of June 30, 2023, which shall be adjusted pursuant to the Net Debt Schedule <br> • "**Minimum Liquidity**" shall be $650 million, consisting of unrestricted cash and revolver availability <br> • "**Minimum LC Capacity**": $500 million of LC capacity, which can also be satisfied with revolver availability and/or unrestricted cash incremental to the Minimum Liquidity requirement |

**Notes**
1. Terms used herein but otherwise not defined shall have the meanings provided in the Restructuring Support Agreement or Backstop Commitment Letter.
2. Current Company estimate is 120-150 days following entry of the Confirmation Order.

# Restructuring Term Sheet

| Transaction Structure | |
|---|---|
| **Rights Offering** | <ul><li>Rights Offering to be available to all unsecured noteholders (subject to eligibility under applicable securities laws) backstopped by the Initial Backstop Parties and any other Backstop Parties.  On the Adjustment Determination Date, the RO Adjustment Determination shall occur. If the Ratings Agencies determine that the projected corporate rating of the Reorganized Debtors is no less than BB (or equivalent rating), then there shall be no upsize of the Rights Offering above $1.3 billion on the Adjustment Determination Date.</li><li>Premium equal to 20% of each Backstop Party's portion of the backstop commitment (the "**Backstop Premium**"), to be paid in equity if the chapter 11 plan is consummated, and a periodic premium paid monthly equal to 10% per annum of each Backstop Party's portion of the backstop commitment (the "**Periodic Premium**", together with the Backstop Premium, the "**Put Premium**").  The Periodic Premium shall be credited against the Backstop Premium, and shall be payable in cash or new equity (in each Backstop Party's discretion)<ul><li>No greater than 1/3 of the aggregate Periodic Premium can be paid in cash on a monthly basis. The Periodic Premium shall accrue from signing but in no event will any cash payment be made prior to court approval of the Backstop Agreement</li></ul></li><li>**Alternative Transaction Premium**: to be earned upon a customary termination event and paid following the Plan Effective Date, equal to 50% of the Backstop Premium payable in cash, after crediting for any Periodic Premium that has been paid in cash, subject to the exclusions in the Backstop Commitment Letter</li><li>Market terms for backstop commitment to include, but not be limited to, a 25% discount to plan equity value assuming a $4.5 billion total enterprise value and a 30% direct investment for Backstop Parties on account of the backstop commitment</li><li>Rights Offering to be conducted in accordance with applicable securities laws; expectation is that (a) Rights Offering stock will be exempted pursuant to section 1145 or, if section 1145 is not available, 4(a)(2) and/or Reg D and (b) Backstop Parties are eligible to stock issued on account of backstop under 4(a)(2) and/or Reg D</li></ul> |
| **Employee Incentive Program ("EIP")** | <ul><li>Employees of the Reorganized Debtors to have reserved for them 12% of the new common equity as follows:<ul><li>8.0% reserved for the Chief Executive Officer (the "**CEO**") of Reorganized TES, the CEO's direct reports, and certain other employees of Reorganized TES</li><li>2.0% reserved for plant level employees of Reorganized TES, including plant union employees</li><li>2.0% reserved for employees who join Reorganized TES after the Plan Effective Date, recruiting of key talent-to-value roles and succession planning</li></ul></li></ul> |
| **Corporate Governance** | <ul><li>To be determined by the Requisite Initial Backstop Parties; new Board members to be selected by the Requisite Initial Backstop Parties; Initial Backstop Parties to consult with the Company regarding number of board seats; CEO to be a board member</li></ul> |
| **Releases and Exculpations** | <ul><li>Customary debtor and third party releases for directors, officers and holders of Interests and affiliates, including Riverstone ("**Equity Affiliates**"); provided, however, that the Consenting Parties' consent to debtor and third party releases for holders of Interests and Equity Affiliates shall be only upon and subject to the terms of any Talen Global Settlement (as defined below), and the Consenting Parties retain the right to object to the Debtors' release of holders of Interests and Equity Affiliates if not resolved under the Talen Global Settlement</li></ul> |

# Restructuring Term Sheet

| Treatment of Claims | |
|---|---|
| **DIP Facility / Super Priority Claims** | • Repaid in full in cash at emergence |
| **RCF / CAF / 1L TL / 1L Notes / Other 1L Obligations[1]** | • Allowed secured claims to be paid in full in cash or otherwise unimpaired, claims subject to diligence and negotiation.  Allowed secured claims to be subject to the consent of the Requisite Consenting Creditors |
| **LMBE-MC Credit Facilities** | • LMBE-MC is a non-debtor during chapter 11 process, with existing credit facilities either (1) remaining in place or (2) refinanced at emergence at the option of the Requisite Consenting Creditors |
| **Unsecured Notes** | • Pro rata share of 100% of new common equity, less new common equity in unsecured claims equity recovery pool, subject to dilution from the Rights Offering (including the Backstop Commitment Agreement) and Employee Incentive Program<br>• Pro rata share of the Rights Offering |
| **Existing Equity** | • Canceled (subject to tax structuring considerations) |
| **GUC / Trade** | • To receive pro rata share of either (x) unsecured claims cash recovery pool or (y) unsecured claims equity recovery pool on a claim by debtor basis subject to dilution from the Rights Offering (including the Backstop Commitment Agreement) and Employee Incentive Program |
| **Employee Obligations** | • Assumption of collective bargaining agreements, subject to the consent of the Requisite Consenting Creditors<br>• Assumption of management employment agreements, subject to the consent of the Requisite Consenting Creditors<br>• Pension obligations unimpaired subject to the consent of the Requisite Consenting Creditors |
| **Cumulus Considerations** | • All Cumulus considerations reserved subject to diligence and negotiations; including potential direct investment in Cumulus, offered to unsecured holders in a TBD allocation with structure and form TBD and with terms acceptable to the Company and the Requisite Consenting Creditors<br>• Continued funding of investments during the case consistent with the latest DIP Budget<br>• Ad Hoc Group to negotiate in good faith regarding a resolution, to the satisfaction of the Company and Requisite Consenting Creditors, of all matters, disputes, arrangements regarding intercompany and antecedent transactions between the Company, Cumulus, TEC, and Riverstone (any such resolution, a "**Talen Global Settlement**") |
| **Other Claims** | • Rejection of retail contracts at commencement of case<br>• Asset retirement obligations unimpaired, subject to the consent of the Requisite Consenting Creditors<br>• PEDFA B & C Bonds unimpaired at emergence with the consent of the Requisite Consenting Creditors, but during the pendency of the chapter 11 cases subject to the DIP Order and in the discretion of the Company<br>• Treatment of environmental liabilities subject to the consent of the Requisite Consenting Creditors |

**Notes**
1.   Fuel Financing to be repaid upon entry of the Interim DIP Order.

3

# Restructuring Term Sheet

| Milestones | |
|---|---|
| **Milestones**<br><br>**(Subject to Court's Availability)** | No later than 11:59 p.m. CT on May 9, 2022 (the "**Outside Petition Date**"), the Company shall commence filing of the chapter 11 cases in the Bankruptcy Court (the date on which such filing occurs, the "**Petition Date**")<br><br>1. <u>The Bankruptcy Court shall have entered the DIP Order on an interim basis</u>: no later than 3 Business Days after the Petition Date<br><br>2. <u>The Company and the Backstop Parties shall have entered into the Backstop Commitment Letters and have agreed upon an amended fee letter for the Ad Hoc Group's financial advisor</u>: no later than 21 days after the Petition Date<br><br>3. <u>The Consenting Creditors shall hold 66.66% in principal amount of total unsecured notes</u>: no later than 21 days after the Petition Date<br><br>4. <u>The Bankruptcy Court shall have entered the DIP Order on a final basis</u>: no later than 45 days after the Petition Date or such later date as agreed to by the requisite consenting lenders under the DIP Order<br><br>5. <u>The Company shall have filed the (i) Plan, (ii) Motion to Approve the Disclosure Statement, and (iii) Motion to Assume the Backstop Commitment Letters</u>: no later than 90 days after the Petition Date<br><br>6. <u>The Talen Global Settlement shall be agreed to the satisfaction of the Company and the Requisite Consenting Creditors</u>: no later than 90 days after the Petition Date<br><br>7. <u>The Bankruptcy Court shall have entered (i) the order approving the Disclosure Statement, and (ii) the Backstop Approval Order</u>: no later than 130 days after the Petition Date<br><br>8. <u>The hearing to approve the Confirmation Order shall have commenced</u>: no later than 170 days after the Petition Date<br><br>9. <u>The Confirmation Order shall have been entered</u>: no later than 184 days after the Petition Date<br><br>10. <u>The Rights Offering shall have been launched</u>: no later than 15 days after the Adjustment Determination Date<br><br>11. <u>Rights Offering Funding Date</u>: no later than 7 days before the projected Plan Effective Date<br><br>12. <u>The Plan Effective Date shall have occurred</u>: no later than 12 months after the Petition Date; *provided* that this milestone may be extended by up to 6 months solely to obtain regulatory approvals |

**<u>Exhibit C</u>**

**Backstop Commitment Letter**

May [●], 2022

<u>CONFIDENTIAL</u>

Talen Energy Supply, LLC
1780 Hughes Landing Boulevard, Suite 800
The Woodlands, Texas 77380
Attention:     Alex Hernandez, CEO
              John Chesser, CFO
              Andrew Wright, General Counsel

**Commitment Letter**

Gentlemen:

Reference is made to that certain Restructuring Support Agreement, dated as of May [●], 2022 (including any exhibits and schedules thereto, the "<u>Restructuring Support Agreement</u>"), by and among Talen Energy Supply, LLC (now and as it may be reorganized under a joint chapter 11 plan of reorganization (the "<u>Plan</u>"), "<u>TES</u>" and collectively with certain direct and indirect subsidiaries of TES set forth on <u>Exhibit A</u> to the Restructuring Support Agreement, the "<u>Debtors</u>") and certain holders of notes issued pursuant to the Unsecured Notes Indentures (as defined in the Restructuring Support Agreement). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement.

The Debtors expect to implement the Restructuring Transactions through the commencement of voluntary cases (the "<u>Chapter 11 Cases</u>") under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder, the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of Texas (together with any court with jurisdiction over such cases, the "<u>Bankruptcy Court</u>"). The Debtors have requested that certain holders of Unsecured Notes that are Consenting Parties and signatories hereto (individually, a "<u>Backstop Party</u>" and, collectively, the "<u>Backstop Parties</u>") "backstop" the Rights Offering contemplated by the Restructuring Support Agreement. The Restructuring Support Agreement, including the term sheet attached thereto as <u>Exhibit B</u> (the "<u>Term Sheet</u>") and incorporated as if fully set forth therein, sets forth the terms and conditions upon which the Backstop Parties are willing to "backstop" the Rights Offering.

This Commitment Letter (this "<u>Commitment Letter</u>") shall be effective upon (a) the execution and delivery by TES and each Backstop Party of the signature pages attached hereto and (b) the occurrence of the Support Effective Date.

1.    <u>Commitments</u>.

(a)    In connection with the Restructuring Transactions and pursuant to the Plan, among other things, the Company will conduct a rights offering (the "<u>Rights Offering</u>"), by distributing to each holder of Unsecured Notes (subject to eligibility requirements under applicable securities laws) rights to purchase ("<u>Subscription Rights</u>") new equity to be

issued pursuant to the Plan (the "New Equity") and available to be purchased in connection with the Rights Offering, and in an amount consistent with the Term Sheet.

(b)    Subject to the terms and conditions set forth herein and in the Term Sheet, each Backstop Party set forth in **Schedule I** hereto hereby severally, and not jointly, commits to purchase, on the Plan Effective Date, the aggregate amount of New Equity that has not been subscribed for and purchased (if any) in the Rights Offering on the terms set forth in the Term Sheet equal to the percentage set forth opposite the name of such Backstop Party on **Schedule I** (as to each Backstop Party at the applicable date of determination, its "Backstop Commitment Percentage") (each such commitment, a "Commitment" and collectively, the "Commitments").

(c)    The Rights Offering will be made, and the New Equity issued thereunder will be issued and sold in reliance upon, the exemption from registration under the Securities Act of 1933 (the "Securities Act") provided in section 1145 of the Bankruptcy Code or, if not available, an exemption from registration provided by section 4(a)(2) and Regulation D of the Securities Act or another available exemption from registration under the Securities Act; *provided*, that, all New Equity issued to the Backstop Parties on account of the Backstop Commitments will be made in reliance on the exemption from registration provided by section 4(a)(2) and Regulation D of the Securities Act or another available exemption from registration under the Securities Act, and, in each case, the Disclosure Statement, Confirmation Order and Plan shall include a statement to such effect; *provided, further*, that any New Equity issued pursuant to the Put Premium shall be issued and sold in reliance upon, the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code or, if not available, an exemption from registration provided by section 4(a)(2) and Regulation D of the Securities Act or another available exemption from registration under the Securities Act.  For the avoidance of doubt, in no event shall any Backstop Party be required to purchase New Equity in excess of the amount equal to its Backstop Commitment Percentage (subject to the satisfaction of its obligations under Section 1(d) hereof).  The Backstop Parties, and by countersigning this Commitment Letter, the Debtors, hereby, severally and not jointly, agree to cooperate and negotiate in good faith the terms and conditions of the New Equity issued to the Backstop Parties and the documents and agreements governing the procedures and arrangements for the Rights Offering, including, without limitation, the Rights Offering Procedures, which shall be in form and substance reasonably acceptable to the Requisite Backstop Commitment Parties.

(d)    Subject to the terms and conditions set forth herein and the Rights Offering Procedures, each Backstop Party agrees, severally and not jointly, to (i) fully exercise all rights issued to it and its Affiliates to purchase New Equity pursuant to the Rights Offering at the applicable per share price, (ii) duly purchase all New Equity issuable to it and its Affiliates pursuant to such exercise (the "Subscription Amount") at the applicable per share price, and (iii) complete, duly execute and submit a subscription exercise form and any other documentation required pursuant to the Rights Offering Procedures and the Plan.

WEIL:\98611384\23\76974.0003

2.  <u>Termination</u>.

This Commitment Letter shall terminate (A) automatically, without further action or notice by any person or entity, if the Restructuring Support Agreement is terminated pursuant to the terms thereof or (B) upon written notice from (x) the Requisite Backstop Parties to TES or (y) TES to the Backstop Parties, (i) if the Bankruptcy Court fails to enter the Backstop Approval Order, which order shall be in form and substance acceptable to Requisite Backstop Parties, by 130 days following the Petition Date, (ii) if the Plan Effective Date does not occur by the date that is twelve months after the Petition Date (the "<u>Termination Date</u>"); provided that the Debtors may extend the Termination Date by six (6) months to the extent that the only unsatisfied condition precedent to the occurrence of the Plan Effective Date is obtaining required regulatory approval, or (iii) (a) if any of the Backstop Approval Order, the order approving the Disclosure Statement, or the Confirmation Order is terminated, reversed, stayed, dismissed, vacated or reconsidered, or any such order is modified or amended after entry without the prior written consent of the Requisite Backstop Commitment Parties, (b) (x) by the Requisite Commitment Parties, if any Debtor has committed a material breach of this Commitment Letter affecting the Commitments, which breach remains uncured and outstanding for a period of ten (10) business days after notice by the Requisite Backstop Commitment Parties or (y) by TES, if any Backstop Commitment Party has committed a material breach of this Commitment Letter, which breach remains uncured and outstanding for a period of ten (10) business days after notice by the Debtors, or (c) if any law or order shall have become effective or been enacted, adopted or issued by any governmental authority that prohibits the implementation of the Plan or the transactions contemplated by this Commitment Letter or the Restructuring Support Agreement.   Additionally, this Commitment Letter may be terminated and the transactions contemplated hereby may be abandoned at any time by mutual written consent of the Debtors and the Requisite Backstop Parties or by the Debtors at their election.   Upon any termination pursuant to the terms herein, this Commitment Letter shall forthwith become void and there shall be no further obligations or liabilities on the part of the Debtors or the Backstop Parties; *provided* that the Debtors' obligations to pay the Put Premium (as defined below) and their reimbursement obligations pursuant to the Restructuring Support Agreement and Section 3 hereof and the indemnification obligations pursuant to Section 4 hereof shall survive the termination of this Commitment Letter indefinitely and shall remain in full force and effect.

3.  <u>Put Premium</u>.

Whether or not the transactions contemplated hereunder are consummated or this Commitment Letter is terminated, the Debtors shall (a) pay to each Backstop Party the premium in the amount set forth in, and calculated in accordance with, the Term Sheet (under the heading "Rights Offering") (the "<u>Put Premium</u>") (which shall be paid in accordance with the Term Sheet), and (b) shall reimburse certain reasonable and documented fees and expenses of the Backstop Parties and Consenting Parties set forth under "Transaction Expenses" in the Restructuring Support Agreement.   If the Put Premium becomes payable as a result of the termination of this Commitment Letter due to certain termination events that customarily trigger the Alternative Transaction Premium (as described in the Term Sheet), the Debtors shall pay the Alternative Transaction

3

Premium as described in the Term Sheet. If the Alternative Transaction Premium becomes payable due to the Debtors exercising a Fiduciary Out or pursuing an Alternative Transaction, the Put Premium shall be paid upon the earlier of (a) promptly following such termination, [to the extent that there is availability under the DIP budget given minimum liquidity constraints, or (b) at such later time as is permitted under the DIP budget][1]; provided that the Put Premium shall be paid upon consummation of an Alternative Restructuring if it has not previously been paid.  Upon entry of the Backstop Approval Order, such premiums and reimbursements will be fully earned and, once paid, to the extent permitted by applicable law, shall not be refundable under any circumstances; *provided* that nothing herein limits the Debtors' rights with respect to the Put Premium paid to any Backstop Party in the event of a breach by such Backstop Party of its obligations under this Commitment Letter and the Restructuring Support Agreement.  The provision for the payment of such premiums and reimbursements is an integral part of the transactions contemplated by this Commitment Letter and, without this provision, the Backstop Parties would not have entered into this Commitment Letter, and any unpaid premiums or reimbursements are intended to constitute an allowed administrative expense of the Debtors under sections 503(b) and 507 of the Bankruptcy Code.  If this Commitment Letter is terminated, nothing contained herein shall limit or restrict the Backstop Parties from seeking allowance and payment of any such unpaid premiums or reimbursements as administrative expenses of the Debtors' estates under the Bankruptcy Code, including under sections 503(b) and 507 thereof.  The terms set forth in this Section 3 shall survive termination of this Commitment Letter and shall remain in full force and effect regardless of whether the transactions contemplated hereby are consummated.

4.  <u>Indemnification</u>.

(a)  If following the date of this Commitment Letter any action, suit or proceeding (related to or arising from this Commitment Letter, the Restructuring Support Agreement or the transactions contemplated hereby or thereby), claim, challenge, litigation or investigation relating to any of the foregoing shall be commenced against, or any claim or demand (related to or arising from this Commitment Letter, the Restructuring Support Agreement or the transactions contemplated hereby or thereby) shall be asserted against any of the Backstop Parties, then the Debtors, together with their respective successors and assigns (each, an "<u>Indemnifying Party</u>"), on a joint and several basis, shall indemnify, defend and hold harmless each Backstop Party and each of such Backstop Party's affiliates and each of their respective officers, directors, managers, partners, stockholders, members, employees, advisors, agents and other representatives and any affiliate of the foregoing, and each of their respective successors and assigns (each, an "<u>Indemnified Party</u>") from and against, and shall promptly reimburse each Indemnified Party for, all losses, damages, liabilities and reasonable and documented costs and expenses, including, without limitation, reasonable and documented out-of-pocket attorneys' fees and expenses and, solely in the case of a conflict of interest, one additional counsel in each applicable jurisdiction to each group of affected Indemnified Parties similarly situated, taken as a whole; arising or resulting from or in connection with any such action, suit or proceeding by a third-party (collectively, "<u>Indemnified Liabilities</u>"); *provided* that Indemnified

---

[1]   NTD: Details of DIP compliance to be finalized prior to execution of this Commitment Letter.

4

Liabilities shall exclude any losses, damages, liabilities, costs or expenses found by a final, non-appealable judgment of a court of competent jurisdiction to arise from an Indemnified Party's gross negligence, bad faith, fraud or a material breach of the obligations of such Indemnified Party under this Commitment Letter or the Restructuring Support Agreement. In addition, the Indemnified Liabilities shall exclude any claim by one Backstop Party against another Backstop Party.

(b)      Each Indemnified Party entitled to indemnification hereunder shall (i) give prompt written notice to the Indemnifying Party of any claim with respect to which it intends to seek indemnification or contribution pursuant to this Commitment Letter and (ii) permit such Indemnifying Party to assume the defense of such claim with counsel selected by the Indemnified Party and reasonably satisfactory to the Indemnifying Party, *provided* that the failure to so notify any Indemnifying Party will not relieve any Indemnifying Party from any liability that any Indemnifying Party may have hereunder except to the extent such Indemnifying Party has been materially prejudiced by such failure; *provided, further*, that any Indemnified Party entitled to indemnification hereunder shall have the right to employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Indemnifying Party has agreed in writing to pay such fees and expenses, (y) the Indemnifying Party shall have failed to assume the defense of such claim within a reasonable time following delivery of the written notice of the Indemnified Party with respect to such claim or failed to employ counsel reasonably satisfactory to such Indemnified Party or (z) in the reasonable judgment of such Indemnified Party, based upon advice of its counsel, a conflict of interest may exist between such Indemnified Party and the Indemnifying Party with respect to such claim (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such claim on behalf of such Indemnified Party). In connection with any settlement negotiated by an Indemnifying Party, no Indemnifying Party shall, and no Indemnified Party shall be required by an Indemnifying Party to, (i) enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Party of a full and unconditional release from all liability in respect to such claim or litigation, (ii) enter into any settlement that attributes or admits liability or fault to the Indemnified Party, or (iii) consent to the entry of any judgment that does not include as a term thereof a full dismissal of the litigation or proceeding with prejudice. In addition, without the consent of the Indemnified Party, no Indemnifying Party shall be permitted to consent to entry of any judgment or enter into any settlement which provides for any action or restriction on the part of the Indemnified Party other than the payment of money damages which are to be paid in full by the Indemnifying Party. If an Indemnifying Party fails or elects not to assume the defense of a claim or is not entitled to assume or continue the defense of such claim pursuant to the foregoing, the Indemnified Party shall have the right (without prejudice to its right of indemnification hereunder), in its discretion, to contest, defend and litigate such claim and may settle such claim, either before or after the initiation of litigation, at such time and upon such terms as the Indemnified Party deems fair and reasonable; *provided, however*, that at least ten days prior to any settlement, written notice of its intention to settle is given to the Indemnifying Party. If requested by the Indemnifying Party, the Indemnified Party agrees (at the expense

5

of the Indemnifying Party) to reasonably cooperate with the Indemnifying Party and its counsel in contesting any claim that the Indemnifying Party elects to contest; *provided* that such cooperation shall not include the provision of any information to the extent that the provision thereof would violate any attorney-client privilege, law, rule or regulation, or any obligation of confidentiality binding on such Indemnified Party.  If such indemnification is for any reason not available or is insufficient to hold an Indemnified Party harmless, each Indemnifying Party agrees to contribute to the Indemnified Liabilities to which the Indemnified Party may be subject in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by each Indemnifying Party and each Indemnified Party with respect to the Commitments or, if such allocation is judicially determined to be unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of each Indemnifying Party on the one hand and of each Indemnified Party on the other hand; *provided*, *however*, that, to the extent permitted by applicable law, an Indemnified Party shall not be responsible for amounts which in the aggregate are in excess of the amount of all premiums and reimbursements actually received by the Indemnified Party from the Indemnifying Party in connection with the Commitments.  Relative benefits to an Indemnifying Party, on the one hand, and an Indemnified Party, on the other hand, with respect to the Commitments shall be deemed to be in the same proportion as (i) the total value paid or received or proposed to be paid or received by the Indemnifying Party pursuant to the issuance and sale of the New Equity contemplated by this Commitment Letter bears to (ii) all premiums and reimbursements actually received by the Indemnified Parties in connection with the Commitments.  The terms set forth in this Section 4 shall survive termination of this Commitment Letter and shall remain in full force and effect regardless of whether the transactions contemplated hereby are consummated.

5.  <u>Information</u>.

The Debtors hereby represent and warrant that any forecasts or projections that have been or will be made available to the Backstop Parties by or on behalf of the Debtors or any of their respective  representatives have been or will be prepared in good faith based upon assumptions that are believed by the Debtors to be reasonable at the time any such forecasts or projections are delivered to the Backstop Parties; it being understood that any such forecasts and projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the Debtors' control, that no assurance can be given that any particular forecasts or projections will be realized, that actual results may differ significantly from the projected results and that such differences may be material.

6.   <u>Conditions to the Obligations of the Backstop Parties</u>.

The obligation of the Backstop Parties to consummate the funding obligations under this Commitment Letter shall be subject to the satisfaction of each of the following conditions precedent:

a.   <u>Exit Liquidity</u>.  The liquidity of the Reorganized Company as of the Plan Effective Date shall be no less than Minimum Liquidity and satisfy Minimum LC Capacity as set forth in the Term Sheet.

b.   <u>Net Debt</u>. The net debt of the Reorganized Company as of the Plan Effective Date shall be as set forth in the Term Sheet.

c.   <u>Exit Financing</u>.  The Exit Facility Documents, including a revolving credit facility and letter of credit facility (if not incorporated within the revolving credit facility), shall be acceptable to the Requisite Backstop Parties.

d.   <u>Agreements</u>.  Each of the Restructuring Support Agreement and this Commitment Letter shall remain in full force and effect and shall not have been terminated prior to the Plan Effective  Date and the Debtors shall not have committed a material breach of their obligations thereunder, which  material breach remains uncured and outstanding.

e.   <u>Backstop Approval Order</u>.  The Bankruptcy Court shall have entered the Backstop Approval Order in form and substance satisfactory to the Requisite Backstop Commitment Parties.

f.   <u>Confirmation Order</u>.  The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Requisite Backstop Commitment Parties.

g.   <u>No Termination</u>.  The Backstop Approval Order, or the  Confirmation Order shall not have been terminated, reversed, stayed, dismissed,  vacated or reconsidered, and no such order shall have been modified or amended in a manner adverse to the Backstop Parties after entry without the prior written consent of the Requisite Backstop Commitment Parties.

h.   <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with the Rights Offering Documents, and the Rights Offering shall have expired in accordance with the terms of the Rights Offering Procedures.

i.   <u>Covenants</u>.  Each of the Debtors shall have performed and complied, in all material respects, with all of its respective covenants and agreements contained in this Commitment Letter that contemplate, by their terms, performance or compliance prior to the Plan Effective Date.

7

j.  <u>No Material Adverse Effect</u>.  Since the date of this Commitment Letter, there shall not have been a Material Adverse Effect.  "<u>Material Adverse Effect</u>" shall mean any event, change, effect, circumstance, occurrence, development, condition, result, state of facts or change of facts ("<u>Event</u>") occurring after the date hereof that, individually or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (i) the Company's ability to implement the Restructuring Transactions or (ii) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of the Debtors, taken as a whole; except, for purposes of clause (ii), to the extent that such Event results from, arises out of, or is attributable to, the following (either alone or in combination): (a) any change in global, national, or regional political conditions (including, without limitation, civil unrest, riots, hostilities, acts of war, sabotage, terrorism (including, without limitation, any cyberattack) or military actions or any escalation or material worsening of any such actions), (b) any change in global, national or regional financial or economic conditions affecting the industries, regions or markets in which the Debtors operate, including, without limitation, any change in the United States or applicable foreign economies or securities, commodities or financial markets (including, without limitation, any changes or developments in prices for oil, natural gas, or other commodities or power prices), (c) any changes in the market price or trading volume of the claims or debt or equity securities of the Company or any other Debtor, (d) any act of God or other calamity or force majeure event (whether or not declared as such), including, without limitation, any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado or other weather event, epidemic, pandemic, disease outbreak (including, without limitation, COVID-19, SARS-CoV-2 virus or any mutation or variation thereof), (e) any changes after the date hereof in applicable law or GAAP or the interpretation or enforcement thereof, (f) the filing or pendency of the Chapter 11 Cases, or (g) any matters disclosed in any first day pleadings or declarations to the extent made available to the Backstop Parties prior to the date hereof; provided, that exceptions set forth in clauses (a), (b), (c), (d), and (e) of this definition shall not apply to the extent that such Event is disproportionately adverse to the Debtors, taken as a whole, as compared to other companies operating in the industries or participating in the markets in which the Debtors operate or participate, as applicable.

k.  <u>Put Premium</u>.  The Debtors shall have paid the applicable Put Premium and shall have paid, or substantially concurrently with the occurrence of the Plan Effective Date will pay, all fees and expenses of the Backstop Parties required to be paid pursuant to Section 3 of this Commitment Letter and the Restructuring Support Agreement.

l.  <u>Antitrust Approvals</u>.  All waiting periods imposed by any antitrust authority in connection with the transactions contemplated by this Commitment Letter shall have terminated or expired and all authorizations, approvals, consents or clearances under the applicable antitrust laws in connection with the transactions contemplated by this Commitment Letter shall have been obtained.

8

m. <u>Other Governmental Approvals</u>.  All other governmental and regulatory approvals or authorizations necessary for the occurrence of the Plan Effective Date shall have been obtained and any required governmental and regulatory filings shall have been made, to the extent the failure to obtain such approvals or authorizations or to make such governmental and regulatory filings would reasonably be expected to result in a Material Adverse Effect on the Debtors (taken as a whole), and no law or order shall have become effective or been enacted, adopted or issued by any governmental authority that prohibits the implementation of the Plan or the transactions contemplated by this Commitment Letter or the Restructuring Support Agreement.

7. <u>Transfer and Assignment; Third Party Beneficiaries</u>.

No Debtor may assign its rights, interests or obligations hereunder without the prior written consent of the Requisite Backstop Commitment Parties and any purported assignment by the Debtors in violation of this Section 7 shall be void *ab initio*.  The Backstop Parties may assign their respective Commitments hereunder to (a) any of their respective affiliates so long as (i) such affiliate is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act and (ii) such affiliate shall have delivered a duly executed joinder to the Restructuring Support Agreement, (b) any other Backstop Party, or (c) to any other party with the prior written consent of the Debtors and the Requisite Backstop Commitment Parties so long as (i) such party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act and (ii) such party shall have delivered a duly executed joinder to the Restructuring Support Agreement.

Except as provided in Section 4 hereof with respect to the Indemnified Parties, this Commitment Letter is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Commitment Letter.

8. <u>Governing Law; Jurisdiction</u>.

This Commitment Letter shall be governed and construed in accordance with the laws of the State of New York.  The parties hereto consent and agree that any action to enforce this Commitment Letter or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Commitment Letter and the agreements, instruments and documents contemplated hereby and thereby shall be brought exclusively in the Bankruptcy Court, or if the Chapter 11 Cases have not yet commenced, in either the United States District Court for the Southern District of New York or any New York state court in the Borough of Manhattan (the "<u>Chosen Courts</u>").   Each of the parties hereto (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto or constitutional authority to finally adjudicate the matter.

Without limiting the rights of any party hereto, each party acknowledges and agrees that the Debtors are entitled to seek damages from any Backstop Party that breaches its obligations under this Commitment Letter; *provided* that each party hereto hereby waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding any special, exemplary, punitive or consequential damages. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS COMMITMENT LETTER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

9. <u>Amendments</u>.

This Commitment Letter and the Restructuring Support Agreement represent the final agreement and the entire understanding among the parties hereto with respect to the subject matter hereof and may not be contradicted by evidence of prior or contemporaneous agreements and understandings of the parties hereto. There are no unwritten oral agreements or understandings between the parties hereto relating to the subject matter hereof. This Commitment Letter may only be modified, amended, or supplemented by an agreement signed by the Debtors and the Requisite Backstop Commitment Parties; *provided*, that (a) the prior written consent of each Backstop Party adversely affected thereby shall be required for any amendment that would (i) modify such Backstop Party's Backstop Commitment Percentage, (ii) have an adverse and disproportionate effect on such Backstop Party, (iii) alter the pricing or duration terms set forth in the Term Sheet and/or this Commitment Letter, or (iv) modify such Backstop Party's Backstop Commitment Percentage; (b) each Backstop Party's prior written consent shall be required for any amendment that would increase its or the aggregate Commitment amount; and (c) each Backstop Party's prior written consent shall be required to amend the definition of "Requisite Backstop Commitment Parties" or to amend this Section 9. Notwithstanding the foregoing, **Schedule I** shall be revised as necessary without requiring a written instrument signed by the Debtors and the Requisite Backstop Commitment Parties to reflect changes in the composition of the Backstop Parties and Backstop Commitment Percentages as a result of transfers permitted hereby.

10. <u>Counterparts</u>.

This Commitment Letter may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to each other party (including via facsimile, portable document format (.pdf) or other electronic transmission), it being understood that each party need not sign the same counterpart.

11. <u>No Fiduciary Duties</u>.

Notwithstanding anything to the contrary herein, the entry into this Commitment Letter and the transactions contemplated hereby shall not create any fiduciary duties between and among the Backstop Parties or other duties or responsibilities to each other, the Debtors or any Debtor's creditors or other stakeholders.

10

12. <u>Antitrust Approval</u>.

(a)     Each of the Debtors and the Backstop Parties agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Commitment Letter, the Plan and the other Definitive Documents, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "<u>HSR Act</u>") with respect to the transactions contemplated by this Commitment Letter with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any other Antitrust Authority, any drafts thereof) under any other antitrust laws that are necessary to consummate and make effective the transactions contemplated by this Commitment Letter as soon as reasonably practicable and no later than fifteen (15) business days following the date of entry of the Backstop Approval Order and (ii) promptly furnishing documents or information reasonably requested by any Antitrust Authority and supplying to any governmental entity as promptly as practicable any additional information or documents that may be requested by such governmental entity or pursuant to any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any governmental entity and taking, or cause to be taken, all other actions and doing, or causing to be done, all other things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Commitment Letter. "<u>Antitrust Authorities</u>" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other governmental entity having jurisdiction pursuant to the antitrust laws, and "<u>Antitrust Authority</u>" means any one of them.

(b)     The Company and each Backstop Party subject to an obligation pursuant to applicable antitrust laws to notify any transaction contemplated by this Commitment Letter, the Plan or the other Definitive Documents that has notified the Company in writing of such obligation (each such Backstop Party, a "<u>Filing Party</u>") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content.  The Company and each Filing Party shall, to the extent permitted by applicable Law:  (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally of) any communications from or with an Antitrust Authority; (ii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all correspondence and communications between such Filing Party or the Company and the Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary or desirable in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (v) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Requisite Backstop Parties and the Company.

11

(c)     Should a Filing Party be subject to an obligation under antitrust laws to jointly notify with one or more other Filing Parties (each, a "Joint Filing Party") any transaction contemplated by this Commitment Letter, the Plan or the other Definitive Documents, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

(d)     The Company and each Filing Party shall use their commercially reasonable efforts to obtain all authorizations, approvals, consents, or clearances under any applicable antitrust laws or to cause the termination or expiration of all applicable waiting periods under any antitrust laws in connection with the transactions contemplated by this Commitment Letter at the earliest possible date after the date of filing.    The communications contemplated by this Section 12 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.   The obligations in this Section 12 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Commitment Letter, the Plan or the other Definitive Documents.

13.    Funding Default.

(a)     Upon the occurrence of the failure by any Backstop Party to pay the applicable purchase price in respect of its Commitment (the "Funding Amount" and such failure, a "Funding Default"), the Backstop Parties (other than any Backstop Party that causes a Funding Default ("a "Defaulting Backstop Party")) shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all Backstop Parties of such Funding Default, which notice shall be given promptly following the occurrence of such Funding Default (such five (5) Business Day period, the "Replacement Period"), to elect, by written notice to the Company, to purchase all or any portion of the New Equity attributable to such Defaulting Backstop Party's Commitment (such purchase, a "Replacement Purchase") on the terms and subject to the conditions set forth in this Commitment Letter and in such amounts as may be agreed upon by all of the non-defaulting Backstop Parties that elect to purchase all or any portion of the New Equity attributable to such Defaulting Backstop Party, or, if no such agreement is reached by the date upon which the Replacement Period expires, based upon each such electing Backstop Party's Backstop Commitment Percentage of the aggregate amount of New Equity that has not been purchased as a result of such Funding Default (such Backstop Parties, the "Replacing Backstop Parties").   The purchase price paid by any Replacing Backstop Party in connection with a Replacement Purchase shall be equal to the applicable purchase price in respect of such Defaulting Backstop Party's Commitment.

(b)     If a Backstop Party is a Defaulting Backstop Party, or is otherwise in breach of its obligations hereunder, it shall not be entitled to any of the Put Premium hereunder.

(c)     Nothing in this Commitment Letter shall require any Backstop Party to fund more than its Backstop Commitment; *provided* that if a Backstop Party makes an election to cover a Defaulting Backstop Party, such election shall be binding, and failure to fund

12

any such cover amount in accordance with this Section 13 shall constitute a Funding Default; *provided* that, for the avoidance of doubt, this Section 13(c) shall not be deemed to limit any Backstop Party's obligations under Section 1(d).

(d)        Notwithstanding anything to the contrary set forth in Section 2 but subject to Section 8, no provision of this Agreement shall relieve any Defaulting Backstop Party from liability hereunder, or limit the availability of the remedies available to the non-defaulting parties hereto, in connection with any such Backstop Party's Funding Default.

(e)        Promptly, and in any case no later than two (2) business days following a Funding Default, each Defaulting Backstop Party shall return to TES (a) any portion of the Put Premium previously paid to it and (b) any fees and expenses for which it has received reimbursement pursuant to the Restructuring Support Agreement.

[*Signature Pages Follow*]

13

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**TALEN ENERGY SUPPLY, LLC**


By: _____
      Name:
      Title:


**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

[Debtors to provide appropriate signature block(s)]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

[Backstop Party signature pages to be updated]

*[Signature pages to Commitment Letter]*

## SCHEDULE I

Backstop Percentages

| Backstop Party | Backstop Commitment Percentage |
|---|---|
| [TO COME] | [TO COME] |
|  |  |
|  |  |
|  |  |
|  |  |

**<u>Exhibit D</u>**

**Joinder**

**FORM OF JOINDER AGREEMENT FOR CONSENTING PARTIES**

This joinder agreement to the *Restructuring Support Agreement*, dated as of [_____], 2022 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**"), between the Company and the Consenting Parties, each as defined in the Agreement, is executed and delivered by _____ (the "**Joining Party**") as of _____, 2022.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

2.  <u>Effectiveness</u>.  Upon (i) delivery of a signature page for this joinder and (ii) written acknowledgement by the Company, the Joining Party shall hereafter be deemed to be a "Subsequent Consenting Party" and a "Party" for all purposes under the Agreement and with respect to any and all Claims and Interests held by such Joining Party.

3.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Claims and Interests set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Parties, as set forth in <u>Section 7</u> of the Agreement to each other Party to the Agreement.

4.  <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Joining Party has caused this joinder to be executed as of the date first written above.

**[JOINING PARTY]**


By:_____
Name:
Title:


Principal Amount of the RCF LCs: $_____
Principal Amount of the CAF Loans: $_____
Principal Amount of the Term Loans: $_____
Principal Amount of 2027 Secured Notes due 2027: $_____
Principal Amount of 6.625% 2028 Secured Notes: $_____
Principal Amount of 7.625% 2028 Secured Notes: $_____
Principal Amount of 9.500% Senior Notes due 2022: $_____
Principal Amount of 6.500% Senior Notes due 2024: $_____
Principal Amount of 6.500% Senior Notes due 2025: $_____
Principal Amount of 10.500% Senior Notes due 2026: $_____
Principal Amount of 7.000% Senior Notes due 2027: $_____
Principal Amount of 6.000% Senior Notes due 2036: $_____
Existing Equity Interests: _____
Other (please describe): _____

Notice Address:


_____
_____
_____
Fax: _____
Attention: _____
Email: _____

Acknowledged:

**TALEN ENERGY SUPPLY, LLC**
**(on behalf of the Company)**

By:_____
Name:
Title:

*[Signature Page to Joinder to Restructuring Support Agreement]*