**<u>Exhibit B</u>**

**Backstop Commitment Letter**

*Execution Version*

May 31, 2022

<u>CONFIDENTIAL</u>

Talen Energy Supply, LLC
1780 Hughes Landing Boulevard, Suite 800
The Woodlands, Texas 77380
Attention:     Len LoBiondo, Executive Vice President, Restructuring
                    John Chesser, CFO
                    Andrew Wright, General Counsel

**Commitment Letter**

Gentlemen:

Reference is made to that certain Restructuring Support Agreement, dated as of May 9, 2022 (including any exhibits and schedules thereto, the "<u>Restructuring Support Agreement</u>"), by and among Talen Energy Supply, LLC (now and as it may be reorganized under a joint chapter 11 plan of reorganization (the "<u>Plan</u>"), "<u>TES</u>" and collectively with certain direct and indirect subsidiaries of TES set forth on <u>Exhibit A</u> to the Restructuring Support Agreement, the "<u>Debtors</u>") and certain holders of notes issued pursuant to the Unsecured Notes Indentures (as defined in the Restructuring Support Agreement). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement.

The Debtors expect to implement the Restructuring Transactions through the commencement of voluntary cases (the "<u>Chapter 11 Cases</u>") under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder, the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of Texas (together with any court with jurisdiction over such cases, the "<u>Bankruptcy Court</u>").  The Debtors have requested that certain holders of Unsecured Notes that are Consenting Parties and signatories hereto (individually, a "<u>Backstop Party</u>" and, collectively, the "<u>Backstop Parties</u>") "backstop" the Rights Offering contemplated by the Restructuring Support Agreement.  The Restructuring Support Agreement, including the term sheet attached thereto as <u>Exhibit B</u> (the "<u>Term Sheet</u>") and incorporated as if fully set forth therein, sets forth the terms and conditions upon which the Backstop Parties are willing to "backstop" the Rights Offering.

This Commitment Letter (this "<u>Commitment Letter</u>") shall be effective upon (a) the execution and delivery by TES and each Backstop Party of the signature pages attached hereto and (b) the occurrence of the Support Effective Date.

1.   <u>Commitments</u>.

(a)     In connection with the Restructuring Transactions and pursuant to the Plan, among other things, the Company will conduct a rights offering (the "<u>Rights Offering</u>"), by distributing to each holder of Unsecured Notes (subject to eligibility requirements under applicable securities laws) rights to purchase ("<u>Subscription Rights</u>") new equity to be

issued pursuant to the Plan (the "New Equity") and available to be purchased in connection with the Rights Offering, and in an amount consistent with the Term Sheet. For the avoidance of doubt, Subscription Rights to purchase 30% of the New Equity shall be allocated to the Backstop Parties on a *pro rata* basis on account of, and as part of the consideration for, the Commitments (as defined below).

(b)     Subject to the terms and conditions set forth herein and in the Term Sheet, each Backstop Party set forth in **Schedule I** hereto hereby severally, and not jointly, commits to purchase, on the Plan Effective Date, the aggregate amount of New Equity that has not been subscribed for and purchased (if any) in the Rights Offering on the terms set forth in the Term Sheet equal to the percentage set forth opposite the name of such Backstop Party on **Schedule I** (as to each Backstop Party at the applicable date of determination, its "Backstop Commitment Percentage") (each such commitment, a "Commitment" and collectively, the "Commitments"). The Rights Offering Procedures shall provide that the each Backstop Party shall receive no less than seven (7) business days' notice of its respective amount of New Equity to be purchased pursuant to this paragraph 1(b) and no less than twenty (20) days' notice of the anticipated funding date.

(c)     The Rights Offering will be made, and the New Equity issued thereunder will be issued and sold in reliance upon, the exemption from registration under the Securities Act of 1933 (the "Securities Act") provided in section 1145 of the Bankruptcy Code or, if not available, an exemption from registration provided by section 4(a)(2) and Regulation D of the Securities Act or another available exemption from registration under the Securities Act; *provided*, that, all New Equity issued to the Backstop Parties on account of the Backstop Commitments will be made in reliance on the exemption from registration provided by section 4(a)(2) and Regulation D of the Securities Act or another available exemption from registration under the Securities Act, and, in each case, the Disclosure Statement, Confirmation Order and Plan shall include a statement to such effect; *provided, further*, that any New Equity issued pursuant to the Put Premium shall be issued and sold in reliance upon, the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code or, if not available, an exemption from registration provided by section 4(a)(2) and Regulation D of the Securities Act or another available exemption from registration under the Securities Act. For the avoidance of doubt, in no event shall any Backstop Party be required to purchase New Equity in excess of the amount equal to its Backstop Commitment Percentage (subject to the satisfaction of its obligations under Section 1(d) hereof). The Backstop Parties, and by countersigning this Commitment Letter, the Debtors, hereby, severally and not jointly, agree to cooperate and negotiate in good faith the terms and conditions of the New Equity issued to the Backstop Parties and the documents and agreements governing the procedures and arrangements for the Rights Offering, including, without limitation, the Rights Offering Procedures, which shall be in form and substance reasonably acceptable to the Requisite Backstop Commitment Parties.

(d)     Subject to the terms and conditions set forth herein and the Rights Offering Procedures, each Backstop Party agrees, severally and not jointly, to (i) fully exercise all rights issued to it and its affiliates to purchase New Equity pursuant to the Rights Offering at the applicable per share price, (ii) duly purchase all New Equity issuable to it and its affiliates pursuant to such exercise (the "Subscription Amount") at the applicable per share

price, and (iii) complete, duly execute and submit a subscription exercise form and any other documentation required pursuant to the Rights Offering Procedures and the Plan.

2. <u>Termination</u>.

This Commitment Letter shall terminate (A) automatically, without further action or notice by any person or entity, if the Restructuring Support Agreement is terminated pursuant to the terms thereof, (B) upon written notice from (x) the Requisite Backstop Commitment Parties to TES or (y) TES to the Backstop Parties, (i) if the Bankruptcy Court fails to enter the Backstop Approval Order, which order shall be in form and substance acceptable to Requisite Backstop Commitment Parties, by 130 days following the Petition Date, or (ii) (a) if any of the Backstop Approval Order, the order approving the Disclosure Statement, or the Confirmation Order is terminated, reversed, stayed, dismissed, vacated or reconsidered, or any such order is modified or amended after entry without the prior written consent of the Requisite Backstop Commitment Parties, (b) (x) by the Requisite Commitment Parties, if any Debtor has committed a material breach of this Commitment Letter affecting the Commitments, which breach remains uncured and outstanding for a period of ten (10) business days after notice by the Requisite Backstop Commitment Parties or (y) by TES, if any Backstop Party has committed a material breach of this Commitment Letter, which breach remains uncured and outstanding for a period of ten (10) business days after notice by the Debtors, or (c) if any law or order shall have become effective or been enacted, adopted or issued by any governmental authority that prohibits the implementation of the Plan or the transactions contemplated by this Commitment Letter or the Restructuring Support Agreement, (C) upon written notice from TES to the Backstop Parties if the Plan Effective Date does not occur by the date that is twelve months after the Petition Date (the "<u>Termination Date</u>"), (D) solely as to a Backstop Party, by such Backstop Party to TES and the other Backstop Parties if the Plan Effective Date does not occur by the Termination Date; *provided* that the Debtors or the Requisite Backstop Commitment Parties may extend the Termination Date by six (6) months to the extent that the only unsatisfied condition precedent to the occurrence of the Plan Effective Date is obtaining required regulatory approvals, or (E) upon written notice from the Requisite Backstop Commitment Parties to TES, if the Bankruptcy Court fails to enter the Backstop Approval Order within sixty (60) days of the date hereof (the "<u>Backstop Order Milestone</u>"). Additionally, this Commitment Letter may be terminated and the transactions contemplated hereby may be abandoned at any time by mutual written consent of the Debtors and the Requisite Backstop Commitment Parties or by the Debtors at their election. Upon any termination pursuant to the terms herein, this Commitment Letter shall forthwith become void and there shall be no further obligations or liabilities on the part of the Debtors or the Backstop Parties; *provided* that the Debtors' obligations to pay the Put Premium (as defined below) and their reimbursement obligations pursuant to the Restructuring Support Agreement and Section 3 hereof and the indemnification obligations pursuant to Section 4 hereof shall survive the termination of this Commitment Letter indefinitely and shall remain in full force and effect.

3. <u>Put Premium</u>.

Whether or not the transactions contemplated hereunder are consummated or this Commitment Letter is terminated, the Debtors shall (a) pay to each Backstop Party the premium in the amount set forth in, and calculated in accordance with, the Term Sheet (under the heading "Rights Offering") (the "<u>Put Premium</u>," or if the Commitment Letter is terminated, the "<u>Alternative Transaction Premium</u>") (which shall be paid in accordance with the Term Sheet), and (b) shall reimburse certain reasonable and documented fees and expenses of the Backstop Parties and Consenting Parties set forth under "Transaction Expenses" in the Restructuring Support Agreement.  However, in the event there is a termination of the Commitment Letter, the Alternative Transaction Premium shall not be due or payable if one or more of the following specified exceptions occur (each, a "<u>Specified Event</u>" and collectively, the "<u>Specified Events</u>"):

a. a Backstop Party individually has committed a material breach of the Commitment Letter (such party, the "<u>Breaching Party</u>"), which breach (the "<u>Individual Breach</u>") remains uncured and outstanding for a period of ten (10) business days after notice by the Debtors, solely as to such breaching Backstop Party; *provided* that the Alternative Transaction Premium shall not be due or payable to any Backstop Party, including the Breaching Party, where such Individual Breach results, following an opportunity for the other Backstop Parties to cure such Individual Breach, in an inability to consummate the transactions contemplated hereunder;

b. the Backstop Parties comprising the Requisite Backstop Commitment Parties collectively have committed a material breach of the Commitment Letter, which breach remains uncured and outstanding for a period of ten (10) business days after notice by the Debtors;

c. the Restructuring Support Agreement is terminated

i. by the Debtors (A) as a result of the occurrence of any of the events described in subsections 5.03(a), (d) (following the occurrence of a Specified Event, subject to any provisos thereto), (h), (i), or (k) thereof (to the extent such termination under subsection 5.03(k) occurs as a result of the identity, business, ownership, or conduct or any other fact or circumstance relating to any Consenting Party), or (B) due to a failure to meet any of the Milestones that was the result of a material breach of this Commitment Letter or the Restructuring Support Agreement by any Backstop Party or, if applicable, to the extent such failure to meet a Milestone occurs as a result of a governmental authority, including any regulatory authority or court of competent jurisdiction, issuing a ruling, judgment, or order enjoining the consummation or rendering illegal the Restructuring, or otherwise indicating that the consummation of the Restructuring shall not be approved, in each case as a result of the identity, business, ownership, or conduct or any other fact or circumstance relating to any Consenting Party, and such ruling, judgment, or order has not been reversed or vacated by the later of (x) the date on which the hearing to approve the Confirmation Order is scheduled to commence in the order approving the

Disclosure Statement or (y) ten (10) Business Days after the Debtors provide written notice to the Backstop Parties (the foregoing (x) and (y), as applicable, the "Governmental Authority Cure Deadline"), it being understood that nothing in this Commitment Letter shall require the Debtors to appeal any decision made by any governmental authority,

ii. pursuant to section 5.04 thereof, or

iii. by the Requisite Consenting Parties due to a failure to meet any of the Milestones;

*provided*, *however*, that, notwithstanding the foregoing, the Alternative Transaction Premium shall be due and payable if the Restructuring Support Agreement is terminated by any party due to a failure to meet Milestone 12 (occurrence of the Plan Effective Date), that was not the result of (x) a material breach of this Commitment Letter or the Restructuring Support Agreement by any Backstop Party or (y) a governmental authority, including any regulatory authority or court of competent jurisdiction, issuing a ruling, judgment, or order enjoining the consummation or rendering illegal the Restructuring, or otherwise indicating that the consummation of the Restructuring shall not be approved, in each case as a result of the identity, business, ownership, or conduct or any other fact or circumstance relating to any Consenting Party, and such ruling, judgment, or order has not been reversed or vacated by the Governmental Authority Cure Deadline; *provided further*, that half of the Alternative Transaction Premium shall be due and payable if the Restructuring Support Agreement is terminated by the Debtors due to a failure to meet Milestone 6 (agreement between the Debtors and the Requisite Backstop Commitment Parties on the terms of the Talen Global Settlement) or Milestone 7 (entry of the order approving the Disclosure Statement and the Backstop Approval Order), or if the Restructuring Support Agreement is terminated by the Requisite Consenting Parties due to a failure to meet Milestone 9 (entry of the Confirmation Order) and, in each case, such termination is not due to a material breach of this Commitment Letter or the Restructuring Support Agreement by any Backstop Party; *provided* that (1) the Debtors may extend Milestone 6 by no more than 30 days, in which case the subsequent milestones (other than Milestone 12), shall automatically extend by the same number of days and (2) regardless of whether the Debtors extend Milestone 6, the Debtors may extend Milestone 9 by up to a total of 45 days (inclusive of any extension pursuant to (1)), in each case (1) and (2) by written notice to the Backstop Parties;

d. this Commitment Letter is terminated pursuant to (i) section 2(C) hereof if such termination occurs as a result of (A) the identity, business, ownership, or conduct or any other fact or circumstance relating to any Backstop Party or (B) a material breach of this Commitment Letter or the Restructuring Support Agreement by any Backstop Party, or (ii) section 2(B)(ii)(c) hereof if such termination occurs as a result of a governmental authority, including any regulatory authority or court of competent jurisdiction, issuing a ruling, judgment, or order enjoining the consummation or rendering illegal the Restructuring, or otherwise indicating that the consummation of the Restructuring shall not be approved, in each case as a

result of the identity, business, ownership, or conduct or any other fact or circumstance relating to any Consenting Party, and such ruling, judgment, or order has not been reversed or vacated by the Governmental Authority Cure Deadline;

e. the Restructuring Support Agreement is terminated by the Requisite Consenting Parties pursuant to section 5.02(g) thereof (to the extent such termination occurs as a result of a governmental authority, including any regulatory authority or court of competent jurisdiction, issuing a ruling, judgment, or order enjoining the consummation or rendering illegal the Restructuring, or otherwise indicating that the consummation of the Restructuring shall not be approved, in each case as a result of the identity, business, ownership, or conduct or any other fact or circumstance relating to any Consenting Party, and such ruling, judgment, or order has not been reversed or vacated by the Governmental Authority Cure Deadline); or

f. this Commitment Letter is terminated by (x) the mutual written consent of the Debtors and the Requisite Backstop Commitment Parties, except as otherwise agreed by the Debtors and the Requisite Backstop Commitment Parties pursuant to such mutual written consent or (y) the Requisite Backstop Commitment Parties pursuant to section 2(E) hereof.

Subject to approval of this Commitment Letter and the terms hereof by the Bankruptcy Court, if the Alternative Transaction Premium becomes payable as a result of the termination of this Commitment Letter (other than following the occurrence of a Specified Event or as set forth otherwise in this paragraph), the Alternative Transaction Premium shall constitute an allowed administrative expense of the Debtors under sections 503(b) and 507 of the Bankruptcy Code without further notice to or action by the Bankruptcy Court or any party. If the Alternative Transaction Premium becomes payable due to the Debtors exercising a Fiduciary Out or pursuing an Alternative Transaction, the Alternative Transaction Premium shall be paid, as applicable, (a) promptly following such termination, if, following payment of any Alternative Transaction Premium, the Debtors' latest Cash Flow Forecast (as defined in the DIP Credit Agreement) projects that the Debtors' Liquidity (as defined in the DIP Credit Agreement) will at all times during the forecasted period exceed the sum of (x) the Minimum Liquidity Level (as defined in the Final DIP Order) and (y) any eligible Discretionary Interest Payments (as defined in the Final DIP Order) and then only if all such eligible Discretionary Interest Payments have been paid; (b) promptly following such termination, if an updated DIP Budget has been delivered pursuant to section 2.16(f) of the DIP Credit Agreement following confirmation of an Approved Plan, as permitted by such updated DIP Budget while remaining in compliance with all applicable covenants of the DIP Credit Agreement; or (c) promptly upon consummation of an Alternative Restructuring; *provided* that in all cases the Put Premium or the Alternative Transaction Premium, as applicable, shall be paid upon consummation of the Plan or an Alternative Restructuring, as applicable, to the extent it has not previously been paid. Upon entry of the Backstop Approval Order, such premiums and reimbursements will be fully earned, and, once paid, to the extent permitted by applicable law, shall not be refundable under any circumstances; *provided* that nothing herein limits the Debtors' rights with respect to the Put Premium paid to any Backstop Party in the event

of a breach by such Backstop Party of its obligations under this Commitment Letter and the Restructuring Support Agreement.  The provision for the payment of such premiums and reimbursements is an integral part of the transactions contemplated by this Commitment Letter and, without this provision, the Backstop Parties would not have entered into this Commitment Letter, and any unpaid premiums or reimbursements are intended to constitute an allowed administrative expense of the Debtors under sections 503(b) and 507 of the Bankruptcy Code.  If this Commitment Letter is terminated, nothing contained herein shall limit or restrict the Backstop Parties from seeking allowance and payment of any such unpaid premiums or reimbursements as administrative expenses of the Debtors' estates under the Bankruptcy Code, including under sections 503(b) and 507 thereof.  The terms set forth in this Section 3 shall survive termination of this Commitment Letter and shall remain in full force and effect regardless of whether the transactions contemplated hereby are consummated.

4.   <u>Indemnification</u>.

(a)     If following the date of this Commitment Letter any action, suit or proceeding (related to or arising from this Commitment Letter, the Restructuring Support Agreement or the transactions contemplated hereby or thereby), claim, challenge, litigation or investigation relating to any of the foregoing shall be commenced against, or any claim or demand (related to or arising from this Commitment Letter, the Restructuring Support Agreement or the transactions contemplated hereby or thereby) shall be asserted against any of the Backstop Parties, then the Debtors, together with their respective successors and assigns (each, an "<u>Indemnifying Party</u>"), on a joint and several basis, shall indemnify, defend and hold harmless each Backstop Party and each of such Backstop Party's affiliates and each of their respective officers, directors, managers, partners, stockholders, members, employees, advisors, agents and other representatives and any affiliate of the foregoing, and each of their respective successors and assigns (each, an "<u>Indemnified Party</u>") from and against, and shall promptly reimburse each Indemnified Party for, all losses, damages, liabilities and reasonable and documented costs and expenses, including, without limitation, reasonable and documented out-of-pocket attorneys' fees and expenses and, solely in the case of a conflict of interest, one additional counsel in each applicable jurisdiction to each group of affected Indemnified Parties similarly situated, taken as a whole); arising or resulting from or in connection with any such action, suit or proceeding by a third-party (collectively, "<u>Indemnified Liabilities</u>"); *provided* that Indemnified Liabilities shall exclude any losses, damages, liabilities, costs or expenses found by a final, non-appealable judgment of a court of competent jurisdiction to arise from an Indemnified Party's gross negligence, bad faith, fraud or a material breach of the obligations of such Indemnified Party under this Commitment Letter or the Restructuring Support Agreement. In addition, the Indemnified Liabilities shall exclude any claim by one Backstop Party against another Backstop Party.

(b)     Each Indemnified Party entitled to indemnification hereunder shall (i) give prompt written notice to the Indemnifying Party of any claim with respect to which it intends to seek indemnification or contribution pursuant to this Commitment Letter and (ii) permit such Indemnifying Party to assume the defense of such claim with counsel selected by the Indemnified Party and reasonably satisfactory to the Indemnifying Party,

7

*provided* that the failure to so notify any Indemnifying Party will not relieve any Indemnifying Party from any liability that any Indemnifying Party may have hereunder except to the extent such Indemnifying Party has been materially prejudiced by such failure; *provided*, *further*, that any Indemnified Party entitled to indemnification hereunder shall have the right to employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Indemnifying Party has agreed in writing to pay such fees and expenses, (y) the Indemnifying Party shall have failed to assume the defense of such claim within a reasonable time following delivery of the written notice of the Indemnified Party with respect to such claim or failed to employ counsel reasonably satisfactory to such Indemnified Party or (z) in the reasonable judgment of such Indemnified Party, based upon advice of its counsel, a conflict of interest may exist between such Indemnified Party and the Indemnifying Party with respect to such claim (in which case, if the Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense of such claim on behalf of such Indemnified Party).  In connection with any settlement negotiated by an Indemnifying Party, no Indemnifying Party shall, and no Indemnified Party shall be required by an Indemnifying Party to, (i) enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Party of a full and unconditional release from all liability in respect to such claim or litigation, (ii) enter into any settlement that attributes or admits liability or fault to the Indemnified Party, or (iii) consent to the entry of any judgment that does not include as a term thereof a full dismissal of the litigation or proceeding with prejudice.  In addition, without the consent of the Indemnified Party, no Indemnifying Party shall be permitted to consent to entry of any judgment or enter into any settlement which provides for any action or restriction on the part of the Indemnified Party other than the payment of money damages which are to be paid in full by the Indemnifying Party.  If an Indemnifying Party fails or elects not to assume the defense of a claim or is not entitled to assume or continue the defense of such claim pursuant to the foregoing, the Indemnified Party shall have the right (without prejudice to its right of indemnification hereunder), in its discretion, to contest, defend and litigate such claim and may settle such claim, either before or after the initiation of litigation, at such time and upon such terms as the Indemnified Party deems fair and reasonable; *provided*, *however*, that at least ten days prior to any settlement, written notice of its intention to settle is given to the Indemnifying Party.  If requested by the Indemnifying Party, the Indemnified Party agrees (at the expense of the Indemnifying Party) to reasonably cooperate with the Indemnifying Party and its counsel in contesting any claim that the Indemnifying Party elects to contest; *provided* that such cooperation shall not include the provision of any information to the extent that the provision thereof would violate any attorney-client privilege, law, rule or regulation, or any obligation of confidentiality binding on such Indemnified Party.  If such indemnification is for any reason not available or is insufficient to hold an Indemnified Party harmless, each Indemnifying Party agrees to contribute to the Indemnified Liabilities to which the Indemnified Party may be subject in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by each Indemnifying Party and each Indemnified Party with respect to the Commitments or, if such allocation is judicially determined to be unavailable, in such proportion as is appropriate to reflect other equitable

considerations such as the relative fault of each Indemnifying Party on the one hand and of each Indemnified Party on the other hand; *provided*, *however*, that, to the extent permitted by applicable law, an Indemnified Party shall not be responsible for amounts which in the aggregate are in excess of the amount of all premiums and reimbursements actually received by the Indemnified Party from the Indemnifying Party in connection with the Commitments. Relative benefits to an Indemnifying Party, on the one hand, and an Indemnified Party, on the other hand, with respect to the Commitments shall be deemed to be in the same proportion as (i) the total value paid or received or proposed to be paid or received by the Indemnifying Party pursuant to the issuance and sale of the New Equity contemplated by this Commitment Letter bears to (ii) all premiums and reimbursements actually received by the Indemnified Parties in connection with the Commitments. The terms set forth in this Section 4 shall survive termination of this Commitment Letter and shall remain in full force and effect regardless of whether the transactions contemplated hereby are consummated.

5.  <u>Information</u>.

The Debtors hereby represent and warrant that any forecasts or projections that have been or will be made available to the Backstop Parties by or on behalf of the Debtors or any of their respective representatives have been or will be prepared in good faith based upon assumptions that are believed by the Debtors to be reasonable at the time any such forecasts or projections are delivered to the Backstop Parties; it being understood that any such forecasts and projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the Debtors' control, that no assurance can be given that any particular forecasts or projections will be realized, that actual results may differ significantly from the projected results and that such differences may be material.

6.  <u>Conditions to the Obligations of the Backstop Parties</u>.

The obligation of the Backstop Parties to consummate the funding obligations under this Commitment Letter shall be subject to the satisfaction of each of the following conditions precedent:

a.  <u>Exit Liquidity</u>.  The liquidity of the Reorganized Company as of the Plan Effective Date shall be no less than Minimum Liquidity and satisfy Minimum LC Capacity as set forth in the Term Sheet.

b.  <u>Net Debt</u>. The net debt of the Reorganized Company as of the Plan Effective Date shall be as set forth on the schedule attached hereto as Schedule II.

c.  <u>Exit Financing</u>.  The Exit Facility Documents, including a revolving credit facility and letter of credit facility (if not incorporated within the revolving credit facility), shall be acceptable to the Requisite Backstop Commitment Parties.

d.  <u>Agreements</u>.  Each of the Restructuring Support Agreement and this Commitment Letter shall remain in full force and effect and shall not have been terminated prior

to the Plan Effective Date and the Debtors shall not have committed a material breach of their obligations thereunder, which material breach remains uncured and outstanding.

e. <u>Backstop Approval Order</u>. The Bankruptcy Court shall have entered the Backstop Approval Order in form and substance satisfactory to the Requisite Backstop Commitment Parties.

f. <u>Confirmation Order</u>. The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Requisite Backstop Commitment Parties.

g. <u>No Termination</u>. The Backstop Approval Order, or the Confirmation Order shall not have been terminated, reversed, stayed, dismissed, vacated or reconsidered, and no such order shall have been modified or amended in a manner adverse to the Backstop Parties after entry without the prior written consent of the Requisite Backstop Commitment Parties.

h. <u>Rights Offering</u>. The Rights Offering shall have been conducted in all material respects in accordance with the Rights Offering Documents, and the Rights Offering shall have expired in accordance with the terms of the Rights Offering Procedures.

i. <u>Covenants</u>. Each of the Debtors shall have performed and complied, in all material respects, with all of its respective covenants and agreements contained in this Commitment Letter that contemplate, by their terms, performance or compliance prior to the Plan Effective Date.

j. <u>No Material Adverse Effect</u>. Since the date of this Commitment Letter, there shall not have been a Material Adverse Effect. "<u>Material Adverse Effect</u>" shall mean any event, change, effect, circumstance, occurrence, development, condition, result, state of facts or change of facts ("<u>Event</u>") occurring after the date hereof that, individually or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (i) the Company's ability to implement the Restructuring Transactions or (ii) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of the Debtors, taken as a whole; except, for purposes of clause (ii), to the extent that such Event results from, arises out of, or is attributable to, the following (either alone or in combination): (a) any change in global, national, or regional political conditions (including, without limitation, civil unrest, riots, hostilities, acts of war, sabotage, terrorism (including, without limitation, any cyberattack) or military actions or any escalation or material worsening of any such actions), (b) any change in global, national or regional financial or economic conditions affecting the industries, regions or markets in which the Debtors operate, including, without limitation, any change in the United States or applicable foreign economies or securities, commodities or financial markets (including, without limitation, any

changes or developments in prices for oil, natural gas, or other commodities or power prices), (c) any changes in the market price or trading volume of the claims or debt or equity securities of the Company or any other Debtor, (d) any act of God or other calamity or force majeure event (whether or not declared as such), including, without limitation, any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado or other weather event, epidemic, pandemic, disease outbreak (including, without limitation, COVID-19, SARS-CoV-2 virus or any mutation or variation thereof), (e) any changes after the date hereof in applicable law or GAAP or the interpretation or enforcement thereof, (f) the filing or pendency of the Chapter 11 Cases, or (g) any matters disclosed in any first day pleadings or declarations to the extent made available to the Backstop Parties prior to the date hereof; provided, that exceptions set forth in clauses (a), (b), (c), (d), and (e) of this definition shall not apply to the extent that such Event is disproportionately adverse to the Debtors, taken as a whole, as compared to other companies operating in the industries or participating in the markets in which the Debtors operate or participate, as applicable.

k.  <u>Put Premium</u>.  The Debtors shall have paid the applicable Put Premium and shall have paid, or substantially concurrently with the occurrence of the Plan Effective Date will pay, all fees and expenses of the Backstop Parties required to be paid pursuant to Section 3 of this Commitment Letter and the Restructuring Support Agreement.

l.  <u>Antitrust Approvals</u>.  All waiting periods imposed by any antitrust authority in connection with the transactions contemplated by this Commitment Letter shall have terminated or expired and all authorizations, approvals, consents or clearances under the applicable antitrust laws in connection with the transactions contemplated by this Commitment Letter shall have been obtained.

m.  <u>Other Governmental Approvals</u>.  All other governmental and regulatory approvals or authorizations necessary for the occurrence of the Plan Effective Date shall have been obtained and any required governmental and regulatory filings shall have been made, to the extent the failure to obtain such approvals or authorizations or to make such governmental and regulatory filings would reasonably be expected to result in a Material Adverse Effect on the Debtors (taken as a whole), and no law or order shall have become effective or been enacted, adopted or issued by any governmental authority that prohibits the implementation of the Plan or the transactions contemplated by this Commitment Letter or the Restructuring Support Agreement.

7.  <u>Transfer and Assignment; Third Party Beneficiaries</u>.

No Debtor may assign its rights, interests or obligations hereunder without the prior written consent of the Requisite Backstop Commitment Parties and any purported assignment by the Debtors in violation of this Section 7 shall be void *ab initio*.  The Backstop Parties may assign their respective Commitments hereunder to (a) any of their respective affiliates (i) with the prior written consent of the Debtors (not to be unreasonably

withheld, conditioned, or delayed, with it being understood and agreed that it would be unreasonable to withhold consent if the transferee's financial wherewithal is equal or superior to that of the transferor and sufficient to satisfy the applicable obligations hereunder), so long as such affiliate (A) is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act and (B) shall have delivered a duly executed joinder to (x) the Restructuring Support Agreement and (y) this Commitment Letter (in form and substance reasonably acceptable to TES), or (ii) without the prior written consent of the Debtors (provided that the transferor continues to have the financial wherewithal sufficient to satisfy the applicable obligations hereunder and continues to be liable for all of the obligations of it and the transferee under this Commitment Letter (including, without limitation, to fund the full amount of its initial Commitment in the event that a transferee of such Commitment (including any subsequent transferee) fails to satisfy its obligation with respect to all or any portion of such transferred Commitment), so long as such affiliate (A) is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act and (B) shall have delivered a duly executed joinder to (x) the Restructuring Support Agreement and (y) this Commitment Letter (in form and substance reasonably acceptable to TES), (b) any other Backstop Party, or (c) any other party with the prior written consent of the Debtors and the Requisite Backstop Commitment Parties so long as (i) such party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act and (ii) such party shall have delivered a duly executed joinder to (x) the Restructuring Support Agreement and (y) this Commitment Letter (in form and substance reasonably acceptable to TES).

Except as provided in Section 4 hereof with respect to the Indemnified Parties, this Commitment Letter is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Commitment Letter.

8.  Governing Law; Jurisdiction.

This Commitment Letter shall be governed and construed in accordance with the laws of the State of New York.  The parties hereto consent and agree that any action to enforce this Commitment Letter or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Commitment Letter and the agreements, instruments and documents contemplated hereby and thereby shall be brought exclusively in the Bankruptcy Court, or if the Chapter 11 Cases have not yet commenced, in either the United States District Court for the Southern District of New York or any New York state court in the Borough of Manhattan (the "Chosen Courts").  Each of the parties hereto (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto or constitutional authority to finally adjudicate the matter. Without limiting the rights of any party hereto, each party acknowledges and agrees that the Debtors are entitled to seek damages from any Backstop Party that breaches its obligations under this Commitment Letter; *provided* that each party hereto hereby waives,

12

to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding any special, exemplary, punitive or consequential damages. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS COMMITMENT LETTER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

9. <u>Amendments</u>.

This Commitment Letter and the Restructuring Support Agreement represent the final agreement and the entire understanding among the parties hereto with respect to the subject matter hereof and may not be contradicted by evidence of prior or contemporaneous agreements and understandings of the parties hereto.   There are no unwritten oral agreements or understandings between the parties hereto relating to the subject matter hereof.  This Commitment Letter may only be modified, amended, or supplemented by an agreement signed by the Debtors and the Requisite Backstop Commitment Parties; *provided*, that (a) the prior written consent of each Backstop Party adversely affected thereby shall be required for any amendment that would (i) modify such Backstop Party's Backstop Commitment Percentage, (ii) have an adverse and disproportionate effect on such Backstop Party, (iii) alter the pricing or duration terms set forth in the Term Sheet and/or this Commitment Letter, or (iv) modify such Backstop Party's Backstop Commitment Percentage; (b) each Backstop Party's prior written consent shall be required for any amendment that would increase its or the aggregate Commitment amount; and (c) each Backstop Party's prior written consent shall be required to amend the definition of "Requisite Backstop Commitment Parties" or to amend this Section 9.  Notwithstanding the foregoing, **<u>Schedule I</u>** shall be revised as necessary without requiring a written instrument signed by the Debtors and the Requisite Backstop Commitment Parties to reflect changes in the composition of the Backstop Parties and Backstop Commitment Percentages as a result of transfers permitted hereby.

10. <u>Counterparts</u>.

This Commitment Letter may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to each other party (including via facsimile, portable document format (.pdf) or other electronic transmission), it being understood that each party need not sign the same counterpart.

11. <u>No Fiduciary Duties</u>.

Notwithstanding anything to the contrary herein, the entry into this Commitment Letter and the transactions contemplated hereby shall not create any fiduciary duties between and among the Backstop Parties or other duties or responsibilities to each other, the Debtors or any Debtor's creditors or other stakeholders.

12. <u>Antitrust Approval</u>.

(a)     Each of the Debtors and the Backstop Parties agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Commitment Letter, the Plan and the other Definitive Documents, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "<u>HSR Act</u>") with respect to the transactions contemplated by this Commitment Letter with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any other Antitrust Authority, any drafts thereof) under any other antitrust laws that are necessary to consummate and make effective the transactions contemplated by this Commitment Letter as soon as reasonably practicable and no later than fifteen (15) business days following the date of entry of the Backstop Approval Order and (ii) promptly furnishing documents or information reasonably requested by any Antitrust Authority and supplying to any governmental entity as promptly as practicable any additional information or documents that may be requested by such governmental entity or pursuant to any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any governmental entity and taking, or cause to be taken, all other actions and doing, or causing to be done, all other things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Commitment Letter. "<u>Antitrust Authorities</u>" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other governmental entity having jurisdiction pursuant to the antitrust laws, and "<u>Antitrust Authority</u>" means any one of them.

(b)     The Company and each Backstop Party subject to an obligation pursuant to applicable antitrust laws to notify any transaction contemplated by this Commitment Letter, the Plan or the other Definitive Documents that has notified the Company in writing of such obligation (each such Backstop Party, a "<u>Filing Party</u>") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content.  The Company and each Filing Party shall, to the extent permitted by applicable Law:  (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally of) any communications from or with an Antitrust Authority; (ii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all correspondence and communications between such Filing Party or the Company and the Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary or desirable in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (v) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Requisite Backstop Commitment Parties and the Company.

(c)      Should a Filing Party be subject to an obligation under antitrust laws to jointly notify with one or more other Filing Parties (each, a "Joint Filing Party") any transaction contemplated by this Commitment Letter, the Plan or the other Definitive Documents, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

(d)      The Company and each Filing Party shall use their commercially reasonable efforts to obtain all authorizations, approvals, consents, or clearances under any applicable antitrust laws or to cause the termination or expiration of all applicable waiting periods under any antitrust laws in connection with the transactions contemplated by this Commitment Letter at the earliest possible date after the date of filing.    The communications contemplated by this Section 12 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.  The obligations in this Section 12 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Commitment Letter, the Plan or the other Definitive Documents.

13.    Funding Default.

(a)      Upon the occurrence of the failure by any Backstop Party to timely pay the applicable purchase price in respect of its Commitment (the "Funding Amount" and such failure, a "Funding Default"), the Backstop Parties (other than any Backstop Party that causes a Funding Default ("a "Defaulting Backstop Party")) shall have the right, but not the obligation, within five (5) Business Days after receipt of written notice from the Company to all Backstop Parties of such Funding Default, which notice shall be given promptly following the occurrence of such Funding Default (such five (5) Business Day period, the "Replacement Period"), to elect, by written notice to the Company, to purchase all or any portion of the New Equity attributable to such Defaulting Backstop Party's Commitment (such purchase, a "Replacement Purchase") on the terms and subject to the conditions set forth in this Commitment Letter and in such amounts as may be agreed upon by all of the non-defaulting Backstop Parties that elect to purchase all or any portion of the New Equity attributable to such Defaulting Backstop Party, or, if no such agreement is reached by the date upon which the Replacement Period expires, based upon each such electing Backstop Party's Backstop Commitment Percentage of the aggregate amount of New Equity that has not been purchased as a result of such Funding Default (such Backstop Parties, the "Replacing Backstop Parties").  The purchase price paid by any Replacing Backstop Party in connection with a Replacement Purchase shall be equal to the applicable purchase price in respect of such Defaulting Backstop Party's Commitment.

(b)      If a Backstop Party is a Defaulting Backstop Party, or is otherwise in breach of its obligations hereunder, it shall not be entitled to any of the Put Premium hereunder.

(c)      Nothing in this Commitment Letter shall require any Backstop Party to fund more than its Backstop Commitment; *provided* that if a Backstop Party makes an election to cover a Defaulting Backstop Party, such election shall be binding, and failure to fund

any such cover amount in accordance with this Section 13 shall constitute a Funding Default; *provided* that, for the avoidance of doubt, this Section 13(c) shall not be deemed to limit any Backstop Party's obligations under Section 1(d).

(d)     Notwithstanding anything to the contrary set forth in Section 2 but subject to Section 8, no provision of this Agreement shall relieve any Defaulting Backstop Party from liability hereunder, or limit the availability of the remedies available to the non-defaulting parties hereto, in connection with any such Backstop Party's Funding Default.

(e)     Promptly, and in any case no later than two (2) business days following a Funding Default, each Defaulting Backstop Party shall return to TES (a) any portion of the Put Premium previously paid to it and (b) any fees and expenses for which it has received reimbursement pursuant to the Restructuring Support Agreement.

14.     <u>Notice.</u>

Notwithstanding anything to the contrary herein, provision to Kirkland & Ellis of any notice that may be due or required to any Backstop Party, as set forth herein, shall constitute notice to such Backstop Party. Such notice to any Backstop Party hereunder will be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and electronic mail addresses:

>   Kirkland & Ellis LLP
>   601 Lexington Avenue
>   New York, New York 10022
>   Facsimile: (212) 446-4900
>   Attention: Steven N. Serajeddini, P.C. (steven.serajeddini@kirkland.com)

>   And

>   Kirkland & Ellis LLP
>   300 North LaSalle Street
>   Chicago, IL 60654
>   Facsimile: (312) 862-2200
>   Attention: Patrick J. Nash, Jr., P.C. (patrick.nash@kirkland.com)
>   Christopher S. Koenig (chris.koenig@kirkland.com)

Any notice given by delivery, mail, or courier will be effective when received. Any notice given by electronic mail will be effective upon confirmation of transmission.

*[Signature Pages Follow]*

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**AUTHORIZED SIGNATORY OF
TALEN ENERGY SUPPLY, LLC
and each of its direct and indirect wholly owned
subsidiaries listed on <u>Exhibit A</u> hereto**

By: _____

      Name: Andrew M. Wright
      Title:   Authorized Signatory

*[Signature pages to Commitment Letter]*

**Exhibit A**

**Company Parties**

1.  Talen Energy Supply, LLC
2.  Talen Montana Holdings, LLC
3.  Talen Montana, LLC
4.  Montana Growth Holdings LLC
5.  Colstrip Comm Serv, LLC
6.  Talen Generation, LLC
7.  Montour, LLC
8.  Brunner Island, LLC
9.  Raven Power Generation Holdings LLC
10. Raven Power Group LLC
11. Raven Power Finance LLC
12. Raven Power Fort Smallwood LLC
13. Raven FS Property Holdings LLC
14. H.A. Wagner LLC
15. Brandon Shores LLC
16. Raven Lot 15 LLC
17. Fort Armistead Road – Lot 15 Landfill, LLC
18. Raven Power Property LLC
19. RMGL Holdings LLC
20. Brunner Island Services, LLC
21. Realty Company of Pennsylvania
22. BDW Corp.
23. Lady Jane Collieries, Inc.
24. Montour Services, LLC
25. Holtwood, LLC
26. Martins Creek, LLC
27. Sapphire Power Generation Holdings LLC
28. Sapphire Power LLC
29. Sapphire Power Finance LLC
30. MEG Generating Company, LLC
31. Sapphire Power Marketing LLC
32. Pedricktown Management Company LLC
33. Pedricktown Investment Company LLC
34. Pedricktown Cogeneration Company LP
35. York Plant Holding, LLC
36. York Generation Company LLC
37. Elmwood Energy Holdings, LLC
38. Elmwood Park Power, LLC
39. Camden Plant Holding, L.L.C.
40. Newark Bay Holding Company, L.L.C.
41. Liberty View Power, L.L.C.

42.    Newark Bay Cogeneration Partnership, L.P.
43.    Morris Energy Management Company, LLC
44.    Morris Energy Operations Company, LLC
45.    Lower Mount Bethel Energy, LLC
46.    Pennsylvania Mines, LLC
47.    MC OpCo LLC
48.    Talen Nuclear Development, LLC
49.    Bell Bend, LLC
50.    Susquehanna Nuclear, LLC
51.    Talen Texas, LLC
52.    Barney Davis, LLC
53.    Nueces Bay, LLC
54.    Laredo, LLC
55.    Talen Texas Property, LLC
56.    Talen Texas Group, LLC
57.    Talen Energy Marketing, LLC
58.    Talen Energy Retail LLC
59.    Talen Treasure State, LLC
60.    Talen Energy Services Group, LLC
61.    Talen Energy Services Holdings, LLC
62.    Talen Energy Services Northeast, Inc.
63.    Talen Land Holdings, LLC
64.    Talen NE LLC
65.    NorthEast Gas Generation Holdings, LLC
66.    Dartmouth Plant Holding, LLC
67.    Dartmouth Power Holding Company, L.L.C.
68.    Dartmouth Power Generation, L.L.C.
69.    Dartmouth Power Associates Limited Partnership
70.    Talen II Growth Parent LLC
71.    Talen II Growth Holdings LLC
72.    Talen Technology Ventures LLC

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**BEMAP MASTER FUND LTD.**

**By: Rubric Capital Management LP, its Sub-Manager**

By: _____
      Name: Michael Nachmani
      Title: Authorized Signatory

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**Blackstone CSP-MST FMAP Fund**


**By: Rubric Capital Management LP, its Sub-Manager**

By: _____
        Name: Michael Nachmani
        Title: Authorized Signatory

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**Nuveen Asset Management, LLC, as investment adviser,
with respect to each fund/account listed below, severally
and not jointly:**

Nuveen All-American Municipal Bond Fund
Nuveen Enhanced High Yield Municipal Bond Fund
Nuveen Dynamic Municipal Opportunities Fund
Nuveen High Yield Municipal Bond Fund
Nuveen Municipal Credit Opportunities Fund
Nuveen Short Duration High Yield Municipal Bond Fund
Nuveen Strategic Municipal Opportunities Fund
Nuveen AMT-Free Municipal Value Fund
Nuveen AMT Free Municipal Credit Income Fund
Nuveen High Yield Municipal Opportunities Fund LP

By: _____
      Name:  Stuart J. Cohen
      Title:    Managing Director & Head of Legal

**Teachers Advisors, LLC, as investment adviser, with
respect to the fund/account listed below, severally and not
jointly:**

Nuveen Opportunistic Strategies, LLC

By: _____
      Name:  Stuart J. Cohen
      Title:    Managing Director & Associate General
      Counsel

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**CITADEL CREDIT MASTER FUND LLC**
By its Manager, Citadel Advisors LLC

By: _____

Name:   Shelliane Mulcahy

Title:    Authorized Signatory

JC

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**[CastleKnight SPV I, LLC]**

By: _____
        Name: Aaron Weitman
        Title:  Managing Partner

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

Notwithstanding section 1(d) of the Commitment Letter, neither the Franklin Excluded Parties[1] nor any of their affiliates (including any such affiliates that are Backstop Parties) shall be required to exercise any rights to purchase New Equity issued to any of the Franklin Excluded Parties; *provided*, that, notwithstanding section 7 of the Commitment Letter, any Backstop Party that is an affiliate of a Franklin Excluded Party shall not transfer its Commitments, Unsecured Notes, or any Claims arising thereunder to any Franklin Excluded Party without the prior written consent of the Debtors.  For the avoidance of doubt, the foregoing shall not, and shall not be deemed to, relieve any Backstop Party from any of its Commitments or other obligations under the Commitment Letter.

**FRANKLIN ADVISERS, INC., AS INVESTMENT
MANAGER ON BEHALF OF CERTAIN FUNDS
AND ACCOUNTS**

By: *Glenn Voyles*
DocuSigned by:
39EB370F3C48428...
Name: Glenn Voyles
Title:  SVP

---

[1]    The "<u>Franklin Excluded Parties</u>" are:  Franklin High Income Fund (Canada); FTIF – Templeton Global High Yield Fund; FT16450 TW-Global High Yield Bond Fund; FSS - Franklin Strategic Income Fund; FIST – Franklin Low Duration Total Return Fund; FTIF – Franklin Strategic Income Fund; and Brighthouse/Franklin Low Duration Total Return Portfolio; and any other funds and accounts that are not managed by Franklin Advisers, Inc.

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**SYSTEM 2 MASTER FUND LIMITED**

By: _____
Name:  Glenn Kennedy
Title:  Director

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**LORD ABBETT GLOBAL FUNDS I PLC-LORD
ABBETT GLOBAL HIGH YIELD FUND**

By:

_____

Name: Steven Rocco
Title: Member & Co-Director of Taxable-Fixed
Income

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**LORD ABBETT INVESTMENT TRUST-LORD
ABBETT HIGH YIELD FUND**

By: _____

Name: Steven Rocco
Title: Member & Co-Director of Taxable-Fixed
Income

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**LORD ABBETT GLOBAL FUNDS I PLC-LORD
ABBETT HIGH YIELD FUND**

By: _____

Name: Steven Rocco
Title: Member & Co-Director of Taxable-Fixed
Income

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**LORD ABBETT TRUST I-LORD ABBETT SHORT
DURATION HIGH YIELD FUND**

By: _____

Name: Steven Rocco
Title: Member & Co-Director of Taxable-Fixed
Income

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**LORD ABBETT BOND-DEBENTURE FUND, INC.**

By: _____

Name: Lawrence B. Stoller
Title: Member & General Counsel

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**LORD ABBETT SERIES FUND, INC. - BOND-
DEBENTURE PORTFOLIO**

By:

_____
Name: Lawrence B. Stoller
Title: Member & General Counsel

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**LORD ABBETT SPECIAL SITUATIONS INCOME
FUND**

By:

Name: Lawrence B. Stoller
Title: Member & General Counsel

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**TSS ENTERPRISE LLC**

By: _____
      Name: Sina Toussi
      Title:  Authorized Person

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**CAPITAL RESEARCH AND MANAGEMENT**
**COMPANY AS INVESTMENT ADVISER FOR AND**
**ON BEHALF OF AMERICAN FUNDS INSURANCE**
**SERIES – AMERICAN HIGH-INCOME TRUST**

By: _____ (*jqqd*)
      Name: Kristine M. Nishiyama
      Title: Authorized Signatory

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**CAPITAL INTERNATIONAL, INC. AS
INVESTMENT ADVISER FOR AND ON BEHALF
OF CAPITAL GROUP US HIGH-YIELD FIXED-
INCOME TRUST (US)**

By: _____ (*jqqd*)
    Name: Kristine M. Nishiyama
    Title: Authorized Signatory

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**CAPITAL RESEARCH AND MANAGEMENT
COMPANY AS INVESTMENT ADVISER FOR AND
ON BEHALF OF THE INCOME FUND OF
AMERICA**

By: _____
    Name: Kristine M. Nishiyama
    Title: Authorized Signatory

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**CAPITAL RESEARCH AND MANAGEMENT
COMPANY AS INVESTMENT ADVISER FOR AND
ON BEHALF OF AMERICAN FUNDS MULTI-
SECTOR INCOME FUND**

By: _____   *(jqqd)*
     Name: Kristine M. Nishiyama
     Title: Authorized Signatory

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**CAPITAL RESEARCH AND MANAGEMENT
COMPANY AS INVESTMENT ADVISER FOR AND
ON BEHALF OF AMERICAN HIGH-INCOME
TRUST**

By: _____ (*jqqd*)
      Name: Kristine M. Nishiyama
      Title: Authorized Signatory

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**CAPITAL RESEARCH AND MANAGEMENT**
**COMPANY AS INVESTMENT ADVISER FOR AND**
**ON BEHALF OF CAPITAL WORLD BOND FUND**

By: _____(*jqqd*)
 Name: Kristine M. Nishiyama
 Title: Authorized Signatory

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**CAPITAL RESEARCH AND MANAGEMENT
COMPANY AS INVESTMENT ADVISER FOR AND
ON BEHALF OF AMERICAN FUNDS INSURANCE
SERIES – CAPITAL WORLD BOND FUND**

By: _____ (*jqqd*)
     Name: Kristine M. Nishiyama
     Title: Authorized Signatory

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**BLACKWELL PARTNERS, LLC - SERIES A**
**BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By: _____
   Name: Jacob Rubin
   Title:  Managing Member

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**CASSINI PARTNERS, LP**
**BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**


By:   _____
Name:  Jacob Rubin
Title:  Managing Member

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**PHILOSOPHY CAPITAL PARTNERS, LP**
**BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By:  _____
      Name:  Jacob Rubin
      Title:  Managing Member

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**STAR V PARTNERS, LLC
BY PHILOSOPHY CAPITAL MANAGEMENT LLC, ITS INVESTMENT ADVISER**

By: _____

Name:  Jacob Rubin
Title:  Managing Member

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**CARRONADE CAPITAL MASTER, LP**
By Carronade Capital Management, LP, its investment manager

By: _Anthony Chiodi_____
      Name: Anthony Chiodi
      Title: CFO

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**GCM GROSVENOR MULTI-ASSET CLASS FUND
III TRADING, L.P.**

By:
                *DocuSigned by:*
                *Girish Kashyap*
                2F1258CEDCBA4E6...
        _____
        Name: Girish S. Kashyap
        Title: Authorized Signatory

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**GCM GROSVENOR STRATEGIC CREDIT
TRADING, L.P.**

By: _Girish Kashyap_
    ⌐ 2F1258CEDCBA4E6...  _____
    Name: Girish S. Kashyap
    Title: Authorized Signatory

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**GCM GROSVENOR STRATEGIC CREDIT**
**SIDECAR TRADING, L.P.**

By: _____   _____
DocuSigned by:
*Girish Kashyap*
2F1258CEDCBA4E6...
Name: Authorized Signatory
Title: Authorized Signatory

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**AZTECA PARTNERS LLC**

By: Appaloosa LP, its managing member

By: Appaloosa Capital Inc., its general partner

By: _____

Name: David Besh

Title: GC

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**PALOMINO MASTER LTD.**

By: Appaloosa LP, its investment advisor

By: Appaloosa Capital Inc., its general partner

By: _____
      Name: David Bersh
      Title: GC

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**


**KING STREET GLOBAL DRAWDOWN FUND, L.P.**
By: King Street Capital Management, L.P.
    Its Investment Manager


By: _____
    Name: Howard Baum
    Title: Director of Operations

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**


**KING STREET CAPITAL, L.P.**
By: King Street Capital Management, L.P.
     Its Investment Manager


By: _____
     Name: Howard Baum
     Title: Director of Operations

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**


**KING STREET CAPITAL MASTER FUND, LTD.**
By: King Street Capital Management, L.P.
    Its Investment Manager


By: _____
    Name: Howard Baum
    Title: Director of Operations

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**Boothbay Absolute Return Strategies, LP**

By: _____
      Name: Daniel Bloom
      Title: CFO & CCO

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**Boothbay Diversified Alpha Master Fund LP**

By: _____
     Name: Daniel Bloom
     Title: CFO & CCO

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**Corbin Opportunity Fund, L.P.**

**By: Corbin Capital Partners, L.P. as its Investment**
**Manager**

By:  _____
Name: Daniel Friedman
Title: General Counsel

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**Corbin ERISA Opportunity Fund, Ltd.**

**By:  Corbin Capital Partners, L.P. as its Investment
Manager**

By:  _____
Name: Daniel Friedman
Title: General Counsel

[*Signature pages to Commitment Letter*]

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**FourWorld Global Opportunities Fund, Ltd.**

By: _____

      Name: John Addis
      Title: Managing Member

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**FourWorld Event Opportunities, LP**

By: _____
    Name: John Addis
    Title: Managing Member

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**CONTRARIAN DISTRESSED DEBT FUND, L.P.**

By:  CDDF GP, LLC, its general partner

By: _____
Name:  Jon R. Bauer
Title:  Manager

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**CONTRARIAN CAPITAL TRADE CLAIMS, L.P.**

By: CCTC GP, LLC, its general partner

By: _____

      Name: Lewis Schwartz
      Title:   Authorized Signatory

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**CONTRARIAN ADVANTAGE-B, LP**

By: TCAB GP, LLC, its general partner

By: _____

      Name: Lewis Schwartz
      Title:   Authorized Signatory

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**Alphaminer Master Fund Limited**

By: _____
Name: Joseph Salegna
Title: Chief Financial Officer, Livello Capital
Management LP

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**Livello Capital Special Opportunities Master Fund LP**

By: _Joseph Salegna_____
Name: Joseph Salegna
Title: Chief Financial Officer, Livello Capital
Management LP

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE**
**DATE FIRST SET FORTH ABOVE:**

**JEFFERIES LLC**

By: _____

    Name:

    Title:    William McLoughlin

                      SVP

*[Signature pages to Commitment Letter]*

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**Citigroup Financial Products Inc**

By: _____
BD0CFB4C119F462...
Name: David Quinn
Title: Authorized Signatory

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**ACR STRATEGIC CREDIT FUND, LP**

By: _____
       Name: Mark Unferth
       Title: Portfolio Manager

## SCHEDULE I

Backstop Amount

| Backstop Party | Backstop Commitment Amount |
|---|---|
| ███████████ | ████ |
| ████████████ | ████ |
| ██████████████ | ████ |
| ███████████████ | ████ |
| █████████████████ | ████ |
| ███████████████ | ████ |
| █████████████ | ████ |
| ███████████████ | ████ |
| ████████████████ | ████ |
| ███████████████ | ████ |
| ██████████████ | ███ |
| ████████████████ | ████ |
| ████████████████ | ████ |
| █████████████ | ████ |
| ██████████ | ████ |
| ███████ | ████ |
| ████████ | ████ |
| █████████████ | ████ |
| █████████████████████████ | ███ |
| ██████████████████████ | ████ |
| ███████████████████████ | ████ |
| ████████████████████████ | ███ |
| ████████████ | ████ |

| | |
|---|---|
| ██████████████ | ████ |
| ████████████████ | ███ |
| ███████████ | ████ |
| █████████████ | ████ |
| █████████████ | ████ |
| █████████ | ███ |
| ██████████ | ████ |
| ███████████████████ | ████ |
| ████ | ████ |
| ███████████ | ████ |
| █████████████ | ████ |
| **Total** | ██████ |

## Schedule II

### Net Debt Schedule

| Illustrative Emergence Date | Targeted Net Debt Balance |
|---|---|
| 6/30/22 | $2,476 |
| 7/31/22 | 2,401 |
| 8/31/22 | 2,322 |
| 9/30/22 | 2,269 |
| 10/31/22 | 2,200 |
| 11/30/22 | 2,169 |
| 12/31/22 | 2,099 |
| 1/31/23 | 1,830 |
| 2/28/23 | 1,465 |
| 3/31/23 | 1,377 |
| 4/30/23 | 1,378 |
| 5/31/23 | 1,441 |
| 6/30/23 | 1,481 |
| 7/31/23 | 1,460 |
| 8/31/23 | 1,396 |
| 9/30/23 | 1,402 |
| 10/31/23 | 1,392 |