```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3    TALEN ENERGY SUPPLY, LLC and  )  CASE NO. 22-90054
      TALEN TECHNOLOGY VENTURES,    )
 4    LLC,                          )  Houston, Texas
                                    )
 5              Debtor.             )  Friday, June 10, 2022
                                    )  9:30 a.m. to 11:34 a.m.
 6    ------------------------------)

 7                    MOTION FOR RELIEF FROM STAY
                  BEFORE THE HONORABLE MARVIN ISGUR
 8                 UNITED STATES BANKRUPTCY JUDGE

 9    APPEARANCES:

10    For Debtor:            PAUL GENENDER, ESQ.
                             WEIL GOTSHAL & MANGES
11                           700 Louisiana
                             Suite 1700
12                           Houston, TX 77002

13                           JESSICA LIOU, ESQ.
                             WEIL GOTSHAL & MANGES
14                           766 Fifth Avenue
                             New York, NY  10153
15
      For Northwest Utilities: JOHN KAPLAN, ESQ.
16                           PERKINS COIE LLP
                             1201 Third Avenue
17                           Suite 4900
                             Seattle, WA  98101
18
      For North Western      H. JOSEPH ACOSTA, ESQ.
19    Corporation:           JAY JACKSON, ESQ.
                             DORSEY & WHITNEY LLP
20                           300 Crescent Court
                             Suite 400
21                           Dallas, TX  75201

22    Court Reporter/Deputy:  A. BANDA

23

24

25
```

```
 1   Transcribed by:           Veritext Legal Solutions
                               330 Old Country Road, Suite 300
 2                             Mineola, NY 11501
                               Tel: 800-727-6396
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     Proceedings recorded by electronic sound recording;
24   Transcript produced by transcription service.

25
```

1        <u>HOUSTON, TEXAS; FRIDAY, JUNE 10, 2022; 9:30 A.M.</u>

2        THE COURT:  Good morning.  Please be seated.  All

3    right.  We're here for a motion for relief from the stay in

4    the Talen Energy Supply case.  It is 22-90054.  If you wish

5    to speak at today's hearing, please make an appearance at

6    the podium and press 5* on your phone.  We should already

7    have electronic appearances that have been made.

8        We can go ahead and we'll start in the courtroom,

9    anyone that wishes to make an appearance, please approach

10   the podium.  Mr. Genender, good morning.

11       MR. GENENDER:  Good morning, Your Honor, Paul

12   Genender, Weil Gotshal & Manges, proposed counsel for the

13   debtors.  And with me is my partner Jessica Liou.  Your

14   Honor, for the Court's purposes Ms. Liou will handle the

15   argument and I will deal with any evidentiary issues.

16       THE COURT:  Thank you.

17       MR. GENENDER:  Thank you.

18       THE COURT:  Good morning.  All right.  On the

19   phone, let me see who we have.  From 425-635-1428.

20       MR. KAPLAN:  Yes, good morning, Your Honor.  My

21   name is John Kaplan from Perkins Coie LLP, I'm hearing on

22   behalf of the moving parties, the four Northwest Utilities

23   that are referred to as the Pacific Northwest Utilities.

24       THE COURT:  Good morning, Mr. Kaplan.  Anyone else

25   wish to --

1            MR. KAPLAN:  Good morning.

2            THE COURT:  -- speak at today's hearing?

3            Mr. Kaplan, I don't see your camera on.  I don't

4    know if you intend to have it on.

5            MR. KAPLAN:  Oh.  Sorry.  It's toggled off.  Can

6    you -- am I on, Your Honor?

7            THE COURT:  I see Mr. Jackson and then I'm just --

8    behind Mr. Acosta.  Mr. Acosta, good morning.

9            MR. ACOSTA:  Good morning, Your Honor, Joe Acosta

10   and Jay Jackson on behalf of North Western Corporation.  I'm

11   having an issue linking in with video, Your Honor, I'm

12   trying to work on that.  I'm on the phone.

13           THE COURT:  I can see Mr. Kaplan now.  Typically,

14   Mr. Acosta, the problem is going to be if you were on a Zoom

15   call earlier today it might still have your camera captured.

16   You have to be sure to clear out that -- any of the other

17   video programs.  We'll wait a minute --

18           MR. ACOSTA:  Okay.

19           THE COURT:  -- and let's be sure that you get

20   connected.

21       (Pause)

22           THE COURT:  Is there anyone else that wishes to

23   speak at this morning's hearing?  If so, you'll need to

24   press 5* one time on your phone.

25       (No response)

1          THE COURT:  Okay.  While Mr. Acosta is getting his

2    video lined up and, Mr. Acosta, you're welcome to waive that

3    or do whatever you want, I'll wait for you or you can waive

4    it.  Let me hear from Mr. Kaplan how he intends to proceed

5    this morning, if you're -- or is Mr. Jackson going to take

6    the take the lead, who's going to do that?

7          MR. KAPLAN:  I'm going to be taking the lead for

8    the Pacific Northwest partners, Your Honor.  I should

9    introduce, I have available for witnesses our two

10   declarants, Mr. Ronald Roberts of Puget Sound Energy and

11   then my partner Jeffrey Hanson.  I should also note that I

12   have on the phone probably 10 to 15 representatives of my

13   client, various in-house counsel, outside counsel and

14   business people that are just interested in this matter and

15   are observing but will not be participating.

16          With respect to how we're going to conduct this

17   this morning, I spoke with Mr. Genender last evening.  We

18   agreed that each other's exhibits should be admissible.  For

19   now we are all going to rest on the declarations that were

20   filed and the additional submissions as our evidence and we

21   don't plan on putting on witnesses, but we are reserving the

22   right to do so based on facts that are argued or any

23   questions that Your Honor might have.  All of our witnesses

24   are present either in the courtroom or virtually and are

25   available to testify.

1          But for now, we just intend to argue off of the

2     pleadings and we'd like to proceed on that basis.

3          THE COURT:  All right.  You said you've agreed on

4     exhibits.  Let's go ahead and get them admitted.  Tell me

5     where your exhibits are found.  Are they the ones at ECF

6     463, 1 through 22?

7          MR. KAPLAN:  Yes, they are, Your Honor.

8          THE COURT:  Mr. Genender, can you confirm that

9     there's no objection to those?

10          MR. GENENDER:  Yes.  What Mr. Kaplan is spot on.

11          THE COURT:  All right.  463, 1 through 22 are

12     admitted.  And where are your exhibits, Mr. Genender?

13     (ECF No. 463, Exhibit Nos. 1 through 22 received)

14          MR. GENENDER:  Your Honor, the debtors are at 450

15     and it is 1 and 2.

16          THE COURT:  All right.  And would you confirm, Mr.

17     Kaplan, there's no objection to 450, 1 and 2?

18          MR. KAPLAN:  No objection, Your Honor.

19          THE COURT:  450, 1 and 2 are admitted.

20     (ECF 450, Exhibit Nos. 1 and 2 received)

21          MR. GENENDER:  Mr. Jackson has exhibits too for

22     his client.

23          THE COURT:  All right.  And, Mr. Jackson, I don't

24     think you've got your phone on yet.  Do you?

25          MR. ACOSTA:  Your Honor, this is John Acosta.  We

1    submitted exhibits and a witness list as well.  I'm still

2    not able to connect on video but I can represent to you

3    there were no objection yesterday.  It appears at Docket 457

4    I believe.

5              THE COURT:  457 we have 1 through 6.  Mr.

6    Genender, can you confirm there's no objection to 457, 1 to

7    6?

8              MR. GENENDER:  No objection, Your Honor.

9              THE COURT:  All right.

10   (ECF 457, Exhibit Nos. 1 through 6 received)

11             THE COURT:  So before we start, I have a question

12   that matters to me I think and maybe you can explain to me

13   the answer and maybe you can explain why it shouldn't matter

14   to me.

15             I'm trying to understand what the economic reasons

16   are to shut down the plant versus to sell your interest in

17   the plant while it's operating.  And I don't know who wants

18   to take the lead on that, but I'm trying to understand from

19   an adequate protection point of view what economic losses

20   you suffer if, in fact, what you have to do is to sell the

21   interest in the plant versus shutting down the plant.  So I

22   don't know who wants to take that.

23             MR. KAPLAN:  Your Honor, I guess I can address it

24   to some extent.  It is somewhat outside my area of expertise

25   and if the Court wants to dive into detail I think Mr.

1    Roberts from Pew Center (ph) is probably the best suited of

2    the parties appearing today or of the witnesses.

3              You know, it's a possibility and my client needs

4    to do something.  What this litigation is about is

5    establishing what the rights are under the contract.  And

6    it's due to this legislation that the Montana legislature

7    passed that kind of chilled everything and was aimed at my

8    clients to just put a stop to everything and to that

9    process.

10             So, I mean, parties can always transact, but they

11   need to transact knowing what their rights are under the

12   contract.  And that's what we're getting to today.

13             As far as sales, again, this is outside my area of

14   expertise because this is such a heavily regulated industry.

15   But I know that prior attempts to sell or to reach various

16   settlements with Talen and perhaps even its predecessor have

17   not gone well with respect to the regulators of -- you know,

18   the clients cannot unilaterally decide to sell their

19   interest in these plants and just go ahead and transact in

20   30 days.  They need regulatory approval.  And so we are

21   unclear what that approval might look like.

22             I don't know if that's a complete answer, but

23   that's to the best of my knowledge.

24             THE COURT:  But it means I still don't understand

25   at all what's going on.  Is there a benefit to your clients

1    to closing down the plant rather than just abandoning their

2    interest in it?  I just can't really -- if your goal is to

3    close down the plant, I don't understand what adequate

4    protection you would need if you were delayed in closing

5    down the plant given that you could abandon your interest,

6    you could sell it.

7            If your goal isn't to close down the plant, then I

8    misunderstand where you're going.  And so I walk in just

9    confused about why we're here.

10            MR. KAPLAN:  Sure.  Abandoning the plant is not

11   really an option.  I mean, this is a very complicated

12   process.  One of my clients, Puget Sound Energy is actually

13   gone through the process of decommissioning the first two

14   units of coal strip, which were at the end of their life,

15   units 1 and 2.

16            We're here today talking about units 3 and 4 that

17   are still operating.  That's a multi-year process to get out

18   of something to shut it down, it's just a very complex

19   process from both an operational process and a regulatory

20   process.  I don't believe that the utility commissions are

21   going to let you just walk away and turn over the keys.

22            There's also the need for long range planning and

23   it cannot just happen instantly.  It's a many years process

24   and --

25            THE COURT:  I do understand how complicated that

```
 1    must be, I'm not a -- I have no idea though what the
 2    economic consequences are from an adequate protection point
 3    of view.  And, I mean, typically one of the key issues in a
 4    motion for relief from the stay is whether the debtor is
 5    providing adequate protection.  And I got it that you want
 6    to proceed with an arbitration, but I don't know why in the
 7    sense of the economic motivations for doing that.
 8              MR. KAPLAN:  Sure.  It's to establish clarity and
 9    if they -- if we go through the arbitration and the ultimate
10    results is that a less than unanimous vote is required to
11    shut it down, then the parties have guidance.  My clients
12    have guidance and they can start moving in that direction if
13    that's what they choose to do.  It would be subject to
14    offers from those parties who want to continue.
15              If there was a transaction to be had, it would
16    need regulatory approval.  If the arbitration turns out the
17    other way and North Western and Talen get their wish and an
18    unanimous vote is required, then my clients need to come to
19    grips with that and seek relief from the regulators as
20    necessary in order to exit the facility.
21              So we're kind of -- it's kind of doing a dance
22    here.  But the ultimate contractual rights, I think the
23    parties deserve to know what their contractual rights are
24    when they sit at the table to transact.
25              THE COURT:  But is your client's goal to shut it
```

1   down or is your client's goal not to shut it down?  Because

2   if your client's goal is to shut it down --

3       (Loud screech in recording)

4       THE COURT:  I'm sorry, I don't know if you could

5   hear that, but that was a problem.

6       MR. KAPLAN:  Yeah, I just lost you for ten

7   seconds, Your Honor.

8       THE COURT:  Yeah, it's 9:42 in the morning and

9   every day we're having their fire alarm problem and they're

10  working on it.  So I'm just going to make a note to tell

11  them -- they've been wanting to listen, so now they can come

12  and listen to it.

13      Yeah, but I don't understand at all if they want

14  to shut it down, what the cost to them of delay is versus if

15  they want to sell it, the cost of delay makes more sense and

16  because I need to know that to understand adequate

17  protection, I'm telling you I have no idea why your clients

18  are needing anything right now.

19      And I do understand that you want to understand

20  your rights, but if understanding your rights is done to

21  advance a goal, I got it.  But since -- if the goal is

22  shutting it down, I don't know what the rush is.  If the

23  goal isn't to shut it down, that's fine, but then why are we

24  going through the arbitration?

25      MR. JACKSON:  Your Honor, can you hear me, this is

1    Jay Jackson?

2            THE COURT:  Mr. Jackson, good morning and I can

3    hear you fine.

4            MR. JACKSON:  If I can address this from North

5    Western's point of view, perhaps that'll help.

6            THE COURT:  Sure.

7            MR. JACKSON:  A couple of years ago there was an

8    effort to sell one of the Pacific Northwest owner's

9    interest, it was Puget Sound Energy's interest in the units

10   -- in unit 3.  Talen also participated in that effort to

11   purchase Puget Sound Energy's interest.

12           Puget Sound Energy, as I understand it, presented

13   the contract and the proposal to their regulator in the

14   State of Washington and the regulator effectively put the

15   kibosh on it.  As a result, the contract was abandoned and

16   the sale was abandoned as well.

17           As it relates to abandoning the facility, the

18   reason that that's difficult, as I understand the system

19   works, is that North Western and Talen want to continue to

20   operate it.  It costs a lot of money on an annual basis to

21   operate.  Each of the owners participate in paying for the

22   budget, to continue to operate it, maintain it, and keep it

23   operating at a public utility practice level.

24           It would not work for the Pacific Northwest owners

25   to abandon their interests because it would leave North

1   Western and Talen with the obligation to continue to fund

2   it.  We would then look back to the Pacific Northwest owners

3   to continue to have them contribute.

4          And so the options, at least from our perspective

5   is, if there's a way to sell -- right now it does not appear

6   that that seems feasible and so the Pacific Northwest owners

7   have proceeded to act in a way that they want to close the

8   facility and comply with the State of Washington's

9   regulations and statute.

10         THE COURT:  So the Talen side wants to leave it

11  open and to charge the people who want to keep it -- who

12  want to close it for keeping it open?

13         MR. JACKSON:  Unless the facility were closed

14  pursuant to an action permitted under the ownership and

15  operation agreement as interpreted by the arbitration

16  proceeding.  They would continue to have an obligation to

17  fund the annual operation of units 3 and 4.

18         THE COURT:  Is the facility sellable?

19         MR. JACKSON:  That's an interesting question and I

20  must say, Your Honor, I don't know the answer to that.  It's

21  -- I guess maybe the best way to put it is it's sellable to

22  a party other than one of the current owners, which would be

23  in this case would either be North Western and Talen.  Is it

24  sellable to somebody else, I do not know?

25         THE COURT:  Does anyone know here?  Because I --

1    it may be that the Bankruptcy Code serves as a vehicle for

2    getting a sale to third parties because the debtor would

3    have the right potentially to sell its interest and any co-

4    owner's interest if it turns out that because of regulatory

5    reasons the interests are indivisible which, you know, may

6    be from what you're describing.

7         And I would -- the reason I'm pushing hard on the

8    economics is to try and figure out if lifting the stay to

9    allow people to go fight makes any sense, as opposed to an

10   economic solution that might make sense and might otherwise

11   not be available.

12        I also -- and I will tell you all the other

13   concern coming out.  I've got a bankruptcy court in Houston

14   dealing with a regulatory issue where essentially I've got

15   states fighting one another about what ought to happen and

16   I'm being asked to make determinations that will resolve

17   some of those regulatory issues by picking or allowing

18   someone else to pick what apparently each side believes to

19   be a parochial arbitration provision.  And I don't know why

20   the parties can't get together and just solve that question

21   and pick a -- if we're going to go to arbitration, why the

22   parties can't meet and pick an independent arbitration

23   mechanism that you both can live with.

24        And with respect to arbitration, I can allow

25   arbitration or say it isn't going to happen if it's going to

1   mess up the bankruptcy case.  I doubt I would do that if the

2   parties could all agree on how to arbitrate something.  But

3   in terms of having a continued useless arbitration fight to

4   figure out how to close something I don't know why the

5   parties can't agree on something that would eliminate this

6   parochial issue.  And federal law is going to trump state

7   law.

8          So if y'all could agree for example that you

9   wanted it to be arbitrated before an arbitrator in Missouri,

10  where we didn't have parochial concerns by each side, I

11  don't know that I couldn't order that.  I don't think I can

12  order it by the way different than the contracts without

13  agreement of the parties.

14         And so I'm not at all suggesting that I will come

15  out with a sua sponte order in arbitration in a different

16  state.  I think that's beyond my authority.  But I don't

17  understand why we can't come to a more palatable economic

18  solution on both fronts.  And maybe the first question that

19  I would really like to resolve is, can the parties agree on

20  a disposition method that makes sense for everyone.  And if

21  that is a sale of the facility with an investment banker on

22  the public markets to the highest bidder, then I think I can

23  order that just under federal law and I think I can order it

24  without consent of the co-owners and with due respect to the

25  regulators in Washington, I don't think they can stop the

1    sale of a plant by a bankruptcy court located in Montana

2    under their regulatory authority.

3            I think they can stop -- Montana maybe can.  But I

4    don't know how another state can come into Montana and

5    regulate the sale of its power plant to somebody in New York

6    under 363 of the Bankruptcy Code.

7            And if, in fact, that's what the stumbling block

8    is and we can get everybody together and say you can

9    effectively market the property, maybe that needs to be

10   considered.  And maybe I'll just want to have legal argument

11   before me today, but I would rather to get to a solution.

12           So, Mr. Kaplan, with those questions sort of,

13   frankly as far as I'm concerned, unanswered and I'm not

14   blaming you for that, it's not like you're not trying to

15   understand them, you are.  But in my mind, they remain

16   unanswered that -- so why this is a rational way to go.

17           If y'all want some time to talk about whether you

18   want to find an economic solution that I can facilitate,

19   I'll give the parties plenty of time to talk.  And if you

20   just want to proceed with your hearing, you can proceed with

21   your hearing.  I'm telling you it's going to be a hard

22   hearing to win when I don't understand what's going on and I

23   really don't.

24           MR. KAPLAN:  Your Honor, I think there -- I'm

25   getting some partial answers from my clients.  It's hard to

1    do this on the fly line appearing.  But with respect to just

2    the abandonment question, there are, as Mr. Jackson

3    indicated, contractual obligations to continue to pay for

4    the share of operations and for the maintenance.  And so

5    there would be walk away from the benefit and just keep all

6    of the costs, so that's not a realistic issue.

7            With respect to a sale of the facility, I think I

8    would like to -- I wasn't really prepared for it, but it's

9    within Mr. Roberts' expertise and if we're going to answer

10   those questions today, I think Mr. Roberts is the only

11   witness here who may be qualified.  He's not an attorney and

12   there's probably an alphabet of governing law here.  There's

13   the federal law and state law governing this generation of

14   power.

15           But if the Court will indulge me with my putting

16   Mr. Roberts on the stand because it sounds like -- I mean,

17   not to argue our motion, I think it is important to clarify

18   some of the procedural issues.  But I don't want to be

19   ducking the Court's questions on the overall economics,

20   because I feel like it's --

21           THE COURT:  No, look --

22           MR. KAPLAN:  -- a thing here.

23           THE COURT:  -- I got that, Mr. Kaplan.  Would it

24   help any if your clients want to, we'll take a break and let

25   y'all talk about whether you want to have an all owners

1    conference to see if a bankruptcy court order, and that way

2    you can talk to Mr. Roberts, by the way, not in front of me,

3    whether a bankruptcy court order to sell the property might

4    make some sense to everyone.  And then we'd come back, you

5    know, next week for this hearing.

6            But if you -- I'm not going to stop you from

7    proceeding today.  I'm trying to tell you the problems I've

8    got.  I would rather see an economic solution and if the

9    owners could determine if they want to try and jointly

10   market the property that could make some sense.

11           Mr. Genender, what's --

12           MR. GENENDER:  Your Honor, I can tag team -- can

13   you hear me okay?

14           THE COURT:  Why don't you come to the podium?

15           MR. GENENDER:  Sure.  I think we have a concern

16   about testimony coming on that's outside of the declarations

17   on this, even though it's a response to your issue.  But I

18   think there's a thought that maybe given the Court's issues

19   the Court has raised and the questions that perhaps it would

20   make sense to adjourn this hearing and allow those

21   discussions to take place.

22           THE COURT:  Well, it's that hearing.

23           MR. GENENDER:  Understood.

24           THE COURT:  You're defending it --

25           MR. GENENDER:  Understood.

1          THE COURT:  -- so I wanted to be sure they're okay

2     with it.  But you're okay if we take a break and -- would

3     your client be prepared to discuss in an open way whether

4     the sale of the entire plant on an open market makes sense?

5          MR. GENENDER:  I don't --

6          MR. KAPLAN:  Your Honor, I guess I would like a

7     short break to try to communicate with my client's team.

8     Where I'm heading is probably just a continuation for a week

9     or two but subject to client confirmation.  And then the

10    opportunity to brief the issues of, you know, the sanctity

11    of your order whether or not that can cure all of the

12    regulatory issues and trump them all, so.

13         THE COURT:  Well, it can't cure and trump them

14    all.  I will tell you that right from the beginning.  But it

15    can maybe cure and trump some of them.  And --

16         MR. KAPLAN:  Yep.

17         THE COURT:  -- I do think and I would love --

18    giving you time to brief this, because in case I'm wrong, I

19    don't want to waste everybody's time heading down the wrong

20    path.

21          I think under 363 that an ownership agreement that

22    would restrict the sale of an asset can be overridden by the

23    Bankruptcy Code, but it can't override police and regulatory

24    power.

25         MR. KAPLAN:  Yeah, yeah.

1              THE COURT:  But I don't think there's police and

2       regulatory power in a state where the plant isn't located

3       over who ought to own the plant.  Now, there may be police

4       and regulatory power as to whether somebody can buy power

5       from that plant, but that's a different question from the

6       operation and ownership of a plant, not within one state.

7              And almost surely, there's going to be federal

8       regulatory authority here.  But what I was hearing you say

9       was, is that an earlier attempt to sell got the kibosh from

10      regulatories in a state where the plant isn't located.  And

11      so a sale could be structured in theory, I don't know about

12      physically whether it could, but that was my impression from

13      reading the papers, where the transmission would not go into

14      a state that didn't want the transmission of coal generated

15      electricity.  If that state doesn't want it, I don't think

16      they can stop other states from getting it, as long as the

17      coal never enters their state.

18             But it may very well be the FERC or some other

19      entity would have regulatory authority and would, you know,

20      be properly exercising it by regulating a sale.  I don't

21      know whether under the law they would have the right to stop

22      a sale or not of a power plant or what the standards would

23      be, but I wouldn't be surprised if they didn't have

24      standards somebody would have to follow from a regulatory

25      point of view.

1        But why I don't do this, let's give you -- how

2   long do you want and we'll come back?  Do you want 30

3   minutes or so or an hour, tell me what would be helpful?

4        MR. KAPLAN:  Your Honor, I would ask for an hour

5   so that would be 11 a.m. Central time.

6        THE COURT:  So I have an 11 a.m. status conference

7   in another case.  I don't think it's going to last long, so

8   I would rather bring you back at 10:45 or 11:15 just so that

9   I'm not calling it exactly the same time, whatever one you

10  want.

11       MR. KAPLAN:  Sure, we'll take 11:15 then.  Thank

12  you.

13       THE COURT:  All right.  Does anybody object to

14  recessing till 11:15?

15     (No response)

16       THE COURT:  Okay.  We'll recess till then.  See

17  you at 11:15.  So you know, my schedule for the rest of the

18  day, I have a 1:30 that's going to last roughly an hour and

19  a half.  And beyond that, you've got my day.  And then I've

20  got time next week if we need time next week, and I've got

21  time the week after that, and any time in the week after

22  that.

23       Okay.  Thank you.  We're in recess.

24       MR. KAPLAN:  Thank you, Your Honor.

25     (Recessed at 9:58 a.m.; reconvened at 11:26 a.m.)

1          THE COURT:  And we're going to go back to the

2     Talen case.  It is 22-90054.  You do not need to make new

3     appearances in Talen, please press 5* if you wish to speak.

4          (Pause)

5          THE COURT:  Mr. Genender, I've got you back.

6          (Pause)

7          THE COURT:  Mr. Acosta, welcome back.

8          MR. ACOSTA:  Thank you, Your Honor.

9          THE COURT:  Mr. Kaplan, welcome back.

10         MR. KAPLAN:  Thank you, Your Honor.

11         THE COURT:  From 612-340-2600 I'm not sure, who do

12    I have?

13         MR. JACKSON:  It's Jay Jackson at 612.

14         THE COURT:  Mr. Jackson, welcome back to you as

15    well.  That's -- apparently didn't get your name associated

16    with it.

17         So, Mr. Kaplan, if I could go back to you and you

18    tell me what type of decision you might have made.

19         MR. KAPLAN:  Yes, I spoke to my clients and then

20    consulted with Mr. Genender and the North Western's counsel

21    as well.  We would like to continue the hearing to allow for

22    additional briefing to address some of the questions that

23    Your Honor was asking me this morning.

24         And the schedule that we worked out with opposing

25    counsel is still predicated on obtaining a hearing in the

1   range of July 12 and 13 if that would work for the Court.

2   But if one of those dates would be available, we'd talked

3   about my filing supplemental materials by the 20th of June

4   and the debtor having an opportunity to reply by July 1.

5           THE COURT:  So would July 12th at 9 o'clock in the

6   morning work for the parties?

7           MR. KAPLAN:  That works for me, Your Honor.

8           THE COURT:  How about anybody else have a

9   conflict, July 12th at 9 o'clock?  You may participate

10  hybrid or -- you can participate virtually or you

11  participate in court, whatever y'all want.  It's -- I'm not

12  sure if you've read all of our local procedures, but

13  everybody gets their own option, so everybody can choose a

14  different thing.

15          MR. GENENDER:  Judge, Paul Genender.  I am here

16  for the record with Jessica Liou, we're on the same line.

17  That's perfectly acceptable for the debtors, thank you.

18          THE COURT:  Mr. Acosta, I know you were trying to

19  talk and I didn't get to hear you.

20          MR. ACOSTA:  I'm sorry, Your Honor, Joe Acosta on

21  behalf of North Western Corporation.  July 12th works for

22  North Western Corporation, Your Honor.

23          THE COURT:  So how long do you think you're going

24  to need on that day?

25          MR. KAPLAN:  Your Honor, I would suggest an hour

1    or two.  It somewhat depends on in answering your questions,

2    what kind of further declarations or evidence we put on and

3    then the debtor's reaction to it.

4           THE COURT:  Yeah.

5           MR. KAPLAN:  So I can't predict.  And we were

6    prepared today to go with no witnesses, so we're probably

7    prepared for about an hour or so today.  It may be more

8    depending on the supplemental materials.  I just can't tell

9    you at this time.

10          THE COURT:  No, I have a plane that afternoon to

11   Corpus Christi, hearings the next day.  So if all you're

12   thinking of is two or three hours, that's more than what you

13   told me you're thinking about we shouldn't have any problem

14   finishing.  I just wanted to be sure you were aware of that.

15   And frankly, if I miss my plane and I fly out later, that

16   happens about every third month, so it's not that big of a

17   deal.  But I was just trying to figure out what I was doing

18   that day.

19          So we'll just see you at 9 o'clock.  And then why

20   don't you now in light of that, reannounce the schedule that

21   the parties have agreed to so we can have a record on the

22   record of the exact dates when different things will get

23   filed in advance of the July 12th, 9 o'clock hearing time.

24          MR. KAPLAN:  Oh, you want me to announce that.

25   Yes.  It's the movant's supplemental materials are due on

1    the 20th of June.  And then any responsive materials would

2    be due by noon on July 1, by noon Central time on July 1.

3    You know, I have not addressed North Western's briefing and

4    I'll let Mr. Acosta or Mr. Jackson address that if they

5    would be filing something additional by the 20th with us or

6    wait and respond to what we file.

7              MR. ACOSTA:  We're perfectly fine with filing on

8    the --

9              THE COURT:  Mr. Acosta, you broke up.  I think you

10   said you can live with the dates he said, but I'm not a

11   hundred percent sure that's what you said.

12             MR. ACOSTA:  Yes, Your Honor, we're perfectly fine

13   with the dates and we'll file our briefs on the same day as

14   the movant files its brief.

15             THE COURT:  Sounds good.  Were there discussions

16   about the parties trying to find a way to market the asset

17   or is that not going to occur and we're merely going to have

18   a hearing on whether to grant relief from the stay?

19             MR. ACOSTA:  Your Honor, with respect, this is Joe

20   Acosta, I hate to answer a question like that without

21   studying it really, really carefully.  But I would point the

22   Court out to Section 363(h).  It applies to the sale of co-

23   tenancies.  And it says that the Court can, in fact, sell a

24   co-tenancy under certain circumstances.

25             So one of those circumstances is not where the

1    property is used for production, transmission, distribution

2    or sale of electric energy or of natural or synthetic gas.

3    And that appears to apply to coal strips from a high level,

4    Your Honor.

5           So that's something I pointed out to the parties

6    during our discussion.  I did want to point out to the Court

7    before because --

8           THE COURT:  And I did not remember that, when I

9    was making my suggestions.  That may bar what I was thinking

10   of doing.  I'm not so sure the parties couldn't agree to do

11   it anyway and have meetings on how to jointly sell the

12   asset.

13          Are -- is this owned in a co-tenancy as opposed to

14   owned in an entity?

15          MR. KAPLAN:  It is, Your Honor.

16          THE COURT:  All right.  Well, be creative and

17   y'all think of a way to get everybody to get the right thing

18   done.  363 obviously H deals with selling the interest of a

19   recalcitrant party.  But maybe we have -- I don't know if

20   it's a word, all calcitrant parties, if we can find a way to

21   get the asset marketed and sold by a trusted person, with

22   third party bidding.  I mean, assets -- the country is

23   better off in general if assets are operated.

24          One could argue I know that we're better off not

25   operating coal assets.  But that's a different question than

1    what I would normally be confronting, but maybe I'll have to

2    confront it here.  But certainly the economics are generally

3    going to be better if you can sell this to somebody who can

4    operate it in a productive way.

5              So I have a hearing on the 362, I won't have a

6    hearing on 363, and hopefully y'all can have some productive

7    conversations and know that I am open to listening to some

8    creative ways to try and solve what looks like a very

9    difficult problem that your clients are confronting.  And I

10   would prefer to facilitate a solution than not.  And it may

11   be that I can't.  But I don't want people -- yep, okay.

12             MR. KAPLAN:  All right.

13             THE COURT:  Well, good luck to you all.  I will

14   see you all on July 12th, thank you.  Good to meet all the -

15   -

16             MR. KAPLAN:  Thank you.

17             THE COURT:  -- lawyers I hadn't before.  Thank,

18   y'all.

19             MR. GENENDER:  Thank you, Your Honor.

20   (Proceedings concluded at 11:34 a.m.)

21                         *  *  *  *  *

22

23

24

25

```
 1                    E X H I B I T   I N D E X

 2   NO.                                            RECEIVED

 3   ECF 463, Exhibit Nos. 1 through 22                 6

 4   ECF 450, Exhibit Nos. 1 and 2                      6

 5   ECF 457, Exhibit Nos. 1 through 6                  7

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          <u>CERTIFICATION</u>

2

3       I certify that the foregoing is a correct transcript from

4       the electronic sound recording of the proceedings in the

5       above-entitled matter.

6       matter.

7

8       _____

9       SHEILA ORMS

10

11

12

13

14      Veritext Legal Solutions

15      330 Old Country Road

16      Suite 300

17      Mineola, NY 11501

18

19      Date:   June 14, 2022

20

21

22

23

24

25