**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **TALEN ENERGY SUPPLY, LLC,** *et al.*, | § § | **Case No. 22-90054 (MI)** |
| | § § | **(Jointly Administered)** |
| Debtors.[1] | § § § | Re: Docket Nos. 17, 127 |

**NOTICE OF INTENT TO EXECUTE CERTAIN
AMENDMENTS TO DIP CREDIT AGREEMENT**

**PLEASE TAKE NOTICE** that, on May 10, 2022, Talen Energy Supply, LLC and

its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession

(collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the Southern District

of Texas (the "**Court**") the *Emergency Motion of Debtors for Interim and Final Orders*

*(A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing the Debtors to Use*

*Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative*

*Expense Status, (D) Granting Adequate Protection to the Prepetition First Lien Secured Parties,*

*(E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief*

[Docket No. 17] (the "**DIP Financing Motion**");

**PLEASE TAKE FURTHER NOTICE** that, on May 11, 2022, the Court entered

the *Interim Order (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing*

*the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority*

*Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition First Lien*

*Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and*

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/talenenergy. The Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

*(G) Granting Related Relief* [Docket No. 127] (the "**Interim DIP Order**") approving the Debtors'

entry into the DIP Credit Agreement[2] and granting other relief requested in the DIP Financing

Motion on an interim basis.

        **PLEASE TAKE FURTHER NOTICE** that the Debtors intend to execute certain

amendments to the DIP Credit Agreement no earlier than Friday, June 17, 2022 substantially in the

form attached hereto as **Exhibit A** (the "**Amendment No. 1**"), subject to satisfaction of the terms

of the DIP Documents (as may be amended, modified, or supplemented from time to time, including

by the Final Order).

        **PLEASE TAKE FURTHER NOTICE** that the cleansing materials related to the

Amendment No. 1 (the "**Cleansing Materials**") shared with certain DIP Lenders and Prepetition

First Lien Secured Parties are attached hereto as **Exhibit B**.

*[Remainder of Page Intentionally Left Blank]*

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Interim DIP Order.

Dated: June 15, 2022
      Houston, Texas

*/s/ Gabriel A. Morgan*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email: Gabriel.Morgan@weil.com
      Clifford.Carlson@weil.com

– and –

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Alexander Welch (admitted *pro hac vice*)
Katherine Lewis (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Matt.Barr@weil.com
      Alexander.Welch@weil.com
      Katherine.Lewis@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\98671550\4\76974.0003

**<u>Certificate of Service</u>**

I hereby certify that on June 15, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


<u>/s/  Gabriel A. Morgan</u>
Gabriel A. Morgan

**<u>Exhibit A</u>**

**Amendment No. 1**

*Posting Version*

## AMENDMENT NO. 1 TO DIP CREDIT AGREEMENT

This AMENDMENT NO. 1 TO DIP CREDIT AGREEMENT, dated as of June [17], 2022 (this "Amendment No. 1"), is entered into by and among (i) Talen Energy Supply, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), (ii) the Subsidiary Guarantors listed on the signature pages hereto, (iii) Citibank, N.A. ("Citibank"), as administrative agent and as collateral trustee (in such capacities, including any permitted successor thereto, the "Administrative Agent") and (iv) each of the Lenders listed on the signature pages hereto (the "Consenting Lenders").

### W I T N E S S E T H:

WHEREAS, the Borrower, the Administrative Agent, the Consenting Lenders and the other Lenders and Issuing Banks are party to that certain Superpriority Secured Debtor-In-Possession Credit Agreement dated as of May 11, 2022 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Existing Credit Agreement" and, the Existing Credit Agreement, as amended by this Amendment No. 1, the "Credit Agreement"; capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement) pursuant to which the Lenders and Issuing Banks agreed, subject to the terms and conditions contained therein, to extend credit to the Borrower;

WHEREAS, pursuant to Section 13.10(a) of the Existing Credit Agreement, the Borrower, the other Credit Parties, the Administrative Agent and the Consenting Lenders (which, together, constitute Required Lenders under the Existing Credit Agreement) have agreed to amend such provisions of the Existing Credit Agreement as provided herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties signatory hereto agree as follows:

1.   Amendments to Credit Agreement.  The Existing Credit Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example:  ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example:  **double-underlined text**) as set forth on the pages of the Credit Agreement attached as Annex A hereto.

2.   Conditions Precedent to Effectiveness.  This Amendment No. 1 shall not be effective until each of the following conditions precedent have been waived or fulfilled to the satisfaction of the Administrative Agent (such date referred to herein as, the "Amendment No. 1 Effective Date"):

(a)   the Administrative Agent shall have received this Amendment No. 1, duly executed by each of the Credit Parties and the Consenting Lenders;

(b)   the representations and warranties set forth herein and in the other Credit Documents (including those representations and warranties that, by their terms, are specifically made as of the Closing Date, which for the avoidance of doubt, shall be made as of the Amendment No. 1 Effective Date) shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any portion of any such representation and warranty that is already qualified or modified by materiality in the text thereof);

(c)   (i) the Administrative Agent shall have received a consent fee for the account of each Consenting Lender and amount equal to (x) in the case of Consenting Lenders that are Term Loan Lenders, 0.10% of such Term Loan Lender's outstanding Term Loans and unused Term Loan Commitments under the Credit Agreement immediately prior to the Amendment No. 1 Effective Date

and (y) in the case of Consenting Lenders that are Revolving Lenders, 0.10% of such Revolving Lender's outstanding Revolving Loan Commitments under the Credit Agreement immediately prior to the Amendment No. 1 Effective Date and (ii) all fees required to be paid on the Amendment No. 1 Effective Date pursuant to that certain Fee Letter, dated as of June [17], 2022 among the Borrower and the Administrative Agent shall have been paid.

3.  <u>Representations and Warranties</u>.  The Borrower hereby represents and warrants, after giving effect to this Amendment No. 1, as follows:

(a)  the execution, delivery and performance by each Credit Party of this Amendment are within such Credit Party's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action and do not (a) contravene the terms of any of such Person's certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents); or (b) violate any law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority, except in the case of any contraventions that would not reasonably be expected, enter individually or in the aggregate, to result in a Material Adverse Effect;

(b)  this Amendment No. 1 has been duly executed and delivered by each Credit Party and constitutes a legal, valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its terms except to the extent that the enforceability thereof may be limited by applicable Bankruptcy Law or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law);

(c)  no Default or Event of Default has occurred and is continuing.

4.  <u>Reference to and Effect on Credit Documents</u>.

(a)  On and after the date hereof, each reference in the Existing Credit Agreement to "this Agreement," "hereunder," "hereof" or words of like import referring to the Existing Credit Agreement shall mean and be a reference to the Existing Credit Agreement, as amended by this Amendment No. 1, and each reference to the Existing Credit Agreement in the other Credit Documents shall mean the Existing Credit Agreement, as amended by this Amendment No. 1.

(b)  The Credit Agreement and the other Credit Documents, after giving effect to the Amendment No. 1, shall be and remain in full force and effect in accordance with their terms as amended hereby and hereby are ratified and confirmed in all respects.

(c)  The execution, delivery and effectiveness of this Amendment No. 1 shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any party to the Existing Credit Agreement.  On and after the effectiveness of this Amendment No. 1, this Amendment No. 1 shall for all purposes constitute a Credit Document under and as defined in the Credit Agreement.

(d)  Each Credit Party hereby ratifies and confirms in all respects all of its obligations under the Credit Documents to which it is a party, as amended hereby, and each Credit Party hereby ratifies and confirms in all respects any prior grant of a security interest under the Credit Documents to which it is party, as amended hereby.

5.  <u>No Novation</u>.  This Amendment No. 1 evidences solely the amendment of certain specified terms and obligations of the Credit Parties under the Existing Credit Agreement and is not a novation or discharge of any of the other obligations of the Credit Parties under the Existing Credit Agreement

that are not hereby amended.  There are no other understandings, express or implied, among the Credit Parties and the Administrative Agent regarding the subject matter hereof or thereof.

6.      Governing Law.  SECTION 13.07 OF THE CREDIT AGREEMENT IS INCORPORATED HEREIN BY REFERENCE MUTATIS MUTANDIS.

7.      Headings.  The headings of the several sections and subsections of this Amendment No. 1 are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Amendment No. 1.

8.      Counterparts; Facsimile Execution.  This Amendment No. 1 may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Amendment No. 1 by facsimile, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Amendment No. 1.

9.      Severability. In case any provision in this Amendment No. 1 shall be invalid, illegal or unenforceable, such provision shall be severable from the remainder of this Amendment No. 1 and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

10.     Miscellaneous.  The terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

IN WITNESS WHEREOF, this Amendment No. 1 has been duly executed and delivered by each of the parties hereto as a sealed instrument as of the date first above written.

**TALEN ENERGY SUPPLY, LLC,** as the Borrower

By:_____
    Name:  John Chesser
    Title:   Chief Financial Officer

**BARNEY DAVIS, LLC**
**BRANDON SHORES LLC**
**BRUNNER ISLAND, LLC**
**FORT ARMISTEAD ROAD – LOT 15 LANDFILL, LLC**
**H.A. WAGNER LLC**
**LAREDO, LLC**
**LOWER MOUNT BETHEL ENERGY, LLC**
**MARTINS CREEK, LLC**
**MC OPCO LLC**
**MONTOUR, LLC**
**NUECES BAY, LLC**
**PENNSYLVANIA MINES, LLC**
**RAVEN FS PROPERTY HOLDINGS LLC**
**RAVEN LOT 15 LLC**
**RAVEN POWER FINANCE LLC**
**RAVEN POWER FORT SMALLWOOD LLC**
**RAVEN POWER GENERATION HOLDINGS LLC**
**SUSQUEHANNA NUCLEAR, LLC**
**TALEN ENERGY MARKETING, LLC**
**TALEN GENERATION, LLC**
**TALEN MONTANA HOLDINGS, LLC**
**TALEN NE LLC**
**TALEN TEXAS, LLC**
as Subsidiary Guarantors

    By:_____
    Name:  John Chesser
    Title: Senior Vice President, Treasurer and Head of M&A

**TALEN MONTANA, LLC**
**MONTANA GROWTH HOLDINGS LLC**
as Subsidiary Guarantors

    By:_____
    Name:  John Chesser
    Title: Chief Financial Officer

[Signature Page to Amendment No. 1]

**Error! Unknown document property name.**

**PEDRICKTOWN COGENERATION COMPANY LP**
**NEWARK BAY COGENERATION PARTNERSHIP, L.P.**
**DARTMOUTH POWER ASSOCIATES LIMITED PARTNERSHIP**
**CAMDEN PLANT HOLDING, L.L.C.**
**ELMWOOD PARK POWER, LLC**
**YORK GENERATION COMPANY LLC**
**TALEN ENERGY SERVICES HOLDINGS, LLC**
**MORRIS ENERGY OPERATIONS COMPANY, LLC**
**HOLTWOOD, LLC**
**TALEN TREASURE STATE, LLC**
**TALEN ENERGY SERVICES NORTHEAST, INC.**
**SAPPHIRE POWER GENERATION HOLDINGS LLC**
**MORRIS ENERGY MANAGEMENT COMPANY, LLC**
**SAPPHIRE POWER LLC**
**SAPPHIRE POWER FINANCE LLC**
**MEG GENERATING COMPANY, LLC**
**SAPPHIRE POWER MARKETING LLC**
**DARTMOUTH PLANT HOLDING, LLC**
**DARTMOUTH POWER HOLDING COMPANY, L.L.C.**
**DARTMOUTH POWER GENERATION, L.L.C.**
**ELMWOOD ENERGY HOLDINGS, LLC**
**NEWARK BAY HOLDING COMPANY, L.L.C.**
**LIBERTY VIEW POWER, L.L.C.**
**PEDRICKTOWN INVESTMENT COMPANY LLC**
**PEDRICKTOWN MANAGEMENT COMPANY LLC**
**YORK PLANT HOLDING, LLC**
**RAVEN POWER PROPERTY LLC**
**RAVEN POWER GROUP LLC**
**REALTY COMPANY OF PENNSYLVANIA**
**BRUNNER ISLAND SERVICES, LLC**
**TALEN TEXAS GROUP, LLC**
**RMGL HOLDINGS LLC**
**TALEN NUCLEAR DEVELOPMENT, LLC**
**TALEN ENERGY RETAIL LLC**
**LADY JANE COLLIERIES, INC.**
**BDW CORP.**
**BELL BEND, LLC**
**MONTOUR SERVICES, LLC**
**TALEN TEXAS PROPERTY, LLC**
**TALEN LAND HOLDINGS, LLC**
**NORTHEAST GAS GENERATION HOLDINGS, LLC**
**TALEN ENERGY SERVICES GROUP, LLC**
**TALEN II GROWTH PARENT LLC**
as Subsidiary Guarantors


By:_____
Name:  John Chesser
Title: Chief Financial Officer and Treasurer


[Signature Page to Amendment No. 1]

Error! Unknown document property name.

**Citibank, N.A.**, as Administrative Agent and a Consenting Lender,

By:_____
Name:
Title:

[Signature Page to Amendment No. 1]

**Error! Unknown document property name.**

**[__]**, as a Consenting Lender,

By:_____
Name:
Title:

[Signature Page to Amendment No. 1]

**Error! Unknown document property name.**

**ANNEX A**

**<u>Amended Credit Agreement</u>**

(To be attached)

*Execution Version*Annex A

---

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

TALEN ENERGY SUPPLY, LLC,
a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code,

The Lenders Party Hereto,

and

CITIBANK, N.A.,
as Administrative Agent and Collateral Trustee

_____

Dated as of May 11, 2022
_____

CITIBANK, N.A.,
GOLDMAN SACHS BANK USA,
RBC CAPITAL MARKETS LLC[1],
BARCLAYS BANK PLC,
CREDIT SUISSE LOAN FUNDING LLC,
DEUTSCHE BANK SECURITIES INC.,
JPMORGAN CHASE BANK, N.A.,

and

MUFG BANK, LTD.,
as Joint Lead Arrangers and Joint Bookrunners

---

[1] RBC Capital Markets is a brand name for the capital markets activities of Royal Bank of Canada and its affiliates.

TABLE OF CONTENTS

Page

SECTION 1.  Defined Terms ........................................................................................ 1

1.01.  Other Definitional Provisions, etc. ........................................................ 40
1.02.  Accounting Terms .................................................................................. 4041
1.03.  Rounding ................................................................................................ 41
1.04.  Times of Day .......................................................................................... 41
1.05.  Timing of Payment of Performance ....................................................... 41
1.06.  [Reserved]. ............................................................................................. 41
1.07.  Calculations, Computations ................................................................... 41
1.08.  Interest Rate Calculations ...................................................................... 4142
1.09.  Disclaimer .............................................................................................. 4142

SECTION 2.  Amount and Terms of Credit ................................................................ 42

2.01.  The Commitments. ................................................................................. 42
2.02.  Minimum Amount of Each Borrowing .................................................. 4243
2.03.  Notice of Borrowing. ............................................................................. 4243
2.04.  Disbursement of Funds .......................................................................... 43
2.05.  Notes. ..................................................................................................... 44
2.06.  Conversions ........................................................................................... 44
2.07.  Pro Rata Borrowings ............................................................................. 4445
2.08.  Interest. .................................................................................................. 45
2.09.  Interest Periods ...................................................................................... 4546
2.10.  Increased Costs. ..................................................................................... 46
2.11.  Compensation. ....................................................................................... 47
2.12.  Change of Lending Office ...................................................................... 4748
2.13.  Replacement of Lenders ........................................................................ 4748
2.14.  Defaulting Lenders ................................................................................ 49
2.15.  Incremental Term Loans; Revolving Commitment Increases. ............... 50
2.16.  Extension of Maturity Date .................................................................... 52
2.17.  [Reserved]. ............................................................................................. 53
2.18.  Alternate Rate of Interest. ...................................................................... 53
2.19.  Priority and Liens; No Discharge. .......................................................... 54

SECTION 3.  Letters of Credit. ................................................................................... 56

3.01.  Letters of Credit. .................................................................................... 56
3.02.  Maximum Letter of Credit Outstandings; Final Maturities ................... 57
3.03.  Letter of Credit Requests; Minimum Stated Amount. ........................... 58
3.04.  Letter of Credit Participations. ............................................................... 58
3.05.  Agreement to Repay Letter of Credit Drawings. ................................... 60
3.06.  Increased Costs ...................................................................................... 6061
3.07.  Provisions Related to Extended Revolving Loan Commitments. ........... 61
3.08.  Conflict with Letter of Credit Request ................................................... 61

SECTION 4.  Unused Commitment Fee; Fees; Reductions of Commitment. .............. 6162

4.01.  Fees. ....................................................................................................... 6162
4.02.  Voluntary Termination of Unutilized Revolving Loan Commitments. ... 62
4.03.  Mandatory Reduction of Commitments. ................................................ 6263

-i-

Page

SECTION 5.     Prepayments; Payments; Taxes...................................................................... 63

    5.01.     Voluntary Prepayments............................................................................ 63
    5.02.     Mandatory Prepayments........................................................................... 6364
    5.03.     Method and Place of Payment.................................................................. 6465
    5.04.     Taxes........................................................................................................ 65

SECTION 6.     Conditions Precedent......................................................................................... 67

    6.01.     Conditions Precedent to Closing and Initial Credit Event....................... 6768
    6.02.     Conditions to Borrowing on the Full Availability Date............................ 70
    6.03.     Conditions to Each Credit Event.............................................................. 7071

SECTION 7.     [Reserved]........................................................................................................... 72

SECTION 8.     Representations and Warranties........................................................................ 72

    8.01.     Company Status....................................................................................... 72
    8.02.     Power and Authority; Due Authorization, Execution and Delivery......... 72
    8.03.     No Violation............................................................................................. 72
    8.04.     Approvals.................................................................................................. 7273
    8.05.     Financial Statements; Projections; No Material Adverse Effect............... 73
    8.06.     Litigation.................................................................................................. 73
    8.07.     True and Complete Disclosure................................................................. 73
    8.08.     Margin Regulations.................................................................................. 7374
    8.09.     Tax Returns and Payments....................................................................... 74
    8.10.     Compliance with ERISA.......................................................................... 74
    8.11.     [Reserved]................................................................................................ 7475
    8.12.     Properties.................................................................................................. 7475
    8.13.     Subsidiaries.............................................................................................. 75
    8.14.     Compliance with Statutes, etc.................................................................. 75
    8.15.     Investment Company Act.......................................................................... 75
    8.16.     Environmental Matters............................................................................. 75
    8.17.     [Reserved]................................................................................................. 75
    8.18.     Intellectual Property, etc........................................................................... 7576
    8.19.     Anti-Terrorism Laws; OFAC; FCPA....................................................... 7576
    8.20.     Energy Regulatory Matters....................................................................... 76

SECTION 9.     Affirmative Covenants....................................................................................... 76

    9.01.     Information Covenants.............................................................................. 76
    9.02.     Books, Records and Inspections............................................................... 7879
    9.03.     Maintenance of Property; Insurance......................................................... 79
    9.04.     Existence; Franchises............................................................................... 7980
    9.05.     Compliance with Statutes, etc.................................................................. 7980
    9.06.     Compliance with Environmental Laws..................................................... 80
    9.07.     End of Fiscal Years.................................................................................. 80
    9.08.     Payment of Taxes..................................................................................... 80
    9.09.     Use of Proceeds........................................................................................ 80
    9.10.     Additional Security; Further Assurances; etc........................................... 8081
    9.11.     Designation of Subsidiaries...................................................................... 82
    9.12.     Ratings...................................................................................................... 82
    9.13.     [Reserved]................................................................................................. 82
    9.14.     Risk Management Policies........................................................................ 8283

-ii-

Page

| | | |
|---|---|---|
| 9.15. | [Reserved] | 8283 |
| 9.16. | Certain Case Milestones | 8283 |
| 9.17. | Certain Other Bankruptcy Matters. | 8283 |
| 9.189. | Bankruptcy Notices | 83 |
| 9.1920. | [Reserved]. | 83 |
| 9.201. | Monthly Conference Call | 83 |
| SECTION 10. | Negative Covenants | 8384 |
| 10.01. | Liens | 8384 |
| 10.02. | Consolidation, Merger or Sale of Assets, etc. | 86 |
| 10.03. | Restricted Payments. | 8687 |
| 10.04. | Indebtedness. | 88 |
| 10.05. | Dividend and Other Payment Restrictions Affecting Subsidiaries. | 9091 |
| 10.06. | Transactions with Affiliates. | 9293 |
| 10.07. | Additional Covenants | 94 |
| 10.08. | Asset Sales | 9495 |
| 10.09. | Susquehanna Dispositions | 95 |
| 10.10. | Restricted Debt Payments | 95 |
| 10.11. | [Reserved]. | 9596 |
| 10.12. | [Reserved] | 9596 |
| 10.13. | [Reserved] | 9596 |
| 10.14. | [Reserved]. | 9596 |
| 10.15. | Subsidiaries. | 9596 |
| 10.16. | Additional Bankruptcy Matters | 9596 |
| SECTION 11. | Events of Default and Remedies | 96 |
| 11.01. | Payments | 96 |
| 11.02. | Representations, etc | 96 |
| 11.03. | Covenants | 9697 |
| 11.04. | Default Under Other Agreements | 9697 |
| 11.05. | Bankruptcy, etc | 9697 |
| 11.06. | ERISA. | 97 |
| 11.07. | Security Documents. | 9798 |
| 11.08. | Judgments | 9798 |
| 11.09. | Change of Control | 9798 |
| 11.10. | [Reserved] | 9798 |
| 11.11. | Bankruptcy Events | 9798 |
| SECTION 12. | The Administrative Agent. | 10½2 |
| 12.01. | Appointment | 10½2 |
| 12.02. | Nature of Duties. | 10½2 |
| 12.03. | Lack of Reliance on the Administrative Agent | 102 |
| 12.04. | Certain Rights of the Administrative Agent | 10½3 |
| 12.05. | Reliance | 103 |
| 12.06. | Indemnification | 103 |
| 12.07. | The Administrative Agent in its Individual Capacity | 103¾ |
| 12.08. | Holders | 103¾ |
| 12.09. | Resignation by the Administrative Agent. | 103¾ |
| 12.10. | Collateral Matters. | 104⅘ |
| 12.11. | Delivery of Information | 105⅚ |
| 12.12. | First Lien Intercreditor Agreement | 106 |

-iii-

Page

SECTION 13.    Miscellaneous. ..................................................................................... 1067

13.01.    Payment of Expenses, etc. ............................................................... 1067
13.02.    Right of Setoff ................................................................................ 108
13.03.    Notices. .......................................................................................... 1089
13.04.    Benefit of Agreement; Assignments; Participations. ...................... 109
13.05.    No Waiver; Remedies Cumulative ................................................ 112
13.06.    Payments Pro Rata. ........................................................................ 1123
13.07.    GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF
              JURY TRIAL. ............................................................................ 1123
13.08.    Counterparts ................................................................................... 1134
13.09.    Headings Descriptive ..................................................................... 1134
13.10.    Amendment or Waiver; etc. ........................................................... 114
13.11.    Survival .......................................................................................... 1156
13.12.    Register ........................................................................................... 1156
13.13.    Confidentiality ................................................................................ 1156
13.14.    No Advisory or Fiduciary Responsibility ...................................... 1167
13.15.    PATRIOT ACT ............................................................................. 117
13.16.    Post-Closing Actions ...................................................................... 117
13.17.    Interest Rate Limitation .................................................................. 1178
13.18.    Lender Action ................................................................................. 1178
13.19.    Effectiveness ................................................................................... 1178
13.20.    Domicile of Loans .......................................................................... 1178
13.21.    Acknowledgement and Consent to Bail-In of Affected Financial Institutions ......... 118
13.22.    Acknowledgement Regarding Any Supported QFCs ..................... 1189
13.23.    Erroneous Payments. ...................................................................... 119
13.24.    Conflicts; Financing Orders Control ............................................. 121

SCHEDULE A                    Subsidiary Debtors
SCHEDULE 1.01(a)            Lender Addresses
SCHEDULE 1.01(b)            Commitments
SCHEDULE 1.01(c)            [Reserved]
SCHEDULE 2.18                 [Reserved]
SCHEDULE 8.10                 Plans
SCHEDULE 8.12                 Real Property
SCHEDULE 8.13                 Subsidiaries
SCHEDULE 8.16                 Environmental Matters
SCHEDULE 10.01               Liens
SCHEDULE 10.04               Indebtedness
SCHEDULE 10.06               Affiliate Transactions
SCHEDULE 13.16               Post-Closing Matters

EXHIBIT A-1                   Form of Notice of Borrowing
EXHIBIT A-2                   Form of Notice of Conversion/Continuation
EXHIBIT B-1                   Form of Revolving Note
EXHIBIT B-2                   [Reserved]
EXHIBIT B-3                   Form of Term Loan Note
EXHIBIT C                     Form of Letter of Credit Request
EXHIBIT D-1                   Form of U.S. Tax Compliance Certificate
EXHIBIT D-2                   Form of U.S. Tax Compliance Certificate
EXHIBIT D-3                   Form of U.S. Tax Compliance Certificate
EXHIBIT D-4                   Form of U.S. Tax Compliance Certificate
EXHIBIT E                     Form of Guarantee and Collateral Agreement
EXHIBIT G                     Form of Compliance Certificate

#95606088v60
98679498

EXHIBIT H                Form of Assignment and Assumption Agreement
EXHIBIT I                 Form of Interim Order
EXHIBIT J                Form of First Lien Intercreditor Agreement

#95606088v60

98679498

## CREDIT AGREEMENT

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of May 11, 2022 among TALEN ENERGY SUPPLY, LLC (the "Borrower"), a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, CITIBANK, N.A., as administrative agent (in such capacity, including any permitted successor thereto, the "Administrative Agent") and as collateral trustee (in such capacity, including any permitted successor thereto, the "Collateral Trustee") under the Credit Documents, and each Lender and each Issuing Lender from time to time party hereto.

WHEREAS, on May 9, 2022, (the "Petition Date"), the Borrower, and certain Subsidiaries and Affiliates of the Borrower (collectively, and together with any other Affiliates of the Borrower that become debtors-in-possession in the Cases, the "Debtors") filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of the Borrower and such Subsidiaries, a "Case" and collectively, the "Cases") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested the Lenders to extend credit (a) in the form of Revolving Loans and Letters of Credit at any time and from time to time prior to the Maturity Date, in an aggregate principal amount at any time outstanding not in excess of $300,000,000 (the "Revolving Facility"), (b) in the form of Term Loans in an aggregate principal amount of $1,000,000,000 (the "Term Facility" and, together with the Revolving Facility, the "New Money Credit Facilities") and (c) in the form of a continuing letter of credit facility to roll up the letters of credit outstanding under the Prepetition Revolving Credit Agreement in an aggregate undrawn amount of $457,905,219 (the "Continuing Letter of Credit Facility" and, together with the New Money Credit Facilities, the "Credit Facilities"), with all of the obligations with respect to all of the foregoing to be guaranteed by each Credit Party;

WHEREAS, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein;

WHEREAS, priority of the Credit Facilities with respect to the Collateral granted to secure the Obligations shall be as set forth in the Interim Order and the Final Order, in each case upon entry thereof by the Bankruptcy Court, and in the Security Documents; and

WHEREAS, all of the claims and the Liens granted under the Financing Orders and the Credit Documents to the Administrative Agent and the Lenders in respect of the Credit Facilities shall be subject to the Carve Out.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

SECTION 1.    Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Accounting Change" shall have the meaning provided in Section 1.07.

"Acquired Debt" shall mean, with respect to any specified Person:

(a)    Indebtedness of any other Person or asset existing at the time such other Person or asset is merged with or into, is acquired by, or became a Restricted Subsidiary of such specified Person, as the case may be, whether or not such Indebtedness is incurred in connection with, or in contemplation of, or to finance, such other Person merging with or into, or becoming a Restricted Subsidiary of, such specified Person; and

(b)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"Additional Lender" shall mean, at any time, any bank, other financial institution or debt provider that, in any case, is not an existing Lender and that agrees to provide any portion of any Incremental Facility in accordance with Section 2.15; provided that each Additional Lender shall be subject to the approval of the Administrative Agent (such approval not to be unreasonably withheld, delayed or conditioned), in each case to the extent any such consent would be required from the Administrative Agent and each Issuing Lender under Section 13.04(c) for an assignment of Loans to such Additional Lender.

"Additional Security Documents" shall have the meaning provided in Section 9.10.

"Adjusted Daily Simple SOFR" shall mean, for purposes of any calculation, the rate per annum equal to Daily Simple SOFR for such calculation; provided that if Adjusted Daily Simple SOFR as so determined shall ever be less than the Floor, then Adjusted Daily Simple SOFR shall be deemed to be the Floor.

"Adjusted Term SOFR" shall mean, for purposes of any calculation, the rate per annum equal to Term SOFR for such calculation; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" shall have the meaning assigned to such term in the introductory statement to this Agreement and shall include any permitted successor to the Administrative Agent appointed pursuant to Section 12.09.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" shall mean, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; provided however that none of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of the Borrower or any Subsidiary thereof as a result of this Agreement, the extension of credit hereunder, or its actions in connection herewith or any other Credit Document.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Affiliate Pricing Options" means the pricing options pursuant to (i) that certain Option Agreement for Omnibus Energy Supply, dated as of September 20, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), among Susquehanna Data LLC, Susquehanna Nuclear LLC and Talen Generation, LLC, (ii) that certain Amendment and Restated Retail Energy Supply Agreement, dated as of September 20, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), between Cumulus Data and Talen Generation, LLC and (iii) that certain Amendment and Restated Energy Supply Agreement, dated as of September 20, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), between Susquehanna Nuclear LLC and Talen Generation, LLC.

"Affiliate Transaction" shall have the meaning provided in Section 10.06(a).

"Agent" shall mean the Administrative Agent, the Collateral Trustee and any other agent appointed hereunder and each of their respective successors and assigns.

"Agent Advisors" shall mean (i) Davis Polk & Wardwell LLP, (ii) RPA Advisors, LLC and (iii) any other financial advisor, auditor, attorney, accountant, appraiser, auditors, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts reasonably retained by the Administrative Agent and/or the Required Lenders with the prior consent of the Borrower (not to be unreasonably withheld or delayed).

"Agreement" shall mean this Superpriority Secured Debtor-In-Possession Credit Agreement as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended, refinanced or renewed from time to time.

"Amendment No. 1" means that certain Amendment No. 1 to DIP Credit Agreement, dated as of June [17], 2022, by and among the Borrower, the Administrative Agent and the Lenders party thereto.

"Amendment No. 1 Effective Date" shall have the meaning provided in Amendment No. 1.

"Applicable Law" shall mean, as to any Person, any ordinance, law, treaty, rule or regulation or any determination, ruling or other directive by and from an arbitrator or a court or other Governmental Authority, in each case, applicable to or binding on such Person or any of its property or assets or to which such Person or any of its property is subject.

"Applicable Margin" shall mean for any day and for any Loan, the following percentages per annum set forth opposite such Loans:

| Class | Term Benchmark Loan | Base Rate Loan |
|---|---|---|
| Revolving Loans | 4.75% | 3.75% |
| Term Loans | 4.75% | 3.75% |

Notwithstanding the foregoing, if the Effective Yield applicable to any Incremental Term Loans incurred pursuant to Section 2.15 exceeds the Effective Yield of the Initial Term Loans at such time by more than 50 basis points, then the interest rate margins for the Initial Term Loans shall be increased to the extent necessary so that the Effective Yield of the Initial Term Loans is equal to the Effective Yield of such Incremental Term Loans minus 50 basis points; provided that any increase in Effective Yield to any Initial Term Loan due to the application or imposition of a Benchmark or Base Rate floor on any Incremental Term Loan shall be effected, at the Borrower's option, (x) through an increase in (or implementation of, as applicable) any Benchmark or Base Rate floor applicable to such Initial Term Loan, (y) through an increase in the Applicable Margin for such Initial Term Loan or (z) any combination of (x) and (y) above, and in each case, solely to the extent that the application or imposition of such floor would cause an increase in the interest rate then in effect under the Initial Term Loans.

"Approved Bankruptcy Court Order" means (a) each of the Financing Orders, as such order is amended and in effect from time to time in accordance with this Agreement, (b) any other order entered by the Bankruptcy Court regarding, relating to or impacting (i) any rights or remedies of any Secured Party, (ii) the Credit Documents (including the Credit Parties' obligations thereunder), (iii) the Collateral, any Liens thereon or any Superpriority Claims (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), (iv) use of cash collateral, (v) debtor-in-possession financing, (vi) adequate protection or otherwise relating to any Prepetition First Lien Secured Debt, (vii) [reserved], or (viii) any Chapter 11 Plan, in any such case, that (x) is in form and substance reasonably satisfactory to the Administrative Agent, (y) has not been vacated, reversed or stayed and (z) has not been amended or modified in a manner adverse to the rights of the Lenders except as agreed in writing by Administrative Agent and the Required Lenders in their sole discretion, and (c) any other order entered by the Bankruptcy Court that (i) is in form and substance reasonably satisfactory to the Administrative Agent, (ii) has not been vacated, reversed or stayed and (iii) has not been amended or modified except in a manner not adverse to the interests of the Administrative Agent and the Lenders in their capacities as such or as is otherwise reasonably satisfactory to the Administrative Agent.

"Approved Fund" shall mean any Fund that is administered, advised or managed by a Lender or an Affiliate of the entity that administers, advises or manages any Fund that is a Lender.

#95606088v60

98679498

"Approved Plan" shall mean a reorganization pursuant to a Chapter 11 Plan that (i) upon the consummation thereof, provides for the termination of the aggregate Commitments and indefeasible payment in full in cash of the Obligations under the Credit Documents (unless each holder thereof agrees to different treatment) and is otherwise acceptable to the Administrative Agent and (ii) indefeasibly repays in full in cash any outstanding "Obligations," as defined in the Prepetition Revolving Credit Agreement (with no outstanding letters of credit issued thereunder and with any commitments thereunder fully terminated), to the extent not fully rolled up, or provides for such other treatment for such obligations as is acceptable to Citibank, N.A., in its capacity as administrative agent under the Prepetition Revolving Credit Agreement.

"Arrangers" shall mean, in their respective capacities as joint lead arrangers and joint bookrunners hereunder, Citibank, N.A., Goldman Sachs Bank USA, RBC Capital Markets LLC, Barclays Bank PLC, Credit Suisse Loan Funding LLC, Deutsche Bank Securities Inc., JPMorgan Chase Bank, N.A. and MUFG Bank, LTD..

"Asset Sale" shall mean (a) the sale, lease (other than an operating lease), conveyance or other disposition of any assets or property other than in the ordinary course of business; provided that the sale, conveyance or other disposition of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries taken as a whole will be governed by Section 10.02 and not by Section 10.08 and (b) the issuance of Equity Interests in any of the Borrower's Restricted Subsidiaries or the sale of Equity Interests in any of the Borrower's Subsidiaries.

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(i)      the licensing of intellectual property pursuant to an agreement in effect on the Petition Date;

(ii)     a transfer of assets or Equity Interests between or among the Borrower and its Restricted Subsidiaries and/or between Restricted Subsidiaries (other than the transfer of any Power Plant Property from a Restricted Subsidiary to the Borrower); provided that if the transferor of such property is a Subsidiary Guarantor or the Borrower then (i) the transferee thereof must either be the Borrower or a Subsidiary Guarantor or (ii) to the extent such transaction constitutes an Investment, such Investment is a Permitted Investment and any Indebtedness corresponding to such Investment must be permitted by Section 10.04;

(iii)    an issuance of Equity Interests by a Restricted Subsidiary of the Borrower to the Borrower or to a Restricted Subsidiary of the Borrower;

(iv)     the sale, lease, conveyance, disposition or other transfer of products or services (including power, power or fuel capacity, energy, power or fuel ancillary services, and other products or services, or the sale of any other inventory or contracts related to any of the foregoing (in each case, whether in physical, financial or any other form), or fuel or emission credits) and any sale, conveyance, transfer or other disposition of damaged, worn-out or obsolete assets;

(v)      the sale or discount, in each case without recourse, of accounts receivable, in connection with the compromise or collection thereof;

(vi)     the consummation of the transactions contemplated by the Post-Petition PPSA;

(vii)    the consummation of the OCGT Agreement Transactions;

(viii)   the sale or other disposition of cash or Cash Equivalents;

(ix)     a Restricted Payment that does not violate Section 10.03 or a Permitted Investment;

(x)      [reserved];

-4-

(xi)    a disposition of assets in connection with a foreclosure, transfer or deed in lieu of foreclosure or other exercise of remedial action;

(xii)    [reserved]; or

(xiii)    any disposition of property and assets to the extent it constitutes, or results from, a Recovery Event.

"Assignee" shall have the meaning provided in Section 13.04(c)(i).

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit H (appropriately completed).

"Attributable Debt" shall mean, in respect of a sale and leaseback transaction, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction including any period for which such lease has been extended or may, at the option of the lessor, be extended.  Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP; provided, however, that if such sale and leaseback transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

"Authorized Officer" shall mean, with respect to (i) delivering Notices of Borrowing, Notices of Conversion/Continuation and similar notices, and any other matter or matters in connection with this Agreement or any other Credit Documents, the chief executive officer, the president, the chief financial officer, the treasurer, the assistant treasurer, the principal accounting officer, the general counsel, assistant general counsel, any senior vice president or any vice president or any other responsible financial or accounting officer of the Borrower or any other Person that has or have been authorized by the board of directors of the Borrower to deliver such notices pursuant to this Agreement and (ii) delivering financial information (including, without limitation, calculations of "Fair Market Value") and Officer's Certificates pursuant to this Agreement, the chief executive officer, the president, the chief financial officer, the treasurer, the assistant treasurer, the principal accounting officer, the general counsel, any senior vice president or any vice president or any other person of the Borrower having substantially the same responsibilities as the aforementioned officers or that have been authorized by the board of directors of the Borrower to deliver such financial information or certificates.

"Available Tenor" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (e) of Section 2.18.

"Avoidance Actions" has the meaning set forth in the Interim Order or the Final Order, as applicable.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" shall mean, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" shall mean Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended from time to time and any successor thereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Cases from time to time.

"Bankruptcy Law" shall mean the Bankruptcy Code, or any similar federal or state or other law for the relief of debtors.

"Base Rate" shall mean, at any time, a rate per annum equal to the greatest of (i) the Prime Lending Rate at such time, (ii) 1/2 of 1% per annum in excess of the NYFRB Rate at such time and (iii) Adjusted Term SOFR for a one-month tenor in effect on such day plus 1.00%.  Any change in the Base Rate shall be effective from and including the effective date of such change; provided that, if the Base Rate as determined pursuant to the foregoing would be less than 1.75%, such rate shall be deemed to be 1.75% for purposes of this Agreement and any other Credit Document.

"Base Rate Borrowing" shall mean any Borrowing of a Base Rate Loan.

"Base Rate Loan" shall mean each Loan that bears interest based on the Base Rate.

"Base Rate Term SOFR Determination Day" shall have the meaning provided in the definition of "Term SOFR".

"Benchmark" shall mean, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" shall mean the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of Section 2.18.

"Benchmark Replacement" shall mean with respect to any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(a)       Adjusted Daily Simple SOFR; or

(b)       the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time, and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread

#95606088v60

98679498

adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated debtor-in-possession credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement and/or any Term Benchmark Loan, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"Benchmark Replacement Date" shall mean the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided

-7-

that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" shall mean, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.18 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Credit Document in accordance with Section 2.18.

"Beneficial Owner" shall have the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act.  The terms "Beneficially Owns" and "Beneficially Owned" shall have a corresponding meaning.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Bilateral Hedge" shall mean, any Hedging Agreement not constituting an FCM Hedge.

"Bilateral Hedging Collateral Upsize Reallocation Amount" shall mean, at any time and subject in each case to pro forma compliance with the applicable basket, the amount that the Borrower has elected by written notice to the Administrative Agent given on one or more occasions (which notice shall be made available by the Administrative Agent to any Lender upon request), to reallocate from basket capacity then available to make Investments pursuant to clause (w) of the definition of "Permitted Investments" (such clause, the "Non-Debtor Investment Basket") to basket capacity to grant liens under Section 10.01(c) (the "Bilateral Hedging Collateral Basket"); provided, that (i) such amount so reallocated shall in no event exceed $100,000,000 at any time, (ii) the Borrower may at any time, by written notice to the Administrative Agent (which shall be made available by the Administrative Agent to any Lender upon request) reallocate any unused amount of the Bilateral Hedging Collateral Upsize Reallocation Amount previously reallocated to the Bilateral Hedging Collateral Basket back to the Non-Debtor Investment Basket  in its sole discretion and (iii) any amount reallocated to be used under the Bilateral Hedging Collateral Basket shall not reduce amounts available under the proviso contained in the Non-Debtor Investment Basket, unless such amounts have been reallocated back to the Non-Debtor Investment Basket and are used in connection with Investments contemplated thereby.

"Bilateral Hedging Counterparty" shall mean, with respect to the Borrower or a Restricted Subsidiary, such Person's counterparty to any Bilateral Hedging~~e Agreement that is not an FCM Counterparty~~(other than an Operational Hedge); provided that any Bilateral Hedging Counterparty, or its credit support provider (including, for the avoidance of doubt, the issuer of a letter of credit in favor of the Borrower or a Restricted Subsidiary) or guarantor, shall either (w) be a Revolving Lender (or an Affiliate thereof) on the Closing Date, (x) have a corporate rating of BBB- or higher by S&P or a corporate family rating of Baa3 or higher by Moody's (or an equivalent rating by another nationally recognized statistical rating organization of similar standing if either of such ratings agencies is not then in the business of providing such ratings) at the time such counterparty accedes to the First Lien Intercreditor Agreement, (y) ~~solely with respect to a Hedging Agreement in effect on the Petition Date,~~ be a counterparty of the Borrower or any Restricted Subsidiary with respect to ~~such~~a Hedging Agreement on the Petition Date or (z) be J. Aron & Company LLC.

-8-

"Board of Directors" shall mean:

(a)      with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(b)      with respect to a partnership, the Board of Directors of the general partner of the partnership;

(c)      with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(d)      with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"Borrowing" shall mean the borrowing of one Type of Loan of a single Class from all the Lenders having Commitments with respect to such Class on a given date (or resulting from a conversion or conversions on such date) and, in the case of Term Benchmark Loans, as to which a single Interest Period is in effect..

"Business Day" shall mean any day (other than a day which is a Saturday, Sunday or legal holiday in the State of New York) on which banks are open for business in New York City.

"Capital Lease Obligations" shall mean, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"Capital Stock" shall mean:

(a)      in the case of a corporation, corporate stock;

(b)      in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(c)      in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(d)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Carve Out" has the meaning set forth in the Interim Order or the Final Order, as applicable.

"Carve Out Trigger Notice" has the meaning set forth in the Interim Order or the Final Order, as applicable.

"Case" and "Cases" shall have the meanings assigned to such terms respectively in the recitals to this Agreement.

-9-

"Cash Equivalents" shall mean:

(a)     United States dollars, Canadian dollars, Euros or, in the case of any Foreign Subsidiary, any local currencies held by it from time to time;

(b)     (i) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (provided that the full faith and credit of the United States is pledged in support of those securities) and (ii) debt obligations issued by the Government National Mortgage Association, Farm Credit System, Federal Home Loan Banks, Federal Home Loan Mortgage Corporation, Financing Corporation and Resolution Funding Corporation, in each case under clauses (i) and (ii) above, having maturities of not more than 12 months from the date of acquisition;

(c)     certificates of deposit and eurodollar time deposits with maturities of six months or less from the date of acquisition, bankers' acceptances with maturities not exceeding 12 months and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus in excess of $500,000,000 and a rating of A3 or higher from Moody's and A- or higher from S&P;

(d)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (b) and (c) above entered into with any financial institution meeting the qualifications specified in clause (c) above;

(e)     commercial paper and auction rate securities having one of the two highest ratings obtainable from Moody's or S&P and in each case maturing within 12 months after the date of acquisition;

(f)     readily marketable direct obligations issued by any state of the United States or any political subdivision thereof, in either case having one of the two highest rating categories obtainable from either Moody's or S&P; and

(g)     (i) money market funds that invest primarily in securities described in clauses (a) through (f) of this definition or (ii) short duration liquidity funds with a total weighted average maturity of no more than ninety (90) days that invest primarily in securities having a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, including those described in clauses (a) through (f) of this definition.

"Cash Flow Forecast" shall mean a cash flow forecast for the Debtors on a consolidated basis, broken down by weeks, covering the 13-week period following delivery thereof, in form and detail reasonably satisfactory to the Required Lenders or the Administrative Agent, which shall reflect, for the periods covered thereby, projected weekly disbursements (in line item detail), cash receipts (in line item detail), loan balances (in line item detail) and ending cash for each week covered by the Cash Flow Forecast and include bank and book cash balance reporting based on actuals; provided that such cash flow forecast shall include supporting information, including a TWCF model underpinning summary and cQuant production and revenue data in form and substance substantially consistent with such information delivered to RPA Advisors, LLC prior to the Petition Date. As used herein, "Cash Flow Forecast" shall initially refer to the projections most recently delivered on or prior to the Petition Date and, thereafter, the most recent Cash Flow Forecast delivered by the Borrower in accordance with Section 9.01(i).

"Cash Management Order" has the meaning provided in the definition of "First Day Orders".

#95606088v60

98679498

"Change in Law" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority, requiring compliance by any Lender (or lending office of such Lender).

"Change of Control" shall mean:

(i)       the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Borrower and its Subsidiaries, taken as a whole, to any "person" (as that term is used in Section 13(d) of the Exchange Act, but excluding any employee benefit plan of the Borrower or any of its Restricted Subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of such plan);

(ii)      the adoption of a plan relating to the liquidation or dissolution of the Borrower;

(iii)     the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as defined above), other than a corporation owned directly or indirectly by the stockholders of the Borrower in substantially the same proportion as their ownership of stock of the Borrower prior to such transaction, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Borrower, measured by voting power rather than number of shares; provided, that, the Borrower shall at all times be directly or indirectly wholly owned by Talen.

"Chapter 11 Plan" shall mean a chapter 11 plan in any or all of the Cases of the Debtors.

"Claims" shall have the meaning provided in the definition of "Environmental Claims."

"Class" or "Tranche" (a) when used with respect to Lenders, refers to whether such Lenders are Lenders of Revolving Loans or Term Loans (which shall not comprise the same Class) in each case having the same terms and Maturity Date, (b) when used with respect to Commitments, refers to the Commitments relating to a given Class of Loans as described in preceding clause (a) and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Loans of a given Class provided by Lenders of such Class as described in preceding clause (a).

"Closing Date" shall mean the first date that all of the conditions precedent in Section 6.01 are satisfied or waived in accordance with Section 6.01, which date is May 11, 2022.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document or any Financing Order, including, without limitation, all Guarantee and Collateral Agreement Collateral, all Mortgaged Properties and, for the avoidance of doubt, including any common or preferred equity, or other interest or claim, in or against any Non-Debtor Entity and held by a Credit Party; provided that Collateral shall exclude all Excluded Assets.

"Collateral Trustee" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"Commitment" shall mean any of the commitments (excluding, for the avoidance of doubt, any Letter of Credit Commitment) of any Lender, i.e., a Revolving Loan Commitment, a Term Loan Commitment, or a Commitment with respect to any other Class of Loans hereunder (as same may be adjusted from time to time in accordance with the terms hereof).

#95606088v60

98679498

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Company" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"Compliance Certificate" shall have the meaning provided in Section 9.01(d).

"Concurrent Cash Distribution" shall have the meaning provided in the definition of "Investments."

"Connection Income Taxes" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Total Assets" shall mean, as of any date of determination, the total consolidated assets of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered in accordance with Section 9.01(a) or (b), and after giving pro forma effect to any acquisition or disposal of any property or assets consummated after the date of the applicable balance sheet and on or prior to the date of determination.

"Consummation Date" shall have the meaning provided in the definition of "Maturity Date".

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary indemnity obligations in effect on the Closing Date or customary and reasonable indemnity obligations entered into in connection with any contractual arrangement, including, but not limited to, any acquisition, capital expenditure, investment or disposition of assets permitted under this Agreement (other than any such obligations with respect to Indebtedness). The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Continuing Letter of Credit Facility" shall have the meaning assigned to such term in the recitals to this Agreement.

"Continuing Letter of Credit Facility Agreement" shall mean that certain Superpriority Secured Continuing Debtor-in-Possession Letter of Credit Facility Agreement, dated as of the date hereof, by and among the Borrower, Citibank, N.A., as administrative agent and as collateral trustee, and each issuing lender party thereto.

"Continuing Letter of Credit Issuing Lender" shall mean each issuing lender party to the Continuing Letter of Credit Facility Agreement.

"Continuing Letter of Credit Obligations" shall mean "Obligations", as defined in the Continuing Letter of Credit Facility Agreement.

"Contract" shall have the meaning provided in the definition of "Excluded Assets".

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Covered Party" has the meaning provided in Section 13.22.

"Credit Documents" shall mean this Agreement and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Note (if any), the Financing Orders, the Guarantee and Collateral Agreement and each other Security Document.

"Credit Event" shall mean the making of any Loan or the issuance, amendment, increase or extension of any Letter of Credit, other than any amendment, increase or extension that does not increase the maximum Stated Amount of such Letter of Credit.

"Credit Facilities" shall have the meaning assigned to such term in the recitals to this Agreement.

"Credit Party" shall mean the Borrower and each Subsidiary Guarantor.

"Cumulus Entities" means Cumulus Growth Holdings LLC and its direct and indirect subsidiaries (including, for the avoidance of doubt, any such direct and indirect subsidiaries that would constitute a Subsidiary of the Borrower).

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to SOFR for the day (such day "$i$") that is five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website.  If by 5:00 pm (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any day "$i$", the SOFR in respect of such day "$i$" has not been published on the SOFR Administrator's Website and a Benchmark Replacement Date with respect to the Daily Simple SOFR has not occurred, then the SOFR for such day "$i$" will be the SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which such SOFR was published on the SOFR Administrator's Website; provided that any SOFR determined pursuant to this sentence shall be utilized for purposes of calculation of Daily Simple SOFR for no more than three (3) consecutive SOFR Rate Days.  Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrower.

"Debtors" shall have the meaning assigned to such term in the recitals to this Agreement.

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would (without cure or waiver hereunder) constitute an Event of Default.

"Defaulting Lender" shall mean any Lender with respect to which a Lender Default is in effect.

"DIP Budget" has the meaning provided in Section 6.01(j)(x).

"DIP Hedges" shall mean Bilateral Hedges and FCM Hedges.

"DIP Issuing Lenders" shall mean, collectively, each Issuing Lender and each Continuing Letter of Credit Issuing Lender.

"<u>DIP Orders</u>" shall mean, collectively, the Interim Order and the Final Order.

"<u>Disposition Exceptions</u>" shall have the meaning provided in <u>Section 10.09</u>.

"<u>Disqualified Institutions</u>" shall mean, the persons identified by the Borrower in writing to the Administrative Agent prior to the Closing Date. Notwithstanding anything to the contrary contained in this Agreement, (a) the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions and (b) the Borrower (on behalf of itself and the other Credit Parties) and the Lenders acknowledge and agree that the Administrative Agent shall have no responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and that the Administrative Agent shall have no liability with respect to any assignment or participation made to a Disqualified Institution.

"<u>Disqualified Stock</u>" shall mean any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the Maturity Date. Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Borrower to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the terms of such Capital Stock provide that the Borrower may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with <u>Section 10.03</u>. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Borrower and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"<u>Dollar Equivalent</u>" shall mean, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any currency other than Dollars, the equivalent amount thereof in Dollars as determined by the Administrative Agent or the applicable Issuing Lender, as the case may be, on the basis of the Exchange Rate (determined in respect of the most recent Measurement Date or other relevant date of determination) for the purchase of Dollars with such currency.

"<u>Dollars</u>" and the sign "<u>$</u>" shall each mean freely transferable lawful money of the United States.

"<u>Domestic Subsidiary</u>" shall mean any Restricted Subsidiary of the Borrower that was incorporated or organized in the United States or any state thereof or the District of Columbia.

"<u>Drawing</u>" shall mean any amount paid by the applicable Issuing Lender in respect of drafts, demands and other presentations for payment under any Letter of Credit (including, in each case, fees and interest thereon).

"<u>EEA Financial Institution</u>" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

-14-

"Effective Yield" shall mean, as to any term loan, the effective yield on such loans as reasonably determined by the Administrative Agent in consultation with the Borrower, consistent with generally accepted financial practices, taking into account the applicable interest rate margins (but not any fluctuations in any Benchmark), any interest rate floors by equating the excess amount of any such floor to interest margin, and all fees, including recurring, up-front or similar fees or original issue discount (amortized over the shorter of (x) the life of such loans and (y) the four years following the date of incurrence thereof) payable generally to Lenders making such loans, but excluding (i) any arrangement, commitment, structuring and underwriting fees and any amendment fees or other fees paid or payable in connection therewith that are not generally shared with the Lenders thereunder and (ii) any customary consent fees paid generally to consenting Lenders.  For purposes of the calculation of Effective Yield, if such term loan includes an interest rate floor greater than the applicable interest rate floor with respect to the Initial Term Loans, such differential between interest rate floors shall be considered in the calculation of Effective Yield only to the extent an increase in the interest rate floor in the Initial Term Loans would cause an increase in the interest rate then in effect thereunder.

"Eligible Transferee" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in commercial loans in the ordinary course of business or any other "accredited investor" (as defined in Regulation D of the Securities Act) (other than a natural person) but in any event excluding (i) the Borrower and its respective Subsidiaries and (ii) Disqualified Institutions (to the extent that such institution has been disclosed on a list that has been made available to all Lenders).

"Environmental Claims" shall mean any administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, investigations and/or adjudicatory proceedings relating to noncompliance with, or liability arising under, Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereafter, "Claims"), including, without limitation, (a) any Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (b) any Claims by any third party arising out of or relating to the presence of, or exposure to, Hazardous Materials.

"Environmental Law" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment or human health or safety (as such relates to exposure to Hazardous Materials) or Hazardous Materials.

"Equity Interests" shall mean Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean any person that would be deemed at any relevant time to be a single employer or otherwise aggregated with the Borrower or any of its Subsidiaries under Section 414(b) or (c) of the Code or Section 4001 of ERISA, or for purposes of Section 412 of the Code, under Section 414(m) or (o) of the Code.

"ERISA Event" shall mean any one or more of the following:

(a)     any Reportable Event;

(b)     the filing of a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or the termination of any Plan under Section 4041(c) of ERISA;

-15-

(c) the institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan;

(d) the failure to make a required contribution to any Plan that would reasonably be expected to result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance; the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived; or the filing of any request for or receipt of a minimum funding waiver or an extension of any amortization period under Section 412 of the Code with respect to any Plan, or that such filing may be made;

(e) a determination that any Plan is, or is expected to be, in "at risk" status (as defined in Section 303(i)(4) or Section 430(i)(4) of the Code;

(f) the failure to make any required contribution to a Multiemployer Plan; the complete or partial withdrawal of the Borrower or any of its Subsidiaries or any ERISA Affiliate from a Multiemployer Plan; the reorganization or insolvency under Title IV of ERISA of any Multiemployer Plan; or notification that a Multiemployer Plan is in "endangered" or "critical" status within the meaning of Section 305 of ERISA or Section 412 of the Code;

(g) the Borrower or any of its Subsidiaries or any ERISA Affiliate ceases operations at a facility so as to become subject to the provisions of Section 4062(e) of ERISA or withdraw as a substantial employer so as to become subject to the provisions of Section 4063(a) of ERISA or ceases making contributions to any Plan subject to Section 4064(a) of ERISA;

(h) the Borrower or any of its Subsidiaries of any ERISA Affiliates incurs liability under Section 4069 or 4212(c) of ERISA; or

(i) the Borrower or any of its Subsidiaries have incurred with respect to a Plan or any Multiemployer Plan a material tax under Chapter 43 of the Code or a material civil penalty under Section 409, 502(i) or 502(l) of ERISA.

"Erroneous Payment" has the meaning provided in Section 13.23(a).

"Erroneous Payment Deficiency Assignment" has the meaning provided in Section 13.23(d)(i).

"Erroneous Payment Impacted Class" has the meaning provided in Section 13.23(d)(i).

"Erroneous Payment Return Deficiency" has the meaning provided in Section 13.23(d).

"Erroneous Payment Subrogation Rights" has the meaning provided in Section 13.23(e).

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Euros" shall mean the single currency of participating member states of the Economic and Monetary Union of the European Union.

"Event of Default" shall have the meaning provided in Section 11.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

#95606088v60

98679498

"Exchange Rate," shall mean, for a currency (other than Dollars), the rate determined by the Administrative Agent to be the rate quoted by the Administrative Agent as the exchange rate for the purchase by the Administrative Agent of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m., New York City time, on the date two (2) Business Days prior to the date as of which the foreign exchange computation is made; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if it does not have as of the date of determination a spot buying rate for any such currency.

"Excluded Assets" shall mean:

(i)       any General Intangible (as defined in the Guarantee and Collateral Agreement) or other rights arising under a lease, contract, agreement, property rights, franchise, investment, permit or license or any contractual obligation entered into by a Credit Party (each a "Contract") and any asset that is subject to any Contract binding on such asset at the time of the acquisition thereof and not incurred in contemplation of such acquisition to the extent such Contract applicable to such Credit Party (x) prohibits, or requires the consent of any person (other than the Credit Parties and their affiliates) that has not been obtained as a condition to, the grant of a security interest in such Contract or any asset subject thereto or (y) would terminate or would be terminable as a result of the grant of a security interest in such Contract or any asset subject thereto (in each case, unless such law, rule, regulation, term provision or condition would be rendered ineffective with respect to the creation of the security interest hereunder pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the UCC, the Bankruptcy Code or other applicable law); provided that the prohibitions specified above shall not include any Proceeds (as defined in the UCC) of any such Contract,

(ii)      any "intent-to-use" application for registration of a trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto,

(iii)     Margin Stock,

(iv)      to the extent in the possession of a third party pursuant to the terms of a fuel enrichment or similar arrangement, ~~yellowcake or U₃0₈~~ uranium; provided that, regardless of the constitution of any ~~yellowcake or U₃0₈~~ uranium received from such third party after such enriching or similar arrangement, for the avoidance of doubt, immediately upon the return to any Credit Party of any proceeds or products related to such ~~yellowcake or U₃0₈~~ uranium, such proceeds or products shall not constitute an Excluded Asset ,

(v)       [reserved];

(vi)      any asset owned by any Credit Party on the date hereof or hereafter acquired that is subject to a Lien permitted by Section 10.01(f), but only to the extent that the contract or written agreement governing such permitted Lien or the permitted debt secured thereby expressly prohibits the grant of a Lien or a security interest on such asset but, in any case, only for so long as and to the extent that such prohibition remains in place,

(vii)     those assets (if any) as to which the Collateral Trustee and the Borrower shall have determined that the cost of obtaining a security interest is excessive in relation to the value of the security to be afforded thereby,

(viii)    the Equity Interests of captive insurance subsidiaries and not-for-profit subsidiaries,

(ix)      any property or assets to the extent the granting of a security interest in which would be prohibited by contractual obligation (including, for the avoidance of doubt, organizational documents) applicable to such property or assets (and not any other property or assets) of the Borrower or the applicable Subsidiary Guarantor as of the date of acquisition of such property or assets (and not created in

-17-

contemplation thereof) and any amendment, restatement, extension, refinancing or other modification thereof or to the extent such grant of a security interest is prohibited by any law, rule or regulation or requires a consent not obtained of any Governmental Authority; <u>provided</u> that this clause (ix) will not apply to restrictions overridden by the UCC anti-assignment provisions or by other applicable law or as a result of the Cases or, to the extent this clause (ix) was applicable because the grant of a security interest would violate applicable law, if there is a change of law that would result in a grant of a security interest no longer violating applicable law; <u>provided</u>, further, that upon the removal of all restrictions specified in this clause (ix) or upon such change in law, as may be applicable, the exclusion set forth in this clause (ix) shall no longer apply,

(x)        to the extent that applicable law requires that a subsidiary of any Credit Party issues nominee or directors' qualifying shares, such nominee or qualifying shares,

(xi)        any property or assets to the extent the granting of a security interest in which would result in material adverse tax consequences as reasonably determined by the Borrower in consultation with the Collateral Trustee,

(xii)        cash and/or letters of credit credited to or carried for, and all products and proceeds thereof at any time held by the counterparty under any FCM Hedge (an "FCM Counterparty"), or carried by others on behalf of such FCM Counterparty to the extent permitted by Section 10.01(b), but only to the extent that the FCM Hedge governing such Lien or the permitted futures or cleared swaps secured thereby expressly prohibits the grant of a Lien or a security interest on such asset but, in any case, only for so long as and to the extent that such prohibition remains in place,

(xiii)        Prepetition Cash Collateral not to exceed the amount outstanding on the Closing Date; *provided* that, for the avoidance of doubt, immediately upon the release of any Prepetition Cash Collateral, such cash shall no longer constitute an Excluded Asset,

(xiv)        any interest (including any Equity Interest of any Subsidiary) in partnerships, joint ventures and non-wholly owned subsidiaries which cannot be pledged without the consent of one or more third parties or such pledge is otherwise prohibited by such Person's organizational documents (in each case, unless such prohibition would be rendered ineffective with respect to the creation of the security interest hereunder pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the UCC, the Bankruptcy Code or other applicable law), excluding proceeds thereof,

(xv) cash collateral posted in favor of the counterparty under any Hedging Agreement (other than FCM Counterparties) to the extent permitted by Section 10.01(c), but only to the extent that such Hedging Agreement governing such Lien expressly prohibits the grant of a Lien or a security interest on such asset but, in any case, only for so long as and to the extent that such prohibition remains in place,

(xvi) Avoidance Actions, and, at all times prior to the entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise,

(xvii)        assets excluded from Collateral by Section 2.19(b)(iv) hereof; and

(xvi)        any direct Proceeds (as defined in the UCC), substitutions or replacements of any of the foregoing, but only to the extent such Proceeds, substitutions or replacements would otherwise constitute Excluded Assets.

"Excluded Hedging Obligation" means, with respect to any Subsidiary Guarantor, any Hedging Obligation if, and to the extent that, all or a portion of the guarantee of such Subsidiary Guarantor of, or the grant by such Subsidiary Guarantor of a security interest to secure, such Hedging Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Subsidiary

-18-

Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the security interest of such Subsidiary Guarantor becomes effective with respect to such Hedging Obligation.  If a Hedging Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedging Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Subsidiary" shall mean:

       (a)      [reserved],

       (b)      Unrestricted Subsidiaries,

       (c)      any captive insurance Subsidiary,

       (d)      not-for-profit Subsidiaries,

       (e)      [reserved],

       (f)      any Immaterial Subsidiary,

       (g)      any Subsidiary, to the extent a guarantee of which is prohibited or restricted by contracts (including, for the avoidance of doubt, organizational documents) existing on the Closing Date (or if acquired after the Closing Date, on the date of such acquisition) (provided that such contracts were not entered into in contemplation hereof) or applicable law (including any requirement to obtain governmental (including regulatory) authority or third party consent, approval, license or authorization) or would result in materially adverse tax consequences as reasonably determined by Borrower,

       (h)      [reserved], and

       (i)      any Subsidiary that is not directly or indirectly a Wholly-Owned Subsidiary of the Borrower.

Notwithstanding the foregoing or anything to the contrary, no Subsidiary shall be an Excluded Subsidiary under this Agreement or any other Credit Document if it is a Debtor.

"Excluded Taxes" shall mean with respect to any Lender or Agent (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender or Agent being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) Taxes attributable to such Lender or Agent's failure to comply with Section 5.04(f), (c) any withholding Taxes that are imposed under FATCA, and (d) any U.S. federal withholding Tax that is imposed on amounts payable to or for the account of a Lender, pursuant to a law in effect at the time such Lender becomes a party to this Agreement (other than pursuant to an assignment request by the Borrower under Section 2.22(b)) or designates a new lending office, except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Credit Parties with respect to such withholding Tax pursuant to Section 5.04(a).

"Existing Letters of Credit" shall have the meaning provided in Section 3.09.

"Fair Market Value" shall mean the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by an Authorized Officer of the Borrower.

#95606088v60

98679498

"FASB" shall mean the Financial Accounting Standards Board.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCM" shall mean a futures commission merchant as defined in the Commodity Exchange Act.

"FCM Counterparty" shall mean any FCM party to an FCM Hedge.

"FCM Hedges" shall mean Hedging Agreements in the form of futures or cleared swaps constituting Hedging Agreements entered into with, or through, a clearing member FCM of Nodal Clear, LLC or ICE Clear US, Inc.

"FCPA" has the meaning provided in Section 8.19.

"Federal Funds Rate" shall mean, on any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as the federal funds effective rate, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by the Administrative Agent (rounded upward, if necessary, to a whole multiple of 1/100 of 1.00%); provided, that if the Federal Funds Rate for any day is less than zero, the Federal Funds Rate for such day will be deemed to be zero.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Fees" shall mean all amounts payable pursuant to or referred to in Section 4.01.

"FERC" shall mean the Federal Energy Regulatory Commission or any successor agency thereto.

"Final Order" shall mean a final order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are reasonably necessary to convert the Interim Order to a final order, with changes to such form as are reasonably acceptable to the Administrative Agent, and, to the extent affecting the rights or obligations thereof, the DIP Issuing Lenders), authorizing and approving on a final basis, among other things, the matters and provisions in the Interim Order and the borrowing by the Borrower of the full amount of the Term Facility and the Revolving Facility, as such order may be amended or modified in a manner reasonably acceptable to the Administrative Agent, and, to the extent affecting the rights or obligations thereof, the DIP Issuing Lenders.

"Final Order Entry Date" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"Financing Orders" shall mean the Interim Order, or, on and after the Final Order Entry Date, the Final Order.

"First Day Orders" means all material orders entered by the Bankruptcy Court pursuant to motions filed on or about the Petition Date by the Debtors which shall include, without limitation, a cash management order (the "Cash Management Order") and an order (or orders) approving the DIP Hedges and generally relating to the Debtors' hedging and commodities exposure (the "Hedging Order").

-20-

"First Lien Intercreditor Agreement" shall mean the Collateral Trust and Intercreditor Agreement, dated as of the date hereof, among the Borrower, the Subsidiary Guarantors, the Collateral Trustee, for the benefit of the Secured Parties, and each other Person from time to time party thereto, substantially in the form of Exhibit J.

"Fiscal Quarter" shall mean, for any Fiscal Year, (i) the fiscal period commencing on January 1 of such Fiscal Year and ending on March 31 of such Fiscal Year, (ii) the fiscal period commencing on April 1 of such Fiscal Year and ending on June 30 of such Fiscal Year, (iii) the fiscal period commencing on July 1 of such Fiscal Year and ending on September 30 of such Fiscal Year and (iv) the fiscal period commencing on October 1 of such Fiscal Year and ending on December 31 of such Fiscal Year.

"Fiscal Year" shall mean the fiscal year of the Borrower and its Restricted Subsidiaries ending on December 31 of each calendar year.

"Fitch" means Fitch Ratings, Inc., or any successor to its rating agency business.

"Flood Documentation" shall mean, with respect to each parcel of owned and ground leased Real Property and located in the United States of America or any territory thereof, (i) a completed "life-of-loan" Federal Emergency Management Agency standard flood hazard determination, together with a notice about special flood hazard area status and flood disaster assistance duly executed by the applicable Credit Party relating thereto (to the extent such Real Property is located in a special flood hazard area) and (ii) evidence of flood insurance as required by Section 9.03(a) hereof and the applicable provisions of the Security Documents, each of which shall (A) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (B) name the Collateral Trustee, on behalf of the Secured Parties, as additional insured and loss payee/mortgagee, (C) identify the address of each property located in a special flood hazard area, the applicable flood zone designation and the flood insurance coverage and deductible relating thereto and (D) be otherwise in form and substance reasonably satisfactory to the Administrative Agent.

"Flood Insurance Laws" shall mean, collectively (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" shall mean a rate of interest equal to 0.75%.

"Foreign Agent" shall mean an Agent that is not a U.S. Person.

"Foreign Lender" shall mean a Lender that is not a U.S. Person.

"Foreign Subsidiary" of any Person shall mean any Restricted Subsidiary of such Person that is not a Domestic Subsidiary.

"FPA" shall mean the Federal Power Act, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Fronting Fee" shall have the meaning provided in Section 4.01(c).

"Full Availability Date" means the first Borrowing date (as set forth in a Notice of Borrowing for Full Availability Term Loans) on which the conditions precedent set forth in Sections 6.01 and 6.02 have been satisfied or waived, which such Borrowing date shall in no event be later than the second (2nd) Business Day following the Final Order Entry Date.

"Full Availability Term Loans" shall mean a Loan made pursuant to Section 2.01(b)(ii).

#95606088v60

98679498

"Fund" shall mean any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time; provided, however, that if any operating lease would be recharacterized as a capital lease due to changes in the accounting treatment of such operating leases under GAAP since the Closing Date, then solely with respect to the accounting treatment of any such lease, GAAP shall be interpreted as it was in effect on the Closing Date.

"Governmental Authority" shall mean any nation or government, or any state, province, territory or other political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank), or any governmental or non-governmental authority regulating the generation and/or transmission of energy.

"Granting Lender" shall have the meaning provided in Section 13.04(g).

"Guarantee and Collateral Agreement" shall have the meaning provided in Section 6.01(n).

"Guarantee and Collateral Agreement Collateral" shall mean all "Collateral" as defined in the Guarantee and Collateral Agreement, but excluding any Excluded Assets.

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, radioactive materials, or asbestos containing materials; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants" or words of similar import, under any Environmental Law; and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"Hedging Agreements" shall mean, with respect to any specified Person, (i) agreements or arrangements designed to protect such Person against fluctuations in interest rates and (ii) any agreement (including each confirmation entered into pursuant to any master agreement) providing for swaps, futures, options, forwards, power purchase or sale agreements, fuel purchase or sale agreements, energy management agreements, emission credit purchases or sales agreements, power transmission agreements, fuel transportation agreements, fuel storage agreements, congestion revenue rights or financial transmission rights, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or fuel, or any other energy commodity, service or risk, price or price indices for any such commodities, services or risks or any other similar derivative agreements, any renewable energy credits, carbon emission credits and any other "cap and trade" related credits, assets or attributes with an economic value and any other similar agreements, entered into by the Borrower or any Restricted Subsidiary. For the avoidance of doubt, any new options will be limited to heat rate call options for the ERCOT portfolio and will not account for more than 50% of the net notional hedging volume of the ERCOT volume at any time.

"Hedging Obligations" shall mean, with respect to any specified Person, the obligations of such Person under any Hedging Agreement.

"Hedging Order" has the meaning provided in the definition of "First Day Orders".

"Immaterial Subsidiary" shall mean, at any time, any Restricted Subsidiary of the Borrower that is designated by the Borrower as an "Immaterial Subsidiary" if and for so long as such Restricted Subsidiary, together with all other Immaterial Subsidiaries, has (i) total assets at such time not exceeding 1.0% of the Borrower's

-22-

Consolidated Total Assets as of the last day of the most recently completed Test Period and (ii) total revenues and operating income for the most recently completed Test Period not exceeding 1.0% of the Borrower's consolidated revenues and operating income for such Test Period, respectively; provided that such Restricted Subsidiary shall be an Immaterial Subsidiary only to the extent that and for so long as all of the above requirements are satisfied.

"In-The-Money-Generation" shall mean the Borrower's generation that has positive energy margin and has secured fuel.

"Incremental Amendment" shall have the meaning provided in Section 2.15(d).

"Incremental Facility" shall mean (i) each Incremental Term Loan and (ii) each Revolving Commitment Increase.

"Incremental Facility Closing Date" shall have the meaning provided in Section 2.15(e).

"Incremental Term Facility" shall have the meaning provided in Section 2.15(a).

"Incremental Term Loans" shall have the meaning provided in Section 2.15(a).

"Indebtedness" shall mean, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables, except as provided in clause (e) below), whether or not contingent:

       (a)      in respect of borrowed money;

       (b)      evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

       (c)      in respect of banker's acceptances;

       (d)      representing Capital Lease Obligations or Attributable Debt in respect of sale and leaseback transactions;

       (e)      representing the balance deferred and unpaid of the purchase price of any property (including trade payables) or services due more than six months after such property is acquired or such services are completed; or

       (f)      representing the net amount owing under any Hedging Obligations,

if and to the extent any of the preceding items (other than letters of credit, Attributable Debt and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP.  In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, but without duplication, the guarantee by the specified Person of any Indebtedness of any other Person; provided, that the amount of such Indebtedness shall be deemed not to exceed the lesser of the amount secured by such Lien and the value of the Person's property securing such Lien.

"Indemnified Person" shall have the meaning provided in Section 13.01(a).

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

#95606088v60

98679498

"Independent Financial Advisor" shall mean an accounting, appraisal, investment banking firm or consultant to Persons engaged in a Permitted Business of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged.

"Individual Revolving Exposure" of any Revolving Lender shall mean, at any time, the sum of (x) the aggregate principal amount of all Revolving Loans made by such Revolving Lender and then outstanding and (y) such Revolving Lender's Revolving Percentage in each then outstanding Letter of Credit multiplied by the sum of the Stated Amount of the respective Letter of Credit and any Unpaid Drawings relating thereto.

"Initial Term Loans" shall mean the Interim Term Loans and the Full Availability Term Loans.

"Intercompany Indebtedness" shall mean any Indebtedness, now existing or hereafter incurred, owed by the Borrower or any Restricted Subsidiary of the Borrower to the Borrower or any other Restricted Subsidiary of the Borrower.

"Interest Election Request" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.09.

"Interest Period" shall mean, as to any Term Benchmark Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter, as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Order" shall mean an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Administrative Agent and, as applicable, the DIP Issuing Lenders) in the form set forth as Exhibit I, with changes to such form as are satisfactory to the Administrative Agent and, as applicable, the DIP Issuing Lenders, in their sole discretion, approving the Credit Documents and related matters.

"Interim Order Entry Date" shall mean the date on which the Interim Order is entered by the Bankruptcy Court and the Administrative Agent shall have received a certified copy thereof.

"Interim Term Loan" shall mean a Loan made pursuant to Section 2.01(b)(i).

"Investments" shall mean, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the forms of loans (including guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities. Except as otherwise provided in this Agreement, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

Notwithstanding anything to the contrary herein, in the case of any Investment made by the Borrower or a Restricted Subsidiary of the Borrower in a Person substantially concurrently with a cash distribution by such Person to the Borrower or a Subsidiary Guarantor (a "Concurrent Cash Distribution"), the amount of such Investment shall be deemed to be the Fair Market Value of the Investment, less the amount of the Concurrent Cash Distribution.

"IRS" shall mean the U.S. Internal Revenue Service.

-24-

"ISP" shall mean the "International Standby Practices 1998" published by the International Chamber of Commerce publication number 590 (or such later version thereof as may be in effect at the time of issuance and subject to which such Letter of Credit may have been issued).

"Issuing Lender" shall mean each Issuing Lender named in Schedule 1.01(b) under the caption "Letter of Credit Commitment" (except as otherwise provided in Section 12.09) and any other Lender reasonably acceptable to the Administrative Agent and the Borrower which agrees to issue Letters of Credit hereunder. Any Issuing Lender may arrange for one or more Letters of Credit to be issued by one or more Affiliates of such Issuing Lender (and such Affiliate shall be deemed to be an "Issuing Lender" for all purposes of the Credit Documents). Any Revolving Lender may, from time to time, become an Issuing Lender under this Agreement with the protections and rights afforded to Issuing Lenders hereunder by executing a joinder, in form and substance reasonably satisfactory to (and acknowledged and accepted by) the Administrative Agent and the Borrower, indicating such Revolving Lender's Letter of Credit Commitment (which commitment may exceed such Revolving Lender's Revolving Loan Commitment) and upon the execution and delivery of any such joinder, such Revolving Lender shall be an Issuing Lender for all purposes hereof. As of the Closing Date, the Issuing Lenders are Citibank, N.A., Goldman Sachs Bank USA and Royal Bank of Canada.

"Leaseholds" of any Person shall mean all the right, title and interest of such Person as lessee, sublessee or licensee in, to and under leases, subleases or licenses of land, improvements and/or fixtures.

"Lender" shall mean each financial institution listed on Schedule 1.01(a), as well as any Person that becomes a "Lender" hereunder. Unless the context otherwise requires, each Issuing Lender shall be deemed to be a Lender herein.

"Lender Default" shall mean, as to any Lender, (i) the wrongful refusal (which has not been retracted) of such Lender or the failure of such Lender (which has not been cured within two (2) Business Days) to make available its portion of any Borrowing or to fund its portion of any unreimbursed payment with respect to a Letter of Credit pursuant to Section 3.04(c) or 3.05, (ii) such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority or (iii) such Lender having made a public statement or notified the Administrative Agent, any Issuing Lender and/or any Credit Party in writing (x) that it does not intend to comply with its obligations under Section 2.01, Section 2.04 or Section 3, as the case may be, in circumstances where such non-compliance would constitute a breach of such Lender's obligations under such respective Sections or (y) of the events described in preceding clause (ii); provided that, for purposes of (and only for purposes of) Section 2.14 and any documentation entered into pursuant to the Letter of Credit Back-Stop Arrangements (and the term "Defaulting Lender" as used therein), the term "Lender Default" shall also include, as to any Lender, (i) any Affiliate of such Lender that has "control" (within the meaning provided in the definition of "Affiliate") of such Lender having been deemed insolvent or having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority, (ii) any previously cured "Lender Default" of such Lender under this Agreement, unless such Lender Default has ceased to exist for a period of at least sixty (60) consecutive days, (iii) such Lender has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (iii) upon receipt of such written confirmation by the Administrative Agent and the Borrower), (iv) the failure of any Lender to pay over to the Administrative Agent, any Issuing Lender or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, (v) such Lender has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action and (vi) has, or has a direct or indirect parent company that has, (A) become the subject of a proceeding under Bankruptcy Law or any other debtor relief law, or (B) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender Default under this clause (v) shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its

assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Letter of Credit" shall have the meaning provided in Section 3.01(a).

"Letter of Credit Back-Stop Arrangements" shall have the meaning provided in Section 2.14(a).

"Letter of Credit Commitment" shall mean the commitment of each Issuing Lender with respect to Letters of Credit set forth opposite such Issuing Lender's name on Schedule 1.01(b) under the caption "Letter of Credit Commitment" or, if an Issuing Lender has entered into an Assignment and Assumption Agreement with respect to such Letter of Credit Commitment, set forth for such Issuing Lender in the Register maintained by the Administrative Agent pursuant to Section 13.12 as the Issuing Lender's "Letter of Credit Commitment".  As of the Closing Date, the amount of Letter of Credit Commitments for each Issuing Lender shall be (x) with respect to Citibank, N.A., $35,000,000, (y) with respect to Goldman Sachs Bank USA, $35,000,000 and (z) with respect to Royal Bank of Canada, $35,000,000.  The Letter of Credit Commitments are part of and not in addition to the aggregate Revolving Loan Commitments.

"Letter of Credit Exposure" shall mean, at any time, the aggregate amount of all Letter of Credit Outstandings at such time.  The Letter of Credit Exposure of any Revolving Lender at any time shall be its Revolving Percentage of the aggregate Letter of Credit Exposure at such time.

"Letter of Credit Fee" shall have the meaning provided in Section 4.01(b).

"Letter of Credit Outstandings" shall mean, at any time, the sum of (i) the Stated Amount of all outstanding Letters of Credit at such time and (ii) the aggregate amount of all Unpaid Drawings in respect of all Letters of Credit at such time. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but (i) any amount may still be drawn thereunder by reason of the operation of any rule of law or standard practices to which any Letter of Credit is subject (such as Rules 3.13 and 3.14 of the ISP and Article 29 of the UCP) or any express term of the Letter of Credit, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn, or (ii) any drawing was made thereunder on or before the last day permitted thereunder and such drawing has not been honored or refused by the applicable Issuing Lender, such Letter of Credit shall be deemed to be "outstanding" in the amount of such drawing.

"Letter of Credit Request" shall have the meaning provided in Section 3.03(a).

"Letter of Credit Sublimit" shall mean $75,000,000.

"Lien" shall mean any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other) or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement) and any preference or priority having the effect of security, and any lease having substantially the same effect as any of the foregoing.

"Liquidity" shall mean, at any time, an amount equal to (i) the amount of the Debtors' Unrestricted cash and Cash Equivalents calculated in a manner consistent with determining the "Ending Unrestricted Cash" as set forth in the DIP Budget plus (ii) the aggregate amount of the Unutilized Revolving Loan Commitments of each Revolving Lender.

"Loan" shall mean an extension of credit by a Lender to the Borrower under Section 2, including the Revolving Loans and the Term Loans.

"Loan Participant" shall mean any Person who participates in the Loans pursuant to Section 13.04; provided that only Eligible Transferees may be Loan Participants.

#95606088v60

98679498

"Majority Lenders" of any Class shall mean those Non-Defaulting Lenders which would constitute the Required Lenders under, and as defined in, this Agreement if all outstanding Obligations of the other Class under this Agreement were repaid in full and all Commitments with respect thereto were terminated.

"Margin Stock" shall have the meaning provided in Regulation U.

"Mark-to-Market" shall mean, as of any date of determination, with respect to Hedging Agreements the fair market liquidation value or termination or close-out amount (or other similar amount), as determined by the Borrower in good faith and in a manner substantially consistent with the calculation methodology delivered to RPA Advisors, LLC prior to the Petition Date.

"Material Adverse Effect" shall mean any event, circumstance or condition that has had, individually or in the aggregate, a materially adverse effect on (i) the business, assets, operations, properties or financial condition of the Borrower and its directly or indirectly wholly owned Restricted Subsidiaries, taken as a whole (other than as a result of events and circumstances leading up to and following the commencement of the chapter 11 proceeding and the continuation and prosecution thereof (including performance required under the Credit Documents)), (ii) the ability of the Borrower and the Subsidiary Guarantors, taken as a whole, to perform their respective payment obligations under the Credit Documents or (iii) the rights and remedies, taken as a whole, of the Administrative Agent and the Lenders under the Credit Documents; provided that for purposes of the accuracy of the representations and warranties as a condition to credit extensions (x) matters or impacts arising from, related to, or in connection with the outbreak and spread of the novel coronavirus known as COVID-19, (y) any matters disclosed on the schedules or exhibits to the Credit Documents and (z) any matters disclosed in any first day pleading or declarations to the extent made available to the Administrative Agent prior to the Closing Date, in each case, shall not constitute, result or otherwise have a Material Adverse Effect.

"Material Indebtedness" shall have the meaning provided in Section 11.04(a).

"Maturity Date" shall mean the date that is the earliest to occur of (a) 18 months after the Closing Date, as such date may be extended in accordance with Section 2.16; (b) 45 days after the Petition Date if the Final Order has not been entered prior to the expiration of such 45-day period; (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court (the "Consummation Date"); (d) the acceleration of the Loans and the termination of the Commitments in accordance with the Credit Documents; and (e) a sale of all or substantially all of the assets of the Borrower (or the Borrower and the Subsidiary Guarantors).

"Maximum Incremental Facilities Amount" shall mean, at any date of determination, $250,000,000.

"Maximum Rate" shall have the meaning provided in Section 13.17.

"Measurement Date" shall mean with respect to any Letter of Credit, each of the following:  (i) each date of issuance of any such Letter of Credit, (ii) each date of an amendment of any such Letter of Credit having the effect of increasing the amount thereof and (iii) each date of any payment by the applicable Issuing Lender under any Letter of Credit.

"Milestone" shall mean the Milestones set forth in Section 9.16.

"Minimum Borrowing Amount" shall mean, at any time, for Revolving Loans, the lesser of $5,000,000 and the Total Revolving Loan Commitment at such time.

"Minority Investment" shall mean any Person (other than a Subsidiary) in which the Borrower or any Restricted Subsidiary owns Capital Stock.

"Moody's" shall mean Moody's Investors Service, Inc., together with its successors.

-27-

"Mortgage" shall mean a mortgage, deed of trust, deed to secure debt, debenture or similar security instrument.

"Mortgage Policy" shall mean an ALTA Lender's title insurance policy (Form 2006).

"Mortgaged Property" shall mean any Real Property owned in fee by the Borrower or any of its Restricted Subsidiaries, which is encumbered (or required to be encumbered) pursuant to the terms hereof.

"Multiemployer Plan" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the Borrower or any of its Subsidiaries or with respect to which the Borrower or any of its Subsidiaries has had any liability (including on account of an ERISA Affiliate).

"Net Insurance/Condemnation Proceeds" shall mean, with respect to any Recovery Event, any cash payments or proceeds received by the Borrower or any of its Restricted Subsidiaries in connection with such Recovery Event, net of (i) transaction fees, expenses and costs associated with such Recovery Event or such receipt of such payments or proceeds therefrom, (ii) payments of unassumed liabilities relating to the assets that are the subject of such Recovery Event at the time of, or within sixty (60) days after, the date of such Recovery Event, (iii) the amount of gross proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness pursuant to this Agreement) which is secured by a Lien (other than a Lien that ranks pari passu with, or subordinated to, the Liens securing the Obligations) on the respective assets which were the subject of such Recovery Event, (iv) without duplication of clause (i), taxes paid or reasonably estimated to be payable in connection with such Recovery Event or such receipt of such payments or proceeds therefrom (including income taxes payable as a result of any gain recognized in connection with such Recovery Event) and (v) the amount of any reasonable reserve established in accordance with GAAP for costs (other than any taxes deducted pursuant to clause (iv) above) incurred by the Borrower or any of its Restricted Subsidiaries (other than any Excluded Subsidiary) in connection with the adjustment or settlement of any claims of the Borrower or such Restricted Subsidiary in respect of such Recovery Event or such receipt of such payments or proceeds therefrom (provided, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability or any estimated taxes referred to under clause (iv) above that are not required to be paid to any Governmental Authority) shall be deemed to be Net Insurance/Condemnation Proceeds of such Recovery Event received on the date of such reduction. Notwithstanding the foregoing, the proceeds of any Recovery Event relating to any asset or property shall not constitute "Net Insurance/Condemnation Proceeds" to the extent that the proceeds of a sale, lease, conveyance or other disposition of such asset or property would not have constituted an Asset Sale (disregarding clause (xiii) of the definition thereof).

"Net Sale Proceeds" shall mean, with respect to any Asset Sale, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such Asset Sale, net of (i) transaction fees, expenses and costs (including, without limitation, any underwriting, brokerage or other customary selling commissions, legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and sales, VAT and transfer taxes arising therefrom), (ii) payments of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within sixty (60) days after, the date of such sale or other disposition, (iii) the amount of gross proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness pursuant to this Agreement) which is secured by a Lien (other than a Lien that ranks pari passu with, or subordinated to, the Lien securing the Obligations) on the respective assets which were the subject of such Asset Sale, (iv) without duplication of clause (i) above, taxes paid or reasonably estimated to be payable in connection therewith, (v) any funded escrow established pursuant to the documents evidencing any such Asset Sale to secure any indemnification obligations or adjustments to the purchase price associated with any such Asset Sale (provided, that to the extent that any amounts are released from such escrow to the Borrower or a Subsidiary thereof, such amounts, net of any related expenses, shall constitute Net Sale Proceeds) and (vi) without duplication of clause (v) above, the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (iv) above) arising from Plan and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (provided, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability)

-28-

or any estimated taxes referred to under clause (iv) above that are not required to be paid to any Governmental Authority shall be deemed to be Net Sale Proceeds of such sale or disposition of assets occurring on the date of such reduction).

"New Money Credit Facilities" shall have the meaning assigned to such term in the recitals to this Agreement.

"Non-Debtor Credit Support" means credit support provided by any Credit Party for the benefit of, or on behalf of, Non-Debtor Entities.

"Non-Debtor Entity" shall mean any non-Debtor entity, joint venture or similar vehicle in which Talen holds an interest, including, without limitation, any Cumulus Entity.

"Non-Defaulting Lender" and "Non-Defaulting Revolving Lender" shall mean and include each Lender or Revolving Lender, respectively, other than any Defaulting Lender.

"Note" shall mean any Revolving Note and any Term Loan Note.

"Notice of Borrowing" shall have the meaning provided in Section 2.03(a).

"Notice of Conversion/Continuation" shall have the meaning provided in Section 2.06.

"Notice Office" shall mean (i) for credit notices, the office of the Administrative Agent located at 1615 Brett Road, Building III, New Castle, Delaware 19720, or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"NYFRB" shall mean the Federal Reserve Bank of New York.

"NYFRB Rate" shall mean, on any day, the greater of (a) the Federal Funds Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided, that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" shall mean the rate for a federal funds transaction quoted at 11:00 a.m. on such date received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligations" shall mean all amounts owing by the Borrower or any Subsidiary Guarantor to the Administrative Agent, the Collateral Trustee, any Issuing Lender or any Lender pursuant to the terms of this Agreement or any other Credit Document (including (x) the obligations to pay, discharge and satisfy any Erroneous Payment Subrogation Right, (y) all interest, fees and other amounts which accrue after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of the Borrower or any of its Restricted Subsidiaries, whether or not allowed or allowable in such case or proceeding).

"OCGT Agreement Transactions" means (a) the sale of real property as contemplated by Sections 3.03(b), 3.04(b), 3.07 and 3.08 of that certain Omnibus Cumulus Growth Transfer Agreement, dated as of September 20, 2021 (as in effect on such date and without giving effect to any subsequent amendment, restatement, amendment and restatement, supplement or modification thereof, the "OTA"), between Talen II Growth Holdings LLC, Talen Coin Holdings LLC, Talen Data Holdings LLC, Talen Energy Supply LLC, Talen Nuclear Development LLC, Susquehanna Nuclear LLC, Talen Generation LLC, MP Opco LLC, Holdwood LLC, Talen Energy Marketing LLC, MC Project Company LLC, LMBE Project Company LLC, Martins Creek LLC, Barney Davis LLC, Cumulus Barney Davis Holdings LLC, Cumulus Growth Holdings LLC, Cumulus Battery Storage Holdings LLC, Cumulus PT Energy Transitions Holdings LLC, Cumulus Real Estate Holdings LLC, Cumulus Renewables Holdings LLC and Talen Energy Corporation, (b) Transfers of PJM Queue Positions (as defined in the OTA) as contemplated by

#95606088v60

98679498

Section 4.02 of the OTA and (c) PJM Capacity Transfers (as defined in the OTA) as contemplated by Section 4.03 of the OTA.

"OFAC" shall mean the United States Treasury Department Office of Foreign Assets Control.

"Officer's Certificate" shall mean a certificate signed on behalf of the Borrower by an Authorized Officer of the Borrower, which certificate shall include: (a) a statement that each of the Officers making such certificate has read the applicable covenant or condition, (b) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate are based, (c) a statement that, in the opinion of each such Officer, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not the applicable covenant or condition has been complied with and (d) a statement as to whether or not, in the opinion of each such Officer, the applicable condition or covenant has been complied with.

"Operational Hedges" shall mean Hedging Obligations incurred, in each case, in the ordinary course of business of the Credit Parties and consistent with the Risk Management Policies and Prudent Industry Practice, that are (i) intercompany Hedging Obligations which do not result in exposure to any entity other than a Credit Party or Wholly-Owned Subsidiary thereof, (ii) required for the continued safe operation of the business of any Credit Party pursuant to Applicable Law, (iii) for the storage, purchase, sale, transfer or transmission, as applicable, of physical fuel, plant consumables, renewable energy credits, or CSAPR Ozone (NoX) emissions allowances, (iv) balancing trades within the prompt 60 days or (v) agreements for energy management or power transmission (or required thereby) or are otherwise necessary for the continued operation of the business of any Credit Party, in each case of this clause (v), which (x) do not increase, on a net notional basis, the Post-Petition Bilateral Exposure of, or amount of In-the-Money Generation hedged by, the Credit Parties and (y) if secured, are secured by Liens permitted by the applicable clause of Section 10.01(c).

"Other Connection Taxes" shall mean with respect to any Lender or Agent, Taxes imposed as a result of a present or former connection between such Lender or Agent and the jurisdiction imposing such Tax (other than connections arising solely from such Lender or Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"Other Taxes" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.13).

"Overnight Bank Funding Rate" shall mean, for any day, the rate comprised of both overnight federal funds and overnight eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Participant" shall have the meaning provided in Section 3.04(a).

"Participant Register" shall have the meaning provided in Section 13.04(h).

"PATRIOT Act" shall have the meaning provided in Section 8.19.

"Payment Office" shall mean the office of the Administrative Agent that is provided in writing to the other parties hereto by the Administrative Agent at times that payments are due.

"Payment Recipient" has the meaning assigned to it in Section 13.23(a).

"PBGC" shall mean the U.S. Pension Benefit Guaranty Corporation.

"Periodic Term SOFR Determination Day" shall have the meaning provided in the definition of "Term SOFR".

"Permitted Business" shall mean the business of acquiring, constructing, managing, developing, improving, maintaining, leasing, owning and operating a power or energy related facility, together with any related assets or facilities, or engaging in wholesale or retail sale of power, as well as any other activities reasonably related to, ancillary to, or incidental to, any of the foregoing activities (including acquiring and holding reserves), including investing in a power or energy related facility.

"Permitted Debt" shall have the meaning provided in Section 10.04(b).

"Permitted Investments" shall mean:

(a)     any Investment in the Borrower or in a Restricted Subsidiary of the Borrower that is a Subsidiary Guarantor;

(b)     [reserved];

(c)     [reserved];

(d)     [reserved];

(e)     any Investment in Cash Equivalents (and, in the case of Excluded Subsidiaries only, Cash Equivalents or other liquid investments);

(f)     [reserved];

(g)     any Investment made solely as a result of the direct receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 10.08;

(h)     [reserved];

(i)     [reserved];

(j)     any Investments received in compromise or resolution of (i) obligations of trade creditors or customers of the Borrower or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (ii) litigation, arbitration or other disputes with Persons who are not Affiliates;

(k)     Investments represented by Hedging Obligations;

(l)     loans or advances to employees in accordance with the DIP Budget;

(m)    mandatory repayments or prepayments of the Loans;

(n)     any Investment in securities of trade creditors, trade counter-parties or customers received in compromise of obligations of those Persons, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(o)     negotiable instruments held for deposit or collection;

-31-

(p)     receivables owing to the Borrower or any Restricted Subsidiary of the Borrower and payable or dischargeable in accordance with customary trade terms; provided, however, that such trade terms may include such concessionary trade terms as the Borrower or any such Restricted Subsidiary of the Borrower deems reasonable under the circumstances;

(q)     payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes;

(r)     [reserved];

(s)     [reserved];

(t)     Investments made pursuant to a commitment that, when entered into, would have complied with the provisions of this Agreement;

(u)     Investments in any Restricted Subsidiary made by an Excluded Subsidiary;

(v)     payments or transfers authorized by the Cash Management Order that are otherwise in compliance with the other provisions of this Agreement including, but not limited to, in connection with intercompany transfers with LMBE-MC;

(w)     Investments made by any Debtor in Non-Debtor Entities of the Borrower (including, for the avoidance of doubt, the provision of Non-Debtor Credit Support) in an aggregate outstanding amount not to exceed at any time  the sum of (i) $275,000,000 minus (ii) the Bilateral Hedging Collateral Upsize Reallocation Amount in effect at such time; provided that no more than $115,000,000 shall be permitted to be outstanding pursuant to this clause (w) prior to the date that is 120 days after the Petition Date;

(x)     Investments in an aggregate amount outstanding not to exceed $5,000,000, and

(xi)     Investments in existence on the Petition Date.

"Permitted Liens" shall have the meaning provided in Section 10.01.

"Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"Petition Date" shall have the meaning assigned to such term in the recitals to this Agreement.

"Plan" shall mean an "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA maintained or contributed to by the Borrower or any of its Subsidiaries or with respect to which the Borrower or any of its Subsidiaries has had any liability (including on account of an ERISA Affiliate).

"Post-Petition Bilateral Exposure" shall mean, as of any date of determination, the resulting difference of (i) Potential Future Exposure minus (ii) the Mark-to-Market value of all Bilateral Hedges secured on a pari passu basis with the New Money Credit Facilities and/or the Prepetition First Lien Secured Debt as of the close of business on the Petition Date.

"Post-Petition PPSA" shall mean a Hedging Agreement by and among any Credit Party and a counterparty evidencing Hedging Obligations under a fuel purchase and sale agreement that fluctuates in value with fluctuations in energy, power or gas prices which replaces the Prepetition PPSA with respect to the "Product" as defined in the Prepetition PPSA and contains terms, limitations and scope that are substantially similar to the Prepetition PPSA or are otherwise approved by the Administrative Agent.

-32-

"Potential Future Exposure" shall mean as of any date of determination, the aggregate potential future exposure, determined as of the close of business on the prior day, that all Bilateral Hedging Counterparties to Hedging Agreements (including, for the avoidance of doubt, Operational Hedges) secured on a pari passu basis with the New Money Credit Facilities and/or the Prepetition First Lien Secured Debt are projected to have to the Borrower and its Restricted Subsidiaries at a 99% confidence interval, which determination shall be made by the Borrower in good faith and in a manner substantially consistent with the calculation methodology delivered to RPA Advisors, LLC prior to the Petition Date.

"Power Plant Property" shall mean (i) all owned real property, goods (excluding inventory), fixtures and equipment comprising, located at or related to each power plant owned by the Borrower and its Restricted Subsidiaries, including all buildings, terminals, storage tanks, refining and other facilities, spare parts, precious metal catalysts, pipelines, pipeline rights, loading racks, rail spurs and loading facilities now owned or hereafter acquired by the Borrower and its Restricted Subsidiaries which are now or hereafter affixed to or situated on each refinery property and (ii) each such power plant, together with all such assets described in clause (i).

"PPSA Inventory Purchase" shall mean the purchase of the Final Volume (as defined in the Prepetition PPSA) pursuant to Section 3.2 of the Prepetition PPSA and the performance of all obligations related thereto.

"Prepetition 6.625% Senior Secured Notes" shall mean that certain Indenture for certain 6.625% notes due 2028, dated as of July 8, 2019 (as supplemented by that certain Supplemental Indenture No. 1, dated as of September 11, 2021, and as otherwise amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof) by and among TES, as issuer, the guarantors party thereto and The Bank of New York Mellon, as trustee.

"Prepetition 7.25% Senior Secured Notes" shall mean that certain Indenture for certain 7.25% notes due 2027, dated as of May 1, 2019 (as supplemented by that certain Supplemental Indenture No. 1, dated as of September 11, 2021, and as otherwise amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof) by and among TES, as issuer, the guarantors party thereto and The Bank of New York Mellon, as trustee.

"Prepetition 7.625% Senior Secured Notes" shall mean that certain Indenture for certain 7.625% notes due 2028, dated as of May 22, 2020 (as supplemented by that certain Supplemental Indenture No. 1, dated as of September 11, 2021, and as otherwise amended, restated, amended and restated, supplemented, waived and/or modified prior to the date hereof) by and among TES, as issuer, the guarantors party thereto and The Bank of New York Mellon, as trustee.

"Prepetition Cash Collateral" shall mean, at any time, collectively, the Prepetition RCF Cash Collateral, the TEM Cash Collateral and the MUFG Cash Collateral, in each case, as defined in the DIP Order.

"Prepetition Commodity Accordion Credit Agreement" shall mean that certain Credit Agreement, dated as of December 14, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof) by and among Talen Energy Marketing, LLC and Susquehanna Nuclear, LLC, as borrowers, TES, as parent, Alter Domus (US) LLC, as administrative agent, and the lenders from time to time party thereto.

"Prepetition First Lien Collateral" has the meaning set forth in Section 2.19(a)(iii).

"Prepetition First Lien Secured Debt" shall mean any secured Indebtedness of any Debtor outstanding on the Petition Date under any of the Prepetition Revolving Credit Agreement, the Prepetition Term Loan Credit Agreement, the Prepetition Commodity Accordion Credit Agreement, the Prepetition 7.25% Senior Secured Notes, the Prepetition 6.625% Senior Secured Notes, the Prepetition 7.625% Senior Secured Notes, the Prepetition PPSA and certain other instruments and exposures, including, without limitation, Secured Commodity Hedges, Secured Interest Rate Hedges and Secured Treasury Services Agreements (each as defined in the Prepetition Intercreditor Agreement).

"Prepetition Indebtedness" shall mean, collectively, Prepetition First Lien Secured Debt and any other Indebtedness of any Debtor outstanding on the Petition Date and set forth on Schedule 10.04.

"Prepetition Intercreditor Agreement" shall mean that certain Collateral Trust and Intercreditor Agreement, dated as of June 1, 2015 (as amended by that certain First Amendment to Collateral Trust and Intercreditor Agreement, dated as of November 13, 2015, that certain Second Amendment to Collateral Trust and Intercreditor Agreement, dated as of August 2, 2019, and as otherwise amended, restated, amended and restated, supplemented and/or modified prior to the date hereof), by and among TES, the subsidiary guarantors from time to time party thereto, Citibank, N.A. as collateral trustee and as administrative agent, and each other party from time to time party thereto.

"Prepetition Payments" shall mean any payment, prepayment or repayment made on account of, or with respect to, any Prepetition Indebtedness.

"Prepetition PPSA" that certain Product Purchase and Sale Agreement, dated as of December 19, 2020 (as amended, restated, amended and restated and/or otherwise modified prior to the date hereof) by and among Talen Energy Marketing, LLC and Talen Generation, LLC, as the sellers, and J. Aron & Company, LLC, as the buyer.

"Prepetition Revolving Credit Agreement" shall mean that certain Credit Agreement dated as of June 1, 2015 (as amended by that certain First Amendment to Credit Agreement, dated as of January 19, 2016, that certain Amendment No. 2, dated as of March 21, 2017, that certain Supplement to Amendment No. 2, dated March 29, 2017, that certain Amendment No. 3, dated as of December 12, 2018, that certain Amendment No. 4, dated as of May 21, 2019, that certain Limited Waiver and Amendment No. 5, dated as of November 19, 2021, that certain Limited Waiver and Amendment No. 6, dated as of November 30, 2021, that certain Amendment No. 7, dated as of December 14, 2021, and that certain Amendment No. 8, dated as of February 28, 2022, and as otherwise amended, restated, amended and restated, supplemented, and/or modified prior to the date hereof, by and among TES, as borrower, the guarantors party thereto, Citibank, N.A., as administrative agent and as collateral trustee, the lenders from time to time party thereto and the issuing lenders from time to time party thereto.

"Prepetition Term Loan Credit Agreement" shall mean that certain Term Loan Credit Agreement, dated as of July 8, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof), by and among TES, Wilmington Trust Company, as term loan administrative agent, and the lenders from time to time party thereto.

"Prime Lending Rate" shall mean the rate which the Administrative Agent publicly announces from time to time as its prime lending rate, the Prime Lending Rate to change when and as such prime lending rate changes. The Prime Lending Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer by the Administrative Agent, which may make commercial loans or other loans at rates of interest at, above or below the Prime Lending Rate; provided, that if the Prime Lending Rate for any day is less than zero, the Prime Lending Rate for such day will be deemed to be zero.

"Primed Liens" has the meaning set forth in Section 2.19(a)(iii).

"Prudent Industry Practice" shall mean those practices and methods as are commonly used or adopted by Persons in the independent power generation industry in the United States in connection with the conduct of the business of such industry, in each case as such practices or methods may evolve from time to time, consistent in all material respects with all applicable legal requirements.

"PUHCA" shall mean the Public Utility Holding Company Act of 2005, as amended to the date hereof and from time to time hereafter, and any successor statute.

"QFC Credit Support" shall have the meaning provided in Section 13.22.

"Qualified Equity Interests" shall mean any Equity Interest of the Borrower other than Disqualified Stock.

-34-

"Quarterly Payment Date" shall mean the last Business Day of each March, June, September and December occurring after the Closing Date.

"Real Property" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, which constitute real property.

"Recovery Event" shall mean any event that gives rise to the receipt by the Borrower or any of its Restricted Subsidiaries of (a) any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, casualty, physical destruction, damage, taking or any other similar event with respect to any property or assets of the Borrower or any of its Restricted Subsidiaries and (ii) under any policy of insurance required to be maintained under Section 9.03, in each case except to the extent such proceeds or awards constitute (x) reimbursement or compensation for amounts previously paid by the Borrower or any of its Restricted Subsidiaries in respect of any such event (as certified to the Administrative Agent by the Borrower pursuant to an Officer's Certificate delivered by an Authorized Officer not later than the fifth Business Day following the date of the receipt of such proceeds or awards) or (y) amounts payable by reason of any loss of revenues or interruption of business or operations or (b) any compensation or remuneration paid to the Borrower or any of its Restricted Subsidiaries arising from the exercise of any Governmental Authority of its claimed or actual power of eminent domain over the property or assets of the Borrower or any such Restricted Subsidiary.

"Register" shall have the meaning provided in Section 13.12.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Replaced Lender" shall have the meaning provided in Section 2.13.

"Replacement Lender" shall have the meaning provided in Section 2.13.

"Reportable Event" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under applicable regulations.

"Repricing Transaction" shall mean (a) any prepayment or repayment of the principal amount of the Term Loans, in whole or in part, with the proceeds of, or conversion of all or any portion of the principal amount of the Term Loans into, any indebtedness having an Effective Yield less than the Effective Yield applicable to such portion of the Term Loans (as such comparative yields are determined in the reasonable judgment of the Administrative Agent consistent with generally accepted financial practices) and (b) any amendment to the initial Term Facility the effect of which is to reduce the Effective Yield applicable to the Term Loans.

#95606088v60

98679498

"Required Lenders" shall mean, at any time, Non-Defaulting Lenders having Revolving Exposures, Term Loans and unused Commitments representing more than 50% of the aggregate Revolving Exposures, outstanding Term Loans and unused Commitments at such time.

"Required Revolving Lenders" shall mean, at any time, Non-Defaulting Lenders the sum of whose outstanding Revolving Loan Commitments at such time (or, after the termination thereof, outstanding Revolving Loans and Revolving Percentages of Letter of Credit Outstandings at such time) represents at least a majority of the Total Revolving Loan Commitment in effect at such time less the Revolving Loan Commitments of all Defaulting Lenders at such time (or, after the termination thereof, the sum of the then total outstanding Revolving Loans of Non-Defaulting Lenders and the aggregate Revolving Percentages of all Non-Defaulting Lenders of the total Letter of Credit Outstandings at such time).

"Required Term Lenders" shall mean, at any time, Non-Defaulting Lenders the sum of whose outstanding Term Loans and Term Loan Commitments at such time represent at least a majority of all outstanding Term Loans and Term Loan Commitments in effect at such time.

"Resolution Authority" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Restricted" shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Restricted Subsidiaries, that such cash or Cash Equivalents appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrower or of any such Restricted Subsidiary (unless such appearance is related to the Credit Documents or Liens created thereunder) (it being understood that (i) any cash and Cash Equivalents pledged as security for any DIP Hedge and (ii) any Prepetition Cash Collateral will, in each case, be Restricted.

"Restricted Investment" shall mean an Investment other than a Permitted Investment.

"Restricted Payment" shall have the meaning provided in Section 10.03(a).

"Restricted Subsidiary" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"Returns" shall have the meaning provided in Section 8.09.

"Revolving Availability Period" shall mean the period from and including the Interim Order Entry Date to but excluding the earlier of the Maturity Date and the date of the termination of the Revolving Loan Commitments.

"Revolving Commitment Increase" shall have the meaning set forth in Section 2.15(a).

"Revolving Commitment Increase Lender" shall have the meaning set forth in Section 2.15(h).

"Revolving Exposure" means, at any time for any Lender, the sum of (a) the outstanding amount of the Revolving Loans of such Lender outstanding at such time and (b) the Letter of Credit Exposure of such Lender at such time.

"Revolving Facility" shall have the meaning assigned to such term in the recitals to this Agreement.

"Revolving Interim Availability Amount" shall mean $75,000,000.

"Revolving Lender" shall mean each Lender with a Revolving Loan Commitment or with outstanding Revolving Loans.

-36-

"Revolving Loan" shall have the meaning provided in Section 2.01(a)(i), and shall include all revolving loans made from time to time pursuant to the Revolving Loan Commitments.

"Revolving Loan Commitments" shall mean, for each Lender, at any time the sum of (without duplication) any Revolving Loan Commitment of such Lender, as the same may from time to time be (x) reduced or terminated pursuant hereto, (y) increased (but only with the consent of the respective Lender) in accordance with the terms hereof (including, without limitation, as a result of one or more Revolving Commitment Increases of such Lender) or (z) adjusted as a result of the assignments to or from such Lender pursuant hereto.

"Revolving Note" shall have the meaning provided in Section 2.05(a).

"Revolving Percentage" shall mean, with respect to any Revolving Lender at any time, a fraction (expressed as a percentage) the numerator of which is the Revolving Loan Commitment of such Revolving Lender at such time and the denominator of which is the Total Revolving Loan Commitment at such time; provided, that if the Revolving Percentage of any Revolving Lender is to be determined after the applicable Revolving Loan Commitments have been terminated, then the Revolving Percentage of such Revolving Lender shall be determined immediately prior (and without giving effect) to such termination (but giving effect to assignments made thereafter in accordance with the terms hereof); provided, further, that, in the case of Section 2.14 when a Lender Default with respect to a Revolving Lender shall exist, "Revolving Percentage" of a Non-Defaulting Revolving Lender at such time shall mean the percentage of the applicable Revolving Loan Commitments (disregarding any such Defaulting Lender's Revolving Loan Commitment) represented by such Non-Defaulting Revolving Lender's Revolving Loan Commitment.

"Risk Management Policies" has the meaning provided in Section 6.01(j).

"Sanctioned Country" means a country or territory that is the subject of comprehensive territorial Sanctions (currently, the Crimea region of Ukraine, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, Cuba, Iran, North Korea, and Syria).

"Sanctioned Person" shall mean, at any time, (i) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the European Union or any European Union member state, or Her Majesty's Treasury of the United Kingdom; (ii) any Person located, organized, or resident in a Sanctioned Country; (iii) any Person that is owned or controlled by one or more Persons described in (i) or (ii); or (iv) any person that is otherwise the subject of Sanctions.

"Sanctions" shall mean applicable economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"SEC" shall mean the Securities Exchange Commission or any successor thereto.

"Secured Parties" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Document" shall mean and include each of the Guarantee and Collateral Agreement, each Mortgage (if any), the First Lien Intercreditor Agreement and each other agreement, instrument or other document executed and delivered pursuant to Section 2.19, Section 6.01 or Section 9.10 to guarantee or secure any of the Obligations; provided that any cash collateral or other agreements entered into pursuant to the Letter of Credit

-37-

Back-Stop Arrangements shall constitute "Security Documents" solely for purposes of (x) Sections 8.03 and 10.01(a) and (y) the term "Credit Documents" as used in Sections 10.04(b)(i)(A) and 13.01.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the website of the NYFRB, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Rate Day" has the meaning provided in the definition of "Daily Simple SOFR".

"SPC" shall have the meaning provided in Section 13.04(g).

"Specified Default" shall mean a Default or an Event of Default arising under Section 11.01 or 11.05.

"Specified Trades" shall mean the specific trades identified by the Borrower to the Administrative Agent as "1097 MW Off Peak DA PJM West Hub(short)".

"Stated Amount" of each Letter of Credit shall mean, at any time, the maximum amount available to be drawn thereunder, in each case determined without regard to whether any conditions to drawing could then be met but after giving effect to all previous drawings made thereunder.

"Stated Maturity" shall mean, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the Closing Date, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"Stock Certificates" shall mean Collateral consisting of certificates representing Equity Interests held by the Borrower or any Subsidiary Guarantor for which a security interest can be perfected by delivering such Stock Certificates, together with undated stock powers or other appropriate instruments of transfer executed in blank for each such certificate.

"Subsidiary" shall mean, with respect to any specified Person: (i) any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and (ii) any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof). Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" shall mean each direct and indirect Wholly-Owned Domestic Subsidiary of the Borrower (other than any Excluded Subsidiary), in each case, whether existing on the Closing Date or established, created or acquired after the Closing Date, unless and until such time as the respective Subsidiary is released from all of its obligations under the Guarantee and Collateral Agreement in accordance with the terms and provisions thereof.

"Superpriority Claims" has the meaning set forth in Section 2.19(a)(i).

"Supported QFC" has the meaning provided in Section 13.22.

"Susquehanna Property" shall have the meaning provided in Section 10.09.

"Talen" shall mean Talen Energy Corporation, a Delaware corporation.

"Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Benchmark Borrowing" shall mean any Borrowing of a Term Benchmark Loan.

"Term Benchmark Loan" shall mean each Loan that bears interest based on Adjusted Term SOFR.

"Term Facility" shall have the meaning assigned to such term in the recitals to this Agreement.

 "Term Interim Availability Amount" shall mean $800,000,000.

"Term Interim Availability Period" means the period from and including the Closing Date to but excluding the earliest of (a) the Final Order Entry Date, (b) the Maturity Date and (c) the date of the termination of the Term Loan Commitments.

"Term Loan Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Term Loans hereunder during the Term Interim Availability Period and on the Full Availability Date, as applicable. The aggregate amount of the Lenders' Term Loan Commitments as of the Closing Date is $1,000,000,000.

"Term Loan Lenders" shall mean a Lender with a Term Loan Commitment or an outstanding Term Loan.

"Term Loan Note" shall have the meaning provided in Section 2.05(a).

"Term Loans" shall mean the Initial Term Loans and any Incremental Term Loans, as the context may require.

 "Term SOFR" shall mean,

(a)     for any calculation with respect to a Term Benchmark Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term

SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward-looking term Secured Overnight Financing Rate (SOFR) (or a successor administrator).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"TES" shall mean Talen Energy Supply, LLC.

"Test Period" shall mean each period of four consecutive Fiscal Quarters of the Borrower then last ended for which financial statements have been delivered or were required to be delivered pursuant to Section 9.01(a) or (b), as applicable, in each case taken as one accounting period.

"Threshold Amount" shall mean $75 million.

"Total Commitment" shall mean, at any time, the sum of the Commitments of each of the Lenders at such time.

"Total Revolving Loan Commitment" shall mean, at any time, the sum of the Revolving Loan Commitments of each of the Lenders at such time.

"Treasury Services Agreement" shall mean any agreement between the Borrower or any Restricted Subsidiary and a counterparty relating to treasury, depository, credit card, debit card, stored value cards, purchasing or procurement cards and cash management services or automated clearinghouse transfer of funds or any similar services.

"Type" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a Term Benchmark Loan.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"UK Financial Institution" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment

"United States" and "U.S." shall each mean the United States of America.

"Unpaid Drawing" shall have the meaning provided in Section 3.05(a).

"Unrestricted" shall mean, when referring to cash or Cash Equivalents of the Borrower or any of its Restricted Subsidiaries, that such cash or Cash Equivalents are not Restricted.

"Unrestricted Subsidiaries" shall mean, each Subsidiary set forth on Schedule 8.13 that is designated therein as an Unrestricted Subsidiary as of the Closing Date unless such Unrestricted Subsidiary is re-designated as a Restricted Subsidiary in accordance with Section 9.11.

"Unused Commitment Fee" shall have the meaning provided in Section 4.01(a).

"Unutilized Revolving Loan Commitment" shall mean, with respect to any Revolving Lender at any time, such Lender's Revolving Loan Commitment at such time less the sum of (i) the aggregate outstanding principal amount of all Revolving Loans made by such Lender at such time and (ii) such Lender's Revolving Percentage of the Letter of Credit Outstandings at such time; provided that the Unutilized Revolving Loan Commitment shall not exceed the Revolving Interim Availability Amount at any time prior to the Full Availability Date.

"U.S. Government Securities Business Day" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" shall mean any Person that is (or is disregarded from) a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regimes" has the meaning provided in Section 13.22.

"U.S. Tax Compliance Certificate" has the meaning provided in Section 5.04(f).

"Variance Report" shall have the meaning provided in Section 9.01(i)(y).

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Domestic Subsidiary" shall mean, as to any Person, any Wholly-Owned Subsidiary of such Person which is a Domestic Subsidiary.

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose Capital Stock is at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time (other than, in the case of a Foreign Subsidiary of the Borrower with respect to the preceding clauses (i) and (ii), director's qualifying shares and/or other nominal amount of shares required to be held by Persons other than the Borrower and its Subsidiaries under applicable law).

"Withholding Agent" shall mean the Borrower and the Administrative Agent.

"Write-Down and Conversion Powers" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the

-41-

EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.01.    <u>Other Definitional Provisions, etc</u>.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Credit Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Credit Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "<u>include</u>," "<u>includes</u>" and "<u>including</u>" shall be deemed to be followed by the phrase "<u>without limitation</u>," (ii) the word "<u>incur</u>" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "<u>incurred</u>" and "<u>incurrence</u>" shall have correlative meanings), (iii) unless the context otherwise requires, the words "<u>asset</u>" and "<u>property</u>" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Equity Interests, securities, revenues, accounts, leasehold interests and contract rights, (iv) the word "<u>will</u>" shall be construed to have the same meaning and effect as the word "<u>shall</u>," (v) unless the context otherwise requires, any reference herein (A) to any Person shall be construed to include such Person's permitted successors and assigns and (B) to the Borrower or any other Credit Party shall be construed to include the Borrower or such Credit Party as debtor and debtor-in-possession and any receiver or trustee for the Borrower or any other Credit Party, as the case may be, in any insolvency or liquidation proceeding and, (vi) all references to any Governmental Authority, shall include any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(c)    The words "<u>hereof</u>," "<u>herein</u>" and "<u>hereunder</u>" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    Unless otherwise expressly provided herein, (a) all references to documents, instruments and other agreements (including the Credit Documents) and all other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements, modifications, refinancings, renewals, replacements and restructurings thereto, but only to the extent that such amendments, restatements, amendments and restatements, extensions, supplements, modifications, refinancings, renewals, replacements and restructurings are permitted by the Credit Documents; and (b) references to any law (including by succession of comparable successor laws) shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

(f)    All certifications to be made hereunder by an officer or representative of a Credit Party shall be made by such Person in his or her capacity solely as an officer or a representative of such Credit Party, on such Credit Party's behalf and not in such Person's individual capacity.

(g)    For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Capital Stock at such time.

-42-

1.02.    Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Notwithstanding any other provision contained herein, any lease that is treated as an operating lease for purposes of GAAP as of the date hereof shall not be treated as Indebtedness or as a Capital Lease Obligation and shall continue to be treated as an operating lease (and any future lease, if it were in effect on the date hereof, that would be treated as an operating lease for purposes of GAAP as of the date hereof shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in or application of GAAP after the date hereof.

1.03.    Rounding.  Any financial ratios required to be maintained pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

1.04.    Times of Day.  Unless specified, all references herein to times of day shall be references to Eastern Time (daylight or standard, as applicable).

1.05.    Timing of Payment of Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance (including delivery of any documents or notices) required on a day which is not a Business Day, the date of such payment (other than as specified otherwise herein) or performance shall extend to the immediately succeeding Business Day and such extension shall be reflected in the computation of interest or fees, as the case may be.

1.06.    [Reserved].

1.07.    Calculations, Computations.  The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lenders); provided that (i) if at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document (including, without limitation, as a result of the effect of such change on any definition including accounting terms) used in calculating such ratio or determining compliance with such requirement (the "Accounting Change") and the Borrower shall so request (or the Administrative Agent notifies the Borrower that the Required Lenders so request), the Administrative Agent and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders) (provided, however, that, until so amended, such ratio or requirement shall continue to be computed in conformity with those accounting principles and policies in effect immediately prior to such Accounting Change); (ii) [reserved], (iii) notwithstanding anything to the contrary contained herein, all financial covenants contained herein or in any other Credit Document shall be calculated, in each case, without giving effect to any election under FASB ASC 825 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof and (iv) all financial statements delivered to the Administrative Agent in accordance with the terms of this Agreement after the date of any accounting change set forth in Section 1.02 shall contain a schedule showing the adjustments, if any, necessary to reconcile such financial statements with GAAP as in effect immediately prior to such accounting changes.

1.08.    Interest Rate Calculations.  All computations of interest, Unused Commitment Fee and other Fees hereunder shall be made on the basis of a year of 360 days (except for interest calculated by reference to the Prime Lending Rate, which shall be based on a year of 365 or 366 days, as applicable) for the actual number of days (including the first day but excluding the last day) occurring the period for which such interest, Unused Commitment Fee or Fees are payable.

1.09.    Disclaimer.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation, administration, submission, performance or calculation, of, or any other matter related to, any interest rate used in this Agreement, or any alternative, successor or replacement

rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as did any existing interest rate prior to its discontinuance, unavailability or replacement.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of any interest rate used in this Agreement, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion and acting in good faith to ascertain any interest rate used in this Agreement, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

SECTION 2.    Amount and Terms of Credit.

2.01.    The Commitments.

(a)    Subject to and upon the terms and conditions set forth herein, each Revolving Lender severally and not jointly agrees to make, at any time and from time to time during the Revolving Availability Period, a revolving loan or revolving loans (each, a "Revolving Loan" and, collectively, the "Revolving Loans") to the Borrower, which Revolving Loans (i) shall be denominated in Dollars, (ii) shall, at the option of the Borrower, be incurred and maintained as, and/or converted into, Base Rate Loans or Term Benchmark Loans; provided that all Revolving Loans comprising the same Borrowing shall at all times be of the same Type, (iii) may be repaid and reborrowed in accordance with the provisions hereof (without premium or penalty), (iv) prior to the Full Availability Date, after giving effect to all Borrowings of all such Revolving Loans and issuances of, or Drawings on, Letters of Credit, the outstanding Revolving Exposure of all Revolving Lenders shall not exceed the Revolving Interim Availability Amount and (v) made by any such Revolving Lender at any time outstanding shall not have an aggregate principal amount, when added to the product of (x) such Revolving Lender's Revolving Percentage and (y) the aggregate amount of all Letter of Credit Outstandings (exclusive of Unpaid Drawings which are repaid with the proceeds of, and simultaneously with the incurrence of, the respective incurrence of Revolving Loans), that exceeds the Revolving Loan Commitment of such Lender at such time.

(b)  (i)   Subject to the terms and conditions set forth herein, each Term Loan Lender agrees, severally and not jointly, to make a Term Loan to the Borrower in a single drawing during the Term Interim Availability Period in a principal amount not to exceed its Term Loan Commitment as of the Closing Date (the "Interim Term Loan"); provided that prior to the Full Availability Date, after giving effect to the making of any Interim Term Loans, the aggregate Term Loans outstanding of all Term Loan Lenders shall not exceed the Term Interim Availability Amount.

(ii)  Subject to the terms and conditions set forth herein, each Term Loan Lender agrees, severally and not jointly, to make a Term Loan to the Borrower on the Full Availability Date in a principal amount equal to the unitilized portion of its respective Term Loan Commitment as of the Full Availability Date (the "Full Availability Term Loan").  Immediately following the making of the Full Availability Term Loan, the Term Loan Commitment of such Lender shall terminate.  Notwithstanding anything to the contrary, unless the Administrative Agent and the Borrower shall otherwise agree, the initial Interest Period of any Full Availability Term Loans that are Term Benchmark Loans shall commence on the date of funding and shall end on the last day of the then-current Interest Period for all Term Benchmark Interim Term Loans then outstanding.

It is understood that amounts repaid or prepaid in respect of Term Loans may not be reborrowed.

2.02.    Minimum Amount of Each Borrowing.  The aggregate principal amount of each Borrowing of Loans under a respective Class shall not be less than the Minimum Borrowing Amount applicable to such Class.

-44-

More than one Borrowing may occur on the same date, but at no time shall there be outstanding more than ten (10) Borrowings of Term Benchmark Loans in the aggregate for all Classes of Loans.

2.03.   Notice of Borrowing.

(a)   To request a Revolving Borrowing or Term Loan Borrowing of (x) Term Benchmark Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office at least three (3) Business Days' prior notice of each Term Benchmark Loan to be incurred hereunder or (y) Base Rate Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office notice no later than 12:00 noon (New York City time) on the date the proposed Base Rate Loan is to be incurred; provided that (in each case) any such notice shall be deemed to have been given on a certain day only if given before 12:00 noon (New York City time) on such day. Each such notice (each, a "Notice of Borrowing"), except as otherwise expressly provided in Section 2.10, shall be irrevocable and shall be in writing, or by telephone promptly confirmed in writing, substantially in the form of Exhibit A-1, appropriately completed to specify:  (i) the aggregate principal amount of the Loans to be incurred pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day) and (iii) whether the Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans or, to the extent permitted hereunder, Term Benchmark Loans and, if Term Benchmark Loans, the initial Interest Period to be applicable thereto. The Administrative Agent shall promptly give each Lender which is required to make Loans of the Class specified in the respective Notice of Borrowing, notice of such proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

(b)   (i)   [Reserved].

(ii)   [Reserved].

(c)   Without in any way limiting the obligation of the Borrower to confirm in writing any telephonic notice of any Borrowing or prepayment of Loans, the Administrative Agent, may act without liability upon the basis of telephonic notice of such Borrowing or prepayment, as the case may be, believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower, prior to receipt of written confirmation. In each such case, the Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of such telephonic notice of such Borrowing or prepayment of Loans, as the case may be, absent manifest error, gross negligence, bad faith or willful misconduct.

2.04.   Disbursement of Funds. No later than 12:00 noon (New York City time) on the date specified in each Notice of Borrowing, each Lender with a Commitment of the respective Class will make available its pro rata portion (determined in accordance with Section 2.07) of each such Borrowing requested to be made on such date. All such amounts will be made available in Dollars and in immediately available funds at the Payment Office, and the Administrative Agent will make available to the Borrower at the Payment Office, or to such other account as the Borrower may specify in writing to the Administrative Agent, the aggregate of the amounts so made available by the Lenders; provided that, if, on the date of a Borrowing of Revolving Loans, there are Unpaid Drawings then outstanding (or any accrued interest, fees or costs in respect of such Unpaid Drawings), then the proceeds of such Borrowing shall be applied, first, to the payment in full of any such Unpaid Drawings with respect to Letters of Credit (and any accrued interest, fees or costs in respect of such Unpaid Drawings) and second, to the Borrower as otherwise provided above. Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on written demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower in writing and the Borrower shall immediately pay such corresponding amount to the Administrative Agent. The Administrative Agent also shall be entitled to recover on demand from such Lender or the Borrower, as the case may be, interest on such

-45-

corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the NYFRB Rate for the first three days and at the interest rate otherwise applicable to such Loans for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to <u>Section 2.08</u>. Nothing in this <u>Section 2.04</u> shall be deemed to relieve any Lender from its obligation to make Loans hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any failure by such Lender to make Loans hereunder.

2.05.   <u>Notes</u>.

(a)   The Borrower's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to <u>Section 13.12</u> and shall, if requested by such Lender, also be evidenced if requested by any applicable Lender (i) in the case of Revolving Loans, by a promissory note duly executed and delivered by the Borrower substantially in the form of <u>Exhibit B-1</u>, with blanks appropriately completed in conformity herewith (each, a "<u>Revolving Note</u>" and, collectively, the "<u>Revolving Notes</u>"), (ii) [reserved] and (iii) in the case of Term Loans, by a promissory note duly executed and delivered by the Borrower substantially in the form of <u>Exhibit B-3</u>, with blanks appropriately completed in conformity herewith (the "<u>Term Loan Note</u>").

(b)   Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and prior to any transfer of any of its Notes will endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby. Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Loans.

(c)   Notwithstanding anything to the contrary contained above in this <u>Section 2.05</u> or elsewhere in this Agreement, the Borrower shall only be required to deliver Notes to Lenders promptly following request for the delivery of such Notes. No failure of any Lender to request or obtain a Note evidencing its Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) incurred by the Borrower which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents. Any Lender which does not have a Note evidencing its outstanding Loans shall in any event be required to make the notations otherwise described in preceding clause (b).

2.06.   <u>Conversions</u>. The Borrower shall have the option to convert, on any Business Day, all or a portion equal to at least the Minimum Borrowing Amount of the outstanding principal amount of Loans made pursuant to one or more Borrowings (so long as of the same Class) of one or more Types of Loans into a Borrowing (of the same Class) of another Type of Loan; <u>provided</u> that, (i) except as otherwise provided in <u>Section 2.10(b)</u>, Term Benchmark Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Loans being converted unless the Borrower pays any amounts due under <u>Section 2.11</u> and no such partial conversion of Term Benchmark Loans shall reduce the outstanding principal amount of such Term Benchmark Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount applicable thereto, (ii) Base Rate Loans may not be converted into Term Benchmark Loans if any Event of Default exists pursuant to <u>Section 11.05</u> on the date of conversion, (iii) if any Event of Default (other than as referred to in preceding clause (ii)) is in existence on the date of the proposed conversion of a Term Benchmark Loan, (x) Base Rate Loans may not be converted into Term Benchmark Loans if the Administrative Agent or the Required Lenders have notified the Borrower that conversions will not be permitted during the existence of such Event of Default and (y) in the absence of the notification referred to in preceding clause (x), Base Rate Loans may only be converted into Term Benchmark Loans with an Interest Period of one (1) month and (iv) no conversion pursuant to this <u>Section 2.06</u> shall result in a greater number of Borrowings of Term Benchmark Loans than is permitted under <u>Section 2.02</u>. Each such conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 12:00 noon (New York City time) at least (x) in the case of conversions of Base Rate Loans into Term Benchmark Loans, three (3) Business Days' prior notice and (y) in the case of conversions of Term Benchmark Loans into Base Rate Loans, one (1) Business Day's prior notice (each, a "<u>Notice of Conversion/Continuation</u>"), in each case substantially in the form of <u>Exhibit A-2</u>, appropriately completed to

-46-

specify the Loans to be so converted, the Borrowing or Borrowings pursuant to which such Loans were incurred and, if to be converted into Term Benchmark Loans, the Interest Period to be initially applicable thereto.  The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Loans.

2.07.    <u>Pro Rata Borrowings</u>.  All Borrowings of Loans under this Agreement shall be incurred from the Lenders <u>pro rata</u> on the basis of their (x) in the case of Revolving Loans, Revolving Loan Commitments and (y) in the case of Term Loans, Term Loan Commitments.  It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

2.08.    <u>Interest</u>.

(a)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Base Rate Loan from the date of Borrowing thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Base Rate Loan to a Term Benchmark Loan pursuant to <u>Section 2.06</u> or <u>2.09</u>, as applicable, at a rate per annum which shall be equal to the sum of the relevant Applicable Margin <u>plus</u> the Base Rate, each as in effect from time to time.

(b)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Term Benchmark Loan from the date of Borrowing thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Term Benchmark Loan to a Base Rate Loan pursuant to <u>Section 2.06</u>, <u>2.09</u> or <u>2.10</u>, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the relevant Applicable Margin as in effect from time to time during such Interest Period <u>plus</u> Adjusted Term SOFR for such Interest Period.

(c)    Upon the occurrence and during the continuance of any Event of Default, the principal of and interest on, each Loan shall upon the election of the Required Lender, in each case, bear interest at a rate per annum equal to the rate which is 2.00% in excess of the rate then borne by such Loans, and all other amounts payable hereunder and under any other Credit Document shall bear interest at a rate per annum equal to, with respect to each Tranche, the rate which is 2.00% in excess of the rate applicable to Loans under such Tranche that are maintained as Base Rate Loans from time to time.

(d)    Accrued (and theretofore unpaid) interest shall be payable (i) in respect of each Base Rate Loan, (x) quarterly in arrears on each Quarterly Payment Date, and (y) at maturity (whether by acceleration or otherwise) and, after such maturity, on written demand, and (ii) in respect of each Term Benchmark Loan, (x) on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three month intervals after the first day of such Interest Period, and (y) on the date of any repayment or prepayment (on the amount repaid or prepaid) at maturity (whether by acceleration or otherwise) and, after such maturity, on written demand.

(e)    In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use or administration of Term SOFR

2.09.    <u>Interest Periods</u>.  At the time the Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or conversion into, any Term Benchmark Loan (in the case of the initial Interest Period applicable thereto) or prior to 12:00 noon (New York City time) on the third Business Day prior to the expiration of an Interest Period applicable to such Term Benchmark Loan (in the case of any subsequent

-47-

Interest Period), the Borrower shall have the right to elect an Interest Period applicable to such Term Benchmark Loan.

If by 12:00 noon (New York City time) on the third Business Day prior to the expiration of any Interest Period applicable to a Borrowing of Term Benchmark Loans, the Borrower has failed to elect, or is not permitted to elect, a new Interest Period to be applicable to such Term Benchmark Loans as provided above, the Borrower shall be deemed to have elected to continue such Term Benchmark Loans as Term Benchmark Loans with an Interest Period of one (1) month effective as of the expiration date of such current Interest Period; provided that if the Borrower is not permitted to elect a new Interest Period to be applicable to such Term Benchmark Loans as provided above, the Borrower shall be deemed to have elected to convert such Term Benchmark Loans into Base Rate Loans effective as of the expiration date of such current Interest Period.

If any partial prepayment of Term Benchmark Loans made pursuant to any Borrowing shall reduce the outstanding principal amount of Term Benchmark Loans made pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto, then such Borrowing may not be continued as a Borrowing of Term Benchmark Loans after the end of the Interest Period then applicable thereto (and the same shall automatically be converted into a Borrowing of Base Rate Loans at the end of such Interest Period) and any election of an Interest Period with respect thereto given by the Borrower shall have no force or effect.

2.10.    Increased Costs.

(a)    In the event that any Lender (or with respect to clause (iv), any Lender or Agent) shall have reasonably determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent) after the Closing Date:

(i)    [reserved]; or

(ii)    at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Term Benchmark Loan (other than with respect to Taxes) because of (x) any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, to a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Term SOFR Reference Rate and/or (y) other circumstances arising since the Closing Date affecting such Lender (including that Adjusted Term SOFR with respect to such Term Benchmark Loan does not adequately and fairly reflect the cost to such Lender of funding such Term Benchmark Loan); or

(iii)    [reserved]; or

(iv)    at any time, that any Change in Law shall subject any Lender or Agent to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on any Term Benchmark Loan;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any Loan) by an amount deemed by such Lender to be material or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender to be material, then the applicable Borrower will, subject to the provisions of Section 2.11(b) (to the extent applicable) pay to such Lender promptly following such Lender's written request (including documentation reasonably supporting such request) therefor, such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    [Reserved].

(c)     If at any time after the Closing Date, the introduction of or any change in any applicable law, rule, regulation, order, guideline or request or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender with any request or directive by such Governmental Authority (whether or not having the force of law), shall (i) impose, modify or make applicable any reserve, deposit, capital adequacy or liquidity or similar requirement against such Lender's Commitments hereunder or its obligations hereunder, or against any corporation controlling such Lender based on the existence of such Lender's Commitments or other obligations hereunder, (ii) impose on any Lender any other conditions relating, directly or indirectly, to this Agreement or any Loan, Commitment or other obligation hereunder, or (iii) subject any Lender or Agent to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on any Loan, Commitment or other obligation hereunder, and the result of any of the foregoing is to increase the cost to any Lender or such other corporation or any Agent of making, maintaining or participating in any Loan, Commitment or other obligation hereunder or reduce the amount of any sum received or receivable by any Lender or such corporation hereunder or reduce the rate of return on its capital or liquidity with respect to Loans, Commitments or other obligations, then within fifteen (15) Business Days after receipt of the certificate referred to below by Borrower from any Lender or any Agent (a copy of which certificate shall be sent by any such Lender to the Administrative Agent), the Borrower, subject to the provisions of Section 2.11(b) (to the extent applicable), agrees to pay to such Lender or such Agent such additional amount or amounts as will compensate such Lender or such other corporation or such Agent for such increased cost or reduction in the amount receivable or reduction on the rate of return on its capital or liquidity.  In determining such additional amounts, each Lender or Agent will act reasonably and in good faith and will use averaging and attribution methods which are reasonable and customary.  Each Lender or Agent, upon determining that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall include a certificate submitted to the Borrower by such Lender or such Agent (a copy of which certificate shall be sent by such Lender to the Administrative Agent) setting forth in reasonable detail the basis for calculation of such additional amounts.

(d)     Notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III shall in each case be deemed to be a change after the Closing Date in a requirement of law or government rule, regulation or order, regardless of the date enacted, adopted, issued or implemented (including for purposes of this Section 2.10 and Section 3.06).

2.11.   Compensation.

(a)     The Borrower agrees to compensate each Lender, promptly following its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Term Benchmark Loans but excluding loss of anticipated profits) which such Lender may sustain:  (i) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of, or conversion from or into, Term Benchmark Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to Section 2.10(a)); (ii) if any prepayment or repayment (including any prepayment or repayment made pursuant to Section 5.01, Section 5.02 or as a result of an acceleration of the Loans pursuant to Section 11) or conversion of any of its Term Benchmark Loans occurs on a date which is not the last day of an Interest Period with respect thereto; (iii) if any prepayment of any of its Term Benchmark Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iv) as a consequence of (x) any other default by the Borrower to repay Term Benchmark Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any election made pursuant to Section 2.10(b).

(b)     Notwithstanding anything to the contrary contained herein, with respect to any Lender's or any Participant's claim for compensation under Section 2.10(a) or 3.06, the Borrower shall not be required to

-49-

compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; provided that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

2.12.    Change of Lending Office.  Each Lender agrees that upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or (d), Section 3.06 or Section 5.04 with respect to such Lender, it will, if requested by the Borrower, will use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans or Letters of Credit affected by such event; provided that such designation is made on such terms that would eliminate or reduce amounts payable pursuant to Section 2.10 or 5.04, as the case may be, in the future and that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Sections 2.10, 2.11, 3.06 and 5.04.

2.13.    Replacement of Lenders.  (a) If any Lender becomes a Defaulting Lender, upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii), (iii) or (iv), Section 2.10(c) or (d), Section 3.06 or Section 5.04 with respect to any Lender which results in such Lender charging to the Borrower increased costs in excess of those being generally charged by the other Lenders, (b) in the case of a refusal by a Lender to consent to a proposed change, waiver, discharge or termination with respect to this Agreement as contemplated by clauses (i) through (ii) of the first proviso to Section 13.10(a) or clauses (i) through (iv) of the second proviso to Section 13.10(a), in each case, which has been approved by the Required Lenders or Majority Lenders, as applicable, or (c) [reserved], the Borrower shall have the right, in accordance with Section 13.04(c), if no Specified Default then exists or would exist after giving effect to such replacement, to (i) replace such Lender (the "Replaced Lender") with one or more other Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "Replacement Lender") or in the case of a replacement where the consent of the respective Lender is required with respect to less than all Classes of its Loans or Commitments, to replace the Commitments and/or outstanding Loans of such Lender in respect of each Class where the consent of such Lender would otherwise be individually required, with identical Commitments and/or Loans of the respective Class provided by the Replacement Lender or (ii) terminate the Commitment of such Lender or Issuing Lender, as the case may be, and (x) in the case of a Lender (other than any Issuing Lender), repay all Obligations (other than contingent obligations not then due and payable) of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date and/or, in the case of a Revolving Lender, re-allocate such Revolving Lender's Revolving Percentage of any Letter of Credit Outstanding in accordance with, and subject to the limitations set forth in Section 2.14(a)(i) as if such Revolving Lender was a Defaulting Lender and if such re-allocation cannot, or can only partially be effected, cash collateralize such Lender's Revolving Percentage of the Letter of Credit Outstandings in a manner reasonably satisfactory to the applicable Issuing Lender and (y) in the case of an Issuing Lender, repay all Obligations (other than contingent obligations not then due and payable) if such Loans are not being repaid pursuant to this Section 2.13) of the Borrower owing to such Lender relating to the Loans and participations held by the Issuing Lender as of such termination date and cancel or backstop on terms reasonably satisfactory to such Issuing Lender any Letters of Credit issued thereby, provided, that, in the case of any such termination of Commitments pursuant to this clause (ii), such termination shall be sufficient (together with all other consenting Lenders or other Commitments being terminated in connection with the adoption of the applicable proposed change, waiver, discharge or termination) to cause the adoption of the applicable proposed change, waiver, discharge or termination, and such termination shall be in respect of any applicable facility only in the case of clause (a) above or, with respect to a Class vote, clauses (b) or (c) above; provided that, in the case of any such assignment resulting from a claim for compensation under Section 2.10 or payments required to be made pursuant to Section 5.04, such assignment will result in a reduction in such compensation or payments thereafter; provided further that:

(a)    at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 13.04(c) (and with all fees payable pursuant to said Section 13.04(c) to be paid by the Replacement Lender and/or the Replaced Lender (as may be agreed to at such time by and among the Borrower, the Replacement Lender and, with respect to fees payable by the Replaced Lender, the Replaced Lender)) pursuant to which the Replacement Lender shall acquire all of the

-50-

Commitments and outstanding Loans (or, in the case of the replacement of only (a) the Revolving Loan Commitment and outstanding Revolving Loans and participations in Letter of Credit Outstandings of a given Class, the Revolving Loan Commitments, outstanding Revolving Loans and participations in Letters of Credit of such Class and/or (b) the outstanding Term Loans of a given Class, the outstanding Term Loans of such Class of the respective Lender) of, and (except for the replacement of only outstanding Term Loans) all participations in Letters of Credit by, the Replaced Lender and, in connection therewith, shall pay to (x) the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the respective Replaced Lender under each Class with respect to which such Replaced Lender is being replaced, (B) an amount equal to all Unpaid Drawings (unless there are no Unpaid Drawings with respect to the Class being replaced) that have been funded by (and not reimbursed to) such Replaced Lender, together with all then unpaid interest with respect thereto at such time and (C) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender (but only with respect to the relevant Class, in the case of the replacement of less than all Classes of Loans then held by the respective Replaced Lender) pursuant to <u>Section 4.01</u> and (y) except in the case of the replacement of only the outstanding Term Loans of one or more Classes of a Replaced Lender, each Issuing Lender an amount equal to such Replaced Lender's Revolving Percentage of any Unpaid Drawing relating to Letters of Credit issued by such Issuing Lender (which at such time remains an Unpaid Drawing) to the extent such amount was not theretofore funded by such Replaced Lender; and

(b)     all obligations of the Borrower then owing to the Replaced Lender (other than those (i) specifically described in clause (a) above in respect of which the assignment purchase price has been, or is concurrently being, paid, but including all amounts, if any, owing under <u>Section 2.11(a)</u> or (ii) relating to any Class of Loans and/or Commitments of the respective Replaced Lender which will remain outstanding after giving effect to the respective replacement) shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this <u>Section 2.13</u>, the Administrative Agent shall be entitled (but not obligated) and is authorized (which authorization is coupled with an interest) to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this <u>Section 2.13</u> and <u>Section 13.04</u>. Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (a) and (b) of the proviso above, recordation of the assignment on the Register by the Administrative Agent pursuant to <u>Section 13.12</u> and, if so requested by the Replacement Lender, delivery to the Replacement Lender of the appropriate Note or Notes executed by the Borrower, (x) the Replacement Lender shall become a Lender hereunder and, unless the respective Replaced Lender continues to have outstanding Term Loans and/or a Revolving Loan Commitment hereunder, the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, <u>Sections 2.10</u>, <u>2.11</u>, <u>3.06</u>, <u>5.04</u>, <u>13.01</u> and <u>13.06</u>), which shall survive as to such Replaced Lender to the extent contemplated herein and (y) except in the case of the replacement of only outstanding Term Loans pursuant to this <u>Section 2.13</u>, the Revolving Percentages of the Lenders shall be automatically adjusted at such time to give effect to such replacement. In the case of the substitution of a Lender pursuant to this <u>Section 2.13</u>, if the Lender being replaced does not execute and deliver to the Administrative Agent a duly completed Assignment and Assumption Agreement and/or any other documentation necessary to reflect such replacement by the later of (x) the date on which the Replacement Lender executed and delivers such Assignment and Assumption Agreement and/or such other documentation and (y) the date as of which all obligations of the Borrower required to be paid to the Replaced Lender pursuant to this <u>Section 2.13</u>, then the Replaced Lender shall be deemed to have executed and delivered such Assignment and Assumption Agreement and/or such other documentation as of such date and the Administrative Agent and the Borrower shall each be entitled (but not obligated) to execute and deliver such Assignment and Assumption Agreement and/or such other documentation on behalf of such Replaced Lender.

2.14.   <u>Defaulting Lenders</u>. Notwithstanding any provision of this Agreement to the contrary, if any Revolving Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Revolving Lender is a Defaulting Lender:

#95606088v60

98679498

(a)        if any Letter of Credit Exposure exists at the time a Revolving Lender becomes a Defaulting Lender then:

(i)        all or any part of such Letter of Credit Exposure shall be reallocated among the Revolving Lenders that are Non-Defaulting Revolving Lenders in accordance with their respective Revolving Percentages, but only to the extent (x) the sum of all Non-Defaulting Revolving Lenders' Individual Revolving Exposures plus such Defaulting Lender's Letter of Credit Exposure does not exceed the aggregate amount of all Non-Defaulting Revolving Lenders' Revolving Loan Commitments and (y) immediately following the reallocation to a Non-Defaulting Revolving Lender, the Individual Revolving Exposure of such Non-Defaulting Revolving Lender does not exceed its Revolving Loan Commitment at such time;

(ii)        if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrower shall within five (5) Business Days following written notice by the Administrative Agent cash collateralize in a manner reasonably satisfactory to the applicable Issuing Lender the unreallocated portion such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (i) above) in aggregate amount equal to 102% of such Defaulting Lender's Letter of Credit Exposure for so long as such Letter of Credit Exposure is outstanding (the "Letter of Credit Back-Stop Arrangements");

(iii)        the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 4.01(b) with respect to such Defaulting Lender's Letter of Credit Exposure;

(iv)        if the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.14(a), then the fees payable to the Revolving Lenders pursuant to Section 4.01(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Revolving Percentages; and

(v)        if any Defaulting Lender's Letter of Credit Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.14(a), then, without prejudice to any rights or remedies of any Issuing Lender or any Revolving Lender hereunder, all letter of credit fees payable under Section 4.01(b) with respect to such Defaulting Lender's Letter of Credit Exposure shall be payable to each Issuing Lender until such Letter of Credit Exposure is cash collateralized and/or reallocated; and

(b)        notwithstanding anything to the contrary contained in Section 2.01(d) or Section 3, so long as any Revolving Lender is a Defaulting Lender (i) no Issuing Lender shall be required to issue, amend, extend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Revolving Loan Commitments of the Non-Defaulting Revolving Lenders and/or cash collateral has been provided by the Borrower in accordance with Section 2.14(a), and (ii) participating interests in any such newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Revolving Lenders in a manner consistent with Section 2.14(a)(i) (and Defaulting Lenders shall not participate therein).

In the event that the Administrative Agent, the Borrower and each Issuing Lender each agrees that a Defaulting Lender has adequately remedied all matters that caused such Revolving Lender to be a Defaulting Lender, then (i) the Letter of Credit Exposure of the Revolving Lenders shall be readjusted to reflect the inclusion of such Revolving Lender's Revolving Loan Commitments and on such date such Revolving Lender shall purchase at par such of the Revolving Loans of the other Revolving Lenders as the Administrative Agent shall determine may be necessary in order for such Revolving Lender to hold such Revolving Loans in accordance with its applicable Revolving Percentage and (ii) so long as no Event of Default then exists, all applicable funds held as cash collateral pursuant to the Letter of Credit Back-Stop Arrangements shall thereafter be promptly returned to the Borrower.  If the Revolving Loan Commitments have been terminated, all other Obligations (other than contingent obligations not due and owing) with respect to the Revolving Loans have been paid in full and no Letters of Credit are outstanding (other than such Letters of Credit that are cash collateralized, back-stopped by a letter of credit or otherwise have been agreed to remain outstanding by the applicable Issuing Lender, in each case on terms reasonably acceptable to the applicable Issuing Lender), then, so long as no Event of Default then exists, all funds

#95606088v60

98679498

held as cash collateral pursuant to the Letter of Credit Back-Stop Arrangements shall thereafter be promptly returned to the Borrower.

2.15. <u>Incremental Term Loans; Revolving Commitment Increases</u>.

(a)     The Borrower shall have the right to request (by written notice to the Administrative Agent) at any time and from time to time after the Closing Date, (x) one or more incremental term facilities (each, an "<u>Incremental Term Facility</u>"), which may be in the form of additional commitments under an existing Class of Term Loans and the loans thereunder (the "<u>Incremental Term Loans</u>") and/or (y) one or more increases in the amount of the Revolving Loan Commitments (each such increase, a "<u>Revolving Commitment Increase</u>"); provided that;

(i)     at the time of each such request and upon the effectiveness of any Incremental Amendment, no Default or Event of Default shall have occurred and be continuing or shall occur as a result thereof;

(ii)     [reserved];

(iii)     each tranche of Incremental Term Loans (or addition of Incremental Term Loans to an existing Class of Term Loans) and each Revolving Commitment Increase shall be in an aggregate principal amount that is not less than $15,000,000 and an integral multiple of $5,000,000 in excess thereof (<u>provided</u> that such amount may be less than $15,000,000 if such amount represents all remaining availability under the limit set forth in clause (iv) below);

(iv)     the aggregate amount of all Incremental Facilities that shall be incurred or that shall become effective, shall not exceed the Maximum Incremental Facilities Amount; and

(v)     the Borrower shall have delivered to the Administrative Agent a certificate executed by an Authorized Officer of the Borrower (A) certifying compliance with the requirements of preceding clauses (i) through (iv), inclusive, and (B) containing the calculations (in reasonable detail) required by the preceding clause (iv) and, if applicable, the definition of "Maximum Incremental Facilities Amount."

(b)     (1) All Incremental Term Loans (and all interest, fees and other amounts payable thereon) shall (x) be Obligations under this Agreement and the other applicable Credit Documents, (y) be secured by the Financing Orders and the relevant Security Documents, and guaranteed under the Guarantee and Collateral Agreement, on a pari passu basis with all existing Tranches (and other Obligations secured equally and ratably therewith) secured by the Financing Orders and each such Security Document and guaranteed under the Guarantee and Collateral Agreement and (z) except for pricing and fees (and subject to the last paragraph of the definition of "Applicable Margin") all terms of such Incremental Term Loans, shall be identical to the terms of the existing Tranches and shall be subject to the First Lien Intercreditor Agreement; provided, however, that (i) in the case of a new tranche of Incremental Term Loans, (I) the maturity and amortization of such tranche of Incremental Term Loans may differ, so long as such tranche of Incremental Term Loans shall have (a) a final stated maturity date of no earlier than 91 days after the Maturity Date and (b) a Weighted Average Life to Maturity as determined by the Borrower and the Lenders providing such Incremental Term Facility, but in any event shall not be shorter than any Tranche; provided, that, any Incremental Term Loans shall be permitted to provide for repayment upon a change of control and for customary mandatory prepayments with respect to asset dispositions, events of loss and incurrences of indebtedness and customary scheduled amortization, (ii) any prepayment of Incremental Term Loans shall be made on a pro rata basis with all then existing Term Loans, except that the Borrower and the lenders in respect of such Incremental Term Loans shall be permitted, in their sole discretion, to elect to prepay or receive, as applicable, any prepayments on a less than pro rata basis (but not on a greater than pro rata basis) and (iii) in the case of Incremental Term Loans to be made pursuant to (and to constitute a part of) an existing Class of Incremental Term Loans, (I) such new Incremental Term Loans shall have the same scheduled repayment dates as then remain with respect to the respective existing Class of Incremental Term Loans (with the amount of each scheduled repayment applicable to such new Incremental Term Loans to be the same (on a proportionate basis) as is theretofore applicable to the respective existing Class of Incremental Term Loans), and (II) on the date of the making of such new Incremental Term Loans, and notwithstanding anything to the contrary set forth in <u>Section 2.09</u>, such new

Incremental Term Loans shall be added to (and form part of) each Borrowing of outstanding Incremental Term Loans of the respective existing Class on a pro rata basis (based on the relative sizes of the various outstanding Borrowings), so that each Lender will participate proportionately in each then outstanding Borrowing of such Class of Incremental Term Loans; and

(2)    Any Revolving Commitment Increase shall (other than with respect to upfront or similar fees) be subject to the terms and conditions applicable to Revolving Loans in this Agreement and the other Credit Documents; provided that, notwithstanding anything to the contrary in this Section 2.15 or otherwise, (1) the borrowing and repayment of Loans with respect to any Revolving Commitment Increase after the associated Incremental Facility Closing Date (and any Revolving Loan Commitment terminations) shall be made on a pro rata basis with all other Revolving Loan Commitments, (2) all Letters of Credit shall be participated on a pro rata basis by all Revolving Lenders with Commitments in accordance with their percentage of the Revolving Loan Commitments, (3) assignments and participations of Revolving Commitment Increases shall be governed by the same assignment and participation provisions in Section 13.04 and (4) the terms of such Revolving Commitment Increase shall not require any mandatory reduction in the Revolving Loan Commitments in respect of such Revolving Commitment Increase prior to the Maturity Date.

(c)    Each notice from the Borrower pursuant to this Section 2.15 shall set forth the requested amount and proposed terms of the relevant Incremental Term Loans or Revolving Commitment Increase.

(d)    Incremental Term Loans may be made, and Revolving Commitment Increases may be provided, by any existing Lender or by any Additional Lender; provided that the Administrative Agent and each Issuing Lender shall have consented (such consent not to be unreasonably withheld, delayed or conditioned) to such Lender's or Additional Lender's making such Incremental Term Loans or providing such Revolving Commitment Increase if such consent would be required under Section 13.04(c) for an assignment of Loans or Revolving Loan Commitments, as applicable, to such Lender or Additional Lender.  Commitments in respect of Incremental Term Loans and Revolving Commitment Increases shall become Commitments (or in the case of a Revolving Commitment Increase to be provided by an existing Revolving Lender, an increase in such Lender's applicable Revolving Loan Commitment) under this Agreement pursuant to an amendment (each, an "Incremental Amendment") to this Agreement and, as appropriate, the other Credit Documents, executed by the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and, to the extent required hereunder, the Administrative Agent.  The Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.15.

(e)    The effectiveness of any Incremental Amendment shall be subject to the satisfaction (or waiver) on the date thereof (each, an "Incremental Facility Closing Date") of each of the conditions set forth in such Incremental Amendment.

(f)    The Borrower will use the proceeds of the Incremental Term Loans and any Revolving Commitment Increase for any purpose not prohibited by this Agreement and as agreed to by the Borrower and the lenders providing such Incremental Facility.

(g)    No Lender shall be obligated to provide any Incremental Term Loans or Revolving Commitment Increase, unless it so agrees in its sole discretion.

(h)    Upon each increase in the Revolving Loan Commitments pursuant to this Section 2.15, (x) each Revolving Lender immediately prior to such increase will automatically and without further act be deemed to have assigned to each Lender providing a portion of the Revolving Commitment Increase (each, a "Revolving Commitment Increase Lender") in respect of such increase, and each such Revolving Commitment Increase Lender will automatically and without further act be deemed to have assumed, a portion of such Revolving Lender's participations hereunder in outstanding Letters of Credit such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding participations hereunder in Letters of Credit held by each Revolving Lender (including each such Revolving Commitment Increase Lender) will equal the percentage of the aggregate Revolving Loan Commitments of all Revolving Lenders represented by

-54-

such Revolving Lender's Revolving Loan Commitment and (y) if, on the date of such increase, there are any Revolving Loans outstanding, such Revolving Loans shall on or prior to the effectiveness of such Revolving Commitment Increase be prepaid from the proceeds of Revolving Loans made hereunder (reflecting such increase in Revolving Loan Commitments), which prepayment shall be accompanied by accrued interest on the Revolving Loans being prepaid and any costs incurred by any Lender in accordance with Section 2.11.  The Administrative Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(i)  This Section 2.15 shall supersede any provisions in Section 2.07, 2.08, 13.06 or 13.10 to the contrary.

2.16.  Extension of Maturity Date.  Notwithstanding anything to the contrary herein, to the extent the Consummation Date with respect to a Chapter 11 Plan for an Approved Plan has not occurred on or prior to the Maturity Date solely because any condition precedent set forth such Chapter 11 Plan with respect to the procurement of any required relicensing or approval from (x) the Nuclear Regulatory Committee, (y) FERC with respect to the Susquehanna nuclear facility or (z) any other regulatory authority (as reasonably agreed between the Administrative Agent and the Borrower) required in connection with the effectiveness of the Consummation Date, in each case, has not been satisfied or obtained (and other than any other conditions that by their nature can only be satisfied on the Consummation Date), then, subject to the satisfaction of the following conditions, the Maturity Date shall be extended and for purposes of the Credit Documents, "Maturity Date" shall mean the date that is twenty four (24) months after the Closing Date; provided that no such extension shall occur unless: (a) the Debtors shall have made good-faith attempts to procure such regulatory approvals prior to the original Maturity Date; (b) the Debtors shall have provided the Administrative Agent (for distribution to the Lenders) with a request for such extension not less than fifteen (15) days prior to the original Maturity Date; (c) a Chapter 11 Plan for an Approved Plan shall have been confirmed by the Bankruptcy Court; (d) the representations and warranties of each Credit Party set forth in the Credit Documents that are qualified by materiality shall be true and correct, and the representations that are not so qualified shall be true and correct in all material respects, in each case, on and as of the date of such extension (other than with respect to any representation and warranty that expressly relates to an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date); (e) at the time of each such request and upon the effectiveness of such extension, no Default or Event of Default shall have occurred and be continuing; and (f) to the extent practicable, at least ten (10) Business Days prior to the effectiveness of such extension (or such shorter period as the Administrative Agent may reasonably agree), the Borrower shall have delivered to the Administrative Agent financial projections (consistent in form with the DIP Budget) through the extended maturity period demonstrating minimum Liquidity throughout the extended maturity period of $150,000,000 or otherwise reasonably acceptable to the Administrative Agent.

2.17.  [Reserved].

2.18.  Alternate Rate of Interest.

(a)  Subject to clauses (b), (c), (d), (e) and (f) of this Section 2.18, if

(i)  the Administrative Agent determines (which determination shall be conclusive absent manifest error) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR rate or the Term SOFR Rate (including because the Term SOFR Reference Rate is not available or published on a current basis), for such Interest Period; provided that no Benchmark Transition Event shall have occurred at such time; or

(ii)  the Administrative Agent is advised by the Required Lenders that prior to the commencement of any Interest Period for a Term Benchmark Borrowing, the Adjusted Term SOFR rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until (x) the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Borrower delivers a new Interest Election Request in accordance with the terms of Section 2.09 or a new Notice of Borrowing in accordance with the terms of Section 2.03, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Term Benchmark Borrowing and any Notice of Borrowing that requests a Term Benchmark Borrowing shall instead be deemed to be an Interest Election Request or a Notice of Borrowing, as applicable, for a Base Rate Borrowing; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then all other Types of Borrowings shall be permitted. Furthermore, if any Term Benchmark Loan is outstanding on the date of the Borrower's receipt of the notice from the Administrative Agent referred to in this Section 2.18(a), then until (x) the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist with respect to the relevant Benchmark and (y) the Borrower delivers a new Interest Election Request in accordance with the terms of Section 2.09 or a new Notice of Borrowing in accordance with the terms of Section 2.03, any Term Benchmark Loan shall on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), be converted by the Administrative Agent to, and shall constitute, a Base Rate Loan.

(b)      Notwithstanding anything to the contrary herein or in any other Credit Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Credit Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders of each affected Class.

(c)      In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.

(d)      The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (e) below and (v) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.18, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Credit Document, except, in each case, as expressly required pursuant to this Section 2.18.

(e)      Notwithstanding anything to the contrary herein or in any other Credit Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has

#95606088v60

98679498

provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)    Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Term Benchmark Borrowing of, conversion to or continuation of Term Benchmark Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

2.19.    Priority and Liens; No Discharge.

(a)    Each of the Credit Parties hereby covenants, represents, warrants and agrees that upon the execution on this Agreement and entry of the Interim Order (and when applicable, the Final Order), the obligations hereunder and under the Credit Documents shall, subject and subordinate to the Carve Out, at all times:

(i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Cases, with priority over any and all claims against the Credit Parties (the "Superpriority Claims");

(ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable, fully-perfected first priority Lien on all Collateral not subject to valid, perfected and non-avoidable Liens;

(iii)    pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable, fully-perfected superpriority first priority priming security interest in and Lien on all Collateral of the same nature, scope and type as the collateral purportedly securing Prepetition First Lien Secured Debt (such collateral, the "Prepetition First Lien Collateral"). Such security interests and Liens shall be senior in all respects to the security interests and Liens of the secured parties under any Prepetition First Lien Secured Debt, in each case arising from their respective current and future Liens. Any Liens that are being primed pursuant to this clause (iii) are referred to as the "Primed Liens"; and

(iv)    pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable, fully-perfected junior Lien on all Collateral that is subject to (a) valid, perfected and non-avoidable Liens in existence at the time of the commencement of the Cases (other than the Primed Liens) or (b) valid and non-avoidable Liens (other than Primed Liens) in existence at the time of the commencement of the Cases that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code;

(b)

(i)    Each Credit Party hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Collateral Trustee on behalf of and for the benefit of the Secured Parties in all of the Debtors' Prepetition First Lien Collateral (as defined in the Interim Order), which includes, without limitation, all of such Debtor's Real Property (other than Excluded

-57-

Assets), now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any Mortgage, assignment or similar instrument.

(ii)    Further to Section 2.19(b)(i) and the Interim Order (and, when entered, the Final Order), to secure the full and timely payment and performance of the Secured Obligations, each Credit Party that is a Debtor hereby MORTGAGES, GRANTS, BARGAINS, ASSIGNS, SELLS, CONVEYS and CONFIRMS, to the Collateral Trustee, for the ratable benefit of the Secured Parties, all or any Real Property (other than Excluded Assets) (which, for the avoidance of doubt, shall include all of such Debtor's right, title and interest now or hereafter acquired in and to (a) all improvements now owned or hereafter acquired by such Debtor, (b) all materials, supplies, equipment, apparatus and other items of personal property now owned or hereafter acquired by such Debtor and now or hereafter attached to, installed in or used in connection with the Real Property, and all utilities whether or not situated in easements, and all equipment, inventory and other goods in which such Debtor now has or hereafter acquires any rights or any power to transfer rights and that are or are to become fixtures (as defined in the UCC) related to the Real Property (other than Excluded Assets), (c) all goods, accounts, inventory, general intangibles, instruments, documents, contract rights and chattel paper, (d) all reserves, escrows or impounds and all deposit accounts maintained by such Debtor with respect to the Real Property (other than Excluded Assets), (e) all leases, licenses, concessions, occupancy agreements or other agreements (written or oral, now or at any time in effect) which grant to any Person a possessory interest in, or the right to use, all or any part of the Real Property (other than Excluded Assets), together with all related security and other deposits, (f) all of the rents, revenues, royalties, income, proceeds, profits, accounts receivable, security and other types of deposits, and other benefits paid or payable by parties to the leases for using, leasing, licensing possessing, operating from, residing in, selling or otherwise enjoying the Real Property (other than Excluded Assets), (g) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of the Real Property (other than Excluded Assets), (h) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing, (i) all property tax refunds payable with respect to the Real Property (other than Excluded Assets), (j) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof, (k) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by such Debtor as an insured party, and (l) all awards, damages, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made to any Debtor by any governmental authority pertaining to any condemnation or other taking (or any purchase in lieu thereof), TO HAVE AND TO HOLD to the Collateral Trustee, and such Debtor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to such property, assets and interests unto the Agents) in each case, to the extent constituting Collateral.

(iii)    All of the Liens described in this Section 2.19 (x) shall be effective and perfected upon entry of the Interim Order, as applicable, without the necessity of the execution, recordation of filings by any Debtor of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Collateral Trustee of, or over, any Collateral, as set forth in the Financing Orders and (y) for the avoidance of doubt, shall in no way limit the Liens and security interests granted by any Credit Party pursuant to the Financing Orders or the Security Documents.

(iv)    Notwithstanding anything to the contrary herein, except as set forth in the Financing Orders, in no event shall the Collateral of the Debtors include (A) if and to the extent invoked pursuant to the Financing Orders, proceeds in an amount equal to the Carve Out (provided that Collateral shall include residual interest in the Carve Out), (B) any other property specifically excluded pursuant to the Financing Orders, (C) any "building" or "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws) having a Fair Market Value (as reasonably determined by a senior financial officer in good faith) not exceeding $10,000,000, presently or hereafter located on any land comprising part of any Real Property and (D) any "building" or "mobile home" (each

-58-

as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws) having a Fair Market Value (as reasonably determined by a senior financial officer in good faith) in excess of $10,000,000, presently or hereafter located on any land comprising part of any Real Property located in the United States until the Administrative Agent has received the Flood Documentation in form and substance reasonably satisfactory to the Administrative Agent.

(v)     Each of the Credit Parties agrees that (i) its obligations under the Credit Documents shall not be discharged by the entry of an order confirming a Chapter 11 Plan (and each of the Credit Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby irrevocably waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the Financing Orders and the Liens granted to the Agents and the Lenders pursuant to the Financing Orders shall not be affected in any manner by the entry of an order confirming a Chapter 11 Plan.

SECTION 3.     Letters of Credit.

3.01.     Letters of Credit.

(a)     Subject to and upon the terms and conditions set forth herein, the Borrower may request that an Issuing Lender issue (or amend, increase or extend an outstanding Letter of Credit), at any time and from time to time on and after the Closing Date and prior to the fifth Business Day prior to the Maturity Date, for the account of the Borrower (or, upon the request of the Borrower for any Affiliate thereof), (x) an irrevocable standby letter of credit, in a form customarily used by such Issuing Lender or in such other form as is reasonably acceptable to such Issuing Lender and the Borrower, and (y) an irrevocable commercial letter of credit, in a form customarily used by such Issuing Lender or in such other form as has been approved by such Issuing Lender and acceptable to the Borrower (each such letter of credit, a "Letter of Credit" and, collectively, the "Letters of Credit"). Each Issuing Lender agrees, subject to the terms of this Agreement, to issue Letters of Credit in an aggregate amount (i) not to exceed its Letter of Credit Commitment (as applicable) at any time, (ii) not to exceed, together with the aggregate Stated Amount of all other Letters of Credit then outstanding, the Letter of Credit Sublimit, (iii) when aggregated with the Letter of Credit Commitments of all of the Issuing Lenders, not to exceed the Revolving Loan Commitments that would be in effect at any time prior to the expiration of all Letters of Credit outstanding at such time (solely after giving effect to the scheduled maturity of any Revolving Loan Commitment occurring prior to the expiration of all such Letters of Credit) and (iv) not to exceed the Revolving Interim Availability Amount that would be in effect at any time prior to the Full Availability Date. Letters of Credit shall be denominated in Dollars. Notwithstanding anything to the contrary herein, Goldman Sachs Bank USA and its Affiliates shall not be under any obligation to issue bank guarantees or commercial Letters of Credit without their prior written consent.

(b)     Subject to and upon the terms and conditions set forth herein, each Issuing Lender agrees that it will, at any time and from time to time on and after the Closing Date and prior to the fifth Business Day prior to the Maturity Date, following its receipt of the respective Letter of Credit Request, issue for account of the Borrower, one or more Letters of Credit as are permitted to remain outstanding hereunder without giving rise to a Default or an Event of Default; provided that no Issuing Lender shall be under any obligation to issue any Letter of Credit of the types described above if at the time of such issuance:

(i)     any order, judgment or decree of any Governmental Authority or arbitrator shall purport by its terms to enjoin or restrain such Issuing Lender from issuing such Letter of Credit or any requirement of law applicable to such Issuing Lender or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuing Lender shall prohibit, or request that such Issuing Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Lender with respect to such Letter of Credit any restriction or reserve or capital or liquidity requirement (for which such Issuing Lender is not otherwise compensated hereunder) not in effect with respect to such Issuing Lender on the date hereof, or any unreimbursed loss, cost or expense which was not applicable or in effect with respect to such Issuing Lender as of the date hereof and which such Issuing Lender reasonably and in good faith deems material to it; or

(ii)    such Issuing Lender shall have received from the Borrower, any other Credit Party or the Required Lenders prior to the issuance of such Letter of Credit notice of the type described in the second sentence of <u>Section 3.03(b)</u> (which has not been rescinded).

3.02.    <u>Maximum Letter of Credit Outstandings; Final Maturities</u>. Notwithstanding anything to the contrary contained in this Agreement, (i) no Letter of Credit shall be issued the Stated Amount of which, when added to the Letter of Credit Outstandings (exclusive of Unpaid Drawings which are repaid on the date of, and prior to the issuance of, the respective Letter of Credit) at such time would exceed, when added to the sum of the aggregate principal amount of all Revolving Loans then outstanding, an amount equal to the Total Revolving Loan Commitment at such time, (ii) no Letter of Credit shall be issued the Stated Amount of which, when added to the Letter of Credit Outstandings (exclusive of Unpaid Drawings which are repaid on the date of, and prior to the issuance of, the respective Letter of Credit) at such time would exceed the Letter of Credit Sublimit and (iii) unless consented to by the Issuing Lender, each Letter of Credit shall by its terms terminate (x) in the case of standby Letters of Credit, on or before the earlier of (A) the date which occurs 12 months after the date of the issuance thereof and (B) five (5) Business Days prior to the Maturity Date then applicable to the Revolving Loan Commitments hereunder (although any such standby Letter of Credit may be automatically extendible (subject, to an annual right of the Issuing Lender to refuse to permit such extension, in each case subject to, and only to the extent provided for by, the express terms of such Letter of Credit) for successive periods of up to 12 months, but, in each case, not beyond the fifth Business Day prior to the Maturity Date then applicable to the Revolving Loan Commitments hereunder, unless either (1) each Revolving Lender with Letter of Credit Exposure with respect to such Letter of Credit has approved of such expiration date or (2)(A) an Approved Plan has been confirmed by the Bankruptcy Court (and the order confirming such Approved Plan has not been vacated, reversed, modified, amended or stayed) which provides for (I) the cash collateralization of 102% of the Stated Amount of each applicable Letter of Credit, (II) a backstop letter of credit supporting at least 100% of the Stated Amount of each applicable Letter of Credit from a nationally recognized creditworthy party and otherwise reasonably satisfactory to each applicable Issuing Lender (III) a "roll-up", renewal, replacement or extension of each applicable Letter of Credit pursuant to the terms of any first-lien exit financing to be effective concurrently with the Consummation Date and satisfactory to each Issuing Lender in its sole discretion or (IV) other arrangements on terms satisfactory to the applicable Issuing Lender and each Revolving Lender with Letter of Credit Exposure with respect to such Letter of Credit (unless, as a result of such arrangements, no Revolving Lender has any such Letter of Credit Exposure) in their sole discretion or (B) at least thirty (30) days (or such shorter period as may be agreed by each Revolving Lender and each applicable Issuing Lender) prior to the Maturity Date then applicable to the Revolving Loan Commitments hereunder, the Borrower cash collateralizes up to the amount of 102% of the Stated Amount of such Letter of Credit (or provides a backstop letter of credit or makes other arrangements with respect to such Letter of Credit on terms reasonably acceptable to the applicable Issuing Lender and each Revolving Lender), it being understood in the case of any Letter of Credit terminating after such date in reliance on this clause (2), that, (I) solely if the cash collateralization (or backstop letter of credit or other arrangements) referred to in this clause (2) has been provided, the participations in such Letter of Credit pursuant to <u>Section 3.04</u> shall be terminated on the fifth Business Day prior to the Maturity Date under the applicable Revolving Loan Commitments hereunder and (II) if the Borrower fails to cash collateralize (or fails to provide a backstop letter of credit or make other arrangements) referred to in this clause (2), the participations in such Letter of Credit shall continue in full force and effect until the Borrower posts such cash collateral (or provides such backstop letter of credit or makes such other arrangements) or the applicable Letter of Credit expires), and (y) in the case of commercial Letters of Credit, on or before the earlier of (A) the date which occurs 180 days after the date of issuance thereof and (B) five (5) Business Days prior to the Maturity Date applicable to Revolving Loan Commitments hereunder (provided, that notwithstanding the foregoing, in no event shall the termination date of any Letter of Credit extend beyond the date that is one year following the Maturity Date applicable to the Revolving Loan Commitments hereunder).

3.03.    <u>Letter of Credit Requests; Minimum Stated Amount</u>.

(a)    Whenever the Borrower desires that a Letter of Credit be issued for its account, the Borrower shall give the Administrative Agent and the respective Issuing Lender at least three (3) Business Days' (or such shorter period as is reasonably acceptable to such Issuing Lender) written notice thereof (including by way of facsimile). Each notice shall be substantially in the form of <u>Exhibit C</u>, appropriately completed (each, a "<u>Letter of</u>

-60-

Credit Request"). If requested by the Issuing Lender, the Borrower also shall submit a letter of credit application on the Issuing Lender's standard form in connection with any request for a Letter of Credit.

(b)        The making of each Letter of Credit Request shall be deemed to be a representation and warranty by the Borrower to the Lenders that such Letter of Credit may be issued in accordance with, and will not violate the requirements of, Section 3.02.  Unless the respective Issuing Lender has received notice from the Borrower, any other Credit Party or the Required Lenders before it issues a Letter of Credit that one or more of the conditions specified in Section 6 are not then satisfied (or waived) in writing by the Required Lenders prior to the issuance of such Letter of Credit, or that the issuance of such Letter of Credit would violate Section 3.02 or the policies of the Issuing Lender applicable to letters of credit in general, then such Issuing Lender shall, subject to the terms and conditions of this Agreement, issue the requested Letter of Credit for the account of the Borrower (or, upon the request of the Borrower any Affiliate thereof) in accordance with such Issuing Lender's usual and customary practices.  Upon the issuance of or modification or amendment to any Letter of Credit, each Issuing Lender shall promptly notify the Borrower and the Administrative Agent, in writing of such issuance, modification or amendment and such notice shall be accompanied by a copy of such Letter of Credit or the respective modification or amendment thereto, as the case may be.  Promptly after receipt of such notice the Administrative Agent shall notify the Participants, in writing, of such issuance, modification or amendment.

(c)        The initial Stated Amount of each Letter of Credit shall not be less than $10,000 (or the Dollar Equivalent thereof) or such other amount specified on Schedule 1.01(b), or such lesser amount as is acceptable to the respective Issuing Lender.

3.04.    Letter of Credit Participations.

(a)        Immediately upon the issuance by an Issuing Lender of any Letter of Credit, such Issuing Lender shall be deemed to have sold and transferred to each Revolving Lender, and each such Revolving Lender (in its capacity under this Section 3.04, a "Participant") shall be deemed irrevocably and unconditionally to have purchased and received from such Issuing Lender, without recourse or warranty, an undivided interest and participation, to the extent of such Participant's Revolving Percentage (or the Dollar Equivalent thereof), in such Letter of Credit, each drawing or payment made thereunder and the obligations of the Borrower under this Agreement with respect thereto, and any security therefor or guaranty pertaining thereto; provided that, with respect to any Participant, in no event shall the dollar amount represented by the aggregate of the Revolving Percentage of all Letter of Credit Outstandings and the outstanding Revolving Loans of such Participant exceed the Revolving Loan Commitments of such Participant.  Upon any change in the Revolving Loan Commitments or Revolving Percentages of the Lenders pursuant to Section 2.13, 2.14, 2.15 or 13.04(c), it is hereby agreed that, with respect to all outstanding Letters of Credit and Unpaid Drawings relating thereto, there shall be an automatic adjustment to the participations pursuant to this Section 3.04 to reflect the new Revolving Percentages of the assignor and assignee Lender, as the case may be.

(b)        In determining whether to pay under any Letter of Credit, no Issuing Lender shall have any obligation relative to the other Lenders other than to confirm that any documents required to be delivered under such Letter of Credit appear to have been delivered and that they appear to substantially comply on their face with the requirements of such Letter of Credit.  Any action taken or omitted to be taken by an Issuing Lender under or in connection with any Letter of Credit issued by it shall not create for such Issuing Lender any resulting liability to the Borrower, any other Credit Party, any Lender or any other Person unless such action is taken or omitted to be taken with gross negligence, bad faith or willful misconduct or material breach of this Agreement on the part of such Issuing Lender or any of such Issuing Lenders' or its Affiliates' employees, directors, officers or agents (in each case, as determined by a court of competent jurisdiction in a final and non-appealable decision).

(c)        In the event that any Issuing Lender makes any payment under any Letter of Credit issued by it and the Borrower shall not have reimbursed such amount in full to such Issuing Lender pursuant to Section 3.05(a), such Issuing Lender shall promptly notify the Administrative Agent, which shall promptly notify each Participant of such failure, and each Participant shall promptly and unconditionally pay to the Administrative Agent at the Payment Office for the account of such Issuing Lender the amount of such Participant's Revolving Percentage (or the Dollar Equivalent thereof) of such unreimbursed payment in same day funds.  If the Administrative Agent so

-61-

notifies, prior to 11:00 a.m. on any Business Day, any Participant required to fund a payment under a Letter of Credit, such Participant shall make available to the Administrative Agent at the Payment Office for the account of the respective Issuing Lender in Dollars such Participant's Revolving Percentage of the amount of such payment on such Business Day in same day funds.  If and to the extent such Participant shall not have so made such payment available to the Administrative Agent at the Payment Office for the account of such respective Issuing Lender, such Participant agrees to pay to such Issuing Lender, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to such Issuing Lender at the NYFRB Rate for the first three days and at the interest rate applicable to Revolving Loans that are maintained as Base Rate Loans for each day thereafter.  The failure of any Participant to make available to an Issuing Lender its Revolving Percentage (or the Dollar Equivalent thereof) of any payment under any Letter of Credit issued by such Issuing Lender shall not relieve any other Participant of its obligation hereunder to make available to such Issuing Lender its Revolving Percentage (or the Dollar Equivalent thereof) of any payment under any Letter of Credit on the date required, as specified above, but no Participant shall be responsible for the failure of any other Participant to make available to such Issuing Lender any such payment.

(d)     Whenever an Issuing Lender receives a payment of a reimbursement obligation as to which it has received any payments from the Participants pursuant to clause (c) above, such Issuing Lender shall pay to the Administrative Agent and the Administrative Agent shall pay to each such Participant which has paid its Revolving Percentage (or the Dollar Equivalent thereof) thereof, in same day funds, an amount equal to such Participant's share (based upon the proportionate aggregate amount originally funded by such Participant to the aggregate amount funded by all Participants) of the principal amount of such reimbursement obligation and interest thereon accruing after the purchase of the respective participations.

(e)     Upon the request of any Participant, the Administrative Agent shall furnish to such Participant copies of any Letter of Credit issued by any Issuing Lender and such other documentation as may reasonably be requested by such Participant.

(f)     The obligations of the Participants to make payments to each Issuing Lender with respect to Letters of Credit shall be irrevocable and not subject to any qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including, without limitation, any of the following circumstances:

(i)     any lack of validity or enforceability of this Agreement or any of the other Credit Documents;

(ii)     the existence of any claim, setoff, defense or other right which the Borrower or any of its Subsidiaries may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, any Participant, or any other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein and therein or any unrelated transactions (including any underlying transaction between the Borrower or any Subsidiary of the Borrower and the beneficiary named in any such Letter of Credit);

(iii)     any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)     the surrender or impairment of any security for the performance or observance of any of the terms of any of the Credit Documents; or

(v)     the occurrence of any Default or Event of Default.

3.05.    Agreement to Repay Letter of Credit Drawings.

(a)    The Borrower agrees to reimburse each Issuing Lender, by making payment to the applicable Issuing Lender in immediately available funds at the applicable Payment Office, for any payment or disbursement made by such Issuing Lender under any Letter of Credit issued by it (each such amount, so paid until reimbursed by the Borrower), an "Unpaid Drawing"), prior to 12:00 noon (New York City time), not later than one (1) Business Day following receipt by the Borrower of written notice of such payment or disbursement; provided that in the absence of such reimbursement by the Borrower within the period provided above, the amount of the Drawing shall immediately and automatically be deemed to be a Revolving Loan under the applicable Tranche (with each Participant in the respective Letter of Credit being required to fund its Revolving Percentage under the applicable Tranche (or the Dollar Equivalent thereof) of the respective Unpaid Drawing in accordance with the provisions of Section 3.04(c), which amounts shall immediately and automatically be deemed a part of such Revolving Loan hereunder) and, initially, shall bear interest at the rate then applicable to Revolving Loans that are Base Rate Loans. If a Drawing is deemed to be a Revolving Loan hereunder, the Borrower's obligation to pay the amount of such Drawing shall be discharged and replaced by the resulting Revolving Loan. Each Issuing Lender shall give the Borrower prompt written notice of each Drawing under any Letter of Credit issued by it; provided that the failure to give any such notice shall in no way affect, impair or diminish the Borrower's obligations hereunder.

(b)    The obligations of the Borrower under this Section 3.05 to reimburse each Issuing Lender with respect to any Drawing shall be absolute, unconditional and irrevocable under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which the Borrower or any Subsidiary of the Borrower may have or have had against any Lender (including in its capacity as an Issuing Lender or as a Participant), including, without limitation, any defense based upon the failure of any drawing under a Letter of Credit to conform to the terms of the Letter of Credit or any nonapplication or misapplication by the beneficiary of the proceeds of such Drawing; provided, however, that the Borrower shall not be obligated to reimburse any Issuing Lender for any wrongful payment made by such Issuing Lender under a Letter of Credit issued by it as a result of acts or omissions constituting gross negligence, bad faith or willful misconduct or material breach of this Agreement on the part of such Issuing Lender (in each case, as determined by a court of competent jurisdiction in a final and non-appealable decision). Neither the Administrative Agent nor the Lenders, nor any Affiliate of the foregoing Persons nor any of the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms, any error in translation, or any consequence arising from causes beyond the control of the Lender; provided that the foregoing shall not be construed to excuse the Lender from liability to the Borrower or any Subsidiary of the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrower and its Subsidiaries to the extent permitted by applicable law) suffered by the Borrower or any Subsidiary that are caused by the Lender's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence, bad faith or willful misconduct or material breach of this Agreement on the part of the Issuing Lender (as finally determined by a court of competent jurisdiction), the Issuing Lender shall be deemed to have exercised care in each such determination.

3.06.    Increased Costs. If at any time after the Closing Date, the introduction of or any change in any applicable law, rule, regulation, order, guideline or request or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Issuing Lender or any Participant with any request or directive by any such Governmental Authority, central bank or comparable agency (whether or not having the force of law), shall either (i) impose, modify or make applicable any reserve, deposit, capital adequacy, liquidity or similar requirement against letters of credit issued by any Issuing Lender or participated in by any Participant, (ii) impose on any Issuing Lender or any Participant any other conditions relating, directly or indirectly, to this Agreement or any Letter of Credit, or (iii) subject any Issuing Lender or Participant to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income

Taxes) on any Letter of Credit, and the result of any of the foregoing is to increase the cost to any Issuing Lender, any Agent, or any Participant of issuing, maintaining or participating in any Letter of Credit, or reduce the amount of any sum received or receivable by any Issuing Lender or any Participant hereunder or reduce the rate of return on its capital with respect to Letters of Credit, then within fifteen (15) Business Days after receipt of the certificate referred to below by Borrower from any Issuing Lender, any Agent, or any Participant (a copy of which certificate shall be sent by such Issuing Lender or such Participant to the Administrative Agent), the Borrower, subject to the provisions of Section 2.11(b) (to the extent applicable), agrees to pay to such Issuing Lender, such Agent, or such Participant such additional amount or amounts as will compensate such Issuing Lender, such Agent, or such Participant for such increased cost or reduction in the amount receivable or reduction on the rate of return on its capital on such liquidity requirements. In determining such additional amounts, each Issuing Lender, Agent or Participant, as the case may be, will act reasonably and in good faith and will use averaging and attribution methods which are reasonable and customary; provided that such Issuing Lender's, Agent's or Participant's determination of compensation owing under this Section 3.06 shall, absent manifest error, be final and conclusive and binding on all the parties hereto. Each Issuing Lender, Agent or Participant, upon determining that any additional amounts will be payable pursuant to this Section 3.06, will give prompt written notice thereof to the Borrower, which notice shall include a certificate submitted to the Borrower by such Issuing Lender, Agent or Participant (a copy of which certificate shall be sent by such Issuing Lender or such Participant to the Administrative Agent), setting forth in reasonable detail the basis for calculation of such additional amounts.

3.07.    Provisions Related to Extended Revolving Loan Commitments.

(a)    [Reserved].

(b)    If the Maturity Date occurs prior to the expiration of any Letter of Credit, the Borrower shall cash collateralize any such Letter of Credit in a manner reasonably satisfactory to the Administrative Agent and the respective Issuing Lenders but only up to the amount of 102% of such Letter of Credit. The occurrence of the Maturity Date shall have no effect upon (and shall not diminish) the percentage participations of the Revolving Lenders in any Letter of Credit issued before the Maturity Date.

3.08.    Conflict with Letter of Credit Request.    Notwithstanding anything else to the contrary in this Agreement, any Letter of Credit Request or any other document related to issuing a Letter of Credit, (i) in the event of any conflict between the terms hereof and the terms of any Letter of Credit Request or such other document, the terms hereof shall control in all respects and (ii) any grant of a security interest pursuant to any Letter of Credit Request shall be null and void (other than, in the case of trade Letters of Credit, the goods subject to such Letters of Credit and the documents relating to such goods).

SECTION 4.    Unused Commitment Fee; Fees; Reductions of Commitment.

4.01.    Fees.

(a)    The Borrower agrees to pay to the Administrative Agent for distribution to each Non-Defaulting Revolving Lender a nonrefundable commitment fee (the "Unused Commitment Fee") for the period from and including the Closing Date to and including the applicable Maturity Date (or such earlier date on which the Total Revolving Loan Commitment has been terminated) computed at a rate per annum equal to 0.50% of the Unutilized Revolving Loan Commitment of such Non-Defaulting Revolving Lender as in effect from time to time. Accrued Unused Commitment Fee shall be due and payable quarterly in arrears on each Quarterly Payment Date, on the date upon which the Total Revolving Loan Commitment is terminated.

(b)    The Borrower agrees to pay to the Administrative Agent for distribution to each Revolving Lender (based on each such Revolving Lender's respective Revolving Percentage) a fee in respect of the daily Stated Amount of each Letter of Credit (the "Letter of Credit Fee") for the period from and including the date of issuance of such Letter of Credit to and including the date of termination or expiration of such Letter of Credit, computed at a rate per annum equal to 4.5%.

-64-

(c)     The Borrower agrees to pay to each Issuing Lender, for its own account, a fronting fee in respect of each Letter of Credit issued by it (the "Fronting Fee") for the period from and including the date of issuance of such Letter of Credit to and including the date of termination or expiration of such Letter of Credit, computed at a rate per annum equal to 0.125% on the daily Stated Amount of such Letter of Credit (or such other rate as shall be separately agreed upon between the Borrower and the Issuing Lender).  Accrued Fronting Fees shall be due and payable quarterly in arrears on each Quarterly Payment Date and upon the first day on or after the termination of the Total Revolving Loan Commitment upon which no Letters of Credit remain outstanding.

(d)     The Borrower shall pay directly to each Issuing Lender for its own account with respect to each Letter of Credit issued to the Borrower the customary issuance, presentation, amendment and other fees, and other standard costs and charges, of such Issuing Lender relating to Letters of Credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable within fifteen (15) Business Days of written demand (including documentation reasonably supporting such request) and are nonrefundable.

(e)     The Borrower agrees to pay to the Administrative Agent such fees as may be agreed to in writing from time to time by the Borrower or any of its Subsidiaries and the Administrative Agent.

4.02.   Voluntary Termination of Unutilized Revolving Loan Commitments.

(a)     On three (3) Business Days' written notice to the Administrative Agent at the Notice Office on or prior to 12:00 noon (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrower shall have the right, at any time or from time to time, without premium or penalty, to terminate the Revolving Loan Commitment in whole, or reduce in part, pursuant to this Section 4.02; provided that a notice of termination under this Section 4.02 may state that such notice is conditional upon the effectiveness of the receipt of proceeds from the issuance of other Indebtedness or Capital Stock or consummation of an asset sale or the occurrence of other events in which case such notice of termination may be rescinded by the Borrower (by notice to the Administrative Agent on or prior to the specified date of termination) if such condition is not satisfied; provided, further that (i) in the event there is more than one Class of Revolving Loan Commitments then outstanding, such reductions shall be applied to such Class or Classes of Revolving Loan Commitments as shall be designated by the Borrower (subject to, and in accordance with, Section 2.15), (ii) in the circumstances contemplated by preceding clause (i), at the time of any such reduction to the Revolving Loan Commitments which is not applied on a proportionate basis to each outstanding Class, the Borrower shall on the date of such reduction (and notwithstanding anything to the contrary contained in this Agreement) effect such borrowings and repayments pursuant to the Revolving Loan Commitments as same will exist after giving effect to the reductions contemplated pursuant to this Section 4.02 so that the outstandings pursuant to the remaining Revolving Loan Commitments shall be based on the revised Revolving Percentages of the various Lenders after giving effect thereto, (iii) each reduction to any Class of Revolving Loan Commitments shall be applied proportionately to permanently reduce the Revolving Loan Commitment of the respective Class of each Lender with such a Commitment and (iv) each partial reduction shall reduce the Revolving Loan Commitment by not less than $1,000,000 and an integral multiple of $500,000 in excess thereof.

(b)     [Reserved].

4.03.   Mandatory Reduction of Commitments.

(a)     The Revolving Loan Commitments shall terminate in their entirety on the applicable Maturity Date.

(b)     [Reserved.]

(c)     The Term Loan Commitment of any Term Loan Lender shall be automatically and permanently reduced by the amount of any Term Loan Borrowing funded by such Lender.  Unless previously terminated, all of the Term Loan Commitments shall terminate on the earlier of (x)(A) immediately after the Borrowing of the Term

Loans on the Full Availability Date or (B) three Business Days following the Final Order Entry Date if no Notice of Borrowing has been received on the Full Availability Date and (y) the Maturity Date.

SECTION 5.     Prepayments; Payments; Taxes.

5.01.   Voluntary Prepayments.

(a)     The Borrower shall have the right to prepay the Loans, without premium or penalty (except as provided in Section 5.01(b)), in whole or in part at any time and from time to time on the following terms and conditions:  (i) the Borrower shall give the Administrative Agent prior to 12:00 noon at the Notice Office prior written notice (x) on the same Business Day (or telephonic notice promptly confirmed in writing) in the case of Base Rate Loans and (y) three (3) Business Days prior in the case of Term Benchmark Loans, of its intent to prepay any Loans, which notice (in each case) shall specify whether Revolving Loans or Term Loans shall be prepaid, the amount of such prepayment and the Types of Loans to be prepaid and, in the case of Term Benchmark Loans, the specific Borrowing or Borrowings pursuant to which such Term Benchmark Loans were made, and which notice the Administrative Agent shall promptly transmit to each of the Lenders; provided that a notice of prepayment under this Section 5.01 (i) may state that such notice is conditional upon the effectiveness of the receipt of proceeds from the issuance of other Indebtedness or Capital Stock or consummation of an asset sale or the occurrence of other events in which case such notice of prepayment may be rescinded by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied; (ii) (x) each partial prepayment of Revolving Loans pursuant to this Section 5.01 shall be in an aggregate principal amount of not less than $1,000,000 and an integral multiple of $5,000,000 in excess thereof (or, if less, the outstanding amount of applicable loans) and (y) each partial prepayment of Term Loans pursuant to this Section 5.01 shall be in an aggregate principal amount of not less than $1,000,000 and an integral multiple of $500,000 in excess thereof (or, if less, the outstanding amount of applicable loans); (iii) each prepayment of Revolving Loans pursuant to this Section 5.01 shall be made in proportion to the outstanding principal of Revolving Loans of the various Revolving Lenders, so that each Revolving Lender's outstandings pursuant to its Revolving Loan Commitments reflect its respective Revolving Percentages as from time to time in effect and (iv) each prepayment pursuant to this Section 5.01 in respect of any Loans made pursuant to a Borrowing shall be applied pro rata among such Loans.

(b)     In the event that, on or prior to the six-month anniversary of the Closing Date, the Borrower (x) prepays, refinances, substitutes or replaces any Term Loans pursuant to a Repricing Transaction or prepays any Term Loans pursuant to Section 5.02(e), or (y) effects any amendment, waiver, amendment and restatement or other modification of this Agreement resulting in a Repricing Transaction, the Borrower shall pay to the Administrative Agent, for the ratable account of each applicable Lender in respect of such Term Loans, a prepayment premium of 1.00% of the aggregate principal amount of the Term Loans so prepaid, refinanced, substituted, replaced, amended or otherwise modified. If, on or prior to the six-month anniversary of the Closing Date, any Lender is a Non-Consenting Lender and is replaced pursuant to Section 2.13 in connection with any amendment, waiver amendment and restatement or other modification of this Agreement resulting in a Repricing Transaction, such Lender (and not any Person who replaces such Lender pursuant to Section 2.13) shall receive its pro rata portion (as determined immediately prior to it being so replaced) of the prepayment premium or fee described in the preceding sentence. Such amounts shall be due and payable on the date of effectiveness of such Repricing Transaction.

5.02.   Mandatory Prepayments.

(a)     If on any date, the sum of (I) the aggregate outstanding principal amount of all Revolving Loans (after giving effect to all other repayments thereof on such date), (II) [reserved] and (III) the aggregate amount of all Letter of Credit Outstandings (or the Dollar Equivalent thereof), exceeds the aggregate Revolving Loan Commitment at such time, then the Borrower shall prepay on such date Revolving Loans (without a reduction to the Revolving Loan Commitments), in an amount equal to such excess.  If, after giving effect to the prepayment of all such outstanding Revolving Loans, the aggregate amount of the Letter of Credit Outstandings (or the Dollar Equivalent thereof) exceeds the aggregate Revolving Loan Commitment at such time, the Borrower shall pay to the Administrative Agent at the Payment Office on such day an amount of cash and/or Cash Equivalents equal to the amount of such excess (up to a maximum amount equal to the Letter of Credit Outstandings at such time), such cash

#95606088v60

98679498

and/or Cash Equivalents to be held as security for all Obligations of the Borrower to the Issuing Lenders and the Lenders hereunder in a cash collateral account to be established by the Administrative Agent.

(b)       The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders under each Tranche on the applicable Maturity Date the aggregate principal amount of all outstanding Loans under such Tranche outstanding on such date.

(c)       No later than the fifth Business Day following the date of receipt by the Borrower or any of its Restricted Subsidiaries of Net Sale Proceeds in respect of any Asset Sale contemplated by Section 10.08(c) or Section 10.08(e), the Borrower shall prepay the Loans in an aggregate amount equal to such Net Sale Proceeds; *provided* that (i) subject to the following clause (ii), only Net Sale Proceeds in excess of $500,000 received in connection any Asset Sale or series of transactions constituting an Asset Sale shall be required to be applied pursuant to this Section 5.02(c) and (ii) no such prepayment shall be required  if the Borrower, directly or through one or more Credit Parties invests an aggregate amount equal to such Net Sale Proceeds in its business or the business of the Credit Parties (including, without limitation, to acquire, maintain, develop, construct, improve, upgrade or repair any asset used or useful in such business or to make any acquisition or other Investment not prohibited by this Agreement) within 365 days of receipt of such Net Sale Proceeds (or, if the Borrower or the relevant Credit Party, as applicable, has contractually committed within 365 days following receipt of such Net Sale Proceeds to reinvest such Net Sale Proceeds, then within the later of (x) 365 days following receipt of such Net Sale Proceeds and (y) 180 days after such contractual commitment).

(d)       No later than the fifth Business Day following the date of receipt by the Borrower or any of its Restricted Subsidiaries, or Collateral Trustee as loss payee, of Net Insurance/Condemnation Proceeds, the Borrower shall prepay the Loans in an aggregate amount equal to such Net Insurance/Condemnation Proceeds.; provided that no such prepayment shall be required if the Borrower, directly or through one or more Credit Parties, invests an aggregate amount equal to such Net Insurance/Condemnation Proceeds in its business or the business of the Credit Parties (including, without limitation, to acquire, maintain, develop, construct, improve, upgrade or repair any long term asset used or useful in such business or to make any acquisition or other Investment not prohibited by this Agreement) within 365 days of receipt of such Net Insurance/Condemnation Proceeds (or, if the Borrower or the relevant Subsidiary, as applicable, has contractually committed within 365 days following receipt of such Net Insurance/Condemnation Proceeds to reinvest such Net Insurance/Condemnation Proceeds, then within the later of (x) 365 days following receipt of such Net Insurance/Condemnation Proceeds and (y) 180 days after such commitment).

(e)       On the date of receipt by the Borrower or any of its Restricted Subsidiaries of any cash proceeds from the incurrence of any Indebtedness of the Borrower or any of its Restricted Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 10.04), the Borrower shall prepay the Loans in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(f)       The proceeds of any prepayment required by Sections 5.02(c), (d) or (e) shall be applied, first, to repay outstanding Term Loans until the Term Loans have been repaid in full, second, to repay outstanding Revolving Loans until the Revolving Loans have been repaid, and third, to (x) cash collateralize 102% of the outstanding Letter of Credit Exposure pursuant to Letter of Credit Back-Stop Arrangements and, to the extent so cash collateralized, permanently reduce the Revolving Loan Commitment in the amount equal to 100% of such outstanding cash collateralized Letter of Credit Exposure and (y) to the extent there is not any outstanding Letter of Credit Exposure, permanently reduce the Revolving Loan Commitment by the amount of any such remaining excess proceeds.

(g)       It is understood and agreed that, for the avoidance of doubt, any mandatory payments required pursuant to Sections 5.02(c), (d) or (e), following the prepayment of the Term Loans as contemplated by clause "first" in Section 5.02(f) shall be shared on a pro rata basis (determined on the basis of all outstanding Obligations and Continuing Letter of Credit Obligations) with the Continuing Letter of Credit Facility until the Continuing Letter of Credit Facility has been fully repaid and all commitments terminated thereunder.

#95606088v60

98679498

5.03.    Method and Place of Payment.  Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 2:00 p.m. on the date when due and shall be made in Dollars in immediately available funds at the Payment Office.  Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

5.04.    Taxes.

(a)    Any and all payments by or on account of any obligation of any Credit Party under any Credit Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding of Indemnified Taxes has been made (including such deductions and withholdings of Indemnified Taxes applicable to additional sums payable under this Section 5.04) the applicable Lender or Agent receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    The Credit Parties shall jointly and severally indemnify each Lender or Agent, within 10 Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 5.04) payable or paid by such Lender or Agent, as applicable, or required to be withheld or deducted from a payment to such Lender or Agent and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or Agent (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or Agent, shall be conclusive absent manifest error.

(d)    Each Lender shall severally indemnify any Agent, within 10 Business Days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified such Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.04(h) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by such Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by such Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes such Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by such Agent to the Lender from any other source against any amount due to such Agent under this paragraph (d).

(e)    As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 5.04, such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)      (i)   Any Lender or Agent that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender or Agent, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender or Agent is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 5.04(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's or Agent's reasonable judgment such completion, execution or submission would subject such Lender or Agent to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender or Agent.

(ii)      Without limiting the generality of the foregoing,

(A)      any Lender or Agent that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender or Agent becomes a Lender or Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender or Agent is exempt from U.S. federal backup withholding tax; and

(B)      any Foreign Lender or Foreign Agent shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender or Foreign Agent becomes a Lender or Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(i)      in the case of a Foreign Lender or Foreign Agent claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed originals of the applicable IRS Form W-8 establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, the applicable IRS Form W-8 establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(ii)      executed originals of IRS Form W-8ECI;

(iii)      in the case of a Foreign Lender or Foreign Agent claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Foreign Lender or Foreign Agent is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of the applicable IRS Form W-8; or

(iv)      to the extent a Foreign Lender or Foreign Agent is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, the applicable IRS Form W-8, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 or Exhibit D-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender or Foreign Agent is a partnership and one or more direct or indirect partners of such Foreign Lender or Foreign Agent are claiming the portfolio interest exemption, such Foreign Lender or Foreign Agent may provide a U.S. Tax Compliance

Certificate substantially in the form of <u>Exhibit D-4</u> on behalf of each such direct and indirect partner;

(C)     any Foreign Lender or Foreign Agent shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender or Foreign Agent becomes a Lender or Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender or Agent under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender or Agent has complied with such Lender's or Agent's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender and Agent agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     If any Lender or Agent determines in its sole discretion exercised in good faith that it has actually received any refund of Tax with respect to which any Credit Party has paid additional amounts pursuant to this <u>Section 5.04</u> (including, for the avoidance of doubt, <u>Section 5.04(c)</u>), such Lender or Agent shall pay to such Credit Party an amount that such Lender or Agent shall, in its reasonable discretion exercised in good faith, determines is equal to the net benefit, after out-of-pocket expenses and tax and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), which was obtained by such Lender or Agent in such year as a consequence of such refund; <u>provided</u> that such Credit Party shall repay to such Lender or Agent the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Lender or Agent is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the Lender or the Administrative Agent be required to pay any amount to any Credit Party pursuant to this paragraph (g) the payment of which would place the Lender or Agent in a less favorable net after-Tax position than the Lender or Agent would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any Lender or Agent to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)     Each party's obligations under this <u>Section 5.04</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.  For the purposes of this <u>Section 5.04</u> and any related definitions, the term "Lender" shall include any Issuing Lender.

SECTION 6.     <u>Conditions Precedent</u>.

-70-

6.01.    Conditions Precedent to Closing and Initial Credit Event.  The effectiveness of this Agreement and of the obligation of each Lender to make Loans, and the obligation of each Issuing Lender to issue Letters of Credit on the Closing Date, is subject to the satisfaction (or waiver) of the following conditions (and the conditions set forth in Section 6.03): On or prior to the Closing Date, (i) the Administrative Agent shall have received signed counterparts of this Agreement from each of the parties hereto in accordance with Section 13.19 and (ii) there shall have been delivered to the Administrative Agent for the account of each of the Lenders that has requested the same at least one (1) Business Day prior to the Closing Date the appropriate (x) Revolving Note executed by the Borrower and (y) Term Loan Note executed by the Borrower, in each case in the amount, maturity and as otherwise provided herein.

(b)    On the Closing Date, the Administrative Agent shall have received a customary opinion addressed to the Administrative Agent, the Collateral Trustee and each of the Lenders and dated the Closing Date (A) from (x) Weil, Gotshal & Manges LLP, New York counsel to the Credit Parties ("Weil") and (y) Pennsylvania counsel to the Credit Parties, with respect to the Debtors' authority to enter into the Credit Documents to which they are a party and (B) from Weil, solely under New York law, with respect to enforceability of this Agreement, the Security Agreement and the First Lien Intercreditor Agreement under New York law.

(c)    The Petition Date shall have occurred and each of the Borrower and each Guarantor shall be a debtor and a debtor-in-possession.

(d)    All First Day Orders entered at, or shortly after, the time of commencement of the Cases shall be reasonably satisfactory in form and substance to the Credit Parties and the Administrative Agent.

(e)    The Administrative Agent shall have received a certificate, dated the Closing Date and the date hereof and signed by an Authorized Officer of the Borrower, confirming compliance with the conditions set forth in paragraphs (a), (b) and (c) of Section 6.03.

(f)    The Interim Order Entry Date shall have occurred not later than five Business Days following the Petition Date and shall be reasonably satisfactory in form and substance to the Credit Parties and Administrative Agent, and the Interim Order shall not have been vacated, reversed, modified, amended or stayed.

(g)    There shall not have occurred a Material Adverse Effect since December 31, 2021.

(h)    No trustee or an examiner (other than a fee examiner and only to the extent such examiner is granted powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code and such powers entitle the examiner to control or dispose of Collateral without the Administrative Agent's consent) under Section 1104 of the Bankruptcy Code.

(i)    (i) The Administrative Agent shall have received, no later than the Closing Date, all documentation and other information about the Borrower and the Subsidiary Guarantors as has been reasonably requested by the Administrative Agent or Lenders that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act, that has been reasonably requested at least three (3) Business Days in advance of the Petition Date and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification (provided that, upon the execution and delivery by such Lender of its signature page to this Agreement, the condition set forth in this clause (ii) shall be deemed to be satisfied).

(j)    The Administrative Agent shall have received (x) on or prior to the Petition Date, an operating budget and cash flow forecast for the forecasted duration of the Cases, but in no case for less than 18 months, commencing on or about the Petition Date, broken down by month, including, without limitation, recourse EBITDA and cash flow summary, projected capital expenditures, asset sales and a line item for total available liquidity, in form and substance consistent with such information delivered to RPA Advisors, LLC prior to the Petition Date and which shall set forth the anticipated uses of the New Money Credit Facilities for such period, in form and substance reasonably satisfactory to the Administrative Agent, with the associated underlying assumptions mutually agreed by

-71-

the Borrower and the advisors to the Arrangers (the "DIP Budget") and (y) a Cash Flow Forecast dated as of a date not more than 5 days prior to the Closing Date.

(k)     The Borrower shall have delivered its risk management and hedging policies (the "Risk Management Policies" to the Administrative Agent.

(l)     On the Closing Date, the Administrative Agent shall have received a certificate from each Credit Party, dated the Closing Date, signed by an Authorized Officer of such Credit Party, and attested to by the Secretary or any Assistant Secretary of such Credit Party, with appropriate insertions, together with copies of the certificate or articles of incorporation and by-laws (or other equivalent organizational documents), as applicable, of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and an incumbency and specimen signature of each officer executing any Credit Document in connection herewith on behalf of such Credit Party, and each of the foregoing shall be in form and substance reasonably acceptable to the Administrative Agent.

(m)     On the Closing Date, the Administrative Agent shall have received good standing certificates dated as of a recent date from the jurisdiction of organization and bring down telegrams, electronic PDFs or facsimiles, if any, for the Credit Parties which the Administrative Agent reasonably may have requested, certified by proper Governmental Authorities or, with respect to any such bring down telegrams, electronic PDFs or facsimiles, service companies.

(n)     All governmental and third-party consents and approvals necessary in connection with the Credit Facilities and the transactions contemplated hereby shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to the Administrative Agent) and shall remain in effect; and no law or regulation shall be applicable that restrains, prevents or imposes materially adverse conditions upon the Credit Facilities or the transactions contemplated hereby.

(o)     On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Guarantee and Collateral Agreement, which shall be in full force and effect, substantially in the form of Exhibit E (as amended, modified, restated, supplemented or extended from time to time, the "Guarantee and Collateral Agreement") covering all of such Credit Party's Guarantee and Collateral Agreement Collateral, together with:

(i)     proper financing statements (Form UCC-1 or the equivalent) for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary to perfect the security interests purported to be created by the foregoing Guarantee and Collateral Agreement;

(ii)     customary lien searches reasonably requested by the Administrative Agent;

(iii)     one or more, as applicable, short-form security agreements that may be filed with the United States Patent and Trademark Office or the United States Copyright Office for the grant of a security interest in patents, trademarks and copyrights, each in substantially the form attached to the Guarantee and Collateral Agreement;

(iv)     evidence that all other actions necessary to perfect and protect the security interests in Collateral purported to be created by the Guarantee and Collateral Agreement have been taken, and the Guarantee and Collateral Agreement shall be in full force and effect;

(v)     [reserved]; and

(vi)     Flood Documentation with respect to any owned or leased "building" or "mobile home" (each as defined in Regulation H, as promulgated by the Federal Reserve Board under the Flood Insurance Laws) located in the United States of the Credit Parties and listed on Schedule 8.12.

To the extent that any of the items described in this Section 6.01(o) shall not have been received by the Administrative Agent notwithstanding the Borrower's use of commercially reasonable efforts to provide same, delivery of such items shall not constitute a condition to the effectiveness of this Agreement and the obligations of

-72-

each Lender to make Loans hereunder and of each Issuing Lender to issue Letters of Credit hereunder, and the Borrower shall instead cause such items to be delivered to the Administrative Agent not later than 60 days following the Closing Date (or such later date as the administrative Agent shall agree in its discretion).

(p)     The Secured Parties shall have a valid and perfected lien on, and security interest in, the Collateral (whether granted pursuant to the Interim Order or the Guarantee and Collateral Agreement).

(q)     The Administrative Agent shall have received, in each case for the account of the applicable Persons all fees and other amounts due and payable by any Credit Party to any of the Lenders or the Administrative Agent on or prior to the Closing Date, including, to the extent invoiced (each such invoice to be accompanied by customary backup documentation) one (1) Business Day prior to the Closing Date, reimbursement or payment of all reasonable and documented out-of-pocket expenses required to be reimbursed or paid by any Credit Party under the Credit Documents or any fee, engagement or similar letter.

(r)     The Administrative Agent shall have received a Notice of Borrowing, substantially in the form of Exhibit A-1 with appropriate insertions, executed by any Authorized Officer of the Borrower; provided that (i) after giving effect to all Term Loan Borrowings requested as of the Closing Date, the outstanding Term Loans of all Term Loan Lenders shall not exceed the Term Interim Availability Amount and (ii) after giving effect to all Revolving Borrowings requested as of the Closing Date, the outstanding Revolving Exposure of all Revolving Lenders shall not exceed the Revolving Interim Availability Amount.

In determining the satisfaction of the conditions specified in this Section 6.01, to the extent any item is required to be satisfactory to any Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Closing Date that the respective item or matter does not meet its satisfaction.

6.02.     Conditions to Borrowing on the Full Availability Date.  The obligation of (x) each Term Loan Lender to make any Term Loan in an aggregate amount in excess of the Term Interim Availability Amount, (y) each Revolving Lender to make any Revolving Loan in an amount where the aggregate Revolving Exposure would exceed the Revolving Interim Availability Amount and (z) each Issuing Lender to issue any Letter of Credit in an amount where the aggregate Revolving Exposure would exceed the Revolving Interim Availability Amount is subject to the satisfaction of the following conditions precedent (in addition to the conditions set forth in Section 6.03):

(a)     The Closing Date shall have occurred and the conditions set forth in Section 6.01 have been satisfied.

(b)     The Final Order Entry Date shall have occurred no later than 45 days after the Petition Date and the Final Order shall approve the full amount of the Credit Facilities.

(c)     (x) All material "second day orders" and all related pleadings intended to be entered on or prior to the date of entry of the Final Order and any order establishing material procedures for the administration of the Cases, shall have been entered by the Bankruptcy Court, and (y) any pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be reasonably satisfactory in form and substance to the Administrative Agent, or this condition is waived by the Administrative Agent. The Administrative Agent acknowledges that the form of such orders substantially in the forms filed on the Petition Date are acceptable.

(d)     The Administrative Agent shall have received a certificate from an Authorized Officer of the Borrower, dated the Full Availability Date certifying that the conditions set forth in clauses (b) and (c) above and in paragraphs (a), (b) and (c) of Section 6.03 have been satisfied.

(e)     The Administrative Agent shall have received, in each case for the account of the applicable Persons (x) all fees and other amounts due and payable by any Credit Party to any of the Lender on or prior to the Full Availability Date, including, to the extent invoiced (each such invoice to be accompanied by customary backup

-73-

documentation) 3 Business Days prior to the Full Availability Date, reimbursement or payment of all reasonable out-of-pocket expenses required to be reimbursed or paid by any Credit Party under the Credit Documents or any fee, engagement or similar letter and (y) all accrued interest on outstanding Revolving Loans, accrued commitment fees in respect of the Revolving Loan Commitments and accrued participation fees in respect of outstanding Letters of Credit.

(f)     All First Day Orders shall have been entered on a final basis and shall be reasonably satisfactory in form and substance to the Credit Parties and the Administrative Agent.

(g)     The Administrative Agent shall have received, to the extent applicable, (x) the Cash Flow Forecast required to be delivered pursuant to Section 6.01(l)(y) and Section 9.01(i)(x) and (y) the Variance Report required to be delivered pursuant to Section 9.01(i)(y).

6.03.     Conditions to Each Credit Event.  The obligation of each Lender to make a Loan, and the obligation of each Issuing Lender to issue, amend, extend or increase Letters of Credit, is subject, at the time of such Credit Event, to the satisfaction or waiver of the following conditions:

(a)     The representations and warranties of each Credit Party set forth in the Credit Documents that are qualified by materiality shall be true and correct, and the representations that are not so qualified shall be true and correct in all material respects, in each case, on and as of the date of such Borrowing or the date of issuance, amendment or extension of such Letter of Credit (other than any amendment, increase or extension that does not increase the Stated Amount of such Letter of Credit), as applicable (other than with respect to any representation and warranty that expressly relates to an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date).

(b)     At the time of and immediately after giving effect to such Borrowing or the issuance of such Letter of Credit, as applicable, no Default shall have occurred and be continuing.

(c)     The making of such Loan (or the issuance of such Letter of Credit) shall not violate any requirement of material law, after giving effect to the Financing Orders and any other order of the Bankruptcy Court, and shall not be enjoined, temporarily, preliminarily or permanently.

(d)     The Interim Order or Final Order, as applicable, and the other Financing Orders (whether interim or final, as applicable) shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect.

(e)     With respect to any Borrowing on any day that is (i) on or after the Closing Date and prior to the Final Order Entry Date, the Interim Order Entry Date shall have occurred and the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to any stay, and shall not have been modified or amended in a manner adverse to the Lenders without the consent of the Administrative Agent and the Required Lenders, and the Credit Parties and their Subsidiaries shall be in compliance with the Interim Order and (ii) 45 days or later after the Petition Date, the Final Order Entry Date shall have occurred and the Final Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to any stay, and shall not have been modified or amended in a manner adverse to the Lenders without the consent of the Administrative Agent and the Required Lenders, and the Credit Parties and their Subsidiaries shall be in compliance with the Final Order.

(f)     With respect to any Borrowing on or after the date of entry of the Final Order, (x) all material "second day orders" and all related pleadings intended to be entered on or prior to the date of entry of the Final Order, including a final cash management order and any order establishing material procedures for the administration of the Cases, shall have been entered by the Bankruptcy Court, or (y) all pleadings related to procedures for approval of significant or outside the ordinary course of business transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, are, in each case, reasonably satisfactory in form and substance to the Administrative Agent (it being understood that any transaction that provides for the termination of the Commitments and the indefeasible repayment in full in cash of the obligations under the Credit

-74-

Documents upon consummation thereof is reasonably satisfactory in form and substance to the Administrative Agent), unless this condition is waived by the Administrative Agent. The Administrative Agent acknowledges that the form of such orders shall be acceptable to the extent substantially the same as the forms filed on the Petition Date (to the extent the orders filed on the Petition Date were acceptable to the Administrative Agent).

(g)     With respect to (i) the making of any Revolving Borrowing or any Term Loan Borrowing, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of <u>Section 2.03(a)</u> and (ii) the issuance of any Letter of Credit, the Administrative Agent and the Issuing Lender shall have received a notice meeting the requirements of <u>Section 3.03(a)</u>.

(h)     Prior to the Full Availability Date, (i) in the case of Term Loans, after giving effect to the making of such Loan, the aggregate amount of the Term Loans outstanding shall not exceed the Term Interim Availability Amount and (ii) in the case of Revolving Loans and Letter of Credit Outstandings, after giving effect to all Revolving Loan Borrowings and issuances of, or Drawings on, Letters of Credit, the outstanding Revolving Exposure of all Revolving Lenders shall not exceed the Revolving Interim Availability Amount.

Each Borrowing and each issuance of a Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a), (b), (c) and (d) of this Section.

SECTION 7.     [Reserved].

SECTION 8.     <u>Representations and Warranties</u>.   In order to induce the Lenders to enter into this Agreement and to make the Loans, and the Issuing Lenders to issue (or the Lenders to participate in) the Letters of Credit as provided herein, the Borrower makes the following representations and warranties.

8.01.   <u>Company Status</u>.  Each Credit Party (i) is a duly organized and validly existing Company in good standing (or existing, as applicable) under the laws of the jurisdiction of its organization, (ii) subject to the entry of the Financing Orders and the terms thereof, has all requisite power and authority to own or lease its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is, to the extent such concepts are applicable under the laws of the relevant jurisdiction, duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except, in the case of clauses (i) (other than with respect to the existence of the Borrower) and (iii), for failures which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

8.02.   <u>Power and Authority; Due Authorization, Execution and Delivery</u>.  Subject to the entry of the Financing Orders and the terms thereof, each Credit Party has all requisite power and authority to execute, deliver and perform its obligations under each of the Credit Documents to which it is party and has taken all necessary Company action to authorize the execution, delivery and performance by it of each of such Credit Documents. Subject to the entry of the Financing Orders and the terms thereof, each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation, enforceable in accordance with its terms, except to the extent (i) that the enforceability thereof may be limited by applicable Bankruptcy Law or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law) and (ii) of the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Credit Parties in favor of the Collateral Trustee.

8.03.   <u>No Violation</u>.  Subject, in the case of each Credit Party that is a Debtor, to the entry of the Financing Orders and the terms thereof, neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Court, will contravene any applicable provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority, except in the case of any contraventions that would not reasonably be expected, enter individually or in the aggregate, to result in a Material Adverse Effect, (ii) other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy

#95606088v60

98679498

Court, will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents, Permitted Liens or Liens created under the Financing Orders) upon any of the property or assets of any Credit Party or any of its Restricted Subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument (other than, in the case of Debtor, any Prepetition First Lien Secured Debt), in each case to which any Credit Party or any of its Restricted Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject, except for any such contravention, breach, default, conflict or Lien that would not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its Restricted Subsidiaries.

8.04. <u>Approvals</u>. Subject, in the case of each Credit Party that is a Debtor, to the entry of the Financing Orders and the terms thereof, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Credit Party (except for (w) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date, (x) filings which are necessary to release liens granted pursuant to the document related to the Indebtedness to be refinanced on or about the Closing Date, (y) filings which are necessary to perfect the security interests created under the Security Documents and (z) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect) to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, (i) the execution, delivery and performance of any Credit Document or (ii) the legality, validity, binding effect or enforceability of any such Credit Document.

8.05. <u>Financial Statements; Projections; No Material Adverse Effect</u>.

(a) The unaudited consolidated balance sheet of the Borrower at December 31, 2021 and the related unaudited consolidated statements of income and cash flows and changes in members' equity of the Borrower for the period ended on such date furnished to the Lenders on or prior to the Closing Date, present fairly in all material respects the consolidated financial position and the results of operations of the Borrower and its consolidated Subsidiaries as of such date. All such unaudited financial statements, notwithstanding the omission of all accompanying explanatory footnotes, have been prepared in accordance with GAAP which has been consistently applied. Such unaudited financial statements are subject to normal year-end audit adjustments.

(b) [Reserved].

(c) The financial projections (including the DIP Budget and Cash Flow Forecasts) and estimates and information of a general economic nature made available to the Administrative Agent and the Lenders in connection with the New Money Credit Facilities or the other transactions contemplated hereby have been prepared in good faith and are based on assumptions that the Borrower believes reasonable at the time made, it being recognized by the Administrative Agent and the Lenders, however, that projections are subject to significant uncertainties and contingencies, which may be beyond the Borrower's and its Subsidiaries' control, and projections as to future events are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that the actual results during the period or periods covered by the projections may differ from the projected results included in such projections and such differences may be material.

(d) Since the Petition Date, no event, change or condition has occurred that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

8.06. <u>Litigation</u>. Except for the Cases, there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened in writing (i) with respect to the Credit Documents or (ii) that have a

reasonable likelihood of adverse determination, and, if adversely determined, have had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

8.07.   True and Complete Disclosure.

(a)   All written information concerning the Borrower or any of its Subsidiaries that has been furnished to the Administrative Agent or any Lender in connection the transactions contemplated hereby (excluding information of a general economic or industry nature), when taken as a whole, is, and all other such written information as supplemented (when furnished) hereafter by or on behalf of the Borrower or any of its Restricted Subsidiaries to the Administrative Agent or any Lender, when taken as a whole, will be, true and accurate in all material respects on the date as of which such information is furnished and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make such information (when furnished and taken as a whole) not materially misleading at such time in light of the circumstances under which such statements were made, it being understood and agreed that for purposes of this Section 8.07, such factual information shall not include the projections, any pro forma financial information, the budgets, other forward looking information or information consisting of statements, estimates or forecasts regarding the future condition of the industries in which they operate.

(b)   As of the Closing Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the date hereof to any Lender in connection with this Agreement is true and correct in all material respects.

8.08.   Margin Regulations.  Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.  None of the Borrower or any of its Subsidiaries is engaged principally, or as one of its material activities, in the business of extending credit for the purposes of buying or carrying Margin Stock.

8.09.   Tax Returns and Payments.  The Borrower and each of its Restricted Subsidiaries has timely filed or caused to be timely filed with the appropriate taxing authority all federal, state, local and foreign tax returns and other statements, forms and reports for taxes (the "Returns") required to be filed by, or with respect to the income, properties or operations of, the Borrower and/or any of its Restricted Subsidiaries, except where the failure to timely file or cause to be timely filed such Returns would not cause a Material Adverse Effect.  The Returns accurately reflect in all respects all liability for Taxes of the Borrower and its Restricted Subsidiaries, as applicable, for the periods covered thereby, except as would not, either individually or in the aggregate, cause a Material Adverse Effect.  The Borrower and each of its Restricted Subsidiaries has paid all post-petition taxes and assessments payable by it which have become due, other than (i) those that are being contested in good faith by appropriate proceedings and adequately disclosed and fully provided for on the financial statements of the Borrower and its Restricted Subsidiaries in accordance with GAAP or (ii) those the failure to pay, either individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  There is no tax assessment proposed in writing against the Borrower or any of its Restricted Subsidiaries that would, if made, have a Material Adverse Effect.

8.10.   Compliance with ERISA.

(a)   Schedule 8.10 sets forth each Plan as of the Closing Date.  Each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  Each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and to the knowledge of the Borrower or any of its Restricted Subsidiaries, nothing has occurred since the date of such determination that would reasonably be expected to result in revocation of such determination (or, in the case of a Plan with no determination, to the knowledge of the Borrower or any of its Restricted Subsidiaries, nothing has

-77-

occurred that would reasonably be expected to materially adversely affect the issuance of a favorable determination letter). No ERISA Event has occurred or is reasonably expected to occur, other than as would not, individually or in the aggregate, have a Material Adverse Effect.

(b) None of the Borrower or any of its Subsidiaries or any ERISA Affiliate has incurred a complete or partial withdrawal from any Multiemployer Plan, and, if each of the Borrower, any of its Subsidiaries and each ERISA Affiliate were to withdraw in a complete withdrawal as of the date this assurance is given or deemed given, the aggregate withdrawal liability that would be incurred would not reasonably be expected, either individually or in the aggregate, to result in a Material Adverse Effect.

(c) There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Borrower or any of its Restricted Subsidiaries, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, would reasonably be expected either individually or in the aggregate to have a Material Adverse Effect.

(d) The Borrower, its Restricted Subsidiaries and any ERISA Affiliate have made all material contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a Plan or Multiemployer Plan save where any failure to comply, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

8.11. [Reserved]

8.12. <u>Properties</u>. All Real Property with a fair market value in excess, individually, of $5,000,000 that is owned by the Borrower or any of its Restricted Subsidiaries as of the Closing Date is correctly set forth in <u>Schedule 8.12</u>. Each of the Borrower and each of its Restricted Subsidiaries has good title to all material property owned by it (except where the failure to have such title, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect). All such material property of the Borrower and its Restricted Subsidiaries are owned or leased free and clear of all Liens other than Permitted Liens.

8.13. <u>Subsidiaries</u>. On and as of the Closing Date, the Borrower has no Subsidiaries other than those Subsidiaries listed on <u>Schedule 8.13</u>. <u>Schedule 8.13</u> sets forth, as of the Closing Date, the exact legal name of each such Subsidiary and its jurisdiction of organization, whether such Subsidiary is a Restricted Subsidiary or an Unrestricted Subsidiary, the percentage ownership (direct and indirect) of the Borrower in each class of Capital Stock or other Equity Interests of each of its Subsidiaries and also identifies each of the direct owners thereof. All outstanding shares of Equity Interests of each Restricted Subsidiary of the Borrower have been duly and validly issued, are fully paid and non-assessable (to the extent applicable).

8.14. <u>Compliance with Statutes, etc</u>. The Borrower and each of its Restricted Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (but not including, in each case, any such statutes, orders or restrictions which is the subject of any other Section in this <u>Section 8</u>, including, without limitation, <u>8.10</u>, <u>8.16</u>, <u>8.17</u> and <u>8.19</u>).

8.15. <u>Investment Company Act</u>. Neither the Borrower nor any of its Restricted Subsidiaries is required to be registered as an "<u>investment company</u>" within the meaning of the Investment Company Act of 1940, as amended.

8.16. <u>Environmental Matters</u>. Except as would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, or as set forth on <u>Schedule 8.16</u>, none of the Borrower or any of its Restricted Subsidiaries: (a) has failed to comply with any Environmental Law or to obtain, maintain, renew and comply with any permit, license, registration or other approval required under Environmental Law; (b) has received any Environmental Claim that would reasonably be expected to result in the termination, revocation or modification of any permit, license, registration, emissions credits or other approval required under Environmental Law; or (c)

possesses knowledge (i) that the Borrower or any of its Restricted Subsidiaries has become subject to any Environmental Claim encumbering any Mortgaged Property, or (ii) of facts, conditions or circumstances that, would reasonably be expected to result in an Environmental Claim against the Borrower or any Restricted Subsidiary. This Section 8.16 sets forth the sole representations and warranties of the Borrower and its Restricted Subsidiaries with respect to environmental and occupational health and safety matters and Hazardous Materials.

8.17.    [Reserved].

8.18.    Intellectual Property, etc.  The Borrower and each of its Restricted Subsidiaries owns or has the right to use all the patents, trademarks, domain names, service marks, trade names, copyrights, inventions, trade secrets, proprietary information, know-how of any type and other similar intellectual property rights, and formulas or rights with respect to the foregoing, needed to conduct the businesses of the Borrower and its Restricted Subsidiaries as presently conducted, without any known conflict with or infringement or misappropriation on any such rights of others which, or the failure to own or have which, as the case may be, would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

8.19.    Anti-Terrorism Laws; OFAC; FCPA.  Neither any Credit Party nor any of its Subsidiaries, nor any of their respective officers, directors, employees or agents, is a Sanctioned Person.  Neither any Credit Party nor any of its Subsidiaries is in violation of (a) the Sanctions, (b) the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended from time to time, the "Act") or (c) the Foreign Corrupt Practices Act of 1977 (Pub. L. 95-213 (signed into law December 19, 1977)) (the "FCPA"), as amended from time to time. The Borrower will not directly or, knowingly, indirectly use the proceeds of any Loan or use any Letter of Credit or part of the proceeds of any Letter of Credit (i) to fund any activities or business of or with any Sanctioned Person, or in any Sanctioned Country, or (ii) for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity in violation of the FCPA or any other applicable anti-corruption law.

No Credit Party (i) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or to its knowledge is otherwise associated with any such Person in any manner that violates in any material respect Section 2 of such executive order or (iii) is a Person on the list of "Specially Designated Nationals and Blocked Persons" or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

8.20.    Energy Regulatory Matters.  Each of the Borrower and the Restricted Subsidiaries (a) to the extent any such entity is a "public utility" under the FPA, such entity has obtained blanket authority from FERC to issue securities and assume liabilities pursuant to Section 204 of the FPA or is otherwise subject to exemption with respect to such activities and (b) with respect to any such entity that is a "public-utility company" under PUHCA, is an "exempt wholesale generator" or is otherwise subject to similar exemption under PUHCA.

SECTION 9.    Affirmative Covenants.  The Borrower hereby covenants and agrees that on and after the Closing Date and until the Total Commitment and all Letters of Credit have terminated (or such Letters of Credit have been cash collateralized, back-stopped by a letter of credit or otherwise been agreed to remain outstanding by the applicable Issuing Lender, in each case on terms reasonably acceptable to the applicable Issuing Lender) and the Loans, Notes and Unpaid Drawings (in each case together with interest thereon), Fees and all other Obligations (other than contingent obligations which are not then due and payable) incurred hereunder and thereunder, are paid in full:

9.01.    Information Covenants.  The Borrower will furnish to the Administrative Agent (who will make available to each Lender):

(a)    Quarterly Financial Statements.  Within 50 days after the close of each of the first three quarterly accounting periods in each Fiscal Year of the Borrower, the unaudited consolidated balance sheet of the Borrower

-79-

and its Subsidiaries as at the end of such quarterly accounting period and the related unaudited consolidated statements of income for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such quarterly accounting period and members equity and statement of cash flows for the elapsed portion of the Fiscal Year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior Fiscal Year. All such unaudited financial statements shall be certified by an Authorized Officer of the Borrower, notwithstanding the omission of all accompanying explanatory footnotes, that they fairly present in all material respects in accordance with GAAP, except for normal quarterly or year-end audit adjustments, the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated.

(b)     Annual Financial Statements.  Within 100 days after the close of each Fiscal Year of the Borrower (commencing with the Fiscal Year ending December 31, 2022), the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income and members equity and statement of cash flows for such Fiscal Year, setting forth comparative figures for the preceding Fiscal Year and certified by PricewaterhouseCoopers LLP or any other independent certified public accountants of recognized national or international standing as determined by the Borrower, accompanied by an opinion of such accounting firm (which opinion shall be without any qualification or exception as to the scope of such audit (other than with respect to, or resulting from, (x) the occurrence of an upcoming maturity date of Indebtedness, (y) any potential inability to satisfy a financial maintenance covenant on a future date or in a future period or (z) a "going concern" qualification with respect to the Cases)).

(c)     [Reserved].

(d)     Officer's Certificates and Perfection Certificate Update.  Concurrently with the delivery of the financial statements provided for in Sections 9.01(a) and (b), (i) a compliance certificate from an Authorized Officer of the Borrower in substantially the form of Exhibit G (each, a "Compliance Certificate") (with blanks appropriately completed and with any deviations from such form as may be acceptable to the Administrative Agent) certifying on behalf of the Borrower that, to such officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing on the date of such Compliance Certificate or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken in connection therewith, which certificate shall identify each Subsidiary as a Restricted Subsidiary or Excluded Subsidiary as of the date of delivery of such certificate or a confirmation that there is no change in such information since the later of the Closing Date and the date of the last such certificate and (ii) commencing with the delivery of the financial statements for the Fiscal Quarter ending June 30, 2022, the information set forth in Schedule 1(a), Schedule 1(b) and Schedule 1(c) of the Perfection Certificate or confirmation that there has been no change in such information since the date of the Perfection Certificate delivered on November 29, 2021.

(e)     Notice of Default, Litigation and Material Adverse Effect.  Promptly, and in any event within five (5) Business Days after any senior officer of the Borrower or any of its Restricted Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken in connection therewith, (ii) any litigation or governmental investigation or proceeding pending against the Borrower or any of its Restricted Subsidiaries (x) which, either individually or in the aggregate, has been adversely determined or has a reasonable likelihood of adverse determination and such adverse determination has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect or (y) with respect to any Credit Document or (iii) any other event, change or circumstance that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(f)     Other Information.  Promptly after the filing or delivery thereof, copies of all financial statements, copies of all registration statements (other than the exhibits thereto and any registration statements on Form S-8 or its equivalent), reports on Forms 10-K, 10-Q and 8-K (or their equivalents), proxy statements and reports, if any, which the Borrower or any of its Restricted Subsidiaries shall publicly file with the SEC or deliver generally to

-80-

holders (or any trustee, agent or other representative thereof) of any Qualified Equity Interests or any Indebtedness in excess of the Threshold Amount (in each case, to the extent not otherwise provided hereunder).

(g)     Monthly Financial Statements.  Within 45 days after the end of each fiscal month (other than any month that ends on the same day as the end of a Fiscal Quarter or Fiscal Year), beginning with the fiscal month ended May 31, 2022, the unaudited consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month and the related unaudited consolidated statements of income for such fiscal month and members equity and statement of cash flows for the elapsed portion of the Fiscal Year ended with the last day of such day of such quarterly accounting period. All such unaudited financial statements shall be certified by an Authorized Officer of the Borrower, notwithstanding the omission of all accompanying footnotes, that they fairly present in all material respects in accordance with GAAP, except for the provision of taxes, customary accounting entries performed on a quarterly basis and any normal quarterly or year-end audit adjustments, the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated.

(h)     [Reserved].

(i)     Cash Flow Forecasts; Variance Reports.  No later than 12:00 a.m. on the Thursday (or if such day is not a Business Day, the next Business Day thereafter) following the end of every two week period, commencing with the two week period ending May 20, 2022, (x) a Cash Flow Forecast, (y) a variance and reconciliation report (each, a "Variance Report") for the prior 2-week period included in the latest Cash Flow Forecast delivered pursuant to Section 6.01(i)(y) or 9.01(i)(x), providing an explanation for all material variances and certified by an Authorized Officer and in form and substance reasonably satisfactory to the Administrative Agent; provided that, for the avoidance of doubt, the existence of any variance (whether material or not) shall not constitute a Default or an Event of Default and (z) a Liquidity certificate in a form reasonably satisfactory to the Required Lenders and certified by the chief financial officer of the Borrower, which shall specify the Liquidity amount as of the close of business on the last Business Day of the two week period ended immediately prior to such date and certify compliance with Section 10.07.

(j)     [Reserved].

(k)     Hedge Reports. No later than 12:00 a.m. midnight ET on each date the Cash Flow Forecast and Variance Report is required to be delivered pursuant to Section 9.01(i)(y), a report setting out, in detail reasonably satisfactory to the Administrative Agent, the Borrower's and its Restricted Subsidiaries hedging arrangements, including Mark-to-Market valuations of Bilateral Hedges by counterparty and FCM Hedges; position reports; risk reports; PnL reports; FCM collateral postings by variation margin and initial margin; cash collateral postings with respect to Bilateral Hedges; summary outputs setting out on-peak and off-peak volumes and by Bilateral Hedges and FCM Hedges, product and location (on an anonymized basis); and Potential Future Exposure calculations of Bilateral Hedges and FCM Hedges, in each case in form and substance substantially consistent with such information delivered to RPA Advisors, LLC and any non-compliance with the Risk Management Policies.

(l)     The Credit Parties shall cooperate fully and promptly with any reasonable request of the Administrative Agent, the Collateral Trustee or the Agent Advisors, and provide them with (x) reasonable access to the Credit Parties' facilities, books and records, officers and consultants upon reasonable advance notice, during normal business hours and at times to be mutually agreed, and (y) any information reasonably requested by the Agent Advisors, in connection with the representation of the Administrative Agent; provided that, with respect to the foregoing clauses (x) and (y), it is understood and agreed that in no event shall Davis Polk & Wardwell LLP be permitted to engage with any Credit Party or any officer of any Credit Party without the presence of counsel to the Credit Parties. Without limiting the foregoing, the Credit Parties shall engage in good faith with the Administrative Agent and the Lenders regarding any contemplated strategic transactions and strategic planning.

Promptly following reasonable request, such other information or documents (financial or otherwise) regarding the operations, business affairs and financial condition of the Borrower or any of its Restricted

Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

Notwithstanding anything to the contrary contained in this <u>Section 9.01</u>, neither the Borrower nor any of its Restricted Subsidiaries shall be required to deliver to the Administrative Agent or any Lender, or otherwise disclose or permit the inspection or discussion of, any information (i) subject to confidentiality agreements or attorney/client work privilege or which constitutes attorney work-product, (ii) that constitutes non-financial trade secrets or non-financial proprietary information or (iii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by applicable law.

Notwithstanding the foregoing, the obligations in paragraphs (a), (b) and (f) of this <u>Section 9.01</u> shall be satisfied with respect to financial information or other information of the Borrower and the Restricted Subsidiaries by furnishing (A) the applicable financial statements of the Borrower or (B) the Borrower's Form 8-K, 10-K or 10-Q, as applicable, filed with the SEC.

Documents and financial information required to be delivered pursuant to <u>Sections 9.01(a)</u>, <u>(b)</u> or <u>(f)</u> (to the extent such financial information is included in materials filed with the SEC or posted on the relevant website, as the case may be) shall be deemed to have been delivered to the Administrative Agent on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the internet at the Borrower's website address identified to the Administrative Agent in writing from time to time (or a successor internet address as provided by the Borrower in accordance with <u>Section 13.03</u>), (ii) on which such information has been posted on the Borrower's behalf on IntraLinks (or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent)) or (iii) is available via the EDGAR system of the SEC on the Internet.

9.02.    <u>Books, Records and Inspections</u>.  The Borrower will, and will cause each of its Restricted Subsidiaries to, keep proper books of record and accounts in which full, true and correct (in all material respects) entries in conformity with GAAP (it being understood and agreed that Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles that are applicable in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder) and all requirements of law shall be made of all material dealings and transactions in relation to its business and activities.  The Borrower will, and will cause each of its Restricted Subsidiaries to, permit officers and designated representatives of the Administrative Agent to visit and inspect, under guidance of officers of the Borrower or such Restricted Subsidiary and subject to any applicable safety rules and procedures, any of the properties of the Borrower or such Restricted Subsidiary, and to examine the books of account of the Borrower or such Restricted Subsidiary and discuss the affairs, finances and accounts of the Borrower or such Restricted Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent may reasonably request; <u>provided</u> that the Administrative Agent shall give the Borrower an opportunity to participate in any discussions with its accountants; <u>provided</u>, <u>further</u>, that, (i) only the Administrative Agent on behalf of the Lenders may exercise the rights of the Administrative Agent and the Lenders under this <u>Section 9.02</u> and (ii) in the absence of an Event of Default, the Administrative Agent shall not exercise its rights under this <u>Section 9.02</u> more often than two times during any Fiscal Year and only one such time shall be at the Borrower's reasonable expense; and <u>provided</u>, <u>further</u>, that when an Event of Default exists, the Administrative Agent and its designees may do any of the foregoing at the reasonable expense of the Borrower at any time during normal business hours and upon reasonable advance notice; <u>provided</u>, <u>further</u>, that notwithstanding anything to the contrary contained in this <u>Section 9.02</u>, neither the Borrower nor any of its Restricted Subsidiaries shall be required to deliver to the Administrative Agent or any Lender, or otherwise disclose or permit the inspection or discussion of, any information (i) subject to confidentiality agreements or attorney/client privilege or which constitutes attorney work product, (ii) that constitutes non-financial trade secrets or non-financial proprietary information or (iii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by applicable law.

-82-

9.03.   Maintenance of Property; Insurance.

(a)       The Credit Parties will (i) keep all tangible property necessary to the business of the Credit Parties in satisfactory working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty and condemnation events, except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) maintain with financially sound and reputable insurance companies (provided, however, there shall be no breach of this Section 9.03 if any such insurer becomes financially unsound and the applicable Credit Party obtains insurance coverage from a different financially sound and reputable insurer) insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies engaged in similar businesses as the Borrower and its Restricted Subsidiaries (after giving effect to any self-insurance reasonable and customary for Persons engaged in similar businesses as the Borrower and its Restricted Subsidiaries) as reasonably determined by the Borrower.  Such insurance, except to the extent any such insurance is not generally available in the marketplace from commercial insurers, shall include physical damage insurance on all material real and personal property (whether now owned or hereafter acquired) on an all risk basis and consistent with the past practices of the Borrower.  Such insurance shall name the Collateral Trustee as additional insured or loss payee, as applicable.

(b)       If at any time the improvements on a Mortgaged Property are located in an area identified as a special flood hazard area by the Federal Emergency Management Agency or any successor thereto or other applicable agency, the Borrower (i) will, and will cause each of its Restricted Subsidiaries to, at all times keep and maintain flood insurance in an amount sufficient to comply with the rules and regulations promulgated under the National Flood Insurance Act of 1968 and Flood Disaster Protection Act of 1973, each as amended from time to time and (ii) deliver to the Collateral Trustee evidence of such compliance in form and substance reasonably satisfactory and acceptable to the Administrative Agent, including a copy of the flood insurance policy and declaration page relating thereto.

9.04.   Existence; Franchises.  Subject to Bankruptcy Law, the terms of the applicable Financing Orders and any required approval by the Bankruptcy Court, the Borrower will, and will cause each of its Restricted Subsidiaries to do or cause to be done all things necessary, as determined in the Borrower's reasonable business judgment, to preserve and keep in full force and effect its existence and its franchises, licenses, permits, copyrights, trademarks and patents; provided, however, that nothing in this Section 9.04 shall prevent (i) sales of assets, dispositions and other transactions by the Borrower or any of its Restricted Subsidiaries in accordance with the terms herein, (ii) the withdrawal by the Borrower or any of its Restricted Subsidiaries of its qualification as a foreign Company in any jurisdiction or (other than with respect to the Borrower) failure to otherwise preserve or keep in full force and effect its existence or rights, franchises, licenses, permits, copyrights, trademarks or patents, if such withdrawal or failure would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (iii) the expiration of copyrights or patents at the end of their statutory term.

9.05.   Compliance with Statutes, etc.  Except as otherwise excused by Bankruptcy Law, the Borrower will, and will cause each of its Restricted Subsidiaries to, (i) comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls and ERISA), except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (ii) maintain in effect and enforce policies and procedures designed to ensure compliance by the Credit Parties, their Subsidiaries and their respective directors, officers, employees and agents, in all material respects, with Sanctions.

9.06.   Compliance with Environmental Laws.  Except as otherwise excused by Bankruptcy Law, the Borrower will comply, and will take reasonable action to cause each of its Restricted Subsidiaries to comply, with all Environmental Laws and permits applicable to, or required by, the ownership, lease or use of any Real Property now or hereafter owned, leased or operated by the Borrower or any of its Restricted Subsidiaries, except such noncompliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

#95606088v60

98679498

9.07.    End of Fiscal Years.  The Borrower will cause its fiscal year to end on December 31 of each calendar year; provided, however, that the Borrower shall be permitted to change the end of its fiscal year upon not less than 10 Business Days advance notice to the Administrative Agent.

9.08.    Payment of Taxes.  Subject to Bankruptcy Law, the terms of the applicable Financing Orders and any required approval by the Bankruptcy Court, the Borrower will pay and discharge, and will cause each of its Restricted Subsidiaries to pay and discharge, all post-petition Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto; provided that neither the Borrower nor any of its Restricted Subsidiaries shall be required to pay any such Tax, assessment, charge, levy or claim which (i) is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP or (ii) the failure to pay would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

9.09.    Use of Proceeds.  All proceeds of the Revolving Loans and the Term Loans and all Letters of Credit will be used (i) to pay the fees, costs and expenses required to be paid in connection with the transactions contemplated hereby and the Cases, (ii) for the working capital and general corporate purposes of the Debtors following the commencement of the Cases in accordance with the terms hereof (including, without limitation, to finance acquisitions permitted under this Agreement, capital expenditures, dividends, restricted payments, Permitted Investments and the PPSA Inventory Purchase) and (iii) to pay obligations arising from or related to the Carve Out, in each case, in accordance with the Cash Flow Forecast (and, with respect to amounts attributable to decarbonization capital expenditures and pension contributions, the DIP Budget) and not in contravention of any requirement of law or any Financing Order or violation of this Agreement or the Credit Documents.

9.10.    Additional Security; Further Assurances; etc.

(a)     The Borrower will, and will cause each other Credit Party to, promptly grant to the Collateral Trustee for the benefit of the Secured Parties security interests and Mortgages in such assets and Real Property of the Borrower and such other Credit Party (other than Excluded Assets) as are not covered by the original Security Documents and as may be reasonably requested from time to time by the Administrative Agent (collectively, as amended, restated, supplemented or otherwise modified from time to time, the "Additional Security Documents"). All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Collateral Trustee and the Borrower and shall constitute valid and enforceable (except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law)) under applicable domestic law and perfected security interests, hypothecations and Mortgages superior to and prior to the rights of all third Persons and enforceable against third parties and subject to no other Liens except for Permitted Liens.  The Additional Security Documents or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect (if and to the extent the assets subject to the applicable Additional Security Document can be perfected by the actions required by such Additional Security Document), preserve and protect the Liens in favor of the Collateral Trustee required to be granted pursuant to the Additional Security Documents and all material taxes, fees and other charges payable in connection therewith shall be paid in full to the extent due and owing. Notwithstanding the foregoing, this Section 9.10(a) shall not apply to (and the Borrower and its Restricted Subsidiaries shall not be required to grant a Mortgage in) any owned Real Property the Fair Market Value or book value of which (as reasonably determined by Borrower or such Subsidiary) is less than or equal to $5,000,000 (provided that the Borrower and its Restricted Subsidiaries shall not be required to grant a Mortgage in any Real Property that the Fair Market Value and book-value are less than the foregoing threshold on the Closing Date).

(b)     The Borrower will, and will cause each of the other Credit Parties to, at the expense of the Borrower, make, execute, endorse, acknowledge, authorize, file and/or deliver to the Collateral Trustee from time to time such other documents, assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents (other than Excluded Assets) as the Collateral Trustee may reasonably require. Furthermore, the Borrower will, and will cause the other Credit Parties to, deliver to the Collateral Trustee with respect to additional Real Property collateral such opinions of counsel, Mortgage Policies and other related

-84-

documentation of the type described on Schedule 13.16 as may reasonably be requested by the Administrative Agent or the Collateral Trustee.  Notwithstanding the foregoing, nothing in this Agreement shall require any Credit Party to make (i) any filings or take any other action to record or perfect the Collateral Trustee's Lien in any intellectual property outside the United States and (ii) no actions in any non-U.S. jurisdiction required by the laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. or to perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction).

(c)        Subject to Section 13.16 (to the extent applicable), the Borrower agrees that each action required by clauses (a) and (b) of this Section 9.10 shall be completed within (i) sixty (60) days in the case of actions related to Real Property and (ii) thirty (30) days in the case of any other matters, in each case, after such action is requested to be taken by the Administrative Agent or the Required Lenders (as such time may be extended by the Administrative Agent or the Collateral Trustee, as applicable, in its reasonable discretion).

(d)        After the Closing Date, upon (i) the formation or acquisition of any new direct or indirect Wholly-Owned Domestic Subsidiary (in each case, other than an Excluded Subsidiary) of the Borrower, (ii) any Excluded Subsidiary ceasing to constitute an Excluded Subsidiary or (iii) the designation in accordance with Section 9.11 of any existing direct or indirect Wholly-Owned Domestic Subsidiary (other than an Excluded Subsidiary) as a Restricted Subsidiary within (i) sixty (60) days in the case of actions related to Real Property and (ii) thirty (30) days in the case of any other matters, in each case, after such formation, acquisition, cessation or designation, or such longer period as the Administrative Agent may agree in writing in its reasonable discretion, the Borrower shall (i) cause each such Domestic Subsidiary that is required to become a Subsidiary Guarantor to duly execute and deliver to the Administrative Agent or the Collateral Trustee (as appropriate) joinders to the applicable Security Documents, as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent (consistent, subject to local law requirements, with the Security Documents in effect on the Closing Date), in each case granting first-priority Liens (subject to Permitted Liens) required by this Section 9.10, (ii) take and cause such Restricted Subsidiary that is required to become a Subsidiary Guarantor to take whatever action (including the recording of Mortgages, the filing of UCC financing statements and delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Collateral Trustee to vest in the Collateral Trustee (or in any representative of the Collateral Trustee designated by it) valid and perfected Liens to the extent required by the Credit Documents, and to otherwise comply with the requirements in this Section 9.10 or the Security Documents and (III) deliver or cause each such Domestic Subsidiary that is required to become a Subsidiary Guarantor (and the parent of each such Domestic Subsidiary that is a Subsidiary Guarantor) to deliver any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes (to the extent certificated) that are required to be pledged pursuant to Security Documents, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank.

(e)        Notwithstanding anything to the contrary contained in this Section 9.10, the Administrative Agent shall not require perfection in, and the Borrower shall not be required to perfect, any assets as to which the Borrower and the Administrative Agent shall reasonably determine that the cost, burden, difficulty or consequences of perfecting a security interest in such asset is excessive in relation to the value of the security to be afforded thereby.

(f)        [Reserved].

(g)        No Credit Party shall be required to obtain landlord lien waivers, bailment lien waivers or estoppels letters with respect to any leased property of such Credit Party.

(h)        Liens required to be granted from time to time pursuant to this Section 9.10 shall be subject to exceptions and limitations set forth in this Agreement, the Financing Orders and the other Credit Documents.

(i)        Each Credit Party shall deliver to the Administrative Agent copies of all Security Documents and all notices or instruments delivered pursuant thereto at the time of delivery of the same to the Collateral Trustee.

9.11.    Designation of Subsidiaries.

(a)    The only Subsidiaries of the Borrower that shall constitute Unrestricted Subsidiaries shall be those Subsidiaries set forth on Schedule 8.13 that are designated therein as Unrestricted Subsidiaries as of the Closing Date, and no other Subsidiary may be designated as an Unrestricted Subsidiary; provided that, notwithstanding the foregoing, any Unrestricted Subsidiary as of the Closing Date may form a Subsidiary after the Closing Date and that will be deemed an Unrestricted Subsidiary solely to the extent that such newly formed Subsidiary is directly related to such Unrestricted Subsidiary's business and for a bona fide purpose; provided that immediately before and after giving effect to such formation, no Default or Event of Default shall have occurred and be continuing.

(b)    The Borrower may at any time designate any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (i) any such Unrestricted Subsidiary shall, upon becoming a Restricted Subsidiary, comply with Section 9.10 to the extent applicable, (ii) the designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall (a) constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time and (b) a return on any Investment by the Credit Parties in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the net book value at the date of such designation of the Credit Parties' (as applicable) Investment in such Subsidiary and may be accomplished via a merger or consolidation of such Unrestricted Subsidiary with, or the sale of all or substantially all of such Restricted Subsidiaries' assets to, a Restricted Subsidiary or the Borrower

9.12.    Ratings.  Within 45 days after the Petition Date, Borrower shall use commercially reasonable efforts to obtain a "point in time" public corporate family rating (but not a specific rating) of the Borrower and a "point in time" rating (but not a specific rating) of each Class of the Loans existing on the Closing Date, in each case from Moody's and any one of either S&P or Fitch (it being understood and agreed that "commercially reasonable efforts" shall in any event include the payment by the Borrower of customary rating agency fees).

9.13.    [Reserved].

9.14.    Risk Management Policies.  The Borrower shall, and shall cause each of the other Credit Parties to remain in compliance in all material respects with its Risk Management Policies.

9.15.    [Reserved].

9.16.    Certain Case Milestones. The Borrower shall ensure the satisfaction of the following milestones (collectively, the "Milestones" and each a "Milestone"):

(a)    not later than 45 days after the Petition Date (or such later date (but in no event later than five (5) Business Days after such 45th day) as the Administrative Agent may reasonably agree), the Final Order Entry Date shall occur; and

(b)    not later than 360 days after the Petition Date, entry of an Approved Bankruptcy Court Order confirming the Chapter 11 Plan for an Approved Plan.

9.17.    Certain Other Bankruptcy Matters. The Credit Parties and the Subsidiaries shall comply (i) in all material respects, after entry thereof, with all of the requirements and obligations set forth in the Financing Orders and the cash management order, as each such order is amended and in effect from time to time in accordance with this Agreement, (ii) in all material respects, after entry thereof, with each order of the type referred to in clause (b) of the definition of "Approved Bankruptcy Court Order", as each such order is amended and in effect in accordance with this Agreement (including, for the avoidance of doubt, the requirements set forth in clause (b) of the definition of "Approved Bankruptcy Court Order") and (iii) in all material respects, after entry thereof, with the orders (to the extent not covered by subclause (i) or (ii) above) approving the Debtors' "first day" and "second day" relief and any pleadings seeking to establish material procedures for administration of the Cases or approving significant or material outside the ordinary course of business transactions and all obtained in the Cases, as each such order is amended and in effect in accordance with this Agreement (including, for the avoidance of doubt, the requirements set forth in clause (c) of the definition of "Approved Bankruptcy Court Order"); provided, that any

-86-

actions taken to enforce any rights or remedies arising from a breach of this Section 9.17 shall be subject to any requirements in the DIP Orders requiring a ruling or entry of an order of the Bankruptcy Court.

9.19.   Bankruptcy Notices.

(a)     The Borrower will furnish to the Administrative Agent (and the Administrative Agent will make available to each Lender), to the extent reasonably practicable, prior to filing with the Bankruptcy Court, the Final Order and all other proposed orders and pleadings related to the Loans and the Credit Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, having a value in excess of $1,000,000, cash management, adequate protection, any Chapter 11 Plan and/or any disclosure statement or supplemental document related thereto.

(b)     The Borrower will furnish to the Administrative Agent (and the Administrative Agent will make available to each Lender), to the extent reasonably practicable, no later than three calendar days (or such shorter period as Administrative Agent may agree) prior to filing with the Bankruptcy Court all other filings, motions, pleadings, other papers or material notices to be filed with the Bankruptcy Court relating to any request (x) to approve any compromise and settlement of claims whether under Rule 9019 of the Federal Rules of Bankruptcy Procedure or otherwise, or (y) for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code, in each case other than notices, filings, motions, pleadings or other information concerning less than $5,000,000 in value.

9.20.   9.19. [Reserved].

9.21.   9.20. Monthly Conference Call.  Host a conference call with representatives of the Administrative Agent (which, for the avoidance of doubt, shall not be obligated to join such call) and the Lenders (including the Agent Advisors) not more than once per month upon reasonable prior notice to be held at such time as reasonably designated by the Borrower (in consultation with the Administrative Agent and the Agent Advisors), at which conference call the Parent shall make available the executive management team and their advisors and there shall be discussed the DIP Budget and the Variance Reports for the prior month related thereto, the Credit Parties' financial condition, business operations, liquidity, business plan and projections.

SECTION 10.   Negative Covenants.  The Borrower hereby covenants and agrees that on and after the Closing Date and until the Total Commitment and all Letters of Credit have terminated (or such Letters of Credit have been cash collateralized, back-stopped by a letter of credit or otherwise been agreed to remain outstanding by the applicable Issuing Lender, in each case on terms reasonably acceptable to the applicable Issuing Lender) and the Loans, Notes and Unpaid Drawings (in each case, together with interest thereon), Fees and all other Obligations (other than any contingent obligations not then due and payable) incurred hereunder and thereunder, are paid in full:

10.01.   Liens.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, create, incur, assume or suffer to exist or become effective any Lien of any kind upon any of their property or assets, now owned or hereafter acquired; provided that the provisions of this Section 10.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "Permitted Liens"):

(a)     Liens created by or pursuant to this Agreement, the Security Documents and the Financing Orders;

(b)     Liens constituting cash posted to secure obligations with respect to Hedging Obligations constituting FCM Hedges, subject to pro forma Liquidity of not less than $150,000,000; provided that (x) there shall not be at any time outstanding more than $400,000,000 of cash posted with FCMs in the form of  initial margin and variation margin in the aggregate and (y) there shall be not be at any time outstanding more than $100,000,000 of cash posted with FCMs in the form of initial margin; provided that initial margin posted as of the Petition Date in respect of FCM Hedges in existence on the Petition Date shall be excluded for purposes of the cap set forth in this clause (y) until the date that is 60 days following the Closing Date; provided further, that for purposes of the limitations in the foregoing clauses (x) and (y), any other form of  credit support (including, without

limitation, letters of credit) posted or provided in the form of initial margin or variation margin, as applicable, shall be included);

(c)     Liens on cash to secure obligations with respect to (i) contracts (other than for Indebtedness) for commercial and trading activities for the purchase, transmission, distribution, sale, lease or hedge of any energy related commodity or service and (ii) Hedging Obligations constituting Bilateral Hedges and/or energy management agreements; provided that the aggregate amount of cash subject to such Liens (which, for the avoidance of doubt, shall include any cash postings or similar deposits and any other cash subject to such Liens) shall not exceed the sum of (i) $225,000,000 plus (ii) the Bilateral Hedging Collateral Upsize Reallocation Amount in effect at such time (provided, that for purposes of the foregoing limitation, any other form of credit support (including, without limitation, letters of credit) posted or provided to secure such obligations shall be included);

(d)     Liens in favor of the Borrower or any of the Subsidiary Guarantors;

(e)     Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature;

(f)     Liens to secure obligations to vendors or suppliers covering the assets sold or supplied by such vendors or suppliers, including Liens to secure Indebtedness or other obligations (including Capital Lease Obligations) permitted by clause (iv) of Section 10.04(b) covering only the assets acquired with or financed by such Indebtedness; provided that individual financings provided by one lender may be cross collateralized to other financings provided by such lender;

(g)     Liens existing on the Petition Date which are listed in Schedule 10.01;

(h)     Liens for taxes, assessments or governmental charges or levies or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(i)     Liens imposed by law, such as carriers', warehousemen's, landlord's, materialmen's and mechanics' Liens and other similar Liens;

(j)     survey exceptions, encroachments, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines, oil, gas and other mineral interests and leases, and other similar purposes, or zoning or other restrictions as to the use of real property and other similar encumbrances and minor title deficiencies, in each case that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair the operation of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(k)     Liens on Prepetition Cash Collateral;

(l)     Liens incurred or deposits made in connection with workers' compensation, unemployment insurance and other types of social security;

(m)     Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual or warranty requirements of the Borrower or any of its Restricted Subsidiaries, including rights of offset and set-off;

(n)     (i) licenses, sublicenses, leases or subleases granted to others that do not materially interfere with the business of the Borrower or its Restricted Subsidiaries, (ii) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease or license agreement permitted by this Agreement to which the Borrower or any of its Restricted Subsidiaries is a party (including any Liens on the interest of such lessor, sublessor, licensor or

#95606088v60

98679498

sublicensee) and (iii) licenses or sublicenses granted by the Borrower or any of its Restricted Subsidiaries to customers;

(o)        Liens securing Indebtedness permitted by Section 10.04(b)(xviii);

(p)        Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(q)        Liens arising from (i) Uniform Commercial Code financing statements filed on a precautionary basis in respect of operating leases or consignment or bailee arrangements entered into in the ordinary course of business or intended by the parties to be true leases (other than any such leases or consignment or bailee arrangements entered into in violation of this Agreement) and (ii) attachment and judgment Liens in respect of decrees and judgments to the extent, and for so long as, such judgments and decrees do not, individually or in the aggregate constitute an Event of Default under Section 11.08;

(r)        (i) Liens that are contractual rights of setoff or netting relating to (A) the establishment of depositary relations with banks not granted in connection with the issuance of Indebtedness, (B) pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any Restricted Subsidiary, (C) purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business and (D) commodity trading or other brokerage accounts incurred in the ordinary course of business, (ii) Liens encumbering reasonable customary initial deposits and margin deposits, (iii) bankers Liens and rights and remedies as to deposit accounts, (iv) Liens of a collection bank arising under Section 4-208 of the UCC on items in the ordinary course of business, (v) Liens in favor of banking or other financial institutions arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions and/or (vi) Liens on the proceeds of any Indebtedness incurred in connection with any transaction permitted hereunder, which proceeds have been deposited into an escrow account on customary terms to secure such Indebtedness pending the application of such proceeds to finance such transaction;

(s)        Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of commercial letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(t)        Liens on Prepetition First Lien Collateral securing Prepetition Indebtedness;

(u)        Liens on assets or securities deemed to arise in connection with the execution, delivery or performance of contracts to sell such assets or stock otherwise permitted under this Agreement;

(v)        any Liens resulting from restrictions on any Equity Interest or undivided interests, as the case may be, of a Person providing for a breach, termination or default under any joint venture, stockholder, membership, limited liability company, partnership, owners', participation or other similar agreement between such Person and one or more other holders of Equity Interests or undivided interests of such Person, as the case may be, if a security interest or Lien is created on such Equity Interest or undivided interest, as the case may be, as a result thereof;

(w)       Liens resulting from any customary provisions limiting the disposition or distribution of assets or property (including without limitation Equity Interests) or any related restrictions thereon (including right of first refusal and tag, drag and similar rights) in joint venture, partnership, membership, stockholder and limited liability company agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements, including owners', participation or similar agreements governing projects owned through an undivided interest; provided, however, that any such limitation is applicable only to the assets that are the subjects of such agreements;

#95606088v60

98679498

(x)     those Liens or other exceptions to title, in either case on or in respect of any facility of the Borrower or any Restricted Subsidiary, arising as a result of any shared land agreement or shared facility agreement with respect to such land or facility, except to the extent that any such Liens or exceptions, individually or in the aggregate, materially adversely affect the value of the relevant property or materially impair the use of the relevant property in the operation of the business of the Borrower or such Subsidiary;

(y)     Liens on cash deposits and other funds or investment property maintained with a depositary institution, in each case arising in the ordinary course of business by virtue of any statutory or common law provision relating to banker's liens, including Section 4-210 of the UCC;

(z)     Liens pursuant to the Credit Documents or otherwise arising under applicable law securing Treasury Services Agreements of the Credit Parties entered into in the ordinary course of business;

(aa)    Liens on "Product" (as defined in the Post-Petition PPSA) and proceeds thereof, in each case, securing Hedging Obligation under the Post-Petition PPSA;

(bb)    Liens incurred by the Borrower or any Credit Party; provided that at the time of incurrence of any such Liens, the aggregate outstanding obligations secured by Liens pursuant to this clause (bb) does not exceed $10,000,000; provided, however, that any Indebtedness secured by a Lien permitted pursuant to this clause (bb) shall not have a final maturity date earlier than, or a Weighted Average Life to Maturity less than, the final maturity date and Weighted Average Life to Maturity, respectively, of any Loans hereunder; and

(cc)    Liens incurred by the Borrower or any Credit Party securing obligations under the Continuing Letter of Credit Facility and subject to the terms of the Guarantee and Collateral Agreement.

10.02.  Consolidation, Merger or Sale of Assets, etc.

(a)     The Borrower may not, directly or indirectly:  consolidate or merge with or into another Person (whether or not the Borrower is the surviving corporation) or otherwise sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Borrower or its Restricted Subsidiaries taken as a whole, in one or more related transactions, to another Person;

(b)     A Subsidiary Guarantor may not sell or otherwise dispose of all or substantially all of the properties or assets of the Borrower or its Restricted Subsidiaries, taken as a whole, to, or consolidate with or merge with or into (whether or not such Subsidiary Guarantor is the surviving Person), another Person, other than the Borrower or another Subsidiary Guarantor.

(c)     In addition, the Borrower may not, and shall not permit any Subsidiary Guarantor to, directly or indirectly, lease all or substantially all of the properties or assets of the Borrower and the Subsidiary Guarantors, taken as a whole, in one or more related transactions, to any other Person.

10.03.  Restricted Payments.

(a)     The Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i)     declare or pay any dividend or make any other payment or distribution on account of the Borrower's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Borrower or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Borrower's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Borrower or to the Borrower or a Restricted Subsidiary of the Borrower);

-90-

(ii)       purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Borrower) any Equity Interests of the Borrower or any direct or indirect parent of the Borrower (other than any such Equity Interests owned by the Borrower or any Restricted Subsidiary of the Borrower); or

(iii)       make any Restricted Investment;

all such payments and other actions set forth in these clauses (i) through (iii) above being collectively referred to as "Restricted Payments."

(b)       The provisions of Section 10.03(a) shall not prohibit:

(i)       the payment of any dividend or distribution or the consummation of any redemption within 90 days after the date of declaration of the dividend or distribution or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend, distribution or redemption payment would have complied with the provisions of this Agreement;

(ii)       any Restricted Payment to Talen Energy Corporation in amounts required to pay fees and expenses (including franchise and similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, officers and employees and general operating and overhead expenses of Talen Energy Corporation in each case to the extent such fees and expenses are attributable to the ownership or operation of the Borrower, if applicable, and its Restricted Subsidiaries; provided that Restricted Payments made pursuant to this clause (ii) shall not, in the aggregate, exceed $1,000,000 in any fiscal year and shall in any event be consistent with the most recently delivered Cash Flow Forecast.

(iii)       [reserved];

(iv)       the payment of any dividend (or, in the case of any partnership or limited liability company, any similar distribution) by a Restricted Subsidiary of the Borrower to the holders of its Equity Interests on a pro rata basis (taking into account the relative preferences, if any, of the various classes of Equity Interests of such Restricted Subsidiary);

(v)       [reserved];

(vi)       [reserved];

(vii)       [reserved];

(viii)       [reserved];

(ix)       [reserved];

(x)       [reserved];

(xi)       [reserved];

(xii)       in respect of any taxable period for which the Borrower or any of its Subsidiaries are members of a consolidated, combined, affiliated, unitary or similar Tax group for U.S. federal or applicable state, local or foreign Tax purposes of which any direct or indirect parent of the Borrower is the common parent, dividends or distributions with respect to the Borrower's Equity Interests in an amount not to exceed the excess, if any, of (A) the amount of any such U.S. federal, state, local or foreign income Taxes that the Borrower and its Subsidiaries would have paid for such taxable period had the Borrower and/or its Subsidiaries, as applicable, been a stand-alone corporate taxpayer or a stand-alone corporate group over (B) the amount of such Taxes paid directly by the Borrower and its Subsidiaries to a

-91-

Governmental Authority for such taxable period; provided that Restricted Payments under this clause (xii) in respect of Taxes attributable to the income of any Unrestricted Subsidiaries of the Borrower shall be permitted only to the extent that the Borrower or its Restricted Subsidiaries have received cash payments from such Unrestricted Subsidiaries in respect of such Taxes (but such payments are not required to exceed the amount of cash any such Unrestricted Subsidiary reasonably determines in good faith using its business judgment is available for distribution); and

(xiii)    the payment of any amounts due in connection with the PPSA Inventory Purchase.

The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Borrower or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.  The Fair Market Value of any assets or securities that are required to be valued by this covenant will be determined by an Authorized Officer of the Borrower; provided, that if the Fair Market Value of such assets or securities involves an aggregate amount in excess of $25,000,000, such Authorized Officer shall deliver to the Administrative Agent an Officer's Certificate with respect to the Fair Market Value of such assets or securities.

10.04.    Indebtedness.

(a)    The Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "incur") any Indebtedness (including Acquired Debt), and the Borrower will not issue any Disqualified Stock and will not permit any of its Restricted Subsidiaries to issue any shares of preferred stock.

(b)    The provisions of Section 10.04(a) will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "Permitted Debt"):

(i)    the incurrence of Indebtedness and Letters of Credit hereunder and under the other Credit Documents (including any Indebtedness and Letters of Credit arising from Commitments pursuant to and in accordance with Section 2.15);

(ii)    the incurrence by the Borrower and its Restricted Subsidiaries of the Prepetition Indebtedness;

(iii)    the incurrence of Indebtedness pursuant to the Post-Petition PPSA;

(iv)    the incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of design, construction, installation or improvement or lease of property (real or personal), plant or equipment used or useful in the business of the Borrower or any of its Restricted Subsidiaries or incurred within 270 days thereafter, in an aggregate principal amount at any time outstanding (as measured on the date of each incurrence of Indebtedness pursuant to this clause (iv)), not to exceed $20,000,000; provided that Indebtedness incurred pursuant to this clause (iv) shall only be permitted to finance newly acquired assets of the Borrower and its Restricted Subsidiaries;

(v)    the incurrence by the Borrower of Hedging Obligations in respect of Indebtedness of the Borrower or its Restricted Subsidiaries then outstanding under Hedging Agreements contemplated by clause (i) of the definition thereof entered into with any Bilateral Hedging Counterparty that is a Lender, an Agent or an Affiliate of the foregoing on the Closing Date or at the time it enters into such Hedging Agreement with the Borrower;

(vi)    the incurrence by the Borrower or any of the Subsidiary Guarantors of Intercompany Indebtedness between or among the Borrower and any of the Subsidiary Guarantors; provided, however,

-92-

that any such Indebtedness of the Subsidiary Guarantors shall be unsecured and subordinated in right of payment to the Obligations and evidenced by an intercompany note on terms reasonably satisfactory to the Administrative Agent;

(vii)    the issuance by any Credit Party to the Borrower or to any other Credit Party of shares of preferred stock; provided, however, that:

(A)    any subsequent issuance or transfer of Equity Interests that results in any such preferred stock being held by a Person other than a Credit Party; and

(B)    any sale or other transfer of any such preferred stock to a Person that is not a Credit Party will be deemed, in each case, to constitute an issuance of such preferred stock by such Restricted Subsidiary that was not permitted by this clause (vii);

(viii)    the incurrence by the Borrower or any of the Subsidiary Guarantors of (x) Hedging Obligations in respect of Bilateral Hedges; provided that ((or the substantially simultaneous incurrence of a series of related Hedging Obligations); provided that (x) in respect of Hedging Obligations (or the substantially simultaneous incurrence of a series of related Hedging Obligations) constituting Bilateral Hedges (other than any Operational Hedges and any Hedging Obligations incurred as a direct result of exercising any Affiliate Pricing Options) (A) at the time of incurrence of any such Hedging Obligations which increase the Potential Future Exposure of the Credit Parties, the aggregate Post-Petition Bilateral Exposure of the Credit Parties does not exceed, on a pro forma basis, if such Hedging Obligations are incurred (i) prior to November 1, 2022, $1,175,000,000 and (ii) thereafter, $750,000,000 and (B) such Hedging Obligations_ are secured pursuant to Liens permitted under Section 10.01(a) and/or collateral posted to secure such Hedging Obligations permitted by Section 10.01(c) above; and (y) Hedging Obligations constituting FCM Hedgesprovided, in the case of this clause (x), that no such Hedging Obligations may be incurred after the Amendment No. 1 Effective Date and prior to November 1, 2022 if such Hedging Obligation is subject to any credit support annex or other collateral support agreement entered after the Amendment No. 1 Effective Date that, in each case, requires the Borrower or such Subsidiary Guarantor, as applicable, to post or provide credit support in the form of variation margin in cash or Cash Equivalents; and (y) FCM Hedges shall (A) be entered into by the Borrower or any Subsidiary Guarantor in the ordinary course of business or otherwise consistent with Prudent Industry Practice in order to manage fluctuations in the price or availability to the Borrower or any Subsidiary Guarantor of any commodity and/or manage the risk of adverse or unexpected weather conditions; provided that, (AB) such FCM Hedges (other than the Specified Trades) shall and any trades which have the effect of "closing out" or otherwise reducing the risk attributable to an FCM Hedge, have a maturity date of not longer than 12 months (provided such maximum tenor shall be reduced by one month on November 1, 2022 and by a further one month on the first day of each subsequent calendar month until such maximum tenor is six months) and (BC) FCM Hedges shall not, at any time on and after the date that is 60 days after the days after entry by the Bankruptcy Court of the Hedging Order, account for more than 25% of hedging volume all DIP Hedges for any period longer than 30 days.;

(ix)    the guarantee by the Borrower or any of the Subsidiary Guarantors of Indebtedness of the Borrower or a Subsidiary Guarantor that was permitted to be incurred by another provision of this Section 10.04.;

(x)    the incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness arising from customary cash management services, netting arrangements, automated clearing house transfers, or the honoring by a bank or other financial institution of a check, draft or similar instrument (except in the case of daylight overdrafts) inadvertently drawn against insufficient funds in the ordinary course of business;

(xi)    the incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness in respect of (x) self-insurance obligations, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, unemployment insurance or other social security legislation or other

Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims and (y) warehouse receipts or similar instruments, performance and surety bonds provided by the Borrower or a Restricted Subsidiary in the ordinary course of business or in connection with judgments that do not result in an Event of Default and obligations in respect of performance and completion guarantees and similar obligations provided by the Borrower or any of its Restricted Subsidiaries; in each case created or issued in a manner consistent with past practice;

(xii)      the provision of Non-Debtor Credit Support; provided that the amount thereof, to the extent constituting Indebtedness, shall constitute an Investment made pursuant to clause (w) of "Permitted Investments";

(xiii)      the incurrence of Indebtedness that may be deemed to arise as a result of agreements of the Borrower or any Restricted Subsidiary of the Borrower providing for indemnification, adjustment of purchase price or any similar obligations, in each case, incurred in connection with the disposition of any business, assets or Equity Interests of any Subsidiary; provided that the aggregate maximum liability associated with such provisions may not exceed the gross proceeds (including non-cash proceeds) of such disposition;

(xiv)      the incurrence of Indebtedness as a result of the PPSA Inventory Purchase;

(xv)      [reserved];

(xvi)      [reserved];

(xvii)      [reserved];

(xviii)      Indebtedness of the Borrower or any Restricted Subsidiary consisting of (A) the financing of insurance premiums and (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xix)      [reserved];

(xx)      [reserved];

(xxi)      [reserved];

(xxii)      Indebtedness (A) representing deferred compensation or similar obligations to employees incurred in the ordinary course of business and (B) consisting of obligations under deferred compensation or other similar arrangements incurred by such Person in connection with any Permitted Investment;

(xxiii)      the incurrence by the Borrower and/or any other Credit Party of Indebtedness in an aggregate principal amount (or accreted value, as applicable) not to exceed $10,000,000 at any time outstanding; and

(xxiv)      Indebtedness incurred by the Borrower or any Credit Party under the Continuing Letter of Credit Facility and subject to the terms of the Guarantee and Collateral Agreement.

(c)      The Borrower will not incur, and will not permit any Subsidiary Guarantor to incur any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Borrower or such Subsidiary Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Obligations on substantially identical terms; provided, however, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Borrower solely by virtue of being unsecured or by virtue of being secured on a first or junior Lien basis.

-94-

(d)        The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of this Section 10.04.

(e)        For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency will be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred; provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-dominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-dominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of the Indebtedness being refinanced.

(f)        The amount of any Indebtedness outstanding as of any date will be (i) the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount; (ii) the principal amount of the Indebtedness, in the case of any other Indebtedness; and (iii) in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of (A) the Fair Market Value of such asset at the date of determination, and (B) the amount of the Indebtedness of the other Person; provided that any changes in any of the above shall not give rise to a default under this Section 10.04.

10.05.    Dividend and Other Payment Restrictions Affecting Subsidiaries.

(a)        The Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiaries to:

(i)        pay dividends or make any other distributions on its Capital Stock to the Borrower or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any indebtedness owed to the Borrower or any of its Restricted Subsidiaries;

(ii)        make loans or advances to the Borrower or any of its Restricted Subsidiaries; or

(iii)        transfer any of its properties or assets to the Borrower or any of its Restricted Subsidiaries.

(b)        the restrictions in Section 10.05(a) above will not apply to encumbrances or restrictions existing under or by reason of:

(i)        this Agreement and other agreements governing Prepetition Indebtedness, on the Petition Date;

(ii)        [reserved];

(iii)        applicable law, rule, regulation or order;

(iv)        customary non-assignment provisions in contracts, agreements, leases, permits and licenses;

(v)        purchase money obligations for property acquired and Capital Lease Obligations that impose restrictions on the property purchased or leased of the nature described in clause (iii) of Section 10.05(a);

-95-

(vi)    any agreement for the sale or other disposition of the stock or assets of a Restricted Subsidiary that is permitted under this Agreement that restricts distributions by that Restricted Subsidiary pending the sale or other disposition;

(vii)    [reserved];

(viii)    Liens permitted to be incurred under Section 10.01 and associated agreements that limit the right of the debtor to dispose of the assets subject to such Liens;

(ix)    provisions limiting the disposition or distribution of assets or property in joint venture, partnership, membership, stockholder and limited liability company agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements, including owners', participation or similar agreements governing projects owned through an undivided interest, which limitation is applicable only to the assets that are the subject of such agreements;

(x)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business or consistent with industry practice;

(xi)    restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase, sale or similar agreement to which the Borrower or any Restricted Subsidiary of the Borrower is a party entered into in the ordinary course of business or consistent with industry practice; provided that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Restricted Subsidiary that are the subject of that agreement, the payment rights arising thereunder and/or the proceeds thereof and not to any other asset or property of the Borrower or such Restricted Subsidiary or the assets or property of any other Restricted Subsidiary;

(xii)    [reserved];

(xiii)    [reserved];

(xiv)    with respect to clause (iii) of Section 10.05(a) only, restrictions encumbering property at the time such property was acquired by the Borrower or any of its Restricted Subsidiaries, so long as such restriction relates solely to the property so acquired and was not created in connection with or in anticipation of such acquisition;

(xv)    [reserved];

(xvi)    other Indebtedness; provided that the restrictions contained in the agreements governing such Indebtedness are not materially more restrictive, taken as a whole, in the good faith judgment of an authorized officer of the Borrower than those contained in the agreements referenced in clauses (i) and (ii) of this Section 10.05(b); and

(xvii)    any encumbrance or restrictions of the type referred to in clauses (i), (ii) and (iii) of Section 10.05(a) imposed by any amendments, modifications, restatements, renewals, increases, supplements, refunding's, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (i) through (xvi) of this Section 10.05(b); provided that such amendments, modifications, restatements, renewals, increases, supplements, refunding's, replacements or refinancings are, in the good faith judgment of a senior financial officer of the Borrower, not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewals, increase, supplement, refunding, replacement or refinancing.

-96-

10.06.   Transactions with Affiliates.

(a)   The Borrower will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (each, an "Affiliate Transaction") involving aggregate payments in excess of $5,000,000, unless:

(i)   the Affiliate Transaction is on terms that are no less favorable to the Borrower (as reasonably determined by the Borrower) or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Borrower or such Restricted Subsidiary with an unrelated Person; and

(ii)   the Borrower delivers to the Administrative Agent:

(A)   with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $10,000,000, a resolution of the Board of Directors set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with this Section 10.06 and that such Affiliate Transaction has been approved by a majority of the disinterested members of the Board of Directors; and

(B)   with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $25,000,000, an opinion as to the fairness to the Borrower or such Restricted Subsidiary of such Affiliate Transaction from a financial point of view issued by an Independent Financial Advisor.

(b)   The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of Section 10.06(a):

(i)   any employment agreement or director's engagement agreement, employee benefit plan, officer and director indemnification agreement or any similar arrangement entered into by the Borrower or any of its Restricted Subsidiaries or approved by an Authorized Officer of the Borrower in good faith;

(ii)   transactions between or among the Credit Parties;

(iii)   OCGT Agreement Transactions;

(iv)   payment of reasonable directors' fees;

(v)   the provision of Non-Debtor Credit Support;

(vi)   (x) Restricted Payments that do not violate the provisions of Section 10.03 and (y) Permitted Investments pursuant to clause (w) of the definition thereof which have been approved by a majority of the disinterested members of the board of managers of the Borrower;

(vii)   any agreement in effect as of the Closing Date and set forth on Schedule 10.06 or any amendment thereto or replacement thereof and any transaction contemplated thereby or permitted thereunder, so long as any such amendment or replacement agreement taken as a whole is not more disadvantageous to the Lenders than the original agreement as in effect on the Closing Date;

(viii)   payments (including reimbursement of expenses) or advances to employees or consultants that are incurred in the ordinary course of business or that are approved by an Authorized Officer of the Borrower in good faith;

#95606088v60

98679498

(ix)     [reserved];

(x)      transactions permitted by, and complying with, the provisions of Section 10.02;

(xi)     transactions with customers, clients, suppliers, joint venture partners or purchasers or sellers of goods or services (including pursuant to joint venture agreements) in compliance with the terms of this Agreement that are fair to the Borrower and its Restricted Subsidiaries, or are on terms not materially less favorable taken as a whole as might reasonably have been obtained at such time from an unaffiliated party, in each case, in the reasonable determination of a senior financial officer of the Borrower;

(xii)    any repurchase, redemption or other retirement of Capital Stock of the Borrower held by employees of the Borrower or any of its Subsidiaries;

(xiii)   loans or advances to employees or consultants;

(xiv)    [reserved];

(xv)     transactions in which the Borrower or any Restricted Subsidiary of the Borrower, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of this Section 10.06;

(xvi)    the issuance of any letters of credit to support obligations of the Borrower or any Affiliate thereof;

(xvii)   transactions between or among Excluded Subsidiaries, and any guarantee and/or other credit support provided by the Borrower and/or any Restricted Subsidiary in respect of any Subsidiary or any Minority Investment so long as all holders of Equity Interests in such Subsidiary or Minority Investment (including the Borrower or any Restricted Subsidiary, as applicable) shall participate directly or indirectly in such applicable guarantee and/or other credit support or shall provide a commitment in respect of any related obligation, in each case, on a pro rata basis relative to their Equity Interests in such Minority Investment; provided that any such transaction shall be fair and reasonable and beneficial to the Borrower and its Restricted Subsidiaries (taken as a whole) and consistent with Prudent Industry Practice;

(xviii)  transactions relating to management, marketing, administrative or technical services between the Borrower and its Restricted Subsidiaries, or between Restricted Subsidiaries;

(xix)    (x) the Tax Sharing Agreement, dated September 20, 2021, by and among the Borrower, Talen and Cumulus Entities and (y) any other tax sharing agreement between or among the Borrower and its Subsidiaries so long as such tax sharing agreement is on fair and reasonable terms with respect to each participant therein;

(xx)     [reserved];

(xxi)    any shared services agreements between or among the Borrower and/or any of its Subsidiaries on terms not materially less favorable taken as a whole as might reasonably have been obtained at such time from an unaffiliated party, in each case, in the reasonable determination of a senior financial officer of the Borrower; and

(xxii)   any agreement to do any of the foregoing.

10.07.   Additional Covenants.

(a)     Liquidity. The Borrower will not permit Liquidity to be less than $150 million at any time for any period of three (3) consecutive days.

(b)     Volumetric Hedging. The Borrower shall not permit the outstanding net Hedging Obligations with respect to power to exceed 5,356.8 gigawatt hours in any fiscal month. In addition, the Credit Parties shall not incur any Hedging Obligation (other than any Operational Hedges and any Hedging Obligations incurred as a direct result of exercising any Affiliate Pricing Options (provided that, (x) prior to the exercise of any Affiliate Pricing Option, the hedges contemplated by the unexercised portion of such Affiliate Pricing Option shall not constitute hedges on an incurrence basis and (y) upon the exercise of any Affiliate Pricing Option, Talen will repurchase equivalent hedge volumes in order to maintain a net neutral hedging position equivalent to the pre-exercise hedge volumes)) which at the time of the incurrence of any Hedging Obligation, the total amount of all such, when combined with any substantially simultaneous incurrence of a series of related Hedging Obligations shall not exceed (i) 75% of monthly In-The, increases the overall percentage of In-The-Money-Generation of hedged by the Debtors for the any particular month in excess of (i) for any month in the succeeding 12-month period following the date of such incurrence or (ii) 50% of monthly In-the-Money-Generation of the Debtors for, 75% of such month's In-The-Money-Generation of the Debtors or (ii) for any month in the succeeding 12-month period following the 12-month period thereafter described in clause (i), 50% of such month's In-the-Money-Generation of the Debtors.

(c)     Affiliate Pricing Options. On and after the Amendment No. 1 Effective Date, in the event any Affiliate Pricing Options are exercised, the Borrower shall not permit the amount of power purchased pursuant to the Affiliate Pricing Options exercised after the Amendment No. 1 Effective Date to exceed 250 megawatts on a net basis.

10.08.     Asset Sales.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale other than:

(a)     [reserved];

(b)     dispositions or write-downs of accounts receivable in connection with the compromise, settlement or collection thereof in the ordinary course of business or bankruptcy or similar proceedings;

(c)     sales, transfers or other dispositions of assets with respect to any Debtor pursuant to any order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Administrative Agent, permitting de minimis asset dispositions without further order of the Bankruptcy Court; provided that the aggregate Fair Market Value of such de minimis asset dispositions shall not exceed $5,000,000 in the aggregate prior to the Maturity Date;

(d)     transfers of condemned property or Real Property as a result of the exercise of "eminent domain" or other similar policies to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property or Real Property that have been subject to a casualty to the respective insurer of such property or Real Property as part of an insurance settlement; and

(e)     other Asset Sales; provided that the aggregate Fair Market Value of all assets sold, transferred or otherwise disposed of in reliance on this clause (e) shall not exceed $5,000,000 prior to the Maturity Date (with the Fair Market Value of each item of non-cash consideration being measured at the time received and without giving effect to any subsequent changes in value).

Notwithstanding anything herein to the contrary, the Borrower will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale with any Affiliate (other than a Credit Party)

10.09.     Susquehanna Dispositions.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, sell, transfer or otherwise dispose of any equity interests in Susquehanna Nuclear, LLC, or any property or assets of Susquehanna Nuclear, LLC (including, without limitation, the Susquehanna Steam Electric Station and any Real Property, plants, fixtures, equipment, intellectual property or other property or assets relating thereto) (such equity interests, assets and property, collectively, the "Susquehanna Property"); provided, that the forgoing shall not apply to any sales, transfers or disposals of Susquehanna Property (a) with a fair market value of

$2,000,000 in the aggregate during any twelve-month period, (b) as would constitute an Asset Sale described in clause (iv) of the definition thereof and that occurs in the ordinary course of business and consistent with historical practices, not in connection with any financing or investment transaction or (c) to the Borrower or its Restricted Subsidiaries (the forgoing clauses (a), (b) and (c), the "Disposition Exceptions"). Notwithstanding anything to the contrary herein or in any Credit Document or Security Document, under no circumstances shall any guarantee by Susquehanna Nuclear, LLC in respect of the Obligations, or any Lien or security interest created pursuant to the Security Documents for the benefit of the Secured Parties with respect to the Susquehanna Property, be released, except for the Disposition Exceptions.

10.10.   Restricted Debt Payments.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case, Indebtedness described in clauses (a), (b) or (d) of the definition of "Indebtedness" of the Borrower or any Restricted Subsidiary; provided that this Section 10.10(a) shall not restrict (i) payments of Indebtedness upon the scheduled maturity of such Indebtedness or within 90 days thereof and (ii) any such payments made with Equity Interests (other than Disqualified Stock) of the Borrower, with the net cash proceeds of an issuance of Equity Interests of the Borrower (other than Disqualified Stock) or a contribution to the Borrower's common equity capital, in each case, to the extent that such payment is made substantially contemporaneously with receipt of such net cash proceeds.

10.11.   [Reserved].

10.12.   [Reserved].

10.13.   [Reserved].

10.14.   [Reserved].

10.15.   Subsidiaries. The Borrower shall not and will not permit any of its Restricted Subsidiaries to form, create or acquire any Subsidiary without the prior written consent of the Required Lenders.

10.16.   Additional Bankruptcy Matters.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, without the Administrative Agent's prior written consent, subject to the terms of the Financing Orders and subject to Section 11, object to, contest, delay, prevent, hinder or interfere with in any manner the exercise of rights and remedies by the Agents or the Lenders with respect to the Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any Agent or Lender to lift an applicable stay of proceedings to do the foregoing (provided that any Credit Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the Financing Orders):

(a)   [reserved];

(b)   subject to the terms of the Financing Orders and subject to Section 11, object to, contest, delay, prevent, hinder or interfere with in any manner the exercise of rights and remedies by the Agents or the Lenders with respect to the Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any Agent or Lender to lift an applicable stay of proceedings to do the foregoing (provided that any Credit Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the Financing Orders and/or prepare for and participate at any hearing held by the Bankruptcy Court regarding any exercise of rights or remedies under this Agreement or the Financing Orders); or

(c)   except as provided or permitted hereunder (including, without limitation, to the extent authorized pursuant to any order of the Bankruptcy Court complying with the terms of this Agreement), make any payment or distribution to any non-Debtor Affiliate outside of the ordinary course of business.

SECTION 11.   Events of Default and Remedies.  Upon the occurrence of any of the following specified events (each, an "Event of Default"):

#95606088v60

98679498

11.01.   <u>Payments</u>.  (a) Default shall be made in the payment of any principal of any Loan or any Unpaid Drawing when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof by acceleration thereof or otherwise or (b) default shall be made in the payment of any interest on any Loan or any Unpaid Drawing or any Fees or any other amounts (other than an amount referred to in clause (a) above) owing hereunder or under any other Credit Documents, when and as the same shall become due and payable, and such default shall continue unremedied for a period of at least two (2) Business Days;

11.02.   <u>Representations, etc</u>.  Any representation or warranty made or deemed made in connection with any Credit Document (other than those specified in <u>Section 11.07</u>) or the Borrowings or issuances of Letters of Credit hereunder, or any representation, warranty, statement or information contained in any certificate of the Borrower furnished in connection with or pursuant to any Credit Document by any Credit Party, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished and, to the extent such false or misleading representation, warranty, statement or other information is capable of being cured (including by means of delivery of an amended, restated, amended and restated or otherwise modified certificate), such false or misleading representation, warranty, statement or other information shall remain uncured for a period of thirty (30) days after notice thereof from the Administrative Agent, Collateral Trustee or the Required Lenders to the Borrower;

11.03.   <u>Covenants</u>.  (a) Default shall be made in the due observance or performance by the Borrower or any Subsidiary of any covenant or agreement contained in <u>Sections 9.01(e)(i)</u>, <u>9.04</u> (with respect to the Borrower's existence) <u>9.09</u>, <u>9.11</u>, <u>9.13</u>, <u>9.16</u>, <u>9.17</u>, <u>12.10(b)</u> or in the provisions of <u>Section 10</u>, (b) default shall be made in the due observance or performance by the Borrower of the covenant contained in <u>Sections 9.01(i)</u> or <u>9.01(k)</u> and such default shall continue unremedied for a period of at least three (3) Business Days, (c) default shall be made in the due observance or performance by the Borrower of the covenant contained in <u>Sections 9.01(g)</u> or <u>9.14</u> and such default shall continue unremedied for a period of at least five (5) Business Days, (d) default shall be made in the due observance or performance by the Borrower of the covenant contained in <u>Section 9.01(l)</u> and such default shall continue unremedied for a period of at least ten (10) Business Days after the date on which written notice thereof is given by the Administrative Agent, the Collateral Trustee or the Required Lenders to the Borrower or (e) default shall be made in the due observance or performance by the Borrower or any Subsidiary of any covenant, condition or agreement contained in any Credit Document (other than specified in this <u>Section 11</u>, including clauses (a), (b) (c) and (d) above) and such default shall continue unremedied for a period of at least thirty (30) days (or, in the case of any default of any covenant or agreement contained in <u>Section 10.06</u>, two Business Days) after the date on which written notice thereof is given by the Administrative Agent, the Collateral Trustee or the Required Lenders to the Borrower;

11.04.   <u>Default Under Other Agreements</u>.  The Borrower or any Restricted Subsidiary shall (a) fail to pay any principal or interest, regardless of amount, due in respect of any Indebtedness (other than (x) in the case of any Debtor, Prepetition First Lien Secured Debt and (y) Indebtedness hereunder) in excess of the Threshold Amount (any such Indebtedness, "<u>Material Indebtedness</u>"), when and as the same shall become due and payable (but after giving effect to any applicable cure or grace periods), or (b) any other event or condition occurs that results in any Material Indebtedness (other than Prepetition First Lien Secured Debt and Indebtedness hereunder) becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, but after giving effect to any applicable cure or grace periods) the holder or holders of any Material Indebtedness (other than Prepetition First Lien Secured Debt and Indebtedness hereunder) or any trustee or agent on its or their behalf to cause any Material Indebtedness (other than Prepetition First Lien Secured Debt and Indebtedness hereunder) to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; <u>provided</u> that clause (b) shall not apply to secured Indebtedness or Hedging Agreement that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

11.05.   <u>Bankruptcy, etc</u>.  (a) a court of competent jurisdiction (i) enters an order or decree under any Bankruptcy Law that is for relief against any of the Borrower's material Restricted Subsidiaries that is not a Debtor as of the Closing Date, (ii) appoints a custodian of any of the Borrower's material Restricted Subsidiaries that is not a Debtor as of the Closing Date for all or substantially all of the property of such Restricted Subsidiary, or (iii) orders the liquidation of the Borrower or any of the Borrower's material Restricted Subsidiaries that is not a Debtor as of the Closing Date, or (b) any of the Borrower's material Restricted Subsidiaries that is not a Debtor as of the

-101-

Closing Date, pursuant to or within the meaning of Bankruptcy Law (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors, unless, in any case, (x) within five (5) Business Days of filing, such subsidiary becomes a Credit Party, (y) within ten (10) Business Days of filing, such Subsidiary's case becomes jointly administered with that of the Borrower and (z) each of the Interim Order and Final Order are made applicable to such Subsidiary).

11.06.    ERISA.

(a)    (i)    One or more ERISA Events shall have occurred; or

(ii)    there is or arises any potential withdrawal liability under Section 4201 of ERISA, if the Borrower, any Restricted Subsidiary of the Borrower or the ERISA Affiliates were to withdraw completely from any and all Multiemployer Plans; and

(b)    such event or events would reasonably be expected to result individually or in the aggregate in the imposition of a lien or the granting of a security interest on the assets of the Borrower, any Restricted Subsidiary or any ERISA Affiliate and such lien or security interest, individually or in the aggregate, has had or would be reasonably expected to have, a Material Adverse Effect;

11.07.    Security Documents.

(a)    Except as permitted by this Agreement or as a result of the discharge of such Subsidiary Guarantor in accordance with the terms of the Credit Documents, any guarantee by a Subsidiary Guarantor (other than an Immaterial Subsidiary) under the Guarantee and Collateral Agreement shall be held by a final decision issued in any judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect or any Subsidiary Guarantor (other than an Immaterial Subsidiary) shall deny or disaffirm in writing its or their obligations under its or their guarantee(s) under the Guarantee and Collateral Agreement or (b) (i) material breach by the Borrower or any of its Restricted Subsidiaries of any material representation or warranty or covenant, condition or agreement in the Security Documents, the repudiation by the Borrower or any of its Restricted Subsidiaries of any of its material obligations under any of the Security Documents or any Financing Order or the unenforceability of any of the Security Documents or any Financing Order against the Borrower or any of its Restricted Subsidiaries for any reason with respect to any material portion of the Collateral or (ii) the Collateral Trustee shall not have or shall cease to have a valid and perfected Lien on any Collateral purported to be covered by the Security Documents or the Financing Orders with the priority required by the relevant Security Document or Financing Order, in each case for any reason other than the failure of Collateral Trustee or any Secured Party to take any action within its control, subject to Permitted Liens;

11.08.    Judgments.  One or more judgments (in the case of any Debtor, arising after the Petition Date) for the payment of money in an aggregate amount in excess of the Threshold Amount (excluding therefrom any amount covered by insurance) shall be rendered against the Borrower or any Restricted Subsidiary and the same shall remain undischarged for a period of at least sixty (60) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower or any Restricted Subsidiary to enforce any such judgment;

11.09.    Change of Control.  A Change of Control shall occur;

11.10.    [Reserved].

11.11.    Bankruptcy Events.  Any of the following shall occur:

(i)    the entry of an order, or the filing of an application, motion, or request for an order by any Credit Party, dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code;

#95606088v60

98679498

(ii)        a trustee, receiver, interim receiver, responsible officer, or an examiner (other than a fee examiner and only to the extent such examiner is granted powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code and such powers entitle the examiner to control or dispose of Collateral without the Administrative Agent's consent) under Section 1104 of the Bankruptcy Code (is appointed or elected in the any of the Cases, any Credit Party (or any Subsidiary or parent thereof) applies for, consents to, or fails to contest in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment;

(iii)        the entry of an order or the filing by any Credit Party of an application, motion or other pleading seeking entry of an order staying, reversing, amending, supplementing, vacating or otherwise modifying the Interim Order or the Final Order in a manner that is adverse to any of the Lenders in any material respect, including, without limitation, the liens and claims granted thereby;

(iv)        (x) the entry of an order in any of the Cases terminating the Credit Parties' rights to use cash collateral or imposing any additional conditions thereon, (y) any other event that terminates the Credit Parties' right to use cash collateral, or (z) any of the Credit Parties files, or fails to promptly oppose a motion to terminate the Credit Parties' use of cash collateral;

(v)        the entry of an order in any of the Cases granting relief from any stay of proceeding (including, without limitation, the automatic stay) to allow a third party to (i) proceed against any assets of the Debtors having an aggregate value in excess of $25,000,000 or (ii) to pursue other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

(vi)        any of the Credit Parties or any of their Subsidiaries, or any person claiming by or through any of the Credit Parties or their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist, support or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or the Lenders relating to the New Money Credit Facilities; provided, however, that the Debtors shall not be precluded from contesting whether an Event of Default has occurred and is continuing;

(vii)        without the written consent of the Administrative Agent, any Credit Party initiates, joins, supports, pursues, or files any pleading in respect of, or otherwise engages in any litigation seeking to impair the rights, liens, security interests, or claims of, or obligations owing by any Credit Party (or any affiliate thereof) to, the Administrative Agent (in any of such entity's capacities) or the Prepetition Revolving Credit Facility Secured Parties (as defined in the Interim Order) (in any of such entities' capacities);

(viii)        any of the Credit Parties files, or fails to promptly oppose, a motion in any of the Cases seeking the entry of an order charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders, the entry of an order in the Cases that is materially adverse to the Lenders and their respective rights and remedies under the New Money Credit Facilities in any of the Cases, or the commencement of any other actions by the Credit Parties, that challenges the rights and remedies of the Agents or the Lenders under the New Money Credit Facilities in any of the Cases or that is inconsistent with the Credit Documents;

(ix)        without the prior written consent of the Administrative Agent, the entry of an order in any of the Cases (other than the Financing Orders and to the extent otherwise explicitly contemplated by the Credit Documents) authorizing the use of cash collateral or authorizing the Debtors to obtain financing under Section 364 of the Bankruptcy Code (other than this Agreement and to the extent otherwise explicitly contemplated by the Credit Documents), unless such financing would repay in full in cash all Obligations upon consummation thereof;

(x)        without the written consent of the Administrative Agent, the filing by any Credit Party or any of its Subsidiaries of, or failure to promptly oppose, any motion or other request with the Bankruptcy Court seeking authority to grant, adequate protection to any other person other than liens on the Collateral

-103-

that are junior to the Priming Liens (as defined in the DIP Orders) or superpriority claims as provided for in Section 507(b) of the Bankruptcy Code that are junior to the Superpriority Claims and the Carve Out;

(xi)     [reserved];

(xii)    [reserved];

(xiii)   the making of any Prepetition Payments other than (A) as permitted by the Interim Order or the Final Order, (B) as permitted by any First Day Orders, (C) as permitted by any other order of the Bankruptcy Court or (D) that do not otherwise exceed, individually, $1,000,000 and, in each case, is consistent with the Cash Flow Forecast (and, with respect to amounts attributable to decarbonization capital expenditures and pension contributions, the DIP Budget);

(xiv)    [reserved];

(xv)     without the prior written consent of the Administrative Agent, other than the Financing Orders and to the extent explicitly contemplated by the Credit Documents, the filing, or failure to promptly oppose, by any Credit Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court seeking entry of an order granting, or the recognition as valid of, other than in respect of this Agreement, the Carve Out and the DIP Hedges or as otherwise explicitly permitted under the applicable Credit Documents, any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Administrative Agent and the Lenders under the Credit Documents or secured by liens senior to the liens under the Prepetition First Lien Secured Debt, or the adequate protection liens granted to the Prepetition First Lien Parties;

(xvi)    other than with respect to the Carve Out and the Liens permitted to have such priority under the Credit Documents and the Financing Orders, any Credit Party shall create or incur any Lien which is pari passu with or senior to any Liens under the Credit Documents;

(xvii)   noncompliance by any Credit Party or any of its Subsidiaries with the terms of the Interim Order or the Final Order in any material respect;

(xviii)  the filing of a motion, pleading or proceeding by any of the Borrower or any of its controlled Affiliates which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders;

(xix)    a Chapter 11 Plan that does not contemplate an Approved Plan or a schedule providing for the idling, closing and/or sale of the Debtors' operations that is not an acceptable sale to the Required Lenders shall be confirmed in any of the Cases, or any order shall be entered which dismisses any of the Cases, which does not provide for termination of the aggregate Commitments, indefeasible payment in full in cash of the obligations under the Credit Documents and cash collateralize all outstanding Letter of Credit Exposure in the manner set forth in Section 2.14(a)(2), or any of the Credit Parties or any of their subsidiaries, shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a Chapter 11 Plan or the entry of such an order;

(xx)     any Credit Party shall file (or fail to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the Credit Parties (unless such sale would result in the repayment in full in cash of all Obligations and cash collateralization of all outstanding Letter of Credit Exposure in the manner set forth in Section 2.14(a)(ii) and be in conjunction with the termination of any unused Commitments under this Agreement);

(xxi)    the entry of an order by the Bankruptcy Court avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations;

(xxii)    the entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Credit Party that is a Debtor to file a chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders (not to be unreasonably withheld);

(xxiii)    if, unless otherwise approved by the Administrative Agent and the Required Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Cases and such order shall not be reversed or vacated within thirty (30) days;

(xxiv)    if any Credit Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any substantial part of the business affairs of the Credit Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; *provided* that the Credit Parties shall have five (5) Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order;

(xxv)    after entry thereof by the Bankruptcy Court, the order confirming a  Chapter 11 Plan for an Approved Plan shall cease to be in full force and effect, or any Credit Party shall fail to satisfy in full all Obligations or the obligations under the Continuing Letter of Credit Facility or fail to comply in any material respect with the order confirming the Chapter 11 Plan for an Approved Plan, or the order confirming the Chapter 11 Plan for an Approved Plan shall have been revoked, remanded, vacated, reversed, rescinded or, without the reasonable consent of the Administrative Agent, modified or amended;

(xxvi)    the actual or asserted (in writing by any Credit Party or any controlled affiliate thereof) invalidity or impairment of any guarantee provided in any Credit Document for the benefit of any of the Lenders;

(xxvii)    the actual or asserted (in writing by a Credit Party or any controlled affiliate thereof) invalidity of any Lien purported to be created by any Credit Document pursuant to which the assets of any Credit Party are pledged as Collateral or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof); or

(xxviii)    the filing or support of any pleading by any Credit Party or Subsidiary thereof seeking, otherwise consenting to, or failing to promptly oppose, any of the matters set forth in clauses (i) through (xxvii) above or otherwise seek or support any relief of the Bankruptcy Court or any other court of competent jurisdiction that would violate the terms of, or cause a default or event of default under, the Interim Order, the Final Order or any other Credit Document, in each case, without the prior written consent of the Required Lenders;

then, and in every such event set forth in <u>Sections 11.01</u> through and including <u>11.11</u> at such time, and at any time thereafter during the continuance of any such event, but subject to the Financing Orders in all respects, any or all of the following actions may be taken:

if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Credit Party:

(i)    declare the Total Commitment terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately and any Unused Commitment Fee shall forthwith become due and payable without any other notice of any kind;

(ii)    declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due

and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived (to the extent permitted by applicable law) by each Credit Party;

(iii)    terminate any Letter of Credit which may be terminated in accordance with its terms;

(iv)    direct the Borrower to pay to the Collateral Trustee at the Payment Office such additional amount of cash or Cash Equivalents, to be held as security by the Collateral Trustee, as is equal to the aggregate Stated Amount of all Letters of Credit issued for the account of the Borrower and then outstanding;

(v)    enforce, as Collateral Trustee, all of the Liens and security interests created pursuant to the Security Documents in accordance with the terms therein;

(vi)    enforce the guarantees of the Subsidiary Guarantors under the Guarantee and Collateral Agreement in accordance with the terms therein; and

(vii)    apply any cash collateral held by the Administrative Agent pursuant to Section 5.02 to the repayment of the Obligations.

Notwithstanding anything to the contrary herein, subject to the provisions of the Interim Order (and, when entered, the Final Order), including the requirement that the Administrative Agent obtain relief from the automatic stay prior to exercising certain rights and remedies under the Credit Documents, (x) with respect to enforcement of Liens or remedies with respect to Collateral, the Administrative Agent shall provide the Borrower five (5) Business Days' notice prior to taking such action (the "Remedies Notice Period")), and (y) after expiration of the Remedies Notice Period, the Administrative Agent shall, at the direction of the Required Lenders, (x) terminate the consensual use of cash collateral and (y) exercise all other rights and remedies provided for in this Agreement, the other Credit Documents, the Financing Orders and under applicable law.  During the Remedies Notice Period, the Debtors may continue to use cash collateral in the ordinary course of business, consistent with past practices, including for the purpose of funding the Carve Out.  During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court for the purpose of contesting whether an Event of Default has occurred and/or is continuing and/or seeking to stay the Administrative Agent's exercise of any rights and remedies and cash collateral may be used for this purpose during the Remedies Notice Period.

SECTION 12.    The Administrative Agent.

12.01.    Appointment.  The Lenders hereby irrevocably designate and appoint Citibank, N.A. as Administrative Agent (for purposes of this Section 12 and Section 13.01, the term "Administrative Agent" also shall include Citibank, N.A. in its capacity as Collateral Trustee pursuant to the Security Documents) to act as specified herein and in the other Credit Documents.  Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental or related thereto.  The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or Affiliates.

12.02.    Nature of Duties.

(a)    The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents.  Neither the Administrative Agent nor any of its officers, directors, agents, employees or Affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or any of their gross negligence, bad faith or willful misconduct (in each case, as determined by a court of competent jurisdiction in a final and non-appealable decision).  The duties of the Administrative Agent shall be mechanical

-106-

and administrative in nature, the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender or the holder of any Note and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

(b)     Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, the Arrangers are named as such for recognition purposes only, and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Credit Documents or the transactions contemplated hereby and thereby, it being understood and agreed that the Arrangers are entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Sections 12.06 and 13.01. Without limitation of the foregoing, the Arrangers shall not, solely by reason of this Agreement or any other Credit Documents, have any fiduciary relationship or other implied relationship in respect of any Lender or any other Person.

12.03.    Lack of Reliance on the Administrative Agent. Each Lender expressly acknowledges that neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent hereinafter taken, including any review of the affairs of the Borrower, any Subsidiary Guarantor or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower, any Subsidiary Guarantor and any other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement. Independently and without reliance upon the Administrative Agent, each Lender and the holder of each Note, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrower and its Subsidiaries in connection with the making and the continuance of the Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of the Borrower and its Subsidiaries and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter. The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of the Borrower or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of the Borrower or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default, and shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Borrower, any Subsidiary Guarantor or any other Credit Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

12.04.    Certain Rights of the Administrative Agent. If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans. Without limiting the foregoing, neither any Lender nor the holder of any Note shall

-107-

have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

12.05.   Reliance.   The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order, electronic mail message, telephone message or other electronic medium signed, or other document or conversation sent or made by any Person that the Administrative Agent believed to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.

12.06.   Indemnification.   To the extent the Administrative Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrower, and without relieving the Borrower of its obligation to do so, the Lenders agree to reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders (determined as if there were no Defaulting Lenders) on the date such indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Total Commitments in effect immediately prior to such date) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, judgments, costs, expenses or disbursements of whatsoever kind or nature which may at any time (including at any time following the payment of the Loans) be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in any way relating to or arising out of performing its duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, suits, judgments, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence, bad faith or willful misconduct or a material breach of the obligations of the Administrative Agent (or any of its directors, officers, employees, partners, agents and other representatives) under the Credit Documents, in each case, as determined by a court of competent jurisdiction in a final and non-appealable decision.  The Agreements in this Section 12.06 shall survive the payment of the Loans and all other amounts payable hereunder.

12.07.   The Administrative Agent in its Individual Capacity.   With respect to its obligation to make Loans, or issue or participate in Letters of Credit, under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Majority Lenders," "Required Lenders," "Required Revolving Lenders" or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in its respective individual capacities.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

12.08.   Holders.   The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

12.09.    Resignation by the Administrative Agent.

(a)    Subject to the appointment of a successor Administrative Agent pursuant to and in accordance with the time frames set forth in clauses (b), (c) and (d) below, (i) the Administrative Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving thirty (30) days' prior written notice to the Lenders and the Borrower and (ii) if the Person serving as an Administrative Agent is a Defaulting Lender, the Borrower may at any time by giving thirty (30) days' prior written notice to such Person and the Required Lenders remove such Person as Administrative Agent.  Any resignation by Administrative Agent hereunder shall also constitute its resignation as an Issuing Lender, in which case the resigning Administrative Agent (x) shall not be required to issue any further Letters of Credit hereunder upon and after the effective date of such resignation and (y) shall maintain all of its rights as Issuing Lender with respect to any Letters of Credit issued by it prior to the date of such resignation.

(b)    Such resignation or removal shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(c)    Upon any such notice of (i) resignation by the Administrative Agent, the Required Lenders shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank with a combined capital and surplus of at least $1,000,000,000 acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (provided that the Borrower's approval shall not be required if a Specified Default then exists) and (ii) removal by the Borrower, the Borrower shall appoint a successor Administrative Agent hereunder or thereunder who shall be a commercial bank with a combined capital and surplus of at least $1,000,000,000.

(d)    In the case of resignation by the Administrative Agent, if a successor Administrative Agent shall not have been so appointed within such thirty (30) day period, the Administrative Agent, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed (provided that the Borrower's consent shall not be required if a Specified Default then exists)), shall then appoint a successor Administrative Agent who shall serve as Administrative Agent hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(e)    If no successor Administrative Agent has been appointed pursuant to clause (b) or (c) above by the 30th day after the date such notice of resignation was given by the Administrative Agent or notice of removal was given by the Borrower, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(f)    Upon a resignation or removal of the Administrative Agent pursuant to this Section 12.09, the Administrative Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 12 (and the analogous provisions of the other Credit Documents) shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

12.10.    Collateral Matters.

(a)    Each Lender authorizes and directs the Collateral Trustee to enter into the Security Documents (including the First Lien Intercreditor Agreement and any other intercreditor agreement contemplated hereby) for the benefit of the Lenders and the other Secured Parties.  Each Lender hereby agrees, and each holder of any Note or participant in Letters of Credit by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders. The Collateral Trustee is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time, to take any action with respect to any Collateral or Security

-109-

Documents which may be necessary to create, perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to the Security Documents.

(b)     The Lenders hereby authorize the Collateral Trustee to release any Lien granted to or held by the Collateral Trustee upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations (other than contingent obligations not due and payable and Letters of Credit that are cash collateralized, back-stopped by a letter of credit or otherwise been agreed to remain outstanding by the applicable Issuing Lender, in each case on terms reasonably acceptable to the applicable Issuing Lender) at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold, transferred or otherwise disposed of (to Persons other than the Borrower and one or more Subsidiary Guarantors) upon the sale, transfer or other disposition thereof in compliance with the relevant provisions of this Agreement, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 13.10), (iv) as otherwise may be expressly provided in the relevant Security Documents, (v) if the property subject to such Lien is owned by a Subsidiary Guarantor, upon release of such Subsidiary Guarantor from its obligations under the Guarantee and Collateral Agreement in accordance with the terms therein and (vi) in lieu of any release permitted pursuant to this Section 12.10(b), the Collateral Trustee may subordinate any such Liens on the Collateral to another Lien permitted under Section 10.01 and may subordinate any Lien on the Collateral that the Collateral Trustee determines in its commercially reasonable judgment was intended by operation of Law or otherwise to be subordinate to another Lien permitted under Section 10.01.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Trustee's authority to release particular types or items of Collateral pursuant to this Section 12.10.

(c)     Without limiting the generality of Section 12.01 above, the Collateral Trustee shall have the sole and exclusive right and authority (to the exclusion of the Lenders), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Secured Parties with respect to all payments and collections arising in connection with the Credit Documents (including in any proceeding described in Section 11.05 or any other bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with any Credit Document to any Secured Party is hereby authorized to make such payment to the Collateral Trustee, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any proceeding described in Section 11.05 or any other bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Secured Party), (iii) act as collateral agent or collateral trustee for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Credit Documents, (vi) except as may be otherwise specified in any Credit Document, exercise all remedies given to the Collateral Trustee and the other Secured Parties with respect to the Collateral, whether under the Credit Documents, applicable requirements of law or otherwise and (vii) execute any amendment, consent or waiver under the Security Documents on behalf of the Secured Parties, to the extent consented to in accordance with Section 13.10 and the terms thereof; provided, however, that the Collateral Trustee hereby appoints, authorizes and directs each Lender, to the extent such Lender is not prohibited by doing so under any applicable law or regulation, to act as collateral sub-agent for the Collateral Trustee and the other Secured Parties for purposes of the perfection of all Liens with respect to the Collateral, including any deposit account maintained by a Credit Party with, and cash and Permitted Investments held by such Secured Party and may further authorize and direct the Secured Parties to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to the Collateral Trustee, and each Secured Party hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(d)     The Collateral Trustee shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Trustee herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Trustee in this Section 12.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the

#95606088v60

98679498

Collateral Trustee may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Trustee's own interest in the Collateral as one of the Lenders and that the Collateral Trustee shall have no duty or liability whatsoever to the Lenders, except for its gross negligence, bad faith, willful misconduct or material breach of the Credit Documents (as determined by a court of competent jurisdiction in a final and non-appealable decision).

12.11.   Delivery of Information.  The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Restricted Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

12.12.   First Lien Intercreditor Agreement.  The Administrative Agent and the Collateral Agent are authorized to enter into the First Lien Intercreditor Agreement (and any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to, and extensions, restructuring, renewals, replacements of, such agreement in connection with the incurrence by any Credit Party of any Indebtedness permitted hereunder and which is to be equally and ratably secured by the Collateral) or any other intercreditor agreement contemplated hereby in connection with any Indebtedness permitted hereunder and which is to be secured on a pari passu or junior priority basis by the Collateral, in each case in order to permit such Indebtedness to be secured by a valid, perfected Lien (with such priority as may be designated by the Borrower or relevant Restricted Subsidiary, to the extent such priority is permitted hereunder), and the parties hereto acknowledge that (x) in the case of pari passu Indebtedness, the First Lien Intercreditor Agreement and (y) in the case of any subordinated or junior lien Indebtedness, such other intercreditor agreement will be binding upon them. Each Lender (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the First Lien Intercreditor Agreement or any other intercreditor agreement (if entered into) and (b) hereby authorizes and instructs the Administrative Agent and Collateral Trustee to enter into the First Lien Intercreditor Agreement or any other intercreditor agreement, as applicable (and any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to, such agreements in connection with the incurrence by any Credit Party of any Indebtedness permitted hereunder and which is to be equally and ratably secured by the Collateral or any Indebtedness permitted hereunder and which is to be secured on a pari passu or junior priority basis by the Collateral, in order to permit such Indebtedness to be secured by a valid, perfected Lien (with such priority as may be designated by the Borrower or relevant Restricted Subsidiary, to the extent such priority is permitted hereunder)), and to subject the Liens on the Collateral securing the Obligations to the provisions thereof. The foregoing provisions are intended as an inducement to any potential provider of Indebtedness as described above to extend credit to the Credit Parties and such providers of Indebtedness are intended third-party beneficiaries of such provisions and the provisions of the First Lien Intercreditor Agreement or other intercreditor agreement as contemplated above.

SECTION 13.   Miscellaneous.

13.01.   Payment of Expenses, etc.

(a)   The Borrower hereby agrees: (i)(a) to pay or reimburse the Administrative Agent, the Collateral Trustee, the Arrangers and each Issuing Lender for all reasonable and documented out-of-pocket costs and expenses incurred on, prior to, or after the Closing Date associated with the syndication of the Loans and Commitments incurred under this Agreement and the preparation, negotiation, execution and administration of this Agreement and the other Credit Documents, and any amendment, waiver, consent or other modification with respect hereto and thereto (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby (including, but not limited to, due diligence expenses, syndication expenses, travel expenses and reasonable and documented out-of-pocket fees, charges and disbursements of the Agent Advisors but in the case of legal fees and expenses, limited to the reasonable and documented out-of-pocket fees, charges and disbursements of Davis Polk & Wardwell LLP (and, if necessary, of

-111-

one local counsel in any relevant jurisdiction) and (b) from and after the Closing Date, to pay or reimburse the Administrative Agent, the Collateral Trustee, any Issuing Lender and each Lender for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Credit Documents (including the reasonable and documented out-of-pocket fees, charges and disbursements of the Agent Advisors and all such costs and expenses incurred during any insolvency, bankruptcy or other legal proceeding, which in the case of legal fees and expenses, shall be limited to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to the Administrative Agent, the Collateral Trustee and the Lenders, collectively, and, if necessary, of one local counsel in any relevant jurisdiction and, in the event of any actual or potential conflict of interest, one additional counsel of each group of affected parties), in each case promptly following receipt by the Borrower of a written demand therefor; and (ii) to indemnify the Administrative Agent, the Collateral Trustee, each Issuing Lender and each Lender, the Arrangers and each of their respective directors, officers, employees, partners, agents and other representatives of each of the foregoing and their respective successors (each, an "Indemnified Person") from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements, joint or several (in the case of legal fees and expenses limited to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnified Persons taken as a whole (and, if reasonably necessary, of one local counsel in any relevant jurisdiction to all Indemnified Persons taken as whole, and, in the event of an actual or perceived conflict of interest, one additional counsel to all affected Indemnified Persons taken as a whole)) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not the Administrative Agent, the Collateral Trustee, the Arrangers, each Issuing Lender, an Arranger or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) related to the entering into and/or performance of this Agreement or any other Credit Document or the use of any Letter of Credit or the proceeds of any Loans or Letters of Credit hereunder or the consummation of the other transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, or (b) any of the foregoing relating to any Environmental Claim arising out of the operations of the Borrower or any of its Subsidiaries or any of their respective properties, including, in each case, without limitation, the reasonable fees and disbursements of one counsel incurred in connection with any such investigation, litigation or other proceeding, and, if necessary, of one local counsel in any relevant jurisdiction and, in the event of any actual or potential conflict of interest, one additional counsel of each group of Indemnified Persons (but excluding any losses, liabilities, claims, damages or expenses to the extent incurred by reason of (x) the gross negligence, bad faith or willful misconduct of the Indemnified Person to be indemnified (or any such Indemnified Person's affiliates and controlling persons or any of its or their respective directors, officers, employees, partners, agents and other representatives) as determined by a court of competent jurisdiction in a final and non-appealable decision, (y) a material breach of the obligations of such Indemnified Person (or any such Indemnified Person's affiliates and controlling persons or any of its or their respective directors, officers, employees, partners, agents and other representatives) under the Credit Documents as determined by a court of competent jurisdiction in a final and non-appealable decision and (z) any dispute solely among Indemnified Persons (other than claims against the Administrative Agent, the Collateral Trustee, any Issuing Lender, any Arranger or any of their respective Affiliates in its capacity or in fulfilling its role as Administrative Agent, Collateral Trustee, Issuing Lender, Arranger or any other similar role hereunder and under any of the other Credit Documents) and not arising out of any act or omission of the Borrower or any of its respective Subsidiaries.  To the extent that the undertaking to indemnify, pay or hold harmless the Administrative Agent, the Collateral Trustee, any Issuing Lender, any Arranger, any Lender or any of their Affiliates set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.  This Section 13.01(a) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)    To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent, the Collateral Trustee or an Issuing Lender under paragraph (a) or (b) of this Section 13.01, each Lender severally agrees to pay to the Administrative Agent, the Collateral Trustee or such Issuing Lender, as the case may be, in proportion to such Lender's "percentage" as used in determining the Required Lenders (determined as if there were no Defaulting Lenders) determined as of the time that the applicable unreimbursed

-112-

expense or indemnity payment is sought (or, the applicable unreimbursed expense or indemnity payment is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Total Commitments in effect immediately prior to such date) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Collateral Trustee or an Issuing Lender in their capacity as such.

(c)     To the fullest extent permitted by applicable law, each party hereto shall not assert, and hereby waives, any claim (except as contemplated by the proviso to the second succeeding sentence) against any Indemnified Person or any party hereto, on any theory of liability, for special, indirect, consequential, punitive or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit, or the use of the proceeds of the foregoing.  No Indemnified Person shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, including, without limitation, SyndTrak, IntraLinks, the internet, email or similar electronic transmission systems, in each case, except to the extent any such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of, or material breach of any Credit Document by, such Indemnified Person (or its officers, directors, employees or Affiliates).  None of the Indemnified Persons or the Borrower or any of their respective Affiliates or the respective directors, officers, employees and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Agreement, the other Credit Documents or the transactions contemplated hereby or thereby; provided, that nothing contained in this sentence shall limit the Borrower's indemnification and reimbursement obligations to the extent set forth herein in respect of damages incurred or paid by an Indemnified Person to a third party.  The Borrower shall not be liable for any settlement of any legal proceeding effected without its consent (which consent shall not be unreasonably withheld or delayed), but if settled with the Borrower's written consent, or if there is a final judgment for the plaintiff against an Indemnified Person in any such legal proceeding, the Borrower agrees to indemnify and hold harmless each Indemnified Person in the manner set forth above.  The Borrower shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened legal proceeding against such Indemnified Person in respect of which indemnity could have been sought hereunder by such Indemnified Person unless (a) such settlement includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such legal proceeding and (b) such settlement does not include any statement as to any admission.

13.02.   Right of Setoff.  Subject to the Financing Orders and the final paragraph of Section 11, in addition to any rights now or hereafter granted under applicable law or otherwise and subject to the terms of the Guarantee and Collateral Agreement, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, but subject to the last sentence hereof, each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) (other than accounts used exclusively for payroll, taxes, fiduciary and trust purposes, employee benefits and petty cash) and any other Indebtedness at any time held or owing by such Lender (including, without limitation, by branches and agencies of such Lender wherever located) to or for the credit or the account of the Borrower or any of its Restricted Subsidiaries against and on account of the Obligations then due and owing (whether at stated maturity, by acceleration or otherwise) and liabilities of the Credit Parties to such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to Section 13.04(c), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document in each case to the extent then due and owing; provided that, in the event that any Defaulting Lender shall exercise any such right of set-off, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.14 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Issuing Lender and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such

-113-

application made by such Lender; provided that the failure to give such notice shall not affect the validity of such application.

13.03.    Notices.

(a)    Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including .pdf, telegraphic, telecopier or cable communication) and mailed, telegraphed, telecopied, cabled or delivered:  (i) if to any Credit Party, at the address specified opposite its signature below or in the other relevant Credit Documents; (ii) if to any Lender, at its address specified on Schedule 1.01(a); and (iii) if to the Administrative Agent, at the Notice Office or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.  All such notices and communications shall, when mailed, telegraphed, telecopied, or cabled or sent by overnight courier, be effective when received if received during the recipient's normal business hours.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent (it being agreed that all such notices and other communications may be sent via email or by way of posting by the Borrower or by another Person on the Borrower's behalf on a relevant website, if any, to which each Lender and the Administrative Agent have access).  Each of the Administrative Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

13.04.    Benefit of Agreement; Assignments; Participations.

(a)    This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective permitted successors and assigns of the parties hereto; provided, however, the Borrower may not assign or transfer any of its rights, obligations or interest hereunder or under the other Credit Documents without the prior written consent of the Lenders and; provided, further, that, although any Lender may grant participations to Loan Participants in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments hereunder except as provided in Sections 2.13 and 13.04(c)) and the Loan Participant shall not constitute a "Lender" hereunder and; provided, further, that no Lender shall transfer or grant any participation under which the Loan Participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final scheduled maturity of any Loan, Note or Letter of Credit (unless such Letter of Credit is not extended beyond the applicable Maturity Date) in which such Loan Participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates, which shall not be considered to be a reduction in the rate of interest or fees) or reduce the principal amount thereof, or increase the amount of the Loan Participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment or a mandatory prepayment of the Loans shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any Loan Participant if the Loan Participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral under all of the Security Documents or all or substantially all of the value of the guarantees provided by the Subsidiary Guarantors under the Security Documents (except as expressly provided in the Credit Documents) supporting the Loans or Letters of Credit hereunder in which such Loan Participant is participating.  In the case of any such participation, the Loan Participant shall not have any rights under this Agreement or any of the other Credit Documents (the Loan Participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the Loan Participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

(b)    (i) Any Issuing Lender may assign to one or more commercial banks that issue letters of credit in the ordinary course of business, all or a portion of its rights and obligations under the unused portion of its Letter of

-114-

Credit Commitment at any time with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)     The Borrower (such consent deemed to have been made with respect to any assignment if the Borrower has not responded within twenty (20) Business Days after delivery of notice of such assignment to an Authorized Officer of the Borrower); provided that no consent of the Borrower shall be required if a Specified Default has occurred and is continuing; and

(B)     the Administrative Agent.

(ii)     The parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Assumption Agreement, together with a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent).

(c)     (i) Subject to the conditions set forth in paragraph (c)(ii) below, any Lender may assign to one or more assignees constituting an Eligible Transferee ("Assignees") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans (including for purposes of this Section 13.04(c), participations in Letters of Credit at the time owing to it)) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)     the Borrower (such consent deemed to have been made with respect to any assignment if the Borrower has not responded within ten (10) Business Days of receipt of notice of such assignment by an Authorized Officer of the Borrower); provided that no consent of the Borrower shall be required for (i) with respect to an assignment related to Revolving Loan Commitments or Revolving Loans to a Revolving Lender or an Affiliate of a Revolving Lender engaged in making, purchasing, holding or otherwise investing in revolving loans in the ordinary course of its activities and which Affiliate is commonly used by the assigning Lender to fund revolver borrowings of large corporate borrowers, (ii) with respect to Term Loans, to a Lender, an Affiliate of a Lender or an Approved Fund or (ii) if a Specified Default has occurred and is continuing, any Assignee;

(B)     the Administrative Agent;

(C)     other than with respect to an assignment of Term Loans, each Issuing Lender at the time of such assignment; and

(D)     [reserved].

The Administrative Agent shall furnish the list of Disqualified Institutions provided by the Borrower (as it may be updated, supplemented or modified from time to time) to each Lender, each prospective Assignee and each prospective Loan Participant requesting the same in connection with an assignment or participation.

Notwithstanding the foregoing or anything to the contrary set forth herein, no assignment of any Loans or Commitments may be made to the Borrower or any Subsidiary or Affiliate of the Borrower.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than an amount of $5,000,000 in the case of the Revolving Facility or $1,000,000 in the case of Term Loans and shall, in each case, be in increments of an amount of $1,000,000 in excess thereof unless each of the Borrower and the

#95606088v60

98679498

Administrative Agent otherwise consents; <u>provided</u> that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption Agreement, together with a processing and recordation fee of $3,500; <u>provided</u> that the Administrative Agent, in its sole discretion, may elect to waive such processing and recordation fee; and

(C)     no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to <u>Section 13.12</u>.

This paragraph (c) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Classes on a non-<u>pro rata</u> basis among such Classes. To the extent of any assignment pursuant to this <u>Section 13.04(c)</u>, the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Loans. At the time of each assignment pursuant to this <u>Section 13.04(c)</u> to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the Borrower the appropriate IRS Forms and documentation under FATCA described in <u>Section 5.04(f)</u>. To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to <u>Section 2.13</u> or this <u>Section 13.04(c)</u> would, at the time of such assignment, result in increased costs under <u>Section 2.10</u> or <u>3.06</u> from those being charged by the respective assigning Lender prior to such assignment, or additional sums pursuant to <u>Section 5.04(a)</u>, then the Borrower shall not be obligated to pay such increased costs (although the Borrower, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment) or such additional sums.

(d)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank or other central bank having jurisdiction over such Lender in support of borrowings made by such Lender from such Federal Reserve Bank or such central bank, any Lender may pledge all or any portion of its Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be. No pledge pursuant to this clause (d) shall release the transferor Lender from any of its obligations hereunder.

(e)     Any Lender which assigns all of its Commitments and/or Loans hereunder in accordance with <u>Section 13.04(c)</u> shall cease to constitute a "<u>Lender</u>" hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, <u>Sections 2.10</u>, <u>2.11</u>, <u>3.06</u>, <u>5.04</u>, <u>12.06</u>, <u>13.01</u> and <u>13.06</u>), which shall survive as to such assigning Lender.

(f)     [Reserved].

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "<u>Granting Lender</u>") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "<u>SPC</u>") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; <u>provided</u>, that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall, as a result of any Change in Law, increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under <u>Section 2.10</u>, <u>2.11</u> or <u>5.04</u>), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Credit Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the

-116-

Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC.

(h)     The Borrower agrees that each Loan Participant shall be entitled to the benefits of Sections 2.10, 3.06 and 5.04 (subject to the requirements and limitations therein, including the requirements under Section 5.04(f) (it being understood that the documentation required under Section 5.04(f) shall be delivered by the Loan Participant to its participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment; provided that such Loan Participant (A) agrees to be subject to the provisions of Section 2.13 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Sections 2.10, 3.06 or 5.04, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Loan Participant and the principal amounts (and stated interest) of each Loan Participant's interest in the Loans or other obligations under the Credit Documents (the "Participant Register"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Loan Participant or any information relating to a Loan Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person, except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

13.05.   No Waiver; Remedies Cumulative. No failure or delay on the part of the Administrative Agent, the Collateral Trustee, any Issuing Lender or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent, the Collateral Trustee, any Issuing Lender or any Lender shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Trustee, any Issuing Lender or any Lender would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Trustee, any Issuing Lender or any Lender to any other or further action in any circumstances without notice or demand.

13.06.   Payments Pro Rata.

(a)     Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than any Lender that has consented in writing to waive its pro rata share of any such payment) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)     Each of the Lenders agrees that, except as otherwise provided in this Agreement, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans, Unpaid Drawings, Unused Commitment Fee or Letter of Credit Fees, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to

-117-

such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c)     Notwithstanding anything to the contrary contained herein, the provisions of the preceding clauses (a) and (b) shall be subject to the express provisions of this Agreement which, among other things, require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

13.07.   GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.

(a)     THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE).  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, EACH PARTY HERETO HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE AFORESAID COURTS.  EACH PARTY HERETO HEREBY FURTHER IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER SUCH PARTY.  EACH PARTY HERETO FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF (i) ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR (ii) THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER IN ANY OTHER JURISDICTION.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)      EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.08.   Counterparts.

(a)      This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Credit Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 13.19, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)      The words "execution," "signed," "signature," and words of like import in this Agreement and the other Credit Documents, including any Assignment and Assumption Agreement, shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

13.09.   Headings Descriptive.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

13.10.   Amendment or Waiver; etc.

(a)      Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Guarantee and Collateral Agreement and the other Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders); provided that no such change, waiver, discharge or termination shall, without the consent of each directly and adversely affected Lender (but not the Required Lenders) (i) extend the final scheduled maturity of any Commitment, Loan or Note or extend the stated expiration date of any Letter of Credit beyond the applicable Maturity Date of such Lender holding such Loan or Note, (ii) reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or reduce (or forgive) the principal amount thereof of such Lender holding such Loan or Note or (iii) (x) amend Section 13.06 or any similar provision of this Agreement or any other Credit Document in a manner that would alter the *pro rata* sharing of payments required thereby or (y) amend Section 5.02(f) or any similar provision of this Agreement or any other Credit Document (including Section 4.1 of the First Lien Intercreditor Agreement) in a manner that would alter the priority of payments required therein or (iv) amend the definition of "Approved Plan"; provided, further, that no such change, waiver, discharge or termination shall, without the consent of each Lender (i) release all or substantially all of the Collateral under all the Security Documents or all or substantially all of the value of the guarantees provided by the Subsidiary Guarantors under the Security Documents (except as expressly provided in the Credit Documents), (ii) amend, modify or waive any provision of this Section 13.10(a) which would result in the reduction of the voting thresholds specified herein (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to any existing Tranche or as otherwise provided herein), (iii) reduce the

-119-

"majority" voting threshold specified in the definition of "Required Lenders" or "Required Revolving Lenders" or change any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, (iv) amend or modify the Superpriority Claim status of the Lenders under the Financing Orders or under any Credit Document or (v) change or alter the priority of security interest of the Lenders in the Collateral under the Intercreditor Agreement or any other Credit Document or subordinating the Liens securing the Loans; provided, further, that no such change, waiver, discharge or termination shall (i) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitment or a mandatory repayment or commitment reduction of Loans shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (ii) without the consent of each Issuing Lender, amend, modify or waive any provision of Section 3 (as applies to such Issuing Lender) or adversely alter its rights or obligations with respect to Letters of Credit issued by it under this Agreement, (iii) [reserved], (iv) without the consent of the Administrative Agent, amend, modify or waive any provision of Section 12 or any other provision as same relates to the rights or obligations of the Administrative Agent, including, without limitation, Section 11.11(vii), (v) without the consent of Collateral Trustee, amend, modify or waive any provision relating to the rights or obligations of the Collateral Trustee, (vi) without the consent of the Majority Lenders of the respective Class affected thereby, amend the definition of "Majority Lenders" to reduce the voting threshold (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Majority Lenders on substantially the same basis as the extensions of Loans and Commitments are included on the Closing Date) and (vii) without the consent of each Lender, amend, modify or waive any provision of Section 3.02.

(b)     [Reserved].

(c)     [Reserved].

(d)     Notwithstanding anything to the contrary contained in this Section 13.10, the Borrower, the Administrative Agent and each Lender agreeing to make Incremental Term Loans may, in accordance with the provisions of Section 2.15, enter into an Incremental Amendment without the consent of the Required Lenders; provided that after the execution and delivery by the Borrower, the Administrative Agent and each such Lender of such Incremental Amendment, such Incremental Amendment may thereafter only be modified in accordance with the requirements of Section 13.10(a).

(e)     Notwithstanding anything to the contrary contained in this Section 13.10, Security Documents (including any Additional Security Documents), intercreditor agreements and related documents executed in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be amended, modified, supplemented and waived with the consent of the Administrative Agent and the Borrower without the need to obtain the consent of any other Person if such amendment, modification, supplement or waiver is delivered in order to (i) comply with local Law (including any foreign law or regulatory requirement) or advice of local counsel, (ii) to cure ambiguities, inconsistency, omissions, mistakes or defects or (iii) to cause such Security Document or other document to be consistent with this Agreement and the other Credit Documents.

(f)     If following the Closing Date, the Administrative Agent and any Credit Party shall have jointly identified an inconsistency, obvious error, or mistake or any error, mistake or omission of a technical nature, in each case, in any provision of the Credit Documents, then the Administrative Agent and the Credit Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Credit Documents and, in cases not covered by preceding clause (e), if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

(g)     Notwithstanding anything to the contrary contained in this Section 13.10 or elsewhere in this Agreement, the Letter of Credit Commitment of any Issuing Lender may be increased or decreased solely with the

#95606088v60

98679498

written consent of such Issuing Lender and the Borrower and upon the provision of such written consent of such increase or decrease to the Administrative Agent.

Notwithstanding the foregoing, the consent of the Required Revolving Lenders shall be necessary (and no consent of any other Lender shall be required) to waive any condition to borrowing Revolving Loans and issuing Letters of Credit set forth in Section 6.03.

13.11.   Survival.  All indemnities set forth herein including, without limitation, in Sections 2.10, 2.11, 3.06, 5.04, 12.06 and 13.01 shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Obligations.

13.12.   Register.  The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this Section 13.12, to maintain a register (the "Register") on which it will record the Commitments from time to time of each of the Lenders, the Loans made by each of the Lenders and each repayment in respect of the principal amount of, or stated interest on, the Loans of each Lender.  Any Term Loans that are not fungible for U.S. federal income tax purposes with another Class of Term Loans shall be recorded separately from any other Class of Loans in the Register.  Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Loans.  With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor.  The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Register upon and only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 13.04(b).  Upon such acceptance and recordation, the assignee specified therein shall be treated as a Lender for all purposes of this Agreement. Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender.  The Register shall be available for inspection by the Borrower or any Lender (solely with regards to Commitments or Loans of such Lender) at any reasonable time and from time to time upon reasonable prior notice.

13.13.   Confidentiality.  Each Lender agrees that it will not disclose (without the prior written consent of the Borrower) (other than to its employees, agents, representatives, auditors, advisors or counsel, its Affiliates involved in the transactions contemplated hereby or the administration of the Credit Documents on a "need to know" basis or to another Lender if such Lender or such Lender's holding or parent company in its reasonable discretion determines that any such party should have access to such information; provided such Persons shall be subject to the provisions of this Section 13.13 to the same extent as such Lender) any information with respect to the Borrower or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document; provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 13.13, (ii) as may be required in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors (provided that, except with respect to disclosures to supervisory or regulatory authorities having jurisdiction over such Lender, the applicable Lender shall give the Borrower prompt notice of such disclosure to the extent permitted by law, rule or regulation), (iii) as may be required in respect to any summons or subpoena or in connection with any litigation (provided that the applicable Lender shall give the Borrower prompt notice of such disclosure to the extent permitted by law, rule or regulation), (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender or as requested by a Governmental Authority (provided that, except with respect to disclosures to supervisory or regulatory authorities having jurisdiction over such Lender, the applicable Lender shall give the Borrower prompt notice of such disclosure to the extent permitted by law, rule or regulation), (v) to the extent such information is received by the Administrative Agent or Lender from a third party that is not known by the Administrative Agent or

-121-

such Lender to be subject to confidentiality arrangements to the Borrower or any of its Subsidiaries, (vi) to the Administrative Agent or the Collateral Trustee, (vii) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement or to any such contractual counterparty's professional advisor (other than a Disqualified Institution), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 13.13, (viii) to any prospective or actual Eligible Transferee in connection with any contemplated transfer or participation of any of the Notes or Commitments or any interest therein by such Lender otherwise permitted by this Agreement; provided that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section 13.13 or provisions no less restrictive than those contained in this Section 13.13, (ix) for purposes of establishing a "due diligence" defense, (x) solely to the extent that such information is independently developed by the Administrative Agent or such Lender without any confidential information provided by (or on behalf of) any Credit Party (xi) on a confidential basis, to any rating agency in connection with rating the Borrower or its Subsidiaries or the facilities hereunder, (xii) with the express written consent of the Borrower or (xiii) limited to the existence of the New Money Credit Facilities, and the amount, type and Closing Date of the New Money Credit Facilities may be disclosed to market data collectors, similar service providers to the lending industry, and service providers to the Lenders in connection with the administration and management the New Money Credit Facilities.

13.14.   No Advisory or Fiduciary Responsibility.   In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), the Borrower and each other Credit Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (i)(A) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arrangers and the Lenders are arms-length commercial transactions between the Borrower, each other Credit Party and their respective Affiliates, on the one hand, and the Administrative Agent, the Arrangers and the Lenders, (B) each of the Borrower and each other Credit Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower and each other Credit Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; (ii) (A) the Administrative Agent, the Arrangers and the Lenders are, and have been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, any other Credit Party or any of their respective Affiliates, or any other Person and (B) none of the Administrative Agent, any Arranger nor any Lender has any obligation to the Borrower, any other Credit Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents or as expressly agreed in writing by the relevant parties the Administrative Agent, the Arrangers and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Credit Parties and their respective Affiliates, and none of the Administrative Agent, any Arranger nor any Lender has any obligation to disclose any of such interests to the Borrower, any other Credit Party or any of their respective Affiliates.

13.15.   PATRIOT ACT.   Each Lender subject to the PATRIOT Act hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower and the other Credit Parties and other information that will allow such Lender to identify the Borrower and the other Credit Parties in accordance with the PATRIOT Act.

13.16.   Post-Closing Actions.   Notwithstanding anything to the contrary contained in this Agreement or the other Credit Documents, the parties hereto acknowledge and agree that the Borrower and its Restricted Subsidiaries shall be required to take the actions specified in Schedule 13.16 attached hereto as promptly as practicable, and in any event within the time periods set forth in Schedule 13.16 as such time periods may be extended in the sole discretion of the Administrative Agent or the Collateral Trustee, as applicable.  The provisions of Schedule 13.16 shall be deemed incorporated by reference in this Section 13.16 as fully as if set forth herein in its entirety.

All conditions precedent, representations and covenants contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above, rather than as elsewhere provided in the Credit Documents); provided that (x) to the extent any representation and warranty would not be true because the

-122-

foregoing actions were not taken on the Closing Date, the respective representation and warranty shall be required to be true and correct in all material respects at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 13.16 and (y) all representations and warranties relating to the Security Documents shall be required to be true in all material respects immediately after the actions required to be taken by this Section 13.16 have been taken.  The acceptance of the benefits of each Credit Event shall constitute a representation, warranty and covenant by the Borrower to each of the Lenders that the actions required pursuant to this Section 13.16 will be, or have been, taken within the relevant time periods referred to in this Section 13.16 and that, at such time, all representations and warranties contained in this Agreement and the other Credit Documents shall then be true and correct in all material respects without any modification pursuant to this Section 13.16.

13.17.   Interest Rate Limitation.   Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

13.18.   Lender Action.   Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy pursuant to any of the Credit Documents against any Credit Party or any other obligor in each case, under any of the Credit Documents (including the exercise of any right of set-off, rights on account of any banker's lien or similar claim or other rights of self-help (other than any such rights afforded by Section 13.02 hereof)), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Credit Party as a Lender in connection with any of the Credit Documents, unless expressly provided for herein (including, without limitation, pursuant to Section 13.02 hereof) or in any other Credit Document, without the prior written consent of the Administrative Agent.

13.19.   Effectiveness.   This Agreement shall become effective on the date on which the Borrower, the Administrative Agent and each of the Lenders shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered (by electronic transmission or otherwise) the same to the Administrative Agent at the Notice Office or, in the case of the Lenders, shall have given to the Administrative Agent telephonic (confirmed in writing), written or telex notice (actually received) at such office that the same has been signed and mailed to it.

13.20.   Domicile of Loans.   Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender (other than a Disqualified Institution).  Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 13.20 would, at the time of such transfer, result in increased costs under Section 2.10, 2.11(a), 3.06 or 5.04 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay for or otherwise indemnify such Lender for such increased costs (although the Borrower shall be obligated to pay for and indemnify such Lender for any other increased costs of the type described above resulting from changes after the date of the respective transfer to the extent provided for in Sections 2.10, 2.11(a), 3.06 or 5.04).

13.21.   Acknowledgement and Consent to Bail-In of Affected Financial Institutions.   Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

#95606088v60

98679498

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)   the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

13.22.   Acknowledgement Regarding Any Supported QFCs.  To the extent that the Credit Documents provide support, through a guarantee or otherwise, for any  agreement or instrument that is a QFC (such support, "QFC Credit Support", and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)     In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.; and

(b)     As used in this Section 13.22, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

-124-

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

13.23.   Erroneous Payments.  If the Administrative Agent notifies a Lender or any Person who has received funds on behalf of a Lender, such Lender (any such Lender or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)   Without limiting immediately preceding clause (a), each Lender, or any Person who has received funds on behalf of a Lender, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)   (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)   such Lender shall (and shall cause any other recipient that receives funds on its behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 13.23(b).

(c)   Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Credit Document, or otherwise payable or distributable by the Administrative Agent to such Lender from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)   In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its behalf) (such unrecovered

-125-

amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its Commitments) of the relevant class with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption Agreement with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent, (ii) the Administrative Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender and (iv) the Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.

(e)     The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender, Issuing Lender or Secured Party, to the rights and interests of such Lender, Issuing Lender or Secured Party, as the case may be) under the Credit Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") (provided that the Credit Parties' Obligations under the Credit Documents in respect of the Erroneous Payment Subrogation Rights shall not be duplicative of such Obligations in respect of Loans that have been assigned to the Administrative Agent under an Erroneous Payment Deficiency Assignment) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Credit Party; provided that this Section 13.23 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt, the immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for the purpose of making such Erroneous Payment.

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)     Each party's obligations, agreements and waivers under this Section 13.23 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Credit Document.

13.24.    Conflicts; Financing Orders Control. In the event of any conflict between the provisions of this Agreement and those of any other Credit Document, the provisions of this Agreement shall control. To the extent that any specific provision hereof or of any Credit Document is inconsistent with any of the DIP Orders, the Interim Order or Final Order (as applicable) shall control.

[signature pages follow]

\*    \*    \*

-127-

**Exhibit B**

**Cleansing Materials**

Subject to FRE 408
Strictly Confidential
Subject to Material Change



# Talen Energy Supply ("TES")
# DIP PFE Increase

June 2022



Subject to FRE 408
Strictly Confidential
Subject to Material Change

# Executive Summary

- The power and gas markets remain strong and favorable to the company

- Jan/Feb 2023 winter pricing exceeding $100MWh on ~5GW of generation

- The company has executed the $1.3 billion equity backstop commitment letter, consistent with the RSA previously announced

    o TALEN ENERGY CORPORATION ("TEC") ANNOUNCES THAT ITS TALEN ENERGY SUPPLY SUBSIDIARY ("TES") HAS RECEIVED A $1.3 BILLION EQUITY INVESTMENT COMMITMENT - Jun 3, 2022 (investorroom.com)

    o Talen Energy Corporation ("TEC") Announces Transformative Recapitalization of Talen Energy Supply ("TES") to Strengthen Balance Sheet, Fund ESG and Data Center Growth Initiatives, and Maximize Value to Stakeholders

© Talen Energy Supply | Proprietary and Confidential



Subject to FRE 408
Strictly Confidential
Subject to Material Change

# Executive Summary

- Since petition date, company has hedged ~13K GWh in PJM using fixed price swaps, focusing on the near-term summer MWh in immediate play

- However, volatility has remained high and the current $750 million potential future exposure (PFE) limit has been reached

- This has left the company hedged meaningfully below target for the Jan/Feb 2023 winter with only 28% hedged; gives the company the opportunity to lock in elevated margin for its highest cash flow generating period (and avoid risk if prices revert to lower historic levels)

- Company is requesting a short-term $425 million increase in PFE Limit, taking the limit from $750 million to $1.175 billion from the effective date to November 1, 2022; no changes to risk policy or types of trades

- The PFE capacity will be used to add incremental hedges to lock-in additional gross margin for balance of 2022 and PJM winter 2023 until summer 2022 positions are settled



Subject to FRE 408
Strictly Confidential
Subject to Material Change

# PJM Forward Commodity Prices Through 2024 as of 5/26/2022



Subject to FRE 408
Strictly Confidential
Subject to Material Change



# ERCOT Forward Commodity Prices Through 2024 as of 5/26/2022





Subject to FRE 408
Strictly Confidential
Subject to Material Change

# Consolidated Hedge Position Summary

| ATC Hedge Positions as of 5/26/2022[1] | | | | |
|---|---|---|---|---|
| | **June 2022** | **Q3 2022** | **Q4 2022** | **Q1 2023** |
| **PJM** | | | | |
| Generation Hedged % (ATC) | 57% | 68% | 40% | 21% |
| UCAP Hedged % (ATC) | 37% | 44% | 22% | 17% |
| Gas % Hedged | 13% | 20% | 29% | 126% |
| **ERCOT** | | | | |
| Generation Hedged % (ATC) | 54% | 62% | 130% | 45% |
| UCAP Hedged % (ATC) | 49% | 48% | 47% | 28% |
| Gas % Hedged | 58% | 69% | 113% | 58% |
| **Montana** | | | | |
| Generation Hedged % (ATC) | 21% | 51% | 43% | 0% |
| UCAP Hedged % (ATC) | 21% | 51% | 43% | 0% |

1.  *Does not necessarily reflect all option positions; includes LMBE-MC hedges. PJM generation includes impact of RGGI purchases.*



Subject to FRE 408
Strictly Confidential
Subject to Material Change

# Hedge Portfolio Comparison – 5/26/2022 vs. 2/25/2022

Material increase in generation and hedges in June and Q3 2022, with additional hedging needed in Q4 2022 and Q1 2023



**Total Portfolio Generation Hedges[1]**

1. Weighted average Generation Hedged % for PJM + ERCOT + Montana. Does not necessarily reflect all option positions; includes LMBE-MC hedges. PJM generation includes impact of RGGI purchases.

© Talen Energy Supply | Proprietary and Confidential



Subject to FRE 408
Strictly Confidential
Subject to Material Change

# Mark-to-Market Roll Off (as of 5/26/2022)[1]

*($ in millions)*

| $ in millions | Jun-22 | Q3 '22 | Q4 '22 | Q1 '23 |
|---|---|---|---|---|
| **PJM Power** [2] | | | | |
| Exchange | (31.5) | (140.6) | (53.7) | (27.3) |
| 1L ISDA | (36.0) | (169.3) | (80.9) | (117.2) |
| Other Bilateral | 10.2 | 29.7 | 23.5 | 23.0 |
| Total Power | (57.3) | (280.1) | (111.1) | (121.6) |
| **PJM Natural Gas** | | | | |
| Exchange | 7.7 | 26.3 | 14.6 | 81.1 |
| 1L ISDA | (0.8) | (3.4) | (1.5) | 59.5 |
| Other Bilateral | 0.0 | 0.0 | 0.0 | (0.0) |
| Total Gas | 6.9 | 22.8 | 13.1 | 140.5 |
| **ERCOT Power** | | | | |
| Exchange | 1.2 | (5.1) | 4.2 | (0.0) |
| 1L ISDA | (36.3) | (195.2) | (24.7) | (18.5) |
| Other Bilateral | (0.9) | 0.7 | (6.2) | (0.9) |
| Total Power | (36.1) | (199.7) | (26.6) | (19.4) |
| **ERCOT Natural Gas** | | | | |
| Exchange | 1.0 | 2.3 | 4.3 | (0.8) |
| 1L ISDA | 9.2 | 37.4 | 7.8 | 4.3 |
| Other Bilateral | (0.0) | 0.0 | (0.0) | 0.0 |
| Total Gas | 10.1 | 39.7 | 12.1 | 3.5 |
| **Montana Power** | | | | |
| Exchange | 0.0 | 0.0 | 0.0 | 0.0 |
| 1L ISDA | (0.1) | (12.8) | (8.9) | 0.5 |
| Other Bilateral | 0.1 | (1.6) | (0.4) | (0.0) |
| Total Power | 0.0 | (14.4) | (9.4) | 0.5 |

1.  Excludes crystallized losses which still have exposure but have already been recognized from an accounting perspective and are no longer subject to MTM moves.
2.  PJM Power Exchange includes MTM related to RGGI purchases.