**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHER DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| TALEN ENERGY SUPPLY, LLC, et al., | § | |
| | § | CASE NO. 22-90054 (MI) |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

**SUPPLEMENTAL BRIEF OF NORTHWESTERN CORPORATION TO JOINDER
[DKT. 299] TO MOTION OF PUGET SOUND ENERGY, INC., AVISTA
CORPORATION, PORTLAND GENERAL ELECTRIC COMPANY, AND
PACIFICORP FOR RELIEF FROM THE AUTOMATIC STAY [DKT. 242]**

COMES NOW NorthWestern Corporation, an interested party in the above-captioned chapter 11 case (the "**NorthWestern**" or "**NWE**"), and files this supplemental brief in connection with its *Joinder* ("**Joinder**") [Dkt. 299] to the Motion for Relief from the Automatic Stay ("**Stay Motion**") [Dkt. 242], filed by Puget Sound Energy, Inc. ("**PSE**"), Avista Corporation ("**Avista**"), Portland General Electric Company ("**PGE**") and PacifiCorp ("**PacifiCorp**," and collectively with PSE, Avista and PGE, the "**PNW Owners**"), pursuant to 11 U.S.C. § 362(d)(1). In support hereof, NorthWestern would respectfully show as follows.

**PRELIMINARY STATEMENT**

1.      While the Court remained optimistic at the June 10, 2022 hearing on the ability of bankruptcy to provide a solution to the dilemma facing the Colstrip Units,[1] in reality, the only real option is for the parties to proceed to Arbitration, as they originally agreed to in the O&O Agreement. There is no market for selling the PNW Owners' co-tenancy interests in the remaining two-coal fired electric generating units in Colstrip, Montana. Even were there a market, section 364(h)(4) of the Bankruptcy Code excepts these types of co-tenancy assets from a forced sale.

---

[1]      Terms not otherwise defined herein have the same meaning ascribed to them in NorthWestern's Joinder and Reply in Support of the Stay Motion [Dkt. 486].

2.     The PNW Owners also cannot simply abandon their interests in the Colstrip Units, because of their continuing obligations to fund (a) the Colstrip Units while they are in operation and (b) any remediation projects after they cease operations.

3.     Finally, delaying the Arbitration is not an option, because the overwhelming evidence shows NorthWestern is required to plan to substitute the Colstrip Units, if they are to close in 2025, or, if not, incorporate into their planning the Unit's continued operations.  This planning takes significant time and effort.  Knowing the answer to whether the PNW Owners can compel closure in 2025 is key to knowing what path NorthWestern's planning must follow.

4.     Thus, cause exists to grant relief from the automatic stay to resolve this dispute through the Arbitration.  The parties have announced they are ready, willing and able to arbitrate and this dispute is well-advanced in a forum outside of bankruptcy.  There will be little, if no, prejudice to the Debtors, as they have separate litigation counsel handling this litigation and appear to have ample liquidity to proceed with arbitration.  As the Operator and fiduciary to the other owners of the Colstrip Units, Talen Montana has a duty to resolve these types of disputes expediently.

5.     Of course, if the Court lifts the stay, there is nothing preventing parties from reaching a business resolution on the way to Arbitration.  But, if they cannot, Arbitration will afford the parties a final resolution to their contractual dispute and the opportunity to plan for the future of the Colstrip Units and the future needs of their respective customers.

## PROCEDURAL BACKGROUND

6.     On May 9-10, 2022, the above-captioned debtors-and-debtors in possession filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101-1532 (as amended, the **"Bankruptcy Code"**).

7.      On May 18, 2022, the PNW Owners filed the Stay Motion, demonstrating "cause" to grant relief from the automatic stay in these cases to proceed with the Montana Lawsuit and Arbitration.  The Stay Motion is supported by the Unsworn Declaration of Ronald J. Roberts [Dkt. 44] and Unsworn Declaration of Jeffrey M. Hanson [Dkt. 243].[2]

8.      On May 27, 2022, after failed discussions with the Debtors' counsel, NorthWestern filed the Joinder to the Stay Motion.  The Joinder is supported by the Unsworn Declaration of John D. Hines [Dkt. 454] and the Unsworn Declaration of John K. Tabaracci [Dkt. 456].

9.      On June 3, 2022, the Debtors filed an opposition to the Stay Motion the ("**Opposition**") [Dkt. 409].  The Opposition is supported by the Unsworn Declaration of Damon D. Obie [Dkt. 447].

10.     On June 8 and 9, 2022, the PNW Owners and NorthWestern, respectively, filed replies to the Opposition [Dkts. 452, 486].

11.     On June 10, 2022, the Court conducted a hearing on the Stay Motion, at the conclusion of which the parties agreed to a briefing schedule to address the Court's questions and the rescheduling of the stay hearing to July 12, 2022.

## ARGUMENTS AND AUTHORITIES

### *Ultimate Burden of Persuasion*

12.     In stay relief litigation, section 362(g) of the Bankruptcy Code allocates the burden of proof by imposing upon the party opposing stay relief the burden of proof on all issues other than the existence of the debtor's equity in the collateral under section 362(d)(2).  *See In re Christie,* 159 B.R. 780, 783 (Bankr. E.D. Tex. 1993).  In other words, the party opposing stay relief—usually the debtor—has the ultimate burden of persuasion (or the risk of non-persuasion)

---

[2]      All referenced unsworn declarations were submitted pursuant to 28 U.S.C. § 1746.

as to all stay issues except the existence of equity.  *See Sonnax Industries, Inc. v. Tri–Component Products Corp. (In re Sonnax Industries, Inc.),* 907 F.2d 1280 (2nd Cir.1990); *In re Powell,* 223 B.R. 225, 232 (Bankr. N.D. Ala. 1998).  However, the party requesting relief from the stay must sustain an initial burden of production, going forward with the evidence to establish that a *prima facie* case for relief exists before the respondent is obligated to go forward with its proof.  *See Sonnax*, 907 F.2d at 1280*; see also Mooney v. Gill*, 310 B.R. 543 (N.D. Tex. 2002) ("In such cases, Courts have held that the "one who seeks relief from the automatic stay must, in the first instance, establish a legally sufficient basis, *i.e.*, 'cause,' for such relief. The burden then lies with the debtor to demonstrate that it is entitled to the stay.")

### *Cause for Relief*

13.    The Stay Motion and Joinder request relief from the automatic stay for "cause," pursuant to section 362(d)(1) of the Code.  Neither the PNW Owners nor NorthWestern relies on a lack of adequate protection as cause for lifting the stay, because neither is a secured creditor of Talen Montana.  Rather, the PNW Owners and NorthWestern seek relief from the automatic stay to conclude the Montana Lawsuit and pursue the Arbitration necessary to resolve the contractual dispute between the owners of the Colstrip Units.

14.    The Bankruptcy Code does not define "cause," and so courts are to determine whether cause exists to grant relief from stay in a case-by-case approach. *In re JCP Props., Ltd.*, 540 B.R. 596, 613 (Bankr. S.D. Tex. 2015) (citing *In re Reitnauer*, 152 F.3d 341, 343 n.4 (5th Cir. 1998)).

15.    Lack of adequate protection is one example of "cause" under section 362(d)(1). Adequate protection is designed to protect the declining value of a secured creditor's collateral during the pendency of the bankruptcy.  *See In re Machado*, Case No. 21-51329, 2022 WL 257396,

at *3 (Bankr. W.D. Tex. Jan. 26, 2022) ("To establish a *prima facie* case of cause due to a lack of adequate protection, the creditor seeking relief must show that the value of the collateralized property is declining or is threatened to decline as a result of the automatic stay."); *In re Kowalsky*, 235 B.R. 590 (Bankr. E.D. Tex. 1999) (same).

16.     However, "it is clear from the legislative history, that lack of adequate protection is merely illustrative of what 'cause' for granting relief from stay under § 362(d)(1) might be . . . [and] is one cause for relief, but is not the only cause."  *In re Shiver*, 33 B.R. 176, 180 (Bankr. N.D. Ohio 1983); *see also Machado*, 2022 WL 257396, at *4 ("A lack of adequate protection is not the only ground for cause for relief from the stay"); *Marable v. Bank of New York Mellon*, 557 B.R. 521 (Bankr. E.D. Tex. 2016) ("However, a lack of adequate protection of an interest in property is only one of the means by which a creditor may show cause for relief from stay."); *Hudgins v. Security Bank of Whitesboro (In re Hudgins)*, 188 B.R. 938 (Bankr. E.D. Tex. 1995) ("Cause" under § 362(d)(1) is not limited to those situations where the property of a party lacks adequate protection in the bankruptcy estate.) (*citing Matter of Spencer,* 115 B.R. 471, 476 (D.Del.1990)).

17.     "What constitutes cause under section 362(d)(1) other than lack of adequate protection has been developed case-by-case." *Milne v. Johnson (In re Milne)*, 185 B.R. 280, 283 (N.D. Ill. 1995) (*citing* Robert E. Ginsberg & Robert D. Martin, 1 Bankruptcy: Text, Statutes, Rules § 3.05(f), at 3-56 (3d. ed. Supp. 1994) ("The use of the word including in the statute is exemplary rather than exhaustive").  For instance, "[a] leading treatise cites showings such as bad faith commencement of the bankruptcy case, wrongdoing by the debtor, potential delay of a multiparty trial, lack of harm to the estate, as with fully insured claims, and similar "causes."  *In*

*re Mirant Corp.*, 303 B.R. 319, (Bankr. N.D. Tex. 2003) (*citing* 3 Collier on Bankruptcy ¶ 362.07[3][a], 15th ed. rev.2002) (emphasis added).

18.     This Court has used different factors to determine whether "cause" exists to provide relief from the automatic stay to pursue litigation outside of bankruptcy court.  *See, e.g., In re Moser*, 578 B.R. 765, 772 (Bankr. S.D. Tex. 2017) (*citing In re Xenon Anesthesia of Texas, PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014)) (utilizing 12 factors); *In re Samshi Homes, LLC*, No. 10-37643-H3-11, 2011 WL 3903054, at *3 (Bankr. S.D. Tex. Sept. 6, 2011) ("In determining whether to lift the automatic stay to allow litigation against a debtor to proceed outside this court, the court considers whether lifting the stay will result in any great prejudice to the debtor or the bankruptcy estate, whether any hardship to a nondebtor of continuation of the stay outweighs any hardship to debtor, and whether the creditor has a probability of prevailing on the merits of the case."); *In re MCC Humble Auto Paint, Inc.*, No. 11-34994-H3-11, at *3 (Bankr. S.D. Tex. Aug. 2011) (same); *In re In re Tonthat*, No. 07-30315-H3-13-2009 WL 2461041, at *2 (Bankr. S.D. Tex. Aug. 7, 2009) (same).

19.     As demonstrated to the Court in the Stay Motion, Joinder and related replies, cause exists under the various factors the Court has used to determine whether to lift the stay to permit outside litigation, because, among other things, the outside litigation will:

> (a)  not represent a hardship for the Debtors,
>
> (b)  assist the Debtors in their reorganization efforts,
>
> (c)  assist the Debtor in upholding their fiduciary responsibilities,
>
> (d)  prevent undue prejudice to NorthWestern, which needs to plan for the future of the Colstrip Units,
> (e)  prevent undue prejudice to NorthWestern's customers in Montana,
>
> (f)  provide a specialized and efficient forum,

(g)  allow advanced, multiparty litigation to conclude, and

(h)  promote judicial economy.

20.      Contrary to what Talen Montana argues, the Movants are not asking the Court to lift the stay to take away any property rights of the Debtors.  The property rights of the Debtors are what they are and such rights are determined based on the O&O Agreement, which provides that Talen Montana is the Operator of the Colstrip Units and Talen Montana owns a 30% ownership interest in Colstrip Unit 3, as a tenant in common with the PNW Owners.  But, since day one, such ownership and operator status of Talen Montana have been subject to defeasance for numerous reasons, including (a) an accident destroying the Colstrip Units, (b) end of the useful life of the Colstrip Units, (c) government regulations mandating the shutdown of the Colstrip Units, and (d) the Owners' election to shut down the Colstrip Units.

21.      It is a fundamental rule in bankruptcy that Talen Montana only held its existing state law right under the O&O Agreement when it entered bankruptcy.  *See, e.g.*, *Benz v. DTRIC Ins. Co. (In re Benz)*, 368 B.R. 861, 866 (B.A.P. 9th Cir. March 28, 2007) ("In addition, the state court in *Santos* overlooked an important concept of bankruptcy law: the property of the estate cannot exceed whatever interests a debtor holds at the commencement of a case."); *In re Jones*, 179 B.R. 450, 455 (Bankr. E.D.Pa. 1995) ("the owner of an insurance policy cannot obtain greater rights to the proceeds of that policy than he would have under state law by merely filing a bankruptcy petition".)[3] **Yet, nothing in the Montana Lawsuit or Arbitration seeks to alter any of Talen Montana's existing property rights under that Agreement.**  Rather, both proceedings seek a clarification of the Owner's property rights, so as to determine whether the

---

[3]        *See also Foothill Capital Corp. v. Clare's Food Market, Inc. (In re Coupon Clearing Serv., Inc.),* 113 F.3d 1091, 1099 (9th Cir. 1997) ("the estate [has] no greater rights in property than those held by the debtor prior to bankruptcy"); *Gendreau v. Gendreau (In re Gendreau),* 122 F.3d 815, 819 (9th Cir. 1997) ("filing bankruptcy cannot give a debtor a greater interest in an asset than that which he owned pre-bankruptcy")).

Units can be permanently closed by a majority decision of the Owners or by the unanimous decision of all Owners.   A failure to obtain such clarification jeopardizes not only the PNW Owners' interests, but the interests of NorthWestern.   In circumstances such as these, when movants are not seeking to strip the debtor of its property rights and are merely seeking to obtain clarification of such rights —which are otherwise jeopardized—courts have lifted the automatic stay because of the relative hardships on the movants.   *See In re Laurel Highlands Foundation, Inc.*, 473 B.R. 641, 662 (Bankr. W.D. Pa. 2012) (court found "cause" to grant relief from stay to allow a governance dispute over the debtor's future operations to be resolved in underlying state court action); *Milne v. Johnson (In re Milne)*, 185 B.R. 280, 284 (N.D. Ill. 1995) (involving obtaining title to property after tax foreclosure sale).

22.     In similar contexts, courts have held that "cause" existed to lift the automatic stay to determine of the property rights of debtors and non-debtors through a previously-filed declaratory action.   In *Tribune Media Services, Inc. v. Beatty (In re Tribune Company)*, Warren Beatty, the actor, had filed a declaratory action against the debtor (Tribune Media Services) over certain motion picture, television, and other rights in the public comic strip series entitled "Dick Tracy" (the "**Dick Tracy Rights**"). 418 B.R. 116, 118 (Bankr. D. Del. 2009).   Tribune was the owner of the Dick Tracy Rights, and, pursuant to a 1995 agreement, had granted Beatty access to such rights to complete one or more theatrical performances, including the 1990 movie, "Dick Tracy."   *Id.* at 120.   In the declaratory action, Beatty argued that he was still entitled to use the Dick Tracy Rights, as he was compliant with the 1995 agreement and was continuing to produce new performances.   *Id.*   Tribune's subsequent bankruptcy stayed Beatty's declaratory action.   *Id.* at 121.   In a subsequent lift stay motion filed by Beatty to proceed with the declaratory action, Tribune argued that (a) it would suffer prejudice if it were forced to litigate in another forum and

(b) the bankruptcy court should be one deciding the property rights of Tribune.  The Delaware bankruptcy court disagreed, finding

> The Debtors [Tribune] frame the issue improperly. Whatever the Debtors hold *is* property of the estate. The question to be addressed is whether the Debtors are entitled presently to use the Dick Tracy Rights (to the exclusion of Beatty) or whether they hold the right to reclaim the Dick Tracy Rights in the future—a reversionary interest. At bottom, this matter involves a contract interpretation dispute. I do not perceive any prejudice to the Debtors that would result from lifting the stay so that this dispute is resolved in the 2008 California Action.

*Id.* at 128.  Accordingly, the Delaware court granted Beatty's lift stay motion to allow the pre-petition declaratory action to proceed and allow the property rights the debtor and non-debtor to be determined in that forum. *Id.* at 129-130.

23.    Similarly, in *American Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, American sought to lift the stay in Continental Airlines' bankruptcy to determine the scope of a settlement agreement, entered into by American and Continental in 1989, that resolved heavily-litigated antitrust claims pending in a California federal district court. 152 B.R. 420, 422 (D. Del. 1993).  American specifically requested that the stay be lifted so that it could file and prosecute a motion with the California district court, which held exclusive jurisdiction over the settlement, to determine whether a portion of a new lawsuit by Continental, with allegations of prior American misconduct, was barred by the 1989 settlement. On appeal, the Delaware district court "conclude[d] that Continental would not be prejudiced by allowing American to litigate in California the discreet issue of whether the settlement agreement bars Continental from introducing [the prior acts of American in Continental's new] litigation." *Id.* at 425.  The Delaware district court further determined that the balance of hardships weighed in favor of American, reasoning that:

> Continental agreed to have the California district court retain exclusive jurisdiction to interpret the scope and meaning of the settlement agreement,

> including the release provision. *Continental now seeks to avoid this contract by hiding behind the automatic stay*. The hardship this situation presents to American is the possibility that a [separate] district court not familiar with the California litigation and the resulting settlement agreement will interpret the agreement in such a way as to dilute its intended purpose and effectiveness.
>
> In contrast, allowing the California court to decide this issue will pose no significant hardship to Continental. Any hardship that may befall Continental as a result of lifting the stay is minimized by permitting American to only file the proposed motion to determine the scope of the general release as it applies to the [prior acts of American.]

*Id.* at 425 (emphasis added).  Accordingly, the Delaware court lifted the automatic stay to allow the California federal district court determine the scope of American's and Continental's rights under the 1989 settlement agreement.

24.     The Debtors seem to argue that the PNW Owners and NorthWestern should be forced to reach a commercial resolution with the Debtor, instead of enforcing their rights under the O&O Agreement.  However, courts that have looked at tenant in common (TIC) debtors such as Talen Montana have determined that the Bankruptcy Code does not enable such TIC debtors to alter or modify the rights of non-debtor TICs.  In *In re Geneva ANHX IV LLC*, thirteen TIC debtors "propose[d] to use substantive consolidation to coerce the [twenty] nonconsenting TIC owners to go along with the Debtor's plan or lose their interests." 496 B.R. 888, 901 (Bankr. C.D. Ill. 2013). But, the Court found that "the proposed use of substantive consolidation *as a sword* against the nondebtor TIC owners is improper and impermissible."  *Id.* (emphasis added).  According to the *Geneva* court,

> The nondebtor TIC owners are entitled to the same protection of their interests they would have under state law if no bankruptcy had ensued. The Debtors point to no Bankruptcy Code provision that would give them the power to modify the rights of those nondebtors. The nondebtor TIC owners' rights exist as a matter of Illinois real property law, not as some burdensome executory contract that the Debtors may reject under section 365. These bankruptcy filings do not empower the Debtors to eliminate or alter the

rights of the non-debtor TIC owners in the manner they propose. Thus, the reorganization theory offered here by the Debtors is not feasible.

*Id.* at 902; *accord In re PEM Thistle Landing TIC 23, LLC*, No. 13-13273(KG), 2014 WL 1319183, at *3 (Bankr. D. Del. April 2, 2014) ("The fatal flaw in Debtor's case is that as a tenant-in-common with less than a one percent interest, it cannot bind or do the bidding of the non-debtor TICs (owning interests of more than 99%)"). Thus, any argument that NorthWestern and the PNW Owners should succumb to a commercial resolution and forsake their rights under the O&O Agreement would be using the automatic stay as a sword to alter or modify the state law rights of NorthWestern and the PNW Owners. The automatic stay should not be used in this fashion.[4]

### ***Strategic Options in Bankruptcy***

25.     At the June 10 stay hearing, the Court peripherally explored potential strategic options available to the parties through this bankruptcy. Specifically, the Court inquired about the potential forced sale the PNW Owners' co-tenancy interests and/or the abandonment. To a certain extent, the parties had already pursued one or more of these options pre-bankruptcy and have failed so far to reach a consensual resolution. The Bankruptcy Code does not offer a better opportunity to reach a different result.

---

[4]     *See In re Cracked Egg, LLC*, 624 B.R. 84, 8-89 (Bankr. W.D. Pa. 2021) ("The Court also observes that the automatic stay in bankruptcy is a *shield and not a sword designed to afford a party with a litigation advantage*. While the automatic stay in bankruptcy is designed to afford the honest but unfortunate debtor with respite from creditor collection activities, the extent or reach of the automatic stay is not absolute."); *In re Sw. Guar., Ltd.*, No. 10-32200-H3-11, 2010 WL 1610075, at *3 (Bankr. S.D. Tex. Apr. 21, 2010) ("The automatic stay ordinarily should not be used as both a shield and a sword") (*citing In re A.H. Robins Co.*, 828 F.2d 1023 (4th Cir.1987); *In re Mirant Corp.*, 314 B.R. 347 (Bankr. N.D. Tex.2004)); *In re Am. Lodging, Inc.*, 397 B.R. 906, 909 (Bankr N.D. Ind. 2008) (Finding the automatic stay should be used as a shield not a sword) ((*citing Winters by and Through McMahon v. George Mason Bank*, 94 F.3d 130, 136 (4th Cir.1996); *In re Globe Inv. and Loan Co. Inc.*, 867 F.2d 556, 560 (9th Cir.1989)); *In re Mirant Corp.*, 314 B.R. 347, 353 (Bankr. N.D. Tex. 2004) ("It has often been said that the automatic stay of section 362(a) is a shield for a debtor, *not a sword to be used offensively.*"); *In re Harris*, 179 B.R. 165, 169 (9th Cir. BAP 1995) ("The automatic stay afforded by section 362 is intended to be a shield protecting debtors and their estates, and *should not be used as a sword for their enrichment*.")

a.       **Potential Sale of Colstrip**

26.       Section 363 of the Bankruptcy Code governs the sale of assets in bankruptcy.  Here, however, the dispute concerns assets (*i.e.*, Colstrip Units) owned in co-tenancy amongst the PNW Owners, NorthWestern and Talen Montana.  (*See* O&O Agreement § 2(a)).  Thus, the potential sale of assets involves the sale of non-debtor assets.  Even assuming there was a market for such coal generating energy assets—which is highly unlikely—section 363 does not permit the sale of these assets without the consent of the non-debtor co-tenants.

27.       Specifically, section 363(h) provides, in relevant part:

> h.       [T]rustee may sell both the estate's interest . . . and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—
>
> > (4)       such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

11 U.S.C. § 363(h).  Here, the Owners are tenants in common.  Section 2(a) of the O&O Agreement specifically provides that the "Project and each part thereof shall be owned by the Owners as tenants in common . . ." (O&O Agreement ¶ 2(a)).  Section 1(n) of the O&O Agreement defines "Project" as meaning

> the coal fired steam electric generating project known as Colstrip Units #3 and #4 Steam Electric Generating Project, consisting of two units, each of 700 megawatt nominal rating, the Common Facilities and related facilities, real property and property rights . . . located near Colstrip, Montana.

Per the definition of "Project" in Section 1(n), there is also no question the Colstrip Units are for "the production, transmission, or distribution, for sale, of electric energy."  NorthWestern and the PNW Owners are all public utility companies that sell and distribute, for sale to the public, the electric energy produced by the Colstrip Units to customers in Montana, Washington and Oregon.

28.     While there is scant case law interpreting section 363(h), the legislative history makes clear section 363(h)(4) was meant "to protect utility providers from disruption in service possibility caused by the bankruptcy of a co-owner. *See Lynette Warman & Cameron Kinvig*, 1 Bus. & Bankr. L.J. 116, 119 (2014) (*citing* 124 CONG. REC. H11,093 (daily ed. Sept. 28, 1978); S. Rep. 95-989, 57 (1978)); *see also Parsons v. Parsons (In re Jeffrey Parsons)*, Adv. No. 21-5002, 2021 WL 549655, at * 5 (Bankr. D. Kan. Nov. 23, 2021) ("[S]ubsection (h)(4) was added to § 363(h) specifically to protect public utilities . . .")  Thus, given the plain language in section 363(h)(4) and legislative history, it would appear to be an insurmountable challenge for the Debtors to attempt to involuntarily sell the non-debtor Owners' interests in the Colstrip Units through this bankruptcy.

29.     Even if a forced sale of non-debtor TIC interests was permissible under the Bankruptcy Code—which it is not—the parties have tried to reach a similar commercial resolution pre-petition and such efforts have failed.  Thus, a theoretical bankruptcy solution would not work.

      **b.     The PNW Owners' Potential Abandonment of Their Ownership of Units 3 and 4**

30.     Section 554 of the Bankruptcy Code governs a debtor's abandonment of estate property.  Here, however, both Talen Montana and NorthWestern do not wish to abandon the Colstrip Units until this project has exceeded its useful life, which will be beyond 2025.  The only other potential abandonment could be by the PNW Owners, in order to be compliant with Washington and Oregon law.  However, there are huge problems with any Owner attempting to abandon its interests in the Colstrip Units.

31.     First, under Section 11(b) of the O&O Agreement, each of the Owners must fund their proportionate share of working capital for the operations of the Colstrip Units. (*See* O&O Agreement ¶ 11(b)).  Each Owner is also required to order sufficient supplies of coal to generate

sufficient energy through the Colstrip Units.  (*Id.* ¶ 12(a)).  Second, each Owner must also take a threshold amount of the energy produced by the Colstrip Units, sufficient to keep the Colstrip Units in operations.  (*Id.* ¶ 13(a), (d), (f)).  Third, all the Owners will be held accountable for their proportionate share of any environmental remediation projects necessary upon the closure of the Colstrip Units.

32.     Thus, none of the Owners, including Talen Montana, can simply walk away from their interests in the Colstrip Units.  Such abandonment would invariably bring more claims amongst the Owners and thus more litigation.

### *Arbitration as the Solution*

33.     NorthWestern commenced arbitration over 13 months ago, in March 2021.  Why?  Because it is the dispute resolution solution that all of the Owners agreed to in O&O Agreement decades ago.  Section 18 of the O&O Agreement specifically states,

> Any controversies arising out of or relating to this Agreement which cannot be resolved through negotiations amongst Project Users within thirty (30) days after inception of the matter in dispute shall, upon demand of any Project User involved in the controversy, be submitted to an Arbitrator having demonstrated expertise in the matter submitted.  If the Project Users cannot mutually agree upon such Arbitrator, then upon petition of any Project User, such Arbitrator shall be appointed by the Superior Court of the State of Washington, in and for the County of Spokane.

(O&O Agreement ¶ 18.)  The O&O Agreement has been amended four times, but this arbitration clause has never been changed.

34.     Ultimately what is at stake in the Arbitration and the Montana Lawsuit is nothing more than a controversy arising over interpreting the O&O Agreement.  The PNW Owners claim that under the O&O Agreement by majority vote they can decide to shut down the Colstrip Units, while NorthWestern and Talen Montana claim that such a decision must be unanimous.  The

positions of both sides create a ripe controversy to be decided in arbitration.  What's more, all the Owners agree that arbitration is the proper forum to resolve this dispute.

35.     Talen Montana highly underplays the significance of proceeding to arbitration right now.  As if conceding bankruptcy does not provide a solution, other than to grant Talen Montana a temporary reprieve, Talen Montana argues that the parties could wait until possible mid-2023 to proceed to Arbitration.  There are several significant flaws with this position.

36.     First, the Owners must agree on a budget to fund the operations of the Colstrip Units.  The O&O Agreement requires the Debtor, as Operator, to propose a budget for the upcoming year by September 1st of each year, and for the Owners to agree upon a budget by November 1st each year (O&O Agreement ¶ 10).  For the past 2 years, the PNW Owners have pushed for a budget that contemplates the eventual shut down of the Colstrip Units by 2025.  If the PNW Owners were to prevail in future budgetary discussions despite Montana Senate Bill 266, the Colstrip Units may have no other choice but to shut down by 2025.

37.     Second, NorthWestern and the PNW Owners, which are regulated public utilities, desperately need to know what their energy supply sources will be.   Such energy supply sources will either include or not include the Colstrip Units.  If it is determined the PNW Owners by majority vote can close the Units, and they do so as they have stated, NorthWestern's energy supply resources will not include the Colstrip Units after 2025, then NorthWestern will absolutely need to acquire alternative energy supply sources.  But, if the Arbitration finds that closure requires a unanimous consent of the owners, NorthWestern can continue to rely of Colstrip for energy supply.  Without a decision on the Arbitration, NorthWestern cannot know whether to plan for future energy supply sources that include the Colstrip Units. Talen Montana simply faces no

similar pressure, because it is not a regulated entity and is not subject to planning obligations to satisfy state regulatory requirements.

38.     Third, the resolving the current controversy will affect Talen Montana in several ways that will substantially advance its reorganization.[5]  As the operator, Talen Montana may need to start planning the wind down of the Colstrip Units.  Talen Montana, as an independent producer of energy, may itself need to locate alternative energy sources.  Moreover, Talen Montana will need to develop a chapter 11 plan that contemplates either the continued existence of the Colstrip Units past 2025 or the liquidation of these assets and related liabilities associated with their wind-down, like remediation expenses and other closure expenses.  For example, per the O&O Agreement, Talen Montana has certain obligations at the end of the operations of the Colstrip Units. (O&O Agreement § 31.)

39.     Extensive environmental duties involving the Colstrip Units do not cease when the Colstrip Units are shut down.  For example, 40 CFR §§ 102 and 104 required Talen to enter into a pre-closure and post-closure plans for the Colstrip Units in October 2016.[6]   And as the Operator, Talen Montana has numerous other continuing environmental obligations regarding Colstrip Units 3 and 4 monitored by the Department of Environmental Equality of Montana.  *See* https://www.talenenergy.com/ccr-colstrip/ (describing environmental requirements for Bottom Ash Pond and EHP A Cell, EHP B Cell, EHP C Cell, EHP D/E Cell, EHP G Cell, EHP J Cell and EHP J-1 Cell at Colstrip Units 3 and 4).  **Delay of the Arbitration solves none of these problems for Talen Montana.**

---

[5]     With respect to the last point, prior courts have found that when issues in pre-bankruptcy litigation must necessarily be decided in confirming a chapter 11 plan and a prior court is more familiar with the issues, "cause" exists to lift the automatic stay to preserve judicial economy.  *In re Prive Vegas, LLC*, Case Nos. 09-34880, 09-34893, 2010 Bankr. LEXIS 127, *7-8 (Bankr. S.D. Fla. Jan. 14, 2010).
[6]     True and correct copies of such closure plans can be found at the following two links: (a) Colstrip+CCR+Written+Closure+Plan+October+2016+3+4+EHP+A.pdf;  and (b) https://s3.amazonaws.com/tln-environmental/Colstrip+3%264+EHP+A/Colstrip+CCR+Post+Closure+Plan+October+2016+3+4+EHP+A.pdf.

## CONCLUSION

For the foregoing reasons, NorthWestern urges the Court to grant the Stay Motion and Joinder and grant such other and further relief under law and equity to which NorthWestern or the PNW Owners may be entitled.

Dated: June 20, 2022                    Respectfully submitted,

                                        **DORSEY & WHITNEY LLP,**

                                        _/S/ H. Joseph Acosta_
                                        **H. Joseph Acosta**
                                        State Bar No. 24006731
                                        acosta.joseph@dorsey.com
                                        300 Crescent Court, Suite 400
                                        Dallas, Texas 75201
                                        Phone: (214) 981.9900
                                        Facsimile: (214) 981.9901

                                        -and-

                                        _/s/ J Jackson_
                                        J Jackson, Esq. (Pro Hac Vice)
                                        State Bar No. MN 049219
                                        50 South Sixth Street, Suite 1500
                                        Minneapolis, Minnesota 55402
                                        Telephone: (612) 340-2760
                                        Email:  jackson.j@dorsey.com

                                        **ATTORNEYS FOR NORTHWESTERN CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2022, a true and correct copy of the foregoing document was electronically filed in the case with the Clerk of the United States Bankruptcy Court by using the CM/ECF system, and a copy was served on the parties who are entitled to receive notice via the Court's ECF notification system.

                                        _/s/ H. Joseph Acosta_
                                        H. JOSEPH ACOSTA