**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| TALEN ENERGY SUPPLY, LLC, et al. | Case No. 22-90054 (MI) |
| Debtors.[1] | (Jointly Administered) |

**SUPPLEMENTAL BRIEF IN SUPPORT MOTION OF PUGET SOUND ENERGY, INC.,
AVISTA CORPORATION, PORTLAND GENERAL ELECTRIC COMPANY,
AND PACIFICORP FOR RELIEF FROM THE AUTOMATIC STAY**

1.      Puget Sound Energy, Inc. ("PSE"), Avista Corporation ("Avista"), Portland General Electric Company ("PGE"), and PacifiCorp (collectively, the "PNW Owners"), hereby submit this Supplemental Brief in support of their Motion for Relief from Stay [Doc. 242] (the "Motion"). In their Motion, the PNW Owners seek relief to allow: (1) the United States District Court for the District of Montana to issue imminent rulings in the Montana Lawsuit[2] on the legality of Montana SB 265 and SB 266 (collectively, the "Montana Statutes"), which will determine (i) whether certain rights under the O&O Agreement[3] are modified by the Montana Statutes, and (ii) whether the PNW Owners can exercise their rights under the O&O Agreement without the threat of incurring substantial penalties, and (2) the Arbitration initiated by NorthWestern to move forward to resolve disputes over the meaning of certain provisions in the O&O Agreement. ***Importantly, the PNW Owners are __not__ seeking relief to close or otherwise dispose of interests in Colstrip at this time, and neither the Montana Lawsuit nor the Arbitration will result in closure***

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/talenenergy. The Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

[2] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Motion.

[3] The O&O Agreement referenced herein is PNW Owners' Exhibit No. 12 [Doc. 463].

157192124.10

*of Colstrip*.

2.     This Supplemental Brief addresses issues raised by the Court at the June 10, 2022 hearing, in anticipation of the continued hearing on the PNW Owners' Motion set for July 12, 2022 at 9:00 a.m. CST.  As discussed below, the PNW Owners face ongoing harm and lack adequate protection as long as the stay applies to the Montana Lawsuit and the Arbitration.  The Montana Statutes substantially impair their rights under the O&O Agreement and their ability to make business decisions and resolve disputes regarding Colstrip.  The issues raised in the Arbitration must be resolved so that the PNW Owners can plan for the future of Colstrip.  In contrast, the Debtor will not be harmed by lifting the stay as requested in the Motion, and there are no realistic alternative solutions while the owners' rights and obligations and the validity of the Montana Statutes remain undetermined.

## I.     Ongoing Harm to PNW Owners

### A.     Clarification of Relief Sought

3.     The very limited relief sought by the PNW Owners is to let the Montana Lawsuit proceed to determine the constitutionality and validity of the Montana Statutes and to let the Arbitration move forward to clarify rights and obligations under the O&O Agreement.  The Arbitration will not itself result in closure of Colstrip.  Further steps—steps that have not yet been taken by any co-owner—will be required to close all or part of Colstrip.  A proposal to close one or both Units will need to be made, and the Committee will need to vote in accordance with the O&O Agreement.  Proposing and voting on such proposal would be subject to the automatic stay if the Debtor remains in bankruptcy.  At this time, the PNW Owners <u>are **not** requesting relief from stay to propose and vote on closure of Units 3 or 4</u>.

**B.**   **Uncertainty About Their Rights Substantially Harms the PNW Owners and NorthWestern**

**a.**   **SB 266 Harms the PNW Owners**

4.      Montana SB 266 makes unlawful and provides for fines of up to $100,000 per day, for any Colstrip co-owner to engage in "conduct . . . to bring about permanent closure of a [Colstrip] generating unit . . . without seeking and obtaining unanimous consent of all co-owners." 2021 Montana Laws Ch. 377 (S.B. 266); Mont. Code Ann. § 30-14-2702(1)(b). SB 266 also subjects a Colstrip co-owner to the same fines for "failure or refusal . . . to fund its share of [Colstrip's] operating costs." *Id.* § 30-14-2702(1)(a).

5.      The PNW Owners challenged the constitutionality of SB 266 in the Montana Lawsuit and, at the time Talen filed this bankruptcy case, a ruling from the Magistrate Judge was expected at any time.  Resolution of the constitutionality of SB 266 is necessary to both clarify the co-owners' rights under the O&O Agreement and to determine whether the co-owners can exercise their rights under the O&O Agreement without subjecting themselves to substantial fines.  Importantly, the PNW Owners challenge to SB 266 is directed solely at the Montana Attorney General.  <u>Talen is not named as a defendant on the PNW Owners' claims challenging SB 266</u>.  More fundamentally, only the Montana Attorney General can enforce SB 266; Talen does not have any right to enforce it.  Talen can articulate no credible harm to it from the overturning of SB 266.

6.      Uncertainty about whether the co-owners can exercise their rights under the O&O Agreement without subjecting themselves to substantial fines significantly harms the PNW Owners. Under the O&O Agreement, each co-owner must, if and when a need arises, make business decisions on a number of issues, including:

- Whether to approve annual budgets (O&O Agreement Section 17(f)(ii);

- Whether to award a contract, approval of any change order, or payment of any controverted claim in excess of $500,000 (O&O Agreement Section 17(f)(iv));
- Whether to repair damage to Colstrip if the estimated cost of repair is in excess of $2,000,000 (O&O Agreement Section 17(f)(vi));
- Whether to vote to remove Colstrip in whole or in part from service (O&O Agreement section 17(f)(vi));
- Whether to vote to approve a proposed Elective Capital Addition in excess of $25,000 (O&O Agreement Section 17(j)); and
- Whether to repair Colstrip when it is damaged (O&O Agreement Section 19(a)).[4]

Given the broad language of SB 266 (prohibiting any and all "conduct" that the Attorney General determines implicates SB 266), making business decisions in accordance with the O&O Agreement (i) not to approve a budget, (ii) not to award a contract, (iii) not to repair damage to Colstrip, (iv) to remove Colstrip from service, or (v) not to approve a proposed Elective Capital Addition could be interpreted by the Montana Attorney General as either "conduct . . . to bring about permanent closure of a [Colstrip] generating unit . . . without seeking and obtaining unanimous consent of all co-owners, or a failure or refusal "to fund its share of [Colstrip] operating costs." The inability to make business decisions if and when the need arises without fear of substantial penalties substantially impairs each PNW Owner's contractual rights.

7.     The need to make business decisions pursuant to the O&O Agreement that may implicate SB 266 can occur at any time. In fact, the need to vote on the 2023 capital and operating budgets is imminent. Under the O&O Agreement, Talen (as Operator) is required to submit the 2023 budgets to the Committee on or before September 1, 2022. O&O Agreement, §§ 7, 10. The Committee is to vote to approve the 2023 budgets on or before November 1, 2022. O&O

---

[4] This list is illustrative of the issues that may arise that could implicate SB 266; this list is not exhaustive.

Agreement, § 10.[5]  As discussed above, a co-owner voting not to approve the 2023 budgets could,

in the absence of the preliminary injunction,[6] expose such co-owner to substantial penalties under

SB 266—regardless of why such co-owner made the business decision to vote not to approve the

2023 budget.  Therefore, even apart from the closure issue, delay in resolving SB 266 harms the

PNW Owners' ability to make necessary decisions about the plant they co-own, for which they

collectively spend approximately $70 million in operating and maintenance costs annually, and

further impairs their already-limited ability to try to sell their interests.  Supplemental Declaration

of Ronald J. Roberts ("Roberts Supp. Decl."), ¶ 4.

8.      Even before the automatic stay put the Montana Lawsuit and Arbitration on hold,

time was of the essence.  For example, final determination of the constitutionality of SB 266—

including resolution of the question whether unanimity is required to close a Colstrip unit—could

be at least two years away even if the Court were to grant relief from stay in July 2022.  Appeal

to the Ninth Circuit alone could take that long, and the parties must first await the Magistrate

Judge's findings and recommendations and the District Court Judge's decision on likely

objections to those recommendations.[7]  The automatic stay further delays resolution of the

constitutionality of SB 266 and compounds the harm to the Colstrip owners.

9.      In sum, resolution of the PNW Owners' challenge to SB 266 will benefit all

---

[5] The O&O Agreement prescribes the time for voting to approve the operating budget.  O&O Agreement, § 10.  The O&O Agreement does not prescribe a time for the Committee to vote on the capital budget (referred to as the construction budget).  *Id.*, § 7.  However, as a practical matter, Talen has historically submitted a combined capital and operating budget to the Committee for approval and the Committee votes on the combined budget.

[6] There is no guaranty that the preliminary injunction will become permanent until the PNW Owners are able to finish the Montana Lawsuit.

[7] "For a civil appeal, [oral argument is typically held] approximately 12-20 months from the notice of appeal date. If briefing isn't delayed, [oral argument typically takes place] approximately 9-12 months from completion of briefing. . . . [M]ost cases are decided within 3 months to a year" after argument. https://www.ca9.uscourts.gov/general/faq/.

owners, including the Debtor, by clarifying their rights under the O&O Agreement and resolving whether each owner can exercise those rights without incurring substantial $100,000-per-day fines for exercising those rights.  Accordingly, the Debtor is not harmed by lifting the stay to allow resolution of the constitutionality of SB 266.

<b>b.      SB 265 Harms the PNW Owners.</b>

10.     SB 265 similarly creates issues that impair the co-owners' rights under the O&O Agreement.  Specifically, Section 18 of the O&O Agreement prescribes that disputes arising out of the O&O Agreement be resolved through arbitration, using a single arbitrator with subject matter expertise, that such arbitration is to occur in Spokane, Washington, and that Washington law applies to the arbitration.  O&O Agreement, § 18.  This provision is intended to provide an expeditious and efficient process for resolving disputes arising out of the O&O Agreement.[8]

11.     SB 265 purports to modify Section 18 of the O&O Agreement by requiring, unless the parties mutually agree, that any such arbitration be before a panel of three arbitrators (without requiring any specific subject matter expertise), that the venue for arbitration be in the State of Montana, and that Montana law will govern such arbitration. 2021 Montana Laws Ch. 376 (S.B. 265); Mont. Code Ann. § 27 5 323(2).  The PNW Owners have challenged the legality of SB 265. Until the issues regarding the legality of SB 265 are resolved, SB 265 creates substantial uncertainty regarding the number of arbitrators, whether the arbitrator(s) are required to have subject matter expertise, the venue for arbitration, and the governing law for such arbitration. This uncertainty impairs the ability to resolve <u>any</u> dispute that may arise out of the O&O Agreement (not just a dispute regarding a vote to close) and frustrates the purpose of Section 18

---

[8] Section 18 of the O&O Agreement also expressly requires that the arbitrator is to render a decision not later than 30 days after the matter is submitted to the arbitrator to ensure that controversies are resolved as expeditiously as practical.

-6-

of the O&O Agreement by impeding the efficient and expeditious resolution of such disputes. To be sure, as a direct result of SB 265, the Arbitration has stalled because the parties have been unable to agree on whether the Arbitration should be conducted pursuant to Section 18 of the O&O Agreement or pursuant to SB 265.[9]

12.     Resolution of the PNW Owners' challenge to SB 265 will clarify the process for resolving disputes that arise out of or relate to the O&O Agreement.  Such resolution is necessary to ensure that any such dispute can be resolved as quickly and efficiently as practical. Accordingly all co-owners, including Debtor, benefit from resolution of the legality of SB 265. Resolution of the legality of SB 265 does not harm Debtor.

### c.     Arbitration is Necessary to Clarify Certain Rights and Obligations Under the O&O Agreement.

13.     As explained in the Motion, under the Washington Clean Energy Transformation Act, Avista, PacifiCorp, and PSE cannot use Colstrip (or other coal-fired generating units) to provide electricity to Washington customers after December 31, 2025, without paying substantial penalties designed to make that option economically irrational. Motion ¶ 9.  In Oregon, PacifiCorp and PGE cannot use coal-fired electricity from Colstrip (or otherwise) to serve Oregon customers beginning January 1, 2030.  *Id.* ¶ 10.  As a result of the Washington and Oregon legislation, the PNW Owners need to take steps to plan for the fact that they will not be able to use Colstrip to serve customers in Washington and/or Oregon (as applicable) after the end of

---

[9] The Court remarked at the June 10, 2022 that it could order an arbitration in a certain location to break the logjam, but the location of the arbitration is a secondary issue; the primary issue is the number of arbitrators (one arbitrator or three arbitrators), the importance of avoiding the delay of appeal to a second arbitration panel (as proposed by Talen in exchange for a single arbitrator initially), the arbitrator-selection process and which court appoints the arbitrator(s) if the parties cannot reach agreement (i.e., a Washington court as required under the O&O Agreement or a Montana court pursuant to SB 265), and the contractual requirement that the arbitrator have subject matter expertise.

157192124.10

2025 or 2029, respectively.  This requires long-term planning by each of the PNW Owners to work with regulators and other stakeholders, ensure compliance with their legal obligations, and plan to ensure that each PNW Owner has sufficient resources to continue to serve their customers.  Talen and NorthWestern are not subject to these legislative mandates.  *Id.* ¶ 11.   Nevertheless, Talen and NorthWestern need to know whether the PNW Owners can or cannot close some or all of Colstrip so that they can plan for the future.

14.     NorthWestern initiated the Arbitration to resolve questions regarding (1) whether unanimous consent of the co-owners is required to close all or part of Colstrip or whether the Committee can vote to close some or all of Colstrip pursuant to the terms of the O&O Agreement and (2) to clarify certain funding obligations under the O&O Agreement.  Resolution of the issues in the Arbitration is necessary to allow each owner to plan for the future with regard to Colstrip.  As discussed in NorthWestern's briefing and supporting declarations, delay in resolving the future of Colstrip also substantially harms NorthWestern which—like the PNW Owners—is legally required to engage in long-term planning for its energy resources to meet the needs of its customers.  *See* Doc. 299, 454, 456, 486, and 606.

15.     Importantly, the Arbitration itself will not result in any closure or disposition of Colstrip—it will only clarify whether the PNW Owners have a right under the O&O Agreement to propose and vote on closure of all or part of Colstrip or whether such closure requires unanimous consent of all owners.   In the Arbitration, NorthWestern asserts that unanimous consent of the co-owners is required to close all or part of Colstrip.  The PNW Owners disagree and argue that, if the voting requirements under the O&O Agreement are satisfied, closure of some or all of Colstrip can occur upon a 55 percent vote of the Committee.  Talen has not taken a position on this issue in the Arbitration, other than to question whether the issues in Arbitration

are ripe.

16.     Regardless of the outcome of the Arbitration, it will take a significant amount of time for the co-owners to work through the issues and plan for a future with or without Colstrip. The PNW Owners need resolution of the Arbitration to clarify their rights under the O&O Agreement.  Time is of the essence.  Closure of Colstrip requires long-term planning to work through issues with regulators and to allow each utility to replace the capacity and energy currently provided by Colstrip to serve each utility's customers.  Closure of a coal facility can take years, including time to mechanically close the facility, resolve administrative issues such as contracts and permits associated with the facility (there are thousands of Colstrip-related contracts), obtain any needed regulatory approvals from state and federal regulatory agencies, and resolve any further litigation.  Roberts Supp. Decl., ¶ 3.  Similarly, if the PNW Owners are not able to close some or all of Colstrip, it will take each of the PNW Owners substantial time to work through issues with regulators and other stakeholders to find solutions that will allow each of the PNW Owners to comply with its legal obligations.  To the extent the stay prevents the Arbitration from moving forward, the PNW Owners are prevented from resolving through Arbitration rights under the O&O Agreement that must clarified to allow each owner to take plan for the future with or without Colstrip.

## II.     Finding a Buyer for Individual Positions or the Whole Plant Is Unlikely

17.     At the June 10, 2022 hearing, the Court expressed a desire to facilitate a sale of the Colstrip plant, if feasible.  However, public records reflect that even the Debtor acknowledges there is likely no value in Colstrip and the likelihood of finding a third-party buyer is low.

18.     First, the Adversary Proceeding Complaint against PPL commencing Adversary Proceeding No. 22-90054 (the "PPL Complaint") notes that even in 2012 Colstrip was assigned **negative value**:

157192124.10

- "PPL initially attempted to sell all of PPL Montana's assets, soliciting bids in September 2012. But it quickly became apparent that, while PPL Montana's hydroelectric assets had significant value, its coal-fired assets had none. In fact, NorthWestern submitted a $740 million bid for only PPL Montana's hydroelectric assets, while bidding only $400 million for the hydroelectric assets and the coal-fired assets together—indicating a substantial negative valuation of the coal-fired assets." PPL Complaint, ¶ 32.

- "Defendants knew, at the time of the Distribution, that both facilities [(Colstrip and Corette)] were deeply troubled and burdened by mounting obligations. Colstrip had been assigned a fair market valuation of approximately $5 million (in connection with the December 2013 termination of a sale-leaseback arrangement for the Colstrip plant) in an analysis that did not fully account for the emerging environmental liabilities …." *Id.*, ¶ 38.

- "The dire condition of PPL Montana's financial condition was further confirmed by Defendants' knowledge that an arm's-length purchaser, NorthWestern, had assigned a significant negative value for the coal-fired assets during the sales process for PPL Montana's assets." *Id.*, ¶ 42.

19.    Therefore, the Debtor acknowledges that its coal assets - consisting of Colstrip and Corette - were valued at **negative $340 million** in an arms' length transaction in September, 2012 and since then environmental remediation costs have increased, as has regulator and customer pressure to move away from coal.

20.    Second, the only recent agreement to sell any units in Colstrip 3 or 4 did not go through.  Roberts Supp. Decl., ¶¶ 6-7.  A December 2019 purchase and sale agreement provided

for NorthWestern's purchase of all of PSE's share of Colstrip Unit 4 for one dollar ($1.00), with PSE retaining its pro rata share of remediation costs, decommissioning costs, and miscellaneous shutdown costs.  Roberts Supp. Decl. ¶ 6 & Ex. A, §§ 2.2, 8.2-8.5.  The proposed transaction was subject to approval by the Montana Public Utility Commission ("MPUC") and the Washington Utilities and Transportation Commission ("WUTC").  *Id.* ¶ 6 & Ex. A, §§ 1.1, 7.6(b).  While MPUC and WUTC proceedings were pending, Talen exercised a right of first refusal under the O&O Agreement to acquire a portion of PSE's interests in Colstrip Unit 4. As a result, the proposed transaction was amended so NorthWestern and Talen would each acquire half of PSE's interests in Unit 4 for fifty cents ($0.50).  *Id.*, ¶ 6.  However, the proposed transactions before the WUTC were met by significant opposition by regulators, stakeholders, customers and other government officials. *Id.*, ¶ 7.  The proposed transactions were mutually terminated by PSE, NorthWestern and Talen.  *Id.*

21.     Third, the general investment environment with respect to coal-fired electricity assets is captured in the Declaration of Ryan Leland Omohundro in Support of Debtors' Chapter 11 Petitions and First Day Relief [Doc. 16] ("Omohundro Decl."), which contains wide-ranging discussion of the Debtors' own plans to exit coal-fired generation and move to greener alternatives:

- "The Talen Generation Plants include three coal-fired generation facilities (the Montour plant in Washingtonville, Pennsylvania (the "Montour Plant") and the Brandon Shores and H.A. Wagner plants in Maryland), which will cease coal-fired operations by the end of 2025 as part of the Talen Transition Strategy. Additionally, the Brunner Island dual-fueled plant in Pennsylvania will cease coal-fired operations by the end of 2028."  Omohundro Decl., ¶ 43.

- "Today's electricity consumers, businesses, and technologies demand electricity that is not only low-cost, but also reliable and zero-carbon. … And further, the Debtors committed to, and began the process of, eliminating coal use at all of their wholly-owned facilities. Each of these projects are part of the transformation of the Company's assets and business model toward a decarbonized future (collectively, the "**Talen Transition Strategy**")."  *Id.*, ¶ 52

22.     The Talen Transition Strategy is based on challenges similar to those facing the PNW Owners, and does not present a sanguine picture of the potential market for 40-year-old coal-fired electricity plants.

23.     Finally, the presence of Montana SB 266 makes a very challenging task of finding a buyer for less than all of the ownership interests even more difficult.  A potential buyer would be buying into a plant facing large regulatory and consumer pressures, large funding obligations, and would be subject to the Montana Attorney General policing whether business decisions are "conduct" that, in the Montana Attorney General's view, violate SB 266 and, therefore, are subject to fines of up to $100,000 per day.

24.     For all of these reasons, while the Court's expressed desire to keep operating assets operating is laudable, there are substantial challenges to finding a buyer for this plant.

**III.     "Abandonment" by PNW Owners is not a Rational Option**

25.     The Court asked why PNW Owners could not walk away and "abandon" their interests in Colstrip and let those who wanted the power to continue to operate and sell it.

26.     Mr. Jackson, counsel for NorthWestern, explained at the June 10 hearing how NorthWestern and Talen would respond to an attempt by the PNW Owners to abandon their interests.  Declaration of John S. Kaplan ("Kaplan Decl."), Ex. A at 12:17–13:3 (6/10 Hearing

157192124.10

Tr.).  Under the O&O Agreement, each owner is responsible for paying its proportionate share of operation-and-maintenance costs and construction costs. Roberts Decl. [Doc. 463-12] at 11, 13–14, ¶¶ 8(b), 11(b).  If PNW Owners tried to abandon their interests in Colstrip, NorthWestern and Talen Montana would demand that the PNW Owners continue to pay their share of these costs based on current ownership interests (i.e., they would not recognize the attempted abandonment). *See* Kaplan Decl. Ex. A at 12:24–13:3 (Mr. Jackson: "It would not work for the Pacific Northwest owners to abandon their interests because it would leave NorthWestern and Talen with the obligation to continue to fund it.  We would then look back to the Pacific Northwest owners to continue to have them contribute.").[10]

## IV.      A Sale Under Section 363(h) Sale is Not Possible.

27.      Section 363(h) permits the trustee or debtor in possession to sell both the estate's interest . . . and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety. 11 U.S.C. § 363(h).  But these sales may proceed only if, among other conditions, "such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power."  11 U.S.C. § 363(h)(4).[11]

28.      Subsection (h)(4) was added specifically to protect public utilities, as opposed to, for example, landowners with mineral rights.  *In re Parsons*, No. 18-12462-12, 2021 WL

---

[10] The PNW Owners could assert defenses against NorthWestern and Talen, and they reserve all rights to do so.

[11] Additionally, the following statutory conditions must also be met for a sale to proceed: "(1) partition in kind of such property among the estate and such co-owners is impracticable; (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners."  11 U.S.C. § 363(h)(4).

5496553, at *4 (Bankr. D. Kan. Nov. 23, 2021). "The last limitation [subsection (h)(4)] is intended to protect public utilities from being deprived of power sources as a result of the bankruptcy of a co-owner. Joint ownership of power generation facilities has long been common in the utility industry, and joint ownership is typically held through tenancy in common for regulatory and rate-making reasons. The risk of sale of an entire power plant upon the bankruptcy of one of its co-owners could seriously impair the ability of utilities to obtain financing for jointly owned projects. Thus, Congress excepted jointly owned utility generation assets from section 363(h)." *Id.* Subsection (h)(4) was added to the Bankruptcy Reform Act as a compromise measure, shortly before enactment, "to protect public utilities from being deprived of power sources as the result of the bankruptcy of a co-owner." *In re Levenhar*, 24 B.R. 331, 332 n.1 (Bankr. E.D.N.Y. 1982) (citing 2 Bankr. L. Ed., Code Commentary and Analysis, § 15.42)).

## V.      Regulatory Approval Would Still be Required for Any Sale

29.      Section 363 of the Bankruptcy Code, governing sales of assets, defers to state regulators. A bankruptcy sale free and clear of any interest in the property can only occur if "applicable nonbankruptcy law permits sale of such property free and clear of such interest." 11 U.S.C. ¶ 363(f)(1). *See also In re Pub. Serv. Co. of New Hampshire*, 108 B.R. 854, 882 n.24 (Bankr. D.N.H. 1989) ("When Congress wanted to make nonbankruptcy law inapplicable in bankruptcy proceedings it knew how to do that explicitly . . . Likewise, when Congress intends to make clear that nonbankruptcy law is applicable in bankruptcy proceedings it knows how to do so, and has done so often, in explicit fashion. See 11 U.S.C. ¶ . . . 363(f)(1).").

30.      A sale of Colstrip units would likely require approval by each state's utility commission that regulates the selling owner. *See* RCW 80.12.020(1) (Washington); ORS 757.480 (Oregon). This need for regulatory approval adds complication and delay.

31.      Furthermore, both the Bankruptcy Court and the Federal Energy Regulatory

Commission (FERC) need to approve the sale of an asset that is subject to FERC regulation.[12] *See e.g., In re Boston Generating, LLC*, No. 10 CIV 6528 DLC, 2010 WL 4288171, at *7 (S.D.N.Y. Nov. 1, 2010). As noted, "FERC exercises jurisdiction over all facilities involved in the transmission or sale of electric energy in interstate commerce, of which the [power plant at issue] is one." *Id.* at *3.

32.    Under the Federal Power Act ("FPA"), public utilities are prohibited from selling, leasing, or disposing of their facilities "without first having secured an order of the Commission authorizing it to do so."  16 U.S.C. § 824b(a)(1).

33.    There is a "parallel approval structure" that is required for bankruptcy sales when the asset to be sold is also regulated by FERC.  *See, e.g., In re Boston Generating, LLC*, No. 10 CIV 6528 DLC, 2010 WL 4288171, at *7 (S.D.N.Y. Nov. 1, 2010).

## VI.    Conclusion

34.    For the reasons stated above and in their Motion and Reply, the PNW Owners respectfully request that this Court modify the automatic stay to permit the Montana Lawsuit and the Arbitration to proceed to conclusion.

//

---

[12] The Federal Power Act has a $10,000,000 threshold for whether FERC approval is needed for a sale of utility assets. 16 U.S.C. 824b.

157192124.10

Dated:  June 20, 2022

Respectfully submitted,

**PERKINS COIE LLP**

*/s/ John S. Kaplan*

John D. Penn
Texas Bar No. 15752300
S.D. Texas I.D. No. 10782
500 N. Akard Street, Suite 3300
Dallas, Texas 75201-3347
Telephone: (214) 965-7700
Facsimile: (214) 965-7799
jpenn@perkinscoie.com

John S. Kaplan
Washington Bar No. 23788
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
jkaplan@perkinscoie.com
*(Admitted Pro Hac Vice)*

Hailey A. Varner Rutledge
Illinois Bar No. 6330584
110 North Wacker Drive, 34th Floor
Chicago, Illinois 60606
Telephone: (312) 324-8400
Facsimile: (312) 324-9400
hrutledge@perkinscoie.com
*(Admitted Pro Hac Vice)*

Counsel to The PNW Owners

-16-

157192124.10

### Certificate of Service

I hereby certify that on June 20, 2022, a true and correct copy of the foregoing document was electronically filed in the case with the Clerk of the United States Bankruptcy Court by using the CM/ECF system, and a copy was served on the parties who are entitled to receive notice via the Court's ECF notification system.

/s/ John S. Kaplan
John S. Kaplan

157192124.10