# EXHIBIT A
*Purchase Agreement*

**COLSTRIP UNIT 4 PURCHASE AND SALE AGREEMENT**

**by and between**

**NORTHWESTERN CORPORATION**

**and**

**PUGET SOUND ENERGY, INC.**

**Dated December 9, 2019**

TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS..................................................................................1
    Section 1.1   Certain Defined Terms.......................................................1
    Section 1.2   Interpretation.....................................................................9

ARTICLE 2 PURCHASE AND SALE OF THE COLSTRIP 4 INTERESTS ............10
    Section 2.1   Purchase and Sale of Colstrip 4 Interests...................10
    Section 2.2   Purchase Price................................................................12
    Section 2.3   Assumption of Liabilities...............................................12
    Section 2.4   Ad Valorem Real and Personal Property Taxes. .......12

ARTICLE 3 CLOSING; CONDITIONS PRECEDENT........................................13
    Section 3.1   Closing ...........................................................................13
    Section 3.2   Closing Deliveries by Buyer.........................................13
    Section 3.3   Closing Deliveries by Seller.........................................13
    Section 3.4   Conditions Precedent to the Closing Obligations of Buyer......................14
    Section 3.5   Conditions Precedent to the Closing Obligations of Seller .....................15
    Section 3.6   Failure to Close .............................................................16

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER.................16
    Section 4.1   Organization and Good Standing..................................16
    Section 4.2   Authority........................................................................17
    Section 4.3   Enforceability.................................................................17
    Section 4.4   Title to Colstrip 4 Interests ..........................................17
    Section 4.5   No Violation or Breach..................................................17
    Section 4.6   Consents.........................................................................17
    Section 4.7   Material Contracts.........................................................18
    Section 4.8   No Disputes; Litigation.................................................18
    Section 4.9   Brokerage Fees and Commissions ...............................18
    Section 4.10  Bankruptcy.....................................................................18
    Section 4.11  Records ...........................................................................18

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER .................18
    Section 5.1   Organization and Qualification.....................................18
    Section 5.2   Authority........................................................................18
    Section 5.3   Enforceability.................................................................19
    Section 5.4   No Violation or Breach..................................................19
    Section 5.5   Consents.........................................................................19
    Section 5.6   No Disputes; Litigation.................................................19
    Section 5.7   Brokerage Fees and Commissions ...............................19
    Section 5.8   Bankruptcy.....................................................................19
    Section 5.9   Regulatory Matters........................................................19

ARTICLE 6 ACCESS AND CONFIDENTIALITY ...........................................20

i

Section 6.1    General Access..........................................................................20
Section 6.2    Confidential Information ..........................................................20

ARTICLE 7 COVENANTS OF SELLER AND BUYER ........................................21
Section 7.1    Conduct of Business Pending Closing.......................................21
Section 7.2    Public Announcements ..............................................................22
Section 7.3    Actions by Parties .....................................................................22
Section 7.4    Further Assurances.....................................................................22
Section 7.5    Records ......................................................................................23
Section 7.6    Regulatory and Other Authorizations and Consents Filings......23
Section 7.7    Fees and Expenses.....................................................................25
Section 7.8    Tax Matters. ..............................................................................25
Section 7.9    Right of First Refusal ................................................................25
Section 7.10   Updates to Disclosure Schedules ..............................................26
Section 7.11   Transfers of Interests.................................................................26

ARTICLE 8 LIABILITY AND INDEMNIFICATION ..........................................26
Section 8.1    Survival .....................................................................................26
Section 8.2    AOC and CCR Rules .................................................................26
Section 8.3    Decommissioning ......................................................................27
Section 8.4    Pension Costs ............................................................................27
Section 8.5    Other Losses Allocated Based on Pre-Closing Date Project Shares..........28
Section 8.6    Losses Allocated Based on Post-Closing Date Project Shares ................28
Section 8.7    Disagreements Regarding Causes of Losses..............................28
Section 8.8    Resolution if Executive Negotiations Do Not Succeed. ............29
Section 8.9    Indemnification By Seller .........................................................30
Section 8.10   Indemnification By Buyer .........................................................30
Section 8.11   Third Party Claims....................................................................31
Section 8.12   Direct Claims ............................................................................32
Section 8.13   Acknowledgement .....................................................................33

ARTICLE 9 TERMINATION AND REMEDIES ...................................................33
Section 9.1    Methods of Termination ...........................................................33
Section 9.2    Effect of Termination ................................................................34
Section 9.3    No Liability ...............................................................................35

ARTICLE 10 DISPUTE RESOLUTION ...............................................................35
Section 10.1   Mutual Discussions ...................................................................35
Section 10.2   Arbitration .................................................................................35

ARTICLE 11 OTHER PROVISIONS.....................................................................36
Section 11.1   Counterparts...............................................................................36
Section 11.2   Governing Law ..........................................................................36
Section 11.3   Entire Agreement ......................................................................37
Section 11.4   Notices.......................................................................................37
Section 11.5   Successors and Assigns.............................................................38
Section 11.6   Amendments..............................................................................38

ii

Section 11.7    Agreement for the Parties' Benefit Only ....................................................38
Section 11.8    Severability ...............................................................................................38
Section 11.9    Bulk Sales or Transfer Laws......................................................................38
Section 11.10  No Waiver.................................................................................................38
Section 11.11  Cumulative Remedies ...............................................................................39
Section 11.12  Further Assurances....................................................................................39
Section 11.13  Counterparts; Effectiveness ......................................................................39
Section 11.14  Specific Performance ................................................................................39

EXHIBITS AND SCHEDULES

Exhibits:

Exhibit A                    Assignment and Assumption Agreement
Exhibit B                    Excluded Assets
Exhibit C                    Power Purchase Agreement
Exhibit E                    Water Rights Transfer Certificate
Exhibit F                    Vote Sharing Agreement
Exhibit G                    Buyer's Officer's Certificate
Exhibit H                    Seller's Officer's Certificate
Exhibit I                    Form of Deed Conveying Seller's Interest and
Exhibit J                    Form of Waiver of Right of First Refusal

Schedules:

Schedule 1.1                 Water Rights
Schedule 2.1(a)              Real Property
Schedule 2.1(b)              Common Facilities Interest and Associated Assets
Schedule 2.1(c)              Material Contracts
Schedule 4.4                 Title to Colstrip 4 Interests
Schedule 4.5                 No Violation or Breach
Schedule 4.6                 Seller's Consents
Schedule 4.7                 Material Contracts
Schedule 5.5                 Buyer's Consents
Schedule 7.1                 Conduct of Business Pending Closing
Schedule 8.5                 Other Losses Allocated Based on Pre-Closing Project Shares
Schedule 8.6                 Losses Allocated Based on Post-Closing Project Shares

## COLSTRIP UNIT 4 PURCHASE AND SALE AGREEMENT

THIS COLSTRIP UNIT 4 PURCHASE AND SALE AGREEMENT (this "*Agreement*"), dated as of December 9, 2019, is by and between NORTHWESTERN CORPORATION, a Delaware corporation ("*Buyer*"), and PUGET SOUND ENERGY, INC., a Washington public utility corporation ("*Seller*").  Buyer and Seller are sometimes referred to herein individually as a "*Party*" and, collectively, as the "*Parties*."

## RECITALS

WHEREAS, Seller is the Owner with respect to a twenty-five percent (25%) undivided interest in the 740MW Colstrip Unit 4, a coal-fired, base-load electric generation facility located in Colstrip, Montana ("*Colstrip Unit 4*") and in all associated real property, equipment, common real property and common equipment and facilities and all rights incidental thereto, as more specifically defined in Section 2.1 (the "*Colstrip 4 Interests*").

WHEREAS, Seller desires to sell and convey to Buyer, and Buyer desires to purchase and acquire from Seller, all of Seller's interest the Colstrip 4 Interests, on the terms and subject to the conditions hereinafter set forth.

WHEREAS, Seller and Buyer are entering into this Agreement to evidence their respective duties, obligations, and responsibilities in respect of the purchase and sale of the Colstrip 4 Interests as contemplated herein.

WHEREAS, certain capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in ARTICLE 1 hereof.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained in this Agreement, and intending to be legally bound, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1**   **Certain Defined Terms**.  As used in this Agreement, the following terms have the respective meanings set forth below or set forth in the Sections referred to below:

"*AAA*" is defined in Section 10.2(a).

"*Action*" means any action, suit, investigation of which Seller has Knowledge, proceeding, condemnation, or audit by or before any court or other Governmental Authority or any arbitration proceeding.

"*Ad Valorem Property*" is defined in Section 2.4(a).

"*Affiliate*" means, as to the Person specified, any Person controlling, controlled by or under common control with such specified Person.  The concept of control, controlling or controlled by as used in the aforesaid context means the possession, directly or indirectly, of the

power to direct or cause the direction of the management and policies of another, whether through the ownership of voting securities, by contract or otherwise.  No Person shall be deemed an Affiliate of any Person solely by reason of the exercise or existence of rights, interests, or remedies under this Agreement.

"*Agreement*" is defined in the preamble.

"*Allocation Dispute Notice*" is defined in <u>Section 8.7</u>.

"*Allocation Dispute Notice Response*" is defined in <u>Section 8.7</u>.

"*AOC*" means the means the Administrative Order on Consent Regarding Impacts Related to Wastewater Facilities Compromising the Closed-Loop System at Colstrip Steam Electric Station, Colstrip Montana entered into between PPL Montana, LLC (n/k/a Talen Montana, LLC) and the Montana Department of Environmental Quality in July and August of 2012, as amended by the March 1, 2017 Agreement to Amend Administrative Order on Consent.

"*Assignment and Assumption Agreement*" means an Assignment of the Material Contracts from Seller to Buyer to be dated as of the Closing Date and substantially in the form set forth on <u>Exhibit A</u>.

"*Assumed Liabilities*" is defined in Section 2.3.

"*Business Day*" means any day which is not a Saturday, Sunday, or legal holiday in the state of Montana.

"*Buyer*" is defined in the preamble.

"*Buyer's Consents*" means the consents, filings and notices required to be obtained by Buyer and delivered at the Closing as listed on <u>Section 5.5</u>.

"*Buyer Fundamental Representations*" means the representations and warranties of Buyer set forth in <u>Section 5.1</u> (Organization and Qualification), <u>Section 5.2</u> (Authority), <u>Section 5.3</u> (Enforceability), and <u>Section 5.7</u> (Brokerage Fees and Commissions).

"*CCR Rules*" means those Environmental Laws relating to the release, discharge, disposal, storage, remediation, or removal of coal combustion residuals, including those rules issued by the United States Environmental Protection Agency pursuant to subtitle D of the Resource Conservation and Recovery Act.

"*Closing*" means the consummation of the transaction contemplated by this Agreement as further defined in <u>Section 3.1</u>.

"*Closing Date*" is defined in <u>Section 3.1</u>.

"*Closing Documents*" means the documents to be delivered by Buyer and Seller at the Closing in accordance with <u>Section 3.2</u> and <u>Section 3.3</u>, respectively.

2

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Colstrip 4 Interests*" is defined in the Recitals and further defined in <u>Section 2.1</u>.

"*Colstrip Unit 3*" means the coal-fired thermal generating plant commonly referred to as Colstrip Unit 3, located near Colstrip, Montana.

"*Colstrip Unit 4*" is defined in the Recitals.

"*Colstrip Units 1 & 2*" means the coal-fired thermal generating plant, consisting of two units commonly referred to as "Colstrip Units 1 & 2," located near Colstrip, Montana.

"*Commercially Reasonable Efforts*" means efforts which are reasonably necessary to cause, or assist in, the consummation of the transactions contemplated by this Agreement and which do not require the performing Party to (i) expend funds, incur expenses or assume liabilities other than those which are reasonable in nature and amount within the context of the transactions contemplated by this Agreement or (ii) amend, waive or terminate the material terms of any Material Contract or arrangement to which the performing Party is a party; *provided* that the Parties will cooperate to amend the Ownership and Operation Agreement and the Common Facilities Agreement to the degree required to give effect to the transactions contemplated by this Agreement.

"*Committee*" has the meaning assigned to it under the Ownership and Operation Agreement.

"*Common Facilities*" has the meaning assigned to it under the Ownership and Operation Agreement.

"*Common Facilities Interest*" is defined in <u>Section 2.1(b)</u>.

"*Confidentiality Agreement*" is defined in <u>Section 6.2</u>.

"*Damages*" is defined in <u>Section 8.9</u>.

"*Debt*" of any Person means at any date, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business and payable not more than 12 months from the date of incurrence, (iv) all obligations of such Person as lessee under any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, has been or would be required to be accounted for as a capital lease on the consolidated balance sheet of that Person, (v) the undrawn face amount of any outstanding letters of credit issued in favor of such Person, and all obligations of such Person to reimburse or prepay any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (vi) all Debt or other monetary obligations (of such Person or of others) secured by any mortgage, lien, pledge, charge, security interest or encumbrance of any kind on any asset of such Person, whether or not such Debt or other monetary obligation is assumed by such Person, (vii) all obligations of such Person

to pay a specified purchase price for assets, goods, securities or services whether or not delivered or accepted (including take-or-pay arrangements and similar obligations), (viii) all obligations of such Person under conditional sale or other title retention agreements (even if the remedies of the sellers or lenders under such agreements in the event of a default thereunder are limited to the repossession or sale of the property or assets covered thereby), and (ix) all Debt or other monetary obligations of others in respect of which such Person has any contingent liability, including without limitation any guarantee.

"*Disclosure Schedule*" is defined in the preamble of <u>ARTICLE 4</u>.

"*Dispute*" is defined in <u>Section 10.1</u>.

"*Dispute Notice*" is defined in <u>Section 10.1</u>.

"*Dispute Notice Response*" is defined in <u>Section 10.1</u>.

"*Employee Benefit Plans*" means any retirement plan, welfare plan, stock option plan, equity or equity based plan, bonus plan, change-in-control, retention, incentive award plan, severance pay plan or policy, deferred compensation plan or policy, executive compensation or supplemental income plan or policy, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life or any other employee benefit plan or program, including, without limitation, each "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA and other employee benefit plan, program, policy, practice, agreement or arrangement, whether or not subject to ERISA.

"*Environmental Laws*" means any Law relating to pollution control or the protection of the environment, including: (a) (i) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., (ii) the Solid Waste Disposal Act, §§ 6901 et seq., (iii) the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq., (iv) the Clean Air Act, 42 U.S.C. §§ 7401 et seq., (v) the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1471 et seq., (vi) the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq., and (vii) the Safe Drinking Water Act, 42 U.S.C. §§ 300f-300j; and (b) such Laws imposing requirements pertaining to (i) any Hazardous Substance, (ii) the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release or threatened Release of any Hazardous Substance, (iii) reporting, licensing, permitting, or investigation in connection with such activities or (iv) any abatement, removal, remedial, corrective or other corrective action in connection with any Hazardous Substance; and (c) such Laws imposing requirements pertaining to the protection of health or safety of employees or the public.

"*Environmental Liabilities*" means all liabilities involving or arising out of the operation or ownership of the Colstrip 4 Interests and arising out of or resulting from or relating to any Environmental Law or any Hazardous Substance.

"*ERISA Affiliate Liability*" means any liabilities, obligations or responsibilities (whether contingent or otherwise) imposed by law on Seller relating to any Employee Benefit Plan maintained by any trade or business (whether or not incorporated) which are or have been within

the last six years under common control with Seller within the meaning of Section 414(b), (c), (m) or (o) of the Code (an "*ERISA Affiliate*"), including (i) liability to any multiemployer plan contributed to, or obligated to contribute to, by the Seller or any of their ERISA Affiliates, including without limitation any liability to the Pension Benefit Guaranty Corporation under Title IV of ERISA and (ii) liability with respect to non-compliance with the notice and benefit continuation requirements of COBRA.

"*Excluded Assets*" means those assets listed on Exhibit B.

"*FERC*" means the Federal Energy Regulatory Commission, or any successor to its functions.

"*FERC 203 Approval*" means the authorization from FERC to transfer certain of the Colstrip 4 Interests to Buyer pursuant to Section 203 of the Federal Power Act.

"*Final Order*" is defined in Section 8.12(h).

"*GAAP*" means generally accepted accounting principles consistently applied as in effect on the date of this Agreement in the United States.

"*Governmental Authority*" means (i) the federal government of the United States of America, (ii) any state, county, municipality, or other governmental subdivision within the United States of America, and (iii) any executive, legislative or judicial court, department, commission, board, bureau, agency, or other instrumentality of the federal government of the United States of America or of any state, county, municipality, or other governmental subdivision within the United States of America.

"*Hazardous Substance*" means any substance or material listed, defined or classified as a pollutant, contaminant, hazardous substance, toxic substance, hazardous waste or words of similar import under any Environmental Law, including petroleum, polychlorinated biphenyls, and asbestos in any form, or any coal combustion materials or by-products.

"*Indemnification Dispute Notice*" is defined in Section 8.12(b).

"*Indemnified Party*" is defined in Section 8.11(a).

"*Indemnifying Party*" is defined in Section 8.11(a).

"*Indemnity Claim Amount*" is defined in Section 8.12(b).

"*Knowledge*" means, with respect to Seller, the actual knowledge of any fact, circumstance, or condition, assuming reasonable inquiry of their direct reports, by Ron Roberts, and with respect to Buyer, the actual knowledge of any fact, circumstance, or condition, assuming reasonable inquiry of their direct reports, by John Hines.

"*Labor Laws*" means any and all Laws relating in any manner to employment, employees and/or individuals performing work as consultants or contractors, including employment standards, employment of minors, employment discrimination, health and safety, labor relations,

unions, withholding, wages and hours and overtime of any kind, work authorization verification, workplace safety and insurance and pay equity.

"*Law*" means any law, statute, rule, regulation, ordinance, standard, code, order, judgment, decision, writ, injunction, decree, certificate of need, award, or other governmental restriction, including any published and publicly available policy or procedure enforceable by any Governmental Authority.

"*Lien*" means any lien, security interest, charge, claim, mortgage, deed of trust, option, warrant, purchase right, lease, pledge, easement, right-of-way, encroachment, building or use restrictions, conditional sales agreement or other encumbrance.

"*Losses*" means any and all claims, liabilities, losses, causes of action, damages, judgments, obligations, deficiencies, demands, fines, penalties, litigation, lawsuits, administrative proceedings, administrative investigations, costs, and expenses, Environmental Liabilities, and ERISA Affiliate Liability, including reasonable attorneys' fees, court costs, investigator expenses, and other costs of suit.

"*Material Adverse Effect*" means a material and adverse effect on (i) the ability of Seller or Buyer to consummate the transactions contemplated by this Agreement or otherwise to comply with its obligations hereunder or (ii) the business, assets, financial condition, or results of operations comprising the Colstrip 4 Interests, in each case taken as a whole, including without limitation (a) any change in any applicable Law if such change has an effect on the Colstrip 4 Interests that is disproportionate to the effect on other coal generation facilities, (b) the Colstrip 4 Interests are substantially damaged or destroyed by any casualty event or a substantial portion of the Colstrip 4 Interests are taken, in part or on whole by any Governmental Authority, (c) changes or developments in national, regional, state, or local wholesale or retail markets for electric power, fuel, or related products, including seasonal changes, (including changes in commodity prices or the effects of actions by competitors), if such matters have an effect on the Colstrip 4 Interests that is disproportionate to the effect on other coal generation facilities; and (d) changes or developments in national, regional, state, or local electric transmission or distribution systems, if such matters have an effect on the Colstrip 4 Interests that is disproportionate to the effect on other coal generation facilities; *provided*, *however*, that such determination shall exclude (A) general economic or political conditions; (B) conditions generally affecting the industries in which the Colstrip 4 Interests operate; (C) any changes in financial, banking or securities markets in general, including any disruption and any decline in the price of any security or any market index or change in prevailing interest rates;  (D) any adverse change or effect principally attributable to the announcement, pendency, or consummation of the transactions contemplated by this Agreement (including any action required or permitted by this Agreement with the written consent of or at the written request of Buyer, decrease in customer demand, any reduction in revenues, any disruption in supplier, partner or similar relationships, or any loss of employees attributable thereto but excluding any failure to obtain Required Regulatory Approvals); (E) any outbreak or escalation of hostilities or the declaration by the United States of a national emergency or war; (F) any failure by the Colstrip 4 Interests meet any internal or published projections, forecasts or supply predictions; (G) any matter of which Buyer is aware of on the date hereof; or (H) any acts of terrorism, any other international or domestic calamity or crisis or geopolitical event, except to the extent such

matters in subsections (A), (B), (C), (E) or (F) have an effect on the Colstrip 4 Interests that is disproportionate to the effect on other coal generation facilities.

"*Material Contracts*" is defined in Section 2.1(c).

"*MPSC*" means the Montana Public Service Commission.

"*Notice of Claim*" is defined in Section 8.12(a).

"*Operator*" means Talen Montana, LLC, the operator of Colstrip Unit 3 and Colstrip Unit 4.

"*Owner*" has the meaning assigned to it under the Ownership and Operation Agreement.

"*Ownership and Operation Agreement*" means the Ownership and Operation Agreement, dated May 6, 1981, as amended by Amendment No. 1 dated October 11, 1991, Amendment No. 2 dated July 13, 1998, Amendment No. 3 entered into in 2004, and Amendment No. 4 entered into in 2008, between Buyer, Seller, Portland General Electric Company, the Washington Water Power Company (now Avista) and Pacific Power & Light Company (now PacifiCorp).

"*Party*" is defined in the preamble.

"*Permits*" means written permits, licenses, franchises, registrations, variances and approvals obtained from any Governmental Authority.

"*Permitted Liens*" means (i) Liens for Taxes not yet due and payable, pledges or deposits made in the ordinary course of business under workers' compensation legislation, unemployment insurance Laws or similar Laws, good faith deposits made in the ordinary course of business in connection with bids, tenders or contracts, including rent security deposits, (ii) in the case of the Real Property, encumbrances and other restrictions and irregularities to title which exist on the date hereof or on the Closing Date and which were not created by, through or under the Seller, (iii) rights reserved to or vested but not yet asserted respecting any Colstrip 4 Interests by any Governmental Authority by the terms of any franchise, grant, license, Permit or provision of applicable Law, to purchase, condemn, appropriate or recapture, or designate a buyer of the real property, (iv) rights reserved to or vested in any municipality or public authority to control or regulate the use of the real property or to use the real property in any manner, including zoning and land use regulations, and (v) mechanic and other similar liens for amounts not yet due or payable.

"*Person*" means any Governmental Authority or any individual, firm, partnership, corporation, limited liability company, joint venture, trust, unincorporated organization or other entity or organization.

"*post-Closing Date Project Share*" means the Project Share attributable to each of Buyer and Seller after giving effect to the transactions contemplated by this Agreement.

"*PPA*" means the Power Purchase Agreement between Buyer and Seller in the form set forth on Exhibit C.

7

"*pre-Closing Date Project Share*" means the Project Share attributable to each of Buyer and Seller as specified in the Ownership and Operation Agreement.

"*Pre-Closing Period*" is defined in Section 2.4(a).

"*Project*" has the meaning assigned to it under the Ownership and Operation Agreement.

"*Project Share*" has the meaning set forth in the Ownership and Operation Agreement.

"*Project Users*" has the meaning assigned to it under the Ownership and Operation Agreement.

"*Prudent Utility Practices*" means the practices, methods and acts generally engaged in or approved by the electric utility industry in the United States for similarly situated facilities in the United States during a particular time period, in a manner consistent with Laws, reliability, safety and environmental protection, and taking into consideration the requirements of this Agreement, the Material Contracts and the other contracts affecting the operation of the Colstrip 4 Interests. Prudent Utility Practices are not necessarily intended to require the optimum or best practices, methods or acts to the exclusion of all others, but rather to include a spectrum of possible practices, methods or acts consistent with the immediately preceding sentence.

 "*Purchase Price*" is defined in Section 2.2.

"*Real Property*" means the real property interests which are included as part of the Colstrip 4 Interest as set forth on Schedule 2.1(a).

"*Records*" means any and all of the books, records, contracts, agreements and files of the Seller existing on the Closing Date and pertaining to the Colstrip 4 Interests, excluding any information if disclosure to Buyer would, in Seller's sole discretion, jeopardize any attorney-client, work-product or other privilege or other information reasonably deemed confidential by Seller.

"*Release*" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment.

"*Representatives*" means officers, directors, employees and other agents of a particular Person.

"*Required Regulatory Approvals*" means the FERC 203 Approval, and such approvals as may be necessary from the MPSC and the Washington Utilities and Transportation Commission; *provided* that an approval will not be deemed to have been obtained until the date after which all appeals have been fully adjudicated and an appeal may no longer be filed, regardless of whether an appeal is filed.

"*Retained Liabilities*" is defined in Section 2.1.

"*Rules*" is defined in Section 10.2.

8

"*Seller*" is defined in the preamble.

"*Seller's Consents*" means the consents, filings and notices required to be obtained by Seller (other than the Required Regulatory Approvals) and delivered at the Closing as listed on Schedule 4.6.

"*Seller Fundamental Representations*" means the representations and warranties of Buyer set forth in Section 4.1 (Organization and Good Standing), Section 4.2 ( Authority), Section 4.3 (Enforceability), Section 4.4 (Title to Colstrip 4 Interests), and Section 4.9 (Brokerage Fees and Commissions).

"*Straddle Period*" is defined in Section 2.4(c).

"*Tax*" or "*Taxes*" means all federal, state, local, foreign and other net income, gross income, estimated, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, lease, service, service use, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property taxes and levied and pending assessments, windfall profits, value added, commercial rent, customs duties, capital gain, social security, royalty, documentary, environmental or other taxes, or fees, assessments, duties or charges in the nature or taxes, of any kind whatever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

"*Tax Return*" means all returns and reports (including elections, declarations, disclosures, attachments, schedules, estimates, information returns, and amended returns and reports) required to be filed with respect to Taxes.

"*Third Party Claim*" is defined in Section 8.11(a).

"*Transfer Taxes*" means all sales, use, excise, stock, stamp, documentary, filing, recording, permit, license, authorization and other similar Taxes, filing fees and similar charges incurred by either Party in connection with the transactions contemplated hereby.

"*Transmission Acquisition Agreement*" means the Purchase and Sale Agreement between Buyer and Seller in connection with Buyer's purchase of Seller's undivided interest in the 500 kilovolt Colstrip Project Transmission System.

"*Update*" is defined in Section 7.10.

"*Vote Sharing Agreement*" means the Vote Sharing Agreement between Buyer and Seller in the form set forth on Exhibit F.

"*Water Rights Transfer Certificate*" means a water rights transfer certificate in the form set forth on Exhibit E pursuant to which Seller shall convey to Buyer the water rights listed on Schedule 1.1.

**Section 1.2**   **Interpretation**.  This Agreement shall not be construed against either Party, and no consideration shall be given or presumption made, on the basis of who drafted this

Agreement or any particular provision hereof or who supplied the form of this Agreement.  In construing this Agreement:

(a)     all references in this Agreement to an "Article," "Section", "subsection", "Exhibit", or "Schedule" shall be to an Article, Section, subsection, Exhibit, or Schedule of this Agreement, unless the context requires otherwise;

(b)     unless the context otherwise requires, the words "this Agreement," "hereof," "hereunder," "herein," "hereby" or words of similar import shall refer to this Agreement as a whole and not to a particular Article, Section, subsection, clause or other subdivision hereof;

(c)     whenever the context requires, the words used herein shall include the masculine, feminine and neuter gender, and the singular and the plural;

(d)     examples shall not be construed to limit, expressly or by implication, the matter they illustrate;

(e)     the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions;

(f)     a defined term has its defined meaning throughout this Agreement and in each Exhibit and Schedule hereto, regardless of whether it appears before or after the place where it is defined;

(g)     each Exhibit and Schedule to this Agreement is a part of this Agreement, and should be construed in light of each other;

(h)     the headings and titles herein are for convenience only and shall have no significance in the interpretation hereof; and

(i)     references to a Law, rule, regulation, contract, agreement, or other document mean that Law, rule, regulation, contract, agreement, or document as amended, modified, or supplemented, if applicable.

## ARTICLE 2
## PURCHASE AND SALE OF THE COLSTRIP 4 INTERESTS

**Section 2.1     Purchase and Sale of Colstrip 4 Interests**.  On the terms and subject to the conditions hereof, Seller covenants and agrees to sell, assign and transfer to Buyer all of Seller's right, title and interest in, and Buyer covenants and agrees to purchase from Seller, effective as of the Closing, all of Seller's right, title and interest in, all of the Colstrip 4 Interests, free and clear of any and all Liens, other than Permitted Liens and excluding the Excluded Assets (as hereinafter defined).  The assets, properties and rights to be purchased or otherwise transferred to Buyer under this Agreement, all of which solely relate to the Colstrip 4 Interests and, except for Excluded Assets, constitute, or will constitute as of Closing, all of Seller's interests in or to the Colstrip 4 Interests, are as follows:

(a)     all of Seller's ownership rights to the Real Property;

10

(b)      the portion of Seller's interest in the Common Facilities and associated assets as described on Schedule 2.1(b) which are associated with the Colstrip 4 Interests (the "*Common Facilities Interest*");

(c)      the portion of Seller's rights under the contracts, leases and agreements related to the Colstrip 4 Interests and which are associated with the Colstrip 4 Interests, including the contracts, leases and agreement that are set forth on Schedule 2.1(c) (the "*Material Contracts*");

(d)      notwithstanding the provisions of Section 2.1(a)-(c) above, the Colstrip 4 Interests shall not include (and the Seller shall retain and the Buyer shall not assume):

(i)      all of Seller's rights and interests related to its interest in Colstrip Units 1 & 2 and Colstrip Unit 3 including interests in Common Facilities and associated assets, rights under contracts, leases and agreements, and ownership rights to real property, to the extent such rights are associated with Seller's continued ownership of Colstrip Units 1 & 2 and a portion of Colstrip Unit 3;

(ii)      claims arising out of liabilities occurring prior to Closing, including Environmental Liabilities and pension liabilities to the extent and as provided for in Sections 8.2, 8.4 and 8.5;

(iii)      claims arising out of those items listed on Schedule 8.5 and as provided for in Section 8.5;

(iv)      future decommissioning and demolition costs in connection with the Colstrip 4 Interests to the extent and as provided for in Section 8.3;

(v)      any obligation or liability related to or arising out of any of the Excluded Assets;

(vi)      any obligation or liability related to or arising out of Actions pending as of the Closing Date against the Seller or any of its Affiliates;

(vii)      any obligation or liability (including any future Actions) related to or arising out of the Seller's conduct of the business or ownership of the Colstrip 4 Interests prior to the Closing;

(viii)      any ERISA Affiliate Liability or any obligation or liability related to or arising out of any collective bargaining agreement of the Seller, whether prior to, on or after the Closing;

(ix)      any ERISA Affiliate Liability or any obligation, liability or expense relating to or arising out of (A) the employment or termination of employment or consultancy of any employee or consultant, or former employee or consultant of the Operator, on or prior to the Closing (B) any collective bargaining agreement of the Operator on or prior to the Closing (C) compliance with or violations of any Labor Laws by the Operator on or prior to the Closing;

(x)     any obligation or liability of any kind or nature relating to (A) Taxes of the Seller; and (B) Taxes related to the Seller's conduct of the business or ownership of the Colstrip 4 Interests prior to the Closing (in the case of real property Taxes, as determined in accordance with Section 2.4(a)); and

(xi)     any obligation or liability of Seller for any Debt.

The foregoing liabilities listed in this <u>Section 2.1(d)</u> are collectively referred to as the "*Retained Liabilities*" and shall remain and be the obligations and liabilities solely of the Seller.

**Section 2.2     Purchase Price**.  The aggregate purchase price and additional consideration for the sale and conveyance of the Colstrip 4 Interests shall be:  One Dollar ($1) (the "*Purchase Price*").

**Section 2.3     Assumption of Liabilities**.  Except as otherwise provided in <u>ARTICLE 8</u>, Buyer shall assume and agree to pay, perform and discharge the liabilities and obligations of Seller related to the Colstrip 4 Interests, including without limitation those liabilities and obligations contained in the Material Contracts, but solely with respect to liabilities or obligations arising solely during periods following the Closing Date (the "*Assumed Liabilities*").

**Section 2.4     Ad Valorem Real and Personal Property Taxes.**

(a)     Seller shall be responsible for its pre-Closing Date Project Share of all ad valorem Taxes imposed on or with respect to the Real Property and any personal property (the "*Ad Valorem Property*") for all Tax periods (or portion of any Tax period beginning on or before and ending after the Closing Date (a "*Straddle Period*")) ending on or prior to the Closing Date (the "*Pre-Closing Periods*").  The portion of such Taxes for which Seller shall be liable for a Straddle Period shall be determined by multiplying its pre-Closing Date Project Share of the amount of Taxes for the entire Straddle Period by a fraction, the numerator of which is the number of days in such Straddle Period prior to and including the Closing Date and the denominator of which is the total number of days in such Straddle Period.

(b)     Any real or personal property tax reductions or refunds with respect to the Ad Valorem Property for or relating to a Pre-Closing Period (as determined in accordance with Section 2.4(a)) shall be for the account of Seller.  If Buyer receives a real property Tax refund or credit with respect to the Ad Valorem Property for or relating to a Pre-Closing Period, Buyer shall promptly remit to Seller its pre-Closing Date Project Share of such refund or credit relating to the Pre-Closing Period.

(c)     Prior to the Closing Date, Seller shall control and conduct all negotiations, proceedings and communications with the Montana Department of Revenue regarding real property Taxes with respect to the Ad Valorem Property, shall keep Buyer informed regarding such negotiations, proceedings and communications and shall not agree to any settlement with the Montana Department of Revenue that affects any Tax period or portion of a Straddle Period beginning after the Closing Date without Buyer's consent, which consent shall not be unreasonably withheld, conditioned or delayed.  From and after the Closing Date, Buyer shall control and conduct all negotiations, proceedings and communications with the Montana Department of Revenue regarding real property Taxes with respect to the Ad Valorem Property,

shall keep Seller informed regarding such negotiations, proceedings and communications, and shall not agree to any settlement with the Montana Department of Revenue that affects any Tax period or portion of a Straddle Period ending on or prior to the Closing Date without Seller's consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Seller shall reasonably cooperate with all such negotiations, proceeds and communications.

## ARTICLE 3
## CLOSING; CONDITIONS PRECEDENT

**Section 3.1**    **Closing**.  The closing of the transactions contemplated by this Agreement (the "*Closing*") shall occur at the offices Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, Minnesota, commencing at 9:00 A.M. or at such other location as may be agreed upon by the Parties on either (i) the second (2nd) Business Day after the satisfaction of all the conditions precedent to the Closing in accordance with Sections 3.4 and 3.5 hereof, or (ii) at such other time or place as may be mutually agreed upon by the Parties in writing.  The date on which the Closing occurs is referred to herein as the "*Closing Date*".

**Section 3.2**    **Closing Deliveries by Buyer**.  At the Closing, Buyer shall deliver, or cause to be delivered, to Seller the following:

(a)    The Purchase Price in cash in accordance with Section 2.2 hereof;

(b)    A certificate of an authorized officer of Buyer, dated as of the Closing Date, in the form set forth in Exhibit G, certifying that (i) the representations and warranties of Buyer set forth in ARTICLE 5 are true, correct and complete as of the Closing Date, except in such circumstances as shall not, individually or in the aggregate, have or reasonably be expected to have a Material Adverse Effect, (ii) the conditions set forth in Section 3.4 have been fulfilled or waived and (iii) the covenants of Buyer set forth in ARTICLE 7 to be performed on or before the Closing Date have been fulfilled or waived in writing by Seller.

(c)    A duly executed copy of the Assignment and Assumption Agreement;

(d)    A copy of the PPA, duly executed by Buyer;

(e)    Duly executed copies of each of the Buyer's Consents;

(f)    A copy of the Vote Sharing Agreement, duly executed by Buyer; and

(g)    Such other documents and certificates as Seller may reasonably request and which are customarily and ordinarily delivered in transactions similar to the transactions to be consummated at the Closing.

**Section 3.3**    **Closing Deliveries by Seller**.  At the Closing, Seller shall execute and deliver, or cause to be executed and delivered, to Buyer the following:

(a)    A duly executed copy of the Assignment and Assumption Agreement;

13

(b)     A certificate of an authorized officer of Seller, dated as of the Closing Date, in the form set forth in Exhibit H, certifying that (i) the representations and warranties of Seller set forth in ARTICLE 4 are true, correct and complete as of the Closing Date, except in such circumstances as shall not, individually or in the aggregate, have or reasonably be expected to have a Material Adverse Effect, (ii) the conditions set forth in Section 3.5 have been fulfilled or waived and (iii) the covenants of Seller set forth in ARTICLE 7 to be performed on or before the Closing Date have been fulfilled or waived in writing by Buyer;

(c)     A copy of the PPA, duly executed by Seller;

(d)     Duly executed copies of each of the Seller's Consents;

(e)     A copy of the Vote Sharing Agreement, duly executed by Seller;

(f)     A certificate that Seller is not a "foreign" person within the meaning of Section 1445 of the Code, which certificate shall set forth all information required by, and otherwise be executed in accordance with, Treasury Regulations Section 1.445-2(b)(2);

(g)     A deed in the form attached hereto as Exhibit I conveying Seller's interest in the Real Property subject only to Permitted Liens (i.e., a deed (i) in which Seller warrants that the Real Property is free from all encumbrances made by the Seller other than Permitted Liens and that Seller will defend the same to the Buyer against the lawful claims and demands of all persons claiming by, through or under Seller, but against no other persons; and (ii) that conveys any after-acquired title to the Real Property that Seller may subsequently obtain, but reserving for Seller, for so long as the Colstrip Project Transmission Agreement, dated May 6, 1981, as amended, is in effect, such easements as may be reasonably necessary for the purpose of owning, operating, maintaining, repairing, replacing, or removing any transmission facility and associated equipment in their current locations on the Real Property), all in a form reasonably acceptable to Buyer (which shall include language providing that such easements shall not, other than to a de minimis extent, adversely effect operations on the Real Property as currently conducted);

(h)     The Water Rights Transfer Certificate; and

(i)     Such other documents and certificates as Buyer may reasonably request and which are customarily and ordinarily delivered in transactions similar to the transactions to be consummated at the Closing.

**Section 3.4     Conditions Precedent to the Closing Obligations of Buyer**.  The obligation of Buyer to proceed with the Closing contemplated hereby is subject to the fulfillment or waiver (by the Buyer, in its absolute discretion, by written notice to the Seller) on or prior to the Closing Date, or on or prior to such earlier date if specified below, of all of the following conditions:

(a)     Seller shall have delivered to Buyer each of the documents described in Section 3.3.

(b)     The representations and warranties of Seller in ARTICLE 4 of this Agreement shall be true and correct without regard to any qualification respecting materiality or Material

Adverse Effect on and as of the Closing Date except in such circumstances as shall not, individually or in the aggregate, have or reasonably be expected to have a Material Adverse Effect, and the covenants and agreements of Seller to be performed on or before the Closing Date shall have been performed in all material respects in accordance with this Agreement.

(c)     Seller shall have obtained and provided copies to Buyer of all the Seller's Consents required for the Closing listed in Schedule 4.6.

(d)     Seller shall have obtained and provided a copy to Buyer of the Required Regulatory Approvals.

(e)     Seller shall have completed the Initial Closing of the transactions contemplated by Transmission Acquisition Agreement (as such term is defined therein).

(f)     No order or decree by any federal or state court or Governmental Authority which prevents the consummation of the sale of the Colstrip 4 Interests contemplated herein shall have been issued and remain in effect (each Party agreeing to use its Commercially Reasonable Efforts to have any such order or decree lifted) and no statute, rule or regulation shall have been enacted by any state or federal government or Governmental Authority which prohibits the consummation of the sale of the Colstrip 4 Interests.

(g)     Seller shall have delivered to Buyer evidence of the filing for termination of all Liens that are not Permitted Liens in form and substance reasonably satisfactory to Buyer; *provided* that Seller shall indemnify Buyer for any Losses incurred by Buyer in connection with Seller's failure to terminate any Lien that is not a Permitted Lien.

(h)     No event causing or constituting a Material Adverse Effect shall have occurred or be occurring.

**Section 3.5     Conditions Precedent to the Closing Obligations of Seller**.  The obligation of Seller to proceed with the Closing contemplated hereby is subject to the fulfillment or waiver (by the Seller, in its absolute discretion, by written notice to the Buyer) on or prior to the Closing Date of all of the following conditions:

(a)     Buyer shall have delivered to Seller each of the documents described in Section 3.2.

(b)     The representations and warranties of Buyer contained in ARTICLE 5 of this Agreement shall be true and correct without regard to any qualification respecting materiality or Material Adverse Effect on and as of the Closing Date except in such circumstances as shall not, individually or in the aggregate, have or reasonably be expected to have a Material Adverse Effect, and the covenants and agreements of Buyer to be performed on or before the Closing Date shall have been performed in all material respects in accordance with this Agreement.

(c)     Buyer shall have obtained and provided copies to Seller of all of Buyer's Consents required for the Closing listed on Schedule 5.5.

(d)     Buyer shall have obtained and provided a copy to Seller of the Required Regulatory Approvals.

(e)     Buyer shall have completed the Initial Closing of the transactions contemplated by Transmission Acquisition Agreement (as such term is defined therein).

(f)     Buyer shall have delivered the Purchase Price as provided in ARTICLE 2 hereof.

(g)     All Owners and Project Users shall have either declined to exercise or executed a waiver substantially in the form attached hereto as Exhibit J with respect to their rights of first refusal contained in Section 24 of the Ownership and Operation Agreement.

(h)     No order or, decree by any federal or state court or Governmental Authority which prevents the consummation of the sale of the Colstrip 4 Interests contemplated herein shall have been issued and remain in effect (each Party agreeing to use its Commercially Reasonable Efforts to have any such order or decree lifted) and no statute, rule or regulation shall have been enacted by any state or federal government or Governmental Authority which prohibits the consummation of the sale of the Colstrip 4 Interests.

**Section 3.6     Failure to Close**.  In the event of any failure to satisfy or waive the conditions precedent set forth in Section 3.4 or Section 3.5, the termination and other provisions of ARTICLE 9 shall govern to the extent applicable.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

As of the date of this Agreement, Seller hereby represents and warrants to Buyer that the statements contained in this ARTICLE 4 (as modified and supplemented by the disclosure schedule delivered to Buyer by Seller contemporaneously herewith setting forth, among other things, items the disclosure of which is necessary or appropriate either in response to an express informational requirement contained in or requested by a provision of this ARTICLE 4, or as an exception to one or more representations or warranties contained in this ARTICLE 4 (the "*Disclosure Schedule*" or "*Schedule*")) are true and correct, *provided* that the mere inclusion of an item in a Disclosure Schedule as an exception to a representation or warranty or covenant shall not be deemed an admission by a Party that such item (or any undisclosed item or information of comparable or greater significance) represents a material exception or fact, event or circumstance with respect to the Seller.  The Disclosure Schedule shall be arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs contained in this ARTICLE 4; *provided*, however, the disclosures in any section or paragraph of the Disclosure Schedule shall qualify as disclosures pursuant to any other sections or paragraphs under the Agreement where such disclosure is reasonably apparent on the face of such disclosures, whether or not repeated under any section number where such disclosure might be deemed appropriate.

**Section 4.1     Organization and Good Standing**.  Seller is a public utility corporation duly organized and validly existing under the laws of the State of Washington and each other jurisdiction where such qualification is required, except where the failure to be so qualified has

not had, and is not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect.

**Section 4.2**    <u>**Authority**</u>.  Seller has all requisite power and authority to own, and to carry on its businesses related to, the Colstrip 4 Interests as now being conducted.  Seller has all requisite power and authority and as of the Closing will have obtained all other applicable governmental, statutory, regulatory or other consents, licenses, waivers or exemptions necessary to execute and deliver this Agreement and the Closing Documents, and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and the Closing Documents, when executed and delivered in accordance herewith, and the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action on the part of Seller.

**Section 4.3**    <u>**Enforceability**</u>.  This Agreement has been, and the Closing Documents, when executed and delivered in accordance herewith, will be, duly and validly executed and delivered by Seller and, assuming due and valid authorization, execution and delivery hereof by Buyer, is a valid and binding agreement of Seller, enforceable against it in accordance with their respective terms, subject to (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar Laws of general application from time to time in effect that affect creditors' rights generally, (b) general principles of equity, and (c) the power of a court to deny enforcement of remedies generally based upon public policy.

**Section 4.4**    <u>**Title to Colstrip 4 Interests**</u>.  Seller owns the Colstrip 4 Interests free and clear of all Liens, other than Permitted Liens and those liens set forth on <u>Schedule 4.4</u> (which will be terminated or released as of the Closing).

**Section 4.5**    <u>**No Violation or Breach**</u>.  Except as set forth in <u>Schedule 4.5</u>, and assuming that all of the Required Regulatory Approvals and Seller's Consents have been obtained, neither the execution and delivery of this Agreement nor the Closing Documents, nor the consummation of the transactions contemplated hereby or thereby and performance of the terms and conditions hereof or thereof by Seller will result in a violation or breach of, or default under, (a) any provision of the organizational documents of Seller and any indenture or (b) any Material Contract under which Seller or the assets comprising Colstrip 4 Interests is bound, except with regard solely to clause (b), any violation, breach or default that would not have a Material Adverse Effect.

**Section 4.6**    <u>**Consents**</u>.  No consent, approval, authorization or permit of, or filing with or notification to, any Person is required for or in connection with the execution and delivery of this Agreement or the Closing Documents by Seller or for, or in connection with, the consummation of the transactions and performance of the terms and conditions contemplated hereby and thereby by Seller except for (a) the Required Regulatory Approvals; (b) the third-party consents, filings, and notices set forth on <u>Schedule 4.6</u>, and (c) immaterial consents, approvals, authorizations, permits, filings or notices.  Neither the execution and delivery of this Agreement or the Closing Documents nor the consummation of the transactions and performance of the terms and conditions hereof or thereof by Seller requires the consent, approval, authorization or permit of the MPSC or the Montana Consumer Counsel.

**Section 4.7**    **Material Contracts**.  Except as set forth on Schedule 4.7, Seller is not party to any contract reasonably necessary for Buyer's use of the Colstrip 4 Interests after Closing to which Buyer is not also a party.

**Section 4.8**    **No Disputes; Litigation**.  There is no Action pending, or to Seller's Knowledge, threatened in writing against Seller, except for Actions that would not have a Material Adverse Effect on Seller's ability to perform its obligations under the Closing Documents.

**Section 4.9**    **Brokerage Fees and Commissions**.  Neither Seller nor any Affiliate of Seller has incurred any obligation or entered into any agreement for any investment banking, brokerage, or finder's fee or commission in respect of the transactions contemplated by this Agreement or the Closing Documents for which Buyer or any of Buyer's Affiliates shall incur any liability.

**Section 4.10**   **Bankruptcy**.  There are no bankruptcy, reorganization, or arrangement proceedings pending against, being contemplated by, or to the Knowledge of Seller threatened against, Seller.

**Section 4.11**   **Records**.  Seller has provided to Buyer copies of any final reports, memoranda, audits, studies, or investigations prepared by Seller's internal environmental professionals or outside environmental consultants retained by or on behalf of Seller which analyze, quantify, audit, or report on actual or potential environmental issues, conditions, or Environmental Liabilities connected with the Colstrip 4 Interests, other than any documents protected by the attorney-client privilege or work-product prepared for litigation or in anticipation of litigation at the direction of counsel.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

As of the date of this Agreement and as of the Closing Date, Buyer represents and warrants to Seller as follows and, except as expressly set forth to the contrary herein, acknowledges that the Seller has entered into this Agreement in reliance upon such representations and warranties:

**Section 5.1**    **Organization and Qualification**.  Buyer is a corporation, duly incorporate, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite corporate power and authority and all necessary permits to carry on its business as now being conducted.

**Section 5.2**    **Authority**.  Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the Closing Documents and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and the Closing Documents, when executed and delivered in accordance herewith, and the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate action on the part of Buyer.

**Section 5.3** **Enforceability**.  This Agreement has been and, when executed and delivered in accordance herewith, the Closing Documents will be, duly and validly executed and delivered by Buyer and constitute valid and binding obligations of Buyer enforceable against it in accordance with their respective terms, subject to (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and other similar Laws of general application from time to time in effect that affect creditors' rights generally, (b) general principles of equity, and (c) the power of a court to deny enforcement of remedies generally based upon public policy.

**Section 5.4** **No Violation or Breach**.  Neither the execution and delivery of this Agreement or the Closing Documents nor the consummation of the transactions and performance of the terms and conditions hereof or thereof by Buyer will (a) result in a violation or breach of any provision of the certificate of incorporation, bylaws or other similar governing documents of Buyer or any material agreement, indenture or other instrument under which Buyer is bound or (b) violate any applicable Law other than such violations as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 5.5** **Consents**.  No consent, approval, authorization or permit of, or filing with or notification to, any Person is required for or in connection with the execution and delivery of this Agreement or the Closing Documents by Buyer or for, or in connection with, the consummation of the transactions and performance of the terms and conditions contemplated hereby and thereby by Buyer, except for (a) the Required Regulatory Approvals; (b) the third-party consents, filings, and notices set forth on Schedule 5.5, and (c) consents, approvals, authorizations, permits, filings, or notices that, if not obtained or made, would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 5.6** **No Disputes; Litigation**.  There is no Action pending, or to Buyer's Knowledge, threatened in writing against Buyer, except for Actions that would not have a Material Adverse Effect on Buyer's ability to perform its obligations under the Closing Documents.

**Section 5.7** **Brokerage Fees and Commissions**.  Neither Buyer nor any Affiliate of Buyer has incurred any obligation or entered into any agreement for any investment banking, brokerage, or finder's fee or commission in respect of the transactions contemplated by this Agreement or the Closing Documents for which Seller or any of the Seller's Affiliates shall incur any liability.

**Section 5.8** **Bankruptcy**.  There are no bankruptcy, reorganization, or arrangement proceedings pending against, being contemplated by, or to the Knowledge of Buyer threatened against, Buyer.

**Section 5.9** **Regulatory Matters**.

(a)     Buyer represents that its acquisition of the Colstrip 4 Interests would not reasonably be expected to result in (i) a denial of any Required Regulatory Approvals primarily based upon Buyer's ability to exercise horizontal or vertical market power or (ii) a denial of any Required Regulatory Approvals primarily based upon any increase in Buyer's horizontal or

vertical market power in the NorthWestern balancing authority area using the standards adopted by FERC in Order No. 697.

(b)     Buyer represents that it does not need approval from any Governmental Authority, other than the Required Regulatory Approvals, to acquire the Colstrip 4 Interests.

## ARTICLE 6
## ACCESS AND CONFIDENTIALITY

**Section 6.1     General Access.**  Seller shall, until the Closing Date (or the earlier termination of this Agreement), (i) cooperate in facilitating reasonable access by Buyer to all of Seller's books, records, contracts, agreements, files, personnel, offices and other facilities and properties, in each case, of Seller, related to the Colstrip 4 Interests and to, (ii) permit Buyer to make such copies and inspections thereof as Buyer may reasonably request, and (iii) furnish Buyer with such financial and operating data and other information with respect to the Colstrip 4 Interests as Buyer may from time to time reasonably request; *provided*, that any such access shall be conducted at Buyer's expense, at a reasonable time and on reasonable notice, under the reasonable supervision of Seller's or Operator's personnel, as appropriate, and in such a manner as to maintain the confidentiality of such information, this Agreement, and the transactions contemplated hereby and not to interfere with the normal operation of the business of Seller or the Colstrip 4 Interests; and *provided*, *further*, that Buyer and its representatives shall comply with all applicable safety rules, regulations and procedures implemented by Seller or Operator, as the case may be.  Seller further agrees to cooperate in facilitating the provision of information by the Operator and its employees of such financial, operating, environmental, and other information with respect to the Colstrip 4 Interests as Buyer may reasonably request.

(b)     In addition to Section 6.1(a) above, Seller specifically agrees to facilitate Buyer's environmental due diligence by promptly providing Buyer copies of any documents prepared by Seller's internal environmental professionals or outside environmental consultants retained by or on behalf of Seller which analyze, quantify, audit, or report on actual or potential environmental issues, conditions, or Environmental Liabilities connected with the Colstrip 4 Interests.

(c)     Nothing in this ARTICLE 6 shall be construed to permit Buyer or its representatives to have access prior to the Closing to (i) any files, records, contracts, or documents of Seller not relating to the Colstrip 4 Interests, (ii) any bids or offers received by Seller for the sale of any of the Colstrip 4 Interests, it being agreed that all such bids or offers shall be the sole property of Seller, (iii) any jeopardize any attorney-client or other privilege as determined by Seller's sole discretion.

**Section 6.2     Confidential Information**.  Buyer and Seller agree to maintain in confidence all information made available to it under this Agreement and to cause their respective officers, directors, agents, employees, representatives, consultants, and advisors to maintain in confidence all information made available to them under this Agreement, all as provided in that certain Mutual Non-Disclosure Agreement between Buyer and Seller dated July 19, 2019 (the "*Confidentiality Agreement*"), and the terms of which are incorporated herein by reference and made a part of this Agreement; *provided* that the Confidentiality Agreement shall terminate upon Closing or two years following the date hereof.  In the event that terms of the

Confidentiality Agreement and this Agreement conflict, the terms of the Confidentiality Agreement shall control.

## ARTICLE 7
## COVENANTS OF SELLER AND BUYER

**Section 7.1**    **Conduct of Business Pending Closing**.  Seller covenants and agrees that:

(a)    *Exclusivity*.  Upon execution of this Agreement and except as noted below, Seller grants Buyer the exclusive right to acquire the Colstrip 4 Interests until the earlier of the Closing or termination of this Agreement.  During such exclusivity period, Seller agrees to:  (i) deal with Buyer, or its representatives, exclusively with regard to all aspects of the acquisition of the Colstrip 4 Interests, and (ii) refrain, directly or indirectly, from soliciting, initiating, encouraging, or engaging in any discussions or negotiations with any Person or entering into any agreement, commitment, understanding or transaction with any Person concerning any proposal regarding the acquisition of the Colstrip 4 Interests, or providing any business, financial or other information relating to any such transaction to any person or entity.  Notwithstanding the foregoing, Buyer and Seller acknowledge and agree that nothing in this Section 7.1 or elsewhere in this Agreement shall restrict or impair Seller's right or obligation to provide a right of first refusal to the Project Users under the Ownership and Operation Agreement pursuant and subject to Section 7.9.  Notwithstanding this Section 7.1(a), nothing in this Section 7.1 shall be construed as limiting the termination rights of the Buyer or Seller under ARTICLE 9 or Buyer's or Seller's rights if any party shall exercise such right of first refusal.

(b)    *Conduct of Business*.  Pending the Closing, and taking into consideration the fact that the Seller is not the Operator and except as provided for in Section 7.1(a) or as reasonably necessary under emergency circumstances (or if required or prohibited pursuant to applicable Law or the Ownership and Operation Agreement), and always subject to and consistent with the extent of Seller's rights and limitations under the Ownership and Operation Agreement, Seller shall comply with the following:

(i)    Seller shall conduct its business related to the Colstrip 4 Interests, and utilize its Commercially Reasonable Efforts to cause the Colstrip 4 Interests to conduct its business in a manner which assumes the long-term operation of Colstrip Unit 4, in the ordinary course in accordance with past practice, and not make any material change with respect thereto;

(ii)    Seller shall comply in all material respects with the Ownership and Operation Agreement;

(iii)    Seller shall take all Commercially Reasonable Efforts to preserve and protect the Colstrip 4 Interests subject to the terms of the Ownership and Operation Agreement and applicable Laws;

(iv)    With respect to any approvals of the Committee: (A) Buyer, following its good faith consideration of Seller's input regarding any matters concerning the Colstrip 4 Interests to be voted upon under the Ownership and Operation Agreement, shall direct all of Seller's votes in connection with the

Colstrip 4 Interests, (B) Seller shall continue to vote on its own behalf in connection with its votes arising from its ownership interest in Colstrip Units 1 & 2 and Colstrip Unit 3 and (C) Buyer and Seller shall consult with each other in good faith regarding any issues regarding both Colstrip Unit 3 and Colstrip Unit 4 and/or Common Facilities prior to voting.

(v)     except as set forth on Schedule 7.1, Seller shall not assign, terminate, amend, give any consent with respect to or waive any rights under, in any material respect, any Material Contract;

(vi)     Seller shall not take any action or enter into any commitment with respect to or in contemplation of any liquidation, dissolution, recapitalization, reorganization, or other winding up of its business or operations related to the Colstrip 4 Interests, except as required by applicable Laws;

(vii)     Seller shall not grant any express further Lien on any of the Colstrip 4 Interests, except for Permitted Liens, those Liens that will be terminated, without cost to Buyer, at Closing;

(viii)     Seller shall provide prompt written disclosure to the Buyer of all relevant information which comes to the attention of the Seller in relation to any fact or matter (whether existing on or before the date of this Agreement or arising afterwards) which may constitute a breach of any of the Seller's representations and warranties set forth in ARTICLE 4; and

**Section 7.2     Public Announcements**.  Without the prior written approval of the other Party, no Party shall issue, or permit any agent or Affiliate of such Party to issue, any press releases or otherwise make, or cause any agent or Affiliate of such Party to make, any public statements with respect to this Agreement or the Closing Documents or the transactions contemplated hereby or thereby, except when and to the extent that such release or statement is deemed in good faith by the releasing Party to be required to obtain the Required Regulatory Approvals or by applicable Law or under the applicable rules and regulations of a stock exchange or market on which the securities of the releasing Party or any of its Affiliates are listed.  In each case to which such exception applies, the releasing Party will use its reasonable efforts to provide a copy of such release or statement to the other Party and incorporate any reasonable changes which are suggested by the non-releasing Party prior to releasing or making the statement.

**Section 7.3     Actions by Parties**.  Each Party agrees to use Commercially Reasonable Efforts to satisfy the conditions to the Closing set forth in Sections 3.4 and 3.5; *provided*, *however*, that neither Buyer nor Seller shall be deemed to have breached its obligations under Section 6.2, Section 7.2 or this Section 7.3 by pursuing the discussions with the MPSC or the Washington Utilities and Transportation Commission or by making any required filings in connection with obtaining the Required Regulatory Approvals.

**Section 7.4     Further Assurances**.  Seller and Buyer each agree that from time to time after the Closing, it will execute and deliver or cause its respective Affiliates to execute and

deliver such further agreements, certificates, documents or opinions and take (or cause its respective Affiliates to take) such other action, as may be reasonably necessary to carry out the purposes and intents of this Agreement.  If at any time any Party shall reasonably request any further action by any other Party to carry out the purposes of this Agreement and the Closing Documents or to further effectuate the transactions contemplated hereby, such other Party, shall promptly take such action (including the prompt execution and delivery of further instruments and documents).

   **Section 7.5**      <u>Records</u>.

   (a)      Maintenance.  Buyer agrees to maintain the Records in accordance with its records retention policy as maintained in compliance with applicable Laws and Buyer's past practices, or if any of the Records pertain to any claim or dispute pending on the date upon which such records would be destroyed pursuant to Buyer's records retention policy, Buyer shall maintain any of the Records designated by Seller until such claim or dispute is finally resolved and the time for all appeals has been exhausted.  Buyer shall give Seller reasonable notice and an opportunity to retain any Records relating to Taxes in the event that Buyer determines to destroy or dispose of them during such period.  After the Closing Date, except as might result in a waiver of any attorney/client, work product or like privilege or violate applicable Laws, Buyer shall provide Seller and its representatives during normal business hours, and upon reasonable notice, reasonable access to, and the right to copy, the Records existing as of the Closing Date, at Seller's cost and expense, for the purposes of

         (i)      complying with any applicable Law affecting Seller's ownership of the Colstrip 4 Interests prior to the Closing Date;

         (ii)      preparing any audit of the books and records of any third party relating to Colstrip Unit 4 prior to the Closing Date, or responding to any audit prepared by such third parties;

         (iii)      preparing Tax Returns;

         (iv)      responding to or disputing any audit, examination, claim or other proceeding in respect of Taxes; or

         (v)      asserting, defending, or otherwise dealing with any inquiry, investigation, claim or dispute under this Agreement or with respect to the Colstrip 4 Interests.

   (b)      Privilege.  Buyer shall not after the Closing Date intentionally waive the attorney/client, work product, or like privilege of Seller or its Affiliates with respect to any of the Records existing as of the Closing Date, without Seller's prior written consent.

   **Section 7.6**      <u>Regulatory and Other Authorizations and Consents Filings</u>.

   (a)      *General*.  Each Party shall use Commercially Reasonable Efforts to obtain all authorizations, consents, orders, and approvals of, and to give all notices to and make all filings with, all Governmental Authorities and third parties that may be or become necessary for its

execution and delivery of, and the performance of its obligations under, this Agreement and will cooperate fully with the other Party in promptly seeking to obtain all such authorizations, consents, orders, and approvals, giving such notices, and making such filings.

(b)     *Required Regulatory Approvals*.  Without limiting the generality of the undertakings pursuant to Section 7.6(a) above, each Party shall (i) use its Commercially Reasonable Efforts to:  gather and obtain all necessary information to complete its respective filings in connection with the Required Regulatory Approvals (including all reports, studies, and exhibits related thereto); consult with the other Party regarding any such filings, consider and incorporate all reasonable comments (if any) submitted by the other Party or its representatives; and the Parties shall make such filings as soon as practicable following the execution and delivery of this Agreement, if not already completed; (ii) prior to and during the pendency of any notice and approval period with respect to such filings, (A) consult with the other Party prior to providing any supplemental information to the applicable regulatory authority and provide prompt written notice to the other Party of all discussions and correspondence with the applicable regulatory authorities that reasonably relates to or bears upon such filings, and (B) use all Commercially Reasonable Efforts and act in good faith to expedite and obtain the Required Regulatory Approvals.  In furtherance and not in limitation of the foregoing, each of the Parties agrees to use its Commercially Reasonable Efforts to applications with any applicable Governmental Authority whose approval is required in connection with the consummation of the purchase by Buyer of the Colstrip 4 Interests as promptly as practicable following the date of this Agreement, the date of which shall be mutually agreed upon by Buyer and Seller.

(c)     *Transfer*.  If the transfer of any instrument, contract, license, lease, permit, or Material Contract to Buyer hereunder shall require the consent of any party thereto other than Seller, then such item shall not be assigned to or assumed by Buyer, if an actual or attempted assignment thereof would constitute a breach thereof or default thereunder.  In such case, Seller and Buyer shall cooperate and each shall use Commercially Reasonable Efforts to obtain such consents to the extent required by such other parties and, if and when any such consents are obtained, to transfer the applicable instrument, contract, license, lease, permit, or Material Contract.  If any such consent cannot be obtained, Seller shall, at Buyer's expense, cooperate in any commercially reasonable arrangement designed to obtain for Buyer all benefits, obligations and privileges of the applicable instrument, contract, license, lease, permit, or document.  Buyer shall indemnify and hold harmless the Seller from any and all Losses arising from or related to Seller's actions taken pursuant to the Buyer's request and/or direction (or such non-action as requested and/or directed by the Buyer, as the case may be) pursuant to this Section 7.6(c).  Notwithstanding the foregoing, the indemnification provisions of this Section 7.6(c) shall not apply to any actions taken by Seller with regard to the Ownership and Operation Agreement.

(d)     *Third Party Consents*.  Seller shall use its Commercially Reasonable Efforts, and Buyer shall use its Commercially Reasonable Efforts to assist Seller, in obtaining any and all consents of third parties and Governmental Authorities necessary or advisable in connection with the transactions contemplated by this Agreement and the Closing Documents, including the provision by Buyer to such third parties and Governmental Authorities of such publicly available financial statements and other publicly available financial information with respect to Buyer and its parent company or companies as such third parties or Governmental Authorities may reasonably request.

**Section 7.7**      **Fees and Expenses**.  Except as otherwise expressly provided in this Agreement, all fees and expenses, including fees and expenses of counsel, financial advisors, and accountants, incurred in connection with this Agreement and the Closing Documents and the transactions contemplated hereby, shall be paid by the Party incurring such fee or expense, whether or not the Closing shall have occurred.

**Section 7.8**      **Tax Matters.**

(a)      After the Closing Date, Buyer and Seller shall provide each other with such cooperation and information related to Colstrip Unit 4 and the Colstrip 4 Interests as the Parties reasonably may request in (i) filing any Tax Return, amending any Tax Return or claiming any Tax refund, (ii) determining any liability for Taxes or any right to Tax refunds or (iii) conducting or defending any audit, examination, claim or other proceeding in respect of Taxes.  Seller and Buyer shall retain all Tax Returns, schedules and work papers, and all material records and other documents related thereto until the expiration of the statute of limitations for the taxable years to which such Tax Returns and other documents relate.

(b)      Buyer and Seller each shall be responsible under applicable Law for payment of fifty percent (50%) of all Transfer Taxes.  The Party responsible for preparing any Tax Returns or other documentation relating to such Transfer Taxes shall prepare and file such Tax Returns or other documentation; *provided*, *however*, that to the extent required by applicable Law, the other Party shall join in the execution of any such Tax Returns and other documentation relating to such Transfer Taxes.  The Party responsible for preparing and filing any such Tax Return or other documentation shall provide to the other Party copies of each such Tax Return or other documentation at least fifteen (15) days prior to the date on which such Tax Return is required to be filed.

(c)      In the event of any conflict between the provisions of <u>ARTICLE 8</u> of this Agreement and this <u>Section 7.8</u> or <u>Section 2.4</u>, the provisions of this <u>Section 7.8</u> and <u>Section 2.4</u> shall control.

**Section 7.9**      **Right of First Refusal**.  Without limiting the generality of the undertakings pursuant to <u>Section 7.3</u> above, Seller shall use its Commercially Reasonable Efforts to:  (a) within five (5) Business Days of the date hereof, notify the Owners and Project Users concerning their execution of a waiver substantially in the form attached hereto as <u>Exhibit J</u> with respect to their rights of first refusal contained in Section 24 of the Ownership and Operation Agreement, (b) use its Commercially Reasonable Efforts to satisfy the condition to the Closing set forth in <u>Section 3.5(g)</u>, and (c) keep Buyer reasonably informed in respect of the status and substance of such discussions, including by providing copies of all relevant correspondence to Buyer.  Seller shall immediately notify Buyer if at any time any Project User or Owner shall exercise or indicate their intent to exercise any such right of first refusal.  Seller shall (x) as soon as practicable, but in any event no later than [date], notify Buyer in writing that the condition set forth in <u>Section 3.5(g)</u> has been satisfied (the "*ROFR Resolution Notice*"), or (y) no later than one hundred twenty (120) days after the date hereof, notify Buyer in writing that the condition set forth in <u>Section 3.5(g)</u> has not yet been satisfied.

**Section 7.10   Updates to Disclosure Schedules**.  From time to time prior to and up to three (3) days prior to the Closing Date, Seller shall provide written notice to Buyer of any fact, matter, condition, event or circumstance that occurs following the date of this Agreement and that, individually or in the aggregate, renders Seller unable, without amending the Disclosure Schedules, to satisfy the condition precedent under <u>Section 3.4(b)</u> (each, an "*Update*").  For the avoidance of doubt, the uploading of documents to the electronic data site of Seller related to the Colstrip 4 Interests or other delivery of documents to Buyer or Seller, as applicable, shall not constitute written notice of an Update. In the event that Buyer does not terminate this Agreement pursuant to <u>Section 9.1(d)(i)</u> following delivery of such Update, then Seller shall be permitted to update the applicable Schedule(s) to properly reflect the fact, matter, condition, event or circumstance disclosed to Buyer in such Update, and the applicable representations and warranties of Seller set forth in this Agreement made following the Update shall be subject to the Schedules attached hereto, as modified or amended by such Update, for purposes of satisfying the conditions to Closing set forth in <u>Section 3.4</u>; *provided*, that, if the Closing occurs, such Update shall not be deemed to have modified the Schedules for purposes of determining whether there has been a breach of the applicable representations and warranties related to Seller's indemnification obligations in <u>ARTICLE 8</u>.

**Section 7.11   Transfers of Interests**.  If, at any time between the date of this Agreement and one year following the Closing Date, Buyer enters into any contract, agreement, arrangement or other understanding with respect to the purchase of any interests of Colstrip Units 1 & 2, Colstrip Unit 3 or Colstrip Unit 4 on terms (individually or in the aggregate) more favorable to the seller of such interests than the terms as agreed upon in this Agreement (as determined by Seller in its sole discretion), Buyer hereby agrees to amend this Agreement to reflect such more favorable terms in this Agreement.

## ARTICLE 8
## LIABILITY AND INDEMNIFICATION

**Section 8.1   Survival**. The representations and warranties of Buyer and Seller shall survive until the date that is eighteen (18) months after the Closing Date, except that the Seller Fundamental Representations, the Buyer Fundamental Representations shall each survive Closing indefinitely.  Claims for breach of any of the covenants and agreements of the Parties set forth herein must be brought no later than sixty (60) days following the expiration of the applicable statute of limitations applicable to such claims.

**Section 8.2   AOC and CCR Rules**. The Parties shall be responsible for Losses arising from the ownership or operation of the Colstrip 4 Interests, the Project, or the Common Facilities, in each case that are caused by or arise from the AOC and/or CCR Rules based on their respective pre-Closing Date Project Shares; provided, however, to the extent any such Losses increase due to violations of Environmental Laws by the Operator or Owners or Releases of Hazardous Substances that (a) wholly arise or wholly take place after the Closing or (b) commenced prior to Closing but that a reasonable environmental professional would determine substantially all of such violations or Releases of Hazardous Substances occurred after the Closing, liability with respect to those incremental Losses shall be as set forth in <u>Section 8.6</u>. The Parties specifically recognize that the Project will continue to burn coal and generate coal combustion residuals after Closing, and agree, notwithstanding anything to the contrary in the

26

proviso contained in the prior sentence, that Losses arising from the continued burning of coal and the generation, storage, deposit, and Release of coal combustion residuals, including the deposit of coal combustion residuals into ponds, the dry storage or staging of coal combustion residuals, and any Release of coal combustion residuals or Hazardous Substances resulting from coal combustion residuals from existing ponds, shall not be considered incremental Losses of the sort described in the preceding sentence and shall not decrease Seller's liability or responsibility for such Losses based on the Parties' respective pre-Closing Date Project Shares, such that all Losses caused by or arising from the AOC and/or CCR Rules that arise from or are caused by the deposit, storage, generation, staging, or Release of coal combustion residuals shall be based on pre-Closing Date Project Shares without regard to whether such deposit, storage, generation, staging, or Release occurs before or after Closing.  Continued operation of the Colstrip 4 Interests consistent with Prudent Utility Practice shall not have any bearing on the allocation of Losses provided for in this Section.  Changes in Law, including changes that alter the nature, scope, or expense of obligations and Losses caused by or arising from the AOC and/or the CCR Rules shall not alter or otherwise have any bearing on the allocation of Losses provided for in this Section; provided, that if any changes in Law after the Closing impact the operation of Colstrip Unit 4, Seller's liability for Losses arising from such impacts on the operation of Colstrip Unit 4 shall be as set forth in Section 8.6.

Section 8.3    **Decommissioning**. The Parties shall be responsible for Losses arising from the decommissioning, mothballing, closure, retirement, deactivation, shut down, deconstruction, removal, or demolition of all or a portion of Colstrip Unit 4, the Project, or the Common Facilities based on their respective pre-Closing Date Project Shares; provided, however, that Seller shall not be responsible for Losses caused by or arising from the decommissioning, mothballing, closure, retirement, deactivation, shut down, deconstruction, removal, or demolition of any buildings constructed after Closing intended to predominantly benefit Colstrip Unit 4.  Continued operation of the Colstrip 4 Interests consistent with Prudent Utility Practice shall not have any bearing on the allocation of Losses provided for in this Section.  Changes in Law, including changes that alter the nature, scope, or expense of obligations and Losses caused by or arising from the decommissioning, mothballing, closure, retirement, deactivation, shut down, deconstruction, removal, or demolition of all or a portion of the Colstrip 4 Interests, the Project, or the Common Facilities shall not alter or otherwise have any bearing on the allocation of Losses provided for in this Section; *provided* that if any changes in Law after the Closing impact the operation of Colstrip Unit 4, Seller's liability for Losses arising from such impacts on Colstrip Unit 4 shall be as set forth in Section 8.6.

Section 8.4    **Pension Costs**. The Parties shall be responsible for Losses arising from pension liabilities that arose prior to Closing or are wholly or partially caused by events, incidents, liabilities, work performed, or conditions from prior to Closing, including claims by the Operator that it has made excess pension contributions, based on their respective pre-Closing Date Project Shares.  If some or all of the pensions for those employed at the Project are converted after Closing to annuities, the Parties' responsibility for any costs to the Owners of such conversions shall be based on the pre-Closing Date Project Shares for that portion of the costs attributable to employment before Closing and based on post-Closing Date Project Shares for that portion of the costs attributable to employment after Closing.  Changes in Law shall not have any bearing on the allocation of Losses provided for in this Section.

**Section 8.5     Other Losses Allocated Based on Pre-Closing Date Project Shares**. The Parties specifically agree that they shall be responsible for all Losses arising from or caused by the items listed on Schedule 8.5 based on their respective pre-Closing Date Project Shares. The Parties shall be responsible for Losses arising from the ownership or operation of the Colstrip 4 Interests, the Project, or the Common Facilities, in each case that are not described in Sections 8.2, 8.3, 8.4, or 8.6, and that do not arise from or are not caused by items listed on Schedule 8.5 or Schedule 8.6, but that are caused by or which arise from events, occurrences or conditions which a reasonable environmental professional would determine substantially all of such events, occurrences or conditions took place or existed before Closing based on their respective pre-Closing Date Project Shares; provided, however, to the extent any such Losses increase due to (a) actions taken after Closing by the Operator or Owners, (b) violations of Environmental Laws by the Operator or Owners that wholly arise or wholly take place after Closing or which a reasonable environmental professional would determine substantially all of such violations took place after the Closing or (c) Releases of Hazardous Substances arising from events, occurrences or conditions that wholly arise or take place or which a reasonable environmental professional would determine substantially all of such events, occurrences or conditions took place after the Closing, Seller's liability with respect to those incremental Losses shall be as set forth in Section 8.6, except that continued operation of the Colstrip 4 Interests consistent with Prudent Utility Practice shall not be deemed an action which gives rise to an increase in Losses.  Continued operation of the Colstrip 4 Interests consistent with Prudent Utility Practices shall not have any bearing on the allocation of Losses provided for in this Section.  The Parties specifically recognize that the Project will continue to burn coal and generate coal combustion residuals after Closing, and agree, notwithstanding anything to the contrary in the proviso contained in the prior sentence, that Losses arising from the continued burning of coal and the generation, storage, deposit, and Release of coal combustion residuals, including the deposit of coal combustion residuals into ponds, the dry storage or staging of coal combustion residuals, and any Release of coal combustion residuals or Hazardous Substances resulting from coal combustion residuals from existing ponds, shall not reduce Seller's liability or be deemed an increase in Losses of the sort described in the proviso to the first sentence in this Section.  Changes in Law shall not have any bearing on the allocation of Losses provided for in this Section; *provided* that if changes in Law after the Closing impact the operation of Colstrip Unit 4, Seller's liability for Losses arising from such impacts on the operations of Colstrip Unit 4 shall be as set forth in Section 8.6.

**Section 8.6     Losses Allocated Based on Post-Closing Date Project Shares**. The Parties specifically agree that they shall be responsible for all Losses arising from or caused by the items listed on Schedule 8.6 based on their respective post-Closing Date Project Shares.  The Parties shall be responsible for Losses arising from the ownership or operation of the Colstrip 4 Interests, the Project, or the Common Facilities, in each case that are not governed by Sections 8.2, 8.3, 8.4, or 8.5, and that do not arise from or are not caused by items listed on Schedule 8.5 or Schedule 8.6, but that are wholly caused by or arise wholly from events or occurrences which take place, or which a reasonable environmental professional would determine substantially all of such events or occurrences took place, after Closing based on their respective post-Closing Date Project Shares.

**Section 8.7     Disagreements Regarding Causes of Losses**. If the Parties are unable to agree as to how Sections 8.2 through 8.6 apply to the allocation of liability for particular Losses,

the Parties agree in the first instance to attempt to settle such disagreement by mutual discussion between executives from both Parties.  Within seven (7) Business Days of the receipt by either Party of a notice from the other Party of the existence of a disagreement referring to this ARTICLE 8 (the "Allocation Dispute Notice"), the receiving Party shall reply with a written response (an "Allocation Dispute Notice Response").  Both the Allocation Dispute Notice and the Allocation Dispute Notice Response shall include (a) a statement of the relevant Party's position with regard to the Dispute and a summary of arguments supporting such position; and (b) the name and title of the executive who will represent that Party in attempting to resolve the Dispute pursuant to this Section 8.7.  Within seven (7) Business Days of delivery of the Allocation Dispute Notice Response, the designated executives shall meet and attempt to resolve the disagreement.  All negotiations pursuant to this clause shall be confidential and shall be treated as compromise and settlement negotiations, and no oral or documentary representations or offers made by the Parties during such negotiations shall be admissible for any purpose in any subsequent proceedings.

> **Section 8.8     Resolution if Executive Negotiations Do Not Succeed.**

(a)     If any disagreement is not resolved within thirty (30) Days of receipt of an Allocation Dispute Notice pursuant to Section 8.7, then, upon either Party's request, the Parties shall jointly retain an independent third-party consultant (with expertise in the subject matter giving rise to the liability) to promptly determine whether the events or occurrences that caused or gave rise to the Losses in question fit within the scope of Section 8.2, Section 8.3, Section 8.4, Section 8.5 (including Schedule 8.5), or Section 8.6 (including Schedule 8.6), and how such Losses are to be allocated based on the application of those sections.  To the extent permitted by law, the Parties shall provide for the confidentiality of the independent third-party consultant's determination, and each Party shall pay half of the consultant's fees and costs.  The determination of the third-party consultant shall be final and binding on the Parties and is not subject to review in other arbitration or in court.  Apportionment of liability disputes described in this Section shall be resolved using this procedures and requirements set forth in this Section (and the subsections below) and not using the procedures provided for in ARTICLE 10 of this Agreement.

(b)     The independent third-party consultant shall agree to act as an impartial and neutral arbitrator in carrying out the duties set forth herein.  The independent third-party consultant shall carry out his or her duties based on the standard procedures used by consultants researching or investigating matters in the industry in question, and not by using processes that are quasi-judicial in nature.  In particular, the independent third-party consultant shall not be required to hold a hearing.  The Parties shall jointly submit written background information to the independent third-party consultant, and shall then cooperate in responding to follow-up questions and requests for documents from the independent third-party consultant.  If the independent third-party consultant asks to conduct a site visit and/or interview Colstrip personnel, the Parties shall cooperate in facilitating such a site visit and/or interviews, including by jointly making requests to the Operator.  The independent third-party consultant shall not communicate to either Party without also including or copying the other Party in such conversation or exchange.  The independent third-party consultant shall provide his or her determination in a written report that is to be transmitted to both Parties.

(c)     If the Parties are unable to agree on an independent third-party consultant, each Party shall appoint one third-party consultant, each of whom shall agree to serve impartially and independently, and then the two consultants so appointed shall themselves find and appoint a third consultant who agrees to serve as the independent third-party consultant contemplated by this Section under the procedures and requirements set forth in this Section.

**Section 8.9    Indemnification By Seller**. Seller shall indemnify, save and hold harmless, Buyer, its Affiliates, and their respective Representatives from and against any and all Losses, costs, losses, liabilities (including liabilities arising under principles of strict or joint and several liability), damages, lawsuits, deficiencies, claims and expenses (whether or not arising out of Third Party Claims), including interest, penalties, additions, travel expenses, wages allocable to loss of employee time, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement of any of the foregoing (collectively, the "*Damages*"), incurred in connection with or arising out of or resulting from:

(a)     any breach or inaccuracy in any of the representations or warranties of Seller contained in this Agreement, any Closing Document to which Seller is a party or any certificate delivered by or on behalf of Seller pursuant to this Agreement (any such breach or inaccuracy to be determined without regard to any qualification for "materiality," "in all material respects" or similar qualification);

(b)     any breach or violation of any covenant, agreement or other obligation of Seller set forth in this Agreement or any Closing Document to which Seller is a party;

(c)     if the Closing has occurred, any failure by Seller to pay, perform or discharge any Retained Liabilities as and when due;

(d)     if the Closing has occurred, any failure by Seller to pay, perform or discharge any Retained Liability as and when due;

(e)     if the Closing has occurred, any liability, obligation or commitment of Seller of any nature (absolute, accrued, contingent or otherwise) relating to the Colstrip 4 Interests and not assumed;

(f)     Seller's portion of any Transfer Taxes in accordance with Section 7.8(b);

(g)     any fraud, willful misconduct or gross negligence in connection with this Agreement by Seller or its Affiliates; or

(h)     any claim by a third-party or liability to a third-party, including a current or former Project User, to the extent it seeks to hold Buyer responsible for more than the share of any Losses provided for in Sections 8.2 through 8.6 above.

**Section 8.10   Indemnification By Buyer**. Buyer shall indemnify, save and hold harmless, Seller, its Affiliates, and their respective Representatives from and against any and all Damages incurred in connection with or arising out of or resulting from:

(a)      any breach or inaccuracy of any representation or warranty made by Buyer in this Agreement or any Closing Document to which Buyer is a party;

(b)      any breach or violation of any covenant, agreement or obligation of Buyer set forth in this Agreement or any Closing Document to which Buyer is a party;

(c)      if the Closing has occurred, any failure of Buyer to pay, discharge or perform any of the Assumed Liabilities as and when due;

(d)      Buyer's portion of any Transfer Taxes in accordance with <u>Section 7.8(b)</u>;

(e)      any fraud, willful misconduct or gross negligence in connection with this Agreement by Buyer; or

(f)      any claim by a third-party or liability to a third-party, including a current or former Project User, to the extent it seeks to hold Seller responsible for more than the share of any Losses provided for in <u>Sections 8.2</u> through <u>8.6</u> above.

**Section 8.11    <u>Third Party Claims.</u>**

(a)      Promptly after receipt by a Party of notice of the commencement of any Action by a third party (a "*Third Party Claim*") with respect to any matter for which indemnification is or may be owing pursuant to <u>Section 8.9</u> or <u>Section 8.10</u> hereof (such Party making a claim under this ARTICLE 8, an "*Indemnified Party*"), the Indemnified Party will give notice thereof to Buyer or Seller, as applicable (the "*Indemnifying Party*"); *provided*, *however*, that the failure of the Indemnified Party to notify the Indemnifying Party will not relieve the Indemnifying Party of any of its obligations hereunder, except to the extent that the Indemnifying Party demonstrates that the defense of such Third Party Claim has been actually prejudiced by the Indemnified Party's failure to give such notice.

(b)      If any Action referred to in this Section is brought against an Indemnified Party and the Indemnified Party gives notice to the Indemnifying Party of the commencement of such Action, the Indemnifying Party will be entitled to participate in such Action, and (unless (x) the Indemnifying Party is also a party to such Action and the Indemnified Party determines in good faith that joint representation would be inappropriate upon the advice of outside counsel that a conflict of interest exists between the Indemnified Party and the Indemnifying Party with respect to such Action, or (y) the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to defend such Action and provide indemnification with respect to such Action) may assume the defense of such Action with counsel reasonably satisfactory to the Indemnified Party and, after notice from the Indemnifying Party to the Indemnified Party of its election to assume the defense of such action, the Indemnifying Party will not, as long as it diligently conducts such defense, be liable to the Indemnified Party under this Section for any fees of other counsel with respect to the defense of such Action, in each case subsequently incurred by the Indemnified Party in connection with the defense of such Action.

(c)      If the Indemnifying Party is entitled to and assumes the defense of an Action, no compromise or settlement of such claims or Action may be effected by the Indemnifying Party without the Indemnified Party's written consent unless (i) there is no effect on or grounds for the

basis of any other claims that may be made against the Indemnified Party, (ii) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party, and (iii) the Indemnified Party will have no liability with respect to any compromise or settlement of such claims or Action. Notwithstanding the assumption by the Indemnifying Party of the defense of any claim or Action, the Indemnified Party will be permitted to join in such defense and to employ counsel at its own expense.

(d)     Notwithstanding the foregoing, if the Indemnified Party determines in good faith that there is a reasonable probability that an Action may result in the Indemnified Party or its Affiliates having to pay monetary Damages for which it would not be entitled to indemnification under this Agreement or having to perform specific performance, the Indemnified Party may, by notice to the Indemnifying Party, assume the exclusive right to defend, compromise or settle such Action, but the Indemnifying Party will not be bound by any compromise or settlement thereof effected without its written consent (which consent shall not be unreasonably withheld, delayed or conditioned).

(e)     The Indemnifying Party and the Indemnified Party agree to provide each other with reasonable access during regular business hours to the properties, books and records and representatives of the other, as reasonably necessary in connection with the preparation for an existing or anticipated Action involving a Third Party Claim and its obligations with respect thereto pursuant to this Article.

   **Section 8.12   Direct Claims**.

(a)     The following procedures will apply to any claim for indemnification by an Indemnified Party that does not involve a Third Party Claim.

(b)     An Indemnified Party will deliver a notice to the Indemnifying Party (a "*Notice of Claim*") as soon as practicable, but in no event later than sixty (60) days, after the Indemnified Party determines that it is or may be entitled to indemnification pursuant to this Agreement; *provided*, *however*, that failure to provide notice will not prejudice the Indemnified Party's right to indemnity, except to the extent the Indemnifying Party prejudiced by the Indemnified Party's failure to give such notice.

(c)     If the Indemnifying Party disputes (x) its obligation to indemnify the Indemnified Party in respect of any indemnification claim set forth in a Notice of Claim, or (y) the amount of such indemnification claim set forth in a Notice of Claim (the "*Indemnity Claim Amount*"), a dispute notice ("*Indemnification Dispute Notice*") will be given as soon as practicable, but in no event later than thirty (30) days, after the Notice of Claim. If no Indemnification Dispute Notice is given within such thirty (30) day period, the validity of the claim for indemnification and the amount of such claim, each as set forth in the Notice of Claim, will be deemed to be agreed, effective on the first (1st) day following such thirty (30) day period, and the amount of such claim as set forth in the Notice of Claim will immediately be payable by the Indemnifying Party. If an Indemnification Dispute Notice is given within such thirty (30) day period, then:

(d)     The portion, if any, of the amount of such claim which is not disputed in the Indemnification Dispute Notice will immediately be payable by the Indemnifying Party.

(e)     Buyer and Seller will negotiate in good faith to settle the dispute, and the portion, if any, of the claim amount which Buyer and Seller agree in writing is payable will be immediately payable by the Indemnifying Party.

(f)     If Buyer and Seller are unable to resolve any portion of the Indemnity Claim Amount within two (2) months following the date the Indemnification Dispute Notice is given, either Buyer or Seller may initiate proceedings in accordance with Section 8.7 to obtain resolution of the dispute.

(g)     If neither Buyer nor Seller initiates legal or arbitration proceedings in respect of the dispute within twelve (12) months following the date the Indemnification Dispute Notice is given, the portion of the claim amount which is disputed will not be payable, and the Indemnified Party will have no further right, under this Agreement, to seek to recover such amount from the Indemnifying Party.

(h)     If Buyer or Seller initiates legal proceedings within the twelve (12) month period specified in Section 8.12(g), the amount, if any, determined in a written final order of a court of competent jurisdiction or final non-appealable decision of an arbitrator ("*Final Order*") as payable by the Indemnifying Party will be payable by the Indemnified Party as of the date of such Final Order.

**Section 8.13     Acknowledgement**. Seller and Buyer each acknowledge that (a) only representations, warranties, covenants or agreements expressly made in this Agreement or the Closing Documents will be deemed to be representations, warranties, covenants or agreements for purposes of this Agreement, and (b) neither Party has relied on any representation, warranty, covenant or agreement not expressly made in this Agreement or the Closing Documents in consummating the transactions herein.

**ARTICLE 9**
**TERMINATION AND REMEDIES**

**Section 9.1     Methods of Termination**.  This Agreement and the transactions contemplated hereby may be terminated prior to the Closing Date as follows:

(a)     at any time by mutual written agreement of Seller and Buyer; or

(b)     by either Seller or Buyer upon the material breach of this Agreement by the other, to be effective, if curable, upon the breaching Party's failure to cure within five (5) Business Days of notice given, and if incurable, upon notice given, *provided* that the Party seeking to terminate has complied with and fulfilled its obligations and undertakings under this Agreement in all material respects; or

(c)     by Seller, in the following events:

(i)     at any time after any final, non-appealable decision is made by the applicable Governmental Authority denying any Required Regulatory Approval requested by the Seller or failing to reasonably meet the request of the Seller in all material respects; or

33

(ii)     at any time after December 31, 2020 if the Closing has not yet occurred;

*provided further*, that the event triggering Seller's termination right did not result from the failure by Seller to fulfill any undertaking or commitment provided for herein on the part of Seller that is required to be fulfilled on or prior to the Closing Date or any such applicable date.

(d)     by Buyer, in the following events:

(i)     if a fact, matter, condition, event or circumstance first disclosed in an Update from Seller has had or would reasonably be expected to have a Material Adverse Effect; *provided*, that (A) Buyer has given Seller at least fifteen (15) Business Days' prior notice of the intent to terminate and (B) Seller has not cured such Material Adverse Effect during such fifteen (15) Business Day period;

(ii)     at any time after any final, non-appealable decision is made by the applicable Governmental Authority denying any Required Regulatory Approval requested by the Buyer or failing to reasonably meet the request of the Buyer in all material respects;

(iii)     at any time after December 31, 2020 if the Closing has not yet occurred;

(iv)     at any time after December 31, 2020, if any order or decree by any federal or state court or Governmental Authority exists which would delay or otherwise impair the consummation of the sale of the Colstrip 4 Interests;

(v)     at any time if any Project User exercises a right of first refusal offered to it by the Seller (pursuant to the terms of the Ownership and Operation Agreement); or

(vi)     if Seller has failed to deliver to the Buyer the ROFR Resolution Notice by within the time specified in Section 7.9;

*provided*, that the event triggering Buyer's termination right did not result from the failure by Buyer to fulfill any undertaking or commitment provided for herein on the part of Buyer that is required to be fulfilled on or prior to the Closing Date or any such applicable date.

**Section 9.2     Effect of Termination**.  In the event either Party desires to terminate this Agreement pursuant to Section 9.1, written notice thereof shall promptly be given by the terminating Party to the other Party, and this Agreement shall terminate effective as of the later of the date such notice is received (or such later effective date as may be set forth therein) or the expiration of any cure period.  If this Agreement is terminated as provided in Section 9.1, all filings, applications and other submissions made to any Governmental Authority with respect to the transactions contemplated by this Agreement and the Closing Documents (other than any filings, applications and other submissions made by Seller that do not involve Buyer) shall, to the

extent practicable, be withdrawn from the Governmental Authority to which they were made; and except for those obligations set forth in ARTICLE 6, pursuant to which the Parties shall continue to be bound, no Party shall have any further obligation hereunder; *provided*, that such termination shall not be construed to limit or waive any right with respect to any breach of this Agreement occurring prior to such termination.

      **Section 9.3**   **No Liability**.  There shall be no liability of any shareholder, partner, member, director, officer, employee, advisor or representative of Buyer or Seller or any Affiliate thereof, whether to Buyer or Seller, as the case may be, or any other Person (including any shareholder, partner, member, director, officer, employee, advisor or representative thereof) in connection with any liability or other obligation of Buyer or Seller or any Affiliate thereof, whether hereunder or otherwise in connection with the transactions contemplated hereby.

**ARTICLE 10**
**DISPUTE RESOLUTION**

      **Section 10.1**   **Mutual Discussions**.  If any dispute or difference of any kind whatsoever shall arise between the Parties in connection with, or arising out of, this Agreement or the Closing Documents, or the interpretation, performance, breach, termination or validity hereof or thereof, including without limitation any claim based on contract, text or statute (the "*Dispute*"), the Parties shall attempt to settle such Dispute in the first instance by mutual discussions in accordance with this Section 10.1.  Within seven (7) Business Days of the receipt by either Party of a notice from the other Party of the existence of a Dispute referring to this ARTICLE 10 (the "*Dispute Notice*"), the receiving Party shall reply with a written response (a "*Dispute Notice Response*").  Both the Dispute Notice and the Dispute Notice Response shall include (a) a statement of the relevant Party's position with regard to the Dispute and a summary of arguments supporting such position; and (b) the name and title of the executive who will represent that Party in attempting to resolve the Dispute pursuant to this Section 10.1.  Within seven (7) Business Days of delivery of the Dispute Notice Response, the designated executives shall meet and attempt to resolve the Dispute.  All negotiations pursuant to this clause shall be confidential and shall be treated as compromise and settlement negotiations, and no oral or documentary representations or offers made by the Parties during such negotiations shall be admissible for any purpose in any subsequent proceedings.

      **Section 10.2**   **Arbitration**.  If any Dispute is not resolved within thirty (30) Days of receipt of a Dispute Notice pursuant to Section 10.1, then, upon either Party's request, the Dispute shall be finally and exclusively resolved by arbitration as follows:

      (a)      The arbitration shall be held accordance with the Commercial Arbitration Rules (the "*Rules*") of the American Arbitration Association (the "*AAA*"), then in effect, except as modified herein.  The arbitration shall be held, and the award shall be issued in Chicago, Illinois.

      (b)      The Parties shall appoint an arbitrator satisfactory to both Parties.  If the arbitrator is not appointed within the time limit provided herein, such arbitrator shall be appointed by the AAA by using a listing, striking and ranking procedure in accordance with the Rules.  Any arbitrator appointed by the AAA shall be a retired judge, preferably from a Federal District Court or Federal Court of Appeals, or a practicing attorney with no less than twenty (20) years of

experience and an experienced arbitrator and if possible shall have experience with disputes relating to electric power infrastructure.

(c)     The hearing shall be held, if possible, within four (4) months after the appointment of the arbitrator, or as soon thereafter as is reasonably practicable.

(d)     By agreeing to arbitration, the entities signing this Agreement do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration proceedings and the enforcement of any award. Without prejudice to such provisional remedies as may be available under the jurisdiction of a court, the arbitrator shall have full authority to grant provisional remedies and to direct the entities signing this Agreement to request that any court modify or vacate any temporary or preliminary relief issued by such court, and to award damages for the failure of any entity signing this Agreement to respect the arbitrator's orders to that effect.

(e)     Any arbitration proceedings, decision or award rendered hereunder and the validity, effect and interpretation of this arbitration agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. §1 et seq.  In arriving at their decision, the arbitrator shall be bound by the terms and conditions of this Agreement and the Closing Documents and shall apply the governing law of this Agreement as designated in <u>Section 11.2</u> hereof.

(f)     Any controversy concerning whether a Dispute is an arbitrable Dispute or as to the interpretation or enforceability of this paragraph shall be determined by the arbitrator.

(g)     The arbitrator is not empowered to award damages in excess of compensatory damages, and each Party hereby irrevocably waives any right to recover consequential, punitive, exemplary or similar damages with respect to any Dispute.  The award, which shall be in writing and shall state the findings of fact and conclusions of Law upon which it is based, shall be final and binding on the Parties and shall be the sole and exclusive remedy among the Parties regarding any claims, counterclaims, issues or accounting presented to the arbitrator.  Judgment upon any award may be entered in any court of competent jurisdiction.  In appropriate circumstances, the arbitrator shall have the authority to order a termination of this Agreement.

(h)     The arbitrator's award shall allocate, in their discretion, among the Parties to the arbitration all costs of the arbitration, including the fees and expenses of the arbitrator and reasonable attorneys' fees, costs and expert witness expenses of the Parties.  The award shall be final and binding on the Parties and may be enforced in any court having jurisdiction.

## ARTICLE 11
## OTHER PROVISIONS

**Section 11.1   <u>Counterparts</u>**.  This Agreement may be executed in one or more counterparts, all of which, taken together, shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party.

**Section 11.2   <u>Governing Law</u>**.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THE TRANSACTIONS

CONTEMPLATED HEREBY SHALL BE GOVERNED BY, ENFORCED, AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

     **Section 11.3**   **Entire Agreement**.  This Agreement and the Confidentiality Agreement and the Schedules and Exhibits hereto and thereto contain the entire agreement between the Parties with respect to the subject matter hereof and supersedes any prior agreements, understandings, representations, or warranties between the Parties.

     **Section 11.4**   **Notices**.  Any notice, request, instruction or other document to be given hereunder by a Party hereto shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

     Notices to Seller shall be addressed as follows:

     NorthWestern Corporation
     208 North Montana Ave. Suite 205
     Helena, MT 59601
     Attention:  Legal Department
     Email: Heather.Grahame@northwestern.com and John.Tabaracci@northwestern.com

     with copies to:

     Dorsey & Whitney LLP
     50 South Sixth Street, Suite 1500
     Minneapolis, MN 55042
     Attention:  B. Andrew Brown and David Swanson
     Email:  Brown.Andrew@dorsey.com and Swanson.Dave@dorsey.com

or at such other address and to the attention of such other Person as Seller may designate by written notice to Buyer.

     Notices to Seller shall be addressed to:

     Puget Sound Energy, Inc.
     355 110th Avenue NE
     Bellevue, WA 98004
     Attention:  Legal Department
     Email:  Steve.Secrist@pse.com and Samuel.Osborne@pse.com

with copies to:

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Attention:  Andrew Bor and Stephanie Hirano
Email:  ABor@perkinscoie.com and SHirano@perkinscoie.com

or at such other address and to the attention of such other Person as Buyer may designate by written notice to Seller.

Section 11.5   **Successors and Assigns**.  The rights and obligations of the Parties shall not be assigned or delegated by either Party, other than with the written consent of the other Party, which may be withheld in such Party's sole discretion; *provided*, *however*, that notwithstanding the foregoing, Buyer may freely transfer its obligations hereunder to any subsidiary or financing source of Buyer, without Seller's prior consent, *provided* that Buyer shall remain liable for all obligations of Buyer hereunder that may be assumed by such subsidiary or financing source.  Subject to the preceding sentence, this Agreement shall be-binding upon and inure to the benefit of the Parties and their successors and assigns.

Section 11.6   **Amendments**.  This Agreement may not be modified or amended except by an instrument or instruments in writing signed by both Parties.

Section 11.7   **Agreement for the Parties' Benefit Only**.  This Agreement is not intended to confer upon any Person not a Party hereto any rights or remedies hereunder, and no Person, other than the Parties and the Indemnified Parties is entitled to rely on any representation, warranty, covenant, or agreement contained herein.

Section 11.8   **Severability**.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any applicable Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to give effect to the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 11.9   **Bulk Sales or Transfer Laws**.  Buyer hereby waives compliance by Seller with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.  Seller agrees to pay all claims of creditors which could be asserted against Buyer because of such noncompliance.  Seller indemnifies Buyer against any liability or expense, including attorneys' fees, incurred by Buyer by reason of the failure of Seller to pay such claims.

Section 11.10 **No Waiver**.  No failure or delay by a Party to this Agreement in exercising any right or remedy provided by Law or under or pursuant to this Agreement shall impair such right or remedy or operate or be construed as a waiver or variation of it or preclude its exercise at any subsequent time and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

**Section 11.11** **Cumulative Remedies**.  The rights and remedies of the Parties under or pursuant to this Agreement are cumulative, may be exercised as often as such Party considers appropriate and are in addition to its rights and remedies under general law.

**Section 11.12** **Further Assurances**.  The Parties agree to use Commercially Reasonable Efforts to perform (or procure the performance of) all further acts and things, and execute and deliver (or procure the execution and delivery of) such further documents, and may be required by applicable Law or as either of the Parties may reasonably require, whether on or after the Closing, to implement and/or give effect to this Agreement and the Closing Documents and the transactions contemplated herein and therein and for the purpose of vesting in the Buyer the full benefit of the Colstrip 4 Interests, rights and benefits to be transferred to the Buyer under this Agreement and the Closing Documents.

**Section 11.13** **Counterparts; Effectiveness**.  This Agreement may be executed in counterparts (including by PDF), each of which shall be deemed an original, but all of which together shall constitute one and the same original instrument.  This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

**Section 11.14** **Specific Performance**.  Seller hereby acknowledges and agrees that money damages would not be a sufficient remedy for any breach of this Agreement by Seller, that Buyer would suffer irreparable harm as a result of any such breach, and that, in addition to all other remedies available under this Agreement or at Law or in equity, Buyer shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach, without posting any bond, security or other undertaking.  In the event of any action by Buyer to enforce this Agreement, Seller hereby waives the defense that there is an adequate remedy at Law.

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the Parties as of the day first above written.

Buyer:

**NORTHWESTERN CORPORATION**

By
Name: Robert C. Rowe
Title: CEO

Seller:

**PUGET SOUND ENERGY, INC.**

By: _____
Name:
Title:

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the Parties as of the day first above written.

**NORTHWESTERN CORPORATION**

By: _____
Name:
Title:

**PUGET SOUND ENERGY, INC.**

By: _____
Name:   Mary Kipp
Title:    President

# EXHIBIT A
## ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*"), dated as of [•], 2020 (the "*Effective Date*"), between PUGET SOUND ENERGY, INC., a Washington public utility corporation ("*Assignor*"), and NORTHWESTERN CORPORATION, a Delaware corporation ("*Assignee*").

## RECITALS:

WHEREAS, Assignor and Assignee are parties to that certain Colstrip Unit 4 Purchase and Sale Agreement, dated December 9, 2019 (the "*Purchase Agreement*");

WHEREAS, Assignor is a party to, or has obligations with respect to the Material Contracts set forth on Schedule 2.1(c) to the Purchase Agreement, each of which Assignor has agreed to assign and, except as otherwise provided herein or in the Purchase Agreement, Assignee has agreed to assume (collectively, the "*Assumed Contracts*"); and

WHEREAS, pursuant to the Purchase Agreement, Assignor agrees to assign the Assumed Contracts to Assignee and, except as otherwise provided herein or in the Purchase Agreement, Assignee agrees to assume the obligations of Assignor under the Assumed Contracts.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties agree as follows:

**SECTION 1.  Sale and Assignment**.  Except as otherwise provided herein or in the Purchase Agreement, Assignor, for good and valuable consideration to it, receipt of which is hereby acknowledged, does hereby assign, transfer, sell and convey unto Assignee all of Assignor's right, title and interest in and to the Assumed Contracts.

**SECTION 2.  Assumption**.

(a)      Assignee hereby (i) assumes the obligations and liabilities of Assignor under the Assumed Contracts to the extent that such obligation or liability. relates to or arises out of the time period after the Effective Date, (ii) shall, subject to clause (i), hereafter be deemed a party to the Assumed Contracts in the same role formerly held by Assignor, (iii) confirms that it has the requisite corporate power and authority to enter into and carry out the transactions contemplated by the Assumed Contracts, and (iv) agrees that after the Effective Date it shall be bound by all the terms of, and undertake all the obligations of Assignor contained in, the Assumed Contracts, with the same force and effect as if Assignee had executed on the Effective Date each of the Assumed Contracts originally as the contracting party named therein.  Each of the foregoing is for the benefit of Assignor and the other parties to the Assumed Contracts.

(b)      Assignee and Assignor hereby covenant and agree to execute and to deliver to the other parties to the Assumed Contracts from time to time such other documents, instruments and agreements as they reasonably may request in order to further evidence the assignment,

assumption and substitution effected hereby or otherwise to carry out the purposes and intent of this Agreement.

(c)      Upon the Effective Date, Assignor shall be released and discharged from each obligation, liability or duty pursuant to the Assumed Contracts arising or accruing on or after the Effective Date and Assignee shall be substituted in lieu of Assignor as a party to each of the Assumed Contracts to which Assignor is a party.

**SECTION 3.  Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of and shall be enforceable by the parties hereto and their respective successors and assigns and shall inure to the benefit of the other parties to the Assumed Contracts and their respective successors and assigns.

**SECTION 4.  Governing Law**.  This Agreement, including all matters of construction, validity and performance, shall in all respects be governed by, and construed in accordance with, the law of the State of Delaware applicable to contracts made in such state and to be performed entirely within such state, without giving effect to principles relating to conflicts of law.

**SECTION 5.  Counterparts**.  This Agreement may be executed by the parties hereto in separate counterparts (or upon separate signature pages bound together into one or more counterparts), each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have each caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the Effective Date.

**Assignor**:

**PUGET SOUND ENERGY, INC.**

By: _____
Name:
Title:

**Assignee**:

**NORTHWESTERN CORPORATION**

By: _____
Name:
Title:

[*Signature Page to Colstrip Unit 4 Assignment and Assumption Agreement*]

**EXHIBIT B**
**EXCLUDED ASSETS**


The "Kluver Property," described as:

  Township 1 North, Range 42 East, M.P.M.

    Section 9:  All

To the extent Seller has any interest in any assets that are or relate to the the property commonly referred to as the "Ankney Property" that had been the subject of litigation, no such interests or rights will be transferred as part of the transactions contemplated by this Agreement and as such are Excluded Assets.

**EXHIBIT C**
**POWER PURCHASE AGREEMENT**

**EXHIBIT A TO TERM SHEET**
**WITH RESPECT TO THE**
**COLSTRIP UNIT 4 TRANSACTION**

**CONFIRMATION FOR UNIT COMMITMENT SERVICE – COLSTRIP UNIT 4**

This Confirmation (this "Confirmation") shall confirm the terms agreed to between NorthWestern Corporation, d/b/a NorthWestern Energy ("Seller") and Puget Sound Energy, Inc. ("Buyer") regarding the purchase of Unit Commitment Service subject to the terms and conditions of the Western Systems Power Pool Agreement, dated effective as of [July 22, 2010], as amended from time to time prior to the date hereof (the "WSPP Agreement"). The undersigned Parties agree to sell and purchase electric energy pursuant to the WSPP Agreement as it is supplemented and modified below:

| | |
|---|---|
| **Seller** | NorthWestern Corporation, d/b/a NorthWestern Energy |
| **Purchaser** | Puget Sound Energy, Inc. |
| **Period of Delivery** | [Commencing on hour ending ("HE") 0100 June 1, 2020 through HE 2400 May 15, 2025][1] |
| **Schedule (Days and Hours)** | 7 x 24 (including NERC holidays) |
| **Delivery Rate** | N/A |
| **Delivery Point** | The high side of the 500 kV bus for Unit 4 in the Colstrip Switchyard, or, at Seller's option and with prior notice to Purchaser, at Mid-C. |
| **Type of Service** | Unit Commitment Service from Colstrip Unit 4, Service Schedule B |
| **Contract Quantity** | 90 MW at any time that Colstrip Unit 4 is operating at or greater than minimum load; 0 MW when Colstrip Unit 4 is off-line. |
| **Contract Price** | For each hour of the term of the contract, regardless of the Delivery Point, the higher of (i) the Mid C Day-Ahead Index Price for on-peak and off-peak periods, as applicable, minus O&M Costs (Base) Equilivant and (ii) the Floor Price applicable to such hour. In addition Purchaser shall pay a monthly payment of 1/12[th] of the annual O&M Costs (Base).

As used herein: |

---

[1] Note to Draft: Delivery term to be confirmed.

"Floor Price" means, for any hour during the Period of Delivery, a per MWh price calculated in accordance with Exhibit A to this Confirmation.

"O&M Costs (Base)" means, the 90 MW share of the O&M Cost (Base) fixed costs as identified and approved annually for Costrip Units 3 and 4 Budget. .

"O&M Costs (Base) Equilivant" means, O&M Cost (Base) divided by the annual net generation, as identified and approved annually for Colstrip Units 3 and 4 Budget.

"Mid C Day-Ahead Index Price" means, as applicable, the "ELECTRICITY-MID   C   PEAK-ICE"   price   or   the "ELECTRICITY-MID C OFF-PEAK-ICE" price, as published by the Intercontinental Exchange for the applicable day of delivery, or if at any time such index is no longer available, such other index as the parties agree provides an economically comparable price.[2]

**Transmission Path for the Transaction**    N/A

**Date of Agreement**    [            ], 2019

**Special Terms and Exceptions**    Notwithstanding anything to the contrary in the WSPP Agreement, the Parties hereby agree to the following modifications thereto:

1.  Section 22 of the WSPP Agreement is hereby revised as follows:

    a.  The reference to two (2) Business Days in Section 22.1(a) is amended to be a reference to ten (10) Business Days;

    b.  Section 22.1(c) is hereby revised to add the following to the end there of:

        *"provided,* that, in the case of the institution of any such proceeding by another person or entity, such proceeding is consented or acquiesced to by the Defaulting Party or is not withdrawn or dismissed within sixty (60) days;"

---

[2] Note to Draft:  Parties to confirm index.

c. The first and second sentences of Section 22.2(a) are deleted in their entirety and the following is substituted therefor:

"If an Event of Default shall have occurred and be continuing, the Non-Defaulting Party, upon written notice to the Defaulting Party, shall have the right to suspend, reinstate and resuspend performance of transactions under this Agreement. Suspension periods shall not affect in any way the thirty (30) day period for exercising a right of termination under Section 22.2(b)."

d. The last sentence of Section 22.2(a) is deleted in its entirety and the following is substituted therefor:

"The Non-Defaulting Party shall provide at least twenty-four (24) hours written notice to the Defaulting Party before any suspension may be terminated."

e. The last sentence of Section 22.3(c) is hereby deleted in its entirety and the following is substituted therefor:  "If the Non-Defaulting Party's aggregate Gains exceed its aggregate Losses and Costs, the Termination Payment shall be deemed to equal $0 and in no event shall the Defaulting Party be entitled to be paid a Termination Payment"; and

f. Section 22.3(e) shall be deleted in its entirety.

2. Sections B-3.8 and B-5 of Service Schedule B are hereby deleted in their entirety.

3. Revision of B-3.9(b) in Schedule B to read, "By the Seller when all of the output of the unit is unavailable" and deleting the remainder of that subsection.

4. THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS CONFIRMATION OR ANY OTHER DOCUMENT DELIVERED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS

3

(WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE PARTIES HERETO.

5.  This Agreement is made under and shall be governed by and construed in accordance with the substantive laws of the State of New York, without giving effect to any choice of law rule (except Section 5-1401 of the New York General Obligations Law) that would cause the application of the laws of any jurisdiction other than the internal laws of the State of New York[3].

**Miscellaneous**     This Confirmation may be executed in multiple counterparts, each of which when so executed and delivered shall constitute a duplicate original and all counterparts together shall constitute one and the same instrument.  The Parties acknowledge and agree that any document or signature delivered by facsimile, PDF or other electronic transmission shall be deemed to be an original executed document for the purposes hereof and such execution and delivery shall be considered valid, binding and effective for all purposes.

IN WITNESS WHEREOF the Parties have executed this Confirmation in the manner appropriate to each on the date set forth above.

NORTHWESTERN CORPORATION, d/b/a NORTHWESTERN ENERGY

By: _____
Name:
Title:

PUGET SOUND ENERGY, INC.

By: _____
Name:
Title:

_____

[3] NTD:  New York law is acceptable, but NorthWestern would prefer to stick with WSPP mediation and arbitration.

4

Exhibit A to
Colstrip Unit 4 Unit Contingent Confirmation

Methodology for calculating the minimum electric cost

Combination of Two parts
- Fuel related variable cost in $/MW
- Non-Fuel variable cost in $/MW

Fuel related Variable costs
- Base price is the equivalent cost of fuel expressed in $/MW at minimum load heat rate
  - Heat rate is approximately 13,500Btu/KWhr
  - Coal consumption at that rate is 0.8 tons /MW
- Base price on the contract starts at $27/ton
  - $27/ton is equivalent to $21.60/MW ($27.00/ton times 0.8tons/MW)

- Base price under the fuel contract adjusts <u>quarterly</u> under the fuel contract – the base price of this contract would be adjusted accordingly  (the quarterly base price would be multiplied by 0.8)

Non Fuel variable costs
- The plant produces an incremental cost worksheet every year which includes a place for non-fuel variable cost
- For 2019, it is $3.81/MW at minimum load
- A new sheet will be developed for the 2020 budget – a new number would be used <u>annually</u> under the contract for non-fuel variable O&M
- If the operator no longer produces an incremental cost worksheet, then mutually agreeable alternative will be calculated or used

Minimum charge for electricity under the PPA then is the combination of Fuel and non-Fuel variable costs as described and adjusted above.
- Minimum charge = Fuel related variable cost + non-Fuel variable cost
  - the example above would produce a minimum charge of $21.60 + 3.81 = $25.41/MW

5

**EXHIBIT E**
**WATER RIGHTS TRANSFER CERTIFICATE**

(See attached.)

Form No. 641 (U3-2015)

**MONTANA DNRC**

# DNRC OWNERSHIP UPDATE DIVIDED INTEREST

Complete one form for each water right that will be divided.  Your water right will be divided into separate water rights based on the information provided.

**Submit all three pages of this form with the filing fee; a deed, contract for deed, or other recorded document; a water right abstract; and a map.**

Contact your local DNRC Water Resources Regional Office if you have any questions.

## Filing Fee $50.00

**FOR DEPARTMENT USE ONLY**

Rec'd Date _____

Rec'd By _____

Fee Rec'd $ _____   Check No._____

Payor _____

Refund $ _____   Date  _____

Deposit Receipt # _____

OUID # _____

*If all interested parties wish to split the water right, each must fill out and sign either part B or part C of this form.  A water right can be split into several portions on one form for one $50 filing fee.  All interested parties must sign off on the split of water rights even if their portions are not split into individual rights.*

**PART A – GENERAL INFORMATION**

1.  **DATE OF LAND TRANSFER (SALE)** _____

2.  **WATER RIGHT BEING DIVIDED** _____

3.  **SELLER (Grantor)** _____
    MAILING ADDRESS _____
    CITY _____   STATE _____   ZIP_____
    PHONE _____   EMAIL _____

4.  **BUYER (Grantee)** _____
    MAILING ADDRESS _____
    CITY _____   STATE _____   ZIP_____
    PHONE _____   EMAIL _____

5.  **HOW IS THIS WATER RIGHT BEING DIVIDED?**  Please check only one.

    ☐  The water right is being divided as specifically identified in a deed, contract for deed, or other recorded document. (Attach a copy and underline the divided interest information.)

    ☐  The water right is being divided proportionately between the buyer and seller based on the place of use described in the water right.  (Attach a copy of the deed, contract for deed, or other recorded document.)

6.  **WATER RIGHT ABSTRACT**

    ☐  A current DNRC general abstract of the water right being divided must be submitted.  To receive DNRC generated water right abstracts, query the water right at the following web address: http://www.nris.mt.gov/dnrc/waterrights/default.aspx or contact the regional office serving your area.

7.  **MAP**

    ☐  A map must be provided.  An aerial photo is preferred.  You may also use a scaled map, county plat or quad map showing township and range, section corners, and a north arrow.  **The following elements must be identified on the map:**
    a. The place of use the seller is retaining;
    b. The place of use the buyer is receiving;
    c. Point(s) of diversion; and
    d. The location of any irrigated acres.

**IMPORTANT NOTES**
- If you want to change or add a point of diversion, place of use, place of storage, or purpose of use of a water right you must first file a change application with the DNRC.
- The combined portions of a divided water right cannot exceed the total flow rate, volume, or period of diversion of the original right.
- The DNRC has no jurisdiction concerning easement, right-of-way, and zoning matters.  The buyer and seller must make these provisions where necessary.
- There may be ongoing court action regarding this water right and terms and conditions applicable to the exercise of the divided right.  The buyer should be familiar with all aspects of the right received.

## PART B – SELLER'S PORTION
(Attach additional sheets if necessary)

**1. SELLER'S NAME** _____

**2. PORTION OF WATER RIGHT RETAINED**

*If specifically identified in the attached recorded document,* what flow rate will be retained by the Seller? _____ ☐ gpm ☐ cfs

Unless specifically divided in the attached recorded document, both the Seller's and Buyer's water right will retain the full flow rate and the use of the flow rate must be shared and/or alternated.  Attach an additional sheet explaining how this will be done such that, in combination, the flow rate of the original water right will not be exceeded.

Purpose of Use _____          Volume (acre-feet) _____

Purpose of Use _____          Volume (acre-feet) _____

**3. POINT OF DIVERSION** (describe the location to the nearest 10 acres, three quarter sections)

_____1/4 _____1/4 _____ 1/4 Sec _____   TWP _____ ☐ N ☐ S  RGE _____ ☐ E ☐ W

Lot/Tract _____   Block _____        Subdivision Name _____

COS _____   Gov't Lot _____        County _____

_____1/4 _____1/4 _____ 1/4 Sec _____   TWP _____ ☐ N ☐ S  RGE _____ ☐ E ☐ W

Lot/Tract _____   Block _____        Subdivision Name _____

COS _____   Gov't Lot _____        County _____

**4. PLACE OF USE**

Purpose of Use _____   County _____

| acres | 1/4 | 1/4 | 1/4 Sec | TWP | ☐ N ☐ S | RGE | ☐ E ☐ W |
|-------|-----|-----|---------|-----|---------|-----|---------|
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |

_____ **Total Acres**

Lot/Tract _____   Block _____   Subdivision Name _____

COS _____   Gov't Lot _____

Geocodes(s) _____

Purpose of Use _____   County _____

| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
|-------------|----------|----------|------------------------|--------------|---------|--------------|---------|
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |

_____ **Total Acres**

Lot/Tract _____   Block _____   Subdivision Name _____

COS _____   Gov't Lot _____

Geocodes(s) _____

**5. SIGNATURE**

I DECLARE UNDER PENALTY OF PERJURY AND UNDER THE LAWS OF THE STATE OF MONTANA THAT THE FOREGOING IS TRUE AND CORRECT.

Seller Signature: _____   Date: _____

Seller Signature: _____   Date: _____

## PART C - BUYER'S PORTION

(Attach additional sheets if necessary.  If more than one buyer, add sheets showing each buyer's portion.)

**1.  BUYER'S NAME** _____

**2.  PORTION OF WATER RIGHT ACQUIRED**

Flow Rate (gpm/cfs) _____ (Only if specifically identified in the attached recorded document—see Part B, Number 2)

Purpose of Use _____ Volume (acre-feet) _____

Purpose of Use _____ Volume (acre-feet) _____

**3.  POINT OF DIVERSION** (describe the location to the nearest 10 acres, three quarter sections)

_____1/4 _____1/4 _____ 1/4 Sec _____ TWP _____ ☐ N ☐ S  RGE _____ ☐ E ☐ W

Lot/Tract _____ Block _____ Subdivision Name _____

COS _____ Gov't Lot _____ County _____

_____1/4 _____1/4 _____ 1/4 Sec _____ TWP _____ ☐ N ☐ S  RGE _____ ☐ E ☐ W

Lot/Tract _____ Block _____ Subdivision Name _____

COS _____ Gov't Lot _____ County _____

**4.  PLACE OF USE**

Purpose of Use _____ County _____

| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |

_____ **Total Acres**

Lot/Tract _____ Block _____ Subdivision Name _____

COS _____ Gov't Lot _____

Geocodes(s) _____

Purpose of Use _____ County _____

| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |
| _____ acres | _____1/4 | _____1/4 | _____ 1/4 Sec _____ | TWP _____ | ☐ N ☐ S | RGE _____ | ☐ E ☐ W |

_____ **Total Acres**

Lot/Tract _____ Block _____ Subdivision Name _____

COS _____ Gov't Lot _____

Geocodes(s) _____

**5.  SIGNATURE**

I DECLARE UNDER PENALTY OF PERJURY AND UNDER THE LAWS OF THE STATE OF MONTANA THAT THE FOREGOING IS TRUE AND CORRECT.

Buyer Signature: _____ Date: _____

Buyer Signature: _____ Date: _____

## WATER RESOURCES OFFICES

**BILLINGS:** AIRPORT INDUSTRIAL PARK, 1371 RIMTOP DR., BILLINGS MT 59105-1978
PHONE:  406-247-4415   FAX:  406-247-4416
SERVING:  Big Horn, Carbon, Carter, Custer, Fallon, Powder River, Prairie, Rosebud, Stillwater, Sweet Grass, Treasure, and Yellowstone Counties

**BOZEMAN:** 2273 BOOT HILL COURT, SUITE 110, BOZEMAN MT 59715
PHONE:  406-586-3136   FAX:  406-587-9726
SERVING:  Gallatin, Madison, and Park Counties

**GLASGOW:** 222 6TH STREET SOUTH, PO BOX 1269, GLASGOW MT  59230-1269
PHONE:  406-228-2561   FAX:  406-228-8706
SERVING:  Daniels, Dawson, Garfield, McCone, Phillips, Richland, Roosevelt, Sheridan, Valley, and Wibaux Counties

**HAVRE:** 210 6TH AVENUE, PO BOX 1828, HAVRE MT  59501-1828
PHONE:  406-265-5516   FAX:  406-265-2225
SERVING:  Blaine, Chouteau, Glacier, Hill, Liberty, Pondera, Teton, and Toole Counties

**HELENA:** 1424 9TH AVE., PO BOX 201601, HELENA MT  59620-1601
PHONE:  406-444-6999   FAX:  406-444-9317
SERVING:  Beaverhead, Broadwater, Deer Lodge, Jefferson, Lewis and Clark, Powell, and Silver Bow Counties

**KALISPELL:** 655 TIMBERWOLF PARKWAY, SUITE 4, KALISPELL MT  59901-1215
PHONE:  406-752-2288   FAX:  406-752-2843
SERVING:  Flathead, Lake, Lincoln, and Sanders Counties

**LEWISTOWN:** 613 NORTHEAST MAIN ST., SUITE E, LEWISTOWN MT  59457-2020
PHONE:  406-538-7459   FAX:  406-538-7089
SERVING:  Cascade, Fergus, Golden Valley, Judith Basin, Meagher, Musselshell, Petroleum, and Wheatland Counties

**MISSOULA:** 2705 SPURGIN RD. BLDG.C, PO BOX 5004, MISSOULA MT  59806-5004
PHONE:  406-721-4284   FAX:  406-542-5899
SERVING:  Granite, Mineral, Missoula, and Ravalli Counties

### *MONTANA DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION*
### *Water Resources Division - Water Rights Bureau*
### *WEBSITE:* http://dnrc.mt.gov/wrd/



**EXHIBIT F**
**VOTE SHARING AGREEMENT**

**VOTE SHARING AGREEMENT**

THIS VOTE SHARING AGREEMENT (this "*Agreement*") is entered into as of [•], 2019 (the "*Effective Date*") by and between NORTHWESTERN CORPORATION, a Delaware corporation ("*NorthWestern*"), and PUGET SOUND ENERGY, INC., a Washington public utility corporation ("*Puget*"). NorthWestern and Puget are sometimes referred to herein individually as a "*Party*" and, collectively, as the "*Parties*." Capitalized terms used herein without definition shall have the respective meanings assigned to such terms in the Ownership and Operation Agreement.

**RECITALS**

WHEREAS, the ownership, operation and maintenance of the Project is governed by that certain Ownership and Operation Agreement, dated as of May 6, 1981, by and between The Montana Power Company, a Montana corporation ("*MPC*"), Puget Sound Energy, Inc. (formerly named "Puget Sound Power & Light Company"), a Washington corporation, Avista Corporation (formerly named "Washington Water Power Company"), a Washington corporation, Portland General Electric Company, an Oregon corporation, and PacifiCorp (successor by merger to the Maine corporation named "Pacific Power & Light Company"), an Oregon corporation, as amended on or about October 11, 1991, July 13, 1998, September 14, 2004 and August 18, 2008 (and as may be subsequently amended, modified and supplemented from time to time, the "*Ownership and Operation Agreement*");

WHEREAS, NorthWestern and Puget are parties to that certain Colstrip Unit 4 Purchase and Sale Agreement dated as of December 9, 2019 whereby NorthWestern acquired Puget's undivided interest in Colstrip Unit 4 (the "*Colstrip Unit 4 Acquisition Agreement*"); and

WHEREAS, the Parties desire to enter into this Agreement to govern their respective voting obligations under the Ownership and Operation Agreement with respect to Puget's retained undivided interest in Colstrip Unit 3 and NorthWestern's undivided interest in Colstrip Unit 4 acquired from Puget, but not NorthWestern's preexisting interest in Colstrip Unit 4 (the "*Shared Vote*").

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained in this Agreement, and intending to be legally bound, the Parties agree as follows:

**ARTICLE 1**
**DEFINITIONS & INTERPRETATION**

**Section 1.1     Definitions.** In this Agreement, the following capitalized terms have the meanings assigned below.

"*AAA*" has the meaning assigned to it in Section 4.2(a).

"*Appointee*" means any of a NorthWestern Appointee or a Puget Appointee.

"*Authorized Officer*" means, with respect to a Party, any officer of such Party.

"*Business Day*" means any day which is not a Saturday, Sunday or legal holiday in the state of Montana.

"*Classification Objection*" means an Objection on the grounds that the other Party has incorrectly classified the subject matter of the Proposal as a Colstrip 3 Proposal, Colstrip 4 Proposal, Mixed Proposal, Unit 3 Decommissioning Proposal, Unit 4 Decommissioning Proposal, Unit 3 Budget Proposal, Unit 4 Budget Proposal, or Remediation Proposal, as applicable.

"*Colstrip Unit 3*" means such portion of the Project commonly known as "Colstrip Unit 3" and the corresponding interest in the Common Facilities and related facilities, real property and property rights.

"*Colstrip 3 Proposal*" means a Proposal, other than a Unit 3 Decommissioning Proposal or Remediation Proposal that relates primarily to Colstrip Unit 3, but not to Proposals concerning the Common Facilities.

"*Colstrip Unit 4*" means such portion of the Project commonly known as "Colstrip Unit 4" and the corresponding interest in the Common Facilities and related facilities, real property and property rights.

"*Colstrip 4 Proposal*" means a Proposal, other than a Unit 3 Decommissioning Proposal or Remediation Proposal that relates primarily to Colstrip Unit 4, but not to Proposals concerning the Common Facilities.

"*Colstrip Unit 4 Acquisition Agreement*" has the meaning assigned to it in the Recitals.

"*Common Facilities*" has the meaning assigned to it under the Ownership and Operation Agreement.

"*Dispute*" has the meaning assigned to it in Section 4.1.

"*Dispute Notice*" has the meaning assigned to it in Section 4.1.

"*Dispute Notice Response*" has the meaning assigned to it in Section 4.1.

"*Disapproval Statement*" means the written statement submitted to the other members of the Project Committee pursuant to Section 17(h) of the Ownership and Operation Agreement.

"*Governmental Authority*" means (i) the federal government of the United States of America, (ii) any state, county, municipality, or other governmental subdivision within the United States of America, and (iii) any executive, legislative or judicial court, department, commission, board, bureau, agency, or other instrumentality of the federal government of the United States of America or of any state, county, municipality, or other governmental subdivision within the United States of America.

"*Law*" means any applicable law, statute, rule, regulation, ordinance, standard, code, order, judgment, decision, writ, injunction, decree, certificate of need, award, or other governmental

2

restrictions, including any published and publicly available policy or procedure enforceable by any Governmental Authority.

"*Mixed Proposal*" means a Proposal that is not a Colstrip 3 Proposal, Colstrip 4 Proposal, Unit 4 Decommissioning Proposal, Unit 3 Decommissioning Proposal, Unit 3 Budget Proposal, Unit 4 Budget Proposal, or a Remediation Proposal.  Mixed Proposal includes, but is not limited to, budget proposals for years for which there are no planned maintenance outages and budget proposals for years for which there are planned maintenance outages for both Unit 3 and Unit 4 which are of the exact same scheduled duration.

"*NorthWestern Appointee*" has the meaning assigned in Section 2.1(c).

"*NorthWestern's Colstrip 4 Project Share*" means the 25% undivided interest in Colstrip Unit 4 acquired by NorthWestern from Puget, pursuant to the Colstrip Unit 4 Acquisition Agreement. For avoidance of doubt NorthWestern's Colstrip 4 Project Shares shall not include NorthWestern 30% undivided interest in Colstrip Unit 4, acquired by NorthWestern from MPC, which at the time of this Agreement is subject to a separate vote sharing agreement.

"*Objection*" means an objection by a Party (or such Party's Appointee) to the manner in which the other Party's Appointee intends to use the Shared Vote. Only the following Objections may be asserted under this Agreement: Classification Objections or Prudency Objections.

"*Ownership and Operation Agreement*" has the meaning assigned to it in the Recitals.

"*Party Appointee*" means either a NorthWestern Appointee or a Puget Appointee.

"*Person*" means any Governmental Authority or any individual, firm, partnership, corporation, limited liability company, joint venture, trust, unincorporated organization or other entity or organization.

"*Poll*" has the meaning assigned in Section 3.2(b).

"*Project*" has the meaning assigned to it under the Ownership and Operation Agreement.

"*Project Committee*" has the meaning assigned to it under the Ownership and Operation Agreement.

"*Puget Appointee*" has the meaning assigned in Section 2.1(b).

"*Proposal*" means any proposal being considered for action by the Project Committee.

"*Prudency Objection*" means an objection by a Party resulting from a good faith determination by an Authorized Officer of such Party that the all or a portion of a Proposal would be inconsistent with Prudent Utility Practices (such determination to be made on the assumption that such Party is a long-term owner (and not merely a lessee) of Puget's Colstrip 3 Project Share or NorthWestern's Colstrip 4 Project Share, as appropriate).

"*Prudent Utility Practices*" means the practices, methods and acts generally engaged in or approved by the electric utility industry in the United States for similarly situated facilities in the United States during a particular time period, in a manner consistent with Laws, reliability, safety and environmental protection, and taking into consideration the requirements of this Agreement, the contracts set forth on Schedule 2.1(c) to the Colstrip Unit 4 Acquisition Agreement and the other contracts affecting the operation of the Project.  Prudent Utility Practices are not necessarily intended to require the optimum or best practices, methods or acts to the exclusion of all others, but rather to include a spectrum of possible practices, methods or acts consistent with the immediately preceding sentence.

"*Puget's Colstrip 3 Project Share*" means the 25% undivided interest in Colstrip Unit 3 owned by Puget.

"*Remediation Proposal*" means a Proposal primarily concerning the remediation of ground water or soil contamination located at Colstrip Unit 3 or Colstrip Unit 4 as required under applicable Laws.

"*Rules*" has the meaning assigned to it in Section 4.2(a).

"*Shared Vote*" has the meaning assigned to it in the Recitals.

"*Unit 3 Budget Proposal*" means a Proposal regarding the Project's budget for a year during which Unit 3 is the only unit at the Project for which there is a planned maintenance outage, or, if both Unit 3 and Unit 4 have planned maintenance outages during a given year, a Proposal regarding the Project's budget for that year if the scheduled duration of the planned maintenance outage for Unit 3 is longer than the scheduled duration of the planned maintenance outage for Unit 4.

"*Unit 4 Budget Proposal*" means a Proposal regarding the Project's budget for a year during which Unit 4 is the only unit at the Project for which there is a planned maintenance outage, or, if both Unit 3 and Unit 4 have planned maintenance outages during a given year, a Proposal regarding the Project's budget for that year if the scheduled duration of the planned maintenance outage for Unit 4 is longer than the scheduled duration of the planned maintenance outage for Unit 3.

"*Unit 3 Decommissioning Proposal*" means a Proposal regarding the decommissioning, mothballing, closure, retirement, deactivation, shut down, deconstruction, removal, or demolition of all or a portion of Colstrip Unit 3.

"*Unit 4 Decommissioning Proposal*" means a Proposal regarding the decommissioning, mothballing, closure, retirement, deactivation, shut down, deconstruction, removal, or demolition of all or a portion of Colstrip Unit 4.

**Section 1.2** **Other Capitalization.** Unless otherwise defined in this Agreement (including the Recitals), all other capitalized terms used in this Agreement have the meanings assigned to such terms in the Ownership and Operation Agreement.

4

Section 1.3 **Interpretation.** Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender; (b) words using the singular or plural number also include the plural or singular number, respectively; (c) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (d) the terms "Article" or "Section" refer to the specified Article or Section of this Agreement; and (e) any reference to the entirety or any part of any agreement or document shall refer to any amendment, supplement or replacement of the same. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

## ARTICLE 2
## APPOINTEES; GENERAL COVENANTS OF THE PARTIES

Section 2.1 **Appointment Processes.**

(a)     Unless otherwise agreed in writing by the Parties, each Appointee appointed pursuant to this Agreement shall (i) have sufficient financial and/or operational experience with electric energy plants similar to the Project, (ii) be an individual who is an employee of one of the Parties to this Agreement or one of their respective affiliates, and (iii) serve in accordance with the applicable terms and provisions of this Agreement and the Ownership and Operation Agreement.

(b)     Puget shall appoint the individual and alternates who shall be entitled to use the Shared Vote on Puget's behalf under this Agreement (the "*Puget Appointee*") and Northwestern shall appoint the individual and alternates who shall be entitled to use the Shared Vote on NorthWestern's behalf under this Agreement (the "*NorthWestern Appointee*").

(c)     Notice of any appointment made pursuant to this Section 2.1 shall be delivered in writing to the other Party not later than one Business Day prior to the effective date of such appointment. Nothing in this Section 2.1 is intended to limit the Parties' ability to agree in writing to alter the selection process for any Appointee.  The Notice of appointment shall contain contact information for the Appointee, including a physical mailing address, electronic mail address, and telephone number.

Section 2.2 **Appointee Obligations.**  During his or her term each Appointee shall act in accordance with this Agreement. If an Appointee breaches any of its material obligations under this Agreement, such Appointee shall be removed by the appointing Party promptly after (a) receipt of written notice from the non-appointing Party, which notice shall describe the breach in reasonable detail, and (b) such appointing Party's or its Appointee's failure to cure such breach within five business days from the date such written notice is received. A replacement Appointee shall be selected in the manner of selecting the Appointee set forth in Section 2.1.

Section 2.3 **General Acknowledgments and Agreements.**  The Parties hereby make the following acknowledgements and agreements:

(a)     Wherever either Party's approval, consent or agreement is required under this Agreement, it is understood that such approval, consent or agreement shall not be unreasonably

withheld, delayed or conditioned unless this Agreement specifically provides that a different standard should apply.

(b)     The Parties shall maintain in confidence the communications, discussions and deliberations with the Appointees and between the Parties regarding the advice to, consultation with, and the establishment of strategy and casting of votes with respect to the Shared Vote; provided that (i) the obligation set forth herein shall not be construed to prohibit disclosure (A) to a Party's employees, shareholders, directors, officers, advisors, agents, representatives or lenders, (B) of information that is or becomes generally available to the public other than as a result of any improper disclosure of such information by the disclosing Party, or (C) of information required to be disclosed under applicable Laws and (ii) the Parties may mutually agree to disclose some or all of the communications, discussions or deliberations addressed hereby. Nothing in this Section 2.3(b) shall constitute a waiver of, or agreement not to assert, any attorney-client, work product, or other privilege unless otherwise available with respect to a Party, its Appointees and their separate deliberations and consultations.

(c)     Nothing contained herein shall prohibit an Appointee from advancing any argument or taking any position at a Project Committee meeting inconsistent with the official vote being cast by the Shared Vote, and the Parties shall not interfere with an Appointee's efforts to communicate with the Project Committee on any matter before the Project Committee.

(d)     This Agreement does not apply to rights, votes, approvals, consents, waivers or the like that are to be made or exercised directly by Owners or Project Users (including by an individual appointed as a Party Appointee but only to the extent acting on behalf of such Owners or Project Users and not as a Party Appointee) under the Ownership and Operation Agreement (as opposed to rights, votes, approvals, consents, waivers or the like designed to be made or exercised by the members of Project Committee or the Project Committee as a whole). The Party Appointees shall not have the power to bind the Parties beyond their ability to cast the Shared Vote hereunder; it being understood that Appointees may waive Objections but do not, in capacities as such, have the power to waive any other rights under this Agreement.

Section 2.4     **Exclusive Remedies.** Furthermore, each Party agrees that its exclusive remedy for a breach of this Agreement shall be an action against the other Party, and not its Appointee, in the manner permitted by this Agreement.

**ARTICLE 3**
**THE VOTING PROCESS**

Section 3.1     **Voting Rights and Objections Generally.**

(a)     With respect to any Colstrip 3 Proposal, Colstrip 4 Proposal, Mixed Proposal, Colstrip 3 Decommissioning Proposal, Colstrip 4 Decommissioning Proposal or Remediation Proposal, the Shared Vote shall be cast strictly in accordance with this Agreement by one of the Party Appointees as described in the table contained below in this Section 3.1(a). Objections shall be communicated as soon as possible but in any event prior to the casting of an official vote by the Project Committee as follows: (i) the Objection shall be communicated verbally by telephone or in person to the other Party Appointee for any Proposal received on the day of the

Project Committee meeting in which such Proposal is to be considered and (ii) the Objection shall be communicated in writing delivered via email or verbally by telephone or in person to the other Party Appointee for any Proposal received prior to the day of the Project Committee meeting in which such Proposal is to be considered. The types of Objections which may be raised and the manner in which the Shared Vote may be cast are set forth on the table below. Subject to Section 3.1(b), if a Party Appointee is absent from a Project Committee meeting and appropriate alternate arrangements consistent with the Ownership and Operation Agreement have not been made (except for such absences due to an emergency or similar circumstances beyond such Appointee's control), the other Party may cast the Shared Vote.

| Subject Matter | Voting Rights if no Objection is Raised | Permitted Objections | Default Resolution After Objection is Raised |
|---|---|---|---|
| **Colstrip 3 Proposal** | Puget Appointee casts Shared Vote | Classification Objection | The Proposal shall be reclassified pursuant to NorthWestern's instructions and the Shared Vote shall be cast by the Party entitled pursuant to this Section 3.1(a), unless Puget contests the Classification Objection in accordance with ARTICLE 4. |
| **Colstrip 4 Proposal** | NorthWestern Appointee casts Shared Vote | Classification Objection | The Proposal shall be reclassified pursuant to Puget's instructions and the Shared Vote shall be cast by the Party entitled pursuant to this Section 3.1(a), unless NorthWestern contests the Classification Objection in accordance with ARTICLE 4. |
| **Mixed Proposal** | NorthWestern Appointee casts Shared Vote | Classification Objection; Prudency Objection | *Classification Objection*: The Proposal shall be reclassified pursuant to Puget's instructions and the Shared Vote shall be cast by the Party entitled pursuant to this Section 3.1(a), unless NorthWestern contests the Classification Objection in accordance with ARTICLE 4.<br><br>*Prudency Objection*: NorthWestern Appointee casts the Shared Vote consistent with the results of a valid Poll conducted in accordance with Section 3.2. So long as a Poll may be conducted, ARTICLE 4 does not apply to Prudency Objections. |

| **Unit 3 Budget Proposal** | Puget Appointee casts the Shared Vote | Classification Objection | The Proposal shall be reclassified pursuant to NorthWestern's instructions and the Shared Vote shall be cast by the Party entitled pursuant to this Section 3.1(a), unless Puget contests the Classification Objection in accordance with <u>ARTICLE 4</u>. |
| **Unit 4 Budget Proposal** | NorthWestern Appointee casts the Shared Vote | Classification Objection | *Classification Objection*: The Proposal shall be reclassified pursuant to Puget's instructions and the Shared Vote shall be cast by the Party entitled pursuant to this Section 3.1(a), unless NorthWestern contests the Classification Objection in accordance with <u>ARTICLE 4</u>. |
| **Unit 4 Decommissioning Proposal** | NorthWestern Appointee casts the Shared Vote | Classification Objection; Prudency Objection | *Classification Objection*: The Proposal shall be reclassified pursuant to Puget's instructions and the Shared Vote shall be cast by the Party entitled pursuant to this Section 3.1(a), unless NorthWestern contests the Classification Objection in accordance with <u>ARTICLE 4</u>.<br><br>*Prudency Objection:* NorthWestern Appointee casts the Shared Vote consistent with the results of a valid Poll conducted in accordance with <u>Section 3.2</u>. So long as a Poll may be conducted, <u>ARTICLE 4</u> does not apply to Prudency Objections. |
| **Unit 3 Decommissioning Proposal** | Puget Appointee casts the Shared Vote | Classification Objection | The Proposal shall be reclassified pursuant to NorthWestern's instructions and the Shared Vote shall be cast by the Party entitled pursuant to this Section 3.1(a), unless Puget contests the Classification Objection in accordance with <u>ARTICLE 4</u>. |

| **Remediation Proposal** | Puget Appointee casts the Shared Vote | Classification Objection | The Proposal shall be reclassified pursuant to NorthWestern's instructions and the Shared Vote shall be cast pursuant to this Section 3.1(a), unless Puget contests the Classification Objection in accordance with ARTICLE 4. |
| --- | --- | --- | --- |

(b)     If, despite the good faith efforts of both Parties the Project Committee vote occurs prior to resolution of the validity of an Objection pursuant to ARTICLE 4, the Shared Vote shall not be cast.

(c)     In connection with any Mixed Proposal, Unit 3 Decommissioning Proposal, Unit 4 Decommissioning Proposal, Unit 3 Budget Proposal, Unit 4 Budget Proposal, or Remediation Proposal, the Party entitled to cast the Shared Vote for such Proposal agrees to reasonably cooperate and consult with the other Party regarding the classification of Proposals and the establishment of strategy and casting of the Shared Vote in accordance with and subject to the terms of this Agreement. This covenant to cooperate includes, without limitation, the obligation to provide the other Party with notice of any conflict or disagreement as soon as reasonably practicable.

**Section 3.2     The Conduct and Results of a Prudency Objection Poll.**

(a)     If a Party asserts a Prudency Objection, the non-objecting Party shall request that the Project Committee conduct a Poll regarding such Proposal as follows: (i) if the Prudency Objection is asserted on the day of or during the Project Committee meeting in which the Proposal is to be considered, the non-objecting Party shall request during the Project Committee meeting that a Poll be conducted during such meeting and (ii) if the Prudency Objection is asserted prior to the day of the Project Committee meeting in which the Proposal is to be considered, the non-objecting Party shall give notice both telephonically and by email to the objecting Party that it will request that a Poll be taken at the Project Committee meeting.

(b)     A valid "Poll" is one in which the Project Committee members (including each of the Appointees selected pursuant to this Agreement) present their respective good faith indications of how they intend to vote on the Proposal being considered. For purposes of conducting the Poll, the Project Shares of NorthWestern and Puget shall be separately tallied for purposes of the Poll and not counted as indicative of the single combined Shared Vote to be cast. Therefore, the results of a valid Poll shall present a pure tally of the Project Users' positions with respect to a Proposal based on each Project User's actual Project Share.

(c)     The official Shared Vote on the Proposal being considered in the Poll shall be cast consistent with the results of the Poll in light of the voting and approval requirements under the Ownership and Operation Agreement (i.e., either approved or not approved). The fact that a Project Committee member casts an official vote on the Proposal that differs from its Poll vote shall have no bearing on the official Shared Vote cast in accordance with this Section 3.2(c). The Shared Vote cast may be changed only upon the concurrence of both Party Appointees and in accordance with the terms and provisions of the Ownership and Operation Agreement.

(d)      Where, through the successful exercise of an Objection, a Party, through its Appointee, has cast the Shared Vote to reject (or not approve) a Proposal, such Party shall have the sole right and, as between the two Parties, the responsibility to submit a Disapproval Statement, and the other Party shall have no right to submit a Disapproval Statement representing the Shared Vote relating to such rejected (or unapproved) Proposal. If in accordance with Section 3.1(b) the Shared Vote was not cast, the Parties shall attempt to submit a joint Disapproval Statement that contains both Parties' positions on, and alternatives with respect to, the Proposal. In all other situations, the Parties shall reasonably cooperate to prepare and submit Disapproval Statements on behalf of the Shared Vote that present positions and alternative proposals that are agreeable to both Parties; it being the express preference of this Agreement that a Disapproval Statement actually be submitted within the time periods required under the Ownership and Operation Agreement.

**ARTICLE 4**
**DISPUTE RESOLUTION**

**Section 4.1**    **Mutual Discussions**.  If any dispute or difference of any kind whatsoever shall arise between the Parties in connection with, or arising out of, this Agreement or the interpretation, performance, breach, termination or validity hereof, including without limitation any claim based on contract, text or statute (the "*Dispute*"), the Parties shall attempt to settle such Dispute in the first instance by mutual discussions in accordance with this Section 4.1. Within seven (7) Business Days of the receipt by either Party of a notice from the other Party of the existence of a Dispute referring to this ARTICLE 4 (the "*Dispute Notice*"), the receiving Party shall reply with a written response (a "*Dispute Notice Response*").  Both the Dispute Notice and the Dispute Notice Response shall include (i) a statement of the relevant Party's position with regard to the Dispute and a summary of arguments supporting such position; and (ii) the name and title of the executive who will represent that Party in attempting to resolve the Dispute pursuant to this Section 4.1.  Within seven (7) Business Days of delivery of the Dispute Notice Response, the designated executives shall meet and attempt to resolve the Dispute.  All negotiations pursuant to this clause shall be confidential and shall be treated as compromise and settlement negotiations, and no oral or documentary representations or offers made by the Parties during such negotiations shall be admissible for any purpose in any subsequent proceedings.

**Section 4.2**    **Arbitration**.  If any Dispute is not resolved within thirty (30) days of receipt of a Dispute Notice pursuant to Section 4.1, then, upon either Party's request, the Dispute shall be finally and exclusively resolved by arbitration as follows:

(a)      The arbitration shall be held accordance with the Commercial Arbitration Rules (the "*Rules*") of the American Arbitration Association (the "*AAA*"), then in effect, except as modified herein.  The arbitration shall be held, and the award shall be issued in Billings, Montana.

(b)      The Parties shall appoint an arbitrator satisfactory to both parties.  If the arbitrator is not appointed within the time limit provided herein, such arbitrator shall be appointed by the AAA by using a listing, striking and ranking procedure in accordance with the Rules.  Any arbitrator appointed by the AAA shall be a retired judge, preferably from a Federal District Court or Federal Court of Appeals, or a practicing attorney with no less than twenty (20) years of

experience and an experienced arbitrator and if possible shall have experience with disputes relating to electric power infrastructure.

(c)     The hearing shall be held, if possible, within four (4) months after the appointment of the arbitrator, or as soon thereafter as is reasonably practicable.

(d)     By agreeing to arbitration, the entities signing this Agreement do not intend to deprive any court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment, or other order in aid of arbitration proceedings and the enforcement of any award. Without prejudice to such provisional remedies as may be available under the jurisdiction of a court, the arbitrator shall have full authority to grant provisional remedies and to direct the entities signing this Agreement to request that any court modify or vacate any temporary or preliminary relief issued by such court, and to award damages for the failure of any entity signing this Agreement to respect the arbitrator's orders to that effect.

(e)     Any arbitration proceedings, decision or award rendered hereunder and the validity, effect and interpretation of this arbitration agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. §1 et seq.  In arriving at their decision, the arbitrator shall be bound by the terms and conditions of this Agreement and the Closing Documents and shall apply the governing law of this Agreement as designated in <u>Section 7.3</u> hereof.

(f)     Any controversy concerning whether a Dispute is an arbitrable Dispute or as to the interpretation or enforceability of this paragraph shall be determined by the arbitrator.

(g)     The arbitrator is not empowered to award damages in excess of compensatory damages, and each Party hereby irrevocably waives any right to recover consequential, punitive, exemplary or similar damages with respect to any Dispute.  The award, which shall be in writing and shall state the findings of fact and conclusions of Law upon which it is based, shall be final and binding on the Parties and shall be the sole and exclusive remedy among the Parties regarding any claims, counterclaims, issues or accounting presented to the arbitrator.  Judgment upon any award may be entered in any court of competent jurisdiction.  In appropriate circumstances, the arbitrator shall have the authority to order a termination of this Agreement.

The arbitrator's award shall allocate, in their discretion, among the Parties to the arbitration all costs of the arbitration, including the fees and expenses of the arbitrator and reasonable attorneys' fees, costs and expert witness expenses of the Parties.  The award shall be final and binding on the Parties and may be enforced in any court having jurisdiction.

**ARTICLE 5**
**TERM & TERMINATION**

**Section 5.1     <u>Term.</u>**  This Agreement shall become effective as of the date first written above and shall continue in full force and effect until the end of the term of the Ownership and Operation Agreement in accordance with Section 32 thereof.

11

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES

Each Party represents and warrants to the other Party that, as of the Effective Date:

(a)     such Party is duly formed and validly existing under the laws of the jurisdiction of its organization and is duly authorized to do business in each other jurisdiction in which it is required to be so qualified with full power and authority to perform its obligations hereunder and that the execution, delivery and performance of this Agreement has been duly authorized by such Party;

(b)     this Agreement has been duly executed and delivered by such Party and constitutes the legal, valid, binding and enforceable obligation of such Party enforceable in accordance with its terms against such Party subject to the effect of bankruptcy, insolvency, moratorium and other similar laws relating to creditors' rights generally, whether existing at law or in equity, by general equitable principles and by an implied covenant of good faith and fair dealing;

(c)     no consent, approval or authorization of, or filing, registration or qualification with, any court or governmental authority on the part of such Party is required for the execution and delivery of this Agreement by such Party and the performance of its obligations and duties hereunder, other than those that have been made or obtained; and

(d)     such Party is in material compliance with all laws and legal requirements applicable to its business.

## ARTICLE 7
## MISCELLANEOUS

**Section 7.1     Assignment: Third Party Beneficiaries.**  A transfer or assignment by either Party of any part of its interest under this Agreement to any other Person (an "*Assignee*") shall be subject to the non-assigning Party's receipt of written evidence that each of the following conditions has been satisfied: (a) the assigning Party shall be simultaneously transferring or assigning a corresponding portion of its Project Share, which is subject to this Agreement, to such Assignee, (b) such Assignee shall have assumed in writing the corresponding duties and obligations of the assigning Party which arise and are attributable to the period after the effective date of the assignment and (c) if a partial (but not a full) assignment of this Agreement is being effected, arrangements regarding the casting of the Shared Vote acceptable to the non-assigning Party shall be agreed upon in writing (including, without limitation, by amending this Agreement). Except as explicitly provided herein, nothing in this Agreement, express or implied, is intended to confer on any person or entity other than the Parties and their successors and assigns permitted hereunder any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**Section 7.2     Specific Performance.**  The Parties hereby declare that it is impossible to measure in money the damages that will accrue to a Party hereto by reason of a failure to perform any of the obligations under this Agreement and agree that the terms of this Agreement shall be specifically enforceable. If any Party hereto institutes any action or proceeding to

12

specifically enforce the provisions hereof, the Party against whom such action or proceeding is brought hereby waives the claim or defense therein that such Party has an adequate remedy at law, and such Party shall not offer in any such action or proceeding the claim or defense that such remedy at law exists.

     **Section 7.3**   <u>Governing Law.</u>  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MONTANA WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

     **Section 7.4**   <u>Severability.</u>  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

     **Section 7.5**   <u>Notices and Communications.</u>  Except as otherwise provided in this Agreement, any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid

     Notices to NorthWestern shall be addressed to the NorthWestern Appointee at the address provided pursuant to Section 2.1(c), with a copy to:

     NorthWestern Corporation
     208 North Montana Ave. Suite 205
     Helena, MT 59601
     Attention:  Legal Department
     Email: Heather.Grahame@northwestern.com and <u>John.Tabaracci@northwestern.com</u>

or at such other address and to the attention of such other Person as NorthWestern may designate by written notice to Puget.

     Notices to Puget shall be addressed to the Puget Appointee at the address provided pursuant to Section 2.1(c), with a copy to:

     Puget Sound Energy, Inc.
     355 110th Avenue NE
     Bellevue, WA 98004
     Attention:  Legal Department
     Email:  <u>Steve.Secrist@pse.com</u> and Samuel.Osborne@pse.com

or at such other address and to the attention of such other Person as Puget may designate by written notice to NorthWestern.

      **Section 7.6**    <u>**Amendments and Waivers.**</u>  This Agreement may be amended, supplemented or otherwise modified only by a writing executed and delivered by each Party. No waiver of any right under this Agreement shall be binding unless such waiver is in a writing by the Party to be bound. No failure to exercise and no delay in exercising, on the part of any Party, any right, remedy, power or privilege under this Agreement, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

      **Section 7.7**    <u>**Further Assurances: Cooperation in Seeking Amendment.**</u>  Each of the Parties agrees to perform all such acts (including executing and delivering such instruments and documents) as reasonably may be requested by the other Party to fully effect the intent and each and all of the purposes of this Agreement.

      **Section 7.8**    <u>**Conflicts.**</u>  In the event of a conflict between the Colstrip Unit 4 Acquisition Agreement, on the one hand, and this Agreement, on the other hand, the terms and provisions of this Agreement shall govern.

      **Section 7.9**    <u>**Headings.**</u>  The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

      **Section 7.10**    <u>**Survival.**</u>  The representations and warranties set forth in <u>ARTICLE 6</u> shall survive the Effective Date.

      **Section 7.11**    <u>**Counterparts.**</u>  This Agreement may be executed in any number of counterparts, each of which shall be considered an original, but all of which together shall constitute a single instrument.

      **Section 7.12**    <u>**Contract Only, etc.**</u>  This Agreement creates a contractual relationship between the Parties and does not give rise to any fiduciary, quasi-fiduciary, partnership or other special relationship which would result in the implication of rights, duties or standards of care or performance other than such rights, duties and standards as would attend a contract between sophisticated commercial parties each represented by separate counsel.

[<em>Signature Page Follows</em>]

14

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the Parties as of the day first above written.

**NORTHWESTERN CORPORATION**

By: _____
Name:
Title:

**PUGET SOUND ENERGY, INC.**

By: _____
Name:
Title:

**EXHIBIT G**
**OFFICER'S CERTIFICATE**

**[•], 2020**

The undersigned, [•], hereby certifies that [he/she] is the duly elected [•] of NORTHWESTERN CORPORATION, a Delaware corporation ("*Buyer*"), and that [he/she] is authorized to execute this Certificate on behalf of Buyer.  Pursuant to <u>Section 3.2(b)</u> of that certain Colstrip Unit 4 Purchase and Sale Agreement, dated December 9, 2019 between and PUGET SOUND ENERGY, INC., a Washington public utility corporation ("*Seller*"), and Buyer (the "*Purchase Agreement*"), the undersigned hereby certifies that:

1.     the representations and warranties of Buyer set forth in <u>Article 5</u> of the Purchase Agreement are true, correct and complete as of the date hereof, except in such circumstances as shall not, individually or in the aggregate, have or reasonably be expected to have a Material Adverse Effect;

2.     the conditions set forth in <u>Section 3.4</u> of the Purchase Agreement have been fulfilled or waived on or before the date hereof; and

3.     the covenants of Buyer set forth in <u>Article 7</u> of the Purchase Agreement have been fulfilled or waived in writing by Seller.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate as of the date first written above.

_____

Name:

Title:

*[Signature Page to Buyer's Officer's Certificate]*

**EXHIBIT H**
**OFFICER'S CERTIFICATE**

**[•], 2020**

The undersigned, [•], hereby certifies that [he/she] is the duly elected [•] and PUGET SOUND ENERGY, INC., a Washington public utility corporation ("*Seller*"), and that [he/she] is authorized to execute this Certificate on behalf of Seller.  Pursuant to Section 3.3(b) of that certain Colstrip Unit 4 Purchase and Sale Agreement, dated December 9, 2019 between Seller and NORTHWESTERN CORPORATION, a Delaware corporation ("*Buyer*") (the "*Purchase Agreement*"), the undersigned hereby certifies that:

1.    the representations and warranties of Seller set forth in Article 4 of the Purchase Agreement are true, correct and complete as of the date hereof, except in such circumstances as shall not, individually or in the aggregate, have or reasonably be expected to have a Material Adverse Effect;

2.    the conditions set forth in Section 3.5 of the Purchase Agreement have been fulfilled or waived on or before the date hereof; and

3.    the covenants of Seller set forth in Article 7 of the Purchase Agreement have been fulfilled or waived in writing by Buyer.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate as of the date first written above.

_____
Name:
Title:

**EXHIBIT I**
**FORM OF DEED**

After Recording Return to:
Northwestern Corporation
Attn: Lands and Permitting
11 East Park Street
Butte, MT 59701

**<u>DEED</u>**

FOR VALUABLE CONSIDERATION, the receipt of which is acknowledged, the undersigned, Puget Sound Energy, Inc., a Washington Public utility corporation with its offices at 355 110th Avenue NE Bellevue, WA 98004 ("Grantor") hereby grants unto Northwestern Corporation, a Delaware corporation with its offices at 11 East Park Street, Butte, MT 59701 ("Grantee") all of Grantor's right, title and interest in and to the following property situated in Rosebud County, Montana (the "County"):

(a)      The real property, interests in real property and other interests described or referenced, or described in the documents referenced, in Part I of Exhibit A (which is attached hereto and hereby made a part hereof) ("Fee Lands");

(b)      The easements, use rights and other interests described or referenced, or described in the documents referenced, in Part II of Exhibit A ("Easements");

(c)      The water rights described in Part III of Exhibit A and all other water rights in the County ("Water Rights");

(d)      The oil and gas leases, severed fee minerals, severed fee oil and gas rights, royalties, agreements, assignments, gas storage agreements and rights, and other interests described or referenced, or described  in the documents referenced, in  Part IV of Exhibit A, and all operating agreements, farmout agreements, farming agreements,  areas of mutual interest, salt water disposal  agreements,  water injection agreements, gas storage agreements, pooling agreements, unitization agreements, purchase agreements, production sales agreements and all other agreements, rights and interests relating to the interests described or referenced, or described in the documents referenced, in Part IV of Exhibit A ("Mineral Interests");

(e)      All other real property or interests in real property in the County of any kind or nature, including without limitation fee, term, leasehold, easement (including without limitation all easements appurtenant to Fee Lands or Mineral Interests or granted or reserved in any document referenced in Exhibit A), prescriptive, possessory, oil, gas, mineral, royalty, deferred and reversionary interests and rights other than the "Kluver Property," as such property is legally described in EXHIBIT C ("Other Interests"); and

(f)      All buildings, fixtures, equipment, and other improvements, and all tenements, hereditaments and appurtenances belonging, appertaining or related to the Fee Lands,

Easements, Water Rights, Mineral Interests and Other Interests (the "Appurtenant Rights").

Grantor's right, title and interest in the Fee Lands, Easements, Water Rights, Mineral Interests, Other Interests and Appurtenant Rights, are collectively referred to herein as the "Property."

The description (meaning herein both word descriptions and specific descriptions) of the Property shall be construed broadly and as inclusive and there shall be no implied exclusions because of the structure of the description of the Property or otherwise. It is Grantor's intent to make a full and complete transfer to Grantee of all of Grantor's right, title and interest in and to any and all real property and interests in real property other than the Kluver Property, located in the County owned or otherwise vested in Grantor as of the date hereof, whatever size, wherever located and whether or not described or inaccurately or inadequately described in Exhibit A, and it is Grantor's further intent that this deed convey after-acquired rights, titles and interests.

TO HAVE AND TO HOLD unto Grantee, and Grantee's successors and assigns, forever, SUBJECT TO THOSE MATTERS SET FORTH ON EXHIBIT B (the "Permitted Encumbrances"). Grantor agrees to defend the same to the Grantee against the lawful claims and demands of all persons claiming by, through or under Grantor, but against no other persons.

EXCEPT with reference to the items referred to in paragraphs (a) to (e) inclusive, this deed is given with the usual covenants expressed in Montana Code Annotated § 30-11-110.

Grantor also hereby conveys to Grantee, its successors and assigns, all rights of Grantor, to the extent assignable, in and to all covenants and warranties with respect to the Property made by Grantor's predecessors in title and with full subrogation of all rights accruing under such covenants and warranties and the statutes of limitation, repose or prescription under the laws of Montana and all rights of action of warranty against all former owners of the Property.

Grantor agrees to take all such further action and execute, acknowledge and deliver all such further documents as may be reasonably necessary or useful to accomplish the purposes of this Deed and to evidence Grantee's interests of record.

This Deed shall be binding upon and shall inure to the benefit of Grantor and Grantee and their respective successors, legal representatives and assigns.

[Signature and acknowledgment on the following page]

Grantor:

PUGET SOUND ENERGY, INC.
a Washington public utility company


By: _____
Name:
Its:


STATE OF WASHINGTON              )
                                 ) ss.
COUNTY OF  _____        )


This instrument was acknowledged before me this ___ day of _____, 20__, by _____,
a _____ of PUGET SOUND ENERGY, INC. a Washington public utility company.


Name _____
Notary Public for the State of _____
Residing at _____
My Commission expires _____

EXHIBIT A
PART I

*An undivided twenty-five percent (25%) interest as Tenant in Common in and to the real property described in Schedule I below.*

## SCHEDULE I
## UNIT 4 GENERATION

Parcel 13       That portion of Sections 34 and 35 in Township 2 North, Range 41 East, PMM, described as Parcel 3 Amended of Certificate of Survey No. 85124 filed December 30, 1998 for record in the office of the Clerk and Recorder of Rosebud County, Montana as document No. 85124.

Parcel 14       Intentionally deleted and replaced by Parcels 14A, 14B and 14C.[1]

Parcel 14A      That portion of the E1/2NE1/4 of Section 34 and W1/2NW1/4 of Section 35 in Township 2 North, Range 41 East, described as Tract 1 of Colstrip Unit 3 and 4 Cooling Towers Minor Subdivision being a subdivision of Parcel 2 of Certificate of Survey No. 34153 as amended by Certificate of Survey No. 85789, which Minor Subdivision was filed in the office of the Clerk and Recorder of Rosebud County, Montana on June 5, 2000 under Document No. 88170.

Parcel 14B      Intentionally deleted.

Parcel 14C      That portion of the E1/2NE1/4 of Section 34 and W1/2NW1/4 of Section 35 in Township 2 North, Range 41 East, described as Tract 3 of Colstrip Unit 3 and 4 Cooling Towers Minor Subdivision being a subdivision of Parcel 2 of Certificate of Survey No. 34153 as amended by Certificate of Survey No. 85789, which Minor Subdivision was filed in the office of the Clerk and Recorder of Rosebud County, Montana on June 5, 2000 under Document No. 88170.

Parcel 15       Intentionally deleted and replaced by Parcels 15A, 15B, and 15C.

Parcel 15A      That portion of the S1/2NE1/4 and N1/2SE1/4 of Section 34 in Township 2 North, Range 41 East, described as Tract 1 of Colstrip Unit 3 and 4 Generation Sites Minor Subdivision being a subdivision of Parcel 4 of Certificate of Survey No. 29931 Amended, filed for record as Document No. 37265, which Minor Subdivision was filed in the office of the Clerk and Recorder of Rosebud County, Montana on June 5, 2000 under Document No. 88169.

Parcel 15B      Intentionally deleted.

---

[1] Note to Draft: The replacement of Parcels 14 and 15 with 14A, 14B, 14C and 15A, 15B and 15C, respectively, is to be reviewed by Seller between signing and closing.

Parcel 15C     That portion of the S1/2NE1/4 and N1/2SE1/4 of Section 34 in Township 2 North, Range 41 East, described as Tract 3 of Colstrip Unit 3 and 4 Generation Sites Minor Subdivision being a subdivision of Parcel 4 of Certificate of Survey No. 29931 Amended, filed for record as Document No. 37265, which Minor Subdivision was filed in the office of the Clerk and Recorder of Rosebud County, Montana on June 5, 2000 under Document No. 88169.

Parcel 16      That portion of Section 3 in Township 1 North, Range 41 East, PMM, described as Tract 1 of Certificate of Survey No. 58701 filed October 29, 1987 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 58701.

Parcel 17      <u>Township 1 North, Range 41 East, P.M.M., Rosebud County, Montana</u>

               Section 2:  W1/2 of Lot 2, Lots 3 and 4, and the S1/2N1/2

               Descriptions are from a deed in settlement of a condemnation action given by Burlington Northern Railroad Company to the Montana Power Company, a Montana corporation, Pacific Power & Light Company, a Maine corporation, Portland General Electric Company, an Oregon corporation, The Washington Water Power Company, a Washington Corporation, and Puget Colstrip Construction Company, a Washington corporation, dated January 25, 1983, recorded in Book 79 Deeds, page 588, records of Rosebud County, Montana.

Parcel 17A     <u>Township 2 North, Range 41 East, P.M.M</u>

               Section 35:     Those portions of the S1/2 being two separate tracts herein referred to as Parcel 1 and Parcel 2 described as follows:

               Parcel 1 beginning at the common corner of Sections 34 and 35, T2N, R41E Sections 2 and 3, TIN, R41E, which is the true point of beginning; thence N 02° 06'11" W along the common line between Sections 34 and 35 a distance of 632.34 feet; thence N 41° 52' 20" E a distance of 2,126.31 feet; thence S 65° 04' 46" E a distance of 1,493.70 feet; thence S 05° 36' 54" E a distance of 1,581.65 feet to the common lines between Sections 2 and 35; thence S 89° 44' 06" W a distance of 260.76 feet along the common line between Section 2 and Section 35 to the quarter section corner common to Sections 2 and 35; thence S 89° 46' 14" W a distance of 2,644.79 feet along the common line between Section 2 and 35 to the true point of beginning.

               Parcel 2 beginning at the common corner of Sections 35 and 36, T2N, R41E and Sections 1 and 2, T1N, R41E; thence S 89° 44' 06" W along the common Line of Sections 2 and 35 a distance of 723.39 feet to a point on the Southwesterly boundary of the Burlington Railroad right-of-way, which point is the true point of beginning; thence S 89° 44' 06" W along the common line of Sections 2 and 35 a distance of 599.14 feet; thence N 02° 22' 02" W a distance of 1,640.32 feet to a point on the southwesterly boundary of the Burlington Northern Railroad right-of-

way; thence S 22° 10' 32" E along the southwesterly boundary of the Burlington Northern Railroad right-of-way to the point of beginning.

Descriptions are from a deed in settlement of a condemnation action given by Burlington Northern Railroad Company to The Montana Power Company, a Montana corporation, Pacific Power & Light Company, a Maine corporation, Portland General Electric Company, an Oregon corporation, The Washington Water Power Company, a Washington corporation, and Puget Colstrip Construction Company, a Washington corporation, dated January 25, 1983, recorded in Book 79 Deeds, page 588, records of Rosebud County, Montana.

Parcel 17B    <u>Township 1 North, Range 41 East, P.M.M., Rosebud County, Montana</u>

Section 3:  That portion of Lot 1 and the SE1/4NE1/4 beginning at the common corner of said Sections 34 and 35, T2N, R41E and Sections 2 and 3, T1N, R41E, which is the true point of beginning; thence S 89` 43' 02" W along the common lines between Sections 34 and 3 a distance of 776.23 feet; thence S 01` 31' 17" W a distance of 2,782.94 feet to the east-west mid-section line of Section 3; thence N 89` 57' 01" E along the mid-section line a distance of 864.60 feet to the quarter section corner common to Sections 2 and 3; thence N 00` 17' 53" W along the common line between Sections 2 and 3 a distance of 2,785.08 feet to the true point of beginning.

Descriptions are from a deed in settlement of a condemnation action given by Burlington Northern Railroad Company to The Montana Power Company, a Montana corporation, Pacific Power & Light, a Maine corporation, Portland General Electric Company, an Oregon corporation, The Washington Water Power Company, a Washington corporation, dated January 25, 1983, recorded in Book 79 Deeds, page 593, records of Rosebud County, Montana.

Parcel 18    <u>Township 2 North, Range 42 East, P.M.M., Rosebud County, Montana</u>

Section 31:  S1/2
Section 32:  S1/2

<u>Township 1 North, Range 42 East, P.M.M., Rosebud County, Montana</u>

Section 5:  All
Section 6:  Lots 1, 2, 3, 4, 5, and 6, SE1/4, S1/2NE1/4, E1/2SW1/4, SE1/4NW1/4

(Recording Reference:  Warranty Deed recorded September 21, 1981 in Book 78 Deeds, page 606).

Parcel 18A    <u>Township 1 North, Range 42 East, P.M.M., Rosebud County, Montana</u>

Section 7:  NE1/4NW1/4, N1/2NE1/4
Section 8:  N1/2 NW1/4

Parcel 19        Easements and rights-of-way more particularly described in documents recorded in the office of the Clerk and Recorder of Rosebud County, Montana under the following book and page numbers, which documents are incorporated herein by this reference and made a part hereof:

Book 79 Deeds        Page 270
Book 79 Deeds        Page 3
Book 79 Deeds        Page 688
Book 81 Deeds        Page 648
Book 79 Deeds        Page 599
Book 79 Deeds        Page 582
Book 85 Deeds        Page 60

*An undivided 12.5% of the real property described in Schedule II below.*

## SCHEDULE II
## UNITS 3 & 4 OTHER

Parcel 20        That portion of Section 28 in Township 2 North, Range 41 East, PMM, described as Tract 1A-A of Certificate of Survey No. 88360 filed July 17, 2000, for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 88360.

Parcel 21        Intentionally deleted.

Parcel 22        That portion of Section 21 in Township 2 North, Range 41 East, PMM, described as Tract 1A-1 of Amended Tract 1A of Amended Tract 1 of Certificate of Survey No. 27879 filed October 19, 1982 for record in the Clerk and Recorder of Rosebud County, Montana as Document No. 37085.

Parcel 23        That portion of Section 33 in Township 2 North, Range 41 East, PMM, described as Tract 1 Amended of Certificate of Survey No. 85920, filed May 4, 1999 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 85920, excepting therefrom:

(a) Tract 2 of Certificate of Survey No. 44126

(b) Castle Rock Lake Subdivision First Filing Document No. 37500

(c) Castle Rock Lake Subdivision Second Filing Document No. 37501

(d) Castle Rock Lake Subdivision Third Filing Document No. 37502

(e) Cimarron Subdivision First Filing Document No. 37503

(f) Plat of Amended Lots 19 and 20, Block 5 Cimarron Subdivision First Filing Document No. 86070.

(g) Amended Plat of Cimarron Subdivision Second Filing Document No. 39051

(h) Cimarron Subdivision Third Filing Document No. 37505

| | |
|---|---|
| Parcel 24 | That portion of Sections 21 and 22 in Township 2 North, Range 41 East, PMM, described as Tract 1 of Certificate of Survey No. 44906 filed August 4, 1984 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 44906. |
| Parcel 25 | That portion of Section 22 in Township 2 North, Range 41 East, PMM, described as Tract 1 of Certificate of Survey No. 44909 filed August 14, 1984 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 44909. |
| Parcel 26 | That portion of Section 21 in Township 2 North, Range 41 East, PMM, described as Tract 1 of Certificate of Survey No. 44910 filed August 14, 1984 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 44910. |
| Parcel 27 | That portion of Section 22 in Township 2 North, Range 41 East, PMM, described as Tract 1 of Certificate of Survey No. 44911 filed August 14, 1984 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 44911. |
| Parcel 28 | That portion of Section 22 in Township 2 North, Range 41 East, PMM, described as Tract 1 of Certificate of Survey No. 44912 filed August 14, 1984 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 44912. |
| Parcel 29 | That portion of Section 22 in Township 2 North, Range 41 East, PMM, described as Tract 1 of Certificate of Survey No. 44907 filed August 14, 1984 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 44907. |
| Parcel 30 | That portion of Section 22 in Township 2 North, Range 41 East, PMM, described as Tract 1 of Certificate of Survey No. 44908 filed August 14, 1984 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 44908. |
| Parcel 31 | That portion of Section 27 in Township 2 North, Range 41 East, PMM, described as Tract 1A-1, Tract 1A-2, and Tract 1A-3 of Amended Tract 1A of Amended Tract 1 of Certificate of Survey No. 27874 filed December 1, 1982 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 37510, subject to Dedication of Tract 1A-3 (Pinebutte Drive) as a public roadway. |

Parcel 32    <u>Township 2 North, Range 42 East P.M.M., Rosebud County, Montana</u>

Section 31:  N1/2
Section 32:  N1/2
Section 30:  S1/2SE1/4, S1/2SE1/4SW1/4

<u>Township 1 North, Range 42 East, P.M.M., Rosebud County, Montana</u>

Section 4:  SW1/4

Parcel 33    Lot 12, Block 1, and Lots 6, 7, 10, 11, 12, 17 and 19, Block 3, of The Amended Plat of BIG TIMBER SUBDIVISION, Corrected Plat of Eastside Townsite Expansion, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 29033.

Lots 1C and 1J, Block 6, Lots 3E, 3H, 3L, Block 7, Lots 2C, 2D, 5, and 6, Block 8, and Lots 2F, 3E, 3G, 4A, and 4B, Block 9, of The Plat of BIG TIMBER SUBDIVISION, Amended Plat of Eastside Townsite Expansion, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 29032.

Lots 1, 2, 3, 4, 5, 6, 7 and 8, of Block 8, Lots 1, 2, 5, 7, 9, 10, 11, 12, 13, 14, 15, 16 and 18, of Block 9, Lots 1 and 5, of Block 11, Lots 1, 2, 3, 6 and 11, Block 4, and Lots 1, 2, 4, 5 and 6, Block 5, of The Amended Plat of STILLWATER SUBDIVISION, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 29031.

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14, Block 1, Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22 and 23, Block 2, Lots 1, 2, 3, 4 and 5, Block 3, Lots 7, 8, 12 and 13, Block 5, Lots 3, 7, 8, 9, 12, 13, 14 and 15, Block 6, Lot 20, Block 7, Lots 5 and 11, Block 8, and Lot 5, Block 11, of The Amended Plat of SWEETGRASS SUBDIVISION, First Filing, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 40609.

Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13, Block 1, Lots 1, 2, 3, 4, 6, 7, and 8, Block 2, Lots, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 18, 19 and 20, Block 3, Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30 and 31, Block 6, and Lots 4, 5, 7, 8, 9, 10, 11, 12, 13, 15,16, 17, 18, 19, 20, 21, 22 and 23, Block 7, of the Amended Plat of STILLWATER SUBDIVISION, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 40611.

Lots 4 and 18, Block 3, Lot 12 Block 4, Lots 3 and 4, Block 6, of CIMARRON SUBDIVISION, Second Filing, Rosebud County, Montana, according to the

official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 37504.

Lots 6, 7, 10 and 31, Block 4, of CASTLE ROCK LAKE SUBDIVISION, Second Filing, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 37501.

Lots 32, 33 and 34, Block 4, of CASTLE ROCK LAKE SUBDIVISION, Third Filing, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 37502.

Tracts 5, 8, 11, 33, 34, 35, 36, 37, 38, 39, 40, 41, 43, 44, 45, 47, 48, 49, of SWEETGRASS ACREAGE TRACTS SUBDIVISION.  This Subdivision Plat Amends a portion of Amended Plat of Sweetgrass Subdivision, First Filing, Sweetgrass Subdivision, Second Filing, and a portion of Amended Plat of Sweetgrass Subdivision, Third Filing, Rosebud County Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 44417.

Lots 12, 19, 20, 21 and 24, Block 3, and Lot 16, Block 4, of CIMARRON SUBDIVISION, Second Filing, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 37504.

Lots 32, 33, 34, 35 and 36, Block 2, Lots 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32A, 32B, 32C, 32D, 32E, 32F, 32G, 32H, 321, 32J, 32K, 32L, 32M, 32N, 320, 32P, 32R, 32S, 32T, 32U, 32V, W, X, Y, Block 5, and Lots 1A, B, C, D, 1E, F, G, H, 1I, J, K, L, 1M, 32Q and 32Z, Block 7, Block 4, of CIMARRON SUBDIVISION, First Filing, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County.

Lot 1B, Block 8, and Lots 1B, 2, and 3, Block 9, of CIMARRON SUBDIVISION, Third Filing, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 37505.

Lots 2A, 2B and 2C, Block 11, of the Second Amended Plat of Block 11 of STILLWATER SUBDIVISION, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 73210.

Lots 1A, 1B, 1C, 1D, 1E and 1F, Block 1 and Lots 1A, 1B, 1C and 1D, Block 2 of CASTLEROCK LAKE SUBDIVISION, First Filing, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 37500.

Lot 2 in Block 43 and Lots 1 and 2 in Block 46 of the CORRECTED PLAT OF THE AMENDED PLAT OF BLOCKS 43 AND 46 OF COLSTRIP TOWNSITE, Rosebud County, Montana, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 28708.

Parcel 34         Intentionally deleted

*An undivided 12.5% of the Colstrip Units 3 and 4 interest in the Common Facilities real property as allocated by the Common Facilities Agreement in the real property described in Schedule III below.*

### SCHEDULE III
### COMMON FACILITIES - ALL UNITS

Parcel 35         That portion of Sections 34 and 35 in Township 2 North, Range 41 East, PMM, described as Parcel B Certificate of Survey No. 34152 filed January 8, 1981 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 34152.

Parcel 36         That portion of Sections 27 and 34 in Township 2 North, Range 41 East, PMM, described as Parcel C of Certificate of Survey No. 34153 filed January 8, 1981 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 34153.

Parcel 37         That portion of Section 35 in Township 2 North, Range 41 East & Section 2 in Township 1 North, Range 41 East, PMM, described as Tract H-1, Tract H-2, Tract H-3 of Certificate of Survey No. 34995 filed March 25, 1982 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 34995.

Parcel 38         That portion of Section 3 in Township 1 North, Range 41 East, PMM, described as Parcel G of Certificate of Survey No. 34996 filed March 25, 1982 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 34996.

Parcel 39         That portion of Section 34 in Township 2 North, Range 41 East, PMM, described as Parcel A-1 Amended of Certificate of Survey No. 85561, filed March 17, 1999 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 85561, excluding therefrom a tract of land described as Parcel A-1-B of Certificate of Survey 85561.

Parcel 40         That portion of Sections 28 and 33 in Township 2 North, Range 41 East, PMM, described as Parcel F-1 Amended and Parcel F-2 Amended of Certificate of Survey No. 85920 filed May 4, 1999 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 85920.

Parcel 41     That portion of Section 34 in Township 2 North, Range 41 East, PMM, described as Parcel D-1 and Parcel D-2 of Certificate of Survey No. 42210 filed January 10, 1984 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 42210.

Parcel 42     That portion of Section 34 in Township 2 North, Range 41 East, PMM, described as Tract 1-A-1, Tract 1-A-2 and Tract 1-A-3 of Certificate of Survey No. 54257 amending Certificate of Survey No. 27875 (Tract 1), Certificate of Survey No. 27878, Certificate of Survey No. 34994 and Dedication of Tracts 1-A-2, 1-B-2, 1-B and 1-D, filed July 30, 1986 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 54257, subject to dedication of Tract 1-A-2 (Willow Avenue) as a public road.

Parcel 43     That portion of Section 24 in Township 6 North, Range 39 East, PMM, described as Tract A and Tract C of Certificate of Survey No. 6100 filed February 13, 1974 for record in the office of the Clerk and Recorder of Rosebud County, Montana as Document No. 6100.

Parcel 44     That parcel commencing at the section corner common Sections Thirteen (13), Fourteen (14), Twenty-three (23) and Twenty-four (24), Township Six (6) North, of Range Thirty-nine (39) East, M.P.M., Rosebud County, Montana, running thence northerly along the section line common to Sections Fourteen (14) and Thirteen (13) to the Yellowstone River; running thence southeasterly along the Yellowstone River to a point where the south boundary line of Section Thirteen (13) meets the Yellowstone River; thence westerly along the south boundary line of the said Section Thirteen (13) to the point of beginning, containing in all approximately 17 acres as described in deed dated December 7, 1973, recorded December 12, 1973 in Book 73, Page 127 and confirmed in Judgment and Decree dated March 21, 1975 by The District Court of the Sixteenth Judicial District, in and for the County of Rosebud, recorded March 21, 1975 in Book 19 Orders and Decree, page 996, records of the County Clerk and Recorder of Rosebud County, Montana.

Parcel 45     Easements and rights-of-way more particularly described in documents recorded in the office of the Clerk and Recorder of Rosebud County, Montana, under the following Book and Page numbers; which documents are incorporated herein by this reference and made a part hereof:

Book 77 Deeds, page 29
Book 75 Deeds, page 306
Book 73 Deeds, page 430
Book 73 Deeds, page 466
Book 74 Deeds, page 245
Book 78 Deeds, page 782
Book 78 Deeds, page 838
Book 74 Deeds, page 169
Book 74 Deeds, page 110

Book 74 Deeds, page 70
Book 77 Deeds, page 941
Book 78 Deeds, page 134
Book 79 Deeds, page 238
Book 74 Deeds, page 14
Book 74 Deeds, page 65
Book 74 Deeds, page 112
Book 79 Deeds, page 240
Book 74 Deeds, page 62
Book 74 Deeds, page 67
Book 74 Deeds, page 242
Book 73 Deeds, page 891
Book 73 Deeds, page 893
Book 73 Deeds, page 284
Book 78 Deeds, page 131
Book 32 Misc., page 476

***An undivided 12.5% of the real property described in Schedule
IV below.***

## *SCHEULDE IV*
## *COLSTRIP COMM SERV, LLC - PROPERTY*

<u>Township 1 North, Range 41 East, M.P.M</u>

Section 1: Lots 1 (43.40), 2(43.40), N/2SE/4, S/2NE/4, SE/4NW/4, less and except
the existing Railroad Right-of-way being the Northern Pacific Railway Company's
Cow Creek Extension of its Rosebud Branch line right-of-way.

<u>Township 1 North, Range 42 East, M.P.M</u>

Section 6: Lot 7 (40.55), less and except 2.66 acres of the Burlington Northern
Railroad Right-of-way.

Section 7: Lots 1 (40.34), 2 (40.29), SE/4NW/4, NE/4SW/4, N/2SE/4, S/2NE/4,
less and except Tract 1 as described in Easement Deed No. 33671-E dated October
11, 1973, recorded in Book 73 Deeds; Page 143 on December 20, 1973, Rosebud
County, Montana, and less and except that portion of the Burlington Northern
Right-of-way located in Lots 1 and 2.

Section 8: NE/4, S/2NW/4, S/2, less and except 35.93 Ao of the Burlington
Northern Railroad Right-of-way, and less and except Tract 1 as described in
Easement Deed No. 33671-E dated October 11, 1973, recorded in Book 73 Deeds,
Page 143 on December 20, 1973, Rosebud County, Montana.

Section 17: E/2, lying north and east of the north and east boundary line of Tract 1 as described in Easement Deed No. 33671-E dated October 11, 1973, recorded in Book 73 Deeds, Page 143 on December 20, 1973, Rosebud County, Montana and lying north and west of the Cow Creek Road as now established in the E/2E/2 and as recorded in the County Road Book, Rosebud County, Montana.

**EXHIBIT A**
**PART II**

[List of easements][2]

_____

[2] <u>Note to Draft</u>: To be provided by Seller between signing and closing.

**EXHIBIT A**
**PART III**

An undivided 8.5175% interest subject to its 8.5175% proportionate share of the burden of 2.0 cubic feet per second of water assigned to Colstrip Community Service Company by instrument recorded March 24, 1989 in Book 84 Deeds, page 528:

    (1) Water Right Number 42KJ W094423-00        Statement of Claim

An undivided 12.5% interest:

| WRKEY | WR NUMBER |
|---|---|
| 190930-2 | 42A 108297 00 |
| 190949-2 | 42A 108308 00 |
| 190961-2 | 42A 108317 00 |
| 231813-2 | 42A 146426 00 |
| 255643-1 | 42A 173935 00 |
| 255644-1 | 42A 173937 00 |
| 255645-1 | 42A 173938 00 |
| 255646-1 | 42A 173939 00 |
| 255647-1 | 42A 173940 00 |
| 255648-2 | 2A 17394100 |
| 255648-2 | 42A 17394100 |
| 255649-2 | 42A 173943 00 |
| 255650-2 | 42A 173944 00 |
| 255651-2 | 42A 173945 00 |
| 255652-1 | 42A 173946 00 |
| 255653-2 | 42A 173947 00 |
| 311888-1 | 42A 173948 00 |
| 326585-1 | 42A 48616 00 |

| | |
|---|---|
| 152039-1 | 42A 83584 00 |
| 335309-1 | 42KJ 108793 00 |
| 110786-1 | 42KJ 58886 00 |
| 166954-2 | 42KJ 94428 00 |

All water rights listed above are subject to item (a) following and water right No. 1 above is subject item (b) following:

(a) Final adjudication under Montana Code Annotated, Title 85, Chapter 2, Part 2.

(b) Grantor's water rights are subject to its proportionate share (8.5175%) of the burden of the 1/4" taps and valves for purpose of stock watering, on an "as is from source, if and when available":

   (i) Granted to Janet MacDonald for use at one location on her lands.

   (ii) Granted to Janet K. MacDonald, situate on Section 21, Township 2 North, Range 41 East, for use on one location on her lands.

   (iii) Granted to Albert Kozelka for use at one location on his lands.

   (iv) Granted to Leo DeCock for use at one location on his lands.

   (v) Granted to Vassau's Flying J for use at one location on his lands.

   (vi) Granted to J. R. Lee for use at one location on his lands.

   (vii) Granted to J.M. Nansel for use at one location on his lands.

   (viii) Granted to Friez Circle Four Ranch for use at one location on its land.

**EXHIBIT A**
**PART IV**

All of Grantor's interest in mineral rights with respect to its ownership interest in the Fee Lands.

**EXIBIT B**

**PERMITTED ENCUMBRANCES:**

(a)      Terms and conditions of a Ownership and Operation Agreement between The Montana Power Company, Puget Sound Power and Light Company, The Washington Water Power Company, Portland General Electric Company and Pacific Power & Light Company dated May 6, 1981, as amended by Amendment No. 1 October 11, 1991 and by Amendment No. 2, effective July 13, 1998 ("Ownership and Operation Agreement").

(b)      Terms and conditions of the Common Facilities Agreement dated as of May 6, 1981, between The Montana Power Company,  a Montana corporation,  Puget  Sound Power  and Light Company, a Washington  corporation, The Washington  Water Power Company, a Washington corporation, Portland General Electric Company, an Oregon corporation, and Pacific Power and Light Company, an Oregon corporation, as amended by Amendment  No. 1 dated January 21, 1992 ("Common  Facilities   Agreement").

(c)      [Any additional exceptions, including updated list from Schedule B, Section 2 – Exceptions from the PSE title commitment.]³

So long as the Project (as defined in the Ownership and Operating Agreement) or the Common Facilities (as defined in the Common Facilities Agreement) or any part thereof  as originally constructed,  reconstructed  or added to is used or useful for the generation of electrical power and  energy, or to the end of the period permitted by applicable law, whichever occurs first, Grantee, by acceptance of this deed, waives its right to partition whether by partition in kind or sale and division of the proceeds thereof, and agrees that it will not resort to any action at law or in equity to partition and further waives the benefit of all laws that may now or hereafter authorize such partition of the properties comprising Colstrip Units 3 and 4 or the Common Facilities. It is agreed that this covenant shall be deemed to run with the land.

As to Parcels 13, 14A, 14C, ISA and 15C of Schedule III Exhibit A Part I, all improvements thereon, including without limitation improvements permanently attached to the real property, have been and shall remain personal property, severed from the real property as provided in deed dated April 1, 1983, recorded May 2, 1983 in Book 79, page 648 and made a part hereof. Grantee by acceptance of this Deed accepts the severance of the improvements from the real property and acknowledges that this Deed does not convey title to the improvements.

For purposes of this Deed the following terms are defined:

"Colstrip Units 1 and 2" shall mean the two 333 MW (gross capacity) coal-fired steam electric generating units located in Colstrip, Montana, and referred to herein as "Colstrip Unit l" and "Colstrip Unit 2" respectively.

---

³ Note to Draft: To be updated between signing and closing, excluding any mortgages, liens and encumbrances to be released by Seller prior to or following closing.

"Colstrip Units 3 and 4" shall mean the two 805 MW (gross capacity) coal-fired steam electric generating units located in Colstrip, Montana, and referred to herein as "Colstrip Unit 3" and "Colstrip Unit 4" respectively.

"Common Facilities Real Property" shall mean the easements and real property used in common by Colstrip Units 1 and 2 and Colstrip Units 3 and 4 and covered by the Common Facilities Agreement.

**EXHBIIT C**

**THE KLUVER PROPERTY**

<u>Township 1 North, Range 42 East, MPM</u>

Section 9:       All

**EXHIBIT J**
**FORM OF WAIVER OF RIGHT OF FIRST REFUSAL**

[Date]

[Owner's Name and Address]

>      Re:    Rights of First Refusal pursuant to the Ownership and Operation Agreement, dated May 6, 1981, as amended by Amendment No. 1 dated October 11, 1991, Amendment No. 2 dated July 13, 1998, Amendment No. 3 entered into in 2004, and Amendment No. 4 entered into in 2008, between Buyer, Seller, Portland General Electric Company, the Washington Water Power Company (now Avista) and Pacific Power & Light Company (now PacifiCorp)

Ladies and Gentlemen:

Any capitalized term not defined in this letter shall have the definition set forth in the Ownership and Operation Agreement.

Puget Sound Energy, Inc. ("*PSE*"), a Washington public utility corporation, has entered into a binding Colstrip Unit 4 Purchase and Sale Agreement, dated December 9, 2019 (the "*Purchase Agreement*"), pursuant to which it has agreed to sell to NorthWestern Corporation, a Delaware corporation ("*Buyer*") and Buyer has agreed to buy PSE's 25% Project Share in Colstrip Unit 4 for a price of $1.00 (the "*Transaction*"). An execution copy of the Purchase Agreement is enclosed herewith.

Section 24 of the Ownership and Operation Agreement requires PSE to offer its Project Share to the other Project Users "at the amount of, and on terms not less advantageous than, those of a bona fide offer from a buyer able and willing to purchase such Owner's or Project User's interest." The portion of such interest to be offered to each Project User must be equal to the proportionate interest of each Project User in the Project after excluding the interest being offered. Accordingly, PSE hereby formally offers to you the right to purchase your proportionate share of its Project Share. The Ownership and Operation Agreement requires that such offer be held open for a period of 90 days. Further, if at the end of the 90-day period, any Project User shall have failed to accept such offer, the proportionate interest offered to such Project User shall be offered on a pro rata basis to the other Project Users, who shall have a further period of 7 days to accept the same. The process shall be repeated until all Project Users then being offered an interest shall have failed to accept such offer.

Should you choose to exercise your right of first refusal, you must submit, and be fully prepared and capable of executing and consummating, a purchase agreement that contains terms no less advantageous than the terms and conditions set forth in the attached Purchase Agreement.

Should you decline to exercise your right of first refusal, PSE respectfully requests that you expressly waive your right of first refusal and/or right of first offer under Section 24 of the Ownership and Operation Agreement with respect to the Transaction in order to expedite PSE's closing of the Transaction with the Buyer. If you are willing to waive such right, please

countersign a copy of this letter below under "WAIVER" and return it to the undersigned as soon as possible. PSE has made the same request of all other Project Users.

If you do not affirmatively exercise your right to purchase your proportionate share of PSE's Project Share within 90 days of the date of this letter, your rights pursuant to Section 24 of the Ownership and Operation Agreement with respect to the Transaction will be deemed to be waived.

Thank you for your prompt consideration of this matter.


Very truly yours,

PUGET SOUND ENERGY, INC.


By:_____
Name: _____
Title:_____


Enclosures

## WAIVER

The undersigned hereby agrees to waive its right of first refusal and/or right of first offer under Section 24 of the Ownership and Operation Agreement in connection with the Transaction described above.

[OWNER'S NAME]

Date: _____

By: _____
Name:_____
Its:_____

[ATTACHMENT: EXECUTED COPY OF PURCHASE AND SALE AGREEMENT]

# DISCLOSURE SCHEDULE

This disclosure schedule (this "<u>Disclosure Schedule</u>") is delivered in connection with that certain Colstrip Unit 4 Purchase and Sale Agreement, dated as of December 9, 2019 (the "<u>Agreement</u>"), by and between NORTHWESTERN CORPORATION, a Delaware corporation ("<u>Buyer</u>") and PUGET SOUND ENERGY, INC., a Washington public utility corporation (the "<u>Seller</u>"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

Any fact or condition disclosed in any section or paragraph of this Disclosure Schedule shall qualify as disclosures pursuant to any other sections or paragraphs under the Agreement where such disclosure is reasonably apparent on the face of such disclosures, whether or not repeated under any section number where such disclosure might be deemed appropriate.

Matters reflected in this Disclosure Schedule are not necessarily limited to matters required by the Agreement to be reflected herein. Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar informational nature. Any disclosure of a fact or circumstance shall not establish, or constitute an admission of, the materiality of such fact or such circumstance or such fact's or circumstance's consequence or relevance to materiality, to a Material Adverse Effect. The information contained herein is disclosed solely for the purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever, including any violation of applicable Law or breach of any agreement.

In accordance with Section 11.3 of the Agreement, this Disclosure Schedule is deemed to be part of the entire agreement of the parties with respect to the subject matter of the Agreement. Any item of information disclosed in this Disclosure Schedule shall be subject to the terms of the Confidentiality Agreement.

Headings and numbers (other than numerical references to sections and subsections of the Agreement) have been inserted in some of the sections of this Disclosure Schedule for convenience of reference only, and such headings or numbers (other than numerical references to sections and subsections of the Agreement) shall not have the effect of amending or changing the express description of the section of this Disclosure Schedule as set forth in the Agreement.