1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4   IN RE:                    §      CASE NO. 22-90054-11
                              §
5   TALEN ENERGY SUPPLY, LLC AND  §   HOUSTON, TEXAS
    TALEN TECHNOLOGY VENTURES,  §
6   LLC,                        §     FRIDAY,
                                §     JUNE 17, 2022
7                 DEBTORS.      §     1:59 P.M. TO 4:35 P.M.

8                       MOTIONS HEARING
9
              BEFORE THE HONORABLE MARVIN ISGUR
10             UNITED STATES BANKRUPTCY JUDGE

11

12      APPEARANCES:                  (SEE NEXT PAGE)

13

14

15

16      (Recorded via CourtSpeak; No log notes)

17

18

19

20            TRANSCRIPTION SERVICE BY:

21      JUDICIAL TRANSCRIBERS OF TEXAS, LLC
               935 Eldridge Road, #144
22             Sugar Land, TX 77478
                   281-277-5325
23             www.judicialtranscribers.com

24

25   Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.

```
 1                         APPEARANCES:

 2

 3  FOR THE DEBTORS:              WEIL GOTSHAL & MANGES, LLP
                                  Gabriel A. Morgan, Esq.
 4                                Clifford W. Carlson, Esq.
                                  700 Louisiana Street
 5                                Suite 1700
                                  Houston, Texas  77002
 6                                713-546-5000

 7                                WEIL GOTSHAL & MANGES, LLP
                                  Paul R. Genender, Esq.
 8                                200 Crescent Court
                                  Suite 300
 9                                Dallas, Texas  75201
                                  214-746-7877
10

11  FOR COMMITTEE OF
    UNSECURED CREDITORS:          MILBANK, LLP
12                                Evan R. Fleck, Esq.
                                  55 Hudson Yards
13                                New York, New York  10001
                                  212-530-5567
14

15  FOR CITIBANK, N.A.            DAVIS POLK & WARDWELL
                                  David Schiff, Esq.
16                                Damian S. Schaible, Esq.
                                  Nate Sokol, Esq.
17                                450 Lexington Avenue
                                  New York, New York  10017
18                                212-450-3182

19                                HAYNES & BOONE, LLP
                                  Arsalan Muhammad, Esq.
20                                1221 McKinney Street
                                  Suite 4000
21                                Houston, Texas  77010
                                  713-547-2257
22
    FOR THE AD HOC
23  LENDER GROUP:                 KIRKLAND & ELLIS, LLP
                                  Patrick J. Nash, Jr., Esq.
24                                300 N LaSalle
                                  Chicago, Illinois  60654
25                                312-862-2290
```

```
 1                      APPEARING (VIA ZOOM):

 2

 3   FOR THE DEBTORS:              WEIL GOTSHAL & MANGES, LLP
                                   Matt Barr, Esq.
 4                                 767 Fifth Avenue
                                   New York, New York  10153
 5                                 212-310-8010

 6   FOR COMMITTEE OF
     UNSECURED CREDITORS:          MILBANK, LLP
 7                                 Dennis F. Dunne, Esq.
                                   55 Hudson Yards
 8                                 New York, New York  10001
                                   212-530-5770
 9
                                   PACHULSKI STANG ZIEHL & JONES,
10                                 LLP
                                   Michael D. Warner, Esq.
11                                 440 Louisiana Street
                                   Suite 900
12                                 Houston, Texas  77002
                                   713-691-9385
13
     FOR MASONIC VILLAGES OF
14   THE GRAND LODGE OF
     PENNSYLVANIA; CONESTOGA
15   WOOD SPECIALTIES CORP;
     RICHARDS ENERGY GROUP; AND
16   URA, INC.:                    MEYER UNKOVIC & SCOTT, LLP
                                   Robert E. Dauer, Jr., Esq.
17                                 535 Smithfield Street
                                   Suite 1300
18                                 Pittsburgh, PA  15222
                                   412-456-2835
19
                                   CHAMBERLAIN HRDLICKA WHITE
20                                 WILLIAMS & AUGHTRY, PC
                                   Jarrod Martin, Esq.
21                                 1200 Smith Street
                                   Suite 1400
22                                 Houston, Texas  77002
                                   713-356-1280
23
     FOR KLEIN COMPANY:            GODWIN BOWMAN, PC
24                                 Sidney Scheinberg, Esq.
                                   1201 Elm Street, Suite 1700
25                                 Dallas, Texas  75270
                                   214-939-4501
```

```
 1                  APPEARANCES (CONTINUED -- VIA ZOOM):

 2

 3   FOR ITG BRANDS, LLC:          BROOKS PIERCE MCLENDON, LLP
                                   Jamey M. Lowdermilk, Esq.
 4                                 Clint Morse, Esq.
                                   230 N Elm Street
 5                                 200 Renaissance Plaza
                                   Greensboro, NC  27401
 6                                 336-271-3167

 7   FOR CCL LABEL, INC., AND
     CCL TUBING, INC.:             BENESCH FRIEDLANDER
 8                                 William E. Schonberg, Esq.
                                   Kevin M. Capuzzi, Esq.
 9                                 200 Public Square, Suite 2300
                                   Cleveland, Ohio  44114
10                                 216-363-4634

11   FOR LEAR CORPORATION:         BODMAN, PLC
                                   Robert Diehl, Esq.
12                                 1901 St. Antoine Street
                                   6th Floor
13                                 Detroit, Michigan  48226
                                   313-600-9684
14
     FOR AD HOC GROUP OF
15   CROSSHOLDER CREDITORS:        PAUL WEISS RIFKIND WHARTON
                                   AND GARRISON
16                                 Alexander Woolverton, Esq.
                                   1285 Avenue of the Americas
17                                 New York, New York  10019
                                   212-373-3256
18
     FOR PHILADELPHIA:             COLE SCHOTZ, PC
19                                 Irving E. Walker, Esq.
                                   300 East Lombard Street
20                                 Suite 1450
                                   Baltimore, Maryland  21202
21                                 410-303-8809

22   FOR HEALTHTRUST
     PURCHASING GROUP:             CAVAZOS HENDRICKS POIROT, PC
23                                 TRUMAN & SPICER
                                   John Dee Spicer, Esq.
24                                 7001 Grapevine Highway
                                   Suite 605
25                                 Fort Worth, Texas  76180
                                   817-313-4130
```

5

1                    APPEARANCES (CONTINUED - VIA ZOOM):

2
  FOR H&S CONSTRUCTORS:          ANDERSON LEHRMAN BARRE &
3                                MARAIST, LLP
                                 Kevin M. Maraist, Esq.
4                                1001 Third Street
                                 Suite 1
5                                Corpus Christi, Texas  78404
                                 361-884-4981
6

7

8

9

10

11  (Please also see Electronic Appearances.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2

3  WITNESS:                    Direct  Cross  Redirect  Recross

4  (None called.)

5

6  EXHIBITS:                              Offered   Received

7  DEBTORS' EXHIBITS
      No. 542-4 through 542-8:             34        34
8     No. 542-2:                           63        63
      No. 542-3:                           63        63
9     No. 542-11 through 542-16:           63        63

10

11 HEALTHTRUST'S EXHIBITS
      No. 525-1:                           37        38
12    No. 525-2:                           37        38

13                            ***

14

15

16

17

18

19

20

21

22

23

24

25

1              **HOUSTON, TEXAS; FRIDAY, JUNE 17, 2022; 1:59 P.M.**

2              THE COURT:  All right.  We're here in the Talen

3    Energy Supply case.  It's 22-90054.

4              Electronic appearances should already have been

5    made on the Record.  If you haven't, please go to the

6    website and make an electronic appearance.  If you wish to

7    actually speak today, we'll go ahead and do a roll call now

8    of those folks.

9              Good afternoon.

10             MR. MORGAN:  Good afternoon, Your Honor.

11             Gabe Morgan, Weil Gotshal, on behalf of the

12   Debtors, Talen Energy Supply and its affiliates.

13   Your Honor, I'm joined today in the courtroom by

14   Mr. Genender and Mr. Carlson, who will be presenting as well

15   as other associates from my firm, and virtually by

16   Mr. Barr, who would like to start today with sort of a short

17   update for Your Honor on where things stand and we'll move

18   into the agenda after he informs Your Honor.

19             THE COURT:  Mr. Morgan, thank you.  I got a note

20   that my microphone isn't on.  Let me -- I think it is now.

21   For those of you that could not hear me, we are calling the

22   Talen Energy Supply case.  It's 22-90054.

23             Electronic appearances should have already been

24   made.  If you haven't made your electronic appearance,

25   please go ahead and do so by going to our website.

1          I am going to go ahead and take a call though of

2    all persons that are intending to speak today.  You can

3    change your mind and speak later and it'll be okay.

4          So is there anybody else in the courtroom that

5    wishes to make a physical appearance?  If so, please

6    approach the podium.

7          MR. FLECK:  Good afternoon, Your Honor.

8          Evan Fleck of Milbank, LLP, proposed counsel to

9    the Official Committee of Unsecured Creditors.  I'm joined

10   virtually by my partner, Mr. Dunne, who you may see on the

11   screen there, and in the courtroom by Mr. Warner, our local

12   counsel from Pachulski.

13         THE COURT:  Good afternoon, Mr. Fleck.  Thank you.

14         MR. SCHIFF:  Good afternoon, Your Honor.

15         David Schiff of Davis Polk and Wardwell for

16   Citibank, N.A., which is the administrative agent and the

17   collateral trustee under the DIP facilities and the

18   collateral trustee for the prepetition first lien collateral

19   trust.  I'm joined by my colleagues, Damian Schaible and

20   Nate Sokol, and our local counsel, Arsalan Muhammad, of

21   Haynes and Boone.  Thank you.

22         THE COURT:  Good afternoon, Mr. Schiff.

23         MR. SCHIFF:  Thank you.

24         MR. NASH:  Good afternoon, Your Honor.

25         Pat Nash from Kirkland and Ellis, on behalf of the

1   Ad Hoc Lender Group.  We're also the plan sponsors.  I don't

2   know that I'll have anything to say here in the courtroom

3   today, but I did want to make an appearance.

4            THE COURT:  Mr. Nash, thank you.

5            MR. NASH:  Thank you, sir.

6            THE COURT:  From 717-361-5247, who do we have on

7   the telephone?

8        (No verbal response.)

9            THE COURT:  717-361-5247 on the phone, will you

10  tell me your name please?

11           MR. SAMPSELL:  Yes, sir.  My name is

12  Patrick Sampsell. I am here to potentially be a witness for

13  the Masonic Villages of Pennsylvania.

14           THE COURT:  Mr. Sampsell, good afternoon.  Your

15  camera is not showing up so I don't know if you want to try

16  and fix that or not.  It's not a big deal to me.  Usually

17  this -- sorry?

18           MR. SAMPSELL:  I'm sorry, sir.  We were trying to

19  work on it.  If you have an idea of what it is though, that

20  would be great.

21       (Pause/equipment being prepared.)

22           THE COURT:  Is there anyone else that wishes to

23  appear by telephone to speak today?  If so, please press

24  five star one time on your phone.  All right.

25           From 412-456-2835?

1          MR. DAUER:  Good afternoon, Your Honor.

2          Robert Dauer, on behalf of the Masonic Villages of

3   the Grand Lodge of Pennsylvania, Conestoga Wood Specialties

4   Corp, Richards Energy Group and URA, Inc., Your Honor.

5   Thank you.

6          THE COURT:  Mr. Dauer, good afternoon.  Thank you.

7          From 917-509-9695, who do we have?

8          MR. BARR:  Thank you, Your Honor.  This is

9   Matt Barr of Weil Gotshal.

10          THE COURT:  Mr. Barr.

11          MR. BARR:  And you allowed me to appear by Zoom,

12   Your Honor.

13          THE COURT:  Of course.  We'll come back to you in

14   a minute, Mr. Barr.  I want to finish taking the roll.

15          From 214-939-4501?

16          MR. SCHEINBERG:  Good afternoon, Your Honor.

17          Sid Scheinberg, on behalf of the Klein

18   (indiscernible) Company.

19          THE COURT:  Thank you, Mr. Scheinberg.  Good

20   afternoon.

21          MR. SCHEIBERG:  Good afternoon, Your Honor.

22          THE COURT:  From 336-271-3167?

23          MS. LOWDERMILK:  Yes, Your Honor.  This is

24   Jamey Lowdermilk.  I am here on behalf of ITG Brands, LLC.

25   I'm co-counsel with Clint Morse.

1          THE COURT:  Ms. Lowdermilk, good afternoon.

2          MS. LOWDERMILK:  Good afternoon, Your Honor.

3          THE COURT:  From 216-363-4634.

4          MR. SCHONBERG:  Good afternoon, Your Honor.  This

5   is William Schonberg, on behalf of CCL Label, Inc. and CCL

6   Tube, Inc., parties to retail contracts with TEM (phonetic)

7   and I am joined by my colleague also from my firm, Benesch

8   Friedlander, Kevin Capuzzi, but if there is an opportunity

9   to speak, I will speak today.

10          THE COURT:  Mr. Schonberg, thank you.  Again I

11  don't think your camera is on and that's okay, but if you

12  want to turn it on, you might get that done if you'll go to

13  the GoToMeeting website.

14          MR. SCHONBERG:  Thank you, Your Honor.

15          THE COURT:  From 717-870-9647?

16          MR. RICHARDS:  Pete Richards, Richards Energy

17  Group.

18          THE COURT:  Mr. Richards, good afternoon.

19          MR. RICHARDS:  Good afternoon, Your Honor.

20          THE COURT:  From 313-600-9684?

21          MR. DIEHL:  Robert Diehl from Bodman, on behalf of

22  Lear Corporation, Your Honor.

23          THE COURT:  Mr. Diehl, good afternoon.

24          MR. DIEHL:  Thank you.

25          THE COURT:  Mr. Martin?

1          MR. MARTIN:  Good afternoon, Your Honor.

2          Jarrod Martin.  I'm acting as co-counsel with

3    Mr. Dauer for Richards Energy Group and the related

4    companies.

5          THE COURT:  Good afternoon.

6          Mr. Woolverton?

7          MR. WOOLVERTON:  Good afternoon, Your Honor.

8          Alexander Woolverton from Paul Weiss Rifkind

9    Wharton and Garrison, on behalf of the Ad Hoc Group of

10   Crossholder Creditors.  Again I don't think I'll have

11   anything to say today, but just wanted to make my appearance

12   for the Record.

13         THE COURT:  Thank you, Mr. Woolverton.  I don't

14   think your camera is on either, but again that's fine.

15         From 410-303-8809.

16         MR. WALKER:  Good afternoon, Your Honor.

17         Irving Walker of Cole Schotz, on behalf

18   Philadelphia (indiscernible), LP.  I am not getting audio on

19   my computer so I'm on my mobile phone for audio.  I hope

20   Your Honor can hear me.

21         THE COURT:  So you're fading in and out.  Part of

22   the time it's very clear and part of the time I think you

23   may look away a little bit and it fades, but I can, in fact,

24   hear you.

25         MR. WALKER:  Okay.  I think I won't

1  (indiscernible) time logging back in.  Thank you, Your

2  Honor.

3         THE COURT:  Thank you.  And the final person

4  that's pressed five star is from 817-313-4130.

5         MR. SPICER:  Yes, Your Honor.  I'm John Dee Spicer

6  from Cavazos Hendricks in Dallas.  I represent HealthTrust

7  Purchasing Group, LP.

8         THE COURT:  Mr. Spicer, good afternoon.

9         I have somebody else now that has pressed five

10  star.  Mr. Maraist, let me get your line active.

11  Mr. Maraist, good afternoon.

12         MR. MARAIST:  Good afternoon, Your Honor.

13         Kevin Maraist for H&S Constructors, Inc., a

14  statutory lien creditor, Your Honor.

15         THE COURT:  Thank you.  So there are 206 people on

16  the phone.  I'm going to leave all of the lines that I

17  haven't so far recognized muted.  As of those of you that I

18  have recognized already, I'm going to leave your phones

19  active so if you would mute your own microphone, you won't

20  need to press five star again, but it will maintain minimal

21  background noise and you're free to speak as you wish just

22  by unmuting your own line.

23         If anybody else chooses to speak during the

24  hearing, you can still feel free to press five star, but I'm

25  just trying to be most efficient for everybody.

1          Mr. Barr, go ahead please.

2          MR. BARR:  Thank you very much, Your Honor.

3          Can you hear me clearly?

4          THE COURT:  I can hear you clearly.

5          MR. BARR:  Thank you and thank you for making time

6  for us today.  As you'll hear in a few moments, most of the

7  calendar is uncontested and we were able to resolve many of

8  the issues with all the stakeholders including the Official

9  Committee of Unsecured Creditors.

10          We do have a contested hearing with respect to our

11  rejection Motion, which you'll hear about soon, and then we

12  have one specific issue with respect to the DIP Motion that

13  we believe is outstanding between us, the Estate, the

14  parties and the Official Committee of with respect to the

15  deadline for a challenge, if any.

16          Since the last hearing, as I've done in the past,

17  Your Honor, just give you quick update on the cases.  Since

18  the last hearing we have more parties that have signed up to

19  the RSA.  Over 77 percent of our unsecured bonds have now

20  signed.  And I can't tell you today how much of holders of

21  our secured debt have signed on to the RSA as well, but

22  maybe at the next hearing I'll be able to tell you that

23  because more and more parties are signing on to the RSA.

24          The last time we were in front of you, we told you

25  that we finalized and executed the backstop commitment

1  letter.  We have now, in fact, filed a motion with Your

2  Honor's court of have a backstop commitment motion heard on

3  July 11th and that's already calendared and scheduled.

4          We intend to file our Plan and Disclosure

5  Statement before that hearing, Your Honor.  And as I told

6  you at the last couple of hearings we've had, we did want to

7  talk about a calendar with respect to the Disclosure

8  Statement Hearing and with respect to the confirmation trial

9  here.  We socialized our calendar with all the stakeholders.

10 We don't believe that any of the parties have any issue with

11 our proposed calendar subject to Your Honor's calendar, of

12 course.  There might be an issue with respect to the

13 challenge period depending on how that falls out with

14 respect to the potential dates.

15         But the dates that we were looking at, Your Honor,

16 was a disclosure statement hearing on August 15th, if

17 Your Honor is available, and a confirmation hearing starting

18 on September 29th, if Your Honor is available.

19         THE COURT:  So let me hear from others.  Let

20 me give you some available dates.  I'm available on

21 August 15th.  I need to hear objections to that date.  And

22 on September 29th, I am also available where you'll only

23 have one brief interruption during the day.  So rather than

24 rethinking all of that, at least for those two dates I'm

25 available.

1          Go ahead please, Mr. Fleck.

2          MR. BARR:  Thank you, Your Honor.

3          MR. FLECK:  Thank you, Your Honor.  Once again for

4    the Record, Evan Fleck, proposed counsel to the Official

5    Committee of Unsecured Creditors.  Mr. Barr is correct that

6    the dates were socialized with us and I think the one issue

7    potentially is the relationship between the expiring of the

8    challenge period and the case calendar and the dates that he

9    proposed for the Disclosure Statement and Confirmation

10   Hearing.

11         And as we can talk about now or later in the

12   hearing, I think Your Honor is probably aware -- and if you

13   weren't, you heard it from Mr. Barr -- we resolved all of

14   the issues with respect to the DIP financing with the

15   exception of the challenge period duration.

16         And I think not as important issue, but one that

17   should get resolved as to the tolling of the period while a

18   standing motion, if any, is before Your Honor.  I think that

19   should get -- that needs to get resolved one way or the

20   other.  I think we have different positions on that as

21   between us and the Debtors.

22         As to -- let me just kind of take it at a macro

23   level.  The Creditors' Committee is not -- contrary to what

24   has been suggested in some of the papers, is not looking

25   to delay these cases.  We are very pleased, in fact, that

1    they -- we come into these cases with a lot of hard work

2    having been done including by an ad hoc group that is

3    comprised of -- a part but not all of the Committee's

4    constituencies.

5          So we don't have an issue with an August 15th

6    disclosure statement hearing, but what we do have an issue

7    is with having an unnecessarily truncated challenge period.

8    Now the Debtors' schedule would have our challenge -- our

9    standing Motion be due depending on whether you use the

10   date that was in their original Motion or their current

11   position either on August 15th -- rather on August 8th or

12   August 16th.  The DIP Motion uses August 16th as the date

13   and for some reason we lost eight days over the course of

14   the negotiation so their current position, I think, is that

15   the expire of the challenge period should be August 8th.

16         So they're coming to the cases with the view that

17   the Committee should drop its papers again if any.  I'll

18   stop saying that because you know that's what I mean.  If we

19   have a basis to come and seek the challenged transactions,

20   we will; otherwise, we won't.  But the Debtors are coming

21   into these cases with the view that we will have filed those

22   papers on or about -- either on the eve of the hearing of

23   the Disclosure Statement or on the date that objections are

24   due for the Disclosure Statement.

25         From our vantage point, to the extent that our

1   investigation reveals that there are challengeable

2   transactions that are appropriate to be subject to

3   challenge, there may very well need to be a modification to

4   the case calendar.  It's not necessarily the case the

5   Disclosure Statement on August 15th doesn't work.  It may be

6   the case, but we don't have those facts now and I'll talk a

7   little bit about some of the issues that we're encountering.

8   We just don't know that today.

9           And so we have no problem, from the Creditors'

10  Committee's perspective, with setting this calendar.  It's

11  well within what they're required to do under the RSA.  And

12  obviously the RSA is not sacrosanct.  Your Honor will

13  determine what the dates ultimately need to be.  But we're

14  happy with the RSA calendar, but the Debtors for various

15  reasons, market turbulence, which we're all aware of, and

16  the like want to move with great speed, and we get that.  So

17  they want to beat the milestones by quite a bit.  So a lot

18  of what they're proposing is very much frontloaded in these

19  cases.  Again that's fine, but it shouldn't come at the

20  expense of a proper investigation.

21          And so our proposal, as you've seen from our

22  papers, is for the Committee's challenge period to expire on

23  September 15th.  Again fine for the Disclosure Statement to

24  be heard beforehand.  If that doesn't seem practical -- and

25  we'll give updates as well.  We come to this case with a lot

1    of friends and former colleagues.  We're going to be in

2    regular dialog.  If we have issues and we're seeing things

3    that are going to give rise to a challenge, it's not going

4    to be a surprise to anybody, but we're perfectly happy to

5    proceed on that basis.

6            What we're not happy to do is find ourselves in a

7    position where we don't have any meaningful opportunity.  We

8    think that's what's being proposed now.  Whether it be

9    August 8th or August 16th -- and I'll talk a little bit in a

10   moment or whenever Your Honor would like to hear from me --

11   with respect to the challenges that we see in getting the

12   information.

13           And this is not a case where a truck of documents

14   was backed up to our offices and people said, "Look, you

15   need to move quickly.  Here you go, have at it."  We don't

16   have the documents yet.  We're in a position that we're

17   going to be serving discovery.  It's not coming voluntarily.

18   That's fine.  We're going to work through that.

19           I don't anticipate problems and I know Your Honor

20   will hear us if we have them, but we're certainly not in a

21   position today that we're ready to go with all the document

22   discovery that we have and then to formulate positions and

23   work with the Committee to determine if there are

24   challenges.

25           So that's a little bit of a longwinded answer to

1   the question: are we okay with the schedule?  But hopefully

2   it's clear.  I'm happy to take questions, Your Honor.

3          THE COURT:  So I've always wondered in these

4   cases -- and this may be the one to go ahead and ask the

5   question -- is if the standing issue is separated from the

6   deadline so that if, for example, they want to stipulate to

7   standing, could you live with a shorter deadline than

8   September 15th?  But if they want to assert standing, then

9   maybe you need the longer deadline or assert a standing

10  burden of proof of you.

11         Do we get any time out of that or is that not

12  worth time to you?

13         MR. FLECK:  Well, I think we do get time, if I'm

14  understanding Your Honor's question, because we are building

15  into this -- they're building into their overall case

16  calendar and the milestones, I believe, being able to stick

17  with the RSA milestones, again which are well beyond what

18  they're proposing in terms of the calendar.  They have to --

19  they are required under the RSA to have a disclosure

20  statement order as of September 16th so a month after

21  they're proposing.

22         But to Your Honor's question, if we didn't have to

23  fight about standing, I think that would help.  We'd

24  still -- it would certainly help because we're not, in part,

25  waiting for that determination from the Court as to whether

1  or not the Committee has standing to pursue the claims.

2         THE COURT:  I would just ask the Debtor to think

3  about whether there isn't something to be done there.  I'm

4  not saying the Debtors today should stipulate that you have

5  standing, but maybe we could set a deadline for them to

6  either say, "We are, we're not going to stipulate as to

7  standing," and then your deadline would toggle off what they

8  say because I don't know if that will make a difference, but

9  I've often wondered if I can get time in a case by dealing

10  in that way and so --

11         MR. FLECK:  Well, we're happy to have that

12  discussion with the Debtors today or at the appropriate

13  time.

14         THE COURT:  All right.  Okay.  I mean, I don't

15  know sitting here what the right date is obviously without

16  hearing from you all about what the right date is.  I've

17  always said -- and it's still true -- that I've never

18  approved an RSA, right?  So they want to stick with the RSA

19  and I respect that as a business judgment reason why they

20  might need to do something so it's not like I think this is

21  at all irrelevant, but I haven't adopted the RSA so it

22  doesn't bind me in any sense.  But I got it that under

23  business judgment rule, they want to comply with their RSA.

24         But perhaps you and Mr. Barr, while we take up

25  other matters today or I don't know if you're negotiating

1   that with someone besides Mr. Barr, you could be excused

2   from the courtroom and you all could talk off on it, if

3   there's a toggle arrangement that will create a couple week

4   savings for one side or the other.

5           MR. FLECK:  As I said, Your Honor, we're happy to

6   do that.  We certainly would benefit from the time wherever

7   we can find it.  In an ideal world, we'd stay on the case

8   calendar.  Again we don't come to this case with

9   preconceived notions that there necessarily are colorable

10  claims to avoid transactions.

11          We know that there are a lot of transactions that

12  occurred before the petition date that people are talking

13  about.  As the statutory other fiduciary, we got a lot of

14  inbounds, as Your Honor would expect, from parties in the

15  case who say, "Look at the Cumulus funding.  Look at the

16  Riverstone dividend.  Look at the cap transactions."

17          THE COURT:  Right.

18          MR. FLECK:  We have a lot of work to do in a short

19  amount of time.

20          THE COURT:  So, Mr. Barr, why don't you assume I'm

21  going to give you August 15th and September 29th just for

22  the purpose of this discussion.

23          If we do that, am I required under anything that

24  today is the day when I need to set the challenge deadline

25  or can I have the luxury of going to the middle of next week

1  to set a challenge deadline?

2          MR. BARR:  Thank you, Your Honor.  I believe that

3  we would have to talk to our DIP lenders and the secured

4  lenders about whether or not they require it in the DIP

5  Order.  Typically, as you know, we would have these in the

6  DIP Order so everybody understands, A, the budget and, B,

7  the timeline with respect to the challenges so I do think we

8  would have to talk to our lenders whether that's important

9  for them.  We're not --

10         THE COURT:  Mr. Schiff is fighting his way up here

11  pushing aside Mr. Schaible to get to the front of the room

12  so.

13      (Laughter.)

14         MR. FLECK:  He hasn't made much progress if he's

15  really fighting and he's still back there.

16         MR. BARR:  But, Your Honor, at the appropriate

17  point, please let us know.  We could -- we can respond to

18  some of the things that you're talking about.  And of course

19  I'm always happy to talk and try to work something out, as

20  we've tried with Mr. Fleck on these issues.

21         But we do think that given -- and the August 8th

22  date is 77 days, just so Your Honor knows, from the

23  appointment of the Committee.  As I know you know, the Local

24  Rule provides 60, but we're not holding them to that.  We,

25  of course, think that they need sufficient time.

1          They also, of course, have the ability to come

2    back to Your Honor should there be cause for the extension.

3    And we also included in there that if they do have colorable

4    claims, they believe, and they do file something by the

5    deadline, they're then is a tolling period with respect to

6    having the standing Motion actually heard.  So I didn't want

7    Mr. Fleck to have all the air cover on that.  We're happy to

8    go through each of those elements with you, but also happy

9    to talk to him to see if there's a toggle.

10         I just -- you know me so I'm going to say it.  I'm

11   not sure the toggle works and I need to think through it a

12   little bit more before I say, Your Honor, thank you for the

13   suggestion, it's really clever, but we don't like it, but

14   I'm not sure it works.

15         THE COURT:  Or you can it's not clever at all and

16   we don't like it.

17      (Laughter.)

18         THE COURT:  Mr. Schiff, is that something you want

19   to talk to Mr. Barr about or is it something that's okay or

20   something not okay without even talking?

21         MR. SCHIFF:  Yes, Your Honor, Mr. Fleck is

22   correct.  I was fighting my way up here.  You're correct.

23   But, no, Your Honor, I think this is a discussion.  It may

24   well be one that works for the DIP lenders and the

25   prepetition secured creditors, but it is something that we

1  would have to discuss and we're glad to try to work through

2  that during the hearing if we can.

3          THE COURT:  If we were to -- is there a way to

4  enter a DIP order that says next whenever day, Wednesday we

5  will decide on the deadline for the Committee to act after

6  you all can have more of an opportunity to work through it

7  or do we need to fix that problem today?

8          MR. SCHIFF:  Your Honor, I think that that

9  suggestion may well work.  I'm reserving a little bit

10 because there's a broad constituency behind the DIP

11 financing and this is a negotiated point and a point that

12 parties do tend to care about.

13         THE COURT:  Right.

14         MR. SCHIFF:  But I think may well be the answer

15 here.

16         THE COURT:  So let me -- so you can talk to people

17 whether you need to step out and talk to them.  I assume

18 you're not going to stick around or have to be here for the

19 discussion of what's happening on the power contracts

20 that -- maybe you do -- on the rejection of the power

21 contracts.

22         MR. SCHIFF:  No.  Your Honor, we're glad to try to

23 work on that with any other parties that are available.  We

24 just --

25         THE COURT:  Let me suggest to you though that I

1    could do the hearing at 1:30 on June 22nd if we can get

2    through the DIP Order today leaving that as an open issue

3    that's then reserved in the DIP Order for completion on that

4    date, if that helps.  I'm not looking to -- I don't want to

5    push this off forever, but I think two or three days may

6    help.

7              MR. SCHIFF:  If I understand Your Honor correctly,

8    you're suggesting that we could get through the DIP Order,

9    enter -- Your Honor could enter a DIP order that reserves on

10   this particular date --

11             THE COURT:  I would enter a final DIP order --

12             MR. SCHIFF:  -- and then that dispute could be

13   reserved?

14             THE COURT:  I would enter a final DIP order that

15   says we will by separate order set a deadline.

16             MR. SCHIFF:  Provided that --

17        (Phone noise.)

18             THE COURT:  For those of you on the phone, our

19   phone system is gradually dying.  They brought in the new

20   part this morning, put it in, had to take it back out so I'm

21   back to the old part again, but I think by Monday my phone

22   system will be back up.  We'll see.  But I -- for those of

23   you on the phone, you didn't even hear the noise we heard

24   here, but it sounded like a fire alarm and for here we hear

25   it.  I don't think you all heard it.  I apologize for the

1   interruption.  Nothing occurred.  Go ahead.

2           MR. SCHIFF:  So, Your Honor, provided that we can

3   discuss with our constituents and we can make sure that

4   there's a meeting of the minds as to how this works among

5   the Debtors, the Committee and us, that likely works.  I

6   don't want to speak for the date, the timing of resolution

7   of that dispute.  We took a position on it in our Reply, but

8   really it's a dispute between the Committee and the Debtors

9   on that one issue.

10          THE COURT:  Thank you.

11          MR. SCHIFF:  Thank you, Your Honor.

12          MR. FLECK:  In fact, the DIP lenders were prepared

13  to give us more time than the Debtors so we're happy to have

14  them as part of the discussion.  And if it wasn't clear,

15  Your Honor, from the Committee's perspective, we're happy to

16  engage in the discussion and see if we can reconvene maybe

17  with a resolution.

18          If not, my further suggestion would be that we

19  might use that opportunity to -- well, if Your Honor is

20  amenable and if we're not able to resolve it among the

21  parties is to work through some of the anticipated discovery

22  issues.  If it -- in any circumstances, we know we're going

23  to be working day and night and weekends to get this work

24  done.

25          We also have the Riverstone investigation that

1   needs to get done.  And if we're going to comply -- again
2   our touchstone is to try to comply with the RSA milestones
3   and that's 90 days so that's set out in the RSA as a
4   separate -- obviously it's not subject to the DIP challenge,
5   but that's the goal for the parties to reach a resolution
6   with respect to any claims that may exist vis-â-vis
7   Riverstone.  So there's a lot of work to be done, Your
8   Honor, tremendous.

9          THE COURT:  All right.

10         MR. FLECK:  So if we can potentially use that
11  date?  If there are disputes with respect to, we'll just set
12  a discovery type schedule.  If Your Honor be amenable, we
13  may look to you.

14         THE COURT:  So here's what I think I'll do is:
15  we're going to move to the executory contract rejection
16  Motion now and then we're going to come back to the DIP
17  Motion when that's done and allow parties that are -- whose
18  primary interest is in the DIP matter to step out of the
19  courtroom, step off the call, come back and rejoin us when
20  you're ready.

21         If the conclusion that group reaches is that we
22  ought to be taking up discovery issue today, we'll do it
23  today.  If the conclusion is to wait till Wednesday, we'll
24  wait till Wednesday.  If you all can't conclude that, I'll
25  worry about it when you come back.  I suspect on that level

1    we all are going to agree on when to start taking things up.

2         MR. FLECK:  Yeah.  And to be clear, from our --

3    we're not advocating to do that today.  We'd like to try to

4    work with the parties and have that as hopefully some sort

5    of broader resolution and work plan to get to the -- through

6    the challenge period.

7         THE COURT:  And I'm assuming for all this that

8    whatever deals you all made on that DIP turn out to be

9    acceptable not only to the Court but that you don't then

10   raise objections from other parties, but I won't listen to

11   what you're doing on the DIP until after you all have had

12   the chance to have your conference because just as I think

13   maybe you don't care a whole lot what happens on those

14   rejection agreements, some of those rejections parties may

15   not care a whole lot what happens on the DIP, so I'm going

16   to really do two separate hearings, which is we're going to

17   start now with the executory contracts, come back to the DIP

18   and we're not going to mix the two for the purpose of

19   discussion.

20        MR. FLECK:  If I may, Your Honor?  If I could just

21   do -- very briefly just -- we'd like to just let Your Honor

22   know who's on the Committee need just do a brief

23   introduction.  They're not here, I'm not going to point them

24   out.  I just wanted to make Your Honor aware the Committee

25   members, they take their roles very seriously here and just

1   wanted to have that on the public Record if I may.

2          THE COURT:  Of course.  If they are listening by

3   audio and video and want to turn on their cameras, that's

4   great.

5          MR. FLECK:  I know many of them are and look

6   forward to participating in hearings and find the ability to

7   participate, to listen in, which obviously has been

8   available or a long time in this court, and to be seen to be

9   very helpful and to have some involvement in the court

10  process as well.

11         So we have seven members on a committee that we

12  think was extremely well formed by Mr. Duran and his

13  colleagues.  The first is the Bank of New York Mellon, which

14  is the Indentured Trustee for the Debtors' unsecured notes.

15         The second is Brandywine Operating Partnership.

16  That's in integrate real estate company that is contract

17  counterparty to the Debtors.

18         The next is Enerfab Power and Industrial.  Enerfab

19  is an equipment repair and maintenance services provider to

20  power companies obviously including Talen.

21         Framatome is a designer and supplier of nuclear

22  steam supply systems and nuclear equipment, services and

23  fuel.

24         We have GE International, which obviously the name

25  is known to the Court and it has quite a few relationships

1  with the Debtors and is a major presence in the power

2  industry.

3          Two more, Your Honor.  The Merrick Group, which

4  provides industrial maintenance and cleaning services.

5          And finally we have the Pension Benefit Guaranty

6  Corporation, which obviously does protect certain critical

7  retiree and employee interests.

8          Enerfab and the PBGC are the co-chairs of the

9  Committee.  And, you know, I'll just note, as you'd expect,

10 the Committee members have been informed of their fiduciary

11 duties, understand what they're here to do, take it very

12 seriously and look forward to their continued work in the

13 cases.

14         THE COURT:  I am confident that has occurred.

15         MR. FLECK:  Thank you, Your Honor.

16         THE COURT:  Thank you.

17         MR. BARR:  Your Honor, it's Matt Barr.

18         If I can just respond to one thing before you

19 allow us to leave --

20         THE COURT:  Go ahead.  I know Mr. Schiff --

21         MR. BARR:  -- the room to talk about something.

22         THE COURT:  Go ahead.  I know Mr. Schiff has

23 something he wants to raise as well, but go ahead, Mr. Barr.

24         MR. BARR:  Great.  Thank you, Your Honor.  We're

25 happy to talk to Mr. Fleck and we will talk to him during

1  the hearing to see if we can resolve the deadline, but I

2  want to make sure that we're not completing a lot of

3  different issues that you just heard Mr. Fleck stand up and

4  talk about.  And they're very capable counsel and if there's

5  a motion to be filed with respect to discovery or a

6  conference that needs to be had with respect to discovery on

7  other issues, they're not in front of us today, not even

8  talking about them today, I am again confident that we'll

9  bring them or they will bring them to you.

10         But I want to make sure that we're focused on what

11 today is, which is a deadline under the DIP with respect to

12 the investigation.  So we'll take a break, we'll talk about

13 it and we'll try to figure that out to see if it could be

14 resolved.  If not, we may need Your Honor to resolve it for

15 us whether today or next week.  And of course with all the

16 other issues, there will be opportunities for us to discuss

17 those.  And we've already started to provide them with

18 discovery.  We'll continue to do that when they ask.  And if

19 not, we'll be back in front of you.

20         THE COURT:  Mr. Barr, thank you.

21         Mr. Schiff?

22         MR. SCHIFF:  Thank you.  Your Honor, I just wanted

23 to add.  Since I spoke, we've already gotten feedback over

24 email.  It sounds like -- the feedback so far is that

25 constituents are fine with this approach so we'll just

1  suggest -- and I'm not 100 percent clear, based on what

2  Mr. Barr just said, but would suggest that there are other

3  issues on the DIP or if it makes sense to take that up now.

4  I do think that we would -- and Mr. Schaible is just

5  confirming that our client, that the agent has confirmed

6  that they have no issues with this approach.  So I think we

7  would be able to resolve that in the Order now if

8  Your Honor's prepared to go forward on the DIP and if other

9  parties are prepared to go forward on the DIP rather than --

10       THE COURT:  I want everybody talking before we go

11  forward on the DIP.  It's going to happen today --

12       MR. SCHIFF:  Okay.

13       THE COURT:  -- but I want to take the break to

14  allow the Debtor, who seems more opposed than you do to

15  doing this, to have an opportunity to talk to you and

16  Mr. Fleck and let's see if we have a consensus.  And if we

17  don't, then I'll have to resolve it.  But we are going to

18  enter a DIP order of some sort today, a final DIP order of

19  some sort today.

20       If there are remaining objections, I'm going to

21  resolve them.  It just seems to me that this is an appendix

22  to it and it sounds like your clients may be coming to that

23  same conclusion so it can wait till Wednesday, but the DIP

24  Order would become final and then would reference that the

25  deadlines that are established -- that will be established

1    on Wednesday are deadlines.  But I think that's an easy fix

2    I can just do on the screen so.

3              MR. SCHIFF:  Very well, Your Honor.  Appreciate

4    it.

5              THE COURT:  Okay.  Thank you.

6              MR. SCHIFF:  Thank you.

7              THE COURT:  All right.  So those who need to be

8    excused from the video or the court are now excused.  And

9    let's move ahead with the Motion to Reject.

10             MR. GENENDER:  Good afternoon, Your Honor.

11             Paul Genender for the Debtors.

12             THE COURT:  Good afternoon.

13             MR. GENENDER:  I would propose starting by

14   offering our evidence related to the rejection Motions and

15   they are -- we filed a witness and exhibit list at 542 and

16   the exhibits that relate to the retail rejection Motion are

17   found at Exhibits 4 through 8 of that document, ECF 542-4

18   through 542-8.

19             THE COURT:  Is there any objection to the

20   admission of 542-4, 5, 6, 7 and 8?  If so, go ahead and

21   speak up if you line is currently active or press five star

22   if you wish to join at this point.

23       (No verbal response.)

24             THE COURT:  All right.  542-4, 5, 6, 7 and 8 are

25   admitted.

1          (Debtors' Exhibit Nos. 542-4 through 542-8 received in

2    evidence.)

3          MR. GENENDER:  Your Honor, Exhibit 4, 542-4 that

4    was just admitted is the declaration of Bryan Alejandro

5    (phonetic).  In that regard since it's in evidence, we would

6    ask that it serve as his direct testimony.  And I think we

7    would suggest if anyone wants -- I mean, maybe I'd just stop

8    there.  Does anyone -- I mean --

9          THE COURT:  Well, if it's admitted as evidence, it

10   doesn't even need to be separately his direct testimony.

11   You just admit it.

12         MR. GENENDER:  Understood.

13         THE COURT:  So if anybody wants to cross-examine

14   Mr. Alejandro --

15         MR. GENENDER:  That's my --

16         THE COURT:  -- I will certainly allow that, but

17   not require it.

18         MR. GENENDER:  Is the Court's preference to deal

19   with the evidence first before I turn it over to Mr. Morgan

20   to argue the Motion?

21         THE COURT:  Well, I want to hear what others have

22   to say.  I have -- and I don't know my -- I have a fairly

23   significant question that I want to ask both sides.  I don't

24   know if that's going to go to you or to Mr. Morgan.  I'll

25   leave it up to you.  But I think that we'll go ahead and see

1   what evidence anyone else wishes to introduce.

2         Do you rest on that evidence at this point?

3         MR. GENENDER:  Yes, Your Honor.

4         THE COURT:  All right.  Is there anyone else that

5   supports the rejection Motion that wishes to introduce any

6   evidence in support of the rejection Motion?

7       (No verbal response.)

8         THE COURT:  Okay.  I'll show that all the evidence

9   in support of the rejection Motion that that Record is

10  closed.

11        Is there anyone that has any evidence that they

12  wish to introduce in opposition to the rejection Motion

13  before we get to legal argument?

14        MR. DAUER:  Your Honor, Robert Dauer, on behalf of

15  Masonic Villages of the Grand Lodge of Pennsylvania;

16  Conestoga Wood Specialties Group; Richards Energy; and URA.

17  Your Honor, I have two witnesses that are available today.

18  I don't believe there are any contested issues of fact so I

19  don't believe it's necessary to put on their testimony so I

20  don't believe we have anything further to offer.  In fact, I

21  think most of the testimony would be consistent with the

22  declaration that is part of the 542-4, Your Honor.

23        THE COURT:  I will tell you in preparing for the

24  hearing, I didn't think we had a disagreement on the

25  underlying factual issues either, but I want to give

1  everything an opportunity to do that.  I will tell both

2  sides that once we close the Record, I'm going to again ask

3  my question.  I'm going to let you all change your mind

4  about whether you need evidence on this today or another

5  day.

6          Anyone else that believes they want to have any

7  evidence to introduce?

8          MR. SPICER:  Your Honor, John Dee Spicer.  I

9  represent HealthTrust Purchasing Group, LP and HealthTrust

10  has Exhibits 1 and 2, which are just the underlying

11  contractual agreement that HealthTrust has with the Debtor

12  and so I would offer those into evidence.

13          THE COURT:  All right.  What is the ECF numbers so

14  that I can get them admitted?

15          MR. SPICER:  Your Honor, let me get my legal

16  assistant to get that for me.  I don't have that in --

17          THE COURT:  Sure.

18          MR. GENENDER:  Your Honor, I'm happy to tell you

19  it's 525.

20          THE COURT:  525.  So we have an offer of -- is

21  it -- Mr. Spicer, there are four exhibits that you filed.

22  You're offering, as I understand it, the Purchasing

23  Agreement dated October 5th of 2012 and its amendment dated

24  May 5th of 2016; is that right?

25          MR. SPICER:  That is correct, Your Honor.  I do

1 have a witness.  I don't think we'll need to call my

2 witness, but if we do, Your Honor, I could offer the other

3 two exhibits, but it would require the witness.

4          THE COURT:  All right.  First let me see if

5 there's any objection to 525-1 and 2.

6          MR. GENENDER:  Your Honor, there's no objection.

7 Paul Genender for the Debtors.

8          THE COURT:  525-1 and 2 are admitted.

9     (HealthTrust's Exhibit Nos. 525-1 and 525-2 received in

10 evidence.)

11          THE COURT:  Mr. Spicer, it's up to you.  I'm not

12 going to control what evidence you put in.  If you want to

13 call a witness and offer 3 and 4, that's fine.  If you want

14 to pass on that, that's fine.  You tell me what you want to

15 do.

16          MR. SPICER:  I think we'll pass on that for now,

17 Your Honor, just to be more expedient.

18          THE COURT:  Thank you.  Anyone else have any

19 evidence that you wish to introduce on the rejection Motion?

20     (No verbal response.)

21          THE COURT:  So let me ask my legal question.

22 Maybe that will change you all's mind, I don't know, maybe

23 not.  It seems to me that if the Debtors have a prepetition

24 contract and post-petition they don't perform under it, but

25 it hasn't yet been assumed so I've got a prepetition

1   contract not yet assumed and the Debtors failed to perform,

2   which I believe are the facts that we have here, I think

3   that gives rise to a prepetition unsecured claim.

4          And if that does give rise to a prepetition

5   unsecured claim and if the Debtors stopped performing on all

6   of these contracts as of the (indiscernible) date, which

7   would have been the ceasing of performance, I don't

8   understand why I care what date I put on the effect of the

9   rejection.  If I put in an effective date on the rejection

10  of today or next year or three weeks ago, it's all an

11  unsecured claim for everything from the nonperformance date,

12  which means either I'm missing something or all of you all

13  are missing something and I'm going to assume I'm missing

14  something.

15         So what's -- why do you all care about the date,

16  why do I care about the date, why does anybody care about

17  the date since the outcome is always the same?  It means I'm

18  wrong on something and I don't understand what.  Go ahead.

19         MR. MORGAN:  Your Honor, I agree.

20         THE COURT:  Okay.  Well, then you can sit down

21  because you don't care.

22      (Laughter.)

23         THE COURT:  If you answer is that simple, then --

24         MR. MORGAN:  We'll I'll elaborate a little more,

25  but I do believe whether you --

1          THE COURT:  Because you all do care and I don't

2    know why and now you're telling me you don't really care.

3          MR. MORGAN:  Well, the reason for setting the date

4    retroactively is in order to -- and the reason we're filing

5    a motion because you could, I think, actually extend your

6    logic further to say why even move to reject them on the

7    first day, you could have just stopped performing and then

8    left parties with whatever claim they have as a result of

9    nonperformance --

10         THE COURT:  Uh-huh.

11         MR. MORGAN:  -- which we did to be considerate.

12   The virtue of proceeding the way that we did so we decided

13   was that it gives parties clear notice and transparency into

14   what our intention is with respect to their contract.  And

15   so from the outset, we knew we were not going to continue in

16   this line of business --

17         THE COURT:  Right.

18         MR. MORGAN:  -- at least not affiliated parties

19   and so we just wanted to just be clear and unequivocal up

20   front, you know, we are leaving and we're not continuing to

21   sign into new contracts or perform.

22         THE COURT:  But that's -- you did that, but you're

23   still arguing that you care about the date.  I understand

24   why you did it when you did it.  I don't know why today you

25   care.  And I'm not hearing from you a reason why you care.

1  I think the outcome is identical.

2        MR. MORGAN:  At least as between the pickup date

3  and the date of the Order.  Let me --

4        THE COURT:  Right.  No, that's right.  And you've

5  dropped the idea that you're going to -- and I know this

6  may -- I don't know how many days there are but I assume

7  some pickup dates are three days or 10 days later.  So

8  you've dropped your request from the petition date to the

9  pickup date.  You're now seeking pickup date.

10       The counterparties are saying it either ought to

11  be today or some future date and I am not understanding the

12  economic difference between pickup date, which is the

13  earliest date you're currently requesting, not the earliest

14  date you originally requested, and what the counterparties

15  want.  And I don't think you're telling me a difference, an

16  economic difference either.

17       MR. MORGAN:  Well, two points, one clarifying and

18  one responsive.  The earliest, that's -- we're still -- you

19  have to differentiate between the broker agreements and the

20  purchase agreements.  So as to the purchase agreements, we

21  do go to the pickup date.  As to broker agreements, we go

22  back to the petition date the logic being either -- just

23  goes back to the date of nonperformance.

24       THE COURT:  But it results --

25       MR. MORGAN:  So the responsive --

1            THE COURT:  I got that, but it stems to all the

2    same question.

3            MR. MORGAN:  It's the same legal question.  The

4    response is, at least in my mind -- our mind, the

5    significance of having the Order fix a date and time that

6    isn't a date in the future is that we can cut off arguments

7    that somehow we are obligated to or giving rise to claims

8    that are coming up after the point of nonperformance, which

9    again I don't believe there are valid claims to that effect,

10   but other parties may assert it.  And so some of this is a

11   little bit of trying to manage what will inevitably be a

12   claim reconciliation process as we are creating a whole

13   group of rejection damages claims to be administered to the

14   Plan.

15           THE COURT:  And I'm inclined to cross that bridge

16   up front and that's why I want to see if everybody's

17   prepared to answer this.  Otherwise if we're not prepared to

18   answer it today -- in fairness to you, I'll let you change

19   your answer too if you want to.  But if people aren't

20   prepared to answer it today, I'll probably given that --

21   unless I missed it, I didn't see anyone that believes you

22   don't have the right to reject.

23           We're only dealing with the date of rejection so

24   I'm inclined to issue an order today authorizing rejection.

25   And if people need some time to brief this setting the

1    effective date of the rejection later with an opinion that

2    would give the reason why, which would resolve everything up

3    front and not leave for later, the fights over at the

4    objection stage.  But let me hear from the counterparties

5    because I suspect I'm missing something.

6          Who wants to address the question or tell me that

7    you want time to address the question?  Because it's a

8    little unfair for me to pop this on everybody and make them

9    answer it right up front when I could do a rejection order

10   now and leave plenty of time to get it briefed properly.

11   Anybody?

12         MR. DAUER:  Your Honor, Robert Dauer again on

13   behalf of my clients.  Your Honor, we would like to

14   opportunity to address and respond to that question.  And I

15   think Debtors' counsel has raised what we believe would be

16   our point is that there potentially is a claim from the

17   filing date through the pickup date if that is the date of

18   rejection or through a later date of rejection, whatever the

19   Court ultimately deems is the appropriate rejection date.

20         THE COURT:  So I thought -- and so I may have

21   misunderstood what occurred and I'll let you all fix this

22   fact for me.  I thought from the petition date to the pickup

23   date that the Debtors did continue to provide the

24   electricity and that they are charging the rate under their

25   contract.

1          Is that incorrect?

2          MR. MORGAN:  That is correct, Your Honor.

3          THE COURT:  So I think there wouldn't be a claim

4    for that time period between the petition date and the

5    pickup date because they provided the services under the --

6    at the same pricing terms of the contract.

7          So it would only be pickup date forward where we

8    have a dispute as to whether those are somehow not

9    prepetition claims or am I missing a fact, Mr. Dauer?

10         MR. DAUER:  No, Your Honor, I believe you are.

11   And that is the question: what is the effective date of

12   rejection?  If the effective date of rejection is the pickup

13   date, I would agree with Your Honor that that becomes a

14   prepetition claim so I think that is --

15         THE COURT:  Yeah, what if the effective date is

16   today?  And let's assume that your pickup date for your

17   client and -- because I don't know the number of days -- was

18   25 days ago.  So let's take that 25-day period.

19         What I think the law is -- and this is what I need

20   you to brief for me -- is that unless that contract is

21   assumed, that the Debtors' post-petition breach of a

22   prepetition contract is merely an unsecured claim, which

23   means that the outcome is the same no matter what date we

24   pick, the economic outcome is the same.  That's the briefing

25   question.

1          MR. DAUER:  Yes, Your Honor.  And I would agree

2     with you, we would like the opportunity to brief that.  We

3     believe that the Debtors' obligations post-petition but

4     pre-rejection or assumption continue under the contract and

5     that their failure to provide the electric post-petition but

6     pre-assumption or pre-rejection would give rise to a claim

7     so I think that is our exact point.

8          THE COURT:  Just to be sure that you're briefing

9     everything, I agree it gives rise to a claim, but I think

10    it's a claim that's a prepetition claim.

11         And are you telling me that you think it gives

12    rise to a claim that is administrative in nature?

13         MR. DAUER:  We do, Your Honor.

14         THE COURT:  Okay.  That's the briefing question.

15         MR. MORGAN:  Your Honor, this is why we're asking

16    for the retroactive relief because we anticipate --

17         THE COURT:  I got it.

18         MR. MORGAN:  Okay.

19         THE COURT:  I got it.  And if, in fact, I issue an

20    opinion up front that addresses that question, it goes much

21    further than what you're even asking me to do.  It may be

22    against you and you may be the one appealing it instead of

23    them, but we get it all addressed up front.  So if I

24    determine, for example, that it is administrative and I

25    issue an opinion that says this does matter, there is an

1  issue before me because that could give rise to an

2  administrative claim and I'm only going to allow the

3  rejection as of the effective date -- I'm sorry -- as of

4  entry date, then he would need to appeal that up front and

5  we resolve it all.

6        If, on the other hand, my initial inclination that

7  it's all a prepetition claim is right, I put that in the

8  opinion at which point they're going to need to appeal it

9  rather than pushing this off and having 80 claim objections

10  that come later.  So I would just rather confront the

11  problem now.  I don't see any downside in confronting it

12  now.  And I think it matters because I don't think I ought

13  to be ruling on this without understanding what I'm doing.

14        And Mr. Dauer, with total respect, is telling me I

15  might be missing what I'm doing and I need to give him a

16  chance to brief that in case I am.

17        MR. MORGAN:  Your Honor, the one concern I have

18  with this approach is the additional time that lapses

19  between today and a decision some point in the future where

20  we may be --

21        THE COURT:  Well, no, we issue -- I'm going to

22  issue the rejection Order today.

23        MR. MORGAN:  Okay.  So it's --

24        THE COURT:  And I'll leave open the effective date

25  of it.

1          MR. MORGAN:  But leave open the effective date as

2   of today or the pickup date?  So today or earlier or today

3   and potentially some point in the future?  Because if they

4   are right, as sort of what you say and don't believe they

5   are, but if they are right, by going to point in the future,

6   we're incurring additional admin expenses.

7          THE COURT:  Well, there's one argument in the

8   briefing that you must reject as of a future date for public

9   policy reasons I think.  If I were to decide that today,

10  then you would still be going out into the future, right?

11         MR. MORGAN:  Yes, Your Honor.

12         THE COURT:  But I'm going to enter the rejection

13  Order today with only the date at issue.

14         MR. MORGAN:  I would suggest or respectfully

15  suggest that you have the ability and the briefing now to

16  determine that the Debtor should not be compelled to perform

17  under these contracts, which we can't even continue

18  performing at least for the retail power.

19         THE COURT:  I'm not going to make you perform from

20  this point forward.

21         As to whether that gives rise to an administrative

22  claim would be the question, right?

23         MR. MORGAN:  Yes, but --

24         THE COURT:  Yeah.

25         MR. MORGAN:  But the issue I'm concerned about is:

1    if these give rise to an administrative claim --

2            THE COURT:  Uh-huh.

3            MR. MORGAN:  -- and it's for the difference

4    between the market and the contract rate or whatever number,

5    whatever amount --

6            THE COURT:  Right, right.

7            MR. MORGAN:  -- and the time period then runs from

8    we say pickup date or rejection date.  I think it's

9    unequivocal, right.  Let me say it this way: I don't think

10   there's any doubt and I don't think Your Honor should have

11   any doubt that we can reject this contract under 365

12   effective today.  Whether or not we can retroactively do it

13   is what parties have taken exception with but --

14           THE COURT:  I have two parties -- and maybe

15   they're going to withdraw those exceptions -- that say you

16   can't actually even do it effective today.

17           MR. MORGAN:  I believe Your Honor has the briefing

18   and the facts to overrule those objections because we

19   clearly can reject what are ordinary executory contracts

20   within an exercise of our business judgment and the factual

21   Record sitting before you is that that business judgment

22   standard has been satisfied.

23           THE COURT:  All right.  Thank you.

24           From 212 -- excuse me -- 267-481-2240, who do we

25   have on the phone?

1          MR. CUNNINGHAM:  Hi, Judge Isgur.  This is

2     Stephen Cunningham with Titanium Finishing Company.  I'm one

3     of the people who filed the objection with the Court.  My

4     question -- there's two parts to this.  One, I see what

5     you're saying about the claim.  I'm not a lawyer so please

6     excuse me there.  But I see what you're saying about the

7     claim.

8          But further in the future we go, the more

9     expensive my claim becomes because right now me trying to

10    find power across -- as the year starts closing and the

11    more expensive power (indiscernible) price goes even higher.

12    So obviously I would like to know when I was dropped.  I

13    would like to be dropped due to the fact of the cost, but

14    that's -- obviously I'd like to know a date.

15         But the other point to this is that we've already

16    mostly -- most of the (indiscernible) been dropped and my

17    fear is that the reason I don't think they can reject these

18    is due to the fact that the day that we -- the day they sent

19    the transaction to my utility to drop off was either before

20    or the -- the day before or the day -- you know, the morning

21    of the day this was filed.  So really they weren't in

22    bankruptcy at the time that it was filed because this is a

23    pretty quick process to file to drop an account.

24         THE COURT:  Yeah.  So Mr. Cunningham -- and I very

25    much appreciate your raising that issue because I think in

1   some of the papers I read, the non-lawyers didn't understand

2   the effect of rejection and I want to take just a moment and

3   explain what that effect is.

4           So whether they were to have breached the contract

5   the day before bankruptcy or whether their breach occurs by

6   order of the Court effective today, you will get a claim in

7   the bankruptcy case that is equal to the loss that you incur

8   from their nonperformance at the stated rate under the

9   contract.

10          So I don't know the amount of your contract, but

11  let's assume that you bought at 15 cents a kilowatt hour and

12  that a replacement contract today is at 30 cents a kilowatt

13  hour.  It means that you're going to get a damages claim

14  equal to that spread, which is a total of 15 cents a

15  kilowatt hour, which means I used a bad sample.  Let's say

16  it was 25 cents a kilowatt hour is what your replacement is

17  today.  You will get a damage award equal to that 10-cent

18  spread.

19          The reason why they would reject it in a

20  bankruptcy case -- and this is essential to understanding

21  what's going on -- is usually in a bankruptcy case, the

22  unsecured creditors only get paid pennies on the dollar.  So

23  if this turns out to be a 25-cent case and if your 10-cent

24  spread is equal to $100,000 over the life of the contract,

25  then you get paid only $25,000 on your $100,000.

1            There is no question that what I've just described

2    to you is an accurate statement of the law with one

3    exception and that's the exception that Mr. Dauer and I

4    believe some other lawyers are going to try and brief, which

5    is if you have this period after the bankruptcy case gets

6    filed but before I've entered the Order, does that get paid

7    100-cent dollars or 25-cent dollars?

8            But that's only going to apply for this 20 or 25-

9    day period unless I rule -- and Mr. Morgan is arguing to me

10   I should rule on this question, which is a different issue,

11   but what Mr. Dauer is arguing is if the drop date was 20

12   days ago, then for the 20 days between the drop date and

13   today, your award wouldn't be a quarter in my hypothetical

14   example, your award would be a dollar-for-dollar award.  And

15   so that's why this briefing matters.

16           I'm hoping that explains to you what's going on

17   here.  It's not that you get no claim.  You get a claim that

18   pays you in reduced dollars.

19           Does that makes some sense?

20           MR. CUNNINGHAM:  I think that -- that makes

21   complete sense and I think that's what my objection was

22   pointing to is that when you approve this Order is when it

23   should be the effective date because obviously that's when

24   my account should be dropped.  They dropped me without

25   anyone stating --

1          THE COURT:  Right.

2          MR. CUNNINGHAM:  -- what your order was going to

3   be and that's what I think my point is here --

4          THE COURT:  Right.

5          MR. CUNNINGHAM:  -- that you didn't rule on it.

6   They ruled before you did.

7          THE COURT:  Right.  So let me tell you then why I

8   think that's wrong and that's what Mr. Dauer is going to try

9   and convince me that I'm wrong about, which is the way this

10  is done, and if the day before bankruptcy they stopped

11  performing, there wouldn't be any question but that it would

12  be a claim that got paid only 25 cents on the dollar because

13  you would have a prepetition claim.  It was a prepetition

14  contract.  They breached it.  You only get a prepetition

15  unsecured claim.

16         And my sense is -- although I've never ruled on

17  this question before, but my sense is that if they stop

18  performing before I issue the Order, it's the same as if

19  they'd stopped performing right before the petition date.

20  Mr. Dauer senses that I'm wrong about that and so he is

21  going to brief it and I assume other counsel may choose to

22  brief it as well.  You will benefit from that briefing if he

23  is correct because his client won't get treated any

24  differently than every other party that is similarly

25  situated.  You are welcome to file your own brief.

1          This is not -- there are calls that Bankruptcy

2    Courts need to make that are classified as "equitable" calls

3    and there are calls that are classified as "legal" calls and

4    that is if the law mandates a certain result, I don't get to

5    change that result based on my sense of fairness.  If the

6    law doesn't mandate it, then we do get into this sense of

7    fairness issue.

8          What I am stating would be a law question so if

9    I'm correct that it's a prepetition claim, I don't have any

10   discretion about it.  If I'm wrong about it, then I do get

11   discretion.  And I hope that continues to -- you're into a

12   really complicated area of bankruptcy law and I'm sorry

13   about that, but you are and I'm trying to tell you what's

14   going on best I can and want you to continue to ask me

15   questions and make statements as you think are appropriate.

16              MR. CUNNINGHAM:  Thank you, Your Honor.

17              THE COURT:  Thank you.  Is there anyone else that

18   wants to address this question today?

19        (No verbal response.)

20              THE COURT:  So I would like to hear responses to

21   Mr. Morgan's argument that the law is not ambiguous, that

22   the latest date of effectiveness ought to be today and that

23   there would not ever be an order entered that would delay

24   the effectiveness until a future date.  And I want to hear

25   arguments that he should not get that ruling today.  So

1  whoever wishes to speak up and argue against him, feel free.

2  And then I'll give you a chance to respond, Mr. Morgan.

3       (No verbal response.)

4       THE COURT:  Is there anybody that wants to pursue

5  that argument?

6       (No verbal response.)

7       THE COURT:  All right.  Actually I'm going to

8  sustain the argument.  I do think it is unambiguous given

9  the evidentiary Record that it is in the Debtors' business

10 judgment to reject these leases.  Although I don't see a

11 difference between rejection and nonperformance, I

12 understand the clarity that we need.

13      The latest date of rejection will be today.  The

14 earliest date of rejection will be the pickup date.  I'm

15 going to have the parties brief which of those two dates it

16 will be.  If you want to submit a proposed form of order

17 like right now, have somebody do it, I'll get it entered

18 today that leaves that as the open question.  Let's go ahead

19 and get briefing deadlines.

20      Mr. Dauer, do you want to do simultaneous briefing

21 deadlines or do you want to do sequential briefing?  I don't

22 care very much and since you're taking the lead on this, let

23 me let you decide.  I'll let Mr. Morgan object if he doesn't

24 like your simultaneous or sequential choice, whatever one

25 you want.

1          MR. DAUER:  Thank you, Your Honor.  Simultaneous
2  is fine with us.
3          THE COURT:  How long do you want?
4          MR. DAUER:  Your Honor, if we could have two
5  weeks, that would be great.
6          THE COURT:  So you're suggesting as July 1
7  deadline for briefing?
8          MR. DAUER:  That would be fine, Your Honor.
9          THE COURT:  Mr. Morgan, are you okay with
10  simultaneous briefing?
11         MR. MORGAN:  Not my preference, but I'm okay with
12  it, Your Honor.
13         THE COURT:  Okay.  Anyone else have a problem with
14  simultaneous briefing on whether the post-pickup pre-today
15  claim is administrative or general unsecured?  Does anyone
16  want to speak up as to the briefing?
17      (No verbal response.)
18         THE COURT:  Okay.  So --
19         MR. SCHEINBERG:  Your Honor, brief --
20         THE COURT:  I'm sorry.  Mr. Scheinberg, go ahead
21  please.
22         MR. SCHEINBERG:  Brief question.  Does this mean
23  also that other parties will be briefing simultaneous as
24  well?  It will be the same deadline for any other briefs,
25  correct?

1          THE COURT:  Anyone that wants to submit a brief on

2    this question would have it due by July 1 at 5:00 o'clock

3    under Mr. Dauer's proposal.

4          MR. SCHEINBERG:  Okay.  Very well, Your Honor.

5    Thank you.

6          THE COURT:  Anyone that doesn't brief, I'm not

7    going to decide this question differently for people that

8    brief and don't brief.  It's going to be a universal ruling

9    so if -- I'll let you all organization on your own.  If

10   people want to work to file one joint brief signed by 10

11   parties, that's fine with me.  If everybody wants to file

12   their own or people don't want to file any, that's fine.

13         MR. SCHEINBERG:  Thank you, Your Honor.

14         THE COURT:  Okay.

15         MR. MORGAN:  Your Honor, if I could ask just for

16   one point of clarification, which is you had said the latest

17   date would be today, the earliest date would be the pickup

18   date.  We bifurcated --

19         THE COURT:  Not as to the brokers.  As to the

20   brokers, it's the petition date.

21         MR. MORGAN:  Okay.  Well, one point I wanted to

22   make on that, which is something that I have discussed with

23   at least one of the objectors' counsel, which is some of --

24   that one counsel had advanced the theory that -- and I'm

25   doing a little bit of his work for him, but I -- advanced

1  the theory that the services of procuring customers

2  prepetition was giving rise to a benefit to the Estate

3  post-petition because we were able to charge more and we had

4  a commission that we owed to brokers.

5          We've agreed with him that we would not use this

6  Order as a means of determining the status of that claim.

7  We disagree with the legal position, but we weren't going to

8  use the rejection *nunc pro tunc* to the petition date as a

9  means to say we're cutting off his legal claim to

10  administrative expense status.

11          I think we could solve this by making both of

12  them -- and again this is me trying to be fair as opposed to

13  taking advantage.  I think we can put both of the rejection

14  dates to the pickup date and that should address their issue

15  because if they have an admin expense claim, it can't run

16  past the date that we stopped receiving a benefit from

17  customers because if they're earning a commission off of

18  what we received from customers.

19          THE COURT:  I don't know what deal you made with

20  him.  I expect you to put into your proposed form of order

21  something that reflects the deal you made with him.

22          MR. MORGAN:  Okay.

23          THE COURT:  So in other words, you're going to

24  give him more rights than what I was prepared to give him,

25  which is great.  I mean, that's the deal you made.  Well,

1  I'll hold you to the deal, but I'm not going to announce it

2  here to find out what the deal is because I don't know what

3  the deal is.  I just told you that your deal --

4         MR. MORGAN:  We will prepare a form of order.

5         THE COURT:  -- and hopefully you all sign off on.

6  Good.  Get it up right away if you could because I'd like to

7  get it signed today.

8         MR. MORGAN:  Okay.

9         THE COURT:  But we're definitely going to make a

10  docket entry that the latest effective date is June 17th.

11         MR. MORGAN:  Okay.

12         THE COURT:  Okay.  Thank you.

13         MR. MORGAN:  Thank you, Your Honor.

14         THE COURT:  So is there --

15         MR. MARTIN:  Your Honor, this is Jarrod Martin for

16  Richards Energy.  We have one kind of small item that was

17  addressed here.  We had set for this hearing two motions to

18  seal for Richards Energy and Masonic.  I think we're pretty

19  agnostic about what the Court does with those Motions

20  because we ultimately didn't end up using those confidential

21  exhibits at the hearing today so we're happy to withdraw the

22  Motions or have the Court enter these.  We really don't care

23  either way.

24         THE COURT:  So as best I could tell the matters

25  you want to seal have not been filed at all; is that right?

1          MR. MARTIN:  They were filed on a sealed basis and

2    transmitted to Debtors' counsel, but they have not been

3    filed in relation to this hearing as exhibits.  They were

4    attached as exhibits to the objection.

5          THE COURT:  So I'm looking at 343, which is a

6    motion to seal.  Where is the document that you're trying to

7    seal under 343?

8          MR. MARTIN:  It would have been attached to the

9    objection.  I'm sorry, Your Honor, I don't have my email in

10   front of me because we have some technical issues internally

11   at my firm, but it was attached to the Richards' objection

12   and the Masonic objection as sealed exhibits.

13         THE COURT:  So let me take -- so the Masonic

14   objection is 344.

15         Is it attached to the Masonic objection?

16         MR. MARTIN:  It was supposed to be.  If it's not,

17   then that's a separate issue.  But I guess what we're saying

18   is we're happy to withdraw the Motion to Seal and just file

19   a notice to withdrawal relating to those exhibits or have

20   the Court enter it.  We really don't have a position either

21   way at this stage.

22         THE COURT:  Yeah.  I'm actually on the same

23   technical kind of question you're on.  I'm trying to figure

24   out where is the exhibit that shouldn't be shown to the

25   public?

1          MR. MARTIN:  One second, Your Honor.  Let me see

2     if I can pull it up on my phone.

3          THE COURT:  Because 344 is not sealed, which was

4     the response of opposition.

5          MR. MARTIN:  Right, it wouldn't -- yeah, it

6     wouldn't be the actual docket entry for 344.  It would have

7     been an attachment to 344 as an Exhibit A or Exhibit B.  If

8     that's not there, then it wasn't filed at all and then we

9     don't have an issue, but it would have been a sealed exhibit

10    to the objection.

11         THE COURT:  So 344 has a number of subparts that

12    include 1 through 5.  Exhibit A, which is not under seal, is

13    a May 26th letter.  Exhibit B, which is not under seal, is a

14    retail electricity agreement.  Exhibit C, which is not under

15    seal --

16         MR. MARTIN:  I believe it's instead redacted

17    rather than under seal, if you open one of the trial

18    electricity agreements.

19         THE COURT:  Right.  So those are redacted.  They

20    don't need to be sealed.  I can't figure out what it is

21    you're trying to seal.

22         MR. MARTIN:  I think it would have been just

23    approval for the redactions, Your Honor.

24         THE COURT:  Okay.

25         MR. MARTIN:  So again we're happy to withdraw

1   that.  That's the Motion still.

2          THE COURT:  Then I'm just going to find that No.

3   343 and 345 are both moot since we don't have the sealed

4   documents to seal.

5          MR. MARTIN:  Perfect.

6          THE COURT:  So they are --

7          MR. MARTIN:  I'm glad we got that resolved.

8          THE COURT:  Okay.  Thank you for being here.

9          MR. MARTIN:  I apologize for the confusion.

10         THE COURT:  We're going to find that moot and

11  we'll go ahead and terminate them.

12         MR. MARTIN:  Appreciate it, Your Honor.  Thank

13  you.

14         THE COURT:  Mr. Morgan, is there anything else we

15  have to do other than the DIP then?

16         MR. MORGAN:  We have another uncontested item,

17  although I think there have been changes to the Order with

18  respect to the hedging program and I know --

19         THE COURT:  I thought that was continued till next

20  week.

21         MR. MORGAN:  The cash management Order was

22  continued to the 28th.

23         THE COURT:  Okay.

24         MR. MORGAN:  But we still have the Debtors' Motion

25  for authority to continue their hedging program.

1          THE COURT:  Do you know that ECF number?  It's not

2   on the my calendar today so.

3          MR. MORGAN:  Mr. Carlson is scheduled to present

4   that so I'll let him --

5          THE COURT:  I'm sorry, there is a hedging motion

6   here.  It is sitting right here and it is No. 29, I

7   apologize.  Okay.  We'll call 29.

8          MR. DIEHL:  Your Honor, could those parties that

9   were involved in the retail contract be excused?

10          THE COURT:  Mr. Diehl, I apologize, I failed to

11   say that, but absolutely.  Anyone that wants to be excused

12   from the hearing, feel free.  Obviously you can stick around

13   if you want to watch what's going on in the rest of the

14   case.  Thank you.

15          MR. DIEHL:  Thank you, Your Honor.

16          MS. LOWDERMILK:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18       (Pause in the proceedings.)

19          MR. CARLSON:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon, Mr. Carlson.

21          MR. CARLSON:  Cliff Carlson, on behalf of the

22   Debtors.  So, Your Honor, the hedging Motion, the update

23   hedging Order the latest version would filed at Docket No.

24   574 and there we've got the proposed form of final Order

25   also attached as an incremental redline from the one we

1 filed on Wednesday and then a cumulative form of order that

2 we -- was entered back on the first day of the hearing --

3 first day of the cases.

4          THE COURT:  All right.

5          MR. CARLSON:  Before I go into just to tell you

6 where we're at with the Motion, if we can move to admit a

7 few exhibits related to this Motion, I think Mr. Genender

8 just handled the retail rejection.

9          So we -- the Debtors would move to admit Exhibits

10 2, 3, 11 and 12 through 16.  That's at ECF 542.

11          THE COURT:  All right.  Is there any objection to

12 the admission of 542-2, 3, 11, 12, 13, 14, 15 or 16?

13      (No verbal response.)

14          THE COURT:  542-2, 3, 11, 12, 13, 14, 15 and 16

15 are admitted.

16      (Debtors' Exhibit Nos. 542-2, 541-3, 542-11 through

17 542-16 received in evidence.)

18          MR. CARLSON:  All right.  Thank you, Your Honor.

19 So as Mr. Morgan previewed, we do have a final order that's

20 been agreed by the Committee, this whole objecting party.

21 We've been working with Committee's counsel and with a

22 number of hedging counterparties counsel to arrive at a form

23 of order that I think is acceptable to everyone.

24          I'd like to hear from other counsel to confirm

25 that point.  And like I said, that's the form of Order that

1  was filed at ECF No. 574.

2          THE COURT:  So let hear if there are any remaining

3  objections to the Order filed at ECF 574.  I've looked at

4  574-3 for my review for today.

5          Does anyone have any objection to 574-1 being

6  entered?

7      (No verbal response.)

8          THE COURT:  All right.

9          MR. CARLSON:  Thank you, Your Honor.

10         THE COURT:  Is that it?

11         MR. CARLSON:  I think that leaves the DIP.

12         THE COURT:  Okay.  With respect to 574, I find,

13  based on the evidence before me, that the Debtors need to

14  enter into the hedging Agreement, its critical to their

15  business operations.  We already authorized an interim

16  order.

17         The changes that have been made between interim

18  and today are changes that provide additional protections to

19  parties other than the Debtor and so they all appear to have

20  been negotiated to make this a more completely open and

21  transparent process to the parties that have the primary

22  interest particularly with respect to the Committee.

23         Given the absence of any objections and the need

24  for hedging and the fact that we've already crossed the

25  Rubicon on the interim Order, I will sign the Order and I'll

1  do that right now.  Hold on.

2       (Pause in the proceedings.)

3            THE COURT:  Sorry, they gave me a new version of

4  PDF today and I didn't know that was going to pop up.  I

5  signed the Order and I'm going to send it to docketing.

6            MR. CARLSON:  Thank you.

7            THE COURT:  Is that it on hedging?

8            MR. CARLSON:  That's it, Your Honor, on hedging.

9            THE COURT:  All right.  It's gone to docketing.

10            So we'll now go back to the DIP Order.

11            Mr. Dunne, you look like you have something to

12  say, but I want to be sure that I haven't missed you if

13  there is something you want to say.

14            MR. DUNNE:  Covering for Mr. Fleck until he gets

15  back.  Your Honor, can you hear me?

16            THE COURT:  I can hear you now.  Thank you.

17            MR. DUNNE:  Yeah, and I don't have anything to

18  add.  The Committee is (indiscernible) relief that was being

19  requested, but I was also covering for Mr. Fleck who I think

20  is back in the courtroom now.

21            THE COURT:  Mr. Fleck is back.  He just said to

22  tell you hello.

23       (Laughter.)

24            THE COURT:  All right.  So Mr. Barr I guess and

25  Mr. Fleck have the lead on this; is that right or?

1  Mr. Morgan?  I'm not sure who's going to take the lead, but

2  you all tell me what you all have determined is the wise way

3  to go about the DIP Order.

4        MR. FLECK:  Your Honor, for the Record, Evan Fleck

5  once again.  We had a constructive discussion.  I don't know

6  that we're concluded on the discussion.  Mr. Barr was going

7  to confer with his client and I don't see him yet.

8        THE COURT:  Why don't we -- do you want to just

9  take a short break?

10       MR. MORGAN:  I was going to ask, Your Honor.

11       Can we take maybe a 10-15 minute recess?

12       THE COURT:  Sure.

13       MR. MORGAN:  Thank you.

14       THE COURT:  We'll come back at 3:35.

15       MR. MORGAN:  Perfect.

16       THE COURT:  We'll recess until then.  Thank you.

17    (Recess taken from 3:19 p.m. to 3:32 p.m.)

18                      AFTER RECESS

19       THE COURT:  All right.  Let's go back on the

20  Record in the Talen case.  It is Case No. 22-90054.

21       Mr. Fleck, Mr. Barr, we started with you two

22  today.  I think we'll finish with you.  Mr. Barr, I think

23  your phone may be muted.

24       MR. FLECK:  Your Honor, I think we have -- we have

25  a proposed resolution, I think, that works for at least the

1    parties who were part of the discussion.  We think that

2    everyone's relevant, but the people that are maybe most

3    directly relevant and with counsel here and on the phone.

4    But it does depend on Your Honor's availability in order to

5    make it work.  I know that happens sometimes.  We apologize

6    for imposing on the Court, potentially.

7              I guess the question would be whether Your Honor

8    would be available for a Disclosure Statement hearing during

9    the latter part of the week of August 22nd.  Matt, did you

10   -- I'm sorry.  Mr. Barr, did you want it -- were you

11   proposing specifically that --

12             MR. BARR:  We concur in that.

13             MR. FLECK:  The 25th -- well --

14             MR. BARR:  Your Honor, this -- yes, thanks, Mr.

15   Fleck, for -- and I apologize, Your Honor, again for being

16   by phone.  I won't do it again.  Is August 25th available

17   for a Disclosure Statement hearing?  And is October 11th,

18   12th or 13th available for Confirmation?  If those work for

19   Your Honor, then we could back into a potential settlement

20   with the Creditors' Committee.

21             THE COURT:  So any chance that you could live with

22   October 6th or 17th?

23             MR. BARR:  I'm sorry, Your Honor.  Can you say

24   that again?

25             THE COURT:  October 6th or 17th?  Or -- and can

1    you live with August 29th?

2            MR. FLECK:  That would work for us, Your Honor,

3    but I -- well, Mr. Barr will speak for himself.

4            THE COURT:  Okay.

5            MR. BARR:  So, Your Honor, let's do the back end

6    first.  October 6th is the day after Yom Kippur, so I'm sure

7    we could accommodate because a number of our colleagues

8    don't celebrate it, however it does potentially cause some

9    issues for other parties.

10           THE COURT:  How about --

11           MR. BARR:  Is there nothing available --

12           THE COURT:  How about October 7th?  I don't --

13   unfortunately -- I don't know why it says it, but my

14   calendar says I am out of the office that whole week of the

15   10th.  And that may be inaccurate, but I can't determine

16   that right now without talking to Ms. Dow.  So would October

17   7th work?

18           MR. BARR:  Yes, Judge.

19           THE COURT:  Okay.

20           MR. BARR:  And hopefully we can do it in one day.

21   If not, it sounded like your next available date was the

22   17th.

23           THE COURT:  Well, or -- I'm guessing that's a

24   family vacation and, you know, I could probably take a few

25   hours during the vacation.  I'm not -- I'm just not too sure

1  of why it's marked off.

2          MR. BARR:  Your Honor, I'm not suggesting that.

3          THE COURT:  Yeah, it doesn't say why it's marked

4  off.  It just says it's marked off, so --

5          MR. BARR:  Okay.

6          THE COURT:  And then if we back up then, can we do

7  August 29th?

8          MR. BARR:  For the Disclosure Statement hearing?

9          THE COURT:  Yes, sir.  Let's say 10:00 in the

10 morning, something like that.

11         MR. BARR:  Sure, Your Honor.  Then I believe

12 what we were talking to the Committee about was an August

13 22nd, 2022 deadline for them to commence any action and keep

14 standing.

15         THE COURT:  Mr. Fleck?

16         MR. FLECK:  Yes, Your Honor.  That's correct.

17         THE COURT:  That works.

18         And then are there other deadlines that you all

19 have negotiated that you don't really need me for?  Which is

20 fine.

21         MR. FLECK:  I think the -- well, I would say, Your

22 Honor, in order to resolve the last part of our objection,

23 it goes to the tolling of the conclusion of the challenge

24 period while a standing motion is before the Court.

25         We didn't -- we actually did not spend a lot of

1  time talking about your suggestion.  I think there wasn't

2  traction for it, but obviously from the Committee's

3  perspective, we think there's a strong basis for the

4  Committee to have standing and not need to seek standing.

5  The Debtors have stipulated, and we know that Your Honor, in

6  other cases, has adopted that position.

7        Having said that, if we need to seek standing at

8  that point, from the 22nd of August, we don't believe that

9  there should -- we want to move quickly, I stand by that; I

10 said it a few times earlier.  The question is really, you

11 know, is it tolled until Your Honor makes the decision or

12 three business days thereafter, or is Your Honor on a clock

13 of -- I think what the Debtors proposed is 30 days, and if

14 you haven't decided by that point, then we may be out of

15 luck.

16        I don't think that works, so what we would like is

17 it continued to be tolled until Your Honor -- until three

18 business days after Your Honor makes a decision on the

19 standing motion.

20        THE COURT:  And I'll do better than that.  I will

21 make a decision within the 30 days.

22        MR. FLECK:  I think we're all happy with that.

23        THE COURT:  Okay.

24        MR. BARR:  Thank you, Your Honor.

25        MR. FLECK:  Okay.  My understand is that I think

1   Mr. Morgan may have a presentation with respect to the DIP.

2   There is -- there's some language I was going to read into

3   the record -- it would probably make sense to do that in a

4   bit -- that resolves the rest of our objection, and it's an

5   agreed -- it's agreed language as between the Committee and

6   the DIP lenders.

7           THE COURT:  So before we go there, let me be sure

8   that no one has -- no one else has a problem with the

9   October 7th, 9:30 hearing on whether to approve the

10  Disclosure Statement.  Excuse me, the August 29th at 9:30

11  hearing on whether to approve the Disclosure Statement and

12  the October 7th at 9:30 hearing on Confirmation of the Plan.

13          Okay, no objection, those will be the dates.  Aand

14  then you'll just need to fill in the interim dates for

15  objections and stuff like that.

16          MR. FLECK:  Okay.  Thank you, Your Honor.  I think

17  since we're talking about the issue of the challenge period

18  and timing, this is in the Order, it's not disputed

19  language, but I'll just state it because it's relevant.

20          The challenge period can be extended for cause

21  shown or an agreement of the parties, and we know that we

22  can always request a hearing in front of Your Honor to the

23  extent it becomes necessary.  Hopefully it will not.

24          Hopefully, you know, we're going to be working

25  very well together in terms of information, but that is --

1  that's language in the order that does -- that's agreed

2  among the parties.

3           THE COURT:  Thank you, sir.  Mr. Morgan?

4           MR. MORGAN:  Good afternoon, Your Honor.

5           THE COURT:  Good afternoon again.

6           MR. MORGAN:  So Mr. Fleck was right, I did have a

7  whole presentation that I've scratched.  I think this has

8  kind of gotten ahead of that, though, and so, Your Honor,

9  what I'd like to do, with your permission, is to come back

10 to, or to come officially to Item 3 on the agenda, which is

11 the Debtor's Motion for Approval of a DIP on a final basis.

12          And I'd like to offer the opportunity to just walk

13 you through the order or to answer questions you have and to

14 sort of -- I don't want to punt it to, Your Honor, but I'd

15 like to use this time effectively and efficiently.  And if

16 you have questions, I think that's probably the most

17 effective use of our time.

18          THE COURT:  Do all the parties know what the deal

19 is at this point?  Or do some of the parties still have

20 issues, you know, besides you and the Committee, with

21 respect to the DIP?

22          MR. MORGAN:  At this point, all the parties that

23 have filed papers are aware of what we have.  And maybe

24 where I should start is, we filed a proposed form of order

25 yesterday that provided a redline against the interim.  And

1   then this afternoon, sometime around 11:00 or noon, we filed

2   a further revised, which had some incremental changes, which

3   were requested by parties.  And that's at Docket 573.

4   There's a -- 573-1 is a clean, 573-2 is an incremental

5   redline, and 573-3 is a cumulative redline.

6          THE COURT:  Why don't we do this, because I have

7   not seen what you filed today at all.

8          MR. MORGAN:  Okay.

9          THE COURT:  So why don't we just go to 573-3 and

10  let you talk me and parties through it  --

11         MR. MORGAN:  Okay.

12         THE COURT:  -- because, I mean, most parties, even

13  if it's here, probably haven't had a chance to see it.  I

14  can put it up on the screen and let you tell me where you

15  want me to look.

16         MR. MORGAN:  Sure.  So the first -- the first --

17  this is cumulative.  So the first -- I'll walk you through

18  the incremental changes because everyone else, I believe,

19  has had an opportunity to see what we filed yesterday.  They

20  were commenting on it or had signed off on it before we even

21  filed it.

22         And candidly, the version that we filed, most of

23  the parties in the room today or on the phone today, have

24  also reviewed and signed off on.  So just to walk you

25  through the incremental changes.

1           The first is in the Debtor's stipulations to the
2   (f), Romanette xii, I have on page 18 of the -- well, I'm on
3   a different redline, so it's --
4           THE COURT:  Oh, I thought you were on the
5   incremental redline.
6           MR. MORGAN:  I'm on the incremental.  Oh, no,
7   that's perfect.
8           THE COURT:  Sorry?
9           MR. MORGAN:  I'm on the incremental.  Sorry.
10           THE COURT:  I think I'm on the incremental, so
11   we'll see.  Here's page 18, right here.
12           MR. MORGAN:  That's right, Your Honor.  So this is
13   -- this is a change adding a defined term, Senior Secured
14   Notes Indentures.  The purpose here is that there's going to
15   be a few changes later on where the intent is to try --
16   these are comments that we received from counsel to
17   Indenture Trustees and Agents, and we're trying to make sure
18   that their fees and expenses are captured in the fee and
19   expense provisions.  And also that they have -- participate
20   in the mechanics of getting the interest paid.
21           So the next change I go to is shortly thereafter,
22   which is (f)(xiv).  This was a comment that we received from
23   the pre-petition PPSA buyer.  And the issue here was there
24   had been language that was added.  This is coming back out.
25           There was language that was added saying that all

1   of the obligations have been fully satisfied.  While counsel

2   didn't disagree with that statement necessarily, they didn't

3   believe there was sufficient evidence in the record to

4   create a finding.  So they asked that we strike that, and we

5   agreed.  We obviously take the position that they have been

6   fully satisfied.

7           Next is (f)(xxxii).  This was just a clean-up

8   comment, just a change in the defined term.  Same with, I

9   believe, is (j) -- or (g).  Actually the next change on page

10  43 of the incremental --

11          THE COURT:  So here's (f) -- sorry.

12          MR. MORGAN:  Sorry.

13          THE COURT:  It's (f)(xxxii), not --

14          MR. MORGAN:  Sorry, Your Honor.  I'm moving too

15  fast.  It's (f)(xxxii), little Romanette 32 on page 34 of

16  the incremental.

17          THE COURT:  Okay.

18          MR. MORGAN:  And that's just -- that's just a

19  conforming change on defined terms.

20          THE COURT:  All right.

21          MR. MORGAN:  And we have a similar change in what

22  I will confirm, but believe that's (g) -- (k).  Paragraph

23  (k) on page 43 of the incremental redline.

24          THE COURT: All right.

25          MR. MORGAN:  Next, I go to page 49, which is

1   paragraph 5.  These are changes that were worked out between

2   the DIP lender -- I'm sorry, between the DIP agent and the

3   UCC relating to the interplay between the roll-up, roll-

4   through, however you want to characterize it, of the

5   continuing LC facility and the UCC's ability to challenge

6   liens that would otherwise secure the LCs.

7            THE COURT:  All right.

8            MR. MORGAN:  We then jump to a cleanup change in

9   paragraph 9, page 62.  This is -- the exhibits changed in

10   the interim order.  We had both the cash flow forecast as

11   Exhibit A and the relative priorities as Exhibit B.  We

12   don't have a cash flow forecast for the final order, so they

13   changed the letter.

14            A material cleanup change on paragraph 12.  Same

15   on page 74.  We had just other errata and cleanup, Your

16   Honor --

17            THE COURT:  Right.

18            MR. MORGAN:  -- in 77, 80, and then in 86 we get

19   to something that is beginning to stray into the area of

20   substance.  This is just -- this is just intended -- and,

21   again, I comment from the Indenture Trustees and Agents,

22   just intended to make it clear that the adjustment of the

23   challenge date will be at the instruction of the note

24   holders, and they're not going to be deciding things without

25   instruction.

1          Then we come to this, and this is a change in the

2    language that we were just discussing.  We're going to have

3    to go and come up with something further to reflect the

4    agreement that was just reached as it relates to the entire

5    entirety of 25.

6          Page 101 -- is that an appropriate time to read,

7    or --

8          MR. FLECK:  No, I was just -- Your Honor, I was

9    just going to suggest that it's probably pretty easy to make

10   the change if we would just be interested in efficiency, if

11   we --

12         MR. MORGAN:  You want to do it?

13         THE COURT:  So I can't do it on the redlining off

14   the real one.

15         MR. FLECK:  Okay.  All right.

16         THE COURT:  So why don't you just remind and we'll

17   come back we'll --

18         MR. FLECK:  Okay.

19         THE COURT:  -- I'll type it in.

20         MR. FLECK:  Okay.

21         THE COURT:  But if I do it on the redline of a

22   .pdf, I don't think I could ever get it back in there, so --

23         MR. FLECK:  Okay.

24         MR. MORGAN:  We're almost done, Your Honor.

25   I appreciate your patience as we tick through all this.

1   Paragraph 36, Modification of DIP Documents.  This was a

2   comment from the -- from the Committee.  Page 101.  They

3   wanted it to be clear that the modifications couldn't happen

4   -- couldn't become effective notwithstanding providing

5   notice, or not without having provided notice, I should say.

6          THE COURT:  Right, right.

7          MR. MORGAN:  41, this is the payment of pre-

8   petition first liens, secured party's fees and expenses.

9   This is a -- I sort of previewed this for you before, Your

10  Honor.  These changes are all related to trying to make sure

11  that the Indenture Trustees and Agents are able to get their

12  fees covered in the same manner as the other secured

13  parties.

14          I have a note here from Mr. Carlson that there's

15  additional language to add.  And maybe we do that -- maybe

16  we do that when we go back to the clean version and add

17  something.  And I have another note, same effect, in 42.  So

18  there's some language, again Indenture Trustee language for

19  both, but in 41 and 42.  And that is it.

20          THE COURT:  All right.  Do we have any objections

21  to these changes?

22      (No audible response.)

23          THE COURT:  Okay.  Okay, so I now have what I have

24  I believe to be the clean version of the document that I can

25  edit in pdf, if you will tell me what edits you all have

1    agreed to, and I'll do the secretarial work.

2         MR. MORGAN:  So the relevant paragraphs are going

3    to be 25, 41 and 42.

4         THE COURT:  Okay, let's go to 25.  25 is a long

5    paragraph.

6         MR. MORGAN:  It's a long order, Your Honor.

7         THE COURT:  Okay.  Effect of stipulations on third

8    parties.

9         MR. MORGAN:  Correct.  If you look on 80, down

10   about a third of the way down the page, August 8th, that's

11   where we -- that's where we agreed to a later date.  Where

12   did we land?  August --

13        MR. FLECK:  August 22nd.

14        MR. MORGAN:  -- 22nd.

15        THE COURT:  Okay.  And what does this state?

16        MR. MORGAN:  So this is -- there's successive

17   provisions identifying that various parties will have the

18   same challenge date as the UCC has for challenges more

19   broadly.

20        THE COURT:  So are these also moved, though, to

21   the 22nd?

22        MR. MORGAN:  I believe they should, unless there's

23   someone from my side or anyone else stands up and disagrees.

24        THE COURT:  And what is 60 days from today?  Oh,

25   60 days from the interim order is when --

1          MR. MORGAN:  Right.  With respect to all other

2    parties.

3          THE COURT:  But when is that?

4          MR. MORGAN:  The interim order was entered --

5    that's a great question.  Guys?  Do you know?

6          MR. FLECK:  Yes.  May 10th was the interim order.

7          MR. MORGAN:  May 10th.

8          THE COURT:  May 10th.

9          MR. FLECK:  I'm sorry, May 11th.

10          MR. MORGAN:  Yeah, May 11th.  So it'd be 60 days

11    from May 11.

12          THE COURT:  So is this date July 11?

13          MR. MORGAN:  I think it would be July 10th.

14          THE COURT:  That's a Sunday.

15          MR. MORGAN:  So it would be July 11th.

16          THE COURT:  Okay.  What do you have next?

17          MR. MORGAN:  And then I think we need to clean up

18    -- let me go back.  Later in that paragraph is where we need

19    to clean up the 30-day challenge, just to make sure that

20    it's agreed by all parties.

21          And I have that -- it's a very long paragraph.

22    There it is.  It's on page 81.

23          THE COURT:  Okay.

24          MR. MORGAN:  Towards the top:  Filing of a motion

25    by the Committee seeking standing with respect to a

1    challenge, attaching a draft of the Complaint setting forth

2    such challenge, shall toll the Committee's challenge period

3    in respect of such challenge until the date, the earlier of

4    30 days following the filing of such standing motion, for

5    three business days after entry of a final order of the

6    Court ruling on such standing motion with respect to such

7    challenge, or such later date as agreed between the

8    Committee, Agent and Debtors, and the Agent agree to the

9    effect that there is a debt.  Is that --

10            MR. FLECK:  Yeah.  Your Honor, I think we would

11   propose to delete Romanette (a) and leave it three business

12   days after entry of a final order, which Your Honor said

13   will be 30 days.

14            THE COURT:  So tell me what this language ought to

15   stay?

16            MR. FLECK:  Well, my -- our proposal would be to

17   delete the clause at (a), the "30 days following" and

18   instead leave to re-letter it so that it's "three business

19   days following entry of a final order."  Your Honor has said

20   that the final order will -- you'll enter and you're going

21   to rule promptly.

22            MR. MORGAN:  See, it's interesting, Mr. Fleck.  I

23   heard it differently, that we would leave (a) and you can

24   take comfort in the fact that we're not going to stray into

25   (b) --

1          THE COURT:  Just a minute.

2          MR. MORGAN:  -- because he'll rule within 30 days.

3          THE COURT:  Just a minute.

4          MR. MORGAN:  But fortunately --

5          MR. FLECK:  The Court has --

6          MR. MORGAN:  Fortunately, we have the judge to --

7          THE COURT:  (Typing into document.)  Is that your

8  deal?  I'm not trying to change you deal; I'm just trying to

9  write it down.

10          MR. FLECK:  I believe it is, Your Honor.

11          THE COURT:  Do you agree, Mr. Morgan?

12          MR. MORGAN:  I do, Your Honor.  That looks right

13  to me.

14          MR. FLECK:  Your Honor, "order" should be lower

15  case, I believe.  I don't think there's a defined term for

16  an order on a standing motion.

17          THE COURT:  (Typing into document.)  At some

18  point, you're going to challenge my editing ability in .pdf,

19  but so far I'm with you.

20          All right, what do you have next?

21          MR. MORGAN:  I think with that, Your Honor knows

22  the incremental changes from today, we have the resolution

23  of the challenge and standing issues.  So unless Your Honor

24  has questions with respect to the form that we filed

25  yesterday, I would ask that you enter the order, Your Honor.

1          THE COURT:  Are there any references in here,

2     though, to when the confirmation hearing will be?

3          MR. MORGAN:  There are not.

4          THE COURT:  All right.  Are there any parties that

5     have any objections to the form of order with the edits that

6     is on the screen?

7          MR. FLECK:  Your Honor, for the record, once again

8     it's Evan Fleck on behalf of the Official Committee.  I

9     don't have any objection to the order, but I do have

10    language that's been agreed as between us and the DIP agent,

11    that I'd propose to read into the record.  It's not for the

12    order, but it does resolve the Committee's objection as it

13    pertains to treatment of the avoidance action proceeds.

14         THE COURT:  Okay.

15         MR. FLECK:  Okay.  And --

16         THE COURT:  And this is not inconsistent with the

17    order?

18         MR. FLECK:  It's not inconsistent with the order,

19    no.

20         THE COURT:  Okay.

21         MR. FLECK:  It doesn't -- yeah.  Okay, so the

22    agreement is that the DIP lenders and the pre-petition

23    secured creditors have agreed that prior to seeking to

24    recovery from either avoidance action proceeds, including

25    avoidance action proceeds arising from the PPL adversary

1   proceeding or commercial tort claims, the DIP lenders and

2   pre-petition secured creditors must use reasonable best

3   efforts to first satisfy their claims and liens from all

4   other DIP collateral.

5           In addition, if the DIP lenders or pre-petition

6   secured creditors ultimately enforce their rights against

7   the DIP collateral, the DIP lenders and pre-petition secured

8   creditors may not seek to recover from the specified

9   proceeds unless six months has elapsed from the commencement

10  of enforcement or there has been a determination by this

11  Court that such party has in fact exhausted reasonable best

12  efforts to recover from the other DIP collateral.

13          THE COURT:  Mr. Schiff, is that your deal?

14          MR. SCHIFF:  Yes.  Your Honor, that is

15  substantially the deal.  I do want to make one

16  clarification, and it might help.  This is -- the

17  relevant provision is paragraph 15 of the order.  I'm

18  not sure, Mr. Morgan, if you know the page reference.

19          THE COURT:  I can find it.  There it is.

20          MR. SCHIFF:  Yes, thank you.  So I just want to be

21  clear as to what -- this all relates to, as Mr. Fleck said,

22  resolution of the Committee's objection with respect to, you

23  know, requested exclusions from collateral.

24          THE COURT:  Right.

25          MR. SCHIFF:  So what was agreed, as Mr. Fleck

1    said, was that there are certain specified assets from which

2    the DIP secured parties and the pre-petition secured parties

3    with respect to their adequate protection liens, for which

4    they would use reasonable best efforts to seek repayment

5    from other sources before looking to those sources.

6              I do just want to clarify from what Mr. Fleck has

7    described as the -- as that sort of basket of protected

8    assets.  It is avoidance proceeds so, you know, there are no

9    liens on the avoidance actions themselves.  The liens on the

10   avoidance proceeds will be subject to this concept.

11             With respect to commercial tort claims, the

12   commercial tort claims from which the -- for which the

13   secured parties will look to other collateral first, would

14   be commercial tort claims with the exclusion of any

15   commercial tort claims that may be asserted on the same

16   facts that -- or facts relating to, you know, the facts

17   alleged in the PPL adversary proceeding.  So that's the one

18   clarification I wanted to make with respect to what Mr.

19   Fleck said.

20             I think there was one other point, Your Honor,

21   which is just, I think it has sort of agreed and understood

22   among the parties that this resolution is also subject to it

23   being the case that -- or I should say that the assets in

24   question shall not be used or depleted for any other

25   purpose.

1          So, in other words, if we're agreeing to a

2   standstill with respect to those assets, it needs to be the

3   case.  And this was part of the agreement and, as I

4   understand it, the Debtors are supportive of this, that

5   those assets will be essentially in a lockbox and not used,

6   with the sole exception of the carve out because the carve

7   out, under this order, supersedes all.

8          THE COURT:  I think that I will do a great

9   disservice to you all if I don't put this in the order.  I

10  think it does modify the order.  And if that's your deal, I

11  would rather slow down for a few minutes, put a little

12  asterisk at the end of 15, and type this into the order,

13  where all you have to do is email this to me, and I'm going

14  to cut and paste it to where it's all down in writing.

15         And especially, for example, with the add-on to

16  the add-on.  I mean, I hope this deal never falls apart, but

17  if it falls apart, you'll want this in writing.  And I would

18  rather -- I'm not asking to wait until Monday to get an

19  order done.  I would rather put everybody through the pain

20  of getting this done right now.  Is that okay with you all?

21  Does it do any injury to the order to put it in the order?

22         MR. SCHIFF:  I don't think so, Your Honor.

23         THE COURT:  Does it cause the Committee any

24  heartburn?  Or the Debtor?

25         MR. MORGAN:  Not for the Debtor, Your Honor.

1          MR. FLECK:  Your Honor, we can --

2          THE COURT:  So let me just do this.  I'm going to

3   put (typing in document.)  And then I'm going to go down to

4   the bottom of the order and I'm going to stick right in here

5   a text box, and cut and paste what you told me.  And then

6   we're going to have to figure how to add the language that

7   you have said, assuming that you agree that's the deal.

8          MR. MORGAN:  I do.

9          MR. FLECK:  I think we do, yeah.

10         THE COURT:  That there won't be any

11  dissipation of the assets.  So can you email that to

12  Marvin_Isgur@txs.uscourts.gov?

13         MR. SCHIFF:  Your Honor, you're requesting that we

14  email you the agreed language?

15         THE COURT:  Can you do that?

16         MR. SCHIFF:  Yes, Your Honor.  I think we probably

17  just need to a moment to settle it, but --

18         THE COURT:  Sure.

19         MR. SCHIFF:  And apologies, Your Honor.  I was

20  trying to take down the email address.

21         THE COURT:  Yeah it's Marvin_Isgur, I-s-g-u-r,

22  @txs.uscourts.gov.

23         MR. SCHIFF:  Thank you, Your Honor.  We'll provide

24  the language in a moment.  Should I step out and do that,

25  Your Honor, or --

1        THE COURT:  Okay.  It should work right now.

2        MR. MORGAN:  And, Your Honor, Mr. Carlson reminded

3  me that I foreshadowed two comments and failed to actually

4  hand them up to you.  So we can do that in the meantime.

5        THE COURT:  Let me figure out what I need to do

6  with my new pdf tools that I don't really know how to use.

7  Well, it looks like it's just going to work.

8        So why don't you tell me what we need to change.

9        MR. MORGAN:  Up to 41 and 42.

10        THE COURT:  All right.

11        MR. MORGAN:  41, at the end of the sentence, and

12  it may be better to find the beginning of the next, "in

13  connection with any amount paid."  About a page-and-a-half

14  in.

15        THE COURT:  Do you see it?

16        MR. MORGAN:  Up above where -- yeah, there we go,

17  where that Romanette (ii) is.

18        THE COURT:  Okay.

19        MR. MORGAN:  Yeah, at the end of that sentence.

20        THE COURT:  "in connection with any amount paid."

21        MR. MORGAN:  So right there.  So where it says

22  pre-petition agent's fee letter, the words to add -- and

23  this is a change from, again, counsel to the Indenture

24  Trustees and agents.

25        THE COURT:  Hold on just a minute --

1              MR. MORGAN:  Or --

2              THE COURT:  Wait just a minute.

3              MR. MORGAN:  So it's "pre-petition agent's fee

4    letter" --

5              THE COURT:  Okay

6              MR. MORGAN:  "Or in accordance with the applicable

7    capital S, Senior, capital S, Secured, capital N, Notes,

8    little i, indenture."  To make sure we use that term we

9    created.  And then in paragraph 42 --

10             THE COURT:  Let's be sure that -- would you look

11   at the end of your page and be sure I didn't run over the

12   page.  I don't think I did.  I just need to take out that

13   98.  Hold on.

14             MR. MORGAN:  You didn't.  Just looking at the

15   clean, the last words on the page are "for the," which it

16   looks like they still are.

17             THE COURT:  Okay.  Good.  Then 42.

18             MR. MORGAN:  And then in 42, at the end, it should

19   be page 102.  Where it says, "discretionary interest

20   payments."

21             THE COURT:  All right.

22             MR. MORGAN:  In both places, it should say -- also

23   say, "or mandatory interest payment, and in parens (s)."

24             And in both of those instances, Your Honor, the

25   "s", I guess, is supposed to be in paren.

1          THE COURT:  I'm sorry?

2          MR. MORGAN:  The "s" is supposed to be in paren

3   for "mandatory interest payment" because there not be more

4   than one.

5          THE COURT:  All right.  And would you look at the

6   end of the page and be sure I haven't messed up the

7   pagination.

8          MR. MORGAN:  Yup.  I end with (indiscernible) so

9   it looks like we're good.

10         And then the one other thing I would say is that

11  in addition to the parties that are here and that are on the

12  phone, there are various hedging counterparties who have

13  different forms of consent rights with respect to the order.

14         The one thing I would ask, Your Honor, is that we

15  sort of recognize that and give them an opportunity to be

16  heard and overrule if they have any -- I just don't want to

17  have an order that --

18         THE COURT:  I'm not signing this order until

19  everyone that is in court and on the phone has a full

20  opportunity to object.

21         So I don't have the insert.

22         MR. SCHIFF:  Your Honor, we're just trying to give

23  the parties a moment to look at it, but I should send it to

24  Your Honor, and we can all look on the screen at this.

25         THE COURT:  I'm not trying to rush you.  I thought

1   it might have been sent, and maybe to the wrong address, but

2   I'll wait until you're ready to send it.

3          By the way, anyone that does not want to stick

4   around and wants to go start their long weekend, for those

5   of you that are going to celebrate the long weekend, you're

6   free to leave when you want.  But I'm going to get this

7   order done and entered before I leave.

8          MR. MORGAN:  And, Your Honor, I understand I have

9   a draft of the retail order in my inbox, so I'll take a look

10  at that as soon as I have an opportunity, and send that to

11  chambers.

12         THE COURT:  and, Mr. Schiff, I'm not trying to

13  rush people.  I thought you all would want this entered

14  today.  But if people need, you know, a few hours to review

15  it, I can enter the order next week.  But I thought people

16  wanted to get it done right now.

17         MR. SCHIFF:  No, Your Honor.  Thank you.  We very

18  much do want the order entered today.

19         THE COURT:  So --

20         MR. SCHIFF:  I sent it to Your Honor's --

21         THE COURT:  You have now sent me the -- well, so I

22  got it.  Let me have a minute.

23         MR. SCHIFF:  Thank you, Your Honor.

24         THE COURT:  This is much shorter than was read to

25  me though, right?

1          MR. MORGAN:  I just read slowly, Your Honor.

2          THE COURT:  This is not that long.  I mean, it's

3  -- I'll put it up.

4          MR. SCHIFF:  Yeah, if you could, that'd be great.

5          MR. MORGAN:  And, Your Honor, this -- I will say

6  that this includes a new capitalized term, Specified DIP

7  Collateral, which would need to be defined within paragraph

8  15, but that should be it.  A small edit; that's how we make

9  it short.

10         THE COURT:  So can I define it right here?

11 Because otherwise --

12         MR. MORGAN:  Well, the thought is because -- Your

13 Honor, because there are these carve outs of avoidance

14 proceeds and the specified commercial tort claims that are

15 described with a case caption in paragraph 15, that if it's

16 possible to make the edit in paragraph 15, to just create a

17 new capitalized term?

18         MR. SCHIFF:  Before we jump --

19         MR. MORGAN:  Sure.

20         MR. SCHIFF:  We need to carve out for the DIP

21 there.

22         MR. MORGAN:  Oh, yeah.

23         MR. SCHIFF:  I'm sorry.  The carve out for the

24 carve out.

25         MR. MORGAN:  Yes, thank you.  You're correct and

1   we can go back to it.

2           MR. SCHIFF:  Yup.

3           THE COURT:  All right, I'm in 15.

4           MR. MORGAN:  Yes.  So, Your Honor, after "or any

5   proceeds derived therefrom," it was right where your cursor

6   was a moment ago.  It's about four lines up.  Yes, right

7   after "therefrom," if we can create a parenthetical and a

8   new capitalized bolded term, I think it would be inside of

9   the comma, "the Specified DIP Collateral."

10          THE COURT:  Hold on.  (Typing in document.)  Is

11  that what you've asked me to do?  Other than I need to close

12  my --

13          MR. MORGAN:  Yes, Your Honor.  I think there's a

14  close quote.  But that is the request.  Thank you, Your

15  Honor.

16          THE COURT:  Is that everybody's deal?

17          MR. MORGAN:  I've gotten two corrections, Your

18  Honor, just standing here.  So one is -- and they're both --

19  they both relate to the insert, not to --

20          THE COURT:  Not to here.

21          MR. MORGAN:  Not to this paragraph but to the

22  insert.

23          THE COURT:  Before I leave 15, is there anybody

24  that has any change to 15 that you know of?  Mr. Muhammed,

25  you were standing up.  Are you okay?

1          MR. MUHAMMED:  I'm fine, Your Honor.

2          THE COURT:  Thank you.  Okay, so I'll go back to

3   the insert.  Okay?

4          MR. MORGAN:  Thank you.  The first correction,

5   Your Honor, it says "determination by the Court."  I believe

6   it's supposed to say "determination by the Court."

7          And the second is the sentence at the end that

8   begins with the specified DIP collateral should, instead,

9   begin with "subject to the capital C Carve Out."

10          MR. SCHIFF:  I think it's capital C, capital O.

11   Is it hyphenated or not hyphenated?

12          MR. MORGAN:  Not hyphenated with a Carve Out, the

13   Specified DIP collateral.

14          Your Honor, those are the two comments that I've

15   received, but other parties are looking at it.  Mr. Fleck's

16   giving me the thumbs up.

17          THE COURT:  All right.  At this point, let me ask

18   if anyone objects to anything about the DIP order or wishes

19   to have additional evidence beyond what has been introduced

20   in support of the final DIP order.

21          Any party at all, you can speak up.  If you can't

22   be heard, please press five-star one time on your phone.

23       (No response.)

24          THE COURT:  I'm hearing no other objections.  Are

25   there any objections in the court?

1        (No response.)

2            THE COURT:  Okay.  I thought I just told it not to

3   show it again, but we'll see.

4            All right, I've signed the order, for the record,

5   and I'm now sending it to Mr. Laws to docket, and it'll be

6   docketed before he goes to sleep tonight.  I can't tell you

7   what that'll be.  But I assume so long as it's on the docket

8   tonight, you're okay, right?  I'm guessing it'll happen like

9   4:45, but --

10           MR. MORGAN:  Thank you, Your Honor.

11           THE COURT:  Mr. Laws, I'm going to send it to the

12  work group.  And it's gone there, okay?  Mr. Morgan?

13           MR. MORGAN:  Your Honor, that concludes our agenda

14  for today.

15           THE COURT:  Does anyone else have any issue that

16  we need to resolve in Talen before we leave for the day.

17  Mr. Fleck?

18           MR. FLECK:  Thank you, Your Honor.  It's not an

19  issue per se, but I did want to raise it because I think

20  it's timely.  As it pertains -- it's really a Committee-

21  specific issue.

22           The Committee had directed us to file an 1102

23  motion, information-sharing protocol, as we've done in a

24  number of cases before Your Honor.  I understand in colloquy

25  with Mr. Warner, that this -- perhaps Your Honor's views

1   with respect to those orders have evolved.

2            THE COURT:  I actually don't know that I've ever

3   done one in the form that it was submitted.  I'm not sure

4   they've evolved -- maybe the knowledge of my concerns has

5   evolved.

6            MR. FLECK:  Okay.  Understood.  we would -- the

7   committee -- and I believe it's appropriate.  The Committee

8   would like to have at least an understanding as to how to

9   protect itself, particularly with respect to confidential

10  information it receives from the Debtors, us, that it's

11  complying with its statutory obligations and also,

12  importantly, not violating its confidentiality agreement

13  with the Debtors.

14           THE COURT:  Let me just --

15           MR. FLECK:  You know where I'm going, so I'll just

16  stop.

17           THE COURT:  Let me just tell you where I am on

18  these things.  And I don't want to says that I am there

19  in a way that I couldn't be persuaded that I'm wrong.  In

20  general, I think people really, really, really over read

21  1102 as perhaps imposing on them duties that don't exist.

22           I think there are strong 1102 duties that do

23  exist, to be sure that your Committee is giving information

24  that people need to have out to your constituents.

25           What concerns me about what I usually get in an

1  1102 motion -- and I don't know what yours would look like

2  -- is that it tries to define that responsibility between

3  the Committee and its constituents and it never gets served

4  on the constituents.

5          And I don't think I can issue an order that says,

6  as to your constituents you don't need to do "x" unless the

7  constituents have the ability to object to that

8  interpretation of 1102.

9          So I'm not always sure you need it.  But if you

10  need it, I don't know how I do it without notice.  I've had

11  one instance that I can recall -- couldn't tell you which

12  case -- where somebody said, "Okay, it's worth it, we're

13  going to give notice to all the constituents," and at that

14  point it became a whole lot easier.

15          But what I don't understand and what I've tried

16  to express reluctance about doing is how I define the

17  relationship of the Committee to its constituents notice of

18  what's going on and an opportunity to object to it.

19          I don't know how big your constituents are in this

20  case.  I don't know if you have a hundred, at which point

21  the notice is no problem, or 10,000.  I just haven't

22  -- you're hitting me pretty cold so I haven't -- I don't

23  know what I'm talking in terms of number here.

24          MR. FLECK:  Understood.  Well, that -- I think

25  that that's the guidance I was looking for.  I think it's

1   helpful as we craft the motion, if we do a motion.

2           THE COURT:  But I also think the Committees that

3   act in good faith under 1102 don't have the kind of

4   liability that they fear that they have, and may make some

5   of this a bit overprotective.  Not overprotective badly;

6   just overprotective unnecessarily, that their inherent

7   protections that are built into Committees that -- I don't

8   believe I'm wrong about this though.

9           So in 18 years, I have never charged any Committee

10  member for anything, I think.  Because it's really hard for

11  me to think I should.  I want people to be willing to serve

12  on Committees.  I think they ought to be doing their duty.

13  And I think when they're making good faith efforts to do

14  their duty, we should respect that.

15          And I think Committee members are fiduciaries of a

16  different nature than perhaps a lawyer or an accountants.

17  They still have -- they have fiduciary duties in the sense

18  that I think we all think of them in common law.  But you

19  have a pretty exhaustive duty to investigate what the law is

20  on a -- on something.

21          I'm not sure that the Committee vote is quite the

22  exhaustive research that you have the duty to do as counsel.

23  When they take your advice and listen to you about what

24  their responsibilities are, they don't need to go check to

25  be sure you're right, for example, and they shouldn't be

1  held liable if they listen to your advice.  They don't need

2  to take your advice on what's the best economic deal, right?

3  But as long as they're doing the best they can, I think

4  they're okay.

5        I leave it up to you as to whether you have the

6  necessity, but I'm trying to also tell your Committee

7  members there's nobody sitting here trigger happy looking to

8  shoot a Committee member, and it's the opposite.  But that

9  doesn't mean they're protected, and I got it.  But I don't

10  think it's actually effective for me to define it without

11  notice anyway.  I think there'd just be a due process

12  violation.

13        So I don't know that I'd give them much protection

14  if I issue an order without giving the other side a chance

15  to deal with it.  Anyway, that's the worry.  And I'm happy

16  to talk about it as much as you want.

17        MR. FLECK:  Okay.  This is very helpful, Your

18  Honor.  I think -- yeah, and to your point about the other

19  side, it may be that it's more appropriate in a context of a

20  bilateral issue, should one arise.  A creditor who's looking

21  for information, they cant receive it, and they want to come

22  and seek -- sort of seek a determination from the Court on

23  that issue, or if the Committee has, at that point in time,

24  has a -- there's a bona fide dispute.  Maybe that's a more

25  appropriate use of --

1          THE COURT:  I will invite the Committee, any time

2    that it's having a dispute with one of its constituent

3    members, to seek an emergency hearing so the constituent

4    member can be heard too, and let them come here.

5          I mean, the other thing is if we issue an order --

6    if you enter into a confidentiality order with the Debtor,

7    I'll enforce that against you to honor your confidentiality

8    order.  And then if there's a problem where you think that

9    might run afoul of your 1102 duties because somebody makes a

10   request to get it, come in and seek it at that point,

11   because then I've got a particular person who says they want

12   it, I'll have you in a confidentiality arrangement, and I

13   won't be, you know, sort of rewriting this theoretical

14   construct.  So I --

15         MR. FLECK:  Okay.

16         THE COURT:  I don't want to discourage you, but

17   I'm trying to tell you my worries and let you deal with it.

18   And if you think I'm wrong, I don't know how many times

19   you've gotten me to change my mind over the years, Mr.

20   Fleck, more than once.  So, you know, come on back and tell

21   me what I'm -- how I'm thinking wrong about it.

22         MR. FLECK:  That's very helpful.  Thank you, Your

23   Honor, and I'm sure my friends who are here in court or on

24   the phone would be -- would appreciate it if I not raise any

25   more questions with you at this point on a Friday afternoon.

1        THE COURT:  No, go ahead.  Go ahead.

2        MR. FLECK:  No, that's all I have for now.

3   I appreciate it.

4        THE COURT:  I've told them they can all leave, and

5   it can just be you and me in the courtroom, and we'll talk

6   through things if they all decide to leave, Mr. Fleck.

7        MR. FLECK:  Thank you very much, Your Honor.

8        THE COURT:  Anybody else have anything else you

9   want to raise?

10       (No response.)

11       THE COURT:  All right.  You all have a good

12   weekend.  Thank you for all the hard work that went into

13   today's hearing.

14       MR. MORGAN:  Thank you, Your Honor.

15       THE COURT:  Thank you.

16       (Proceedings adjourned at 4:35 p.m.)

17                    *  *  *  *  *

18        *I certify that the foregoing is a correct*

19   *transcript to the best of my ability due to the condition of*

20   *the electronic sound recording of the ZOOM/video/telephonic*

21   *proceedings in the above-entitled matter.*

22   */S/ MARY D. HENRY*

23   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*
     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
24   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
     *JTT TRANSCRIPT #65950*
25   *DATE FILED:  JUNE 23, 2022*