IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE:                          § CASE NO. 22-90054-11
                                § HOUSTON, TEXAS
TALEN ENERGY SUPPLY, LLC,        § MONDAY,
ET AL,                          § AUGUST 8, 2022
             DEBTORS.           § 3:27 P.M. TO 4:23 P.M.


<u>MOTION HEARING (VIA ZOOM)</u>


BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE




APPEARANCES:                        SEE NEXT PAGE


**(Recorded via CourtSpeak; No Log Notes)**




<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM)</u>:

```
FOR THE DEBTOR:              WEIL GOTSHAL & MANGES, LLP
                            Cliff Carlson, Esq.
                            Matt Barr, Esq,
                            Paul Genender, Esq,
                            Dave Morgan, Esq.
                            Alex Welch, Esq.
                            700 Louisiana, Ste. 1700
                            Houston, TX  77002
                            713-546-5000


FOR THE AD HOC GROUP OF
FIRST LIEN CREDITORS:       AKIN GUMP STRAUSS HAUER
                            & FELD, LLP
                            Mary L. Brimmage, Esq.
                            2300 N. Field Street
                            Suite 1800
                            Dallas, TX  75201
                            214-969-2885


FOR THE AD HOC TERM LOAN
AND SECURED NOTES GROUP:    KING & SPALDING, LLP
                            Mark Maloney, Esq.
                            353 N. Clark St., 12th Floor
                            Chicago, IL  60654
                            312-764-6921


FOR THE AD HOC GROUP OF
UNSECURED NOTEHOLDERS:      KIRKLAND & ELLIS, LLC
                            Steven N. Serajeddini, Esq.
                            601 Lexington Avenue
                            New York, NY  10022
                            212-446-4800


FOR TALEN ENERGY CORPORATION:  VINSON & ELKINS, LLP
                            Matt W. Moran, Esq.
                            2001 Ross Ave., Ste. 3700
                            Dallas, TX  75201
                            214-220-7723


FOR THE OFFICIAL COMMITTEE  MILBANK, LLP
OF UNSECURED CREDITORS:     Evan R. Fleck, Esq.
                            55 Hudson Yards
                            New York, NY  10001-2163
                            212-530-5567


(Please also see Electronic Appearances.)
```

1         **HOUSTON, TEXAS; MONDAY, AUGUST 8, 2022; 3:27 P.M.**

2         THE COURT:  All right.  Good afternoon.  We're here

3 in the Talen Energy case, the Case Number is 22-90054.

4         Electronic appearances have been made.  If you wish

5 to speak at today's hearing, I would ask that press five-star

6 one time on your phone, if you haven't already.

7         Why don't we go ahead and take appearances in court?

8 And then we'll take any appearances on the phone.  If you'd

9 come forward to the microphone and go ahead, please,

10 Mr. Carlson.

11         MR. CARLSON:  Good afternoon, Your Honor.  Cliff

12 Carlson of Weil Gotshal on behalf of the Debtors.  And I

13 think --

14         THE COURT:  Good afternoon --

15         MR. CARLSON:  -- joined with me --

16         THE COURT:  -- Mr. Carlson.

17         MR. CARLSON:  -- joined with me on the phone is Matt

18 Barr, Paul Genender, Dave Morgan, and Alex Welch.

19         THE COURT:  All right.  Thank you.

20         Mr. Brimmage, good afternoon.

21         MR. BRIMMAGE:  Good afternoon, Your Honor.  Marty

22 Brimmage with Akin, Gump, Strauss, Hauer & Feld, here on

23 behalf of the Ad Hoc Group of First Lien Creditors.  We have

24 filed a joinder in the -- in one of the motions that's being

25 heard this afternoon.

1          THE COURT:  All right.  Thank you.

2          From (404)572-4857?  (404)

3          MR. MALONEY:  Your Honor, good afternoon -- sorry.

4          THE COURT:  Good afternoon.  Go ahead.

5          MR. MALONEY:  Making an appearance on behalf of the

6    Movant Ad Hoc Term Loan, the secured note group, Mark Maloney

7    from King & Spalding.  You previously heard from my partner

8    Matt Warren.  I'm going to be handling the hearing this

9    afternoon.

10          THE COURT:  Mr. Maloney, thank you and welcome.

11          MR. MALONEY:  Thank you, Your Honor.

12          THE COURT:  Mr. Serajeddini.

13          MR. SERAJEDDINI:  Good afternoon, Your Honor.  For

14    the Record,  Steven N. Serajeddini on behalf of the Ad Hoc

15    Group of Unsecured Noteholders and the backstop

16    (indiscernible) glad to be before Your Honor today.

17          THE COURT:  Thank you.  Good to have you back.

18          Mr. Moran, good afternoon.

19          MR. MORAN:  Good afternoon, Your Honor.  Matt Moran

20    on behalf of Talen Energy Corporation.

21          THE COURT:  Thank you.

22          All right.  We have a lot of people listening.  If

23    anybody else wants to speak during the course of the hearing,

24    please press five star when you're ready to do so.

25          Let's go ahead.  I don't know -- the moving parties

1    have all moved for similar relief.  Decided who's going to go

2    first?  Oh, I do have somebody else --

3              MR. MALONEY:  Your Honor --

4              THE COURT:  -- who wants to speak.  Hold on.

5              MR. MALONEY:  Sorry.

6              THE COURT:  Let me find who this is.  Hold on.

7         (Pause in proceedings)

8              THE COURT:  Mr. Genender, good afternoon.

9              MR. GENENDER:  Good afternoon, Your Honor.  Thank

10   you very much.

11             THE COURT:  All right.  So who is going to take the

12   lead?

13             MR. MALONEY:  Your Honor, Mark Maloney on behalf of

14   the Movants.

15             THE COURT:  Thank you, Mr. Maloney.  Go ahead.

16             MR. MALONEY:  Thank you, Your Honor.  And first,

17   thank you and your staff so much for hearing us on such short

18   notice.  I know that this is an imposition.  It's very

19   important to my clients, of course.  But I do want to thank

20   you and your staff for hearing us so quickly and on an

21   emergency basis.

22             THE COURT:  It is not an imposition and glad to have

23   you.

24             MR. MALONEY:  Thank you, Your Honor.

25             Your Honor, we're here asking that the August 16th

1    hearing currently set for the backstop motion be moved to no

2    earlier than August 24th.  The hearing on August 16th, the

3    setting of the hearing was made without any consultation with

4    my client.  It's my understanding also without consultation

5    with any other parties that had previously sought discovery in

6    connection with the original backstop motion.  That having

7    been said, we're only asking for an additional eight days.

8         Now, based on the meet-and-confer held on Sunday --

9    as soon as we saw these papers on Friday, we asked for a meet-

10   and-confer and we were able to do that on Sunday.  And what

11   that disclosed is that there is going to need to be more

12   document production, including more document requests,

13   including two, I believe, from the Debtors themselves, which

14   have already been submitted to several parties, or at least to

15   a couple of parties.

16        From the Debtors' perspective, my understanding is

17   -- and I appreciate them doing this as quickly as they --

18   they're going to be finished with document production on

19   Wednesday.  But then, following that, Your Honor, as we've

20   digested all of this, to my understanding, there are currently

21   seven depositions contemplated.  And under the current

22   schedule, we would need to do that, you know, in essentially

23   three business days before the hearing, and five if you count

24   -- if you count the weekend.

25        I just -- and then, after that, Your Honor, from my

1    client's perspective, we want to digest everything that we

2    heard, both in the documents and the depositions, and

3    determine if we're going to object and we cleary have problems

4    and we have concerns, and we want to examine those and take

5    discovery of -- and if there's going to be objections -- and

6    there might well be objections from at least some folks, you

7    know, there's going to be a material evidentiary hearing with

8    a number of witnesses, I believe there's seven deponents.  And

9    I know there will be lots of exhibits.

10        And this is just going to require some effort to

11   prepare properly.  That is, assuming there are objections, and

12   we have to assume that there may be, but we have not made that

13   firm decision yet.  All we're asking for is another eight days

14   to get all this done in a sufficient and hopefully orderly

15   process.

16        And this is a material issue for my clients, Your

17   Honor.  And I say that because, you know, I have not heard a

18   specific business reason why this had to happen so quickly.

19   But the Kirkland -- or the Ad Hoc Unsecured Group, represented

20   by Kirkland & Ellis, they filed a response to the

21   (indiscernible) and I appreciate their response.  We panned

22   that response, it illustrates really what our issues are here.

23   They believe that this motion -- my motion is a delay tactic

24   or a strategic or what have you.  I can assure you it's not.

25        If I was interested in a strategic, lengthy passage

1    of time, I wouldn't be looking for eight days.  Our request is
2    measured with the work that we think needs to be done and this
3    due process is necessary so we can get this done in a proper
4    fashion (indiscernible) your clients, my client, wouldn't even
5    have an interest in this because you're going to get paid in
6    full anyway.  And let's discuss that, Your Honor.
7         I note that they say in their response, and I quote:
8         "The restructuring transaction supported by the backstop
9         motion will render allowed secured claims held by the Ad
10        Hoc Term Loan and Secured Notes Group and the Ad Hoc
11        Group of First Lien Lenders unimpaired and paid in full,
12        in cash."
13        And as you heard from my partner Mr. Warren, we
14   would love nothing more.
15        Here's the problem:  This process and these
16   agreements don't guarantee that in any way, shape, or form.
17   More importantly, there are scenarios in which (indiscernible)
18   happened that way and all we'll be left with is a sub two-
19   hundred-and-twenty-eight-million-dollar administrative claim
20   that could be paid out of pocket, out of the collection of
21   collateral that my clients have.  So this is a very, very
22   material issue.
23        I will tell you this, Your Honor.  If
24   (indiscernible) group were willing to give up, where you get
25   paid in full, I get my fee, if you don't get paid in full, I'm

1      happy not to take the fee.  We'll still have -- that's an

2      issue that I'm fairly certain that will be (indiscernible),

3      but that is not where we are.

4              They note further in their response -- and I think

5      this is also very instructive and telling -- that, when it

6      turns out, after they executed their original backstop

7      agreement, that it turned out that that agreement was no

8      longer sufficient, that the Debtor needed more money because

9      of an updated business plan, that they stepped up and

10     (indiscernible) that additional funding under these amended

11     agreements that are now the subject of the new backstop or the

12     backstop motion of -- that is now set for hearing on

13     August 16th.

14              I certainly am happy that they stepped up, but

15     here's the question.  They weren't contractually obligated to

16     step up.  And if the backstop agreement (glitch in the audio)

17     administrative claim is approved, they might be contractually

18     obligated to step up again if it turns out that the Debtors

19     need more money than the backstop agreement is committed to.

20     And we know, Your Honor, that that's not a hypothetical

21     concern because it's already happened.  It's not speculative,

22     it's already happened.

23              And so my clients' concern is:  What if it happens

24     again?  How likely is that?  Why did it happen the first time?

25     What went wrong and so on?  We want to understand all of those

1    issues, why they need the money, why did the business plan

2    change, why they now have a sale option -- which is very

3    interesting and probably a very positive development and we

4    want to understand it.  What is the prospects for all of these

5    things actually occurring and what are the risks it won't play

6    out the way everyone is hoping because we know the Debtors'

7    own projections have not panned out exactly as they originally

8    intended.  So, again, this isn't hypothetical.

9           Now -- so it matters to my client because, if the

10   Debtors do need more money, the ad hoc unsecured group is not

11   contractually committed to provide it.  And all that may

12   happen is my client may be left holding the bag, and that is a

13   bag with a $228 million administrative.

14          So I beg to differ with Kirkland's response that my

15   clients don't have a very meaningful interest in this issue,

16   which is not strategic.  We want enough time to understand it,

17   to digest it and decide whether we want to object; and, if so,

18   how best to prosecute that.  And I believe we need the minimal

19   additional time that we've asked for to make sure that that

20   gets done in an orderly fashion.

21          And so that's what it boils down to.  This is a very

22   modest request.  It's only designed to make sure that we can

23   get things done appropriately, consistent with due process.

24   It's not strategic, it's not a delay.  It's just asking for

25   enough time to get them right, consistent with due process.

1        And with that, Your Honor, I'll yield to the others

2   who are either joining or who filed their own motions.  And

3   I'm happy to respond to any questions.  But I do, once again,

4   appreciate the Court's time.

5        THE COURT:  Mr. Maloney, one of the things you

6   mentioned was that the admin claim would be paid out of your

7   clients' collateral.  Could you explain that a little more

8   fully?

9        MR. MALONEY:  Well, Your Honor, as I understand it,

10  that what happens, if the Plan as currently contemplated by

11  the Debtors is unable to go effective because the funding

12  doesn't prove enough -- appreciate what's going to have to

13  happen is going to be a combination of committed funds by the

14  plan support parties and (indiscernible) consideration of the

15  Debtors.  And if those numbers don't match up, then we won't

16  go effective.  And if we don't go effective, then that

17  triggers a termination and no obligation of the Kirkland

18  parties to fill that gap or to come up with more money.

19       And now there's an admin claim because the ultimate

20  result of these cases, which presumably would be a different

21  Plan where, you know, the secured creditors essentially take

22  the company back or some other structure.  But in order to

23  confirm that Plan, you've got to pay this admin claim.  And I

24  would be happy for some sort of arrangement or commitment that

25  that admin claim is paid out of whatever sources of funding

12

1      might available (indiscernible) collateral.  I'm told that

2      there may be some, but I can't be assured of that.  And

3      certainly unless --

4              THE COURT:  I guess I'm trying to understand, under

5      the law, how they would have the right to eat into your

6      collateral to pay an admin claim.  It seems like that would be

7      prohibited by the law.  That's why I'm questioning that

8      argument, it's because it means I don't understand the

9      argument because it seems to me you could simply say, no,

10     don't use my collateral to pay the admin claim, and that you

11     have to win that as a matter of law.  Therefore, I'm thinking

12     I don't understand then what's going on, and that's why I'm

13     following up on that part of your argument.

14             MR. MALONEY:  Your Honor, I believe it comes down to

15     a practical matter.  My clients -- at the end of where the

16     road we travel, if that road ends, this deal is better

17     (indiscernible), then the alternative is necessarily going to

18     be something that requires some measure of a confirmed Plan

19     that figures out a way to transfer value and transfer assets,

20     essentially a debt-for-equity swap with my clients being the

21     shareholders.  But we're not going to be able to confirm that

22     without taking care of admin claims, regardless of where the

23     funding has to come from.

24             Now we could decline, we could say, no, that's not

25     going to happen.

1          THE COURT:  Right.

2          MR. MALONEY:  Then that means --

3          THE COURT:  At which --

4          MR. MALONEY:  -- we all get --

5          THE COURT:  At which point the admin claims then

6    would get paid in full, and they got to compromise, right?  I

7    guess I'm -- I think what I'm hearing you say is it doesn't

8    really come out of your collateral, but you may decide later

9    it's in your strategic interest to have it come out of your

10   collateral.  And I got it that that's a problem you need to

11   worry about.  I wanted to be sure I understood the argument

12   right, and I think I do, if -- I'll let you tell me if I don't

13   understand it right.

14          MR. MALONEY:  Well, we'll be left to either rest on

15   rights that say, you know what, you guys go figure this out,

16   and then the company just, you know, languishes without an

17   exit.  My clients don't have an interest in that, either.

18          THE COURT:  And there's --

19          MR. MALONEY:  But I don't think we should be made

20   to --

21          THE COURT:  There's always an exit, sometimes it's

22   to a lower number.

23          MR. MALONEY:  Well, you're right, Your Honor.  I

24   guess, at the end of the day, what this does is it -- you

25   know, it constrains us, I think inappropriately and

1    unnecessarily.  If we get to a place where what everybody is

2    saying will happen, which we'll get paid in full, okay.

3                THE COURT:  All right.  Okay.  Thank you.

4                Who else wants to join in the argument?

5                Go ahead, Mr. Brimmage.

6                MR. BRIMMAGE:  Good afternoon, Your Honor.  Again,

7    Marty Brimmage of Akin, Gump, Strauss, Hauer & Feld, here on

8    behalf of the Ad Hoc Group of First Lien Creditors.

9                I think Mr. Maloney articulated, both in his motion

10   and in his arguments, the sum and substance of our argument.

11   I'm going to just highlight a couple of points, Your Honor.

12   And I'm really going to focus on what I'll call the procedural

13   aspects of the discovery aspects, the schedule and the timing

14   and not the merits.

15               So, to make sure the Court is clear, there were two

16   motions filed and we filed a joinder.  Mr. Moran of Vinson &

17   Elkins sent us a email at 3:32, so two minutes after the

18   hearing started, letting us know that he had agreed to the

19   18th, so he would not be arguing.  I'm unbelievably

20   disappointed in that for a variety of reasons, but let me go

21   through that.  But I wanted the Court to have that update

22   right up front.  So, instead of three of us arguing, there's

23   only two.

24               But let me -- be that as it may, let me go through

25   this real quick, if I could.  The bottom line, Your Honor, is

1    the time frame set for this to be heard on the 16th is simply

2    just not enough.  Adding two more days -- which, by the way,

3    we, frankly, did not consider -- is -- doesn't alleviate the

4    strict time limits of this and how much has to be done in a

5    short period of time.

6         And I know that this is a really important issue,

7    but I'm going to throw out there that there's an availability

8    issue for the 18th and 19th, as well, that I'll go into if the

9    Court wants to hear about it.  But we never went there on that

10   because the 18th really wasn't an issue.

11        What we really need is another week, which was put

12   in the papers by both parties, or all three parties,

13   certainly, at the time.  And the week is for good reason.

14   Given the amount of stuff -- and Your Honor, I know what

15   you're thinking.  These are big firms, sophisticated firms,

16   with lots of people, surely they can move mountains in a

17   matter of days.

18             THE COURT:  Actually, that's --

19             MR. BRIMMAGE:  And the answer is, normally --

20             THE COURT:  That's not what I'm thinking.  What I'm

21   thinking is, is, when you're asking me to move the hearing to,

22   I plan to be with my family.

23             MR. BRIMMAGE:  And keep that in mind, please,

24   because you being with your family is really important.  Some

25   of us our moving our freshmen into college dorms on the 18th,

1     and more than one of us.  And others of us have other kid

2     obligations on that date, as well.  And we didn't go into that

3     in the papers because it wasn't that big a deal.  So, ideally,

4     one week would be perfect.  But because of reasons that we

5     totally understand, that doesn't work.

6           But the date that does work absolutely perfectly,

7     and there's no business reason not for it to, is the 29th.

8     The Court already has time set aside for the Disclosure

9     Statement hearing.  Everybody knows the Disclosure Statement

10     hearing isn't going forward on the 29th.  Everybody has set

11     aside the 29th and are available and ready to roll on the

12     29th.

13           So, while it's not perfect, it's not ideal, it's

14     certainly way better than the 18th because it does give us

15     time to do two things because that's all the discovery that

16     needs to be done.

17           Also, Your Honor, I want to highlight we may have a

18     discovery fight that is brewing.  I won't preview it for you

19     right now, but it has to do with discovery that we sought that

20     we understand we're not going to get, and we'll deal with that

21     in due course.  But having it on the 29th affords time to deal

22     with all these issues in a timely way and get to the Court and

23     let us file objections in a timely way and have an organized

24     hearing.

25           So, while I recognize it's not perfect, Your Honor,

1    and I get that, under the circumstances, the 29th is already

2    available, the 29th affords the time that it takes to get this

3    done, and the 29th is what we would respectfully request the

4    Court urge or order the Debtors to move this to.

5        And Your Honor, if you have any questions, I'm happy

6    to answer them, but I didn't want to go over any of the stuff

7    that Mr. Moran already went over, or what's really the debate.

8        THE COURT:  Mr. Brimmage, thank you.

9        Mr. Moran.

10       MR. MORAN:  Thank you, Your Honor.  Matt Moran for

11   Talen Energy Corporation.

12       We did file a motion because there is a lot to do

13   and we thought August 16th was unworkable.  The Debtors

14   proposed this afternoon, August 18th.  There's still a lot to

15   do, maybe less than ideal.  But we had worked out an agreement

16   with the Debtors that we would get our track shoes on and get

17   it done if the hearing moved to August 18th, and we reached

18   that agreement right after we started, which is why we didn't

19   inform the Court earlier.

20       But to be clear, we did intend to object to this

21   backstop motion.  We have a lot to say about it.  We have a

22   lot to do in connection with the hearing.  But for purposes of

23   today, we're putting down our swords if the hearing was to

24   move to the 18th.

25       THE COURT:  Thank you.

1        Mr. Fleck?

2        (No verbal response),

3        THE COURT:  Mr. Fleck, I don't know if that's you or

4   someone else from your firm, but you were in the middle of my

5   screen, so I figured I would call on you to see what the

6   committee's position is.  And you can pass this off to

7   somebody else if you want to.

8        MR. FLECK:   That's okay, Your Honor.  It's an easy

9   one today for us.  For the Record, Evan Fleck of Milbank on

10   behalf of the Official Committee of Unsecured Creditors.

11        Your Honor, we did not join in the motion, that was

12   by design.  The Committee does not object to the scheduling of

13   the hearing for the 16th.  We'll be prepared to go forward

14   that day.

15        We have not yet reached a determination as to

16   whether, on the merits, we're in support of the backstop as

17   revised.  We have had constructive discussions with the ad hoc

18   group and the Debtors on those issues, and they are

19   continuing.  But as to today's motion, we do not join in it.

20   We don't have any objection to the hearing being set on the

21   16th.

22        THE COURT:  Thank you.

23        All right.  Who wants to respond from the Debtor or

24   from the lender?

25        MR. GENENDER:  Your Honor, Paul Genender of Weil,

1    Gotshal & Manges for the Debtor -- for the Debtors.  If I can

2    jump in, if that's okay with the Court?

3                    THE COURT:  Sure.

4                    MR. GENENDER:  Thank you.

5                    I thought it might make sense -- and Judge, if I can

6    ask that Jenae Ward (phonetic) be a presenter.  We didn't have

7    time to do a reply, a response, and I thought it might help

8    put a few things into focus and context for the Court a little

9    bit.  If Jenae Ward could be the presenter, that would be

10   great.

11                   THE COURT:  Hold on.

12                   MR. GENENDER:  Thank you.

13                   THE COURT:  So there's an awful lot of people there.

14   If Jenae Ward can turn on their camera, I will be able to find

15   you more easily.  I'm sure -- wait a minute.  Maybe I found

16   you.  Hold on.  I found Jenae Ward.  All right.

17                   MR. GENENDER:  Thank you, Your Honor.

18                   THE COURT:  All right.  Thank you.

19                   You are now the presenter.

20                   MR. GENENDER:  Thank you, Judge.

21                   So while Ms. Ward is putting up these couple of

22   slides, I think it's important, in connection with thinking

23   about this hearing, to realize this is not something that

24   started last Friday, when a notice was filed.  The original

25   backstop motion was filed on June 13th.  The hearing was

1    originally set for July 11th.  It was later extended to

2    July 26th and then -- at the request of the (indiscernible)

3    and their effort, it was adjourned.

4           The parties that opposed the backstop motion that

5    was originally filed about ten days after the motion was filed

6    on June 13th, put down significant discovery on the Debtors

7    between the 22nd and 30th of June, six sets of document

8    requests, interrogatories, three dozen requests for admission.

9    The Debtors answered the written discovery, produced over 2700

10   documents from 12 custodians in advance of the original

11   hearing date.  I know the Court can imagine that, in producing

12   that amount of documents, remember we went through the review

13   was multiple-fold of those numbers.

14          Depositions were scheduled for three requested

15   witnesses (indiscernible) VP of Restructuring (indiscernible)

16   is a (indiscernible) and a 30(b)(6).  Before the depositions

17   occurred, the hearing was adjourned to provide the Debtors

18   additional time to negotiate necessary amendments to the BCL

19   and the restructuring support agreement to address additional

20   capital needs based on the updated business plan.

21          And then the next slide.

22          Since that time in late June, the Debtors worked to

23   update (indiscernible) business plan to reflect the shifts in

24   the market.  That updated business plan was approved by the

25   TES Restructuring Committee on July 14th.  On the next day,

1     July 15th, it was shared followed by various creditor groups,

2     including TEC and Riverstone.  The Debtors were providing

3     documents and diligence related to the updated business plan

4     (indiscernible).

5             In the two weeks leading up to August 4th, the

6     parties exchanged drafts of termsheets with respect to

7     amendments of the RSA and the BCL.  On August 4th, the

8     Restructuring Committee approved the updated business plan and

9     amendments, the RSA termsheet was sent to BCL.

10            August 5th, last Friday, the Debtors filed a notice,

11    the amended RSA termsheet and the amended BCL (indiscernible)

12    hearing for August 16th, which aligned as a milestone in the

13    amended agreement.

14            As it relates to a proposed timeline, Your Honor,

15    even before filing the amended RSA, termsheet, and the amended

16    BCL before seeking any additional discovery requests, Debtors

17    anticipated the needs providing incremental discovery to cover

18    the time period between mid-July and the present, August 5th.

19    The first additional production -- in other words, we received

20    -- when we started gathering documents to be produced before

21    they even made a request of us, Your Honor, we got a formal

22    request from Mr. Moran's clients Saturday night.  We'd already

23    started gathering documents.

24            We got on the phone, I think there were 45 or 50

25    people invited (indiscernible) and conferred and laid out what

1     we thought would be a workable schedule, letting everyone know

2     that we would be producing documents on a rolling basis,

3     irrespective of waiting on requests, and that we would have

4     that completed by Wednesday of this week.  And we had already

5     made production in that regard.

6             And that -- and then understanding that TEC had

7     requested our deposition without proving they were all

8     necessary, we would make the witnesses available this Friday

9     and this weekend, and that we would need two short depositions

10    ourselves, and limited issue targeted discovery to TEC and its

11    advisors, which we've done.

12            And then, just to be sure, doable, 100 percent --

13    and I think the reason I wanted to go through this with Your

14    Honor is to let you know that this is an updating and

15    refreshing of discovery and not starting from scratch by any

16    means.  The hard work, the heavy lifting is done.

17            As of July 21st, Your Honor, the -- three of the

18    five witnesses that were requested were to be deposed on that

19    day.  And there was not a single complaint about discovery

20    that I was told or was brought to my attention.  And we had

21    adjourned because there other things that had to happen.  But

22    we're just refreshing as it relates to this.

23            And I think that, with the Court's permission, I

24    would like to pass the podium to my partner Alex Welch to

25    speak to -- I went through the discovery, what the logistics

1    would be in that regard, Your Honor.  I'd like Mr. Welch to

2    address why this isn't -- why this isn't an entirely new deal,

3    why this is not an entirely new deal and why the changes are

4    not that significant.  And with the Court's permission, if I

5    could turn it over to Mr. Welch for that.

6              THE COURT:  Hold on one second.  I have somebody

7    that wants to speak.  This may be Mr. Welch, I don't know.

8    But from (718) 536 --

9              MR. GENENDER:  It is.

10             THE COURT:  -- 8463.

11             MR. WELCH:  Thank you, Your Honor.  Can you hear me?

12             THE COURT:  Yes, sir, Mr. Welch.  Go ahead.

13             MR. WELCH:  Thank you.  For the Record, Alexander

14   Welch of Weil Gotshal for the Debtors, Your Honor.

15             And I just want to pick up on what my partner had to

16   say about the changes and the time.  As you heard, Your Honor,

17   we filed the backstop motion June 13th, nearly 60 days ago.

18   Now these movants have had sufficient time to prepare.  The

19   objections -- everybody here knows and been preparing for a

20   very long time on what we expected before we filed the motion,

21   before we even entered into the backstop commitments, we

22   received the backstop commitments.

23             And the changes that I'll take the Court through in

24   a moment, we'd say are material for the Debtors, but not

25   material, in terms of prejudice of anyone in preparing for

1    objections or don't think the question, Your Honor, what has

2    changed?

3          And I'd say, following the updating of the Debtors'

4    business plan, it would become evident that we needed to top-

5    size the RSA (indiscernible) and as Your Honor will recall, we

6    adjourned the backstop hearing, we returned to the negotiating

7    table with the backstop parties.  And we're happy to report it

8    was time well spent.

9          And so, as you will see, on August 5th, we filed the

10   amended backstop letter, together with the amended

11   restructuring support agreement.  And those updated amendments

12   are due tomorrow, and the backstop parties are expecting to

13   have them approved by the negotiating milestone of August 16.

14   Your Honor, we fought hard to keep it from being any shorter

15   than that.  And that will be borne out in the discovery we

16   produced.  But frankly, this was the amount of time we thought

17   parties would justifiably and reasonably need to prepare for a

18   hearing, while balancing the needs of (indiscernible) backstop

19   parties, that given the contract up to now $1.55 billion in

20   equity financing.  And as I'll take you through, we

21   (indiscernible) prejudice anyone's ability to prepare for the

22   16th.

23          Now it includes additional benefits for the Debtors

24   and removes prior existing conditionality.  In other words,

25   Your Honor, we believe we've narrowed the gap and the issues

1    for the estate.  For example, we have (indiscernible) the

2    Debtors' business plan, upsize from one six five to 1.9

3    billion.  The backstop parties have agreed to increase the

4    (indiscernible) commitment from 1.3 to 1.55 (indiscernible)

5    Your Honor, no small feat, and so one we certainly appreciate.

6         The Debtors have obtained additional capital

7    (indiscernible) to match any difference between the commitment

8    and the requirements of the rights offering, again, to provide

9    more certainty, to address some of the objections we expect to

10   hear on the -- at the hearing, which we hope will be on the

11   16th or the 18th.

12        We agreed to remove numerous diligent doubts,

13   notably, those around Debtors' pension program, employee

14   (indiscernible) retirement obligations, and environmental

15   obligations (indiscernible) create even more certainty around

16   the BCL, certainly (indiscernible).

17        Finally, we negotiated a go-shop, you'll see this in

18   the papers.  And it's just in response to the (indiscernible),

19   which you'll see in the (indiscernible), but nevertheless we

20   responded by asking (indiscernible) go-shop (indiscernible)

21   that's reflected in the papers.  But we can't begin that go-

22   shop period until the BCL is approved.  A fair bargain was

23   struck with the BCL problems, but one we're excited to get

24   started as soon as possible.

25        And one more point, if I may, Your Honor?  We know

1        (indiscernible) following the confirmation hearing.  We've

2        potentially shortened that by getting clarity on future

3        ownership now, the sooner the better.  Getting the BCL

4        approved helps accomplish that and (indiscernible) if ahead of

5        confirmation, rather than following it.

6                THE COURT:  So --

7                MR. WELCH:  (Indiscernible) so, in sum, Your Honor,

8        we think the changes that have happened over the last weeks

9        enure to everyone's benefit, and particularly the Debtors, and

10       shouldn't have caused any prejudice to those preparing to

11       object to the Debtors' motion.

12               And with that, I'll pass the virtual podium to my

13       partner, Mr. Genender.

14               THE COURT:  Thank you, Mr. Welch.

15               MR. GENENDER:  Your Honor, the only thing that I'd

16       want to say would be that (indiscernible) is doable.  And I

17       think, taken in context, this is a refresher and an update.

18       And I know I can speak from experience that I've done more in

19       less time in your court.

20               THE COURT:  All right.  There's somebody else that

21       has asked to speak, and then we'll come back to you,

22       Mr. Brimmage.  I see you there.  I need to find out who this

23       is.

24               Oh, it's Mr. Serajeddini again.  We'll let your side

25       finish, Mr. Serajeddini.  Go ahead.

1          MR. SERAJEDDINI:  Thank you, Your Honor.  For the

2     record, Steven Serajeddini of Kirkland & Ellis.

3          Your Honor, I'm going to try my best not to be

4     duplicative.  I think it's important here that the motion has

5     been on file for two and a half months.  The objecting parties

6     have had the opportunity to gather whatever they need.

7          The only (indiscernible) that we heard about that's

8     informing what they're doing today is the filing -- or the

9     finalization, rather, of the Debtors' business plan.  I just

10    want the Court to be aware that these parties have had that

11    business plan for many weeks, as Mr. Genender showed on the

12    demonstrative, and they've had ample opportunity to ask

13    questions, try to understand it.  And that's not a new fact,

14    that's not something that they found out about on Friday, Your

15    Honor.

16         Moreover, they have also had access and can -- or

17    are free to -- or sorry, (indiscernible).  They also

18    understand that the Debtors have been properly hedged through

19    the end of the business plan.  And this is the first time that

20    the Debtors have formally updated the business plan.  It's not

21    like there was a business plan that was on file and there's

22    some dramatic, material alteration.  The Debtors have

23    implemented their hedging strategy (indiscernible) through the

24    end of the case, and that hedging strategy is now fixed.  So

25    we're not expecting any future material modifications to that

1    business plan.  So that's all fixed and they know that and

2    they can confirm that with a couple of simple questions and

3    some basic diligence.

4         That's not something that requires depositions.

5    This is a business judgment issue.  Your Honor already has the

6    facts before, frankly, to make that business judgment

7    determination.  Today, for the first time Kirkland heard that

8    there were substantive problems was actually quite a narrow

9    one and one that I think Your Honor's line of questioning was

10   very helpful in terms of pinning down.

11        These parties -- were not seeking a carveout to

12   their collateral.  So these parties are secured creditors.

13   And to the extent they feel like their secured collateral is

14   in jeopardy as a result of these Chapter 11 cases, they can

15   come before Your Honor and seek adequate protection.  They

16   have that right, they can do that at any point in this process

17   if this disastrous state of the world that apparently

18   (indiscernible) it's not possible for the company to now

19   hedged, they're free to come to the Court and seek that

20   relief.  And so that's their protection.

21        Their protection is not to come in here and say that

22   the parties that are justifying their position in this case

23   (indiscernible) a billion and a half of equity behind the

24   secured creditors are somehow not entitled to reasonable

25   compensation for that.  And again, that's not an issue that

1      requires extensive discovery.  That's something we can debate

2      before Your Honor and, at most, it will require a financial

3      advisor on either side to debate it before Your Honor to get

4      to the bottom of.

5             So, for that reason, Your Honor, it's the Debtors'

6      motion, it's been on file for over two and a half months, and

7      these parties should be prepared to proceed.  And if they're

8      not, it's only the fault of their own.

9             THE COURT:  All right.  Thank you.

10            Mr. Brimmage.  And then we'll go back to

11     Mr. Maloney.

12            MR. BRIMMAGE:  Thank you, Your Honor.  Again, Marty

13     Brimmage with Akin Gump.

14            So I want to emphasize I'm not going to argue the

15     merits of the underlying issues.  But I think the undisputed

16     facts absolutely tell the story.

17            Now let's be clear about what you just heard from

18     the Debtors.  What you heard is they unilaterally reset the

19     depositions before twice, and then, immediately before them,

20     they canceled them.  And then not a word from them.  Yes, they

21     did produce documents before.  But this notion that we should

22     all be ready and, if we're not, it's our fault, we were never

23     put on notice about the Friday filing until the Friday filing

24     came out, that was our notice.  There was no notice about the

25     16th until the 16th came out in the notice, and that was our

1    notice.  Nothing was done to identify that schedule or what

2    was happening.  The depositions that are set were put in a

3    time frame without consulting with us.

4            So this notion that we should have already been

5    prepared for this and that we knew this was coming, that is

6    true on one hand, but specifically when is absolutely not

7    true.

8            Now let's break this down a little bit.  There were

9    -- there's going to be five to six depositions that

10   Mr. Genender talked about, but now he wants two more.  Not a

11   problem, he's entitled to that.  So we're looking at seven to

12   eight.

13           But what else did we hear from Mr. Genender that I

14   thought was incredibly telling?  If this is so ready, why

15   aren't the documents already here?  He's going to take until

16   Wednesday to produce the rest of the documents.  Now what is

17   the rest of the documents?  I don't know, Your Honor, we don't

18   know.  There's no evidence on that.  But we shouldn't be

19   having to get ready for depositions where we don't have them

20   all.

21           And so Thursday is not practical because we're not

22   going to get them.  And by the way, there's not a time frame

23   on Wednesday, there's just Wednesday.  We'll get you -- we'll

24   complete the documents.  Again, if were supposed to all be

25   ready, we should already have them.  Those should have been --

1    I mean, we're -- they should be in our laps, ready to roll.

2    They're not and they're not going to be.  That's undisputed.

3            What else is undisputed?  The number of depositions

4    and the days that are remaining.  What else is undisputed?

5    They wanted it on the 16th.  That leaves us Monday, the 15th,

6    to get ready for eight possible witnesses, maybe seven.  So

7    that means we start depositions on Friday, we go Saturday,

8    Sunday, we're going to do seven or eight.  Then we have Monday

9    to prepare, and we're going to have Tuesday.

10           So let me give you another undisputed fact.  The

11   lead litigation counsel and the lead (indiscernible) counsel

12   for Akin Gump are not available on the 18th, period, end of

13   story.  So that would be inappropriate for our clients to go

14   forward.  That's an undisputed fact, Your Honor.

15           So I would just simply say we didn't create this

16   situation.  I didn't hear of a business reason why it can't

17   get moved to the 29th, when we know, undisputed fact,

18   everybody is available because everybody has had it on their

19   calendar for a long, long time.  There's simply no reason not

20   to move it.

21           So, Your Honor, we would respectfully request, based

22   on the record that you've heard today and the admissions from

23   the Debtors about where they are with discovery, document

24   discovery, and that they want two more witnesses, fine.

25   That's just simply too much in that short period of time, so

1     we would respectfully request that you move it to the 29th.

2              THE COURT:  Thank you.

3              Mr. Maloney.

4              MR. MALONEY:  Thank you, Your Honor.

5              I would -- I appreciate Mr. Brimmage's comments and

6     I won't repeat them.  I would observe, yeah, this motion has

7     been pending for quite a while.  You know, if the Debtors are

8     going forward on their original schedule and gotten this

9     backstop agreement approved, we'd be in a very unfortunate

10    posture because it would have been approved before the

11    business plan was resolved -- was revised, before we knew the

12    backstop agreement didn't provide enough money.

13             But that happened.  And I can't emphasize enough how

14    critically important and concerning it is to my client that

15    that happened.  And so the idea that we want to exhaustively

16    understand why that happened and why, according to the

17    Debtors, that it's not likely to happen again, I can't

18    overstate the importance of that from my client's perspective,

19    Your Honor.

20             And I'll say one more thing.  If I thought the

21    discovery was going to proceed until now until whenever we --

22    you set the hearing, it would be like it was before, I would

23    tell you it's just -- it can't work, we're going to need

24    30 days because that was not an orderly process.  I personally

25    was finding out right before depositions were supposed to

1    occur that they weren't happening, after I had traveled to
2    New York for them and whatnot.
3        I understand that things got hairy and difficult and
4    there were all sorts of complications, so I understand that.
5    And (indiscernible) anticipating it's going to be better in
6    the second round, then I believe we can get it done with an
7    additional eight days.  But that was not an orderly process,
8    and I'm hoping for more and I'm expecting more.  And if we can
9    get it done, you know, eight days (indiscernible) until the
10   29th.
11       But the bottom point is the business plan that we
12   received on Friday, and I haven't sat down with
13   (indiscernible) to compare them.  I know that others in my
14   firm and others that are (indiscernible) have, it's not the
15   same.  There are differences.  And being behind exactly why
16   the changes occurred is an important issue.  And it may well
17   be one of the issues that Mr. Brimmage was mentioning that
18   there might be a dispute over in terms of gaining that
19   information.
20       So we want to get this information and we want to
21   get it quickly.  We're not trying to delay.  We just want
22   enough time to get it right because it's a critical issue.
23       Thank you, Your Honor.
24       THE COURT:  Thank you.
25       Mr. Moran --

1          MR. MORAN:  Your Honor --

2          THE COURT:  -- you can go ahead, and then I'm going

3     to go back to the Debtor for a moment.

4          Go ahead, Mr. Moran.

5          MR. MORAN:  Your Honor, I just wanted to clarify or

6     comment on a few issues that were mentioned by the Debtors and

7     the ad hoc group that we take issue with.

8          First, in one of those sheets of the deck, it said

9     that the parties received or circulated, I think, drafts of

10    the new RSA an the new backstop commitment letter prior to

11    last Friday.  Not us, we never saw it before last Friday.

12    Last Friday was the first time we saw the new RSA or the new

13    backstop commitment letter.

14         Second, there was a comment about no complaints with

15    the discovery process.  To be clear, we have had some issues,

16    some of them were worked out.  Some other things, like the

17    privilege log, we're still waiting on, and we may have further

18    issues that -- I don't want to get -- not responding to.

19         And then finally, there was a comment that the

20    updated business plan has been out for weeks.  There was an

21    updated business plan that came out on July 15th, but there

22    was an additional business plan that came out last week -- I

23    saw it for the first time last week -- that had some

24    additional information that changed the size of the equity

25    rights offering.

1          So things are changing quickly, and I wanted to just

2     comment on those three issues.

3          And I guess the last thing, Your Honor, is we didn't

4     have a chance to talk to any of the Debtors about this

5     business plan.  And they've taken the position that all of the

6     discovery we need to get related to the business plan has to

7     go through the formal litigation process, as opposed to

8     informal communications (indiscernible).

9          THE COURT:  Thank you.

10         Mr. Brimmage has indicated that they had requested

11    these depositions and did not get them, and then you all have

12    rescheduled them for this weekend.  Is that accurate?

13         MR. GENENDER:  Your Honor, this is Paul Genender.

14    I'm assuming that question was directed to me.

15         The -- I don't think that's what Mr. Brimmage said.

16    The depositions that were previously requested by Mr. Moran

17    and by, at that point, the UCC, I think Mr. Brimmage had

18    joined in one or two of those.  Those were of a corporate

19    representative, that's the one Mr. Brimmage requested.

20         And the other two that Mr. Moran had previously

21    requested were of John Chesser (phonetic) and Len LoBiondo

22    (phonetic) of the company.  Those were scheduled and moved

23    around multiple times because the hearing was moved, once at

24    Mr. Moran's request from the 11th of July to the 26th.  And

25    then, yes, the depositions were moved, in consultation with

1    Mr. Moran and Mr. Brimmage, and they were -- and

2    (indiscernible) with Mr. Maloney and that's (indiscernible)

3    And I appreciate that he was gracious about (indiscernible)

4    it.

5            But they weren't -- they didn't happen because the

6    hearing eventually got adjourned, to be reset for the 15th of

7    August, Your Honor, last Friday.  The depositions that

8    Mr. Moran requested last Friday night, which went from 3:00 to

9    5:00, were even -- there was a comment that they were

10   unilaterally set.  They wanted to meet and confer about them.

11   On Sunday morning, I laid out we spent time when we could make

12   those witnesses available after the documents are produced.

13           And I do want to correct one thing Mr. Brimmage

14   said.  He said (indiscernible) if we're so ready, why does it

15   take until Wednesday to get the documents?  Well, it's not

16   taking until Wednesday to get all the documents, we've already

17   made one or two productions, and we're going to continue to

18   make those on a rolling basis.  But some of the documents,

19   Your Honor, that we're producing that they've requested occur

20   up until (indiscernible) together.  And they've requested them

21   very extensively from a number of different people

22   (indiscernible) necessary, but we're not -- we're trying to

23   alleviate any dispute there.

24           And so I'll stop there.  I think that -- I hope that

25   answers your question, Your Honor.  We had proposed a date for

1     witnesses that Mr. Moran requested and the current schedule,

2     obviously the schedule moved back a couple of days.  Mr. Moran

3     had suggested something that might be a little bit less

4     ambitious to get the witnesses.

5          And as it relates -- as it relates to the two

6     depositions that we're requesting, Your Honor, I'm sure this

7     is just an oversight, but I specifically said that they're

8     short, two hours or less, emphasis on the "less," pretty

9     targeted.

10          THE COURT:  All right.

11          MR. BRIMMAGE:  Your Honor, if I can just make one

12     point of clarification?

13          THE COURT:  Go ahead.

14          MR. BRIMMAGE:  And I'm sure that Mr. -- it's an

15     undisputed fact and Mr. Genender will confirm this, or Weil

16     will.  We didn't notice all of the depositions before, but we

17     did identify to Weil that we would attend and participate in

18     all of the depositions that were set to go forward.  I just

19     wanted -- I don't want the Court to misconstrue --

20          THE COURT:  All right.

21          MR. BRIMMAGE:  -- whether we noticed or didn't

22     notice them back (indiscernible) --

23          THE COURT:  The issue --

24          MR. BRIMMAGE:  -- (indiscernible).

25          THE COURT:  The issue with the last one -- the issue

1    with the last one doesn't matter.  It was whether the Debtor

2    produced those witnesses, was my concern.  All right.

3              MR. BRIMMAGE:  And then, the bottom line, Your

4    Honor, they unilaterally canceled them, period.  That's the

5    bottom line.

6              THE COURT:  All right.  Anyone else?

7         (No verbal response).

8              THE COURT:  I'm going to grant the motion.  I

9    believe this is a terribly important matter to determine

10   whether the backstop should be approved.  It is for a huge

11   amount of money.

12             The main reason not to grant the motion is to let

13   the go-shop get started.  And I, Mr. Welch, very much

14   appreciate the arguments that you're making about that.

15             I am persuaded, however, given the importance of

16   what's happening, that taking the depositions ending over the

17   weekend is just not fair and workable.  The reason why the

18   hearing is set on the 16th is the Debtors requested it last

19   Friday to be set on the 16th.  I have not heard a reason for

20   the 16th versus the 29th, other than the go-shop, and a really

21   important reason, which is to try and comply with the RSA.

22   RSAs can't control the Court.  We haven't approved the RSA and

23   I'm not going to let it interfere with people's due process

24   rights.

25             I have expressed before that I think this type of

1      backstop financing is a -- and I don't mean "this type," in

2      other words, its economics, I'm expressing no view on the

3      economics.  I think the existence of backstop exit financing

4      is a great invention.  Whoever here invented that -- and it's

5      probably one of the people that I'm looking at.  And we ought

6      to respect that to the highest degree possible, but that does

7      not include not giving people a full chance to examine it.

8            And although this has been on file for 10 or

9      12 weeks, 10 or 11 weeks, there were changes and there hasn't

10     been the discovery that I would have expected.  I'm not sure

11     which straw broke the camel's back, but it's probably the

12     rescheduled depositions that have just persuaded me that I

13     ought to grant the motion.

14           So the hearing will be on the 29th.  If that blows

15     the RSA, it blows the RSA.  It's not my intention, but I can't

16     let that control what we're doing.  The hearing will begin at

17     8:00 o'clock in the morning on the 29th, so that we can get it

18     finished.

19           Does anyone have a conflict at 8:00 a.m. on the

20     29th?

21        (No verbal response)

22          THE COURT:  Okay.  The hearing is continued from

23     this -- I'm sorry.  Mr. Brimmage?

24          MR. BRIMMAGE:  Your Honor, one point of

25     clarification.  With the hearing then, we can work with the

1    Debtors, or do we need to work with you on what the new

2    objection deadline would be?

3             THE COURT:  Why don't I just set the new objection

4    deadline for the 22nd at 5:00 o'clock p.m.?

5             MR. BRIMMAGE:  Thank you, Your Honor.

6             THE COURT:  Is there anybody that can't make

7    8:00 a.m. --

8             UNIDENTIFIED:  Thank you, Your Honor.

9             THE COURT:  -- 8:00 a.m. on the 29th?

10        (No verbal response)

11            THE COURT:  Oh, wait.  I do have somebody else that

12   wants to speak.  Let me see who that is.

13            UNIDENTIFIED:  (Indiscernible).

14            THE COURT:  I'm sorry?

15            UNIDENTIFIED:  (Indiscernible) of Weil Gotshal for

16   the Debtors.

17            THE COURT:  All right.  Go ahead, please.

18            UNIDENTIFIED:  Thank you, Your Honor.

19            Before we go through the effort of scheduling and

20   incurring what I'm sure will be a great deal of time and

21   effort on behalf of the parties, I think we probably need a

22   moment to confer with Kirkland and their clients with respect

23   to their willingness to proceed on this timeline, which I'm

24   sure that they do, in fact, but we still have our bird in the

25   hand and know whether or not we need to pivot at this point,

1    Your Honor.

2           THE COURT:  If the case falls apart, it falls apart.

3    You can file something.  I'm not going to delay scheduling all

4    this stuff.  If it's a problem for the --

5           UNIDENTIFIED:  Understood.

6           THE COURT:  If it's a problem for the lenders, it's

7    a problem for the lenders.  I'm not making them stick around.

8    And if you want to proceed with your old motion on the 16th,

9    I'm going to let you do that.  But I don't think you want to

10   proceed with your old, unrevised motion.  So that will be up

11   to you and them.  I'm not going to put Mr. Serajeddini on the

12   spot right now.  We'll see what they do.

13          All right.  Anyone else?

14       (No verbal response).

15          THE COURT:  Okay.  We'll see you on the 29th.

16          Contact Ms. Do if you all need any emergency

17   hearings.  Thank you.  We're in --

18          UNIDENTIFIED:  Thank you, Your Honor.

19          THE COURT:  We're in recess.

20          UNIDENTIFIED:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          COUNSEL:  Thank you, Your Honor.  Thank you, Your

23   Honor.  Thank you.

24          THE COURT:  Thank you.

25       (Proceedings concluded at 3:27 p.m.)

42

* * * * *

1          I certify that the foregoing is a correct transcript

2     to the best of my ability produced from the

3     ZOOM/video/telephonic recording of the proceedings in the

4     above-entitled matter.

5        /S./ MARY D. HENRY

6     CERTIFIED BY THE AMERICAN ASSOCIATION OF

7     ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8     JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9     JTT TRANSCRIPT #66146

10    DATE FILED:  AUGUST 10, 2022