IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-90054-11 |
| | § | HOUSTON, TEXAS |
| TALEN ENERGY SUPPLY, LLC, | § | MONDAY, |
| ET AL, | § | AUGUST 29, 2022 |
| DEBTORS. | § | 8:00 A.M. TO 9:13 A.M. |

MOTION HEARING

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

(Recorded via CourtSpeak; no log notes)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:

FOR DEBTORS TALEN ENERGY          WEIL GOTSHAL & MANGES, LLP
SUPPLY, LLC, TALEN ENERGY         Matthew Barr, Esq.
SERVICES NORTHEAST, INC.,         Paul Genender, Esq.
ET AL.:                           700 Louisiana Street
                                  Suite 1700
                                  Houston, TX 77002
                                  713-546-5000

                                  WEIL GOTSHAL & MANGES, LLP
                                  Alexander Welch, Esq.
                                  Jessica Liou, Esq.
                                  767 Fifth Avenue
                                  New York, NY 10153
                                  212-310-8127


FOR THE OFFICIAL COMMITTEE        MILBANK, LLP
OF UNSECURED CREDITORS:           Evan R. Fleck, Esq.
                                  Dennis Dunne, Esq.
                                  55 Hudson Yards
                                  New York, NY 10001
                                  212-530-5567


FOR THE BANK OF NEW YORK          MORGAN LEWIS & BOCKIUS, LLP
MELLON, AS TRUSTEE UNDER          Glenn Siegel, Esq.
SENIOR UNSECURED NOTES            101 Park Avenue
INDENTURES:                       Suite 4000
                                  New York, NY 10178
                                  212-309-6000


FOR THE AD HOC GROUP OF           AKIN GUMP STRAUSS HAUER & FELD
FIRST LIEN CREDITORS:             Scott Alberino, Esq.
                                  2001 K Street, NW
                                  Washington, DC 20006
                                  202-887-4027


FOR THE AD HOC GROUP OF           KIRKLAND & ELLIS, LLP
UNSECURED NOTEHOLDERS AND         Christopher S. Koenig, Esq.
BACKSTOP PARTIES:                 300 N. Lasalle Street
                                  Chicago, IL 60654
                                  312-862-2372

<u>APPEARANCES (CONTINUED):</u>

| | |
|---|---|
| FOR THE AD HOC TERM LOAN<br>AND SECURED NOTES GROUP: | KING AND SPALDING, LLP<br>Matthew Warren, Esq.<br>353 N. Clark Street, 12th Floor<br>Chicago, IL 60654<br>312-764-6921 |
| FOR RIVERSTONE HOLDINGS,<br>LLC, TALEN ENERGY<br>CORPORATION, AND CUMULUS<br>GROWTH HOLDINGS, LLC: | VINSON & ELKINS, LLP<br>David S. Meyer, Esq.<br>1114 Avenue of the Americas<br>32nd Floor<br>New York, NY 10036<br>212-237-0058 |

(Please also see Electronic Appearances.)

1      **HOUSTON, TEXAS; MONDAY, AUGUST 28, 2022; 8:00 A.M.**

2            THE COURT:  Good morning.  Please be seated.

3            All right.  We are here on the Talen Energy case, it

4      is 22-90054.  Appearances have been made electronically.  If

5      you wish to speak at today's hearing and you are on the phone,

6      please press five star one time on your phone so that we can

7      get your line active.

8            Mr. Barr, I don't think we have anyone that didn't

9      show up today.  This is the largest crowd I've had in the

10     courtroom in three years.

11        (Laughter.)

12            THE COURT:  I'm not kidding, since --

13            MR. BARR:  Well, I'm happy to report --

14            THE COURT:   -- since March of 2020.

15            MR. BARR:   -- it's the largest crowd on an

16     uncontested matter.

17            THE COURT:  I know, especially on an --

18        (Laughter.)

19            THE COURT:  I haven't even had this many people on a

20     contested matter, but you need to finish in four hours.  So go

21     ahead.

22        (Laughter.)

23            MR. BARR:  I will -- I will try to beat that.

24            Thank you very much, Your Honor.  Matt Barr of Weil

25     Gotshal on behalf of the Talen Debtors.  And thank you for

1    making time for us today.  With me, Your Honor, in the

2    courtroom is Mr. John Chesser, the CFO of Talen, who is one of

3    our declarants; Mr. Bo Yi from Evercore, one of our

4    declarants.  On the phone, or Zoom, or GoToMeeting is

5    Ms. Carol Flaton, one of our independent directors who is also

6    a declarant in connection with today's hearing.

7            And we also have Mr. Andy Wright, our general

8    counsel, here in the courtroom, Your Honor.  I also have with

9    me colleagues, Mr. Alex Welch and Mr. Paul Genender, who will

10   both be part of the presentation today.

11           Your Honor, again, thank you for taking the time

12   today in what as you put in here we had for a very important

13   day in the Talen cases with respect to the backstop commitment

14   letter motion.  And that's the only thing that's on the agenda

15   today, Your Honor, and that's the backstop commitment letter

16   motion as amended, and that started at Docket 524 filed on

17   July 13 and continued a few times.

18           Your Honor may have noticed we did file a

19   certificate of no objection on the docket at 1128, and I'm

20   happy to report that there are no objections and we are

21   standing here unopposed.  We seek entry of -- we filed a

22   revised motion -- revised order which Mr. Welsh will walk

23   through at the end of the presentation if Your Honor is

24   inclined to approve the motion at Docket 1128-1.

25           Your Honor remembers this was adjourned a few times

1    and we did spend some time with you in connection with

2    discovery, and I'm happy to report that we used that time to

3    try to resolve certain issues in connection with the motion

4    and in connection with the cases generally.

5         I'm happy to report that we have agreements with

6    both the groups of secured lenders and an agreement in

7    principle with TEC/Riverstone, our sponsor and equity holders.

8    And, Your Honor, if it's okay with you, I'm going to take a

9    few moments to walk the through in a second.  We're not

10   seeking any approval of any of those today in front of you,

11   but they will form the basis of certain amendments to our Plan

12   that we intend to file shortly, as well as a motion that we

13   intend to file hopefully today, and I'll explain a little bit

14   about that in a moment as well.

15        We did file on the docket amended RSAs, Restructure

16   Support Agreements, that have the signatures of our secured

17   lenders.  You also may have seen that the Official Committee

18   of Unsecured Creditors filed on the docket a motion -- or a

19   statement in support, reserving their rights in connection

20   with the Chapter 11 Plan, which we all understand and

21   anticipated them to do that.

22        So before the evidence portion, which I'll turn over

23   to Mr. Genender, if it's okay, I'll take a few minutes and

24   just walk through some of the settlements that we have.

25   Again, not seeking approval of any of them in connection with

1    today's hearing.

2              The first is with the Ad Hoc Group of First Lien

3    Secured Lenders represented by the Akin Gump firm and Houlihan

4    Lokey.  That's the "CAF" lenders as we refer to them.  And

5    that's in connection with the Commodity Accordion Facility.

6              We reached an agreement with respect to them on the

7    allowed amount of their secured claim under a Chapter 11 Plan,

8    and in particular in importance the make whole amount in

9    connection with their claim.  And that will be reflected as

10   mentioned in the Chapter 11 Plan itself.  The Docket

11   Number 1125, Exhibit A, does have the RSA and the terms of

12   that proposed settlement which we'll incorporate into the

13   Plan.

14             After significant back and forth and negotiations

15   between us, the CAF lenders, and the Ad Hoc Group, and

16   backstop parties, Your Honor, we were able to negotiate the

17   allowed amount of their claim, which would be $986.76 million,

18   comprised of $848 million of principle plus a $133 million

19   make whole, or excuse me, amount on account of any and all

20   premiums asserted or assertable under the applicable documents

21   as of the petition date, and then accrued and unpaid interest

22   in the amount of $543 million.

23             Your Honor --

24             THE COURT:  I'm sorry, of how much?

25             MR. BARR:  $5,433,000 --

1           THE COURT:  Okay.  Yeah, the number's --

2           MR. BARR:   -- $5,430,000.  Thank you.

3           THE COURT:  Got it.  Thank you.

4           MR. BARR:  That would be a lot of expenses.

5           THE COURT:  It would have been.  It would have been

6     more than I would have expected so, yeah.

7           MR. BARR:  As always I appreciate you listening very

8     carefully.  Thank you.

9        (Laughter.)

10          MR. BARR:  Your Honor, importantly in the unforeseen

11    circumstance where our global RSA potentially is terminated

12    and falls apart, the Debtors have the option of continuing to

13    move forward with this settlement even under a alternative

14    transaction or an alternative Plan.

15          Again, we're not seeking approval of that today, but

16    did want to announce it and it will be incorporated into the

17    Plan and we'll meet our burden in connection with the Plan to

18    explain to you why that settlement meets the standard under

19    9019 and otherwise.

20          Second, the Ad Hoc Group of Secured Lenders

21    represented by King & Spaulding and Houlihan Lokey, Your

22    Honor, you may remember these, this is the other Senior

23    Secured Ad Hoc Group.  And we were able to enter into an

24    agreement with them with respect to the their client's secured

25    claims in the allowed amount of their secured claims, which

1    similarly will be incorporated into the Chapter 11 Plan.  It's

2    referenced on Docket Number 1125, Exhibit B, the RSA that they

3    signed.  And again, we were able to negotiate a significant

4    discount with respect to the asserted amount of their claims

5    including the make whole.

6            There are one, two, three, four tranches of debt

7    that comprise this particular class of secured claims, and in

8    total it will be allowed in the amount of $2,048,000,000, plus

9    accrued and unpaid pre-petition interest and post-petition

10   interest at the applicable contract rate, including default

11   rate, plus the lesser of $20 million and an amount equal to

12   40 percent of the applicable premium or redemption price under

13   the respective documents.

14           And those amounts aren't fixed today because it will

15   be a matter of timing as well when we get to the effective

16   date.  But that's the formula we would use to fix the allowed

17   amount of their claim.

18           THE COURT:  When you say contract rate --

19           MR. BARR:  Yes.

20           THE COURT:  -- which includes the default rate, can

21   you explain how you flip between the amount of the default

22   rate and the default rate in terms of whatever your agreement

23   is?  Does that question make sense?  By contract rate --

24           MR. BARR:  It's the default rate under the contract.

25           THE COURT:  Okay.  So is there an agreement that

1    the -- or not, and I'm just asking, that the default rate is

2    applicable?  Or is that an open issue for us to resolve?

3            MR. BARR:  Default rate to the extent there is one

4    is applicable.

5            THE COURT:  Okay.  Thank you.

6            MR. BARR:  Sure.  The last component of the

7    agreement we have with this group of secured lenders is there

8    will be incorporated into the Chapter 11 Plan an exit roll

9    election, meaning that some of these creditors, if they chose

10   to roll their pre-petition secured debt into the exit facility

11   would have the ability to do that.  There is a cap on the

12   amount of the lenders in the aggregate that can do that, the

13   25 percent of the funded amount of the exit facility could get

14   rolled from this particular tranche of -- these particular

15   tranches of debt.

16           Similarly, Your Honor, if for some reason the global

17   RSA falls away, we have the option of continuing to move

18   forward with this particular settlement.

19           Lastly, we have an agreement in principle with Talen

20   Energy Corporation and certain of the other entities related

21   to Talen Corporation and Riverstone.  Your Honor, including

22   non-debtor Cumulus, which if you may recall from the first day

23   that's the side of our house that deals with the

24   infrastructure that's being built for digital data, coin,

25   battery, renewables, et cetera.

1       There are certain elements of this settlement that
2    will be incorporated into the Chapter 11 Plan, and there are
3    certain elements of this settlement that will be hopefully
4    filed later today and brought in front of Your Honor by
5    separate motion.  And I'll explain that in a moment.
6       The elements that will be incorporated into the
7    Chapter 11 Plan, Your Honor, and we're finalizing the RSA and
8    we'll put that on the docket as well, are that the TEC
9    entities and Riverstone will support the Chapter 11 Plan, that
10   the TEC will receive 1 percent of primary equity and certain
11   warrants of TES, the Debtor, and its subsidiaries.  And there
12   will be mutual releases granted in connection with the Chapter
13   11 Plan.  Again, similarly we're not seeking approval of any
14   of that today and we will meet our burden in connection with
15   the Chapter 11 Plan with those particular elements.
16       As mentioned, we do plan on filing a motion
17   hopefully later today.  There are two components to that
18   motion.  Some we will be seeking only a final basis, and some
19   we will be seeking on an emergency basis.  And that motion,
20   Your Honor, seeks a few things.  First, it seeks emergency
21   relief with respect to certain urgent funding required to
22   Cumulus.
23       As Your Honor may recall, during our cash management
24   discussions and other discussions we have the ability, and we
25   do through certain ways, to fund the Cumulus entities, the

1    Debtors do.  Part of the settlement, although we believe it's

2    ordinary course, is conditioned on us getting approvals of

3    certain funds.  Those funds going there are roughly

4    $20 million.  And I believe that all the parties agree to the

5    emergency relief of making that payment during the pendency of

6    the final approval, which is other components of the potential

7    settlement with TEC.

8            And in connection with us continuing to fund during

9    the interim period certain governance rights would be restored

10   for the TEC -- TES estates in connection with Cumulus.

11           The second stage which, again, we'll seek on a full

12   notice, Your Honor, and again, that will be part of the filing

13   hopefully today, we intend to seek approval of further funding

14   to Cumulus on a longer period of time, assumption of various

15   intercompany contracts, the implementation of certain

16   additional governance protections for the TES bankruptcy

17   estates, and limited releases related to the transactions in

18   connection with the Cumulus formation pre-bankruptcy.

19           Your Honor, what this settlement does is it ensures

20   that we and our partners at the Cumulus entities continue to

21   fund, that we, as the Debtors, have what we believe is

22   appropriate governance in connection as we continue to fund,

23   and ensures that you heard from Mr. Hernandez that we continue

24   to transform the company and continue the growth that we have

25   a vision of.  He is not in court today, I believe he is by

1       phone.  He did ask if he should come and he had other things

2       to deal with today, but you will see him again in connection

3       with these motions, Your Honor.

4                    THE COURT:  Thank you.

5                    When would you need that emergency hearing?

6                    MR. BARR:  What time is it, Your Honor?

7              (Laughter.)

8                    MR. BARR:  Tomorrow would be fantastic, but we are

9       here as soon as Your Honor's calendar allows it.  It's not

10      ready to be filed, there is one more board meeting that needs

11      to occur for final approvals, but we do anticipate filing it

12      today.  Again, the only thing we'd be seeking relief on an

13      emergency basis --

14                   THE COURT:  Is the 20 million.

15                   MR. BARR:   -- is the funding and the governance.

16                   THE COURT:  When is the first funding needed to

17      avoid --

18                   MR. BARR:  Irreparable harm.

19                   THE COURT:   -- exigent -- yeah.

20                   MR. BARR:  Tomorrow, I'm being told from the pews.

21      Can we stretch that a day?

22                   UNIDENTIFIED SPEAKER:  Sooner is better if

23      necessary.

24                   MR. BARR:  Sooner is better, Your Honor, but.

25              (Pause in the proceedings.)

1          THE COURT:  So basically I've reserved tomorrow for

2     the fight that we don't have, so I do have time tomorrow.  I

3     would rather make it as late as possible just from a process

4     point of view.

5          MR. BARR:  Sure.

6          THE COURT:  When you say we have everybody on board,

7     does that mean like the Committee and all of those guys for

8     the 20 million and the --

9          MR. FLECK:  Good morning, Your Honor.  For the

10    Record, Evan Fleck of Milbank for the Official Committee of

11    Unsecured Creditors.

12         THE COURT:  Good morning, Mr. Fleck.

13         MR. FLECK:  Mr. Barr is accurate as to the interim

14    relief.  We have vetted -- the Committee has vetted the

15    dollars that are needed on an urgent basis, and subject to

16    seeing the documents, which are still being prepared as we

17    heard, I expect the Committee will not have an objection with

18    respect to the matter that would be on for let's say tomorrow.

19    The later motion that was described is a different story and

20    we'll work with the Debtors on that.

21         THE COURT:  So tell me more, and I'm not trying to

22    take away your thunder, I'm trying to figure out what I can do

23    in terms of getting this scheduled and giving people notice

24    about the governance issue that you're also seeking on

25    emergency relief.

1          MR. BARR:  The governance issues that we're seeking

2     on emergency relief, and if you want more details, I'm happy

3     to have somebody come up and give you more detail, are really

4     implementing the rights that we currently have under the LLCA

5     agreements that under Delaware law ceased when we filed for

6     Chapter 11.  We didn't control that entity, so we couldn't

7     amend the LLC for the bankruptcy determination.  So --

8          THE COURT:  I may have written this down wrong, but

9     I heard you say that you wanted to restore some TEC governance

10    rights.  Do you mean TES governance rights?

11         MR. BARR:  I did, and I thought I corrected myself.

12    I was wrong.  It's TES's governance rights.  So it's --

13         THE COURT:  Okay.

14         MR. BARR:  -- to benefit the bankruptcy --

15         THE COURT:  Okay.

16         MR. BARR:  -- estates.

17         THE COURT:  Okay.

18         MR. BARR:  Yes.

19         THE COURT:  Can I hear an argument that spending

20    $20 million on the Cumulus facilities is not ordinary course,

21    in case anyone wants to make that right now?

22         MR. FLECK:  For the Record once again, it's Evan

23    Fleck, Your Honor.  What I would propose, Your Honor, is to

24    not make the argument today because that has been the subject

25    of extensive debate as between the Debtors and the Committee.

1    We don't think it is ordinary course, and we've agreed, after

2    lots of discussion, that we would put a pin in that issue.

3    And I think to make the argument, which we could obviously,

4    risks undermining some of the --

5           THE COURT:  Okay.  I'm not looking --

6           MR. FLECK:   -- kind of agreement that we've

7    reached.

8           THE COURT:  I didn't realize that --

9           MR. FLECK:  No, you wouldn't have reason to --

10          THE COURT:   -- I was --

11          MR. FLECK:  -- know that.  We tried to, you know,

12   kind of --

13          THE COURT:  Okay.  A hearing will be held tomorrow

14   afternoon at 3:00 o'clock or later, so it'll be the earlier of

15   3:00 o'clock or 24 hours after the motion is filed.  So send

16   your people to go get work.  So people can look at CM/ECF,

17   looking at the filing minute and CMECF, and if it's filed at

18   4:00, I'll do the hearing at 4:00.  But I'll want 24 hours

19   notice I think.

20          Does that work from a practical point of view?

21          MR. BARR:  I've been told we'll make it work.

22          THE COURT:  Send people away.

23          MR. BARR:  Thank you, Your Honor.  So unless you

24   have any other questions for me, we're prepared to move our

25   evidence into the Record.

1          THE COURT:  I had I believe three questions on how

2     the new agreement worked.  I think I know the answers

3     actually.  But the rest of it I actually thought I understood

4     from reading the materials that you all filed, and I think I

5     understand these, but I wanted to ask these questions now and

6     then let you decide what kind of presentation that --

7          MR. BARR:  Okay.

8          THE COURT:  -- you want.  So give me a moment to --

9     (Pause in the proceedings.)

10          THE COURT:  Hold on, it wants me to sign into

11     Acrobat.  Let me see if I can figure how to do that.

12          (Pause in the proceedings.)

13          THE COURT:  I don't think you're going to find any

14     of these questions that monumental, but I just thought it

15     would make more sense for the hearing to progress so I didn't

16     have any questions as we were moving forward.

17          MR. BARR:  Thank you.

18          (Pause in the proceedings.)

19          THE COURT:  My first question is in Page 13 of the

20     attached agreement.  And what I want to do is to describe to

21     you what I think the last sentence of D means.

22          MR. BARR:  Page 13 of the PDFs, Your Honor?

23          THE COURT:  13 of the paginated agreement.

24          MR. BARR:  Okay.

25          THE COURT:  I think.  No, I got that wrong.

1      (Pause in the proceedings.)

2          THE COURT:  It's going to be 13 of the PDF.  Right

3  here.

4          MR. BARR:  Page 3?

5          THE COURT:  Correct, so this is Paragraph 1D.  When

6  it says that the rights are negotiated separately rather than

7  jointly, my assumption of that is that if someone breaches it,

8  the obligation only -- the breach only visits on the breaching

9  party and not on all parties, but that whatever is contained

10  in the final agreement is available to all parties so there

11  won't be separate equity agreements with each party, it's just

12  each party can negotiate on their own without other parties

13  risking their breach of the duty of good faith.

14          That's what I think it means, and I want to be sure

15  that's what it means.

16          MR. BARR:  That is correct, Your Honor.

17          THE COURT:  All right.

18          MR. BARR:  And we have confirmation from counsel to

19  the backstop parties, as well.

20          THE COURT:  Thank you.  On the next page under 3A,

21  if a backstop party breaches under 3A, and it's not a 3B

22  breach that results in 25 percent or more breaching, then that

23  breaching party does not get the put premium, non-breaching

24  parties do get the put premium, but a non-breaching party may

25  not get the alternative premium if the non-breaching party

1    doesn't fund the alternative transaction.

2              Is that generally what that says?

3              MR. BARR:  It is, Your Honor.  And again have

4    confirmation from counsel from the BCO parties.

5              THE COURT:  Thank you.  Sorry, I just want to be

6    sure that what I'm doing is what I think I'm doing.

7              With respect to Paragraph , I believe that it is

8    appropriate in order to implement the parties' -- what I

9    believe their intent is here, for me to supplement any

10   findings that might be submitted to me in writing with the

11   following conclusions of law and findings of fact.  And I want

12   to know if there are any objections to these, which is that

13   this agreement could not occur outside of a bankruptcy case.

14             The agreement includes bankruptcy protections that

15   are available only under the Bankruptcy Code and therefore, if

16   there is a breach under the agreement, it would be a core

17   matter under 28 USC Section 157 and would not be subject to

18   any *Stern* objection with or without consent.

19             Moreover, to the extent that consent is required

20   under executive benefits, that that consent exists under

21   Paragraph 8, meaning that although we would be required to

22   apply New York law under Paragraph 8, if there is a dispute

23   under the agreement, we would have the authority to enter --

24   we would have exclusive authority because it is a core matter

25   as well, to enter a final judgment with respect to whether or

1    not there is a breach, the penalties for such a breach, and of

2    course all of that would still be subject to the limitations

3    on the remedies which are contained I think in Paragraph 8 of

4    the agreement.

5         And if those additional findings are appropriate, I

6    would like to make them, and if you think they are

7    inappropriate, I would like your arguments as to why.

8         MR. BARR:  Thank you, Your Honor.

9         From the Debtors' perspective they are completely

10    appropriate and we agree.  Thank you.

11         From the backstop party lender's perspective we're

12    getting the nod that they are agreeable as well.

13         THE COURT:  Okay.

14         MR. BARR:  Thank you.

15         THE COURT:  And finally, the commitment amount for

16    the backstop parties is blacked out.  I'm assuming that that

17    is because there is an agreement that the particular amount

18    that any particular backstop party is funding ought to be

19    confidential.  But we've even blacked out the names of the

20    backstop parties even though all of them are signing it.  So I

21    don't know that that --

22         MR. BARR:  Right.

23         THE COURT:   -- means very much.

24         How do I enforce this if the only copy that I have

25    also has this blacked out, and shouldn't -- if the parties are

1      in agreement that the amount of allocation to each backstop

2      party is commercially sensitive, and I could understand why it

3      is and I'm not going to challenge that kind of agreement if

4      that's made by the parties, shouldn't we have some process in

5      effect, and maybe you've already done it and I've missed it,

6      you've thrown quite a bit at me overnight, to require you to

7      file an unredacted schedule, one under seal so that there's a

8      reference to that where the Court could enforce that, if there

9      is a breach.

10             MR. BARR:  Two things, Your Honor.  We're hearing

11     that that's fine from the backstop committee parties' counsel,

12     but if we, you know, found ourselves in the circumstance that

13     we would ever have to enforce in front of Your Honor, we would

14     probably put in front of you an unredacted schedule showing

15     the amounts of that particular party because we of course have

16     it unredacted.  But they've agreed that we can file it

17     redacted -- unredacted under seal if you would prefer that,

18     Your Honor.

19             THE COURT:  I'm just betting that there are at least

20     20 prior versions of this so --

21             (Laughter.)

22             THE COURT:  -- so I would prefer to have an

23     unredacted under seal version of Schedule 1 filed.  If there

24     isn't a reason not to do that, just so that I have a reference

25     that, you know, if somebody says that that particular party's

1     backstop commitment was 200 million and somebody else says it

2     was 210, you know, I can look and that will be the dispositive

3     answer to it.

4               MR. BARR:  Sure.

5               THE COURT:  So let me -- I'm seeing this side of the

6     room agree.  Does the Committee have any problem doing

7     anything like that, Mr. Fleck, or --

8               MR. FLECK:  No issues, Your Honor.

9               THE COURT:  Okay.

10             MR. BARR:  Would Your Honor, if you're inclined to

11    approve the motion, just add something to the order directing

12    us to file it under seal or --

13            THE COURT:  I'm directing you to file it under seal.

14            MR. BARR:  Excellent.  Thank you.

15      (Laughter.)

16            THE COURT:  All right.  Other than that I do think I

17    understand what you're doing.  I think this is just a

18    remarkable negotiation that occurred between the parties.  And

19    as to all the parties, the parties that are making the

20    commitment, that obtained the commitment, that obtained the

21    changes to the commitment.  This is just remarkable that you

22    all got this done.  I mean this is one of the larger

23    financings of this type of which I am familiar at all.  And to

24    have reached an accommodation on such material changes just is

25    a credit to all the fine lawyering in the case.

1          So you can put on what evidence you want that isn't

2     already filed and you can put on some live testimony, but I

3     am, you know, excited about the progress that you all have

4     made and that is here on unopposed basis.  Not so much it's

5     unopposed, because you've now made my next few days boring,

6     but --

7          (Laughter.)

8          THE COURT:  -- the fact that it's negotiated is a

9     pretty remarkable achievement that everybody deserves to take

10    some credit for.

11         MR. BARR:  I very much appreciate the comment and

12    there's a lot of people on this side of the room that spent a

13    lot of time so I appreciate the comment as you know.

14         I'm going to ask Mr. Genender to be as short as he

15    can to walk you through the evidence just so the Record is

16    complete so that we could have it admitted.  And then we're

17    happy to answer any questions, walk through the black line

18    that Your Honor may have, and then seek approval of the

19    motion.

20         THE COURT:  Oh, does anybody else want to make any

21    sort of opening statement that is of the type of that Mr. Barr

22    has made, or make any other comments?

23         Mr. Dunne?  Mr. Dunne, I did read the statement the

24    Committee filed and very much appreciated both the content and

25    the tenor of what you all chose to file.  Thank you.

1          MR. DUNNE:  Thank you, Your Honor.  And for the

2     Record, Dennis Dunne from Milbank on behalf of the Official

3     Committee of Unsecured Creditors.  I think this is the first

4     time I'm in -- live in the room since February of 2020.  It's

5     good to be back.

6          THE COURT:  It's good to have you back.

7          MR. DUNNE:  Good to see you, right, that the suit

8     pants fit as well.  It's -- but I'll be brief, I'm not going

9     to repeat it, what we filed in the pleading.  When the

10    Committee was formed, you know, we kind of jumped into the

11    moving river of the negotiations that the Debtors had had pre-

12    petition with the Ad Hoc Committee.  And that RCA contained a

13    lot of positive elements, the main one being what Your Honor

14    just said, it's a large amount of dollars that were committed

15    for a long period of time.

16         It also can't contain what we thought were some

17    negative ones, too much conditionality, milestone on a sponsor

18    settlement, and more importantly it was funding a business

19    plan that we were quickly hearing was going to be superceded

20    by a new one that might actually require additional dollars.

21         So I'd say a couple of weeks into the case we

22    thought we might actually have to object to this.

23         THE COURT:  I'm looking at 1.6 to 1.9, it doesn't

24    sound too big until you realize that's a quarter of a billion

25    dollars.

1          MR. DUNNE:  Exactly right.  Exactly right.

2          THE COURT:  So.

3          MR. DUNNE:  The -- but we are here today not

4     objecting because the parties have heard our issues, they've

5     addressed and resolved the concerns of the Official Committee.

6     I think that we've tightened up the conditionality in it and

7     we've increased the committed amounts to match the revised

8     funding needs of the new business plan.  And I'd say most

9     importantly it includes a go shop.  There's a go shop

10    requirement for the Debtors to canvass the market over a 90-

11    day period.

12          The go shop had no analog in the original BCA and

13    the Committee welcomes its inclusion in the revised version.

14    It is a potential vehicle for unsecured creditors to receive

15    more, and if not, to be comfortable that there wasn't a better

16    alternative outside of the transactions contemplated with BCA.

17    And the Committee expects to work closely with the Debtors to

18    make sure that that's vigorously pursued so we either get that

19    comfort or we see the alternative.

20          I also echo what Your Honor said a few minutes ago

21    that this is a lot of accomplishment in a short period of time

22    in the case with a lot of parties, and they -- I think

23    everybody should be commended for what's been achieved to

24    date.  But from our perspective it's not yet finished, Judge.

25    There's a couple of kind of categories of important work to be

1   done, first of which is what always needs to happen, the

2   mapping of total enterprise value by a legal entity.

3          We represent all the unsecured creditors, there's a

4   large portion of that that are part of the backstop

5   commitment, there's also bondholders who didn't get to

6   participate or can't participate in that, as well as trade

7   creditors, et cetera.  What we will need to do is figure out

8   how to allocate value by legal entity to determine when

9   somebody just has one claim at this entity how much are they

10  receiving.  We don't know that yet to date, and there's work

11  that's going on with respect to arguments about intercompany

12  claims, movement of value from boxes, substantive

13  consolidation arguments and the like.  But we expect to be

14  fully immersed in that effort with the Debtors shortly. It

15  requires a fair amount of information flow.

16         The second, I think that Mr. Fleck mentioned this at

17  the DIP hearing, that we have been told by a number of parties

18  in connection with their retention and shortly thereafter that

19  there was a number of transactions that had occurred prior to

20  the filing that they wanted the independent committee to

21  analyze.  Some of those have become the subject of standing

22  motion, not for today, one of which is next week and that

23  one's with respect to, you know, a half a billion dollar

24  dividend paid to Riverstone.

25         You've also heard Mr. Barr talk about settlements

1    with respect to that.  We weren't party to those settlements.

2    We're hearing a lot of those terms for the first time.  The

3    Committee's going to, you know, fully analyze them and assess

4    the reasonableness and propriety of them.  But we're also not

5    going to pause what we're doing to see how this plays out in

6    confirmation.

7            On the flip we're not asking Mr. Barr to delay his

8    time table for confirmation.  We're expecting to do both

9    simultaneously.

10           As an aside, we have reached out to Riverstone to

11   try to discuss settlement, we've been rebuffed to date.

12   That's their prerogative, but I raise it because if we're

13   going to hit the time table that the Debtors want for

14   confirmation, what the other parties want, we're going to be

15   in continuous engagement on every front, whether that's

16   settlement front or litigation in order to do it.

17           But happily for today it's consensual and it's a lot

18   of positive developments, but we're not completely there yet.

19   And as the Court knows, the Committee supports the approval of

20   the relief requested today, and we'll be back in front of Your

21   Honor next week on one of the motions.

22           THE COURT:  Thank you.

23           To be clear, assuming that we approve this today, we

24   are not approving or endorsing the RSA or the amended RSA,

25   although there are triggering events that exist in those RSAs

1    that can affect what we are approving today.  And so they are

2    somewhat of an external measure of various events that might

3    occur, and I regard those as different events.  So I just want

4    the Record clear that I'm not approving the RSA, but I am

5    approving the RSAs -- the references to the RSA --

6              MR. DUNNE:  Right.

7              THE COURT:   -- as triggering various events that

8    might occur under the financing, all of which seems

9    appropriate to try and get this kind of exit financing

10   available to the Debtor.  But your objections to the

11   allocations, for example, within the RSA are all being

12   preserved for presumably confirmation but certainly beyond

13   today.

14             MR. DUNNE:  Thank you, Your Honor.

15             THE COURT:  Thank you.

16             Good morning.

17             MR. SIEGEL:  Good morning, Your Honor.  Glenn Siegel

18   for the Bank of New York.  We are the indenture trustee for

19   the unsecured bonds.  We sit on the Creditors Committee, we

20   are in complete accord with everything that Mr. Dunne has

21   said.

22             I'm only here to make a couple of additional points,

23   none of which suggest that we're in opposition to anything,

24   but rather, that there are a few issues that still need to be

25   addressed and we're very confident that they will be addressed

1      and they'll be addressed successfully, but we wanted Your

2      Honor to be aware of where we are in those things.

3              We, of course, are delighted that somewhere in

4      excess of 80 percent of our holders have signed up to the RSA

5      and are providing financing that this company needs to get out

6      of bankruptcy.  That does leave, based on my rough math, about

7      $250 million worth of bond holders who have not signed up.

8      And they will have their own discreet issues that will need to

9      be addressed.

10             For those who do decide not to participate in the

11     rights offering we just need to be comfortable that the

12     distribution they get without the rights offering is

13     reasonable and we haven't gotten there yet.  We haven't had

14     the valuation done and we haven't looked at that.  And

15     moreover we just want to make sure that their participation in

16     the rights offering should they decide to participate in the

17     rights offering is not contingent upon their signature to the

18     RSA.  Some people may decide they want to do one and not the

19     other.

20             The second point which, again, we need to address at

21     some point in time, is as is the case in many of these rights

22     offerings, they will only be made available to QUIBS

23     (phonetic), or at least that's what it says currently.  So we

24     need to make sure that those who are not qualified to

25     participate in the rights offering are otherwise adequately

1      compensated for the right to participate, which they will not

2      be able to avail themselves of.

3             Those are our only two points.

4             THE COURT:  So on the point you make that non-

5      participating parties have every right at confirmation to

6      object to what their distribution right is, absolutely.  I'm

7      not taking away those rights.

8             The other point is a little finer issue and I'm not

9      sure what the deal is between the parties, and I don't want

10     anything that I do today to support or not support what you

11     said, which is that a party that wants to participate can

12     participate without signing up for the RSA.  I don't know if

13     that's the deal or not, and it may be that we need to learn

14     about that.  Because I have -- I had assumed that some of the

15     RSA -- some of the funding obligations were actually contained

16     within the RSA that people would voluntarily sign up for.

17            MR. SIEGEL:  I assume --

18            THE COURT:  So you may be correct, but you may be

19     incorrect and I don't know and I don't want --

20            MR. SIEGEL:  And you are --

21            THE COURT:  -- somebody to be --

22            MR. SIEGEL:  -- absolutely right.  I may be correct

23     and I may be incorrect because this thing is -- this is still

24     evolving.

25            THE COURT:  Right.

1          MR. SIEGEL:  We have not -- if there is a draft of

2     the actual documentation surrounding the rights offering, I

3     have not seen or reviewed it yet.  But I assume as is the case

4     in any of these plans, there will be a -- they'll have to sign

5     up for the rights offering, there'll be a subscription

6     agreement, so forth.  And we'll just have to review that.

7          THE COURT:  I just -- what I want to be sure of is

8     if signing up to participate in the rights offering requires

9     parties to also sign up to the RSA, does that mean that your

10     client does or does not object to what we're doing today?

11          MR. SIEGEL:  We object to nothing that is going on

12     today.

13          THE COURT:  Okay.  Fair enough.

14          MR. SIEGEL:  To be absolutely clear.

15          THE COURT:  And I am not the -- okay, then I do -- I

16     just wanted to --

17          MR. SIEGEL:  We -- well, what --

18          THE COURT:  -- I'm not declaring whether you are

19     right in your comment or wrong in your comment.

20          MR. SIEGEL:  -- what I -- what I'm trying to do,

21     which I think is important, is not to surprise you in the

22     future if things go in a different direction, which I don't

23     expect that they will.

24          THE COURT:  Okay.  I won't be surprised, I just

25     don't want -- I think on your comments is people are reserving

1     all their rights till confirmation with respect to complaints

2     about distributions.  Yes, I intentionally am not approving

3     that today.  But I think I may be approving something that

4     would require people, and it may not, that would require

5     people to sign up for the RSA, and if that's part of what

6     we're doing, which I hadn't thought about till you made your

7     comment, I'm not changing whatever the documents say by that

8     comment.

9               MR. SIEGEL:  You aren't -- Your Honor, you are not

10    changing what the documents are saying.  I am simply saying

11    once we see the full plan and we see the treatment of holders,

12    we have an obligation to make sure all our bondholders are

13    treated identically --

14              THE COURT:  Of course.  Of course.

15              MR. SIEGEL:   -- and that's all I'm doing.

16              THE COURT:  All right.  Thank you, sir.

17              MR. SIEGEL:  Thank you.

18              MR. ALBERINO:  Good morning, Your Honor.  Scott

19    Alberino from Akin Gump on behalf of the Ad Hoc First Lien

20    Group.

21              THE COURT:  Good morning.

22              MR. ALBERINO:  Good morning.  Your Honor, I'll be

23    brief.  I think we've, you know, heard from Mr. Barr about the

24    settlements that were reached, you know, on the road to, you

25    know, reaching the compromises, you know, that have been put

1    in motion, you know, what's going to happen here today.

2              Your Honor, I just want to be -- I wanted to make

3    sure that we were kind of clear on the Record about a few

4    things.  The Ad Hoc First Lien Group, we have been involved

5    with respect to the backstop for, you know, a long time here.

6    My partner, Mr. Brimmage, was in front of you a couple of

7    weeks ago on a continuance motion.  And as Your Honor is well

8    aware, a lot is happening behind the scenes, and this backstop

9    motion which was filed back in mid-June, over the past couple

10   of months, you know, there's a lot of work done on all sides,

11   you know, to incrementally modify, change and begin to resolve

12   objections.

13             Our clients were part of those discussions, and have

14   been for the last two months, you know, working behind the

15   scenes with the company preparing for what we thought may have

16   been a contested hearing today on the backstop.  And we're

17   pleased that we were able to ultimately reach an agreement

18   with the company, you know, and the backstop parties, you

19   know, to resolve these issues.

20             But, Your Honor, I want to make sure you understand

21   that the settlement that we reached, you know, which is the

22   third amendment to the RSA, this amendment was reached in

23   resolution of our issues.  It was important for our clients

24   heading up to this hearing to understand where the company and

25   where the backstop parties ultimately resided on the allowance

1    of our claims, the treatment of our claims under the plan, how

2    our claims will be classified, and importantly, the priority

3    of our claims.

4           These issues were not trivial issues.  The CAF is a

5    significant piece of the company's capital structure.  We may

6    hear more about it as the case goes on, but the commodity

7    accordion facility or the CAF as we refer to is, you know, was

8    a significant $850 million facility put in place, you know,

9    back in December of this year.  It was an important funding

10   for the company to help deal with, you know, a rising pricing

11   environment, to deal with their hedging issues.  And as Your

12   Judge knows -- as the Judge knows, as this case has gone on

13   the company ultimately had to file for bankruptcy to raise

14   even more money to deal with this stuff.  But we'll hear more

15   about the CAF I assume at a future date in this case.

16          But, Your Honor, there's a couple of things I wanted

17   to point out about our agreement.  Number one, it's not just

18   an agreement with the company.  It's an agreement with the

19   backstop parties as well.  This was key for us.  You know, we

20   were going to resolve these issues with the backstop parties,

21   it was critical that we not only had an agreement with the

22   company as to our treatment allowance classification and

23   priority issues, we wanted that deal locked up with the

24   consenting parties, you know, on the backstop agreement as

25   well.  So those -- the Kirkland group, that ad hoc group, they

1    are parties to the settlement that we have reached as well as

2    the company.

3          Number two, the agreement is durable.  You know,

4    this is not an agreement that is intended solely for the RSA

5    plan that's going to be negotiated and put on file soon.  The

6    agreement has durability concepts baked into it and Mr. Barr

7    alluded to the fact that even if the global RSA were to blow

8    up, you know, in a manner that -- in a manner where the

9    consenting parties did not receive their backstop fee, the

10   company would still have the option to keep our settlement

11   locked in and make a decision as to whether they wanted to use

12   that deal as kind of a stepping stone, you know, for

13   reassessing and perhaps, you know, building another plan.

14         But the settlement itself is durable, it is survive

15   termination of the RSA, it remains binding on the Ad Hoc Group

16   that are signed to the RSA that will receive the benefits

17   under the backstop agreement, and, you know, that was

18   critical.  I want to make sure that point was not lost on Your

19   Honor in case we're back in front of you at some point, you

20   know, dealing with some of these issues.

21         So, Your Honor, listen, we are happy with where we

22   ended up, we know we've got some wood to chop, you know, the

23   Committee will, you know, potentially raise some issues, our

24   settlement will be addressed at confirmation, you know, if

25   not, perhaps earlier, you know, if we're dealing with it in

1    the context of the Committee prosecuting the standing motion.

2    But standing here today, you know, I wanted to make sure Your

3    Honor understood that there's a nexus between our deal and

4    resolution of our backstop issues, Your Honor.

5            THE COURT:  I don't have any problem with that, I

6    just want to be sure that I make the statement pretty clearly

7    on the Record with you.

8            The Debtor may be bound to proceed in good faith to

9    attempt to get approval of your agreement as may backstop

10   parties.  If for any reason your agreement is not approved,

11   let's say by an objection by the Committee or some other party

12   that isn't bound to act in good faith with respect to your

13   deal, then it may blow up your settlement, but it isn't going

14   to blow up what we're being asked to do today.

15           So it's durable once we sign an order on it, and

16   it's durable as to parties perhaps as we move forward to

17   whether to sign an order on it, but today we're not approving

18   it.  And any party that signed up individually as an RSA

19   party, let's say, or otherwise to your deal, I've got not

20   problem with that.  Their vote on the Committee is not bound

21   by any such agreement, nor can they be bound to vote on the

22   Committee as a result of any agreement that they have made on

23   behalf of their individual holdings with respect to their

24   fiduciary Committee duties.

25           If all that's consistent with what you're telling

1        me, I'm a happy camper.  I just want to be sure it is.

2                MR. ALBERINO:  I believe it is, Your Honor.  I don't

3        believe any of the Committee members are actually

4        signatories --

5                THE COURT:  Okay.

6                MR. ALBERINO:   -- to the RSA, so I think we're fine

7        in that regard.  But no issues with what you said, Your Honor.

8                THE COURT:  Thank you, sir.

9                MR. ALBERINO:  Thank you.

10               MR. KOENIG:  Good morning, Your Honor.  For the

11       Record, Kirkland -- Chris Koenig of Kirkland & Ellis for

12       the --

13               THE COURT:  Good morning.

14               MR. KOENIG:   -- Ad Hoc Group of Unsecured

15       Noteholders and the backstop parties.  My partner,

16       Mr. Serajeddini, wasn't able -- was unable to be physically

17       here in the courtroom, but, you know, he hopes and expects to

18       be here again real soon.

19               We obviously support the relief requested by the

20       Debtors in the backstop motion and the amended order that was

21       filed last night.  But with the Court's indulgence I just want

22       to make a few brief remarks about how we got here to this

23       point of an uncontested backstop motion.

24               So pre-petition there really was no dispute about

25       who the fulcrum creditors were, it was unsecured noteholders.

1    But given the astronomical amount of deleveraging that the

2    Debtors were seeking in these cases, that meant that the

3    unsecured noteholders were going to have to step up to the

4    table and write a very large check in order to protect their

5    position in the capital structure.

6         And of course, as Your Honor knows, we stepped up

7    and agreed to write that check, not once, but twice.  First,

8    the $1.3 billion check that we wrote in late -- in late May,

9    and we stepped up again in July when the Debtors' business

10   plan changed and it became evident that an additional, you

11   know, quarter of a billion dollars was necessary.  And we've

12   stepped up time and time again in these cases to build

13   additional consensus, and as circumstances changed to meet

14   those changing circumstances.

15        So we stepped up again and learned that the Debtors

16   have received inbound third party interest in their business.

17   Because of that we agreed to amend the RSA to provide for the

18   go shop that you've heard about this morning.  We think that

19   that's an unusual concession by a plan sponsor as ourselves to

20   allow the Debtors to pursue higher and better offers in

21   addition to the one that they're currently pursuing with us.

22   In our view, of course, a transaction is only higher and

23   better if it leads to payment in full of the unsecured notes.

24   Hopefully that will be a discussion for another day if that

25   does comes to pass.

1          But in light of this interest, we agreed that the
2   Debtors should have the opportunity to run an open market test
3   using our backstop as a floor for value so that there could be
4   no meaningful dispute at confirmation that our restructuring
5   delivers the most value for unsecured creditors along the
6   lines of what Mr. Dunne said here this morning.

7          We've also stepped up by amending our deal to build
8   additional consensus with other parties as Mr. Barr outlined.
9   You know, we have amended the RSA now three times in the past
10  number of days to reach consensus with two different secured
11  creditor groups and also the plan sponsor.  The RSA always
12  contemplated that allowed secured claims would be unimpaired.
13  We effectively kicked the can on what exactly that meant.  You
14  know, now we have stepped up and settled with the secured
15  creditor constituencies regarding the allowed amount of their
16  claims including backstop premiums and the like.

17         And as Mr. Barr outlined, we also stepped up with
18  respect to Riverstone and resolving the issues related not
19  only to Cumulus but with respect to the Chapter 11 Plan as
20  well.  Of course, there's still work to do to obtain full
21  consensus for our transaction.  You heard Mr. Dunne and we're
22  committing to work with him as we've worked with all the other
23  parties to date to see if consensus can be reached ahead of
24  confirmation.

25         But, you know, as Your Honor knows, there was a

1    robust discovery process leading up to this objection.
2    Parties in interest had ample time to kick the tires on the
3    backstop.  There are no objectors here today because the
4    proposed backstop which is of course the keystone of the
5    restructuring that's contemplated by the RSA and the Chapter
6    11 Plan that will be filed shortly is the highest and best
7    value option to maximize value for these Debtors, of course
8    subject to the backstop.
9         So, Your Honor, we support we entry of the revised
10   proposed backstop order.  That's all I have to say.  Unless
11   you have any questions for me, I'll pass the lectern.
12        THE COURT:  No, my only comment is I don't have any
13   problem with your preserving your right to argue that's what
14   highest and best means.
15        MR. KOENIG:  I was certain you were going to say
16   that, Your Honor.  But I just wanted our position to be clear
17   on the Record.
18        THE COURT:  Thank you, sir.
19        MR. KOENIG:  Thank you, Your Honor.
20        MR. WARREN:  Good afternoon, Your Honor.  Matt
21   Warren of King & Spalding on behalf of the secured term
22   lenders and noteholders or as now -- or as referred to in our
23   fourth amended RSA, the "non-CAF consenting lenders."
24        THE COURT:  All right.
25        MR. WARREN:  The names have become a challenge, Your

1    Honor, in the case.

2         (Laughter.)

3         MR. WARREN:  Your Honor, I would echo what was said

4    by Mr. Koenig, although I will reserve on there being notice

5    too as to the fulcrum security lied in the case at any time.

6    But, Your Honor, as you know, from the start of the case we

7    made a focal point on the alternative transaction fee, when it

8    would be paid, how it would be paid, how it interlaid with our

9    collateral use.

10        And one item that Mr. Barr and Mr. Koenig alluded to

11   was the agreement on the allowed amount of secured claims,

12   Your Honor.  An important part of that, which I'm sure Your

13   Honor will appreciate from our various prior hearings, was

14   also the agreement that the RSA is be amended that it would be

15   paid in full in cash on the effective date of the Chapter 11

16   Plan under the RSA.  And as Mr. Alberino alluded to, there are

17   survivability, durability components in the RSA providing

18   additional protection to where that alternative transaction

19   fee is paid.

20        There is support for a payment in full in cash of

21   the agreed allowed upon amounts on the effective date of the

22   plan.  That did tie to a lot of the prior hearings we've had

23   before Your Honor.  I think it's an important part of the

24   settlement that we want to make clear.

25        I also wanted to quickly address Your Honor's

1    question again on the language that said the contract rate

2    hasn't increased for the companies to fall -- there's a

3    default rate on the term loan, Your Honor, there's not a

4    default rate on the three series of secured bonds.  But the

5    three series of secured bonds do accrue interest on interest

6    including the pre-petition interest.  So the best we could

7    come up with on that language within less than full paragraph

8    was interest at the contract rate, so I wanted to provide some

9    additional clarity there, Your Honor.

10            THE COURT:  I don't care, but I just didn't -- I

11    didn't understand it when he first told it to me was why I

12    asked the question.  I didn't have a problem with it, I didn't

13    want there to be ambiguity.

14            MR. WARREN:  Yeah, we tried to use little words for

15    four series of secured instruments, Your Honor.  Thank you.

16            THE COURT:  Thank you, sir.

17            Mr. Meyer, I understand you're not talking to

18    people.

19            MR. MEYER:  That sounds like me, Your Honor.

20            THE COURT:  That's right.

21        (Laughter.)

22            MR. MEYER:  Good morning, Your Honor.  David Meyer

23    of Vinson & Elkins on behalf of Riverstone, TEC, and Cumulus

24    Growth and its subsidiaries.

25            Your Honor, we're not objecting to the backstop

1    despite our prior concerns and issues we've raised.  There

2    have been extensive efforts to reach a comprehensive

3    resolution of the TES issues, which as Mr. Barr outlined will

4    be part of the Chapter 11 Plan, as well as the Cumulus

5    resolution that Mr. Barr also outlined.

6         And what you'll find, Your Honor, is there's a web

7    of interconnected agreements creating alignment in interest

8    between the Debtors, the Ad Hoc Group, TEC, Cumulus, and Orion

9    which is the lender to Cumulus Digital.  As Mr. Barr outlined

10   it's an agreement in principle.  I expect we finalize these

11   documents today and will be back in front of you quickly on

12   that front.  And there will also be definitive documentation

13   that will be considered as part of the final approval for the

14   Cumulus resolution.  But based on achieving this result TEC is

15   not objecting today and we're happy with the resolution on all

16   fronts.

17        THE COURT:  Appreciate the announcement.  Thank you,

18   Mr. Meyer.

19        MR. MEYER:  Thank you, Your Honor.

20        THE COURT:  Anyone else?

21      (No audible response.)

22        THE COURT:  All right.  Mr. Genender.

23        MR. GENENDER:  Good morning, Your Honor.  Paul

24   Genender, Weil Gotshal & Manges, for the Debtors.  I will try

25   to live up to Mr. Barr's prognostication of being brief with

1    this.

2         THE COURT:  It'll be the first time.

3         MR. GENENDER:  It will be the first time.

4      (Laughter.)

5         MR. BARR:  That's why I said it.

6         MR. GENENDER:  My curiosity was what the Court's

7    comment was going to be about that, and you satisfied my

8    curiosity.  So thank you very much.

9         Your Honor, we have Exhibits 1 through 106 that have

10   been filed with the Court at ECFs 1102, 1104, and 1129.  And

11   corresponding some of those were filed under seal and there's

12   a corresponding sealing motion, and the ones under seal were

13   filed at 11:14 and 11:15.

14        I could -- and included in those, Your Honor, for

15   the Record, at 1129, 2, 3 and 4 are the declarations of John

16   Chesser, Carol Flaton, and Bo Yi that are -- would be our

17   testimony in support of the motion we're here on today, Your

18   Honor.  So if that's an acceptable method, I would offer

19   admission of those exhibits.

20        THE COURT:  All right.  Do we have any objection to

21   the admission of the exhibits that are filed at 1102, 1

22   through 50; 110 --

23        MR. GENENDER:  Four --

24        THE COURT:   -- 4 --

25        MR. GENENDER:  Yeah.

1          THE COURT:   -- 1 through 50; 1114, 1 through 41;

2     1115, 1 through 42.  I'm going to stop there and see if I have

3     any objections to any of those.

4          (No audible response.)

5          THE COURT:  All right.  There are no objections.

6     Those are all admitted.

7          (Exhibits 1102-1 through -50 and 1104-1 through -50 and

8     1114-1 through -41 received in evidence.)

9          THE COURT:  Do we have any objections to the

10    admission as substantive evidence at today's hearing, 1129, 1

11    through 4, as testimony that comes in for today's hearing

12    subject to any cross-examination?

13         (No audible response.)

14         THE COURT:  All right.  The declarations are

15    admitted at 1129.

16         (Exhibits 1129-1 through -4 received in evidence.)

17         THE COURT:  Is there any cross-examination for any

18    of the witnesses today?

19         (No audible response.)

20         THE COURT:  Is there any further direct of any of

21    the witnesses today?

22         MR. GENENDER:  There's none by the Debtors, Your

23    Honor.

24         THE COURT:  Thank you.  All right.  They are all

25    admitted.  Go ahead.

1          MR. GENENDER:  That's the conclusion of our

2     presentation of the evidence.

3          THE COURT:  Okay.  I can make that comment next time

4     then.

5       (Laughter.)

6          MR. GENENDER:  I did it once, at least I did it

7     once.

8          THE COURT:  That's right.  That's right.

9          MR. GENENDER:  Thank you, Judge.  Thank you very

10     much.

11          THE COURT:  Thank you.

12          MR. GENENDER:  And, Your Honor, I would say we did

13     do a lot of discovery and I would like to commend the parties

14     in doing it in a professional manner.  It was -- we got a lot

15     done and I just want to say that for the Record.

16          THE COURT:  Mr. Genender, thank you.

17          Does anyone else have any evidence that they wish to

18     introduce either in support of or in opposition to the motion

19     that is here today?

20          All right.  Go ahead.

21          MR. WELCH:  Good morning, Your Honor.

22          THE COURT:  Good morning.

23          MR. WELCH:  Alexander Welch of Weil Gotshal for the

24     Debtors.

25          Given Your Honor has heard from a bunch of folks

1      today and Mr. Barr in his way has instructed me not to

2      overcook the goose.  I think what I would propose, Your Honor,

3      is, if you're amenable, to take the Court quickly through the

4      redline to the order.

5              THE COURT:  Sure.

6              MR. WELCH:  And then ask Your Honor if he's of a

7      mind to, to enter the order.

8              THE COURT:  And then I didn't hear what you just

9      said.

10              MR. WELCH:  And then ask the Court is you're of mind

11      to, to enter the order.

12              THE COURT:  Okay.  I've got the redline and let me

13      put it up on the screen.

14          (Pause in the proceedings.)

15              THE COURT:  All right.

16              MR. WELCH:  So, Your Honor, the redline here

17      reflects a few comments mostly clarifying, but a couple of

18      comments from the Committee, and of course will reflect the

19      findings Your Honor referred to at the beginning of the

20      presentation.  If I take you -- you know, that's just some

21      clarifying.

22              Paragraph 3, comment from the Committee, it's

23      requesting notice.  Again, Paragraph 5, just a clarifying

24      comment with respect to the accrual of the fee.  And also

25      clarifying comment with respect to reimbursement of parties'

1       reservation of rights with respect to that.

2               From a standard perspective, Your Honor,

3       Paragraph 10, this just refers to the commencement of the go

4       shop.  It's really safety language we would say, Your Honor,

5       we just want to make sure parties are on notice and aware that

6       we will be commencing the go shop following approval of this

7       order.  We will of course be filing formal bidding procedures

8       for your approval.  So this go shop and this marketing process

9       will all be subject to the approval of those bidding

10      procedures and of course compliance with them.

11              Paragraph 11, this is what I would describe as a

12      fresh start paragraph, Your Honor.  We want to make sure that,

13      you know, anything that had happened prior to this date would

14      not later come back to bite any party to it.

15              And unless Your Honor has any further questions,

16      we'd ask that you enter the order.

17              THE COURT:  Anyone else have anything they want to

18      highlight in the order?  I hadn't reviewed the redline only

19      because I've never read the original, so I only read the final

20      order.

21              So anybody else have anything?

22          (No audible response.)

23              THE COURT:  All right.  As you know from the

24      beginning I had a few questions.  They've been adequately

25      answered.  I'm going to sign 1182 which is up on your

1       screen -- I'm sorry, 1128 which is up on your screen.

2           (Pause in the proceedings.)

3               THE COURT:  All right.  I sent that to docketing, it

4       should be docketed very soon.

5               What else do we need to do on that motion?  I have

6       another motion up for today, as well, the Committee's motion.

7               MR. WELCH:  Nothing else from the Debtors, Your

8       Honor.  Thank you very much.  And thank you to all the

9       parties.

10              THE COURT:  Thank you.

11              Mr. Fleck, we're going to take up the application by

12      the Committee to employ Pennsylvania special counsel, which is

13      ECF Number 979.  I set it for hearing only because I didn't

14      know why the Committee needed Pennsylvania counsel and I

15      didn't want that to duplicate work that the Debtors were

16      doing.  So I basically wanted an explanation for the reasons

17      behind the Committee hiring it's own separate counsel.

18              MR. FLECK:  Understood, Your Honor.  For the Record

19      once again Evan Fleck of Milbank on behalf of the Official

20      Committee of Unsecured Creditors.

21              This is Docket Number 979.  I would note, Your

22      Honor, we do have the declarants for the application are on

23      the line, Mr. Shiner of Tucker Arensberg, as well as

24      Ms. Cynthia Wong of the PBGC.

25              THE COURT:  So I did not set this for hearing, I

1    don't have any question over the capability of the firm at

2    all, that is --

3              MR. FLECK:  We weren't sure, Your Honor, we just --

4              THE COURT:   -- nothing -- I appreciate them being

5    here and I -- the only reason I set it was a necessity reason

6    and not of any question over the deal or any question over the

7    reimbursement -- your reimbursement obligations to them or the

8    talent of the firm, all of which was apparent from what you

9    had filed.  I just wasn't sure why you needed separate

10   counsel.

11             MR. FLECK:  Sure.  Yes, Your Honor, and I apologize

12   that this aspect of the application was not as clear as

13   perhaps it should have been.  But the issues for which their

14   expertise is required relate to Pennsylvania law as you noted

15   and it goes to the CAF issues that have been referenced here a

16   few times.  The question is really whether one of the Debtors'

17   pre-petition facilities, that's the CAF, is validly secured by

18   mortgages that existed before the CAF was incurred in December

19   of 2021.

20             So they -- that firm had helped the Committee to

21   provide analysis and advice with respect to effectively how

22   Pennsylvania law treats the issues of those mortgages and

23   they're specific to that state's laws that bear on the

24   outcome.  So their advice has already been provided to the

25   Committee, it went into ultimately the Committee's

1    determination to pursue the standing motion that's on for

2    hearing on September 28th.  I expect that the Committee,

3    again, if Your Honor approves the application, will rely on

4    their services as appropriate going forward.

5         Ms. Wong, as she addressed in her declaration, would

6    speak to this now on the Record and as would anyone from the

7    Committee, that they're very careful with respect to

8    duplication of services.  Milbank is not a Pennsylvania law

9    firm, we're not -- do not have expertise with respect to

10   issues under Pennsylvania law.

11        THE COURT:  You don't want to speak too highly about

12   that because people are listening.  But go ahead.

13        (Laughter.)

14        MR. FLECK:  And we instead should have state law

15   expertise from that firm.  Similarly our local counsel,

16   Pachulski, is not situated to provide that advice to the

17   Committee either.

18        THE COURT:  I think that my reason for setting the

19   hearing probably goes away given the announced CAF settlement,

20   that you may oppose, but it creates a different reason for

21   having counsel for the Committee.  So I'm not sure that I even

22   have a reason for having set this anymore given the announced

23   CAF settlement.

24        Let me see if there's any -- and just for the Record

25   what I have is the Debtor having reached an agreement with the

1       parties, whoever was concerned that the Committee might be

2       hiring counsel that would duplicate what the Debtors already

3       have a fiduciary duty to do.  Now that they have an announced

4       settlement it is pretty clear that the Committee would need

5       separate counsel on that to me.

6               Let me hear if anybody has any objection, otherwise

7       I'm going to sign the order.  I know none has been filed, but

8       the circumstances just changed for me in terms of what's going

9       on.  Do you want to put any evidence on?  You can.  Otherwise

10      I'll sign the order.

11              MR. FLECK:  I don't think that's necessary from our

12      perspective.  Thank you, Your Honor.

13              THE COURT:  All right.  Let me take a look at the

14      actual form of the order for today, I have not done so.

15          (Pause in the proceedings.)

16              THE COURT:  I've signed that order and it has been

17      sent to docketing.  Thank you.

18              MR. FLECK:  Thank you, Your Honor.

19              THE COURT:  Can we talk before we leave about what

20      we're doing tomorrow, because I don't know what we have that's

21      now moot and what we have that we're going to proceed on in

22      the morning, just so my preparation to be appropriate.

23              MR. BARR:  Sure.  Ms. Liou will address the lift

24      stay motion, and then hopefully, Your Honor, we'll file that

25      motion before 3:00, so we'll see you tomorrow at 3:00, but

1       obviously --

2                       THE COURT:  Right.  I think about the 10:00 o'clock

3       portion.

4                       MR. BARR:  Yes.  Ms. Liou's coming.  Thank you.

5                       THE COURT:  Ms. Liou, good morning.

6                       MS. LIOU:  Good morning, Your Honor.  Jessica Liou

7       from Weil Gotshal & Manges here on behalf of the Talen

8       Debtors.

9                       Your Honor, we do expect the stay extension hearing

10      tomorrow to move forward with respect to one matter and that

11      would be the Durnack pension plan matter.

12                      We are currently discussions with parties, opposing

13      counsel on the Burnett matter and the State of Montana both

14      lift stay motion and stay extension motion regarding terms of

15      a resolution.  My hope is that by later this morning we should

16      be able to take that off your calendar.  As of now it may

17      still proceed.

18                      But ideally we will end up proceeding solely with

19      the Durnack matter.  You may have noticed that we filed a

20      notice on the docket regarding the adjournment of the Kinder

21      Morgan matter.  That has been adjourned indefinitely given

22      that the State Court matter has now been removed to your

23      court.

24                      THE COURT:  All right.  So the only other thing I

25      have is Mr. Acosta's motion to appear pro hac which is now on

1   tomorrow morning's calendar.  I'm going to sign that right now

2   so that he doesn't have to worry about that once we get that

3   done.

4         (Pause in the proceedings.)

5         MS. LIOU:  Your Honor, we do expect the hearing

6   tomorrow to be an evidentiary hearing.

7               THE COURT:  Good.

8         MS. LIOU:  So --

9         (Laughter.)

10        MS. LIOU:  -- I just wanted to give you a little

11  bit of a heads up about that.

12              THE COURT:  No, that's fine.  So I've got it

13  starting at I think 10:00 tomorrow.

14              MS. LIOU:  That's right.

15              THE COURT:  At 10:00.  Is that right?

16              MS. LIOU:  Uh-huh.

17              THE COURT:  Do you have any estimate on the length

18  of the hearing?

19              MS. LIOU:  I would expect at most an hour and a

20  half.

21              THE COURT:  All right.  That's not binding anybody,

22  I was trying to make plans.

23              If Mr. Acosta is worried about his pro hac, it has

24  been signed and sent to chambers and is taken off tomorrow's

25  docket.

1          What else do we need to do today?

2          MS. LIOU:  Nothing else.

3          THE COURT:  Anyone else have anything they need to

4     raise?

5        (No audible response.)

6          THE COURT:  All right.  Thank you.  We're in recess.

7        (Tha parties thank the Court.)

8        (Hearing adjourned 9:13 a.m.)

9                              *  *  *  *  *

10         *I certify that the foregoing is a correct transcript*

11    *to the best of my ability produced from the electronic sound*

12    *recording of the proceedings in the above-entitled matter.*

13     ___/S./  MARY D. HENRY_____

14    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

16    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17    *JTT TRANSCRIPT #66237*

18    *DATE FILED:  AUGUST 30, 2022*

19

20

21

22

23

24

25