1             IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                     HOUSTON DIVISION

4

5   IN RE:                    §    CASE NO. 22-90054-11
                              §    (Jointly Administered)
6   TALEN ENERGY SUPPLY, LLC, and §  HOUSTON, TEXAS
    NORFOLK SOUTHERN RAILWAY CO., §  TUESDAY,
7                             §    SEPTEMBER 6, 2022
        Debtors.              §    1:32 P.M. TO 2:36 P.M.
8

9                     MOTION HEARING
                 Debtors' Motion to Continue
10      Each of the UCC Standing Motions (ECF #1158)

11         BEFORE THE HONORABLE MARVIN J. ISGUR
               UNITED STATES BANKRUPTCY JUDGE
12

13

14      APPEARANCES:              SEE NEXT PAGE

15

16      (Recorded via CourtSpeak; no log notes.)

17

18

19

20             TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 Eldridge Road, #144
22              Sugar Land, TX 77478
                 Tel: 281-277-5325
23              www.judicialtranscribers.com

24

25   Proceedings recorded by electronic sound recording;
       transcript produced by transcription service.

```
 1                        APPEARANCES

 2
   FOR THE DEBTORS:              GABRIEL MORGAN, Esquire
 3                               PAUL GENENDER, Esquire
                                 ALFREDO PEREZ, Esquire
 4                               CLIFF CARLSON, Esquire
                                 NAT BARR, Esquire
 5                               Weil Gotschal & Manges, LLP
                                 700 Louisiana, Suite 1700
 6                               Houston, Texas 77002
                                 713-546-5000
 7

 8
   FOR ALTER DOMUS (US) LLC:     ROBERT BRUNER, Esquire
 9                               Norton Rose Fulbright US LLP
                                 1301 McKinney, Suite 5100
10                               Houston, Texas 77010
                                 713-651-5216
11

12
   FOR THE OFFICIAL COMMITTEE    ATARA MILLER, Esquire
13 OF UNSECURED CREDITORS:       MATTHEW BROD, Esquire
                                 Milbank
14                               55 Hudson Yards
                                 New York, New York 10001
15                               212-530-5000

16
   FOR THE AD HOC GROUP:         CHRIS KOENIG, Esquire
17                               Kirkland & Ellis
                                 300 North LaSalle
18                               Chicago, Illinois 60654
                                 312-862-2372
19

20
   FOR CITIBANK N.A.             DAVID SCHIFF, Esquire
21 AS COLLATERAL TRUSTEE:        Davis, Polk & Wardwell, LLP
                                 450 Lexington Avenue
22                               New York, New York 10017
                                 212-450-3182
23

24

25


                JUDICIAL TRANSCRIBERS OF TEXAS, LLC
```

1                      APPEARANCES (Continued)

2

3  FOR TEC & RIVERSTONE:        MATT MORAN, Esquire
                                PAUL HEATH, Esquire
4                               DAVID MEYER, Esquire
                                Vinson & Elkins
5                               845 Texas Avenue, Ste. 4700
                                Houston, Texas 77002
6                               713-758-3313

7

8  FOR THE AD HOC GROUP         MARTY BRIMMAGE, Esquire
   OF FIRST LIEN CREDITORS:     Akin Gump Strauss Hauer & Feld
9                               2300 N. Field St., Ste. 1800
                                Dallas, Texas 75201
10                              214-969-2885

11

12  (Please also see Electronic Appearances.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX

2    EXHIBIT                    IDENTIFIED       RECEIVED

3    ECF No. 1168, 1-13              7               8
     ECF No. 1177-1, 6/15/22 Depo
4        Transcript of Ryan Omohundro   8           17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **HOUSTON, TEXAS; TUESDAY, SEPTEMBER 6, 2022; 1:32 P.M.**

2           THE COURT:  Please be seated.  All right, we're

3  here in the Talen Energy Supply case.  It is 22-90054.

4  Electronic appearances have been made.  If you intend to

5  speak on the phone at today's hearing, if you would please

6  press five star one time on your phone.

7           If you plan to speak in court, if you would please

8  come forward to the podium.  Mr. Koenig?

9           MR. KOENIG:  Good afternoon, Your Honor.  Chris

10  Koenig from Kirkland & Ellis on behalf of the Ad Hoc Group.

11  Can you hear me this afternoon?

12           THE COURT:  I can, Mr. Koenig.  Thank you.

13           MR. KOENIG:  Thank you.

14           THE COURT:  Mr. Schiff?

15           MR. SCHIFF:  Good afternoon, Your Honor.  David

16  Schiff of Davis, Polk & Wardwell, LLP on behalf of Citibank

17  N.A. in the capacity of Collateral Trustee.

18           THE COURT:  Good afternoon.

19           Mr. Carlson?

20           MR. CARLSON:  Good afternoon, Your Honor.  Cliff

21  Carlson of Weil Gotschal on behalf of the Debtors.  Joined

22  with me here in the courtroom, Paul Genender, Alfredo Perez,

23  and Gabe Morgan.  And then joined with me on the phone is

24  Matt Barr.

25           THE COURT:  Thank you.

1      MS. MILLER:  Good morning, Your Honor.  Atara

2  Miller from Milbank on behalf of the Official Committee of

3  Unsecured Creditors.  And with me in the courtroom is my

4  partner, Matthew Brod, also from Milbank.

5      THE COURT:  Ms. Miller, good afternoon.

6      MS. MILLER:  Good afternoon.

7      MR. MORAN:  Hello, Your Honor.  Matt Moran with

8  Vinson & Elkins.  Joined with me today is Paul Heath in the

9  courtroom, as well as David Meyer on the phone.  We

10  represent TEC and Riverstone.

11      THE COURT:  Thank you.  Good afternoon, Mr. Moran.

12      MR. BRUNER:  Good afternoon.  Bob Bruner --

13      THE COURT:  Good afternoon, Mr. Bruner.

14      MR. BRUNER:  -- Norton Rose Fulbright, on behalf

15  of Alter Domus, as agent under the commodity coding

16  facility.

17      THE COURT:  Thank you.

18      MR. BRIMMAGE:  Marty Brimmage with Akin Gump

19  Strauss Hauer & Feld, here on behalf of the Ad Hoc Group of

20  First Lien Creditors.

21      THE COURT:  Thank you.

22      All right.  I believe it is the Debtors' motion.

23      MR. CARLSON:  Thank you, Your Honor.  And, again,

24  Cliff Carlson.

25      So, Your Honor, what we have on today's Agenda is

1    just the Debtors' Motion to Continue each of the UCC

2    standing motions.  It was filed at ECF No. 1158.

3              And we do have a presentation which is primarily

4    legal argument, and we have a demonstrative we'd like to put

5    up on the screen.

6              But before we do that, we'd also move to offer

7    into evidence our exhibits filed at Docket No. 1168 into

8    evidence.

9              THE COURT:  Are we going to have any live

10   testimony?

11             MR. CARLSON:  No testimony, Your Honor.

12             THE COURT:  All right.  Is there any objection to

13   1168, 1 through 13, being admitted?

14             MS. MILLER:  Can you just give us one minute, Your

15   Honor?

16             THE COURT:  Sure.

17             MS. MILLER:  Do Debtors have a copy for us?  And

18   it's the demonstrative that you would like to put with that?

19             MR. CARLSON:  We do.

20        (Counsel reviewing exhibits.)

21             MS. MILLER:  We have no objection to the proposed

22   exhibits, Your Honor.

23             THE COURT:  All right.  1168, 1 through 13 are

24   admitted.

25        (ECF No. 1168, Exhibits 1 through 13 received in

1  evidence.)

2          MR. CARLSON:  So, Your Honor, I think it's Rebecca

3  Richardson, she would be the person that we planned to put

4  up the demonstrative --

5          THE COURT:  Are you resting on your evidence?

6          MR. CARLSON:  Yes, Your Honor.  That's the

7  entirety of our evidence.

8          THE COURT:  All right.  We'll show that the Movant

9  has rested on its evidence.

10          Is there any other party that supports the Motion

11  for a Continuance that has any evidence that it wishes to be

12  introduced today?

13      (No response.)

14          THE COURT:  All right.  Any evidence from any

15  party in opposition to the motion?

16          MS. MILLER:  No, Your Honor.

17          THE COURT:  All right.  We'll show the evidentiary

18  record is closed.

19          MS. MILLER:  Oh, sorry.

20          THE COURT:  I'm sorry?

21          MS. MILLER:  My apologies, Your Honor.  We'd like

22  to move into evidence the deposition transcript of Ryan

23  Omohundro from June 15th, 2022, which was attached as

24  Exhibit 1 to Docket 1177.

25          THE COURT:  Is there any objection to 1177-1 being

1   admitted?

2           MR. CARLSON:  Your Honor, we would object to

3   relevance.

4           THE COURT:  Any other objection?

5           MR. CARLSON:  Just relevance.

6           THE COURT:  All right.  We --

7           MR. CARLSON:  Your Honor --

8           THE COURT:  The relevance objection is preserved

9   until we see portions of it that are offered and an

10  explanation of relevance.  But it's admitted subject to a

11  relevance objection.  Go ahead.

12          MR. BRIMMAGE:  Your Honor, I was going to make an

13  objection as well.  Little bit of a surprise here.  So I'm

14  going to object to hearsay and not conforming to the rules

15  of a witness being unavailable.

16          I don't know what's in the deposition, but I'd

17  like to have an opportunity to see it.

18          THE COURT:  Sorry, who's your client?

19          MR. BRIMMAGE:  The First Lien Lenders.

20          THE COURT:  Got it.  Sorry.

21          MR. BRIMMAGE:  Your Honor, for the Record, Marty

22  Brimmage with Akin Gump, here on behalf of the Ad Hoc Group

23  of First Lien Lenders, and we filed a joinder to the

24  Debtors' motion today.

25          THE COURT:  All right.

1        MS. MILLER:  And I'm not sure I understand the

2   objection, given that it wasn't filed in the Record.

3        THE COURT:  The objection is whether the

4   deposition is admissible under the Federal Rules of

5   Evidence; right?

6        MR. BRIMMAGE:  Correct, Your Honor.

7        MS. MILLER:  I mean, we can preserve.  I think

8   there are admissions against interests that are clearly

9   admissible and not hearsay, and we can address it along with

10  Mr. -- along with the Debtors' referenced objection when we

11  get to it.

12       THE COURT:  Mr. Brimmage?

13       MR. BRIMMAGE:  Your Honor, it's an out-of-court

14  statement made for the truth of the matter asserted therein.

15  I think what we just heard was for the truth of admissions.

16       I don't know what's in it, but it's -- I can't

17  not object to it, because I think it's an out-of-court

18  statement.  There's been no showing of the witness being

19  unavailable.  There's been no showing that all parties were

20  present at the deposition and had an opportunity to question

21  the witness on it.

22       If there were issues that are in there that need

23  to be Re-Directed or Re-Crossed, it could have been

24  addressed.

25       THE COURT:  If it's an admission against interest,

1  does that matter?

2        MR. BRIMMAGE:  I think it might.  I mean, if

3  it's an admission against interest and it could have been

4  followed up on, it might.  But it's still an out-of-court

5  statement.

6        THE COURT:  Well, it's an out-of-court statement,

7  but under the definition of hearsay?  Is it a statement

8  offered against an opposing party and made by the party in

9  an individual or representative capacity?

10       MR. BRIMMAGE:  I've never seen it, so I don't

11 know.  But I know that it was made out of court.  I know --

12 I wasn't at the deposition.  To my knowledge, Akin Gump and

13 our clients were not represented at the deposition.  If I'm

14 wrong about that, please, someone correct me.

15       THE COURT:  I think that doesn't matter.  If it is

16 -- Mr. Alejandro, I think, is the CRO of the Debtor; right?

17       MR. BRIMMAGE:  Correct.

18       THE COURT:  Yep.  So it's a statement offered

19 against the Debtor and made in that party's representative

20 capacity, then it's not hearsay.

21       I'm going to overrule the hearsay objection; it's

22 admitted subject to relevance.

23     (Exhibit ECF No. 1177-1 received in evidence.)

24       THE COURT:  Okay, let's go ahead.  So who did you

25 want to have the presentation?

1          MR. CARLSON:   Rebecca Richardson.

2          THE COURT:   All right.   Ms. Richardson, can I get

3   you to turn your camera on briefly -- oh, wait, that's you

4   right there.   Got you.   All right.

5          Ms. Richardson, you have the screen.

6          Mr. Carlson, go ahead.

7          MR. CARLSON:   Thank you.

8          So, Your Honor, I think what the Debtors are

9   seeking is pretty simple here.   We -- in light of the

10   settlements that we've reached -- and there's three

11   settlements that I'll walk the Court through briefly.   But

12   in light of the settlements that we've reached, we think it

13   makes sense for the Court to continue the hearing on each of

14   the Standing Motions that are scheduled for later in

15   September, to allow the Debtors to proceed with their Plan

16   and seek approval of those settlements as part of our

17   confirmation process.

18          And each of those three -- so those three

19   settlements, two of which relate to the motions that have

20   been filed for the Committee.   The first is what we call --

21   we refer to as the "Talen Gold Settlement" in our papers.

22   And that's the settlement that the Debtors and the Unsecured

23   Notes Group have reached with TEC, the equity holder, and

24   the Riverstone entity, the equity sponsor, that has been

25   negotiated over the past several weeks.

1          Second is, the settlement that we've reached with

2  the Secured Lender Group that we refer to as the "CAF

3  Lenders," and that's represented by the Akin group.

4          And then finally -- and this one isn't -- doesn't

5  relate to the UCC Standing Motions, but it's our settlement

6  with the First Lien Lenders, also referred to as the no-CAF

7  First Lien Lenders, represented by King & Spalding.

8          And so as Mr. Barr previewed last week, we are in

9  the process of incorporating the settlement into our

10  Chapter 11 Plan and a time to get that on file.  I think he

11  said seven to ten days as of last week, and we're on track

12  to get that on file within the next few days.  And that will

13  incorporate and seek approval of those settlements pursuant

14  to 9019 and 1123 of the Bankruptcy Code.

15          And so, you know, Your Honor, given where we're at

16  today -- and we think it's most fair and sensible to allow

17  the Debtors to move forward and to put on their case, and be

18  provided the opportunity to present a complete picture of

19  why those settlements should be approved.

20          And really, it comes down to sort of two points.

21  Number one, we think it's really -- it's the Debtors'

22  property rights and we own -- no one disputes that we own

23  these causes of action and we have the exclusive authority

24  to settle them, and we have.

25          The only thing that's being challenged is whether

1  our judgment -- or we've exercised our business judgment to

2  approve those settlements.  And we think we should be -- we

3  should be allowed to move forward to put on our case for why

4  they should be.

5          And second, Your Honor, is really a way of

6  prejudice here.  We don't think there's any prejudice to the

7  Committee.  You know, we aren't saying they won't have their

8  day in court.  They will.  We just think that the Debtors

9  have the right to move forward and put on their case as part

10  of confirmation of our Plan before it makes sense for this

11  Court to determine whether or not the STN, you know,

12  standing requirements are met, including whether or not the

13  Debtors unjustifiably refused to prosecute claims that we've

14  determined to settle.

15          THE COURT:  So let's assume for a minute that we

16  go through this hearing, and I leave the hearing and say:  I

17  think the Debtors have a big uphill battle here.  I think

18  it's going to be hard to prove that they should prevail in

19  the compromises, but that I understand why you made the

20  compromises and I'm not prepared to reject them out of hand.

21  I just think you're going to lose.  Who wins then, the

22  standing hearing?

23          MR. CARLSON:  If the Court's determined -- if the

24  Court determines that you get why we did it, but we think --

25  I think we win.  I think in that situation, that standing

1   can't be granted.  I think that --

2         THE COURT:  I think you do, too, and that's what

3   I'm trying to figure out.  And I want Ms. Miller to answer

4   that if she thinks I'm wrong about that.  But I'm

5   contemplating a different kind of hearing than maybe the

6   two of you are contemplating.

7         Defeating the compromise doesn't win standing.  It

8   might ultimately, defeating the compromise, where if there

9   are no alternatives left for you.  But on the -- if we were

10   to hold a hearing soon, and me thinking you haven't done

11   enough to win your compromise and you're probably not going

12   to win it, I don't think that's an unjustifiable refusal.

13         So I'm trying to figure out why we're -- I don't

14   understand why this is such a big deal to either party,

15   given where I think the burdens are.  And I want maybe a

16   better understanding from both sides as to what's the proof

17   at that hearing.

18         The burden's on them, right?  And they've got to

19   prove -- not that you're going to lose, but that you're

20   being unjustifiable in trying to win.  Hard, hard burden.

21         MR. CARLSON:  So I agree, Your Honor, and that is

22   that it is their burden to show each of the three elements

23   of standing, which is that the claims are colorable and that

24   the Debtors have unjustifiably refused to prosecute them.

25   But we think --

1          THE COURT:  What's the third one?

2          MR. CARLSON:  The third one is court approval to

3    prosecute them.

4          THE COURT:  Oh, okay.

5          MR. CARLSON:  So this sort of swallows up one and

6    two.  And so, you know, Your Honor, the reason that this is

7    prejudicial to the Debtors is that we don't think it makes

8    sense to move forward and be litigating discrete aspects as

9    part of that Element No. 2, and have many confirmation

10   hearings in September, when really this is a packaged --

11   these are packaged settlements that you look -- and you need

12   to look at -- the Court will need to look at all of the puts

13   and takes and the costs and benefits of these settlements.

14         And the settlements -- if part of those -- and

15   they're dealing with several things beyond just the claims

16   that the UCC seeks to litigate, but they go to the heart of

17   confirmation and these parties' support for confirmation,

18   and what they're bringing to the table and their

19   contributions at confirmation.

20         THE COURT:  But the other side of that is, if it's

21   so unreasonable that it's unjustifiable, and your behavior

22   is atrocious, why should I go through a confirmation

23   hearing?  In other words, if their standard is high enough,

24   I don't know why they want to go through the hearing.  I'm

25   going to hear that from Ms. Miller.

1          But if the standard against them is so high,

2    and they meet it, do you really want to go through a

3    confirmation hearing?

4          MR. CARLSON:  Well, Your Honor, we think -- and if

5    this is still directed at me and not Ms. Miller, I'll answer

6    it, but -- is this for me or Ms. Miller?

7          THE COURT:  It's for you.  She's going to get to

8    tell me why she wants it.

9          I don't know why -- I am worried about how to

10   structure the hearing because I am not going to hold a mini-

11   confirmation hearing in deciding whether your actions are

12   unjustifiable.  That would be unfair.

13         But if her standing is proving that it is

14   unjustifiable of you to move to a confirmation hearing, and

15   she wins, that's going to be a huge savings to the estate;

16   right?  Of having you re-direct your efforts.  But her

17   standard is so high, I don't know how she's going to win,

18   but --

19         MR. CARLSON:  Well, I guess I would have sort-of

20   two points to respond to that.  Number one, I think it's the

21   Debtors' right and our prerogative to move forward, and we

22   bear the risk.  And the Committee can always come back if we

23   don't confirm the Plan and we don't get the settlement

24   approved.

25         THE COURT:  It's not your -- it's never your right

1  to behave in an unjustifiable way, right?  It's your behave

2  -- it's your right to proceed down a justifiable route and

3  try and win or not.

4          MR. CARLSON:  Sure.  And I guess that sort of goes

5  -- will go to my second point, which is that it really will

6  be -- and I think this is the point I've already made -- is

7  that it really will be unfair to be able to have a standing

8  hearing and it sort of inverts the process.

9          We have -- we have settlements already in hand.

10 We've already exercised our authority granting another party

11 to prosecute claims that are already settled.  It flips the

12 natural process for having those heard.

13         THE COURT:  I would think -- okay, look, there's

14 one standing hearing in the case; right?  Not a series of

15 them?

16         MR. CARLSON:  Well, there are two, so we have --

17         THE COURT:  No, as to each claim, the Committee

18 can get one standing motion, at which things are collateral

19 estoppel or *res judicata*.  They're issue-precluded.

20         You don't want that now, when it's entered as

21 unbearable?

22         MR. CARLSON:  We don't think -- we don't think we

23 should be going down that path at this stage.  We think --

24 we agree, we think we'll carry our burden on those, but

25 having two separate evidentiary hearings on those standing

1    motions on claims that have been settled doesn't make sense

2    to us at this stage.

3              THE COURT:  Go ahead.  Is that your presentation?

4              MR. CARLSON:  No, no, Your Honor.  Let me just --

5              THE COURT:  Okay.

6              MR. CARLSON:  And so, Your Honor, just to briefly

7    walk you through kind of why -- what these settlements

8    accomplish.  First, the Talen global settlement, the

9    Debtors, the unsecured notes group, and TEC and Riverstone,

10   have been negotiating for the past several weeks.

11             It really results in a number of different issues.

12   Some of those are going to be heard, and the aspects of

13   what's being asked to be approved, on the 28th.  And then a

14   number of them are going to be incorporated in our Plan.

15             And those benefits that we've negotiated as part

16   of the Talen global settlement is, number one, it solves the

17   Plan structure issue where TEC has agreed to contribute.

18   TEC is the new reorganized holding company and that will

19   result in a savings of $115 million worth of potential tax

20   liabilities if the entities were to be consolidated.

21             It provides the Debtors with greater economic

22   rights and governance rights over the cumulus entities,

23   which is part of the Debtors' vision, obviously, in a go-

24   forward Plan towards a decavernized future.  And it resolves

25   Plan issues and valuation issues and what the treatment will

1  be for our equity holder under the Plan.

2          And, yes, you know, finally, it does, as one

3  aspect of that global settlement, provide for a mutual

4  release of claims, including the Riverstone claims, that the

5  UCC is seeking standing to prosecute.  But, again, that's

6  only one aspect of a larger deal, and they need to be --

7  they need to be evaluated in totality.

8          And then second, Your Honor, is the CAF

9  settlement, where the Debtors -- again the Debtors, the CAF

10  lenders, and the unsecured notes group, have negotiated a

11  settlement with the CAF lenders that fully resolves the

12  amount of their allowed claim.  And, in particular, it

13  resolves a dispute over the amount of their make-whole, and

14  resulting in a $120 million discount in the amount of that

15  make-whole.  And it also results in having the full support

16  of the CAF lenders in support of our Chapter 11 Plan.

17          And then finally, Your Honor, we've also reached a

18  settlement with the other non-CAF lenders, represented by

19  the King & Spalding group, that resolves the amount of their

20  allowed claims, including a make-whole Plan as well.

21          And so we're at today -- you know, since we filed,

22  we have got almost all of the pieces for a fully consensual

23  Chapter 11 Plan.  We've got holders of about 80 --

24  approximately 83 percent of our unsecured notes group.

25  We've got holders of approximately 86 percent of our CAF

1   claims, 97 percent of our terminal lenders, and 48 percent

2   of our secured notes.

3          And, you know, we of course will work to try to

4   get the remaining pieces in place, and parties will reserve

5   their rights with respect to confirmation.  And parties who

6   are not yet signed on to support the settlements and the

7   Plan will retain all those rights and can be heard at

8   confirmation.

9          And between now, we intend to seek additional

10  support of those parties and have them embodied in hopefully

11  a consensual Chapter 11 Plan.

12         THE COURT:  If you lose confirmation, do you think

13  they then get standing?  Assuming we don't have an earlier

14  standing motion where they're claim-precluded out of that.

15         MR. CARLSON:  They haven't -- no --

16         THE COURT:  So let's assume we have no advance

17  standing hearing, we go through confirmation, and you lose

18  on the grounds that the settlements are unreasonable.  So I

19  rule they're unreasonable settlements.  Do they now get

20  standing?

21         MR. CARLSON:  Not necessarily, Your Honor.  I

22  think they get to be heard on their standing motion.  But I

23  don't think -- I don't think --

24         THE COURT:  Would you propose another unreasonable

25  compromise?  Why would I do that?

1        MR. CARLSON:  Granted, it would make it much more

2   difficult for us to defend an STN motion at that point in

3   time, but I don't think it necessarily follows that they

4   would be automatically granted standing.

5        THE COURT:  Okay.  Thank you.

6        MR. CARLSON:  So, Your Honor, I think that really

7   concludes my presentation.  Again, just to summarize, we

8   think --

9        THE COURT:  Okay.  Ms. Miller?

10       MR. CARLSON:  Oh, I'm sorry, Your Honor.  Just one

11   thing we needed to clarify is that at the beginning, Ryan

12   Omohundro is not the CRO.  He was a corporate representative

13   in the deposition, but he's not a CRO from the company.

14   Just wanted to make that clarification.

15       THE COURT:  Okay, thank you.  Ms. Miller?  Oh,

16   sorry.

17       MR. BRIMMAGE:  Your Honor, Marty Brimmage on

18   behalf of the ad hoc group of first lien lenders.  I'm

19   totally happy to have Ms. Miller go next, but I didn't want

20   to go after her to be more of a rebuttal, or the other

21   parties that are --

22       THE COURT:  Yeah, I mainly want to hear why we're

23   doing this from her because --

24       MR. BRIMMAGE:  That's fine, Your Honor.

25       THE COURT:  Yeah, I -- this seems to me to put a

1 burden that you don't want, and to preclude your remedies

2 you do want.  So I need to understand better why I should do

3 this.

4         MS. MILLER:  Your Honor, frankly, I am almost as

5 confused as you are about why we're standing here on an

6 emergency motion, and I think it's quite telling to me that

7 the Debtors pushed to have this hearing, you know, even on

8 the original schedule, which we adjourned slightly to

9 accommodate the Debtors' witness.

10         But to have it, you know, on a day's notice, just

11 to avoid having a standing motion, I think there's no

12 question that the burden is high for us on a standing

13 motion, here where the Debtor has negotiated settlements.

14         But I think there's also no question that the

15 compromises that the Debtors have negotiated include no

16 value for the particular claims that the Committee's seeking

17 standing for.  And I think that what's going on here is that

18 there is an attempt or belief that if you put it in the

19 context of 9019 and confirmation, it will obscure the fact

20 that these particular claims for which the Committee's

21 seeking standing, are being settled for no value.  And I

22 think there's no question or debate in the record.

23         And I would maybe now point to Mr. Omohundro's

24 testimony, which was 1177-1.  At the bottom of page 107, and

25 carrying on to page 108, Mr. Omohundro was asked --

1          THE COURT:  Hold on, let me get it up.

2          MS. MILLER:  Sure.  This was in the context of the

3     DIP hearing and certain of the --

4          THE COURT:  Oh, well that's filed under seal, I

5     think.  Where would I find an unsealed version of this?

6     (Locating document.)  I think I've got it.

7          MS. MILLER:  Okay.

8          THE COURT:  Okay.  Page what now?

9          MS. MILLER:  It's at the bottom of page 107 of the

10    transcript.

11         THE COURT:  Okay.

12         MR. CARLSON:  Your Honor, if I may, just for the

13    Record, where are you finding this?  Because I looked and

14    didn't see a Witness and Exhibit List.  So where exactly is

15    this?

16         THE COURT:  1177 is a Witness and Exhibit List,

17    and 1176 is the sealed version of that.

18         MR. CARLSON:  Thank you.

19         THE COURT:  So I'm at the bottom of 106 (sic).

20    This is being showed, even though it's sealed.  So tell me

21    if I end up with a problem.

22         MS. MILLER:  I don't think there's anything.  I

23    mean, I'll leave it to the Debtor if it's there.

24         THE COURT:  So I'm at the bottom of 106 (sic) of

25    the transcript, or 106 (sic) of these --

1          MS. MILLER:  106 (sic) of the transcript.

2          THE COURT:  Okay.

3          MS. MILLER:  Sorry.  107 of the transcript.

4          THE COURT:  107 of the transcript.  Okay.

5          MS. MILLER:  So Mr. Omohundro was asked whether

6     there was some reason that the Debtors didn't conduct an

7     investigation of the claims arising from the accordion

8     facility, which is what we refer to as the CAF.

9          And his answer was, "Other than -- other than that

10    the Debtors believed it was a legitimate transaction, no."

11         And then Mr. Omohundro was asked whether the

12    Debtors haven't investigated possible claims relating to the

13    accordion facilities.  They don't know how much they're

14    giving up to the DIP lenders in that circumstance, when they

15    agreed to provide the liens on the proceeds of any such

16    claim.  And Mr. Omohundro said, "I don't know how we'd be

17    able to value something we didn't investigate."

18         I'm not sure now that we're in the context of the

19    actual settlement, the Debtors can take the position that

20    all of a sudden they know the value of the claims, which

21    they've never investigated -- they don't suggest otherwise

22    in any of these papers -- but now they reasonably settled

23    them and knew what an appropriate or reasonable value was.

24         I agree, Your Honor, it is a high burden, and I am

25    very confident that we can carry that burden.

1          THE COURT:  So let me ask you, do you also agree

2     that you only get one shot at standing?  In other words, if

3     you -- let's assume that you go forward and you lose, on a

4     hearing two weeks from now.  And then we go to confirmation.

5     Do you get to, again, assert standing at that point?  Or

6     once you are denied standing, that's permanent; right?

7          MS. MILLER:  Well, I would think, Your Honor, that

8     it would depend on the basis for which Your Honor denied it;

9     right?  So I could imagine --

10          THE COURT:  Let's say I deny it because I think

11     the settlement's unreasonable, however you knew all about it

12     at the time of the hearing.  So you win that it's an

13     unreasonable settlement.  I don't know that you can have

14     another standing hearing because under the law it wouldn't

15     be new evidence, right?  You're choosing to proceed at a

16     time before it's ripe, and I may let you do that.  But I'm

17     not going to then let you come back after it's ripe and do

18     it over.

19          MS. MILLER:  Well, I think one question -- I think

20     the facts may matter and the context may matter in the sense

21     that you may decide that the settlement is unreasonable but

22     our standing -- well, you'd have to decide that the

23     settlement is reasonable for us to be -- for our standing

24     to be denied?

25          THE COURT:  No, I don't.

1          MS. MILLER:  Well, you'd have to --

2          THE COURT:  All I would have to decide is --

3          MS. MILLER:  That it was a reasonable exercise of

4   the Debtors.

5          THE COURT:  No.  That it was a not unjustifiable

6   exercise.  So they think -- we know what their testimony is

7   going to be.  They think the global deal is worth the price,

8   right?  That's what they're going to tell me.

9          And I have to decide it is unjustifiable for them

10  to proceed when they think the global deal is worth the

11  price.  And you're going to have to prove that it's -- that

12  there just aren't circumstances under which that's

13  justifiable.

14         On the other hand, if you wait until after I say

15  that the settlement's not reasonable -- which would not be

16  the standard at hearing one -- then I understand why you

17  would proceed.  I don't know why you want your bite at the

18  apple before you get that conclusion.

19         Can I ask a different -- let me just ask you

20  something else, because I am worried.  I don't want this

21  buried in the confirmation hearing, and I hear that as being

22  a very legitimate concern on your part.

23         I wonder if it doesn't make some sense --

24  primarily out of just respect for the Committee and what its

25  rights and duties are -- to, as part of the confirmation

1    hearing, set aside a separate block of the hearing, where

2    witnesses are going to be recalled and where the only thing

3    we consider are the merits of the two compromises as that

4    part of the hearing, so it's not lost.

5         Because I know from a litigation strategy why that

6    would worry you, and I don't know that I'm going to be

7    bothered by saying to the Debtors:  Your confirmation burden

8    is going to be met in two different segments, but one is

9    going to be to prove the reasonableness of the compromises.

10        And that -- we're going to have isolated evidence

11   on that where it'll just be, you know, the second third of

12   the hearing is going to be reserved for that, and bring your

13   witnesses back.  Does that make some sense so that it

14   doesn't get lost and you do get a full, fair shot?

15        MS. MILLER:  So I think in good procedure we would

16   do that to a certain extent anyway, at confirmation, because

17   my understanding is that they're going to have -- they're

18   going to try to do this under 9019.  And so they would need

19   to make a showing on the confirmation for the Plan, but also

20   separate showings on 9019 for settlements.

21        THE COURT:  Yeah, but they're going to put, let's

22   say, Mr. Alejandro, up there and he's going to give, you

23   know, all of his testimony by declaration to cover

24   everything.  And I'm saying, no, I do worry about losing

25   something important like this by saying, "Okay, well,

1    they've got the votes, they've got this, they've got that."

2          Why wouldn't I give you your own several hours for

3    this issue?

4          MS. MILLER:  So I think that would help.  I mean,

5    listen, my real concern here is that I do think there is a

6    different question of whether the settlements in toto are

7    reasonable, and whether the settlement of these claims are

8    reasonable.

9          And what I think frankly happened here is they

10   were not part of the negotiation, they were not used as

11   leverage.  The Debtors -- I mean, certainly the CAF publicly

12   abdicated their right and agreed to secure the DIP

13   financing, that they would not pursue these claims.  They

14   could not possibly have had any leverage to extract any

15   value for them in a negotiation.

16         And all of a sudden, that gets folded into a much

17   broader discussion when you're on the eve of confirmation,

18   and the consequence is that the whole deal potentially falls

19   apart.  I mean, the way the settlements are structured now,

20   if the Committee gets standing now, as long as it's resolved

21   by confirmation, those settlements stand and remain.  If the

22   Committee gets standing at confirmation, those settlements

23   blow up.

24         I mean, to me, good order says:  Let's do it now,

25   let's start the process.  The Debtors have said it's the

1  same discovery so --

2        THE COURT:  What is the benefit of giving you

3  standing now?

4        MS. MILLER:  The benefit is that the Court will

5  have -- will be able to develop a record and evaluate the

6  claims, consider whether or not if we can put on a showing

7  that, you know, we think we can sustain that they're

8  colorable and, more than that, that they're viable claims,

9  then it gives the Debtors time to renegotiate those

10 agreements, and get to a real global settlement.

11        THE COURT:  But why does it -- I don't understand

12 why it matters if you have standing.  If you think that's

13 the way the evidence is going to come in, you just defeat

14 the 9019s; right?

15        MS. MILLER:  Well, the 9019 is not whether or not

16 the claims are colorable or even whether they're likely to

17 survive a Motion to Dismiss or even whether they're more

18 likely than not to be right.  Once you're at a 9019, the

19 standard is whether or not the settlements to consider, in

20 toto, are reasonable.

21        THE COURT:  Yeah.  And look, if you have fear that

22 you're going to lose on the 9019 side, I guarantee you're

23 going to lose on the unjustifiability side.  I mean, those

24 go hand-in-hand.  You're not going to win if they're

25 unjustifiable.

1          If it might make sense to resolve them in a 9019,

2  you may win if the 9019's still not reasonable.

3          MS. MILLER:  I think the question before the Court

4  is different, right?  The question on the standing motion --

5          THE COURT:  I know it's harsher on -- but it's

6  harsher on you.  That's what I'm trying to fix.  That's why

7  I'm confused.

8          MS. MILLER:  I'm willing to take the pressure.

9  You know, the question --

10          THE COURT:  Not bad.  I want the right outcome,

11  and I actually don't want to rule when I think you're at an

12  evidentiary -- not an evidentiary.  You're at a legal

13  juggernaut of having to overcome -- and maybe my view of the

14  legal standards is wrong.

15          But I think you're agreeing that you've got to

16  prove, to get standing, that their conduct is unjustifiable.

17  And that'll be a lot easier if you've already won the 9019

18  than it will be when you actually have some concern that you

19  might lose the 9019.

20          MS. MILLER:  But the question about the

21  unjustifiability with respect to my standing motion is with

22  respect to the settlement of those particular claims --

23          THE COURT:  Right.

24          MS. MILLER:  -- which is a different inquiry.  So

25  it keeps the Court --

1           THE COURT:  Why is that different?

2           MS. MILLER:  Because once you're at the 9019 of

3   Plan confirmation, you're looking at the total settlement

4   and whether or not it's necessary.  They're going to have

5   the argument that says:  And, Your Honor, these settlements

6   fall apart if standing is granted now.  So, of course, you

7   can't get the Committee's standing now because all of a

8   sudden they have the argument that says that these are, you

9   know, inextricably linked and necessary to the Plan.  That's

10  not true today.

11          THE COURT:  Of course.  They're going to be at

12  risk of losing all on confirmation.  Talk about leverage for

13  you; right?  I'm not going to confirm and then drag along

14  9019s, where the big picture says don't.

15          But that's the idea why I don't understand how you

16  and justifiability is -- your job is to look at the big

17  picture.  It isn't just at whether this maximizes or

18  minimizes the returns to unsecured creditors.  They have a

19  bigger job than that.

20          And if part of their reason for taking this

21  conduct is to look at a big picture, you're going to lose

22  that it's unjustifiable.

23          MS. MILLER:  I think, Your Honor -- I mean, our

24  view is we'd like to get to the right outcome.

25          THE COURT:  Right.

1          MS. MILLER:  And we'd like to do it on the

2    timetable that's been imposed on us by the Debtors.  We

3    don't want to wait until confirmation.  I mean, we brought

4    these motions now, first of all, because we had to, right?

5          THE COURT:  Right.

6          MS. MILLER:  So I feel a little bit like I'm Alice

7    in Wonderland, under the rabbit hole where they say, "You've

8    got to do it now," and you can't do it now.

9          THE COURT:  I'm not blaming you for bringing the

10   motions.  It's the timing that I'm worried about.

11         MS. MILLER:  So, you know, listen, they wanted us,

12   and they set up a process and a procedure for this case,

13   which required the Committee to investigate in a very short

14   period of time.  We discussed that with Your Honor; we

15   agreed that we would do it.

16         We did it.  We brought our motion.  They wanted

17   all the claims on the table so that they could negotiate

18   them and find a resolution to everything.  And what they

19   didn't say was:  Negotiate a resolution to everything else,

20   not including -- include all constituents but not the

21   Committee, and not include or resolve the claims that they

22   had defined that they weren't pursuing, or had agreed with

23   other parties not to pursue, gave to the Committee to

24   pursue, and now they want to block us.  And it just seems

25   like, you know, they're -- they want to hang a lot on the

1 pressure of the confirmation train, and I think that's a

2 concern for us.

3          THE COURT:  I don't get blackmailed easily, if

4 that makes you feel any better.  Not by you; I mean by them.

5          MS. MILLER:  That was just --

6          THE COURT:  That's directed at them, which is --

7 and I don't mean this to be too cavalierly, but to some

8 extent I don't care.  If they can't justify it, they can't

9 justify it.  But justifying in the big picture may justify

10 it, and that's why I think it makes sense to do it only once

11 when you have the possibility of standing.

12          Let me hear from them for a minute about this idea

13 of within the confirmation hearing, setting aside a

14 different block of time, where the only evidence about the

15 compromise comes in during that block, where we're all

16 really focused on that concept and see what they think of

17 that idea.

18          MS. MILLER:  Sure.

19          MR. CARLSON:  So, Your Honor, I think -- I think

20 we would be okay with that approach.  I don't -- I think,

21 you know, I may want to check with Mr. Barr to make sure,

22 but I think that that would be acceptable to the Debtors.

23          THE COURT:  Mr. Barr, now's the time to pitch in

24 if you don't like that.

25          I haven't seen five-star yet.  I'll find you, Mr.

1  Barr.  Mr. Barr, can you hear me now?

2           MR. BARR:  (No response.)

3           THE COURT:  Mr. Barr?

4           MR. BARR:  Your Honor, it's now -- can you hear me

5  okay, Your Honor?

6           THE COURT:  I can.  Thank you.

7           MR. BARR:  Thank you.  And for the record, Matt

8  Barr of Weil Gotschal for the Record.

9           Your Honor, if I could just maybe get a better

10 understanding of exactly what you are suggesting.  Either --

11 I'm happy to paraphrase it or if you want --

12          THE COURT:  So this is going to be a time block

13 for confirmation that we have.  It's usually an open-ended

14 time clock.

15          What I'm suggesting is, is that we have a portion

16 of it that is reserved for approval or non-approval of the

17 9019s.  And although it would all be encompassed in an 1129

18 order, I want the evidence coming in in a separate block of

19 time so that we don't lose focus, which I think is a concern

20 everybody always has where you have a witness and he talks

21 about 17 different things, one of which is the compromise,

22 and then there's the pressure of finishing that witness.

23          No, I want a separate block of time, and anybody

24 that wants evidence that's going to be considered as to

25 whether the compromises ought to be approved, has to put it

1   on during that block of time.

2          And you -- that may mean you have to recall a

3   witness for that, for the confirmation hearing, because I'm

4   not going to take, you know, part of the witness' testimony

5   from whether the Plan is feasible into whether we ought to

6   approve the 9019.  The 9019 stuff comes in in its own block

7   of time.  It's just --

8          MR. BARR:  Sure, I understand.  I just want to

9   make sure --

10         THE COURT:  It's frankly to regulate me, right?

11  Because nobody cares what everybody else thinks.

12         MR. BARR:  No, I appreciate that, Your Honor, and

13  I think that does work for us, with one clarification.

14  Obviously 9019 is the standard, but also 1123 allows us to

15  incorporate settlements into the Chapter 11 Plan itself.  So

16  I don't want anybody to lose site of that.

17         It will be an integral part of the Plan and the

18  Plan process for the confirmation process itself, but I

19  understand what you're asking is that with respect to the

20  settlement elements of the Chapter 11 Plan, with respect to

21  these claims, that we would have specific witness time and

22  arguments as opposed to it being lost, using your words, in

23  the entire Rule 29 arguments.

24         So we'll have a lot of time.  But we are going to

25  raise arguments, however it's in the entire Plan process.

1          THE COURT:  Of course.  And they're going to make

2     arguments that say the Plan's not worth it if that's the

3     price, right?

4          MR. BARR:  Understand, yes.

5          THE COURT:  But, Ms. Miller, I'm -- you can tell

6     how reticent I am to not postpone things given my concerns

7     about this.  I want to give you one more chance to tell me

8     I'm wrong though, otherwise I'm going to give you that

9     second block of time.

10         I also really want to respect what the Committee

11    is trying to do here.  I think it's really important.  And

12    anyone that doesn't believe that they're -- that if you win,

13    you win, and I'm going to rule for you -- hasn't been before

14    me very much.

15         MS. MILLER:  We appreciate that, Your Honor.  I

16    guess the only thing that continues to give me pause is that

17    I'm not sure that the standard, that you have in mind for

18    unjustifiably refused, is quite as high as it is.  So I'm

19    thinking of lots of cases which obviously were briefed in

20    connection with the standing motion itself and not in

21    connection with this motion.  So I did not spend my weekend

22    re-reading them.  But they're --

23         THE COURT:  Well, I actually think it changes

24    somewhat over time, right?  If you get to the point where

25    the 9019 gets disapproved, then it becomes -- almost the

1    burden gets shifted, it's so much of a sea change.

2           On the other hand, when you are before that whole

3    envelope of confirmation comes, and they're simply saying,

4    "We need this for the big picture," it seems justifiable,

5    probably.

6           MS. MILLER:  So what I'm struggling with, I guess,

7    is that these motions really were brought even before the

8    settlements were negotiated, and so -- and the Debtors had

9    already decided not to bring them.

10          THE COURT:  Right.

11          MS. MILLER:  They did not say, "We're not going to

12   litigate them because we think we can get value out of them

13   in a settlement."  We had lots of back-and-forth, and I

14   think the Debtors admitted one of my letters to Mr. Genender

15   in connection with that.  But the Debtors' response was, "We

16   still think they have no value.  If you want to show us that

17   we're wrong, we're open to it but" -- and they say it

18   multiple times, both in their opening motion and in their

19   reply here.

20          So, you know, what's troubling me is that when you

21   look at the timeline that's up on the screen, what they did

22   was they effectively negotiated a settlement that obscured

23   the fact that they had already decided that these claims had

24   no value.

25          And so we're going through the motions where I

1  think it was unjustifiable refusal separate and apart from
2  these settlements, and they're trying to use the
3  settlements.  I mean, it's sort of -- to follow with the
4  Alice in Wonderland analogy, it's the illogical logic of so
5  many of the characters there, right?  Because we have a
6  settlement, it can't be an unjustifiable refusal but they
7  had already refused before they negotiated the settlement.
8          THE COURT:  Well, and remembering that I haven't
9  seen evidence yet, but I've seen allegations.  Their
10  allegation is that these were investigated by the board,
11  right?
12          MS. MILLER:  So, I mean, we can separate
13  Riverstone and CAF.
14          THE COURT:  I'm just saying that's their
15  allegation, right?
16          MS. MILLER:  On Riverstone, they do make that
17  allegation.
18          THE COURT:  Right.
19          MS. MILLER:  And I agree, maybe it's the harder
20  burden for us there, but on CAF, I mean, you saw Mr.
21  Omohundro's testimony; they never investigated it.  They
22  never investigated it, they gave up the right to negotiate
23  it, it was preserved for the Committee in connection with
24  the DIP order.
25          THE COURT:  But on that one, they claimed to be

1   getting $120 million.

2           MS. MILLER:  No.  So I --

3           THE COURT:  That's what they claim.  That's what

4   they claim.

5           MS. MILLER:  No, no, no.  So I think CAF --

6           THE COURT:  Yup.

7           MS. MILLER:  Okay, so they intentionally

8   conflate --

9           TH COURT:  Okay.

10          MS. MILLER:  -- two separate CAF-related --

11          THE COURT:  Right.  No, I got it, yeah.

12          MS. MILLER:  -- things that we filed, right?

13  There's the CAF standing motion and the claim objection.

14          THE COURT:  Correct.

15          MS. MILLER:  The claim objection relates

16  specifically to those items which they believe they're

17  getting consideration for.

18          THE COURT:  Yes.  Well --

19          MS. MILLER:  And that maybe should be held off.

20          THE COURT:  Well, but that assumes that CAF would

21  settle part and not all, and I don't know that.  All I'm

22  saying is out of that, they are getting what they describe

23  as a tangible $120 million.

24          MS. MILLER:  Which I should say on the record that

25  we dispute, right?

1          THE COURT:  I sort of think you do.  I understand,

2    okay.

3          MS. MILLER:  I think it goes without saying that

4    that valuation is an interesting question, right?

5          THE COURT:  Yeah.

6          MS. MILLER:  I think with fluctuating interest

7    rates, it's a real factual dispute --

8          THE COURT:  Right.

9          MST. MILLER:  -- but I think the more fundamental

10   point is that with respect to the claims that are the

11   subject of the standing motion, they're not getting

12   anything.  They couldn't have negotiated a settlement.  They

13   said they weren't pursuing the claims.  Only the Committee

14   was allowed to investigate those.

15         THE COURT:  Only the Committee was allowed to --

16   oh, you mean because of the --

17         MS. MILLER:  Because of the DIP order.

18         THE COURT:  Right.

19         MS. MILLER:  So it's -- you know, I think that

20   we're in a place where I just am not sure that the case law

21   with the Court, an application or an interpretation of the

22   unjustifiable refusal standard that goes as far as you have

23   to -- I have to prove that, you know, there was no scenario

24   in which they couldn't have possibly thought that this was

25   an okay outcome.

1          THE COURT:  Well, what is supposed to happen when

2     you have one Plaintiff and one Defendant, and the claims

3     against that Defendant are bifurcated so that the Plaintiff

4     on all of the claims -- because you're not yet a Plaintiff

5     on any of them.  The Plaintiff on all of the claims doesn't

6     investigate Category B, does investigate Category A, and

7     reaches an overall deal.

8          What am I supposed to do with that?  Is that

9     unjustifiable that they're settling it all?

10          MS MILLER:  I think we're entitled to evidence on

11     what was the negotiation, was it included or not.  And if it

12     wasn't included in the negotiation, and no value was

13     attributed to it, then I think we carry over on

14     unjustifiably refused.

15          THE COURT:  So, assume that they --

16          MS. MILLER:  Even if --

17          THE COURT:  Assume this means that the --

18          MS. MILLER:  Even if they thought it was a really

19     good deal.

20          THE COURT:  No, I -- well, let's assume they

21     thought it was a really good deal and the CAF shows up and

22     they say, "Are you kidding?  We wouldn't have settled part

23     without settling all?

24          MS. MILLER:  So I think you're raising what is a

25     very, very common argument and, you know, I spent a lot of

1   years of my recent life litigating the Puerto Rico

2   restructuring, and that was the heart of every argument, and

3   it is notably absent from these papers and on their

4   substantive motion.

5            The inextricable linkage between the settlements,

6   the fact that if you push down one domino, the whole house

7   falls.  That's not here.  Why?  Because it is expressly

8   carved out.  There is no effect on the CAF settlement if the

9   Committee gets standing.  There's no effect on the

10  Riverstone settlement if the Committee gets standing.

11           THE COURT:  Well, there's no effect on them, but

12  they could still be approved, right?  At which point, your

13  standing would be a nice thing to hang on the wall.

14           MS. MILLER:  Right.  Right.  And if you think

15  about the Riverstone claims, I mean it's interesting because

16  the Riverstone claim is binary, right?  It's either it was a

17  fraudulent transfer or it wasn't.  If it was, and we prevail

18  on the claim, so giving the Committee standing doesn't

19  affect anything that happened.  But so that stands.

20           They keep the settlement in hand, we get to pursue

21  the claims.  If we lose, no harm, no foul, the settlement

22  stays.  And if we win, the settlement falls apart, but we

23  just got them $500 million, and aren't we all a lot better

24  off.

25           THE COURT:  Wait a minute.  Are you telling me

1  that the current renegotiated settlement, if you get

2  standing, that CAF still needs to do it?

3         MS. MILLER:  Yes.  And Riverstone also, expressly

4  incorporated into those settlement agreements.

5         THE COURT:  Let me see that.

6         MS. MILLER:  Sorry, Your Honor, I just want to --

7         THE COURT:  No, take your time.  I just didn't

8  realize that, and so I need to see it.  I'll put it up on

9  the screen if you'll give me some document references.

10        MS. MILLER:  So I'm looking at -- okay, hold on.

11 This has two ECF numbers, so let me hopefully -- I'm looking

12 at 1168-6.  Hopefully that takes you to the right document.

13        THE COURT:  (Reviewing documents.)  Okay.

14        MS. MILLER:  Okay.  So, Your Honor, it's

15 Section 26.04(b)(ii) where it provides -- so this is the

16 section detailing the CAF consenting party CAF settlement

17 termination events.

18        And in Section E towards the bottom third of

19 page 9 of the exhibit, so in that romanette (ii) section, it

20 provides:  The only termination event would be -- so in E,

21 the Bankruptcy Court enters an order that has not been

22 stayed granting any party or entity's standard to (x) pursue

23 claims or causes of action against CAF consenting parties or

24 (y) challenge the prepetition commodity of according

25 facility claims, and in each case the exclusive settlement

1 authority over some or all claims, causes of action or

2 defenses against the CAF consenting parties.

3          And we have not sought exclusive authority here,

4 or standing.

5          THE COURT:  So it's a termination event if we

6 enter an order allowing you to pursue claims and causes of

7 action against the CAF parties.

8          MS. MILLER:  But only with exclusive settlement

9 authority over some or all of the claims.

10          THE COURT:  That's under (y).

11          MS. MILLER:  Well, I think it's under E.  E is (x)

12 or (y).

13          THE COURT:  Right.

14          MS. MILLER:  And in each case meaning (x) or (y),

15 the exclusive settlement authority over some or all of the

16 causes of action or defenses against the CAF consenting

17 parties or the prepetition commodity accordingly.

18          And it has to be because the CAF consenting

19 parties is (x) and the CAF claims is (y).

20          THE COURT:  All right.  So giving you standing

21 doesn't terminate the settlement, but the settlement

22 terminates what you're attempting to sue over.  They still

23 get a complete release if we approve it; right?

24          MS. MILLER:  They would get a complete release if

25 we -- if the settlement were approved.

1          THE COURT:  If confirmation -- if the settlement's

2   approved, CAF gets a complete release even if you have

3   standing to pursue claims.

4          MS. MILLER:  Right.

5          THE COURT:  I would have -- that's what I --

6          MS. MILLER:  So we've got -- we've got to get a

7   schedule that --

8          THE COURT:  No, I thought you were telling me that

9   -- I'm sorry.  I thought you were telling me that if you got

10  standing, the Debtors could settle with CAF, and then you

11  could still sue them.

12         MS. MILLER:  No.

13         THE COURT:  Okay.

14         MS. MILLER:  So everything runs until

15  confirmation.

16         THE COURT:  That's where I misunderstood, okay.

17         MS. MILLER:  Sorry.  Apologies if I caused

18  confusion.

19         THE COURT:  No.  No, no, no, no, no.  This is me

20  trying to grapple with it, so --

21         MS. MILLER:  It is a set of agreements.  No, the

22  point is that when the Debtors negotiated the settlements,

23  they expressly contemplated overall to where the Committee

24  might get standing to pursue them and might move forward

25  litigating that, and effectively said you have until

1   confirmation to get it all done.

2          And if these issues haven't been resolved at

3   confirmation, then we've got to figure it out either under

4   whatever adversary you're going to bring or in the context

5   of a settlement.

6          THE COURT:  So your hearing on CAF is September

7   28th, and when is confirmation?

8          MS. MILLER:  I think they're projecting it for

9   December 15th, which in the real world -- in the world,

10  seems like a very long time.

11         THE COURT:  No, it doesn't.

12         MS. MILLER:  But in a bankruptcy world --

13         THE COURT:  I don't see how you can get a judgment

14  by then.  So on September 28th, if you win, you then have to

15  commence an adversary proceeding against them and carry it

16  forward to at judgment before confirmation?

17         MS. MILLER:  I think the reality is that the

18  dynamics shift.

19         THE COURT:  No, because they can still settle out

20  from under you if there isn't a judgment; right?  Or

21  frankly, even if there is, I guess, but --

22         MS. MILLER:  They could.  I mean, we could move

23  for summary judgment early if we're confident on our claims.

24         THE COURT:  I thought we were down a --

25         MS. MILLER:  We could seek an expedited schedule.

1           THE COURT:  I thought we were down a new path, and
2    we're really not, because the concern I had was, and where
3    you made me take a big step back, was believing maybe they
4    couldn't settle everything at confirmation.  That
5    possibility is there.  I'm not saying they win on that.
6           And if they didn't have that possibility, then it
7    would be kind of silly not to give you standing, right?
8    Because that's why I was sort of backing off and saying
9    maybe I'm making a big mistake.  I got it.
10          MS. MILLER:  Right.
11          THE COURT:  I'm going to do what I have, you know,
12   sort of loudly -- unless somebody wants to come up and argue
13   against it, which is we're not bifurcating confirmation.
14          Confirmation takes place over the same discrete
15   time period it would have occurred in before, but there'll
16   be a reserved portion of the confirmation hearing for
17   whether to approve or not approve the compromises, and any
18   evidence in support of or against the compromises needs to
19   be introduced at that part of the hearing.
20          I am granting the Debtor's Motion to Continue the
21   Standing Motions until confirmation, primarily because of my
22   belief.  And this belief may be incorrect for the purposes
23   of appellate reasons.
24          But my belief is that the standard today is that
25   the Debtors are unjustifiable in trying to take a global

1 settlement route.  And the standard, if they fail in their

2 global settlement route, will be that it's unjustifiable not

3 to let somebody else prosecute the claims because they've

4 already failed on a global settlement route.

5         So I think the standard to the Committee is the

6 Committee gets one good fair shot at it.  And I frankly

7 think the good fair shot comes better at confirmation -- and

8 there are all sorts of reasons not to do it now, primarily

9 cost reasons.

10        However, militating against the cost reason, I am

11 not restricting in any manner today, I'm not changing in any

12 manner what we might have already done, the Committee's full

13 right to discover the merits of these compromises.  So

14 that's preserved in all respects.

15        Does anyone want to argue against the ruling,

16 other than Ms. Miller, who may -- who I think has preserved

17 all of her rights here.  You're welcome to argue a little

18 bit more but it's -- I think we've talked about it quite a

19 bit.

20        MS. MILLER:  I've done this enough to know when to

21 stop arguing.  I do think, thought, that there is one

22 technical housekeeping point --

23        THE COURT:  Sure.

24        MS. MILLER:  -- that I'd like to make sure that we

25 get on the record, which is -- right now there's a deadline

1  by which we need to bring the claim.

2          THE COURT:  Your deadline is extended until a date

3  to be set at confirmation, which will be not shorter than 30

4  days after confirmation is denied.

5          MS. MILLER:  Thank you, Your Honor.

6          THE COURT:  And it may be longer.  We'll make a

7  docket entry to that effect.  Does that work for you?

8          MS. MILLER:  Yes.  Thank you, Your Honor.

9          THE COURT:  Thank you.  Does anyone want to argue

10  against the ruling including the extension of her right to

11  bring this if confirmation's denied?

12      (No response.)

13          THE COURT:  Mr. Carlson?

14          MR. CARLSON:  Your Honor, I don't object to the

15  ruling.  I just wanted to make a clarification.  There's how

16  many deadlines to object to the standing motion on the CAF,

17  and then also their claim rejection?  I just wanted to

18  clarify that those deadlines would be tolled as well, to

19  confirmation, or extended to a date.

20          THE COURT:  Well, I don't want to wait until the

21  time when you normally deal with objections to confirmation,

22  which is like three days before the hearing.  So what would

23  be reasonable?  You now know what their position is.  Let's

24  give them plenty of notice of what your confirmation

25  position is.  Maybe three weeks before confirmation for

1  responding to this?

2           MR. CARLSON:  Three weeks to respond to what

3  exactly?  I just wanted to make sure I understand.

4           THE COURT:  To their Motion for Standing and to

5  their -- any opposition they might have to the compromise.

6           MR. CARLSON:  So, sorry.  So the proposed -- the

7  Court is saying three weeks prior to confirmation, we would

8  have an objection deadline on standing and claim objection.

9           THE COURT:  Claim objections concerning this

10 issue, assuming they're filed.

11          MR. CARLSON:  Yeah, I think that's acceptable to

12 the Debtors.  And the one additional point is we would like

13 the opportunity then to also be able to update or supplement

14 our objection to the existing Riverstone standing motion

15 that we'd already filed an objection to.

16          THE COURT:  Three weeks before confirmation.

17          MR. CARLSON:  Yes.

18          THE COURT:  Does that work for you, Ms. Miller?

19 Is that enough time?

20          MS. MILLER:  I think it's enough time.  I'd like

21 more time, and since they are already filed their objection

22 to the Riverstone standing motion, it would seem reasonable

23 to ask us to do it four weeks in advance so that we can take

24 whatever discovery has happened and take it at that time.

25          THE COURT:  Four weeks in advance is fine.  Four

1  weeks in advance.

2          MS. MILLER:  Thank you, Your Honor.

3          THE COURT:  Okay.  Thank you all.

4          MR. CARLSON:  Thank you, Your Honor.

5          THE COURT:  We're in recess.

6      (Proceedings adjourned at 2:36 p.m.)

7                    *  *  *  *  *

8          *I certify that the foregoing is a correct*

9  *transcript to the best of my ability due to the condition of*

10 *the electronic sound recording of the ZOOM/video/telephonic*

11 *proceedings in the above-entitled matter.*

12 */S/ MARY D. HENRY*

13 *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

14 *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

15 *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

16 *JTT TRANSCRIPT #66271*

17 *DATE FILED:  SEPTEMBER 9, 2022*

18

19

20

21

22

23

24

25