IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 22-90054-11 |
| | § HOUSTON, TEXAS |
| TALEN ENERGY SUPPLY, LLC, | § WEDNESDAY, |
| ET AL, | § OCTOBER 26, 2022 |
| DEBTORS. | § 8:57 A.M. TO 11:14 A.M. |

**APPROVAL OF DEBTOR'S DISCLOSURE STATEMENT**

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

**(Recorded via CourtSpeak; no log notes.)**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| FOR THE DEBTOR: | WEIL GOTSHAL & MANGES, LLP |
| | Gabriel A. Morgan, Esq. |
| | Matt Barr, Esq. |
| | Alexander Welch, Esq. |
| | Paul Genender, Esq. |
| | Cliff Carlson, Esq. |
| | 700 Louisiana, Ste. 1700 |
| | Houston, TX  77002 |
| | 713-546-5000 |
| | |
| FOR THE AD HOC GROUP OF UNSECURED NOTEHOLDERS: | KIRKLAND & ELLIS, LLP |
| | Christopher S. Koenig, Esq. |
| | 300 North LaSalle |
| | Chicago, IL  60654 |
| | 312-862-2000 |
| | |
| FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS: | MILBANK, LLP |
| | Matthew Brod, Esq. |
| | Dennis Dunne, Esq. |
| | Alex Lees, Esq. |
| | 55 Hudson Yards |
| | New York, NY  10001-2163 |
| | 212-530-5567 |
| | |
| FOR BANK OF NEW YORK MELLON: | MORGAN LEWIS & BOCKIUS, LLP |
| | Glenn Siegel, Esq. |
| | 101 Park Avenue |
| | Suite 4000 |
| | New York, NY  10178-0060 |
| | 212-309-6000 |
| | |
| FOR ARCH INSURANCE COMPANY AND ATLANTIC SPECIALTY INSURANCE COMPANY: | MANIER HEROD, PC |
| | Michael E. Collins, Esq. |
| | 1201 Demonbreun Street |
| | Suite 900 |
| | Nashville, TN  37203 |
| | 615-742-9350 |

<u>APPEARANCES (CONT'D)</u>:


FOR CITIBANK, NA, AS DIP
AGENT, COLLATERAL TRUSTEE:        DAVIS POLK & WARDWELL, LLP
                                  David Schiff, Esq.
                                  450 Lexington Avenue
                                  New York, NY  10017
                                  212-450-4000


(Please also see Electronic Appearances.)

4

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| LEONARD BIONDO | | | | |
| By Mr. Genender | 50 | . | . | . |

| EXHIBITS: | Admitted |
|---|---|
| DEBTOR'S EXHIBITS 1406-1 | |
| THROUGH 1406-11 | 49 |

***

1        **HOUSTON, TEXAS; WEDNESDAY, OCTOBER 26, 2022; 8:57 A.M.**

2      THE COURT:  All right.  Good morning.  We are here

3 in the Talen Energy Supply case.  It's 22-90054.

4      Electronic appearances should have been made.  If

5 you haven't made your electronic appearance, you can do that

6 on our website.

7      If you want to speak at today's hearing, you can

8 wait and press five-star when you're ready to speak or you

9 can go ahead and announce now your name whenever you want to.

10      We'll start with anyone in court that wants to

11 identify themselves for the purpose of speaking.

12      Good morning.

13      MR. MORGAN: Good morning, Your Honor.  Gabe Morgan

14 of Weil Gotshal on behalf of the Debtors.  And I'm joined by

15 my partners Matt Barr, Alexander Welch, Paul Genender, and

16 Cliff Carlson.

17      THE COURT:  Good morning.

18      MR. KOENIG:  Good morning, Your Honor.  Chris

19 Koenig of Kirkland & Ellis for the Ad Hoc Group of Unsecured

20 Noteholders.  Thank you.

21      THE COURT:  Good morning.

22      MR. BROD:  Good morning, Your Honor.  Matthew Brod

23 of Milbank on behalf of the Committee.  I'm joined by my

24 partners Dennis Dunne and Alex Lees.

25      THE COURT:  Good morning.

1          MR. SIEGEL:  Good morning, Your Honor.  Glenn

2   Siegel from Morgan Lewis on behalf of Bank of New York as

3   Indenture Trustee.

4          THE COURT:  Good morning.

5          MR. COLLINS:  Good morning, Your Honor.  Michael

6   Collins, Manier Herod, PC, for Arch Insurance Company and

7   Atlantic Specialty Insurance Company.

8          THE COURT:  Good morning.

9          MR. SCHIFF:  Good morning, Your Honor.  David

10  Schiff of Davis, Polk & Wardwell on behalf of Citibank, N.A.,

11  as DIP agent, Collateral Trustee.

12          THE COURT:  Good morning.

13      Do we have anyone on the phone that wishes to

14  address any issues initially?  Otherwise, you can wait and

15  press five-star when the time comes.

16      (No verbal response)

17          THE COURT:  So we have 118 phone participants.  I'm

18  going to leave all the lines muted.  I will -- again, when

19  you're ready to speak, you feel free to press five-star.

20          So, Mr. Morgan, tell me what we have.

21          MR. MORGAN:  So the only item on the Agenda this

22  morning is approval of the Debtors' Disclosure Statement.

23          THE COURT:  Or disapproval, right?

24          MR. MORGAN:  Well, hopefully approval.

25      (Laughter)

1          THE COURT:  All right.

2          MR. MORGAN:  And I should also say, Your Honor,

3    before I get going, that I -- we're also joined by Andrew

4    Wright, who's the general counsel for the Debtors and also a

5    signatory on the Disclosure Statement, as well as virtually

6    by Len LoBiondo, who is the Executive Vice President of

7    Restructuring for Talen Energy Supply and also a signatory on

8    the Disclosure Statement.  They are present and you will hear

9    from Mr. LoBiondo in a little bit.

10          THE COURT:  Thank you.

11          MR. MORGAN:  So, Your Honor, to your question,

12    we're very pleased to be here this morning to present to you

13    a significant milestone, hopefully approval of the Disclosure

14    Statement, and entry of an order approving the solicitation

15    and bidding procedures.

16          To remind Your Honor, although the plan is not yet

17    fully consensual, it enjoys widespread support, including

18    over 33 percent of the aggregate outstanding principal amount

19    of the unsecured notes, 86 percent of the aggregate

20    outstanding principal amount of the pre-petition commodity

21    accordion facility -- which is the "CAF" -- 98 percent of the

22    aggregate principal amount of the pre-petition term loan, and

23    48 percent of the aggregate principal amount of the secured

24    notes, as well as TEC and Riverstone, which are the Debtors'

25    corporate parent and equity sponsor.

1           With respect to the matter this morning, the

2      Debtors made significant progress in addressing all informal

3      comments and almost all formal objections.  But we understand

4      that there is still one unresolved issue, which has been

5      raised by the Committee, and we'll get to that.

6           The other issue or the other objection that was

7      outstanding as of last night, but I believe has been resolved

8      this morning, was the objection filed by the Bank of New

9      York.  We have reached an agreement to continue working on a

10     construct with them that resolves their issue for today but

11     does not resolve their issue for confirmation.  All parties'

12     rights are reserved on that construct.  There's been no

13     formal agreement on what it is we will end up doing with the

14     trustee.  But we have, at least for today's purposes,

15     resolved their objection.

16          THE COURT:  What is that resolution?

17          MR. MORGAN:  The resolution is to try and work --

18     well, the resolution is twofold:

19          I believe we actually resolved the issue that they

20     raised in their objection as it relates to the alleged

21     unequal treatment --

22          THE COURT:  Right.

23          MR. MORGAN:  -- by treating all holders equally.

24     They have asked for some form of, call it "crediting" or

25     "setoff" of the value that would be provided on the 4(a)(2)

1      rights to ineligible holders against the cash exercise of the

2      1145 rights.

3              So we're working on whether or not that actually is

4      feasible.  And that's something that I understand that they

5      would like.  And the noteholders group has been discussing it

6      with them and we've been trying to figure out if it actually

7      works.  So we're all still very much in the middle of working

8      through that.

9              THE COURT:  If --

10             MR. MORGAN:  But that's the put and ask.

11             THE COURT:  So the Disclosure Statement issue you

12     think is resolved, in terms of BNY.

13             MR. MORGAN:  Well, I don't think they ever had a

14     Disclosure Statement issue.

15             THE COURT:  Under --

16             MR. MORGAN:  I think that was a --

17             THE COURT:  But the --

18             MR. MORGAN:  -- confirmation issue.

19             THE COURT:  But the issue between you all is

20     resolved, right?

21             MR. MORGAN:  I --

22             THE COURT:  I'm not going to --

23             MR. MORGAN:  I believe so.

24             THE COURT:  -- have that fight today.

25             MR. MORGAN:  I believe so.  And I'd like for their

1    counsel and the unsecured notes to be able to confirm that,

2    but ...

3            THE COURT:  So if you all then make the change

4    that is being discussed, how do we protect any change from

5    then having an adverse effect on others or do we need to make

6    some disclosure today, so that people understand that there

7    could -- that there are discussions going on and, if they go

8    on, that there could be a change at the confirmation hearing

9    that could have an adverse effect?  I don't know that what

10   you're talking about could have an adverse effect on anybody,

11   but --

12           MR. MORGAN:  Your Honor, I believe it would only

13   improve the position of the ineligible unsecured noteholders

14   who wish to elect 1145 cashlessly or partially cashlessly.

15           THE COURT:  But if they potentially get an

16   improvement, does somebody potentially get a detriment; and,

17   if so, who?

18           MR. MORGAN:  The --

19           MR. SIEGEL:  May I, Your Honor?

20           THE COURT:  Of course.

21           MR. SIEGEL:  Your Honor, the way the construct

22   would work, effectively is, as you may remember, as the plan

23   is currently proposed, with respect to 4(a)(2) rights, they

24   would have -- be entitled to cash or shares --

25           THE COURT:  Right.

1          MR. SIEGEL:  -- if they were shown to be non-
2     accredited.
3          THE COURT:  Right.
4          MR. SIEGEL:  There is an 1145 construct, the Debtor
5     wrote in the plan, requiring that you exercise under 1145 in
6     order to get to 4(a)(2).
7          THE COURT:  Correct.
8          MR. SIEGEL:  So what we've been discussing -- and
9     we feel pretty good that we'll be able to work this out -- is
10    that, if you not are an accredited investor, you can take the
11    cash you would otherwise get under 4(a)(2) and use it to
12    purchase the rights that you would be getting under 1145.
13    And we are comfortable that that is helpful to them.
14          As to your question, that really ultimately only
15    affects the backstop.  And we're negotiating with the
16    backstop towards getting this done because they might have to
17    provide a little bit more cash in order to make this happen.
18    And while I don't want to speak for them, we're having very
19    constructive conversations.
20          THE COURT:  So, in your view -- I just want to be
21    sure that if --
22          MR. SIEGEL:  Sure.
23          THE COURT:  -- I make a deal, that I don't then
24    have to send this back out and --
25          MR. SIEGEL:  Understood.

1          THE COURT:  -- re-solicit it, right?

2          MR. SIEGEL:  Understood.

3          THE COURT:  In your view, the -- if you can reach

4     the agreement that you're hoping to reach, you don't believe

5     any further solicitation would be required because you think

6     that any adversely affected parties would consent.

7          MR. SIEGEL:  Exactly.

8          THE COURT:  Okay.  Okay.  I just didn't want to

9     create a problem again that --

10          MR. KOENIG:  Your Honor, again, Chris Koenig now of

11     Kirkland & Ellis for the unsecured noteholders group.

12          You know, Your Honor, I believe I represent the

13     potentially adversely parties here.  We are the backstop

14     parties that are, you know, providing the backstop

15     commitment.  We -- you know, what Mr. Siegel said is correct,

16     you know, we've had these constructive conversations.  And I

17     believe that, because the rights offering documents are not

18     going out today --

19          THE COURT:  Right.

20          MR. KOENIG:  -- the rights offering will be post-

21     confirmation, you know, whatever disclosure issue could be

22     resolved, you know, we would certainly be willing to

23     represent, in the event we get to a deal.  We control the

24     class.  We certainly have, you know, more than two-thirds in

25     amount and one-half in number, and we would be able to

1        confirm on the record at the confirmation hearing that the --

2                    THE COURT:  Okay.

3                    MR. KOENIG:  -- proposed deal is acceptable to us.

4                    So, from our perspective, there's no potential

5        disclosure issue here while we continue to work through the

6        issues in advance of confirmation.

7                    THE COURT:  Thank you.

8                    Mr. Siegel, I do think that what they did, did

9        resolve your Disclosure Statement objection.  It may have

10       resolved it in a way you don't like, but I think it resolved

11       it.  And I want to be sure that I'm right about that.

12                   MR. SIEGEL:  Your Honor, I think that, had we gone

13       forward, I would have made an argument to you about that,

14       that I think would have preserved the argument.  I can't

15       predict how you would have ruled.  But I had more to talk

16       about --

17                   THE COURT:  Okay.

18                   MR. SIEGEL:  -- but we don't have to talk about it.

19                   THE COURT:  So, for today, you're going to withdraw

20       your Disclosure Statement objection --

21                   MR. SIEGEL:  Exactly.

22                   THE COURT:  -- without prejudice to whatever your

23       confirmation --

24                   MR. SIEGEL:  My --

25                   THE COURT:  -- objection might be.

1          MR. SIEGEL:  Yes, exactly.  And by the way, there's

2     also, you know, rights offering documents that haven't been

3     approved and we would reserve rights as to those, as well.

4          MR. KOENIG:  Right.  And we're going to continue to

5     work through on the issues in advance of confirmation.  And

6     again, this is an agreement in principle between the ad hoc

7     group and the trustee.  We've been working with the Debtors,

8     but we obviously have some wood to chop there about actually

9     getting to a formal agreement, so ...

10          THE COURT:  Sounds good.

11          MR. KOENIG:  All right.

12          THE COURT:  Thank you --

13          MR. KOENIG:  Thank you --

14          THE COURT:  -- very much.

15          MR. KOENIG:  -- Your Honor.

16          MR. MORGAN:  And for the record, Gabe Morgan on

17     behalf of the Debtors.

18          Just to say it, all rights are reserved on the

19     agreement between the unsecured notes group and the trustee.

20     We're not there yet.

21          THE COURT:  Okay.  So you're telling me what we

22     have now is a Committee objection.

23          MR. MORGAN:  So what we have now is all the changes

24     that we have made to the plan -- to the plan, to the

25     Disclosure Statement, to the solicitation order procedures,

1    bid procedures to address all of the issues that have been

2    raised.  And the only remaining issue that hasn't been

3    addressed through those changes in the one presented by the

4    Committee.

5         THE COURT:  So I have an issue that I probably

6    should raise now, in case it needs -- you all need to have

7    some discussions, and it may not.

8         I think that the thing that the bidding procedures

9    that are attached to the Disclosure Statement might -- and

10   I'm not sure they do -- but might allow a consultation party

11   to obtain inside information and, following obtaining inside

12   information, become a bidder.  Maybe it doesn't do that.  But

13   if it does that, I think that's a problem because it means

14   that the bidding would not be on a level playing field.  What

15   was the intent on that question?

16        MR. MORGAN:  So, consistent with the complex case

17   procedures, the intent was not to allow that; that, if a

18   party -- if a party indicates that it intends to be a bidder,

19   it will no longer be entitled to the information that it

20   receives as a consultation party.

21        THE COURT:  No, but that's the problem.  They can't

22   get the information, then decide to become a bidder, and then

23   get cut off because they've already got inside information.

24   Once they get it, ever, they're permanently barred, unless

25   you then make that information timely available to every

1     other bidder, I mean, which would be possible.

2             But what I don't want to do is to have you

3     transmit, for example, information to a consultation party

4     about what somebody else's bid was.  This is sort of the

5     starkest problem.  Okay?  So a consultation party learns

6     that, you know, Acme is going to bid $1 billion.  They can't

7     then decide to become a bidder, having received inside

8     information.  But I think that is currently allowed, where

9     they're only cut off after they announce they're going to be

10     bidder.  Well, that's too late.  That's -- they've already

11     got the inside information.

12             MR. MORGAN:  So, Your Honor, this really is an

13     issue with one consultation party.  That consultation party,

14     which is our corporate parent sponsor Riverstone, has

15     indicated that they are not going to be a bidder, which is

16     how we resolved the issue and got comfortable with it on our

17     side, that they can be a consultation party, receive that

18     information, and will not be participating in the sale

19     process.

20             THE COURT:  What I need written in here, though, is

21     that, once you receive that information -- it needs to be

22     formalized in the documents.  I'll show you the language that

23     is bothering me --

24             MR. MORGAN:  Sure.

25             THE COURT:  -- and maybe that will help.

1              MR. MORGAN:  And Your Honor, there's no resistance
2       from our part to that.  We're not looking to --
3              THE COURT:  I got it.
4              MR. MORGAN:  Yeah.
5              THE COURT:  I just want to fix it and I'm glad it's
6       not a problem.  But I just want to be clear that it is the
7       receipt of the inside information that results in the
8       disqualification and that's irreversible.  Although I think I
9       could probably live with something that says it's reversible
10      if every other bidder, you know, gets that same inside
11      information.  But beyond that, I think it's a problem.
12             So let me take you to page -- let me find this.
13             MR. MORGAN:  I believe it's Page 18.
14             THE COURT:  No.  Hold on.
15             MR. MORGAN:  Oh, would it -- oh, in the bid
16      procedures?
17             THE COURT:  Page 15 --
18             MR. MORGAN:  15.
19             THE COURT:  -- of this document.  And I think it's
20      in other places, but this sort of drove it home to me, that
21      -- and what I'm looking at, for the record, is the proposed
22      order at 1407-1.
23          (Pause in proceedings)
24             THE COURT:  This is the language that I think at
25      least implies that a consultation party can make that

1    decision, at which point you may cut off giving them

2    additional information.  And that just can't happen.  Once

3    you give them the information, they can't then become a

4    bidder.

5           And -- but maybe this -- this language is, I know,

6    not the contractual version of it.  But I want to be sure

7    that we properly describe it, so that no bidder has a concern

8    that they may not be on a level playing field.

9           MR. MORGAN:  So there's no concern from our part to

10   clarify that here.  We can either try to work through the

11   language now; or, if Your Honor prefers, we can sort of take

12   it back, work something out, and then present it to you at --

13          THE COURT:  So I set my day aside to be with you,

14   Mr. Morgan, so you can dictate language to me and I will type

15   it in, or you can submit something later in the day on this.

16   I just want to --

17          MR. MORGAN:  Why don't we -- why don't we -- having

18   recognized that issue, why don't we work on it while we work

19   through the Committee's issue and any other comments or

20   questions Your Honor has?  And then we can come back to it

21   and propose something.

22          THE COURT:  Sounds good.

23       (Participants confer)

24          MR. MORGAN:  Okay.

25          THE COURT:  So, if -- let me just interrupt you one

1     more time, Mr. Morgan.

2               MR. MORGAN:  Please.

3               THE COURT:  Is there anybody here, other than the

4     Committee, who has any objection to the Disclosure Statement

5     that has not been resolved, or are we down solely to the

6     Committee?  So anyone else that has an objection, either

7     present in the courtroom or on the phone, to the approval of

8     the order that was filed at 1407-1, now is the time to speak

9     up, unless you're the Committee.

10              (No verbal response)

11              THE COURT:  We have a well trained group of

12    participants, Mr. Morgan.

13              (Laughter)

14              MR. MORGAN:  We've cracked the whip hard.

15              THE COURT:  Thank you.

16              MR. MORGAN:  So, Your Honor, I think, just as a

17    matter of form here, we have Mr. LoBiondo participating

18    virtually.  We were going to move his -- well, I guess we

19    were going to put on a short direct with him just to create

20    the evidentiary record for Your Honor to approve the

21    Disclosure Statement, if you're so inclined.

22              And I'd turn the podium over to Mr. Genender to go

23    through the evidence on that.

24              THE COURT:  Do you want to take that up or let me

25    hear from the Committee what their outstanding objection is

1      and then we'll move into the evidence?

2              MR. MORGAN:  Oh, I'm happy to also address that

3      before we move to evidence, too, if you --

4              THE COURT:  Good.

5              MR. MORGAN:  Or -- okay.  So, Your Honor, the one

6      remaining issue with the Committee is to the definition of

7      "sale transaction" in the plan.  Per its papers -- and you

8      may hear something more from them live, but per its papers,

9      the Committee's view is that the Disclosure Statement and the

10     solicitation process should not -- the Disclosure Statement

11     should not be approved and solicitation should not commence

12     unless and until the plan has been amended to remove a

13     proviso in the definition of "sale transaction" that requires

14     a sale transaction to be and eligible alternative

15     restructuring.

16             So, to remind Your Honor, when the parties amended

17     the RSA in August to allow for the go shop, the concept of an

18     eligible alternative restructuring was introduced.  An

19     eligible alternative restructuring that one that repays the

20     notes in full and provides no worse treatment to all other

21     stakeholders under the plan or is a transaction that has been

22     approved by the RSA consenting parties, the notes.

23             After that, the parties then negotiated with the

24     various stakeholders to come up with the terms of the plan.

25     And under the plan, the Debtors ultimately agreed -- after

1    negotiating this point fairly extensively, the Debtors

2    ultimately agreed that they could only toggle into a sale

3    transaction under this plan if that sale transaction

4    qualified as an eligible alternative restructuring.

5         But -- and this is the key -- while we were -- are

6    willing to put that in the plan, we were clear that it was

7    not a condition to our sale process.  The bidding procedures

8    include express language, and I'll read it:

9         "Notwithstanding anything herein or in the plan to

10   the contrary, a bid need not complete" -- I'm sorry --

11   "contemplate or constitute an eligible alternative

12   restructuring to constitute a qualified bid."

13        And the Disclosure Statement has similar

14   statements, making it clear that we are seeking, will

15   entertain, and can elect to pursue, our business judgment,

16   any value-maximizing bid, regardless of whether or not it is

17   an eligible alternative restructuring.

18        So I want to voice a concern I have in the area,

19   and it may be the same concern that the Committee has -- I

20   don't know and we can hear from them -- which is we moved

21   ahead in the case based on the deal that you just described,

22   right?  I don't think it would be fair to take into

23   consideration, if you will, the time delay and administrative

24   cost of having to redo the Disclosure Statement and the plan

25   if the other transaction is otherwise better.  Otherwise,

1    we're giving a leg down to the alternative by imposing costs

2    on it that could be avoided today.

3          If that's -- if you want to give some first look at

4    the RSA arrangement, I don't know that I have a problem  with

5    that.  But it doesn't seem consistent with what got announced

6    earlier, to disadvantage their bid by building in delay and

7    cost that would then be charged against consideration of that

8    and your clients' business judgment.  So how do we overcome

9    that issue, so that it's -- it truly is -- it's a business

10   judgment, but it's a business judgment with a level playing

11   field.

12         MR. MORGAN:  Well, Your Honor, the way that we,

13   ultimately, got comfortable with this construct was that the

14   delay in cost can be contained.  And that's through the

15   procedures and the local rules that allow for conditional

16   approval of Disclosure Statement, and also Your Honor can

17   shorten time periods as it relates to notice.

18         So, if we were in a situation where we needed to

19   pivot because we had a deal that's better than the RSA deal,

20   but not quite an eligible alternative restructuring, we could

21   come back and move quickly and it would be a question of

22   weeks, not months.

23         THE COURT:  But would your board, in considering

24   that, take into account the weeks and take into account the

25   costs or would that be by order, excluded from the board's

1    ability to consider it, so that, again, there's no leg down
2    to the alternative bidder?
3            MR. MORGAN:  I guess we're -- at least where my
4    head is the cost would be relatively *de minimis* in the grand
5    scheme of the values that we're talking about.
6            THE COURT:  So we could order it to be excluded
7    from consider -- the cost and delay --
8            MR. MORGAN:  Well, Your Honor --
9            THE COURT:  -- if they're both *de minimis*, can be
10   excluded from the consideration.
11           MR. MORGAN:  I think, in the business judgment of
12   the board, they can consider whether it is *de minimis* and
13   then put that into the --
14           THE COURT:  Uh-huh.
15           MR. MORGAN:  -- factoring that they have.
16           THE COURT:  Yeah.  But then it's not -- I
17   understand the concern.  Let me hear from the Committee.  But
18   I -- we need to find a way to resolve that.  I'm not trying
19   to get around deals you've made.  But the deal you made can't
20   then back out of another deal that you've made.
21           So let me hear from the Committee on this.
22           MR. BROD:  Good morning, Your Honor.  For the
23   record, Matthew Brod of Milbank on behalf of the Committee.
24           Now, before getting into the issue that you and Mr.
25   Morgan just discussed, if you'll indulge me, Your Honor, I

1     just wanted to spend a few minutes to discuss our broader

2     plan issues and how those were, in fact, resolved through the

3     amended Disclosure Statement, if that works for Your Honor.

4               THE COURT:  Sure.

5               MR. BROD:  Thank you.

6               So, as Your Honor has heard throughout these cases,

7     the plan is built on a number of settlements, agreements, and

8     assumptions.  And we do not take issue with all of these

9     points, not all of the settlements, not all of the

10    assumptions, but certain of them are problematic from our

11    perspective.

12              The first issue is the Riverstone settlement that

13    you've heard about.

14              The second is the CAF.

15              And the third is the methodology that underlies the

16    plan's value allocation.  And this is an exhibit to the plan

17    that sets forth the estimated recoveries for unsecured

18    creditors on a Debtor-by-Debtor basis.

19              And as we discussed with Your Honor at a prior

20    hearing, the Committee maintains that both the Riverstone

21    settlement and the CAF settlement are not reasonable, they

22    shouldn't be approved, and they settle valuable causes of

23    action that have been identified by the Committee for no

24    value.

25              We also believe that the Riverstone settlement

1    violates the absolute priority rule because it delivers new

2    equity and warrants to the Riverstone/TEC parties on account

3    of their existing equity without paying the relevant

4    unsecured creditors in full.

5           And on the third piece, the value allocation, we do

6    believe there are a number of underlying issues.  And these

7    are problems because they ultimately drive the value that

8    unsecured creditors would receive at their particular Debtor

9    entity.

10          And the first one is the understated enterprise

11   value.  And the way the Debtors have set this up is their

12   enterprise value doesn't ascribe any value to their own PPL

13   litigation.  They've also not taken into account any

14   incremental business plan value gains.  But I think more

15   important, Your Honor, is that this business plan understates

16   the value of Cumulus, which we've talked about before.

17          And as you'll hear at the confirmation hearing --

18   it's not an issue for today -- but the Debtors' valuation

19   values Cumulus on a pure dollars-in basis.  And so what that

20   means is that the value assumes no expectation of growth, no

21   return on the investment, which we believe to be an

22   unsupportable assumption, given the various statements and

23   testimony that you've heard throughout these cases.

24          The other issue to raise with Your Honor is the

25   improper allocation of the DIP liabilities.  The way the

1    value allocation is set up here is that the DIP financing

2    claims are assumed to be satisfied by the various Debtors

3    based upon their distributable value.  But as a matter of

4    fairness, as a matter of logic, as a matter of equity, we

5    believe these DIP claims should be satisfied by the relevant

6    Debtor entities based upon their actual use of the DIP

7    proceeds.

8         And finally, Your Honor, we have, in our view, an

9    improper allocation of the Debtors' hedging costs.  The plan

10   value allocation allocates post-petition hedging costs to a

11   single Debtor entity, that's Talen Energy Marketing.  And the

12   Committee maintains that these costs should, instead, be

13   allocated to the relevant generation entities because those

14   are the entities for whose benefit the hedging activities are

15   performed in the first place.

16        And so the reason why we mention these issues today

17   is twofold:

18        First, so all the parties-in-interest are aware of

19   the issues that the Committee intends to raise at the

20   confirmation hearing if we're not otherwise able to resolve

21   our issues consensually.

22        And second, Your Honor, because the originally

23   filed Disclosure Statement didn't adequately disclose the

24   Committee's position on these issues and, at least in our

25   view, the substantial risk that the plan cannot be confirmed.

1    And so we felt the Disclosure Statement wasn't complete,

2    which is why in our filed objection we both raised these

3    issues substantively, but also, where we could, proposed

4    additional disclosures.  And so, as you've heard, the Debtors

5    have incorporated additional language into the Disclosure

6    Statement.

7         Importantly, from our perspective, they've also

8    resolved the bidding procedures to require an auction if

9    multiple bids are received.  That was very important from the

10   Committee's perspective.  And they also added more meaningful

11   consultation rights for the Committee.  So those issues, as

12   you've heard, are not relevant for today.

13        So then we're left with the issue that you were

14   discussing with Mr. Morgan, which is the "sale transaction"

15   definition.  And so the question for us is whether this plan

16   should be solicited in its current form when we think, from a

17   pure process perspective, as Your Honor alluded to, we think

18   this provision is harmful to the estates.  We think it's

19   inconsistent with the sale process that was conducted.  We

20   think it only benefits the ad hoc group.  And ultimately, we

21   think it results in inefficiencies, in terms of how the case

22   would be run going forward.

23        And although the Debtors would suggest that this is

24   a confirmation issue, we don't believe that's right.  We

25   don't think it's a premature objection to the plan.  We think

1    the issue is for today because, if and when the Debtors

2    ultimately seek to confirm their plan, from our perspective,

3    the harm will have already occurred.

4         And Your Honor, I -- just to take a step back --

5    and I know you mentioned this before.  The sale process was a

6    key point in these cases.  And as Your Honor might recall,

7    one of the key reasons that the Committee didn't object to

8    approval of the backstop was because the Debtors agreed to

9    conduct a robust sale process.  And that was designed to

10   determine whether the RSA deal, the equitization transaction,

11   was, in fact, the highest or otherwise best deal on the

12   table.  But that sale process could only serve as a critical

13   market check if it's given a fair shot, and we don't think

14   that's the case.

15        And the definition and the structure of the plan

16   that the Debtors had mentioned, you know, does require that a

17   sale transaction constitute an eligible alternative

18   restructuring.  And that is a transaction that must satisfy,

19   not just DIP claims and secured claims and the breakup fees,

20   but also all unsecured notes; not all unsecured creditors,

21   just the unsecured notes.

22        And so I think our issues with this are twofold.

23   One is the cost, but also the company's consideration at the

24   appropriate time because, if the Debtors ultimately decide to

25   pursue a sale transaction, then this provision does mean that

1    there will be some incremental cost, some incremental delay.

2    We don't know what that is.  Maybe it's weeks, maybe it's a

3    month, maybe it's two months.  Whatever it is, we feel like

4    that's an inappropriate charge to the process.

5          But I think even more problematic -- and I think

6    this is what you were getting at, Your Honor -- is that the

7    mere inclusion of the provision puts a thumb on the scale in

8    favor of the RSA transaction.  And that's because, if the

9    Debtors ultimately are in a position where they have to weigh

10   two alternatives -- so the RSA deal on the one hand and a

11   sale transaction on the other -- the company will be forced

12   to charge the sale transaction with whatever those costs are

13   and whatever those delays are.  And that means the sale

14   transaction today is starting from behind, and we don't think

15   that's appropriate.

16         And so I think the question from our perspective

17   is:  Notwithstanding what was done, in terms of the sale

18   process, the bidding, and where we were a few months ago, why

19   is this provision in the plan?

20         Well, it's not in the commitment letter that Your

21   Honor approved.  It's not in the RSA.  But the ad hoc group

22   ultimately demanded it when they were in the plan negotiation

23   process and you've heard the reasons why the company got

24   comfortable with the provision.  But from our perspective,

25   Your Honor, you do have the authority, in terms of your

1    ability to manage your own docket or under 105(d)(2) of the

2    Bankruptcy Code, to decide today that this issue should be

3    resolved and the plan should not be solicited until the issue

4    is rectified.

5          THE COURT:  Let me take a stab at something.

6          (Pause in proceedings)

7          THE COURT:  The language may not be perfect.  But

8    if we take that concept that's on your screen and incorporate

9    it into a confirmation order -- I do understand that the

10   estate might have some costs that it's going to bear, which

11   the Debtor is describing as *de minimis*, and you may think

12   it's more than *de minimis*.  But in reality, does this solve

13   the problem?

14         MR. BROD:  And just to clarify, confirmation order

15   or the Disclosure Statement order?

16         THE COURT:  I'm sorry.  Disclosure statement order.

17         MR. BROD:  yeah.

18         THE COURT:  The order we're issuing today that

19   approves --

20         MR. BROD:  Understood.

21         THE COURT:  -- the bidding --

22         MR. BROD:  I --

23         THE COURT:  -- procedures.

24         MR. BROD:  I think it does, Your Honor, yes.

25         THE COURT:  Let me hear from the Debtor and from

1    any other party that thinks that this is inconsistent with

2    what we ought to be doing.

3            MR. MORGAN:  Your Honor, we find this language

4    troubling.

5            First, this is materially altering the exercise of

6    fiduciary duties.  And so, if Your Honor were to put language

7    --

8            THE COURT:  You're exercising --

9            MR. MORGAN:  -- like this --

10           THE COURT:  -- them now by excluding their offer.

11   That's what I'm questioning is it's today's exercise of

12   fiduciary duties they're challenging by saying you've

13   proposed a plan that doesn't let you consider offers on a

14   heads-up basis.  Do you think -- if you want to incorporate

15   into the current plan that the exercise of your fiduciary

16   duties allows you to consider those on a heads-up basis in

17   the currently proposed plan, I don't need this.  But it's

18   today's exercise of fiduciary duties.

19           You can't argue to me that you get to breach them

20   today and, therefore, by breaching them today, you should not

21   be required to breach them again in the future because

22   today's breach produces a need for a breach in the future.  I

23   mean, it's just -- it's circular.  Why are we doing it this

24   way?  Why aren't you considering other offers?

25           MR. MORGAN:  We are, Your Honor.

1        THE COURT:  But you're considering them not on a

2   heads-up basis because of a particular provision in the plan

3   that could be eliminated.  So why has it been your fiduciary

4   judgment that you should do it that way?

5        (Participants confer)

6        MR. MORGAN:  Well, I -- so what Mr. Barr just said

7   over my shoulder is --

8        MR. BARR:  Sorry.

9        MR. MORGAN:  -- is where I was going, which is:

10  How is this different than a breakup fee in the other sale

11  context?  I -- effectively, there are breakage costs to pivot

12  from one transaction to another transaction and they're in

13  any scenario.  Those costs have to be considered by the

14  board.  By forcing the board to --

15       THE COURT:  Why does the --

16       MR. MORGAN:  -- to discount --

17       THE COURT:  -- have to consider *de minimis* costs?

18       MR. MORGAN:  Well, to the extent they are *de*

19  *minimis*, then --

20       THE COURT:  You told me --

21       MR. MORGAN:  -- then we can --

22       THE COURT:  You told me --

23       MR. MORGAN:  -- weigh them into --

24       THE COURT:  -- they would be.

25       MR. MORGAN:  I believe they are.

1          THE COURT:  Okay.

2          MR. MORGAN:  I -- they would be weighed as such,

3    right?  And that's the judgment of the board.  By imposing an

4    order that they cannot consider these factors, then, one, I -

5    - you know, we have concerns about making sure we get the

6    exculpation because, you know, we'll comply with any order

7    Your Honor gives, obviously.  But now the exercise of our

8    fiduciary duties is being shaped by what we may and may not

9    consider at the board level.

10         The second thing, Your Honor, just looking at some

11   of these, is some of these considerations -- you know, just

12   to take sort of an *ad absurdum* argument, you know, the cost

13   of any such delay.  What if we have a buyer who can't close

14   for a year, right?  We should be able to take into

15   consideration delay.  The quantum of delay is something that

16   the board should be considering in its deliberations.

17         THE COURT:  And that --

18         MR. MORGAN:  And that's --

19         THE COURT:  That should say the cost of any such

20   delay that was occasioned by the failure to incorporate it

21   into the plan.

22         MR. MORGAN:  But this -- that's hitting on the nub

23   of our concern, which is these considerations are

24   considerations that will be weighed by the board in the

25   exercise of its fiduciary duty.  By trying to proscriptively

1        determine what can and cannot be considered, we're starting

2        to --

3                    THE COURT:  What's a fair breakup fee?

4                    MR. MORGAN:  I'd want it to be as modest as

5        possible.  I have to -- I supposed you'd have to --

6                    THE COURT:  I mean, I --

7                    MR. MORGAN:  -- speak to the --

8                    THE COURT:  I don't know --

9                    MR. MORGAN:  -- RSA parties about --

10                   THE COURT:  -- that I'm going to have a problem and

11       I don't know that the Committee is going to have a problem if

12       what you want to incorporate is a breakup fee.  But what

13       you've incorporated is something that is problematic.

14           (Participants confer)

15                   MR. MORGAN:  Mr. Barr again.  There is a breakup

16       fee, it is the backstop fee, which is approved and would be

17       part of the breakage costs in this and has to be considered.

18       And I don't think anyone is --

19                   THE COURT:  So it's --

20                   MR. MORGAN:  -- here saying --

21                   THE COURT:  -- already in there, if you were to

22       consider the alternative transaction.

23                   MR. BARR:  Correct.

24                   MR. MORGAN:  Yes.

25                   THE COURT:  You're telling me you want to exclude

1    the ability to close on the alternative transaction taking

2    into account an existing breakup fee, and that's their

3    challenge to you and I'm not sure why we're doing it.

4             MR. MORGAN:  Well, Your Honor, let me parse that.

5    I -- how could we not consider the costs of the backstop fee

6    being triggered and pivoting to an alternative.  It --

7             THE COURT:  I don't have a problem with that.

8             MR. MORGAN:  Okay.

9             THE COURT:  But you're not.  Your justification for

10   this, I thought, was this is very similar to a breakup fee.

11   And now you're telling me you already have a breakup fee.

12            MR. MORGAN:  But we have --

13            THE COURT:  So if you --

14            MR. MORGAN:  We have --

15            THE COURT:  If you already have one, then consider

16   the alternative in light of the breakup fee.

17            MR. MORGAN:  Which we are and would.

18            THE COURT:  But not --

19            MR. MORGAN:  The point --

20            THE COURT:  -- in the alternative.

21            MR. MORGAN:  But the point of the Committee is that

22   there are other costs.  That's -- if you distill it all down,

23   they're just saying there are other costs in addition to the

24   actual backstop breakup fee, and those costs are time and

25   delay.

1          THE COURT:  No.  What you're saying is those are

2     things you want to take into account.

3          MR. MORGAN:  I don't know how we can't, but I also

4     think that they're modest.

5          THE COURT:  Why are you excluding the transactions

6     at all?  Why not think about them as part of this plan --

7          MR. MORGAN:  That --

8          THE COURT:  -- as opposed to --

9          MR. MORGAN:  For that --

10          THE COURT:  -- automatically excluding them?

11          MR. MORGAN:  For that I have to say it was a

12     negotiated point, and that's really the -- you know, the

13     premise of our analysis there is that that was an ask, it was

14     something we negotiated, and it was something we conceded to.

15          THE COURT:  You may not be able to give it.  We'll

16     see.

17          Let me hear from Mr. Koenig.

18          MR. KOENIG:  Again, Chris Koenig of Kirkland &

19     Ellis for the unsecured noteholders.

20          So, Your Honor, we're the party that's affected by

21     all of those.  We're the current plan sponsors.  We've agreed

22     to backstop $1.65 billion of new money equity --

23          THE COURT:  Right.

24          MR. KOENIG:  -- which is an extraordinary amount of

25     money.

37

1          What I would say is this is an unusual process.

2     The Bankruptcy Code doesn't require a market check in order

3     for a Chapter 11 plan to be confirmed and this sort of

4     parallel process is unusual.  It's unusual because of the

5     unique nature of this case.  It's something that was

6     carefully negotiated among my group, the Debtors, and the

7     Committee.

8          What Mr. Brod said was that, you know, they agreed

9     to the backstop as part of -- or they agreed to this process

10    as part of, you know, consenting to the backstop.

11          THE COURT:  Right.

12          MR. KOENIG:  This was known at that time.  The

13    contours of this -- the market checks were known at that

14    time, that, you know, there had to be an eligible alternative

15    restructuring in order for my group to consent, or we would

16    otherwise consent to it.

17          But to be clear, every Chapter 11 case has this

18    possibility, right?  That the Debtors are proceeding towards

19    confirmation with one plan.  And a party could come out of

20    nowhere, there were bidding procedures or not, the Debtors

21    have fiduciary duties.  There are fiduciary outs in every

22    single RSA --

23          THE COURT:  Uh-huh.

24          MR. KOENIG:  -- that exists in complex Chapter 11

25    cases.  And to the extent a party comes out of nowhere,

1    whether there are bidding procedures or not, and provides a

2    deal that, in the Debtor's view, is higher and better than

3    the deal that is on the table in the currently contemplated

4    Chapter 11 plan, the Debtors have their fiduciary duties to

5    evaluate --

6            THE COURT:  Yeah.  What I've --

7            MR. KOENIG:  -- it, including --

8            THE COURT:  -- never seen --

9            MR. KOENIG:  -- the costs.

10           THE COURT:  -- is one that requires them to write a

11   new plan.  Why not give them the fiduciary out that's exactly

12   what you described, that's exactly what I normally see, and

13   that says, at that point, if they need a fiduciary out, we

14   shift to that sale under this plan.

15           MR. KOENIG:  That --

16           THE COURT:  Why are we imposing this?

17           MR. KOENIG:  Your Honor, respectfully, the Debtors

18   have that potential today under the documents.  And as Mr.

19   Morgan explained, it would be very simple for the Debtors to

20   pivot if that's the situation that they find themselves in.

21           THE COURT:  Well, why do we need to do a new plan

22   and a new Disclosure Statement if they find themselves there?

23   Why can't -- I mean, they shouldn't want to walk away from

24   your deal if they're not properly exercising their fiduciary

25   duty.  I got that.  But if they are, why are we imposing this

1    additional delay and costs, as opposed to allowing them to

2    pivot under this plan?  I'm not understanding the reasoning

3    for that.  I've never seen it before.  And to tell me that

4    this is normal, it may be, but it may be something normal

5    I've never seen.

6         So it's -- if you really want to tell me it's

7    normal, give me examples of where people had to abandon plans

8    when they -- in the exercise of their fiduciary judgment,

9    they have a better alternative?  People don't write it that

10   way.  They write it they can shift.  And you've taken away

11   their ability to shift, which I think is abnormal.  And so

12   tell me I'm doing something normal that is inconsistent with

13   my experience.  Maybe I'm missing something.

14         MR. KOENIG:  Your Honor, respectfully, what I would

15   say is that most plans don't involve this potential pivot.

16   There's a --

17         THE COURT:  Right.

18         MR. KOENIG:  -- a plan sponsor and the parties

19   proceed to confirmation and the Debtors have the burden to

20   demonstrate that that Chapter 11 plan is highest and best

21   value for the estates.

22         THE COURT:  Right.

23         MR. KOENIG:  And we consented to this dual-track

24   process --

25         THE COURT:  Right.

1          MR. KOENIG:  -- because we're the beneficiaries of

2     that process.  And as I said, we're the plan sponsors who are

3     putting up $1.65 billion of new capital, and this was an

4     important consideration for us.

5          And as Mr. Morgan said -- and you know, I think he

6     undersold it a little bit -- it was a -- it was a heated

7     discussion and it was something that was very important to

8     us.

9          THE COURT:  Yeah.  But what I'm used to seeing and

10    what makes sense to me is the Debtor gets there and says we

11    need to shift, we need to shift over to this arrangement,

12    it's different than what we disclosed, we think it's better.

13    And then you determine whether the Debtor, under the

14    provisions of the Bankruptcy Code, can amend the plan and go

15    there without further disclosure.  Sometimes you can;

16    sometimes you can't.  You're taking away the code provision

17    alternative for them to make a shift.  I don't understand

18    why.

19         MR. KOENIG:  Your Honor, what we've agreed to as

20    part of providing this new money capital is that -- and we

21    will have the right to either consent -- of course, we would

22    have the right to and the ability to consent to a transaction

23    that is lower than payment in full, in cash, plus post-

24    petition interest.  But this is something that, respectively,

25    I believe exists in every deal that they could -- this could

1    occur between Disclosure Statement and plan confirmation and

2    they would have to -- and they would have to make a decision

3    in their fiduciary duties, and I don't --

4              THE COURT:  All I want to do is take out the

5    provision that you -- there's a provision that's the weirdest

6    thing I've ever seen that says this plan doesn't work if we

7    need to amend to shift somewhere else and the Court's

8    approval is a nullity.  That's weird.  Why don't we just take

9    out that provision and let the Code do its business and let

10   your contract do its work?  But not something that says that

11   my approval is limited to something that you happen to want

12   it to be limited to.

13             MR. KOENIG:  Understood --

14             THE COURT:  There is no --

15             MR. KOENIG:  -- Your Honor.

16             THE COURT:  -- reason for that.

17             MR. KOENIG:  Understood, Your Honor.  I would, you

18   know, rest on my argument --

19             THE COURT:  Well --

20             MR. KOENIG:  -- and like --

21             THE COURT:  -- I'm going to let you all talk about

22   a good alternative.

23             MR. KOENIG:  I was going to say, Your Honor, I

24   think it --

25             THE COURT:  Yeah.

1          MR. KOENIG:  -- makes sense for us to get in the

2     hallway.

3          THE COURT:  We'll do that.

4          MR. KOENIG:  Thank you.

5          THE COURT:  Why don't we come back at 10:15.

6     That's -- and you all can get more time than that if you

7     need.  But 30 minutes ought to be enough to work through

8     this.  We'll see you all at 10:15.  Again, if you need more

9     time, just send in one representative and tell me that.  I'll

10    come out no matter what.  Thank you.

11         COUNSEL:  Thank you.  Thank you, Your Honor.

12       (Recess taken from 9:46 a.m. to 10:14 a.m.)

13                    AFTER RECESS

14         THE COURT:  Be seated.

15         Mr. Genender.

16         MR. GENENDER:  Yeah.  Good morning, Your Honor.

17    Can we have 15 more minutes?

18         THE COURT:  How many more?

19         MR. GENENDER:  Fifteen.

20         THE COURT:  Okay.  We'll see you at 10:30.

21         MR. GENENDER:  Thank you, Judge.

22         THE COURT:  Thank you.

23         MR. GENENDER:  Appreciate it.

24       (Recess taken from 10:15 a.m. to 10:28 a.m.)

25                    AFTER RECESS

43

1           THE COURT:  Please be seated.

2           Mr. Carlson?

3           MR. CARLSON:  Your Honor, we need 15 more minutes,

4     final 15 minutes, hopefully.

5           THE COURT:  Have I been complaining?

6           MR. CARLSON:  No.

7           THE COURT:  Okay.

8           MR. CARLSON:  All right.

9           THE COURT:  We'll see you at 10:45.

10           MR. CARLSON:  Thank you.

11           THE COURT:  Thank you.

12        (Recess taken from 10:29 a.m. to 10:44 a.m.)

13                        AFTER RECESS

14           THE COURT:  Please be seated.

15           Mr. Morgan?

16           MR. MORGAN:  Good morning, Your Honor.

17           So, after discussion in the hallways, we do not

18     have resolution among all of us.  We are generally aligned

19     with the ad hocs on a proposal that I'll lay out, in terms of

20     how to try and bridge from --

21           THE COURT:  I don't think I should do that,

22     frankly.  If you all have a deal, that's fine; if not, then

23     you need to prosecute your case, right?

24           MR. MORGAN:  Well, what we're prepared to do is to

25     make adjustments to the time line and articulate a certain

1      concession/stipulation from the ad hocs.  And then I think

2      that positions what our case is, so I'll lay that out.  And

3      then I can go ahead and sort of make our thoughts -- share

4      our thoughts, make our case on that, if that's okay with Your

5      Honor.

6                THE COURT:  So --

7                MR. MORGAN:  It may be easier if I just do it.

8                THE COURT:  Okay.  I'm not going to -- I don't

9      think it's fair for me to try and negotiate something is all

10     that I was saying.  So I think you need to put on your case

11     however you want to put it on.  And if that means describing

12     what your new case is, as opposed to your old case, that's

13     fine, however you want to go about it.  But it's -- I'm not

14     going to then sort of mediate as the Judge between you and

15     the Committee.

16               MR. MORGAN:  Understood, Your Honor.  And you said

17     it more eloquently than I.

18               THE COURT:  All right.

19               MR. MORGAN:  So, when you look at the time line we

20     had for the sale and confirmation process --

21               THE COURT:  Should we --

22               MR. MORGAN:  -- we --

23               THE COURT:  -- put that up on the screen somewhere?

24     I think it's in here somewhere, right?

25               MR. MORGAN:  It is.  It's --

1          (Participants confer)

2               MR. MORGAN:  It's in the solicitation order itself.

3     Actually, it's in the bid procedures, as well.  There it is,

4     there it is.  Actually, Your Honor, if you could scroll up.

5     There we go.

6               The bid deadline is November 14th.  We wanted to

7     keep that because it's been communicated to the market.

8     Although not approved, it's still public, so we want to keep

9     that deadline.

10              What we would then do is bring in the deadline to

11    select a third-party successful bidder from November 29th to

12    November 18th.  That would be sort of the bids are due on

13    Monday and we have to pick by Friday.

14              And at that time, if we are picking a third-party

15    successful bidder that is not an eligible alternative

16    restructuring, we will file an amended Disclosure Statement

17    and plan and seek conditional approval of the Disclosure

18    Statement within ten days from that filing.

19              So we would, by the end of November, have a

20    conditional Disclosure Statement and we would be seeking a

21    combined hearing sometime thereafter, in accordance with the

22    rules; or, if we could, on a shortened basis.

23              So what that ends up doing, Your Honor -- and this

24    is why I say it is the underpinning for the case.  What that

25    ends up doing is making our time line no more than two to

1      three weeks' delayed.

2             THE COURT:  Why would it be delayed at all?

3             MR. MORGAN:  Well, it could be -- it could be if we

4      shortened the notice.  We just don't have -- we don't have --

5      we have agreement by the ad hoc group that they would be okay

6      with expedited notice for the conditional hearing, for the

7      approval of the conditional Disclosure Statement.  They have

8      not agreed to a shortened confirmation notice.  We would

9      likely seek that and like to -- we would like to try and keep

10     our timing and say there is no impact on timing at all.  But

11     we think, at worst, it would be two to three weeks.

12             And when we -- and then --

13             THE COURT:  So, if we get to November 29th and you

14     have proposed an alternative where you no longer are going to

15     take their bid, try and get confirmation, but alternative,

16     would they then have any say that you're concerned about as

17     to why we couldn't proceed on December 15th?

18             MR. MORGAN:  They would have the right to object.

19             THE COURT:  As a party or in some other --

20             MR. MORGAN:  As a --

21             THE COURT:  Like everybody has --

22             MR. MORGAN:  As a --

23             THE COURT:  -- a right to --

24             MR. MORGAN:  As a stake --

25             THE COURT:  Everybody has a right to object to it.

1          MR. MORGAN:  Right.  As a party-in-interest and as

2     a creditor of the estate.

3          THE COURT:  Okay.

4          MR. MORGAN:  And so that's why we think, at that

5     hearing -- excuse me, Your Honor.  At that hearing at the end

6     of November, we are going to be setting the time line for

7     confirmation, and that's when we would anticipate having some

8     disagreement as to what the future holds.  But when we look

9     at it, it can't be more than two to three weeks from what we

10    already had.

11         THE COURT:  All right.

12         MR. MORGAN:  So, Your Honor, when we look at those

13    delays and consider whatever associated costs there is and

14    when we think about the breakage and we're trying to weigh

15    two options, we're looking at that time and whatever

16    potential additional litigation expense there is around that.

17    That incremental time and cost, that's what I mean when I

18    said earlier we see that as being *de minimis*.

19         And so we will alert our board and let them know

20    the colloquy and the discussion that's been had today.

21    They'll be attuned to the issue.  And when we look at these -

22    - when we look at what's being proposed, we do believe it

23    would be *de minimis* and shouldn't be determinative of a

24    selection between one path or another.

25         THE COURT:  All right.  And do you have any

48

1      evidence that you want to put on today in support of what you

2      are now advocating?

3              MR. MORGAN:  We have evidence to put on in support

4      of the Disclosure Statement in general.  I don't know that

5      the incremental change between when we broke and came back,

6      if there's any additional evidence for that, but --

7              THE COURT:  It's up to you.

8              MR. MORGAN:  -- but we'll put on --

9              THE COURT:  I just -- I want you to put on your

10     case, so that you can try and get approval for whatever it is

11     you want to try and get approval for.

12             MR. MORGAN:  Understood --

13             THE COURT:  And then --

14             MR. MORGAN:  -- Your Honor.

15             THE COURT:  -- I'll listen to the opposition as to

16     whether they oppose it.

17             MR. MORGAN:  I think I should -- let me just

18     consult with Mr. Genender quickly.

19         (Participants confer)

20             MR. GENENDER:  Good morning, Your Honor.  Paul

21     Genender for the Debtors.

22             Before I call Mr. LoBiondo as our witness, I wanted

23     to offer into evidence off of our amended witness and exhibit

24     list, which is Document 1406, Exhibits 1406-1 through 11.

25             THE COURT:  Any objection to 1406-1 through 11

1    being admitted?

2             UNIDENTIFIED:  No objection, Your Honor.

3             THE COURT:  They are admitted.

4        (Debtors' Exhibits 1406-1 through 1406-11 received in

5    evidence)

6             MR. GENENDER:  Your Honor, the Debtors would call

7    Mr. LoBiondo, who I see just --

8             THE COURT:  All right.

9             MR. GENENDER:  -- appeared on the screen.

10            THE COURT:  Mr. LoBiondo, good morning.  Would you

11   raise your right -- I need you to press five-star one time on

12   your phone.  Mr. LoBiondo, good morning.

13        (No verbal response)

14            THE COURT:  I didn't hear you yet.  Could I get you

15   to do that one more time?  I may have messed up.

16        (Pause in proceedings)

17            THE COURT:  Now let's try it.  Mr. LoBiondo, good

18   morning.

19            THE WITNESS:  Good morning, Your Honor.

20            THE COURT:  Would you raise your right hand,

21   please, sir?

22        LEONARD LOBIONDO, WITNESS FOR THE DEBTORS, SWORN.

23            THE COURT:  All right.  So I believe that what

24   we're going to have for most of your testimony will be a

25   proffer by Mr. Genender, what he believes you would say.  And

1       I'm going to ask you, when he is done with that proffer, to

2       either expand on it, affirm it, withdraw it, be sure it's the

3       truth, the whole truth, and nothing but the truth.

4                   Mr. Genender.

5                   MR. GENENDER:  I'm actually going to do Q-and-A if

6       that's okay with the Court.

7                   THE COURT:  Oh, you're going to do a Q-and-A?

8       That's great.

9                   MR. GENENDER:  Okay.  Thank you.

10                  THE COURT:  Go ahead.

11                  MR. GENENDER:  Thank you.

12                  DIRECT EXAMINATION OF LEONARD LOBIONDO

13      BY MR. GENENDER:

14      Q    Would you please state your full name for the Record,

15      sir?

16      A    Leonard LoBiondo.

17      Q    How are you employed, Mr. LoBiondo?

18      A    I'm employed as the Executive Vice President of

19      Restructuring for Talen Energy Supply, LLC.

20      Q    And how long have you served in that role?

21      A    Since early May 2022.

22      Q    Mr. LoBiondo, can you describe what your involvement in

23      these cases has been as the Debtors' EVP of Restructuring?

24      A    Yes.  I'm responsible for the strategy and guiding the

25      Debtors through the Chapter 11 process by coordinating the

1    Debtors' management resources, as well as the external

2    (indiscernible) I've led the negotiations with the various

3    principals, with the secured lender, the Ad Hoc Group of

4    Unsecured Lenders, TEC, as well as Riverstone, to effectuate,

5    among other things, the RSA (indiscernible) and the

6    TEC/Riverstone/Cumulus settlement, and then ultimately the

7    Debtors' plan of reorganization.

8    Q    Mr. LoBiondo, can you describe for the Court your

9    restructuring experience in general?

10   A    Sure.  I have over 30 years of restructuring experience,

11   providing professional services to major companies and

12   (indiscernible) businesses, all in financial distress.  I was

13   a senior partner at Zolfo Cooper, the Chief Operating Officer

14   of Kroll Zolfo Cooper.  At the time, they were preeminent

15   financial restructuring firms.

16       I've advised a wide variety of creditors, secured and

17   unsecured, Debtors, investors, as well as the Court and

18   management teams in restructuring processes, both in and out

19   of court, advising on various boards of directors and CRO.

20       And I'm a retired CPA and CIRA, which is a certified

21   insolvency and restructuring advisor.

22   Q    Thank you, sir.

23       Mr. LoBiondo, are you familiar with the disclosure --

24   the current Disclosure Statement that was just admitted as

25   Exhibit 9 in this hearing, which is ECF-1396?  Are you

1       familiar with that document?

2       A     I am, yes.

3       Q     Have you reviewed it in its entirety?

4       A     Yes.

5       Q     And did you sign it on behalf of one of the entities?

6       A     I did.

7       Q     To your knowledge, is everything in that Disclosure

8       Statement true and correct?

9       A     Yes, to the best of my knowledge.

10      Q     Do you have a view, Mr. LoBiondo, as to whether the

11      Disclosure Statement that you just testified about provides

12      sufficient information, so that each voting party can decide

13      whether or not to vote to accept the plan with fair notice?

14      A     Yes.  Based on my experience and my review, I believe

15      that the Debtors' Disclosure Statement contains adequate

16      information for the holders of all impaired classes and

17      claims to make informed decisions whether to vote for or

18      against the plan.

19                  MR. GENENDER:  Pass the witness.

20                  THE COURT:  Thank you.

21                  Is there any cross-examination for Mr. LoBiondo?

22                  MR. BROD:  Not from the Committee, Your Honor.

23                  THE COURT:  Any other party?

24              (No verbal response)

25                  THE COURT:  All right.  Thank you, Mr. Genender.

1          MR. GENENDER:  Thank you, Your Honor.

2          That closes the evidentiary portion of the Debtors'

3    case, Your Honor.  Thank you.

4          THE COURT:  Thank you.

5          Is there any additional evidence that anyone wishes

6    to introduce?

7              (No verbal response)

8          THE COURT:  All right.  We'll show the evidentiary

9    record as closed.

10          THE WITNESS:  Thank you, Your Honor.

11              (Witness excused.)

12          THE COURT:  So I'm going to do something, which I

13    may view as being out of order, but I'm doing it on purpose,

14    so that I am not in any way doing it after the fact, so the

15    parties are going to be able to protect their own interests.

16    This is primarily for -- I'm announcing this, and it may

17    viewed as adverse to him, but I'm announcing it, so that Mr.

18    Koenig can object to what I'm doing before we get the order

19    that he's looking for.

20          I am setting, on the Debtors' announcement that

21    they may file an alternative plan not later than

22    November 29th of 2022, a hearing on whether to conditionally

23    approve whatever they might file on November 29th.  And that

24    will be set for hearing on December the 1st at 10:30 a.m.

25              And I am setting for confirmation a contingent

1    hearing on that for December 15th, 2022, at 9:00 a.m., but

2    only will take it up if, in the absence of the provision of

3    the order that states that the order approving the plan is

4    only this plan and not any amended plan, if, in the absence

5    of that, we would have been able to have taken out the now

6    new plan on the basis of 1127 at a confirmation hearing as an

7    amendment that did not require additional solicitation or

8    additional disclosure beyond which -- that which would have

9    occurred on the approval that is granted on December 1.

10           So, if it's changed, we wouldn't be able to take up

11   ordinarily, if the change had been made on that date, without

12   this sort of unusual provision, we'll take it up.  If it's a

13   change that is so material that it means that we wouldn't

14   have been able to take it up, then we won't take it up.  So

15   it's a contingent setting of a hearing, but I think everybody

16   knows what I'm trying to accomplish here.  It's just to re-

17   level the playing field back to one of normalcy.

18           And I'm doing that not on the Debtors' motion, they

19   have not requested this, nor on the Committee's motion, they

20   haven't, but just because I can control my own calendar and I

21   think that's the fair way to control it, given the dispute

22   that we have.

23           Mr. Koenig, I'm trying to do this in a manner --

24   I've thought, well, maybe I should approve this and then tell

25   people what I'm going to do, and that seemed unfair to you,

1    so I'm not doing it that way.  And feel free, if you need, to

2    now withdraw your support for approval of the order that you

3    come in wanting.  I'm going to let you withdraw that support

4    and those chips will fall where they fall.  But I just

5    thought it was unfair to do it in a different order, Mr.

6    Koenig.

7              MR. KOENIG:  Thank you, Your Honor.  Again, for the

8    Record, Chris Koenig for the Ad Hoc Group of Unsecured

9    Noteholders.

10             Appreciate the notice, Your Honor, and that's

11   helpful.  What I would just say in support of what the

12   Debtors were seeking is a couple of things:

13             Number one, the schedule that we and the Debtors

14   believe is appropriate here that Mr. Morgan outlined is a

15   matter of delay of a couple of weeks.  And in contrast, in

16   order for these Debtors to emerge from Chapter 11, there are

17   a number of regulatory hurdles that need to be overcome, most

18   notably approval of the Nuclear Regulatory Commission, which

19   is a long process that will take many months.  And so, by

20   contrast, we and the Debtors had believed that, you know, a

21   delay of a few short weeks was pretty *de minimis* in light of

22   the longer time frame of many, many months to get regulatory

23   approval.

24             Your Honor, the plan and Disclosure Statement was

25   negotiated with the Debtors and my clients extensively.  This

1    provision was very important to us and our support for the

2    plan because, candidly, we do not be -- there are issues with

3    the plan and with solicitation that, if we were not

4    supportive of the plan, you know, we would be bringing before

5    Your Honor.

6              This is a plan that we support and we believe is

7    appropriate.  But if this goes in a different direction and

8    the ad hoc group -- and the Debtors propose a plan -- which

9    is not here today -- that does not have our support, we would

10   want the opportunity to make a full and fair record before

11   Your Honor.

12             We -- as to solicitation and as to confirmation of

13   that plan, obviously, we're not here on that today.  But just

14   to flag for Your Honor that it is not as though we can just

15   pivot to another -- pivot to another plan.  We consented to

16   this plan structure for a specific reason.  There is an issue

17   that we would raise at the appropriate time at that

18   conditional Disclosure Statement hearing.  We consented to

19   shortened notice of that in order to try to address Your

20   Honor's concerns about the timing.  But we would want an

21   opportunity to make that record in front of Your Honor at the

22   appropriate time.  And it's difficult to make that record

23   without knowing what plan they would be proposing --

24             THE COURT:  Yeah.

25             MR. KOENIG:  -- today.

1              THE COURT:  So let's be real.  It's really a

2       longshot that we're going to be there anyway, right?

3              MR. KOENIG:  I understand --

4              THE COURT:  So --

5              MR. KOENIG:  -- Your Honor.

6              THE COURT:  Yeah.

7              MR. KOENIG:  I'm just --

8              THE COURT:  And --

9              MR. KOENIG:  -- trying to --

10             THE COURT:  And if we end up with that longshot,

11      you're going to be able to make your record.  I don't want

12      you to make a record today over a longshot that you can't

13      predict what it was.

14             MR. KOENIG:  I --

15             THE COURT:  That would really be unfair to you.

16             MR. KOENIG:  I understand.

17             THE COURT:  And you know, you'll be able to that

18      make that record.

19             MR. KOENIG:  I understand, Your Honor.  My concern

20      is one of notice of due process --

21             THE COURT:  Yeah.

22             MR. KOENIG:  -- that's all and --

23             THE COURT:  You'll be able to make that record.  I

24      don't know what I'll do with it, but you'll be able to make

25      that record.  And I'm telling you -- and that -- that's the

1      reason I was pretty careful about the December 15th hearing.

2           MR. KOENIG:  Uh-huh.

3           THE COURT:  I'm not guaranteeing -- and we'll see

4      what the Committee does with this.  I'm not guaranteeing that

5      there's going to be actually a confirmation hearing on the

6      15th because, if there is, as a result of the change of the

7      buyer, let's say, some change that would require additional

8      business, that's -- then I'm not going to hold the hearing on

9      the 15th.  So it all depends on how it fits in.  But

10     certainly you're going to reserve the right to object to all

11     of that.

12          MR. KOENIG:  I understand.  We're going forward

13     today on our plan and we're the party that's here with the

14     check that's been written --

15          THE COURT:  Right.

16          MR. KOENIG:  -- and we're prepared to proceed on

17     that basis, but that basis includes, you know, the terms and

18     conditions that have been --

19          THE COURT:  And I'm not changing them.

20          MR. KOENIG:  I understand.  I understand, Your

21     Honor.

22          THE COURT:  Yep.  Okay.  Thank you, Mr. Koenig.

23          MR. KOENIG:  Thank you, Your Honor.

24          THE COURT:  So, if the Committee wants to prosecute

25     its objection, I need to hear an argument as to why, in the

1     light -- in light of all that's occurred today, why we should

2     not approve the Disclosure Statement and the solicitation

3     procedures, with the one change that either Mr. Morgan is

4     going to dictate to me what to type into the order or submit

5     a new order, and I guess the other deadlines that we've

6     talked about.

7               But go ahead.  Do you want a minute to talk to your

8     team?

9               MR. BROD:  No.  It's okay, Your Honor.

10              THE COURT:  Okay.

11              MR. BROD:  For the record, Matthew Brod from

12    Milbank on behalf of the Committee.

13              I think the construct that you laid out, Your

14    Honor, works for the Committee.  I think our view is that, if

15    we're in this alternative scenario, we are likely to be able

16    to move forward.  Obviously, the ad hoc group has reserved

17    rights on our ability to do so.  We'll have our rights at

18    that time.

19              THE COURT:  Uh-huh.

20              But I think what was most important for the

21    Committee is trying as best as possible to sync up the

22    confirmation date, the December 15th that the company has

23    under the current plan with what you put forward.  And I

24    think, if we have a reasonable shot of hitting that date for

25    an alternative plan, I think that works for the Committee.

1          THE COURT:  Appreciate that.

2          Then I'm going to, with the changes that have

3     already been discussed on the record, which are very minimal.

4     And Mr. Morgan, I'll let you tell me whether you want to

5     dictate them in.  But given the other two changes that you

6     announced that are going to go into the table, it may be

7     easier for you to submit it later this afternoon.

8          MR. MORGAN:  It would, Your Honor.

9          THE COURT:  You want to -- okay.

10          MR. MORGAN:  We'll submit it.

11          THE COURT:  I'm approving this with the one change,

12     in terms of the only substantive change being the one

13     announced just by Mr. Morgan and then the one change that,

14     once somebody receives confidential information as a

15     consultation party, they are precluded from bidding, unless

16     that information is timely provided to all other bidders.

17     I'm approving it.

18          I will then -- and I think what's best on this,

19     given that I'm doing it on my own motion -- do my own order

20     that goes ahead and sets out the other deadlines.  If you all

21     want it incorporated into this order, that's fine with me,

22     but I really don't think it's fair for me to impose that

23     really for the reasons Mr. Koenig laid out, on something that

24     he would necessarily agreed to.  So it may just be better if

25     I did my own little order that does that.  But you all tell

1      me what you all want to do.

2          (Participants confer)

3              THE COURT:  Does anybody have a problem with a

4      standalone, sort of *sua sponte* --

5              MR. MORGAN:  Yeah.

6              THE COURT:  -- order?

7              MR. MORGAN:  I'll --

8              THE COURT:  And that way, he gets the order he

9      wants.

10             MR. MORGAN:  And Your Honor, sort of two thoughts.

11             One, we do have language that we've been

12     circulating with folks, in terms of the bidding procedures,

13     so we do have something we could read to you.

14             THE COURT:  Great.

15             MR. MORGAN:  The other, if Your Honor is inclined

16     to do your own order, I don't think we have a strong

17     preference as to whether it's incorporated into the

18     solicitation order or standalone, but we would -- could we go

19     through the language now or is that imposing too much on you?

20             THE COURT:  It's not imposing too much, but I

21     haven't figured out the language to do it.

22         (Laughter)

23             THE COURT:  So I was going to go back and listen to

24     what I said and then try and put it into something decretal.

25     I think everybody heard what I said, so it -- why don't we do

1      this?  Let me let you -- back up one second.

2              Are the changes to the table that's up on the

3      screen changes that are just going to be enough -- not that

4      much, so that I can fill it in now?

5              MR. MORGAN:  Yes, with one caveat, which is there

6      are exhibits and this table is repeated in a couple of

7      different places, so I just -- I would want to -- that's why

8      I said I -- we should submit it because I want to --

9              THE COURT:  That's fine.

10             MR. MORGAN:  -- flip back through and make sure we

11     caught in each, you know, and every ballot --

12             THE COURT:  Good.

13             MR. MORGAN:  -- it's all --

14             THE COURT:  Okay.  Then --

15             MR. MORGAN:  -- fairly disclosed.

16             THE COURT:  -- let me go to Page 50 and you can

17     tell me what you're going to do with that language.

18             MR. MORGAN:  Sure.

19             THE COURT:  And then I will  set a deadline of the

20     27th at five o'clock for the Committee and your client and

21     Mr. Koenig's client to submit an order agreed as to form only

22     as to what I said I'm going to do *sua sponte* or to file a

23     notice by 5:00 o'clock tomorrow that you can't agree on form

24     only, at which I'll write my own.  And that way, you all can

25     probably do a better job writing it than I could.  Does that

1       work?  But we'll do it separate from this order.

2                   MR. MORGAN:  Okay.

3                   THE COURT:  Let's not -- let's get this order

4       entered today --

5                   MR. MORGAN:  Okay.

6                   THE COURT:  -- so you can start your process.

7       We're okay in just getting something in per form?  Does that

8       work for all you all?  And if not, I'll write my own.

9            (Participants confer)

10                  THE COURT:  Okay.

11                  UNIDENTIFIED:  Yes.

12                  UNIDENTIFIED:  Yes.

13                  MR. MORGAN:  Yeah.

14                  UNIDENTIFIED:  Yes, Your Honor.

15                  THE COURT:  Mr. Koenig, are you -- and I'm not

16      trying to impose on you to do something you don't want to do.

17      Are you okay signing off as to form of what my *sua sponte*

18      order --

19                  MR. KOENIG:  Your Honor, Chris Koenig for the

20      record.

21                  We're fine with what you proposed, Your Honor, form

22      only.  And we obviously reserve our rights on the rest of it,

23      but ...

24                  THE COURT:  Thank you.

25                  MR. KOENIG:  Thank you.

1          THE COURT:  Okay.  So tell me what's the language

2     here.

3          MR. MORGAN:  So, at the end of the first paragraph

4     after the words "no longer be applicable," period.

5          THE COURT:  Right.

6          MR. MORGAN:  The new language is:

7          "For the avoidance of doubt, if a consultation

8     party has received commercially sensitive information in

9     connection with the sale process" -- comma, yeah -- "then

10    such consultation party" --

11         THE COURT:  Hold on.

12         MR. MORGAN:  "-- will not be an acceptable bidder"

13    -- and that's a defined term -- "unless and until such

14    information is disclosed to all other active potential

15    bidders."

16         THE COURT:  You said "all other active," and then I

17    missed a word.

18         MR. MORGAN:  "Potential bidders," everyone else

19    still involved in the process.

20         THE COURT:  Okay.

21         MR. MORGAN:  And that, we believe, was the

22    confirmation Your Honor was looking for.

23         THE COURT:  I do, too.

24         Is there anybody that believes that that's an

25    inappropriate thing to add in?

1      (No verbal response)

2           THE COURT:  Okay.  So you're just going to include

3      that in what you submit to me.  I'm typing it only so I can

4      read it, instead of --

5           MR. MORGAN:  We will, Your Honor.

6           THE COURT:  That works.

7           What else do we need to do?  I'm approving the

8      Disclosure Statement.  I know this has been an extensive

9      process by the parties.  I think it's a very complete

10     Disclosure Statement, it does everything that it needs to do.

11          I appreciate that the Debtors made some concessions

12     today for the concerns of the Committee.  And even if not

13     fully acceptable to the Committee, they've been able to live

14     with it.  And given what the Court is going to do in terms of

15     its attempt to schedule a prompt hearing if we end up down

16     that path.

17          I think it's really unlikely we'll end up down that

18     path, and I don't want to overblow the concerns that I wanted

19     to honor today, but I think it's a legitimate concern, and so

20     we do need to worry about these sort of low probability

21     events.  But it's not one where --

22          MR. MORGAN:  I --

23          THE COURT:  But for the avoidance of doubt -- since

24     that's the words -- I don't think that anyone was doing

25     anything wrong by trying to get it the way that you all are

1    trying to get it.  It's not like anybody wasn't acting in

2    good faith to promote their own interests in an above-board

3    manner.  So I don't want anything I've said today to be taken

4    as any complaint about anybody or tarnishing anybody.  I just

5    didn't think it was the right way to go.  That's a far

6    different cry from any sort of adverse finding and I'm making

7    no adverse finding about what was proposed at all.  I'm just

8    trying to get to a commercial solution, but I think we're

9    good.

10              MR. MORGAN:  I agree, Your Honor.  I think we are

11   good.

12              And there's nothing else on the Agenda for today,

13   so that's really the --

14              THE COURT:  All right.  Does anyone else have

15   anything that they want to raise today?

16        (No verbal response)

17              THE COURT:  Okay.  So we're going to get two

18   orders.  We'll get the one that we just have looked at

19   probably by the end of today.  Would you contact Ms. Do, so

20   that she can put that in my emergency box?

21              MR. MORGAN:  We will, Your Honor.

22              THE COURT:  Hopefully, we'll get the other one by

23   the end of the day tomorrow, but if not, I'll do something on

24   my own on Friday and get it out.

25              MR. MORGAN:  And Your Honor --

1          THE COURT:  All right.

2          MR. MORGAN:  -- if it's looking like we can't get

3     something to you by the end of the day tomorrow, we'll

4     contact chambers and let you know, so that --

5          THE COURT:  That's fine.

6          MR. MORGAN:  -- you don't have to --

7          THE COURT:  I --

8          MR. MORGAN:  -- you don't have to guess just

9     because we didn't show up at the deadline.

10          THE COURT:  With which deadline?

11          MR. MORGAN:  The ...

12        (Laughter)

13          MR. MORGAN:  The second order --

14          THE COURT:  The second order.

15          MR. MORGAN:  -- the form of order --

16          THE COURT:  Yeah.

17          MR. MORGAN:  -- that we -- we're going to submit.

18          THE COURT:  I appreciate that.  But seriously, it's

19     not that hard to --

20          MR. MORGAN:  Okay.

21          THE COURT:  -- see that you did it or not, so ...

22          MR. MORGAN:  Okay.

23          THE COURT:  Okay.  Thanks very much.  I appreciate

24     everybody coming in.

25          MR. MORGAN:  Thank you, Your Honor.

1          THE COURT:  We'll recess until this afternoon.

2      (The parties thank the Court.)

3          THE COURT:  Thank you.

4      (Proceedings concluded at 11:13 a.m.)

5                          * * * * *

6      *I certify that the foregoing is a correct*

7  *transcript to the best of my ability produced from the*

8  *electronic sound recording of the proceedings in the*

9  *above-entitled matter.*

10     */S/  MARY D. HENRY*

11  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

12  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

13  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

14  *JTT TRANSCRIPT #66495*

15  *DATE FILED:  NOVEMBER 1, 2022*

16

17

18

19

20

21

22

23

24

25