United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 20, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | **Chapter 11** |
|  | § |  |
| **TALEN ENERGY SUPPLY, LLC,** *et al.,* | § | **Case No. 22-90054 (MI)** |
|  | § |  |
|  | § | **(Jointly Administered)** |
| Debtors.[1] | § |  |
|  | § |  |

**FINDINGS OF FACT, CONCLUSIONS OF LAW,  AND ORDER
CONFIRMING JOINT CHAPTER 11 PLAN OF  TALEN ENERGY
SUPPLY, LLC AND ITS AFFILIATED DEBTORS \***

Talen Energy Supply, LLC ("**TES**") and its affiliated debtor subsidiaries (the "**TES
Debtors**"), and Talen Energy Corporation ("**TEC**" and, together with the TES Debtors, the
"**Debtors**")[2] having:

a. commenced, on May 9, 2022 (the "**Initial Petition Date**") and December 12, 2022 (the
"**TEC Petition Date**"), these chapter 11 cases by filing voluntary petitions in the
United States Bankruptcy Court for the Southern District of Texas (the "**Court**") for
relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

b. obtained, on December 15, 2022, entry of the *Order Directing (I) Joint Administration
of Additional Chapter 11 Case and (II) That Certain Orders in the Chapter 11 Cases
of Talen Energy Supply, LLC, et al. Be Made Applicable to Additional Debtor* [Docket
No. 1736];

c. proposed and filed the *Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its
Affiliated Debtors*, dated December 14, 2022 [Docket No. 1722] (including any
exhibits and schedules thereto and as may be modified, amended, or supplemented
from time to time, the "**Plan**")[3]; filed the *Disclosure Statement for Joint Chapter 11
Plan of Talen Energy Supply, LLC. and Its Affiliated Debtors*, dated October 26, 2022
[Docket No. 1417] (including any exhibits and schedules thereto and as may be

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Claims and
Noticing Agent at https://cases.ra.kroll.com/talenenergy.  The Debtors' primary mailing address is 1780 Hughes
Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

[2] The "TES Debtors" refers to TES and its affiliated debtor subsidiaries in the above-captioned cases that filed
voluntary petitions on the Initial Petition Date (as defined below).

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.
The rules of interpretation set forth in Article I of the Plan shall apply to this Confirmation Order.

\* Amended on 12/20/22, solely to delete the word "proposed" from the title.

modified, amended, or supplemented from time to time, the "**Disclosure Statement**"); and filed the *Supplement to Disclosure Statement for Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1571] (including any exhibits and schedules thereto and as may be modified, amended, or supplemented from time to time, the "**Disclosure Statement Supplement**");

d.  obtained, on October 26, 2022, after notice and hearing, entry of the *Order (I) Approving (A) Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (B) Solicitation and Voting Procedures, (C) Forms of Ballots and Notices in Connection Therewith, (D) Notice and Objection Procedures for Assumption, Assumption and Assignment, or Rejection of Executory Contracts and Unexpired Leases and Form and Manner of Cure Notice, and (E) Procedures for Submission of Bids and Form and Manner of Sale Notice; (II) Scheduling Confirmation Hearing; (III) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; and (IV) Granting Related Relief* [Docket No. 1415] (the "**Disclosure Statement Order**"), which, among other things, (i) approved the Disclosure Statement, (ii) approved the solicitation procedures related to the Disclosure Statement, (iii) set the deadline for filing objections to confirmation of the Plan as of December 6, 2022 at 5:00 p.m. (Prevailing Central Time); and (iv) scheduled a hearing to consider confirmation of the Plan for December 15, 2022 at 09:00 a.m. (Prevailing Central Time) (the "**Confirmation Hearing**");

e.  served, through their claims, noticing, and solicitation agent, Kroll Restructuring Administration LLC ("**Kroll**"), (i) the Disclosure Statement, the Plan, and related solicitation materials, including the ballots (the "**Ballots**"), notice of non-voting status, and notice of the Confirmation Hearing (collectively, the "**Initial Solicitation Materials**") and (ii) the Disclosure Statement Supplement, the Plan and related solicitation materials, including the Ballots, notice of non-voting status, and notice of the Confirmation Hearing (collectively, the "**Supplemental Solicitation Materials**" and, together with the Initial Solicitation Materials, the "**Solicitation Materials**"), as applicable, to holders of Claims and Interests in accordance with the Disclosure Statement Order, as described in (a) the *Affidavit of Service of Solicitation Materials* [Docket No. 1670-1] filed on December 9, 2022, (b) the *Affidavit of Service of Solicitation Materials* [Docket No. 1670-2] filed on December 9, 2022, and (c) the *Affidavit of Service of Supplemental Solicitation Materials* [Docket No. 1670-3] filed on December 9, 2022 (collectively, the "**Solicitation Affidavits**") and the *Declaration of Alex Orchowski of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors*, filed on December 12, 2022 [Docket No. 1686] (the "**Solicitation Declaration**");

f.  caused to be published, on November 15, 2022, in the national edition of the *New York Times* and the *Houston Chronicle* notice of the Confirmation Hearing as set forth in the *Certificate of Publication*, filed by Kroll on December 7, 2022 [Docket No. 1648-1] (the "**Certificate of Publication**");

g. caused, on November 22, 2022, through Kroll, the *Notice of (I) Assumption or Rejection of Executory Contracts and Unexpired Leases, and (II) Cure Claims Related to Assumption in Connection with Confirmation of Plan* [Docket No. 1562] (the "**Cure Notice**") to be served on the counterparties to such executory contracts and unexpired leases as set forth in the *Affidavit of Service of Cure Notice*, filed December 7, 2022 [Docket No. 1648-6];

h. filed, (i) on November 29, 2022, the *Notice of Filing of Plan Supplement in Connection with Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1598], (ii) on December 9, 2022, the *Notice of Filing of Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1674], (iii) December 14, 2022, the *Notice of Filing of Second Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1713], and (iv) on December 14, 2022, the *Notice of Filing of Third Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1724] (collectively, and as may be further amended or supplemented from time to time, the "**Plan Supplement**"); and

i. filed, on December 12, 2022, the (i) *Debtors' Memorandum of Law in Support of Confirmation of Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1681], (ii) *Declaration of Leonard LoBiondo in Support of Confirmation of Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1690] (the "**LoBiondo Declaration**"), (iii) *Declaration of Carol Flaton in Support of Confirmation of Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1688] and the *Supplement to Declaration of Carol Flaton in Support of Confirmation of Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1720] (together, the "**Flaton Declarations**"), (iv) *Declaration of Ryan Leland Omohundro in Support of Confirmation of Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1691] (the "**Omohundro Declaration**"), (v) *Declaration of John A. Chesser in Support of Confirmation of Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1689] (the "**Chesser Declaration**"), (vi) *Declaration of Andrew Karian in Support of Confirmation of Joint Chapter 11 Plan of Talen Energy Supply, LLC and its Affiliated Debtors* [Docket No. 1693] (the "**Karian Declaration**"), and (vii) *Declaration of Bo Yi in Support of Confirmation of Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. 1687] (the "**Yi Declaration**" and, together with the LoBiondo Declaration, the Flaton Declarations, the Omohundro Declaration, the Chesser Declaration, and the Karian Declaration, the "**Declarations**");

This Court having:

a. held the Confirmation Hearing on December 15, 2022;

b. fully considered the entire record of the Confirmation Hearing;

c. heard the arguments and considered the evidence presented, proffered, and adduced at the Confirmation Hearing;

d. taken judicial notice of the entire record of these chapter 11 cases; and

e. overruled all objections to the Plan and Confirmation and all statements and reservations of rights not consensually resolved or withdrawn, except as expressly provided herein; and

NOW, THEREFORE, after due deliberation and sufficient cause appearing therefor, this Court hereby FINDS, DETERMINES, and CONCLUDES as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

a. <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  All findings of fact and conclusions of law announced by this Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

b. <u>Jurisdiction, Venue, Core Proceeding</u>.  This Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. § 1334.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper plan proponents under section 1121(a) of the Bankruptcy Code.

c.      Chapter 11 Petitions.  On the Initial Petition Date, the TES Debtors commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  On May 10, 2022, this Court entered an order authorizing the joint administration of the TES Debtors' chapter 11 cases in accordance with Bankruptcy Rule 1015(b).  *See* [Docket No. 30].  On the TEC Petition Date, TEC filed with this Court a voluntary case under chapter 11 of the Bankruptcy Code.   On December 15, 2022, this Court entered an order authorizing the joint administration of TEC's chapter 11 case with the TES Debtors' chapter 11 cases in accordance with Bankruptcy Rule 1015(b).  *See* [Docket No. 1736].

d.      Since the Initial Petition Date and the TEC Petition Date, as applicable, the Debtors have operated their business and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On May 23, 2022, the U.S. Trustee appointed an official committee of unsecured creditors (the "**Creditors' Committee**") in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code [Docket No. 264].  No trustee or examiner has been appointed in these chapter 11 cases.

e.      Judicial Notice.  This Court takes judicial notice of the docket of these chapter 11 cases maintained by the Clerk of this Court, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before this Court during the pendency of these chapter 11 cases.   Any resolution of objections to confirmation of the Plan explained on the record at the Confirmation Hearing is hereby incorporated by reference.  Except to the extent set forth herein, all unresolved objections, statements, informal objections, and reservations of rights, if any, related to the Plan or confirmation of the Plan are overruled on the merits and denied in their entirety.

f.     Burden of Proof.  Based on the record of these chapter 11 cases, each of the Debtors has met the burden of proving by a preponderance of the evidence each applicable element of sections 1129(a) and (b) of the Bankruptcy Code, including all other sections of the Bankruptcy Code referenced therein or implicated thereby.

g.     Principal Purpose.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

h.     Solicitation.  As described in and evidenced by the Solicitation Affidavits and the Solicitation Declaration, transmittal and service of the Solicitation Materials, including the transmittal and service of the Supplemental Solicitation Materials (collectively, the "**Solicitation**") were timely, adequate, appropriate, and sufficient under the circumstances.  The Solicitation (i) was conducted in good faith, (ii) complied with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Disclosure Statement Order, and all other applicable non-bankruptcy rules, laws, and regulations applicable to the Solicitation, and (iii) was appropriate and satisfactory based upon the circumstances of these chapter 11 cases.  The Released Parties, Exculpated Parties, and Global Settlement Parties acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including with respect to (1) the solicitation of acceptance or rejection of the Plan and (2) the participation in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan, and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan and this Confirmation Order.

i.     Notice.  As evidenced by the Solicitation Affidavits, the Certificate of Publication, and the Solicitation Declaration, all parties required to be given notice of the Confirmation Hearing

(including the deadline for filing and serving objections to confirmation of the Plan) have been given due, proper, adequate, timely, and sufficient notice of the Confirmation Hearing in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable non-bankruptcy rules, laws, and regulations and such parties had an opportunity to appear and be heard with respect thereto.  No other or further notice is required with respect thereto.

j.      <u>Voting Record Date</u>.  The Solicitation Materials and the Plan were distributed to Holders in the Voting Classes that held a Claim or Interest as of October 26, 2022 (the "**Voting Record Date**").  The establishment and notice of the Voting Record Date were reasonable and sufficient.

k.      <u>Tabulation</u>.  As described in the Solicitation Declaration, the holders of Claims in Class 3A (Prepetition First Lien Non-CAF Claims), Class 3B (Prepetition CAF Claims), Class 4 (Unsecured Notes Claims), Class 5A (General Unsecured Claims) at three Debtor entities, Class 5B (Uri Claims), and Class 6 (General Unsecured Convenience Claims) at all but two Debtor entities are Impaired under the Plan and have voted to accept the Plan in the numbers and amounts required by section 1126 of the Bankruptcy Code.  All procedures used to tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (effective as of August 1, 2021), the Disclosure Statement Order, and all other applicable non-bankruptcy rules, laws, and regulations.  Pursuant to the Disclosure Statement Order, the other Classes of Claims against and Interests in the Debtors are either deemed to reject or presumed to accept the Plan.  Notwithstanding the rejection of Class 5A at all but three Debtor entities and Class 6 at two Debtor entities and the deemed rejection of the

Plan by Class 9, Class 11, and Class 13, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.

l.      <u>Bankruptcy Rule 3016</u>.  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as proponents of the Plan.  The Debtors appropriately filed the Disclosure Statement (including the Disclosure Statement Supplement) and the Plan with this Court, thereby satisfying Bankruptcy Rule 3016(b).  The discharge, release, injunction, and exculpation provisions of the Plan are set forth in bold and with specific and conspicuous language, thereby complying with Bankruptcy Rule 3016(c).

m.      <u>Cram Down Requirements</u>.  With respect to those classes that rejected or are deemed to reject the Plan, the requirements of section 1129(b) of the Bankruptcy Code have been satisfied and the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. The Plan does not unfairly discriminate between similarly situated Classes of Claims or Interests that rejected or are deemed to reject the Plan.  Furthermore, the Plan is fair and equitable with respect to the Classes of Claims or Interests that rejected or are deemed to reject the Plan, as the Plan provides that no holder of any Claim or Interest that is junior to the Claims or Interests of such Classes will receive or retain any property under the Plan on account of such junior Claim or Interests.

n.      <u>Executory Contracts and Unexpired Leases</u>.  The Debtors have exercised reasonable business judgment in determining whether to assume or reject Executory Contracts and Unexpired Leases pursuant to <u>Article V</u> of the Plan.  Each assumption of an Executory Contract or Unexpired Lease pursuant to <u>Article V</u> of the Plan shall be legal, valid, and binding upon the Debtors or Reorganized Debtors and their successors and assigns and all non-Debtor parties and their successors and assigns to such Executory Contract or Unexpired Lease.  Moreover, the

Debtors have cured, or provided adequate assurance that the Debtors or Reorganized Debtors or their successors and assigns, as applicable, will cure, defaults (if any) under or relating to each of the Executory Contracts and Unexpired Leases that are being assumed by the Debtors pursuant to the Plan.

o.    Plan Supplement.  The documents contained in the Plan Supplement comply and are consistent with the Bankruptcy Code and the terms of the Plan, and the filing and notice of such documents were good and proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement Order, and the facts and circumstances of these chapter 11 cases.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan, the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement at any time before the Effective Date.

p.    Best Interest of Creditors.  The Liquidation Analysis provided in the Disclosure Statement, and the other evidence presented, proffered, or adduced at the Confirmation Hearing, including the Omohundro Declaration, (i) are persuasive and credible, (ii) have not been controverted by any evidence, and (iii) establish that each holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

q.    Value.  Based on Section X.C.1.c of the Disclosure Statement, and the testimony presented, proffered, or adduced at the Confirmation Hearing, including the Yi Declaration, which this Court has determined to be credible, persuasive, and based on appropriate assumptions and

valid analysis and methodology, this Court finds that the Plan Enterprise Value (as defined in the Disclosure Statement) is the highest and best value of the Debtors' business and is a reasonable and appropriate measure of the Reorganized Debtors' value given the facts and circumstances of these chapter 11 cases.

       r.    <u>Sale Process</u>.  The Sale Process was conducted in accordance with the Bidding Procedures that were approved by this Court pursuant to the Disclosure Statement Order and was completed on November 17, 2022 with no qualified bids received, as described in the *Notice of No Qualified Bids and Cancellation of Auction* [Docket No. 1523].

       s.    <u>Directors, Officers, and Insiders</u>.  The officers, directors, and managers of the Debtors shall be relieved of any and all duties with respect to the Debtors as of the Effective Date of the Plan.  The identities and affiliations of the persons proposed to serve as the initial managers and officers of the Reorganized Debtors after the Effective Date have been fully disclosed to the extent such information is available, and the appointment to, or continuance in, such offices of such persons is consistent with the interests of Holders of Claims against and Interests in the Debtors and with public policy.

       t.    <u>Release, Exculpation, and Injunction Provisions</u>.  The injunction, release, and exculpation provisions contained in the Plan for the benefit of the Released Parties, Global Settlement Parties, and Exculpated Parties, as applicable, are essential components of the Plan. The releases of non-Debtors contained in the Plan are consensual in that all Releasing Parties were given due and adequate notice thereof and sufficient opportunity and instruction to elect to opt out of such releases.  Good and valid justifications have been demonstrated in support of the releases granted by the Debtors and their Estates and the Reorganized Debtors (the "**Debtor Releases**"), and the Debtors have satisfied the business judgment standard with respect to the Debtor Releases.

The Debtor Releases represent a valid exercise of the Debtors' business judgment.  Accordingly, as has been established based upon the record in these chapter 11 cases and the evidence presented in connection with the Confirmation Hearing, the release provisions contained in <u>Article VIII</u> of the Plan (i) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code, (ii) are consistent with and permissible under applicable law, (iii) were given in exchange for good and valuable consideration provided by the Released Parties, (iv) are in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and all other parties in interest, (v) were negotiated in good faith and at arm's-length, (vi) are fair, equitable, and reasonable, and (vii) failure to implement the Debtor Releases would jeopardize the Debtors' ability to confirm and implement the Plan, and the compromises and settlements provided therein.

u.     The process described in the Solicitation Declaration and the Solicitation Affidavits that the Debtors and Kroll followed to identify the relevant parties on which to serve the applicable Ballot or notice containing an opportunity to opt out of the releases (each, a "**Release Opt-Out Form**") and to distribute the Release Opt-Out Forms (i) is consistent with the industry standard, and (ii) was reasonably calculated to ensure that each Holder of Claims or Interests in each Class was informed of its ability to opt out of the releases and the consequences for failing to timely do so.  For the avoidance of doubt, any party that elected in the Release Opt-Out Form to opt out of the releases prior to any deadline to submit a Ballot, whether under any original or extended deadline, shall be neither a Released Party nor a Releasing Party under the Plan.

v.     The exculpation provisions contained in the Plan are appropriately tailored to the circumstances of these chapter 11 cases and are appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.*, 48 F. 4th 419 (5th Cir. 2022), because they are supported by proper

evidence, proposed in good faith, formulated following extensive good faith, arm's-length negotiations with key constituents, and appropriately limited in scope. The Exculpated Parties reasonably relied upon the exculpation provisions as a material inducement to engage in postpetition negotiations with the Debtors that culminated in the Plan, the Global Plan Settlement, and all other settlements and compromises therein that maximize value for the Debtors' Estates. The record in these chapter 11 cases fully supports the exculpation provisions, which provisions are supported by all of the Global Settlement Parties, are appropriately tailored to protect the Exculpated Parties from unnecessary litigation, and contain appropriate carve outs for actions determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence. The record in these chapter 11 cases further supports the inclusion of the Debtors' independent managers (Carol Flaton and Gary Wotjaszek) as Exculpated Parties because such parties were integral to the restructuring, owed fiduciary duties to the Debtors and the Debtors' Estates, and fulfilled their fiduciary duties at all times throughout these chapter 11 cases.

w.     The injunction provisions contained in the Plan are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the discharge, release, and exculpation provisions of the Plan. The injunction provisions are appropriately tailored to achieve those purposes. Subject in all respects to Article XI of the Plan, no entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party, Exculpated Party, or Global Settlement Party that arose or arises from, in whole or in part, a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E of the Plan, without this Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim for actual fraud, gross negligence, or willful misconduct against such Released Party, Exculpated Party, or Global Settlement Party and (ii) specifically authorizing such Entity or Person

12

to bring such Claim or Cause of Action against such Released Party, Exculpated Party, or Global Settlement Party.

x.  <u>Modifications to Plan</u>.  Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan made after solicitation of the Plan or in this Confirmation Order (including those modifications announced on the record of the Confirmation Hearing) constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim under the Plan.  Notice of these modifications was adequate and appropriate under the facts and circumstances of these chapter 11 cases.  In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims or Interests be afforded any further opportunity to change previously cast acceptances or rejections of the Plan.  Accordingly, the Plan is properly before this Court, and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

y.  <u>Compromises and Settlements</u>.  The Plan is deemed to constitute a motion under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 with respect to all settlements provided for therein, including but not limited to those set forth in <u>Article VIII.A.2</u> (the CAF Settlement), <u>VIII.A.3</u> (the First Lien Non-CAF Settlement), <u>VIII.A.4</u> (the TEC Global Settlement), and <u>VIII.A.5</u> (the Global Plan Settlement) (collectively, the "**Plan Settlements**"). Entry of this Confirmation Order constitutes this Court's approval of the terms of the Plan Settlements provided for under the Plan.  In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases,

and other benefits provided under the Plan and with the support of the various creditors, stakeholders, and other parties in interest, including the Consenting Parties, the CAF Consenting Parties, the First Lien Non-CAF Consenting Parties, the TEC Consenting Parties, and the Global Settlement Parties, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  In addition, the compromises and Plan Settlements embodied in the Plan are integral to the Plan and preserve value by enabling the Debtors to avoid extended, value-eroding litigation that could delay the Debtors' emergence from chapter 11.  Entry of this Confirmation Order constitutes this Court's approval of the Plan Settlements and compromises, including the releases in connection with the Plan Settlements, and a finding by this Court that the Plan Settlements are fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests because, among other things: (a) each of the Plan Settlements reflects a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes and allowing the Debtors to expeditiously exit chapter 11, on the other hand; (b) absent each of the Plan Settlements, there is a likelihood of complex and protracted litigation with the attendant expense, inconvenience, delay and uncertainty that have a possibility to derail the Debtors' reorganization efforts and would jeopardize the Debtors' ability to confirm and implement the Plan, and the compromises and settlements provided therein; (c) each of the parties supporting each of the Plan Settlements, including the Debtors, the Consenting Parties, the CAF Consenting Parties, the First Lien Non-CAF Consenting Parties, the TEC Consenting Parties, and the Global Settlement Parties, are represented by counsel that is recognized as being knowledgeable, competent, and experienced; (d) each of the Plan Settlements

is the product of arm's-length bargaining and good faith negotiations between sophisticated parties; and (e) each of the Plan Settlements will maximize the value of the Debtors' Estates by preserving and protecting the ability of the Reorganized Debtors to continue operating outside of bankruptcy protection and in the ordinary course of business, and is essential to the successful implementation of the Plan.  Based on the foregoing, the Plan Settlements satisfy the requirements of applicable Fifth Circuit law for approval of settlements and compromises pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, and the Plan Settlements are hereby approved.

z.      The CAF Settlement is the product of good faith arm's-length negotiations between the Debtors, the Consenting Parties and the CAF Consenting Parties.  The CAF Settlement, as incorporated into the RSA Third Amendment, resolves any and all claims and causes of action related to the Prepetition CAF Facility, including: (i) potential claims regarding the extent, classification, priority, secured status and treatment of the prepetition liens securing the loans under the Prepetition CAF Agreement (including potential challenges to the validity of the mortgages securing the Prepetition CAF); (ii) potential claims regarding the amount of the "makewhole" under the Prepetition CAF Agreement; (iii) potential disputes related to the rate at which postpetition interest accrues on the Prepetition CAF Agreement Claims; and (iv) potential fraudulent conveyance, preference and avoidance claims relating to the Prepetition CAF Agreement.[4]  The CAF Settlement also resolves disputes regarding certain components of the makewhole calculation including: (i) the rate of interest applicable to the CAF Make Whole (as defined in the Disclosure Statement); (ii) the appropriate LIBOR forward curve applicable to the CAF Make Whole; (iii) the inclusion of default interest in the calculation of the CAF Make Whole

_____

[4] *See Notice of Third Amendment and Fourth Amendment to Restructuring Support Agreement* [Docket No. 1125].

amount; and (iv) whether postpetition interest paid during these chapter 11 cases should be netted against the CAF Make Whole amount.  The Creditors' Committee supports the Plan and Plan Settlements in accordance with the terms of the Global Plan Settlement.

        aa.    <u>Exit Capital Structure, Exit Facilities, and New Debt</u>.  The evidentiary record demonstrates that the exit capital structure contemplated by the Plan, Plan Supplement, RSA, and Backstop Commitment Letter is reasonable and appropriate and sufficient to fully perform all of the Debtors' obligations under the Plan, as well as all obligations of the Reorganized Debtors under all assumed agreements.  The terms and structure of the Exit Facilities and the New Debt, as currently contemplated by the Plan (and any commitments, engagements, or similar arrangements with respect to the provisions, arrangement or structuring thereof), are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are in the best interests of the Debtors' Estates and their creditors.

        bb.    <u>Good Faith</u>.  The Debtors have proposed the Plan (and all documents necessary to effectuate the Plan) in good faith and not by any means forbidden by law.  The Debtors' good faith is evident from the facts and record of these chapter 11 cases, the Solicitation Materials, the Declarations, the record of the Confirmation Hearing, and other proceedings held before this Court in these chapter 11 cases.  The Plan (including all documents necessary to effectuate the Plan, including the Plan Supplement) was negotiated at arm's length among the Global Settlement Parties, the Released Parties, the Exculpated Parties and their respective advisors, each as applicable.  The Debtors, the Released Parties, the Global Settlement Parties, and the Exculpated Parties have been and will be acting in good faith if they proceed to (i) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated therein, including the

16

funding or deemed funding (in each case, to the extent applicable) of (a) the Exit Facilities pursuant to the terms and conditions of the Exit Facility Documents, including any Exit Credit Agreement and (b) the New Debt pursuant to the terms and conditions of any documentation with respect thereto (the "**New Debt Documents**"), and (ii) take any actions authorized by the Plan and this Confirmation Order.

cc.     <u>Satisfaction of Confirmation Requirements</u>.  The Plan satisfies the requirements for confirmation by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation, set forth in section 1129 of the Bankruptcy Code.

dd.     <u>Likelihood of Satisfaction of Conditions Precedent to Effective Date</u>.  Each of the conditions precedent to the Effective Date, as set forth in <u>Article IX</u> of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with the Plan.

<u>**ORDER**</u>

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

**A.    Confirmation of Plan**

1.     The Plan and each of its provisions is confirmed pursuant to section 1129 of the Bankruptcy Code.  The documents contained in or contemplated by the Plan, including the Plan Supplement (collectively, the "**Plan Documents**"), are hereby authorized and approved.  The terms of the Plan and the Plan Documents are incorporated herein by reference and are an integral part of this Confirmation Order.  The terms of the Plan, the Plan Documents, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date.  Subject to the terms of the Plan and the DIP Documents, the Debtors reserve the right to alter, amend, update, or modify the Plan Documents prior to the Effective Date.  The failure to specifically include or refer to any particular article, section, or provision of the Plan or the Plan

Documents in this Confirmation Order shall not diminish or impair the effectiveness or enforceability of such article, section, or provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

**B.    Objections**

2.    Except as set forth herein, any objections (including any reservations of rights contained therein) to confirmation of the Plan or other responses or reservations of rights with respect thereto that have not been withdrawn prior to entry of this Confirmation Order shall be, and hereby are, overruled on the merits and denied.

**C.    No Action**

3.    Pursuant to the appropriate provisions of any applicable State's general corporation or limited liability company laws, other applicable non-bankruptcy law, and section 1142(b) of the Bankruptcy Code, (i) no action of the respective directors, managers, members, stockholders, or other equity holders of the Debtors, as applicable, shall be required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including any Plan Document, and (ii) to the extent the Debtors determine any Person or Entity is a necessary party to execute and deliver or join in the execution or delivery of any instrument required to effect a transfer of property dealt with by the Plan, or perform any other act in furtherance of the transactions contemplated by the Plan and this Confirmation Order, and in furtherance of consummation of the Plan, and such Person or Entity is so informed by the Debtors, then such Person or Entity is directed to take such steps as necessary to comply with the foregoing and section 1142(b) of the Bankruptcy Code.

**D.      Governmental Approvals Not Required**

4.      Except as otherwise set forth herein, this Confirmation Order constitutes all approvals and consents required, if any, by the laws, rules, or regulations of any State or any other governmental authority with respect to the implementation and consummation of the Plan and the Plan Documents and any other acts that may be necessary or appropriate for the implementation or consummation of the Plan or the Plan Documents to the fullest extent permitted by law and nothing herein to the contrary shall diminish the authority of section 1142 of the Bankruptcy Code.

**E.      Implementation and Effectiveness of Plan**

5.      On or before the Effective Date, the Debtors and the Reorganized Debtors, as applicable, and the appropriate officers, representatives, and members of the boards of managers or boards of directors thereof, as applicable, shall be authorized to and may issue, execute, deliver, file, or record such documents, securities, contracts, instruments, releases, and other agreements, including the Plan Documents, and take any other actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, including the Restructuring Transactions and all other actions delineated in <u>Article IV</u> of the Plan or otherwise contemplated by the Plan, including the conversion, merger, or dissolution of any Debtor, without the need for any further approvals (including, without limitation, by any stockholder, member, board of directors, or board of managers), authorization, or consents, except for those expressly required pursuant to the Plan.  All actions contemplated by the Plan, including all actions in connection with any Plan Document, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, without further application to, or order of this Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or Reorganized Debtors.

**F.    Restructuring Transactions**

6.    On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with this Confirmation Order and the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions and the issuance of the New Common Equity and the New Warrants, under and in connection with the Plan and the Plan Documents.

7.    This Confirmation Order shall, and shall be deemed to, pursuant to sections 363, 1123, 1142, 1145, and 1146 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions, and, to the extent such actions were taken before the Confirmation Date, such actions are ratified in all respects, and, in each case, no further approvals, authorization, or consents, except those expressly required pursuant to the Plan or this Confirmation Order, or, to the extent applicable, the DIP Documents, or any Consenting First Lien Hedge Agreements, shall be required.  All Global Settlement Parties, and any other parties necessary to effectuate, to the full extent permitted under section 1142 of the Bankruptcy Code, any transactions approved by, contemplated by, or necessary to effectuate the Plan, shall be deemed to consent to any such transactions, subject to the terms of the RSA.

**G.    GUC Trust**

8.    The GUC Trust Agreement is hereby approved in all respects.  The GUC Trust shall be established and funded pursuant to, and in accordance with, the terms of the Plan and the GUC Trust Agreement.  The Debtors, the Reorganized Debtors, and any of their Affiliates (or anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the GUC Trust

and shall incur no liability in connection with the GUC Trust (subject to any obligations of the Debtors or Reorganized Debtors, as applicable, pursuant to the Plan or GUC Trust Agreement).

**H.      Authorization and Issuance of Plan Securities**

9.      The Reorganized Debtors are authorized to issue all Plan-related securities, including the New Common Equity, New Warrants, and New Warrant Equity, in accordance with the terms of the Plan.  All New Common Equity, New Warrants, and New Warrants Equity shall be, upon issuance, duly authorized, validly issued, fully paid and non-assessable.

**I.      Securities Registration Exemption**

10.      The offer, issuance and distribution under the Plan of the New Common Equity (a) to Holders of Unsecured Notes Claims and (b) constituting the Backstop Periodic Premium or the Backstop Put Premium will, in each case, be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.  The offer, sale, issuance and distribution under the Plan of the Rights Offering Equity to be issued pursuant to the 1145 Rights Offering (including pursuant to any oversubscription right implemented in connection therewith) will be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.  The Rights Offering Equity issued in the 4(a)(2) Rights Offering (including the Backstop Shares and the Backstop Direct Investment Shares and any shares issued pursuant to any oversubscription right implemented in connection with the 4(a)(2) Rights Offering) will be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder.  The offer, issuance and distribution under the Plan of the New Common Equity, New Warrants, and New Warrants Equity to the Riverstone Settlement Recipients will, in each case, be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 4(a)(2) of the Securities Act and Regulation

D promulgated thereunder.   All unsubscribed shares of New Common Equity issued to the Backstop Parties pursuant to the Backstop Commitment Letter will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder.

11.     The New Common Equity issued under the Plan may be sold without registration under the Securities Act by the recipients thereof: (1) pursuant to section 1145 of the Bankruptcy Code, only with respect to the New Common Equity (a) issued to Holders of Unsecured Notes Claims, (b) constituting the Backstop Periodic Premium, (c) constituting the Backstop Put Premium and (d) pursuant to the 1145 Rights Offering, in each case, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the U.S. Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; and (2) subject to section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, only with respect to (a) the New Common Equity issued in connection with the 4(a)(2) Rights Offering (including the Backstop Shares and the Backstop Direct Investment Shares) and (b) the New Common Equity, the New Warrants, and the New Warrants Equity issued to the Riverstone Settlement Recipients and (c) unsubscribed shares of New Common Equity issued to the Backstop Parties pursuant to the Backstop Commitment Letter, in each case subject to the requirements of the applicable provisions of Rule 144 or Rule 144A, or any other registration exemption under the Securities Act; and (3) otherwise subject to any other applicable non-securities law regulatory approval.

12.     Persons who purchase the New Common Equity pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated

thereunder will hold "restricted securities."  Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Holders of restricted securities would, however, be permitted to resell New Common Equity without registration to the extent such sale complies with the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act, or if such securities are registered with the U.S. Securities and Exchange Commission.

13.     The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

14.     Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Common Equity through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of the New Common Equity, New Warrants, or New Warrants Equity, and the Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

15.     DTC and all other Persons and Entities shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Equity, New Warrants, or New Warrants Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

16.     Notwithstanding anything to the contrary in the Plan or otherwise, no Person or Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Equity, the New Warrants, or the New Warrants Equity are exempt

from registration and/or eligible for DTC book-entry delivery, settlement, and depository services or validly issued, fully paid and non-assessable.

**J.      Approval of Rights Offering**

17.      On and after the Effective Date, all documents necessary to effectuate the Rights Offering shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.  All of the New Common Equity, New Warrants, and New Warrants Equity to be issued in accordance with the terms of the Rights Offering and the TEC Global Settlement, as applicable, (a) shall be duly authorized, validly issued, fully paid, and non-assessable, consistent with the terms of the New Parent Organizational Documents, and (b) shall not be subject to avoidance or recharacterization for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code, the Plan, or this Confirmation Order, or any applicable non-bankruptcy law.

**K.      Authorization and Entry into Exit Facilities and New Debt**

18.      The Reorganized Debtors are authorized to enter into, execute, and deliver the Exit Facility Documents and the New Debt Documents on the terms consistent with the Plan (including the consent rights thereunder).  Substantially final versions of such documents shall be filed by the Debtors on the docket, and any party with standing shall have five (5) business days to file an objection to any such Exit Facility Documents or New Debt Documents solely on the basis that such documents are not materially consistent with the Plan or Confirmation Order; *provided* that if no objections are filed or if any such objections are filed and overruled by this Court, then such documents shall be (i) deemed approved without further action and (ii) deemed reasonable and appropriate and adequate to allow the Reorganized Debtors to fully perform all obligations under

any agreements assumed pursuant to the Plan.  In the event of an objection, the Debtors may seek a hearing and order of this Court on an emergency basis.

19.  On and after the Effective Date, the Exit Facility Documents and the New Debt Documents shall constitute legal, valid, and binding obligations of the applicable Reorganized Debtors and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or this Confirmation Order, and the Reorganized Debtors, as applicable, shall be authorized to incur the obligations under the Exit Facilities and the New Debt and use the proceeds of such debt, in each case, in accordance with the terms of the Plan, the Exit Facility Documents, and the New Debt Documents without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person or Entity.  The terms and conditions of the Exit Facility Documents and the New Debt Documents shall bind the Reorganized Debtors and each other Entity that enters into the Exit Facility Documents and the New Debt Documents.

20.  This Confirmation Order, subject to the approval process outlined in paragraph 18 above, approves the Exit Facility Documents and the New Debt Documents (including, in each case, the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees, expenses, indemnities and other amounts paid and/or obligated to be paid by the Debtors or Reorganized Debtors, as applicable, in connection therewith), any commitment letters, engagement letters, fee letters, or similar arrangements in connection with the structuring, arranging, negotiation, or implementation of the Exit Facilities and/or the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and

25

fees, expenses, indemnities, and other amounts paid and/or obligated to be paid in connection therewith (including any payments under any such commitment letter, engagement letter, fee letter or similar agreement)), and, to the extent not approved by this Court previously, each Reorganized Debtor is authorized to, without further notice to this Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities and New Debt, including the Exit Facility Documents and the New Debt Documents, each as applicable, and incur and pay any fees, expenses, indemnities, and other amounts paid and/or obligated to be paid in connection therewith, and (ii) in connection with the Exit Facilities or the New Debt, make any act or take any action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person or Entity, subject to such modifications as the applicable Reorganized Debtor may deem to be necessary to enter into the Exit Facility Documents and the New Debt Documents.

21.     On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit Facility Documents and the New Debt Documents, as applicable (i) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents and the New Debt Documents, (ii) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents and the New Debt Documents with the priorities established in respect thereof under applicable nonbankruptcy law and any intercreditor agreement entered into in connection with the Exit Facility Documents or the New Debt Documents, and (iii) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or applicable non-bankruptcy law.  To the extent

provided in the Exit Facility Documents and the New Debt Documents, the Exit Facility Agents or any agent, trustee, or other representative of the relevant debtholders acting in a similar capacity, as applicable, under the New Debt Documents, as applicable, are authorized, but not required, to file with the appropriate authorities mortgages, financing statements, and other documents and to take any other action in order to evidence, validate, and perfect such liens or security interests.

**L.  Consenting FCM Hedge Agreements**

22.     From and after the Effective Date, the Consenting FCM Hedge Agreements shall continue in accordance with and subject to their respective terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtors pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. Entry of this Confirmation Order constitutes this Court's approval of the Reorganized Debtors' assumption of each of the Consenting FCM Hedge Agreements.   The Debtors' obligations under the Consenting FCM Hedge Agreements will continue according to the same terms applicable to the Debtors pursuant to the Consenting FCM Hedge Agreements, as existed prior to the Effective Date. For the avoidance of doubt, neither the foregoing nor anything else herein shall modify the terms of any Consenting FCM Hedge Agreement or discharge any claims arising under the Consenting FCM Hedge Agreement or the Hedging Order, all of which shall remain in full force and effect.   Nothing contained in the Plan or this Confirmation Order, including this paragraph 22, shall alter rights of the Consenting FCM Hedge Counterparty and the Debtors or Reorganized Debtors, as applicable, under the Consenting FCM Hedge Agreement.   The Debtors and the Reorganized Debtors, as applicable, shall be authorized to perform all obligations under the Consenting FCM Hedge Agreement pursuant to the Hedging Order.

**M.     Consenting First Lien Hedge Agreements**

23.     From and after the Effective Date, the Consenting First Lien Hedge Agreements shall continue in accordance with and subject to their respective terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtors pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.   Entry of this Confirmation Order constitutes this Court's approval of the Reorganized Debtors' assumption of each of the Consenting First Lien Hedge Agreements.   The obligations under the Consenting First Lien Hedge Agreements will continue according to the same terms applicable to the Debtors, as existed prior to the Effective Date.  For the avoidance of doubt, neither the foregoing nor anything else herein shall modify the terms of any Consenting First Lien Hedge Agreement.   Notwithstanding anything to the contrary in this paragraph 23, except to the extent that a Holder of an Allowed Postpetition Hedge Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Postpetition Hedge Claim, each Holder of such Allowed Postpetition Hedge Claim shall be indefeasibly paid in full, in Cash or, solely to the extent any other treatment is permitted under the terms of any Consenting First Lien Hedge Agreement, treated in accordance with such Consenting First Lien Hedge Agreement.

**N.     Delivery of Distributions**

24.     The Debtors and the Reorganized Debtors, as applicable, are authorized and directed to make all distributions under the Plan pursuant to the terms of the Plan and to pay any fees and expenses approved by this Confirmation Order or any other order of this Court.

**O.     Executory Contracts and Unexpired Leases**

25.     Pursuant to Article V of the Plan, as of and subject to the occurrence of the Effective Date (except as otherwise provided herein or in the Plan) and the payment of any applicable Cure Claim, all Executory Contracts and Unexpired Leases shall be deemed assumed by the applicable

Reorganized Debtor(s), unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to a Final Order (including pursuant to any motion filed by the Debtors subsequent to entry of this Confirmation Order), (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Rejection Schedule.

26.     Except as otherwise expressly provided in this Confirmation Order with respect to a named counterparty, any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of its Executory Contract or Unexpired Lease shall be deemed to have consented to such assumption or assumption and assignment.  The Debtors reserve the right to amend the Cure Notice or the Rejection Schedule at any time prior to the Effective Date, including any amendments that reflect changes to the Debtors' intention to assume or reject any Executory Contracts or Unexpired Leases.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor(s) in accordance with its terms.

27.     To the extent a dispute relates solely to the amount of any Cure Claim or the nature thereof (a "**Cure Dispute**"), the Reorganized Debtors may assume the applicable Executory Contract or Unexpired Lease before the resolution of the Cure Dispute; <u>provided</u>, that such assumption shall be subject to the condition subsequent of the applicable Reorganized Debtor satisfying the amount, if any, determined by this Court or agreed to by the parties to constitute the proper Cure Claim. The Debtors or Reorganized Debtors, as applicable, may settle any Cure Dispute without any further notice to any party or any action, order, or approval of this Court.

28.     Upon an agreement between the Debtors and the counterparty to the relevant Executory Contract or Unexpired Lease, any Cure Dispute or any other unresolved objection regarding the assumption of such Executory Contract or Unexpired Lease ("**Assumption Dispute**") may be adjourned to a hearing after the Confirmation Hearing (collectively, the "**Adjourned Assumption Disputes**").

29.     The Debtors or Reorganized Debtors, as applicable, reserve and shall have the right to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty (30) days after an order of this Court resolving the Assumption Dispute with respect to such contract or lease becomes a Final Order.

**P.     Compromises and Settlements**

30.     The Plan is a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual and legal rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

31.     The entry of this Confirmation Order constitutes this Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by this Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein and in the Plan are nonseverable from each other and from all other terms of the Plan.  In accordance with and subject to the provisions of the Plan (including the consent rights thereunder), pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of this Court, after the Confirmation Date, (i) the Reorganized Debtors, Pachulski, on behalf of the Creditor's Committee, or the GUC Trust, as applicable, may compromise and settle any Claims against, and Interests in, the Debtors and their

Estates, and (ii) the Reorganized Debtors may compromise and settle Causes of Action against other Persons or Entities; provided, that the settlement of Claims related to the PPL Adversary Proceeding shall be subject to the rights described in Article VII.B of the Plan, provided further that GUC Trust approval shall not be required for any settlement of claims related to the PPL Adversary Proceeding among any non-Debtors.

32.     Certain Claims and Causes of Action may exist between one or more of the Debtors and one or more of their Affiliates (not including TEC, Riverstone, the TEC Owners, or the Cumulus Affiliates), which Claims and Causes of Action have been settled, and such settlement is reflected in the treatment of the Intercompany Claims and the Claims against and Interests in each Debtor entity.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of such Claims and Causes of Action pursuant to Bankruptcy Rule 9019.

33.     CAF Settlement.  The provisions of the CAF Settlement constitute a good faith compromise and settlement among the Debtors, the Consenting Parties, and the CAF Consenting Parties of all Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Debtors and the CAF Consenting Parties, and are in consideration of the value provided to the Estates by the CAF Consenting Parties pursuant to the CAF Settlement.  The Plan shall be deemed a motion to approve the CAF Settlement as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  Entry of this Confirmation Order constitutes this Court's approval of the CAF Settlement, as well as a finding by this Court that the CAF Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

34.     First Lien Non-CAF Settlement.   The provisions of the First Lien Non-CAF Settlement constitute a good faith compromise and settlement among the Debtors, the Consenting Parties, and the First Lien Non-CAF Consenting Parties of all Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Debtors and the First Lien Non-CAF Consenting Parties, and are in consideration of the value provided to the Estates by the First Lien Non-CAF Consenting Parties pursuant to the First Lien Non-CAF Settlement.   The Plan shall be deemed a motion to approve the First Lien Non-CAF Settlement as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.Entry of this Confirmation Order constitutes this Court's approval of the First Lien Non-CAF Settlement, as well as a finding by this Court that the First Lien Non-CAF Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

35.     TEC Global Settlement.  The provisions of the TEC Global Settlement constitute a good faith compromise and settlement among the Debtors, the Consenting Parties, and the TEC Consenting Parties of all Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Debtors, the TEC Consenting Parties, and the Cumulus Affiliates, and are in consideration of the value provided to the Estates by the TEC Consenting Parties pursuant to the TEC Global Settlement.  The Plan shall be deemed a motion to approve the TEC Global Settlement as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy

Code and Bankruptcy Rule 9019. Entry of this Confirmation Order constitutes this Court's approval of the TEC Global Settlement, as well as a finding by this Court that the TEC Global Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

36.     Global Plan Settlement.  The provisions of the Global Plan Settlement constitute a good faith compromise and settlement among the Global Settlement Parties of all Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Global Settlement Parties (including the Committee Claims and the Unsecured Notes Trustee Claims), and are in consideration of the value provided to the Estates by the Global Settlement Parties pursuant to the Global Plan Settlement. The Plan shall be deemed a motion to approve the Global Plan Settlement as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. Entry of this Confirmation Order constitutes this Court's approval of the Global Plan Settlement, as well as a finding by this Court that the Global Plan Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

37.     The Global Settlement Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (1) the solicitation of acceptance or rejection of the Plan in good faith  and  in compliance with the applicable provisions of the Bankruptcy Code or (2) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy

Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan. No entity or person may commence or pursue a Claim or Cause of Action of any kind against any Global Settlement Party that arose or arises from, in whole or in part, a Claim or Cause of Action subject to this paragraph 37 of this Confirmation Order, without this Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim for actual fraud, gross negligence, or willful misconduct against any such Global Settlement Party and such party is not exculpated pursuant to this provision; and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against such Global Settlement Party.

38.     Upon and subject to the occurrence of the Effective Date, any right the Committee may have to assert or pursue any Committee Claim shall be waived.

39.     Upon and subject to the occurrence of the Effective Date, any right the Unsecured Notes Trustee may have to assert or pursue any Unsecured Notes Trustee Claim shall be waived.

40.     If a party to the Global Plan Settlement is in breach of its terms, the parties that are not in breach shall not be obligated to perform any obligations for the benefit of such breaching party.

**Q.     Conditions Precedent to Effective Date**

41.     The Plan shall not become effective unless and until all conditions set forth in Article IX.A of the Plan have been satisfied or waived pursuant to Article IX.B of the Plan.

**R.     Release, Exculpation, and Injunction Provisions**

42.     As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan or any Plan Document, all injunction, release, discharge, and exculpation provisions embodied in the Plan, including those contained in Article VIII, are hereby approved and shall be effective and binding on all Persons and Entities, to the extent provided in the Plan, without further order or action by this Court. For the avoidance of doubt,

any Holder of a Claim that abstained from voting to accept or reject the Plan but timely opted out

of the releases set forth in the Plan shall not be a "Releasing Party" under the Plan.

**S.      Dissolution of Official Committees**

43.      On the Effective Date, any official committees appointed in these chapter 11 cases,

including the Creditors' Committee, shall dissolve; provided that, following the Effective Date,

any such committees, including the Creditors' Committee, shall continue in existence solely for

the purposes of (i) filing and prosecuting applications for allowance of Professional Fee Claims

and (ii) seeking removal of the committee as a party in interest in any proceeding on appeal.  Upon

the dissolution of any official committees appointed in these chapter 11 cases, including the

Creditors' Committee, such committee members and their respective Professionals shall cease to

have any duty, obligation, or role arising from or related to these chapter 11 cases and shall be

released and discharged from all rights and duties from or related to these chapter 11 cases;

provided, that, for the avoidance of doubt, any Claims or Causes of Action asserted by the

Creditors' Committee, whether direct or derivative (including any Claims seeking declaratory

judgments) shall be withdrawn with prejudice and/or vest in the Debtors' Estates, to be

immediately fully and indefensibly released in accordance with Article VIII.C of the Plan.

**T.      Retention of Jurisdiction**

44.      Subject to Article XI of the Plan, pursuant to sections 105(a) and 1142 of the

Bankruptcy Code, this Court shall retain exclusive jurisdiction with respect to all matters arising

from or related to these chapter 11 cases, the Plan, and the implementation of this Confirmation

Order, including, without limitation, those matters set forth in Article XI of the Plan.

**U.      Statutory Fees**

45.      All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date

shall be paid by the Debtors in full in Cash on the Effective Date.  The Debtors shall file all monthly

operating reports through the Effective Date.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees in full in Cash when due and payable, and shall file with this Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of quarterly fees.

## V.     Documents, Mortgages, and Instruments

46.     Each federal, State, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the transactions, including the Restructuring Transactions, contemplated by the Plan and this Confirmation Order and directed pursuant to section 1142 of the Bankruptcy Code to take such steps with respect to the foregoing to implement the transactions necessary to consummate the Plan.

## W.     Exemption from Certain Transfer Taxes

47.     To the fullest extent permitted by applicable law, all sale transactions and asset transfers consummated by the Debtors and approved by this Court on and after the Confirmation Date through and including the Effective Date, including (i) the issuance, distribution, transfer or exchange of any securities, instruments, or documents, including the distribution of the New Common Equity, the New Warrants, and the Rights Offering Subscription Rights, (ii) the creation of any Lien, mortgage, deed of trust, or other security interest, (iii) all sale transactions and asset transfers consummated by the Debtors and approved by this Court on and after the Confirmation Date through and including the Effective Date, (iv) the release of collateral securing the Prepetition Debt Documents and/or any other indebtedness contemplated to be terminated by the Plan, (v) the

36

grant of collateral under the Exit Facility Documents and the New Debt Documents and (vi) the issuance, renewal, modification or securing of indebtedness (including, for the avoidance of doubt, the modifications and/or securing of indebtedness contemplated by the Exit Facility Documents and the New Debt Documents), and the making, delivery or recording of any deed, mortgage or other instrument of transfer under, in furtherance of, or in connection with, the Plan and this Confirmation Order, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  This Confirmation Order is and shall be binding upon and shall govern the acts of all Persons and Entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other Persons and Entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument without requiring the payment of any filing or recording fees, documentary stamp tax, document recording tax, deed stamps, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales tax, use tax, transfer tax, intangible tax or similar tax or governmental assessment.

## X.   Reversal/Stay/Modification/Vacatur of Order

48.    Except as otherwise provided in this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority,

or Lien incurred or undertaken by the Debtors, the Reorganized Debtors, or any other Person or Entity authorized or required to take action to implement the Plan, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.  Notwithstanding any such reversal, stay, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, the Plan Documents, or any amendments or modifications to the foregoing.

**Y.    Provisions of Plan and Confirmation Order Nonseverable and Mutually Dependent**

49.    The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

**Z.    Headings**

50.    Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

**AA.    Governing Law**

51.    Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise with respect to such document, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).  The rights, duties, and obligations arising under the Plan Documents shall be governed by the applicable law set forth therein.

**BB.    Applicable Non-Bankruptcy Law**

52.    Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Confirmation Order, the Plan, the Plan Documents, and any other related documents or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

**CC.    Notice of Entry of Confirmation Order and Effective Date**

53.    In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Confirmation Date, the Debtors shall serve notice of the entry of this Confirmation Order, substantially in the form attached as **Exhibit B** hereto (the "**Confirmation Notice**"), on all parties who hold a Claim or Interest in these cases, the U.S. Trustee, and any other parties in interest.  Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Confirmation Order.

54.    As soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall serve notice of the occurrence of the Effective Date, substantially in the form attached as **Exhibit C** hereto (the "**Consummation Notice**"), on all parties who hold a Claim or Interest in these cases, the U.S. Trustee, and any other parties in interest.  Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of occurrence of the Effective Date.

**DD.    Final Order**

55.    This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

**EE.    Waiver of Stay**

56.    The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of 14 days after entry of the order are hereby waived.  This

Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

**FF.      Inconsistency**

57.      To the extent of any inconsistency between this Confirmation Order and the Plan, this Confirmation Order shall govern.

**GG.     Valid and Binding**

58.      All documents necessary to implement the Plan and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements.

**HH.     Term of Injunctions or Stays**

59.      Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays arising under or entered during these chapter 11 cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**II.      Substantial Consummation**

60.      On the Effective Date, the Plan shall be deemed to be substantially consummated under section 1101(2) and 1127(b) of the Bankruptcy Code.

**JJ.      Closure of these Chapter 11 Cases**

61.      The Reorganized Debtors shall, after the full administration of these chapter 11 cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of this Court to close these chapter 11 cases.  As of the Effective Date, the Reorganized Debtors may submit separate orders to this Court under certification of counsel closing certain individual chapter 11 cases and changing the caption of these chapter 11 cases accordingly.

Matters concerning Claims may be heard and adjudicated in a Debtor's chapter 11 case that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed.

**KK.    Miscellaneous Provisions.**

62.    ***Assumption of LoBiondo Employment Agreement***.  The Employment Agreement of Leonard LoBiondo, as amended on December 12, 2022, is hereby assumed by the TES Debtors effective upon Confirmation of the Plan.

63.    ***Retention of PJT Partners LP***.  Upon entry of this Confirmation Order, TEC is hereby authorized to retain PJT Partners LP ("**PJT**") as investment banker (as defined in that certain engagement agreement between PJT and Vinson & Elkins LLP, dated as of March 8, 2022 (the "**PJT Engagement Letter**")), in accordance with (i) the Amended and Restated RSA Fifth Amendment, (ii) the Fee Cap (as defined therein), and (iii) to the extent not inconsistent with (i) and (ii), the PJT Engagement Letter, without any requirement to file interim or final fee applications.  For the avoidance of doubt, any Restructuring Fee (as defined in the Amended and Restated RSA Fifth Amendment) paid to PJT shall be funded under the Plan by such arrangement as agreed to by the parties to the Amended and Restated RSA Fifth Amendment.

64.    ***Cleveland Brothers***.  Notwithstanding anything in the Plan or this Confirmation Order to the contrary, any and all Executory Contracts and Unexpired Leases between any of the Debtors and Cleveland Brothers Equipment Co., Inc. ("**Cleveland Brothers**") shall be assumed under the Plan as of the Effective Date (the "**Cleveland Brothers Agreements**") and such assumption shall not alter, impair, release, waive, or be deemed to satisfy any of the parties' respective rights, claims and obligations (including any payment obligations of the Debtors or Reorganized Debtors to Cleveland Brothers) under the Cleveland Brothers Agreements, including, but not limited to, any Cure Claims, any contingent claims and any claims that have accrued but

are not in default (and regardless of whether such claims have been invoiced) that are held by Cleveland Brothers as of the date the Cleveland Brothers Agreements are assumed. The hearing to determine the amount of any Cure Claims held by Cleveland Brothers is hereby adjourned in accordance with paragraphs 26-28 of this Confirmation Order.

65. ***Certain ISO-NE Matters***. Notwithstanding anything to the contrary in the Plan, the Plan Supplement or this Confirmation Order, on the Effective Date the following contracts with ISO New England Inc. ("**ISONE**") shall be assumed (collectively, the "**ISONE Contracts**"): (i) Service Agreement No. 1 annexed to the ISONE Tariff to which TEM is bound by order of the Federal Energy Regulatory Commission; (ii) the Standard Large Generator Interconnection Agreement by and among ISONE and Dartmouth Power Associates, LP ("**DPA**") and NSTAR Electric Company, as amended from time to time; (iii) the Market Participant Service Agreement dated September 1, 2007, by and among ISONE and DPA; (iv) the Security Agreement dated March 7, 2014, by and between DPA and ISONE; and (v) the Uncertificated Securities Control Agreement dated March 10, 2014, by and among DPA, ISONE, and Blackrock Liquidity Funds. The assumption of the ISONE Contracts shall not alter any of the parties' respective rights and obligations under the ISONE Contracts, including, without limitation, any valid netting (either based on setoff or recoupment), under the ISONE Contracts. Nothing in the Plan, the Plan Supplement, or this Confirmation Order impairs any valid liens held by ISONE securing any obligations of any of the Debtors under the ISONE Contracts.

66. ***Texas Comptroller and TWC***. Nothing provided in the Plan or Confirmation Order shall impair any valid statutory or common law setoff rights of the Texas Comptroller of Public Accounts (the "**Texas Comptroller**") and the Texas Workforce Commission (the "**TWC**"), in accordance with 11 U.S.C. § 553. Nothing provided in the Plan or Confirmation Order shall impair

any rights of the Texas Comptroller or the TWC to pursue any non-debtor third parties for tax debts or claims.  Nothing provided in the Plan or Confirmation Order shall be construed to preclude the payment of any administrative expense tax claims held by the Texas Comptroller or the TWC.

67.    ***Texas Taxing Authorities***.  Notwithstanding anything to the contrary contained in the Plan or Disclosure Statement, any taxes due by any of the Debtors to Nueces County, Montgomery County, Cypress-Fairbanks ISD, and Harris County (collectively, the "**Texas Taxing Authorities**") for the 2022 tax year shall be paid in the ordinary course.  Any secured claims of the Texas Taxing Authorities shall be entitled to interest to the extent provided under sections 506(b), 1129 and/or 511 of the Bankruptcy Code.  Any valid and perfected liens securing Texas Taxing Authorities' claims shall retain the same force and effect and priority pursuant to state law until such claims are satisfied in full.

68.    ***Certain Surety Bond Treatment***.  <u>Surety Bond Obligations.</u>  Certain sureties (collectively, the "**Sureties**" and each, individually, a "**Surety**")—including, without limitation, Argonaut Insurance Company, Atlantic Specialty Insurance Company, Arch Insurance Company, and Travelers Casualty and Surety Company of America—issued surety bonds on behalf of certain Debtors, including TEC (collectively, the "**Existing Surety Bonds**" and each, individually, an "**Existing Surety Bond**").  Certain of the Debtors, including TEC (collectively, the "**Indemnitors**") executed certain indemnity agreements and/or related agreements with one or more of the Sureties (collectively, the "**Existing Indemnity Agreements**" and, each, an "**Existing Indemnity Agreement**").

69.    <u>Treatment of Surety Bond Agreements</u>.  The Surety Bond Agreements (defined below) and their treatment under paragraphs 68-70 of this Confirmation Order are essential elements of the Plan, and Plan Supplement, and are supported by adequate consideration.

Notwithstanding any other provisions of the Plan, the Plan Supplement, this Confirmation Order, or otherwise, on the Effective Date, any rights and obligations arising under the (i) the Existing Surety Bonds; (ii) any Existing Indemnity Agreements; (iii) any Surety collateral, including, without limitation, cash, letters of credit, and/or the proceeds of any such collateral (the "**Surety Support**"); (iv) any Surety agreements governing Surety Support; (items (i), (ii), (iii), and (iv) collectively, the "**Surety Bond Agreements**") under the Surety Bond Agreements or any common law indemnity, subrogation and/or surety rights under applicable law shall be deemed reaffirmed and ratified by the applicable Reorganized Debtors and Indemnitors, shall continue in full force and effect, and the rights and obligations thereunder shall not be altered, modified, discharged, enjoined, impaired or released by the Plan, the Plan Supplement, or this Confirmation Order. Subject to the Debtors' and Sureties' rights and defenses under the Existing Indemnity Agreements, the Debtors are authorized to maintain, continue, renew and/or obtain any surety bonds, including, without limitation, Existing Surety Bonds, and maintain, continue, renew, and/or provide any Surety collateral, including, without limitation, Surety Support, without further order of this Court, and any such agreements entered into prior to the Effective Date shall be treated as Surety Bond Agreements under this Order.  For the avoidance of doubt, nothing in the Plan, the Plan Supplement, or this Confirmation Order shall bar, alter, limit, impair, release, modify, enlarge, or enjoin any rights and obligations of any Indemnitors under the Surety Bond Agreements.  In furtherance of and to effectuate the treatment of the Surety Bond Agreements as provided herein, to the extent that any of the Surety Bond Agreements are deemed to be one or more executory contracts, any such agreements and/or obligations thereunder shall be assumed by the Debtors pursuant to section 365 of the Bankruptcy Code upon the Effective Date (and the Sureties hereby consent to such assumption on the terms set forth herein and subject to any ballots

and/or opt out forms submitted by the Sureties in connection with the Plan).  If on and after the Effective Date the Surety Bond Agreements cease to be in effect solely as a result of a determination by a court of competent jurisdiction that such agreements are non-assumable under applicable bankruptcy law, any such Surety Bond Agreements shall be deemed reinstated or ratified on the terms of such Surety Bond Agreement that existed immediately prior to the Effective Date.  Nothing in the Plan or this paragraph shall impair or enlarge any Surety's rights under any of the Surety Bond Agreements or against any non-Debtors.

71.    <u>Existing Surety Support</u>.  Notwithstanding any other provision of the Plan, this Confirmation Order, or Plan Supplement, any Surety Support shall remain in place to secure any obligations under any Surety Bond Agreement, including, without limitation, the Surety Bond Obligations, in accordance with the terms of such agreements.  At any time after the Effective Date, solely to the extent provided in the applicable agreement, the Sureties may apply their respective Surety Support or the proceeds therefrom to payment or reimbursement of any and all premiums, losses, expenses, including, without limitation, attorneys' fees regardless of whether such premiums, losses or expenses arise before or after entry of this Confirmation Order.

71.    ***PPL Parties Reservation of Rights Against Debtors***.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order, affirmative defenses or counterclaims (solely to the extent any such counterclaims either (i) seek declaratory relief to eliminate or reduce liability against any of the PPL Parties and/or (ii) give rise to setoff or recoupment) of PPL Corp., CEP Reserves, Inc., PPL Capital Funding, Inc., PPL Electric Utilities Corp., and PPL Energy Funding Corp. (collectively, the "**PPL Parties**") asserted or to be asserted in that certain adversary proceeding, *Talen Montana, LLC, et al. v. PPL Corp., et al.*, Adv. No. 22-9001 (including any of the proceedings consolidated therewith pursuant to the Order Consolidating

Related Proceedings entered by this Court on August 3, 2022 [Adv. Proc. Docket No. 53]), pending before this Court, are expressly reserved in defense to such Cause of Action, and the Debtors reserve all rights, including to contest the validity and merits of such affirmative defenses and counterclaims.

72.     ***J. Aron & Company, LLC***.  Nothing in the Cure Notice, as it may be amended, modified, or supplemented from time to time, shall be construed to impair the rights of J. Aron & Company, LLC under that certain *Amended and Restated ISDA Master Agreement entered into by J. Aron & Company, LLC and Talen Energy Marketing, LLC*, on August 15, 2022 (as amended thereafter from time to time**,** the "**J. Aron ISDA**") pursuant to the Hedging Order or otherwise modify the obligations of the parties under the J. Aron ISDA.

73.     ***PBGC Release Carve-Out***.  Nothing in these chapter 11 cases, the Disclosure Statement, the Plan, this Confirmation Order, or any other document filed in these chapter 11 cases shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plans for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plans, subject to any and all applicable rights and defenses of such parties, which are expressly preserved.  The PBGC and the Pension Plans shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Disclosure Statement, Plan, Confirmation Order, Bankruptcy Code, or other document filed in these chapter 11 cases.  For the avoidance of doubt, the Reorganized Debtors shall not be released from any liability or obligation under ERISA, the Internal Revenue Code, and any other applicable law relating to the Pension Plans.

74.     ***Orion Energy Partners Investment Agent, LLC.***  Notwithstanding anything to the contrary herein, the Revenue Put Guaranty[5] and all liabilities and obligations thereunder shall be deemed assumed by TEC on the Confirmation Date.

75.     ***RBC.***  Nothing herein shall discharge any claims arising under the ISDA 2002 Master Agreement between RBC Capital Markets, LLC ("**RBC**") and Talen Energy Marketing, LLC  (including any schedules and exhibits attached thereto, the "**RBC Hedge Agreement**"), all of which shall remain in full force and effect.  Nothing contained in the Plan or this Confirmation Order, including paragraph 23, shall alter any rights of RBC and the Debtors or Reorganized Debtors, as applicable, under the RBC Hedge Agreement.  The Debtors and the Reorganized Debtors, as applicable, shall be authorized to perform their respective obligations pursuant to the Hedging Order.

76.     ***URENCO.***  Notwithstanding anything in the Plan or this Confirmation Order to the contrary, with respect to any and all Executory Contracts between any of the Debtors and URENCO Enrichment Company Limited, URENCO UK Limited, URENCO Deutschland GmbH, URENCO Nederland B.V., and Louisiana Energy Services, LLC that are assumed under the Plan on the Effective Date (the "**URENCO Agreements**"), including with respect to any contingent obligations, such assumption shall not alter, impair, or modify any of the parties' respective rights and obligations under the URENCO Agreements.

77.     ***NorthWestern Settlement***.     Talen Montana and NorthWestern Corporation ("**NorthWestern**") are parties to that certain *Purchase and Sale Agreement*, dated as of September

---

[5] The term "**Revenue Put Guaranty**" shall have the meaning assigned in that certain Credit Agreement, dated as of September 20, 2021, among Cumulus Digital LLC, the other Loan Parties party thereto, Orion Energy Partners Investment Agent, LLC, as Administrative Agent and Collateral Agent, and the Lenders party thereto from time to time (as amended, amended and restated, supplemented or otherwise modified from time to time, including by that certain Omnibus Amendment Agreement, dated as of September 29, 2022).

26, 2013 (the "**Montana PSA**"), and TES, Talen Montana, and NorthWestern are parties to that certain *Seller Guaranty*, dated as of September 26, 2013 (the "**Montana Guaranty**"). NorthWestern has asserted certain claims against the Debtors in connection with the PSA and Guaranty, including the claims set forth in Proof of Claim No. 936 and Proof of Claim No. 973 (collectively, the "**NorthWestern POCs**"), and the Debtors have asserted certain claims against NorthWestern in connection with the PSA. The Debtors and NorthWestern have agreed to a settlement of their claims (the "**NorthWestern Settlement**").

78.     Pursuant to the NorthWestern Settlement, and notwithstanding any provisions in the Plan, Plan Supplement or this Order: (a) the NorthWestern POCs are deemed resolved and Northwestern shall formally withdraw the Northwestern POCs; (b) the Debtors shall release any and all claims against NorthWestern in connection with the Montana PSA for the Debtors' defense costs relating to the Montana Hydroelectic Litigation; (c) NorthWestern shall release any and all claims against the Debtors in connection with the Montana PSA for NorthWestern's defense costs incurred post-petition relating to the Montana Hydroelectic Litigation, to the extent such claims are not included in the NorthWestern POCs; and (d) NorthWestern shall consent to the Debtors' rejection of the Montana PSA and the Montana Guaranty, which shall, for the avoidance of doubt, eliminate any and all future cost-sharing or other obligations arising under the Montana PSA.

79.     The provisions of the NorthWestern Settlement constitute a good faith compromise and settlement among the Debtors and NorthWestern of all Claims, Causes of Action, Interests, and controversies among such parties relating to the NorthWestern POCs, including all potential Claims, Causes of Action, Interests relating to the NorthWestern POCs, and are in consideration of the value provided to the Estates by NorthWestern pursuant to the NorthWestern Settlement. Notwithstanding any provisions in the Plan, Plan Supplement or this Order, entry of

this Confirmation Order constitutes this Court's approval of the NorthWestern Settlement, as well as a finding by this Court that the NorthWestern Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

80. ***Prepetition First Lien Secured Parties.*** For the avoidance of doubt, following the date hereof until the occurrence of the Effective Date, paragraph 42 of the DIP Order and the Debtors' rights and obligations with respect to payment of interest thereunder shall continue in full force and effect in accordance with the terms thereof, including, without limitation, the rights of the Prepetition First Lien Secured Parties thereunder.

81. ***Trading Procedures.*** All Holders of Unsecured Notes Claims and/or Backstop Commitments, to the extent such Holder, together with any direct or indirect subsidiary or Affiliate of, or beneficial holder, investment fund, fund, or account that is advised, managed, or controlled by, such Holder or its Affiliates (such parties, generally, "**Related Holders**"), holds "disclosable economic interests" (as defined by Bankruptcy Rule 2019(a)(l)) with respect to Unsecured Notes Claims that represent, in the aggregate, four and a half percent (4.5%)[6] or greater of the Unsecured Notes Claims and/or Backstop Commitments that represent, in the aggregate, four and a half percent (4.5%) or greater of the total amount of Backstop Commitments, are hereby ordered to provide to (x) counsel to the Debtors, Weil, Gotshal & Manges LLP 767 Fifth Avenue New York, New York 10153 Attn.: Matt S. Barr; Gabriel A. Morgan; and Alexander W. Welch and (y) counsel to the Requisite Consenting Parties, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Christopher S. Koenig, Alexander McCammon, and Gabriela Hensley ((x) and (y) together, the "**Notice Firms**"), within seven (7) business days of the Debtors'

---

[6] For purposes of compliance with the notice provision of this paragraph and the Trading Procedures, Holders should assume that the aggregate amount of Unsecured Notes Claims is $1.429 billion and the aggregate amount of Backstop Commitments is $1.55 billion.

service of notice of entry of this Confirmation Order, the following information (the "**Initial Disclosure**" and the related procedures, the "**Initial Disclosure Procedure**"), which may be included in applications to various regulatory agencies to approve the change of control contemplated by the Plan and this Confirmation Order (the "**Applications**" and the information, the "**Equity Holder Information**"):

- name, address, and citizenship of any potential holders that are expected to have the ability to exercise control or substantial influence over any entity that holds or has the ability to exercise control over the license, certification, operations, assets, or other item that is subject to regulation (each entity, a "**Regulated Entity**," and each such holder a "**Substantial Equity Holder**");

- the amount of Unsecured Notes Claims and Backstop Commitments held by such Holder;

- whether the holder has a controlling or voting equity interest in any other public utility subject to the regulation of the Federal Energy Regulatory Commission (the "**FERC**") or United States Nuclear Regulatory Commission (the "**NRC**"), and the nature of such interests or control, including the percentage ownership in such other entities and whether the holder has any board seats with the public utility, such information to be supplied in the manner reasonably directed by the Debtors; and

- any other information that is required to be disclosed in a relevant application, including any information bearing upon the eligibility or suitability of a potential Substantial Equity Holder with respect to control of a Regulated Entity.

82.    In addition to the Equity Holder Information specified above, potential Substantial Equity Holders shall cooperate with the Debtors as reasonably necessary to prepare and obtain approval of the Applications.

83.    The following procedures (the "**Trading Procedures**") shall apply to the trading of Unsecured Notes Claims and Backstop Commitments upon entry of the Confirmation Order and through the Effective Date:

<u>Pre-Acquisition Notice</u>:

- From the date of entry of the Confirmation Order and through the Effective Date, five (5) business days prior to any acquisition of any Unsecured Notes Claims and/or Backstop Commitments that would result in an entity or its Related Holders becoming a holder of five percent (5%) (a "**5% Holder**") or greater of the Unsecured Notes Claims or Backstop Commitments**,** as applicable, such entity or Related Holder shall serve on the Notice Firms advance written notice of the intended transfer (the "**Pre-Acquisition Notice**") which may, but shall not be required to, include a statement as to why the proposed acquisition would not adversely affect an Application.

- From the date of entry of the Confirmation Order and through the Effective Date, five (5) business days prior to any acquisition of any Unsecured Notes Claims and/or Backstop Commitments that would result in an entity or its Related Holders becoming a holder of ten percent (10%) (a "**10% Holder**") or greater of the Unsecured Notes Claims or Backstop Commitments**,** as applicable, such entity or Related Holder shall serve on the Notice Firms a Pre-Acquisition Notice which may, but shall not be required to, include a statement as to why the proposed acquisition would not adversely affect an Application.

<u>Objection Procedures</u>:

- The Debtors and the Requisite Consenting Parties shall have five (5) business days after receipt of a Pre-Acquisition Notice to file with the Court and serve on the entity filing the Pre-Acquisition Notice an objection to the proposed transfer on the grounds that such transfer may, in the Debtors' or the Requisite Consenting Parties' respective reasonable discretion, materially and adversely affect an Application, including but not limited to causing a material delay in the processing of an Application. If an objection is filed, such entity shall not proceed with the proposed transaction (or if such entity does proceed with the proposed transaction, such transaction shall not be effective) unless and until (i) the objection is withdrawn, overruled, or otherwise resolved, or (ii) the proposed transaction is approved by a final and non-appealable order of the Bankruptcy Court determining that the proposed acquisition will not materially and adversely affect the Application. If no objection to a Pre-Acquisition Notice is filed within such 5-business day period or if an objection to a Pre-Acquisition Notice is filed and later withdrawn, the transaction may proceed solely as set forth in the Pre-Acquisition Notice. In addition, any such entity shall have the right at any time to seek a ruling by the Court that the Debtors' or Requisite Consenting Parties' objection, as applicable, that a proposed transfer will materially and adversely affect the Application was either not reasonable or not made in good faith. Any further transactions within the scope of this paragraph that would result in such entity or its Related Holders acquiring additional Unsecured Notes Claims that represent five

percent (5%) or greater of the Unsecured Notes Claims or Backstop Commitments, as applicable, must comply with the same noticing and 5-day objection procedures.

Continuing Notice Obligations:

- From the date of entry of the Confirmation Order and through the Effective Date, five (5) business days following any transfer of any Unsecured Notes Claims and/or Backstop Commitments that would result (or has resulted) in a decrease in the amount of Unsecured Notes Claims and/or Backstop Commitments held by a 10% Holder such that such 10% Holder would cease (or has ceased) to be a 10% Holder, such entity or Related Holder shall notify the Notice Firms.

- From the date of entry of the Confirmation Order and through the Effective Date, five (5) business days following any transfer of any Unsecured Notes Claims and/or Backstop Commitments that would result (or has resulted) in a decrease in the amount of Unsecured Notes Claims and/or Backstop Commitments held by a 5% Holder such that such 5% Holder would cease (or has ceased) to be a 5% Holder, such entity or Related Holder shall notify the Notice Firms.

84.     Transfers in violation of the Trading Procedures could have a material impact on required regulatory approvals for Consummation and could result in a meaningful delay of the Effective Date; accordingly, any transfer of Unsecured Notes Claims or Backstop Commitments made in violation of the Trading Procedures, RSA, and/or Backstop Commitment Letter shall be deemed void *ab initio*; provided, however, that the Debtors may waive, in writing, and in consultation with the applicable regulatory agencies, any and all requirements, stays, and notification procedures contained in this Confirmation Order or any other order entered with respect hereto.

85.     Inclusion of the Initial Disclosure Procedures and Trading Procedures (the "**Procedures**") in the Confirmation Notice (as defined herein) shall constitute good and sufficient notice of these Procedures on the persons and entities affected hereby and such notice is hereby approved.]

86.     ***Reservation of Rights of any Governmental Unit, including the United States.***
Nothing in this Confirmation Order, the Plan, or the Plan Supplement discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("**Governmental Unit**") that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iii) any liability to a Governmental Unit under police and regulatory law that any entity would be subject to as the owner or operator of property after the Confirmation Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Confirmation Order or the Plan enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

87.     Nothing in this Confirmation Order authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police, statutory, or regulatory law (for the avoidance of doubt, with respect to licenses issued by the Nuclear Regulatory Commission (NRC), such approval shall be deemed obtained upon the issuance of (1) a license transfer approval order by the NRC, and (2) if applicable, the issuance of a final order concluding any agency adjudicatory proceeding concerning the transfer of the license, but such approval shall be deemed obtained without regard to any petition for rehearing or petition for judicial review).

88.     Nothing in this Confirmation Order authorizes the transfer or assignment of any interests in contracts, leases, rights-of-use and easements, and rights-of-way, or other interest or agreements with any Governmental Units without compliance with all applicable legal requirements under non-bankruptcy laws, regulations, and rules.  Nothing in this Confirmation

Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Confirmation Order or to adjudicate any defense asserted under this Confirmation Order.

89.     Notwithstanding any provision of the Plan, this Confirmation Order, or any implementing or supplementing plan documents, any valid setoff rights under federal law as recognized in section 553 of the Bankruptcy Code or recoupment rights of the United States shall be preserved and are unaffected.  For the avoidance of doubt, the United States opts out of the releases provided in Article VIII.D of the Plan and is not a Releasing Party; *provided*, however, if any agency of the United States or any agency of any state actually votes to accept the Plan, such agency shall be deemed to provide the releases in Article VIII.D of the Plan for such agency and only for such agency.

90.     ***Pennsylvania, Maryland, and Montana Administrative Order and Consent Decree***.  Notwithstanding anything to the contrary in the Plan, Plan Supplement, or Definitive Documents, the applicable Reorganized Debtors party to and/or named as defendant in the following consent decrees and agreements shall continue to be bound by their terms (subject to any of the Reorganized Debtors' rights, claims, and defenses thereunder):

- Consent Decree approved by the United States Court for the Middle District of Pennsylvania on November 8, 2019 (Case No. 19-CV-1324, Doc. Nos. 4, 13) imposing remediation, monitoring and reporting requirements on Talen Energy Corporation and Bruner Island, LLC related to the Bruner Island Steam Electric Station.

- Administrative Order on Consent Regarding Impacts Related to Wastewater Facilities Comprising the Closed-Loop System at Colstrip Steam Electric Station, Colstrip, Montana, between Talen Montana, LLC, and Montana Department of Environmental Quality (MT DEQ) executed August 3, 2012, as amended March 1, 2017 (Colstrip AOC).  For the avoidance of doubt, this includes the settlement agreement entered into by and between Talen Montana, LLC, and MT DEQ, effective date October 18, 2021, and which is included as an addendum to the Colstrip AOC.

- Administrative Consent Agreement Regarding the Implementation of the Code of Maryland Regulations 26.11.09.08B(4) at the Brandon Shores and H.A. Wagner

electric generating stations (collectively referred to as the "**Fort Smallwood Complex**"), executed between Raven Power Fort Smallwood, LLC and the Maryland Department of the Environment on February 25, 2016; Administrative Consent Agreement Regarding Operation of Particulate Matter Continuous Monitoring Emissions Systems at the Fort Smallwood Complex, executed between Raven Power Fort Smallwood, LLC, Raven Power Generation Holdings, LLC, Brandon Shores, LLC and the Maryland Department of the Environment on April 19, 2016; and Administrative Consent Order Regarding Sulfur Dioxide Emissions at the Fort Smallwood Complex, executed between Raven Power Fort Smallwood, LLC and the Maryland Department of the Environment on December 4, 2019.

91.     **Prepetition Cumulus Intercompany Claims**.  Notwithstanding anything to the contrary in the Plan or Plan Supplement, the treatment of Prepetition Cumulus Intercompany Claims pursuant to <u>Article III.B.7</u> of the Plan is approved; <u>provided</u> that the Debtors have confirmed that no such Prepetition Cumulus Intercompany Claims exist, and, to the extent any such Claims exist, such Claims are waived by its respective Holder.

92.     **Prepetition Intercompany Claims**.  Notwithstanding anything to the contrary in the Plan or Plan Supplement, Prepetition Intercompany Claims shall be canceled, released, discharged, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Prepetition Intercompany Claims shall not receive any distribution on account of such Claims.

93.     ***Exculpated Parties.***  Notwithstanding anything to the contrary in the Plan or Plan Supplement, the definition of Exculpated Parties in the Plan shall be revised to the following: "*Exculpated Parties*" means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) Carol Flaton and Gary Wojtaszek, each in their capacity as an independent manager of TES; and (iii) the Creditors' Committee and each of its members.

Signed:  December 20, 2022

Marvin Isgur
United States Bankruptcy Judge

**<u>Exhibit A</u>**

**Plan**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **TALEN ENERGY SUPPLY, LLC,** *et al.,* | § | **Case No. 22-90054 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

### JOINT CHAPTER 11 PLAN OF TALEN ENERGY SUPPLY, LLC
### AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan
Clifford Carlson
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Alexander Welch (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated:  December 14, 2022
            Houston, Texas

---

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' Claims and Noticing Agent at https://cases.ra.kroll.com/talenenergy.  The Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

**TABLE OF CONTENTS**

Page

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ...................................................................................................1
 A. Defined Terms ............................................................................................................. 1
 B. Rules of Interpretation ............................................................................................. 25
 C. Computation of Time ............................................................................................... 26
 D. Governing Law ......................................................................................................... 26
 E. Reference to Monetary Figures ............................................................................... 26
 F. Reference to the Debtors or the Reorganized Debtors .......................................... 26
 G. Controlling Document .............................................................................................. 26
 H. Consultation, Information, Notice, and Consent Rights ........................................ 26

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS .............................. 27
 A. Administrative Claims .............................................................................................. 27
 B. DIP Claims ............................................................................................................... 28
 C. Postpetition Hedge Claims ....................................................................................... 28
 D. Postpetition Other Hedge Claims ........................................................................... 29
 E. Restructuring Expenses ........................................................................................... 29
 F. Priority Tax Claims .................................................................................................. 30

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 30
 A. Summary of Classification ....................................................................................... 30
 B. Treatment of Claims and Interests .......................................................................... 32
 C. Special Provision Governing Unimpaired Claims .................................................. 38
 D. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ............... 38
 E. Elimination of Vacant Classes ................................................................................ 38
 F. Voting Classes; Presumed Acceptance by Non-Voting Classes ........................... 38
 G. Controversy Concerning Impairment ...................................................................... 39

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .................................... 39
 A. No Substantive Consolidation ................................................................................. 39
 B. Sources of Consideration for Plan Distributions ................................................... 39
 C. New Debt ................................................................................................................... 39
 D. Rights Offering and Backstop Commitment Letter ................................................ 39
 E. Reorganized Debtors Organizational Documents .................................................. 40
 F. Registration Rights Agreement ............................................................................... 40
 G. Corporate Existence ................................................................................................ 41
 H. Employee Equity Incentive Plan ............................................................................. 41
 I. Series B & C PEDFA Bonds .................................................................................... 41
 J. Consenting FCM Hedge Agreements ...................................................................... 41
 K. Consenting First Lien Hedge Agreements .............................................................. 41
 L. Pension Plans ........................................................................................................... 42
 M. Asset Retirement Obligations ................................................................................. 42
 N. GUC Trust ................................................................................................................ 42
 O. TEC Global Settlement ............................................................................................ 46
 P. Global Plan Settlement ............................................................................................ 46
 Q. Issuance or Distribution of New Common Equity and New Warrants .................. 48
 R. Vesting of Assets ...................................................................................................... 48
 S. Cancellation of Existing Securities and Agreements .............................................. 48
 T. Corporate Action ..................................................................................................... 50
 U. Restructuring Transactions ...................................................................................... 50
 V. Exemption from Certain Taxes and Fees ............................................................... 51
 W. Preservation of Causes of Action ............................................................................ 51
 X. Insurance Policies .................................................................................................... 51
 Y. Workers' Compensation Programs ......................................................................... 52

i

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................ 53
    A.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ..................................... 53
    B.    Assumption and Rejection of Executory Contracts and Unexpired Leases ................................. 53
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................................. 54
    D.    Dispute Resolution .................................................................................................................... 54
    E.    Indemnification Obligations ..................................................................................................... 55
    F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ....................... 55
    G.    Reservation of Rights ................................................................................................................ 55
    H.    Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4) ..................................... 55

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................................... 55
    A.    Timing and Calculation of Amounts to Be Distributed ............................................................. 55
    B.    Partial Distributions on Account of Allowed Claims ................................................................ 56
    C.    Rights and Powers of Distribution Agent ................................................................................. 56
    D.    Special Rules for Distributions to Holders of Disputed Claims and Interests ............................. 56
    E.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ................................. 56
    F.    Securities Registration Exemption ........................................................................................... 58
    G.    Compliance with Tax Requirements and Withholding ............................................................. 59
    H.    Allocations ............................................................................................................................... 60
    I.    No Postpetition Interest on Claims ........................................................................................... 60
    J.    Setoffs and Recoupment ........................................................................................................... 60
    K.    Claims Paid or Payable by Third Parties ................................................................................. 60

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
             DISPUTED CLAIMS .......................................................................................................... 61
    A.    Allowance of Claims ................................................................................................................ 61
    B.    Claims and Interests Administration Responsibilities .............................................................. 62
    C.    Estimation of Claims ................................................................................................................ 63
    D.    Adjustment to Claims Register Without Objection .................................................................... 64
    E.    Disallowance of Claims ............................................................................................................ 64
    F.    Amendments to Claims ............................................................................................................. 64
    G.    Distributions After Allowance ................................................................................................. 64
    H.    Single Satisfaction of Claims .................................................................................................... 64

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...................... 64
    A.    Compromises and Settlements of Claims, Interests, and Controversies ..................................... 64
    B.    Discharge of Claims and Termination of Interests .................................................................... 66
    C.    Releases by the Debtors ............................................................................................................ 67
    D.    Releases by Holders of Claims and Interests ............................................................................ 67
    E.    Exculpation .............................................................................................................................. 68
    F.    Injunction ................................................................................................................................ 69
    G.    Subordination Rights ................................................................................................................ 70
    H.    Release of Liens ....................................................................................................................... 70

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN .................................. 70
    A.    Conditions Precedent to the Effective Date ............................................................................... 70
    B.    Waiver of Conditions ................................................................................................................ 72
    C.    Substantial Consummation ....................................................................................................... 72
    D.    Effect of Non-Occurrence of Conditions to the Effective Date ................................................... 72

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ............................... 72
    A.    Modification and Amendments ................................................................................................. 72
    B.    Effect of Confirmation on Modifications .................................................................................. 73
    C.    Revocation or Withdrawal of the Plan ...................................................................................... 73

ARTICLE XI. RETENTION OF JURISDICTION ................................................................................ 73

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................................................. 75
    A.    Immediate Binding Effect ......................................................................................................... 75

B.    Waiver of Stay ...................................................................................................... 75
C.    Additional Documents ........................................................................................... 75
D.    Payment of Statutory Fees .................................................................................... 76
E.    Reservation of Rights ............................................................................................ 76
F.    Successors and Assigns.......................................................................................... 76
G.    Service of Documents ........................................................................................... 76
H.    Term of Injunctions or Stays................................................................................. 78
I.     Entire Agreement .................................................................................................. 78
J.     Nonseverability of Plan Provisions ...................................................................... 78
K.    Votes Solicited in Good Faith ............................................................................... 78
L.     Dissolution of Creditors' Committee .................................................................... 78
M.    Expedited Tax Determination ............................................................................... 79

iii

## INTRODUCTION

Talen Energy Supply, LLC and its Debtor affiliates propose this *Joint Plan of Reorganization*.  Capitalized terms used but not otherwise defined shall have the respective meanings ascribed to such terms in Article I.A.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan, the settlements and transactions contemplated thereby, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*1145 Rights Offering*" means the portion of the Rights Offering to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code, in such amount that the New Common Equity issued pursuant to the 1145 Rights Offering, together with the New Common Equity issued in exchange for the Unsecured Notes, are principally in exchange for a Claim pursuant to section 1145 of the Bankruptcy Code.

2.      "*1145 Subscription Rights*" means the Rights Offering Subscription Rights to be distributed pursuant to the 1145 Rights Offering.

3.      "*6.625% Secured Notes*" means the 6.625% senior secured notes due 2028 issued pursuant to the 6.625% Secured Notes Indenture.

4.      "*6.625% Secured Notes Debt*" shall have the meaning ascribed to "Prepetition 6.625% Senior Secured Notes Debt" in the DIP Order.

5.      "*6.625% Secured Notes Indenture*" means that certain indenture dated July 8, 2019, by and among TES, as issuer, each of the guarantors named therein, and the Secured Notes Trustee, as amended and supplemented from time to time.

6.      "*7.250% Secured Notes*" means the 7.250% senior secured notes due 2027 issued pursuant to the 7.250% Secured Notes Indenture.

7.      "*7.250% Secured Notes Debt*" shall have the meaning ascribed to "Prepetition 7.250% Senior Secured Notes Debt" in the DIP Order.

8.      "*7.250% Secured Notes Indenture*" means that certain indenture dated May 21, 2019, by and among TES, as issuer, each of the guarantors named therein, and the Secured Notes Trustee, as amended and supplemented from time to time.

9.      "*7.625% Secured Notes*" means the 7.625% senior secured notes due 2028 issued pursuant to the 7.625% Secured Notes Indenture.

1

10.     "*7.625% Secured Notes Debt*" shall have the meaning ascribed to "Prepetition 7.625% Senior Secured Notes Debt" in the DIP Order.

11.     "*7.625% Secured Notes Indenture*" means that certain indenture dated May 22, 2020, by and among TES, as issuer, each of the guarantors named therein, and the Secured Notes Trustee, as amended and supplemented from time to time.

12.     "*2022 Unsecured Notes*" means the 9.500% senior unsecured notes due 2022 issued pursuant to the 2022 Unsecured Notes Indenture.

13.     "*2022 Unsecured Notes Indenture*" means that certain indenture dated April 13, 2017, by and among TES, as issuer, each of the guarantors named therein, and the Bank of New York Mellon, as trustee, as amended and supplemented from time to time.

14.     "*2024 Unsecured Notes*" means the 6.500% senior unsecured notes due 2024 issued pursuant to the 2024 Unsecured Notes Indenture.

15.     "*2024 Unsecured Notes Indenture*" means that certain indenture dated August 4, 2017, by and among TES, as issuer, each of the guarantors named therein, and the Bank of New York Mellon, as trustee, as amended and supplemented from time to time.

16.     "*2025 Unsecured Notes*" means the 6.500% senior unsecured notes due 2025 issued pursuant to the Unsecured Notes 2001 Indenture.

17.     "*2026 Unsecured Notes*" means the 10.500% senior unsecured notes due 2026 issued pursuant to the 2026 Unsecured Notes Indenture.

18.     "*2026 Unsecured Notes Indenture*" means that certain indenture dated November 29, 2017, by and among TES, as issuer, each of the guarantors named therein, and the Bank of New York Mellon, as trustee, as amended and supplemented from time to time.

19.     "*2027 Unsecured Notes*" means the 7.000% senior unsecured notes due 2027 issued pursuant to the Unsecured Notes 2001 Indenture.

20.     "*2036 Unsecured Notes*" means the 6.000% senior unsecured notes due 2036 issued pursuant to the Unsecured Notes 2001 Indenture.

21.     "*4(a)(2) Rights Offering*" means the portion of the Rights Offering to be conducted in reliance upon the exemption from registration under the Securities Act provided in section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, in such amount that is equal to the total size of the Rights Offering minus the size of the 1145 Rights Offering.

22.     "*4(a)(2) Subscription Rights*" means the Rights Offering Subscription Rights to be distributed pursuant to the 4(a)(2) Rights Offering.

23.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (ii) Professional Fee Claims; (iii) the Restructuring Expenses to the extent not previously paid for any reason; (iv) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (v) fees payable to the U.S. Trustee pursuant to Section 1930 of the Judicial Code; (vi) postpetition Intercompany Claims; and (vii) the TEC Expense Reimbursement to the extent not previously paid for any reason.  For the avoidance of doubt, the Backstop Periodic Premium and the Backstop Put Premium or Backstop Alternative Transaction Premium, as applicable, in each case payable to the respective Backstop Parties in accordance with the Backstop

Order, are Allowed Administrative Claims; <u>provided</u> that, notwithstanding <u>Article III.B.6</u>, the Backstop Periodic Premium, the Backstop Put Premium, and the Backstop Alternative Transaction Premium shall be satisfied in accordance with the terms of the Backstop Order.

24.     "*Affiliate*" shall, with respect to an Entity, have the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

25.     "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (i) a Claim that is evidenced by a Proof of Claim Filed by the applicable Bar Date established in the Chapter 11 Cases (or for which Claim under the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed); (ii) a Claim that is listed in the Schedules, if any, as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed that asserts a Claim different in amount or priority from that listed in the Schedule; or (iii) a Claim Allowed pursuant to the Plan or a Final Order; <u>provided</u> that with respect to a Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within any applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or, if at any time the Claim shall have been Allowed by a Final Order.  "Allow," "Allowing," and "Allowance," shall have correlative meanings.

26.     "*Amended and Restated RSA Fifth Amendment*" means that certain *Amended and Restated Fifth Amendment and Limited Joinder to Restructuring Support Agreement*, dated as of December 7, 2022, by the Debtors, the Requisite Consenting Parties, and the TEC Consenting Parties.

27.     "*Amendment to Backstop and RSA*" means that certain *First Amendment to the Amended and Restated Commitment Letter and Sixth Amendment to the Restructuring Support Agreement*, dated as of December 14, 2022, by the Debtors and the Backstop Parties party thereto.

28.     "*Asbestos Claims*" means any direct claims against any of the Debtors arising from asbestos exposure, but excluding any indemnification Claims against the Debtors related thereto.

29.     "*Asset Retirement Obligations*" means obligations for the decommissioning and environmental remediation costs associated with the Debtors' energy generation facilities and related properties.

30.     "*Automatic Stay Extension Adversary Proceeding*" means the adversary proceeding filed on July 16, 2022 by TES, TEM, Talen Montana, and Nueces Bay, LLC against PacifiCorp, *et al.*, Adversary Proc. No. 22-03219.

31.     "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code and applicable non-bankruptcy law.

32.     "*Backstop Alternative Transaction Premium*" means the "Alternative Transaction Premium" as defined in the Backstop Commitment Letter and approved by the Backstop Order.

33.     "*Backstop Amount*" means, with respect to the Rights Offering Equity, an aggregate purchase price of $1.55 billion; <u>provided</u> that the Backstop Parties may (but are not required to) agree at any time to backstop any upsized Rights Offering Amount on the same terms as the initial $1.55 billion Backstop Amount, pursuant to the Backstop Commitment Letter, RSA, and Backstop Order.

34.     "*Backstop Commitment*" means a "Commitment" as defined in the Backstop Commitment Letter.

35.     "*Backstop Commitment Letter*" means that certain *Commitment Letter*, dated as of May 31, 2022, by and among TES and the Backstop Parties thereto, as amended and restated by that certain *Amended and Restated*

3

*Commitment Letter*, dated as of August 10, 2022, and as amended by the Amendment to Backstop and RSA, and as the same may be amended, modified, or amended and restated from time to time in accordance with its terms.

36.     "*Backstop Direct Investment*" means Rights Offering Subscription Rights to purchase 30.0% of the Rights Offering Equity, which will be allocated to the Backstop Parties in accordance with the Backstop Commitment Letter.

37.     "*Backstop Direct Investment Shares*" means the Rights Offering Equity purchased by the Backstop Parties in accordance with the Backstop Direct Investment.

38.     "*Backstop Order*" means that certain *Order (I) Authorizing the Debtors to Enter into Backstop Commitment Letter, (II) Approving All Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1133], approving, among other things, the Debtors' entry into and performance under the Backstop Commitment Letter.  For the avoidance of doubt, the Backstop Order shall constitute a Definitive Document.

39.     "*Backstop Parties*" shall have the meaning set forth in the Backstop Commitment Letter.

40.     "*Backstop Periodic Premium*" means the "Periodic Premium" as defined in the Restructuring Term Sheet.

41.     "*Backstop Put Premium*" means the "Put Premium" as defined in the Restructuring Term Sheet.

42.     "*Backstop Shares*" means the Rights Offering Equity purchased by the Backstop Parties pursuant to their respective Backstop Commitments as set forth in and in accordance with the Backstop Commitment Letter.

43.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

44.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas (Houston Division) having jurisdiction over the Chapter 11 Cases, and, to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

45.     "*Bankruptcy Local Rules*" means the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas.

46.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

47.     "*Bar Date*" means, collectively, the General Bar Date, the Governmental Bar Date, the TEC General Bar Date and the TEC Governmental Bar Date.

48.     "*Bar Date Order*" means, collectively, the *Order (I) Establishing Procedures for Filing Proofs of Claim; and (II) Granting Related Relief* [Docket No. 792], and any order of the Bankruptcy Court establishing a Bar Date for Claims against TEC.

49.     "*Burnett Litigation*" shall have the meaning ascribed to it in the Disclosure Statement.

50.     "*Business Day*" means any day, other than a Saturday, Sunday, or "*legal holiday*" (as defined in Bankruptcy Rule 9006(a)), or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

51.    "*CAF Claim Objection*" means the *Objection of the Official Committee of Unsecured Creditors to Proof of Claim by Alter Domus (US) LLC, as Administrative Agent* [Docket No. 1088], pursuant to which the Creditors' Committee objected to Proof of Claim No. 1616 filed by Alter Domus (US) LLC in its capacity as the administrative agent under the Prepetition CAF Agreement.

52.    "*CAF Consenting Parties*" shall have the meaning set forth in the RSA Third Amendment.

53.    "*CAF Consenting Parties Consent Rights*" means any applicable consent, approval, and/or consultation right of the CAF Consenting Parties or Requisite CAF Consenting Parties as set forth in the RSA Third Amendment.

54.    "*CAF Settlement*" means the settlement of all Claims, Interests, and controversies among the Debtors, the Consenting Parties, and the CAF Consenting Parties, the terms of which are set out in the RSA Third Amendment and incorporated by reference herein.

55.    "*CAF Standing Motion*" means the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Certain Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 1085], including the draft complaint attached thereto and the claims asserted in such draft complaint (whether direct or derivative).

56.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

57.    "*Cause of Action*" means any action, claim, interest, cause of action, controversy, proceeding, reimbursement claim, contribution claim, recoupment right, debt, third-party claim, indemnity claim, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any Claim pursuant to section 362 of the Bankruptcy Code; (iv) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any Avoidance Actions.

58.    "*Chapter 11 Cases*" means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

59.    "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

60.    "*Claims and Noticing Agent*" means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors pursuant to the *Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 59].

61.    "*Claims Objection Deadline*" means with respect to all Claims, including the General Unsecured Claims or General Unsecured Convenience Claims, two-hundred seventy (270) days following the Effective Date, or such other and later date that is approved by Order of the Bankruptcy Court.

62.    "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

63.    "*Class*" means a category of Holders of Claims or Interests as set forth in <u>Article III</u> pursuant to section 1122(a) of the Bankruptcy Code.

64.     "*Collateral Trustee*" means Citibank, N.A., in its capacity as administrative agent and/or collateral trustee under the Intercreditor Agreement, the Prepetition Guarantee and Collateral Agreement and any related debt and security documents or other instruments, including the Security Documents (as defined in the Intercreditor Agreement).

65.     "*Colstrip Arbitration*" shall have the meaning set forth in the Disclosure Statement.

66.     "*Committee Budget*" means $500,000 of Committee Expenses to be paid in Cash by the Debtors or Reorganized Debtors in consideration of the value being provided pursuant to the Global Plan Settlement.

67.     "*Committee Budget Deficit*" means any Committee Expenses incurred at any time in excess of the Committee Budget, which will be paid from the GUC Trust Assets (other than the General Unsecured Convenience Claims Fund).

68.     "*Committee Budget Excess*" means any unused amounts remaining in the Committee Budget on the Effective Date, which will be transferred by the Reorganized Debtors to the GUC Trust as GUC Trust Assets promptly upon written request by the GUC Trustee to the Reorganized Debtors.

69.     "*Committee Claims*" means any and all objections, Claims, Causes of Action, Challenges (as defined in the DIP Order), or other challenges to any relief sought by the Debtors in these Chapter 11 Cases that the Creditors' Committee, derivatively on behalf of the Estates, directly or otherwise, raised, could have raised, or could raise in the future relating to approval of the Disclosure Statement, Plan Confirmation, the RSA, the CAF Settlement, the First Lien Non-CAF Settlement, the TEC Global Settlement, or pursuant to a Challenge, including (x) with respect to the enterprise valuation, collateral valuation, releases, exculpations, injunctions, and other transactions contemplated by the Plan and (y) on account of any potential objection, Claim, Cause of Action, or Challenge on the grounds set forth in the (i) Standing Motions; (ii) CAF Claim Objection; (iii) *Objection of the Official Committee of Unsecured Creditors to (I) Approval of the Disclosure Statement for Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors and (II) the Proposed Bidding Procedures* filed on October 17, 2022 [Docket No. 1362], and (iv) *Supplement to Limited Objection of Official Committee of Unsecured Creditors to Emergency Motion of Debtors for (I) Interim Order (A) Authorizing Debtors to Fund Cumulus Data and (B) Granting Related Relief and (II) Final Order (A) Authorizing Entry Into Cumulus Term Sheet, (B) Approving Obligations Thereunder, Including Assumption of Cumulus Agreements, and (C) Granting Related Relief* [Docket No. 1328].

70.     "*Committee Expenses*" means the reasonable and documented fees and costs of the Creditors' Committee's retained professionals incurred during the period commencing on the Confirmation Date through the Effective Date for claims reconciliation (including preparing and filing objections to claims), consultation, or monitoring these Chapter 11 Cases in connection with the Debtors' prosecution of Estate Claims or Causes of Action.

71.     "*Committee Member Expense Estimate*" means the aggregate unpaid Committee Member Expenses through the Effective Date as estimated in accordance with Article II.E.5.

72.     "*Committee Member Expenses*" means the reasonable and documented expenses of the members of the Creditors' Committee (other than members' professional fees), which shall be reserved and paid from the Professional Fee Escrow in accordance with Article II.E.4, subject to the Debtors' and Requisite Consenting Parties' right to review such estimated expenses.

73.     "*Committee PPL Stipulation*" means the *Stipulation Between and Among the Debtors, Non-Debtor Talen Parties, PPL Adversary Proceeding Defendants, Riverstone Parties, and the Committee Governing Participation of the Committee in the Adversary Proceeding* [Adv. Proc. No. 22-09001, Docket No. 55], which set forth the terms of the Creditors' Committee's participation in the PPL Adversary Proceeding.

74.     "*Company*" means, collectively, TEC and its direct and indirect subsidiaries.

75.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

76.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

77.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

78.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.  For the avoidance of doubt, the Confirmation Order shall (i) constitute a Definitive Document, (ii) be subject to the DIP Consent Rights, and (iii) shall be reasonably acceptable to the Creditors' Committee solely to the extent that it adversely affects the consideration or rights negotiated by the Creditors' Committee pursuant to the Global Plan Settlement.

79.     "*Consenting FCM Hedge Agreement*" means an FCM Hedge Agreement with Consenting FCM Hedge Counterparty.

80.     "*Consenting FCM Hedge Counterparties*" means "Consenting FCMs" as defined in the Hedging Motion.

81.     "*Consenting First Lien Hedge Agreement*" means a First Lien Hedge Agreement with Consenting First Lien Hedge Counterparty.

82.     "*Consenting First Lien Hedge Counterparties*" means "Consenting 1L Hedge Counterparties" as defined in the Hedging Motion.

83.     "*Consenting First Lien Hedge Obligations*" means any obligations by a Debtor to a Consenting First Lien Hedge Counterparty arising from or based on any Consenting First Lien Hedge Agreement.

84.     "*Consenting Parties*" shall have the meaning set forth in the RSA.

85.     "*Consenting Parties Consent Rights*" means any applicable consent, approval, and/or consultation right of the Consenting Parties or Requisite Consenting Parties as set forth in the RSA.

86.     "*Consummation*" means the occurrence of the Effective Date.

87.     "*Creditors' Committee*" means the official committee of unsecured creditors of the Debtors, appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on May 23, 2022 [Docket No. 264], the membership of which may be reconstituted from time to time.

88.     "*Cumulus Affiliates*" means, collectively, Cumulus Growth Holdings LLC and its direct and indirect subsidiaries, but excluding any joint ventures.

89.     "*Cumulus Intercompany Claims*" means any Claim against a Debtor held by a Cumulus Affiliate.

90.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) sufficient to cure the Debtors' defaults under any Executory Contract or Unexpired Lease assumed or assumed and assigned by the Debtors pursuant to section 365 of the Bankruptcy Code other than a default that is not required to be cured pursuant to section 365 of the Bankruptcy Code.

91.     "*Cure Notice*" means a notice on parties to Executory Contracts or Unexpired Leases to be assumed, assumed and assigned, or rejected reflecting the Debtors' intention to potentially assume, assume and assign, or reject the contract or lease in connection with the Plan and, where applicable, setting forth the proposed amount of the applicable Cure Claim (if any).

92.     "*D&O Liability Insurance Policies*" means, collectively, all insurance policies (including any "tail policy") issued or providing coverage to any of the Debtors for current or former directors', managers', and officers' liability, and all agreements, documents, or instruments related thereto.

93.     "*Debtor(s)*" has the meaning set forth in the introductory paragraph of the Plan.

94.     "*Debtor in Possession*" means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

95.     "*Definitive Documents*" has the meaning set forth in the RSA.  Each Definitive Document shall be consistent with the RSA and, in each case to the extent applicable, otherwise subject to the Consenting Parties Consent Rights, the CAF Consenting Parties Consent Rights, the First Lien Non-CAF Consenting Parties Consent Rights, and the TEC Consenting Parties Consent Rights.

96.     "*DIP Agent*" means Citibank, N.A., solely in its capacity as administrative agent and collateral trustee under the DIP Credit Agreements, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreements.

97.     "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreements, the DIP Facilities, or the DIP Order, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Order.

98.     "*DIP Consent Rights*" means any applicable consent, approval, and/or consultation right of the DIP Agent or DIP Lenders as set forth in the DIP Documents.

99.     "*DIP Credit Agreements*" means, collectively, the DIP New Money Credit Agreement and the DIP LC Credit Agreement.

100.    "*DIP Documents*" has the meaning set forth in the DIP Order.

101.    "*DIP Facilities*" means (i) a new money term loan facility in the aggregate principal amount of $1 billion, (ii) a new money revolving credit facility with aggregate commitments of $300 million, including a letter of credit sub-facility in an aggregate amount of up to $75 million to issue new letters of credit, and (iii) a letter of credit facility in the aggregate amount of $457,905,219 consisting of all letters of credit outstanding under the Prepetition RCF Agreement as of the Petition Date, each as approved by the DIP Order.

102.    "*DIP LC Credit Agreement*" means that certain *Superpriority Secured Debtor-in-Possession Letter of Credit Facility Agreement*, dated as of May 11, 2022, by and among TES, as borrower, the DIP Agent, and the DIP Lenders, as approved by the DIP Order, and as may be amended, modified, or amended and restated from time to time in accordance with its terms.

103.    "*DIP Lenders*" means the lenders and issuing lenders from time to time party to the DIP Credit Agreements.

104.    "*DIP New Money Credit Agreement*" means that certain *Superpriority Secured Debtor-in-Possession Credit Agreement*, dated as of May 11, 2022, by and among TES, as borrower, the DIP Agent, and the DIP Lenders, as approved by the DIP Order, as amended by that certain *Amendment No. 1 to the DIP Credit Agreement*, dated as of June 17, 2022, and as may be further amended, modified, or amended and restated from time to time in accordance with its terms.

105.    "*DIP Order*" means, as applicable, the *Final Order (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition First Lien*

*Secured Parties, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* [Docket No. 588] or the *Interim Order (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition First Lien Secured Parties, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* [Docket No. 127], authorizing the Debtors to enter into the DIP Credit Agreements and access the DIP Facilities, as may be amended, supplemented or modified from time to time.

106.    "*Disallowed*" means any Claim, or any portion thereof, that (i) has been disallowed by Final Order or settlement; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including any claims bar date order, or otherwise deemed timely Filed under applicable law; or (iii) is not scheduled on the Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.  "Disallow" and "Disallowance" shall have correlative meanings.

107.    "*Disclosure Statement*" means the disclosure statement in support of the Plan, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.  For the avoidance of doubt, the Disclosure Statement shall constitute a Definitive Document.

108.    "*Disclosure Statement Order*" means the *Order (I) Approving (A) Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (B) Solicitation and Voting Procedures, (C) Forms of Ballots and Notices in connection therewith, (D) Notice and Objection Procedures for Assumption or Assumption and Assignment of Executory Contracts and Unexpired Leases and Form and Manner of Cure Notice, and (E) Procedures for Submission of Bids and Form and Manner of Sale Notice; (II) Scheduling Confirmation Hearing; (III) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; and (IV) Granting Related Relief*, the proposed form of which is attached as Exhibit A to the motion to approve the Disclosure Statement.  For the avoidance of doubt, the Disclosure Statement Order shall (i) constitute a Definitive Document and (ii) be subject to the DIP Consent Rights.

109.    "*Disputed*" means, with respect to a Claim or Interest, a Claim that is not yet Allowed or Disallowed.

110.    "*Distribution Agent*" means (i) in the case of distributions to the Holders of Allowed General Unsecured Claims and Allowed General Unsecured Convenience Claims, the GUC Trustee or its agent and (ii) in the case of all other distributions to be made to holders of Allowed Claims other than General Unsecured Claims and General Unsecured Convenience Claims under the Plan, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

111.    "*Distribution Record Date*" means, other than with respect to Holders of public Securities, the record date for purposes of determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which, unless otherwise specified, shall be the earlier of (i) the date that is two (2) Business Days before the Effective Date or such other date as is designated by the Debtors (in consultation with the Creditors' Committee) and (ii) the date such Claim becomes Allowed.  The Distribution Record Date shall not apply to any public Securities the Holders of which shall receive a distribution in accordance with Article VI.E of the Plan and the customary procedures of DTC, as applicable.

112.    "*DTC*" means The Depository Trust Company.

113.    "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors, in consultation with the Consenting Parties, on which (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (iii) the Plan is declared effective.  Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

114.    "*Eligible Holder*" means each Holder of a Claim that is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act, as verified pursuant to the Rights Offering Procedures.

115.    "*Employee Equity Incentive Plan*" means the post-Effective Date employee equity incentive plan, (i) the terms of which shall be filed with the Plan Supplement in the form as agreed at such time between the Debtors and the Requisite Consenting Parties, (ii) shall not be inconsistent with the RSA and the Restructuring Term Sheet, and (iii) shall constitute a Definitive Document.  For the avoidance of doubt, any terms of the Employee Equity Incentive Plan not so agreed shall be determined by the Reorganized Board.

116.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

117.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

118.    "*Excluded Litigation Matters*" means, collectively, (i) Asbestos Claims, (ii) the Kinder Morgan Litigation, (iii) the Montana Hydroelectric Litigation, (iv) the Pension Litigation, (v) the PPL Adversary Proceeding, (vi) the Burnett Litigation, and (vii) the Colstrip Arbitration.

119.    "*Exculpated Parties*" means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) each director, manager, or officer of any Debtor entity; and (iii) the Creditors' Committee and each of its members.

120.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

121.    "*Exit Agent*" means, in its capacity as such, the administrative and collateral agent under the Exit Facilities, including successors thereto.

122.    "*Exit Credit Agreement(s)*" means any credit agreements to be entered into in connection with the Exit Facilities (including any guarantee agreements, pledge and collateral agreements, and other security documents), which shall be materially consistent with the Plan.  For the avoidance of doubt, the Exit Credit Agreement(s) shall constitute Definitive Documents.

123.    "*Exit Facilities*" means any credit facility in accordance with the RSA, including a priority revolving credit facility, in a principal amount of at least $1,000,000,000 with the capacity for the issuance of letters of credit.

124.    "*Exit Facility Documents*" means any such financing documents to be entered into in connection with the Exit Facilities (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents), which shall be materially consistent with the Plan.  For the avoidance of doubt, the Exit Facility Documents shall constitute Definitive Documents.

125.    "*Exit Facility Roll Amount*" means an aggregate amount of up to 25% of the funded principal amount of the Exit Facilities that may be allocated to the First Lien Non-CAF Consenting Parties.

126.    "*Exit Lenders*" means, collectively, in their capacity as such, the lenders under the Exit Facilities.

127.    "*FCM Hedge Agreements*" means "FCM Agreements" as defined in the Hedging Motion.

128.    "*File,*" "*Filed,*" or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, with the Claims and Noticing Agent.

129.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which

10

no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, the local rules of the Bankruptcy Court or applicable non-bankruptcy law, may be filed relating to such order shall not prevent such order from being a Final Order.

130.    *"First Lien Hedge Agreements"* means "1L Hedging Agreements" and / or "Postpetition 1L Hedging Agreements" as applicable, each as defined in the Hedging Motion.

131.    *"First Lien Non-CAF Consenting Parties"* means the "First Lien Consenting Parties" as defined in the RSA Fourth Amendment.

132.    *"First Lien Non-CAF Consenting Parties Consent Rights"* means any applicable consent, approval, and/or consultation right of the First Lien Non-CAF Consenting Parties or Requisite First Lien Non-CAF Consenting Parties as set forth in the RSA Fourth Amendment.

133.    *"First Lien Non-CAF Settlement"* means the settlement of all Claims, Interests, and controversies among the Debtors, the Consenting Parties, and the First Lien Non-CAF Consenting Parties, the terms of which are set out in the RSA Fourth Amendment and incorporated by reference herein.

134.    *"First Lien Non-CAF Subsequent Plan Consenting Parties"* means any Holder of First Lien Non-CAF Claims that either (i) votes to accept the Plan or (ii) does not vote to reject the Plan.

135.    *"General Bar Date"* means August 1, 2022, at 5:00 p.m. (prevailing Central Time), which is the deadline by which all Entities, except Governmental Units, shall File Proofs of Claim against the Debtors (other than TEC) as established by the Notice of Chapter 11 Bankruptcy Cases, Docket No. 237, Exhibit 1 and the Bar Date Order.

136.    *"General Unsecured Claim"* means any Unsecured Claim, other than (i) Administrative Claims; (ii) DIP Claims; (iii) Professional Fee Claims; (iv) Priority Tax Claims; (v) Other Priority Claims; (vi) Section 510(b) Claims; (vii) Intercompany Claims; (viii) Postpetition Other Hedge Claims; (ix) Postpetition Hedge Claims; (x) Unsecured Notes Claims; (xi) General Unsecured Convenience Claims; (xii) Cumulus Intercompany Claims; (xiii) Uri Claims; (xiv) TEC Creditor Claims; or (xv) any other Claim or Interest that is separately classified under the Plan in any other Class other than Class 5A.  For the avoidance of doubt, General Unsecured Claims do not include any Interests of the Debtors or Claims for Indemnification Obligations.

137.    *"General Unsecured Convenience Claim"* means an Unsecured Claim that (x) is Allowed in the amount of $2,000 or less and (y) would otherwise be considered a General Unsecured Claim (without giving effect to clause (xi) of that term); provided, however, that any General Unsecured Claim that was originally Allowed in excess of $2,000 may not be subdivided into multiple General Unsecured Claims of $2,000 or less for purposes of receiving treatment as a General Unsecured Convenience Claim.

138.    *"General Unsecured Convenience Claims Fund"* means Cash in the amount of $200,000 to be transferred by the Debtors or the Reorganized Debtors to the GUC Trust on or prior to the Effective Date, for purposes of making distributions to Holders of Allowed Class 6 General Unsecured Convenience Claims, in accordance with Article III.B.8. For the avoidance of doubt, the General Unsecured Convenience Claims Fund is not included in the GUC Cash Pool.

139.    *"Global Plan Settlement"* means the settlement of all Claims, Interests, and controversies among the Debtors, the Consenting Parties, the CAF Consenting Parties, the First Lien Non-CAF Consenting Parties, the TEC Consenting Parties, and the Creditors' Committee and the consideration given or received, as applicable, by each as set forth in the Plan and as summarized in Article IV.P.

140.     "*Global Settlement Parties*" means, collectively, (i) the Debtors, (ii) the Consenting Parties, (iii) the CAF Consenting Parties, (iv) the First Lien Non-CAF Consenting Parties, (v) the TEC Consenting Parties, (vi) the Creditors' Committee, (vii) the GUC Trustee, and (viii) with respect to each of the foregoing Entities in clauses (i) through (vii), all of their respective Related Parties.

141.     "*Governmental Bar Date*" means November 7, 2022, at 5:00 p.m. (prevailing Central Time), which is the deadline by which all Governmental Units shall File Proofs of Claim against the Debtors (other than TEC), as established by Bankruptcy Local Rule 3003-1 and ratified by the Bar Date Order.

142.     "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

143.     "*GUC Cash Pool*" means $26.05 million in Cash to be transferred by the Debtors or Reorganized Debtors to the GUC Trust on the Effective Date and administered by the GUC Trustee for purposes of (i) satisfying the obligations of the GUC Trust, including the GUC Trust Expenses and any Committee Budget Deficit, if any, and (ii) making distributions to Holders of Allowed Class 5A General Unsecured Claims, in accordance with Article III.B.6. For avoidance of doubt, the General Unsecured Convenience Claims Fund is in addition to the GUC Cash Pool.

144.     "*GUC Settlement Allocation*" means that certain allocation formula for the GUC Trust Net Assets among each Debtor set forth as Exhibit F to the *Supplement to Disclosure Statement for Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors*, filed contemporaneously herewith, and which may be amended, supplemented, or modified from time to time by order of the Bankruptcy Court in connection with Confirmation or otherwise.

145.     "*GUC Trust*" means that certain trust to be established on the Effective Date, in accordance with the GUC Trust Agreement and Article IV.N of the Plan, to, as applicable, administer, process, settle, resolve, liquidate, satisfy, and pay General Unsecured Claims, Uri Other Claims, and General Unsecured Convenience Claims.

146.     "*GUC Trust Agreement*" means that certain trust agreement to be executed on or prior to the Effective Date that, among other things, (i) establishes and governs the GUC Trust and (ii) establishes, *inter alia*, the procedures governing the rights of the GUC Trustee with respect to the objection to, or allowance of, General Unsecured Claims, Uri Claims, and General Unsecured Convenience Claims, which agreement shall be in form and substance reasonably acceptable to the Debtors, the Creditors' Committee, and the Requisite Consenting Parties.

147.     "*GUC Trust Assets*" means: (i) the GUC Cash Pool; (ii) the GUC PPL Recovery Pool; (iii) the Committee Budget Excess; and (iv) the General Unsecured Convenience Claims Fund.

148.     "*GUC Trust Beneficiaries*" means Holders of: (i) Allowed Class 5A General Unsecured Claims; and (ii) Allowed Class 6 General Unsecured Convenience Claims, solely to the extent of the General Unsecured Convenience Claims Fund.

149.     "*GUC Trust Net Assets*" means the GUC Trust Assets less: (i) the GUC Trust Expenses; and (ii) the General Unsecured Convenience Claims Fund.

150.     "*GUC Trustee*" means the individual appointed by the Creditors' Committee, and reasonably acceptable to the Debtors and Requisite Consenting Parties, in accordance with Article IV.N of the Plan and any successor thereto in accordance with the GUC Trust Agreement.

151.     "*GUC Trust Expenses*" means all reasonable and documented fees, expenses, and costs incurred by the GUC Trustee in connection with carrying out the obligations of the GUC Trust and otherwise in accordance with the GUC Trust Agreement, including costs related to the maintenance or distribution of the GUC Trust Assets, bonding, insurance, storage, as well as indemnity reserves, the GUC Trustee's fees and expenses (acting in the capacity as the GUC Trustee, or as a professional representing the GUC Trust), attorneys' fees, the fees of other professionals and other Persons retained by the GUC Trustee and the GUC Trust, and any taxes imposed on the GUC Trust or in respect of the GUC Trust Assets.

152. "*GUC Trust Interests*" means the non-certificated and non-transferable beneficial interests granted to each GUC Trust Beneficiary, which shall entitle such holder to: (i) in the case of Allowed Class 6 General Unsecured Convenience Claims, to a Pro Rata share of the General Unsecured Convenience Claims Fund; and (ii) in the case of Allowed Class 5A General Unsecured Claims, to a share of GUC Trust Net Assets pursuant to the GUC Settlement Allocation.

153. "*GUC PPL Recovery Pool*" means 10% of the net proceeds (if any) recovered by the Debtors or the Reorganized Debtors, as applicable, pursuant to the PPL Adversary Proceeding, subject to a cap of $11 million.

154. "*Hedging Motion*" means that certain *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) Continue Performing Under Prepetition Hedging Agreements, (B) Enter Into and Perform Under New Postpetition Hedging Agreements, and (C) Grant Related Liens and Superpriority Claims and Authorize Posting of Postpetition Margin Collateral and Exchange Collateral, (II) Modifying Automatic Stay, and (III) Granting Related Relief* [Docket No. 29].

155. "*Hedging Order*" means that certain *Final Order (I) Authorizing Debtors to (A) Continue Performing Under Prepetition Hedging Agreements, (B) Enter Into and Perform Under New Postpetition Hedging Agreements, and (C) Grant Related Liens and Superpriority Claims and Authorize Posting of Margin Collateral and Postpetition Exchange Collateral, (II) Modifying Automatic Stay, and (III) Granting Related Relief* [Docket No. 558].

156. "*Holder*" means an Entity holding (including as successor or assignee pursuant to a valid succession or assignment) a Claim or an Interest, as applicable, solely in its capacity as such.

157. "*Impaired*" means, when used in reference to a Claim or Interest (or Class thereof), a Claim or Interest (or Class thereof) that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

158. "*Indemnification Obligations*" means each of the Debtors' and New Parent's indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, executive employee arrangements, or employment or other contracts, or otherwise, for the managers, directors, and officers that have been employed by, or served on the board of directors or board of managers of, any of the Debtors and New Parent, at any time from the Petition Date through the date immediately prior to the Effective Date, and the employees, attorneys, accountants, investment bankers, and other professionals and agents that have been employed by any of the Debtors and New Parent at any time from the Petition Date through the date immediately prior to the Effective Date.

159. "*Indenture Trustee Charging Lien*" means any Lien or priority of payment to which (a) the Unsecured Notes Trustee is entitled under the Unsecured Indentures against distributions to be made to Holders of Unsecured Notes Claims or (b) the Secured Notes Trustee is entitled under the Secured Notes Indentures against distributions to be made to Holders of Secured Notes Claims, as applicable, for payment of any Indenture Trustee Fees.

160. "*Indenture Trustee Fees*" means all reasonable and documented compensation, fees, expenses, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by, as applicable, (i) The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., each as trustee, under the Unsecured Notes Indentures or the Series A PEDFA Documents, as applicable, or (ii) Wilmington Savings Fund Society, FSB, as trustee under the Secured Notes Indentures, in connection with the Chapter 11 Cases, whether before or after the Petition Date or before or after the Effective Date.

161. "*Ineligible Holder*" means each Holder of a Claim who duly certifies in accordance with the Rights Offering Procedures that it is not an "Accredited Investor" as defined in Rule 501(a) of the Securities Act.

162. "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor or a non-Debtor Affiliate, other than Cumulus Intercompany Claims.

163. "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor or a non-Debtor Affiliate, except for TES Existing Equity Interests and TEC Existing Equity Interests.

164. "*Intercreditor Agreement*" means that certain *Collateral Trust and Intercreditor Agreement* dated as of June 1, 2015 and as amended, restated, amended and restated, supplemented or otherwise modified from time to time, by and among certain of the Debtors, as borrower and guarantors, the Collateral Trustee, and the other Persons from time to time party thereto.

165. "*Interests*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security.

166. "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 631].

167. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

168. "*Kinder Morgan Litigation*" shall have the meaning ascribed to it in the Disclosure Statement.

169. "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

170. "*LoBiondo Employment Agreement*" shall have the meaning ascribed to it in the Disclosure Statement.

171. "*Montana Hydroelectric Litigation*" shall have the meaning ascribed to it in the Disclosure Statement.

172. "*MUFG*" means MUFG Bank, LTD.

173. "*MUFG Cash Management Parties*" shall mean MUFG Bank, Ltd., MUFG Union Bank, N.A., and any of their affiliates, each in their capacities as a depository institution or provider of cash management or treasury services, including, without limitation, any services provided in connection with that certain *Commercial Card Agreement*, dated February 3, 2016, by and between TES and MUFG Union Bank, N.A., as amended.

174. "*New Common Equity*" means the new common equity of New Parent to be authorized, issued, and outstanding on and after the Effective Date.

175. "*New Debt*" means the indebtedness to be issued by the Reorganized Debtors, including under the Exit Facilities.

176. "*New Parent*" means Reorganized TEC, the ultimate direct and indirect parent of the Reorganized Debtors.

177. "*New Parent Organizational Documents*" means the certificate of incorporation and stockholders agreement, certificate of formation and limited liability company agreement or other similar organizational or formation documents of the New Parent. For the avoidance of doubt, the New Parent Organizational Documents shall be (i) Definitive Documents and (ii) solely to the extent necessary to ensure that such New Parent Organizational Documents are consistent with the TEC Global Settlement, TEC Definitive Documents.

178. "*New Warrants*" means warrants to purchase up to 5.00% of the New Common Equity, after giving effect to the Rights Offering and the Backstop Put Premium, with (i) a tenor of five years, (ii) a strike price set at the Effective Date based on a $3.5 billion equity value, assuming pro forma net debt as of the Effective Date as set forth in Schedule II to the Backstop Commitment Letter plus any Permitted Indebtedness Upsize (as defined in the

Restructuring Term Sheet), and (iii) Black-Scholes protection (determined using the standard Black-Scholes pricing model, assuming 27.5% volatility for the remaining tenor), the terms of which will be set forth in the New Warrants Agreement.

179.    "*New Warrants Agreement*" means a warrant agreement to be entered into by New Parent that shall govern the terms of the New Warrants.  For the avoidance of doubt, the New Warrants Agreement shall be a TEC Definitive Document.

180.    "*New Warrants Equity*" means the New Common Equity issuable upon the exercise of the New Warrants.

181.    "*Non-Excluded Litigation Matters*" means litigation pending on the Petition Date in which any Debtor is named as a defendant or otherwise may be liable, other than any Excluded Litigation Matter.

182.    "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim; (ii) a Priority Tax Claim; (iii) a DIP Claim; (iv) a Professional Fee Claim; (v) a Postpetition Hedge Claim; and (vi) a Postpetition Other Hedge Claim.

183.    "*Other Secured Claim*" means any Secured Claim against any Debtor, including any Secured Tax Claim or Prepetition First Lien Hedge Claim, other than a (i) Prepetition First Lien Secured Claim and (ii) DIP Claim.

184.    "*Pachulski*" means Pachulski Stang Ziehl & Jones LLP.

185.    "*PEDFA*" means the Pennsylvania Economic Development Financing Authority.

186.    "*Pension Litigation*" shall have the meaning ascribed to it in the Disclosure Statement.

187.    "*Pension Plans*" means, collectively, the TES Pension Plan and the Talen Montana Pension Plan.

188.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

189.    "*Petition Date*" means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

190.    "*Plan*" means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as may be amended, supplemented or modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the RSA.  For the avoidance of doubt, the Plan shall (i) constitute a Definitive Document, (ii) be subject to the DIP Consent Rights, and (iii) be reasonably acceptable to the Creditors' Committee solely to the extent that it adversely affects the consideration or rights negotiated by the Creditors' Committee pursuant to the Global Plan Settlement.

191.    "*Plan Objection Deadline*" means December 6, 2022 at 5:00p.m. (Prevailing Central Time), which is the deadline to object to Confirmation of the Plan.

192.    "*Plan Settlements*" means, collectively, the CAF Settlement, the First Lien Non-CAF Settlement, the TEC Global Settlement, and the Global Plan Settlement.

193.    "*Plan Supplement*" means a supplement or supplements to the Plan containing certain documents and forms of documents, agreements, schedules, and exhibits relevant to the implementation of the Plan, which shall include, but in each case to the extent applicable: (a) the New Parent Organizational Documents; (b) to the extent known, terms of the Employee Equity Incentive Plan; (c) to the extent available, any executed documents or other information in connection with the Exit Facilities; (d) the Rejection Schedule; (e) the Schedule of Retained Causes of Action; (f) the Rights Offering Procedures; (g) the TEC Definitive Documents; (h) the Retail PPA Incentive Equity Calculation Exhibit; (i) to the extent known, information required to be disclosed in accordance with section

1129(a)(5) of the Bankruptcy Code; (j) the Restructuring Transactions Exhibit; (k) the Registration Rights Agreement; (l) the identity of the GUC Trustee; (m) the form of the GUC Trust Agreement; (n) the GUC Settlement Allocation; and (o) any other documents necessary to effectuate the Plan and Restructuring Transactions, in each case consistent with the Plan and RSA; <u>provided</u>, <u>however</u>, that the Debtors shall have the right to amend documents contained in, and exhibits thereto, the Plan Supplement in accordance with the terms of this Plan and the RSA; <u>provided</u>, <u>further</u>, that the Plan Supplement shall be reasonably acceptable to the Creditors' Committee solely to the extent that it adversely affects the consideration or rights negotiated by the Creditors' Committee pursuant to the Global Plan Settlement.

194.    "*Postpetition Hedge Claim*" means any postpetition Claim against any Debtor arising pursuant to any Consenting FCM Hedge Agreement or Consenting First Lien Hedge Agreement.

195.    "*Postpetition Other Hedge Claim*" means any postpetition Claim against any Debtor arising pursuant to any Hedging Agreement (as defined in the Hedging Motion), other than any postpetition Claims arising pursuant to any Consenting FCM Hedge Agreement or Consenting First Lien Hedge Agreement.

196.    "*PPL Adversary Proceeding*" means the adversary proceeding originally filed on May 10, 2022 by Talen Montana against PPL Corp., *et al*, and later consolidated with other proceedings under Adversary Proc. No. 22-09001.

197.    "*Preference Action*" means an Avoidance Action pursuant to section 547 of the Bankruptcy Code.

198.    "*Prepetition Agents*" means, collectively, the Collateral Trustee, the Prepetition CAF Agent, the Prepetition RCF Agent, and the Prepetition TLB Agent.

199.    "*Prepetition CAF*" shall have the meaning ascribed to "Prepetition Commodity Accordion Facility" in the DIP Order.

200.    "*Prepetition CAF Agent*" means Alter Domus (US) LLC, in its capacity as administrative agent under the Prepetition CAF Agreement and the other Prepetition CAF Documents, including any successor thereto.

201.    "*Prepetition CAF Agreement*" means that certain *Credit Agreement*, dated as of December 14, 2021 and as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, by and among Susquehanna Nuclear and TEM, as borrowers, TES, as parent, the Subsidiary Guarantors, as guarantors, the Prepetition CAF Agent, and the lenders party thereto from time to time.

202.    "*Prepetition CAF Claims*" means all Claims against any Debtor arising from or based upon the Prepetition CAF Agreement or any of the other Prepetition CAF Documents, including accrued but unpaid interest, costs, fees, premiums, and indemnities.

203.    "*Prepetition CAF Documents*" means the Prepetition CAF Agreement and all related agreements and documents executed by any of the Debtors in connection with the Prepetition CAF Agreement.

204.    "*Prepetition Debt Documents*" means, collectively, the Intercreditor Agreement, the Security Documents (as defined in the Intercreditor Agreement), the Prepetition Guarantee and Collateral Agreement, the Prepetition CAF Documents, the Prepetition RCF Documents, the Prepetition TLB Documents, the Secured Notes Documents, the Unsecured Notes Documents, and the Series B & C PEDFA Documents.

205.    "*Prepetition First Lien Hedge Claim*" means a prepetition Claim against any Debtor arising pursuant to a First Lien Hedge Agreement, other than a claim arising pursuant to a Consenting First Lien Hedge Agreement.

206.    "*Prepetition First Lien Non-CAF Claim Amount*" means an amount equal to $2,048.00 million, comprising (i) $470 million of 6.625% Secured Notes Debt, (ii) $750 million of 7.250% Secured Notes Debt, (iii) $400 million of 7.625% Secured Notes Debt, and (iv) $428 million of Prepetition TLB Debt.

207.    "*Prepetition First Lien Non-CAF Claims*" means the Prepetition First Lien Secured Claims, other than the Prepetition CAF Claims.

208.    "*Prepetition First Lien Secured Claims*" means, in each case to the extent Allowed as Secured Claims, Prepetition CAF Claims, Prepetition TLB Claims, and Secured Notes Claims.

209.    "*Prepetition Guarantee and Collateral Agreement*" means that certain *Guarantee and Collateral Agreement*, dated as of June 1, 2015 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time), by and among TES, certain subsidiaries party thereto, and the Collateral Trustee.

210.    "*Prepetition RCF Agent*" means Citibank, N.A., in its capacity as administrative agent and collateral trustee under the Prepetition RCF Agreement and the other Prepetition RCF Documents, including any successor thereto.

211.    "*Prepetition RCF Agreement*" means that certain *Credit Agreement*, dated as of June 1, 2015 and as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, by and among TES, as borrower, the Subsidiary Guarantors, as guarantors, the Prepetition RCF Agent, and the lenders party thereto from time to time.

212.    "*Prepetition RCF Documents*" means the Prepetition RCF Agreement and all related agreements and documents executed by any of the Debtors in connection with the Prepetition RCF Agreement.

213.    "*Prepetition RCF Lenders*" means the lenders and issuing lenders under the Prepetition RCF Agreement.

214.    "*Prepetition TLB Agent*" means Wilmington Trust, National Association, in its capacity as administrative agent under the Prepetition TLB Agreement and the other Prepetition TLB Documents, including any successor thereto.

215.    "*Prepetition TLB Agreement*" means that certain *Term Loan Credit Agreement*, dated as of July 8, 2019 and as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, by and among TES, as borrower, the Subsidiary Guarantors, as guarantors, the Prepetition TLB Agent, and the lenders party thereto from time to time.

216.    "*Prepetition TLB Claims*" means all Claims against any Debtor arising from or based upon the Prepetition TLB Credit Agreement or any of the other Prepetition TLB Documents, including accrued but unpaid interest, costs, fees, and indemnities.

217.    "*Prepetition TLB Debt*" shall have the meaning ascribed to "Prepetition Term Loan Debt" in the DIP Order.

218.    "*Prepetition TLB Documents*" means the Prepetition TLB Agreement and all related agreements and documents executed by any of the Debtors in connection with the Prepetition TLB Agreement.

219.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

220.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

221.    "*Professional*" means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered on or after the Petition Date and before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the

Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

222. "*Professional Fee Claims*" means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date and before or on the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court other than Restructuring Expenses.

223. "*Professional Fee Claims Estimate*" means the aggregate unpaid Professional Fee Claims through the Effective Date as estimated in accordance with Article II.E.5.

224. "*Professional Fee Escrow*" means an escrow account established and funded pursuant to Article II.E.4.

225. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

226. "*Registration Rights Agreement*" means the registration rights agreement to be entered into by New Parent and certain of the Backstop Parties pursuant to Article IV.F. For the avoidance of doubt, the Registration Rights Agreement shall constitute a Definitive Document.

227. "*Registration Rights Party*" means each Backstop Party that is reasonably expected to be the beneficial owner (within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934) of three percent (3%) or more of the outstanding New Common Equity as of the Effective Date.

228. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

229. "*Rejection Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended by the Debtors in accordance with the RSA from time to time up to the Effective Date. For the avoidance of doubt, the Rejection Schedule shall constitute a Definitive Document.

230. "*Related Parties*" means, with respect to an Entity, its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; provided, that the following parties and Entities shall not be deemed or included as Related Parties hereunder: (a) PPL Corp.; (b) CEP Reserves, Inc.; (c) PPL Electric Utilities Corp.; (d) PPL Energy Funding Corp.; (e) PPL Capital Funding, Inc.; and (f) any other affiliates of PPL Corp. added as defendants to the PPL Adversary Proceeding.

231. "*Released Party*" means each of the following in their capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) each of the Debtors' Estates; (iv) TEC and the TEC Owners; (v) the Consenting Parties; (vi) the Backstop Parties; (vii) the DIP Agent and DIP Lenders; (viii) the Consenting FCM Hedge Counterparties; (ix) Consenting First Lien Hedge Counterparties; (x) the CAF Consenting Parties; (xi) the First Lien Non-CAF Consenting Parties and the First Lien Non-CAF Subsequent Plan Consenting Parties; (xii) the Prepetition Agents; (xiii) the Prepetition RCF Lenders; (xiv) the Creditors' Committee and its members; (xv) the MUFG Cash Management Parties; and (xvi) with respect to each of the foregoing Entities in clauses (i) through (xv), such Entity's Related Parties to the maximum extent permitted by law; provided that, notwithstanding the foregoing, if a Consenting FCM Hedge Counterparty or a Consenting First Lien Hedge Counterparty does not agree to have its Consenting FCM Hedge Agreement or Consenting First Lien Hedge Agreement assumed by the Reorganized Debtors, or otherwise terminates such agreement prior to the Effective Date, then neither such counterparty nor any of its respective Related Parties in

their capacity as such shall be a Released Party.  Notwithstanding the foregoing, any Person that opts out of the releases set forth in Article VIII.D of the Plan and/or objects to the Plan shall not be deemed a Released Party hereunder.

232.     "*Releasing Party*" means collectively, (a) the Holders of all Claims or Interests that vote to accept the Plan, (b) the Holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the Holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the Holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties (even if such Released Party purports to opt out of the releases set forth herein).

233.     "*Reorganized Board*" means the initial board of managers or directors, as applicable, of New Parent.

234.     "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including New Parent.

235.     "*Reorganized Debtors Organizational Documents*" means the certificates of incorporation, certificates of formation, bylaws, limited liability company agreements, operating agreements, or other similar organizational or formation documents, as applicable, of each Reorganized Debtor, including the New Parent Organizational Documents.

236.     "*Reorganized TEC*" means TEC on or after the Effective Date.

237.     "*Required DIP Lenders*" means "Required Lenders" as defined in the DIP Credit Agreements.

238.     "*Requisite Backstop Commitment Parties*" shall have the meaning set forth in the RSA.

239.     "*Requisite CAF Consenting Parties*" shall have the meaning set forth in the RSA Third Amendment.

240.     "*Requisite Consenting Parties*" shall have the meaning set forth in the RSA.

241.     "*Requisite First Lien Non-CAF Consenting Parties*" shall have the meaning ascribed to "Requisite Non-CAF First Lien Consenting Parties" in the RSA Fourth Amendment.

242.     "*Requisite Initial Backstop Parties*" shall have the meaning set forth in the RSA.

243.     "*Restructuring*" means the restructuring of the existing debt and other obligations of the Debtors and certain of their non-Debtor Affiliates on the terms and conditions set forth in the Plan and Plan Supplement and subject to the terms of the RSA.

244.     "*Restructuring Expenses*" means the reasonable and documented fees and expenses incurred by and/or payable to (i) the Unsecured Creditor Group Advisors, the advisors to the CAF Consenting Parties, and the advisors to the First Lien Non-CAF Consenting Parties, in each case pursuant to the RSA, the Backstop Commitment Letter, or the Backstop Order, as applicable, and/or (ii) all parties whose fees and expenses are entitled to be paid under the DIP Order.

245.     "*Restructuring Term Sheet*" means the amended term sheet attached as Exhibit A to the RSA First Amendment.

246.     "*Restructuring Transactions*" shall have the meaning set forth in Article IV.U hereof, including the transactions described in the Restructuring Transactions Exhibit.

247.     "*Restructuring Transactions Exhibit*" means the summary of transaction steps to complete the restructuring contemplated by the Plan, to be included in the Plan Supplement.

248.   "*Retail PPA Equity Calculation*" means the methodology for calculating the Retail PPA Incentive Equity (as set forth in Annex 2 to the TEC Global Settlement Term Sheet).

249.   "*Retail PPA Incentive Equity*" means (i) prior to entry into the Global Plan Settlement, the New Common Equity (or cash payment) provided to the Riverstone Settlement Recipients, as set forth in Annex 2 to the TEC Global Settlement Term Sheet, and (ii) on or after entry into the Global Plan Settlement, the New Common Equity (or cash payment) provided to the Riverstone Settlement Recipients that is calculated in accordance with the Retail PPA Incentive Equity Calculation Exhibit.

250.   "*Retail PPA Incentive Equity Calculation Exhibit*" means the Retail PPA Incentive Equity Calculation Exhibit, which will be filed as part of the Plan Supplement and which is a TEC Definitive Document.

251.   "*Rights Offering*" means, collectively, the 1145 Rights Offering and the 4(a)(2) Rights Offering, in each case pursuant to the Rights Offering Procedures.

252.   "*Rights Offering Amount*" means, with respect to the Rights Offering Equity, an aggregate purchase price of $1.55 billion; provided that the Rights Offering Amount may be automatically increased to an aggregate purchase price of up to a maximum of $1.9 billion or automatically decreased to a minimum of $600 million, in accordance with the RSA and the Rights Offering Procedures.

253.   "*Rights Offering Equity*" means the New Common Equity purchased via the exercise of Rights Offering Subscription Rights pursuant to the Rights Offering Procedures.

254.   "*Rights Offering Procedures*" means the procedures in form and substance reasonably acceptable to the Requisite Backstop Commitment Parties for the implementation of the Rights Offering, to be approved by the Bankruptcy Court.  For the avoidance of doubt, the Rights Offering Procedures shall constitute a Definitive Document.

255.   "*Rights Offering Subscription Rights*" shall have the meaning ascribed to "Subscription Rights" in the Backstop Commitment Letter and unless otherwise specified, will encompass both the 1145 Subscription Rights and the 4(a)(2) Subscription Rights.

256.   "*Riverstone*" means, collectively, Riverstone V Coin Holdings, L.P., Raven Power Holdings LLC, C/R Energy Jade, LLC, and Sapphire Power Holdings LLC.

257.   "*Riverstone Settlement Contribution*" means $1 million in Cash, to be paid by Riverstone to the Debtors in connection with the Global Plan Settlement.

258.   "*Riverstone Settlement Recipients*" means, collectively, Raven Power Holdings LLC, C/R Energy Jade, LLC, Sapphire Power Holdings LLC, Talen MidCo LLC, Riverstone V Coin Holdings. L.P., and any of their respective designees.

259.   "*Riverstone Standing Motion*" means the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Certain Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 1040], including the draft complaint attached thereto and the claims asserted in such draft complaint (whether direct or derivative), pursuant to which the Creditors' Committee sought standing to assert and litigate certain causes of action on behalf of the Debtors' Estates related to a 2017 cash dividend payment and certain expense reimbursements paid to Riverstone.

260.   "*RSA*" means that certain *Restructuring Support Agreement*, dated as of May 9, 2022, by and among the Debtors and the Consenting Parties, any exhibits thereto and as amended by the RSA First Amendment, the RSA Second Amendment, the RSA Third Amendment, the RSA Fourth Amendment, the RSA Fifth Amendment, the Amended and Restated RSA Fifth Amendment, and the Amendment to the Backstop and RSA, and as the same may be further amended, modified, or amended and restated from time to time in accordance with its terms.

261. "*RSA Fifth Amendment*" means that certain *Fifth Amendment and Limited Joinder to Restructuring Support Agreement*, dated as of August 29, 2022, as may be amended, restated, and amended and restated, or otherwise modified from time to time, by and among the Debtors, the Consenting Parties, TEC, and Riverstone and any exhibits thereto.

262. "*RSA First Amendment*" means that certain *First Amendment to Restructuring Support Agreement*, dated as of August 4, 2022 and any exhibits thereto.

263. "*RSA Fourth Amendment*" means that certain *Fourth Amendment and Limited Joinder to Restructuring Support Agreement*, dated as of August 27, 2022, by and among the Debtors, the Consenting Parties, and the First Lien Non-CAF Consenting Parties and any exhibits thereto.

264. "*RSA Second Amendment*" means that certain *Second Amendment to Restructuring Support Agreement*, dated as of August 10, 2022 and any exhibits thereto.

265. "*RSA Third Amendment*" means that certain *Third Amendment and Limited Joinder to Restructuring Support Agreement*, dated as of August 27, 2022, by and among the Debtors, the Consenting Parties, and the CAF Consenting Parties and any exhibits thereto.

266. "*Schedule of Retained Causes of Action*" means a schedule of Causes of Action to be retained by the Reorganized Debtors as set forth in the Plan Supplement, which for the avoidance of doubt shall not include any Preference Actions or Claims or Causes of Action against Riverstone, TEC, the TEC Owners, the Consenting Parties, or the Backstop Parties, or any of their respective Related Parties. For the avoidance of doubt, the Schedule of Retained Causes of Action shall constitute a Definitive Document.

267. "*Schedules*" means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs Filed by the Debtors on June 25, 2022 [Docket Nos. 635-778] pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

268. "*Section 510(b) Claims*" means any Claim against any Debtor that is subject to subordination in accordance with sections 510(b) of the Bankruptcy Code or otherwise.

269. "*Secured*" means, when referring to a Claim, a Claim secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, in each case, as determined pursuant to section 506(a) of the Bankruptcy Code.

270. "*Secured Notes*" means, collectively, the 6.625% Secured Notes, the 7.250% Secured Notes, and the 7.625% Secured Notes.

271. "*Secured Notes Claims*" means all Claims against any Debtor arising from or based upon the Secured Notes or any of the other Secured Notes Documents, including accrued but unpaid interest, costs, fees, premiums, and indemnities.

272. "*Secured Notes Documents*" means, collectively, the Secured Notes Indentures, the Secured Notes, and all related agreements and documents executed by any of the Debtors in connection with the Secured Notes.

273. "*Secured Notes Indentures*" means, collectively, the 6.625% Secured Notes Indenture, the 7.250% Secured Notes Indenture, and the 7.625% Secured Notes Indenture.

274. "*Secured Notes Trustee*" means Wilmington Savings Fund Society, FSB, as trustee under each of the Secured Notes Indentures.

275. "*Secured Tax Claim*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

276. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

277. "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

278. "*Series A PEDFA Bonds*" means the Series 2009A Exempt Facilities Revenue Refunding Bonds issued pursuant to the Series A PEDFA Documents.

279. "*Series A PEDFA Documents*" means, collectively, (i) that certain *Series 2009A Trust Indenture* dated as of April 1, 2009, by and among PEDFA, as issuer, and the Bank of New York Mellon, as trustee, and (ii) that certain *Series 2009A Exempt Facilitates Loan Agreement* dated as of April 1, 2009, by and among PEDFA and TES (f/k/a PPL Energy Supply, LLC), each as amended, supplemented or otherwise modified from time to time.

280. "*Series B & C PEDFA Bonds*" means, collectively, the Series B PEDFA Bonds and the Series C PEDFA Bonds.

281. "*Series B & C PEDFA Documents*" means, collectively, the Series B PEDFA Documents and the Series C PEDFA Documents.

282. "*Series B PEDFA Bonds*" means the Series 2009B Exempt Facilities Revenue Refunding Bonds issued pursuant to the Series B PEDFA Documents.

283. "*Series B PEDFA Documents*" means, collectively, (i) that certain *Series 2009B Trust Indenture* dated as of April 1, 2009, by and among PEDFA, as issuer, and the Bank of New York Mellon, as trustee, (ii) that certain *Series 2009B Exempt Facilitates Loan Agreement* dated as of April 1, 2009, by and among PEDFA and TES (f/k/a PPL Energy Supply, LLC), and (iii) that certain *Letter of Credit Reimbursement Agreement (Series 2009B)* dated as of February 3, 2021, by and between TES and MUFG, each as amended, supplemented or otherwise modified from time to time.

284. "*Series C PEDFA Bonds*" means the Series 2009C Exempt Facilities Revenue Refunding Bonds issued pursuant to the Series C PEDFA Documents.

285. "*Series C PEDFA Documents*" means, collectively, (i) that certain *Series 2009C Trust Indenture* dated as of April 1, 2009, by and among PEDFA, as issuer, and the Bank of New York Mellon, as trustee, (ii) that certain *Series 2009C Exempt Facilitates Loan Agreement* dated as of April 1, 2009, by and among PEDFA and TES (f/k/a PPL Energy Supply, LLC), and (iii) that certain *Letter of Credit Reimbursement Agreement (Series 2009C)* dated as of February 3, 2021, by and between TES and MUFG, each as amended, supplemented, or otherwise modified from time to time.

286. "*Settled CAF Claim Amount*" means an amount equal to (i) the sum of (a) the Settled CAF Prepetition Claim Amount, (b) postpetition interest pursuant to section 506(b) of the Bankruptcy Code on the full amount of the Settled CAF Prepetition Claim Amount at a rate based on the 1-month LIBOR rate as set forth in the Prepetition CAF Agreement, plus fixed 8.00% interest, plus 2.00% (constituting default interest), from the Petition Date through the Effective Date, and (c) postpetition interest on a monthly basis on any accrued and unpaid amounts set forth in (b) above at a rate based on the 1-month LIBOR rate as set forth in the Prepetition CAF Agreement, plus fixed 8.00% interest, plus 2.00% (constituting default interest) less (ii) $2 million, pursuant to the Global Plan Settlement.

287. "*Settled CAF Prepetition Claim Amount*" means $986.76 million, which is the sum of (i) $848 million principal, (ii) $133.33 million on account of any and all premiums asserted or assertable under the Prepetition CAF as of the Petition Date (including, for the avoidance of doubt, any amounts attributable to the MOIC Amount

and/or the Make Whole Amount, each as defined in the Prepetition CAF Agreement), and (iii) accrued and unpaid prepetition interest in the amount of $5,430,000.

288.    "*Settled First Lien Non-CAF Claim Amount*" means an amount equal to the sum of (i) the Prepetition First Lien Non-CAF Claim Amount, plus (ii) accrued and unpaid prepetition interest and postpetition interest at the applicable contract rate (each as increased due to the Debtors' default), plus (iii) the lesser of (x) $20 million in the aggregate and (y) an amount equal to forty percent (40%) of the "Applicable Premium" or redemption price premium in excess of principal amounts, as applicable, that would be due and owing under the respective Secured Notes Indentures, as if such notes were optionally redeemed pursuant to section 3.07 of such indenture on the Effective Date.

289.    "*SIR*" means any self-insured retention pursuant to a Uri Insurance Policy.

290.    "*Standing Motions*" means, collectively, the CAF Standing Motion and the Riverstone Standing Motion.

291.    "*Subsidiary Guarantors*" means all subsidiaries of TES in which TES has a majority common equity ownership *other than* Talen II Growth Holdings LLC, Talen Technology Ventures LLC, LMBE-MC Holdco I LLC, LMBE-MC Holdco II LLC, MC Project Company LLC, LMBE Project Company LLC, and Talen Receivables Funding LLC.

292.    "*Susquehanna Nuclear*" means Susquehanna Nuclear, LLC.

293.    "*Talen Montana*" means Talen Montana, LLC.

294.    "*Talen Montana Pension Plan*" means the Talen Montana Retirement Plan, a qualified defined benefit pension plan sponsored by Talen Montana.

295.    "*TEC*" means Talen Energy Corporation.

296.    "*TEC Creditor Claim*" means any Claim held against TEC, but which shall not, for the avoidance of doubt, include any General Unsecured Claims, General Unsecured Convenience Claims, or any Uri Claims.

297.    "*TEC Consenting Parties*" means, collectively, TEC and Riverstone.

298.    "*TEC Consenting Parties Consent Rights*" means any applicable consent, approval, and/or consultation right of the TEC Consenting Parties as set forth in the RSA Fifth Amendment.

299.    "*TEC Definitive Documents*" shall have the meaning ascribed to "Definitive TEC Settlement Documentation" in the RSA Fifth Amendment and are subject to the terms thereof.  The TEC Definitive Documents will be included in the Plan Supplement.

300.    "*TEC Existing Equity Interests*" means Interests in TEC.

301.    "*TEC Expense Reimbursement*" means: (i) up to $15 million in reasonable and documented fees and transaction expenses incurred by the professional advisors to TEC, the Cumulus Affiliates, and/or Riverstone, which advisors are PJT Partners LP as investment banker and Vinson & Elkins LLP as legal counsel, and which shall be paid by TES prior to the filing of any TEC chapter 11 case in accordance with the TEC Global Settlement Term Sheet; (ii) the amount of any reasonable and documented professional fees and expenses incurred by Vinson & Elkins LLP in the preparation for filing any TEC chapter 11 case, which shall be paid by TES prior to the filing of any such TEC chapter 11 case, provided that Vinson & Elkins LLP shall estimate in good faith their unpaid fees and expenses incurred in connection therewith and shall deliver such reasonable, good faith estimate to the Debtors no later than three (3) Business Days prior to the filing of such TEC chapter 11 case; and (iii) as otherwise provided in the Amended and Restated RSA Fifth Amendment.

302.     "*TEC General Bar Date*" means the deadline by which all Entities, except Governmental Units, shall File Proofs of Claim against TEC, as shall be established by the applicable Bar Date Order.

303.     "*TEC Global Settlement*" means the settlement of all Claims, Interests, and controversies among the Debtors, the Consenting Parties, and the TEC Consenting Parties, the terms of which are set out in the RSA Fifth Amendment and incorporated by reference herein.

304.     "*TEC Global Settlement Term Sheet*" means the term sheet for the TEC Global Settlement attached as Exhibit A to the RSA Fifth Amendment.

305.     "*TEC Governmental Bar Date*" means the date that is one hundred and eighty (180) days after the TEC Petition Date, which is the deadline by which all Governmental Units shall File Proofs of Claim against the TEC, as established by Bankruptcy Local Rule 3003-1 and ratified by the applicable Bar Date Order.

306.     "*TEC Owners*" means, collectively, Talen MidCo LLC, Riverstone V Coin Holdings, L.P., Raven Power Holdings LLC, C/R Energy Jade, LLC, Sapphire Power Holdings LLC, and Riverstone Holdings LLC.

307.     "*TEC Petition Date*" means the date on which TEC commences its Chapter 11 Case.

308.     "*TEM*" means Talen Energy Marketing, LLC.

309.     "*TES*" means Talen Energy Supply, LLC.

310.     "*TES Existing Equity Interests*" means Interests in TES.

311.     "*TES Pension Plan*" means the Talen Energy Retirement Plan, a qualified defined benefit pension plan sponsored by TES.

312.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

313.     "*Unimpaired*" means, when used in reference to a Claim or Interest (or Class thereof), a Claim or Interest (or Class thereof) that is not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

314.     "*Unsecured*" means, when referring to a Claim, any Claim that is not Secured.

315.     "*Unsecured Creditor Group Advisors*" has the meaning set forth in the RSA.

316.     "*Unsecured Notes*" means, collectively, the 2022 Unsecured Notes, the 2024 Unsecured Notes, the 2025 Unsecured Notes, the 2026 Unsecured Notes, the 2027 Unsecured Notes, the 2036 Unsecured Notes, and the Series A PEDFA Bonds.

317.     "*Unsecured Notes 2001 Indenture*" means that certain indenture dated October 1, 2001, by and among TES, as issuer, each of the guarantors named therein, and the Bank of New York Mellon, as trustee, as amended and supplemented from time to time.

318.     "*Unsecured Notes Claims*" means all Claims against any Debtor arising from or based upon the Unsecured Notes or any of the other Unsecured Notes Documents, including accrued but unpaid interest, costs, fees, and indemnities.

319.     "*Unsecured Notes Documents*" means, collectively, the Unsecured Notes Indentures, the Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the Unsecured Notes.

320.     "*Unsecured Notes Indentures*" means, collectively, the 2022 Unsecured Notes Indenture, the 2024 Unsecured Notes Indenture, the 2026 Unsecured Notes Indenture, and the Unsecured Notes 2001 Indenture.

321.     "*Unsecured Notes Trustee*" means the Bank of New York Mellon, as trustee, under each of the Unsecured Notes Indentures and the Series A PEDFA Documents.

322.     "*Unsecured Notes Trustee Claims*" means any and all objections, Claims, Causes of Action, or Challenges that the Unsecured Notes Trustee, on its own behalf, on behalf of the Estates, or otherwise, raised, could have raised, or could raise in the future relating to approval of the Disclosure Statement, the Plan, Confirmation, or the RSA, including (x) with respect to the enterprise valuation, collateral valuation, releases, exculpations, injunctions and other transactions contemplated by the Plan and (y) on account of any potential objection, Claim, Cause of Action, or Challenge set forth in the *Limited Objection of the Bank of New York Mellon, as Trustee, to the Disclosure Statement for Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* filed October 17, 2022 [Docket No. 1364].

323.     "*Uri Claim*" means a timely asserted Claim that asserts a claim for damage caused directly or indirectly by Winter Storm Uri.  For the avoidance of doubt, except for Claims for subrogation, Uri Claims shall not include Claims held by insurance providers.

324.     "*Uri Insurance Policy*" means any insurance policies issued or providing coverage to one or more Debtors pursuant to which one or more Debtors asserts that coverage is/was provided for, *inter alia*, defense of and damages, if any, that are alleged to be caused by Winter Storm Uri, including all Uri Claims.

325.     "*Uri Insurance Proceeds Claim*" means a Uri Claim for which recovery is pursued under Article III.B.7.b(i) hereof.

326.     "*Uri Other Claim*" means a Uri Claim for which recovery is pursued other than under Article III.B.7.b(i) hereof.

327.     "*U.S. Trustee*" means the United States Trustee for Region 7.

328.     "*Winter Storm Uri*" means the major winter and ice storm that had widespread impacts across the United States, including Texas, in the period beginning 12:00 a.m. (Central Time), February 12, 2021, and ending at 11:59 p.m. (Central Time), February 20, 2021.

B.     *Rules of Interpretation*

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan, Confirmation Order, and/or RSA, as applicable; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references

to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as and to the extent applicable; (xii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Reorganized Debtors, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, provided that any effectuating provision that has an economic impact will not be considered "immaterial"; and (xiv) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.       *Computation of Time*

         Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.       *Governing Law*

         Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein (including in the Plan Supplement), the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in the State of New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

E.       *Reference to Monetary Figures*

         All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.       *Reference to the Debtors or the Reorganized Debtors*

         Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.       *Controlling Document*

         In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Disclosure Statement or the Plan Supplement, the Confirmation Order shall control.

H.       *Consultation, Information, Notice, and Consent Rights*

         Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the RSA set forth in the RSA (without enhancement or expansion thereof), including any Consenting Parties Consent Rights, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any

such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the RSA Third Amendment set forth in the RSA Third Amendment (without enhancement or expansion thereof), including any CAF Consenting Parties Consent Rights, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the RSA Fourth Amendment set forth in the RSA Fourth Amendment (without enhancement or expansion thereof), including any First Lien Non-CAF Consenting Parties Consent Rights, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the RSA Fifth Amendment set forth in the RSA Fifth Amendment (without enhancement or expansion thereof), including any TEC Consenting Parties Consent Rights, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Notwithstanding anything herein to the contrary, any and all consultation, information, notice and consent rights of the DIP Lenders and DIP Agent set forth in the DIP Documents (without enhancement or expansion thereof), including any DIP Consent Rights, with respect to the form and substance of the Plan, all exhibits to the Plan, and the Plan Supplement, including, to the extent set forth in the DIP Documents, any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraphs as such rights relate to any document referenced in the RSA (including any amendments thereto) or the DIP Documents, as applicable, shall not impair such rights or obligations.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including DIP Claims, Postpetition Hedge Claims, Postpetition Other Hedge Claims, Professional Fee Claims, Priority Tax Claims, and postpetition Intercompany Claims) have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III.

A.    *Administrative Claims*

Except with respect to Professional Fee Claims, Postpetition Hedge Claims, Postpetition Other Hedge Claims, DIP Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Claim, on or as soon as thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) days after the date such Administrative

Claim becomes an Allowed Administrative Claim; provided that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course; provided, further, that the Backstop Periodic Premium, the Backstop Put Premium, the Backstop Alternative Transaction Premium, and any other Allowed Claim arising in connection with the Backstop Commitment Letter shall be paid in accordance with the terms and conditions of the Backstop Order.

B.     *DIP Claims*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the aggregate amount of the DIP Obligations (as defined in the DIP Order), including (i) the principal amount outstanding under the DIP Facilities on such date; (ii) the face amount of all outstanding letters of credit; (iii) all interest accrued and unpaid thereon through and including the date of payment; and (iv) all accrued and unpaid fees, expenses and indemnification obligations payable under the DIP Documents.  Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall be indefeasibly paid in full in Cash (or in the case of outstanding letters of credit or contingent DIP Claims, shall be terminated (only in the case of outstanding letters of credit), cash collateralized (in an amount and manner satisfactory to the DIP Agent), or fully supported through the issuance of backstop letters of credit, in each case in accordance with the terms of the DIP Documents) by the Debtors on or prior to the Effective Date (as the case may be as required by the DIP Documents).  Contemporaneously with the effectuation of the final of the foregoing payments, terminations, cash collateralization, or otherwise, the DIP Facilities and the "*Loan Documents*" referred to therein shall be deemed canceled, all commitments under the DIP Documents shall be deemed terminated, all Liens on property of the Debtors or the Reorganized Debtors, as applicable, arising out of or related to the DIP Facilities shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and all guarantees of the Debtors or the Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders.  Upon the reasonable request of the Debtors or the Reorganized Debtors, as applicable, and at the Debtors' or Reorganized Debtors', as applicable, sole cost and expense, the DIP Agent or the DIP Lenders shall take all actions to effectuate and confirm such termination, release and discharge.  The Debtors or the Reorganized Debtors as applicable, shall also be authorized to make any such filings contemplated by the foregoing sentence on behalf of the DIP Agent and/or the DIP Lenders, at the sole cost and expense of the Debtors or Reorganized Debtors, as applicable, and the DIP Agent and the DIP Lenders shall have no liabilities related thereto.  Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the DIP Facilities and the DIP Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to this paragraph) after the Effective Date with respect to any unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agent and the other DIP Lenders to expense reimbursement, indemnification, and other similar amounts (either from the Debtors (which rights shall be fully enforceable against the Debtors or Reorganized Debtors, as applicable) or the DIP Lenders) and any provisions that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.  The DIP Agent and the DIP Lenders shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Cases, the Debtors, or the formulation, preparation, dissemination, or negotiation of the Plan, the Disclosure Statement, the DIP Facilities or the Exit Facilities, or any Restructuring Transaction.

C.     *Postpetition Hedge Claims*

Except to the extent that a Holder of an Allowed Postpetition Hedge Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Postpetition Hedge Claim, each Holder of such Allowed Postpetition Hedge Claim shall be indefeasibly paid in full in Cash or, solely to the extent any other treatment is permitted under the terms of any Consenting FCM Hedge Agreement or Consenting First Lien Hedge Agreement, treated in accordance with such Consenting FCM Hedge Agreement or Consenting First Lien Hedge Agreement.

D.    *Postpetition Other Hedge Claims*

Except to the extent that a Holder of an Allowed Postpetition Other Hedge Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Postpetition Other Hedge Claim, each Holder of such Allowed Postpetition Other Hedge Claim shall be treated in accordance with the terms set forth in section 1129(a)(9) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Postpetition Other Hedge Claims will receive interest on such Allowed Postpetition Other Hedge Claims after the Petition Date to the extent required by section 1129(a)(9) of the Bankruptcy Code.

E.    *Restructuring Expenses*

1.    <u>Restructuring Expenses</u>

During the period commencing on the Petition Date through the Effective Date, the Debtors will promptly pay in full in Cash any Restructuring Expenses in accordance with the terms of the RSA and the DIP Order. Without limiting the foregoing, to the extent that any Restructuring Expenses remain unpaid as of the Business Day prior to the Effective Date, on the Effective Date, the Reorganized Debtors shall pay in full in Cash any outstanding Restructuring Expenses that are invoiced without the requirement for the Filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval. Any Restructuring Expenses invoiced after the Effective Date shall be paid promptly, but no later than ten (10) Business Days from receiving an invoice. Any Restructuring Expenses that constitute DIP Obligations are entitled to all rights and protections of other DIP Obligations.

2.    <u>Committee Expenses</u>

In consideration of the value provided under the Global Plan Settlement and to the extent the Creditors' Committee complies with all material terms and conditions of the Global Plan Settlement, the Debtors shall pay the Committee Expenses in accordance with any applicable Bankruptcy Court order, up to the amount of the Committee Budget; <u>provided</u> that any Committee Budget Excess on the Effective Date shall be paid to the GUC Trust and become GUC Trust Assets; <u>provided</u> <u>further</u> that any Committee Budget Deficit shall be paid from the GUC Trust Assets.

3.    <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

4.    <u>Professional Fee Escrow</u>

If the Professional Fee Claims Estimate or Committee Member Expense Estimate are greater than zero, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the sum of the Professional Fee Claims Estimate and Committee Member Expense Estimate, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the New Debt, or otherwise). The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (ii) shall be held in trust for the Professionals and the Creditors' Committee members; <u>provided</u> that all funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims and Allowed Committee Member Expenses have been irrevocably paid in full shall be returned to the Reorganized Debtors. Allowed Professional Fee Claims and Allowed Committee Member Expenses shall be paid in Cash to such Professionals or Creditors' Committee members, as applicable, from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; <u>provided</u> that the Debtors' obligations with respect to Professional Fee Claims and the Committee Member Expenses shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims, Committee Member Expenses, and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow from the Debtors' Estates or the Reorganized Debtors without any further action or order of the Bankruptcy Court.

5.      Professional Fee Claims and Committee Member Expenses Estimates

Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Creditors' Committee, as applicable, before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date; provided, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

Members of the Creditors' Committee shall estimate in good faith their Committee Member Expenses as of the Effective Date and shall deliver such reasonable good faith estimate to the Debtors and the Requisite Consenting Parties no later than five (5) Business Days prior to the Effective Date. If a Creditors' Committee member does not provide an estimate prior to such deadline, the Debtors, in consultation with the Creditors' Committee, shall estimate in good faith such member's Committee Member Expenses.

6.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash all reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Notwithstanding anything to the contrary herein, on and after the Effective Date, all of the GUC Trust Expenses, including any professional fees, shall be paid from the GUC Trust Assets (other than the General Unsecured Convenience Claims Fund).

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code; provided that the Debtors are authorized in their absolute discretion, but not directed, to prepay all or a portion of any Allowed Priority Tax Claim at any time without penalty or premium.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      *Summary of Classification*

Claims and Interests, except for Administrative Claims, including DIP Claims, Postpetition Hedge Claims, Postpetition Other Hedge Claims, Professional Fee Claims, Priority Tax Claims, and postpetition Intercompany Claims are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other

Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F.

1.    Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3A | Prepetition First Lien Non-CAF Claims | Impaired | Entitled to Vote |
| 3B | Prepetition CAF Claims | Impaired | Entitled to Vote |
| 4 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| 5A | General Unsecured Claims | Impaired | Entitled to Vote |
| 5B | Uri Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Convenience Claims | Impaired | Entitled to Vote |
| 7 | Prepetition Cumulus Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

31

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 8 | Prepetition Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 11 | TES Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 12 | TEC Creditor Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 13 | TEC Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests*

    1.      <u>Class 1 – Other Priority Claims</u>

        a.      *Classification*:  Class 1 consists of all Other Priority Claims.

        b.      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).

        c.      *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

    2.      <u>Class 2 – Other Secured Claims</u>

        a.      *Classification*: Class 2 consists of all Other Secured Claims.

        b.      *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Secured Claim, each such Holder shall receive at the applicable Debtor's or the applicable Reorganized Debtor's discretion:

> (i)  payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, payment shall be made in accordance with its terms in the ordinary course);
>
> (ii)  reinstatement of such Holder's Allowed Other Secured Claim;
>
> (iii)  the applicable Debtor's interest in the collateral securing such Holder's Other Secured Claim; or
>
> (iv)  such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

c.  *Voting*: Class 2 is Unimpaired under the Plan.  Each Holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.  Class 3A – Prepetition First Lien Non-CAF Claims

a.  *Classification*: Class 3A consists of all Prepetition First Lien Non-CAF Claims.

b.  *Allowance*: On the Effective Date, in accordance with the First Lien Non-CAF Settlement as incorporated into this Plan pursuant to section 1123(b)(3) of the Bankruptcy Code, the Prepetition First Lien Non-CAF Claims shall be Allowed in the Settled First Lien Non-CAF Claim Amount, and shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

c.  *Treatment*:  Except to the extent that a Holder of an Allowed Prepetition First Lien Non-CAF Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Prepetition First Lien Non-CAF Claim, each such Holder shall receive payment in full in Cash of such Holder's Pro Rata share of the Settled First Lien Non-CAF Claim Amount on the Effective Date.

d.  *Voting*:  Class 3A is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

4.  Class 3B – Prepetition CAF Claims

a.  *Classification*: Class 3B consists of all Prepetition CAF Claims.

b.  *Allowance*: On the Effective Date, in accordance with the CAF Settlement as incorporated into this Plan pursuant to section 1123(b)(3) of the Bankruptcy Code, the Prepetition CAF Claims shall be Allowed in the Settled CAF Claim Amount, and shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

c.  *Treatment*:  Except to the extent that a Holder of an Allowed Prepetition CAF Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Prepetition CAF Claim, each such Holder shall receive payment in full in Cash of such Holder's Pro Rata share of the Settled CAF Claim Amount on the Effective Date.

          d.       *Voting*:  Class 3B is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

5.        <u>Class 4 – Unsecured Notes Claims.</u>

          a.       *Classification*: Class 4 consists of all Unsecured Notes Claims.

          b.       *Allowance*: On the Effective Date, the Unsecured Notes Claims shall be Allowed in the aggregate amount of approximately $1.429 billion principal amount, plus accrued and unpaid interest as of the Petition Date at the applicable contractual interest rate and any unpaid fees and expenses payable in accordance with the Unsecured Notes Documents, and shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

          c.       *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of an Allowed Unsecured Notes Claim against any Debtor, in each case without duplication among the Debtors, shall receive, in accordance with the Restructuring Transactions, its Pro Rata share of, as applicable:

              (i)      99% of the New Common Equity, less the New Common Equity distributed on account of the Retail PPA Incentive Equity, and subject to dilution from the Rights Offering, the Backstop Periodic Premium, the Backstop Put Premium, the New Warrant Equity, and the Employee Equity Incentive Plan;

              (ii)     the 1145 Subscription Rights; and

              (iii)    with respect to:

                  A.   Eligible Holders of Unsecured Notes Claims: solely if such Holder fully exercises its 1145 Subscription Rights, the 4(a)(2) Subscription Rights; or

                  B.   Ineligible Holders of Unsecured Notes Claims (if any): solely if such Holder fully exercises its 1145 Subscription Rights, New Common Equity or Cash, at the option of the Requisite Consenting Parties, subject to the Rights Offering Procedures, in the amount equal to the value of the (4)(a)(2) Subscription Rights that would have been distributable to such Holder if such Holder was an Eligible Holder of Unsecured Notes Claims.

          d.       *Voting*: Class 4 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

6.        <u>Class 5A – General Unsecured Claims</u>

          a.       *Classification*: Class 5A consists of all General Unsecured Claims.

          b.       *Treatment*: On the Effective Date or as soon as practicable thereafter, except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of an Allowed General Unsecured Claim shall receive its share of the GUC Trust Net Assets with such share to be determined based on the GUC Settlement Allocation.  Distributions to Holders of Allowed Class 5A General Unsecured Claims may be made periodically or once at the conclusion of the administration of the

GUC Trust, which distributions shall be at the sole discretion of the GUC Trustee, subject to <u>Article IV.N.5</u>.

    c.    *Voting*: Class 5A is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

7.    <u>Class 5B – Uri Claims</u>

    a.    *Classification*: Class 5B consists of all Uri Claims.

    b.    *Treatment*: Notwithstanding any injunction or similar provision contained in this Plan, except to the extent that a Holder of a Uri Claim agrees in writing with the GUC Trust to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Uri Claim:

        (i)    the Holder of a Uri Claim may pursue such Uri Claim to final judgment, including any appeals, in any court(s) having competent jurisdiction, or settlement. Any such final judgment or settlement will be satisfied solely to the extent of any available proceeds of any applicable Uri Insurance Policy, and the provisions of (b)(ii) hereof. The applicable Debtors may be named in the litigation as a party defendant(s) subject to the provisions herein. Nothing in the Plan, the Plan Supplement, or any Definitive Document releases the applicable Debtor(s) from their liability for Uri Claims, <u>provided</u> however, their liability is limited to the amount of available proceeds of any applicable Uri Insurance Policy and the provisions of (b)(ii) hereof. Except as provided above and notwithstanding anything that is otherwise to the contrary in the Plan Supplement or any Definitive Document, effective as of the Effective Date, the Debtors shall be discharged of all Uri Claims pursuant to section 1121(d) of the Bankruptcy Code, and Holders of Uri Claims shall solely be entitled to the treatment provided in this <u>Article III.B.7</u>. Neither the GUC Trust nor the GUC Trustee may be named as a party to any such litigation; and

        (ii)    to the extent that any applicable Uri Insurance Policy contains a SIR, such SIR on an Allowed Uri Claim shall be paid, satisfied, settled and discharged by the allowance of a Class 5A General Unsecured Claim in the amount of the applicable SIR. The GUC Trustee may file such motions with the Bankruptcy Court as it deems appropriate for the administration of Claims in the amount of the applicable SIR.

    c.    *Voting*: Class 5B is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

8.    <u>Class 6 – General Unsecured Convenience Claims</u>

    a.    *Classification*: Class 6 consists of all General Unsecured Convenience Claims.

    b.    *Treatment*: Except to the extent that a Holder of a General Unsecured Convenience Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such General Unsecured Convenience Claim, each such Holder shall receive its Pro Rata share of the General Unsecured Convenience Claims Fund, with such Pro Rata share to be determined based on the Allowed amount of such General Unsecured Convenience Claim relative to the aggregate amount of all Allowed General Unsecured Convenience Claims against all Debtors; <u>provided</u>, <u>however</u>, that in no event shall any Holder of a General Unsecured Convenience Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such

General Unsecured Convenience Claim.  Distributions to Holders of Allowed Class 6 General Unsecured Convenience Claims may be made periodically or once at the conclusion of the administration of Class 6 General Unsecured Convenience Claims, which distributions shall be at the sole discretion of the GUC Trustee, subject to <u>Article IV.N.5</u>.

    c.    *Voting*: Class 6 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

9.    <u>Class 7 – Prepetition Cumulus Intercompany Claims</u>

    a.    *Classification*: Class 7 consists of all prepetition Cumulus Intercompany Claims.

    b.    *Treatment*: Except to the extent that a Holder of a prepetition Cumulus Intercompany Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, compromise, release, and discharge of and in exchange for each prepetition Cumulus Intercompany Claim, each Holder of such prepetition Cumulus Intercompany Claim shall receive, in accordance with the Restructuring Transactions, on the Effective Date or as soon as possible thereafter:

    (i)    **If the TEC Global Settlement has not been terminated as of the Effective Date**: such treatment agreed to thereunder, which shall be deemed to render such Holder Unimpaired; or

    (ii)    **If the TEC Global Settlement has been terminated as of the Effective Date**: such Holder's rights and entitlements hereunder as a Holder of a General Unsecured Claim and this Class shall be deemed vacant pursuant to <u>Article III.E</u>.

    c.    *Voting*: Class 7 is Unimpaired under the Plan.  Each Holder of a prepetition Cumulus Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Prepetition Cumulus Intercompany Claims are not entitled to vote to accept or reject the Plan.

10.    <u>Class 8 – Prepetition Intercompany Claims</u>

    a.    *Classification*: Class 8 consists of all prepetition Intercompany Claims.

    b.    *Treatment*: Except to the extent that a Holder of a prepetition Intercompany Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, compromise, release, and discharge of and in exchange for each prepetition Intercompany Claim, each Holder of such prepetition Intercompany Claim shall receive such treatment as to render such Holder Unimpaired.

    c.    *Voting*: Class 8 is Unimpaired under the Plan.  Each Holder of a prepetition Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of prepetition Intercompany Claims are not entitled to vote to accept or reject the Plan.

11.    <u>Class 9 – Section 510(b) Claims</u>

    a.    *Classification*: Class 9 consists of all Section 510(b) Claims against each Debtor.

    b.    *Treatment*:  Section 510(b) Claims will be canceled, released, discharged, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Claims.

    c.    *Voting*:  Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

12.    <u>Class 10 – Intercompany Interests</u>

    a.    *Classification*: Class 10 consists of all Intercompany Interests.

    b.    *Treatment*: Intercompany Interests shall be Reinstated so as to maintain the organizational structure of the Debtors as such structure exists on the Effective Date unless implementation of the Restructuring (including as set forth in the Restructuring Transactions Exhibit) requires otherwise.

    c.    *Voting*: Class 10 is Unimpaired under the Plan.  Each Holder of an Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

13.    <u>Class 11 – TES Existing Equity Interests</u>

    a.    *Classification*: Class 11 consists of all TES Existing Equity Interests.

    b.    *Treatment*:

        (i)    **If the TEC Global Settlement has not been terminated as of the Effective Date:** TES Existing Equity Interests shall be Reinstated so as to maintain the organizational structure of the Company as such structure exists on the Effective Date unless implementation of the Restructuring (including as set forth in the Restructuring Transactions Exhibit) requires otherwise.

        (ii)    **If the TEC Global Settlement has been terminated as of the Effective Date:** On the Effective Date, TES Existing Equity Interests shall be cancelled, released, and extinguished, and be of no further force or effect, whether surrendered for cancellation or otherwise, and there shall be no distributions for Holders of TES Existing Equity Interests on account of such Interests.

    c.    *Voting*: Each Holder of a TES Existing Equity Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of TES Existing Equity Interests are not entitled to vote to accept or reject the Plan.

14.    <u>Class 12 – TEC Creditor Claims</u>

    a.    *Classification*: Class 12 consists of all TEC Creditor Claims.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed TEC Creditor Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such TEC Creditor Claim, on the Effective Date, or as soon thereafter as reasonably practicable, each such Holder shall receive, at the option of the Reorganized Debtors, (i) payment in full in Cash, (ii) Reinstatement, or (iii) such other treatment rendering such TEC Creditor Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    c.    *Voting*:  Class 12 is Unimpaired under the Plan.  Each Holder of a TEC Creditor Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

Bankruptcy Code.  Therefore, Holders of TEC Creditor Claims are not entitled to vote to accept or reject the Plan.

15.    Class 13 – TEC Existing Equity Interests

a.    *Classification*: Class 13 consists of all TEC Existing Equity Interests.

b.    *Treatment*: On the Effective Date, TEC Existing Equity Interests shall be cancelled, released, and extinguished, and in connection with the same and in furtherance of the TEC Global Settlement, the Riverstone Settlement Recipients shall receive the consideration set forth in Article IV.O.

c.    *Voting*: Each Holder of a TEC Existing Equity Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of TEC Existing Equity Interests are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired (including, for the avoidance of doubt, any Claim that is Reinstated) by the Plan.  Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

D.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims with respect to each Debtor.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

G.     *Controversy Concerning Impairment*

       If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *No Substantive Consolidation*

       The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

B.     *Sources of Consideration for Plan Distributions*

       The Reorganized Debtors shall fund distributions under the Plan (including with respect to the settlements embodied herein) with (i) Cash on hand and (ii) the issuance or distribution of (a) the New Common Equity, including pursuant to the Rights Offering, (b) the New Warrants, and (c) the New Debt.  The GUC Trust shall fund distributions to Holders of Allowed General Unsecured Claims from the GUC Trust Net Assets and to Holders of Allowed General Unsecured Convenience Claims from the General Unsecured Convenience Claims Fund.

C.     *New Debt*

       The Reorganized Debtors shall issue the New Debt and provide any related guarantees, and the New Debt will be made available to the Reorganized Debtors, pursuant to and subject to the terms and conditions set forth in the Exit Facility Documents.  Each First Lien Non-CAF Consenting Party shall be able to elect to waive its Allowed Prepetition First Lien Non-CAF Claim and exchange such Claim for participation in the Exit Facilities on a dollar-for-dollar basis, in an aggregate amount (among all such electing First Lien Non-CAF Consenting Parties) not to exceed the Exit Facility Roll Amount.

       Confirmation shall be deemed approval of the issuance and incurrence of the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Court previously, the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to issue and incur the New Debt and related guarantees, including the Exit Facility Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the New Debt.

D.     *Rights Offering and Backstop Commitment Letter*

       1.      Rights Offering

       Following entry of the Confirmation Order and approval by the Bankruptcy Court of the Rights Offering Procedures, one or more Debtors shall conduct the Rights Offering.  In accordance with the RSA, Backstop Commitment Letter, and the Rights Offering Procedures, each Holder of Allowed Unsecured Note Claims shall have Rights Offering Subscription Rights to purchase up to its Pro Rata allocation (on a Claim by Debtor basis) of the Rights Offering Amount, subject to the Backstop Direct Investment.  For the avoidance of doubt, both Eligible Holders and Ineligible Holders may participate in the 1145 Rights Offering, while only Eligible Holders may participate in the 4(a)(2) Rights Offering.

       2.      Backstop Commitment Letter

In accordance with the RSA, Backstop Commitment Letter, and the Backstop Order, and subject to the terms and conditions thereof:

    a.    each of the Backstop Parties shall (i) fully exercise all of its Rights Offering Subscription Rights, and (ii) purchase its Pro Rata share of the Backstop Amount on or prior to the Effective Date; and

    b.    in exchange for providing their respective Backstop Commitments, each Backstop Party will receive its respective allocation of the Backstop Put Premium and the Backstop Direct Investment (after taking into account crediting of the Backstop Periodic Premium).

E.    *Reorganized Debtors Organizational Documents*

On the Effective Date, (i) the term of the current members of the board of managers of TES and the board of directors of TEC shall expire, (ii) the Reorganized Board shall be established, and (iii) the Reorganized Debtors shall adopt the Reorganized Debtors Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan and the Plan Supplement as necessary to consummate the Plan and Restructuring Transactions. The Reorganized Board will consist of the Reorganized Debtors' Chief Executive Officer and other members, the new members to be selected by the Requisite Initial Backstop Parties. The Requisite Initial Backstop Parties will consult with the Debtors regarding the number of board seats. The identities of the members of the Reorganized Board shall be set forth in the Plan Supplement to the extent known at the time of filing.

To the extent required under the Plan, the Restructuring Transactions Exhibit, or applicable non-bankruptcy law, on or immediately prior to the Effective Date, the Reorganized Debtors will file such Reorganized Debtors Organizational Documents (which shall be consistent with the RSA, the Plan, and the Plan Supplement) as are required to be filed with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors Organizational Documents will include a provision prohibiting the issuance of non-voting equity Securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective Reorganized Debtors Organizational Documents, as permitted by the Reorganized Debtors Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the Reorganized Debtors Organizational Documents. Additionally, on the Effective Date, the Holders of the New Common Equity will be subject to the New Parent Organizational Documents, which shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of New Common Equity shall be deemed to be bound thereby, in each case without the need for execution by any party thereto other than New Parent.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement (including the Exit Credit Agreement(s)), shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the Reorganized Debtors Organizational Documents, as the boards of directors or boards of managers of the applicable Reorganized Debtors (including the Reorganized Board) deem appropriate. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors or the GUC Trustee, as applicable. The Reorganized Debtors will be entitled to transfer funds between and among themselves as necessary to consummate and carry out the terms of the Plan. Except as set forth herein, any changes in intercompany balances resulting from such transfers will be reasonably accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

F.    *Registration Rights Agreement*

On the Effective Date, each Registration Rights Party shall be entitled to, and New Parent shall, enter into the Registration Rights Agreement. Pursuant to the Registration Rights Agreement, such Registration Rights Parties will be entitled to certain registration rights with respect to the New Common Equity issued to such Holders. The

Registration Rights Agreement shall be (i) in the form reasonably acceptable to (a) the Company and (b) Registration Rights Parties that have committed to provide at least 50.1% in aggregate principal amount of commitments by all Registration Rights Parties under the Backstop Commitment Letter and (ii) contained in the Plan Supplement to be Filed with the Bankruptcy Court.  For the avoidance of doubt, the consummation of any such initial public offering or direct listing shall not be a condition precedent to the Effective Date.

G.      *Corporate Existence*

        Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the New Parent Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law); provided that such modifications shall be implemented in accordance with the RSA.

H.      *Employee Equity Incentive Plan*

        The Debtors and the Requisite Consenting Parties shall negotiate in good faith regarding the terms, form, and substance of the Employee Equity Incentive Plan that shall be included in and filed with the Plan Supplement; provided that such Employee Equity Incentive Plan shall not be inconsistent with the terms agreed in the RSA and the Restructuring Term Sheet.  On the Effective Date, equity grants under the Employee Equity Incentive Plan shall be reserved for certain of the directors, officers, and employees of the Reorganized Debtors on terms acceptable to the Reorganized Board and the Requisite Consenting Parties as disclosed pursuant to the Plan Supplement and consistent with the RSA and the Restructuring Term Sheet.

I.      *Series B & C PEDFA Bonds*

        From and after the Effective Date, the Series B & C PEDFA Documents shall continue in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtors pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the Series B & C PEDFA Documents. The obligations under the Series B & C PEDFA Documents will continue in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

J.      *Consenting FCM Hedge Agreements*

        From and after the Effective Date, the Consenting FCM Hedge Agreements shall continue in accordance with and subject to their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtors pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the Consenting FCM Hedge Agreements.  The Debtors' obligations under the Consenting FCM Hedge Agreements will continue according to the same terms applicable to the Debtors pursuant to the FCM Hedge Agreements, as existed prior to the Effective Date.  For the avoidance of doubt, neither the foregoing nor anything else herein shall modify the terms of any Consenting FCM Hedge Agreement.

K.      *Consenting First Lien Hedge Agreements*

        From and after the Effective Date, the Consenting First Lien Hedge Agreements shall continue in accordance with and subject to their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized

Debtors pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the Consenting First Lien Hedge Agreements.  The obligations under the Consenting First Lien Hedge Agreements will continue according to the same terms applicable to the Debtors, as existed prior to the Effective Date.  For the avoidance of doubt, neither the foregoing nor anything else herein shall modify the terms of any Consenting First Lien Hedge Agreement.

L.      *Pension Plans*

From and after the Effective Date, the Pension Plans shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtors pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the Pension Plans.  The obligations under the Pension Plans will continue in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

M.      *Asset Retirement Obligations*

From and after the Effective Date, unless otherwise provided for in the Plan or Plan Supplement, the Asset Retirement Obligations shall be Reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtors pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  The Asset Retirement Obligations will continue in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

N.      *GUC Trust*

        1.      Creation and Governance of GUC Trust

Provided that the Global Plan Settlement has not been terminated, on or before the Effective Date, the Debtors shall irrevocably transfer all of their rights, title, and interest in and to the GUC Trust Assets to the GUC Trust, which GUC Trust Assets, or interests in the GUC Trust Assets, shall vest or shall be deemed to vest in the GUC Trust as of the Effective Date, and the Debtors and the GUC Trustee shall execute the GUC Trust Agreement and shall take all steps necessary to establish the GUC Trust in accordance with the Plan and the beneficial interests therein, including (i) on or before the Effective Date, the funding of the GUC Cash Pool and the General Unsecured Convenience Claims Fund, (ii) the payment of the Committee Budget Excess, if any, to the GUC Trust as GUC Trust Assets promptly upon written request by the GUC Trustee to the Reorganized Debtors, and (iii) the payment of the GUC PPL Recovery Pool, as provided herein.  In the event of any conflict between the terms of the Plan and the terms of the GUC Trust Agreement, the terms of the Plan shall govern.  The GUC Trust Assets shall automatically vest in the GUC Trust as provided herein, without further action by any Person, free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.

After the Effective Date, the Debtors and Reorganized Debtors shall have no interest in the GUC Trust Assets and, to the extent the Debtors or the Reorganized Debtors are holding or receive any GUC Trust Assets on or after the Effective Date, they shall hold such asset in trust for the benefit of the GUC Trust and promptly turnover such asset to the GUC Trust in accordance with the Plan.  To the extent that any GUC Trust Assets cannot be transferred to the GUC Trust because of a restriction on transferability under applicable non-bankruptcy law or the Plan that is not superseded or preempted by the Bankruptcy Code, the GUC Trust's interest in such asset shall be a lien upon and security interest in such asset, perfected without any need to file financing statements, mortgages, or any similar recordation, and such asset shall be deemed to have been retained by the Debtors, and the GUC Trustee shall be deemed to have been designated as a representative of the Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce and pursue such asset on the behalf of the Debtors.

The GUC Trustee shall be the exclusive administrator of the assets of the GUC Trust (including the GUC Trust Assets) for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to any matters

involving Class 5A General Unsecured Claims, Class 5B Uri Other Claims, or Class 6A General Unsecured Convenience Claims under the Plan and for purposes of carrying out the GUC Trustee's duties under the GUC Trust Agreement. The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee. The GUC Trustee shall be a party in interest under section 1109(b) of the Bankruptcy Code only for purposes of the claims reconciliation process, including objecting to General Unsecured Claims, Uri Claims, or General Unsecured Convenience Claims; provided that the GUC Trustee may otherwise be a party in interest with the prior written consent of the Reorganized Debtors or as otherwise ordered by the Bankruptcy Court. The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article IV.N. The GUC Trustee shall hold and distribute the GUC Trust Assets in accordance with the provisions of the Plan and the GUC Trust Agreement. Other rights and duties of the GUC Trustee shall be as set forth in the GUC Trust Agreement. For the avoidance of doubt, the Claims and Causes of Action held by the Debtors or Reorganized Debtors relating to the PPL Adversary Proceeding shall vest in and be controlled by the Debtors or, after the Effective Date, the Reorganized Debtors, notwithstanding that the GUC PPL Recovery Pool shall be transferred by the Debtors or the Reorganized Debtors, as applicable, to the GUC Trust, at which time (and not before) such proceeds shall vest in the GUC Trust, provided, however, that the GUC Trust's interests in and rights to receive the GUC PPL Recovery Pool shall vest as of the Effective Date.

2.      GUC Trustee and GUC Trust Agreement

A substantially final draft of the GUC Trust Agreement will be filed with the Plan Supplement and generally will provide for, among other things: (i) the transfer of the GUC Trust Assets to the GUC Trust; (ii) the payment of GUC Trust Expenses from the GUC Trust Assets (other than the General Unsecured Convenience Claims Fund); and (iii) distributions to Holders of Allowed Class 5A General Unsecured Claims and Allowed Class 6 General Unsecured Convenience Claims, as provided herein and in the GUC Trust Agreement. The GUC Trust Agreement may include reasonable and customary provisions that allow for the limitation of liability of the GUC Trustee and its professionals, agents, and advisors, among others, and for indemnification of such Persons by the GUC Trust, including those set forth below. Any such indemnification shall be the sole responsibility of the GUC Trust and payable solely from the GUC Trust Assets. The GUC Trustee shall be responsible for all decisions and duties with respect to the GUC Trust and the GUC Trust Assets, except as otherwise provided in the Plan, the Confirmation Order, or the GUC Trust Agreement. Upon the Effective Date, the GUC Trust Agreement shall conclusively be deemed binding upon and enforceable against each of the GUC Trust Beneficiaries, without any further action by any Person or Entity.

3.      Preservation of Privilege

The Reorganized Debtors and the GUC Trust shall enter into a common interest agreement whereby the Reorganized Debtors will be able to share documents, information, or communications (whether written or oral) relating to the General Unsecured Claims, Uri Claims, or General Unsecured Convenience Claims. The GUC Trust shall seek to preserve and protect all applicable privileges attaching to any such documents, information, or communications. The GUC Trustee's receipt of such documents, information or communications shall not constitute a waiver of any privilege. All privileges shall remain in the control of the Debtors or the Reorganized Debtors, as applicable, and the Debtors or the Reorganized Debtors, as applicable, retain the sole right to waive their own privileges. Reasonable agreements will be made with the GUC Trustee such that confidential information and privileges are preserved, while permitting the GUC Trustee to use, as necessary to administer the GUC Trust, such information and privilege; absent such agreements, either the GUC Trustee or the Reorganized Debtors may present the issue to the Bankruptcy Court for resolution.

4.      GUC Trust Fees and GUC Trust Expenses

From and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the GUC Trust Expenses from the GUC Trust Assets (other than the General Unsecured Convenience Claims Fund), except as otherwise provided in the GUC Trust Agreement. The GUC Trust Expenses shall be payable from GUC Trust Assets (other than the General Unsecured Convenience Claims Fund) on a consolidated basis without allocation among the Debtors' Estates, and without regard to the GUC Settlement Allocation of the GUC Net Trust Assets among the Debtors' Estates. The Debtors, the Reorganized Debtors, or any of their Affiliates (or anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the GUC Trust.

5.      Tax Treatment of GUC Trust

In furtherance of this <u>Article IV.N</u> of the Plan and subject to the succeeding paragraph: (i) the GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the GUC Trust Beneficiaries consistent with the terms of the Plan, and accordingly, all assets held by the GUC Trust are intended to be deemed for U.S. federal income tax purposes to have been distributed by the Debtors or the Reorganized Debtors, as applicable, to the GUC Trust Beneficiaries, and then contributed by the GUC Trust Beneficiaries to the GUC Trust in exchange for their applicable GUC Trust Interests; (ii) the primary purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treas. Reg. § 301.7701-4(d), including the resolution of General Unsecured Claims, Uri Claims, and General Unsecured Convenience Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) all parties (including the Debtors, the Reorganized Debtors, the Estates, Holders of General Unsecured Claims, Holders of Uri Other Claims, Holders of General Unsecured Convenience Claims and the GUC Trustee) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the Holders of General Unsecured Claims and Holders of General Unsecured Convenience Claims, as applicable, followed by the deemed transfer of such assets to the GUC Trust); (iv) all parties shall report consistently with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee); (v) the GUC Trustee shall be responsible for filing all applicable tax returns for the GUC Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a); and (vi) the GUC Trustee shall annually send to each holder of an interest in the GUC Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes.

The GUC Trustee may timely elect to treat any portion of the GUC Trust allocable to Disputed Claims as one or more "disputed ownership funds" governed by Treas. Reg. § 1.468B-9 (and make any appropriate elections). Notwithstanding the foregoing, if on the Effective Date the GUC Trust has received all cash to which it is entitled under the Plan (including, all net proceeds, if any, to which it is entitled with respect to the PPL Adversary Proceeding), the assets treated as transferred to the GUC Trust, other than any such assets that are allocable to General Unsecured Claims and General Unsecured Convenience Claims that are Allowed Claims as of the Effective Date, may be required to be treated as held by a disputed ownership fund (without any election) and not as a liquidating trust, for U.S. federal income tax purposes. In either such case the GUC Trustee shall (y) file such tax returns (including but not limited to the filing of a separate federal tax return for any "disputed ownership fund") and pay such taxes as may be required consistent with such treatment and (z) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the GUC Trustee), the GUC Trustee shall determine the appropriate tax reporting for the GUC Trust in respect of the disputed ownership fund provisions.

If all or a portion of the GUC Trust is treated as one or more "disputed ownership funds", all parties (including the Debtors, the Estates, GUC Trust Beneficiaries receiving GUC Trust Interests, and the GUC Trustee) shall report for United States federal, state, and local income tax purposes consistently with the foregoing. Any taxes (including with respect to earned interest, if any) imposed on the GUC Trust as a result of this treatment (including as a result of any deemed transfer of the assets out of a disputed ownership fund upon resolution of any Claim) shall be paid by the GUC Trustee out of GUC Trust Assets (and reductions shall be made to amounts disbursed from the trust to account for the need to pay such taxes or any other costs or expenses). For the avoidance of doubt, the GUC Trustee shall be permitted to sell any assets of a disputed ownership fund to the extent necessary to satisfy such tax liability (including any tax liability arising in connection with such sale).

The GUC Trustee may request an expedited determination of taxes of the GUC Trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

6.      Non-Transferability of GUC Trust Interests

The GUC Trust Interests, and any right to receive a distribution from the GUC Trust, shall not be evidenced by any certificate, security, receipt, or any other form or manner whatsoever, except as maintained on the books and records of the GUC Trust by the GUC Trustee.  Any and all GUC Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.  In addition, any and all GUC Trust Interests will not constitute "securities" and will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it should be determined that any such interests constitute "securities," the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer, issuance and distribution under the Plan of the GUC Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

7.      Dissolution of GUC Trust

The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the GUC Trustee under the Plan have been made; provided that in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within six (6) months before the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions) is necessary to facilitate or complete the recovery on, liquidation and distribution of, the GUC Trust Assets.

Upon dissolution of the GUC Trust, any remaining GUC Trust Assets shall be distributed to holders of Allowed General Unsecured Claims and Allowed General Unsecured Convenience Claims in accordance with the Plan and the GUC Trust Agreement, subject to Article IV.N.11, as appropriate.

8.      Single Satisfaction of Allowed General Unsecured Claims

Notwithstanding anything to the contrary herein, in no event shall holders of General Unsecured Claims or General Unsecured Convenience Claims recover, on account of any such Claim, more than 100% of their Allowed Claim from the GUC Trust.

9.      Cooperation of Debtors and Reorganized Debtors

The Debtors or the Reorganized Debtors, as applicable, upon reasonable notice, shall reasonably cooperate with the GUC Trustee in the administration of the GUC Trust, including by providing reasonable access to officers, directors, employees, personnel, advisors, and pertinent documents, including books and records, to the extent the Debtors or the Reorganized Debtors have such information and/or documents, to the GUC Trustee sufficient to enable the GUC Trustee to perform its duties hereunder and under the GUC Trust Agreement, including in connection with contesting, settling, compromising, or objecting to any General Unsecured Claim, Uri Claim, or General Unsecured Convenience Claim (including as it relates to any Non-Excluded Litigation Matter); provided that, in each case, the GUC Trust agrees upon request to reimburse reasonable out-of-pocket expenses for preservation and collection of documents, copying, or similar expenses, that would not otherwise be borne by the Reorganized Debtors.  The Reorganized Debtors agree to provide not less than thirty (30) days' written notice to the GUC Trustee prior to filing any motion to close these Chapter 11 Cases.

10.     Indemnification

The GUC Trustee and each of his Related Parties (each, a "GUC Trustee Indemnified Party") shall be indemnified for, and defended and held harmless against, by the GUC Trust and solely from the GUC Trust Assets, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) actually incurred without gross negligence, willful misconduct, or fraud on the part of the applicable GUC Trustee Indemnified Party (which gross negligence, willful misconduct, or fraud, if any, must be determined by a final, non-appealable order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the GUC Trustee Indemnified Parties in connection with the

45

acceptance, administration, exercise, and performance of their duties under the Plan or the GUC Trust Agreement, as applicable, if the applicable GUC Trustee Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the GUC Trust or the GUC Trust Beneficiaries. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence, willful misconduct, or fraud. The amounts necessary for the indemnification provided in this Section (including, but not limited to, any costs and expenses incurred in enforcing the right of indemnification in this Section) shall be paid by the GUC Trustee out of the GUC Trust Assets. The GUC Trustee shall not be personally liable for the payment of any GUC Trust Expense or claim or other liability of the GUC Trust, and no Person shall look to the GUC Trustee personally for the payment of any such expense or liability. The indemnification provided in this Section shall survive the death, dissolution, incapacity, resignation or removal of the GUC Trustee, GUC Trustee Indemnified Party or the termination of the GUC Trust and shall inure to the benefit of each GUC Trustee Indemnified Party's heirs and assigns.

11.     Abandonment

If, in the GUC Trustee's reasonable judgment, the GUC Trustee believes in good faith that any GUC Trust Assets have inconsequential value to the GUC Trust or GUC Trust Beneficiaries, the GUC Trustee shall have the right to cause the GUC Trust to abandon or otherwise dispose of such property, including, but not limited to, by way of donation to a non-profit 501(c)(3) organization that the GUC Trustee may select in his discretion.

O.     *TEC Global Settlement*

Notwithstanding anything to the contrary herein, on the Effective Date, in accordance with the terms of the Plan and Restructuring Transactions Exhibit, and in consideration of the value being provided pursuant to the TEC Global Settlement to the Debtors' Estates, provided that the TEC Global Settlement has not been terminated, the Riverstone Settlement Recipients shall receive:

1.     1.00% of the New Common Equity, after giving effect to the Rights Offering and the Backstop Put Premium;

2.     the Retail PPA Incentive Equity; and

3.     the New Warrants.

In addition to the foregoing, the TEC Expense Reimbursement shall be paid by TES prior to the filing of any TEC chapter 11 case in accordance with the TEC Global Settlement Term Sheet, without the requirement for the Filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval; provided that, Vinson & Elkins LLP shall comply with any requirement to file fee applications for postpetition services provided as special counsel to TEC, if Vinson & Elkins LLP is retained as special counsel in any TEC chapter 11 case.

TEC and the Riverstone Settlement Recipients intend, for U.S. federal and applicable state and local income tax purposes, that (a) the 1.00% New Common Equity and the New Warrants received by the Riverstone Settlement Recipients pursuant to the TEC Global Settlement shall be treated as stock or securities received pursuant to a "recapitalization" within the meaning of Sections 368(a)(1)(E) and 1036 of the Internal Revenue Code of 1986, as amended (including analogous provisions of state and local law) and (b) the Plan constitutes a "plan of reorganization" within the meaning of Treas. Reg. Sections 1.368-2(g) and 1.368-3(a) and agree to file all tax returns consistent therewith.

P.     *Global Plan Settlement*

The treatment of General Unsecured Claims, Uri Claims, and General Unsecured Convenience Claims under the Plan, together with the other terms and conditions set forth in the Plan and the Confirmation Order (including the releases and exculpations set forth herein and in the Confirmation Order), reflects the proposed compromise and settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of the Committee Claims and

Unsecured Notes Trustee Claims. The Global Plan Settlement is incorporated into the Plan and includes the following material terms and conditions in consideration of the value provided by the respective and applicable party pursuant to the Global Plan Settlement:

1. Holders of General Unsecured Claims, Uri Claims, or General Unsecured Convenience Claims shall receive the treatment set forth in Article III.B.6, Article III.B.7, or Article III.B.8, as applicable.

2. The Creditors' Committee shall support the Plan and not make or file any objection contrary to or against the relief sought by the Debtors in relation to the Plan.

3. The Creditors' Committee shall file with the Bankruptcy Court a statement in support of the Plan.

4. The Creditors' Committee shall prepare a letter to Holders of General Unsecured Claims, Uri Claims, and General Unsecured Convenience Claims recommending that such Holders vote in favor of the Plan, which the Debtors may distribute to such Holders.

5. The Creditors' Committee shall agree by stipulation reasonably acceptable to the Global Settlement Parties to a stay of the Standing Motions and prosecution of CAF Claim Objection (together with all deadlines related thereto) (for the avoidance of doubt, the stipulation filed at [Docket No. 1563] is acceptable to the Global Settlement Parties).

6. Upon the Confirmation Date, the Standing Motions shall be dismissed and the CAF Claim Objection shall be overruled, in each case, without prejudice. In the event the Plan does not go effective and has been withdrawn or is no longer capable of being consummated on terms materially consistent with the terms of the Global Plan Settlement, the Creditors' Committee may refile the Standing Motions and CAF Claim Objection with any appropriate modifications based on the circumstances as they exist at the time of filing. In the event an order is entered denying confirmation of a Plan consistent with the terms of the Global Plan Settlement, the parties will submit a mutually agreed briefing schedule with respect to the Standing Motions and the CAF Claim Objection.

7. The Global Settlement Parties, including the Creditors' Committee, shall support the assumption of the LoBiondo Employment Agreement effective upon Confirmation.

8. The GUC Cash Pool shall be funded as follows: (i) CAF Consenting Parties: $2 million (through reduction of the Settled CAF Claim Amount); (ii) Debtors: $23.05 million in Cash; and (iii) Riverstone: $1 million in Cash; notwithstanding the allocations provided in this provision, the GUC Cash Pool and the General Unsecured Convenience Class Fund shall be fully funded by the Debtors or the Reorganized Debtors, as applicable, and shall be paid to the GUC Trust in accordance with the provisions of Article IV.N.5.

9. The GUC Trust Assets shall consist of the GUC Cash Pool, the GUC PPL Recovery Pool, the Committee Budget Excess, and the General Unsecured Convenience Claims Fund.

10. Riverstone has agreed to amend the Retail PPA Equity Calculation to waive rights to any amounts due on account of (i) the net present value of the difference between the Subsequent Projected Retail PPA Net Savings and the Projected Retail PPA Net Savings (each as defined in the Retail PPA Equity Calculation) and (ii) the net present value of the difference between the Actual Retail PPA Net Savings (as defined in the Retail PPA Equity Calculation) and the Subsequent Projected Retail PPA Net Savings. A revised calculation in accordance with the terms of the Global Plan Settlement will be filed as the Retail PPA Incentive Equity Calculation Exhibit in the Plan Supplement.

11. The Debtors shall, on the Confirmation Date, pay in full in Cash the reasonable and documented fees and expenses incurred by the Unsecured Notes Trustee, subject to the Debtors' and Requisite Consenting Parties' right to review such documented fees and expenses.

12.     Any Global Settlement Party may request that the Honorable David R. Jones, United States Bankruptcy Judge for the Southern District of Texas, as the mediator appointed under the *Order Appointing Judge Jones as Mediator* [Docket No. 1470], resolve any disputes concerning the Plan, the Plan Supplement, or the incorporation of the Global Plan Settlement into such documents.

13.     The Global Settlement Parties agree that the Confirmation Hearing will commence on December 15, 2022.

Q.     *Issuance or Distribution of New Common Equity and New Warrants*

On the Effective Date, New Parent is authorized to issue or distribute the New Common Equity (including the Retail PPA Incentive Equity) and the New Warrants (if applicable) and shall issue or distribute the New Common Equity and the New Warrants (if applicable) in accordance with the terms of the Plan, the TEC Global Settlement Term Sheet, and the Restructuring Transactions Exhibit without the need for any further board, member, equity holder or other corporate action.  All of the New Common Equity issuable or distributable under the Plan, when so issued or distributed, shall be duly authorized, validly issued and, as applicable, fully paid and non-assessable.  The New Parent Organizational Documents shall, as applicable, have provided for a sufficient amount of authorized New Common Equity to effectuate the issuance or distribution of New Common Equity (including the Retail PPA Incentive Equity) contemplated by and in connection with the Plan, including, if applicable, the Rights Offering, the New Warrants Agreement, the Backstop Commitment Letter, and the Employee Equity Incentive Plan, and New Parent shall issue or reserve for issuance a sufficient amount of New Common Equity to effectuate all such issuances.  The New Parent Organizational Documents, as applicable, shall be binding, unless otherwise specifically set forth therein, on all Entities receiving New Common Equity (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to any New Parent Organizational Documents.

R.     *Vesting of Assets*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, including all Causes of Action, all Executory Contracts and Unexpired Leases assumed or assumed and assigned by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or the Confirmation Order.  In addition, all rights, benefits, and protections provided to any of the Debtors pursuant to the Plan, the Plan Supplement, or the Confirmation Order including, but not limited to, the release, exculpation, and injunction provisions provided in Article VIII of the Plan, shall vest in each respective Reorganized Debtor unless expressly provided otherwise by the Plan or the Confirmation Order.  On and after the Effective Date, each Reorganized Debtor may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

S.     *Cancellation of Existing Securities and Agreements*

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and subject to the terms of the applicable agreement, and except as otherwise set forth in the Plan, or in the Plan Supplement or any related agreement, instrument, or document, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest (collectively, the "Cancelled Agreements") (except that the following shall not be Cancelled Agreements: the agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents governing, relating to and/or evidencing (i) certain Intercompany Interests not modified by the Plan, (ii) the Series B & C PEDFA Bonds, (iii) any Claims or Interests Reinstated pursuant to the Plan, and (iv) any security interests granted in connection with or with respect to the Exit Facilities which secure the Exit Facilities) and any rights of any Holder in respect thereof shall be deemed cancelled and of no force or effect and the Debtors shall not have any continuing obligations thereunder; provided, however, that each of the Cancelled Agreements shall continue in effect solely for the purposes of (a) allowing Holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (b) allowing and

48

preserving the rights of the Prepetition Agents, DIP Agent, Secured Notes Trustee, and the Unsecured Notes Trustee, as applicable, to (1) make distributions on account of such Claims or Interests; (2) assert or maintain any rights the Unsecured Notes Trustee or Secured Notes Trustee may have against any money or property distributable or allocable to Holders of Unsecured Notes Claims and Secured Notes Claims, as applicable (including the Indenture Trustee Charging Lien) pursuant to the terms of the Unsecured Notes Indentures, the Secured Notes Indentures, and the Series A PEDFA Documents, as applicable, for the payment of outstanding Indenture Trustee Fees and any other fees, expenses and indemnification obligations arising under (and due pursuant to the terms of) the Unsecured Notes Indentures and the Secured Notes Indentures, as applicable; (3) receive compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation, consummation, and defense of the Plan; (4) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Prepetition Agents, DIP Agent, DIP Lenders (solely with respect to any letters of credit under the DIP Facilities), Secured Notes Trustee, or Unsecured Notes Trustee may have under the Plan, the applicable credit agreement, letters of credit, indentures, collateral agreements, or pledge agreements; and (5) appear and raise issues in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable credit agreements or indentures, and defend, compromise, settle or prosecute litigation in connection therewith; provided, further, that the Prepetition Agents, DIP Agent, Secured Notes Trustee, and the Unsecured Notes Trustee may take such further action to implement the terms of this Plan, including the Restructuring Transactions, as agreed to with the Debtors or the Reorganized Debtors, as applicable, and the Consenting Parties, to the extent not inconsistent with the Confirmation Order, the Plan, or the RSA.

On and after the Effective Date, all duties, responsibilities or obligations of the Collateral Trustee, Prepetition CAF Agent, the Holders of Prepetition CAF Claims, the Prepetition RCF Agent, the Prepetition RCF Lenders, the Prepetition TLB Agent, the Holders of Prepetition TLB Claims, the DIP Agent, the Holders of DIP Claims, the Secured Notes Trustee, the Holders of Secured Notes Claims, the Unsecured Notes Trustee, and the Holders of Unsecured Notes Claims, in each case under (i) the Prepetition Debt Documents (including the Series A PEDFA Documents) and (ii) the DIP Credit Agreements and the other DIP Documents, shall, in each case, be fully discharged, and such Persons shall have no rights or obligations arising from or related to such agreements, instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for or expressly reserved pursuant to the Plan, provided that the foregoing shall not apply to the extent applicable Claims are Reinstated; provided, further, that notwithstanding anything to the contrary in the Plan, any and all any right or obligation to compensation, indemnification, expense reimbursement, or contribution in (i) the Prepetition Debt Documents (including the Series A PEDFA Documents) and (ii) the DIP Credit Agreements and the other DIP Documents, that, in each case of the foregoing clauses (i) and (ii), by its terms survives termination of such documents, shall survive the occurrence of the Effective Date and any such rights shall continue and be fully enforceable against the Debtors or Reorganized Debtors, as applicable, and such rights and obligations shall not be discharged or released pursuant to the Plan or the Confirmation Order; provided, further, that any fees, costs, indemnities, or other amounts due and owing to the Prepetition Agents, the Secured Notes Trustee, and the Unsecured Notes Trustee under any applicable Prepetition Debt Document (including the Series A PEDFA Documents) or in respect of any fees or obligations owed in connection with any letters of credit issued thereunder shall be paid in full in Cash on the Effective Date, provided that any such Prepetition Agent, the Secured Notes Trustee, or the Unsecured Notes Trustee shall provide the Debtors with no less than five days advance notice of any such amounts. For the avoidance of doubt, the Debtors, the Reorganized Debtors, the Prepetition CAF Agent, the Prepetition RCF Agent, the Prepetition TLB Agent, the DIP Agent, the Secured Notes Trustee, the Unsecured Notes Trustee, and the Distribution Agent may (x) make post-Effective Date Distributions or take such other action to exercise their rights (including asserting the Indenture Trustee Charging Lien against any such post-Effective Date Distributions) and discharge their obligations relating to the interests of the Holders of such Claims in accordance with the Plan and (y) may take any other action necessary to cause the Plan to become effective, including by implementing the Restructuring Transactions set forth in this Plan; provided, further, that the Collateral Trustee shall have no obligations, responsibilities or liabilities under the Intercreditor Agreement or otherwise with respect to any distributions made under the Plan. For the avoidance of doubt, neither the CAF Settlement nor the First Lien Non-CAF Settlement shall create or result in any obligation of turnover under the Intercreditor Agreement or otherwise result in the reduction of distributions to be made in respect of any Obligations (as defined in the Intercreditor Agreement) other than, in the case of the CAF Settlement, the Prepetition CAF Claims, and in the case of the First Lien Non-CAF Settlement, the Prepetition First Lien Non-CAF Claims. The Debtors or the Reorganized Debtors, as applicable, shall be authorized to pay the reasonable and

documented fees and expenses of the DIP Agent and the Prepetition Collateral Trustee related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date.

To the extent the Unsecured Notes Trustee or Secured Notes Trustee provides services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order, the Secured Notes Indentures, or the Unsecured Notes Indentures after the Effective Date, the Unsecured Notes Trustee and the Secured Notes Trustee, as applicable, each in its respective capacity as such, shall be entitled to receive from the Reorganized Debtors, without further Bankruptcy Court approval, compensation in full for such services and reimbursement of reasonable and documented out-of-pocket expenses incurred with such services.  The payment of such compensation and expenses will be made promptly by the Reorganized Debtors.  In consideration of the value provided under the Global Plan Settlement and to the extent the Unsecured Notes Trustee complies with all material terms and conditions of the Global Plan Settlement, on the Confirmation Date, the Debtors shall pay in full in Cash the reasonable and documented fees and expenses incurred by the Unsecured Notes Trustee, subject to the Debtors' and Requisite Consenting Parties' right to review such documented fees and expenses.

If the record Holder of any of the Secured Notes or Unsecured Notes is DTC or its nominee or another securities depository or custodian thereof, and such Secured Notes or Unsecured Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Secured Notes or Unsecured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

T.      *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan and the Plan Supplement shall be deemed authorized and approved by the Bankruptcy Court in all respects, including (i) the issuance or distribution of the New Common Equity (including the Retail PPA Incentive Equity) and the New Warrants, if any; (ii) the selection of the directors and officers for New Parent and the other Reorganized Debtors; (iii) implementation of the Restructuring Transactions; and (iv) all other actions contemplated by the Plan, the Plan Supplement (whether to occur before, on, or after the Effective Date), or the Restructuring Transactions Exhibit.  Upon the Effective Date, all matters provided for in the Plan and Restructuring Transactions Exhibit involving the corporate structure of New Parent and the other Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors, New Parent, the other Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, members, directors, managers, or officers of the Debtors, New Parent, or the other Reorganized Debtors.  On or before the Effective Date, as applicable, the appropriate officers of the Debtors, New Parent, or the Reorganized Debtors, shall be authorized to issue, distribute, execute, and/or deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of New Parent or the other Reorganized Debtors, as applicable to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.T shall be effective notwithstanding any requirements under non-bankruptcy law.

U.      *Restructuring Transactions*

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors shall take all actions set forth in the Restructuring Transactions Exhibit, and may enter into any transaction and take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to, effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; and (iv) all other actions that the Debtors determine to be necessary, including making filings or recordings that may be required by applicable law in connection

50

with the Plan and entering into operational agreements necessary to preserve the value of the Debtors' investment in certain Cumulus Affiliates (collectively, the "Restructuring Transactions"). The Restructuring Transactions shall be structured in a manner that takes into account the tax position of creditors and the Reorganized Debtors.

V.      *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan or the Plan Supplement shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

W.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (except any Preference Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date; provided that, upon the Effective Date, the Reorganized Debtors shall be deemed to have waived all Preference Actions. **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity not released pursuant to the Plan**.

X.      *Insurance Policies*

1.      Director and Officer Liability Insurance

On and after the Effective Date, all D&O Liability Insurance Policies entered into by any of the Debtors shall continue in full force and effect in accordance with their terms and, to the extent applicable, shall be assumed in their entireties by the applicable Reorganized Debtors pursuant to sections 105 and 365 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of such D&O Liability Insurance Policies.

Notwithstanding anything to the contrary contained in the Plan or Confirmation Order, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors, as applicable, under the Plan.

2.      Other Insurance Policies

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Definitive Documents, the RSA, the DIP Order, the Confirmation Order, any Cure Notice, any bar date notice or claim objection, any other document related to and/or incorporated in any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases), subject to the occurrence of the Effective Date: (i) from and after the Effective Date, each of the insurance policies, workers' compensation policies, and related agreements entered into by any of the Debtors shall continue in full force and effect in accordance with their terms and, to the extent applicable, shall be assumed in their entireties by the applicable Reorganized Debtors pursuant to sections 105 and 365 of the Bankruptcy Code; (ii) entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of such insurance policies, workers' compensation policies, and related agreements; (iii) nothing shall waive, impact, release, discharge, impair, enlarge, diminish or prejudice in any respect any insurance policy, workers' compensation policy, and/or related agreements and/or any of the rights, claims, defenses, and obligations

(in the case of each of the foregoing, whether arising before or after the Effective Date) of the insurers, the insureds, the Debtors, or the Reorganized Debtors under the insurance policies, workers' compensation policies, and/or related agreements, as applicable, in any manner (including any rights to arbitration in accordance with the applicable insurance policies, workers' compensation policies, and/or related agreements), and such insurers, the insureds, and Reorganized Debtors shall retain all rights and defenses under such insurance policies, workers' compensation policies, and/or related agreements, as applicable; (iv) the Claims of insurers arising (whether before or after the Effective Date) under the insurance policies, workers' compensation policies, and/or related agreements entered into by any of the Debtors shall be paid in full in the ordinary course of business by the applicable Reorganized Debtors; (v) nothing shall waive, impact, release, discharge, enlarge, diminish, impair or prejudice in any respect any insurers' right to seek payment or reimbursement from the Debtors (and, after the Effective Date, the Reorganized Debtors) or to draw on any collateral or security therefor under such insurance policies, workers' compensation policies, and/or related agreements, as applicable, in accordance with the governing agreements; and (vi) on the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (a) claimants with valid workers' compensation claims, Uri Insurance Proceeds Claims, or direct action claims against an insurer under applicable non-bankruptcy law to proceed with such claims; (b) the insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (1) workers' compensation claims, (2) Uri Insurance Proceeds Claims, (3) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay and/or the injunctions set forth in Article VIII of the Plan to proceed with its claim, and (4) all costs in relation to each of the foregoing; (c) the insurers to collect from any or all of the collateral or security provided by or on behalf of the Debtors (and the Reorganized Debtors) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors) under the Debtors' applicable insurance policies, workers' compensation policies, and/or related agreements, in such order as the applicable insurer may determine; and (d) the insurers to cancel any insurance policies, workers' compensation policies, and/or related agreements, and take other actions relating to the insurance policies, workers' compensation policies, and/or related agreements (including effectuating a setoff), to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies, workers' compensation policies, and/or related agreements. Notwithstanding anything to the contrary in this Article IV.X.2, nothing in this Article IV.X.2 shall be deemed to modify the treatment of Uri Claims as provided in Article III.B.7.

3.      Insurance Neutrality

Without altering Article IV.X.2 hereof, nothing in the Plan or the Confirmation Order, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (i) any rights or obligations of any insurer or (ii) any rights or obligations of the Debtors or the Reorganized Debtors arising out of or under any applicable insurance policy or any related agreements.  The insurers, the Debtors, and Reorganized Debtors, as applicable, shall retain all rights and defenses under such insurance policies and related agreements.  Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the insurance policies and related agreements shall control.  For the avoidance of doubt, (i) none of the Debtors' or any insurers' defenses, rights, and obligations with respect to the coverage, denial of coverage, the proper court, forum or jurisdiction for any disputes regarding coverage or regarding the insurers' rights and obligations under any insurance policies and related agreements (collectively, the "**Coverage Dispute**") shall be altered in any way; and (ii) nothing herein shall constitute a determination, consent to, or waiver of jurisdiction as to the Coverage Dispute. Nothing contained in the Plan or the Confirmation Order shall operate to require any insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order. Notwithstanding anything to the contrary in this Article IV.X.3, nothing in this Article IV.X.3 shall be deemed to modify the treatment of Uri Claims as provided in Article III.B.7.

Y.      *Workers' Compensation Programs*

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate or in which the Debtors previously operated; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insured workers' compensation bonds, policies, programs, and plans for

52

workers' compensation and (c) workers' compensation insurance policies or programs. All Proofs of Claims filed by the Debtors' current or former employees on account of workers' compensation claims shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for herein; provided that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors', as applicable, defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans. For the avoidance of doubt, the Asbestos Claims are not subject to this provision. Notwithstanding anything to the contrary in this Article IV.Y, nothing in this Article IV.Y shall be deemed to modify the treatment of Uri Claims as provided in Article III.B.7.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (b) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, the GUC Trust or the GUC Trustee, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors or the GUC Trust, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims or General Unsecured Convenience Claims and shall be treated in accordance with Article III.B.6 or Article III.B.7, as applicable.

B.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts required to be assumed pursuant to the RSA (including management employment agreements) and all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor, other than (i) those that are identified on the Rejection Schedule; (ii) those that have been previously rejected by a Final Order; (iii) those that have been previously assumed or assumed and assigned by a Final Order (including pursuant to any motion filed by the Debtors subsequent to entry of the Confirmation Order); (iv) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; and (v) those which the Debtors have, as of the Confirmation Date, received authority to reject pursuant to an order of the Bankruptcy Court and which the effective date of such rejection is after the Effective Date; provided, that, notwithstanding the foregoing, no Executory Contract or Unexpired Lease will be deemed assumed if (a) the counterparty to such Executory Contract or Unexpired Lease did not receive a Cure Notice (as defined herein) and (b) the amount of the Cure Claim associated with such Executory Contract or Unexpired Lease exceeds $5 million. For the avoidance of doubt, the Debtors are authorized to perform, or continue to perform, under any Executory Contract or Unexpired Lease assumed pursuant to this Plan prior to the Effective Date. Notwithstanding anything to the contrary herein, the LoBiondo Employment Agreement shall be deemed assumed by the applicable Reorganized Debtor on the Confirmation Date.

The Debtors reserve the right to seek enforcement of an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejection Schedule pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date; provided that rejections of Unexpired

53

Leases of non-residential real property shall be effective as of the later of (i) the Effective Date and (ii) the date on which the leased premises are unconditionally surrendered to the landlord under such rejected Unexpired Lease.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

In addition, unless otherwise provided by an order of the Bankruptcy Court, fourteen (14) days prior to the Plan Objection Deadline, the Debtors shall serve the Cure Notice on parties to Executory Contracts or Unexpired Leases to be assumed, assumed and assigned, or rejected. **Any objection to the proposed assumption or assumption and assignment of an Executory Contract or Unexpired Lease under the Plan or related amount of the Cure Claim must be Filed, served and actually received by the Debtors by the later of (i) the Plan Objection Deadline and (ii) within fourteen (14) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.** Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment. The Debtors reserve the right to amend the Cure Notice or the Rejection Schedule, at any time prior to the Effective Date, including any amendments that reflect changes to the Debtors' intention to assume or reject certain Executory Contracts or Unexpired Leases.

C.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors, as applicable, of such Cure Claim, as applicable; provided that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease; provided that the Debtors or the Reorganized Debtors, as applicable, will remain obligated to pay any accrued but unbilled rent and other charges under any such assumed Unexpired Lease of non-residential real property, including with respect to reconciliations, adjustments, and indemnification obligations. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.     *Dispute Resolution*

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or the cure payments required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors (and subject to the consent of the Requisite Consenting Parties) or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

E.      *Indemnification Obligations*

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed or assumed and assigned by the applicable Debtor or New Parent effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise.  Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules or the Rejection Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Allowed Claim in the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled

to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    *Partial Distributions on Account of Allowed Claims*

The Reorganized Debtors shall be authorized to cause partial distributions to be made on account of Allowed Claims (other than General Unsecured Claims and General Unsecured Convenience Claims) before all Claims are Allowed.

C.    *Rights and Powers of Distribution Agent*

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan and the Restructuring Transactions Exhibit; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  The GUC Trust may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the GUC Trust for all taxable periods through the date on which final distributions are made.

D.    *Special Rules for Distributions to Holders of Disputed Claims and Interests*

Notwithstanding any provision otherwise in the Plan and except with respect to Claims administered solely by the GUC Trustee or as otherwise agreed by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

E.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    <u>Record Date for Distribution</u>

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  The Distribution Record Date shall not apply to Securities deposited with DTC, the Holders of which shall receive distributions in accordance with the customary procedures of DTC.

All distributions to Holders of Unsecured Notes Claims shall be deemed to be made to or by the Unsecured Notes Trustee.  Regardless of whether such distributions are made by the Unsecured Notes Trustee or by the Distribution Agent at the reasonable direction of the Unsecured Notes Trustee, the applicable Indenture Trustee Charging Liens shall attach to the property to be distributed to the Holders of Unsecured Notes Claims in the same manner as if such distributions were made through the Unsecured Notes Trustee.

All distributions to Holders of Secured Notes Claims shall be deemed to be made to or by the Secured Notes Trustee.  Regardless of whether such distributions are made by the Secured Notes Trustee or by the Distribution Agent at the reasonable direction of the Secured Notes Trustee, the applicable Indenture Trustee Charging Liens shall attach to the property to be distributed to the Holders of Secured Notes Claims in the same manner as if such distributions were made through the Secured Notes Trustee.

Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors or the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the

Plan with Holders of Claims in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions. All New Common Equity to be distributed under the Plan pursuant to section 1145 of the Bankruptcy Code shall be issued in the names of such Holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent; provided, that such New Common Equity will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system.

2.    Delivery of Distributions

Subject to Article VI.E.1 of the Plan, the Distribution Agent will issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any Holder of an Allowed Claim as and when required by the Plan at: (i) the address of such Holder on the books and records of the Debtors or their agents or (ii) at the address in any written notice of address change delivered to the Debtors or the Distribution Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any Holder is returned as undeliverable, no distribution or payment to such Holder shall be made unless and until the Distribution Agent has been notified of the then-current address of such Holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such Holder without interest.

Distributions of the New Common Equity to be distributed under the Plan pursuant to section 1145 of the Bankruptcy Code will be made through the facilities of DTC in accordance with DTC's customary practices; provided, that such New Common Equity will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system; provided, further, that to the extent that the New Common Equity is not distributed pursuant to section 1145 of the Bankruptcy Code or eligible for distribution in accordance with DTC's customary practices, the Debtors or Reorganized Debtors, as applicable, will take such reasonable actions as may be required to cause distributions of the New Common Equity under the Plan. To the extent distributions are to be made through the facilities of DTC, any distribution that otherwise would be made to any holder eligible to receive a distribution who does not own or hold an account eligible to receive such a distribution through DTC on a relevant distribution date will be forfeited. For the avoidance of doubt, DTC shall be considered a single holder for purposes of distributions.

3.    Distributions on Account of Allowed Uri Claims

As of the Effective Date, (i) Holders of Uri Claims will be permitted to pursue such Claims to final judgment or settlement and attempt to recover any liquidated final judgment or settlement on account of such Claims solely to the extent of any available proceeds of any applicable Uri Insurance Policy and (ii) providers of Uri Insurance Policies will be permitted to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, Uri Claims and all costs in relation thereto. Except as provided in Article III.B.7.b(i), in no event will any Debtor, its Estate, or any Reorganized Debtor be liable to such Holder in any way whatsoever with respect to such Holder's Uri Claim except that, to the extent any applicable Uri Insurance Policy contains a SIR, such SIR shall be satisfied through the allowance of a General Unsecured Claim solely in the amount of the applicable SIR, if any.

4.    No Fractional Shares/Warrants

No fractional shares of New Common Equity or New Warrants shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of shares of New Common Equity or New Warrants that is not a whole number, such New Common Equity or New Warrants, as applicable, shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number, and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of authorized and/or issued shares of New Common Equity or New Warrants to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

5.      Minimum Distribution

Holders of Allowed Class 5A General Unsecured Claims entitled to distributions of less than $100, in the aggregate, or Allowed Class 6 General Unsecured Convenience Claims entitled to distributions of less than $20, in the aggregate, shall not receive any distribution from the GUC Trust and such Claims shall be discharged pursuant to Article VIII.B herein and its Holder is forever barred pursuant to Article VIII.F herein from asserting that Claim against the Debtors, Reorganized Debtors, or the GUC Trust or their property, as applicable.

6.      Undeliverable Distributions and Unclaimed Property

With respect to any distributions made to Holders of Allowed Claims by the Debtors or Reorganized Debtors, one (1) year from the later of: (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date of a Claim distribution on an Allowed Claim, all property of the Debtors available for distributions payable on account of such Claim that are undeliverable or otherwise unclaimed shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the Holder of a Claim in the same Class) to such property or distribution shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.  The Reorganized Debtors and the Distribution Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

With respect to any distributions made to Holders of Allowed General Unsecured Claims or Allowed General Unsecured Convenience Claims by the GUC Trust, in the event that any distribution to any GUC Trust Beneficiary is returned as undeliverable, the GUC Trustee may, but is not required to, use reasonable efforts to determine the then current address of such holder and re-send such distribution to such Holder; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date that is the earliest to occur of depositing in the mail for the entitled recipient, receipt by the entitled recipient, or delivery to a third party delivery service for delivery to the entitled recipient.  After such date, all unclaimed property or interests in property on account of Class 5A or Class 6 distributions shall revert to the GUC Trust without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Allowed Claim of any Holder to such property or GUC Trust Interest shall be discharged and forever barred; and no further distributions to such GUC Trust Beneficiary shall be made.

The GUC Trustee shall suspend distributions to any Holder of an Allowed Claim in Classes 5A or 6 that has not provided its federal taxpayer identification number or social security number, as the case may be, to the GUC Trustee.  If the federal taxpayer identification number or social security number, as the case may be, is not provided to the GUC Trust within ninety (90) days after written request, the applicable underlying General Unsecured Claim or General Unsecured Convenience Claim will be expunged and its GUC Trust Interest disallowed for all purposes under the Plan and any distribution from the GUC Trust shall be waived and forfeited.

F.      *Securities Registration Exemption*

The offer, issuance and distribution under the Plan of the New Common Equity (a) to Holders of Unsecured Notes Claims and (b) constituting the Backstop Periodic Premium or the Backstop Put Premium will, in each case, be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.  The offer, sale, issuance and distribution under the Plan of the Rights Offering Equity to be issued pursuant to the 1145 Rights Offering will be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.  The Rights Offering Equity issued in the 4(a)(2) Rights Offering (including the Backstop Shares and the Backstop Direct Investment Shares) will be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder.  The offer, issuance and distribution under the Plan of the New Common Equity, New Warrants and New Warrants Equity to the Riverstone Settlement Recipients will, in each case, be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder.

Pursuant to section 1145 of the Bankruptcy Code, the New Common Equity issued under the Plan may be sold without registration under the Securities Act by the recipients thereof, subject to: (1) only with respect to the New

Common Equity (a) issued to Holders of Unsecured Notes Claims, (b) constituting the Backstop Periodic Premium, (c) constituting the Backstop Put Premium and (d) pursuant to the 1145 Rights Offering, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (2) only with respect to the New Common Equity issued in connection with the 4(a)(2) Rights Offering (including the Backstop Shares and the Backstop Direct Investment Shares), section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, the requirements of the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act; and (3) any other applicable regulatory approval.  All unsubscribed shares of New Common Equity issued to the Backstop Parties pursuant to the Backstop Commitment Letter will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder.

Persons who purchase the New Common Equity pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities."  Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Holders of restricted securities would, however, be permitted to resell New Common Equity without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act, or if such securities are registered with the U.S. Securities and Exchange Commission.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Common Equity through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of the New Common Equity, New Warrants, or New Warrants Equity, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

DTC and all other Persons and Entities shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Equity, New Warrants, or New Warrants Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan or otherwise, no Person or Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Equity, the New Warrants, or the New Warrants Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services or validly issued, fully paid and non-assessable.

G.    *Compliance with Tax Requirements and Withholding*

In connection with the Plan, to the extent applicable, New Parent, the other Reorganized Debtors, the GUC Trust, and the Distribution Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, any such Person making a distribution pursuant to the Plan, or any other related agreement, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan, or any other related agreement, to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary or appropriate to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  If a request is made to a Holder of a Claim to provide information necessary or appropriate (including an appropriate Form W-9, Form W-8BEN, Form W-8BEN-E or other appropriate Form W-8) to comply with such withholding and reporting requirements and such Holder fails to comply before the date that is 90 days after the request is made in writing, the amount of such distribution shall irrevocably revert to the Reorganized Debtors or GUC Trust, as

applicable, and any Claim in respect of such distribution shall be discharged and forever barred from assertion against any Debtor or Reorganized Debtor or GUC Trust, as applicable, and its respective property.  Any amounts withheld pursuant to this section shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan distribution.  The Reorganized Debtors and GUC Trust reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

H.      *Allocations*

        To the extent permitted by applicable law, (as reasonably determined by the Debtors), distributions received in respect of an Allowed Claim shall be allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to accrued but unpaid interest as Allowed herein.

I.      *No Postpetition Interest on Claims*

        Unless otherwise specifically provided for in the Plan (including with respect to the CAF Settlement and the First Lien Non-CAF Settlement), the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

J.      *Setoffs and Recoupment*

        Except as otherwise expressly provided herein, the Debtors or the Reorganized Debtors or the GUC Trust, as applicable, may, but shall not be required to, set off against or recoup from any Claims against the Debtors, any Claims of any nature whatsoever that the Debtors, the Reorganized Debtors, or the GUC Trust, as applicable, may have against the Holder of such Claims against the Debtors, to the extent such setoff or recoupment is either (i) consented to by the applicable Holder or (ii) otherwise adjudicated by the Bankruptcy Court.  Neither the Debtors' nor GUC Trust's failure to setoff or recoup nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors or the GUC Trust of any such Claim they may have against the Holder of such Claim.

        In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor or the GUC Trust (as applicable), unless (i) the Debtors or the Reorganized Debtors, as applicable, and the Requisite Consenting Parties have consented, or the GUC Trust has consented, as applicable, or (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.  Notwithstanding the foregoing, this paragraph does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence prior to the Effective Date, including, for the avoidance of doubt, any Consenting FCM Hedge Agreement or Consenting First Lien Hedge Agreement.

K.      *Claims Paid or Payable by Third Parties*

        1.      Claims Paid by Third Parties

        A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or the GUC Trust.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the GUC Trust on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to (x) with

respect to any distribution received from the GUC Trust, the GUC Trust, and (y) with respect to any other distribution, the applicable Reorganized Debtor, in each case, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.      Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any payment on the Claims Register by the Claims and Noticing Agent without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, payments to Holders of Allowed Claims covered by the Debtors' insurance policies shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims*

After the Effective Date, each of the Debtors or the Reorganized Debtors or the GUC Trust, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim, or in the case of General Unsecured Claims or General Unsecured Convenience Claims, is Allowed by written agreement of the GUC Trust.

With respect to (i) General Unsecured Claims, the Uri Claims, and the General Unsecured Convenience Claims, the GUC Trustee on behalf of the GUC Trust may assert objections to such Claims through and including the Claims Objection Deadline, and (ii) all other Claims, the Reorganized Debtors may assert objections to such Claims through and including the Claims Objection Deadline. The GUC Trustee and Reorganized Debtors, as applicable, shall be entitled to an extension of the Claims Objection Deadline from time to time, subject to filling an appropriate motion with, and obtaining an order from, the Bankruptcy Court based upon the GUC Trustee's or Reorganized Debtor's determination, as applicable, that such extension is appropriate and reasonable under the circumstances. It is anticipated that multiple extensions of the Claims Objection Deadline may be sought by the GUC Trustee or the Reorganized Debtors and granted by the Bankruptcy Court. Nothing herein shall prejudice the GUC Trustee's or the Reorganized Debtors' right to seek an extension of the Claims Objection Deadline at any time.

Notwithstanding anything to the contrary in the Plan or GUC Trust Agreement, neither the Debtors, the Reorganized Debtors, nor the GUC Trustee shall object to any Uri Insurance Proceeds Claim, and adjudication of such Claim solely for purposes of Allowance, whether by final judgment or settlement, shall be determined solely by the non-bankruptcy court in which such Claim is pursued; *provided*, however, that GUC Trust and the GUC Trustee shall have the sole and exclusive right to object to or estimate Uri Insurance Proceeds Claims, to the extent and as necessary

to adjust the Claims Register to reflect that such Uri Insurance Proceeds Claims are satisfied, compromised, settled, released, and discharged, in full, and entitled to a single recovery, pursuant to the terms of the Plan.

B.    *Claims and Interests Administration Responsibilities*

From the Confirmation Date through the Effective Date, (i) solely with respect to (other than the Excluded Litigation Matters) General Unsecured Claims, Uri Other Claims, and General Unsecured Convenience Claims, Pachulski, on behalf of the Creditors' Committee and in consultation with the Debtors, and (ii) the Debtors, with respect to all other Claims (other than Uri Insurance Proceeds Claims), shall have the exclusive authority (x) to File, withdraw, or litigate to judgment objections to Claims; (y) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, provided that any Excluded Litigation Matters are subject to the provisions below in this Article VII.B; and (z) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, the Creditors' Committee shall be responsible for administering, except for the Excluded Litigation Matters, all General Unsecured Claims, Uri Other Claims, and General Unsecured Convenience Claims through the Effective Date.

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the exclusive authority with respect to all Claims other than the General Unsecured Claims, Uri Claims, and General Unsecured Convenience Claims (i) to File, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Notwithstanding anything to the contrary in the Plan or any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the GUC Trustee on behalf of the GUC Trust shall have the sole authority to File and prosecute objections to, except for the Excluded Litigation Matters, Class 5A General Unsecured Claims, Class 5B Uri Other Claims, and Class 6 General Unsecured Convenience Claims, and the GUC Trust shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all such Claims (including on the basis that any such Claim is subject to subordination or should be reclassified as another Class of Unsecured Claims); (2) settle, compromise, or resolve any Disputed Claim that would be a Class 5A General Unsecured Claim, Class 5B Uri Other Claim, or Class 6 General Unsecured Convenience Claim, without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  To the extent a single Proof of Claim includes a Class 5A General Unsecured Claim, Class 5B Uri Other Claim, or Class 6 General Unsecured Convenience Claim in addition to other Claims, the GUC Trustee's exclusive authority is solely to the extent of such Class 5A General Unsecured Claim, Class 5B Uri Other Claim, or Class 6 General Unsecured Convenience Claim and shall not extend to any further amount or relief included with or related to such other Claims.  For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, may (after consultation with the Creditors' Committee or, following the Effective Date, the GUC Trustee) seek to reclassify or convert any Claims to Class 5A General Unsecured Claims, Class 5B Uri Claims, or Class 6 General Unsecured Convenience Claims.

Notwithstanding anything to the contrary herein, the Debtors or Reorganized Debtors, as applicable, shall continue to defend or prosecute, at their sole expense, the Excluded Litigation Matters; provided that, if the Global Plan Settlement has not been terminated, the Debtors or Reorganized Debtors, as applicable, may not settle any Excluded Litigation Matters that would result in result in a Class 5A General Unsecured Claim, a Class 5B Uri Other Claim, and/or a Class 6 General Unsecured Convenience Claim without obtaining either (i) relief from a court with competent jurisdiction (and if such court is a court other than the Bankruptcy Court, the Creditors' Committee or the GUC Trustee, as applicable, shall be deemed, for purposes of such proposed settlement presented to such other court, a party-in-interest with standing to be heard in such other court for such purpose, solely to the extent that such settlement would result in a Class 5A General Unsecured Claim, a Class 5B Uri Other Claim, or a Class 6 General Unsecured Convenience Claim and only with respect to such matters), or (ii) the approval of the Creditors' Committee or the GUC Trustee, as applicable; provided further that, if the Global Plan Settlement has not been terminated, the Debtors or Reorganized Debtors, as applicable, may not settle the PPL Adversary Proceeding without (i) the consent

of the Creditors' Committee or the GUC Trustee, as applicable, or (ii) further order of the Bankruptcy Court after notice and opportunity for hearing. With respect to the PPL Adversary Proceeding, the GUC Trustee shall have the same rights provided to the Creditors' Committee under the Committee PPL Stipulation. For avoidance of doubt, as to the PPL Adversary Proceeding, the GUC Trustee's approval is not required for any settlement of claims among any non-Debtors. For the avoidance of doubt, the Debtors or Reorganized Debtors, as applicable, shall have the sole and exclusive authority to defend, prosecute, settle, or otherwise resolve any and all claims or causes of action asserted against any of the Debtors or held by any of the Debtors (subject to the above provision in this Article VII.B regarding the PPL Adversary Proceeding), including each of the Excluded Litigation Matters, to the extent that resolution of any such matter or issue would not result in a Class 5A General Unsecured Claim, a Class 5B Uri Other Claim, and/or a Class 6 General Unsecured Convenience Claim or waiver of any defense the Debtors had with respect to any such claim as of the Petition Date; provided that any such settlement entered into under the foregoing shall not become effective with respect to any party to such settlement that has an unresolved proof of claim asserting an Unsecured Claim against any of the Debtors, without the Debtors or Reorganized Debtors, as applicable, having provided five (5) days' notice, if reasonably practicable, to the Creditors' Committee or GUC Trustee, as applicable.

Notwithstanding anything to the contrary in the Plan or any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the GUC Trustee on behalf of the GUC Trust shall have the sole authority, in the GUC Trustee's sole discretion, to continue to defend, prosecute, settle, compromise, dismiss, or in any other fashion address, at the GUC Trust's sole expense, the Non-Excluded Litigation Matters, only to the extent such prosecution would not result in any liability or the incurrence of costs or expenses for any Reorganized Debtor, Released Party, or Exculpated Party, that are not reimbursable pursuant to Article IV.N.9, in the Bankruptcy Court or in any other federal or state court or tribunal; and to the extent of the GUC Trustee's involvement in any Non-Excluded Litigation Matter, the GUC Trust shall be deemed to be the sole representative of the Debtors and the Estates in such Non-Excluded Litigation Matter. The GUC Trustee, on behalf of the GUC Trust, in its capacity as the sole representative of the Debtors and the Estates for such limited purpose in connection with any Non-Excluded Litigation Matter, shall have the authority to file a proceeding to remove such Non-Excluded Litigation Matter from any court.

For the avoidance of doubt, the Debtors and the Reorganized Debtors shall not be responsible for any Committee Expenses in excess of the Committee Budget or any GUC Trust Expenses.

For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor or the GUC Trust, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.W.

On and after the Effective Date, the Reorganized Debtors and the GUC Trust will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. The Debtors, the Reorganized Debtors, and the GUC Trustee shall cooperate in good faith, including providing a reasonable amount of notice of not less than five (5) days before the filing of any objection or stipulation seeking to convert or reclassify Claims into General Unsecured Claims, or seeking to convert or reclassify General Unsecured Claims into other Claims, and, in each case, the rights and defenses of the Debtors, the Reorganized Debtors, or the GUC Trust, as applicable, to any objections after conversion or reclassification are fully preserved.

C.    *Estimation of Claims*

Before or after the Effective Date, the Debtors, the Reorganized Debtors, or the GUC Trust (as applicable) may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Debtors or the GUC Trust, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek

reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Register Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Reorganized Debtors, or the GUC Trustee, as applicable, upon stipulation between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions (including from the GUC Trust) on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors or the GUC Trust, as applicable.

F.      *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of (i) the Bankruptcy Court or (ii) the Reorganized Debtors or the GUC Trust, as applicable.

G.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date.

H.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      *Compromises and Settlements of Claims, Interests, and Controversies*

1.      <u>General Compromise and Settlement of Claims, Interests, and Controversies</u>

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights

that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Confirmation Date, (i) the Reorganized Debtors, Pachulski, on behalf of the Creditor's Committee, or GUC Trust, as applicable, may compromise and settle Claims against, and Interests in, the Debtors and their Estates, and (ii) the Reorganized Debtors may compromise and settle Causes of Action against other Entities; provided, that the settlement of Claims related to the PPL Adversary Proceeding shall be subject to the rights described in Article VII.B herein.

Certain Claims and Causes of Action may exist between one or more of the Debtors and one or more of its Affiliates (not including TEC, Riverstone, the TEC Owners, or the Cumulus Affiliates), which Claims and Causes of Action have been settled, and such settlement is reflected in the treatment of the Intercompany Claims and the Claims against and Interests in each Debtor entity. The Plan shall be deemed a motion to approve the good faith compromise and settlement of such Claims and Causes of Action pursuant to Bankruptcy Rule 9019.

    2.        <u>CAF Settlement</u>

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the provisions of the CAF Settlement shall constitute a good faith compromise and settlement among the Debtors, the Consenting Parties, and the CAF Consenting Parties of all Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Debtors and the CAF Consenting Parties, and are in consideration of the value provided to the Estates by the CAF Consenting Parties pursuant to the CAF Settlement. The Plan shall be deemed a motion to approve the CAF Settlement as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019; and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the CAF Settlement, as well as a finding by the Bankruptcy Court that the CAF Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

    3.        <u>First Lien Non-CAF Settlement</u>

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the provisions of the First Lien Non-CAF Settlement shall constitute a good faith compromise and settlement among the Debtors, the Consenting Parties, and the First Lien Non-CAF Consenting Parties of all Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Debtors and the First Lien Non-CAF Consenting Parties, and are in consideration of the value provided to the Estates by the First Lien Non-CAF Consenting Parties pursuant to the First Lien Non-CAF Settlement. The Plan shall be deemed a motion to approve the First Lien Non-CAF Settlement as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019; and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the First Lien Non-CAF Settlement, as well as a finding by the Bankruptcy Court that the First Lien Non-CAF Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

    4.        <u>TEC Global Settlement</u>

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the provisions of the TEC Global Settlement shall constitute a good faith compromise and settlement among the Debtors, the Consenting Parties, and the TEC Consenting Parties of Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Debtors, the TEC

Consenting Parties, and the Cumulus Affiliates, and are in consideration of the value provided to the Estates by the TEC Consenting Parties pursuant to the TEC Global Settlement. The Plan shall be deemed a motion to approve the TEC Global Settlement as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019; and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the TEC Global Settlement, as well as a finding by the Bankruptcy Court that the TEC Global Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

      5.    <u>Global Plan Settlement</u>

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the provisions of the Global Plan Settlement shall constitute a good faith compromise and settlement among the Global Settlement Parties of Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Global Settlement Parties (including the Committee Claims and the Unsecured Notes Trustee Claims), and are in consideration of the value provided to the Estates by the Global Settlement Parties pursuant to the Global Plan Settlement. The Plan shall be deemed a motion to approve the Global Plan Settlement as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019; and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Global Plan Settlement, as well as a finding by the Bankruptcy Court that the Global Plan Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

Except as otherwise specifically provided in the Plan, the Global Settlement Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Cases, the Debtors, the formulation, preparation, dissemination, or negotiation of the RSA, the Backstop Commitment Letter, the Plan, the Disclosure Statement, the DIP Facilities, the Rights Offering, the Exit Facilities, the CAF Settlement, the First Lien Non-CAF Settlement, the TEC Global Settlement, the Global Plan Settlement, or any Restructuring Transaction.

Upon and subject to the occurrence of the Effective Date, the Creditors' Committee shall be deemed to have waived any right to assert or pursue any of the Committee Claims.

Upon and subject to the occurrence of the Effective Date, the Unsecured Notes Trustee shall be deemed to have waived any right to assert or pursue any of the Unsecured Notes Trustee Claims.

If a party to the Global Plan Settlement is in breach of its terms, the parties that are not in breach shall not be obligated to perform any obligations for the benefit of such breaching party.

B.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property should have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "*event of default*" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer

continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Releases by the Debtors*

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, the Debtors and their Estates, and the Reorganized Debtors, and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and their respective Estates, including any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the DIP Facilities, the RSA, the Backstop Commitment Letter, the Rights Offering, the Rights Offering Procedures, the TEC Definitive Documents, the Prepetition Debt Documents, the Exit Facility Documents, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan, the Disclosure Statement, the RSA, the Backstop Commitment Letter, the TEC Definitive Documents, the CAF Settlement, the First Lien Non-CAF Settlement, the TEC Global Settlement, the Global Plan Settlement, the Rights Offering, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Plan, the Plan Supplement, the Disclosure Statement, the Backstop Commitment Letter, the Rights Offering, the Exit Facilities, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this <u>Article VIII.C</u> (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (iii) shall not release the Claims and Causes of Action asserted by the Debtors in the PPL Adversary Proceeding; and (iv) shall not release any Claims or Causes of Action reflected on the Schedule of Retained Causes of Action, which, for the avoidance of doubt, shall not include any Preference Actions or Claims or Causes of Action against Riverstone, TEC, the TEC Owners, the Consenting Parties, or the Backstop Parties, or any of their respective Related Parties.**

D.      *Releases by Holders of Claims and Interests*

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have**

been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the DIP Facilities, the RSA, the Backstop Commitment Letter, the Rights Offering, the Rights Offering Procedures, the Prepetition Debt Documents, the Exit Facility Documents, the formulation, preparation, dissemination, negotiation of the RSA, the Plan, the Disclosure Statement, the Backstop Commitment Letter, the Rights Offering, the Exit Facilities, the CAF Settlement, the First Lien Non-CAF Settlement, the TEC Global Settlement, the Global Plan Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Backstop Commitment Letter, the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this **Article VIII.D** (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these third-party releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; and (iii) shall not release the Claims and Causes of Action asserted prior to Confirmation in the PPL Adversary Proceeding.

E.      *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out, in whole or in part, from the Petition Date through the Effective Date (and following the Effective Date solely with respect to any issuance or distribution of securities, the distribution of any property, or the implementation of the Restructuring, each pursuant to and in accordance with the Plan), of the Chapter 11 Cases, the Debtors, the formulation, preparation, dissemination, or negotiation of the RSA, the Backstop Commitment Letter, the Plan, the Disclosure Statement, the DIP Facilities, the Rights Offering, the Exit Facilities, the CAF Settlement, the First Lien Non-CAF Settlement, the TEC Global Settlement, the Global Plan Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with all applicable laws with regard to the solicitation and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in this **Article VIII.E** (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes

of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; and (iii) shall not exculpate the Claims and Causes of Action asserted prior to Confirmation in the PPL Adversary Proceeding.

F.    *Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR DISTRIBUTIONS REQUIRED TO BE PAID OR DELIVERED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO Article VIII.C OR Article VIII.D, SHALL BE DISCHARGED PURSUANT TO Article VIII.B OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO Article VIII.E, AND ALL OTHER PARTIES IN INTEREST ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE GUC TRUST, THE GUC TRUSTEE, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO Article VIII.E WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN; PROVIDED THAT SUCH PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST, OR INTERESTS IN, A DEBTOR, A REORGANIZED DEBTOR, OR AN ESTATE SHALL NOT BE PRECLUDED FROM EXERCISING THEIR RIGHTS AND REMEDIES, OR OBTAINING THE BENEFITS, PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN.

SUBJECT IN ALL RESPECTS TO Article XI, NO ENTITY OR PERSON MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST ANY RELEASED PARTY EXCULPATED PARTY, OR GLOBAL SETTLEMENT PARTY THAT AROSE OR ARISES FROM, IN WHOLE OR IN PART, THE CHAPTER 11 CASES, THE DEBTORS, THE DIP FACILITIES, THE RSA, THE BACKSTOP COMMITMENT LETTER, THE RIGHTS OFFERING, THE RIGHTS OFFERING PROCEDURES, THE CAF SETTLEMENT, THE FIRST LIEN NON-CAF SETTLEMENT, THE TEC GLOBAL SETTLEMENT, THE GLOBAL PLAN SETTLEMENT, THE PREPETITION DEBT DOCUMENTS, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION OF THE RSA, THE PLAN, THE DISCLOSURE STATEMENT, THE BACKSTOP COMMITMENT LETTER, THE RIGHTS OFFERING, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RSA, THE PLAN, THE DISCLOSURE STATEMENT, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE

**ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO THE FOREGOING WITHOUT THE BANKRUPTCY COURT (I) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND, INCLUDING NEGLIGENCE, BAD FAITH, CRIMINAL MISCONDUCT, WILLFUL MISCONDUCT, FRAUD, OR GROSS NEGLIGENCE AGAINST A RELEASED PARTY OR EXCULPATED PARTY AND (II) SPECIFICALLY AUTHORIZING SUCH ENTITY OR PERSON TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST ANY SUCH RELEASED PARTY, EXCULPATED PARTY, OR GLOBAL SETTLEMENT PARTY.  THE BANKRUPTCY COURT SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION TO DETERMINE WHETHER A CLAIM OR CAUSE OF ACTION IS COLORABLE AND, ONLY TO THE EXTENT LEGALLY PERMISSIBLE AND AS PROVIDED FOR IN Article XI, SHALL HAVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.**

G.      *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, the Intercreditor Agreement or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

H.      *Release of Liens*

Except (i) with respect to the Liens securing (a) the New Debt (which Liens securing such New Debt shall, for the avoidance of doubt, secure the Consenting First Lien Hedge Obligations outstanding on the Effective Date to the extent required by the documentation evidencing such Consenting First Lien Hedge Obligations), and (b) to the extent elected by the Debtors with respect to an Allowed Other Secured Claim in accordance with Article III.B.2; or (ii) as otherwise provided herein (including in Article IV.S and Article IV.N) or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute and deliver such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.  Subject in all respects to Article IV.V, the Reorganized Debtors (or their designee) and the Exit Agent (or its designee) shall be authorized to submit, file (of record or otherwise) or otherwise deliver any documents executed and delivered pursuant to the foregoing sentence without further authorization from the holders of any such security interests.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to Article IX.B):

1.      the Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance consistent with the RSA;

2.      the Bankruptcy Court shall have entered the Confirmation Order in form and substance materially consistent with the Plan (including the consent rights contained herein) and the RSA and such order shall not have been vacated, reversed, or stayed pending appeal;

3.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (and any amendment thereto), including the Rights Offering Procedures (if any), shall have been Filed in a manner consistent in all material respects with the RSA and the consent rights contained herein;

4.      the Bankruptcy Court shall have entered the Backstop Order, in form and substance acceptable to the Requisite Backstop Commitment Parties;

5.      the Backstop Commitment Letter shall not have been terminated and shall remain in full force and effect (with all conditions precedent thereto having been satisfied or waived);

6.      the RSA shall not have been terminated and shall be in full force and effect;

7.      no Event of Default (as defined in the DIP Credit Agreements or DIP Order, as applicable) shall have occurred and be continuing under the DIP Credit Agreements or the DIP Order, as applicable, that has not been waived by the DIP Agent or cured by the Debtors in a manner consistent with the DIP Documents;

8.      the Professional Fee Escrow shall have been established and funded in Cash in accordance with Article II.E.4;

9.      the conditions precedent to entry into the New Debt shall have been satisfied, waived, or shall be satisfied contemporaneously with the occurrence of the Effective Date;

10.     the Exit Facility Documents shall have been executed and delivered by each Entity party thereto and the Debtors shall have issued the indebtedness contemplated thereby;

11.     the New Parent Organizational Documents and agreements providing for the terms of the New Common Equity shall have been adopted, in each case, on terms consistent with the Plan and the RSA;

12.     all conditions precedent to the issuance of the New Common Equity, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

13.     the Reorganized Debtors, shall have, in the aggregate, on the Effective Date a minimum liquidity of $650 million consisting of unrestricted Cash and availability under the Exit Facilities;

14.     provided that the Global Plan Settlement has not been terminated, (a) the GUC Trust shall have been created in accordance with the GUC Trust Agreement and Cash in the amount of the GUC Cash Pool and the General Unsecured Convenience Claims Fund shall have been received by the GUC Trust, and (b) the Riverstone Settlement Contribution shall have been received by the Debtors;

15.     all applicable transactions contemplated under the TEC Global Settlement Term Sheet, including the payment of the TEC Expense Reimbursement, shall have occurred;

16.     the DIP Claims shall have been indefeasibly paid in full in Cash in accordance with the terms of the DIP Documents and all undrawn letters of credit outstanding under the DIP Documents shall have been terminated, backstopped, or cash collateralized in accordance with the terms of the DIP Documents;

17.     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents (other than any such authorization, consent, regulatory approval, ruling, or document that is customarily obtained or completed after assignment, conveyance or vesting of an applicable asset) that, after giving effect to the entry of the Confirmation Order, are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such authorizations, consents,

regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods shall have expired;

18.    the Debtors and Reorganized Debtors, as applicable, shall have implemented the Restructuring Transactions in a manner consistent with the Plan, the Plan Supplement, and the RSA;

19.    all Restructuring Expenses shall be paid as set forth in Article II.E; and

20.    provided that the Global Plan Settlement has not been terminated, all Committee Expenses up to the Committee Budget shall be paid as set forth in Article II.E.

Notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; provided, that to the extent a condition precedent (a "Prerequisite Condition") may be required to occur prior to another condition precedent (a "Subsequent Condition") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

B.    *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors, with the consent of the Requisite Consenting Parties (and, (i) solely with respect to the conditions set forth in Article IX.A.1, Article IX.A.2, Article IX.A.3, Article IX.A.7, Article IX.A.16, and Article IX.A.19, with the consent of the DIP Agent, (ii) solely with respect to the conditions set forth in Article IX.A.1, Article IX.A.2, Article IX.A.3, and Article IX.A.19, the Requisite CAF Consenting Parties and the Requisite First Lien Non-CAF Consenting Parties, as applicable, (iii) solely with respect to the condition set forth in Article IX.A.16, with the consent of each affected DIP Lender, (iv) solely with respect to the condition set forth in Article IX.A.19, with the consent of the applicable Prepetition Agent, (v) solely with respect to the conditions set forth in Article IX.A.1, Article IX.A.2, Article IX.A.3, Article IX.A.14 and Article IX.A.20, with the consent of the Creditors' Committee, and (vi) solely with respect to the conditions set forth in Article IX.A.1, Article IX.A.2, Article IX.A.3, and Article IX.A.15, with the consent of the TEC Consenting Parties) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

C.    *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

D.    *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments*

Subject to the applicable provisions of the RSA and the DIP Documents, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan, except as provided in the Disclosure Statement Order; provided

that any such amendment or modification that adversely affects the consideration or rights negotiated by the Creditors' Committee pursuant to the Global Plan Settlement shall be reasonably acceptable to the Creditors' Committee. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, those restrictions on modifications set forth in the Plan, the applicable provisions of the RSA and the DIP Documents, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; provided that each of the foregoing actions shall not violate the RSA or the DIP Documents.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

Subject to the applicable provisions of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, in accordance with the preceding sentence, or if Confirmation and Consummation do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the non-Debtor subsidiaries.

**ARTICLE XI.
RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to (i) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease and (ii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date, including, for the avoidance of doubt, the PPL Adversary Proceeding and the Automatic Stay Extension Adversary Proceeding;

6. adjudicate, decide, or resolve any and all matters related to Causes of Action;

7. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9. resolve any dispute, claim, or inconsistency relating to, or enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K.1;

14. adjudicate, decide, or resolve any and all matters related to the GUC Trust, the GUC Trust Assets or the GUC Settlement Allocation;

15. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement, including with respect to the Backstop Commitment Letter;

17. adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

18. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

21.      hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

22.      hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.      enforce all orders previously entered by the Bankruptcy Court;

24.      hear any other matter not inconsistent with the Bankruptcy Code;

25.      enter an order concluding or closing the Chapter 11 Cases; and

26.      enforce the injunction, release, and exculpation provisions set forth in Article VIII.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and the Reorganized Debtors, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Waiver of Stay*

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order.  The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

C.      *Additional Documents*

On or before the Effective Date, and consistent in all material respects with the terms of the RSA, the Backstop Commitment Letter, and the Backstop Order, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.      *Payment of Statutory Fees*

        All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  The Debtors shall File all monthly operating reports through the Effective Date.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees in full in Cash when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.  For the avoidance of doubt, the GUC Trust shall not be responsible for paying post-Effective Date U.S. Trustee Fees or be required to file quarterly reports.

E.      *Reservation of Rights*

        Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with <u>Article IX.A</u> hereof.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor or Consenting Party with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or Consenting Party with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns*

        The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Service of Documents*

        Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors, the Requisite Consenting Parties, the TEC Consenting Parties, the CAF Consenting Parties, the First Lien Non-CAF Consenting Parties, the DIP Agent, and the Creditors' Committee shall be served on:

| | |
|---|---|
| Debtors: | Talen Energy Supply, LLC |
| | 1780 Hughes Landing Blvd., Suite 800 |
| | The Woodlands, TX  77380 |
| | Attn.: Andrew M. Wright and Leonard LoBiondo |
| | andrew.wright@talenenergy.com |
| | leonard.lobiondo@talenenergy.com |
| | |
| | <u>with copies to:</u> |
| | |
| Counsel to Debtors: | Weil, Gotshal & Manges LLP |
| | 767 Fifth Avenue |
| | New York, New York 10153 |
| | Attn.: Matt S. Barr; Gabriel A. Morgan; and |
| | Alexander W. Welch |
| | Matt.Barr@weil.com |
| | Gabriel.Morgan@weil.com |
| | Alexander.Welch@weil.com |
| | |
| Counsel to Requisite Consenting Parties: | Kirkland & Ellis LLP |
| | 601 Lexington Avenue |
| | New York, New York 10022 |

Attn.: Steven N. Serajeddini, P.C.
steven.serajeddini@kirkland.com

Kirkland & Ellis LLP
300 North LaSalle Drive
Chicago, Illinois 60654
Attn: Patrick J. Nash, Jr. P.C.; Christopher S. Koenig;
and Alexander McCammon
patrick.nash@kirkland.com
chris.koenig@kirkland.com
alexander.mccammon@kirkland.com

Counsel to TEC Consenting Parties:        Vinson & Elkins LLP
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Attn: David S. Meyer; Paul E. Heath; Jessica C. Peet;
and Lauren R. Kanzer
dmeyer@velaw.com
pheath@velaw.com
jpeet@velaw.com
lkanzer@velaw.com

Counsel to CAF Consenting Parties:        Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn: Ira S. Dizengoff; Brad M. Kahn; Scott L.
Alberino; and Kate Doorley
idizengoff@akingump.com
bkahn@akingump.com
salberino@akingump.com
kdoorley@akingump.com

Counsel to First Lien Non-CAF Consenting Parties:        King & Spalding LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Attn: Matthew L. Warren; Lindsey Henrikson; and
W. Austin Jowers
mwarren@kslaw.com
lhenrikson@kslaw.com
ajowers@kslaw.com

Counsel to DIP Agent:        Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Damian Schaible; David Schiff; and
Michael Pera
damian.schaible@davispolk.com
david.schiff@davispolk.com
michael.pera@davispolk.com

Counsel to Creditors' Committee:        Milbank LLP
55 Hudson Yards
New York, NY 10001
Attn: Dennis F. Dunne; Evan R. Fleck; and
Matthew L. Brod
ddunne@milbank.com

efleck@milbank.com
mbrod@milbank.com

Pachulski Stang Ziehl & Jones LLP
440 Louisiana Street, Suite 900
Houston, TX 77002
Attn: Michael D. Warner
mwarner@pszjlaw.com

H.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement*

The Plan, Restructuring Transactions Exhibit, Plan Supplement, Confirmation Order, Backstop Commitment Letter, the Backstop Order, and RSA (assumption of which agreements is, to the extent not already approved pursuant to a Final Order, approved by the Confirmation Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

J.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; provided that at the request of the Debtors (and subject to the RSA), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted; provided, further, that any such alteration or interpretation shall be acceptable to the Debtors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent from the Debtors; and (iii) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, and any persons, including the Global Settlement Parties, will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under or in connection with the Plan and any previous plan, if any, and, therefore, neither any of such parties or individuals nor the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under or in connection with the Plan and any previous plan.

L.      *Dissolution of Creditors' Committee*

On the Effective Date, any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve; provided that following the Effective Date, any such committees, including the Creditors' Committee, shall continue in existence solely for the purposes of (i) filing and prosecuting applications for allowance of Professional Fee Claims and (ii) seeking removal of the committee as a party in interest in any proceeding on appeal.  Upon the dissolution of any official committees appointed in the Chapter 11 Cases, including the Creditors'

78

Committee, such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; provided, that for the avoidance of doubt, any Claims or Causes of Action asserted by the Creditors' Committee, whether direct or derivative (including any Claims seeking declaratory judgments) shall be withdrawn with prejudice and/or vest in the Debtors' Estates, to be immediately fully and indefensibly released in accordance with of Article VIII.C the Plan.

M.        *Expedited Tax Determination*

The Debtors or Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors for all taxable periods through the Effective Date.

*[Remainder of Page Intentionally Left Blank]*

Dated: December 14, 2022
      Houston, Texas

Respectfully submitted,

/s/ *Leonard LoBiondo*
Name: Leonard LoBiondo
Title:   Executive Vice President

on behalf of

Talen Energy Supply, LLC

/s/ *Andrew Wright*
Name: Andrew M. Wright
Title:   Authorized Signatory

on behalf of

each of the Debtor affiliates of Talen Energy
Supply, LLC

**<u>Exhibit B</u>**

**Confirmation Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **TALEN ENERGY SUPPLY, LLC, *et al.*,** | § | **Case No. 22-90054 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

### NOTICE OF ENTRY OF ORDER CONFIRMING JOINT CHAPTER 11 PLAN OF TALEN ENERGY SUPPLY, LLC AND ITS AFFILIATED DEBTORS

**PLEASE TAKE NOTICE** that on December 15, 2022, the Honorable Marvin Isgur, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), entered the *Findings of Fact, Conclusions of Law, and Order Confirming Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. [●]] (the "**Confirmation Order**") confirming the *Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors*, dated December 14, 2022 [Docket No. 1722] (as supplemented, the "**Plan**").[2]

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan and the Disclosure Statement may be obtained free of charge by visiting the website maintained by Kroll Restructuring Administration LLC at https://cases.ra.kroll.com/talenenergy/Home-Index. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://www.pacer.gov/. Please note that a PACER password and login are required to access documents via PACER.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the provisions thereof are binding on the Debtors, the Reorganized Debtors, any holder of a Claim against, or Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder voted to accept the Plan.

---

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' Claims and Noticing Agent at https://cases.ra.kroll.com/talenenergy. The Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Dated:  December [●], 2022
         Houston, Texas

                              ___/s/ Draft_____

                              WEIL, GOTSHAL & MANGES LLP
                              Gabriel A. Morgan
                              Clifford Carlson
                              700 Louisiana Street, Suite 1700
                              Houston, Texas 77002
                              Telephone:  (713) 546-5000
                              Facsimile:  (713) 224-9511

                              – and –

                              WEIL, GOTSHAL & MANGES LLP
                              Matthew S. Barr (admitted *pro hac vice*)
                              Alexander Welch (admitted *pro hac vice*)
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone:  (212) 310-8000
                              Facsimile:  (212) 310-8007

                              *Attorneys for Debtors*
                              *and Debtors in Possession*

.                                        4

**<u>Exhibit C</u>**

**Consummation Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **TALEN ENERGY SUPPLY, LLC,** *et al.,* | § | Case No. 22-90054 (MI) |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

**NOTICE OF EFFECTIVE DATE OF JOINT CHAPTER 11 PLAN OF
TALEN ENERGY SUPPLY, LLC AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE** that on December 15, 2022, the Honorable Marvin Isgur, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), entered the *Findings of Fact, Conclusions of Law, and Order Confirming Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors* [Docket No. [●]] (the "**Confirmation Order**") confirming the *Joint Chapter 11 Plan of Talen Energy Supply, LLC and Its Affiliated Debtors*, dated December 14, 2022 [Docket No. 1722] (as supplemented, the "**Plan**").[2]

**PLEASE TAKE FURTHER NOTICE** that on [●], 2023 all conditions precedent to consummation of the Plan were satisfied or waived in accordance with Article IX of the Plan. Further, no stay of the Confirmation Order is in effect. Accordingly, [●], 2023 is the Effective Date of the Plan. As of the Effective Date, the injunction set forth in Article VIII.F of the Plan is now in place.

**PLEASE TAKE FURTHER NOTICE** that in accordance with Article V.B. of the Plan, on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts required to be assumed pursuant to the RSA (including management employment agreements) and all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor, other than (i) those that are identified on the Rejection Schedule; (ii) those that have been previously rejected by a Final Order; (iii) those that have been previously assumed or assumed and assigned by a Final Order; (iv) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that was pending on the Confirmation Date; and (v) those which the Debtors have, as of the Confirmation Date, received authority to reject pursuant to an order of the Bankruptcy Court and which the effective date of such rejection is after the Effective Date; provided, that, notwithstanding the foregoing, no Executory Contract or Unexpired Lease will be deemed assumed if (a) the counterparty to such

---

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' Claims and Noticing Agent at https://cases.ra.kroll.com/talenenergy. The Debtors' primary mailing address is 1780 Hughes Landing Boulevard, Suite 800, The Woodlands, Texas 77380.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Executory Contract or Unexpired Lease did not receive a Cure Notice and (b) the amount of the Cure Claim associated with such Executory Contract or Unexpired Lease exceeds $5 million.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan and the Disclosure Statement may be obtained free of charge by visiting the website maintained by Kroll Restructuring Administration LLC at https://cases.ra.kroll.com/talenenergy/Home-Index.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://www.pacer.gov/.  Please note that a PACER password and login are required to access documents via PACER.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the provisions thereof (including the exhibits and schedules thereto and all documents and agreements executed pursuant thereto or in connection therewith), the Plan Supplement, and the Confirmation Order are effective and enforceable and shall bind the Reorganized Debtors, the Released Parties, the Exculpated Parties, all holders of Claims and Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted or are deemed to have accepted the Plan), any other person giving, acquiring, or receiving property under the Plan, any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, any other party in interest in the Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.  All settlements, compromises, releases (including, without limitation, the releases set forth in Article VIII.C and D of the Plan), waivers, discharges, exculpations, and injunctions set forth in the Plan are effective and binding on any Person or entity that may have had standing to assert any settled, compromised, released, waived, discharged, exculpated, or enjoined Causes of Action

*[Remainder of Page Left Blank Intentionally]*

7

Dated:  [●], 2023
      Houston, Texas

              */s/ Draft*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan
Clifford Carlson
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

– and –

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Alexander Welch (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*