United States Bankruptcy Court
Southern District of Texas
**ENTERED**
April 06, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 22-90054 |
| **TALEN ENERGY SUPPLY, LLC, *et al.*,** | § | |
| Debtors. | § | Jointly Administered |
| | § | CHAPTER 11 |

## MEMORANDUM OPINION

Talen Energy Supply, LLC and its affiliated debtors request that the Court retroactively reject certain executory contracts. If the Court were to grant the Debtors' motion, various counterparties to those executory contracts would fail on their asserted administrative expense claims. The Debtors argue that these counterparties are not entitled to administrative expense claims. The Court agrees. Because the counterparties are only entitled to unsecured claims, the date of rejection does not affect the treatment of the counterparties' claims, and the Debtors' motion for a retroactive rejection date is moot.

## BACKGROUND

Talen is one of the largest energy and power generation companies in North America. (ECF No. 15 at 3). Talen and its affiliated debtors filed bankruptcy on May 9, 2022 (the "Petition Date"). (ECF No. 1). On May 10, 2022, the Debtors moved for authorization to reject executory contracts. (ECF No. 15). In particular, the Debtors sought to reject: (i) electricity purchase agreements between Talen Energy Marketing, LLC ("TEM") and various counterparties ("Retail Purchase Agreements"); and (ii) related broker agreements ("Retail Broker Agreements" and together with the Retail Purchase Agreements, the "Retail Agreements") because TEM lost money supplying electricity under the Retail Purchase Agreements. (ECF No. 15 at 1–2, 5). The Debtors request that Retail Agreements be rejected "effective *nunc pro tunc* to the Petition Date." (ECF No. 15 at 11).

Energy brokers Richards Energy Group, Inc. and URA, Inc., and energy purchasers Masonic Villages of the Grande Lodge of Pennsylvania and Conestoga Wood Specialties Corp. (the "Respondents"), object to the Debtors' motion.[1] (ECF Nos. 342; 344). The Respondents argue that the equities weigh against retroactive rejection because the Debtors failed to provide reasonable notice of intent to reject prior to the Petition Date. (ECF Nos. 342 at 1, 3; 344 at 1). In addition, the Debtors allegedly provided electricity below market rates through hedge contracts. (ECF Nos. 342 at 4; 344 at 4). The Debtors allegedly sold those hedge contracts at a significant profit prior to filing bankruptcy and distributed the proceeds to an affiliated non-Debtor entity. (ECF Nos. 342 at 4; 345 at 5).

On June 15, 2022, the Debtors proposed to reject the Retail Purchase Agreements as of certain "Pick-Up Dates" instead of the Petition Date. (ECF No. 554 at 2). A Pick-Up Date is when "a retail counterparty's electric account has been transitioned to service with the Public Utility." (ECF No. 554 at 2). The Debtors allege that they transitioned to the Public Utilities post-petition in accordance with each state's public utility commission's rules and regulations or tariff rules for transitioning electricity accounts. (ECF No. 15 at 6). The Debtors also allege that they could not have notified the Respondents prior to the Petition Date because doing so would have risked harming TEM. (ECF No. 554 at 8).

The parties argued the motion on June 17, 2022. The Court asked the parties to brief whether the Debtors' breach of the Retail Agreements gives rise to administrative claims,[2] which

---

[1] Other parties also objected to the Debtors' motion. *See* ECF Nos. 230; 332; 334; 335; 341; 387; 421; 428; 439; 444; 458; 485; 528; 582; 583; 584; 585; 586. By the Court's invitation for any party to submit post-hearing briefing and the silence of these objecting parties, the Court deems them to rely on the Respondents' post-hearing briefing.

[2] THE COURT: What I think the law is -- and ***this is what I need you to brief for me*** -- is that unless that contract is assumed, that ***the Debtors' post-petition breach of a pre-petition contract is merely an unsecured claim***, which means that the outcome is the same no matter what date we pick, the economic outcome is the same. ***That's the briefing question.***

could determine whether the Court needs to decide the *nunc pro tunc* motion.³  (ECF No. 662 at 44–45).  Following the hearing,⁴ the Court entered an order stating:

> [T]he Retail Purchase Agreements set forth on <u>Schedule 1</u> and the Retail Broker Agreements set forth on <u>Schedule 2</u> are hereby rejected as of June 17, 2022 (the "**Rejection Date**"); *provided*, that the Rejection Date may be deemed to be an earlier date upon a subsequent order of the Court after further briefing, which briefing shall be due on July 1, 2022 at 5:00 p.m. (Prevailing Central Time) or such later date as determined by the Court.

---

> [Counsel for the Respondents]:  Yes, Your Honor.  And I would agree with you, *we would like the opportunity to brief that*.  We believe that the Debtors' obligations post-petition but pre-rejection or assumption continue under the contract and that their failure to provide the [electricity] post-petition but pre-assumption or pre-rejection would give rise to a claim so I think that is our exact point.
>
> THE COURT:  Just to be sure that you're briefing everything, I agree it gives rise to a claim, but *I think it's a claim that's a pre-petition claim.  And are you telling me that you think it gives rise to a claim that is administrative in nature?*
>
> [Counsel for the Respondents]:  We do, Your Honor.
>
> THE COURT:  Okay.  *That's the briefing question.*

(ECF No. 662 at 44–45) (emphasis added).

³ The Court made clear that the post-trial briefing was meant for the Respondents to explain how they are entitled to administrative claims:

> THE COURT: . . . [I]f, in fact, I issue an opinion up front that addresses that question, it goes much further than what you're even asking me to do. It may be against [the Debtors] and you may be the one appealing it instead of [the Respondents], but we get it all addressed up front. So if I determine, for example, that it is administrative and I issue an opinion that says this does matter, there is an issue before me because that could give rise to an administrative claim and I'm only going to allow the rejection . . . as of entry date, then he would need to appeal that up front and we resolve it all.
>
> If, on the other hand, my initial inclination that it's all a pre-petition claim is right, I put that in the opinion at which point they're going to need to appeal it rather than pushing this off and having 80 claim objections that come later. So I would just rather confront the problem now. I don't see any downside in confronting it now.

(ECF No. 662 at 45–46).

⁴ The declaration of Ryan Omohundro, an advisor to the Debtors, was admitted into evidence without objection at the hearing.  (ECF Nos. 662 at 35; 542-4).

(ECF No. 616 at 2). The Respondents and the Debtors filed post-hearing briefs. (ECF Nos. 831; 834). The Respondents focus on their potential entitlement to administrative claims and the impropriety of *nunc pro tunc* relief. (ECF No. 831). The Debtors focus on the Respondents' inability to assert administrative claims. (ECF Nos. 834; 835). The Respondents then objected that the Debtors' argument is improper because the underlying rejection motion seeks *nunc pro tunc* relief, not a finding that the Respondents cannot assert administrative claims. (ECF No. 906 at 3). The Debtors filed a reply, and the Court took the matter under advisement. (ECF No. 1012).

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

The Respondents do not meet their burden to establish that they are entitled to administrative expense claims, so the Debtors' *nunc pro tunc* motion is moot.

### I.   CONSIDERING ENTITLEMENT TO ADMINISTRATIVE EXPENSE CLAIMS NOW

The Respondents argue that it is premature to discuss their entitlement to administrative expense claims. This argument contradicts the substance of the June 17, 2022 hearing. At the hearing, the Respondents asked for the opportunity to brief whether they are entitled to administrative expense claims. (ECF No. 662 at 45). The Court clearly informed the parties it intended to determine whether the Respondents could be entitled to administrative expense claims based on the post-hearing briefing because such a finding would inform the necessity of ruling on the *nunc pro tunc* motion. (*See* ECF No. 662 at 39–41, 45–46). The Court also informed the parties that the Court's ruling would be universal: "Anyone that doesn't brief, I'm not going to decide this question differently for people that brief and don't brief. It's going to be a universal

ruling . . . ." (ECF No. 662 at 56). No party objected then or in the initial post-hearing briefing. Only after the Debtors filed their post-hearing briefing in which they argue that the Respondents are unable to make administrative expense claims did the Respondents object. The Respondents were given a full opportunity to argue that they are entitled to administrative expense claims. The Respondents' contention that "[t]he Rejection Date is the sole issue before the Court" is wrong in light of the June 17, 2022 hearing. Entitlement to administrative expense claims is properly before the Court in the context of the *nunc pro tunc* motion.[5]

## II.   ENTITLEMENT TO ADMINISTRATIVE EXPENSE CLAIMS

Under 11 U.S.C. § 507(a), administrative expenses under 11 U.S.C. § 503(b) are given priority over all other unsecured claims other than domestic support obligations and certain trustee expenses not relevant in this case. 11 U.S.C. § 507(a). The Respondents have the burden of showing that are entitled to administrative expense claims. *Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.)*, 931 F.3d 432, 441 (5th Cir. 2019) ("The claimant seeking administrative expenses bears the burden of proof." (citing *Toma Steel Supply, Inc. v. TransAmerican Nat. Gas Corp. (In re TransAmerican Nat. Gas Corp.)*, 978 F.2d 1409, 1416 (5th Cir. 1992))).

Section 365 of the Bankruptcy Code governs rejection of executory contracts and expired leases. The parties agree that the Retail Agreements are executory contracts and that the Debtors rejected the Retail Agreements. Rejection of an executory contract constitutes breach of the contract "immediately before the date of the filing of the petition." 11 U.S.C. § 365(g)(1); *Mission*

---

[5] The Respondents also argue that "[t]he relief the Debtors and the UCC would like the Court to take would likely constitute an advisory opinion, as Respondents have not filed an application for administrative expenses yet." (ECF No. 906 at 3). But some parties to the Retail Agreements, including Respondents Conestoga (Claim No. 1870) and Masonic (Claim No. 1879), have submitted claims referencing entitlement to administrative expense status for breach of contract damages under the Retail Agreements. (*See also* Claim Nos. 592; 1849; 2114).

*Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019) ("[A] rejection is a breach."). A party aggrieved by a rejected contract may assert a general unsecured claim for damages. *Id.* at 1658 ("By thus giving the counterparty a pre-petition claim, Section 365(g) places that party in the same boat as the debtor's unsecured creditors, who in a typical bankruptcy may receive only cents on the dollar." (citing *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531–32 (1984))); 11 U.S.C. § 502(g)(1); *see Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 582 (S.D.N.Y. 2001) ("[C]ourts consistently hold that a post-petition breach of a pre-petition contract gives rise only to a pre-petition claim." (citing *In re Riodizio, Inc.,* 204 B.R. 417, 424 n. 6 (Bankr. S.D.N.Y. 1997))). The Respondents' claims are simply unsecured claims. Their claims are not elevated to administrative expense status because they are not "actual, necessary costs and expenses of preserving the estate" and they do not fall within the exception for damages inflicted on innocent third parties through a trustee's operation of a bankruptcy estate. *See Reading Co. v. Brown*, 391 U.S. 471 (1968).

    **A.**    **Actual, Necessary Costs And Expenses Of Preserving The Estate**

Administrative expense priority exists to address a specific business problem. "Once bankruptcy proceedings are underway, '[t]hird parties might refuse to extend credit to debtors-in-possession for fear that their claims would not be paid.'" *Whistler*, 931 F.3d at 441–42 (quoting *TransAmerican*, 978 F.2d at 1416). Thus, administrative priority encourages third parties to provide goods and services to the debtor-in-possession so that it may continue its business and generate funds with which to pay pre-petition creditors. *See id.* at 442. Consistent with that policy, administrative expenses under § 503(b)(1)(A) include "the actual, necessary costs and expenses of preserving the estate." In general, an "'actual and necessary cost' under section 503(b)(1)(A) . . . must have arisen post-petition and as a result of actions taken by the trustee that benefitted the

estate." *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 387 (5th Cir. 2001) (citing *TransAmerican*, 978 F.2d at 1416)). "Section 503(b)(1)(A) claims, therefore, generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate." *Id.* (citing *TransAmerican*, 978 F.2d at 1415).

To qualify as an administrative expense, the goods or services must have been delivered or provided pursuant to a post-petition transaction; "it is not enough that payment becomes due after the petition date if the transaction was entered into with the debtor prepetition." *In re Northstar Offshore Grp., LLC*, 628 B.R. 286, 299 (Bankr. S.D. Tex. 2020) (quoting 4 COLLIER ON BANKRUPTCY ¶ 503.06[3][a] (Richard Levin & Henry J. Sommers eds., 16th ed.); *see Berliner Handels-Und Frankfurter Bank v. E. Tex. Steel Facilities, Inc., (In re E. Tex. Steel Facilities, Inc.)*, 117 B.R. 235, 242 (Bankr. N.D. Tex. 1990) ("[T]he Court looks to the time the agreement was consummated, not the time which the performance was made. 'It is established that a debt is not entitled to priority as a cost and expense of administration simply because the claimants' right to payment arises after the debtor-in-possession has taken some action.'" (quoting *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 955 (1st Cir. 1976))).

The Retail Agreements are pre-petition contracts for which the Debtors (as debtors-in-possession) gave notice of rejection on the first day of bankruptcy. Although the Debtors continued performing under the Retail Purchase Agreements until the Pick-Up Dates, they did so because it would have violated state rules and regulations to cease performance any earlier. In any event, the Respondents seek administrative expense status for the breach of contract damages under the Retail Purchase Agreements incurred *after* the Pick-Up Dates. Regarding the Retail Broker Agreements, the Debtors assert, and the Respondents do not dispute, that the unpaid fees

are for services performed prior to the Petition Date.  (ECF No. 1012 at 4).  The Retail Agreements are not post-petition transactions.

The issue of whether the debtor-in-possession engaged in post-petition activity for the purpose of benefitting the estate is "a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no 'benefit,' it cannot have been 'necessary.'"  *Northstar*, 628 B.R. at 299 (quoting *Tex. v. Lowe (In re H.L.S. Energy Co. Inc.)*, 151 F.3d 434, 437 (5th Cir. 1998)); *see also TransAmerican*, 978 F.2d at 1416 ("The words 'actual' and 'necessary' have been construed narrowly: the debt must benefit the estate and its creditors." (quoting *NL Indus., Inc. v. GHR Energy Corp.*, 940 F.2d 957, 966 (5th Cir. 1991), *cert. denied*, 502 U.S. 1032 (1992))) (cleaned up).  The focus is on the benefit to the bankruptcy estate and not the loss to the creditor.  *Whistler*, 931 F.3d at 442–43 ("[A]n administrative priority claim 'must have arisen from a transaction with the debtor in possession,' as opposed to the pre-petition debtor." (quoting *Lasky v. Phones for All, Inc. (In re Phones for All, Inc.)*, 288 F.3d 730, 732 (5th Cir. 2002))).

There is no evidence that the Respondents provided any benefit to the estates under the Retail Agreements after the Pick-Up Dates.  Indeed, the Debtors immediately sought to reject the Retail Agreements because they were losing money on the Retail Purchase Agreements.  (ECF No. 542-4 at 5–6).  Continued performance under the Retail Purchase Agreements would have resulted in net cash losses of approximately $500,000,000.00 on an undiscounted basis between May 2022 through the end of 2025, approximately $217,000,000.00 of which was "expected to crystallize" between May 2022 and October 2022.  (ECF No. 542-4 at 5–6).  Even if the Debtors lost money because they exited hedging positions pre-petition, the Respondents still did not provide any ***benefit*** to the estates by participating in a contract in which the Debtors would lose significant sums.  And there is no benefit to continuing the Retail Broker Agreements if the Debtors

intended to discontinue performance under the Retail Purchase Agreements. The Respondents provided no post-Pick-Up Date benefit that was necessary to the preserving the estates. These claims do not fit within the usual definition of "actual, necessary costs and expenses of preserving the estate."

### B.     The *Reading* Exception

Actual and necessary costs are not just the costs without which rehabilitation would be impossible. *Reading*, 391 U.S. at 483. Indeed, administrative expense claims may arise from damages resulting from the wrongdoing of a trustee or entity acting as trustee. *Id.* at 485 ("[D]amages resulting from the negligence of a receiver acting within the scope of his authority as receiver give rise to 'actual and necessary costs' of a Chapter XI arrangement."); *see Al Copeland Enters. v. Tex. (In re Al Copeland Enters., Inc.)*, 991 F.2d 233, 238 (5th Cir. 1993) ("[A]dministrative expenses entitled to first priority status are not necessarily confined to those enumerated at 11 U.S.C. § 503(b).'" (quoting *In re Flo-Lizer, Inc.,* 107 B.R. 143, 145 (Bankr. S.D. Ohio 1989), *aff'd,* 916 F.2d 363 (6th Cir.1990))); *Jack/Wade Drilling*, 258 F.3d at 387 ("When a third party is damaged by the wrongful conduct of a receiver in the course of operating the debtor's estate, however, the Court concluded that it would be unfair to force that party to share equally with those creditors for whose benefit the estate was being operated." (citing *Reading*, 391 U.S. at 478)).

In *Reading Co. v. Brown*, the Supreme Court held that tort claims arising from the bankruptcy receiver's negligence to be actual and necessary costs of the bankruptcy despite the lack of an actual benefit to the estate. *Reading*, 391 U.S. at 485. The Supreme Court recognized the statutory objective of "fairness to all persons having claims against an insolvent,"[6] but

---

[6] There is a general presumption in bankruptcy favoring equality in distribution. *Jack/Wade Drilling*, 258 F.3d at 387–88 (quoting *Nathanson v. NLRB,* 344 U.S. 25, 29 (1952)).

9 / 12

determined that it would be unfair to treat a third party damaged by the wrongful conduct of a receiver in the course of operating the debtor's estate the same as creditors for whose benefit the estate was being operated. *Id.* at 477–78 (finding that the "petitioner did not merely suffer injury at the hands of an insolvent business: it had an insolvent business thrust upon it by operation of law."). Notably, the Fifth Circuit identified fairness as the principle underlying the *Reading* exception, not a trustee's wrongdoing:

> We do not hold that a claimant must necessarily show a wrongful act committed in the course of a trustee's operation of a business in an attempt to improve the position of the existing creditors in order to obtain administrative expense priority under the *Reading* exception. We simply hold that, in this case, fairness does not compel the granting of administrative priority to TMC's claim for attorney fees. The driving force behind the Supreme Court's decision in *Reading* was the great injustice that would result to the claimant if it were denied its right to recover its fire damages; the real result of forcing it to collect a pro rata share of the estate with the existing creditors.

*Jack/Wade Drilling*, 258 F.3d at 390 n.4.

The potential unfairness in *Reading* does not exist in this case. The Debtors rejected executory contracts they were permitted to reject using their sound business judgment. And the Debtors did not leave any party in the lurch by immediately ceasing their electricity supply. Instead, the Debtors transitioned the Respondents to certain Public Utility providers while following state rules and regulations for transitioning electricity accounts. The Debtors continued to sell the electricity at unfavorable rates under the Retail Purchase Agreements during this time. Following the Pick-Up Dates, the Respondents were back in the public markets, but (other than breach of contract damages) they were not damaged. There is no equitable reason that the Respondents should be entitled to better treatment than other unsecured creditors. And the Respondents' simple reference to *Copeland* as the Fifth Circuit "extend[ing] the allowability of

administrative expenses which did not benefit the estate in the normal sense" does nothing to change this reality.[7] (*See* ECF No. 831 at 6).

C.     11 U.S.C. § 363(d)(3)

The Respondents compare § 365(d)(3)'s command to "perform all obligations related to any unexpired lease of nonresidential real property until it is assumed or rejected" with §365(g) as evidence of a "pre- and post-petition distinction." (ECF No. 831 at 3). The Respondents admit that with respect to executory contracts (as distinct from unexpired leases of nonresidential real property), "a § 365(g)(1) rejection similarly constitutes a pre-petition breach, conferring a claim for unsecured damages." However, the crux of the Respondents' argument rests upon a cite describing a "limbo-like state" for executory contracts pre-rejection. (ECF No. 831 at 3–5); *Sumitomo Tr. & Banking Co., Ltd., v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 672 (Bankr. W.D. Mich. 1992). Yet the Respondents only describe these administrative expense rights as "potential" rights. (ECF No. 831 at 2–6). They do not explain how those administrative expense rights actually arise.

---

[7] The Fifth Circuit has declined to grant administrative expense status to non-defaulting parties to a contract under the *Reading* exception without the potential for injustice:

> TMC's damages, however, did not stem from any act by the trustee that could be considered either as wrongful or as unilateral as that which the Court considered in *Reading*. TMC chose to deal with Jack/Wade prior to the bankruptcy and voluntarily entered into the contract on which the trustee based his lawsuit. We admit that TMC was likely unaware that Jack/Wade would be unable to meet its financial obligations. Contracting parties, however, are expected to understand the risks associated with making agreements with others. The degree of "innocence" which contributed to the extreme injustice that would have resulted in *Reading* does not seem to be present in the present case.

*Jack/Wade Drilling*, 258 F.3d at 390. Moreover, in *Copeland*, the Fifth Circuit determined that the interest on state sales tax revenues the debtor-in-possession wrongfully withheld should be classified as administrative expenses. *Copeland*, 991 F.2d at 240. This sort of wrongdoing, and inherent injustice by the failure to grant administrative expense status, is not present here.

The Court requested briefing so the Respondents could describe how those "potential" administrative expense rights come to be: "I think it's a claim that's a pre-petition claim. And are you telling me that you think it gives rise to a claim that is administrative in nature? . . . That's the briefing question." (ECF No. 662 at 45). The Respondents' argument that they may be entitled to administrative expense status because landlords of unexpired leases of nonresidential real property are sometimes so entitled is not persuasive. This case does not involve landlords and tenants who attempt to benefit from a pre-rejected nonresidential lease. Here, the Debtors promptly informed the Respondents of their intent to reject the Retail Agreements on the first day of the bankruptcy case. The Debtors then transitioned the Respondents to new electricity suppliers on the Pick-Up Dates. It is insufficient to simply state that "contract claims are not without statutory rights, as that 'gap period' <u>may</u> give rise to an administrative expense application under § 503(b)" and hope that an analogy can be drawn to the treatment landlords receive under § 365(d). (*See* ECF No. 831 at 4). Far more was required.

## CONCLUSION

A separate order will be entered.

SIGNED 04/06/2023

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　　Marvin Isgur
　　　　　　　　　　　　　　　　　　United States Bankruptcy Judge