United States Bankruptcy Court
Southern District of Texas
**ENTERED**
June 14, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE: § § | CASE NO: 22-90054 |
| TALEN ENERGY SUPPLY, LLC, *et al.*, § § | CHAPTER 11 |
| Debtors. § § | |
| TALEN MONTANA, LLC, *et al.*, § , § § | |
| VS. § § | ADVERSARY NO. 22-9001 |
| PPL CORP., *et al.*, § § | |
| Defendants. § | |

## MEMORANDUM OPINION

Talen Montana, LLC brought suit against PPL Corp. ("PPL"), PPL Capital Funding, Inc., PPL Electric Utilities Corp., and PPL Energy Funding Corp. (the "PPL Parties") to recover alleged fraudulent transfers. The PPL Parties moved for partial summary judgment on the basis that the statute of repose in Section 18-607(c) of the Delaware Limited Liability Company Act prevents Talen Montana from bringing its claims more than three years after a transfer. Because Montana law applies to the fraudulent transfer claims, the PPL Parties are not entitled to summary judgment.

## BACKGROUND

Talen Montana (formerly PPL Montana, LLC) seeks to avoid transfers of approximately $900,000,000.00 to its former parent companies—the PPL Parties—following its sale of hydroelectric assets to NorthWestern Corporation. (ECF No. 1 at 2). Talen Montana alleges that the PPL Parties directed PPL Montana to complete the transfers knowing that it had hundreds of

millions of dollars of liabilities and no means to satisfy them beyond the assets it sold to NorthWestern. (ECF No. 1 at 2).

I.     **PPL MONTANA**

In 1997, Montana deregulated its electricity market. (ECF Nos. 56 at 6; 65 at 8). In 1999, PPL, a Pennsylvania utility, acquired Montana Power Company's generating assets via its subsidiary, PPL Montana. (ECF Nos. 1 at 2–3, 5; 65 at 8). Talen Montana alleges that PPL Montana transferred at least $325,000,000.00 to PPL and its affiliates through 2012. (ECF No. 1 at 2).

By 2012, PPL Montana faced significant pension and environmental remediation liabilities, especially with respect to a coal-fired power plant in Colstrip, Montana. (ECF Nos. 1 at 2, 6; 65 at 3). Environmental regulatory conditions severely devalued the Colstrip plant: at one point, NorthWestern bid $740,000,000.00 for PPL Montana's hydroelectric assets and $400,000,000.00 for PPL Montana's hydroelectric and coal-fired assets together. (ECF Nos. 1 at 9; 65 at 15). The offer for the joint acquisition at a price lower than the offer for the hydroelectric assets apparently reflected the environmental clean-up costs associated with the coal-fired assets. In September 2013, PPL Montana sold its hydroelectric assets to NorthWestern for approximately $900,000,000.00. (ECF Nos. 1 at 3, 10; 65 at 4). Under PPL's direction, PPL Montana distributed the proceeds to PPL entities starting November 17, 2014. (ECF Nos. 1 at 3, 10; 65 at 17). At the time of the transfer, PPL or its affiliates employed all of PPL Montana's Board of Managers and almost all of its officers. (ECF Nos. 1 at 10; 65 at 18). Talen Montana alleges that after this distribution, PPL Montana only owned the coal-fired assets and was unable to fund its pension and environmental obligations. (ECF No. 1 at 3).

**II.     THE SPIN AGREEMENTS**

While selling PPL Montana's hydroelectric assets, Talen Montana alleges that PPL began the process of divesting its merchant power business to focus on becoming a "pure-play regulated utility." (ECF No. 1 at 11). To meet this goal, PPL entered into a transaction with Riverstone Holdings LLC in which Riverstone would contribute certain of its competitive power-generating assets and PPL would contribute its "Energy Supply Business" (including PPL Montana) to Talen Energy Corporation and Talen Energy Holdings, Inc. (the "Spin Agreements"). (ECF Nos. 56 at 15; 65 at 53; 68 at 14). The negotiations over the Spin Agreements overlapped with PPL Montana's sale of hydroelectric assets to NorthWestern:

- On September 26, 2013, PPL Montana and NorthWestern executed a sale agreement;

- On June 9, 2014, Riverstone and PPL entered into the Spin Agreements;

- On November 17, 2014, the NorthWestern sale was consummated; and

- On June 1, 2015, the Spin Agreements were consummated.

(ECF Nos. 65 at 52–53, 61; 68 at 14; 145 at 18). As a result of the Spin Agreements, PPL Montana became a subsidiary of Talen Energy Corporation and was renamed Talen Montana, LLC. (ECF Nos. 1 at 3–4; 65 at 20). PPL's public shareholders took 65% of Talen Energy Corporation's ownership and Riverstone took 35%. (ECF Nos. 65 at 53; 145 at 8).

On June 2, 2016, Riverstone signed an Agreement and Plan of Merger to take Talen Energy Corporation private. (ECF No. 65 at 64). Riverstone fully assumed control of Talen Energy Corporation in December 2016. (ECF Nos. 65 at 66; 145 at 9).

### III.     POST-SPIN LITIGATION AND TALEN'S BANKRUPTCY

Talen Montana and its affiliates filed for bankruptcy on May 9, 2022. (Case No. 22-90054, ECF No. 1). Talen Montana brought this complaint quickly thereafter asserting actual and constructive fraudulent transfers. (ECF No. 1 at 15–17).

#### A.     The Rosebud and Delaware Lawsuits

On October 29, 2018, Talen Montana Retirement Plan and Talen Energy Marketing[1] filed a class action complaint in Rosebud County, Montana against the PPL Parties for actual and constructive fraudulent transfers (the "Rosebud Action"). (ECF No. 1 at 13). The Montana state court later stayed the Rosebud Action pending resolution of a lawsuit in the Delaware Court of Chancery in which the PPL Parties filed suit against Talen Montana and Riverstone (the "Delaware Action"). (ECF Nos. 1 at 14; 63 at 2). In the Delaware Action, the PPL Parties assert that (i) PPL Montana was solvent at the time of the Spin; (ii) claims arising out of the distribution to PPL are time-barred; (iii) Talen Montana and its affiliates breached provisions of the Spin Agreements; and (iv) the PPL Parties are entitled to indemnification. (ECF No. 1 at 14).

PPL removed the Rosebud Action to the United States District Court for the District of Montana on December 10, 2018. (ECF Nos. 89 at 16; 89-33). On September 13, 2019, the district court remanded the matter to state court. *Talen Mont. Ret. Plan v. PPL Corp.*, No. CV-18-174-BLG-SPW, 2019 WL 4410347, at *1 (D. Mont. Sept. 16, 2019). The Ninth Circuit Court of Appeals denied PPL's petition for permission to appeal under 28 U.S.C. § 1453(c). *Talen Mont. Ret. Plan v. PPL Corp.*, No. 19-80132, 2019 WL 8301814, at *1 (9th Cir. Nov. 21, 2019). Once this adversary proceeding was filed, the Rosebud Action was: (i) again removed to federal court;

---

[1] The Retirement Plan filed a Second Amended Complaint removing Talen Marketing as a plaintiff on December 30, 2019. (ECF No. 1 at 14).

(ii) transferred to the Southern District of Texas on June 16, 2022; and (iii) referred to the Bankruptcy Court on July 22, 2022. (S.D. Tex. Case No. 22-1990, ECF Nos. 1; 35; 40). The Delaware Action was also removed, transferred, and referred to the Bankruptcy Court. (S.D. Tex. Case No. 22-2037, ECF Nos. 1; 5; 8; 15).

### B. Proceedings Before This Court

The Court consolidated the Rosebud Action and the Delaware Action into this adversary proceeding on August 3, 2022. (ECF No. 53). Talen Montana and Talen Energy Supply later filed an amended complaint against the PPL Parties and CEP Reserves, Inc. on August 24, 2022. (ECF No. 56). The amended complaint pleads the following counts:

> Count 1: Actual fraudulent transfer under the Bankruptcy Code and Montana law against all of the PPL Parties;
>
> Count 2: Constructive fraudulent transfer under the Bankruptcy Code and Montana law against all of the PPL Parties;
>
> Count 3: Breach of contract for a failure to indemnify against PPL;
>
> Count 4: Disallowance of the PPL Parties' claims under 11 U.S.C. § 502(b)(1);
>
> Count 5: Disallowance of the PPL Parties' claims under 11 U.S.C. § 502(d); and
>
> Count 6: Equitable subordination of the PPL Parties' claims under 11 U.S.C. § 510(c).

(ECF No. 56 at 19–26).

On September 23, 2022, the PPL Parties filed their answers and affirmative defenses as well as: (i) counterclaims against Talen Montana and Talen Energy Supply; and (ii) third-party claims against Riverstone, Talen Energy Corporation, Talen Energy Holdings, Inc., Raven Power Holdings, LLC, C/R Energy Jade, LLC, and Sapphire Power Holdings, LLC. (ECF No. 65). The PPL Parties plead the following counts:

> Count I: Breach of the Spin Agreements against Talen, Talen Energy Holdings, and Talen Energy Supply for allowing Talen Montana to file actions in Montana state court;

      Count II: Declaratory and injunctive relief against all of the defendants for the failure to commence an action to recover the proceeds of the NorthWestern sale within three years as required by Delaware law;

      Count III: Breach of the Spin Agreements against Talen Energy Corporation, Talen Energy Holdings, Talen Energy Supply, Talen Montana, Raven, Jade, and Sapphire for filing the Montana actions and this adversary proceeding and thereby indicating they would not fulfill their obligations to indemnify the PPL Parties;

      Count IV: Tortious interference against Riverstone for causing its affiliates to interfere with and breach the Spin Agreements; and

      Count V: Declaratory judgment that PPL is not obligated to indemnify the defendants.

(ECF No. 65 at 87–97).

On September 30, 2022, the PPL Parties filed a motion for partial summary judgment on Counts 1 and 2 of the amended complaint and Count II of the counterclaims and third-party claims. (ECF No. 68 at 10). The PPL Parties argue that Talen Montana and Talen Energy Supply cannot proceed on Counts 1 and 2 because they are time-barred by the three-year statute of repose under Section 18-607(c) of the Delaware Limited Liability Company Act. (ECF No. 68 at 12). In connection with the motion for partial summary judgment, the PPL Parties filed a motion for certification to the Delaware Supreme Court to determine whether the three-year statute of repose in Section 18-607(c) applies to creditors of Delaware LLCs asserting claims under state fraudulent transfer law. (ECF No. 71 at 3). Talen Montana responded in opposition to the motions for certification and partial summary judgment. (ECF Nos. 85; 93). Talen Energy Corporation also filed a response to the motion for partial summary judgment. (ECF No. 92). The Court heard oral arguments on the motion for summary judgment on October 31, 2022, and the parties filed post-hearing briefing. (ECF Nos. 110; 120; 127; 128; 137; 138).

**JURISDICTION**

The Court has jurisdiction over this matter under 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(H).  Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine dispute of material fact means that evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party."  *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  It is the movant's burden to establish that no genuine issue of material fact exists.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citing *Condrey v. SunTrust Bank of Ga.,* 429 F.3d 556, 562 (5th Cir. 2005)).  A party asserting that a fact cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact.  FED. R. CIV. P. 56(c)(1).  If the movant establishes "the absence of evidence supporting an essential element of the non-movant's case," the burden shifts to the non-movant to establish a genuine dispute of material fact.  *Sossamon*, 560 F.3d at 326 (citing *Condrey*, 429 F.3d at 562).

In ruling on a motion for summary judgment, a court should view the facts and evidence in light most favorable to the non-moving party.  *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014).  Nevertheless, the court is not obligated to search the record for the non-moving party's evidence.  *Keen v. Miller Env't. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012).  "Summary judgment may not

be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). The Court need only consider the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Aubrey v. Sch. Bd. of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

## DISCUSSION

The PPL parties seek summary judgment on Counts 1 and 2 of the amended complaint and Count II of the counterclaims and third-party claims. (ECF No. 68 at 14). Counts 1 and 2 of the amended complaint seek to avoid and recover the transfer of the proceeds from the NorthWestern sale under Montana fraudulent transfer law and 11 U.S.C. § 544(b). (ECF No. 56 at 19–22). Count II of the counterclaims and third-party claims seeks a declaratory judgment that proceeds from the NorthWestern sale may not be recovered because an action was not timely commenced under Delaware law. (ECF No. 139 at 93).

The Court must determine whether to apply the three-year statute of repose under Section 18-607(c) of the Delaware Limited Liability Company Act or the four-year statute of limitations under Montana fraudulent transfer law. The parties agree that the Court should use the factors under the "most significant relationship" test, but they disagree as to their application. (*See* ECF Nos. 68 at 33–34; 93 at 22). If Delaware law does not apply, the PPL Parties are not entitled to summary judgment. Upon review of the relevant factors, the Court determines that Montana law applies. Thus, the PPL Parties are not entitled to summary judgment.

The Court is confronted with a choice of law issue in the context of bankruptcy. If a conflict exists between the relevant jurisdictions, the Court may need to decide whether to apply

federal law or the law of the forum to select the applicable limitations period. *Wilmington Sav. Fund Soc'y, FSB v. iHeartCommunications, Inc. (In re iHeartMedia, Inc.)*, 597 B.R. 339, 350 (Bankr. S.D. Tex. 2019) (citing *Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981)). In this case, the Court need not decide whether to apply federal or Texas choice of law rules because both lead to application of the "most significant relationship" test as enunciated in Sections 6 and 145 of the Restatement (Second) of Conflicts. *See Deutsche Bank Tr. Co. Ams. v. U.S. Energy Dev. Corp. (In re First River Energy, L.L.C.)*, 986 F.3d 914, 924 (5th Cir. 2021) ("We need not decide between the Texas forum's law or federal law where both bodies of law reach the same result." (citing *Woods-Tucker*, 642 F.2d at 748)); *MC Asset Recovery, LLC v. Commerzbank A.G. (In re Mirant Corp.)*, 675 F.3d 530, 536 (5th Cir. 2012) ("In tort cases, Texas courts apply the most significant relationship test. The independent judgment test is essentially synonymous with the most significant relationship approach. In either case, Sections 6 and 145 provide the appropriate analytical framework.") (cleaned up); *see also Cyrus II*, 413 B.R. at 615 ("The independent judgment test or the most significant contacts test recommended by *Vanston* is 'essentially synonymous with the "most significant relationship" approach adopted by' the Restatement . . . ." (citing *Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel Corp.)*, 87 B.R. 154, 158 (Bankr. D. Colo. 1988))).

Section 145 of the Restatement sets forth the contacts to be considered in determining the proper state's law that should be applied. The proper state's law is selected by comparing:

(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred;

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(d) the place where the relationship, if any, between the parties is centered.

RESTATEMENT (SECOND) OF CONFLICT OF L. § 145(2) (AM. L. INST. 1971).  Section 145 states that "[t]hese contacts are to be evaluated according to their relative importance to the particular issue." *Id.*

Section 145 provides the requisite guidance for the factors listed in Section 6(2) of the Restatement:

    (a)    the needs of the interstate and international systems;

    (b)    the relevant policies of the forum;

    (c)    the relevant policies of the other interested states and the relative interests of those states in the determination of the particular issue;

    (d)    the protection of justified expectations;

    (e)    the basic policies underlying the particular field of law;

    (f)    certainty, predictability, and uniformity of result; and

    (g)    ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF L. § 6(2) (1971).

The Court begins with the Section 145 contacts as they provide the backdrop for the Section 6 analysis. *Mirant*, 675 F.3d at 537; *see* RESTATEMENT (SECOND) OF CONFLICT OF L. § 145(2) (1971) ("Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: . . . ."); *Taylor v. Cmty. Bankers Sec., LLC*, No. CIV.A. H-12-02088, 2013 WL 3166336, at *4 (S.D. Tex. June 20, 2013) ("[C]ourts should generally evaluate the contacts applicable to a section 145 analysis first, as those contacts provide context for a review of the underlying principles of § 6 of the Restatement." (citing *Mirant*, 675 F.3d at 537)); *Feuerbacher v. Moser*, No. 4:11-CV-272, 2012 WL 1070138, at *11 (E.D. Tex. Mar. 29, 2012); *Mukamal v. The Nat'l Christian Found., Inc. (In re Palm Beach Fin. Partners, L.P.)*, No. 09-

36379-BKC-PGH, 2014 WL 12498025, at *9 (Bankr. S.D. Fla. Dec. 10, 2014); *Janvey v. Adams & Reese, LLP*, No. 3:12-CV-0495-N, 2013 WL 12320921, at *9 (N.D. Tex. Sept. 11, 2013). *Cf. Cannon Oil & Gas Well Servs., Inc. v. KLX Energy Servs., L.L.C.*, 20 F.4th 184, 191 (5th Cir. 2021) ("Those 'general principles [in Section 6]' are the background considerations that underlie 'the more specific rules' in the Restatement for tort (section 145) or contract (section 188).").

The conflict of law analysis should not turn on the number of contacts favoring a state, but the qualitative nature of the Section 145 contacts as affected by the Section 6 policy factors. *Taylor*, 2013 WL 3166336, at *4 (citing *Gutierrez v. Collins*, 583 S.W.2d 312, 319 (Tex. 1979)). The law of the state with the most *significant* contacts, not simply the most contacts, will apply. *Palm Beach*, 2014 WL 12498025, at *9.

Constructive fraudulent transfers may cause "intangible" injuries. *Mirant*, 675 F.3d at 537. And the specific facts of a case may diminish the relevance of the Section 145 factors. *Id.* Indeed, in fraudulent transfer matters, it may be difficult to determine where the alleged injury and conduct causing the alleged injury occurred. *See Palm Beach*, 2014 WL 12498025, at *9 ("[F]raudulent transfer actions present a unique challenge for courts engaging in a significant relationships analysis."). Here, however, the creditors on whose behalf Talen Montana ultimately brings suit are mostly located in Montana: (i) "845 of the 1240 proposed class members [in the Rosebud Action] are Montana citizens, which is 68.1%"; (ii) 601 of the Retirement Plan's 748 beneficiaries are Montana residents; (iii) and "hundreds of Talen Montana's creditors are located in Montana or provided goods and services in Montana." *Talen Mont. Ret. Plan*, 2019 WL 4410347, at *5; (ECF No. 93 at 23–24); *see ASARCO LLC v. Ams. Min. Corp.*, 382 B.R. 49, 63 (S.D. Tex. 2007), *on reconsideration in part,* 396 B.R. 278 (S.D. Tex. 2008).

In its remand ruling under the local controversy exception to the Class Action Fairness Act's removal provisions, the federal district court in Montana found that "the harm is the Defendants defrauding mostly Montanan creditors, many of whom are employees or retirees, of a then Montana-based company." *Talen Mont. Ret. Plan*, 2019 WL 4410347, at *7. The court concluded that "the sheer amount of damage caused to Montana citizens, particularly the hundreds of employees and retirees residing in Rosebud County, and to the Montana Department of Environmental Quality makes this a controversy that 'uniquely affects' Montana unlike anywhere else." *Id.* at *7. Although some of Talen Montana's creditors are not Montanans, many are, and the Court finds significant alleged injury in Montana. *Id.* ("[S]ome other states each have a smattering of Talen Montana creditors."). Moreover, in the event Talen Montana is unable to pay for its environmental remediation obligations or its pension obligations as a result of these alleged fraudulent transfers, it is mostly Montanans who will suffer imperiled retirement plans or a damaged environment. The first Section 145 contact favors Montana.

Significant events pertaining the transfer took place in Montana: (i) Peter Simonich, one of three members on PPL Montana's board of managers, was a Montana resident; (ii) Mr. Simonich was the highest-ranking officer in PPL Montana at the time of the sale of the hydroelectric assets; (iii) Mr. Simonich's approval was necessary for the sale; and (iv) Mr. Simonich approved the transfer to PPL. *Talen Mont. Ret. Plan*, 2019 WL 4410347, at *6. The PPL Parties' references to the residency of PPL Montana's other two managers and the absence of money passing through a Montana bank are not enough to tilt the scales to Delaware. (ECF No. 100 at 29). This contact favors Montana.

The parties involved in the distribution of the NorthWestern sale proceeds are PPL Montana and the PPL entities to which PPL Montana transferred the proceeds. (ECF No. 66 at 4).

At the time of the transfer, PPL Montana was a Delaware LLC that conducted business activities in Montana and had its principal executive offices in Montana. (*See* ECF Nos. 120 at 76–77; 68 at 36). The PPL Parties are Pennsylvania or Delaware entities with their principal places of business in Pennsylvania or Nevada. (ECF No. 66 at 47). This contact does not strongly favor one state over another. *See Mirant*, 675 F.3d at 537.

Finally, material aspects of the relationship between PPL Montana and the PPL Parties are centered in Montana: the assets PPL Montana sold are located in Montana, and PPL Montana's principal place of business was Montana. (ECF Nos. 66 at 3–4; 68 at 36). But the PPL Parties point out that PPL Montana's LLC agreement was governed by Delaware law, and PPL Montana was a Delaware LLC at the time of the distribution. (ECF No. 68 at 36). The Court cannot determine where the relationship between the parties was clearly centered, and ultimately this contact does not seem "particularly relevant" to these fraudulent transfer claims. *Mirant*, 675 F.3d at 537; *see Palm Beach*, 2014 WL 12498025, at \*9 (placing weight only on the third Section 145 contact in a fraudulent transfer choice of law analysis).

The Section 145 contacts favor Montana. The Court recognizes that aspects of the Section 145 contacts may be of diminished relevance in a fraudulent transfer matter. *See Mirant*, 675 F.3d at 537. Thus, in accord with the Fifth Circuit's choice of law analysis in *Mirant*, the Court turns to the Section 6 factors.

"[A]ny rule of choice of law, like any other common law rule, represents an accommodation of conflicting values." RESTATEMENT (SECOND) OF CONFLICT OF L. § 6 cmt. c (1971). In cases like this one, "the difficulties and complexities involved have as yet prevented the courts from formulating a precise rule, or series of rules, which provide a satisfactory

accommodation of the underlying factors in all of the situations which may arise." *Id.* Thus, the Court must look to these factors to arrive at a decision that will best accommodate them. *Id.*

Regarding the first Section 6 factor—the needs of the interstate and international systems—"[p]robably the most important function of choice-of-law rules it to make the interstate and international systems work well. Choice-of-law rules . . . should seek to further harmonious relations between states and to facilitate commercial intercourse between them." *Id.* cmt. d. This requires consideration of the needs and policies of other states and of all the states. *Id.* In applying this factor in *Mirant*, the Fifth Circuit found New York's law, which reflected the approach taken by the majority of the states, to better meet the needs of the interstate system than Georgia law. 675 F.3d at 538 ("Here, the needs of the interstate system are best met by the application of New York's law which reflects the approach taken by an overwhelming majority of the states."). The parties do not dispute that under the law of most states, plaintiffs have four years to bring fraudulent transfer claims. (*See* ECF No. 120 at 97); UNIF. FRAUDULENT TRANSFER ACT § 9 (1981); *Uniform Fraudulent Transfer Act (UFTA)*, PRACTICAL LAW GLOSSARY ITEM 7-382-3893 ("The UFTA has been enacted in 45 states (including Delaware and New York), the District of Columbia, and the US Virgin Islands."); Michael H. Strub, Jr. & Jeffrey M. Reisner, *The Expansion of the Triggering Creditor Doctrine in an Action to Avoid Fraudulent Transfers*, 24 AM. BANKR. INST. L. REV. 249, 252 (2016) ("For example, many state fraudulent transfer statutes provide that the trustee must bring a claim within four years after the transfer."). In fact, Delaware has a four-year statute of limitations for general fraudulent transactions. DEL. CODE ANN. tit. 6, § 1309 (1996); (ECF No. 120 at 30); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 431 (S.D. Tex. 2008) ("The statute of limitations for fraudulent transfers under Delaware law is four years."). But if, as the PPL Parties contend, the three-year statute of repose under Section 18-607(c) of the Delaware Limited

Liability Company Act should apply to this distribution, Montana's fraudulent transfer law, which does not similarly curtail the time in which plaintiffs may bring fraudulent transfer claims, is more consistent with the majority approach. (*See* ECF No. 120 at 30). Because Montana's law is more consistent with the majority approach, this factor favors application of Montana law.

Regarding the second factor—the relevant policies of the forum—"where the state of the forum has no interest in the case apart from the fact that it is the place of the trial of the action . . . the only relevant policies of the state of the forum will be embodied in its rules relating to trial administration . . . ." RESTATEMENT (SECOND) OF CONFLICT OF L. § 6 cmt. e (1971); *Fishback Nursery, Inc. v. PNC Bank, N.A.*, No. 3:16-CV-03267-B, 2017 WL 6497802, at *6 (N.D. Tex. Dec. 19, 2017), *aff'd*, 920 F.3d 932 (5th Cir. 2019) ("The forum state has no special interest in applying its laws to lien disputes brought in its borders just because it is the forum state."). Texas has no interest in this case apart from the fact that it is the place of the trial of the action after Talen entities filed for bankruptcy in Texas. This factor does not favor either Montana or Delaware.

Regarding the third factor—the relevant policies of the other interested states and the relative interests of those states in the determination of the particular issue—the Court should appraise the "relative interests of the state involved . . . ." RESTATEMENT (SECOND) OF CONFLICT OF L. § 6 cmt. f. It is generally fitting that the state whose interests are most deeply affected to have its law apply. *Id.* Determining which state has the dominant interest requires examination of the particular issue involved. *Id.* Here, both states have interests in this matter. Delaware has an interest in the application of its law limiting the ability to bring claims against Delaware LLCs, especially when many specifically choose to organize their LLCs in Delaware to obtain certain protections. Montana has an interest in: (i) the application of its law permitting victims of fraudulent transfers to bring claims against transferees, especially if business activity took place

in Montana and fraudulent transfers affected Montana creditors; (ii) ensuring the quality of its environment is maintained[2]; (iii) ensuring that pension obligations to Montanans are paid; and (iv) if Talen Montana is liable for personal injury claims to Montanans,[3] ensuring that those Montanans are made whole. Although the Court has already determined that the Talen entities' Joint Chapter 11 Plan is feasible, recovery of an alleged fraudulent transfer of this magnitude would undoubtedly increase the likelihood that these obligations will be satisfied. (*See* Case No. 22-90054, ECF No. 1760 at 6, 17). And when protection of the environment is a concern in a bankruptcy case, courts should give weight to remedial efforts to resolve the environmental damage. *See Midlantic Nat. Bank v. N.J. Dep't of Env't Prot.*, 474 U.S. 494, 507 (1986) (finding an exception to a trustee's power to abandon property when done "in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards."). In light of: (i) public policy favoring environmental protection; and (ii) Montana's interest in protecting Montanan fraudulent transfer victims, this factor substantially favors the application of Montana law.

---

[2] Talen Montana's environmental remediation obligations are defined by an "Administrative Order on Consent" entered into July 2012 with the Montana Department of Environmental Quality. (ECF No. 66 at 11). Talen Montana allegedly posted over $100,000,000.00 in financial assurance as of August 24, 2022. (ECF No. 58 at 8). This financial assurance is reviewed every five years, and Talen Montana alleges that it continues to owe obligations under the Administrative Order. (ECF No. 66 at 11). Talen Montana's president testified to the Montana legislature that Talen Montana will not default on its environmental liability obligations regardless of whether it recovers the transfer of the NorthWestern sale proceeds. (ECF No. 69 at 35). And the Talen entities' Joint Chapter 11 Plan specifies that "Asset Retirement Obligations," which include "environmental remediation costs associated with the Debtors' energy generation facilities," will "continue in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date." (Case No. 22-90054, ECF No. 1760 at 63, 102).

[3] Talen Montana is a defendant in the "Burnett Litigation" in Montana for personal injury and property damage allegedly caused by coal dust from the Colstrip plant as well as structural damages from increases in groundwater levels allegedly attributable to Colstrip ponds and blasting activities at a nearby coal mine. (Case No. 22-90054, ECF No. 1417 at 84).

The fourth factor—the protection of justified interests—is an important value because "it would be unfair and improper to hold a person liable under the law of one state when he had justifiably molded his conduct to conform to the requirements of another state." RESTATEMENT (SECOND) OF CONFLICT OF L. § 6 cmt. g. In some sense, this factor cuts both ways: Talen Montana may have expected to have had four years to bring a fraudulent transfer claim, and the PPL Parties may have expected not to have liability three years after the transfer. While the Court is not aware of evidence that Talen Montana specifically molded its conduct to the belief that it had four years to bring a fraudulent transfer claim, it is worth noting that the transfer took place November 17, 2014 and the Retirement Plan commenced the Rosebud Action October 29, 2018 (approximately three years and eleven months after the transfer). Similarly, the Court is not aware of evidence that the PPL Parties in some way relied on avoiding liability if no party brought a fraudulent transfer claim relating to the transfer by November 17, 2017.

The PPL parties argue that the relevant entities are Delaware entities and have an expectation that Delaware law would apply to them and their transactions. (*See* ECF No. 68 at 38). But whether Delaware law should apply to the Spin Agreements—a consensual transaction between PPL and Riverstone—is a different question from whether Delaware law should apply to the alleged fraudulent transfer of the distribution of the NorthWestern sale proceeds. Simply because contracting parties agree that Delaware law applies to a consensual transaction does not mean that Delaware law must be thrust upon Talen Montana's creditors. The focus of fraudulent transfer law is the protection of creditors; the Spin Agreements' choice-of-law provisions have no bearing on that focus. Ultimately, given PPL Montana's ownership of assets and principal executive offices in Montana, it is reasonable that PPL Montana's creditors would expect any fraudulent transfers would be governed by Montana law. This factor favors Montana.

The fifth factor—the basic policies underlying the particular field of law—is "of particular importance" when "the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules." RESTATEMENT (SECOND) OF CONFLICT OF L. § 6 (1971) cmt. h. "In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved." *Id.* The basic policy at issue is the protection of creditors from fraudulent transfers.

The relevant difference here is that a fraudulent transfer claim under Montana's law must be brought within four years while a claim under Section 18-607 of the Delaware Limited Liability Company Act must be brought within three years. In considering "the entire corpus of fraudulent transfer law," this difference between Delaware and Montana law is minor. *See Mirant*, 675 F.3d at 537. Thus, this factor, which is of particular importance, should favor the law that "best achieves the basic policy underlying this particular field of law." *Id.* Here, Montana best achieves the basic policy of fraudulent transfer law: its longer period in which plaintiffs may bring claims for fraudulent transfers provides more opportunity for plaintiffs to avoid and recover fraudulent transfers, thereby providing more opportunities to protect creditors from fraudulent transfers. *See Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 485 (W.D. Tex. 2013) ("[A]pplying North Carolina law (which has a slightly longer statute of limitations) would better achieve one of the basic policies underlying both the Bankruptcy Code and state fraudulent transfer law, which is 'the protection of creditors from fraudulent transfers. Georgia does have an interest in seeing its law applied to LLCs formed in Georgia, ***but the relevant policy difference here is a mere one-year difference in the statute of limitations***, not a substantive difference in fraudulent transfer law." (citing *Mirant*, 675 F.3d at 537)) (cleaned up) (emphasis added). "Thus,

the basic creditor protection policy underlying fraudulent transfer law will be better served by the application of [Montana] law in this case." *Mirant*, 675 F.3d at 537–38; *see Taylor*, 2013 WL 3166336, at *5 ("[I]t is likely that there will be slight variations between Virginia and Texas law that could affect the likelihood of recovery. . . . [W]hile Virginia has an interest in application of the law that would benefit the defendants who are citizens of that state, the investors from Texas and other states would benefit from application of a uniform body of law like the UFTA.").[4]

Regarding the sixth factor—certainty, predictability, and uniformity of result—the majority of laws have a four-year statute of limitations on fraudulent transfer actions. This favors Montana law. *See Mirant*, 675 F.3d at 538; *Taylor*, 2013 WL 3166336, at *5.

The seventh factor—ease in the determination and application of the law to be applied—does not favor either Montana or Delaware. The Court has no evidence that either Montana or Delaware law is significantly more or less difficult to apply to this matter.

In sum, when considering the qualitative nature of the Section 145 contacts and the Section 6 factors, Montana fraudulent transfer law eclipses Delaware law limiting liabilities. Multiple factors favor Montana; none favor Delaware. Because Montana fraudulent transfer applies, the PPL Parties' motion for partial summary judgment is denied.

---

[4] Montana has an interest in protecting Montanan victims of fraudulent transfers. Montana expresses this interest by allowing victims four years to bring their claims. If Montana has the most significant relationship to the fraudulent transfer, the protections it affords Montanans should trump the protections Delaware affords members of its LLCs. Of course, the inverse could be true if Delaware had the most significant relationship; in that instance, it may be equally unfair for Montana's law to trump Delaware's interests.

## CONCLUSION

A separate order will be entered.

SIGNED 06/14/2023

_____
Marvin Isgur
United States Bankruptcy Judge